**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALAIN MARCHAND, Individually and On Behalf of All Others Similarly Situated, | ) ) ) **Case No.** |
| Plaintiff, | ) ) |
| v. | ) **CLASS ACTION COMPLAINT** ) |
| MOMO INC., YAN TANG, and JONATHAN XIAOSONG ZHANG, | ) **JURY TRIAL DEMANDED** ) |
| Defendants. | ) ) ) |

Plaintiff Alain Marchand ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Momo Inc. ("Momo" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Momo securities between April 21, 2015 and April 29, 2019, both dates inclusive (the "Class Period"), seeking to recover

damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.    Momo was founded in 2011 and is headquartered in Beijing, the People's Republic of China ("PRC" or "China").  The Company was formerly known as Momo Technology Company Limited and changed its name to Momo Inc. in July 2014.

3.    Momo operates a mobile-based social and entertainment platform in the PRC. The Company operates the Momo platform that includes its Momo mobile application (or "app") and various related features, functionalities, tools, and services to users, customers, and platform partners.

4.    On February 23, 2018, Momo announced that it had reached a definitive agreement with Tantan Limited ("Tantan"), a social and dating app in China, and all of its shareholders, under which Momo agreed to acquire a 100% fully diluted equity stake in Tantan for a combination of share consideration and cash, including approximately 5.3 million newly issued Class A ordinary shares of the Company and US$600.9 million in cash.  Momo announced the successful closing of its acquisition of Tantan on May 11, 2018.

5.    Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that:  (i) Momo's compliance procedures and controls were inadequate to prevent, *inter alia*, illicit financial reporting activity; (ii) Momo's social and dating app, Tantan, was materially noncompliant with PRC law and/or regulations; (iii) Tantan was consequently at an increased risk of being removed

from Chinese app stores at the direction of Chinese governmental authorities; and (iv) as a result, Momo's public statements were materially false and misleading at all relevant times.

6.    On June 27, 2018, Spruce Point Capital Management LLC ("Spruce Point") issued a short seller report on Momo, recommending a "strong sell" opinion on the Company's shares.  The Spruce Point Report cited, *inter alia*, possible compliance issues with the content of Momo's services under relevant PRC regulation, Momo's failure to disclose corrective taken by Chinese authorities against one of its variable interest entities,[1] and that the Company was engaged in related party transactions and illicit business dealings (the "Spruce Point Report").

7.    According to several agencies cited throughout the Spruce Point Report, Momo had a reputation for being a "sex cam" service—*i.e.*, Momo users were using Momo's services for illicit sexual content.  The Spruce Point Report highlighted how these services put Momo at an increased risk of violating the Ministry of Commerce's ("MOC") and the State Administration of Radio, Film and TV's ("SARFT") new regulations limiting the behavior of live streamers and raising accountability for platforms.

8.    The Spruce Point Report also alleged that Momo had failed to disclose that China's State Administration for Industry and Commerce ("SAIC") had charged Beijing Momo, one of Momo's VIEs, with illicit financial reporting activity, which coincided with three Momo directors citing "personal reasons" for their resignation.  According to the Spruce Point Report,

---

[1] Accountants refer to a variable interest entity ("VIE") as an entity in which an investor holds a controlling interest without majority share ownership/voting rights.  According to Topic 810 of the Financial Accounting Standards Board's Accounting Standards Codification, or ASC 810, a VIE is an investee whose "equity investors do not have sufficient equity at risk for the entity to finance its activities without additional subordinated financial support or, as a group, the holders of the entity's equity investment at risk lack any one of the following three characteristics:  a. The power, through voting rights or similar rights, to direct the activities of an entity that most significantly impact the entity's economic performance[;] b. The obligation to absorb the expected losses of the entity[; or] c. The right to receive the expected residual returns of the entity."

the SAIC charged Beijing Momo with "*Filing Corporate Information With the Intent To Conceal The Truth and Falsify*" on November 2, 2017.  Beijing Momo allegedly resolved these charges on November 29, 2017 by filing "amendments to past financial reports and ownership statements on November 27, 2017."  According to the Spruce Point Report, "three Momo Directors resigned for 'personal reasons' without further elaboration" in the midst of these corrective actions on November 24, 2017.  The Spruce Point Report alleged that Beijing Momo had "corrected fillings in each year from 2013 to 2016," which indicated "overstated revenues / costs and changes to the timing of Purple Sky / Matrix transfer of ownership from [Defendant Tang] to Momo." Specifically, "[r]evenues and costs appear[ed] to have both been materially misstated," and "the date on which Purple Sky and Matrix . . . transferred their share in Beijing Momo to [Defendant Tang] was changed from the October 24, 2013 to October 10, 2013."

