**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen, Esq. (LR 5733)
Phillip Kim, Esq. (PK 9384)
Jing Chen, Esq. (JC 2908)
Yu Shi, Esq. (YS 2182)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: info@rosenlegal.com

*Lead Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| RICHARD RUPP and RODRIGO LEAL, Individually and On Behalf of All Others Similarly Situated, | Case No.: 1:19-cv-04433-GBD |
| Plaintiff, v. | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| MOMO INC., YAN TANG, and JONATHAN XIAOSONG ZHANG, | CLASS ACTION |
| Defendants. | **JURY TRIAL DEMANDED** |

Lead Plaintiff Richard Rupp and named plaintiff Rodrigo Leal ("Plaintiffs") individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their amended complaint against Defendants (defined below), allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation conducted by and through their attorneys, which included, among other things, a review and analysis of: (i) Defendants' public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) Defendants' public filings with Chinese regulatory agencies, including the State Administration for Market Regulation ("SAMR") and its local provincial offices; (iii) public reports and news articles; (iv) transcripts of Defendants' conference calls; (v) interviews with witnesses with relevant information; and (vi) other publicly-available material and data identified herein. Plaintiffs' investigation is continuing, and many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control or custody.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired the American Depositary Shares[1] ("ADSs") of Momo Inc. ("Momo or the "Company") from April 20, 2015 through May 10, 2019, inclusive (the "Class Period").[2] Plaintiffs seek to

---

[1]  American Depositary Shares, also known as ADSs, are U.S. dollar-denominated shares of stock of a foreign-based company available for purchase on an American stock exchange. ADSs are issued by depository banks in the U.S. under agreement with the issuing foreign company.

[2] Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of Momo at all relevant times; members of such excluded persons' immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Momo operates several mobile-based social and entertainment platforms. In investors' eyes, the Chinese government's intrusive regulation of online media to enforce decency norms is a potent threat. In 2014, accused of facilitating prostitution, Momo had already run afoul of these regulations and norms. Momo therefore sought to reassure investors that the risk of government intervention was relatively minimal. Momo claimed that it had established a sophisticated content moderation system employing a host of contractors and sophisticated artificial intelligence to identify, remove, and ultimately prevent offending posting. To further comfort investors that the risk of government intervention was relatively limited, Defendants concealed that one of Momo's providers of often quite risqué videos was in fact a Momo related party, potentially bringing Momo within the scope of any government action targeted at that related party. When a third-party analyst disclosed that the content provider was a related party, Momo's stock fell, damaging investors. Despite its stated measures, however, Momo knowingly tolerated illegal practices on its platforms. A journalist reported that one of Momo's platforms effectively served as a marketplace for sex workers to advertise prostitution, leading the Chinese government to ban Momo's app Tantan from mobile app stores and later ordering Momo to face further damaging government action. Both announcements caused Momo's stock price to plunge.

3.     The Chinese government pervasively regulates all media through both formal and informal means. There are severe consequences for running afoul of these formal or informal regulation. They can include fines, revocation of business licenses, detention of key personnel, etc. Accordingly, as investors well understand, Momo's talent agencies must take extreme care to

ensure their talent stays well within what Chinese censors consider decent – or face the consequences.

4.      Momo is one of China's leading mobile-based social and entertainment platforms. On the Momo app, predominantly female performers offer live talent shows, video-based interactive performances, and short videos, for a predominantly male audience. Momo makes money when appreciative or attention-seeking viewers purchase virtual gifts in Momo's stores to bestow on performers. Momo keeps a proportion of the money the viewers pay for the gifts. The market is surprisingly large. In 2018, Momo by itself earned $1.5 billion from selling these virtual gifts.

5.      With the explosion of the virtual gifts market into a billion-dollar industry, entrepreneurs have formed talent agencies to discover, hire, train, and promote performers who will provide live video performances. Beijing Mushang Culture Media Company Limited ("Beijing Mushang"), is the second-largest agency that feeds performers into Momo and one of Momo's Top Ten Partners.

6.      Beijing Mushang's business model risks raising the Chinese government's ire. Talent agencies must focus on performers who will be attractive to Momo's clientele, which is largely male, and older. Beijing Mushang appeals to this clientele chiefly through performers who are female, young, attractive, and as risqué as they and Beijing Mushang can get away with.

7.      To minimize perceptions of the risks it faced, Momo did not disclose any relationship with Beijing Mushang. Momo's implicit assurances that it was an unrelated third party served to suggest that Momo might well escape liability should the government sanction Beijing Mushang.

8.     Yet Beijing Mushang is not an unrelated party. Momo exerts significant influence over Beijing Mushang. Beijing Mushang's performers may only perform on Momo and were prohibited from performing for any of Momo's accomplished competitors.  Momo keeps 60% of the value of the virtual gifts paid to Beijing Mushang's performers, with Beijing Mushang and the performer splitting the remaining 40%. The contracts these performers sign with Beijing Mushang heavily favor Momo's interests over Beijing Mushang's. And since 2017, Momo has owned about 18.75% of Beijing Mushang. Through Momo's control and ownership, Beijing Mushang was a related party, and under US Generally Accepted Accounting Principles ("GAAP") and SEC regulations, transactions between the two had to be recorded as related party transactions in Momo's financial statements.

9.     The importance of Beijing Mushang and other agencies soared when, in November 2017, Momo formally announced that it was transitioning to an agency-led model. Beijing Mushang was by far the largest beneficiary. It accounted for at least $244 million in revenues for Momo in 2018, or about 12% of Momo's total revenues.

10.    On June 27, 2018, Spruce Point Capital Management LLC ("Spruce Point") disclosed in a report ("Spruce Point Report") that Beijing Mushang was a Momo related party. That day, the price of, Momo's ADS price fell $2.48, or 5.47%, to close at $42.86, damaging investors.

11.    In 2014, a Chinese government report singled out Momo by name as a purveyor of pornography and other indecent content. Since then, Momo has boasted to investors of the extraordinary lengths it takes to moderate content so that it would not face greater consequences. Momo reported that as of April 2017, 2018, and 2019, it retained 350, 550, and 1,126 contractors for its content moderation team, or in each case more than half as much as Momo's total

employees. Momo boasted that this dedicated team was "aided by both proprietary and third-party software and technologies to sweep our platform and the data being transmitted on a real-time basis around-the-clock." Momo boasted that the team and artificial intelligence would quickly identify any new pattern of illicit or improper activity and ban it across all users.

12.     In May 2018, Momo acquired a mobile dating app, Tantan. Like Western equivalents such as Tinder, users on Tantan pick usernames and set up profiles and profile pictures of themselves. To accommodate the more intrusive Chinese government, Tantan preapproves profile pictures and usernames.

13.     Yet unbeknownst to investors, Tantan served as an emporium for sex workers to sell prostitution. These users, largely young women, used nearly identical methods. They: (1) picked suggestive usernames, (2) uploaded scantily-clad profile pictures, and (3) on these profile pictures, prominently displayed their contact information as well as other things such as their availability for unspecified services. Users viewing the profile picture and name can easily guess that the women are offering sex and have all the information needed to contact them to arrange to buy those services.

