UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

RICHARD RUPP and RODRIGO LEAL,   :   19-cv-4433-GBD
Individually and on Behalf of All Others   :
Similarly Situated,   :
  :   **ECF Case**
  :   **Electronically Filed**
                        Plaintiff,   :
  :
          v.   :
  :
MOMO INC., YAN TANG, and   :
JONATHAN XIAOSONG ZHANG,   :
  :
                        Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANT MOMO INC.'S
MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**


SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Scott D. Musoff
Robert A. Fumerton
Michael C. Griffin
Four Times Square
New York, New York 10036
Phone:  (212) 735-3000

*Attorneys for Defendant Momo Inc.*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ...............................................................................................1

STATEMENT OF FACTS .......................................................................................................4

      A.     Momo's Businesses ....................................................................................4

      B.     Momo Extensively Discloses the Specific Risks of Its Business ...........................4

      C.     Talent Agencies Such as Beijing Mushang Form to Promote Performers ..............7

      D.     In May 2018, Momo Acquires Chinese Mobile Dating App Tantan ......................8

      E.     In April 2019, There Are Reports of Illicit User Content on Tantan,
            and Momo Implements Additional Enhanced Screening .......................................9

      F.     In May 2019, Plaintiffs File This Action as Momo's ADS Swiftly Rebounds .....10

ARGUMENT ..........................................................................................................................10

I.     PLAINTIFFS FAIL TO PLEAD ANY MISSTATEMENT OR ACTIONABLE
      OMISSION .................................................................................................................11

      A.     Plaintiffs Do Not Plead Any Misstatement or
            Actionable Omission About Content Screening ....................................................11

            1.     Momo's Disclosures Regarding Content Screening Were Accurate .........11

            2.     Momo Repeatedly Warned Its Procedures May Not Be Effective ............14

            3.     Plaintiffs Fail To Allege that Momo's Procedures Were
                Materially Ineffective Throughout the Putative Class Period....................15

      B.     Plaintiffs Do Not Plead Any Misstatement or
            Actionable Omission About Beijing Mushang ......................................................16

            1.     Plaintiffs Fail To Allege Facts Showing Momo
                and Beijing Mushang Were Related Parties .............................................17

            2.     Plaintiffs Fail To Allege Any Material
                Transaction Between Momo and Beijing Mushang...................................17

            3.     Plaintiffs Fail To Allege Momo's Subjective Accounting
                Judgments Were False, Unreasonable or Not Sincerely Held ...................19

i

II.      PLAINTIFFS FAIL TO PLEAD SCIENTER ....................................................................20

         A.      Plaintiffs Fail To Plead Motive and Opportunity ....................................................21

         B.      Plaintiffs Fail To Plead Conscious Misbehavior or Recklessness.........................22

III.     PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION ....................................................24

CONCLUSION.................................................................................................................................25

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Alaska Laborers Employers Retirement Fund v. Scholastic Corp.*,
No. 07 CV 7402 GBD, 2011 WL 3427208 (S.D.N.Y. Aug. 3, 2011) ..............................22

*In re AmTrust Financial Services, Inc. Securities Litigation*,
No. 17-CV-1545 (LAK), 2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019)...........................20

*In re Aratana Therapeutics Inc. Securities Litigation*,
315 F. Supp. 3d 737 (S.D.N.Y. 2018)...............................................................................21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...........................................................................................................21

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007).................................................................................................21

*Barilli v. Sky Solar Holdings, Ltd.*,
389 F. Supp. 3d 232 (S.D.N.Y. 2019)................................................................................13

*Barrett v. PJT Partners Inc.*,
No. 16-CV-2841 (VEC), 2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017)............................13

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007).............................................................................................................4

*Borochoff v. GlaxoSmithKline PLC*,
No. 07 Civ. 5574 (LLS), 2008 WL 2073421 (S.D.N.Y. May 9, 2008),
*aff'd sub nom. Avon Pension Fund v. GlaxoSmithKline PLC*,
343 F. App'x 671 (2d Cir. 2009) .......................................................................................22

*Brophy v. Jiangbo Pharmaceuticals, Inc.*,
781 F.3d 1296 (11th Cir. 2015) .........................................................................................18

*In re China Mobile Games & Entertainment Group, Ltd Securities Litigation*,
No. 14-CV-4471 (KMW), 2016 WL 922711 (S.D.N.Y. Mar. 7, 2016) .......................16, 17

*In re Citigroup, Inc. Securities Litigation*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004), *aff'd sub nom.*
*Albert Fadem Tr. v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006) ...........................13

*City of Cambridge Retirement System v. Altisource Asset Management Corp.*,
908 F.3d 872 (3d Cir. 2018)...............................................................................................18

*City of Roseville Employees' Retirement System v. Nokia Corp.*
No. 10 CV 967, 2011 WL 7158548 (S.D.N.Y. Sept. 6, 2011) ...............................14, 15, 24

*City of Taylor General Employees Retirement System v. Magna International Inc.*,
967 F. Supp. 2d 771 (S.D.N.Y. 2013).................................................................................22

*City of Warren Police & Fire Retirement System v. Foot Locker, Inc.*,
No. 18-CV-1492 (AMD) (SJB), 2019 WL 4752325 (E.D.N.Y. Sept. 30, 2019) ..............22

*In re Deutsche Bank Aktiengesellschaft Securities Litigation*,
No. 16-CIV-3495ATBCM, 2017 WL 4049253 (S.D.N.Y. June 28, 2017),
*aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*,
729 F. App'x 55 (2d Cir. 2018) ...........................................................................................13

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)..............................................................................18, 19, 20, 23

*Fait v. Regions Financial Corp.*,
655 F.3d 105 (2d Cir. 2011)................................................................................................19

*Gamm v. Sanderson Farms, Inc.*,
944 F.3d 455 (2d Cir. 2019)..........................................................................................10, 15

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011).................................................................................21

*Goldsmith v. Weibo Corp.*,
Civil Action No. 17-4728 (SRC), 2018 WL 2733694 (D.N.J. June 7, 2018)..............12, 14

*Harris v. AmTrust Financial Services, Inc.*,
135 F. Supp. 3d 155 (S.D.N.Y. 2015),
*aff'd*, 649 F. App'x 7 (2d Cir. 2016)......................................................................20, 24, 25

*In re Jumei International Holding Ltd. Securities Litigation*,
No. 14-cv-9826, 2017 WL 95176 (S.D.N.Y. Jan. 10, 2017) ...............................................1

*Kuriakose v. Federal Home Loan Mortgage Corp.*,
897 F. Supp. 2d 168 (S.D.N.Y. 2012),
*aff'd sub nom. Central States, Southeast & Southwest Areas Pension Fund v. Fed.*
*Home Loan Mortgage Corp.*, 543 F. App'x 72 (2d Cir. 2013).........................................20

*Lea v. TAL Education Group*,
No. 18 CIV. 5480 (LAP), 2019 WL 4688691 (S.D.N.Y. Sept. 25, 2019),
*appeal docketed*, No. 19-3549 (2d Cir. Oct. 25 2019).........................................17, 23, 24