9.      Additionally, the Spruce Point Report allegedly determined that Momo owned at least two undisclosed talent agencies (one of which was among its top five) and engaged in related party transactions.  Momo allegedly promoted certain preferred talent featured on its services over others.  According to the Spruce Point Report, some of these preferred talent were from Momo's undisclosed talent agencies, while others were the result of bribes.  The preferred talent were then allegedly placed in a better position to receive "gifted" currency from Momo users and fans, which created a conflict of interest because Momo received a typical 50-60% cut of gift value on its services.  According to Spruce Point, this also "creates uncertainty around accounting treatment and opens the door for potentially illegal activities (e.g. money laundering)."

10.     The Spruce Point Report also pointed to Momo's Form 20-F for 2017 filed with the SEC, wherein it disclosed Hunan Qindao Culture Spread Co ("Hunan") as an equity

investment of $4.4 million in 2016, with shared live streaming revenue of $3.9 million. The Spruce Point Report noted that Hunan was not disclosed as a talent agent, despite Spruce Point finding otherwise, and that Spruce Point could not understand why Hunan received a $5.1 million prepayment from Momo, as prepayments to agents were unusual.  Additionally, the Spruce Point Report could not match Momo's reported performance of Hunan with its statutory fillings in China in some instances, noting alleged material differences.

11.    The Spruce Point Report also addressed how Beijing Momo invested RMB 230,000 in one of its top five agencies, Beijing Mushang Culture Media, on November 30, 2017, and failed to disclose the subsidiary in its Form 20-F for 2017 filed in April 2018.  The Spruce Point Report alleged that Beijing Mushang's financial reports were "highly suspicious and may potentially suggest money laundering," as well as noted that the agency might not even exist, given that its reported address appeared to be a false address per a physical investigation of its location, which turned up a residential apartment without business signage, but rather a door with a sign that a read "Home delivery, just walk in."

12.    Additionally, the Spruce Point Report alleged that Momo held a minority interest "in a very popular and highly rated illegal (in China) gambling operation," the mobile gambling app Pokermaster, via another undisclosed VIE since July 2015.  The Spruce Point Report noted that since a China Central Television ("CCTV") exposé on April 15, 2018, the Pokermaster app was no longer available in China or on the Apple store outside China.  The Spruce Point Report also alleged that Spruce Point's Chairman and Chief Executive Officer ("CEO"), Defendant Yan Tang ("Tang"), was a famously documented gambler, and that one of Momo's annual meetings even had a Vegas gambling theme.

13.     Finally, the Spruce Point Report alleged several issues with Momo's acquisition of Tantan.  First, the Spruce Point Report alleged that the Tantan acquisition was made to hide Momo's slowing growth, which started in its second fiscal quarter of 2017.  The Spruce Point posited this theory based on its belief that Tantan appeared limited to user base expansion given that operations between Tantan and Momo were to remain almost entirely distinct, and that Tantan's acquisition was unduly expensive for mere client acquisition or speculation.  Second, the Spruce Point Report posited the alternative theory that Momo overpaid for Tantan, in part, because Momo needed to use cash it might have trouble getting out of China.  According to the Spruce Point Report, Momo "acquired Momo Tantan VIE with RMB cash in China" and "stopped disclosing the location of its cash holdings" after the third fiscal quarter of 2016. Additionally, three equity limited partnerships allegedly became Tantan shareholders on October 25, 2017 under mysterious circumstances.  Thus, the Spruce Point Report theorized that the newly added limited partnerships could have been put in place immediately before the Tantan transaction to hide who actually received the cash, and that Momo insiders could be the beneficiaries of the sales, consistent with Beijing Momo's prior illicit reporting that got it in trouble with the SAIC (see ¶ 8 above).