14.     On April 19, 2019, a local newspaper published an article disclosing that sex workers were advertising prostitution services on Tantan and the tactics they employed to do so. A reporter also tested Tantan and immediately located at least 10 sex workers advertising prostitution near him. The advertisements were obvious. For example, one woman not only exposed both her contact information and herself in her profile picture, but also used the username "Alone." Another similarly underdressed sex worker who similarly displayed her contact information advertised that she "can transact in person" on her profile picture.

15.     The article revealed that Momo had turned a blind eye to its role facilitating crime and potentially faced serious consequences, which promptly followed. Less than 10 days later on April 28, 2019, the Chinese government ordered the removal of Tantan from all Android phones for "disseminat[ing] illegal information including prostitution and pornography." In response, the price of Momo's ADSs fell $2.51, or 6.8%, damaging investors.

16.     Then on May 10, 2019, Momo announced that as directed by the government, it would undertake "self-inspection" between May 11 and June 11, a euphemistic phrase for a Chinese administrative law measured meant not only to rectify conduct but also to punish Momo. The "self-inspection" not only included implementing "internal measures aimed at strengthening its content screening efforts," but also required Momo to suspend the ability of users to post social newsfeed during the period of self-inspection.  In response, the price of Momo's ADSs again fell by $3.32, or 10.3%, damaging investors.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

19.     Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as Defendants conduct business in this judicial district and the Company is headquartered in this judicial district.

20.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including

but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

21.     Lead Plaintiff Richard Rupp ("Rupp"), as set forth in Rupp's previously-filed PSLRA Certification (Dkt. No. 16-2), incorporated by reference herein, purchased Momo shares during the Class Period, and was damaged thereby.

22.     Named plaintiff Rodrigo Leal ("Leal") purchased Momo ADSs during the Class Period, and was damaged thereby. Leal's PSLRA Certification is attached hereto as Exhibit 1.

23.     Defendant Momo is a Cayman Islands corporation headquartered in Beijing, China. Momo operates mobile-based social and entertainment platforms in China. Momo is one of China's leading providers of mobile-based social, dating, and entertainment apps. On the Momo app, performers post or livestream videos of themselves performing talent shows or recreational activities, or simply chatting with viewers. Momo also hosts various social games. The Momo app had 81.1 million, 99.1 million, and 113.3 million monthly active users ("MAUs") as of December 31, 2017, 2018, and 2019, respectively. Since May 2018, Momo has also operated Tantan, a dating app aimed primarily at younger users. During the Class Period, Momo's shares traded on NASDAQ under the ticker MOMO.

24.     Defendant Yan Tang ("Tang") is the company's co-founder and has served as its chief executive officer ("CEO") since its inception in July 2011. Tang was appointed to be the chairman of the board of directors in November 2014. Tang owns all of Momo's Class B supervoting shares and controls 70.9% of Momo's voting power.

25.     Defendant Jonathan Xiaosong Zhang has served as the Company's chief financial officer ("CFO") since May 2014.  Defendant Zhang has more than 20 years of experience in

accounting and finance in both the U.S. and China. Defendant Zhang earned his master's degree in accountancy from the University of Illinois in 1994. He was an auditor at KPMG's Los Angeles office between 1995 and 1999. He then moved to PricewaterhouseCoopers's Beijing office, where he served as a manager and then senior manager between 2000 and 2004. He was the CFO of Vimicro International Corporation, which traded on NASDAQ, between September 2004 and January 2007, the CFO of BJB Career Education Company Limited from June 2009 through June 2010, and the CFO of iSoftStone Holdings Limited, which traded on the NYSE, from July 2010 through April 2014. Defendant Zhang also served an independent director and chairman of the audit committee of Tarena International Inc. and Sungy Mobile Limited, both of which were publicly-listed companies that traded on NASDAQ. Defendant Zhang is a Certified Public Accountant in the State of California.

26.     Defendants Tang and Zhang are the "Individual Defendants."

27.     Defendant Momo and the Individual Defendants are the "Defendants."

28.     Each of the Individual Defendants:

    a.     directly participated in the management of the Company;

    b.     was directly involved in the day-to-day operations of the Company at the highest levels;

    c.     was privy to confidential proprietary information concerning the Company and its business and operations;

    d.     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

      e.      was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

      f.      was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

      g.      approved or ratified these statements in violation of the federal securities laws.

29.    Momo is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

30.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Momo under *respondeat superior* and agency principles.

## DETAILED ALLEGATIONS OF FRAUD

### The Company

*Momo's Past Run-Ins with The Law*

31.    In its early life, Momo earned a reputation as a sex app.  While the app's reputation certainly helped Momo attract customers, it also brought unwanted attention from the Chinese government.  In 2014, a Chinese state-owned newspaper criticized Momo as a "hormone-filled" app that facilitated sex, helped sex workers find customers, and led to sexual assaults.[3]  Also in 2014, following customer complaints, the Chinese government's National Office Against Pornographic and Illegal Publications singled out Momo in a crackdown on online pornography.[4]

---

3 http://tech.sina.com.cn/i/2014-04-17/14249327317.shtml
4 https://www.theguardian.com/technology/2014/jun/12/momo-chinese-app-exposes-sex-divide

Then, in March 2015, the Chinese government fined Momo 60,000 RMB for disseminating pornography and ordered it to shut down all pages that featured pornographic media, screen all media for pornography, and temporarily make it impossible for users to upload media. Ominously, the Chinese government also ordered Momo to submit a rectification report[5] and make a public apology.[6]

32.     Eager to reassure investors that its lurid days were behind it, Defendants disclosed in all of Momo's annual reports filed with the SEC that to remove pornographic or illicit content, it had hired, trained and implemented a "dedicated team" of full-time contractors, "aided by both proprietary and third-party software and technologies to sweep our platform and the data being transmitted on a real-time basis around-the-clock." Each year, the number of contractors on Momo's content moderation team was substantial compared to Momo's total employee count.

**Fraud 1: Undisclosed Material Related Party Transactions with Beijing Mushang**

    *(i)     Momo Invested in and Controlled Beijing Mushang*

33.     Early in its life, Momo earned most of its revenues from membership subscriptions, with more minor contribution from other businesses like mobile marketing services and mobile games. But with declining growth in these core businesses, Momo in September 2015 pursued a new business plan, which it called live video service.

34.     The live videos in live video service are sessions created by performers themselves. Momo does not charge the performers or the viewers. Instead, Momo earns live video service revenues by selling virtual gifts to users of the Momo app. The purchasers then bestow the gifts

---

5 In China, the order to submit a "rectification report" represents an administrative warning to correct a serious violation.  In a typical "rectification report", the offending company states what it did wrong and how it would correct the wrongdoing.  Continued violation, or failure to adhere to what is promised in a rectification report, could lead to further, more drastic penalties.
6 http://cpc.people.com.cn/n/2015/0403/c83083-26794631.html

on their favorite performers to express appreciation or seek attention. Virtual gifts can cost as little as RMB 0.1 (US$ 0.014) for a virtual rose to as much as RMB 2888.8 (US$408.73) for a virtual space warship. Momo keeps 60% of the cost of the gift, while the performer and agent, if any, split the remaining 40%.