*In re Lululemon Securities Litigation*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd,* 604 F. App'x 62 (2d Cir. 2015)..............15, 21

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014)................................................................................16

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund,*
    135 S. Ct. 1318 (2015)......................................................................................19

*Porwal v. Ballard Power Systems, Inc.*,
    No. 18 CIV. 1137 (GBD), 2019 WL 1510707 (S.D.N.Y. Mar. 21, 2019) ..................11, 25

*SEC v. Saltsman*,
    No. 07-CV-4370, 2016 WL 4136829 (E.D.N.Y. Aug. 2, 2016) ......................................18

*In re SINA Corp. Securities Litigation*,
    No. 05 CIV. 2154(NRB), 2006 WL 2742048 (S.D.N.Y. Sept. 26, 2006).........................14

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019).............................................................................13, 14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)......................................................................................20, 24

*Thomas v. Shiloh Industries, Inc.*,
    No. 15-cv-7449 (KMW), 2017 WL 1102664 (S.D.N.Y. Mar. 23, 2017)....................22, 23

*In re Travelzoo Inc. Securities Litigation*,
    Nos. 11 CIV. 5531 GBD, 11 Civ. 6845 GBD,
    2013 WL 1287342 (S.D.N.Y. Mar. 29, 2013) ...........................................................16, 22

## STATUTES

15 U.S.C. § 78j(b)..............................................................................................10

15 U.S.C. § 78u-4(b)(2) ........................................................................................1

## REGULATIONS

17 C.F.R. § 240.10b-5 (2019)................................................................................10

Defendant Momo Inc. ("Momo" or the "Company") respectfully submits this memorandum of law in support of its motion to dismiss the Amended Class Action Complaint (the "Amended Complaint" or "AC") pursuant to Rules 8(a), 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure and Section 101(b) of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(2) (the "PSLRA").[1]

## PRELIMINARY STATEMENT

This putative securities fraud class action is a classic attempt to plead fraud by hindsight, made even worse by the fact that the Company expressly disclosed the exact risks Plaintiffs now claim were concealed. The Company operates two leading mobile-based social and entertainment platforms ("apps") in the People's Republic of China ("China" or "PRC"): Momo, the Company's flagship product, most well known for its user-generated live streaming videos; and Tantan, a popular online dating app that the Company acquired in May 2018. In April 2019, a local Chinese newspaper alleged that certain users were soliciting prostitution on Tantan. Ten days later, PRC regulators temporarily suspended Tantan from the Android and Apple app stores (which temporarily prevented new downloads of the app) as part of an industry-wide regulatory review. Momo's stock fell approximately 25 percent.

The Tantan app was reinstated shortly thereafter, the Company faced no further regulatory action, and the stock price quickly rebounded. Plaintiffs nevertheless bring this action seeking to recoup their losses from the temporary drop by asserting two strained theories of securities fraud against the Company. First, Plaintiffs claim that each of the Company's annual reports over four years, from 2014 to 2018, misled investors about the Company's content

---

[1] Plaintiffs also assert claims against Momo's Chief Executive Officer ("CEO") Yan Tang and Chief Financial Officer ("CFO") Jonathan Xiaosong Zhang (the "Individual Defendants"), who have not been served. However, the Court may still dismiss the Amended Complaint in its entirety. *See, e.g.*, *In re Jumei Int'l Holding Ltd. Sec. Litig.*, No. 14-cv-9826, 2017 WL 95176, at *1 n.1, *6 (S.D.N.Y. Jan. 10, 2017) (Pauley, J.).

screening procedures and failed to disclose that certain users posted indecent or illegal content on Momo and/or Tantan.  Second, and completely unrelated, Plaintiffs claim that all of the Company's quarterly and annual reports since August 2017 (when it released its Q2 2017 results) were materially false or misleading because they failed to disclose purported related party transactions with a talent agency, Beijing Mushang, that recruits performers who generate content for the Momo app.  Both theories fail as a matter of law for multiple independent reasons.

First, Plaintiffs fail to allege any actionable misstatement or omission.  With respect to user content, each of the Company's annual reports described its screening procedures in detail. Plaintiffs do not claim these disclosures were false or that the Company did not employ the disclosed procedures.  Instead, Plaintiffs argue the Company's disclosures were tantamount to representations that it was "doing everything it could to comply with applicable laws and regulations" (AC ¶ 87) and was "adequately preventing violations" (*id.* ¶ 110).  But that assertion is conclusively refuted by the disclosures themselves, which make no such guarantees.  (*See infra* § I.A.1.)  To the contrary, each of the Company's challenged disclosures during the putative class period contained extensive warnings on this precise issue, such as:

> [W]e cannot be sure that our internal content control efforts will be sufficient to remove all content that may be viewed as indecent or otherwise non-compliant with PRC law and regulations[.] . . . [A]nd, irrespective of our efforts to control the content on our platform, government campaigns and other actions to reduce illicit content and activities could subject us to negative press or regulatory challenges and sanctions[.]

(*See, e.g.*, Ex. A, 2014 Form 20-F at 48.)[2]  Faced with these and other disclosures, no reasonable investor could have been misled.  (*See infra* § I.A.2.)  In any event, Plaintiffs fail to allege any substantial noncompliance at the time of any of the challenged statements.  (*See infra* § I.A.3.)

---

[2]    All exhibits are attached to the accompanying Declaration of Robert A. Fumerton, dated January 24, 2020.

Plaintiffs' allegations about supposed undisclosed related-party transactions fare no better.  Plaintiffs allege that a subsidiary of the Company acquired an interest in Beijing Mushang in 2017, and that Momo and Beijing Mushang have an exclusivity agreement, but that is insufficient to show that the Company had actual control or substantial influence over Beijing Mushang, as required to be considered a related party.  (*See infra* § I.B.1.)  Moreover, Plaintiffs fail to allege any specific transaction between the Company and Beijing Mushang, much less any "material" or "unusual" transactions required to trigger a duty to disclose.  (*See infra* § I.B.2.)  Moreover, these determinations involve complex accounting judgments that are not actionable absent allegations showing that the Company did not have a reasonable basis for its judgment, which Plaintiffs do not allege.  Regardless, Plaintiffs also fail to allege how the omission of such information would have been material to investors.  (*See infra* § I.B.3.)

Second, Plaintiffs' claims also fail because Plaintiffs do not allege facts giving rise to the requisite strong inference of scienter.  Plaintiffs cannot plead motive and opportunity to commit securities fraud based on just four stock sales by the Individual Defendants, which were made pursuant to Rule 10b5-1 plans and did not occur near the time of the relevant events.  And Plaintiffs' allegations about the stock sales of insiders who are not defendants and are not alleged to have known or participated in the events at issue are irrelevant.  (*See infra* § II.A.)  Plaintiffs' allegations of conscious misbehavior or recklessness likewise fail because Plaintiffs do not allege facts showing that the Individual Defendants knew or recklessly disregarded any specific information that was contrary to the Company's public disclosures.  (*See infra* § II.B.)