14.     Following the release of the Spruce Point Report, Momo's American depositary receipt ("ADR") price fell $2.48 per share, or 5.47%, to close at $42.86 per share on June 27, 2018.

15.     On June 28, 2018, Momo issued a press release, appended as an exhibit to Momo's report on Form 6-K with the SEC, responding to the allegations contained in the Spruce Point Report (the "June 2018 Press Release").  The June 2018 Press Release provided a sparse rebuttal to the allegations contained in the Spruce Point Report, merely stating, in relevant part,

that "[b]ased upon [its] review and evaluation, the Company believes that the report contains numerous errors, unsubstantiated statements and misleading conclusions and interpretations regarding events relating to the Company."

16.    Despite its public denial, the Company's inadequate compliance procedures and controls came to a head on April 29, 2019, when Momo issued a press release disclosing that the Tantan social and dating mobile app had been removed from certain mobile app stores at the direction of Chinese authorities (the "April 2019 Press Release").  More specifically, the April 2019 Press Release stated, in relevant part:

> Momo . . . today announced that it has become aware that certain mobile app stores in China have removed the Tantan mobile app on direction of governmental authorities in China.
>
> The Company is proactively communicating with the relevant government authorities and intends to fully cooperate with such authorities in order to restore the availability of the Tantan mobile app in the subject mobile app stores as soon as possible. ***The Company also plans to conduct a comprehensive internal review of the <u>content</u> in the Tantan mobile app and undertake other measures necessary to stay in full compliance with all relevant laws and regulations.*** Pending restoration of the Tantan app in the relevant app stores in China, the Company's ability to attract new Tantan users will be adversely affected, while existing Tantan users may continue to use the app.

(Emphasis added.)

17.    On this news, Momo's ADR price fell $2.51 per share, or 6.81%, to close at $34.36 per share on April 29, 2019.

18.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

19.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

21.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Momo securities are traded on the NASDAQ Stock Market ("NASDAQ") located within this Judicial District.

22.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

23.     Plaintiff, as set forth in the attached Certification, acquired Momo securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

24.     Defendant Momo is incorporated under the jurisdiction of the Cayman Islands with its principal executive offices located at 20th Floor, Block B, Tower 2, Wangjing SOHO, No.1 Futongdong Street, Chaoyang District, Beijing 100102, PRC.  Momo securities trade in an efficient market on the NASDAQ under the ticker symbol "MOMO."

25.     Defendant Tang has served as Momo's Chairman and CEO at all relevant times.

26.     Defendant Jonathan Xiaosong Zhang ("Zhang") has served as Momo's Chief Financial Officer ("CFO") at all relevant times.

27.     The Defendants referenced above in ¶¶ 25-26 are sometimes referred to herein as the "Individual Defendants."

28.     The Individual Defendants possessed the power and authority to control the contents of Momo's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Momo's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Momo, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

29.     Momo was founded in 2011 and is headquartered in Beijing, PRC. The Company was formerly known as Momo Technology Company Limited and changed its name to Momo Inc. in July 2014.

30.     Momo operates a mobile-based social and entertainment platform in the PRC. The Company operates the Momo platform that includes its Momo app and various related features, functionalities, tools, and services to users, customers, and platform partners.

31.     On February 23, 2018, Momo announced that it had reached a definitive agreement with Tantan, a social and dating app in China, and all of its shareholders, under which Momo agreed to acquire a 100% fully diluted equity stake in Tantan for a combination of share

consideration and cash, including approximately 5.3 million newly issued Class A ordinary shares of the Company and US$600.9 million in cash.  Momo announced the successful closing of its acquisition of Tantan on May 11, 2018.

**Materially False and Misleading Statements Issued During the Class Period**

32.    The Class Period begins on April 21, 2015.  On April 20, 2015, after market hours, Momo filed its annual report on Form 20-F with the SEC, reporting the Company's financial and operating results for the fiscal year ended December 31, 2014 (the "2014 20-F"). For 2014, Momo reported a net loss of $25.42 million, or $0.97 per diluted share, on net revenue of $44.76 million, compared to a net loss of $9.33 million, or $0.26 per diluted share, on net revenue of $3.13 million for 2013.