35.     Due to the ephemeral nature of live videos, they are relatively harder to regulate and tend to contain racier content than pre-recorded short videos.

36.     Momo's live video service business soon took off. In 2016, Momo earned 68.1% from its live video service business, reaching 83.6% by 2017. In 2018, Momo earned $1.56 billion in revenues from selling virtual gifts.

37.     At inception, Momo relied on performers to promote themselves. But with Momo and its many competitors making the virtual gifts business boom in China, professional talent agencies were formed to find, recruit, and popularize performers.

38.     The agencies' business model raises obvious problems. The majority of viewers are men. The majority of performers are young attractive women. The performers engage the audience via live videos, with the objective of putting on performances that will elicit the most virtual gifts. Thus, agencies' business model is to select young attractive women who will appeal to a largely male audience, an activity likely to draw the attention of the Chinese government.

39.     And there is real money at stake. In just six days in late 2018, a performer named Bai Bian De Shu Shu received virtual gifts worth RMB 6.2 million ($0.91 million), in a Key Performer Contest. Another performer, Mushang Dumpling, received RMB 4.5 million ($0.67 million) in that same six-day contest.[7] Based on the financial data that Plaintiffs obtained from the

---

7 http://dy.163.com/v2/article/detail/E3F9T2FV0511BKEG.html

local agencies of China SAMR, the operating revenues of Beijing Mushang were RMB 34.547 million (US$5.11 million) in 2017 and RMB 1.144 billion (US$169.17 million) in 2018.

40.     If it kept agencies at arm's length, Momo could protect itself from any potential crackdown from the Chinese government. Yet if it entangled itself with the agencies, Momo risked becoming a target in a Chinese government investigation of practices it viewed as unsavory. The nature of Momo's relationships with its talent agencies was therefore material to investors.

*(ii)     Both GAAP and SEC regulations mandate disclosure of related party transactions*

*Regulation S-K*

41.     SEC Regulation S-K (27 CFR § 229.10) requires that annual reports such as those filed by Momo on Form 20-F comply with the requirements of Regulation S-K "to the extent provided in the forms and rules under [the Exchange] Act."

42.     Under Item 7.B., Form 20-F requires disclosure of transactions with related parties, including:

> "transactions or loans between the company and **(a) enterprises that directly or indirectly through one or more intermediaries, control or are controlled by, or are under common control with, the company**; (b) **associates**; (c) individuals owning, directly or indirectly, an interest in the voting power of the company that gives them significant influence over the company, and close members of any such individual's family; (d) key management personnel, that is, those persons having authority and responsibility for planning, directing and controlling the activities of the company, including directors and senior management of companies and close members of such individuals' families; and (e) enterprises in which a substantial interest in the voting power is owned, directly or indirectly, by any person described in (c) or (d) or over which such a person is able to exercise significant influence. This includes enterprises owned by directors or major shareholders of the company and enterprises that have a member of key management in common with the company. Close members of an individual's family are those that may be expected to influence, or be influenced by, that person in their dealings with the company. **An associate is an unconsolidated enterprise in which the company has a significant influence or which has significant influence over the company. Significant influence over an enterprise is the power to participate in the financial and operating policy decisions of the enterprise but is less than control over those policies. Shareholders beneficially owning a 10% interest in the voting power of the company are presumed to have a significant influence on the company.**"

43.     Under SEC regulations, Momo must disclose

"The nature and extent of any transactions or presently proposed transactions which are material to the company or the related party, or any transactions that are unusual in their nature or conditions, involving goods, services, or tangible or intangible assets, to which the company or any of its parent or subsidiaries was a party.
The amount of outstanding loans (including guarantees of any kind) made by the company, its parent or any of its subsidiaries to or for the benefit of any of the persons listed above. The information given should include the largest amount outstanding during the period covered, the amount outstanding as of the latest practicable date, the nature of the loan and the transaction in which it was incurred, and the interest rate on the loan."

Form 20-F, Item 7.B 1.

*GAAP*

44.     The SEC has the statutory authority to promulgate GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB"). GAAP constitutes those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

45.     SEC and NASDAQ rules and regulations require that publicly traded companies such as Momo include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC. See Sections 12 and 13 of the Exchange Act; Rule 10-01(d) of Regulation S-X.

46.     SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

47.     Management is responsible for preparing financial statements that conform to GAAP. The AICPA Professional Standards provide:

The financial statements are management's responsibility . . . Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process,

summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. . . . Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility. PCAOB AU 110.03.
Within auditing standards, an ***arm's length transaction*** **is defined as a "transaction conducted on such terms and conditions between a willing buyer and a willing seller who are unrelated and are acting independently of each other and pursuing their own best interests."**[8] (AU-C 550.10).

48.     The SEC recognizes the U.S. Financial Accounting Standards Board (FASB) as the designated private sector standards setter for U.S. public companies. See Release Nos. 33-8221; 34-47743; IC-26028; FR-70. According to professional standards set by the American Institute of Certified Public Accountants, SFAS is *the* preferred source for determination of GAAP requirements.  Failure to follow SFAS is a violation of Rule 203 of the AICPA code of professional conduct.

49.     GAAP Statement of Financial Accounting Standards ("SFAS") requires disclosure of all material transactions between Momo, and related parties. ASC 850-10-50-1.

50.      ASC 850, Related Parties, establishes requirements for disclosure of transactions between a company and related parties.

51.     Under ASC 850, related parties include:

a.   "Entities for which investments in their equity securities would be required [] to be accounted by the equity method by the investing entity"; and

b.   "other parties with which the entity may deal if one party controls or can significantly influence the management or operating policies of the other to an

---

8 Whenever text appearing in a quote is bolded and italicized, emphasis has been added.

extent that one of the transacting parties might be prevented from fully pursuing its own separate interests". ASC 850-10-20.

52.     ASC 323-10-30-1 & 2 provide that an entity must recognize an investment using the equity method if, among other circumstances, the entity has significant influence over the investment entity.

53.     ASC 323-10-15-6 provides examples of conditions that would give an entity significant influence over an investee, which include "[m]aterial intra-entity transactions" (i.e., transactions between the entity and the investee), "[t]echnological dependency," and "[p]articipation in policy-making processes."

54.     Disclosures of related party transactions shall include: (a) the nature of the relationship involved, (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (c) the dollar amount of transactions for each of the periods for which income statements are presented, and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. ASC 850-10-50-1.

55.     FASB specifically points out that "[t]ransactions involving related parties cannot be presumed to be carried out on an arm's-length basis, as the requisite conditions of competitive, free-market dealings may not exist. Representations about transactions with related parties, if made, shall not imply that the related party transactions were consummated on terms equivalent to those that prevail in arm's-length transactions unless such representations can be substantiated." ASC 850-10-50-5.

56.     Unless a company tells them otherwise, investors reasonably expect that major transactions with related parties are disclosed so that investors can take the related party nature into account when evaluating the substance and quality of the transactions and their impact on the Company.