Third, Plaintiffs do not allege loss causation.  The April 2019 report of allegedly illicit activity on Tantan, and accompanying regulatory scrutiny, did not reveal that any prior statement by the Company was false.  Nor was it the materialization of an undisclosed risk.  To the

contrary, it was the materialization of a ***specifically disclosed*** risk.  Similarly, the short seller report on which Plaintiffs rely for their Beijing Mushang allegations did not reveal that any of the Company's prior financial statements were false or misleading, and in any event was expressly based only on public information, which cannot constitute a corrective disclosure. Thus, Plaintiffs have not plausibly alleged that their losses were caused by any purported misstatement or omission.  (*See infra* § III.)

For at least these reasons, and as explained in more detail below, all of Plaintiffs' claims fail as a matter of law and should be dismissed with prejudice.

## STATEMENT OF FACTS[3]

### A.      Momo's Businesses

Momo is one of China's leading social and entertainment mobile apps, which connects people and facilitates interactions based on location, interests and a variety of recreational activities including live talent shows, short videos, social games, live chats and mobile karaoke experiences.  (Ex. E, 2018 Form 20-F at 39; AC ¶ 4.)  Momo generates revenues from live video services, value-added services, mobile marketing services, mobile games and other services. (Ex. E, 2018 Form 20-F at 40.)  Momo's live video service, which allows users to purchase and send in-show virtual gifts to other users hosting live shows, currently contributes the largest share of revenues, generating 79.9% of net revenues in 2018.  (*Id.*)

### B.      Momo Extensively Discloses the Specific Risks of Its Business

In April 2014, eight months before the Company's initial public offering ("IPO") in December 2014, a newspaper alleged that Momo was a "hormone-filled" app that facilitated sex,

---

[3]      The facts described here are based on the well-pled facts in the AC, which are assumed to be true for the purpose of this motion only, and the documents incorporated by reference therein or otherwise integral to Plaintiffs' allegations. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 564 (2007) (on a motion to dismiss, court assumes all well-pled facts are true but not conclusory assertions or legal conclusions).

helped sex workers find customers and led to sexual assaults.  (AC ¶ 31.)  Plaintiffs allege that

PRC regulators subsequently fined the Company 60,000 RMB (approximately $8,700) and ordered

it to remove offending content, submit a rectification report and publicly apologize.  (*Id.*)

As the April 2014 incident highlights, the Company's business faces two key related

risks: (i) it depends on user-generated content that it cannot fully control and (ii) that content is

closely regulated and scrutinized by PRC regulators.  Accordingly, the Company extensively

disclosed these exact risks to its investors in each annual report that Plaintiffs now challenge:

> ***User misconduct and misuse of our platform may adversely impact our brand image, and we may be held liable for information or content displayed on, retrieved from or linked to our platform, which may materially and adversely affect our business and operating results.***
>
> Our platform allows mobile users to freely contact and communicate with people nearby, and our live video service allows users to host and view live shows. **<u>Because we do not have full control over how and what users will use our platform to communicate, our platform may be misused by individuals or groups of individuals to engage in immoral, disrespectful, fraudulent or illegal activities</u>**. . . . **<u>We have implemented control procedures to detect and block illegal or inappropriate content and illegal or fraudulent activities conducted through the misuse of our platform, but such procedures may not prevent all such content from being broadcasted or posted or activities from being carried out</u>**. Moreover, as we have limited control over real-time and offline behaviors of our users, to the extent such behaviors are associated with our platform, our ability to protect our brand image and reputation may be limited. Our business and the public perception of our brand may be materially and adversely affected by misuse of our platform.
>
> . . . **<u>In response to allegations of illegal or inappropriate activities conducted through our platform or any negative media coverage about us, PRC government authorities may intervene and hold us liable for non-compliance with PRC laws and regulations concerning the dissemination of information on the internet and subject us to administrative penalties or other sanctions</u>**, such as requiring us to restrict or discontinue some of the features and services provided on our mobile application. . . . As a result, our business may suffer, our user base, revenues and profitability may be materially and adversely affected, and the price of our ADSs may decline.

(Ex. A, 2014 Form 20-F at 9 (underlined emphases added).)[4]

> ***Content posted or displayed on our social networking platform, including the live video shows hosted by us or our users, may be found objectionable by PRC regulatory authorities and may subject us to penalties and other severe consequences.***
>
> . . .
>
> We have designed and implemented procedures to monitor content on our social networking platform, including the live video shows hosted by us or our users, in order to comply with relevant laws and regulations. However, **it may not be possible to determine in all cases the types of content that could result in our liability as a distributor of such content and, if any of the content posted or displayed on our social networking platform is deemed by the PRC government to violate any content restrictions, we would not be able to continue to display such content and could become subject to penalties**[.]
>
> We may also be subject to potential liability for any unlawful actions by our users on our platform. . . . **Although we have adopted internal procedures to monitor content and to remove offending content once we become aware of any potential or alleged violation, we may not be able to identify all the content that may violate relevant laws and regulations** or third-party intellectual property rights. . . .

(*Id.* at 24 (underlined emphases added).)[5]

Moreover, the Company provided specific detail on its procedures for screening offensive or illegal content:

> **[W]e have a dedicated team of over 100 personnel reviewing and handling content on our mobile platform for compliance with applicable laws and regulations. They are aided by both proprietary and third-party software and technologies to sweep our platform and the data being transmitted on a real-time basis around-the-clock**. We monitor and screen user information and user generated content against a spam list, which is a list of content and behaviors that we have determined are likely to be indicative of inappropriate or illegal content or illegal activities. . . .

---

[4]    (*See also* Ex. B, 2015 Form 20-F at 9; Ex. C, 2016 Form 20-F at 8-9; Ex. D, 2017 Form 20-F at 7-8.; Ex. E, 2018 Form 20-F at 10.)

[5]    (*See also* Ex. B, 2015 Form 20-F at 21; Ex. C, 2016 Form 20-F at 22-23; Ex. D, 2017 Form 20-F at 22; Ex. E, 2018 Form 20-F at 8-9.)

6

(*Id.* at 48 (emphasis added).)[6]

Yet, again, the Company cautioned investors that it could not guarantee these efforts would be 100% effective and, if they are not, this could "dramatically reduce" the price of its ADSs:

> Although we employ these methods to filter our users and content posted by our users, **we cannot be sure that our internal content control efforts will be sufficient to remove all content that may be viewed as indecent or otherwise non-compliant with PRC law and regulations**. . . . The Chinese government has wide discretion in regulating online activities and, irrespective of our efforts to control the content on our platform, government campaigns and other actions to reduce illicit content and activities could subject us to negative press or regulatory challenges and sanctions[.] . . . **If government actions or sanctions are brought against us, or if there are widespread rumors that government actions or sanctions have been brought against us, our reputation could be harmed, we may lose users, customers or platform partners, our revenues and results of operation may be materially and adversely affected and the price of our ADSs could be dramatically reduced.**

(*Id.* at 23 (emphases added).)[7]

The Company also disclosed that it has been subject to "negative publicity about . . . the misuse of [its] services, which has adversely affected [its] brand, public image and reputation." (*Id.* at 8.)[8]

## C.    Talent Agencies Such as Beijing Mushang Form to Promote Performers

With the explosion of the virtual gifts market into a billion-dollar industry, entrepreneurs formed talent agencies to discover, hire, train and promote performers. (AC ¶ 5.) On the Company's Q3 2017 earnings call, company executives explained:

> [W]e are working more closely with the professional agencies in talent discovery and management, optimizing our incentive plans and making them better motivated

---

[6]    (*See also* Ex. B, 2015 Form 20-F at 43 (150 screening personnel); Ex. C, 2016 Form 20-F at 43 (350 screening personnel); Ex. D, 2017 Form 20-F at 41 (550 screening personnel); Ex. E, 2018 Form 20-F at 44 (1,126 screening personnel).)