33.    Appended as exhibits to the 2014 20-F were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified that "[t]he [2014 20-F] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

34.    On April 25, 2016, Momo filed its annual report on Form 20-F with the SEC, reporting the Company's financial and operating results for the fiscal year ended December 31, 2015 (the "2015 20-F").  For 2015, Momo reported a net income of $13.70 million, or $0.06 per diluted share, on net revenue of $133.99 million, compared to a net loss of $25.42 million, or $0.97 per diluted share, on net revenue of $44.76 million for 2014.

35.    Appended as exhibits to the 2015 20-F were signed SOX certifications, wherein the Individual Defendants certified that "[t]he [2015 20-F] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "[t]he information

contained in the [2015 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

36.     On April 26, 2017, Momo filed its annual report on Form 20-F with the SEC, reporting the Company's financial and operating results for the fiscal year ended December 31, 2016 (the "2016 20-F"). For 2016, Momo reported a net income of $145.25 million, or $0.72 per diluted share, on net revenue of $553.10 million, compared to a net income of $13.70 million, or $0.06 per diluted share, on net revenue of $133.99 million for 2015.

37.     Appended as exhibits to the 2016 20-F were signed SOX certifications, wherein the Individual Defendants certified that "[t]he [2016 20-F] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [2016 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

38.     On April 26, 2018, Momo filed its annual report on Form 20-F with the SEC, reporting the Company's financial and operating results for the fiscal year ended December 31, 2017 (the "2017 20-F"). For 2017, Momo reported a net income of $318.57 million, or $1.54 per diluted share, on net revenue of $1.32 billion, compared to a net income of $145.25 million, or $0.72 per diluted share, on net revenue of $553.10 million for 2016.

39.     Appended as exhibits to the 2017 20-F were signed SOX certifications, wherein the Individual Defendants certified that "[t]he [2017 20-F] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [2017 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

40.    On May 29, 2018, Momo issued a press release, appended as an exhibit to Momo's report on Form 6-K with the SEC, announcing the Company's unaudited financial results for its first fiscal quarter of 2018 (the "1Q 2018 6-K"). The 1Q 2018 6-K included a quote from Momo's CEO, Defendant Tang, which lauded Momo's acquisition of Tantan, stating, in relevant part:

> We closed the acquisition of Tantan in May and together will be moving forward as a dominant player in China's open social territory. Tantan has made remarkable progresses in user growth and monetization since the beginning of 2018. We believe Tantan has a great deal of potential to be unlocked and will be adding tremendous value to our ecosystem in the future.

41.    The 1Q 2018 6-K also highlighted Tantan's expected beneficial impact on Momo's business outlook, stating, in relevant part:

> For the second quarter of 2018, the Company expects total net revenues to be between $470.0 million and $485.0 million, representing a year-over-year increase of 51% to 55%. Our revenue guidance includes around $4.5 million revenue from Tantan for the month of June 2018 which we expect to consolidate in our financial statement of the second quarter of 2018.

42.    On April 26, 2019, Momo filed an annual report on Form 20-F with the SEC, reporting the Company's financial and operating results for the fiscal year ended December 31, 2018 (the "2018 20-F"). For 2018, Momo reported a net income of $426.01 million, or $1.99 per diluted share, on net revenue of $2.03 billion, compared to a net income of $318.57 million, or $1.54 per diluted share, on net revenue of $1.32 billion for 2017.

43.    The 2018 20-F assured investors that Momo implemented a robust compliance and content monitoring system for its social platforms, including Tantan, "around-the-clock," which minimized the Company's risks associated with applicable laws and regulations, stating, in relevant part:

> As an operator of social platforms, we view content management and monitoring as a critical part of our operations. As of the date of this annual report, Momo and

Tantan collectively have a dedicated team of over 1,126 personnel reviewing and handling content on our mobile platform for compliance with applicable laws and regulations. They are aided by both proprietary and third-party software and technologies to sweep our platforms and the data being transmitted on a real-time basis around-the-clock. We monitor and screen user information and user generated content against a spam list, which is a list of content and behaviors that we have determined are likely to be indicative of inappropriate or illegal content or illegal activities. Additionally, our users can also easily report fraud if they come across suspicious content, and each user complaint is processed by our content management and monitoring system.