*Beijing Mushang Was a Related Party*

57.     Beijing Mushang was formed in June 2016. It grew rapidly, earning about RMB 3.7 million in 2016, but nearly ten times more – RMB 34.5 million – in 2017.

58.     A Momo subsidiary acquired an 18.75% interest in Beijing Mushang in March 2017.

59.     Momo faced harsh competition in the live video market, including from Yingke, YY, Douyin Live, Douyu, and Huya. But Momo's arrangement with Beijing Mushang included an exclusivity agreement:

    a.     Former Employee 1 ("FE 1") has worked at Beijing Mushang since June 2018, and is a manager in the operations department of Beijing Mushang, responsible for overseeing Beijing Mushang's performers.   FE1 reported that Beijing Mushang had an exclusivity agreement with Momo. According to FE 1, the agreement mandated that ***both*** Beijing Mushang and Beijing Mushang's performers work exclusively with Momo.

    b.     Former Employee 2 ("FE 2"), who worked as a talent agent[9] at Beijing Mushang from May 2017 to May 2018, confirmed that Beijing Mushang exclusively works for Momo. FE 2 also reported that Momo kept 60% of the virtual gifts'

---

9 A talent agent is responsible for discovering, recruiting, and training performers.

sales price and remitted 40% to Beijing Mushang to distribute with its performers.

60.    Contractually unable to enter into agreements with Momo's competitors, Beijing Mushang was dependent on Momo and its platforms. Similarly, the transactions were material to Beijing Mushang, as it had no other source of revenue. Thus, Momo had significant influence over Beijing Mushang.

61.    According to a form contract between Beijing Mushang and a performer,[10] Beijing Mushang required the performers to sign an agreement not only with it, but also with Momo. The performers thereby contractually obligated themselves to (among other things):

   a.  "Promote [Momo's] Product, including but not limited to increasing the number of [] users of [Momo's] Product through promotional activities, organizing and guiding users [], enlivening the atmosphere of the [] room and maintaining the order in [the] room."

   b.  "Regulate the behaviors of himself and other users in the room" and immediately report any violations to Momo.

   c.  "Obey the management of [Momo]."

   d.  Submit to Momo's "supervis[ion]" of the performer's activities in the room, "including but not limited to room activeness, number of new users in the room and behaviors of users in the room."

   e.  Submit to Momo's "supervis[ion]" of the performer's "promotional activities for [Momo's] Product."

---

[10] https://www.immomo.com/jobs/59 (not accessible from U.S.-based IP addresses).

62.    A similar form service agreement that Momo used to hire service providers through Beijing Mushang is also available on Momo's website.[11.]

63.    Thus, Momo also had significant influence over Beijing Mushang because Momo was able to "participate in [Beijing Mushang's] policy-making processes."

*Defendants Failed to Disclose the Nature of Momo's Relationship with Beijing Mushang and Material Related Party Transactions*

64.    Beijing Mushang was a related party to Momo because, as noted above, Momo could significantly influence the management or operating policies of Beijing Mushang to an extent that Beijing Mushang might be prevented from fully pursuing its own separate interests.

65.    The transactions between Momo and Beijing Mushang were material.

66.    FE 1 reported that Beijing Mushang was Momo's second largest talent agency. Further, Momo itself recognized Beijing Mushang's importance, officially designating it as one of its top 5 partners.

67.    Through 2017, growth in live video revenues began to plateau. That year, live video earned $212.6 million in Q1, $259.4 million in Q2, and $302.6 million in Q3.

68.    To address declining growth, Momo announced on its Q3 2017 earnings call on November 28, 2017, that Momo was "working more closely with the professional agencies in talent discovery and management" and "planning to go deeper with [its] exploration in the area of professional entertainment content production and distribution."

69.    With the announcement that agencies would take on an even more important role in finding and developing performers, Beijing Mushang's role became even more critical.

70.     Momo earned over $251 million profits from Beijing Mushang in 2017 and 2018:

---

[11] http://www.immomogame.com/newsdetail/?post_id=15602

| Year | Beijing Mushang Operating revenue | Estimated Momo Revenue From Beijing Mushang |
|---|---|---|
| 2018 | RMB 1,143,710,000 | RMB1,715,565,000 (US$244,713,643.82) |
| 2017 | RMB 34,547,000 | RMB 51,820,500 (US$7,391,840.81) |

71.     But in its SEC filings Momo never mentioned Beijing Mushang, as a related party or otherwise.

72.     Alternatively Momo was required to disclose its transactions with Beijing Mushang because Beijing Mushang was an associate per SEC rules.  According to Item 7.B of Form 20-F:

> An associate is an unconsolidated enterprise in which the company has a significant influence or which has significant influence over the company. Significant influence over an enterprise is the power to participate in the financial and operating policy decisions of the enterprise but is less than control over those policies. ***Shareholders beneficially owning a 10% interest in the voting power of the company are presumed to have a significant influence on the company.***

Momo owned 18.75% of Beijing Mushang, and thus, is at minimum presumed to have significant influence over Beijing Mushang pursuant to Item 7.B.

73.     Therefore, even if Beijing Mushang is not a related party, it is an associate of Momo. SEC Form 20-F requires the identification and disclosure of all transactions with associates, similar to disclosures needed for a related party.  Momo made no such disclosures about Beijing Mushang.

74.     On June 27, 2018, when the Spruce Point Report was published exposing that Beijing Mushang was a Momo related party, the price of Momo's ADS price fell $2.48, or 5.47%, to close at $42.86 on that day, damaging investors.

**Fraud 2: Undisclosed Facilitation of Prostitution on Momo Platforms**

75.     In its early days, Momo had earned a material portion of its revenues from a dating app. Momo's app, however, had a reputation as a place where users went to seek casual sex. In China, an app that encourages legal but casual sex is not merely frowned upon; it also risks serious government punishment. In Momo's case, that crackdown came in 2014 and 2015 (*see* ¶ 31).

76.     Momo acquired Tantan in May 2018. Tantan is a Chinese mobile dating app that is nearly identical to Tinder. Tantan holds promise for Momo because its clientele is younger than Momo's typical users. Tantan is free to use, but Momo earns money because users can purchase premium subscriptions and other value-added services.

77.     Momo, eager to appease investors' concerns that it would again face Chinese government scrutiny, boasted in each of its annual reports of its purportedly superlative content moderation team.

78.     For example, Momo's 2018 20-F reported:

As an operator of social platforms, we view content management and monitoring as a critical part of our operations. As of the date of this annual report, Momo and Tantan collectively have a dedicated team of over 1,126 personnel reviewing and handling content on our mobile platform for compliance with applicable laws and regulations. They are aided by both proprietary and third-party software and technologies to sweep our platforms and the data being transmitted on a real-time basis around-the-clock. We monitor and screen user information and user generated content against a spam list, which is a list of content and behaviors that we have determined are likely to be indicative of inappropriate or illegal content or illegal activities. Additionally, our users can also easily report fraud if they come across suspicious content, and each user complaint is processed by our content management and monitoring system.

79.     Thus, Momo assured investors that Momo would quickly identify new patterns of illicit activity through human review, user complaints, and artificial intelligence. Once Momo identified these new patterns, it would add it to the list of content and behaviors indicative of

inappropriate content or activities. By keeping its platforms free of content the Chinese government deems objectionable, Momo would not be subject to regulatory intervention.