[7]    (*See also* Ex. B, 2015 Form 20-F at 21; Ex. C, 2016 Form 20-F at 22; Ex. D, 2017 Form 20-F at 21; Ex. E, 2018 Form 20-F at 23.)

[8]    (*See also* Ex. B, 2015 Form 20-F at 8; Ex. C, 2016 Form 20-F at 8; Ex. D, 2017 Form 20-F at 7; Ex. E, 2018 Form 20-F at 10.)

to help us improve the content quality and diversity. Moreover, we are planning to go deeper with our exploration in the area of professional entertainment content production and distribution both within and beyond the Momo platform.

(Ex. F, Q3 2017 Earnings Call at 7; *see* AC ¶ 68.)  One such agency is Beijing Mushang Culture Media Company Limited ("Beijing Mushang").  (AC ¶ 8.)[9]

On June 27, 2018, short seller Spruce Point issued a report (the "Spruce Point Report") stating that a subsidiary of the Company acquired a 19 percent interest in Beijing Mushang in November 2017 for RMB 230,000 (approximately $35,000).  (Ex. J, Spruce Point Report at 10, 22, 28; AC ¶ 10.)  The Spruce Point Report instructs readers to "assume" that Spruce Point "has a short position" in Momo and "stand[s] to realize significant gains in the event that the price of its stock declines."  (Ex. J, Spruce Point Report at 2.)  The Spruce Point Report also states that it is based solely on "publicly available information."  (*Id.*)

### D.    In May 2018, Momo Acquires Chinese Mobile Dating App Tantan

In May 2018, the Company expanded its business by acquiring Tantan, a leading Chinese mobile dating app.  (Ex. E, 2018 Form 20-F at 39.)  Like similar apps such as Tinder, users on Tantan pick usernames, set up profiles and post pictures of themselves in hopes of attracting other users for social or romantic relationships.  (AC ¶ 12.)  Tantan is free to use, but users may purchase premium subscriptions and other value-added services.  (*Id.* ¶ 76.)

Plaintiffs do not allege any misuse of the Momo or Tantan platforms between April 2014 and April 2019.   During that time, as the apps grew in popularity, so did the Company's staff of content screeners.  As of April 2019, the Company reported that "Momo and Tantan collectively have a dedicated team of over 1,126 personnel reviewing and handling content on our mobile

---

[9]    These performers enter a service agreement with Momo, which governs the content that they provide on the Momo app in an effort to ensure compliance with Momo's quality standards and with all applicable regulations.  (AC ¶¶ 8, 59, 62.)

platform for compliance with applicable laws and regulations." (Ex. E, 2018 Form 20-F at 10.)

In other words, the Company's content screening team increased more than tenfold since 2014

(when it was a team of 100).

### E.   In April 2019, There Are Reports of Illicit User Content on Tantan, and Momo Implements Additional Enhanced Screening

On April 19, 2019, a local newspaper, from the city of Nanchang in China's Jiangxi

Province, published an article claiming sex workers use Tantan to solicit customers. (Ex. K,

Nanchang Article; AC ¶¶ 14, 84.) The next trading day, April 22, 2019, the Company's ADS price

*increased* slightly from $35.67 to $36.26. (Ex. I, Stock Prices.)

On April 29, 2019, the Company announced that "certain mobile app stores in China have

removed the Tantan mobile app on direction of governmental authorities in China." (Ex. G,

4/29/19 Press Release; AC ¶¶ 15, 84.) The Company further explained:

> The Company is proactively communicating with the relevant government authorities and intends to fully cooperate with such authorities in order to restore the availability of the Tantan mobile app in the subject mobile app stores as soon as possible. The Company also plans to conduct a comprehensive internal review of the content in the Tantan mobile app and undertake other measures necessary to stay in full compliance with all relevant laws and regulations. Pending restoration of the Tantan app in the relevant app stores in China, the Company's ability to attract new Tantan users will be adversely affected, while existing Tantan users may continue to use the app.

(Ex. G, 4/29/19 Press Release; AC ¶ 87.) The Company's ADS price fell 6.81% from $36.87 to

$34.36. (Ex. I, Stock Prices; AC ¶¶ 15, 86.)

On May 10, 2019—the last day of the putative class period—the Company issued another

press release announcing that, as directed by the government, it would undertake a one-month

"self-inspection" beginning May 11, 2019 to implement "internal measures aimed at

strengthening its content screening efforts." (Ex. H, 5/10/19 Press Release; AC ¶¶ 16, 88.)

During that month, users would not be able to post new content to Momo's or Tantan's social

9

newsfeeds. (Ex. H, 5/10/19 Press Release; AC ¶¶ 16, 88.) The same day, Momo's ADS price fell 10.3% from $32.29 to $28.97. (Ex. I, Stock Prices; AC ¶¶ 16, 88.)

**F.     In May 2019, Plaintiffs File This Action as Momo's ADS Swiftly Rebounds**

This action was filed five days later on May 15, 2019. (ECF No. 1.) By that time, the Company's ADS price had already begun to bounce back. By the end of the one-month self-inspection on June 11, 2019, the Company's ADS price had increased to $31.89. (*Id.*) In the 90 days following the end of the putative class period, the average ADS price was $31.95. (*Id.*) Plaintiffs assert claims under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all purchasers of Company's ADS from April 20, 2015 through May 10, 2019.

## ARGUMENT

To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). Mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" are insufficient. *Id.* To state a claim under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (2019), Plaintiffs must adequately plead that Defendants: "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 463 (2d Cir. 2019) (citation omitted). Such allegations must also satisfy the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and PSLRA, which require Plaintiffs to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were

10

fraudulent," as well as "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Porwal v. Ballard Power Sys., Inc.*, No. 18 CIV. 1137 (GBD), 2019 WL 1510707, at \*4 (S.D.N.Y. Mar. 21, 2019) (Daniels, J.) ("*Ballard Power*") (citations omitted).

## I.    PLAINTIFFS FAIL TO PLEAD ANY MISSTATEMENT OR ACTIONABLE OMISSION

Plaintiffs claim that (i) every one of the Company's annual reports since April 2015 (when Momo filed its 2014 Form 20-F) was materially false or misleading because Momo's content screening procedures were not 100% effective (AC ¶ 110); and (ii) every one of the Company's quarterly and annual reports since August 2017 (when Momo released its Q2 2017 results) was materially false or misleading because it failed to disclose transactions with Beijing Mushang as related-party transactions (*id.* ¶¶ 98, 102-03).  Neither theory withstands scrutiny.