44.    The 2018 20-F also touted Momo's overarching culture of compliance as demonstrated by the dedicated compliance functions of its highest levels of management, which included, *inter alia*, keeping management apprised of significant developments in the law. Specifically, the 2018 20-F stated, in relevant part:

The audit committee is responsible for, among other things . . . monitoring compliance with our code of business conduct and ethics, including reviewing the adequacy and effectiveness of our procedures to ensure proper compliance.

* * *

The nominating and corporate governance committee is responsible for, among other things . . . advising the board periodically with regards to significant developments in the law and practice of corporate governance as well as our compliance with applicable laws and regulations, and making recommendations to the board on all matters of corporate governance and on any remedial action to be taken.

45.    Additionally, the 2018 20-F touted Tantan's services, particularly with regard to Tantan's potential to drive Momo's business in the Chinese market, stating, in relevant part:

Tantan is a leading social and dating app in China. Tantan, whose primary users consist of young mobile internet users, is designed to help its users find and establish romantic connections, as well as meet interesting people. Tantan had 4.1 million paying users for the period from June 1, 2018 to December 31, 2018 and has become one of the leading choices for young mobile internet users in China to find relationships.

We believe that Tantan strategically complements our Momo platform. First, Tantan's users are younger on average than Momo's users, allowing us to expand our footprint among younger demographics. Second, whereas the Momo platform

has been primarily focused on connecting people in a broader sense among larger groups and communities, Tantan is primarily focused on one-to-one matching for romantic purposes. Additionally, compared to Momo, Tantan is a younger brand with strong potential to grow its user base and revenues. We believe that our acquisition of Tantan helps us enrich our product line, expand our user base, broaden our social scenarios and strengthen our leading position in China's open social market.

Tantan's users can enjoy many of the core features of Tantan for free, including swiping through a pool of users to find potential matches and communicating with the matches through instant messaging tool on the app. However, to enjoy certain premium features, a user must pay a monthly subscription fee or purchase the premium features on an ala carte basis. For example, in order to use unlimited number of the "swipe right" feature which indicates "like," a Tantan user must pay to subscribe to VIP membership, which was launched in early 2018. In order to get access to a list of users who have "swiped right" on the user, a Tantan user needs to pay to subscribe the "See Who Liked Me" feature, which was launched in July 2018. Tantan users and subscribers may also purchase, on a pay-per-use basis, certain other premium features, such as Super Exposure and Super Likes, which all aim at increasing the paying users' exposure to other Tantan users.

46.    Notwithstanding Momo's self-touted compliance system and the view that Tantan would thrive in a PRC-regulated market, the 2018 20-F contained merely generic, boilerplate representations regarding Momo's risks related to its ongoing compliance with relevant PRC laws and regulations.  For example, while simultaneously continuing to assert the Company's compliance with existing PRC rules and regulations, the 2018 20-F stated, in relevant part:

We may . . . be subject to potential liability for any unlawful actions by our users on our platform. It may be difficult to determine the type of content or actions that may result in liability to us and, if we are found to be liable, we may be prevented from operating our business in China . . . . Although we have adopted internal procedures to monitor content and to remove offending content once we become aware of any potential or alleged violation, we may not be able to identify all the content that may violate relevant laws and regulations or third-party intellectual property rights. Even if we manage to identify and remove offensive content, we may still be held liable.

* * *

In response to allegations of illegal or inappropriate activities conducted through our platform or any negative media coverage about us, PRC government authorities may intervene and hold us liable for non-compliance with PRC laws

and regulations concerning the dissemination of information on the internet and subject us to administrative penalties or other sanctions, such as requiring us to restrict or discontinue some of the features and services provided on our mobile application. Therefore, our business may be subject to investigations or subsequent penalties if contents generated by our users are deemed to be illegal or inappropriate under PRC laws and regulations.