80.     Unbeknownst to investors, Momo tolerated criminal activity on Momo and Tantan.

81.     During the Class Period, the Momo and Tantan apps were full of sex workers advertising their services. The sex workers followed a nearly uniform approach. They would post a scantily clad profile picture.[12] They would pick a suggestive username. And, crucially, they would paste their offline contact information directly onto their profile picture, and in some cases suggestive sounding phrases like "can transact in person."

82.     Indeed, the approach was so uniform and obvious that it was not difficult to identify which profiles were sex workers.  If Momo really did generate "spam lists" of  "content and behavior that [Momo] have determined are likely to be indicative of inappropriate or illegal content or illegal activities" as Momo claimed in its 20-Fs, the profile pictures of sex workers featuring a suggestive profile plus contact information would have been on that blacklist.  That Momo's "spam list" missed this obvious approach used by sex workers indicates that Momo either didn't have a "spam list" at all or were willing to tolerate criminal activity on its platforms.

83.     Moreover, both the Momo and Tantan apps require profile pictures to be approved. Therefore, it was hard for Momo to miss profile pictures containing women in states of under-dress with their contact information prominently shown – unless Momo wanted to turn a blind eye.

84.     On April 19, 2019, the Nanchang Evening News, a newspaper from the city of Nanchang in China's Jiangxi Province, published an article detailing how prostitutes use Tantan

---

[12] China is still a relatively traditional society compared to the West, with different (and more conservative) standards for what constitutes unacceptably revealing dress.

to solicit customers.[13]  The article included several anecdotes, including those from a "Mr. Zhang" who was solicited by prostitutes when he attempted to use the app to find a friend or date.

85.     The same article reported that a Nanchang Evening News reporter tested Tantan and immediately located at least 10 prostitutes in his location in Nanchang.  One prostitute named "Alone" charged RMB 1500 for one night. Another prostitute named "Tired", with Chinese characters stating "can transact in person" printed in her profile photo, immediately sent him a list of the sexual services she could provide and the prices for each.

86.     Less than 10 days later, on April 28, 2019, the Chinese authorities ordered that Tantan be removed from all Android phones: "Tantan disseminated illegal information including prostitution and pornography."[14] Following this news, Momo's ADS price fell $2.51 per share, or 6.81%, to close at $34.36 per share on April 29, 2019. On May 1, 2019, Tantan app was also removed from the Apple app store.

87.     In connection with the removal of the Tantan app on Android and Apple app stores, Momo sought to reassure investors by stating: "the Company plann[ed] to conduct a comprehensive internal review of the content in the Tantan mobile app and undertake other measures necessary to stay in full compliance with all relevant laws and regulations."  This statement – that Momo would need to conduct a review of the contents on Tantan's app and take measures to comply with Chinese law – renders false Momo's statements in the 20-F that it had robust content moderation capabilities in place and was already doing everything it could to comply with applicable laws and regulations.

---

13 https://kknews.cc/society/66orgq3.html
14 https://www.guancha.cn/politics/2019_04_29_499644.shtml?s=zwyxgtjbt

88.     Whatever measures that Momo took to comply with Chinese laws in the wake of Tantan's ban still weren't enough.  The Chinese government was still dissatisfied with Momo's lackadaisical efforts at content moderation.  On May 10, 2019, Momo announced that Chinese regulators had ordered Momo to undertake "self-inspection", a euphemism for punishment. As part of the "self-inspection", Momo was ordered to "undertake certain internal measures aimed at strengthening its content screening efforts" and suspended the ability of users to post social newsfeeds on Momo for one month, from May 11 to June 11, 2019.  On this news, Momo's ADS price fell $3.32 per share, or 10.28%, to close at $28.97 per share on May 10, 2019, further damaging Plaintiffs and other investors.

89.     It is not a surprise that this news was so poorly-received by the market.  An order to conduct "self-inspection" is a serious matter.  Chinese administrative agencies issue orders for "self-inspection" as a punishment for violations of laws and regulations, and it signals that the offending company is no longer in the good grace of the government.   "Self-inspection" is troubling because it indicates the possibility of subsequent, greater penalties.

90.     In China, a company's relationship with regulators has profound implications for its economic success.  A good or bad relationship with the government affects all aspects of business development, including: the stringency of government supervision, compliance costs, opportunities to obtain financing, availability of beneficial tax treatment and government subsidies, success in litigation, etc.  The order for Momo to conduct "self-inspection" indicates deterioration in Momo's relationship with its regulators.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

*Failure to Disclose Beijing Mushang as a Related Party or Associate*

91.     The Class Period begins on April 20, 2015, when the Company filed an annual report on Form 20-F with the SEC announcing the Company's financial and operating results for the fiscal year ended December 31, 2014 (the "2014 20-F").  Defendant Tang signed the 2014 20-F. Defendants Tang and Zhang certified the 2014 20-F's accuracy pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX").

92.     On April 25, 2016, the Company filed an annual report on Form 20-F with the SEC announcing the Company's financial and operating results for the fiscal year ended December 31, 2015 (the "2015 20-F").  Defendant Tang signed the 2015 20-F. Defendants Tang and Zhang certified the 2015 20-F's accuracy pursuant to SOX Section 302.

93.     On April 26, 2017, the Company filed an annual report on Form 20-F with the SEC announcing the Company's financial and operating results for the fiscal year ended December 31, 2016 (the "2016 20-F").  Defendant Tang signed the 2016 20-F. Defendants Tang and Zhang certified the 2016 20-F's accuracy pursuant to SOX Section 302.

94.     On April 26, 2018, the Company filed an annual report on Form 20-F with the SEC announcing the Company's financial and operating results for the fiscal year ended December 31, 2017 (the "2017 20-F").  Defendant Tang signed the 2017 20-F. Defendants Tang and Zhang certified the 2017 20-F's accuracy pursuant to SOX Section 302.

95.     On April 26, 2019, the Company filed an annual report on Form 20-F with the SEC announcing the Company's financial and operating results for the fiscal year ended December 31, 2018 (the "2018 20-F").  Defendant Tang signed the 2018 20-F. Defendants Tang and Zhang certified the 2018 20-F's accuracy pursuant to SOX Section 302.

96.     As noted above, pursuant to GAAP, Beijing Mushang was a related party to Momo. GAAP required that Momo disclose all material related party transactions between Momo and Beijing Mushang in the financial statements.

97.     Momo's 2017 20-F and 2018 20-F contained financial statements for Momo that Defendants stated were prepared according to GAAP.   In the 20-Fs, Momo stated: "The consolidated financial statements of [the Company] have been prepared in accordance with the accounting principles generally accepted in the United States of America ("U.S. GAAP")" and "We prepare our financial statements in conformity with U.S. GAAP[.]"

98.     Momo's 2017 and 2018 20-Fs failed to disclose that Beijing Mushang was a related party, rendering them false and misleading and in violation of GAAP.