### A.    Plaintiffs Do Not Plead Any Misstatement or Actionable Omission About Content Screening

The Company's disclosures about its content screening were not false or misleading for at least three reasons: (i) they were accurate; (ii) they repeatedly warned that the Company's procedures may not always be effective; and (iii) Plaintiffs do not allege facts showing the procedures were materially ineffective throughout the putative class period.

#### 1.    Momo's Disclosures Regarding Content Screening Were Accurate

As an initial matter, Plaintiffs do not claim that the Company's description of its content screening was inaccurate.  Instead, Plaintiffs mischaracterize the Company's disclosures and attribute statements to Defendants that they never made.  For example, Plaintiffs claim the Company's Form 20-Fs "sought to reassure investors that risk of government intervention was relatively minimal," (AC ¶ 2), "boasted to investors of the extraordinary lengths it takes to moderate content so that it would not face greater consequences," (*id.* ¶ 11), "assured investors

11

that Momo would quickly identify new patterns of illicit activity," (*id.* ¶ 79), represented that "it had robust content screening capabilities in place and was already doing everything it could to comply with applicable laws and regulations," (*id.* ¶ 87), and "reassure[d] investors that it's now adequately preventing violations after being called out by the Chinese government in 2014," (*id.* ¶ 110).  But the actual statements Plaintiffs challenge contained no such guarantees or assurances.  It is axiomatic that "[a] securities fraud claim based on purported statements that a defendant did not actually make fails, necessarily, to state a claim upon which relief can be granted."  *Goldsmith v. Weibo Corp.*, Civil Action No. 17-4728 (SRC), 2018 WL 2733694, at *9 (D.N.J. June 7, 2018) ("*Weibo*") (dismissing securities fraud claims premised on statements about Chinese company's regulatory compliance where company's actual disclosures were not "even remotely similar to the language used in the allegations," which "seem to be no more than mere hyperbole used to bolster Plaintiff's 'false impression' theory of fraud").

In reality, the Company's disclosures merely provided an accurate description of its controls:

> As of the date of this annual report, we have a dedicated team of over 100 personnel reviewing and handling content on our mobile platform for compliance with applicable laws and regulations. They are aided by both proprietary and third-party software and technologies to sweep our platform and the data being transmitted on a real-time basis around-the-clock. We monitor and screen user information and user generated content against a spam list, which is a list of content and behaviors that we have determined are likely to be indicative of inappropriate or illegal content or illegal activities.

(*See, e.g.*, Ex. A, 2014 Form 20-F.)  Plaintiffs do not allege that this description—which appeared virtually unchanged in each of the Company's 20-F filings for 2014 to 2018 (AC ¶¶ 106-09)[10]—was inaccurate.  They do not claim, for instance, that the Company misrepresented the size of its screening team or did not use proprietary and third-party software and technologies

---

[10]    The only material change was the size of Momo's screening staff, which rose to 1,126 by 2018.  (*Id.* ¶ 105.)

to provide around-the-clock monitoring.  And to the extent Plaintiffs suggest the Company may not "have a 'spam list' at all," (AC ¶ 82), they plead no factual basis for that assertion.

Thus, Plaintiffs' theory ultimately boils down to the contention that the Company's disclosures must have been misleading because some inappropriate content allegedly went undetected.  But without more, that does not plausibly indicate that the Company made false disclosures regarding its controls.  Courts have repeatedly held that otherwise accurate descriptions of internal controls are not rendered false or misleading if those controls are not 100 percent effective.  *See, e.g.*, *Singh v. Cigna Corp.*, 918 F.3d 57, 60, 63 (2d Cir. 2019) ("*Cigna*") ("[A] reasonable investor would not rely on [statements that company was 'subject to . . . numerous and complex regulations' and had 'established policies and procedures to comply with applicable requirements'] as representations of satisfactory compliance."); *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 254 (S.D.N.Y. 2019) (Swain, J.) ("[S]tatements regarding the introduction of internal controls do not, standing alone, constitute assertions that the controls are adequate, nor does a subsequent circumvention of such controls support an inference that descriptive statements about the implementation of such controls were false."); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 379 (S.D.N.Y. 2004) (Swain, J.) ("Many of the risk management passages quoted in the Complaint describe processes[,]" which plaintiff do not allege "were false or misleading at the time they were included in the public statements, nor facts showing that the processes were not followed."), *aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006).[11]

---

[11]    *See also Barrett v. PJT Partners Inc.*, No. 16-CV-2841 (VEC), 2017 WL 3995606, at *1 (S.D.N.Y. Sept. 8, 2017) (Caproni, J.) ("Plaintiff appears to be proceeding on the premise that because Caspersen did bad things while employed by PJT, its statements regarding the existence of its internal controls that are designed and intended to prevent fraud are per se false. That is simply not the case."); *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, No. 16-CIV-3495ATBCM, 2017 WL 4049253, at *7 (S.D.N.Y. June 28, 2017) (Torres, J.) ("[A]lthough there is evidence that the Bank's AML and KYC procedures were deficient at identifying the

13

### 2.      Momo Repeatedly Warned Its Procedures May Not Be Effective

Moreover, in addition to accurately describing its content screening procedures, the Company repeatedly cautioned investors of the *exact* risks that Plaintiffs claim materialized in April 2019—namely, that (i) those procedures may not be effective; (ii) any indecent or illegal user posts could subject the Company to sanctions, fines and negative press; and (iii) such events could "dramatically reduce" the price of the Company's ADS.  (*See supra* at 5-8 (quoting risk disclosures).)  As this Court held in *City of Roseville Employees' Retirement System v. Nokia Corp.*, "[n]o reasonable investor could have been misled from these disclosures into thinking that the risks . . . did not actually exist or could not have adverse effects on [the company]."  No. 10 CV 967, 2011 WL 7158548, at *5 (S.D.N.Y. Sept. 6, 2011) (Daniels, J.) (dismissing securities fraud claims on this basis); *see also Cigna*, 918 F.3d at 64 ("If anything, these statements seem to reflect [company's] uncertainty as to the very possibility of maintaining adequate compliance mechanism[s] in light of complex and shifting government regulations."); *Weibo*, 2018 WL 2733694, at *10 ("Taking the relevant disclosures made in the SEC filings as a whole, no reasonable investor could interpret Defendants' statement as creating a 'false impression' that Weibo [was in compliance with, or exempted from, PRC regulations]."); *In re SINA Corp. Sec. Litig.*, No. 05 Civ. 2154(NRB), 2006 WL 2742048, at *9 (S.D.N.Y. Sept. 26, 2006) (Buchwald, J.) (dismissing allegations of fraud based on regulatory actions over objectionable conduct where "SINA extensively warned its investors about the peril of potential government restrictions and the risks involved" and "acknowledged candidly and repeatedly—before, during, and at the end of the Class Period—that it could not predict the actions of the Chinese government").

---

mirror trades, statements concerning the adequacy of the Bank's internal controls are not actionable."), *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018).