47.    Appended as exhibits to the 2018 20-F were signed SOX certifications, wherein the Individual Defendants certified that "[t]he [2018 20-F] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [2018 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

48.    The statements referenced in ¶¶ 32-47 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Momo's compliance procedures and controls were inadequate to prevent, *inter alia*, illicit financial reporting activity; (ii) Momo's social and dating app, Tantan, was materially noncompliant with PRC rules and/or regulations; (iii) Tantan was consequently at an increased risk of being removed from Chinese app stores at the direction of Chinese governmental authorities; and (iv) as a result, Momo's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

49.    On June 27, 2018, Spruce Point issued a short seller report on Momo, recommending a "strong sell" opinion on the Company's shares.  The Spruce Point Report cited, *inter alia*, possible compliance issues with the content of Momo's services under relevant PRC regulation, Momo's failure to disclose corrective taken by Chinese authorities against one of its

variable interest entities, and that the Company was engaged in related party transactions and illicit business dealings.

50.     According to several agencies cited throughout the Spruce Point Report, Momo had a reputation for being a "sex cam" service—*i.e.*, Momo users were using Momo's services for illicit sexual content.  The Spruce Point Report highlighted how these services put Momo at an increased risk of violating the MOC's and the SARFT's new regulations limiting the behavior of live streamers and raising accountability for platforms.  Specifically, the Spruce Point Report stated, in relevant part:

**Recent Regulations Focused On Content Are Likely To Hit Elements of Momo's "Brand" of Live Streaming Particularly Hard**

- New regulations were put in place during 2017 by the Ministry of Commerce (MOC) and the State Administration of Radio, Film and TV (SARFT) limiting the behavior of live streamers and raising accountability for platforms. Agents mentioned that restrictions included no midriff (area between chest and waist) exposure, no filming on beds and limited cleavage, to name just a few. Implementation of these rules has only recently been enforced with many sanctions since February 2018

- Based on countless hours we've spent viewing Momo's website, it appears that Momo has limited interest/capability in shutting down violators of these policies and that these same performers are often the most recommended/viewed performers outside of competitions

- However, there is no need to take our word for it. Four of the agencies that we spoke with gave the unsolicited opinion that Momo has a reputation as a (sex) cam site. We believe that this has directly contributed to Momo's advertising woes[.]

\* \* \*

**Small Exclusive Agent #2:**

"*I don't think Momo will be a long lasting platform as its reputation is not good. In most peoples experience it is a live cam site for sex and this is something it cannot wash off.*"

**Super Agency #6:**

*"Momo is good for publicity. <u>Most people think of Momo as a sex site which has predominantly male users."</u>*

**Small Agency #9:**

*"A successful broadcaster on Yizhibo would not survive on Momo. <u>Momo is low level. Momo was successful because it was like a porn cam channel.</u> **<u>The users were 30 to 50 year old males in second and third tier cities. Their motives were clear. They wanted to see sex performances.</u>** <u>Despite being cleaned up Momo is still this sort of channel and encourages people to climax.</u> **<u>If Momo can not change directions then it will have a problem."</u>***

**Large Agency #11:**

**<u>*"90% of the audience are male. They are not interested in art but more about sex.*</u>** <u>*Older men with their families in the US. They are lonely and spend a lot of money each month."*</u>

(Emphasis in original.)

51.      The Spruce Point Report also alleged that Momo had failed to disclose that China's SAIC had charged Beijing Momo, one of Momo's VIEs, with illicit financial reporting activity, which coincided with three Momo directors citing "personal reasons" for their resignation.  According to the Spruce Point Report, the SAIC charged Beijing Momo with "*Filing Corporate Information With the Intent To Conceal The Truth and Falsify*" on November 2, 2017.  Beijing Momo allegedly resolved these charges on November 29, 2017 by filing "amendments to past financial reports and ownership statements on November 27, 2017." According to the Spruce Point Report, "three Momo Directors resigned for 'personal reasons' without further elaboration" in the midst of these corrective actions on November 24, 2017.  The Spruce Point Report alleged that Beijing Momo had "corrected fillings in each year from 2013 to 2016," which indicated "overstated revenues / costs and changes to the timing of Purple Sky / Matrix transfer of ownership from [Defendant Tang] to Momo."  Specifically, "[r]evenues and

costs appear[ed] to have both been materially misstated," and "the date on which Purple Sky and Matrix . . . transferred their share in Beijing Momo to [Defendant Tang] was changed from the October 24, 2013 to October 10, 2013."