99.     Besides identifying the identity of each related party, GAAP requires Momo to disclose its transactions with all related parties, including: (a) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (b) the dollar amount of transactions for each of the periods for which income statements are presented, and (c) amounts due from or to Beijing Mushang as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. *See* ASC 850-10-50-1.  Because Momo omitted to disclose Beijing Mushang as a related party, Momo never made the necessary disclosures in (a) to (c) with regards to Beijing Mushang.

100.    Alternatively, Momo violated SEC's rule requiring companies to disclose on Form 20-F all transactions with associates.  Beijing Mushang was an associate of Momo because Momo owned 18.75% of Beijing Mushang, which is sufficient to trigger the SEC's presumption of Momo having significant influence over Beijing Mushang, making the latter an associate of Momo.

101.    Additionally, Momo was also required to disclose related party transactions in its quarterly earnings releases.

102.    On August 22, 2017, Momo filed with the SEC a Form 6-K, disclosing its financial results for the second quarter ended June 30, 2017 (the "2Q2017 Form 6-K").  The 2Q2017 Form 6-K included Momo's income statement and balance sheet as of that date, but omitted material related party transactions with Beijing Mushang.

103.    Momo's quarterly earnings releases for the third quarter of 2017 (filed on Form 6-K with the SEC on November 28, 2017), first quarter of 2018 (filed on Form 6-K with the SEC on May 29, 2018), second quarter of 2018 (filed on Form 6-K with the SEC on August 22, 2018), third quarter of 2018 (filed on Form 6-K with the SEC on December 5, 2018), first quarter of 2019 (filed on Form 6-K with the SEC on May 28, 2019), and second quarter of 2019 (filed on Form 6-K with the SEC on August 27, 2019) were thus similarly false and misleading for omitting to disclose related party transactions with Beijing Mushang.

*Misleading Statements Concerning Momo's Lack of Content Moderation*

104.    Every year during the Class Period, Momo's 20-F stated that it's dedicated a growing number of personnel to content moderation, aided by state-of-the-art artificial intelligence, to generate spam lists of contents and behavior that suggests illegal activities.

105.    Momo's 2018 20-F states:

As an operator of social platforms, we view content management and monitoring as a critical part of our operations. As of the date of this annual report, Momo and Tantan collectively have a dedicated team of over 1,126 personnel reviewing and handling content on our mobile platform for compliance with applicable laws and regulations. They are aided by both proprietary and third-party software and technologies to sweep our platforms and the data being transmitted on a real-time basis around-the-clock. We monitor and screen user information and user generated content against a spam list, which is a list of content and behaviors that we have determined are likely to be indicative of inappropriate or illegal content or illegal activities.

106.     Similarly, Momo's 2017 20-F states:

As of the date of this annual report, we have a dedicated team of over 550 personnel reviewing and handling content on our mobile platform for compliance with applicable laws and regulations. They are aided by both proprietary and third-party software and technologies to sweep our platform and the data being transmitted on a real-time basis around-the-clock. We monitor and screen user information and user generated content against a spam list, which is a list of content and behaviors that we have determined are likely to be indicative of inappropriate or illegal content or illegal activities.

107.     Momo's 2016 20-F states:

As of the date of this annual report, we have a dedicated team of over 350 personnel reviewing and handling content on our mobile platform for compliance with applicable laws and regulations. They are aided by both proprietary and third-party software and technologies to sweep our platform and the data being transmitted on a real-time basis around-the-clock. We monitor and screen user information and user generated content against a spam list, which is a list of content and behaviors that we have determined are likely to be indicative of inappropriate or illegal content or illegal activities.

108.     Momo's 2015 20-F states:

As of the date of this annual report, we have a dedicated team of over 150 personnel reviewing and handling content on our mobile platform for compliance with applicable laws and regulations. They are aided by both proprietary and third-party software and technologies to sweep our platform and the data being transmitted on a real-time basis around-the-clock. We monitor and screen user information and user generated content against a spam list, which is a list of content and behaviors that we have determined are likely to be indicative of inappropriate or illegal content or illegal activities.

109.     Momo's 2014 20-F states:

As of the date of this annual report, we have a dedicated team of over 100 personnel reviewing and handling content on our mobile platform for compliance with applicable laws and regulations. They are aided by both proprietary and third-party software and technologies to sweep our platform and the data being transmitted on a real-time basis around-the-clock. We monitor and screen user information and user generated content against a spam list, which is a list of content and behaviors that we have determined are likely to be indicative of inappropriate or illegal content or illegal activities.

110.     Indeed, every year since 2014, Momo claims to be dedicating an increasing number of personnel to monitor content.  Every year, Momo states that it generates a "spam list" of contents and behavior that suggest illegal activities, reassuring investors that it's now adequately preventing

violations after being called out by the Chinese government in 2014.  Yet, as shown by the ease

with which sex workers were able to post profiles on Momo and Tantan to solicit customers, and

the uniformity of the approach taken by sex workers to identify themselves on Momo and Tantan

(*i.e.* revealing profile picture plus contact information), Momo had either been turning a blind eye

to prostitution on its apps, or its content moderation efforts had been so woefully ineffective, that

the Chinese government banned Tantan in April 2019 and ordered Momo to conduct "self-

inspection" in May 2019.

## ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER

*Massive Insider Stock Sales During the Class Period*

111.    During the Class Period, Momo insiders unloaded massive numbers of Momo

ADSs.  Insider stock sales support scienter because they show that insiders were eager to make

money on their Momo ADSs before bad news came out and that could affect the value of their

Momo ADSs.

112.    During the Class Period, Defendant Tang sold Momo ADSs through a company

owned by a family trust he controlled, Gallant Future Holdings Limited, in two sales totaling 6

million Momo ADSs and proceeds of over $226 million:

> a.  On April 17, 2017, shortly before Momo announced poor Q1 2017 results that
>
> caused its stock price to fall, Tang sold 4,000,000 Momo ADSs for total
>
> proceeds of $152.8 million. The ADSs Tang sold accounted for 60.1% of his
>
> total Class A shares. The sales were pursuant to a Rule 10b5-1 plan adopted on
>
> March 29, 2017.

b. On April 16, 2018, Tang sold 2,000,000 Momo ADSs for total proceeds of $74.0 million. The ADSs Tang sold accounted for 38.5% of his total Class A shares. The sales were through a Rule 10b5-1 plan adopted on March 26, 2018.

113. During the Class Period, Defendant Zhang sold 1.25 million Momo ADSs in two transactions, pocketing $46.9 million:

a. On April 17, 2017, shortly before Momo announced poor Q1 2017 results that caused its stock price to fall, Zhang sold 500,000 Momo ADSs for total proceeds of $19.1 million. The sales were through a Rule 10b5-1 plan adopted on March 29, 2017. This sale accounted for 25% of Zhang's total shares, at a minimum.[15]

b. On April 9, 2018, Zhang sold 750,000 Momo ADSs for total proceeds of $27.8 million. The sales were through a Rule 10b5-1 plan adopted on March 26, 2018. This sale accounted for 37.5% of Zhang's total shares, at a minimum. [16]

114. During the Class Period, David Ying Zhang, a Momo director since April 2012, sold 577,024 Momo ADSs in 7 transactions with total proceeds of $22.9 million:

a. On June 13, 2017, Zhang sold 2,339 Momo ADSs for total proceeds of $87,923.01.