### 3.   Plaintiffs Fail to Allege that Momo's Procedures Were Materially Ineffective Throughout the Putative Class Period

Finally, Plaintiffs' claims also fail because they do not allege particularized facts showing that the Company's screening was in fact materially defective throughout the four-year putative class period.  As the Second Circuit recently confirmed, "when a complaint claims that statements were rendered false or misleading through the nondisclosure of illegal activity, the facts of those underlying illegal acts must also be pleaded with particularity."  *Gamm*, 944 F.3d at 458.  Moreover, it is black letter law that "[a] violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false ***at the time it was made***."  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (Forrest, J.) (emphasis in original), *aff'd,* 604 F. App'x 62 (2d Cir. 2015).

Here, Plaintiffs only allege inappropriate user posts on Tantan in April 2019—at the very end of the four-year putative class period.  (*See* AC ¶¶ 14, 82.)  These reports have no bearing on the accuracy of the Company's challenged disclosures in 2015, 2016, 2017 or 2018.  *See Nokia*, 2011 WL 7158548, at *5 ("Plaintiff's factual allegations do not demonstrate [the] risk had already transpired and was not disclosed at the time any of the statements at issue were made.")  Plaintiffs' lone conclusory assertion that "[d]uring the Class Period, the Momo and Tantan apps were full of sex workers advertising their services" is devoid of any factual support, let alone the requisite particularized factual support.  (AC ¶ 81.)  Indeed, Plaintiffs do not provide allegations regarding any inappropriate posts on the Momo app at any time during the putative class period (the Nanchang article was about Tantan only).  Thus, Plaintiffs have not alleged any then-existing substantial deficiency in the Company's content screening.  At best, they have suggested that in April 2019 the Company's screening was not perfectly effective (as it had always warned might be the case).  As this Court has made clear, "'[t]he securities laws were not designed to

15

provide an umbrella cause of action for the review of management practices, nor is 'fraud by hindsight' a viable basis upon which to challenge management practices that ultimately result in losses.'" *In re Travelzoo Inc. Sec. Litig.*, Nos. 11 Civ. 5531 GBD, 11 Civ. 6845 GBD, 2013 WL 1287342, at *7 (S.D.N.Y. Mar. 29, 2013) (Daniels, J.) (citations omitted).[12]

**B.      Plaintiffs Do Not Plead Any Misstatement or Actionable Omission About Beijing Mushang**

Plaintiffs' allegations that the Company did not disclose supposed related-party transactions with Beijing Mushang also fail to state a claim for multiple reasons.  "Omissions are actionable only if the defendant has a duty to disclose the information and fails to do so." *In re China Mobile Games & Entm't Grp., Ltd Sec. Litig.*, No. 14-CV-4471 (KMW), 2016 WL 922711, at *4 (S.D.N.Y. Mar. 7, 2016) (Wood, J.) ("*China Mobile*") (citation omitted) (dismissing securities fraud claims premised on purported failure to disclose related-party transactions).  Here, Plaintiffs fail to allege facts sufficient to show that the two companies are related under the accounting rules they cite.  And, even if the two companies could be considered related, Plaintiffs fail to allege any material or unusual transaction with Beijing Mushang that would require disclosure.  Plaintiffs also fail to allege facts showing that Momo's subjective accounting judgments about Beijing Mushang were false, unreasonable or not sincerely held.  And in any event, Plaintiffs do not allege how the lack of disclosure about Beijing Mushang was material to investors or could have rendered any of the Company's disclosures misleading.

---

[12]   Plaintiffs' failure to allege facts showing substantial noncompliance at the time of the challenged statements distinguishes this case from those where shareholders have adequately alleged that statements about compliance efforts were materially misleading.  *See, e.g.*, *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (plaintiffs adequately pled solar company's "description of pollution-preventing equipment and 24-hour monitoring teams" were materially misleading based on allegations showing "in fact the equipment and 24-hour team were ***then failing*** to prevent ***substantial violations*** of the Chinese regulations," which the company privately disclosed to regulators just two weeks after its public offering and ultimately led to violent protests and regulators shutting down the company's plant) (emphasis added).

16

1.      **Plaintiffs Fail To Allege Facts Showing Momo
and Beijing Mushang Were Related Parties**

Plaintiffs assert that "[a] Momo subsidiary acquired an 18.75% interest in Beijing Mushang in March 2017." (AC ¶ 58.) But this, without more, does not establish Beijing Mushang was a related party. *See Lea v. TAL Educ. Grp.*, No. 18 CIV. 5480 (LAP), 2019 WL 4688691, at *4-6 (S.D.N.Y. Sept. 25, 2019) (Preska, J.) (30 percent interest in company was insufficient to establish relatedness for securities fraud claims based on purported failure to disclose related-party transactions), *appeal docketed*, No. 19-3549 (2d Cir. Oct. 25, 2009).

Plaintiffs' allegations, based on purported confidential witnesses, that Beijing Mushang has an exclusivity agreement with the Company and requires performers to abide by Momo's policies when broadcasting on the platform, also fail to show the Company controlled Beijing Mushang. (*See* AC ¶ 59.) The accounting rules on which Plaintiffs rely (*id.* ¶¶ 49-51) define control as "[t]he possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity through ownership, by contract, or otherwise." (Ex. L, ASC 850-10-20.) Plaintiffs do not allege facts showing that Momo had the ability to "direct" Beijing Mushang's management or policies. At most, the form service agreement Plaintiffs cite shows that Momo had some control over the performers on its platform. (AC ¶¶ 61-62.) *See In re China Mobile*, 2016 WL 922711, at *6 (plaintiffs failed to allege a related-party transaction with sufficient particularity where "there [were] no documents and no reference to facts that would support the allegation" of relatedness).

2.      **Plaintiffs Fail To Allege Any Material
Transaction Between Momo and Beijing Mushang**

Separate and apart from whether Beijing Mushang was a related party, Plaintiffs also fail to allege any unusual or material transactions between Momo and Beijing Mushang. (*See* AC ¶¶ 57-63.) A company must disclose related party transactions only if they are "material" or

17

"unusual in their nature or conditions." (*Id.* ¶ 42 (quoting Item 7.B of Form 20-F); *see also id.* ¶ 49 ("GAAP . . . requires disclosure of all ***material transactions*** between Momo[] and related parties." (emphasis added)); *id.* ¶ 56 ("investors reasonably expect that ***major transactions*** with related parties are disclosed" (emphasis added)).)  Plaintiffs offer a single chart that purports to show "Beijing Mushang Operating [R]evenue" and "Estimated Momo Revenue From Beijing Mushang" for 2017 and 2018.  (*Id.* ¶ 70.)  But Plaintiffs do not explain where these numbers come from, including what "operating revenue" consists of, why that is a relevant metric or how Plaintiffs supposedly "estimated" Momo's revenue.  They appear to have simply taken Beijing Mushang's purported operating revenue and divided it by two-thirds.  But Plaintiffs provide no allegations showing a factual basis for that assumption.