52.    Additionally, the Spruce Point Report allegedly determined that Momo owned at least two undisclosed talent agencies (one of which was among its top five) and engaged in related party transactions.  Momo allegedly promoted certain preferred talent featured on its services over others.  According to the Spruce Point Report, some of these preferred talent were from Momo's undisclosed talent agencies, while others were the result of bribes.  The preferred talent were then allegedly placed in a better position to receive "gifted" currency from Momo users and fans, which created a conflict of interest because Momo received a typical 50-60% cut of gift value on its services.  According to Spruce Point, this also "creates uncertainty around accounting treatment and opens the door for potentially illegal activities (e.g. money laundering)."

53.    The Spruce Point Report also pointed to Momo's Form 20-F for 2017 filed with the SEC, wherein it disclosed Hunan as an equity investment of $4.4 million in 2016, with shared live streaming revenue of $3.9 million. The Spruce Point Report noted that Hunan was not disclosed as a talent agent, despite Spruce Point finding otherwise, and that Spruce Point could not understand why Hunan received a $5.1 million prepayment from Momo, as prepayments to agents were unusual.  Additionally, the Spruce Point Report could not match Momo's reported performance of Hunan with its statutory fillings in China in some instances, noting alleged material differences.

54.    The Spruce Point Report also addressed how Beijing Momo invested RMB 230,000 in one of its top five agencies, Beijing Mushang Culture Media, on November 30, 2017,

and failed to disclose the subsidiary in its Form 20-F for 2017 filed in April 2018. The Spruce Point Report alleged that Beijing Mushang's financial reports were "highly suspicious and may potentially suggest money laundering," as well as noted that the agency might not even exist, given that its reported address appeared to be a false address per a physical investigation of its location, which turned up a residential apartment without business signage, but rather a door with a sign that a read "Home delivery, just walk in."

55.    Additionally, the Spruce Point Report alleged that Momo held a minority interest "in a very popular and highly rated illegal (in China) gambling operation," the mobile gambling app Pokermaster, via another undisclosed VIE since July 2015. The Spruce Point Report noted that since a CCTV exposé on April 15, 2018, the Pokermaster app was no longer available in China or on the Apple store outside China. The Spruce Point Report also alleged that Spruce Point's Chairman and CEO, Defendant Tang, was a famously documented gambler, and that one of Momo's annual meetings even had a Vegas gambling theme.

56.    Finally, the Spruce Point Report alleged several issues with Momo's acquisition of Tantan. First, the Spruce Point Report alleged that the Tantan acquisition was made to hide Momo's slowing growth, which started in its second fiscal quarter of 2017. The Spruce Point posited this theory based on its belief that Tantan appeared limited to user base expansion given that operations between Tantan and Momo were to remain almost entirely distinct, and that Tantan's acquisition was unduly expensive for mere client acquisition or speculation. Second, the Spruce Point Report posited the alternative theory that Momo overpaid for Tantan, in part, because Momo needed to use cash it might have trouble getting out of China. According to the Spruce Point Report, Momo "acquired Momo Tantan VIE with RMB cash in China" and "stopped disclosing the location of its cash holdings" after the third fiscal quarter of 2016.

Additionally, three equity limited partnerships allegedly became Tantan shareholders on October 25, 2017 under mysterious circumstances. Thus, the Spruce Point Report theorized that the newly added limited partnerships could have been put in place immediately before the Tantan transaction to hide who actually received the cash, and that Momo insiders could be the beneficiaries of the sales, consistent with Beijing Momo's prior illicit reporting that got it in trouble with the SAIC (see ¶ 8 above).

57.     Following the release of the Spruce Point Report, Momo's ADR price fell $2.48 per share, or 5.47%, to close at $42.86 per share on June 27, 2018.