---

15 Momo's SEC filings reveal that in and around the time of his 2017 sale, Defendant Zhang owned less than 1% of Momo's total outstanding shares, or at most 3.9 million shares. Thus, Zhang's sale of ADSs representing 1,000,000 shares accounted for at least 25% of his total shares.

16 Momo's SEC filings reveal that in and around the time of his 2018 sale, Defendant Zhang owned less than 1% of Momo's total outstanding shares, or at most 4.0 million shares. Thus, Zhang's sale of ADSs representing 1,500,000 shares accounted for at least 37.5% of his total shares.

    b.  On August 31, 2017, Zhang sold 30,000 Momo ADSs for total proceeds of $1.13 million.

    c.  On December 19, 2017, Zhang sold 100,000 Momo ADSs for total proceeds of $2.58 million.

    d.  On March 15, 2018, Zhang sold 200,000 Momo ADS for total proceeds of $7.54 million.

    e.  On June 1, 2018, Zhang sold 99,222 Momo ADS for total proceeds of $7.54 million.

    f.  On September 25, 2018, Zhang sold 80,000 Momo ADS for total proceeds of $3.6 million.

    g.  On September 26, 2018, Zhang sold 65,463 Momo ADS for total proceeds of $3.04 million.

115.    During the Class Period, David Ying Zhang's funds, Matrix Partners China II and Matrix Partners China II-A, disposed of 27,100,000 ADSs:

    a.  On August 29, 2016, Matrix Partners China II distributed 2,916,667 Momo ADSs to its partners for no additional consideration, while Matrix Partners China II-A distributed 324,074 ADSs to its partners for no additional consideration.

    b.  On February 10, 2017, Matrix Partners China II distributed 4,702,573 Momo ADSs to its partners for no additional consideration. Matrix Partners China II-A distributed 324,074 ADSs to its partners for no additional consideration that same day.

    c.   On March 31, 2017, Matrix Partners China II distributed 3,293,919 Momo ADSs to its partners, while Matrix Partners China II-A distributed 365,991 ADSs to its partners for no additional consideration.

    d.   On June 7, 2017, Matrix Partners China II distributed 8,526,841 Momo ADSs to its partners for no additional consideration, while Matrix Partners China II-A distributed 947,427 ADSs to its partners for no additional consideration.

    e.   On December 21, 2017, Matrix Partners China II distributed 1,800,000 Momo ADSs to its partners for no additional consideration. Matrix Partners China II-A distributed 200,000 ADSs to its partners for no additional consideration that same day.

    f.   On March 16, 2018, Matrix Partners China II distributed 3,150,000 Momo ADSs to its partners for no additional consideration, while Matrix Partners China II-A distributed 350,000 ADSs to its partners for no additional consideration.

116.    During the Class Period, Xiaoliang Lei, who co-founded Momo and has been the president of its game operations since April 2018, sold Momo ADSs through a company owned by a family trust he controlled, First Optimal Holdings Ltd., in 2 transactions with total proceeds of $28.0 million:

    a.   On April 17, 2017, Lei sold 250,000 ADs for total proceeds of $9.6 million.

    b.   On April 9, 2018, Lei sold 500,000 ADSs for total proceeds of $18.6 million.

117.    During the Class Period, Li Wang, Momo's chief operating officer since June 2014 and president since April 2018, sold 1.56 million Momo ADSs for total proceeds of $57.0 million, in 4 sales:

    a.  On April 17, 2017, Wang sold 500,000 ADSs for total proceeds of $19.1 million.

    b.  On September 26, 2017, Wang sold 300,000 ADSs for total proceeds of $10.1 million.

    c.  On March 28, 2018, Wang sold 260,000 ADSs for total proceeds of $9.4 million.

    The sales accounted for at least 54% of Wang's total shares, at a minimum.[17]

    d.  On April 9, 2018, Wang sold 500,000 ADSs for total proceeds of $18.5 million.

    The sale accounted for 25% of Wang's total shares, at a minimum.[18]

118.    During the Class Period, Yong Li, who cofounded Momo and has been a director since April 2012, sold 6.1 million Momo ADSs for total proceeds of $ 189,716,000 between June 9, 2015 through June 1, 2018 in 8 sales:

    a.  On June 9, 2015, Li sold 2,100,000 ADSs for total proceeds of $36 million.

    b.  On November 15, 2016, Li sold 400,000 ADSs for total proceeds of $8.044 million.

    c.  On March 15, 2017, Li sold 200,000 ADSs for total proceeds of $6.732 million.

    d.  On March 9, 2018, Li sold 400,000 ADS for total proceeds of $14.3 million.

    e.  On March 13, 2018, Li sold 600,000 ADSs for total proceeds of $21.444 million.

---

17 Momo's SEC filings reveal that in and around the time of his 2017 sale, Wang owned less than 1% of Momo's total outstanding shares, or at most 3.9 million shares. Thus, Wang's sale of ADSs representing 2.1 million shares accounted for at least 25% of his total shares.
18 Momo's SEC filings reveal that in and around the time of his 2018 sale, Defendant Zhang owned less than 1% of Momo's total outstanding shares, or at most 4.0 million shares. Thus, Wang's sale of ADSs representing 1,000,000 shares accounted for at least 25% of his total shares.

f.   On May 13, 2018, Li sold 300,000 ADSs for total proceeds of $12.9 million.

g.   On June 1, 2018, Li sold 2.1 million ADSs for total proceeds of $90.3 million.

119.   During the Class Period, Zhiwei Li, who cofounded Momo and was its chief technology officer from inception until November 1, 2016, sold 231,321 Momo ADSs for total proceeds of $5.4 million in 2 sales:

a.   On September 9, 2016, Li sold 170,000 ADSs for total proceeds of $4.2 million.

b.   On November 16, 2016, Li sold 61,321 ADSs for total proceeds of $1,258,306.92.

120.   Neil Nanpeng Shen, a director since May 2014 founding managing partner of Sequoia Capital China sold 244,944 personally-held ADSs on May 31, 2018 for total proceeds of $10.5 million.

121.   Jingping Zhang, co-president from March 2014 to May 31, 2016, sold 33,717 Momo shares for total proceeds of $0.36 million in a transaction on June 24, 2016.

122.   Sequoia Capital China, through its various investment vehicles, sold 5,040,934 Momo ADSs for total proceeds of US$127.5 million in 10 transactions between September 22, 2016 and March 12, 2018.

123.   During the Class Period, Yunfeng Financial Group Limited, through its investment vehicle Rich Moon Limited, ultimately owned by former director Joseph Tsai, sold 12,581,910 Momo ADSs for total proceeds of US$303.2 million in 3 transactions taking place between September 1, 2016 and March 9, 2017.

124.   Alibaba Investment Limited, which formerly had a director on Momo's board, sold 25.4 million Momo ADSs for total proceeds of US$828.9 million in 3 transactions taking place in March 2017.