Plaintiffs' failure to allege any material transaction between Momo and Beijing Mushang is fatal to their claims.  *See ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 202 & n.8 (2d Cir. 2009) (bank's failure to disclose transactions with a special purpose entity it created and controlled was not actionable because plaintiffs failed to allege transactions were material); *SEC v. Saltsman*, No. 07-CV-4370(NGG)(RML), 2016 WL 4136829, at *14 (E.D.N.Y. Aug. 2, 2016) (Garaufis, J.) ("[e]ven at the motion to dismiss stage," SEC's failure to specify which transactions were related-party transactions "is insufficient").[13]

More broadly, Plaintiffs also fail to allege how any omission of transactions with Beijing Mushang, even if true, would have been material to investors or would have rendered the Company's actual disclosures false or misleading.  While Plaintiffs claim this alleged omission

---

[13]    *See also City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 883 (3d Cir. 2018) ("By not identifying a single . . . transaction in which Erbey improperly participated, the complaint attempts to establish falsity through the very sort of 'speculative fraud by hindsight that the [PSLRA] was intended to eliminate.'") (citation omitted); *Brophy v. Jiangbo Pharm., Inc.*, 781 F.3d 1296, 1306 (11th Cir. 2015) ("We agree with the district court that the lack of information in the complaint concerning the timing of the [purported related-party] transaction is fatal to the allegation that it was a material omission in Jiangbo's SEC filings.").

was an "implicit assurance[] that [Beijing Mushang] was an unrelated third party," which "served to suggest that Momo might well escape liability should the government sanction Beijing Mushang," (AC ¶ 7), this contravenes the very accounting standards Plaintiffs cite, which require disclosure only of material transactions. Moreover, Plaintiffs do not allege that Beijing Mushang *was* ever sanctioned by the government or engaged in any improper conduct that would give rise to such a risk. There are simply no facts alleged to suggest that any disclosure relating to Beijing Mushang would have mattered to investors one way or the other. *See ECA*, 553 F.3d at 202 n.8 ("[A] failure to adequately plead that the related party transaction was material for purposes of [accounting rules] . . . is also a failure to plead materiality for purposes of section 10(b) and Rule 10b-5.").

### 3. Plaintiffs Fail To Allege Momo's Subjective Accounting Judgments Were False, Unreasonable or Not Sincerely Held

In any event, Plaintiffs cannot substitute their own judgment as to the validity of Momo's decision to include or not include Beijing Mushang in its disclosures, absent allegations that the Company's judgments were false and not sincerely believed when made. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015). Subjective accounting judgments are statements of opinion. *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 111 (2d Cir. 2011). The very rules Plaintiffs cite confirm as much. For example, ASC 850-10-50-1, on which Plaintiffs rely (AC ¶¶ 49-51), recognizes that "[d]etermining the ability of an investor to exercise significant influence is not always clear and applying judgment is necessary to assess the status of each investment." (Ex. L, ASC 850-10-50-1.) As the Second Circuit has explained:

> "[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. . . . Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient."

19

*Novak*, 216 F.3d at 309 (internal quotation marks omitted). Even if there was a GAAP violation, that corresponding evidence is missing here.

*ECA*, 553 F.3d at 200.

"In the absence of a restatement or allegations pointing to objective facts that Defendants' accounting methods violated GAAP, carping about Defendants' application of GAAP amounts to no more than a "'naked assertion" devoid of "further factual enhancement'"; it does not permit the Court to infer that the Defendants committed accounting fraud." *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 172 (S.D.N.Y. 2015) (Caproni, J.) (citations omitted), *aff'd*, 649 F. App'x 7 (2d Cir. 2016). Momo has never issued a restatement or corrective disclosure regarding Beijing Mushang. And Plaintiffs point to no facts whatsoever evincing fraudulent intent. Plaintiffs' inability to point to objective facts undermining the Company's accounting judgments defeats any claim of fraud. *See In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17-CV-1545 (LAK), 2019 WL 4257110, at *14-17 (S.D.N.Y. Sept. 9, 2019) (Kaplan, J.) (dismissing securities claims premised on accounting judgments because plaintiffs failed to allege those judgment were not sincerely believed); *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 181 (S.D.N.Y. 2012) (Keenan, J.) ("[T]he Court will not intervene in a business and accounting judgment simply because [plaintiffs] reached different conclusions than [the company's] accountants."), *aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013).

## II.   PLAINTIFFS FAIL TO PLEAD SCIENTER

Plaintiffs' claims fail for the separate and independent reason that they do not allege particularized facts giving rise to the requisite "strong inference" of scienter. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309 (2007). The inference must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* Plaintiffs may plead

20

scienter by alleging (i) "motive and opportunity" to commit fraud, or (ii) "strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  Here, Plaintiffs fail on both scores.

### A.   Plaintiffs Fail To Plead Motive and Opportunity

Plaintiffs' motive and opportunity allegations consist solely of alleged stock sales by Company insiders.  (AC ¶¶ 111-25.)  Plaintiffs point to just two sales by each of the Individual Defendants (Mr. Tang, Momo's co-founder and CEO, and Mr. Zhang, Momo's CFO) during the four-year putative class period.  (AC ¶¶ 112-13; *see also id.* ¶¶ 24-25.)  These allegations are insufficient for multiple reasons.

First, Plaintiffs fail to allege what, if any, profit the Individual Defendants made on any of the sales; instead, they allege only the gross proceeds.  This alone renders the allegations inadequate.  *See In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 762 n.12 (S.D.N.Y. 2018) (Engelmayer, J.) ("Plaintiffs' failure to allege defendants' profits would itself be a sufficient basis to reject an inference of motive."); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011) (Holwell, J.) ("allegations demonstrat[ing] only gross proceeds without identifying net profits . . . say nothing about a seller's motive").

Second, all four alleged sales were made pursuant to Rule 10b5-1 plans, which Plaintiffs do not allege were themselves suspicious.  (AC ¶¶ 112-13.)  This too, by itself, defeats Plaintiffs' claims.  *See Aratana Therapeutics*, 315 F. Supp. 3d at 764 ("[A]s a general matter, '[t]rades made pursuant to a Rule 10b5-1 trading plan do not give rise to a strong inference of scienter.'" (citation omitted)); *Lululemon*, 14 F. Supp. 3d at 585 (no inference of scienter where plaintiff "pleads no facts that even remotely suggest that [defendant] entered into the [Rule 10b5-1] Plan 'strategically' so as to capitalize on insider knowledge").

21

Third, Plaintiffs do not claim the sales had anything to do with the purported misstatements here. Plaintiffs do not allege the sales occurred near the time of any of the relevant events here or coincided with any meaningful movement in the Company's ADS price. *See City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 800 (S.D.N.Y. 2013) (Buchwald, J.) (no inference of scienter where defendants did not sell stock "at the end of the putative class period, when insiders would have 'rushed to cash out'" (citation omitted)).