58.     On June 28, 2018, Momo issued a press release, appended as an exhibit to Momo's report on Form 6-K with the SEC, responding to the allegations contained in the Spruce Point Report. The June 2018 Press Release provided a sparse rebuttal to the allegations contained in the Spruce Point Report, merely stating, in relevant part:

> Momo . . . today has issued the following statement in response to allegations made in a report by Spruce Point Capital Management, LLC.
>
> The Company has been made aware of and carefully reviewed the short seller report published by Spruce Point Capital Management LLC, on June 27, 2018. **_Based upon this review and evaluation, the Company believes that the report contains numerous errors, unsubstantiated statements and misleading conclusions and interpretations regarding events relating to the Company._**
>
> The Company notes that it remains committed to maintaining high standards of corporate governance, as well as transparent and timely disclosure in compliance with the applicable rules and regulations of the United States Securities and Exchange Commission and the NASDAQ Global Select Market.

(Emphasis added.)

59.     Then, on April 29, 2019, a mere three days after Momo filed the 2018 20-F, Momo issued a press release disclosing that the Company's Tantan social and dating mobile app

had been removed from certain mobile app stores at the direction of Chinese authorities.  More

specifically, the April 2019 Press Release stated, in relevant part:

> Momo . . . today announced that it has become aware that certain mobile app
> stores in China have removed the Tantan mobile app on direction of governmental
> authorities in China.
>
> The Company is proactively communicating with the relevant government
> authorities and intends to fully cooperate with such authorities in order to restore
> the availability of the Tantan mobile app in the subject mobile app stores as soon
> as possible. ***The Company also plans to conduct a comprehensive internal
> review of the <u>content</u> in the Tantan mobile app and undertake other measures
> necessary to stay in full compliance with all relevant laws and regulations.***
> Pending restoration of the Tantan app in the relevant app stores in China, the
> Company's ability to attract new Tantan users will be adversely affected, while
> existing Tantan users may continue to use the app.

(Emphasis added.)

60.    On this news, Momo's ADR price fell $2.51 per share, or 6.81%, to close at

$34.36 per share on April 29, 2019.

61.    As a result of Defendants' wrongful acts and omissions, and the precipitous

decline in the market value of the Company's securities, Plaintiff and other Class members have

suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

62.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

otherwise acquired Momo securities during the Class Period (the "Class"); and were damaged

upon the revelation of the alleged corrective disclosures.  Excluded from the Class are

Defendants herein, the officers and directors of the Company, at all relevant times, members of

their immediate families and their legal representatives, heirs, successors or assigns and any

entity in which Defendants have or had a controlling interest.

63.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Momo securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Momo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

64.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

65.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

66.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Momo;

- whether the Individual Defendants caused Momo to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Momo securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

67.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

68.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Momo  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Momo securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

69.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

70.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

71.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

72.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

73.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Momo securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Momo securities and options at artificially inflated prices.  In furtherance of

this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

74.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Momo securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Momo's finances and business prospects.

75.     By virtue of their positions at Momo, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

76.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Momo, the Individual Defendants had knowledge of the details of Momo's internal affairs.

77.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Momo.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Momo's businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Momo securities was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning Momo's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Momo securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

78.    During the Class Period, Momo securities were traded on an active and efficient market.   Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Momo securities at prices artificially inflated by Defendants' wrongful conduct.   Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.   At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Momo securities was substantially lower than the prices paid by Plaintiff and

the other members of the Class.  The market price of Momo securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

79.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

80.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

81.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

82.    During the Class Period, the Individual Defendants participated in the operation and management of Momo, and conducted and participated, directly and indirectly, in the conduct of Momo's business affairs.  Because of their senior positions, they knew the adverse non-public information about Momo's misstatement of income and expenses and false financial statements.

83.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Momo's financial condition and results of operations, and to correct promptly any public statements issued by Momo which had become materially false or misleading.

84.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Momo disseminated in the marketplace during the Class Period concerning Momo's results of operations.    Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Momo to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Momo within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Momo securities.

85.    Each of the Individual Defendants, therefore, acted as a controlling person of Momo.  By reason of their senior management positions and/or being directors of Momo, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Momo to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Momo and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

86.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Momo.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  May 15, 2019

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
Jonathan Lindenfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: ahood@pomlaw.com
Email: jlindenfeld@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*