125.     Thus, during the Class Period, insiders sold over 59.8 million Momo ADSs for total proceeds of more than $1.8 billion.[19]

*Defendants Tang and Zhang were aware that they had to disclose related parties*

126.     As part of each annual audit, under Generally Accepted Auditing Standards, a Company's management must disclose the existence of all related parties and related party transactions.

127.     In addition, prior to issuing an unqualified or "clean" audit opinion, an auditor will require that a Company's Chief Executive Officer and Chief Financial Officer sign a "management representation letter."   These written representations are mandated as a professional standards requirement under PCAOB AS 2410 and AS No. 18.  The management representation letter will represent to the auditors that the CEO and CFO are not aware of any undisclosed related party transactions and that all related party transactions are fully disclosed in the footnotes to the financial statements.

128.     PCAOB AU333.05 requires independent auditors to obtain written representations from management, including the CEO and CFO,  as a part of an audit of financial statements performed in accordance with generally accepted auditing standards, including but not limited to the names of all related parties and transactions with related parties, amounts receivable from or payable to related parties, and support for any assertion that a transaction with a related part was conducted on arm's-length terms.

---

19 This figure does not include the shares disposed of by David Ying Zhang's funds, Matrix Partners China II and Matrix Partners China II-A.

129.    AU333.08 specifically states that materiality considerations would not apply to those representations that are not directly related to amounts included in the financial statements, such as *amounts relating to related parties.*

130.    These representations are contained in what is known as a "management representation letter."[20]  Management representation letters are used to provide information to the auditors about matters that cannot be objectively tested because they depend on management's knowledge, such as management's intentions and the completeness of information provided to the auditor.

131.    Accordingly, Defendants Tang and Zhang knew that they each had an obligation to disclose the related party transactions to the auditors and in the financial statements because they were told as much by the auditor.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

132.    Plaintiffs bring this action as a class action pursuant to Rule 23 Federal Rule of Civil Procedure on behalf of themselves and all persons or entities that purchased or otherwise acquired Momo ADSs during the Class Period.[21]

133.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Momo ADSs were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be

---

20 The illustrative management representation letter provided by PCAOB under AU333.16 is incorporated herein by reference and can be found at
https://pcaobus.org/Standards/Archived/PreReorgStandards/Pages/AU333.aspx.
21 Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of Momo at all relevant times; members of such excluded persons' immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

134.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

135.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

136.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

> (a)   whether the Exchange Act were violated by Defendants' acts as alleged herein;
>
> (b)   whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and prospects of Momo;
>
> (c)   whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
>
> (d)   whether the Defendants caused Momo to issue false and misleading SEC filings and public statements during the Class Period;
>
> (e)   whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements;
>
> (f)   whether the prices of Momo ADSs during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

137.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

138.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made public misrepresentations or failed to disclose materials facts during the Class Period; (b) the false and misleading statements and/or omissions were material; (c) Momo ADSs traded in efficient markets during the Class Period.

Momo ADSs traded in efficient markets during the Class Period for the following reasons:

• Momo ADSs met the requirements for listing, and were listed and actively traded on NASDAQ, a highly efficient and automated market;

• On average more than 2% of Momo's total ADSs outstanding were traded weekly during the Class Period;

• As a public issuer, Momo filed periodic public reports with the SEC and NASDAQ;

• Momo regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- Momo was followed by numerous securities analysts employed by major brokerage firms, including Citi, Credit Suisse, J.P. Morgan, Morgan Stanley, Nomura, UBS, etc., who wrote reports that were widely distributed and publicly available;

- More than ten market makers made a market in Momo ADSs during the Class Period;

- Momo met the criteria for eligibility to file a S-3 Registration Statement during the Class Period;

- The price of Momo ADSs responded quickly to incorporate and reflect new public information concerning Momo during the Class Period.

Based on the foregoing, the market for Momo ADSs promptly digested current information regarding Momo from all publicly available sources and reflected such information in the prices of the shares, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

139.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

### COUNT I

#### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

140.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

141.    This Count, asserted against all Defendants, is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

142.    This Count is asserted against all defendants and is based upon Section 10(b) of the

Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

143.    During the Class Period, the engaged in a plan, scheme, conspiracy and course of

conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices

and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members

of the Class; made various untrue statements of material facts and omitted to state material facts

necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading; and employed devices, schemes and artifices to defraud in connection

with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class

Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as

alleged herein; (ii) artificially inflate and maintain the market price of Momo ADSs; and (iii) cause

Plaintiffs and other members of the Class to purchase or otherwise acquire Momo ADSs and

options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of

conduct, Defendants, and each of them, took the actions set forth herein.

144.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the

Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly

and annual reports, SEC filings, press releases, audit reports, and other statements and documents

described above, including statements made to securities analysts and the media that were designed

to influence the market for Momo ADSs. Such reports, filings, releases and statements were

materially false and misleading in that they failed to disclose material adverse information and

misrepresented the truth about Momo's finances and business prospects.

145.    By virtue of their positions at Momo, the Defendants had actual knowledge of the

materially false and misleading statements and material omissions alleged herein and intended

thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, the Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Defendants. Said acts and omissions of the Defendants were committed willfully or with reckless disregard for the truth. In addition, each of the Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

146.   Information showing that the Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the CEO and CFO of Momo, the Individual Defendants had knowledge of the details of Momo's internal affairs.

147.   Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Momo. As officers and/or directors of a publicly-held company, Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Momo's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price for Momo ADSs was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Momo's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Momo ADSs at artificially inflated prices and relied upon the price of the ADSs, the integrity of the market for the securities and/or upon statements disseminated by the Defendants, and were damaged upon the revelation of the alleged corrective disclosures.

148.    During the Class Period, Momo ADSs were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Momo ADSs at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said ADSs, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Momo ADSs was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Momo ADSs declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

149.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

150.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's ADSs during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

151.     During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

152.     The Company and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's ADSs during the Class Period.

153.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

154.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

155.    As a result of the foregoing, the market price of the Company's ADSs was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's ADSs during the Class Period in purchasing the Company's ADSs at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

156.    Had Plaintiffs and the other members of the Class been aware that the market price of the Company's ADSs had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's ADSs at the artificially inflated prices that they did, or at all.

157.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

158.    By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's ADSs during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

159.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

160.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the

conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

161.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

162.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's ADSs.

163.   Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

164.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a)     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class Representatives;

(b)     Awarding damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, together with interest thereon;

(c)     Awarding Plaintiffs and the other members of the Class prejudgment and post-interest; and

(d)     Awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: November 20, 2019            Respectfully submitted,

                                   **THE ROSEN LAW FIRM, P.A.**

                                   By: /s/ Laurence Rosen
                                   Laurence Rosen, Esq. (LR 5733)
                                   Phillip Kim, Esq. (PK 9384)
                                   Jing Chen, Esq. (JC 2908)
                                   Yu Shi, Esq. (YS 2182)
                                   275 Madison Avenue, 40th Floor
                                   New York, New York 10016
                                   Telephone: (212) 686-1060
                                   Fax: (212) 202-3827

                                   *Lead Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of November 2019, a true and correct copy of the foregoing AMENDED CLASS ACTION COMPLAINT was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ Laurence Rosen
Laurence Rosen