In sum, Plaintiffs' attempt to allege that motive and opportunity falls far short even of other cases where this Court has found insider sales insufficient to give rise to a strong inference of scienter. *See, e.g.*, *In re Travelzoo*, 2013 WL 1287342, at *10 (no inference of scienter despite allegations that founder, who had never before sold stock, sold $186 million worth during the class period, CEO sold all of his stock and another director sold 95% of her stock).[14]

## B. Plaintiffs Fail to Plead Conscious Misbehavior or Recklessness

Where, as here, Plaintiffs fail to allege scienter through motive and opportunity, allegations "demonstrating persuasive circumstantial evidence of conscious misbehavior or recklessness . . . 'must be correspondingly greater[.]'" *Thomas v. Shiloh Indus., Inc.*, No. 15-CV-7449 (KMW), 2017 WL 1102664, at *3 (S.D.N.Y. Mar. 23, 2017) (Wood, J.) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)). Plaintiffs must allege facts showing "conduct so highly unreasonable that it constitutes 'an extreme departure from the standards of

---

[14] Plaintiffs also allege stock sales over the four-year putative class period by various other purported insiders who are not named as defendants here nor alleged to have participated in or known of the purported misstatements. (*See* AC ¶¶ 114-24.) Such allegations are irrelevant, as this Court and others have repeatedly held. *See Alaska Laborers Emp'rs Ret. Fund v. Scholastic Corp.*, No. 07 CV 7402 (GBD), 2011 WL 3427208, at *2 (S.D.N.Y. Aug. 3, 2011) (Daniels, J.) ("substantial amount of stock sold by non-defendant insiders" did not support inference of scienter where plaintiff did not allege "the Individual Defendants engaged in any misconduct with the non-defendant insiders"); *accord City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, No. 18-CV-1492(AMD)(SJB), 2019 WL 4752325, at *13 (E.D.N.Y. Sept. 30, 2019) (Donnelly, J.); *Borochoff v. GlaxoSmithKline PLC*, No. 07 CIV. 5574 (LLS), 2008 WL 2073421, at *8 (S.D.N.Y. May 9, 2008), *aff'd sub nom. Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671 (2d Cir. 2009).

22

ordinary care,' such that 'the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.* (citation omitted).

"Conclusory statements that Defendants 'consciously turned a blind eye' to problems with the company's internal controls . . . absent any concrete, compelling evidence to support the allegation, do not suffice to show scienter." *Id.* at *5. Here, Plaintiffs fail to allege any facts showing any Defendant turned a "blind eye" to indecent or illegal user content shared on Momo or Tantan or substantial deficiencies in the Company's internal controls. (*See* AC ¶ 110.) Far from supporting a strong inference of scienter, Plaintiffs' allegations and the Company's public disclosures give rise to a much more compelling inference of nonfraudulent intent:  the Company candidly disclosed the risks posed by illicit user content and increased regulatory scrutiny, and expanded its content screening team tenfold over four years in an effort to mitigate those risks.

With respect to Beijing Mushang, Plaintiffs' allegation that Defendants were generally aware of the requirement to disclose material related party transactions misses the point entirely. (*See* AC ¶¶ 126-31.)  Plaintiffs must allege that Defendants knew or recklessly disregarded that the Company failed to disclose material related-party transactions with Beijing Mushang.  As explained above, they fail to do so. (*See supra* § I.B.2.)  Without such allegations, Plaintiffs cannot plead the Company's accounting judgments were reckless. *See Shiloh Indus.*, 2017 WL 1102664, at *5 ("A failure 'to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct[.]'" (citation omitted)).

Moreover, "Plaintiffs' arguments regarding scienter . . . suffer from a basic problem concerning plausibility." *ECA*, 553 F.3d at 203.  "[P]lausibility depends on a number of factors including 'the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's

inferences unreasonable.'" *TAL*, 2019 WL 4688691, at *3 (quoting *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011)). Here, Plaintiffs' plausibility problem stems from the fact that the Company ***did disclose*** material related-party transactions with another talent agency, Hunan Qindao Cultural Spread Ltd. ("Hunan Qindao"). (*See, e.g.*, Ex. E, 2018 Form 20-F at 96; *see also* Ex. J, Spruce Point Report at 24-25.) Specifically, under a section titled "**Transactions with Certain Other Related Parties**," the Company disclosed:

> We paid revenue sharing of live video and other services in the aggregate amount of RMB26.8 million [US$3.9 million], RMB201.1 million [US$29.8 million] and RMB429.3 million (US$62.4 million) to Hunan Qindao Cultural Spread Ltd., a company in which we own 26.4% equity interest, and its subsidiaries, for the year ended December 31, 2016, 2017 and 2018, respectively.

(Ex. E, 2018 Form 20-F at 96.) Plaintiffs provide no explanation for why the Company would properly disclose material related-party transactions with Hunan Qindao, but omit any transactions with Beijing Mushang. Yet the explanation is obvious: the Company believed it was required to disclose the Hunan Qindao transactions, but not any immaterial transactions with Beijing Mushang. This obvious alternative explanation renders Plaintiffs' purported inference of fraud completely implausible, much less cogent and compelling. *See Tellabs*, 551 U.S. at 309.

## III.    PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION

Finally, Plaintiffs also fail to allege loss causation, which requires allegations "'that the market reacted negatively to a corrective disclosure" or "that the loss was foreseeable and caused by the materialization of the [concealed] risk." *Harris*, 135 F. Supp. 3d at 173 n.30 (citations omitted). First, as to content screening, the Nanchang article and later regulatory action were neither a corrective disclosure of a prior false statement nor a materialization of a concealed risk. *See Nokia*, 2011 WL 7158548, at *11 (no loss causation where purported corrective disclosure "d[id] not speak to whether any problems or delays existed at the time the alleged

24

misrepresentations were made earlier in the year"). Rather, they reflect the materialization of *specifically disclosed* risks about which the Company repeatedly cautioned investors.

The Spruce Point Report also does not suffice to allege loss causation. Notably, in the eighteen months since the Spruce Point Report came out, Momo has not restated any financials or disclosed any material related-party transactions with Beijing Mushang. Moreover, the report is admittedly based solely on "publicly available information." (Ex. J, Spruce Point Report at 2.) Finally, it contains a slew of allegations having nothing to do with the statements Plaintiffs challenge here, including that the Company's CEO "was possibly operating a . . . highly rated illegal gambling operation," the Tantan acquisition may have been "used to reward insiders in advance of the IPO," and Momo's business model faces a "30%-50% downside." (*See id.* at 8-12.) And Plaintiffs "fail[] to allege any facts to show that the price decline was caused, in whole or in part, by the cherry picked pieces of the report that [they] contend[] are true and not the [other] allegations that [they] ha[ve] cast aside." *Harris*, 135 F. Supp. 3d at 173 n.30.[15]

## CONCLUSION

For the foregoing separate and independent reasons, the Amended Complaint should be dismissed in its entirety with prejudice.

---

[15]    Because Plaintiffs have not alleged a Section 10(b) claim, their Section 20(a) claims must also be dismissed. *See Ballard Power*, 2019 WL 1510707, at *10.

25

Dated:  New York, New York
       January 24, 2020


                            Respectfully submitted,

                            /s/ Robert A. Fumerton
                            Scott D. Musoff
                            Robert A. Fumerton
                            Michael C. Griffin
                            SKADDEN, ARPS, SLATE,
                              MEAGHER & FLOM LLP
                            Four Times Square
                            New York, New York 10036
                            Phone:  (212) 735-3000
                            Fax:  (212) 735-2000
                            scott.musoff@skadden.com
                            robert.fumerton@skadden.com
                            michael.griffin@skadden.com

                            *Attorneys for Defendant Momo Inc.*