# EXHIBIT C

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 20-F

**(Mark One)**

☐  **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934**

**OR**

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2016.**

**OR**

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from          to          .**

**OR**

☐  **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Date of event requiring this shell company report**

**Commission file number: 001-36765**

# Momo Inc.
**(Exact name of Registrant as specified in its charter)**

**N/A**
**(Translation of Registrant's name into English)**

**Cayman Islands**
**(Jurisdiction of incorporation or organization)**

**20th Floor, Block B**
**Tower 2, Wangjing SOHO**
**No.1 Futongdong Street**
**Chaoyang District, Beijing 100102**
**People's Republic of China**
**(Address of principal executive offices)**

**Jonathan Xiaosong Zhang, Chief Financial Officer**
**Telephone: +86-10-5731-0567**
**Email: ir@immomo.com**
**20th Floor, Block B**
**Tower 2, Wangjing SOHO**
**No.1 Futongdong Street**
**Chaoyang District, Beijing 100102**
**People's Republic of China**
**(Name, Telephone, Email and/or Facsimile number and Address of Company Contact Person)**

**Securities registered or to be registered pursuant to Section 12(b) of the Act.**

| Title of each class | Name of each exchange on which registered |
|---|---|
| American depositary shares, each representing two Class A ordinary shares | The NASDAQ Stock Market LLC (The NASDAQ Global Select Market) |

**Class A ordinary shares, par value
US$0.0001 per share\***

\*   Not for trading, but only in connection with the listing on The NASDAQ Global Select Market of American depositary shares.

**Securities registered or to be registered pursuant to Section 12(g) of the Act.**

**NONE**
**(Title of Class)**

**Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act.**

**NONE**
**(Title of Class)**

_____

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report: 292,062,065 Class A ordinary shares and 96,886,370 Class B ordinary shares, par value US$0.0001 per share, as of December 31, 2016.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer   ☐                                                                  Accelerated filer            ☒

Non-accelerated filer   ☐                                                                  Emerging growth company   ☒

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act. ☒

†   The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

US GAAP ☒       International Financial Reporting Standards as issued                 Other ☐
                by the International Accounting Standards Board  ☐

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow.   Item 17 ☐   Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.   Yes ☐   No ☐

**Table of Contents**

**TABLE OF CONTENTS**

| | | | |
|---|---|---|---|
| INTRODUCTION | | | 1 |
| FORWARD-LOOKING INFORMATION | | | 1 |
| PART I | | | 2 |
| | Item 1. | Identity of Directors, Senior Management and Advisers | 2 |
| | Item 2. | Offer Statistics and Expected Timetable | 2 |
| | Item 3. | Key Information | 2 |
| | Item 4. | Information on the Company | 36 |
| | Item 4A. | Unresolved Staff Comments | 61 |
| | Item 5. | Operating and Financial Review and Prospects | 61 |
| | Item 6. | Directors, Senior Management and Employees | 82 |
| | Item 7. | Major Shareholders and Related Party Transactions | 91 |
| | Item 8. | Financial Information | 96 |
| | Item 9. | The Offer and Listing | 97 |
| | Item 10. | Additional Information | 98 |
| | Item 11. | Quantitative and Qualitative Disclosures about Market Risk | 106 |
| | Item 12. | Description of Securities Other than Equity Securities | 107 |
| PART II | | | 108 |
| | Item 13. | Defaults, Dividend Arrearages and Delinquencies | 108 |
| | Item 14. | Material Modifications to the Rights of Security Holders and Use of Proceeds | 108 |
| | Item 15. | Controls and Procedures | 108 |
| | Item 16A. | Audit Committee Financial Expert | 109 |
| | Item 16B. | Code of Ethics | 109 |
| | Item 16C. | Principal Accountant Fees and Services | 109 |
| | Item 16D. | Exemptions from the Listing Standards for Audit Committees | 110 |
| | Item 16E. | Purchases of Equity Securities by the Issuer and Affiliated Purchasers | 110 |
| | Item 16F. | Change in Registrant's Certifying Accountant | 110 |
| | Item 16G. | Corporate Governance | 110 |
| | Item 16H. | Mine Safety Disclosure | 110 |
| PART III | | | 111 |
| | Item 17. | Financial Statements | 111 |
| | Item 18. | Financial Statements | 111 |
| | Item 19. | Exhibits | 111 |
| SIGNATURES | | | 113 |

i

Table of Contents

## INTRODUCTION

In this annual report, except where the context otherwise requires and for purposes of this annual report only:

- "$," "dollars," "US$" or "U.S. dollars" refers to the legal currency of the United States;

- "ADSs" refers to our American depositary shares, each representing two Class A ordinary shares, par value US$0.0001 per share;

- "China" or the "PRC" refers to the People's Republic of China, and solely for the purpose of this annual report, excludes Hong Kong, Macau and Taiwan;

- "MAUs" refers to monthly active users. Prior to June 2014, we defined MAUs during a given calendar month as Momo users who were daily active users for at least one day during the 28-day period counting back from the last day of such calendar month. Beginning from June 2014, we define MAUs during a given calendar month as Momo users who were daily active users for at least one day during the 30-day period counting back from the last day of such calendar month. Daily active users are Momo users who accessed our platform through Momo mobile application and utilized any of the functions on our platform on a given day. The active users on Hani, our stand-alone live video application, were not included in the MAUs disclosed herein;

- "Momo Inc.," "we," "us," "our company," or "our" refers to our holding company Momo Inc., its subsidiaries and its consolidated affiliated entity and its subsidiaries;

- "ordinary shares" prior to the completion of our initial public offering in December 2014 refers to our ordinary shares of par value US$0.0001 per share, and upon and after the completion of our initial public offering refers to our Class A and Class B ordinary shares, par value US$0.0001 per share; and

- "RMB" or "Renminbi" refers to the legal currency of China.

Our reporting and functional currency is U.S. dollar. This annual report contains translations of certain foreign currency amounts into U.S. dollars for the convenience of the reader. Unless otherwise stated, all translations of Renminbi into U.S. dollars were made at the rate at RMB6.9430 to US$1.00, the noon buying rate on December 30, 2016 as set forth in the H.10 statistical release of the U.S. Federal Reserve Board. We make no representation that the Renminbi or U.S. dollar amounts referred to in this annual report could have been or could be converted into U.S. dollars or Renminbi, as the case may be, at any particular rate or at all. On April 21, 2017, the noon buying rate for Renminbi was RMB6.8845 to US$1.00.

Unless the context indicates otherwise, all share and per share data in this annual report give effect to a share split effected on September 12, 2012 in which each of the previously issued ordinary shares and preferred shares were split into 10 ordinary shares and preferred shares, respectively.

## FORWARD-LOOKING INFORMATION

This annual report on Form 20-F contains forward-looking statements that reflect our current expectations and views of future events. These statements are made under the "safe harbor" provisions of the U.S. Private Securities Litigation Reform Act of 1995. You can identify these forward-looking statements by words or phrases such as "may," "could," "should," "would," "will," "expect," "anticipate," "aim," "estimate," "intend," "plan," "believe," "likely to," "project," "continue," "potential," or other similar expressions. We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our financial condition, results of operations, business strategy and financial needs. These forward-looking statements include, but are not limited to, statements about:

- our goals and strategies;

1

**Table of Contents**

- our future business development, financial condition and results of operations;

- the expected growth of mobile social networking platforms, live video services, mobile marketing services, mobile games and online entertainment services in China;

- our expectations regarding demand for and market acceptance of our services;

- our expectations regarding our user base and level of user engagement;

- our monetization strategies;

- our plans to invest in our technology infrastructure;

- competition in our industry; and

- relevant government policies and regulations relating to our industry.

You should not place undue reliance on these forward-looking statements and you should read these statements in conjunction other sections of this annual report, in particular the risk factors disclosed in "Item 3. Key Information—D. Risk Factors." These statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from those expressed or implied by the forward-looking statements. Moreover, we operate in a rapidly evolving environment. New risks emerge from time to time and it is impossible for our management to predict all risk factors, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ from those contained in any forward-looking statement. The forward-looking statements made in this annual report relate only to events or information as of the date on which the statements are made in this annual report. We do not undertake any obligation to update or revise the forward-looking statements except as required under applicable law.

**PART I**

**Item 1.        Identity of Directors, Senior Management and Advisers**

Not applicable.

**Item 2.        Offer Statistics and Expected Timetable**

Not applicable.

**Item 3.        Key Information**

**A.        Selected Financial Data**

The following table presents the selected consolidated financial information of our company. The selected consolidated statements of comprehensive (loss) income data for the years ended December 31, 2014, 2015 and 2016 and the selected consolidated balance sheets data as of December 31, 2015 and 2016 have been derived from our audited consolidated financial statements included in this annual report beginning on page F-1. The selected consolidated statements of comprehensive (loss) income data for the years ended December 31, 2012 and 2013 and the selected consolidated balance sheets data as of December 31, 2012, 2013 and 2014 have been derived from our audited consolidated financial statements not included in this annual report. Our audited consolidated financial statements are prepared and presented in accordance with accounting principles generally accepted in the United States, or U.S. GAAP. Our historical results do not necessarily indicate results expected for any future period. You should read the following selected financial data in conjunction with the consolidated financial statements and related notes and "Item 5. Operating and Financial Review and Prospects" included elsewhere in this annual report.

2

**Table of Contents**

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2012** | **2013** | **2014** | **2015** | **2016** |
| | (in US$ thousands, except share and share-related data) | | | | |
| **Selected Data of Consolidated Statements of Operations** | | | | | |
| Net Revenues[1] | — | 3,129 | 44,755 | 133,988 | 553,098 |
| **Cost and expenses[2]** | | | | | |
| Cost of revenues | — | (2,927) | (15,762) | (30,312) | (241,463) |
| Research and development expenses | (1,454) | (3,532) | (9,264) | (23,265) | (31,399) |
| Sales and marketing expenses | (419) | (3,018) | (35,538) | (52,631) | (97,173) |
| General and administrative expenses | (1,969) | (3,010) | (10,354) | (22,879) | (38,983) |
| **Total cost and expenses** | (3,842) | (12,487) | (70,918) | (129,087) | (409,018) |
| Other operating income | — | — | 26 | 713 | 406 |
| **(Loss) Income from operations** | (3,842) | (9,358) | (26,137) | 5,614 | 144,486 |
| Interest income | 3 | 32 | 722 | 7,805 | 8,194 |
| Impairment loss on long-term investments | — | — | — | — | (5,765) |
| **(Loss) Income before income tax and share of income on equity method investments** | — | — | (25,415) | 13,419 | 146,915 |
| Income tax expenses | — | — | — | (92) | (5,136) |
| **(Loss) Income before share of income on equity method investments** | — | — | (25,415) | 13,327 | 141,779 |
| Share of income on equity method investments | — | — | — | 370 | 3,471 |
| **Net (loss) income attributable to Momo Inc.** | (3,839) | (9,326) | (25,415) | 13,697 | 145,250 |
| Deemed dividend to preferred shareholders | (3,093) | (8,120) | (57,663) | — | — |
| **Net (loss) income attributable to ordinary shareholders** | (6,932) | (17,446) | (83,078) | 13,697 | 145,250 |
| Net (loss) income per share attributable to ordinary shareholders | | | | | |
| Basic | (0.12) | (0.26) | (0.97) | 0.04 | 0.38 |
| Diluted | (0.12) | (0.26) | (0.97) | 0.03 | 0.36 |
| Weighted average shares used in computing net (loss) income per ordinary share | | | | | |
| Basic | 60,103,654 | 67,190,411 | 85,293,775 | 342,646,282 | 377,335,923 |
| Diluted | 60,103,654 | 67,190,411 | 85,293,775 | 401,396,548 | 407,041,165 |

Notes:

(1)    Components of our net revenues are presented in the following table:

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2012** | **2013** | **2014** | **2015** | **2016** |
| | (in US$ thousands) | | | | |
| Live video service | — | — | — | 1,231 | 376,925 |
| Value-added service | — | 2,808 | 29,756 | 58,462 | 67,603 |
| Mobile marketing | — | 12 | 1,975 | 38,885 | 66,339 |
| Mobile games | — | 92 | 11,237 | 31,082 | 35,453 |
| Other services | — | 217 | 1,787 | 4,328 | 6,778 |
| **Total** | — | 3,129 | 44,755 | 133,988 | 553,098 |

(2)    Share-based compensation expenses were allocated in cost and expenses as follows:

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2012** | **2013** | **2014** | **2015** | **2016** |
| | (in US$ thousands) | | | | |
| Cost of revenues | — | 34 | 155 | 915 | 2,785 |
| Research and development expenses | 39 | 269 | 674 | 3,502 | 5,646 |
| Sales and marketing expenses | 11 | 128 | 736 | 3,780 | 5,880 |
| General and administrative expenses | 542 | 532 | 5,073 | 9,185 | 17,395 |
| **Total** | 592 | 963 | 6,638 | 17,382 | 31,706 |

3

**Table of Contents**

The following table presents our selected consolidated balance sheet data as of December 31, 2012, 2013, 2014, 2015 and 2016.

| | As of December 31, | | | | |
|---|---|---|---|---|---|
| | **2012** | **2013** | **2014** | **2015** | **2016** |
| | | (in US$ thousands) | | | |
| **Selected Consolidated Balance Sheet Data:** | | | | | |
| Cash and cash equivalents | 18,539 | 55,374 | 450,968 | 169,469 | 257,564 |
| Total assets | 20,784 | 63,025 | 478,504 | 542,157 | 769,738 |
| Total liabilities | 143 | 5,566 | 38,113 | 73,771 | 135,719 |
| Total mezzanine equity | 27,199 | 80,319 | — | — | — |
| Total (deficit) equity | (6,558) | (22,860) | 440,391 | 468,386 | 634,019 |

**B.    Capitalization and Indebtedness**

Not applicable.

**C.    Reasons for the Offer and Use of Proceeds**

Not applicable.

**D.    Risk Factors**

**Risks Related to Our Business and Industry**

*If we fail to retain our existing users, further grow our user base, or if user engagement on our platform declines, our business and operating results may be materially and adversely affected.*

The size of our user base and the level of our user engagement are critical to our success. Although our MAUs generally grew over time since our inception, there were times when our user base failed to grow as we expected. For example, the growth rate of our MAUs significantly decreased in 2015 primarily due to the reduced growth of number of smartphone users in China, and upgrades to our platform that take time for users adapt to. Our MAUs was 69.8 million in December 2015, representing a 0.7% increase from 69.3 million in December 2014, compared to a 105.6% growth rate from December 2013 to December 2014. Although our MAUs regained traction and increased by 16.2% from 69.8 million in December 2015 to 81.1 million in December 2016, there is no guarantee that our MAUs will continue to grow at a desirable rate or at all. Growing our user base and increasing the overall level of user engagement on our social networking platform and in particular our live video service, which currently contributes a majority of our revenues, are critical to our business. If our user growth rate slows down, as it did in 2015, our success will become increasingly dependent on our ability to retain existing users and enhance user engagement on our platform. If our Momo mobile application is no longer one of the social networking tools that people frequently use, or if people do not perceive our services to be interesting or useful, we may not be able to attract users or increase the frequency or degree of their engagement. A number of user-oriented instant communication products that achieved early popularity have since seen the size of their user base or level of user engagement decline, in some cases precipitously. There is no guarantee that we will not experience a similar erosion of our user base or user engagement level in the future. A number of factors could negatively affect user retention, growth and engagement, including if:

- we are unable to attract new users to our platform or retain existing ones;

- we fail to introduce new and improved services, or if we introduce services that are not favorably received by users;

- we are unable to combat spam on or inappropriate or abusive use of our platform, which may lead to negative public perception of us and our brand;

- technical or other problems prevent us from delivering our services in a rapid and reliable manner or otherwise adversely affect the user experience;

- we suffer from negative publicity, fail to maintain our brand or if our reputation is damaged;

- we fail to address user concerns related to privacy and communication, safety, security or other factors;

4

**Table of Contents**

- there are adverse changes in our services that are mandated by, or that we elect to make to address, legislation, regulations or government policies; and

- the growth of number of smartphone users in China stalls.

If we are unable to grow our user base or enhance user engagement, our platform will become less attractive to our users, customers and platform partners, which would have a material and adverse impact on our business and operating results.

*We are in the early stages of monetization and cannot guarantee that the monetization strategies we have adopted will be successfully implemented or generate sustainable revenues and profit.*

Our monetization model is new and evolving. We began to generate revenues in the second half of 2013 through primarily membership subscriptions and also game publishing and other services, but we continue to explore and implement new monetization models. While membership subscriptions contributed a majority of our revenues prior to 2016, live video service, which we launched in September 2015 and adopts a virtual items-based revenue model, has replaced membership subscription as our major source of revenues in 2016. The services that we currently provide, including live video service, value-added service (comprising membership subscriptions and virtual gift service), mobile marketing services, mobile games, and other services, contributed approximately 68.1%, 12.2%, 12.0%, 6.4% and 1.3%, respectively, of our net revenues in 2016. As online social networking and online entertainment industries in China are relatively young, prevailing monetization models similar to as ours have yet to be proven to be sustainable, and it may be more difficult to predict user and customer behaviors and demands compared to other established industries. Apart from live video services, from time to time we have launched new services on our platform, explored new monetization models and broadened our revenue sources, and we expect to continue to do so. For example, in February 2015, we launched our first self-developed game on our platform, which generated revenues through in-game purchases of virtual items. In the second quarter of 2015, we launched our in-feed marketing solutions powered by a proprietary self-serve advertising system, and started to offer brand-oriented display ads and action-driven ad products such as app downloads. In the fourth quarter of 2016, we launched a virtual gift service which allows our users to purchase and send virtual gifts to other users outside of live video service. However, there is no assurance that any of these and other new monetization models would be profitable or sustainable. If our strategic initiatives do not enhance our ability to monetize our existing services or enable us to develop new approaches to monetization, we may not be able to maintain or increase our revenues and profits or recover any associated costs.

We may in the future introduce new services to further diversify our revenue streams, including services with which we have little or no prior development or operating experience. If these new or enhanced services fail to engage users, customers or platform partners, we may fail to attract or retain users or to generate sufficient revenues to justify our investments, and our business and operating results may suffer as a result.

*We have a limited operating history in a dynamic market, which makes it difficult to evaluate our future prospects.*

The market for social networking platforms is relatively new, highly dynamic and may not develop as expected. Our users, customers and platform partners may not fully understand the value of our services, and potential new users, customers and platform partners may have difficulty distinguishing our services from those of our competitors. Convincing potential users, customers and platform partners of the value of our services is critical to the growth of our user base and the success of our business.

We launched our Momo mobile application in August 2011, and the relatively short operating history as well as our evolving monetization strategies make it difficult to assess our future prospects or forecast our future results. You should consider our business and prospects in light of the risks and challenges we encounter or may encounter in this developing and rapidly evolving market. These risks and challenges include our ability to, among other things:

- expand our paying user base for the various services offered by our platform, including live video service, value-added service, mobile games and others;

5

**Table of Contents**

- develop and deploy diversified and distinguishable features and services for our users, customers and platform partners;

- convince customers of the benefits of our marketing services compared to alternative forms of marketing, and continue to increase the efficiency of our mobile marketing solutions and expand our network of marketers;

- develop or implement strategic initiatives to monetize our platform;

- develop beneficial relationship with key strategic partners and talented broadcasters for our live video service;

- develop a reliable, scalable, secure, high-performance technology infrastructure that can efficiently handle increased usage;

- successfully compete with other companies, some of which have substantially greater resources and market power than us, that are currently in, or may in the future enter, our industry, or duplicate the features of our services;

- attract, retain and motivate talented employees; and

- defend ourselves against litigation, regulatory, intellectual property, privacy or other claims.

If we fail to educate potential users, customers and platform partners about the value of our services, if the market for our platform does not develop as we expect or if we fail to address the needs of this dynamic market, our business will be harmed. Failure to adequately address these or other risks and challenges could harm our business and cause our operating results to suffer.

***We currently generate a substantial portion of our revenues from our live video service. We may not be able to continue to grow or continue to achieve profitability from such service.***

In September 2015, we launched our live video service with a virtual items-based revenue model whereby users can enjoy live performances and interact with the broadcasters for free, and have the option of purchasing in-show virtual items. We have achieved initial success for this service, which contributed US$1.2 million and US$376.9 million, or 0.9% and 68.1% of our net revenues in 2015 and 2016, respectively. While we plan to continue to invest significantly in expanding our live video service, we may not be able to continue to achieve the level of profitability based on the virtual items-based revenue model, as we have relatively little experience in operating such service. In addition, popular broadcasters may cease to use our service and we may be unable to attract new talents that can attract users or cause such users to increase the amount of time spent on our platform or the amount of money spent on in-show virtual items.

Under our current arrangements with our broadcasters, including popular broadcasters and our other users, we share with them a portion of the revenues we derive from the sales of in-show virtual items in our live video service. Although we believe we have a large and diversified pool of talented broadcasters as well as paying users, which allows us to effectively control the risk of revenue concentration, if a large number of our broadcasters, particularly popular broadcasters, were to leave our platform for competing platforms at the same time, or if a large number of our users decided to use live video services provided by our competitors, we might not be able to expand the user base of our live video service and achieve or maintain the level of revenues and profitability as we currently anticipate.

***We may not be able to successfully maintain and increase the number of paying users for the various services we offer on our platform.***

Revenues generated from live video service, value-added service, mobile marketing services, mobile games, and other services historically accounted for substantially all of our total revenues. Our future growth depends on our ability to convert our users into paying users of our services, including live video service, value-added service, mobile games and other services, and our ability to retain our existing paying users. However, we cannot assure you that we will be successful in any of the foregoing initiatives, nor can we assure you that we will be able to successfully compete with current and new competitors on attracting paying users. We had 5.6 million paying users for our live video service in 2016, compared to 0.2 million in 2015. For membership subscription, which is one of our value-added services, we had 3.5 million members as of December 31, 2016, representing a 20.7% increase from 2.9 million members as of December 31, 2015. Our efforts to provide greater incentives for our users to pay for our various services may not continue to succeed. Our paying users may discontinue their spending on our services because they no longer serve their needs, or simply because the interests and preferences of these users shift. If we cannot successfully maintain or increase the number of our paying users, our business, results of operations and prospects will be adversely affected.

6

Table of Contents

*We generate a significant portion of our revenues from mobile marketing services, and the loss of marketers, or reduction in spending by marketers, could seriously harm our business.*

Our mobile marketing services generated 4.4%, 29.0% and 12.0% of our revenues in 2014, 2015 and 2016, respectively. Since we began to offer mobile marketing services in the third quarter of 2013, we have diversified and expanded our mobile marketing service offerings to increasingly monetize our platform. Currently our mobile marketing services primarily comprise in-feed marketing solutions and brand-oriented display ads. As is common in the industry, our marketers do not have long-term advertising commitments with us. Many of our marketers spend only a relatively small portion of their overall advertising budget with us. In addition, marketers may view some of our products as experimental and unproven. Marketers may not continue to do business with us, or they may advertise with us based on terms unfavorable to us, if we do not deliver our marketing solutions in an effective manner, or if they do not believe that their investment in advertising with us will generate a competitive return relative to other alternatives. For example, failure to maintain or increase the quantity or quality of ads shown to users, or a decrease in user engagement may cause marketers to reduce or cease their spending on our mobile marketing services.

In addition, expenditures by marketers tend to be cyclical, reflecting overall economic conditions and budgeting and buying patterns. Adverse macroeconomic conditions can also have a material negative impact on the demand for advertising and cause our marketers to reduce the amounts they spend on advertising, which could adversely affect our revenues and business.

*We have incurred significant net losses in the past. We may not be able to remain profitable.*

We have incurred significant net losses before 2015. Although we generated net income in 2015 and 2016, we may not continue to be profitable. We believe that our future revenue growth will depend on, among other factors, the popularity of social networking applications, as well as our ability to attract new users, increase user engagement, effectively design and implement monetization strategies, develop new services and compete effectively and successfully. In addition, our ability to sustain profitability is affected by various factors, many of which are beyond our control, such as the continuous development of social networking, live video services, mobile marketing services, and mobile games in China.

We may again incur losses in the near future due to our continued investments in services, technologies, research and development and our continued sales and marketing initiatives. Changes in the macroeconomic and regulatory environment or competitive dynamics and our inability to respond to these changes in a timely and effective manner may also impact our profitability. Accordingly, you should not rely on the revenues of any prior quarterly or annual period as an indication of our future performance.

*Our business is dependent on the strength of our brand and market perception of our brand.*

In China, we market our services under the brand " 陌陌 " or "Momo." Our business and financial performance are highly dependent on the strength and the market perception of our brand and services. A well-recognized brand is critical to increasing our user base and, in turn, facilitating our efforts to monetize our services and enhancing our attractiveness to customers. From time to time, we conduct marketing activities across various media to enhance our brand and to guide public perception of our brand and services. In order to create and maintain brand awareness and brand loyalty, to influence public perception and to retain existing and attract new mobile users, customers and platform partners, we may need to substantially increase our marketing expenditures. We cannot assure you, however, that these activities will be successful or that we will be able to achieve the brand promotion effect we expect.

7

Table of Contents

In addition, people may not understand the value of our platform, and there may be a misperception that Momo is used solely as a tool to randomly meet or date strangers. Convincing potential new users, customers and platform partners of the value of our services is critical to increasing the number of our users, customers and platform partners and to the success of our business.

***Negative publicity may harm our brand and reputation and have a material adverse effect on our business and operating results.***

Negative publicity involving us, our users, our management, our social networking platform or our business model may materially and adversely harm our brand and our business. We cannot assure you that we will be able to defuse negative publicity about us, our management and/or our services to the satisfaction of our investors, users, customers and platform partners. There has been negative publicity about our company and the misuse of our services, which has adversely affected our brand, public image and reputation. Such negative publicity, especially when it is directly addressed against us, may also require us to engage in defensive media campaigns. This may cause us to increase our marketing expenses and divert our management's attention and may adversely impact our business and results of operations.

In November 2014, Mr. Yan Tang, our co-founder, chairman and chief executive officer, received a letter from a PRC law firm on behalf of Wangzhiyi Information Technology (Beijing) Co, Ltd., or Wangzhiyi, a PRC company affiliated with Netease, Inc., or Netease, where Mr. Tang was employed from December 2003 to September 2011. The letter claimed that because Mr. Tang established our consolidated affiliated entity Beijing Momo Technology Ltd., or Beijing Momo, in July 2011 and Beijing Momo launched our application in August 2011, all while Mr. Tang was still an employee of Wangzhiyi, that he breached the terms of his employment agreement with Wangzhiyi, and violated his covenants to not compete with and devote himself to Wangzhiyi during the term of his employment. The letter requested that Mr. Tang apologize in writing to Wangzhiyi promptly and reserved Wangzhiyi's right to pursue further action. Mr. Tang believes the claims lack merit and intends to defend himself against these claims vigorously.

On December 10, 2014, Netease posted a formal statement on its website alleging that Mr. Tang engaged in unethical conduct while employed by Netease. The statement contained several allegations, including those made in the letter described in the preceding paragraph. We note that none of the allegations put forth in Netease's statement are directed against our company, and the allegations essentially relate to several alleged incidents that occurred before Mr. Tang joined our company. Mr. Tang has informed us that he believes the allegations are malicious and intends to vigorously defend himself against them.

We cannot predict what future action Netease or Wangzhiyi might take with respect to their claims against Mr. Tang. Nor can we predict whether additional public statements will be issued by Netease or any other party containing new allegations against Mr. Tang, other management personnel or our company. In the event that Netease or Wangzhiyi were to pursue these claims by means of court proceedings, we cannot predict the length or outcome of any such proceedings. Any legal action, regardless of its merits, could be time consuming and could divert the attention of Mr. Tang away from our business. Should Netease or Wangzhiyi prevail in any future lawsuit against Mr. Tang, his reputation could be harmed and he may be ordered to pay damages and/or cease any actions deemed to be wrongful by the court. Moreover, although we were not named in the letter, we cannot be sure that Netease or Wangzhiyi will not initiate proceedings against us in the future. Any such proceedings may result in negative publicity for us and divert our management's attention and could materially and adversely affect our reputation, business and results of operations.

***User misconduct and misuse of our platform may adversely impact our brand image, and we may be held liable for information or content displayed on, retrieved from or linked to our platform, which may materially and adversely affect our business and operating results.***

Our platform allows mobile users to freely contact and communicate with people nearby, and our live video service allow users to host and view live shows. Because we do not have full control over how and what users will use our platform to communicate, our platform may be misused by individuals or groups of individuals to engage in immoral, disrespectful, fraudulent or illegal activities. For example, on a daily basis we detect spam accounts through which illegal or inappropriate content is posted and illegal or fraudulent activities are conducted. Media reports and internet forums have covered some of these incidents, which has in some cases generated negative publicity about our brand and platform. We have implemented control procedures to detect and block illegal or inappropriate content and illegal or fraudulent activities conducted through the misuse of our platform, but such procedures may not prevent all such content from being broadcasted or posted or activities from being carried out. Moreover, as we have limited control over real-time and offline behaviors of our users, to the extent such behaviors are associated with our platform, our ability to protect our brand image and reputation may be limited. Our business and the public perception of our brand may be materially and adversely affected by misuse of our platform.

8

Table of Contents

In addition, if any of our users suffers or alleges to have suffered physical, financial or emotional harm following contact initiated on our platform, we may face civil lawsuits or other liabilities initiated by the affected user, or governmental or regulatory actions against us. In response to allegations of illegal or inappropriate activities conducted through our platform or any negative media coverage about us, PRC government authorities may intervene and hold us liable for non-compliance with PRC laws and regulations concerning the dissemination of information on the internet and subject us to administrative penalties or other sanctions, such as requiring us to restrict or discontinue some of the features and services provided on our mobile application. Therefore, our live video service may be subject to investigations or subsequent penalties if contents contained in the live videos are deemed to be illegal or inappropriate under PRC laws and regulations. See "—Risks Related to Doing Business in China—If we fail to obtain and maintain the requisite licenses and approvals required under the complex regulatory environment applicable to our businesses in China, or if we are required to take compliance actions that are time-consuming or costly, our business, financial condition and results of operations may be materially and adversely affected." As a result, our business may suffer and our user base, revenues and profitability may be materially and adversely affected, and the price of our ADSs may decline.

*The market in which we operate is fragmented and highly competitive. If we are unable to compete effectively for users or user engagement, our business and operating results may be materially and adversely affected.*

As a social networking platform that provides multiple services, including live video service, value-added service, mobile marketing services and other services, we are subject to intense competition from providers of similar services, as well as potential new types of online services. Our competitors may have substantially more cash, traffic, technical, broadcasters, business networks and other resources, as well as broader product or service offerings and can leverage their relationships based on other products or services to gain a larger share of marketing budgets. We may be unable to compete successfully against these competitors or new market entrants, which may adversely affect our business and financial performance.

We believe that our ability to compete effectively depends upon many factors both within and beyond our control, including:

- the popularity, usefulness, ease of use, performance and reliability of our services compared to those of our competitors, and the research and development abilities of us and our competitors;

- changes mandated by, or that we elect to make to address, legislation, regulations or government policies, some of which may have a disproportionate effect on us;

- acquisitions or consolidation within our industry, which may result in more formidable competitors;

- our ability to monetize our services;

- our ability to attract, retain, and motivate talented employees;

- our ability to manage and grow our operations cost-effectively; and

- our reputation and brand strength relative to our competitors.

9

Table of Contents

***If we fail to keep up with technological developments and evolving user expectations, we may fail to maintain or attract users, customers or platform partners, and our business and operating results may be materially and adversely affected.***

We operate in a market characterized by rapidly changing technologies, evolving industry standards, new product and service announcements, new generations of product enhancements and changing user expectations. Accordingly, our performance and the ability to further monetize the services on our platform will depend on our ability to adapt to these rapidly changing technologies and industry standards, and our ability to continually innovate in response to both evolving demands of the marketplace and competitive services. There may be occasions when we may not be as responsive as our competitors in adapting our services to changing industry standards and the needs of our users. Historically, new features may be introduced by one player in the industry, and if they are perceived as attractive to users, they are often quickly copied and improved upon by others.

Introducing new technologies into our systems involves numerous technical challenges, substantial amounts of capital and personnel resources and often takes many months to complete. For example, the market for mobile devices in China is highly fragmented, and the lower resolution, functionality, operating system compatibility and memory currently associated with the kaleidoscopic models of mobile devices in the Chinese marketplace may make the use of our services through these devices more difficult and impair the user experience. We intend to continue to devote resources to the development of additional technologies and services. We may not be able to effectively integrate new technologies on a timely basis or at all, which may decrease user satisfaction with our services. Such technologies, even if integrated, may not function as expected or may be unable to attract and retain a substantial number of mobile device users to use our Momo mobile application. We also may not be able to protect such technology from being copied by our competitors. Our failure to keep pace with rapid technological changes may cause us to fail to retain or attract users or generate revenues, and could have a material and adverse effect on our business and operating results.

***If we fail to effectively manage our growth and control our costs and expenses, our business and operating results could be harmed.***

We have experienced rapid growth in our business and operations and expansion of our platform since our inception in 2011, which places significant demands on our management, operational and financial resources. However, given our limited operating history and the rapidly evolving market in which we compete, we may encounter difficulties as we establish and expand our operations, product development, sales and marketing, and general and administrative capabilities. We face significant competition for talented employees from other high-growth companies, which include both publicly traded and privately held companies, and we may not be able to hire new talents quickly enough to meet our needs and support our operations. If we fail to effectively manage our hiring needs and successfully integrate our new hires, our efficiency and ability to meet our forecasts and our employee morale, productivity and retention could suffer, and our business and operating results could be adversely affected.

We expect our costs and expenses to continue to increase in the future as we seek to broaden our user base and increase user engagement, and develop and implement new features and services that require more complexity. In addition, our cost and expenses, such as our research and development expenses, sales and marketing expenses and general and administrative expenses, have grown rapidly as we expanded our business. Historically, our costs have increased each year, and we expect to continue to incur increasing costs to support our anticipated future growth. We expect to continue to invest in our infrastructure in order to enable us to provide our services rapidly and reliably to users. Continued growth could also strain our ability to maintain reliable service levels for our users and customers, develop and improve our operational, financial, legal and management controls, and enhance our reporting systems and procedures. If we are unable to generate adequate revenues and to manage our expenses, we may again incur significant losses in the future and may not be able to maintain profitability. Our expenses may grow faster than our revenues, and our expenses may be greater than we anticipate. Managing our growth will require significant expenditures and the allocation of valuable management resources. If we fail to achieve the necessary level of efficiency in our organization as we grow, our business, operating results and financial condition could be harmed.

10

Table of Contents

***Privacy concerns relating to our services and the use of user information could negatively impact our user base or user engagement, or subject us to governmental regulation and other legal obligations, which could have a material and adverse effect on our business and operating results.***

We collect user profile, user location and other personal data from our users in order to better understand our users and their needs and to support our social interest graph engine and our big data analytical capabilities for more targeted services such as interest- or location-based user groups and mobile marketing services. Concerns about the collection, use, disclosure or security of personal information or chat history or other privacy-related matters, even if unfounded, could damage our reputation, cause us to lose users, customers and platform partners and subject us to regulatory investigations, all of which may adversely affect our business. While we strive to comply with applicable data protection laws and regulations, as well as our privacy policies pursuant to our terms of use and other obligations we may have with respect to privacy and data protection, any failure or perceived failure to comply with these laws, regulations or policies may result, and in some cases have resulted, in inquiries and other proceedings or actions against us by government agencies or others, as well as negative publicity and damage to our reputation and brand, each of which could cause us to lose users, customers and platform partners and have an adverse effect on our business and operating results.

Any systems failure or compromise of our security that results in the unauthorized access to or release of the data or chat history of our users, customers or platform partners data or chat history could significantly limit the adoption of our services, as well as harm our reputation and brand. We expect to continue expending significant resources to protect against security breaches. The risk that these types of events could seriously harm our business is likely to increase as we expand the number of services we offer and increase the size of our user base.

Our practices may become inconsistent with new laws or regulations concerning data protection, or the interpretation and application of existing consumer and data protection laws or regulations, which is often uncertain and in flux. If so, in addition to the possibility of fines, this could result in an order requiring that we change our practices, which could have an adverse effect on our business and operating results. Complying with new laws and regulations could cause us to incur substantial costs or require us to change our business practices in a manner materially adverse to our business. See also "—Risks Related to Doing Businesses in China—Uncertainties in the interpretation and enforcement of PRC laws and regulations could limit the legal protections available to you and us."

***The continuing and collaborative efforts of our senior management and key employees are crucial to our success, and our business may be harmed if we were to lose their services.***

We depend on the continued contributions of our senior management, especially the executive officers listed in "Item 6. Directors, Senior Management and Employees—A. Directors and Senior Management" section of this annual report, and other key employees, many of whom are difficult to replace. The loss of the services of any of our executive officers or other key employees could materially harm our business. Competition for qualified talent in China is intense. Our future success is dependent on our ability to attract a significant number of qualified employees and retain existing key employees. If we are unable to do so, our business and growth may be materially and adversely affected and the trading price of our ADSs could suffer. Our need to significantly increase the number of our qualified employees and retain key employees may cause us to materially increase compensation-related costs, including stock-based compensation.

***If we fail to launch new self-developed or licensed games that attract new players and retain existing players, our business, operating results and prospects may be adversely affected.***

Historically, we relied on mobile games for a significant portion of revenues. Revenues generated from mobile games contributed 25.1%, 23.2% and 6.4% of our total revenues in 2014, 2015 and 2016, respectively. Although mobile games contributed to a lesser portion of our revenues in 2016, we still see mobile games as an important part of our business and intend to continue to invest in mobile games. Growing and retaining our user base and converting some of our users into paying users depend significantly on our ability to continuously offer new games and game updates that anticipate and effectively respond to changing player interests and preferences.

Table of Contents

We have recently started to scale back from licensed mobile game services and instead focus on self-developed games in order to better align the games offered on our platform with the positioning and strength of Momo as a location-based social platform. We are relatively new to the development of mobile games. User demand and user preferences for new games is difficult to predict, in part due to relatively short life cycles of online games. If we fail to accurately predict our users' needs and technological trends or are otherwise unable to complete the development of games in a timely fashion, we may be unable to introduce new self-developed games into the market successfully. The development of new games requires high levels of innovation and significant resources and investments. If the games we develop do not become popular or profitable, we may not be able to recover the investments we have made. In addition, we may not be able to compete effectively for game development talents, who are important for the development of successful games.

Neither can we assure you that the new games we offer, whether self-developed or licensed games, will attract a large number of players and be commercially successful, nor can we guarantee that we will be able to meet our timetable for new game launches. A number of factors, including changing game player preferences and our relationship with existing and new third-party game developers, could affect the popularity of new games or delay the launch of new games on our platform. If we cannot launch new and popular self-developed games or maintain our existing partnership with third-party game developers, and attract new players or retain existing players, our business, results of operations and prospects will be materially and adversely affected.

In addition, new games that we offer may attract game players away from existing games on our platform. If this occurs, it will decrease the player base of our existing games, which could result in decreased revenues from such existing games. Game players of our existing games may also spend less money to purchase virtual items in our new games than they would have spent if they had continued playing our existing games, which could materially and adversely affect our revenues.

***We may not be able to adequately protect our intellectual property, which could cause us to be less competitive and third-party infringements of our intellectual property rights may adversely affect our business.***

We rely on a combination of patent, copyright, trademark and trade secret laws and restrictions on disclosure to protect our intellectual property rights. See also "Item 4. Information on the Company—B. Business Overview." Despite our efforts to protect our proprietary rights, third parties may attempt to copy or otherwise obtain and use our intellectual property or seek court declarations that they do not infringe upon our intellectual property rights. Monitoring unauthorized use of our intellectual property is difficult and costly, and we cannot be certain that the steps we have taken will prevent misappropriation of our intellectual property. From time to time, we may have to resort to litigation to enforce our intellectual property rights, which could result in substantial costs and diversion of our resources.

There have been instances where third parties have cloned and launched counterfeits of our Momo mobile application on app stores or internet forums. Some of these counterfeits, once installed inadvertently by mobile users, were reported to automatically download and install other applications to these users' mobile phones, charging them various fees. These counterfeits may mislead mobile users and negatively affect their perception of our application. Moreover, we may have to expend resources in connection with any legal actions that we take to curb these counterfeiting activities in order to protect our intellectual property rights, user experience and brand perception.

***We have been and may be subject to intellectual property infringement claims or other allegations by third parties for information or content displayed on, retrieved from or linked to our platform, or distributed to our users, which may materially and adversely affect our business, financial condition and prospects.***

We have been and may in the future be subject to intellectual property infringement claims or other allegations by third parties for services we provide or for information or content displayed on, retrieved from or linked to our platform, or distributed to our users, which may materially and adversely affect our business, financial condition and prospects.

Companies in the internet, technology and media industries are frequently involved in litigation based on allegations of infringement of intellectual property rights, unfair competition, invasion of privacy, defamation and other violations of other parties' rights. The validity, enforceability and scope of protection of intellectual property rights in internet-related industries, particularly in China, are uncertain and still evolving. We face, from time to time, and expect to face in the future, allegations that we have infringed the trademarks, copyrights, patents and other intellectual property rights of third parties, including our competitors, or allegations that we are involved in unfair trade practices. For example, on October 22, 2015, we were served a civil complaint by Guangzhou Tian He People's Court in which the plaintiff claimed that *Xiaoyao Xiyou*, a game that we operated and currently operate, infringed upon the plaintiff's copyright in works of literature and art of a game, constituting unfair competition. The plaintiff demanded that we cease the infringement and pay compensation and legal costs totaling approximately RMB10 million (US$1.4 million). See "Item 8. Financial Information— A. Consolidated Statements and Other Financial Information—Legal Proceedings." As we face increasing competition and as litigation becomes a more common method for resolving commercial disputes in China, we face a higher risk of being the subject of intellectual property infringement claims.

Table of Contents

We allow users to upload text, graphics, audio, video and other content to our platform and download, share, link to and otherwise access games and other content on our platform. We have procedures designed to reduce the likelihood that content might be used without proper licenses or third-party consents. However, these procedures may not be effective in preventing the unauthorized posting of copyrighted content. Therefore, we may face liability for copyright or trademark infringement, defamation, unfair competition, libel, negligence, and other claims based on the nature and content of the materials that are delivered, shared or otherwise accessed through our platform.

Defending intellectual property litigation is costly and can impose a significant burden on our management and employees, and there can be no assurances that favorable final outcomes will be obtained in all cases. Such claims, even if they do not result in liability, may harm our reputation. Any resulting liability or expenses, or changes required to our platform to reduce the risk of future liability, may have a material adverse effect on our business, financial condition and prospects.

*User growth and engagement depend upon effective interoperation with mobile operating systems, networks, mobile devices and standards that we do not control.*

We make our services available across a variety of mobile operating systems and devices. We are dependent on the interoperability of our services with popular mobile devices and mobile operating systems that we do not control, such as Android, iOS and Windows. Any changes in such mobile operating systems or devices that degrade the functionality of our services or give preferential treatment to competitive services could adversely affect usage of our services. Further, if the number of platforms for which we develop our services increases, which is typically seen in a dynamic and fragmented mobile services market such as China, it will result in an increase in our costs and expenses. In order to deliver high quality services, it is important that our services work well across a range of mobile operating systems, networks, mobile devices and standards that we do not control. We may not be successful in developing relationships with key participants in the mobile industry or in developing services that operate effectively with these operating systems, networks, devices and standards. In the event that it is difficult for our users to access and use our services, particularly on their mobile devices, our user growth and user engagement could be harmed, and our business and operating results could be adversely affected.

*Our operations depend on the performance of the internet infrastructure and fixed telecommunications networks in China.*

Almost all access to the internet in China is maintained through state-owned telecommunication operators under the administrative control and regulatory supervision of the Ministry of Industry and Information Technology, or the MIIT. Moreover, we primarily rely on a limited number of telecommunication service providers to provide us with data communications capacity through local telecommunications lines and internet data centers to host our servers. We have limited access to alternative networks or services in the event of disruptions, failures or other problems with China's internet infrastructure or the fixed telecommunications networks provided by telecommunication service providers. Web traffic in China has experienced significant growth during the past few years. Effective bandwidth and server storage at internet data centers in large cities such as Beijing are scarce. With the expansion of our business, we may be required to upgrade our technology and infrastructure to keep up with the increasing traffic on our platform. We cannot assure you that the internet infrastructure and the fixed telecommunications networks in China will be able to support the demands associated with the continued growth in internet usage. If we cannot increase our capacity to deliver our online services, we may not be able to the increases in traffic we anticipate from our expanding user base, and the adoption of our services may be hindered, which could adversely impact our business and our ADS price.

13

Table of Contents

In addition, we have no control over the costs of the services provided by telecommunication service providers. If the prices we pay for telecommunications and internet services rise significantly, our results of operations may be materially and adversely affected. Furthermore, if internet access fees or other charges to internet users increase, some users may be prevented from accessing the mobile internet and thus cause the growth of mobile internet users to decelerate. Such deceleration may adversely affect our ability to continue to expand our user base.

### *Our business and operating results may be harmed by service disruptions, or by our failure to timely and effectively scale and adapt our existing technology and infrastructure.*

People use our platform for real-time communication, socializing, entertainment and information. We have experienced, and may in the future experience, service disruptions, outages and other performance problems due to a variety of factors, including infrastructure changes, human or software errors, hardware failure, capacity constraints due to an overwhelming number of people accessing our mobile services simultaneously, computer viruses and denial of service, fraud and security attacks. Any disruption or failure in our infrastructure could hinder our ability to handle existing or increased traffic on our platform or cause us to lose content stored on our platform, which could significantly harm our business and our ability to retain existing users and attract new users.

As the number of our users increases and our users generate more content on our platform, we may be required to expand and adapt our technology and infrastructure to continue to reliably store and analyze this content. It may become increasingly difficult to maintain and improve the performance of our services, especially during peak usage times, as our services become more complex and our user traffic increases. If our users are unable to access Momo mobile application in a timely fashion, or at all, our user experience may be compromised and the users may seek other mobile social networking tools to meet their needs, and may not return to Momo or use Momo as often in the future, or at all. This would negatively impact our ability to attract users and maintain the level of user engagement.

### *Existing or future strategic alliances, long-term investments and acquisitions may have a material and adverse effect on our business, reputation and results of operations.*

We have made and intend to continue to make long-term investments in third-party companies. From time to time we evaluate and enter into discussions regarding potential long-term investments. Our existing and any future long-term investments could have a material impact on our financial condition and results of operations. If our long-term investments are unable to implement or remediate the necessary controls, procedures and policies, do not perform as we have expected or become less valuable to our business due to a change in our overall business strategy or other reasons, we may not be able to realize the anticipated benefits of investments and we may have to incur unanticipated liabilities, expenses, impairment charges or write-offs.

We may also in the future enter into strategic alliances with various third parties. Strategic alliances with third parties could subject us to a number of risks, including risks associated with sharing proprietary information, non-performance by the counterparty and an increase in expenses incurred in establishing new strategic alliances, any of which may materially and adversely affect our business. We may have little ability to control or monitor their actions and to the extent strategic third parties suffer negative publicity or harm to their reputation from events relating to their business, we may also suffer negative publicity or harm to our reputation by virtue of our association with such third parties.

In addition, we may acquire additional assets, technologies or businesses that are complementary to our existing business. Future acquisitions and the subsequent integration of new assets and businesses into our own would require significant attention from our management and could result in a diversion of resources from our existing business, which in turn could have an adverse effect on our business operations. Acquired assets or businesses may not generate the financial or operating results we expect. In addition, acquisitions could result in the use of substantial amounts of cash, potentially dilutive issuances of equity securities, the incurrence of debt, the incurrence of significant goodwill impairment charges, amortization expenses for other intangible assets and exposure to potential unknown liabilities of the acquired business. Moreover, the costs of identifying and consummating acquisitions may be significant. In addition to possible shareholders' approval, we may also have to obtain approvals and licenses from the government authorities in the PRC for the acquisitions and comply with applicable PRC laws and regulations, which could result in increased costs and delays.

14

Table of Contents

***We rely on assumptions and estimates to calculate certain key operating metrics, and real or perceived inaccuracies in such metrics may harm our reputation and negatively affect our business.***

The number of monthly active users of Momo is calculated using internal company data that has not been independently verified. While the number of monthly active users is based on what we believe to be reasonable calculations for the applicable periods of measurement, there are inherent challenges in measuring usage and user engagement across our large user base. We treat each account as a separate user for the purposes of calculating our monthly active users, because it may not always be possible to identify people that have set up more than one account. Accordingly, the calculations of our monthly active users may not accurately reflect the actual number of people using Momo.

Our measures of user growth and user engagement may differ from estimates published by third parties or from similarly titled metrics used by our competitors due to differences in methodology. If customers or platform partners do not perceive our user metrics to be accurate representations of our user base or user engagement, or if we discover material inaccuracies in our user metrics, our reputation may be harmed and customers and platform partners may be less willing to allocate their resources or spending to Momo, which could negatively affect our business and operating results.

***We have granted, and expect to continue to grant, share options under our share incentive plans, which may result in increased share-based compensation expenses.***

We have adopted three share incentive plans as of the date of this annual report for the purpose of granting share-based compensation awards to employees, directors and consultants to incentivize their performance and align their interests with ours. In November 2012, we adopted a share incentive plan, or the 2012 Plan, which was amended and restated in October 2013. In November 2014, we adopted the 2014 share incentive plan, or the 2014 Plan, pursuant to which a maximum aggregate of 14,031,194 Class A ordinary shares may be issued pursuant to all awards granted thereunder. Beginning in 2017, the number of shares reserved for future issuances under the 2014 Plan will be increased by a number equal to 1.5% of the total number of outstanding shares on the last day of the immediately preceding calendar year, or such lesser number of Class A ordinary shares as determined by our board of directors, on the first day of each calendar year during the term of the 2014 Plan. With the adoption of the 2014 Plan, we will no longer grant any incentive shares under the 2012 Plan. In addition, in January 2015, Momo Technology Overseas Holding Company Limited, or Momo BVI, our wholly-owned BVI subsidiary, adopted a share incentive plan, or the BVI Plan. As of March 31, 2017, options to purchase 30,787,026 Class A ordinary shares (excluding those that have been forfeited) had been granted under the 2012 Plan, 14,574,278 of which remained outstanding. In addition, as of March 31, 2017, options to purchase 17,654,048 Class A ordinary shares and 340,001 restricted share units had been granted under the 2014 Plan, of which 13,686,533 options remained outstanding and 237,500 restricted share units remained outstanding. Options to purchase an aggregate of 8,000,000 shares of Momo BVI under the BVI Plan remained outstanding as of March 31, 2017. See "Item 6. Directors, Senior Management and Employees—B. Compensation" for a detailed discussion. We expect to incur share-based compensation expenses of US$40.5 million, US$29.8 million and US$36.4 million in 2017, 2018, and after 2018, respectively, in connection with the currently outstanding share-based awards, and we may grant additional share-based awards under our share incentive plans, which will further increase our share-based compensation expenses. We believe the granting of share-based awards is of significant importance to our ability to attract and retain our employees, and we will continue to grant share-based awards to employees in the future. As a result, our expenses associated with share-based compensation may increase, which may have an adverse effect on our results of operations.

***If we fail to implement and maintain an effective system of internal controls, we may be unable to accurately report our results of operations or prevent fraud or fail to meet our reporting obligations, and investor confidence and the market price of our ADSs may be materially and adversely affected.***

We are subject to reporting obligations under the U.S. securities laws. The Securities and Exchange Commission, or the SEC, as required by Section 404 of the Sarbanes-Oxley Act of 2002, has adopted rules requiring public companies to include a report of management in its annual report that contains management's assessment of the effectiveness of such company's internal controls over financial reporting.

15

Table of Contents

Our management has concluded that our internal controls over financial reporting were effective as of December 31, 2016. We however were not subject to the requirement to provide an attestation report by our registered public accounting firm regarding internal control over financial reporting as we were an "emerging growth company" as such term is defined in the JOBS Act as of December 31, 2016.

Once we cease to be an "emerging growth company", our independent registered public accounting firm must attest to and report on the effectiveness of our internal control over financial reporting. If we fail to maintain effective internal controls over financial reporting in the future, our management and, if applicable, our independent registered public accounting firm may not be able to conclude that we have effective internal controls over financial reporting at a reasonable assurance level. This could result in a loss of investor confidence in the reliability of our financial conditions which in turn could negatively impact the trading price of our ADSs and result in lawsuits being filed against us by our shareholders or otherwise harm our reputation. Furthermore, we have incurred and anticipate that we will continue to incur considerable costs and use significant management time and other resources in an effort to comply with Section 404 and other requirements of the Sarbanes-Oxley Act.

### We have limited insurance coverage.

The insurance industry in China is still at an early stage of development and business and litigation insurance products offered in China are limited. Other than the directors and officers liability insurance, we do not maintain any third-party liability, property, business interruption or key-man life insurance. The costs of insuring for these risks and the difficulties associated with acquiring such insurance on commercially reasonable terms make it impractical for us to have such insurance. In addition, any insurance policies that we maintain may not adequately cover our actual loss and we may not be able to successfully claim our losses under the insurance policies at all or on a timely basis. Any business disruption, litigation or natural disaster may cause us to incur substantial costs and divert our resources.

### We face risks related to health epidemics and natural disasters.

Our business could be adversely affected by the effects of epidemics. In recent years, there have been outbreaks of epidemics in China and globally. Our business operations could be disrupted if one of our employees is suspected of having H1N1 flu, avian flu or another epidemic, since it could require our employees to be quarantined and/or our offices to be disinfected. In addition, our results of operations could be adversely affected to the extent that the outbreak harms the Chinese economy in general and the mobile internet industry in particular.

We are also vulnerable to natural disasters and other calamities. Although we have servers that are hosted in an offsite location, our backup system does not capture data on a real-time basis and we may be unable to recover certain data in the event of a server failure. We cannot assure you that any backup systems will be adequate to protect us from the effects of fire, floods, typhoons, earthquakes, power loss, telecommunications failures, break-ins, war, riots, terrorist attacks or similar events. Any of the foregoing events may give rise to server interruptions, breakdowns, system failures, technology platform failures or internet failures, which could cause the loss or corruption of data or malfunctions of software or hardware as well as adversely affect our ability to provide services on our platform.

### Risks Related to Our Corporate Structure

#### If the PRC government finds that the agreements that establish the structure for operating our businesses in China do not comply with PRC regulations on foreign investment in internet and other related businesses, or if these regulations or their interpretation change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations.

Current PRC laws and regulations impose certain restrictions or prohibitions on foreign ownership of companies that engage in internet and other related businesses, including the provision of internet content and online game operations. Specifically, foreign ownership of an internet content provider may not exceed 50%. We are a company registered in the Cayman Islands and Beijing Momo Information Technology Co., Ltd., or Beijing Momo IT, our wholly-owned PRC subsidiary, is considered a foreign-invested enterprise. To comply with PRC laws and regulations, we conduct our business in China through Beijing Momo, our consolidated affiliated entity, and its subsidiaries, based on a series of contractual arrangements by and among Beijing Momo IT, Beijing Momo and its shareholders. As a result of these contractual arrangements, we exert control over Beijing Momo and its subsidiaries and consolidate or combine their operating results in our financial statements under U.S. GAAP. Beijing Momo and its subsidiaries hold the licenses, approvals and key assets that are essential for our business operations.

16

**Table of Contents**

In the opinion of our PRC counsel, Han Kun Law Offices, the ownership structure of our PRC subsidiary and Beijing Momo, and the contractual arrangements among our PRC subsidiary, Beijing Momo and its shareholders are in compliance with existing PRC laws, rules and regulations. There are, however, substantial uncertainties regarding the interpretation and application of current or future PRC laws and regulations. Thus, we cannot assure you that the PRC government will not ultimately take a view contrary to the opinion of our PRC counsel. If we are found to be in violation of any PRC laws or regulations or if the contractual arrangements among Beijing Momo IT, Beijing Momo and its shareholders are determined to be illegal or invalid by the PRC court, arbitral tribunal or regulatory authorities, the relevant governmental authorities would have broad discretion in dealing with such violation, including, without limitation:

- revoke our business and operating licenses;

- require us to discontinue or restrict operations;

- restrict our right to collect revenues;

- block our websites;

- require us to restructure the operations in such a way as to compel us to establish a new enterprise, re-apply for the necessary licenses or relocate our businesses, staff and assets;

- impose additional conditions or requirements with which we may not be able to comply; or

- take other regulatory or enforcement actions against us that could be harmful to our business.

The imposition of any of these penalties may result in a material and adverse effect on our ability to conduct our business. In addition, if the imposition of any of these penalties causes us to lose the rights to direct the activities of our consolidated affiliated entity and its subsidiaries or the right to receive their economic benefits, we would no longer be able to consolidate our consolidated affiliated entity and its subsidiaries. We do not believe that any penalties imposed or actions taken by the PRC government would result in the liquidation of the Company, Beijing Momo IT, or our consolidated affiliated entity and its subsidiaries.

***We rely on contractual arrangements with Beijing Momo and its shareholders for our operations in China, which may not be as effective in providing operational control as direct ownership.***

Due to the PRC restrictions or prohibitions on foreign ownership of internet and other related businesses in China, we operate our business in China through our consolidated affiliated entity Beijing Momo and its subsidiaries, in which we have no ownership interest. We rely on a series of contractual arrangements with Beijing Momo and its shareholders, including the powers of attorney, to control and operate its business.

Our ability to control the consolidated affiliated entity and its subsidiaries depends on the powers of attorney, pursuant to which Beijing Momo IT can vote on all matters requiring shareholder approval in the Beijing Momo. We believe this power of attorney is legally enforceable but may not be as effective as direct equity ownership. These contractual arrangements are intended to provide us with effective control over Beijing Momo and its subsidiaries and allow us to obtain economic benefits from them. See "Item 4. Information on the Company—C. Organizational Structure—Contractual Arrangements with Beijing Momo" for more details about these contractual arrangements.

17

**Table of Contents**

Although we have been advised by our PRC counsel, Han Kun Law Offices, that these contractual arrangements are valid, binding and enforceable under existing PRC laws and regulations, these contractual arrangements may not be as effective in providing control over Beijing Momo and its subsidiaries as direct ownership. If Beijing Momo or its shareholders fail to perform their respective obligations under the contractual arrangements, we may incur substantial costs and expend substantial resources to enforce our rights. All of these contractual arrangements are governed by and interpreted in accordance with PRC law, and disputes arising from these contractual arrangements will be resolved through arbitration in China. However, the legal system in China, particularly as it relates to arbitration proceedings, is not as developed as in other jurisdictions, such as the United States. See "—Risks Related to Doing Business in China—Uncertainties in the interpretation and enforcement of PRC laws and regulations could limit the legal protections available to you and us." There are very few precedents and little official guidance as to how contractual arrangements in the context of a variable interest entity, or a consolidated affiliated entity, should be interpreted or enforced under PRC law. There remain significant uncertainties regarding the ultimate outcome of arbitration should legal action become necessary. These uncertainties could limit our ability to enforce these contractual arrangements. In addition, arbitration awards are final and can only be enforced in PRC courts through arbitration award recognition proceedings, which could cause additional expenses and delays. In the event we are unable to enforce these contractual arrangements or we experience significant delays or other obstacles in the process of enforcing these contractual arrangements, we may not be able to exert effective control over our affiliated entities and may lose control over the assets owned by Beijing Momo and its subsidiaries. As a result, we may be unable to consolidate Beijing Momo and its subsidiaries in our consolidated financial statements, our ability to conduct our business may be negatively affected, and our business operations could be severely disrupted, which could materially and adversely affect our results of operations and financial condition.

### We may lose the ability to use and enjoy assets held by Beijing Momo and its subsidiaries that are important to the operation of our business if Beijing Momo or its subsidiaries declares bankruptcy or becomes subject to a dissolution or liquidation proceeding.

Beijing Momo and its subsidiaries, including Chengdu Momo, Zhejiang Shengdian Digital Network Co., Ltd., or Zhejiang Shengdian, and Tianjin Heer Technology Co., Ltd., or Tianjin Heer, hold certain assets that are important to our business operations, including the value-added telecommunication service license concerning the internet information service, or the ICP license, the internet culture operation license and the internet audio/video program transmission license. Under our contractual arrangements, the shareholders of Beijing Momo may not voluntarily liquidate Beijing Momo or approve it to sell, transfer, mortgage or dispose of its assets or legal or beneficial interests exceeding certain threshold in the business in any manner without our prior consent. However, in the event that the shareholders breach this obligation and voluntarily liquidate Beijing Momo, or Beijing Momo declares bankruptcy, or all or part of its assets become subject to liens or rights of third-party creditors, we may be unable to continue some or all of our business operations, which could materially and adversely affect our business, financial condition and results of operations. Furthermore, if Beijing Momo or its subsidiary undergoes a voluntary or involuntary liquidation proceeding, its shareholders or unrelated third-party creditors may claim rights to some or all of its assets, thereby hindering our ability to operate our business, which could materially and adversely affect our business, financial condition and results of operations.

### Contractual arrangements we have entered into with Beijing Momo may be subject to scrutiny by the PRC tax authorities. A finding that we owe additional taxes could significantly reduce our consolidated net income and the value of your investment.

Pursuant to applicable PRC laws and regulations, arrangements and transactions among related parties may be subject to audit or challenge by the PRC tax authorities. We may be subject to adverse tax consequences if the PRC tax authorities determine that the contractual arrangements among our PRC subsidiary, Beijing Momo and its shareholders are not on an arm's length basis and therefore constitute favorable transfer pricing. As a result, the PRC tax authorities could require that Beijing Momo adjust its taxable income upward for PRC tax purposes. Such an adjustment could adversely affect us by increasing Beijing Momo's tax expenses without reducing the tax expenses of our PRC subsidiary, subjecting Beijing Momo to late payment fees and other penalties for under-payment of taxes, and resulting in our PRC subsidiary's loss of its preferential tax treatment. Our consolidated results of operations may be adversely affected if Beijing Momo's tax liabilities increase or if it is subject to late payment fees or other penalties.

18

Table of Contents

***If the chops of Beijing Momo IT, Beijing Momo and Beijing Momo's subsidiaries are not kept safely, are stolen or are used by unauthorized persons or for unauthorized purposes, the corporate governance of these entities could be severely and adversely compromised.***

In China, a company chop or seal serves as the legal representation of the company towards third parties even when unaccompanied by a signature. Each legally registered company in China is required to maintain a company chop, which must be registered with the local Public Security Bureau. In addition to this mandatory company chop, companies may have several other chops which can be used for specific purposes. The chops of Beijing Momo IT, our PRC subsidiary, Beijing Momo and Beijing Momo's subsidiaries are generally held securely by personnel designated or approved by us in accordance with our internal control procedures. To the extent those chops are not kept safe, are stolen or are used by unauthorized persons or for unauthorized purposes, the corporate governance of these entities could be severely and adversely compromised and those corporate entities may be bound to abide by the terms of any documents so chopped, even if they were chopped by an individual who lacked the requisite power and authority to do so.

***The shareholders of Beijing Momo may have potential conflicts of interest with us, which may materially and adversely affect our business.***

The shareholders of Beijing Momo, our consolidated affiliated entity, include Messrs. Yan Tang, Yong Li, Xiaoliang Lei and Zhiwei Li, who are also our shareholders, directors or officers. Conflicts of interest may arise between the roles of Messrs. Yan Tang, Yong Li, Xiaoliang Lei and Zhiwei Li as shareholders, directors or officers of our company and as shareholders of Beijing Momo. We rely on these individuals to abide by the laws of the Cayman Islands, which provide that directors and officers owe a fiduciary duty to our company to act in good faith and in the best interest of our company and not to use their positions for personal gain. The shareholders of Beijing Momo have executed powers of attorney to appoint Beijing Momo IT, our PRC subsidiary, or a person designated by Beijing Momo IT to vote on their behalf and exercise voting rights as shareholders of Beijing Momo. We cannot assure you that when conflicts arise, shareholders of Beijing Momo will act in the best interest of our company or that conflicts will be resolved in our favor. If we cannot resolve any conflicts of interest or disputes between us and these shareholders, we would have to rely on legal proceedings, which may be expensive, time-consuming and disruptive to our operations. There is also substantial uncertainty as to the outcome of any such legal proceedings.

***We may rely on dividends paid by our PRC subsidiary to fund cash and financing requirements. Any limitation on the ability of our PRC subsidiary to pay dividends to us could have a material adverse effect on our ability to conduct our business and to pay dividends to holders of the ADSs and our ordinary shares.***

We are a holding company, and we may rely on dividends to be paid by our PRC subsidiary for our cash and financing requirements, including the funds necessary to pay dividends and other cash distributions to the holders of the ADSs and our ordinary shares and service any debt we may incur. If our PRC subsidiary incur debt on their own behalf in the future, the instruments governing the debt may restrict their ability to pay dividends or make other distributions to us.

Under PRC laws and regulations, a wholly foreign-owned enterprises in the PRC, such as Beijing Momo IT, may pay dividends only out of its accumulated profits as determined in accordance with PRC accounting standards and regulations. In addition, a wholly foreign-owned enterprise is required to set aside at least 10% of its after-tax profits each year, after making up previous years' accumulated losses, if any, to fund certain statutory reserve funds, until the aggregate amount of such a fund reaches 50% of its registered capital. At the discretion of the board of director of the wholly foreign-owned enterprise, it may allocate a portion of its after-tax profits based on PRC accounting standards to staff welfare and bonus funds. These reserve funds and staff welfare and bonus funds are not distributable as cash dividends. Any limitation on the ability of our wholly-owned PRC subsidiary to pay dividends or make other distributions to us could materially and adversely limit our ability to grow, make investments or acquisitions that could be beneficial to our business, pay dividends, or otherwise fund and conduct our business.

***Substantial uncertainties exist with respect to the enactment timetable, interpretation and implementation of draft PRC Foreign Investment Law and how it may impact the viability of our current corporate structure, corporate governance and business operations.***

The Ministry of Commerce of the People's Republic of China, or MOFCOM, published a discussion draft of the proposed Foreign Investment Law in January 2015 aiming to, upon its enactment, replace the trio of existing laws regulating foreign investment in China, namely, *the Sino-foreign Equity Joint Venture Enterprise Law, the Sino-foreign Cooperative Joint Venture Enterprise Law and the Wholly Foreign-invested Enterprise Law*, together with their implementation rules and ancillary regulations. The draft Foreign Investment Law embodies an expected PRC regulatory trend to rationalize its foreign investment regulatory regime in line with prevailing international practice and the legislative efforts to unify the corporate legal requirements for both foreign and domestic investments. While the Ministry of Commerce solicited comments on this draft earlier this year, substantial uncertainties exist with respect to its enactment timetable, interpretation and implementation. The draft Foreign Investment Law, if enacted as proposed, may materially impact the viability of our current corporate structure, corporate governance and business operations in many aspects.

19

Table of Contents

Among other things, the draft Foreign Investment Law expands the definition of foreign investment and introduces the principle of "actual control" in determining whether a company is considered a foreign-invested enterprise, or an FIE. The draft Foreign Investment Law specifically provides that entities established in China but "controlled" by foreign investors will be treated as FIEs, whereas an entity set up in a foreign jurisdiction would nonetheless be, upon market entry clearance by the MOFCOM, treated as a PRC domestic investor provided that the entity is "controlled" by PRC entities and/or citizens. In this connection, "control" is broadly defined in the draft law to cover the following summarized categories: (i) holding 50% of more of the voting rights of the subject entity; (ii) holding less than 50% of the voting rights of the subject entity but having the power to secure at least 50% of the seats on the board or other equivalent decision making bodies, or having the voting power to exert material influence on the board, the shareholders' meeting or other equivalent decision making bodies; or (iii) having the power to exert decisive influence, via contractual or trust arrangements, over the subject entity's operations, financial matters or other key aspects of business operations. Once an entity is determined to be an FIE, it will be subject to the foreign investment restrictions or prohibitions set forth in a "negative list," to be separately issued by the State Council later, if the FIE is engaged in the industry listed in the negative list. Unless the underlying business of the FIE falls within the negative list, which calls for market entry clearance by the MOFCOM, prior approval from the government authorities as mandated by the existing foreign investment legal regime would no longer be required for establishment of the FIE.

The "variable interest entity" structure, or VIE structure, has been adopted by many PRC-based companies, including us, to obtain necessary licenses and permits in the industries that are currently subject to foreign investment restrictions in China. See "—If the PRC government finds that the agreements that establish the structure for operating our businesses in China do not comply with PRC regulations on foreign investment in internet and other related businesses, or if these regulations or their interpretation change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations" and "Information on the Company—C. Organizational Structure— Contractual Arrangements with Beijing Momo." Under the draft Foreign Investment Law, variable interest entities, or consolidated affiliated entities, that are controlled via contractual arrangement would also be deemed as FIEs, if they are ultimately "controlled" by foreign investors. Therefore, for any companies with a VIE structure in an industry category that is on the "negative list," the VIE structure may be deemed legitimate only if the ultimate controlling person(s) is/are of PRC nationality (either PRC companies or PRC citizens). Conversely, if the actual controlling person(s) is/are of foreign nationalities, then the variable interest entities will be treated as FIEs and any operation in the industry category on the "negative list" without market entry clearance may be considered as illegal.

Through our dual-class share structure, our co-founder, chairman and chief executive officer, Mr. Yan Tang, a PRC citizen, possessed and controlled 74.4% of the voting power of our company as of March 31, 2017. However, the draft Foreign Investment Law has not taken a position on what actions shall be taken with respect to the existing companies with a VIE structure, whether or not these companies are controlled by Chinese parties, although a few possible options were proposed at the comment solicitation stage. Moreover, it is uncertain whether the mobile internet industry, in which our variable interest entities operate, will be subject to the foreign investment restrictions or prohibitions set forth in the "negative list" to be issued. If the enacted version of the Foreign Investment Law and the final "negative list" mandate further actions, such as MOFCOM market entry clearance, to be completed by companies with existing VIE structure like us, we face uncertainties as to whether such clearance can be timely obtained, or at all.

20

Table of Contents

**Risks Related to Doing Business in China**

*Uncertainties in the interpretation and enforcement of PRC laws and regulations could limit the legal protections available to you and us.*

The PRC legal system is based on written statutes and court decisions have limited precedential value. The PRC legal system evolves rapidly, and the interpretations of many laws, regulations and rules may contain inconsistencies and enforcement of these laws, regulations and rules involves uncertainties.

From time to time, we may have to resort to administrative and court proceedings to enforce our legal rights. However, since PRC judicial and administrative authorities have significant discretion in interpreting and implementing statutory and contractual terms, it may be more difficult to predict the outcome of a judicial or administrative proceeding than in more developed legal systems. Furthermore, the PRC legal system is based, in part, on government policies and internal rules, some of which are not published in a timely manner, or at all, but which may have retroactive effect. As a result, we may not always be aware of any potential violation of these policies and rules. Such unpredictability towards our contractual, property (including intellectual property) and procedural rights could adversely affect our business and impede our ability to continue our operations.

*If we fail to obtain and maintain the requisite licenses and approvals required under the complex regulatory environment applicable to our businesses in China, or if we are required to take compliance actions that are time-consuming or costly, our business, financial condition and results of operations may be materially and adversely affected.*

The internet and mobile industries in China are highly regulated. Beijing Momo and its subsidiaries are required to obtain and maintain applicable licenses and approvals from different regulatory authorities in order to provide their current services. Under the current PRC regulatory scheme, a number of regulatory agencies, including but not limited to the State Administration of Press, Publication, Radio, Film and Television, or SARFT, the Ministry of Culture, or MOC, Ministry of Industry and Information Technology, or MIIT, and the State Council Information Office, or SCIO, jointly regulate all major aspects of the internet industry, including the mobile internet and mobile games businesses. Operators must obtain various government approvals and licenses for relevant mobile business.

We have obtained the ICP licenses for provision of internet information services, internet culture operation license for operation of online games, and internet audio/video program transmission license for our live video service. These licenses are essential to the operation of our business and are generally subject to regular government review or renewal. However, we cannot assure you that we can successfully renew these licenses in a timely manner or that these licenses are sufficient to conduct all of our present or future business.

We are also required to obtain an internet publishing license from SARFT in order to publish online games through the mobile networks. As of the date of this annual report, we have yet to obtain an internet publishing license, and are in the process of preparing the application documents. Each mobile game is also required to be approved by SARFT prior to the commencement of its operations in China. As of the date of this annual report, we have obtained approvals from the SARFT for 16 games, and we are still in the process of applying with the SARFT for the approvals of the remaining games. In the event of any failure to meet the above-mentioned requirements, we may no longer be able to offer games on our platform, which would have a material adverse effect on our business and results of operations. All domestic online games must be filed with the MOC within 30 days after operation, and all imported online games must be approved by the MOC. As of March 31, 2017, 24 of the 31 online games we offered had completed the filing with the MOC. If we fail to complete, obtain or maintain any of the required licenses or approvals or make the necessary filings, we may be subject to various penalties, such as confiscation of the net revenues that were generated through online games, the imposition of fines and the discontinuation or restriction of our operations of online games.

If we fail to complete, obtain or maintain any of the required licenses or approvals or make the necessary filings, we may be subject to various penalties, such as confiscation of the net revenues that were generated through the unlicensed internet or mobile activities, the imposition of fines and the discontinuation or restriction of our operations. Any such penalties may disrupt our business operations and materially and adversely affect our business, financial condition and results of operations.

21

**Table of Contents**

***Regulation and censorship of information disseminated over the mobile and internet in China may adversely affect our business and subject us to liability for content posted on our platform.***

Internet companies in China are subject to a variety of existing and new rules, regulations, policies, and license and permit requirements. In connection with enforcing these rules, regulations, policies and requirements, relevant government authorities may suspend services by, or revoke licenses of, any internet or mobile content service provider that is deemed to provide illicit or pornographic information or content online or on mobile devices, and such activities may be intensified in connection with any ongoing government campaigns to eliminate prohibited content online. The competent government authorities, including the State Internet Information Office, the Ministry of Industry and Information Technology and the Ministry of Public Security, may crack down on illicit and pornographic information and content in the internet information services industry from time to time. Applicable sanctions, including fines, revocation of online publishing and online video licenses, and criminal prosecution, may be imposed on the provider of such information or content or its responsible officers.

We endeavor to eliminate illicit and pornographic information and content from our platform. We have made substantial investments in resources to monitor content that users post on our platform and the way in which our users engage with each other through our platform. Since our inception, we have terminated  tens of million user accounts because we viewed content generated by those users to be indecent and we terminated a substantial percentage of new user accounts in order to eliminate spam, fictitious accounts and indecent content from our platform. We use a variety of methods to ensure our platform remains a healthy and positive experience for our users, including a designated content management team, licensed third-party software, and our own data analytics software. Although we employ these methods to filter our users and content posted by our users, we cannot be sure that our internal content control efforts will be sufficient to remove all content that may be viewed as indecent or otherwise non-compliant with PRC law and regulations. Government standards and interpretations as to what constitutes illicit and pornographic online information, content or behavior are subject to interpretation and may change. Although we have not received any government sanctions in connection with content posted on our platform, government standards and interpretations may change in a manner that could render our current monitoring efforts insufficient. The Chinese government has wide discretion in regulating online activities and, irrespective of our efforts to control the content on our platform, government campaigns and other actions to reduce illicit and pornographic content and activities could subject us to negative press or regulatory challenges and sanctions, including fines, the suspension or revocation of our licenses to operate in China or a ban of our platform, including closure of one or more parts of or our entire business. Further, our senior management could be held criminally liable if we are deemed to be profiting from illicit and pornographic content on our platform. Although our business and operations have not been materially adversely affected by government campaigns or any other regulatory actions in the past, we cannot assure you that our business and operations will be immune from government actions or sanctions in the future. If government actions or sanctions are brought against us, or if there are widespread rumors that government actions or sanctions have been brought against us, our reputation could be harmed, we may lose users, customers or platform partners, our revenues and results of operation may be materially and adversely affected and the price of our ADSs could be dramatically reduced.

***Content posted or displayed on our social networking platform, including the live video shows hosted by us or our users, may be found objectionable by PRC regulatory authorities and may subject us to penalties and other severe consequences.***

The PRC government has adopted regulations governing internet and wireless access and the distribution of information over the internet and wireless telecommunication networks. Under these regulations, internet content providers and internet publishers are prohibited from posting or displaying over the internet or wireless networks content that, among other things, violates PRC laws and regulations, impairs the national dignity of China or the public interest, or is obscene, superstitious, fraudulent or defamatory. Furthermore, internet content providers are also prohibited from displaying content that may be deemed by relevant government authorities as "socially destabilizing" or leaking "state secrets" of the PRC. Failure to comply with these requirements may result in the revocation of licenses to provide internet content or other licenses, the closure of the concerned platforms and reputational harm. The operator may also be held liable for any censored information displayed on or linked to their platform. For a detailed discussion, see "Item 4. Information on the Company—B. Business Overview—Regulation."

We have designed and implemented procedures to monitor content on our social networking platform, including the live video shows hosted by us or our users, in order to comply with relevant laws and regulations. However, it may not be possible to determine in all cases the types of content that could result in our liability as a distributor of such content and, if any of the content posted or displayed on our social networking platform is deemed by the PRC government to violate any content restrictions, we would not be able to continue to display such content and could become subject to penalties, including confiscation of income, fines, suspension of business and revocation of required licenses, which could materially and adversely affect our business, financial condition and results of operations.

**Table of Contents**

We may also be subject to potential liability for any unlawful actions by our users on our platform. It may be difficult to determine the type of content or actions that may result in liability to us and, if we are found to be liable, we may be prevented from operating our business in China. Moreover, the costs of compliance with these regulations may continue to increase as a result of more content being made available by an increasing number of users of our social networking platform, which may adversely affect our results of operations. Although we have adopted internal procedures to monitor content and to remove offending content once we become aware of any potential or alleged violation, we may not be able to identify all the content that may violate relevant laws and regulations or third-party intellectual property rights. Even if we manage to identify and remove offensive content, we may still be held liable.

***Adverse changes in economic and political policies of the PRC government could have a material and adverse effect on overall economic growth in China, which could materially and adversely affect our business.***

Our revenues are substantially generated in China. Accordingly, our results of operations, financial condition and prospects are influenced by economic, political and legal developments in China. Economic reforms begun in the late 1970s have resulted in significant economic growth. However, any economic reform policies or measures in China may from time to time be modified or revised. China's economy differs from the economies of most developed countries in many respects, including with respect to the amount of government involvement, level of development, growth rate, control of foreign exchange and allocation of resources. While the PRC economy has experienced significant growth in the past 30 years, growth has been uneven across different regions and between economic sectors. The PRC government exercises significant control over China's economic growth through strategically allocating resources, controlling the payment of foreign currency-denominated obligations, setting monetary policy and providing preferential treatment to particular industries or companies. Although the Chinese economy has grown significantly in the past decade, that growth may not continue, as evidenced by the slowing of the growth of the Chinese economy since 2012. Any adverse changes in economic conditions in China, in the policies of the Chinese government or in the laws and regulations in China could have a material adverse effect on the overall economic growth of China. Such developments could adversely affect our business and operating results, lead to reduction in demand for our services and adversely affect our competitive position.

***Under the PRC Enterprise Income Tax Law, we may be classified as a PRC "resident enterprise," which could result in unfavorable tax consequences to us and our shareholders and have a material adverse effect on our results of operations and the value of your investment.***

Under the PRC Enterprise Income Tax Law, or the EIT Law, which became effective on January 1, 2008, an enterprise established outside the PRC with "de facto management bodies" within the PRC is considered a "resident enterprise" for PRC enterprise income tax purposes and is generally subject to a uniform 25% enterprise income tax rate on its worldwide income. In 2009, the State Administration of Taxation, or the SAT, issued the Notice Regarding the Determination of Chinese-Controlled Overseas Incorporated Enterprises as PRC Tax Resident Enterprise on the Basis of De Facto Management Bodies, or SAT Circular 82, which provides certain specific criteria for determining whether the "de facto management body" of a PRC-controlled enterprise that is incorporated offshore is located in China. Further to SAT Circular 82, on July 27, 2011, the SAT issued the Administrative Measures for Enterprise Income Tax of Chinese-Controlled Offshore Incorporated Resident Enterprises (Trial), or SAT Bulletin 45, to provide more guidance on the implementation of SAT Circular 82; the bulletin became effective on September 1, 2011. SAT Bulletin 45 clarified certain issues in the areas of resident status determination, post-determination administration and competent tax authorities' procedures.

According to SAT Circular 82, an offshore incorporated enterprise controlled by a PRC enterprise or a PRC enterprise group will be considered as a PRC tax resident enterprise by virtue of having its "de facto management body" in China and will be subject to PRC enterprise income tax on its worldwide income only if all of the following conditions are met: (a) the senior management and core management departments in charge of its daily operations function have their presence mainly in the PRC; (b) its financial and human resources decisions are subject to determination or approval by persons or bodies in the PRC; (c) its major assets, accounting books, company seals, and minutes and files of its board and shareholders' meetings are located or kept in the PRC; and (d) more than half of the enterprise's directors or senior management with voting rights habitually reside in the PRC. SAT Bulletin 45 specifies that when provided with a copy of Chinese tax resident determination certificate from a resident Chinese controlled offshore incorporated enterprise, the payer should not withhold 10% income tax when paying the Chinese-sourced dividends, interest, royalties, among others, to the Chinese controlled offshore incorporated enterprise.

23

Table of Contents

Although SAT Circular 82 and SAT Bulletin 45 only apply to offshore incorporated enterprises controlled by PRC enterprises or PRC enterprise groups and not those controlled by PRC individuals or foreigners, the determination criteria set forth therein may reflect the SAT's general position on how the term "de facto management body" could be applied in determining the tax resident status of offshore enterprises, regardless of whether they are controlled by PRC enterprises, individuals or foreigners.

If the PRC tax authorities determine that we or any of our non-PRC subsidiaries is a PRC resident enterprise for PRC enterprise income tax purposes, then we or any such non-PRC subsidiary could be subject to PRC tax at a rate of 25% on its world-wide income, which could materially reduce our net income. In addition, we will also be subject to PRC enterprise income tax reporting obligations.

If the PRC tax authorities determine that our company is a PRC resident enterprise for PRC enterprise income tax purposes, gains realized on the sale or other disposition of ADSs or ordinary shares may be subject to PRC tax, at a rate of 10% in the case of non-PRC enterprises or 20% in the case of non-PRC individuals (in each case, subject to the provisions of any applicable tax treaty), if such gains are deemed to be from PRC sources. Any such tax may reduce the returns on your investment in the ADSs.

***We face uncertainty with respect to indirect transfer of equity interests in PRC resident enterprises by their non-PRC holding companies.***

We face uncertainties regarding the reporting on and consequences of previous private equity financing transactions involving the transfer and exchange of shares in our company by non-resident investors. According to the Notice on Strengthening Administration of Enterprise Income Tax for Share Transfers by Non-PRC Resident Enterprises issued by the PRC State Administration of Taxation on December 10, 2009, with retroactive effect from January 1, 2008, or SAT Circular 698, where a non-resident enterprise transfers the equity interests in a PRC resident enterprise indirectly through a disposition of equity interests in an overseas holding company (other than a purchase and sale of shares issued by a PRC resident enterprise in public securities market), or an Indirect Transfer, and such overseas holding company is located in a tax jurisdiction that: (a) has an effective tax rate less than 12.5% or (b) does not tax foreign income of its residents, the non-resident enterprise, as the seller, shall report such Indirect Transfer to the competent tax authority of the PRC resident enterprise within 30 days of execution of the equity transfer agreement for such Indirect Transfer. The PRC tax authority will examine the true nature of the Indirect Transfer, and if the tax authority considers that the foreign investor has adopted an abusive arrangement without reasonable commercial purposes and for the purpose of avoiding or reducing PRC tax, they will disregard the existence of the overseas holding company that is used for tax planning purposes and re-characterize the Indirect Transfer. As a result, gains derived from such Indirect Transfer may be subject to PRC withholding tax at the rate of up to 10%. SAT Circular 698 also points out that when a non-resident enterprise transfers its equity interests in a PRC resident enterprise to its related parties at a price lower than the fair market value, the competent tax authorities have the power to make a reasonable adjustment on the taxable income of the transaction.

On February 3, 2015, the SAT issued a Public Notice [2015] No. 7, or Public Notice 7, to supersede existing provisions in relation to the Indirect Transfer as set forth in Circular 698, while the other provisions of Circular 698 remain in force. Public Notice 7 introduces a new tax regime that is significantly different from that under Circular 698. Public Notice extends its tax jurisdiction to capture not only Indirect Transfer as set forth under Circular 698 but also transactions involving transfer of immovable property in China and assets held under the establishment and place in China of a foreign company through the offshore transfer of a foreign intermediate holding company. Public Notice 7 also addresses the transfer of the equity interest in a foreign intermediate holding company widely. In addition, Public Notice 7 provides clearer criteria than Circular 698 on how to assess reasonable commercial purposes and introduces safe harbor scenarios applicable to internal group restructurings. However, it also brings challenges to both the foreign transferor and transferee of the Indirect Transfer as they have to make self-assessment on whether the transaction should be subject to PRC tax and to file or withhold the PRC tax accordingly.

24

Table of Contents

There are few guidances and practical experience as to the application of Circular 698 and Public Notice 7. Where non-resident investors were involved in our private equity financing, if such transactions were determined by the tax authorities to lack reasonable commercial purpose, we and our non-resident investors may become at risk of being taxed under Circular 698 and Public Notice 7 and may be required to expend valuable resources to comply with Circular 698 and Public Notice 7 or to establish that we should not be taxed under Circular 698 and Public Notice 7, which may have a material adverse effect on our financial condition and results of operations or the non-resident investors' investments in us.

The PRC tax authorities have the discretion under SAT Circular 59, Circular 698 and Public Notice 7 to make adjustments to the taxable capital gains based on the difference between the fair value of the equity interests transferred and the cost of investment. We may pursue acquisitions in the future that may involve complex corporate structures. If we are considered a non-resident enterprise under the PRC Enterprise Income Tax Law and if the PRC tax authorities make adjustments to the taxable income of the transactions under SAT Circular 59, Circular 698 and Public Notice 7, our income tax costs associated with such potential acquisitions will be increased, which may have an adverse effect on our financial condition and results of operations.

***China's M&A Rules and certain other PRC regulations establish complex procedures for some acquisitions of Chinese companies by foreign investors, which could make it more difficult for us to pursue growth through acquisitions in China.***

The Regulations on Mergers and Acquisitions of Domestic Enterprises by Foreign Investors, or the M&A Rules, and other recently adopted regulations and rules concerning mergers and acquisitions established additional procedures and requirements that could make merger and acquisition activities by foreign investors more time consuming and complex. For example, the M&A Rules require that MOFCOM be notified in advance of any change-of-control transaction in which a foreign investor takes control of a PRC domestic enterprise, if (i) any important industry is concerned, (ii) such transaction involves factors that impact or may impact national economic security, or (iii) such transaction will lead to a change in control of a domestic enterprise which holds a famous trademark or PRC time-honored brand. Moreover, the Anti-Monopoly Law promulgated by the Standing Committee of the National People's Congress on August 30, 2007 and effective as of August 1, 2008 requires that transactions which are deemed concentrations and involve parties with specified turnover thresholds (i.e., during the previous fiscal year, (i) the total global turnover of all operators participating in the transaction exceeds RMB10 billion and at least two of these operators each had a turnover of more than RMB400 million within China, or (ii) the total turnover within China of all the operators participating in the concentration exceeded RMB2 billion, and at least two of these operators each had a turnover of more than RMB400 million within China) must be cleared by MOFCOM before they can be completed. In addition, on February 3, 2011, the General Office of the State Council promulgated a Notice on Establishing the Security Review System for Mergers and Acquisitions of Domestic Enterprises by Foreign Investors, or the Circular 6, which officially established a security review system for mergers and acquisitions of domestic enterprises by foreign investors. Further, on August 25, 2011, MOFCOM promulgated the Regulations on Implementation of Security Review System for the Merger and Acquisition of Domestic Enterprises by Foreign Investors, or the MOFCOM Security Review Regulations, which became effective on September 1, 2011, to implement the Circular 6. Under Circular 6, a security review is required for mergers and acquisitions by foreign investors having "national defense and security" concerns and mergers and acquisitions by which foreign investors may acquire the "de facto control" of domestic enterprises with "national security" concerns. Under the MOFCOM Security Review Regulations, MOFCOM will focus on the substance and actual impact of the transaction when deciding whether a specific merger or acquisition is subject to security review. If MOFCOM decides that a specific merger or acquisition is subject to security review, it will submit it to the Inter-Ministerial Panel, an authority established under the Circular 6 led by the National Development and Reform Commission, or NDRC, and MOFCOM under the leadership of the State Council, to carry out security review. The regulations prohibit foreign investors from bypassing the security review by structuring transactions through trusts, indirect investments, leases, loans, control through contractual arrangements or offshore transactions. There is no explicit provision or official interpretation stating that the merging or acquisition of a company engaged in the mobile games business requires security review, and there is no requirement that acquisitions completed prior to the promulgation of the Security Review Circular are subject to MOFCOM review.

25

Table of Contents

In the future, we may grow our business by acquiring complementary businesses. Complying with the requirements of the above-mentioned regulations and other relevant rules to complete such transactions could be time consuming, and any required approval processes, including obtaining approval from the MOFCOM or its local counterparts may delay or inhibit our ability to complete such transactions. It is unclear whether our business would be deemed to be in an industry that raises "national defense and security" or "national security" concerns. However, MOFCOM or other government agencies may publish explanations in the future determining that our business is in an industry subject to the security review, in which case our future acquisitions in the PRC, including those by way of entering into contractual control arrangements with target entities, may be closely scrutinized or prohibited.

***PRC regulations relating to offshore investment activities by PRC residents may limit our PRC subsidiary's ability to increase its registered capital or distribute profits to us or otherwise expose us to liability and penalties under PRC law.***

The SAFE promulgated the Circular on Relevant Issues Relating to Domestic Resident's Investment and Financing and Roundtrip Investment through Special Purpose Vehicles, or SAFE Circular 37, in July 2014 that requires PRC residents or entities to register with SAFE or its local branch in connection with their establishment or control of an offshore entity established for the purpose of overseas investment or financing. In addition, such PRC residents or entities must update their SAFE registrations when the offshore special purpose vehicle undergoes material events relating to any change of basic information (including change of such PRC citizens or residents, name and operation term), increases or decreases in investment amount, transfers or exchanges of shares, or mergers or divisions. SAFE Circular 37 is issued to replace the Notice on Relevant Issues Concerning Foreign Exchange Administration for PRC Residents Engaging in Financing and Roundtrip Investments via Overseas Special Purpose Vehicles, or SAFE Circular 75.

If our shareholders who are PRC residents or entities do not complete their registration with the local SAFE branches, our PRC subsidiary may be prohibited from distributing its profits and proceeds from any reduction in capital, share transfer or liquidation to us, and we may be restricted in our ability to contribute additional capital to our PRC subsidiary. Moreover, failure to comply with the SAFE registration described above could result in liability under PRC laws for evasion of applicable foreign exchange restrictions.

To our knowledge, Messrs. Yan Tang, Yong Li, Zhiwei Li and Xiaoliang Lei have completed SAFE registration in connection with our financings and share transfer. However, we cannot compel all of our beneficial owners to comply with SAFE registration requirements. As a result, we cannot assure you that all of our shareholders or beneficial owners who are PRC residents or entities have complied with, and will in the future make or obtain any applicable registrations or approvals required by, SAFE regulations. Failure by such shareholders or beneficial owners to comply with SAFE regulations, or failure by us to amend the foreign exchange registrations of our PRC subsidiary, could subject us to fines or legal sanctions, restrict our overseas or cross-border investment activities, limit our subsidiaries' ability to make distributions or pay dividends or affect our ownership structure, which could adversely affect our business and prospects.

***Failure to comply with PRC regulations regarding the registration requirements for employee stock ownership plans or share option plans may subject the PRC plan participants or us to fines and other legal or administrative sanctions.***

In February 2012, SAFE promulgated the Notices on Issues Concerning the Foreign Exchange Administration for Domestic Individuals Participating in Stock Incentive Plans of Overseas Publicly-Listed Companies, or Circular 7, which replaced the Application Procedures of Foreign Exchange Administration for Domestic Individuals Participating in Employee Stock Ownership Plans or Stock Option Plans of Overseas Publicly-Listed Companies issued by SAFE on March 28, 2007. Under the Circular 7 and other relevant rules and regulations, PRC residents who participate in stock incentive plan in an overseas publicly-listed company are required to register with SAFE or its local branches and complete certain other procedures. Participants of a stock incentive plan who are PRC residents must retain a qualified PRC agent, which could be a PRC subsidiary of such overseas publicly listed company or another qualified institution selected by such PRC subsidiary, to conduct the SAFE registration and other procedures with respect to the stock incentive plan on behalf of its participants. Such participants must also retain an overseas entrusted institution to handle matters in connection with their exercise of stock options, the purchase and sale of corresponding stocks or interests and fund transfers. In addition, the PRC agent is required to amend the SAFE registration with respect to the stock incentive plan if there is any material change to the stock incentive plan, the PRC agent or the overseas entrusted institution or other material changes. We and our PRC employees who have been granted stock options are subject to these regulations. Failure of our PRC stock option holders to complete their SAFE registrations may subject these PRC residents to fines and legal sanctions and may also limit our ability to contribute additional capital into our PRC subsidiary, limit our PRC subsidiary's ability to distribute dividends to us, or otherwise materially adversely affect our business.

26

Table of Contents

***PRC regulation of loans to, and direct investment in, PRC entities by offshore holding companies and governmental control of currency conversion may restrict or prevent us from using offshore funds to make loans to our PRC subsidiary and consolidated affiliated entity and its subsidiaries, or to make additional capital contributions to our PRC subsidiary.***

We are an offshore holding company conducting our operations in China through our PRC subsidiary and consolidated affiliated entity and its subsidiaries. We may make loans to our PRC subsidiary and consolidated affiliated entity and its subsidiaries, or we may make additional capital contributions to our PRC subsidiary, or we may establish new PRC subsidiaries and make capital contributions to these new PRC subsidiaries, or we may acquire offshore entities with business operations in China in an offshore transaction.

Most of these ways are subject to PRC regulations and approvals. For example, loans by us to our wholly-owned PRC subsidiary to finance their activities cannot exceed statutory limits and must be registered with the local counterpart of SAFE. If we decide to finance our wholly-owned PRC subsidiaries by means of capital contributions, these capital contributions must be approved by the MOFCOM or its local counterpart. Due to the restrictions imposed on loans in foreign currencies extended to any PRC domestic companies, we are not likely to make such loans to Beijing Momo, which is PRC domestic company. Further, we are not likely to finance the activities of Beijing Momo by means of capital contributions due to regulatory restrictions relating to foreign investment in PRC domestic enterprises engaged in mobile internet services, online games and related businesses.

On August 29, 2008, SAFE promulgated the Circular on the Relevant Operating Issues Concerning the Improvement of the Administration of the Payment and Settlement of Foreign Currency Capital of Foreign-Invested Enterprises, or SAFE Circular 142, regulating the conversion by a foreign-invested enterprise of foreign currency registered capital into Renminbi by restricting how the converted Renminbi may be used. SAFE Circular 142 provides that Renminbi capital converted from foreign currency registered capital of a foreign-invested enterprise may only be used for purposes within the business scope approved by the applicable governmental authority and may not be used for equity investments within the PRC. In addition, SAFE strengthened its oversight of the flow and use of the Renminbi capital converted from the foreign currency registered capital of a foreign-invested company. The use of such Renminbi capital may not be altered without SAFE approval, and such Renminbi capital may not in any case be used to repay Renminbi loans if the proceeds of such loans have not been used. Violations of SAFE Circular 142 could result in severe monetary or other penalties. Furthermore, SAFE promulgated a circular on November 9, 2010, known as Circular 59, which tightens the examination of the authenticity of settlement of net proceeds from overseas offerings. SAFE further promulgated the Circular on Further Clarification and Regulation of the Issues Concerning the Administration of Certain Capital Account Foreign Exchange Businesses, or Circular 45, on November 9, 2011, which expressly prohibits foreign-invested enterprises from using registered capital settled in Renminbi converted from foreign currencies to grant loans through entrustment arrangements with a bank, repay inter-company loans or repay bank loans that have been transferred to a third party. Circular 142, Circular 59 and Circular 45 may significantly limit our ability to transfer the net proceeds from our overseas offerings, including our initial public offering consummated in December 2014, to our PRC subsidiary and to convert such proceeds into Renminbi, which may adversely affect our liquidity and our ability to fund and expand our business in the PRC.

On April 8, 2015, SAFE promulgated the Circular on Reforming the Management Approach Regarding the Foreign Exchange Capital Settlement of Foreign-invested Enterprises, or SAFE Circular 19, which will, upon its effective date as of June 1, 2015, supersedes the SAFE Circular 142. Circular 19 provides that, among other things, the foreign-invested company may convert the foreign currency in its capital account into RMB on a "at will" basis and the RMB funds so converted can be used for equity investments.

On June 9, 2016, SAFE promulgated the Circular on Reforming and Regulation of Administrative Policy on Settlement of Foreign Exchange of Capital Account, or SAFE Circular 16, which became effective on June 9, 2016. According to SAFE Circular 16, the foreign exchange capital of FIEs, foreign debt and funds raised through offshore listings may be settled on a discretionary basis, and can be settled at banks. The proportion of such discretionary settlement is temporarily determined as 100%. The RMB converted from relevant foreign exchange shall be kept in a designated account, and if a domestic enterprise needs to make further payment from such account, it still must provide supporting documents and go through the review process with the banks.

27

Table of Contents

***Fluctuation in the value of the RMB may have a material adverse effect on the value of your investment.***

The value of the RMB against the U.S. dollar and other currencies is affected by changes in China's political and economic conditions and China's foreign exchange policies, among other things. In July 2005, the PRC government changed its decades-old policy of pegging the value of the RMB to the U.S. dollar, and the RMB appreciated more than 20% against the U.S. dollar over the following three years. Between July 2008 and June 2010, this appreciation halted and the exchange rate between the RMB and the U.S. dollar remained within a narrow band. Since June 2010, the RMB has fluctuated against the U.S. dollar, at times significantly and unpredictably, and in recent years the RMB has depreciated significantly against the U.S. dollar. Since October 1, 2016, the RMB has joined the International Monetary Fund (IMF)'s basket of currencies that make up the Special Drawing Right (SDR), along with the U.S. dollar, the Euro, the Japanese yen and the British pound. In the fourth quarter of 2016, the RMB has depreciated significantly in the backdrop of a surging U.S. dollar and persistent capital outflows of China. With the development of the foreign exchange market and progress towards interest rate liberalization and Renminbi internationalization, the PRC government may in the future announce further changes to the exchange rate system and there is no guarantee that the RMB will not appreciate or depreciate significantly in value against the U.S. dollar in the future. It is difficult to predict how market forces or PRC or U.S. government policy may impact the exchange rate between the RMB and the U.S. dollar in the future.

Our revenues and costs are mostly denominated in RMB, whereas our reporting currency is the U.S. dollar. Any significant depreciation of the RMB may materially and adversely affect our revenues, earnings and financial position as reported in U.S. dollars. To the extent that we need to convert U.S. dollars we received from our initial public offering into RMB for our operations, appreciation of the RMB against the U.S. dollar would have an adverse effect on the RMB amount we would receive from the conversion. Conversely, if we decide to convert our RMB into U.S. dollars for the purpose of making payments for dividends on our ordinary shares or ADSs or for other business purposes, appreciation of the U.S. dollar against the RMB would have a negative effect on the U.S. dollar amount available to us.

***Our leased property interests may be defective and our right to lease the properties affected by such defects may be challenged, which could cause significant disruption to our business.***

Under PRC laws, all lease agreements are required to be registered with the local housing authorities. We presently lease five premises in China, and the landlords of these premises have not completed the registration of their ownership rights or the registration of our leases with the relevant authorities. Failure to complete these required registrations may expose our landlords, lessors and us to potential monetary fines. If these registrations are not obtained in a timely manner or at all, we may be subject to monetary fines or may have to relocate our offices and incur the associated losses.

***The audit report included in this annual report is prepared by an auditor who is not inspected by the Public Company Accounting Oversight Board and, as such, you are deprived of the benefits of such inspection.***

Our independent registered public accounting firm that issues the audit reports included in this annual report filed with the US Securities and Exchange Commission, as auditors of companies that are traded publicly in the United States and a firm registered with the US Public Company Accounting Oversight Board (United States), or the PCAOB, is required by the laws of the United States to undergo regular inspections by the PCAOB to assess its compliance with the laws of the United States and professional standards. Because our auditors are located in the Peoples' Republic of China, a jurisdiction where the PCAOB is currently unable to conduct inspections without the approval of the Chinese authorities, our auditors are not currently inspected by the PCAOB.

Inspections of other firms that the PCAOB has conducted outside China have identified deficiencies in those firms' audit procedures and quality control procedures, which may be addressed as part of the inspection process to improve future audit quality. This lack of PCAOB inspections in China prevents the PCAOB from regularly evaluating our auditor's audits and its quality control procedures. As a result, investors may be deprived of the benefits of PCAOB inspections.

28

Table of Contents

The inability of the PCAOB to conduct inspections of auditors in China makes it more difficult to evaluate the effectiveness of our auditor's audit procedures or quality control procedures as compared to auditors outside of China that are subject to PCAOB inspections. Investors may lose confidence in our reported financial information and procedures and the quality of our financial statements.

***If additional remedial measures are imposed on the Big Four PRC-based accounting firms, including our independent registered public accounting firm, in administrative proceedings brought by the SEC alleging the firms' failure to meet specific criteria set by the SEC, with respect to requests for the production of documents, we could be unable to timely file future financial statements in compliance with the requirements of the Exchange Act.***

Starting in 2011, the Chinese affiliates of the "big four" accounting firms, including our independent registered public accounting firm, were affected by a conflict between US and Chinese law. Specifically, for certain U.S. listed companies operating and audited in mainland China, the SEC and the PCAOB sought to obtain from the Chinese firms access to their audit work papers and related documents. The firms were, however, advised and directed that under China law they could not respond directly to the US regulators on those requests, and that requests by foreign regulators for access to such papers in China had to be channeled through the China Securities Regulatory Commission, or CSRC.

In late 2012, this impasse led the SEC to commence administrative proceedings under Rule 102(e) of its Rules of Practice and also under the Sarbanes-Oxley Act of 2002 against the Chinese accounting firms, including our independent registered public accounting firm. A first instance trial of the proceedings in July 2013 in the SEC's internal administrative court resulted in an adverse judgment against the firms. The administrative law judge proposed penalties on the firms including a temporary suspension of their right to practice before the SEC, although that proposed penalty did not take effect pending review by the Commissioners of the SEC. On February 6, 2015, before a review by the Commissioner had taken place, the firms reached a settlement with the SEC. Under the settlement, the SEC accepts that future requests by the SEC for the production of documents will normally be made to the CSRC. The firms will receive matching Section 106 requests, and are required to abide by a detailed set of procedures with respect to such requests, which in substance require them to facilitate production via the CSRC. If they fail to meet specified criteria, the SEC retains authority to impose a variety of additional remedial measures on the firms depending on the nature of the failure. Remedies for any future noncompliance could include, as appropriate, an automatic six-month bar on a single firm's performance of certain audit work, commencement of a new proceeding against a firm, or in extreme cases the resumption of the current proceeding against all four firms.

In the event that the SEC restarts the administrative proceedings, depending upon the final outcome, listed companies in the United States with major PRC operations may find it difficult or impossible to retain auditors in respect of their operations in the PRC, which could result in financial statements being determined to not be in compliance with the requirements of the Securities Exchange Act of 1934, as amended, or the Exchange Act, including possible delisting. Moreover, any negative news about any such future proceedings against these audit firms may cause investor uncertainty regarding China-based, United States-listed companies and the market price of our ADSs may be adversely affected.

If our independent registered public accounting firm were denied, even temporarily, the ability to practice before the SEC and we were unable to timely find another registered public accounting firm to audit and issue an opinion on our financial statements, our financial statements could be determined not to be in compliance with the requirements of the Exchange Act. Such a determination could ultimately lead to the delisting of our ADSs from the NASDAQ Global Select Market or deregistration from the SEC, or both, which would substantially reduce or effectively terminate the trading of our ADSs in the United States.

**Risks Related to Our ADSs**

***The trading price of our ADSs is likely to be volatile, which could result in substantial losses to investors.***

The price of our ADSs has been and is likely to continue to be volatile and could fluctuate widely due to factors beyond our control. This may happen because of broad market and industry factors, like the performance and fluctuation of the market prices of other companies with business operations located mainly in China that have listed their securities in the United States. A number of Chinese companies have listed their securities on U.S. stock markets. The securities of some of these companies have experienced significant volatility, including price declines in connection with their initial public offerings. The trading performances of these Chinese companies' securities after their offerings may affect the attitudes of investors toward Chinese companies listed in the United States in general and consequently may impact the trading performance of our ADSs, regardless of our actual operating performance.

29

Table of Contents

In addition to market and industry factors, the price and trading volume for our ADSs may be highly volatile for factors specific to our own operations, including the following:

- variations in our revenues, earnings, cash flow and data related to our user base or user engagement;

- announcements of new investments, acquisitions, strategic partnerships or joint ventures by us or our competitors;

- announcements of new products, services and expansions by us or our competitors;

- changes in financial estimates by securities analysts;

- detrimental adverse publicity about us, our services or our industry;

- additions or departures of key personnel;

- release of lock-up or other transfer restrictions on our outstanding equity securities or sales of additional equity securities; and

- potential litigation or regulatory investigations.

Any of these factors may result in large and sudden changes in the volume and price at which our ADSs will trade.

In the past, shareholders of public companies have often brought securities class action suits against those companies following periods of instability in the market price of their securities. If we were involved in a class action suit, it could divert a significant amount of our management's attention and other resources from our business and operations and require us to incur significant expenses to defend the suit, which could harm our results of operations. Any such class action suit, whether or not successful, could harm our reputation and restrict our ability to raise capital in the future. In addition, if a claim is successfully made against us, we may be required to pay significant damages, which could have a material adverse effect on our financial condition and results of operations.

*If securities or industry analysts do not publish research or reports about our business, or if they adversely change their recommendations regarding our ADSs, the market price for our ADSs and trading volume could decline.*

The trading market for our ADSs will be influenced by research or reports that industry or securities analysts publish about our business. If one or more analysts who cover us downgrade our ADSs, the market price for our ADSs would likely decline. If one or more of these analysts cease to cover us or fail to regularly publish reports on us, we could lose visibility in the financial markets, which in turn could cause the market price or trading volume for our ADSs to decline.

*We currently do not expect to pay dividends in the foreseeable future, and you must rely on price appreciation of our ADSs for return on your investment.*

We currently intend to retain most, if not all, of our available funds and any future earnings to fund the development and growth of our business. As a result, we do not expect to pay any cash dividends in the foreseeable future. Therefore, you should not rely on an investment in our ADSs as a source for any future dividend income.

30

Table of Contents

Our board of directors has complete discretion as to whether to distribute dividends subject to our memorandum and articles of association and certain restrictions under Cayman Islands law. In addition, our shareholders may by ordinary resolution declare a dividend, but no dividend may exceed the amount recommended by our directors. Even if our board of directors decides to declare and pay dividends, the timing, amount and form of future dividends, if any, will depend on, among other things, our future results of operations and cash flow, our capital requirements and surplus, the amount of distributions, if any, received by us from our subsidiary, our financial condition, contractual restrictions and other factors deemed relevant by our board of directors. Accordingly, the return on your investment in our ADSs will likely depend entirely upon any future price appreciation of our ADSs. There is no guarantee that our ADSs will appreciate in value or even maintain the price at which you purchased the ADSs. You may not realize a return on your investment in our ADSs and you may even lose your entire investment in our ADSs.

### Substantial future sales or the expectation of substantial sales of our ADSs in the public market could cause the price of our ADSs to decline.

Sales of our ADSs in the public market, or the perception that these sales could occur, could cause the market price of our ADSs to decline. Such sales also might make it more difficult for us to sell equity or equity-related securities in the future at a time and price that we deem appropriate. If any existing shareholder or shareholders sell a substantial amount of ADSs, the prevailing market price for our ADSs could be adversely affected. In addition, if we pay for our future acquisitions in whole or in part with additionally issued ordinary shares, your ownership interests in our company would be diluted and this, in turn, could have a material and adverse effect on the price of our ADSs.

### Mr. Yan Tang, our co-founder, chairman and chief executive officer, has considerable influence over important corporate matters. Our dual-class voting structure will limit your ability to influence corporate matters and could discourage others from pursuing any change of control transactions that holders of our Class A ordinary shares and ADSs may view as beneficial.

Mr. Yan Tang, our co-founder, chairman and chief executive officer, has considerable influence over important corporate matters. We have adopted a dual-class voting structure in which our ordinary shares consists of Class A ordinary shares and Class B ordinary shares. Holders of Class A ordinary shares are entitled to one vote per share in respect of matters requiring the votes of shareholders, while holders of Class B ordinary shares are entitled to ten votes per share. Each Class B ordinary share is convertible into one Class A ordinary share at any time by the holder thereof, while Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances. Due to the disparate voting powers associated with our two classes of ordinary shares, Mr. Tang beneficially owned a total of 74.4% of the aggregate voting power of our company as of March 31, 2017, including 74.3% that was owned through Gallant Future Holdings Limited, a company 100% beneficially owned by Mr. Tang through a family trust. As of March 31, 2017, all of our outstanding 85,886,370 Class B ordinary shares were held by Gallant Future Holdings Limited.

As a result of his majority voting power, Mr. Tang has considerable influence over matters such as electing directors and approving material mergers, acquisitions or other business combination transactions. This concentrated control will limit your ability to influence corporate matters and could also discourage others from pursuing any potential merger, takeover or other change of control transactions, which could have the effect of depriving the holders of our Class A ordinary shares and our ADSs of the opportunity to sell their shares at a premium over the prevailing market price.

### We may be classified as a passive foreign investment company under U.S. tax law, which could result in adverse U.S. federal income tax consequences to U.S. holders of our ADSs or ordinary shares.

Under United States federal income tax law, we will be classified as a PFIC for any taxable year if either (i) 75% or more of our gross income for the taxable year is passive income or (ii) 50% or more of the value of our assets (determined on the basis of a quarterly average) is attributable to assets that produce or are held for the production of passive income (the "asset test"). Although the law in this regard is unclear, we treat Beijing Momo as being owned by us for U.S. federal income tax purposes, not only because we exercise effective control over the operation of this entity but also because we are entitled to substantially all of its economic benefits, and, as a result, we consolidate its results of operations in our consolidated U.S. GAAP financial statements. If it were determined, however, that we are not the owner of Beijing Momo for U.S. federal income tax purposes, we would likely be treated as a PFIC for the taxable year ended December 31, 2016 and would anticipate being a PFIC for future taxable years. Assuming that we are the owner of Beijing Momo for United States federal income tax purposes and based upon our income and assets and the value of our ADSs, we do not believe that we were a PFIC for the taxable year ended December 31, 2016 and do not anticipate becoming a PFIC in the foreseeable future.

31

Table of Contents

However, because PFIC status is a factual determination made annually after the close of each taxable year on the basis of the composition of our income and assets, there can be no assurance that we will not be a PFIC for current the taxable year or any future taxable year. Fluctuations in the market price of our ADSs may cause us to become a PFIC for the current or subsequent taxable years because the value of our assets for purposes of the asset test, including the value of our goodwill and unbooked intangibles, may be determined by reference to the market price of our ADSs from time to time (which may be volatile). In estimating the value of our goodwill and other unbooked intangibles, we have taken into account our current market capitalization. If our market capitalization subsequently declines, we may be or become classified as a PFIC for the current taxable year or future taxable years. In addition, the overall level of our passive assets will be affected by how, and how quickly, we spend our liquid assets. Under circumstances where our revenue from activities that produce passive income significantly increase relative to our revenue from activities that produce non-passive income, or where we determine not to deploy significant amounts of cash for active purposes, our risk of becoming classified as a PFIC may substantially increase. Furthermore, because there are uncertainties in the application of the relevant rules, it is possible that the IRS may challenge our classification of certain income or assets as non-passive, or our valuation of our goodwill and other unbooked intangibles, each of which may result in our company becoming classified as a PFIC for the current or subsequent taxable years.

If we were to be or become classified as a PFIC, a U.S. Holder (as defined in "Item 10. Additional Information—E. Taxation—United States Federal Income Tax Considerations") will generally be subject to reporting requirements and may incur significantly increased U.S. federal income tax on gain recognized on the sale or other disposition of the ADSs or ordinary shares and on the receipt of distributions on the ADSs or ordinary shares to the extent such gain or distribution is treated as an "excess distribution" under the U.S. federal income tax rules. Further, if we were a PFIC for any year during which a U.S. Holder held our ADSs or ordinary shares, we generally would continue to be treated as a PFIC for all succeeding years during which such U.S. Holder held our ADSs or ordinary shares. You are urged to consult your tax advisor concerning the U.S. federal income tax consequences of holding and disposing of ADSs or ordinary shares if we are or become classified as a PFIC. For more information see "Item 10. Additional Information—E. Taxation—United States Federal Income Tax Considerations—Passive Foreign Investment Company Rules."

***The approval of the China Securities Regulatory Commission may be required in connection with our initial public offering under PRC law.***

The M&A Rules, which were adopted in 2006 by six PRC regulatory agencies, including the CSRC, purport to require offshore special purpose vehicles that are controlled by PRC companies or individuals and that have been formed for the purpose of seeking a public listing on an overseas stock exchange through acquisitions of PRC domestic companies or assets to obtain CSRC approval prior to publicly listing their securities on an overseas stock exchange. The interpretation and application of the regulations remain unclear, and our initial public offering consummated in December 2014 may ultimately require approval from the CSRC. If CSRC approval is required, it is uncertain how long it will take us to obtain the approval and any failure to obtain or delay in obtaining CSRC approval for our initial public offering would subject us to sanctions imposed by the CSRC and other PRC regulatory agencies, which could include fines and penalties on our operations in China, restrictions or limitations on our ability to pay dividends outside of China, and other forms of sanctions that may materially and adversely affect our business, results of operations and financial condition.

Our PRC counsel, Han Kun Law Offices, has advised us that, based on its understanding of the current PRC laws and regulations, we are not required to submit an application to the CSRC for the approval of the listing and trading of our ADSs on the NASDAQ Global Select Market because (i) the CSRC currently has not issued any definitive rule or interpretation concerning whether offerings like our initial public offering are subject to this regulation, and (ii) our wholly-owned PRC subsidiary was established by foreign direct investment, rather than through a merger or acquisition of a domestic company as defined under the M&A Rules. However, we cannot assure you that relevant PRC government agencies, including the CSRC, would reach the same conclusion as our PRC counsel, and hence we may face regulatory actions or other sanctions from the CSRC or other PRC regulatory agencies. These regulatory agencies may impose fines and penalties on our operations in China, limit our operating privileges in China, delay or restrict the repatriation of the proceeds from our initial public offering into China or take other actions that could have a material adverse effect on our business, financial condition, results of operations and prospects, as well as the trading price of the ADSs. In addition, if the CSRC or other regulatory agencies later promulgate new rules or explanations requiring that we obtain their approvals for our initial public offering, we may be unable to obtain a waiver of such approval requirements, if and when procedures are established to obtain such a waiver. Any uncertainties and/or negative publicity regarding such approval requirement could have a material adverse effect on the trading price of the ADSs.

32

Table of Contents

***Our memorandum and articles of association contain anti-takeover provisions that could have a material adverse effect on the rights of holders of our Class A ordinary shares and ADSs.***

Our currently effective second amended and restated memorandum and articles of association contain provisions to limit the ability of others to acquire control of our company or cause us to engage in change-of-control transactions. These provisions could have the effect of depriving our shareholders of an opportunity to sell their shares at a premium over prevailing market prices by discouraging third parties from seeking to obtain control of our company in a tender offer or similar transaction. Our dual-class voting structure gives disproportionate voting power to the Class B ordinary shares held by Gallant Future Holdings Limited, a company 100% beneficially owned by Yan Tang, our co-founder, chairman and chief executive officer. Mr. Tang beneficially owned 74.4% of the aggregate voting power of our company as of March 31, 2017, including 74.3% of the aggregate voting power owned through Gallant Future Holdings Limited. In addition, our board of directors has the authority, without further action by our shareholders, to issue preferred shares in one or more series and to fix their designations, powers, preferences, privileges, and relative participating, optional or special rights and the qualifications, limitations or restrictions, including dividend rights, conversion rights, voting rights, terms of redemption and liquidation preferences, any or all of which may be greater than the rights associated with our Class A ordinary shares, in the form of ADS or otherwise. Preferred shares could be issued quickly with terms calculated to delay or prevent a change in control of our company or make removal of management more difficult. If our board of directors decides to issue preferred shares, the price of our ADSs may fall and the voting and other rights of the holders of our Class A ordinary shares and ADSs may be materially and adversely affected.

***You may face difficulties in protecting your interests, and your ability to protect your rights through U.S. courts may be limited, because we are registered by way of continuation under Cayman Islands law.***

We are an exempted company limited by shares registered under the laws of the Cayman Islands. Our corporate affairs are governed by our memorandum and articles of association, the Companies Law (2016 Revision) of the Cayman Islands and the common law of the Cayman Islands. The rights of shareholders to take action against the directors, actions by minority shareholders and the fiduciary responsibilities of our directors to us under Cayman Islands law are to a large extent governed by the common law of the Cayman Islands. The common law of the Cayman Islands is derived in part from comparatively limited judicial precedent in the Cayman Islands as well as from the common law of England, the decisions of whose courts are of persuasive authority, but are not binding, on a court in the Cayman Islands. The rights of our shareholders and the fiduciary responsibilities of our directors under Cayman Islands law are not as clearly established as they would be under statutes or judicial precedent in some jurisdictions in the United States. In particular, the Cayman Islands has a less developed body of securities laws than the United States. Some U.S. states, such as Delaware, have more fully developed and judicially interpreted bodies of corporate law than the Cayman Islands. In addition, Cayman Islands companies may not have standing to initiate a shareholder derivative action in a federal court of the United States.

Shareholders of Cayman Islands exempted companies like us have no general rights under Cayman Islands law to inspect corporate records or to obtain copies of lists of shareholders of these companies. Our directors have discretion under our articles of association to determine whether or not, and under what conditions, our corporate records may be inspected by our shareholders, but are not obliged to make them available to our shareholders. This may make it more difficult for you to obtain the information needed to establish any facts necessary for a shareholder motion or to solicit proxies from other shareholders in connection with a proxy contest.

As a result of all of the above, public shareholders may have more difficulty in protecting their interests in the face of actions taken by management, members of the board of directors or controlling shareholders than they would as public shareholders of a company incorporated in the United States.

Table of Contents

*Certain judgments obtained against us by our shareholders may not be enforceable.*

We are a Cayman Islands company and all of our assets are located outside of the United States. Substantially all of our current operations are conducted in China. In addition, a majority of our current directors and officers are nationals and residents of countries other than the United States. Substantially all of the assets of these persons are located outside the United States. As a result, it may be difficult or impossible for you to effect service of process within the United States upon us or these persons or to bring an action against us or against these individuals in the United States in the event that you believe that your rights have been infringed under the U.S. federal securities laws or otherwise. Even if you are successful in bringing an action of this kind, the laws of the Cayman Islands and of China may render you unable to enforce a judgment against our assets or the assets of our directors and officers. There is no statutory enforcement in the Cayman Islands of judgments obtained in the federal or state courts of the United States (and the Cayman Islands are not a party to any treaties for the reciprocal enforcement or recognition of such judgments), a judgment obtained in such jurisdiction will be recognized and enforced in the courts of the Cayman Islands at common law, without any re-examination of the merits of the underlying dispute, by an action commenced on the foreign judgment debt in the Grand Court of the Cayman Islands, provided such judgment (a) is given by a foreign court of competent jurisdiction, (b) imposes on the judgment debtor a liability to pay a liquidated sum for which the judgment has been given, (c) is final, (d) is not in respect of taxes, a fine or a penalty, and (e) was not obtained in a manner and is not of a kind the enforcement of which is contrary to natural justice or the public policy of the Cayman Islands. However, the Cayman Islands courts are unlikely to enforce a judgment obtained from the U.S. courts under civil liability provisions of the U.S. federal securities law if such judgment is determined by the courts of the Cayman Islands to give rise to obligations to make payments that are penal or punitive in nature. Because such a determination has not yet been made by a court of the Cayman Islands, it is uncertain whether such civil liability judgments from U.S. courts would be enforceable in the Cayman Islands.

*We are an emerging growth company within the meaning of the Securities Act and may take advantage of certain reduced reporting requirements.*

We are an "emerging growth company," as defined in the JOBS Act, and we may take advantage of certain exemptions from requirements applicable to other public companies that are not emerging growth companies including, most significantly, not being required to comply with the auditor attestation requirements of Section 404 for so long as we are an emerging growth company until the fifth anniversary from the date of our initial listing.

The JOBS Act also provides that an emerging growth company does not need to comply with any new or revised financial accounting standards until such date that a private company is otherwise required to comply with such new or revised accounting standards. However, we had elected to "opt out" of this provision and, as a result, we will comply with new or revised accounting standards as required when they are adopted for public companies. This decision to opt out of the extended transition period under the JOBS Act was irrevocable.

*We are a foreign private issuer within the meaning of the rules under the Exchange Act, and as such we are exempt from certain provisions applicable to United States domestic public companies.*

Because we are a foreign private issuer under the Exchange Act, we are exempt from certain provisions of the securities rules and regulations in the United States that are applicable to U.S. domestic issuers, including:

- the rules under the Exchange Act requiring the filing of quarterly reports on Form 10-Q or current reports on Form 8-K with the SEC;

- the sections of the Exchange Act regulating the solicitation of proxies, consents, or authorizations in respect of a security registered under the Exchange Act;

- the sections of the Exchange Act requiring insiders to file public reports of their stock ownership and trading activities and liability for insiders who profit from trades made in a short period of time; and

- the selective disclosure rules by issuers of material nonpublic information under Regulation FD.

34

Table of Contents

We are required to file an annual report on Form 20-F within four months of the end of each fiscal year. In addition, we intend to publish our results on a quarterly basis through press releases, distributed pursuant to the rules and regulations of the NASDAQ Global Select Market. Press releases relating to financial results and material events will also be furnished to the SEC on Form 6-K. However, the information we are required to file with or furnish to the SEC will be less extensive and less timely compared to that required to be filed with the SEC by U.S. domestic issuers. As a result, you may not be afforded the same protections or information, which would be made available to you, were you investing in a U.S. domestic issuer. As a Cayman Islands company listed on the NASDAQ Global Select Market, we are subject to the NASDAQ Global Select Market corporate governance listing standards. However, NASDAQ Global Select Market rules permit a foreign private issuer like us to follow the corporate governance practices of its home country. Certain corporate governance practices in the Cayman Islands, which is our home country, may differ significantly from the NASDAQ Global Select Market corporate governance listing standards. To the extent that we choose to utilize the home country exemption for corporate governance matters, our shareholders may be afforded less protection than they otherwise would under the NASDAQ Global Select Market corporate governance listing standards applicable to U.S. domestic issuers. We follow home country practice with respect to annual shareholders meetings and did not hold an annual meeting of shareholders in 2016. As a result, you may not be afforded the same protections or information, which would be made available to you, were you investing in a U.S. domestic issuer.

***The voting rights of holders of ADSs are limited by the terms of the deposit agreement, and you may not be able to exercise your right to vote your Class A ordinary shares.***

As a holder of our ADSs, you will only be able to exercise the voting rights with respect to the underlying Class A ordinary shares in accordance with the provisions of the deposit agreement. Under the deposit agreement, you must vote by giving voting instructions to the depositary. Upon receipt of your voting instructions, the depositary will vote the underlying Class A ordinary shares in accordance with these instructions. You will not be able to directly exercise your right to vote with respect to the underlying shares unless you withdraw the shares. Under our currently effective second amended and restated memorandum and articles of association, the minimum notice period required for convening a general meeting is 14 days. When a general meeting is convened, you may not receive sufficient advance notice to withdraw the shares underlying your ADSs to allow you to vote with respect to any specific matter. If we ask for your instructions, the depositary will notify you of the upcoming vote and will arrange to deliver our voting materials to you. We cannot assure you that you will receive the voting materials in time to ensure that you can instruct the depositary to vote your shares. In addition, the depositary and its agents are not responsible for failing to carry out voting instructions or for their manner of carrying out your voting instructions. This means that you may not be able to exercise your right to vote and you may have no legal remedy if the shares underlying your ADSs are not voted as you requested.

***The depositary for our ADSs will give us a discretionary proxy to vote our Class A ordinary shares underlying your ADSs if you do not vote at shareholders' meetings, except in limited circumstances, which could adversely affect your interests.***

Under the deposit agreement for the ADSs, if you do not vote, the depositary will give us a discretionary proxy to vote our Class A ordinary shares underlying your ADSs at shareholders' meetings unless:

- we have failed to timely provide the depositary with notice of meeting and related voting materials;

- we have instructed the depositary that we do not wish a discretionary proxy to be given;

- we have informed the depositary that there is substantial opposition as to a matter to be voted on at the meeting;

- a matter to be voted on at the meeting would have a material adverse impact on shareholders; or

- the voting at the meeting is to be made on a show of hands.

The effect of this discretionary proxy is that if you do not vote at shareholders' meetings, you cannot prevent our Class A ordinary shares underlying your ADSs from being voted, except under the circumstances described above. This may make it more difficult for shareholders to influence the management of our company. Holders of our Class A ordinary shares are not subject to this discretionary proxy.

35

Table of Contents

***You may not receive dividends or other distributions on our Class A ordinary shares and you may not receive any value for them, if it is illegal or impractical to make them available to you.***

The depositary of our ADSs has agreed to pay to you the cash dividends or other distributions it or the custodian receives on Class A ordinary shares or other deposited securities underlying our ADSs, after deducting its fees and expenses. You will receive these distributions in proportion to the number of Class A ordinary shares your ADSs represent. However, the depositary is not responsible if it decides that it is unlawful or impractical to make a distribution available to any holders of ADSs. For example, it would be unlawful to make a distribution to a holder of ADSs if it consists of securities that require registration under the Securities Act but that are not properly registered or distributed under an applicable exemption from registration. The depositary may also determine that it is not feasible to distribute certain property through the mail. Additionally, the value of certain distributions may be less than the cost of mailing them. In these cases, the depositary may determine not to distribute such property. We have no obligation to register under U.S. securities laws any ADSs, ordinary shares, rights or other securities received through such distributions. We also have no obligation to take any other action to permit the distribution of ADSs, ordinary shares, rights or anything else to holders of ADSs. This means that you may not receive distributions we make on our Class A ordinary shares or any value for them if it is illegal or impractical for us to make them available to you. These restrictions may cause a material decline in the value of our ADSs.

***You may experience dilution of your holdings due to inability to participate in rights offerings.***

We may, from time to time, distribute rights to our shareholders, including rights to acquire securities. Under the deposit agreement, the depositary will not distribute rights to holders of ADSs unless the distribution and sale of rights and the securities to which these rights relate are either exempt from registration under the Securities Act with respect to all holders of ADSs, or are registered under the provisions of the Securities Act. The depositary may, but is not required to, attempt to sell these undistributed rights to third parties, and may allow the rights to lapse. We may be unable to establish an exemption from registration under the Securities Act, and we are under no obligation to file a registration statement with respect to these rights or underlying securities or to endeavor to have a registration statement declared effective. Accordingly, holders of ADSs may be unable to participate in our rights offerings and may experience dilution of their holdings as a result.

***You may be subject to limitations on transfer of your ADSs.***

Your ADSs are transferable on the books of the depositary. However, the depositary may close its books at any time or from time to time when it deems expedient in connection with the performance of its duties. The depositary may close its books from time to time for a number of reasons, including in connection with corporate events such as a rights offering, during which time the depositary needs to maintain an exact number of ADS holders on its books for a specified period. The depositary may also close its books in emergencies, and on weekends and public holidays. The depositary may refuse to deliver, transfer or register transfers of our ADSs generally when our share register or the books of the depositary are closed, or at any time if we or the depositary thinks it is advisable to do so because of any requirement of law or of any government or governmental body, or under any provision of the deposit agreement, or for any other reason.

**Item 4.        Information on the Company**

**A.    History and Development of the Company**

We started our operations in July 2011 when our founders established Beijing Momo in China. In order to facilitate foreign investment in our company, we incorporated our holding company under the name of Momo Technology Company Limited in the British Virgin Islands in November 2011. In July 2014, Momo Technology Company Limited was redomiciled in the Cayman Islands as an exempted company registered under the laws of the Cayman Islands, and was renamed Momo Inc. The following outlines other major changes to our corporate structure in the past years.

- In December 2011, we established Momo HK, a wholly-owned subsidiary, in Hong Kong.

36

- In March 2012, Beijing Momo IT was established as a wholly-owned subsidiary of Momo HK.

- In April 2012, we underwent a corporate restructuring, whereby we obtained effective control over Beijing Momo through a series of contractual arrangements among Beijing Momo, Beijing Momo IT and the shareholders of Beijing Momo IT.

- In May 2013, we established Chengdu Momo as a wholly-owned subsidiary of Beijing Momo.

- In March 2014, we formed Momo Technology Overseas Holding Company Limited and our Delaware subsidiary, Momo Information Technologies Corp.

- In January 2015, we established Shanghai Momo Technology Co., Ltd. as a wholly-owned subsidiary of Beijing Momo.

- In October 2015, we established Chengdu Biyou Technology Co., Ltd., or Chengdu Biyou, as a wholly-owned subsidiary of Chengdu Momo.

- In March 2016, we established Tianjin Heer as a wholly-owned subsidiary of Beijing Momo.

- In November 2016, we established Momo Pictures Co., Ltd., as a wholly-owned subsidiary of Beijing Momo, and QOOL Media (Tianjin) Co., Ltd., as a joint venture which is 70% owned by Beijing Momo.

- In March 2017, we acquired 100% equity interest of Zhejiang Shengdian, upon which it became a subsidiary of Beijing Momo. Zhejiang Shengdian now holds our internet audio/video program transmission license.

In December 2014, we completed our initial public offering and listed our ADSs on the NASDAQ Global Select Market under the symbol "MOMO."

Our principal executive offices are located at 20th Floor, Block B, Tower 2, Wangjing SOHO, No.1 Futongdong Street, Chaoyang District, Beijing 100102, People's Republic of China. Our telephone number at this address is +86-10-5731-0567. Our registered office in the Cayman Islands is located at P.O. Box 309, Ugland House, Grand Cayman KY1-1104, Cayman Islands. Our agent for service of process in the United States is Law Debenture Corporate Services Inc., of 801 2nd Avenue, Suite 403, New York, NY 10017.

**Withdrawal of Proposed Going Private Transaction**

Our board of directors received a preliminary non-binding proposal letter dated June 23, 2015 from Mr. Yan Tang, our chairman and chief executive officer, Matrix Partners China II Hong Kong Limited, Sequoia Capital China Investment Management L.P. and Huatai Ruilian Fund Management Co., Ltd., or collectively the Buyer Group, to acquire all of our outstanding Class A ordinary shares not already owned by the Buyer Group in a going private transaction for US$18.90 per ADS, or US$9.45 per Class A ordinary share, in cash. Our board of directors formed a special committee consisting of two of our independent directors, namely, Dr. Dave Daqing Qi and Mr. Benson Bing Chung Tam, on June 23, 2015 to consider and evaluate the proposal and any other alternative proposals or other strategic alternatives that may be available to our company, and to negotiate the terms of any potential definitive agreement. On April 5, 2016, Alibaba Investment Limited and Rich Moon Limited joined the Buyer Group for the proposed going private transaction.

On April 5, 2016, the Buyer Group (including Alibaba Investment Limited and Rich Moon Limited) executed an amendment to the consortium agreement dated July 6, 2015 among themselves to extend the exclusivity period, pursuant to which the Buyer Group agreed that during the period beginning on July 6, 2015 and ending on the earlier of (i) April 5, 2017 and (ii) the termination of the consortium agreement by mutual written agreement of the members of the Buyer Group, members of the Buyer Group will work exclusively with each other with respect to the going private transaction.

On August 18, 2016, the special committee of our board of directors received a letter from the Buyer Group, stating that the Buyer Group would like to withdraw the non-binding going private proposal with immediate effect.

37

Table of Contents

**B.    Business Overview**

We operate Momo, one of China's leading mobile-based social networking platforms. We enable users to establish and expand social relationships based on location and interests. Our platform includes our Momo mobile application and a variety of related features, functionalities, tools and services that we provide to users, customers and platform partners. We also operate a stand-alone video application called Hani, which features the live video content on our core Momo mobile application.

We aim to offer our users an authentic social experience by encouraging them to provide detailed personal information on Momo. Leveraging our social interest graph engine and our analysis of user behavior data, we are able to provide users a customized experience based on their social preferences and needs. Momo users can maintain and strengthen their relationships through our private and group communication tools, content creation and sharing functions, recreational activities such as gaming, as well as the offline social activities promoted on our platform. Enabled by technological development, we believe video creation and sharing is becoming an important way for users to socialize and have fun via the internet. In order to capture the opportunities created by such social trend, in 2016 we introduced various video features and services including live streaming, short video as well as video chat in peer-to-peer and group chatting environment. The various video features and functionalities not only enrich the ways in which our users can express themselves and interact but also provide entertaining contents to our users and help them build more social and recreational activities around it.

We have built a large user base on Momo since its launch in 2011. Our MAUs increased 16.2% to 81.1 million in December 2016 from 69.8 million in December 2015. Our MAUs were 69.3 million in December 2014. The growth rate of our MAUs slowed down in 2015 primarily due to the reduced growth of number of smartphone users in China, and upgrades to our platform during 2015 that took time for users to adapt to.

Our Momo mobile application can be downloaded and used free of charge, and we generate our revenues from the various services we offer on the Momo platform. Our revenues increased significantly from US$44.8 million in 2014 to US$134.0 million in 2015 and further to US$553.1 million in 2016. We currently generate our revenues from live video service, value-added service, mobile marketing, mobile games and other services. Our live video service, which was launched in September 2015 and allows users to purchase and send in-show virtual gifts to other users hosting live shows, currently contributes to the largest share of our revenues, generating 68.1% of our net revenues in 2016. We generated 66.5%, 43.6% and 12.2% of our net revenues from value-added service in 2014, 2015 and 2016, respectively, in relation to our membership subscription package that provides members with additional functions and privileges on our platform and, starting in the fourth quarter of 2016, virtual gift service, which allows our users to purchase and send virtual gifts to other users outside of the live video service. Mobile marketing services, mobile games and other services contributed 4.4%, 25.1% and 4.0%, respectively, of our revenues in 2014, 29.0%, 23.2% and 3.3%, respectively, of our revenues in 2015, and 12.0%, 6.4% and 1.3%, respectively, of our revenues in 2016. We had a net loss of US$25.4 million in 2014, and a net income of US$13.7 million and US$145.3 million in 2015 and 2016, respectively.

**The Momo Platform**

Our Momo platform includes our Momo mobile application and a variety of related features, functionalities, tools and services that we provide to users, customers and platform partners. The Momo mobile application, which is available on Android, iOS and Windows platforms, enables users to establish and expand their social relationships based on locations and interests. Momo offers a personal and lively way for users to discover people nearby, and facilitates the connecting, communicating, interacting, and content sharing with others. Momo features various location and interest-based features, including *Nearby* functions, live broadcast and others. Communications within our platform are supported by multi-media instant messaging tools. Momo's social features are increasingly integrated with video functions to offer more fun and entertaining contents and to enhance and encourage social interaction between users.

38

**Table of Contents**

Key features and functionalities offered by the Momo platform include the following:

### "Nearby" Functions

*Nearby People*. This function allows users to find out their approximate distance from each other in real time and is the primary tool through which users can establish and expand their social relationships. *Nearby People* is organized under our default tab and presents a curated list of nearby users with their profile pictures, relative distances and the time they last checked-in on Momo. The list of nearby people is by default ordered by proximity to the application users. All users can customize the list by viewing nearby people by gender, age and some other attributes. Users can initiate contact with nearby users by sending greeting messages and selecting to follow their accounts in order to receive notifications on their status updates. A user who receives a greeting message may then reply and choose to become a Momo friend of the initiator by also following such user. Users can adjust their privacy settings to avoid being seen by strangers or to appear invisible. Our application also allows users to block other users and report inappropriate behaviors.

We also offer *Diandian,* which appears as a small virtual button overlaid on the *Nearby People* list. When activated, our recommendation engine will push potential matches to a user based on profile and behavioral data such as interesting places the recommended user has travelled to, favorite books and movies and what interest groups he or she participates in. The user may then swipe left or right to show if he or she is interested in the recommendation. Only users who have mutually shown interests to each other may become Momo friends and message each other.

If a user is interested in finding out more about another user on our platform, he or she can review the *User Profile* page, which is a function that we offer to provide a quick snapshot of a user. Information featured on this page includes profile pictures, detailed personal information such as name, age, hometown, horoscope, occupation, relationship status, groups joined, interests and favorite books and movies, the user's historical posts and videos shared as well as the broadcasters that the user follows. Members can also post a voice recording as part of their profile. The profile page also contains a summary providing insights to a user's behavioral characteristics.

*Nearby Video*. This is an interactive short video service which allows users to create and share short videos, which can be seen by both nearby users and their followers. Supported by face recognition technology, our short video service also allows users to add fun lenses in the videos, in addition to emoticons, on-screen messages and doodles. Viewers are able to interact with the creator by leaving messages, liking the content, sending virtual gifts, redistributing the content or following the creator.

*Message Board*. *Message Board* is an important entry point for users to interact with and learn about other users nearby. It contains a stream of feeds, including status updates, micro-blogs, locations, photos, videos, music and commentaries posted by nearby users, facilitating connections between people in the same neighborhoods. The order of feeds is defined by our algorithm which computes both physical proximity of the content creator and how recent that post is shared. For each feed they create, users can control whether the feed may be viewed by all Momo users, only their friends or only themselves. Users can interact with each other by leaving comments, liking the post or following the creator.

### "Live Video" Functions

The *Live Video* function allows users to live stream a variety of content and activities including talent shows such as singing, dancing and talk shows, as well as casual chatting between broadcasters and viewers. Unlike traditional on-demand video experiences, live video allows the viewers to interact with the broadcasters on a real-time basis and thus facilitates a much more dynamic social experience. For example, a user can request a song from the live broadcaster and a broadcaster can connect a viewer to his or her live video channel through video calls. To provide fun, interactive experience between live broadcasters and viewers, the *Live Video* function offers interesting features such as customized filters and lenses as well as virtual gifts and associated special effects, some of which are enabled by face recognition and augmented reality technology. For example, a user can pay to put virtual animated cat ears over a broadcaster's head. Viewers of live video shows may interact with broadcasters using online messages for free or by sending virtual gifts purchased with virtual currency. The live video tab currently consists of "Recommended Live Broadcasts", which features a curated list of popular performers with certain entertaining talents, "Nearby Live Broadcasts", which allows users to browse videos streamed by broadcasters nearby, and "New Live Broadcasts", which presents new broadcasters on the platform.

Table of Contents

### *"Follow" Functions*

The *Follow* tab was introduced in March 2017 to aggregate content that a user chooses to follow and video content our algorithm "thinks" the user might want to follow based his or her interest graph. There are two subsections within the tab. The "Follow" section under the *Follow* tab contains a stream of feeds created by people followed by the user while the "Recommended" section features premium video content that our recommendation engine, based on the interest graph, believes the user might like or suggests the user to follow.

### *Other Functions*

Other key features and functionalities include the following:

*Groups*. Our application allows users to create and/or participate in location-based groups created across points of interest and based on residential complexes, educational institutions and commercial buildings. Location-based groups are generally established around a certain topic of interest. Each group is given a shared Momo discussion page on which group members can discuss their common interests, post their photos and exchange messages.

Our users can create groups by first selecting a specific location around which the group is centered, which must be associated with a specific residential complex, educational institution or commercial building, and second, selecting a topic of interest for the group. Our application displays nearby groups created by users as ranked by proximity. A user must apply to join a group, and admission is determined by the creator and managers of the group. In addition to our default distance-based listing of nearby groups, users are also able to search for groups using keywords pertaining to certain points of interest. To further enhance interaction, we also display who among the people that a user has followed are members of a particular group.

Users can propose and organize offline events for the location-based groups. A separate page will be created for an event containing information about the activity such as type, venue and time, based on which group members can decide whether to join the event and confirm attendance. A list of confirmed attendees will be shown on the activity page as well.

*Circles. Circles* are themed discussion forums that allow users to share feelings and ideas over certain topics. Unlike the *Group* function, no applications or pre-approvals are needed to participate in discussions in the *Circles*. Within each of the *Circles*, a user can create a post or interact with a post by liking it, leaving a comment or redistributing it.

### *Instant Messaging*

Our application is supported by instant messaging function, which allows users to communicate with each other using various forms of messages and expressions including text, emoticons, voice recordings, pictures and video messages, or to engage in real-time communication through a video chat function. Many of our fun and trendy emoticons are inspired by characters in popular culture. One of the key features of our instant messaging function is that the dialogue window presents the distance between the two parties in real time. Senders can see whether their messages have been delivered to or read by the recipient, and can choose to have their messages removed immediately after being read. Our instant messaging feature also allows users to turn voice messages into text, share their location information, invite other users to games, and send virtual gifts and red envelopes to each other.

## Mobile Games

Our application offers games primarily developed by third-party developers, some of which are customized for our platform and user profile. We started to publish games on our platform for third-party developers in 2013, and we launched our first self-developed game in February 2015. As of December 31, 2016, we operated 19 non-exclusive licensed games, six exclusive licensed games and six self-developed games. Games on our platform are designed with a variety of themes, cultural characteristics and features to appeal to different segments of the game player community. Some of the games on our platform have social features and are developed to be enjoyed, shared and played among Momo friends. Our users log into and play our games with their Momo accounts. Such social features contribute to the high player stickiness of mobile games offered on our platform.

40

Table of Contents

**Monetization Opportunities**

We started monetization in July 2013. We currently generate revenues primarily from live video service, value-added service, mobile marketing services, mobile games, and other services.

*Live Video Service*

We launched our live video service in September 2015. Initially, the service adopted an online live concert format whereby certain talented performers were invited to put on live music shows in a professional studio environment. Such shows were broadcasted live in one to four sessions on a daily basis and at pre-announced times. In the fourth quarter of 2015, we opened more live channels in order to enable more performers to put on talent shows to entertain and interact with their audience. The broadcasters can "go live" and connect with their audience via their mobile phones instead of through professional devices. Their audience will be able to interact on a real time basis with the broadcasters and other fellow viewers by texting for free or purchasing and sending virtual gifts, for which we shared a portion of the revenues generated with the broadcasters. Until April 2016, we only offered the service to a limited number of talented performers pre-selected carefully by us. In April 2016, we opened up the service to all the users of our platform so that each one of them can become a broadcaster if they wish.

*Value-added Service*

*Membership Subscription*

We provide enhanced membership privileges to users who subscribe to our membership package by paying membership fees. Our memberships are currently divided into two tiers, basic and premium. Enhanced privileges for all members include VIP logos, higher limits on the maximum number of users group and the number of users that the member can follow, access to certain special emoticons, the ability to add a short video and a voice recording to the profile page and to see a list of recent visitors to their profile page, and certain other special features unavailable to the non-members. Additional privileges for our premium members include the abilities to check out visitors to their message boards and to remove advertisements from their feeds.

*Virtual Gift Service*

We launched our virtual gift service on the Momo platform in the fourth quarter of 2016 to enhance users' interaction and social networking with each other. Users simultaneously purchase and send the virtual gifts to other users, and we generate revenue from the sales of the virtual gifts.

*Mobile Marketing Services*

We seek to provide advertising and marketing solutions to enable our customers to promote their brands and conduct effective marketing activities. We provide our customers with analytical tools to enable them to track and improve the effectiveness of their marketing campaigns on our platform. Our advertising and marketing customers include brand marketers, local merchants, application developers and publishers as well as other small and medium-sized businesses and individuals. Our mobile marketing services currently include the following:

*In-feed and other marketing solutions.* We offer advertising units that appear as feeds on *Message Board*, *Nearby People* and *Follow*. Powered by a proprietary self-serve advertising system with a real-time bidding mechanism, our in-feed marketing solutions are performance-based and serve a wide range of marketers including application developers, local businesses, brand owners, as well as other small and medium-sized businesses and individuals. We offer advertising units in various formats, including text-based content, pictures and video clips. In addition, our advertising system also allows customers to target certain cohorts of users based on their geographic locations, gender, age, type of devices and some other parameters. Our customers can use a combination of the various formats and targeting capabilities to create their marketing campaigns more effectively.

*Brand-oriented display ads.* We provide brand marketers with various ad formats for them to drive brand awareness through our platform. The forms of advertisements we offer to brand marketers currently include full screen banner ads that appear before the application is loaded and banners on frequently visited pages on our platform.

41

Table of Contents

As the features and functionalities of our platform continue to evolve, we may offer integrated marketing packages that include multiple advertising units such as feeds, banners, video ads and sponsorships in the future.

### Mobile Games

As a social networking platform, we intend to offer games that have strong features which we believe will not only increase the interactions between users and communication within groups, but also broaden our revenue sources. Such games may be developed by third parties, where we share revenues generated by in-game purchases of virtual items with such developers, or developed in-house. We have recently started to scale back from licensed mobile game services and instead focus on self-developed games in order to better align the games offered on our platform with the positioning and strength of Momo as a location-based social platform.

### Other Services

Our other services primarily include paid emoticons, gift mall sales and Duobao service, which allows the users to purchase a right to participate in quasi-lucky draw games, in which they have the opportunity of winning physical goods. We generate revenues from Duobao service both through sales of our own inventory and sales of third-party products. We ceased to provide gift mall services and paid emoticons in November 2016 and Duobao service in January 2017, due to the adjustment of our strategic priorities. Our users can still use our emoticons for free, except for certain special emoticons, which only our members can use.

### Technology

Our proprietary networking protocols ensure fast, reliable and stable mobile communications under different network environments in China. Our architecture focus on providing consistent user experience across different mobile devices, operating systems and network environments, which is particularly necessary in China given the wide variety of choices of mobile devices, operating systems and mobile networks.

### Social Interest Graph Recommendation Engine

We have developed a comprehensive database of user social interests from the activities on our platform. We create a social interest profile for each user account based on user actions, such as group and topics memberships, social relationships, as well as demographic data such as age, gender and location. Based on these social interest profiles, our recommendation engine allows us to push content to Momo users who are more likely to find such content interesting and relevant. We believe that social context can improve the relevance of advertisements and make them a more integral part of the user experience, rather than an interruption of it. Therefore, we are continually refining our recommendation engine to improve the relevance of information we push to users.

### Scalable Distributed Storage

Our proprietary model optimizes and facilitates cost-effective data storage by building memory on solid state drives. This distributed storage model allows us to efficiently and securely manage a large amount of data while storing data on servers that are easily scalable.

### Service Oriented Architecture

Our platform adopts service-oriented architecture that allows efficient software development and frequent upgrading of our services. Our platform is built on technologies that can facilitate cost-effective learning and joint research and development across different coding languages.

### Precision in Locating Users

Location is a key attribute of our social networking platform. Our rich experience in location-based technology has allowed us to develop technology capable of precisely locating static or mobile users within units of five meters horizontally. We believe our ability to locate users with this precision is unique in our industry.

42

Table of Contents

*Exploration in emerging technological areas*

As video continues to gain popularity as a primary way for the users to communicate, share, socialize and have fun on our platform, we are devoting a considerable amount of resources into developing our technological capabilities in areas such as augmented reality, face recognition, image processing including beatification techniques and other emerging territories to make video sharing and streaming a more enjoyable experience for our users.

## Content Management and Monitoring

As of the date of this annual report, we have a dedicated team of over 350 personnel reviewing and handling content on our mobile platform for compliance with applicable laws and regulations. They are aided by both proprietary and third-party software and technologies to sweep our platform and the data being transmitted on a real-time basis around-the-clock. We monitor and screen user information and user generated content against a spam list, which is a list of content and behaviors that we have determined are likely to be indicative of inappropriate or illegal content or illegal activities. Additionally, Momo users can also easily report fraud if they come across suspicious content, and each user complaint is processed by our content management and monitoring system.

Our corporate policy requires a user to accept our terms of use during the registration process before becoming a Momo user. In the user agreement, the user makes certain acknowledgments and covenants, including, among others, (i) the user is solely responsible for the authenticity, legality, harmlessness and relevancy of all information submitted for registration purpose or delivered to other users, (ii) the user is not impersonating other people or spreading information in the name of others, (iii) the user alone is responsible for any losses or injuries arising from or caused by the content on our platform and (iv) the user agrees to indemnify us for our losses or injuries arising from or caused by the activities of or content generated by the user.

## Branding and Marketing

We primarily attract our users through word-of-mouth and other free channels. Our brand building activities generally comprise purchasing online advertising in the form of text, banner and video, placing TV commercials, and public relations efforts. In January 2017, we hosted our *Momo Live Broadcasting 2017 Evening of Surprise*, featuring A-list celebrities and popular hosts, in Beijing in order to further promote our brand and live video service. We also acquire users directly through online and offline marketing channels such as search engines, application stores and pre-installations.

## Customer Service

As of the date of this annual report, we have a dedicated team of over 60 customer service personnel in our customer service center in Chengdu, China, who support our viewers and broadcasters of live video service, members and mobile game players. Our dedicated customer service team is well-trained on our live video service, membership services and mobile games functionalities. For our users who subscribed to our membership services, our customer service personnel provide around-the-clock support through a members-only toll-free phone number and other online communication channels. Our customer service team helps our members with issues they encounter on our mobile platform, gathers feedback on how to improve our services and receives member complaints and suggestions. Our customer service team also addresses issues that our mobile game players encounter and gathers player feedback on the functionality and popularity of the mobile games we offer.

## Intellectual Property

We rely on a combination of patent, copyright, trademark and trade secret laws and restrictions on disclosure to protect our intellectual property rights. As of December 31, 2016, we had four pending patent applications filed with the State Intellectual Property Office of the PRC. We had registered 132 trademarks and had applied for 154 trademarks with the Trademark Office of the State Administration for Industry & Commerce of the PRC. We had registered 60 software copyrights and 56 copyrights with the PRC National Copyright Administration. We had also registered 53 domain names, including *immomo.com*, *wemomo.com*, *immomogame.com* and *momocdn.com*.

43

**Table of Contents**

## Seasonality

Overall, the historical seasonality of our business has been relatively mild due to our rapid growth, but seasonality may increase in the future. Historically, there is noticeable downward trends in user activities as well as revenue growth in the weeks prior to and after the Chinese Lunar New Year. However, seasonal fluctuations have not historically posed significant operational or financial challenges to us, as such periods tend to be brief and predictable. Due to our limited operating history, the seasonal trends that we have experienced in the past may not apply to, or be indicative of, our future operating results.

## Competition

As a mobile social networking platform that also provides live video service, we are subject to intense competition from providers of similar services, as well as potential new types of online services.

Our competitors may have substantially more cash, traffic, technical, performer and other resources, as well as broader product or service offerings and can leverage their relationships based on other products or services to gain a larger share of marketing budgets from customers. We believe that our ability to compete effectively depends upon many factors, including the size, composition and engagement of our user base, our ad targeting capabilities, our pool of popular live broadcasters, market acceptance of our mobile marketing services and online entertainment services, our marketing and selling efforts, and the strength and reputation of our brand. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business and Industry—The market in which we operate is fragmented and highly competitive. If we are unable to compete effectively for users or user engagement, our business and operating results may be materially and adversely affected." We also experience significant competition for highly skilled personnel, including management, engineers, designers and product managers. Our growth strategy depends in part on our ability to retain our existing personnel and add additional highly skilled employees. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business and Industry—The continuing and collaborative efforts of our senior management and key employees are crucial to our success, and our business may be harmed if we were to lose their services."

## Insurance

We do not maintain property insurance, business interruption insurance or general third-party liability insurance, nor do we maintain key-man life insurance.

## Regulations

This section sets forth a summary of the most significant rules and regulations that affect our business activities in China or our shareholders' rights to receive dividends and other distributions from us.

### *Corporate Laws and Industry Catalog Relating to Foreign Investment*

The establishment, operation and management of corporate entities in China are governed by the Company Law of the PRC, or the Company Law, effective in 1994, as amended in 1999, 2004, 2005 and 2013, respectively. The Company Law is applicable to our PRC subsidiary and consolidated affiliated entity and its subsidiaries unless the PRC laws on foreign investment have stipulated otherwise.

The establishment, approval, registered capital requirement and day-to-day operational matters of wholly foreign-owned enterprises, such as our PRC subsidiary, are regulated by the Wholly Foreign-owned Enterprise Law of the PRC effective in 1986, as amended in 2000 and 2016, and the Implementation Rules of the Wholly Foreign-owned Enterprise Law of the PRC effective in 1990, as amended in 2001 and 2014, and the Interim Administrative Measures for the Record-filing of the Incorporation and Change of Foreign-invested Enterprises effective in 2016.

Investment activities in the PRC by foreign investors are principally governed by the Guidance Catalog of Industries for Foreign Investment, or the Catalog, which was promulgated and is amended from time to time by the Ministry of Commerce and the National Development and Reform Commission. The latest version of the Catalogue went effective on April 10, 2015. The Catalog divides industries into three categories: encouraged, restricted and prohibited. Industries not listed in the Catalog are generally open to foreign investment unless specifically restricted by other PRC regulations.

44

**Table of Contents**

Establishment of wholly foreign-owned enterprises is generally permitted in encouraged industries. Some restricted industries are limited to equity or contractual joint ventures, while in some cases Chinese partners are required to hold the majority interests in such joint ventures. In addition, restricted category projects are subject to higher level government approvals. Foreign investors are not allowed to invest in industries in the prohibited category. For example, pursuant to the latest Catalog amended in 2015, the provision of value-added telecommunications services falls in the restricted category and the percentage of foreign ownership cannot exceed 50%.

To comply with such foreign ownership restrictions, we operate our businesses in China through Beijing Momo, which is owned by PRC citizens. Beijing Momo is controlled by Beijing Momo IT through a series of contractual arrangements. Beijing Momo holds an internet content provider, or ICP, license to provide value-added telecommunication services, which is an industry in which foreign investment is "restricted" under the currently effective Catalog.

Beijing Momo IT is currently engaged in the business of software development, which is an industry in which foreign investment is "encouraged" under the currently effective Catalog.

### Regulations Relating to Telecommunications Services

In September 2000, the State Council issued the Regulations on Telecommunications of China, or the Telecommunications Regulations, to regulate telecommunication activities in China. The telecommunications industry in China is governed by a licensing system based on the classifications of the telecommunications services set forth under the Telecommunications Regulations.

The Ministry of Industry and Information Technology, together with the provincial-level communications administrative bureaus, supervises and regulates the telecommunications industry in China. The Telecommunications Regulations divide the telecommunications services into two categories: infrastructure telecommunications services and value-added telecommunications services. The operation of value-added telecommunications services is subject to the examination, approval and licenses granted by the Ministry of Industry and Information Technology or its provincial-level communications administrative bureaus. According to the Catalog of Classification of Telecommunications Businesses effective in March 2016, provision of information services through the internet, such as the operation of our *immomo.com* website, is classified as value-added telecommunications services.

### Regulations Relating to Foreign Investment in Value-Added Telecommunications Industry

According to the Administrative Rules for Foreign Investment in Telecommunications Enterprises issued by the State Council effective in January 2002, as amended in September 2008 and February 2016, a foreign investor may hold no more than a 50% equity interest in a value-added telecommunications services provider in China and such foreign investor must have experience in providing value-added telecommunications services overseas and maintain a good track record. Due to these regulations, we operate our website through Beijing Momo and its subsidiaries. The most updated version of Guiding Catalog for Foreign Investment Industries, which was promulgated by the MOFCOM and the National Development and Reform Commission and became effective from April 10, 2015, or the Guiding Catalog, imposes the 50% restrictions on foreign ownership in value-added telecommunications business as well.

The Circular on Strengthening the Administration of Foreign Investment in and Operation of Value-added Telecommunications Business, or the Circular, issued by the former Ministry of Information Industry in July 2006, reiterated the regulations on foreign investment in telecommunications businesses, which require foreign investors to set up foreign-invested enterprises and obtain an internet content provider, or ICP, license to conduct any value-added telecommunications business in China. Under the Circular, a domestic company that holds an ICP license is prohibited from leasing, transferring or selling the license to foreign investors in any form, and from providing any assistance, including providing resources, sites or facilities, to foreign investors that conduct value-added telecommunications business illegally in China. Furthermore, certain relevant assets, such as the relevant trademarks and domain names that are used in the value-added telecommunications business must be owned by the local ICP license holder or its shareholders. The Circular further requires each ICP license holder to have the necessary facilities for its approved business operations and to maintain such facilities in the regions covered by its license. In addition, all value-added telecommunications service providers are required to maintain network and information security in accordance with the standards set forth under the relevant PRC regulations. If an ICP license holder fails to comply with the requirements in the Circular and also fails to remedy such non-compliance within a specified period of time, the Ministry of Industry and Information Technology or its local counterparts have the discretion to take administrative measures against such license holder, including revoking its ICP license. Beijing Momo, the operator of our website, owns the relevant domain names and registered trademarks and has the necessary personnel to operate the website.

45

**Table of Contents**

*Regulations on Broadcasting Audio/Video Programs through the Internet*

On April 13, 2005, the State Council announced Several Decisions on Investment by Non-state-owned Companies in Culture-related Business in China. These decisions encourage and support non-state-owned companies to enter certain culture-related business in China, subject to restrictions and prohibitions for investment in audio/video broadcasting, website news and certain other businesses by non-state-owned companies. These decisions authorize the SARFT and the Ministry of Culture to adopt detailed implementing rules according to these decisions.

On December 20, 2007, the SARFT and the MIIT jointly issued the Rules for the Administration of Internet Audio and Video Program Services, commonly known as Circular 56, which came into effect as of January 31, 2008 and was amended on August 28, 2015. Circular 56 reiterates the requirement set forth in the Audio/Video Broadcasting Rules that online audio/video service providers must obtain a license from the SARFT. Furthermore, Circular 56 requires all online audio/video service providers to be either wholly state-owned or state-controlled. According to relevant official answers to press questions published on the SARFT's website dated February 3, 2008, officials from the SARFT and the MIIT clarified that online audio/video service providers that already had been operating lawfully prior to the issuance of Circular 56 may re-register and continue to operate without becoming state-owned or controlled, provided that such providers have not engaged in any unlawful activities. This exemption will not be granted to online audio/video service providers established after Circular 56 was issued. Such policies have been reflected in the Application Procedure for Audio/Video Program Transmission License.

On April 1, 2010, the SARFT issued the Internet Audio/Video Program Services Categories (Provisional), or the Provisional Categories, which classified internet audio/video programs into four categories.

In 2009, the SARFT released a Notice on Strengthening the Administration of Online Audio/Video Content. This notice reiterated, among other things, that all movies and television shows released or published online must comply with relevant regulations on the administration of radio, film and television. In other words, these movies and television shows, whether produced in the PRC or overseas, must be pre-approved by SARFT, and the distributors of these movies and television shows must obtain an applicable permit before releasing any such movie or television show. In 2012, the SARFT and the State Internet Information Office of the PRC issued a Notice on Improving the Administration of Online Audio/Video Content Including Internet Drama and Micro Films. In 2013, SARFT released a Supplemental Notice on Improving the Administration of Online Audio/Video Content Including Internet Drama and Micro Films. This notice stresses that entities producing online audio/video content, such as internet dramas and micro films, must obtain a permit for radio and television program production and operation, and that online audio/video content service providers should not release any internet dramas or micro films that were produced by any entity lacking such permit. For internet dramas or micro films produced and uploaded by individual users, the online audio/video service providers transmitting such content will be deemed responsible as a producer. Further, under this notice, online audio/video service providers can only transmit content uploaded by individuals whose identity has been verified and such content shall comply with the relevant content management rules. This notice also requires that online audio/video content, including internet drama and micro films, be filed with the relevant authorities before release.

**Table of Contents**

On April 25, 2016, the SARFT promulgated the Provisions on the Administration of Private Network and Targeted Transmission Audio/Video Program Services, which became effective as of June 1, 2016 and applies to the provision of radio, TV programs and other audio/video programs to targeted audience on TV and all types of handheld electronic equipment. The Provision covers the internet and other information networks as targeted transmission channels, including the provision of content, integrated broadcast control, transmission and distribution and other activities conducted in such forms as Internet protocol television (IPTV), private network mobile TV and Internet TV. Anyone who provides private network and targeted transmission audio/video program services must obtain an audio/video program transmission license, with a term of three years, issued by the SARFT and operate its business pursuant to the scope as provided in such license. Foreign-invested enterprises are not allowed to engage in the above referenced business.

On July 7, 2016, the MOC promulgated Notice on Strengthening the Administration of Network Performance, which regulates the behavior of entities operating network performance and performers. Entities operating network performance shall be responsible for the service and content post on their website which are provided by performers, perfect the content management mechanism, and shut down the channel and stop the spreading as soon as realize any network performance in violation of relevant laws and regulations. Network performers shall be responsible for their performances and shall not perform any program containing violence, pornography, or other similarly prohibited elements. The cultural administration authorities or cultural market enforcement authorities of relevant government supervise entities operating network performance and shall investigate all entities operating network performance in their thoroughly and publish any fine or action results or blacklist in time.

On September 2, 2016, the SARFT issued a Notice on Problems regarding Strengthening the Administration of Internet Audio/Video Programs Live Broadcasting Services, which provides that the provision of audio/video live broadcasting of important political, military, economic, social, cultural, sports and other activities and events requires an audio/video program transmission license which covers item (5) under internet audio/video program services category I, and the provision of audio/video live broadcasting of cultural activities by general social organizations, sports events and like activities requires an audio/video program transmission license which covers item (7) under internet audio/video program services category II.

On November 4, 2016, the Cyberspace Administration of China promulgated the Provisions on the Administration of Online Live Broadcasting Services, which became effective as of December 1, 2016. Such Provisions provides that anyone who provides online live broadcasting services through online performances, internet video/audio programs and so forth, shall obtain relevant qualifications as required by laws and regulations.

In November 2016, the SARFT issued a Notice on Strengthening the Administration of Audio/Video Programs Transmission on Weibo, Wechat and Other Internet Social Networking Platforms, which further clarifies that anyone who operates internet audio/video services through Weibo, Wechat and other internet social networking platforms must obtain an audio/video program transmission license and operate its business pursuant to the scope as provided in such license.

As of the date of this annual report, we hold an internet audio/video program transmission license through Zhejiang Shengdian, a wholly-owned subsidiary that we acquired in March 2017.

### Regulations on Online Comics and Internet Cultural Products

The Interim Administrative Provisions on Internet Culture was promulgated by MOC on February 17, 2011 and became effective on April 1, 2011. Pursuant to the Interim Administrative Provisions on Internet Culture, online comics are deemed to be online culture products, and any entity engaged in producing, transmitting and distributing online culture products shall apply for an internet culture operation license that includes the business scope of actual online activities. As of the date of this annual report, we have obtained an internet culture operation license and received the approval to expand the scope of the license to cover the operation of comic and animation products.

### Regulations on Internet Publication and Cultural Products

The Administrative Measures for Internet Publication Service, or Internet Publication Measures, were jointly promulgated by the SARFT and the MIIT on February 6, 2016 and became effective on March 10, 2016. The Internet Publication Measures superseded the Tentative Measures for Internet Publication Administration, which were jointly promulgated by the SARFT and the MIIT in 2002. The Internet Publication Measures define internet publication service and internet publication item, and publication of internet publication item via the internet requires an internet publishing license. Pursuant to the Internet Publication Measures, online game constitutes an internet publication item and therefore, an online game operator shall obtain an internet publishing license so that it can directly offer its online games to the public in the PRC. As of the date of this annual report, we have not yet obtained an internet publishing license, and are in the process of preparing the application documents.

47

Table of Contents

*Regulations on Online Games and Foreign Ownership Restrictions*

Pursuant to the Guidance Catalog, the internet culture business (other than online music business) falls within the category of industries prohibiting foreign investment. On February 17, 2011, the Ministry of Culture issued the revised Interim Provisions on the Administration of Internet Culture, or the Internet Culture Interim Provisions, effective as of April 1, 2011. According to the Internet Culture Interim Provisions, "internet cultural products" are defined as including the online games specially produced for Internet and games reproduced or provided through Internet. Provision of operating Internet cultural products and related services is subject to the approval of the Ministry of Culture or its provincial counterpart.

On June 3, 2010, the Ministry of Culture promulgated the Provisional Administration Measures of Online Games, or the Online Game Measures, which came into effect on August 1, 2010. The Online Game Measures governs the research, development and operation of online games and the issuance and trading services of virtual currency. Under the Online Game Measures, all operators of online games, issuers of virtual currencies and providers of virtual currency trading services, or Online Game Business Operators, are required to obtain internet culture operation licenses. An internet culture operation license is valid for three years and in case of renewal, the renewal application should be submitted 30 days prior to the expiry date of such license.

In addition, Online Game Business Operators should request the valid identity certificate of game users for registration, and notify the public 60 days ahead of the termination of any online game operations or the transfer of online game operational rights. Online game business operators are also prohibited from (i) setting compulsory matters in the online games without game users' consent; (ii) advertising or promoting the online games that contain prohibited content, such as anything that compromise state security or divulges state secrets; and (iii) inducing game users to input legal currencies or virtual currencies to gain online game products or services, by way of random draw or other incidental means. The Online Game Measures also states that the state cultural administration authorities will formulate the compulsory clauses of a standard online game service agreement, which have been promulgated on July 29, 2010 and are required to be incorporated into the service agreement entered into between online game business operators and game users, with no conflicts with the rest of clauses in such service agreements.

On July 11, 2008, the General Office of the State Council promulgated the Regulation on Main Functions, Internal Organization and Staffing of the General Administration of Press and Publication, or the Regulation on Three Provisions. On September 14, 2009, the Central Organization Establishment Commission issued the corresponding interpretations, or the Interpretations on Three Provisions. The Regulation on Three Provisions and the Interpretation on Three Provisions granted the Ministry of Culture overall jurisdiction to regulate the online game industry, and granted the General Administration of Press and Publication the authority to issue approvals for the internet publication of online games. Specifically, (i) the Ministry of Culture is empowered to administrate online games (other than the pre-examination and approval before internet publication of online games); (ii) subject to the Ministry of Culture's overall administration, General Administration of Press and Publication is responsible for the pre-examination and approval of the internet publication of online games; and (iii) once an online game is launched, the online game will be only administrated and regulated by the Ministry of Culture. As of March 31, 2017, 24 of the 31 online games we offered had completed the filing with the Ministry of Culture. If we fail to complete, obtain or maintain any of the required licenses or approvals or make the necessary filings, we may be subject to various penalties, such as confiscation of the net revenues that were generated through online games, the imposition of fines and the discontinuation or restriction of our operations of online games.

On September 28, 2009, the General Administration of Press and Publication, the National Copyright Administration and the National Working Group to Eliminate Pornography and Illegal Publications jointly issued the Circular on Consistent Implementation of the Stipulation on the Three Provisions of the State Council and the Relevant Interpretations of the State Commission for Public Sector Reform and the Further Strengthening of the Pre-examination and approval of Online Games and the Approval and Examination of Imported Online Games, or the GAPP Notice. The GAPP Notice explicitly prohibits foreign investors from directly or indirectly engaging in online game business in China, including through consolidated affiliated entities. Foreign investors are not allowed to indirectly control or participate in PRC operating companies' online game operations, whether (i) by establishing other joint ventures, entering into contractual arrangements or providing technical support for such operating companies; or (ii) in a disguised form such as by incorporating or directing user registration, user account management or game card consumption into online game platforms that are ultimately controlled or owned by foreign companies. The GAPP Notice reiterates that the General Administration of Press and Publication is responsible for the examination and approval of the import and publication of online games and states that downloading from the internet is considered a publication activity, which is subject to approval from the General Administration of Press and Publication. Violations of the GAPP Notice will result in severe penalties. For detailed analysis, see "Risk Factors—Risks Related to Our Corporate Structure—If the PRC government finds that the agreements that establish the structure for operating our businesses in China do not comply with PRC regulations on foreign investment in internet and other related businesses, or if these regulations or their interpretation change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations."

48

**Table of Contents**

On May 24, 2016, the SARFT promulgated the Circular on the Administration over Mobile Game Publishing Services, which became effective as of July 1, 2016. The Circular provides that game publishing service entities shall be responsible for examining the contents of their games and applying for game publication numbers. To apply for publication of domestically-developed mobile puzzle games that are not related to political, military, national or religious topics or contents and have no or simple story lines, entities shall submit the required documents to provincial publication administrative departments at least 20 working days prior to the expected date of online publication (public beta). Entities applying for publication of domestically-developed mobile games that are not included in abovementioned category shall go through stricter procedures, including submitting manager accounts for content review and testing accounts for game anti-indulgence system. Game publishing service entities must set up a specific page to display the information approved by the SARFT, including copyright owner of the game, publishing service entity, approval number, publication number and others, and shall take charge of examining and recording daily updates of the game. For mobile games (including pre-installed mobile games) that have been published and operated online before implementation of this Circular, to maintain the publication and operation of such games online, relevant approval procedures shall be made up by the game publishing service entities and enterprises with the provincial publication administrative departments before December 31, 2016 as required by this Circular. Otherwise, they shall cease to be published or operated online.

### Regulations Relating to Internet Content and Information Security

The Administrative Measures on Internet Information Services specify that internet information services regarding news, publications, education, medical and health care, pharmacy and medical appliances, among other things, are to be examined, approved and regulated by the relevant authorities. Internet information providers are prohibited from providing services beyond those included in the scope of their ICP licenses or filings. Furthermore, these measures clearly specify a list of prohibited content. Internet information providers are prohibited from producing, copying, publishing or distributing information that is humiliating or defamatory to others or that infringes the lawful rights and interests of others. Internet information providers that violate the prohibition may face criminal charges or administrative sanctions by the PRC authorities. Internet information providers must monitor and control the information posted on their websites. If any prohibited content is found, they must remove the offensive content immediately, keep a record of it and report it to the relevant authorities. Beijing Momo, as an ICP license holder, is subject to these measures.

Internet information in China is also regulated and restricted from a national security standpoint. The Standing Committee of the National People's Congress has enacted the Decisions on Maintaining Internet Security, which may subject violators to criminal punishment in China for any effort to: (i) gain improper entry into a computer or system of strategic importance; (ii) disseminate politically disruptive information; (iii) leak state secrets; (iv) spread false commercial information; or (v) infringe intellectual property rights. The Ministry of Public Security has promulgated measures that prohibit use of the internet in ways which, among other things, result in a leakage of state secrets or a spread of socially destabilizing content. As an ICP license holder, Beijing Momo is subject to the laws and regulations relating to information security.

In August 2013, the MOC issued the Administration Measures on Content Review by Internet Culture Operating Entities, or the Content Review Measures, which became effective on December 1, 2013. According to the Content Review Measures, an internet culture operating entity shall censor and review its products and services to be provided to the public to ensure that such products and services do not contain any content prohibited by law, and the censor record shall be kept for at least two years. Internet culture operating entities shall adopt technical measures to conduct real-time censor over the products and services, set up internal content control department and establish content control policies. If the internet culture operating entity identifies any illegal content, it shall immediately suspend the products or services containing such content and preserve relevant record, and, in the event that such illegal content might lead to material issues, report to provincial branch of MOC.

49

**Table of Contents**

*Regulations on Anti-fatigue Compliance System and Real-name Registration System*

On April 15, 2007, eight PRC government authorities, including the General Administration of Press and Publication, the Ministry of Education, the Ministry of Public Security and the Ministry of Industry and Information Technology, jointly issued the Notice on Protecting Minors Mental and Physical Health and Implementation of Online Game Anti-fatigue System, which requires the implementation of an anti-fatigue compliance system and a real-name registration system by all PRC online game operators. Under the anti-fatigue compliance system, three hours or less of continuous playing by minors, defined as game players under 18 years of age, is considered to be "healthy", three to five hours is deemed "fatiguing", and five hours or more is deemed "unhealthy." Game operators are required to reduce the value of in-game benefits to a game player by half if it discovers that the amount of a time a game player spends online has reached the "fatiguing" level, and to zero in the case of the "unhealthy" level.

To identify whether a game player is a minor and thus subject to the anti-fatigue compliance system, a real-name registration system should be adopted to require online game players to register their real identity information before playing online games. Pursuant to a notice issued by the relevant eight government authorities on August 3, 2011, online game operators must submit the identity information of game players to the National Citizen Identity Information Center, a subordinate public institution of the Ministry of Public Security, for verification as of October 1, 2011.

*Regulations Relating to Internet Information Services and Content of Internet Information*

In September 2000, the State Council issued the Administrative Measures on Internet Information Services, or the Internet Measures, to regulate the provision of information services to online users through the internet. According to the Internet Measures, internet information services are divided into two categories: services of an operative nature and services of a non-operative nature. Our business conducted through our immomo.com website involves operating internet information services, which requires us to obtain an ICP license. If an internet information service provider fails to obtain an ICP license, the relevant local branch of the Ministry of Industry and Information Technology may levy fines, confiscate its income or even block its website. When the ICP service involves areas of news, publication, education, medical treatment, health, pharmaceuticals and medical equipment, and if required by law or relevant regulations, specific approval from the respective regulatory authorities must be obtained prior to applying for the ICP license from the Ministry of Industry and Information Technology or its provincial level counterpart. Our affiliated PRC entity, Beijing Momo, currently holds an ICP license issued by Beijing Communications Administration, a local branch of the Ministry of Industry and Information Technology. Our ICP license will expire in January 2022.

*Regulations Relating to Privacy Protection*

As an internet content provider, we are subject to regulations relating to protection of privacy. In recent years, PRC government authorities have enacted laws and regulations on internet use to protect personal information from any unauthorized disclosure. The Administrative Measures on Internet Information Services prohibit ICP service operators from insulting or slandering a third party or infringing upon the lawful rights and interests of a third party. Under the Several Provisions on Regulating the Market Order of Internet Information Services, issued by the Ministry of Industry and Information Technology in 2011, an ICP service operator may not collect any user personal information or provide such information to third parties without the consent of a user. An ICP service operator must expressly inform the users of the method, content and purpose for the collection and processing of such user personal information and may only collect such information necessary for the provision of its services. An ICP service operator is also required to properly keep the user personal information, and in case of any leak or likely leak of the user personal information, the ICP service operator must take immediate remedial measures and, in severe circumstances, to make an immediate report to the telecommunications regulatory authority. In addition, pursuant to the Decision on Strengthening the Protection of Online Information issued by the Standing Committee of the National People's Congress in December 2012 and the Order for the Protection of Telecommunication and Internet User Personal Information issued by the Ministry of Industry and Information Technology in July 2013, any collection and use of user personal information must be subject to the consent of the user, abide by the principles of legality, rationality and necessity and be within the specified purposes, methods and scopes. An ICP service operator must also keep such information strictly confidential, and is further prohibited from divulging, tampering or destroying of any such information, or selling or providing such information to other parties. Any violation of the above decision or order may subject the ICP service operator to warnings, fines, confiscation of illegal gains, revocation of licenses, cancellation of filings, closedown of websites or even criminal liabilities. We are subject to these regulations as an online business operator.

50

**Table of Contents**

***Regulations Relating to Taxation***

In January 2008, the PRC Enterprise Income Tax Law took effect. The PRC Enterprise Income Tax Law applies a uniform 25% enterprise income tax rate to both foreign-invested enterprises and domestic enterprises, except where tax incentives are granted to special industries and projects. Under the PRC Enterprise Income Tax Law and its implementation regulations, dividends generated from the business of a PRC subsidiary after January 1, 2008 and payable to its foreign investor may be subject to a withholding tax rate of 10% if the PRC tax authorities determine that the foreign investor is a non-resident enterprise, unless there is a tax treaty with China that provides for a preferential withholding tax rate. Distributions of earnings generated before January 1, 2008 are exempt from PRC withholding tax.

Under the PRC Enterprise Income Tax Law, an enterprise established outside China with "de facto management bodies" within China is considered a "resident enterprise" for PRC enterprise income tax purposes and is generally subject to a uniform 25% enterprise income tax rate on its worldwide income. A circular issued by the State Administration of Taxation in April 2009 regarding the standards used to classify certain Chinese-invested enterprises controlled by Chinese enterprises or Chinese enterprise groups and established outside of China as "resident enterprises" clarified that dividends and other income paid by such PRC "resident enterprises" will be considered PRC-source income and subject to PRC withholding tax, currently at a rate of 10%, when paid to non-PRC enterprise shareholders. This circular also subjects such PRC "resident enterprises" to various reporting requirements with the PRC tax authorities. Under the implementation regulations to the PRC Enterprise Income Tax Law, a "de facto management body" is defined as a body that has material and overall management and control over the manufacturing and business operations, personnel and human resources, finances and properties of an enterprise. In addition, the tax circular mentioned above specifies that certain PRC-invested overseas enterprises controlled by a Chinese enterprise or a Chinese enterprise group in the PRC will be classified as PRC resident enterprises if the following are located or resided in the PRC: senior management personnel and departments that are responsible for daily production, operation and management; financial and personnel decision making bodies; key properties, accounting books, the company seal, and minutes of board meetings and shareholders' meetings; and half or more of the senior management or directors who have the voting rights.

Pursuant to the Arrangement between Mainland China and the Hong Kong Special Administrative Region for the Avoidance of Double Taxation and Tax Evasion on Income, the withholding tax rate in respect to the payment of dividends by a PRC enterprise to a Hong Kong enterprise is reduced to 5% from a standard rate of 10% if the Hong Kong enterprise directly holds at least 25% of the PRC enterprise. Pursuant to the Notice of the State Administration of Taxation on the Issues concerning the Application of the Dividend Clauses of Tax Agreements, or Circular 81, a Hong Kong resident enterprise must meet the following conditions, among others, in order to enjoy the reduced withholding tax: (i) it must be a company; (ii) it must directly own the required percentage of equity interests and voting rights in the PRC resident enterprise; and (iii) it must have directly owned such required percentage in the PRC resident enterprise throughout the 12 months prior to receiving the dividends. Furthermore, the Administrative Measures for Non-Resident Enterprises to Enjoy Treatments under Tax Treaties (For Trial Implementation), which became effective in October 2009, require that non-resident enterprises must obtain approval from the relevant tax authority in order to enjoy the reduced withholding tax rate. There are also other conditions for enjoying the reduced withholding tax rate according to other relevant tax rules and regulations. Accordingly, Momo Technology HK Company Limited may be able to benefit from the 5% withholding tax rate for the dividends it receives from Beijing Momo, if it satisfies the conditions prescribed under Circular 81 and other relevant tax rules and regulations, and obtain the approvals as required. However, according to Circular 81, if the relevant tax authorities consider the transactions or arrangements we have are for the primary purpose of enjoying a favorable tax treatment, the relevant tax authorities may adjust the favorable withholding tax in the future.

Table of Contents

In January 2009, the SAT promulgated the Provisional Measures for the Administration of Withholding of Enterprise Income Tax for Non-resident Enterprises, or the Non-resident Enterprises Measures, pursuant to which entities that have direct obligation to make certain payments to a non-resident enterprise shall be the relevant tax withholders for such non-resident enterprise. Further, the Non-resident Enterprises Measures provides that, in case of an equity transfer between two non-resident enterprises which occurs outside China, the non-resident enterprise which receives the equity transfer payment shall, by itself or engage an agent to, file tax declaration with the PRC tax authority located at place of the PRC company whose equity has been transferred, and the PRC company whose equity has been transferred shall assist the tax authorities to collect taxes from the relevant non-resident enterprise. On April 30, 2009, the MOF and the SAT jointly issued the Notice on Issues Concerning Process of Enterprise Income Tax in Enterprise Restructuring Business, or Circular 59. On December 10, 2009, the SAT issued the Notice on Strengthening the Administration of the Enterprise Income Tax concerning Proceeds from Equity Transfers by Non-resident Enterprises, or Circular 698. Both Circular 59 and Circular 698 became effective retroactively as of January 1, 2008. By promulgating and implementing these two circulars, the PRC tax authorities have enhanced their scrutiny over the direct or indirect transfer of equity interests in a PRC resident enterprise by a non-resident enterprise.

On February 3, 2015, the SAT issued a Public Notice [2015] No. 7, or Public Notice 7, to supersede existing provisions in relation to the Indirect Transfer as set forth in Circular 698, while the other provisions of Circular 698 remain in force. Public Notice 7 introduces a new tax regime that is significantly different from that under Circular 698. Public Notice extends its tax jurisdiction to capture not only Indirect Transfer as set forth under Circular 698 but also transactions involving transfer of immovable property in China and assets held under the establishment and place, in China of a foreign company through the offshore transfer of a foreign intermediate holding company. Public Notice 7 also addresses transfer of the equity interest in a foreign intermediate holding company widely. In addition, Public Notice 7 provides clearer criteria than Circular 698 on how to assess reasonable commercial purposes and introduces safe harbor scenarios applicable to internal group restructurings. However, it also brings challenges to both the foreign transferor and transferee of the Indirect Transfer as they have to make self-assessment on whether the transaction should be subject to PRC tax and to file or withhold the PRC tax accordingly.

There are few guidances and practical experience as to the application of Circular 698 and Public Notice 7. Where non-resident investors were involved in our private equity financing, if such transactions were determined by the tax authorities to lack reasonable commercial purpose, we and our non-resident investors may become at risk of being taxed under Circular 698 and Public Notice 7 and may be required to expend valuable resources to comply with Circular 698 and Public Notice 7 or to establish that we should not be taxed under Circular 698 and Public Notice 7.

The PRC tax authorities have the discretion under SAT Circular 59, Circular 698 and Public Notice 7 to make adjustments to the taxable capital gains based on the difference between the fair value of the equity interests transferred and the cost of investment.

*Value Added Tax*

On January 1, 2012, the Chinese State Council officially launched a pilot value-added tax ("VAT") reform program, or Pilot Program, applicable to businesses in selected industries. Businesses in the Pilot Program would pay VAT instead of business tax. The Pilot Industries in Shanghai included industries involving the leasing of tangible movable property, transportation services, research and development and technical services, information technology services, cultural and creative services, logistics and ancillary services, certification and consulting services. Revenues generated by advertising services, a type of "cultural and creative services," are subject to the VAT tax rate of 6%. According to official announcements made by competent authorities in Beijing and Guangdong province, Beijing launched the same Pilot Program on September 1, 2012, and Guangdong province launched it on November 1, 2012. On May 24, 2013, the Ministry of Finance, or the MoF, and the State Administration of Taxation, or the SAT, issued the Circular on Tax Policies in the Nationwide Pilot Collection of Value Added Tax in Lieu of Business Tax in the Transportation Industry and Certain Modern Services Industries, or the Circular 37. The scope of certain modern services industries under the Circular 37 extends to the inclusion of radio and television services. On August 1, 2013, the Pilot Program was implemented throughout China. On December 12, 2013, the MoF and the SAT issued the Circular on the Inclusion of the Railway Transport Industry and Postal Service Industry in the Pilot Collection of Value-added Tax in Lieu of Business Tax, or Circular 106. Among the other things, Circular 106 abolished Circular 37, and refined the policies for the Pilot Program. On April 29, 2014, the MoF and the SAT issued the Circular on the Inclusion of Telecommunications Industry in the Pilot Collection of Value-added Tax in Lieu of Business Tax. On March 23, 2016, the MoF and the SAT issued the Circular on Comprehensively Promoting the Pilot Program of the Collection of Value-added Tax in Lieu of Business Tax. Effective from May 1, 2016, the PRC tax authorities collect VAT in lieu of Business Tax in all regions and industries. All of our entities were subject to VAT at the rate of 6% for services provided and 17% for goods sold as of December 31, 2016.

52

**Table of Contents**

*Regulations Relating to Copyright and Trademark Protection*

China has adopted legislation governing intellectual property rights, including copyrights and trademarks. China is a signatory to major international conventions on intellectual property rights and is subject to the Agreement on Trade Related Aspects of Intellectual Property Rights as a result of its accession to the World Trade Organization in December 2001.

*Copyright*. The National People's Congress amended the Copyright Law in 2001 and 2010 to widen the scope of works and rights that are eligible for copyright protection. The amended Copyright Law extends copyright protection to Internet activities, products disseminated over the Internet and software products. In addition, there is a voluntary registration system administered by the China Copyright Protection Center. To address copyright infringement related to content posted or transmitted over the internet, the National Copyright Administration and former Ministry of Information Industry jointly promulgated the Administrative Measures for Copyright Protection Related to the Internet in April 2005. These measures became effective in May 2005. To comply with these laws and regulations, we have implemented internal procedures to monitor and review the content we have been licensed from content providers before they are released on our platform and remove any infringing content promptly after we receive notice of infringement from the legitimate rights holder.

On December 20, 2001, the State Council promulgated the new Regulations on Computer Software Protection, effective from January 1, 2002, which are intended to protect the rights and interests of the computer software copyright holders and encourage the development of software industry and information economy. In the PRC, software developed by PRC citizens, legal persons or other organizations is automatically protected immediately after its development, without an application or approval. Software copyright may be registered with the designated agency and if registered, the certificate of registration issued by the software registration agency will be the primary evidence of the ownership of the copyright and other registered matters. On February 20, 2002, the National Copyright Administration of the PRC introduced the Measures on Computer Software Copyright Registration, which outline the operational procedures for registration of software copyright, as well as registration of software copyright license and transfer contracts. The Copyright Protection Center of China is mandated as the software registration agency under the regulations.

The State Council and the National Copyright Administration have promulgated various rules and regulations and rules relating to protection of software in China, including the Regulations on Protection of Computer Software promulgated by State Council on January 30, 2013 and effective since March 1, 2013, and the Measures for Registration of Copyright of Computer Software promulgated by SARFT on February 20, 2002 and effective since the same date. According to these rules and regulations, software owners, licensees and transferees may register their rights in software with the National Copyright Administration or its local branches and obtain software copyright registration certificates. Although such registration is not mandatory under PRC law, software owners, licensees and transferees are encouraged to go through the registration process and registered software rights may be entitled to better protections. As of December 31, 2016, we had registered 60 software copyrights in China.

*Trademark*. The PRC Trademark Law, adopted in 1982 and revised in 1993, 2001 and 2013 respectively, protects the proprietary rights to registered trademarks. The Trademark Office under the State Administration for Industry and Commerce handles trademark registrations and may grant a term of ten years for registered trademarks, which may be extended for another ten years upon request. Trademark license agreements shall be filed with the Trademark Office for record. In addition, if a registered trademark is recognized as a well-known trademark, the protection of the proprietary right of the trademark holder may reach beyond the specific class of the relevant products or services. As of December 31, 2016, we had 132 registered trademarks and 154 trademark applications in China.

Table of Contents

*Regulations Relating to Foreign Exchange*

Pursuant to the Regulations on the Administration of Foreign Exchange issued by the State Council and effective in 1996, as amended in January 1997 and August 2008, respectively, current account transactions, such as the sale or purchase of goods, are not subject to PRC governmental approvals. Certain organizations in the PRC, including foreign-invested enterprises, may purchase, sell and/or remit foreign currencies at certain banks authorized to conduct foreign exchange business upon providing valid commercial documents. However, approval of the PRC State Administration of Foreign Exchange, or SAFE, is required for capital account transactions.

In August 2008, SAFE issued a circular on the conversion of foreign currency into Renminbi by a foreign-invested company that regulates how the converted Renminbi may be used, or the SAFE Circular 142. The circular requires that the registered capital of a foreign-invested enterprise converted into Renminbi from foreign currencies may only be utilized for purposes within its business scope. For example, such converted amounts may not be used for investments in or acquisitions of other companies, which can inhibit the ability of companies to consummate such transactions. In addition, SAFE strengthened its oversight of the flow and use of the Renminbi registered capital of foreign-invested enterprises converted from foreign currencies. The use of such Renminbi capital may not be changed without SAFE's approval, and may not in any case be used to repay Renminbi loans if the proceeds of such loans have not been utilized. Furthermore, SAFE promulgated a circular in November 2010, which, among other things, requires the authenticity of settlement of net proceeds from offshore offerings to be closely examined and the net proceeds to be settled in the manner described in the offering documents. Violations may result in severe penalties, such as heavy fines.

In November 2012, SAFE promulgated the Circular of Further Improving and Adjusting Foreign Exchange Administration Policies on Foreign Direct Investment which substantially amends and simplifies the current foreign exchange procedure. Pursuant to this circular, the opening of various special purpose foreign exchange accounts (e.g. pre-establishment expenses account, foreign exchange capital account, guarantee account), the reinvestment of RMB proceeds by foreign investors in the PRC, and remittance of foreign exchange profits and dividends by a foreign-invested enterprise to its foreign shareholders no longer require the approval or verification of SAFE, and multiple capital accounts for the same entity may be opened in different provinces, which was not possible before. In addition, SAFE promulgated the Circular on Printing and Distributing the Provisions on Foreign Exchange Administration over Domestic Direct Investment by Foreign Investors and the Supporting Documents in May 2013, which specifies that the administration by SAFE or its local branches over direct investment by foreign investors in the PRC shall be conducted by way of registration and banks shall process foreign exchange business relating to the direct investment in the PRC based on the registration information provided by SAFE and its branches.

In April 8, 2015, SAFE promulgated the Circular on Reforming the Management Approach Regarding the Foreign Exchange Capital Settlement of Foreign-invested Enterprises, which will, upon its effective date as of June 1, 2015, supersedes the SAFE Circular 142. This circular provides that, among other things, the foreign-invested company may convert the foreign currency in its capital account into RMB on a "at will" basis and the RMB funds so converted can be used for equity investments.

On June 9, 2016, SAFE promulgated the Circular on Reforming and Regulation of Administrative Policy on Settlement of Foreign Exchange of Capital Account, or SAFE Circular 16, which became effective on June 9, 2016. According to SAFE Circular 16, the foreign exchange capital of FIEs, foreign debt and funds raised through offshore listing may be settled on a discretionary basis, and can be settled at the banks. The proportion of such discretionary settlement is temporarily determined as 100%. The RMB converted from relevant foreign exchange will be kept in a designated account, and if a domestic enterprise needs to make further payment from such account, it still must provide supporting documents and go through the review process with the banks.

Furthermore, SAFE Circular 16 reiterates that the use of capital by domestic enterprises must adhere to the principles of authenticity and self-use within the business scope of enterprises. The foreign exchange income of capital account and RMB obtained by domestic enterprise from foreign exchange settlement must not be used (i) directly or indirectly for payment beyond the business scope of the enterprises or payment prohibited by relevant laws and regulations; (ii) directly or indirectly for investment in securities and investment in wealth management products except for principal-guaranteed bank wealth management products, unless otherwise provided by relevant laws and regulations; (iii) directly or indirectly for extending entrusted loans to non-affiliate enterprises, unless permitted by the scope of business; and/or (iv) for construction or purchase of real estate that is not for self-use, except for foreign-invested real estate enterprises.

54

Table of Contents

*Regulations Relating to Labor*

Pursuant to the PRC Labor Law effective in 1995 and the PRC Labor Contract Law effective in 2008, a written labor contract is required when an employment relationship is established between an employer and an employee. Other labor-related regulations and rules of the PRC stipulate the maximum number of working hours per day and per week as well as the minimum wages. An employer is required to set up occupational safety and sanitation systems, implement the national occupational safety and sanitation rules and standards, educate employees on occupational safety and sanitation, prevent accidents at work and reduce occupational hazards.

In the PRC, workers dispatched by an employment agency are normally engaged in temporary, auxiliary or substitute work. Pursuant to the PRC Labor Contract Law, an employment agency is the employer for workers dispatched by it and shall perform an employer's obligations toward them. The employment contract between the employment agency and the dispatched workers, and the placement agreement between the employment agency and the company that receives the dispatched workers shall be in writing. Furthermore, the company that accepts the dispatched workers shall be jointly and severally liable for any damage caused to the dispatched workers due to violation of the Labor Contract Law by the employment agencies arising from their contracts with dispatched workers. An employer is obligated to sign an indefinite term labor contract with an employee if the employer continues to employ the employee after two consecutive fixed-term labor contracts. The employer also has to pay compensation to the employee if the employer terminates an indefinite term labor contract. Except where the employer proposes to renew a labor contract by maintaining or raising the conditions of the labor contract and the employee is not agreeable to the renewal, an employer is required to compensate the employee when a definite term labor contract expires. Furthermore, under the Regulations on Paid Annual Leave for Employees issued by the State Council in December 2007 and effective as of January 2008, an employee who has served an employer for more than one year and less than ten years is entitled to a five-day paid vacation, those whose service period ranges from 10 to 20 years is entitled to a 10-day paid vacation, and those who has served for more than 20 years is entitled to a 15-day paid vacation. An employee who does not use such vacation time at the request of the employer shall be compensated at three times their normal salaries for each waived vacation day.

Pursuant to the Regulations on Occupational Injury Insurance effective in 2004, as amended in 2010, and the Interim Measures concerning the Maternity Insurance for Enterprise Employees effective in 1995, PRC companies must pay occupational injury insurance premiums and maternity insurance premiums for their employees. Pursuant to the Interim Regulations on the Collection and Payment of Social Insurance Premiums effective in 1999 and the Interim Measures concerning the Administration of the Registration of Social Insurance effective in 1999, basic pension insurance, medical insurance and unemployment insurance are collectively referred to as social insurance. Both PRC companies and their employees are required to contribute to the social insurance plans. Pursuant to the Regulations on the Administration of Housing Fund effective in 1999, as amended in 2002, PRC companies must register with applicable housing fund management centers and establish a special housing fund account in an entrusted bank. Both PRC companies and their employees are required to contribute to the housing funds.

According to the Social Insurance Law, an employer that fails to make social insurance contributions may be ordered to pay the required contributions within a stipulated deadline and be subject to a late fee. If the employer still fails to rectify the failure to make social insurance contributions within the stipulated deadline, it may be subject to a fine ranging from one to three times the amount overdue. According to the Regulations on Administration of Housing Fund, an enterprise that fails to make housing fund contributions may be ordered to rectify the noncompliance and pay the required contributions within a stipulated deadline; otherwise, an application may be made to a local court for compulsory enforcement.

*Regulations Relating to Dividend Distribution*

Wholly foreign-owned companies in the PRC may pay dividends only out of their accumulated profits after tax as determined in accordance with PRC accounting standards. Remittance of dividends by a wholly foreign-owned enterprise out of China is subject to examination by the banks designated by SAFE. Wholly foreign-owned companies may not pay dividends unless they set aside at least 10% of their respective accumulated profits after tax each year, if any, to fund certain reserve funds, until such time as the accumulative amount of such fund reaches 50% of the wholly foreign-owned company's registered capital. These reserve funds are not distributable as cash dividends.

55

Table of Contents

***SAFE Regulations on Offshore Special Purpose Companies Held by PRC Residents or Citizens***

SAFE Circular on Relevant Issues Relating to Domestic Resident's Investment and Financing and Roundtrip Investment through Special Purpose Vehicles, or Circular 37, issued by SAFE and effective in July 2014, regulates foreign exchange matters in relation to the use of special purpose vehicles, or SPVs, by PRC residents or entities to seek offshore investment and financing and conduct round trip investment in China. Under Circular 37, a SPV refers to an offshore entity established or controlled, directly or indirectly, by PRC residents or entities for the purpose of seeking offshore financing or making offshore investment, using legitimate domestic or offshore assets or interests, while "round trip investment" refers to the direct investment in China by PRC residents or entities through SPVs, namely, establishing foreign-invested enterprises to obtain the ownership, control rights and management rights. Circular 37 requires that, before making contribution into an SPV, PRC residents or entities are required to complete foreign exchange registration with the SAFE or its local branch. SAFE Circular 37 further provides that option or share-based incentive tool holders of a non-listed SPV can exercise the options or share incentive tools to become a shareholder of such non-listed SPV, subject to registration with SAFE or its local branch.

PRC residents or entities who have contributed legitimate domestic or offshore interests or assets to SPVs but have yet to obtain SAFE registration before the implementation of the Circular 37 shall register their ownership interests or control in such SPVs with SAFE or its local branch. An amendment to the registration is required if there is a material change in the SPV registered, such as any change of basic information (including change of such PRC residents, name and operation term), increases or decreases in investment amount, transfers or exchanges of shares, or mergers or divisions. Failure to comply with the registration procedures set forth in Circular 37, or making misrepresentation on or failure to disclose controllers of foreign-invested enterprise that is established through round-trip investment, may result in restrictions on the foreign exchange activities of the relevant foreign-invested enterprises, including payment of dividends and other distributions, such as proceeds from any reduction in capital, share transfer or liquidation, to its offshore parent or affiliate, and the capital inflow from the offshore parent, and may also subject relevant PRC residents or entities to penalties under PRC foreign exchange administration regulations.

We have completed the foreign exchange registration of PRC resident shareholders of Mr. Yan Tang, Mr. Yong Li and Mr. Xiaoliang Lei for our financings and share transfer.

***M&A Rule and Overseas Listing***

In August 2006, six PRC regulatory agencies, including China Securities Regulatory Commission, or CSRC, jointly adopted the Provisions Regarding Mergers and Acquisitions of Domestic Enterprises by Foreign Investors, or the M&A Rule, which became effective in September 2006. This M&A Rule purports to require, among other things, offshore SPVs, formed for listing purposes through acquisition of PRC domestic companies and controlled by PRC companies or individuals, to obtain the approval of the CSRC prior to publicly listing their securities on an overseas stock exchange. We believe that CSRC approval is not required in the context of our initial public offering as we are not a special purpose vehicle formed for listing purpose through acquisition of domestic companies that are controlled by our PRC individual shareholders, as we acquired contractual control rather than equity interests in our domestic affiliated entities.

However, we cannot assure you that the relevant PRC government agency, including the CSRC, would reach the same conclusion as we do. If the CSRC or other PRC regulatory agency subsequently determines that we need to obtain the CSRC's approval for our initial public offering or if CSRC or any other PRC government authorities will promulgate any interpretation or implementing rules before our listing that would require CSRC or other governmental approvals for our initial public offering, we may face sanctions by the CSRC or other PRC regulatory agencies. In such event, these regulatory agencies may impose fines and penalties on our operations in the PRC, limit our operating privileges in the PRC, delay or restrict the repatriation of the proceeds from our initial public offering into the PRC, or take other actions that could have a material adverse effect on our business, financial condition, results of operations, and prospects, as well as the trading price of our ADSs.

Table of Contents

***SAFE Regulations on Employee Share Options***

Pursuant to the Notice on Issues Concerning the Foreign Exchange Administration for Domestic Individuals Participating in Stock Incentive Plan of Overseas Publicly Listed Company, or Circular 7, issued by SAFE in February 2012, employees, directors, supervisors and other senior management participating in any stock incentive plan of an overseas publicly listed company who are PRC citizens or who are non-PRC citizens residing in China for a continuous period of not less than one year, subject to a few exceptions, are required to register with SAFE through a domestic qualified agent, which could be a PRC subsidiary of such overseas listed company, and complete certain other procedures. Failure to complete the SAFE registrations may subject them to fines and legal sanctions and may also limit our ability to contribute additional capital into our wholly foreign-owned subsidiaries in China and limit these subsidiaries' ability to distribute dividends to us.

In addition, the State Administration for Taxation has issued certain circulars concerning employee share options or restricted shares. Under these circulars, the employees working in the PRC who exercise share options or are granted restricted shares will be subject to PRC individual income tax. The PRC subsidiaries of such overseas listed company have obligations to file documents related to employee share options or restricted shares with relevant tax authorities and to withhold individual income taxes of those employees who exercise their share options. If the employees fail to pay or the PRC subsidiaries fail to withhold their income taxes according to relevant laws and regulations, the PRC subsidiaries may face sanctions imposed by the tax authorities or other PRC government authorities. These registrations and filings are a matter of foreign exchange control and tax procedure and the grant of share incentive awards to employees is not subject to the government's discretionary approval. Compliance with PRC regulations on employee incentive plans has not had, and we believe will not in the future have, any material adverse effect on the implementation of our 2012 Plan and 2014 Plan.

57

**Table of Contents**

**C.    Organizational Structure**

The following diagram illustrates our corporate structure, including our subsidiaries, consolidated affiliated entity and its subsidiaries as of the date of this annual report.



Notes:

(1)    We exercise effective control over Beijing Momo through contractual arrangements among Beijing Momo IT, Beijing Momo and Messrs. Yan Tang, Yong Li, Xiaoliang Lei and Zhiwei Li, who hold 72.0%, 16.0%, 6.4% and 5.6% of the equity interest in Beijing Momo, respectively. The shareholders of Beijing Momo are shareholders, directors or officers of Momo Inc.

(2)    QOOL Media (Tianjin) Co., Ltd. is a joint venture established in November 2016 and has minimum operation as of the date of this annual report.

58

Table of Contents

**Contractual Arrangements with Beijing Momo**

PRC laws and regulations place certain restrictions on foreign investment in and ownership of internet-based businesses. Accordingly, we conduct our operations in China principally through Beijing Momo and its subsidiaries, over which we exercise effective control through contractual arrangements among Beijing Momo IT, Beijing Momo and its shareholders.

The contractual arrangements allow us to:

- exercise effective control over Beijing Momo;

- receive substantially all of the economic benefits of Beijing Momo; and

- have an option to purchase all or part of the equity interests in Beijing Momo when and to the extent permitted by PRC law.

As a result of these contractual arrangements, we are the primary beneficiary of Beijing Momo and its subsidiaries, and, therefore, have consolidated the financial results of Beijing Momo and its subsidiaries in our consolidated financial statements in accordance with U.S. GAAP.

The following is a summary of the currently effective contractual arrangements by and among our wholly-owned subsidiary, Beijing Momo IT, Beijing Momo, and the shareholders of Beijing Momo. Beijing Momo IT has also entered into an exclusive cooperation agreement and a supplemental agreement with each of Chengdu Momo and Tianjin Heer.

*Business operation agreement.* Under the business operation agreement entered into among Beijing Momo IT, Beijing Momo and the shareholders of Beijing Momo on April 18, 2012, as supplemented on June 9, 2014, the shareholders of Beijing Momo agreed that Beijing Momo would not enter into any transaction that could materially or adversely affect its assets, business, interests or operations without prior written consent from Beijing Momo IT, including conducting business beyond the usual and normal scope, entering into any loan or other debtor-creditor relationship with third party, selling or disposing of assets or rights, including intellectual property rights, and creating guarantees or any other security on any of its assets or intellectual property rights in favor of a third party. In addition, the shareholders of Beijing Momo agreed to vote for or appoint nominees designated by Beijing Momo IT to serve as Beijing Momo's directors, chairman, general managers, financial controllers and other senior managers. Furthermore, Beijing Momo's shareholders agreed to accept and implement proposals set forth by Beijing Momo IT regarding employment, day-to-day business operations and financial management. Beijing Momo IT is entitled to any dividends or other interests declared by Beijing Momo and the shareholders of Beijing Momo have agreed to promptly transfer such dividends or other interests to Beijing Momo IT. These agreements have an initial term of ten years from the date of execution, and may be extended at the discretion of Beijing Momo IT. Beijing Momo IT may terminate this agreement at any time by giving a prior written notice to Beijing Momo and its shareholders. Neither Beijing Momo nor its shareholders may terminate this agreement.

*Exclusive call option agreements*. Under the exclusive call option agreements between Beijing Momo IT, Beijing Momo and each of the shareholders of Beijing Momo entered into on April 18, 2012, and amended and restated on April 18, 2014, each of the shareholders of Beijing Momo irrevocably granted Beijing Momo IT an exclusive option to purchase, to the extent permitted under PRC law, all or part of their equity interests in Beijing Momo for a nominal price of RMB10 or the lowest price permitted under PRC law. In addition, Beijing Momo irrevocably granted Beijing Momo IT an exclusive and irrevocable option to purchase any or all of the assets owned by Beijing Momo at the lowest price permitted under PRC law. Without Beijing Momo IT's prior written consent, Beijing Momo and its shareholders will not sell, transfer, mortgage or otherwise dispose of Beijing Momo's material assets, legal or beneficial interests or revenues of more than RMB500,000, or allow an encumbrance on any interest in Beijing Momo. These agreements will remain effective until all equity interests held in Beijing Momo by its shareholders are transferred or assigned to Beijing Momo IT.

59

**Table of Contents**

*Equity interest pledge agreements*. Under the equity interest pledge agreements between Beijing Momo IT, Beijing Momo and the shareholders of Beijing Momo entered into on April 18, 2012, and amended and restated on April 18, 2014, the shareholders of Beijing Momo pledged all of their equity interests in Beijing Momo (including any equity interest subsequently acquired) to Beijing Momo IT to guarantee the performance by Beijing Momo and its shareholders of their respective obligations under the contractual arrangements, including the payments due to Beijing Momo IT for services provided. If Beijing Momo or any of its shareholders breach their obligations under these contractual arrangements, Beijing Momo IT, as the pledgee, will be entitled to certain rights and remedies, including priority in receiving the proceeds from the auction or disposal of the pledged equity interests in Beijing Momo. Beijing Momo IT has the right to receive dividends generated by the pledged equity interests during the term of the pledge. The pledge becomes effective on the date when the pledge of equity interests contemplated under the agreement is registered with the relevant local administration for industry and commerce and will remain binding until Beijing Momo and its shareholders discharge all their obligations under the contractual arrangements. We have registered the equity interest pledge agreements with Chaoyang Branch of Beijing Administration for Industry and Commerce in Beijing.

*Powers of attorney*. Pursuant to the powers of attorney entered into on April 18, 2012 and amended and restated on April 18, 2014, each shareholder of Beijing Momo irrevocably appointed Beijing Momo IT as their attorney-in-fact to act for all matters pertaining to Beijing Momo and to exercise all of their rights as shareholders of Beijing Momo, including attending shareholders' meetings and designating and appointing legal representatives, directors and senior management members of Beijing Momo. Beijing Momo IT may authorize or assign its rights under this appointment to any other person or entity at its sole discretion without prior notice to or prior consent from the shareholders of Beijing Momo. Each power of attorney remains in force until the shareholder ceases to hold any equity interest in Beijing Momo.

*Spousal consent letters*. Under the spousal consent letters, each spouse of the married shareholders of Beijing Momo unconditionally and irrevocably agreed that the equity interest in Beijing Momo held by and registered in the name of their spouse will be disposed of pursuant to the equity interest pledge agreement, the exclusive call option agreement, and the power of attorney. Each spouse agreed not to assert any rights over the equity interest in Beijing Momo held by their spouse. In addition, in the event that the spouses obtain any equity interest in Beijing Momo held by their spouse for any reason, they agreed to be bound by the contractual arrangements.

*Exclusive cooperation agreements.* Beijing Momo IT entered into an exclusive cooperation agreement and a supplemental agreement with Beijing Momo and Chengdu Momo, respectively, on August 31, 2014 to supersede the exclusive technology consulting and management services agreement signed in April 2012 between Beijing Momo IT and Beijing Momo. In May 2016, Beijing Momo IT entered into an exclusive cooperation agreement and a supplemental agreement with Tianjin Heer. Pursuant to the aforesaid exclusive cooperation agreements, each as amended, Beijing Momo IT has the exclusive right to provide, among other things, licenses, copyrights, technical and non-technical services to Beijing Momo, Chengdu Momo and Tianjin Heer and receive service fees and license fees as consideration. Beijing Momo, Chengdu Momo and Tianjin Heer will maintain a pre-determined level of operating profit and remit any excess operating profit to Beijing Momo IT as consideration for the licenses, copyrights, technical and non-technical services provided by Beijing Momo IT. Each agreement has an initial term of ten years from the date of execution, and may be extended at the sole discretion of Beijing Momo IT. Beijing Momo IT may terminate the agreement at any time with a 30-day notice to Beijing Momo, Chengdu Momo and Tianjin Heer, as applicable, but Beijing Momo, Chengdu Momo and Tianjin Heer may not terminate the agreement.

In the opinion of Han Kun Law Offices, our PRC counsel:

- the ownership structures of Beijing Momo IT and Beijing Momo will not result in any violation of PRC laws or regulations currently in effect; and

- the contractual arrangements among Beijing Momo IT, Beijing Momo and the shareholders of Beijing Momo governed by PRC law are valid, binding and enforceable, and do not and will not result in any violation of PRC laws or regulations currently in effect.

60

**Table of Contents**

However, there are substantial uncertainties regarding the interpretation and application of current and future PRC laws, regulations and rules. Accordingly, the PRC regulatory authorities may in the future take a view that is contrary to the above opinion of our PRC counsel. If the PRC government finds that the agreements that establish the structure for operating our business do not comply with PRC government restrictions on foreign investment in our businesses, we could be subject to severe penalties, including being prohibited from continuing operations. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Corporate Structure—If the PRC government finds that the agreements that establish the structure for operating our businesses in China do not comply with PRC regulations on foreign investment in internet and other related businesses, or if these regulations or their interpretation change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations," and "Item 3. Key Information—D. Risk Factors—Risks Related to Doing Business in China—Uncertainties in the interpretation and enforcement of PRC laws and regulations could limit the legal protections available to you and us."

Beijing Momo IT also entered into an exclusive cooperation agreement and a supplemental agreement with Chengdu Momo and Tianjin Heer on August 31, 2014 and May 1, 2016, respectively, which agreements are substantially similar to the ones entered into between Beijing Momo IT and Beijing Momo described above.

**D.    Property, Plant and Equipment**

Our headquarters and our principal service development facilities are located in Beijing. We leased an aggregate of approximately 17,992 square meters of office space in Beijing, Chengdu, Tianjin, Shanghai, Guangzhou and San Francisco as of March 31, 2017. These leases vary in duration from two to four years.

The servers that we use to provide our services are primarily maintained at various third-party internet data centers in Beijing.

**Item 4A.    Unresolved Staff Comments**

None.

**Item 5.    Operating and Financial Review and Prospects**

The following discussion of our financial condition and results of operations is based upon, and should be read in conjunction with, our audited consolidated financial statements and the related notes included in this annual report on Form 20-F. This report contains forward-looking statements. See "Forward-Looking Information." In evaluating our business, you should carefully consider the information provided under the caption "Item 3. Key Information—D. Risk Factors" in this annual report on Form 20-F. We caution you that our businesses and financial performance are subject to substantial risks and uncertainties.

**A.    Operating Results**

**Major Factors Affecting Our Results of Operations**

*User Growth*. Our revenues are driven by the number of our paying users for the various services we offer to users, including live video service, value-added service, online games and other services. For 2016, we generated our revenues primarily from live video service, which was launched in September 2015, and membership subscription, which had been our major revenue source until 2016 and forms part of our value-added service. The number of paying users for our live video service increased from 0.2 million in 2015 to 5.6 million in 2016. For membership subscription, which is one of our value-added services, we had 2.9 million members as of December 31, 2015, same as the number of members as of December 31, 2014. Our members increased from 2.9 million as of December 31, 2015 to 3.5 million as of December 31, 2016. The number of paying users of our mobile games on the Momo platform increased from 0.5 million in 2014 to 1.5 million in 2015 and then decreased to 0.8 million in 2016. The number of our paying users is affected by the growth in our active user base, our ability to convert a greater portion of our users into paying users, and strategies we pursue to achieve active user growth at reasonable costs and expenses.

We have experienced rapid user growth since our inception, although such rate of growth slowed significantly in 2015 and regained growth momentum in 2016. Our MAUs were 69.8 million and 69.3 million in December 2015 and December 2014, respectively. Our MAUs increased from 69.8 million in December 2015 to 81.1 million in December 2016. The growth rates of our MAUs and number of members have slowed down in 2015 primarily due to the reduced growth of number of smartphone users in China, and upgrades to our platform that take time for users to adapt to. The growth rates of our MAUs and number of members regained momentum in 2016 primarily as a result of the popularity of our recently introduced live video service, as well as other new social functions and entertaining contents on our platform.

61

Table of Contents

*User Engagement*. Changes in user engagement could affect our revenues and financial results. Active user engagement powered by diverse functionalities and rich contents is essential for our ability to generate revenues from the various services we offer to users, including our live video business, value-added service, among others.

*Monetization*. We started monetization in the second half of 2013 by introducing mobile games and membership services to our users, and we are continuing to refine the ways to monetize our service offerings without adversely affecting user experience. In 2015, we started to offer premium membership services, in-feed marketing solutions and live video service and in the fourth quarter of 2016, we launched a virtual gift service which allows our users to purchase and send virtual gifts to other users outside of live video service, which all contributed to our revenue growth. For mobile games, we have recently started to scale back from licensed mobile game services and instead focus on self-developed games in order to better align the games offered on our platform with the positioning and strength of Momo as a location-based social platform. Our future revenue growth will be affected by our ability to effectively execute our monetization strategies.

*Investment in Technology Infrastructure and Talent*. Our technology infrastructure is critical for us to retain and attract users, customers and platform partners. We must continue to upgrade and expand our technology infrastructure to keep pace with the growth of our business, to develop new features and services for our platform and to further enhance our big data analytical capabilities.

Our employee headcount has increased significantly as our business has grown and we expect this trend to continue for the foreseeable future. The number of our employees increased from 456 as of December 31, 2014 to 779 as of December 31, 2015 and further to 924 as of December 31, 2016. There is strong demand in China's internet industry for talented and experienced personnel from fast-growing, large-scale social networking platforms. We must recruit, retain and motivate talented employees while controlling our personnel-related expenses, including share-based compensation expenses.

## Taxation

### Cayman Islands

We are registered by way of continuation into the Cayman Islands. Under the current law of the Cayman Islands, we are not subject to income or capital gains tax in the Cayman Islands. In addition, our payment of dividends to our shareholders, if any, is not subject to withholding tax in the Cayman Islands.

### British Virgin Islands

Our subsidiary incorporated in the British Virgin Islands is a tax-exempted company.

### United States

Our subsidiary incorporated in the United States is subject to state income tax and federal income tax at different tax rates, depending on taxable income levels. As our U.S. subsidiary did not have any taxable income, no income tax expense was provided for in the year ended December 31, 2016.

### Hong Kong

Our subsidiary incorporated in Hong Kong is subject to the uniform tax rate of 16.5%. Under the Hong Kong tax laws, it is exempted from the Hong Kong income tax on its foreign-derived income and there are no withholding taxes in Hong Kong on the remittance of dividends. No provision for Hong Kong tax has been made in our consolidated financial statements, as our Hong Kong subsidiary had not generated any assessable income in 2014, 2015 or 2016.

### People's Republic of China

Pursuant to the EIT Law, which became effective on January 1, 2008, foreign-invested enterprises and domestic companies are subject to enterprise income tax at a uniform rate of 25%. In August 2014, Beijing Momo IT was qualified as a software enterprise. As such, Beijing Momo IT will be exempt from income taxes for two years beginning in its first profitable year (i.e. 2015 and 2016) followed by a tax rate of 12.5% for the succeeding three years (i.e. from 2017 to 2019). Chengdu Momo qualified as a western China development enterprise and the income tax rate was 15% in 2014 and 2015. Chengdu Momo is in the process of applying for the western China development enterprise status. Chengdu Momo applied the same preferential income tax rate of 15% in 2016 and the renewal of recognition of Chengdu Momo as a western China development enterprise has been accepted by the competent tax authorities recently. The other entities incorporated in the PRC were subject to an enterprise income tax at a rate of 25%.

**Table of Contents**

We have recognized income tax expense of nil, US$0.1 million and US$5.1 million for the years ended December 31, 2014, 2015 and 2016, respectively.

Effective January 1, 2012, the PRC Ministry of Finance and the State Administration of Taxation launched a Business Tax to Value-Added Tax Transformation Pilot Program, or the VAT Pilot Program, which imposes VAT in lieu of business tax for certain "modern service industries" in certain regions and eventually expands to nation-wide in 2013. According to the implementation circulars released by the Ministry of Finance and the State Administration of Taxation on the VAT Pilot Program, the "modern service industries" include research, development and technology services, information technology services, cultural innovation services, logistics support, lease of corporeal properties, attestation and consulting services. Effective from May 1, 2016, PRC tax authorities collect VAT in lieu of business tax in all regions and industries. All of our entities were subject to VAT at rate of 6% for services provided and 17% for goods sold as of December 31, 2016. With the imposition of VAT in lieu of business tax, our revenues are subject to VAT payable on goods sold or taxable services provided by a general VAT taxpayer for a taxable period, which is the net balance of the output VAT for the period after crediting the input VAT for the period. Hence, the amount of VAT payable does not result directly from output VAT generated from goods sold or taxable services provided. In addition, according to the prevailing PRC tax regulations, the input VAT caused by purchasing goods or services can be credited against output VAT by general taxpayer when calculating VAT payable, provided that the general taxpayer obtained and verified the relevant VAT special invoices corresponding to the cost or expenditures within a defined time period. All of our entities have obtained the VAT special invoices as the deduction vouchers, and therefore, we have adopted the net presentation of VAT.

Pursuant to applicable PRC laws and regulations, arrangements and transactions among related parties may be subject to audit or challenge by the PRC tax authorities. We may be subject to adverse tax consequences and our consolidated results of operations may be adversely affected if the PRC tax authorities determine that the contractual arrangements among our PRC subsidiary, Beijing Momo and its shareholders are not on an arm's length basis and therefore constitute favorable transfer pricing. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Corporate Structure—Contractual arrangements we have entered into with Beijing Momo may be subject to scrutiny by the PRC tax authorities. A finding that we owe additional taxes could significantly reduce our consolidated net income and the value of your investment."

## Results of Operations

The following table sets forth a summary of our consolidated results of operations for the periods indicated, both in absolute amounts and as percentages of our total net revenues. This information should be read together with our consolidated financial statements and related notes included elsewhere in this annual report. The results of operations in any period are not necessarily indicative of the results that may be expected for any future period.

| | Year Ended December 31, | | | | | |
| | 2014 | | 2015 | | 2016 | |
| | US$ | % | US$ | % | US$ | % |
| | (in US$ thousands, except for percentages) | | | | | |
| **Net revenues** | 44,755 | 100.0 | 133,988 | 100.0 | 553,098 | 100.0 |
| Live video service | — | — | 1,231 | 0.9 | 376,925 | 68.1 |
| Value-added service | 29,756 | 66.5 | 58,462 | 43.6 | 67,603 | 12.2 |
| Mobile marketing services | 1,975 | 4.4 | 38,885 | 29.0 | 66,339 | 12.0 |
| Mobile games | 11,237 | 25.1 | 31,082 | 23.2 | 35,453 | 6.4 |
| Other services | 1,787 | 4.0 | 4,328 | 3.3 | 6,778 | 1.3 |
| **Cost and expenses** | | | | | | |
| Cost of revenues | (15,762) | (35.2) | (30,312) | (22.6) | (241,463) | (43.7) |
| Research and development expenses | (9,264) | (20.7) | (23,265) | (17.4) | (31,399) | (5.7) |
| Sales and marketing expenses | (35,538) | (79.4) | (52,631) | (39.3) | (97,173) | (17.6) |
| General and administrative expenses | (10,354) | (23.2) | (22,879) | (17.0) | (38,983) | (7.0) |
| **Total cost and expenses** | (70,918) | (158.5) | (129,087) | (96.3) | (409,018) | (74.0) |
| Other operating income | 26 | 0.1 | 713 | 0.5 | 406 | 0.1 |
| **(Loss) Income from operations** | (26,137) | (58.4) | 5,614 | 4.2 | 144,486 | 26.1 |
| Interest income | 722 | 1.6 | 7,805 | 5.8 | 8,194 | 1.5 |
| Impairment loss on long-term investments | — | — | — | — | (5,765) | (1.0) |
| **(Loss) Income before income tax and share of income on equity method investments** | (25,415) | (56.8) | 13,419 | 10.0 | 146,915 | 26.6 |
| Income tax expense | — | — | (92) | (0.1) | (5,136) | (0.9) |
| **(Loss) Income before share of income on equity method investments** | (25,415) | (56.8) | 13,327 | 9.9 | 141,779 | 25.7 |
| Share of income on equity method investments | — | — | 370 | 0.3 | 3,471 | 0.6 |
| **Net (loss) income** | (25,415) | (56.8) | 13,697 | 10.2 | 145,250 | 26.3 |

63

Table of Contents

*Comparison of the Years Ended December 31, 2014, 2015 and 2016*

### *Net revenues*

We currently generate revenues primarily from live video service, value-added service, mobile marketing services, mobile games, and other services. Revenues from live video service, value-added service and other services are presented net of value-added taxes and surcharges. Mobile marketing services are presented net of agency rebates, value-added taxes and surcharges. Mobile games revenues include revenues generated from mobile games developed by third-party game developers and from self-developed mobile games. Mobile games revenues generated by third-party game developers are presented net of revenue sharing with game developers, commission fees made to third-party application stores and other payment channels, value-added taxes and surcharges. Mobile games revenues derived from self-developed games are recorded on a gross basis. Net revenues increased significantly from US$134.0 million in 2015 to US$553.1 million in 2016, primarily due to a significant increase in net revenues from live video service, mobile marketing services and value-added service. Net revenues increased significantly from US$44.8 million in 2014 to US$134.0 million in 2015, primarily due to a significant increase in net revenues from value-added service, mobile marketing services and mobile games.

### *Live video service*

We started to offer live video services on our Momo platform in September 2015. We generate revenues when users purchase and send in-show virtual gifts to broadcasters. We launched live video service in September 2015. Initially, the service adopted an online live concert format whereby we invited certain talented performers to put on live music shows in a professional studio environment. Such shows were broadcasted live in one to four sessions on a daily basis and at pre-announced times. In the fourth quarter of 2015, we opened more live channels in order to enable more performers to put on talent shows to entertain and interact with their audience. Until April 2016, we only offered the service to a limited number of talented performers pre-selected carefully by us. In April 2016, we opened up the service to all the users of our platform so that each one of them can become a broadcaster if they wish. Our live video service revenues increased significantly to US$376.9 million in 2016 from US$1.2 million in 2015, primarily due to the increase in the number of broadcasters and paying users for our live video service as a result of the above-mentioned changes of the service from 2015 to 2016. The number of paying users for our live video service increased from 0.2 million in 2015 to 5.6 million in 2016.

### *Value-added service*

Value-added service comprises membership subscription and virtual gift service. Momo users can become members by paying monthly, quarterly, semi-annual or annual membership fees. Momo members are entitled to additional functionalities and privileges on our mobile application. We offer four basic membership subscription packages, priced at RMB12 (US$1.7) per month, RMB30 (US$4.3) per three months, RMB60 (US$8.6) per six months and RMB108 (US$15.6) per year, respectively. Additionally, in June 2015, we introduced our four premium membership subscription packages, priced at RMB30 (US$4.3) per month, RMB88 (US$12.7) per three months, RMB168 (US$24.2) per six months and RMB298 (US$42.9) per year, respectively, representing an increase in price from the basic membership subscription packages of 150%, 193%, 180% and 176%, respectively. We started to offer virtual gift service on our platform in the fourth quarter of 2016.

64

**Table of Contents**

*2016 compared to 2015.* Revenues from our value-added service increased 15.6% to US$67.6 million in 2016 from US$58.5 million in 2015, primarily driven by (i) an increase in membership subscription revenue as a result of an increase in average revenue per member from US$18.3 in 2015 to US$20.0 in 2016, as more members bought our premium membership package, and an increase in the number of our members from 2.9 million as of December 31, 2015 to 3.5 million as of December 31, 2016, and (ii) revenues amounted to US$1.7 million from our virtual gift service, which was launched in the fourth quarter of 2016. Average revenue per member in a year is calculated by dividing (i) the membership subscription revenues in such year by (ii) (A) the sum of the number of members as of March 31, June 30, September 30 and December 31 of such year (B) divided by 4.

*2015 compared to 2014.* Revenues from our value-added service increased 96.5% to US$58.5 million in 2015 from US$29.8 million in 2014, primarily driven by the increase in average revenue per member, due to the premium membership introduced in June 2015, and, to a lesser extent, the increase in the number of our members. Average revenue per member increased from US$14.5 in 2014 to US$18.3 in 2015. During 2014, the number of members generally increased gradually since the beginning of the year to reach 2.9 million as of December 31, 2014. During the first half of 2015, the number of members continued to generally increase and reached a peak of 3.5 million as of June 30, 2015. The number of members then gradually decreased during the second half of 2015 and reached 2.9 million as of December 31, 2015. Although the number of members remained similar at 2.9 million as of December 31, 2014 and 2015, more members contributed membership subscription revenues in 2015 as compared with 2014. The growth rate of our number of members has slowed down in 2015 primarily due to the reduced growth of number of smartphone users in China, and upgrades to our platform that take time for users to adapt to.

### Mobile marketing services

Our mobile marketing services currently include in-feed marketing solutions powered by a proprietary self-serve advertising system, brand-oriented display ads, and advertising services provided through third-party partnerships.

*2016 compared to 2015.* Mobile marketing services revenues increased 70.6% to US$66.3 million in 2016 from US$38.9 million in 2015, primarily due to an increase in revenue of US$29.2 million from our in-feed advertising services as a result of an increase in effective cost per mille (eCPM) of our in-feed advertising service as well as better sell-through of our existing advertisement inventories, partially offset by a decrease in revenue of US$1.7 million from our brand-oriented display ads.

*2015 compared to 2014.* Mobile marketing services revenues increased significantly to US$38.9 million in 2015 from US$2.0 million in 2014, primarily due to an increase in revenue of US$30.3 million from our recently launched advertising services, including the improving efficiency of our proprietary in-feed marketing solutions launched in the second quarter of 2015, and third-party strategic partnerships with Alibaba and 58.com that were launched at the end of 2014. In addition, there was a stronger demand for display banners from brand marketers, which resulted in an increase in revenue of US$6.6 million from our brand-oriented display ads.

### Mobile games

As of December 31, 2016, we had three types of mobile game services, namely non-exclusive licensed mobile game services, exclusive licensed mobile game services and self-developed mobile game services. For non-exclusive licensed mobile game services, we offer our mobile game platform for mobile games developed by third-party game developers, and we share user payments with such game developers. Game developers may offer their games on other platforms in addition to ours. For exclusive licensed mobile game services, we offer our mobile game platform for mobile games developed by third-party game developers, and our platform is the only one through which players can access such games. In addition to licensed mobile games, we also operate self-developed mobile games on our mobile game platform. As of December 31, 2016, we operated 19 non-exclusive licensed games, six exclusive licensed games and six self-developed games. We expect the number of games operated on our platform to fluctuate quarter by quarter. Our revenues from mobile games depend on the number of paying users, which ultimately is determined by our ability to select and offer engaging games tailored to our platform and our user profiles.

65

Table of Contents

*2016 compared to 2015.* Our mobile games revenues increased 14.1% to US$35.5 million in 2016 from US$31.1 million in 2015, primarily due to an increase in revenue from a new self-developed game which we launched in the second quarter of 2016 and for which we recognized revenue on a gross basis, partially offset by a decrease in revenue from existing games. The number of paying users of our mobile games on the Momo platform decreased by 46.7% from 1.5 million in 2015 to 0.8 million in 2016.

*2015 compared to 2014.* Our mobile games revenues increased significantly to US$31.1 million in 2015 from US$11.2 million in 2014, primarily due to the launch of 22 new games in 2015 resulting in more paying users. The number of paying users of our mobile games on the Momo platform increased from 0.5 million in 2014 to 1.5 million in 2015, representing a 200% increase.

### Other services

Our other services include Duobao service, paid emoticons and gift mall sales.

*2016 compared to 2015.* Other services revenues increased 56.6% to US$6.8 million in 2016 from US$4.3 million in 2015, primarily due to our new business Duobao service.

*2015 compared to 2014.* Other services revenues were US$4.3 million in 2015, compared to US$1.8 million in 2014. The growth in other services revenues from 2014 to 2015 was primarily due to an increase in revenues from the sale of paid emoticons.

### Cost and expenses

### Cost of revenues

Cost of revenues consists primarily of costs associated with the operation and maintenance of our platform, including revenue sharing, commission fees, bandwidth costs, labor costs, depreciation and other costs.

Revenue sharing primarily include payments to broadcasters and agencies for our live video service, self-developed mobile game subcontractors and virtual gift recipients. Commission fees are payments made to third-party application stores and other payment channels for distributing our live video service, self-developed mobile games, paid emotions and our mobile marketing services. Users can make payments for such services through third-party application stores and other payment channels. These third-party application stores and other payment channels typically charge a handling fee for their services. Bandwidth costs, including internet data center and content delivery network fees, consist of fees that we pay to telecommunication carriers and other service providers for telecommunication services, hosting our servers at their internet data centers, and providing content and application delivery services. Labor costs consist of salaries and benefits, including share-based compensation expenses, for our employees involved in the operation of our platform. Depreciation mainly consists of depreciation cost on our servers, computers and other equipment. We expect our cost of revenues to increase in the future as we continue to expand our services, as well as to enhance the capability and reliability of our infrastructure to support user growth and increased activity on our platform.

Table of Contents

The following table sets forth the components of our cost of revenues by amounts and percentages of our total cost of revenues for the periods presented:

| | Year Ended December 31, | | | | | |
| | 2014 | | 2015 | | 2016 | |
| | US$ | % | US$ | % | US$ | % |
| | (in US$ thousands, except for percentages) | | | | | |
| **Cost of revenues:** | | | | | | |
| Revenue sharing | — | — | 1,099 | 3.6 | 173,934 | 72.0 |
| Commission fees | 4,202 | 26.7 | 7,348 | 24.2 | 21,598 | 8.9 |
| Bandwidth costs | 6,425 | 40.7 | 8,064 | 26.6 | 17,297 | 7.2 |
| Labor costs | 1,395 | 8.9 | 4,848 | 16.0 | 10,537 | 4.4 |
| Depreciation | 1,748 | 11.1 | 4,637 | 15.3 | 5,933 | 2.5 |
| Other costs | 1,992 | 12.6 | 4,316 | 14.3 | 12,164 | 5.0 |
| **Total cost of revenues** | 15,762 | 100.0 | 30,312 | 100.0 | 241,463 | 100.0 |

*2016 compared to 2015.* Our cost of revenues increased significantly from US$30.3 million in 2015 to US$241.5 million in 2016, primarily due to a US$172.8 million increase in revenue sharing resulting from an increase in live video service revenue, a US$14.3 million increase in commission fees resulting from an increase in fees to payment channels due to a higher volume of cash collection through such channels, a US$9.2 million increase in bandwidth costs, a US$5.7 million increase in labor costs resulting from an increase in the number of employees involved in the operation of our platform, and a US$1.3 million increase in depreciation and amortization costs, which were driven by additional services and functions introduced on the Momo platform.

*2015 compared to 2014.* Our cost of revenues increased 92.3% from US$15.8 million in 2014 to US$30.3 million in 2015, primarily due to a US$3.5 million increase in labor costs resulting from an increase in the number of employees involved in the operation of our platform, a US$3.1 million increase in commission fees which was driven by the growth of our revenues, a US$2.9 million increase in depreciation costs and a US$2.2 million in bandwidth costs, which were driven by strong traffic growth.

*Research and development expenses*

Research and development expenses consist primarily of salaries and benefits, including share-based compensation expenses, for research and development personnel and rental expenses associated with research and development activities. Expenditures incurred during the research phase are expensed as incurred. We expect our research and development expenses to increase as we expand our research and development team to develop new features and services for our platform and to further enhance our big data analytical capabilities.

*2016 compared to 2015.* Our research and development expenses increased by 35.0% from US$23.3 million in 2015 to US$31.4 million in 2016. This increase was primarily due to a US$7.4 million increase in salaries and benefits for research and development personnel. Our research and development headcount increased from 319 as of December 31, 2015 to 367 as of December 31, 2016.

*2015 compared to 2014.* Our research and development expenses increased by 151.1% from US$9.3 million in 2014 to US$23.3 million in 2015. This increase was primarily due to a US$13.2 million increase in salaries and benefits for research and development personnel. Our research and development headcount increased from 213 as of December 31, 2014 to 319 as of December 31, 2015.

*Sales and marketing expenses*

Sales and marketing expenses consist primarily of general marketing and promotional expenses, as well as salaries and benefits, including share-based compensation expenses, for our sales and marketing personnel. We expect our sales and marketing expenses to increase as we plan to enhance our brand awareness, attract new users and promote our new services.

*2016 compared to 2015.* Our sales and marketing expenses increased by 84.6% from US$52.6 million in 2015 to US$97.2 million in 2016, primarily due to a US$27.4 million increase in marketing and promotional expenses to enhance our brand awareness, attract new users and promote our live video service, and a US$14.3 million increase in salaries and other benefits for our sales and marketing personnel. Our sales and marketing headcount increased from 274 as of December 31, 2015 to 337 as of December 31, 2016.

*2015 compared to 2014.* Our sales and marketing expenses increased from US$35.5 million in 2014 to US$52.6 million in 2015, primarily due to a US$13.7 million increase in salaries and other benefits for our sales and marketing personnel. Our sales and marketing headcount increased from 148 as of December 31, 2014 to 274 as of December 31, 2015.

Table of Contents

*General and administrative expenses*

General and administrative expenses consist primarily of salaries and expenses, including share-based compensation expense, professional fees and rental expenses. We expect our general and administrative expenses to increase as our business grows.

*2016 compared to 2015.* Our general and administrative expenses increased from US$22.9 million in 2015 to US$39.0 million in 2016. This increase was primarily due to a US$13.1 million increase in salaries and other benefits, including share-based compensation expenses, for our general and administrative personnel, and a US$3.4 million increase in expense of writing off prepayments to game developers due to termination of certain game licensing contracts or inability to recover certain prepaid costs as a result of poor performance of games.

*2015 compared to 2014.* Our general and administrative expenses increased from US$10.4 million in 2014 to US$22.9 million in 2015. This increase was primarily due to a US$7.7 million increase in salaries and other benefits, including share-based compensation expenses, for our general and administrative personnel, a US$1.6 million increase in professional fees for legal, auditing and other services and a US$1.4 million increase in expense of writing off prepayments to game developers due to termination of certain game licensing contracts.

### *Net (loss) income*

*2016 compared to 2015.* Primarily as a result of the foregoing, our net income increased from US$13.7 million in 2015 to US$145.3 million in 2016.

*2015 compared to 2014.* Primarily as a result of the foregoing, we recorded net income of US$13.7 million in 2015, compared to net loss of US$25.4 million in 2014.

### Inflation

Since our inception, inflation in China has not materially impacted our results of operations. According to the National Bureau of Statistics of China, the year-over-year percent changes in the consumer price index for December 2014, 2015 and 2016 were increases of 1.5%, 1.6% and 2.1%, respectively. Although we have not in the past been materially affected by inflation since our inception, we can provide no assurance that we will not be affected in the future by higher rates of inflation in China.

### Critical Accounting Policies

We prepare our financial statements in conformity with U.S. GAAP, which requires us to make estimates and assumptions that affect our reporting of, among other things, assets and liabilities, revenues and expenses and contingent assets and liabilities. We continually evaluate these estimates and assumptions based on the most recently available information, our own historical experience and other factors that we believe to be relevant under the circumstances. Since our financial reporting process inherently relies on the use of estimates and assumptions, our actual results could differ from what we expect. This is especially true with some accounting policies that require higher degrees of judgment than others in their application. We consider the policies discussed below to be critical to an understanding of our audited consolidated financial statements because they involve the greatest reliance on our management's judgment.

### *Revenue Recognition*

We recognize revenues when persuasive evidence of an arrangement exists, delivery has occurred, the sales price is fixed or determinable, and collectability is reasonably assured. We principally derive our revenues from live video service, value-added service, mobile marketing services, mobile games, and other services.

*Live Video Service.* We provide live video service whereby users can enjoy live performances and interact with the broadcasters for free, and have the option of purchasing in-show virtual gifts. Broadcasters can either host the performance on their own or join a broadcaster agency. Users purchase virtual gifts from us and simultaneously present them to broadcasters to show their support. We determine the prices of virtual gifts and generate revenue from the sales of virtual gifts upon purchase. Under the arrangements with broadcasters or broadcaster agency, we share with them a portion of the revenues derived from the sales of virtual gifts. Revenues derived from the sale of virtual gifts are recorded on a gross basis as we have determined that we act as the principal to fulfill all obligations related to the live video services. The portion paid to broadcasters and/or broadcaster agencies is recognized as cost of revenues.

68

Table of Contents

*Value-added Service.* Value-added service comprises membership subscription and virtual gift service. Membership subscription is a service package that enables members to enjoy additional functions and privileges. The contract periods for the membership subscription are one month, one quarter, six months and one year. All membership subscription is non-refundable. We collect membership subscription in advance and record it as deferred revenue. Revenues are recognized ratably over the contract period for the membership subscription services. Virtual gift service was launched on the Momo platform in 2016 to enhance users' interaction and social networking with each other. Users simultaneously purchase and send the virtual gifts to other users. Revenue recognized related to virtual gift services is insignificant for each of the years presented.

*Mobile Marketing.* We provide advertising and marketing solutions to customers, enabling them to promote their brands and to conduct effective marketing activities through our mobile application.

### (i) Display-based online mobile marketing services

For display-based online mobile marketing services such as banners and location-based advertising on mobile applications, we recognize revenue ratably over the period that the mobile marketing service is provided commencing on the date the customer's advertisement is displayed, or on the number of times that the advertisement has been displayed for advertising arrangements based on cost per thousand impressions.

### (ii) Performance-based mobile marketing services

We enable advertising customers to place links on our mobile platform on a pay-for-effectiveness basis, which is referred as cost for performance model. We charge fees directly from advertising customers based on the effectiveness of advertising links, which is measured by active clicks. We estimate revenue based on our internal data, which are confirmed by the respective customers, or based on a fixed unit price.

Our revenue transactions are based on standard business terms and conditions, which are recognized net of agency rebates, if applicable.

*Mobile Games.* We publish licensed mobile games developed by third-party game developers and our self-developed mobile games to game players through our mobile application.

### Licensed mobile games services

We generate revenue by offering mobile games services developed by third-party game developers. All of the licensed games can be accessed and played by game players directly through our mobile game platform. We primarily view the game developers to be our customers and consider our responsibility under our agreements with the game developers to be promotion of the game developers' games. We generally collect payments from game players in connection with the sale of in-game virtual currencies and remit certain agreed-upon percentages of the proceeds to the game developers and records revenues net of remittances. Purchases of in-game currencies are not refundable after they have been sold unless there are unused in-game currencies at the time a game is discontinued. Typically, a game will only be discontinued when the monthly revenues generated by a game become consistently insignificant. We do not currently expect to pay any material cash refunds to game players or game developers in connection with a discontinued game.

Licensed mobile game revenue recognition involves certain management judgments, such as determining who is the principal in providing game services to our players, estimating the consumption date of the in-game currencies and the period of player relationship. We concluded that licensed game developers are the principals based on the fact that the games are primarily hosted by the game developers and such developers are responsible for the maintenance of the games and determination of the prices of the virtual items used in the games. Our primary responsibility is to promote the games of the third-party developers, provide virtual currency exchange services, and offer customer support to resolve registration, log-in, virtual currency exchange and other related issues. Therefore, we report such revenues net of predetermined revenue-sharing with the game developers and commission fees made to third-party application stores and other payment channels.

69

**Table of Contents**

*(i) Non-exclusive licensed mobile games services*

We enter into non-exclusive agreements with game developers and offer our mobile game platform for the mobile games developed by such game developers. We have determined that we have no additional performance obligation to the developers or game players upon players' completion of the corresponding in-game purchase. Therefore, revenues from the sale of in-game currencies are primarily recorded net of remittances to game developers and commission fees made to third-party application stores and other payment channels and deferred until the estimated consumption date by individual games (i.e., the estimated date in-game currencies are consumed within the game), which is typically within a short period of time ranging from zero to six days after purchase of the in-game currencies.

We estimate the in-game virtual currency consumption date based on the consumption behavior of game players for each reporting period. The amount and timing of our game revenues could be materially different for any period if management made different judgments or utilized different estimates. Any adjustments arising from changes in the estimate would be applied prospectively on the basis that such changes are caused by new information indicating a change in the user behavior pattern.

*(ii) Exclusive licensed mobile games services*

We enter into exclusive agreements with game developers and provide our mobile game platform for the mobile games developed by such game developers. Under the exclusive agreements, players can access the games only through our platform. We have determined that we are obligated to provide mobile games services to game players who purchased virtual items to gain an enhanced game-playing experience over an average period of player relationship. We believe that our performance for, and obligation to, the game developers correspond to the game developers' services to the players. We do not have access to the data on the consumption details and the types of virtual items purchased by game players. Therefore, we cannot estimate the economic life of the virtual items. However, we maintain historical data of a particular player when the player makes a purchase and logs into the relevant games. We have adopted a policy to recognize revenues net of remittances to game developers and commission fees made to third-party application stores and other payment channels over the estimated period of player relationship on a game-by-game basis.

We estimate the period of player relationship based on an assessment of our historical data, user behavioral patterns as well as industry research data. The period of player relationship is estimated based on data collected from those players who have purchased in-game currencies. We estimate the life of the player relationship to be the average period from the first purchase of in-game currencies to the date the player ceases to play the game.

To estimate the last login date the player plays the game, we selected all paying players that logged into the game during a particular period and continue to track these players' log-on behaviors over a period to determine if each user is "active" or "inactive," which is determined based on a review of the period of inactivity or idle period from the user's last log-in. We observe the behaviors of these players to see whether they subsequently return to a game based on different inactive periods (e.g. not logging in) of one month. The percentage of players calculated that do not log back in is estimated to be the probability that players will not return to the game after a certain period of inactivity.

We consider a paying player to be inactive once he or she has reached a period of inactivity for which it is probable (defined as at least 80%) that a player will not return to a specific game. We believe that using an 80% threshold for the likelihood that a player will not return to a game is a reasonable estimate. We have consistently applied this threshold to our analysis.

If a new game is launched and only a limited period of paying player data is available, then we consider other qualitative factors, such as the playing patterns for paying players for other games with similar characteristics in the market. As of December 31, 2016, we operated six games under exclusive arrangements and the estimated period of the player relationship ranged from 20 to 99 days.

Future usage patterns may differ from historical usage patterns and therefore the estimated period of player relationship with us may change in the future. The consideration of player relationship with each game is based on our best estimate that takes into account all known and relevant information at the time of assessment. We assess the estimated period of player relationships on a quarterly basis. Any adjustments arising from changes in the estimated period of player relationships are applied prospectively as such change results from new information indicating a change in the game player's behavioral patterns.

Table of Contents

*Self-developed mobile games*

In February 2015, we launched the first self-developed game on our platform and started to generate revenues by in-game sales of virtual item. We have determined that we have an implied obligation to the players who purchased the virtual items to gain an enhanced game-playing experience over the average playing period of the paying players, and accordingly, we recognize the revenues ratably over the estimated period of player relationship starting from the point in time when the players purchase the virtual items and when all other revenue recognition criteria are met. The estimated period of player relationship of our six self-developed games ranged from 20 to 110 days for the year ended December 31, 2016. We recognize revenue derived from our self-developed mobile games on a gross basis as we act as a principal to fulfill all obligations related to the mobile game operation. Commission fees paid to third-party application stores and other payment channels are recorded as cost of revenues.

*Other Services*. Other services primarily include Duobao service and paid emoticons.

### Consolidation of Affiliated Entities

PRC regulations currently limit direct foreign ownership of business entities providing value-added telecommunications services, advertising services and internet services in the PRC where certain licenses are required for the provision of such services. To comply with these PRC regulations, we conduct a substantial majority of our business through Beijing Momo and its subsidiaries.

Beijing Momo IT, our wholly-owned PRC subsidiary, holds the power to direct the activities of Beijing Momo and its subsidiaries that most significantly affect our economic performance and bears the economic risks and receives the economic benefits of Beijing Momo and its subsidiaries through a series of contractual agreements with Beijing Momo and/or their nominee shareholders, including:

- Exclusive cooperation agreements, as supplemented;

- Equity interest pledge agreement;

- Business operation agreement;

- Exclusive call option agreement;

- Powers of attorney; and

Based on the advice of Han Kun Law Offices, our PRC legal counsel, we believe above contractual agreements are currently legally enforceable under PRC law and regulations.

More specifically, through these contractual agreements, we believe that the nominee shareholders of Beijing Momo do not have the direct or indirect ability to make decisions regarding the activities of Beijing Momo that could have a significant impact on the economic performance of Beijing Momo because all of the voting rights of Beijing Momo's nominee shareholders have been contractually transferred to Beijing Momo. Therefore, we have effective control over Beijing Momo. In addition, we believe that our ability to exercise effective control, together with the exclusive cooperation agreements, as supplemented, exclusive call option agreement and equity interest pledge agreement, give us the rights to receive substantially all of the economic benefits from Beijing Momo. Hence, we believe that the nominee shareholders of Beijing Momo do not have the rights to receive the expected residual returns of Beijing Momo, as such rights have been transferred to Beijing Momo. We evaluated the rights we obtained through entering into these contractual agreements and concluded we have the power to direct the activities that most significantly affect Beijing Momo's economic performance and also have the rights to receive the economic benefits of Beijing Momo that could be significant to Beijing Momo.

Accordingly, we are the primary beneficiary of Beijing Momo and have consolidated the financial results of Beijing Momo and its subsidiaries in our consolidated financial statements.

71

Table of Contents

The shareholders of Beijing Momo are also our shareholders, directors or officers and therefore have no current interest in acting contrary to the contractual arrangements. However, uncertainties in the PRC legal system could limit our ability to enforce these contractual arrangements and if the shareholders of Beijing Momo were to reduce their shareholdings in our company, their interests may diverge from our interests, which may increase the risk that they would act contrary to the contractual arrangements, such as causing Beijing Momo to not pay service fees under the contractual arrangements when required to do so. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Corporate Structure—We rely on contractual arrangements with Beijing Momo and its shareholders for our operations in China, which may not be as effective in providing operational control as direct ownership."

72

**Table of Contents**

*Income Taxes*

In preparing our consolidated financial statements, we must estimate our income taxes in each of the jurisdictions in which we operate. We estimate our actual tax exposure and assess temporary differences resulting from different treatment of items for tax and accounting purposes. These differences result in deferred tax assets and liabilities, which we include in our consolidated balance sheet. We must then assess the likelihood that we will recover our deferred tax assets from future taxable income. If we believe that recovery is not likely, we must establish a valuation allowance. To the extent we establish a valuation allowance or increase this allowance, we must include an expense within the tax provision in our consolidated statement of operations.

Management must exercise significant judgment to determine our provision for income taxes, our deferred tax assets and liabilities and any valuation allowance recorded against our net deferred tax assets. We base the valuation allowance on our estimates of taxable income in each jurisdiction in which we operate and the period over which our deferred tax assets will be recoverable. If actual results differ from these estimates or we adjust these estimates in future periods, we may need to establish an additional valuation allowance, which could materially impact our financial position and results of operations.

U.S. GAAP requires that an entity recognize the impact of an uncertain income tax position on the income tax return at the largest amount that is more likely than not to be sustained upon audit by the relevant tax authority. If we ultimately determine that payment of these liabilities will be unnecessary, we will reverse the liability and recognize a tax benefit during that period. Conversely, we record additional tax charges in a period in which we determine that a recorded tax liability is less than the expected ultimate assessment. We did not recognize any significant unrecognized tax benefits during the periods presented in this annual report.

Uncertainties exist with respect to the application of the New EIT Law to our operations, specifically with respect to our tax residency status. The New EIT Law specifies that legal entities organized outside of the PRC will be considered residents for PRC income tax purposes if their "de facto management bodies" are located within the PRC. The New EIT Law's implementation rules define the term "de facto management bodies" as "establishments that carry out substantial and overall management and control over the manufacturing and business operations, personnel, accounting, properties, etc. of an enterprise."

Because of the uncertainties resulted from limited PRC tax guidance on the issue, it is uncertain whether our legal entities organized outside of the PRC constitute residents under the New EIT Law. If one or more of our legal entities organized outside of the PRC were characterized as PRC tax residents, the impact would adversely affect our results of operations. See "Item 3. Key Information—D. Risk Factors—Risks Related to Doing Business in China."

*The Useful Lives and Impairment of Property and Equipment*

Property and equipment are stated at historical cost less accumulated depreciation. Depreciation is computed using the straight-line method over the estimated useful lives of the assets, generally from three to five years. Judgment is required to determine the estimated useful lives of assets, especially for computer equipment, including determining how long existing equipment can function and when new technologies will be introduced at cost-effective price points to replace existing equipment. Changes in these estimates and assumptions could materially impact our financial position and results of operations.

We review our long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may no longer be recoverable. When these events occur, we measure impairment by comparing the carrying value of the long-lived assets to the estimated undiscounted future cash flows expected to result from the use of the assets and their eventual disposition. If the sum of the expected undiscounted cash flow is less than the carrying amount of the assets, we would recognize an impairment loss based on the fair value of the assets.

73

Table of Contents

*Fair Value of Our Ordinary Shares*

Prior to our initial public offering in December 2014, we were a private company with no quoted market prices for our ordinary shares. We therefore needed to make estimates of the fair value of our ordinary shares at various dates for the following purposes:

- Determining the fair value of our ordinary shares at the date of issuance of convertible instruments as one of the inputs into determining the intrinsic value of the beneficial conversion feature, if any.

- Determining the fair value of our ordinary shares at the date of the grant of a share-based compensation awards to our employees as one of the inputs into determining the grant date fair value of the award.

- Determining the fair value of our ordinary shares at the date of the grant of a share-based compensation awards to non-employees as one of the inputs into determining the grant date fair value of the award and fair value as of each period end thereafter.

In determining the estimated fair value of our ordinary shares, we have considered the guidance prescribed by the *AICPA Audit and Accounting Practice Aid, Valuation of Privately-Held-Company Equity Securities Issued as Compensation*, or the Practice Aid, which sets forth the preferred types of valuation that should be used. These estimates are not necessary to determine the fair value of our ordinary shares after our ADSs began trading.

The following table sets forth the fair value of our ordinary shares estimated at different dates in 2012, 2013 and 2014:

| Date | Class of Shares | Fair Value | Purpose of Valuation | DLOM | Discount Rate |
|------|-----------------|------------|----------------------|------|---------------|
| April 12, 2012 | Ordinary shares | US$ 0.01 | To determine potential beneficial conversion feature in connection with the issuance of Series A-1 and Series A-2 preferred shares | 33.5% | 40.0% |
| June 11, 2012 | Ordinary shares | US$ 0.03 | To determine potential beneficial conversion feature in connection with the issuance of Series A-3 preferred shares | 33.5% | 38.0% |
| July 13, 2012 | Ordinary shares | US$ 0.09 | To determine potential beneficial conversion feature in connection with the issuance of Series B preferred shares | 33.5% | 38.0% |
| November 1, 2012 | Ordinary shares | US$ 0.19 | Share option grant | 33.0% | 35.0% |
| October 8, 2013 | Ordinary shares | US$ 0.40 | To determine potential beneficial conversion feature in connection with the issuance of Series C preferred shares | 20.0% | 30.0% |
| March 1, 2014 | Ordinary shares | US$ 4.00 | Share option grant | 16.0% | 21.0% |
| April 22, 2014 | Ordinary shares | US$ 4.22 | To determine potential beneficial conversion feature in connection with the issuance of Series D preferred shares | 14.0% | 21.0% |
| October 29, 2014 | Ordinary shares | US$ 6.75 | Share option grant | 5.0% | 18.0% |

Note: the fair values of ordinary shares stated above were adjusted by 1:10 share split that occurred in September 2012.

74

**Table of Contents**

In determining the fair value of our equity interest in 2012, 2013 and 2014 prior to the completion of our initial public offering, we used both the market approach, also known as backsolve method, and the income approach, also known as the discounted cash flow method.

The backsolve method takes into consideration of the rights and preferences of each class of equity and solves for the total equity value that is comparable with a recent transaction in our own securities, considering the rights and preferences of each class of equity. The method was used when we completed financing transactions with investors on arm's length basis.

The discounted cash flow, or DCF method, incorporates the projected cash flow of our management's best estimation as of each measurement date. The projected cash flow estimation includes, among others, analysis of projected revenue growth, gross margins and terminal value. The assumptions used in deriving the fair value of ordinary shares are consistent with our business plan.

The DCF method of the income approach involves applying appropriate discount rates to discount the future cash flows forecast to present value. In determining an appropriate discount rate, we have considered (i) the weighted-average cost of capital, or WACC and (ii) the rate of return expected by venture capitalists, or VCR.

*Weighted Average Cost of Capital.* We calculated the cost of equity of the business as of the valuation dates using the capital asset pricing model, or CAPM, the most commonly adopted method for estimating the required rate of return for equity. Under CAPM, the cost of equity is determined with consideration of, the risk-free rate, systematic risk, equity market premium, size of our company, the scale of our business and our ability in achieving forecasted projections. In deriving the WACCs, certain publicly traded companies involving social network were selected for reference as our guideline companies. To reflect the operating environment in China and the general sentiment in the U.S. capital markets towards the social network, the guideline companies were selected with consideration of the following factors: (i) the guideline companies should provide similar services, and (ii) the guideline companies should either have their principal operations in Asia Pacific region, as we operate in China, and/or are publicly listed companies in the United States as we planned to list our shares in the United States.

*VCR.* According to guidance prescribed by the AICPA Audit and Accounting Practice Aid, "Valuation of Privately-Held-Company Equity Securities Issued as Compensation," because private enterprises often seek financing from private equity investors, including venture capital firms, the venture capital arena provides an observable market for the cost of capital for privately held enterprises. The expected return from venture capitalists for investing in our company when we were in expansion stage ranges from 35% to 50%. As we progress through early stage of development towards our initial public offering, the expected return from venture capitalists for investing in our company gradually declines when we were in bridge and IPO stage, which generally range from 25% to 35%.

After considering the WACC, VCR, the relative risk of the industry and the characteristics of our company, we used a discount rate of 40% as of the valuation dates in April 2012 and 18% as of October 2014. The decrease in discount rates was primarily due to our business growth and additional funding from multiple series of preferred shares investments.

The above assumptions used in determining the fair values were consistent with our business plan and major milestones we achieved. We also applied general assumptions, including the following:

- there will be no major changes in the existing political, legal, fiscal and economic conditions in countries in which we will carry on our business;

- there will be no major changes in the current taxation law in countries in which we operates, that the rates of tax payable remain unchanged and that all applicable laws and regulations will be complied with;

- exchange rates and interest rates will not differ materially from those presently prevailing;

- the availability of financing will not be a constraint on the future growth of our operation;

75

Table of Contents

- we will retain and have competent management, key personnel, and technical staff to support our ongoing operation; and

- industry trends and market conditions for related industries will not deviate significantly from economic forecasts.

Since our capital structure comprised convertible preferred shares and ordinary shares at each grant date, we used the option-pricing method to allocate equity value of our company to preferred and ordinary shares, taking into account the guidance prescribed by the Practice Aid. This method involves making estimates of the anticipated timing of a potential liquidity event, such as a sale of our company or an initial public offering, and estimates of the volatility of our equity securities. The anticipated timing is based on the plans of our board and management. Estimating the volatility of the share price of a privately held company is complex because there is no readily available market for the shares. We estimated the volatility of our shares based on historical volatility of guideline companies' shares. Had we used different estimates of volatility, the allocations between preferred and ordinary shares would have been different.

We also applied a discount for lack of marketability, or DLOM, ranging from 33.5% to 5.0%, to reflect the fact that there is no ready market for shares in a closely-held company like us. When determining the DLOM, the Black-Scholes option pricing model was used. Under this option-pricing method, the cost of the put option, which can hedge the price change before the privately held shares can be sold, was considered as a basis to determine the discount for lack of marketability. This option pricing method was used because it takes into account certain company-specific factors, including the timing of our initial public offering and the volatility of the share price of the guideline companies engaged in the same industry.

Since our initial public offering in December 2014, the determination of the fair value of the ordinary shares is based on the market price of our ADSs, each representing two Class A ordinary shares, traded on the NASDAQ Global Select Market.

### *Share-based Compensation*

All share-based awards to employees and management, including share options, restricted shares and restricted share units, are measured at the grant date based on the fair value of the awards. Share-based compensation, net of forfeitures, is recognized as an expense on a straight-line basis over the requisite service period, which is the vesting period.

Share awards issued to non-employees are measured at fair value at the earlier of the commitment date or the date the services are completed and recognized over the period the services are provided.

The following table sets forth certain information regarding the share options granted under our 2012 Plan and 2014 Plan to our employees, management and non-employees at different dates in 2014, 2015 and 2016.

| Grant Date | No. of Options Grant | Exercise Price per Option | | Weighted Average Fair Value per Option at the Grant Dates | | Intrinsic Value per Option at the Grant Dates | | Type of Valuation |
|---|---|---|---|---|---|---|---|---|
| March 1, 2014 | 4,593,526 | US$ | 0.1404 | US$ | 3.87 | US$ | 3.86 | Retrospective |
| October 29, 2014 | 2,963,500 | US$ | 0.0002 | US$ | 6.75 | US$ | 6.75 | Contemporaneous |
| April 22, 2015 | 2,975,397 | US$ | 0.0002 | US$ | 5.60 | US$ | 5.60 | Contemporaneous |
| May 4, 2015 | 2,752,000 | US$ | 0.0002 | US$ | 5.63 | US$ | 5.63 | Contemporaneous |
| August 13, 2015 | 476,000 | US$ | 0.0002 | US$ | 7.86 | US$ | 7.86 | Contemporaneous |
| October 15, 2015 | 1,535,525 | US$ | 0.0002 | US$ | 6.51 | US$ | 6.51 | Contemporaneous |
| November 13, 2015 | 93,000 | US$ | 0.0002 | US$ | 6.34 | US$ | 6.34 | Contemporaneous |
| March 31, 2016 | 2,585,860 | US$ | 0.0002 | US$ | 5.62 | US$ | 5.62 | Contemporaneous |
| June 16, 2016 | 2,330,000 | US$ | 0.0002 | US$ | 5.585 | US$ | 5.585 | Contemporaneous |
| July 6, 2016 | 1,247,000 | US$ | 0.0002 | US$ | 4.955 | US$ | 4.955 | Contemporaneous |
| October 15, 2016 | 220,000 | US$ | 0.0002 | US$ | 11.75 | US$ | 11.75 | Contemporaneous |
| December 30, 2016 | 1,194,262 | US$ | 0.0002 | US$ | 9.19 | US$ | 9.19 | Contemporaneous |

76

Table of Contents

We estimated the fair value of share options on the date of grant using the binomial tree pricing model before we completed our initial public offering and the Black-Sholes pricing model after we completed our initial public offering. The fair value of each option grant is estimated on the date of grant with the following key assumptions:

|  | 2014 | 2015 | 2016 |
|---|---|---|---|
| Risk-free interest rate | 2.44%-3.25% | 2.15%-2.19% | 1.75%~2.70% |
| Contractual term (number of years) | 10 | 10 | 10 |
| Expected volatility | 53.70%-57.50% | 55.30%-55.70% | 52.5%~55.3% |
| Expected dividend yield | 0.00% | 0.00% | 0.00% |

The following table sets forth certain information regarding the restricted share units granted under our 2014 Plan to certain directors.

| Grant Date | No. of Restricted Share Units Grant | Weighted Average Fair Value per Restricted Share Units at the Grant Date | Type of Valuation |
|---|---|---|---|
| December 11, 2014 | 40,001 | US$8.51 | Contemporaneous |
| May 17, 2016 | 200,000 | US$6.50 | Contemporaneous |

**Recent Accounting Pronouncements**

A list of recent accounting pronouncements that are relevant to us is included in note 2 to our consolidated financial statements, which are included in this annual report.

**B.     Liquidity and Capital Resources**

As of December 31, 2016, we have financed our operations primarily through the issuance of preferred shares in private placements and net cash provided by operating activities. As of December 31, 2014 and 2015 and 2016, we had US$451.0 million, US$169.5 million and US$257.6 million, respectively, in cash and cash equivalents. Our cash and cash equivalents primarily consist of cash on hand and highly liquid investments, which are unrestricted from withdrawal or use, or which have original maturities of three months or less when purchased. We believe that our current cash and cash equivalents and our anticipated cash flows from operations will be sufficient to meet our anticipated working capital requirements and capital expenditures for the next 12 months. We may, however, need additional capital in the future to fund our continued operations.

In the future, we may rely significantly on dividends and other distributions paid by our PRC subsidiary for our cash and financing requirements. There may be restrictions on the dividends and other distributions by our PRC subsidiary. The PRC tax authorities may require us to adjust our taxable income under the contractual arrangements that our PRC subsidiary currently has in place with our consolidated affiliated entity in a way that could materially and adversely affect the ability of our PRC subsidiary to pay dividends and make other distributions to us. In addition, under PRC laws and regulations, our PRC subsidiary may pay dividends only out of its accumulated profits as determined in accordance with PRC accounting standards and regulations. Our PRC subsidiary is required to set aside at least 10% of its accumulated after-tax profits each year, if any, to fund a statutory reserve fund, until the aggregate amount of such fund reaches 50% of its respective registered capital. At its discretion, our PRC subsidiary may allocate a portion of its after-tax profits based on PRC accounting standards to staff welfare and bonus funds. The reserve fund and the staff welfare and bonus funds cannot be distributed as cash dividends. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Corporate Structure—We may rely on dividends paid by our PRC subsidiary to fund cash and financing requirements. Any limitation on the ability of our PRC subsidiary to pay dividends to us could have a material adverse effect on our ability to conduct our business and to pay dividends to holders of the ADSs and our ordinary shares." Furthermore, our investments made as registered capital and additional paid-in capital of our PRC subsidiary, consolidated affiliated entity and its subsidiaries are also subject to restrictions on their distribution and transfer according to PRC laws and regulations.

Table of Contents

As a result, our PRC subsidiary, consolidated affiliated entity and its subsidiaries in China are restricted in their ability to transfer their net assets to us in the form of cash dividends, loans or advances. As of December 31, 2016, the amount of the restricted net assets, which represents registered capital and additional paid-in capital cumulative appropriations made to statutory reserves, was US$109.0 million. As of December 31, 2016, we held cash and cash equivalents of US$11.5 million in aggregate outside of the PRC and US$246.1 million in aggregate in the PRC, of which US$245.9 million was denominated in RMB and US$0.2 million was in U.S. dollars. Of such cash and cash equivalents held in the PRC, our PRC subsidiary held cash and cash equivalents in the amount of US$13,396 and RMB1,452.5 million (US$209.2 million), and our consolidated affiliated entity and its subsidiaries held cash and cash equivalents in the amount of US$0.2 million and RMB254.5 million (US$36.7 million).

As an offshore holding company, we are permitted under PRC laws and regulations to provide funding from the proceeds of our offshore fund raising activities to our PRC subsidiary only through loans or capital contributions, and to our consolidated affiliated entity and its subsidiaries only through loans, in each case subject to the satisfaction of the applicable government registration and approval requirements. See "Item 3. Key Information—D. Risk Factors—Risks Related to Doing Business in China—PRC regulation of loans to, and direct investment in, PRC entities by offshore holding companies and governmental control of currency conversion may restrict or prevent us from using offshore funds to make loans to our PRC subsidiary and consolidated affiliated entity and its subsidiaries, or to make additional capital contributions to our PRC subsidiary." As a result, there is uncertainty with respect to our ability to provide prompt financial support to our PRC subsidiary and consolidated affiliated entity when needed. Notwithstanding the foregoing, our PRC subsidiary may use its own retained earnings (rather than RMB converted from foreign currency denominated capital) to provide financial support to our consolidated affiliated entity either through entrustment loans from our PRC subsidiary to our consolidated affiliated entity or direct loans to such consolidated affiliated entity's nominee shareholders, which would be contributed to the consolidated variable entity as capital injections. Such direct loans to the nominee shareholders would be eliminated in our consolidated financial statements against the consolidated affiliated entity's share capital.

Our full-time employees in the PRC participate in a government-mandated contribution plan pursuant to which certain pension benefits, medical care, unemployment insurance, employee housing fund and other welfare benefits are provided to such employees. We accrue for these benefits based on certain percentages of the employees' salaries. The total provisions for such employee benefits were US$2.6 million, US$6.5 million and US$9.1 million in 2014, 2015 and 2016, respectively. We expect our contribution towards such employee benefits to increase in the future as we continue to expand our workforce and as salary levels of our employees continue to increase.

The following table sets forth a summary of our cash flows for the periods indicated:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2016 |
| | (in US$ thousands) | | |
| Net cash (used in) provided by operating activities | (5,933) | 57,252 | 218,311 |
| Net cash used in investing activities | (9,549) | (333,380) | (118,348) |
| Net cash provided by (used in) financing activities | 412,256 | (2,233) | 14 |
| Effect of exchange rate changes on cash and cash equivalents | (1,180) | (3,138) | (11,882) |
| Net increase in (decrease by) cash and cash equivalents | 395,594 | (281,499) | 88,095 |
| Cash and cash equivalents at beginning of period | 55,374 | 450,968 | 169,469 |
| Cash and cash equivalents at end of period | 450,968 | 169,469 | 257,564 |

*Anticipated Use of Cash*

We intend to continue to invest in our research and development capabilities to grow our user base and enhance user experience. We intend to continue to market our services, promote our brand, strengthen our customer service capabilities and enhance monetization. In order to support our overall business expansion, we also expect to continue to make investments in our corporate facilities and information technology infrastructure. We may pursue strategic alliances and acquisitions that complement our social networking platform. We plan to fund these expenditures with cash and cash equivalents that we have.

78

**Table of Contents**

*Operating Activities*

Net cash provided by operating activities amounted to US$218.3 million in 2016, which was primarily attributable to a net income of US$145.3 million, adjusted for non-cash items of US$42.4 million and an increase of US$30.6 million in working capital. The non-cash items primarily included US$31.7 million in share-based compensation expenses, US$8.4 million in depreciation on property and equipment and US$5.8 million in impairment loss on long-term investments, partially offset by US$3.5 million of investing income. The increase in working capital was primarily attributable to an increase in accounts payable of US$32.0 million, an increase in accrued expenses and other current liabilities of US$15.5 million and an increase in deferred revenue of US$15.5 million, which was partially offset by an increase in accounts receivable of US$23.0 million and an increase in prepaid expenses and other current assets of US$15.6 million. The increase in accounts payable was mainly attributable to the increase in revenue-sharing payable to live broadcasters and game developers. The increase in accrued expenses and other current liabilities was mainly attributable to (i) an increase in payroll and welfare payable due to increased headcount and increased salaries, and (ii) an increase in marketing promotional fees payable, partially offset by a decrease in payable to employees for exercise of stock options. The increase in deferred revenue was mainly attributable to the increase of number of paying users for our live video service, the increase of our members and membership subscription fees that our members paid in advance, as well as the increase in mobile marketing revenues and mobile games revenues paid in advance. The increase in accounts receivable was mainly attributable to an increase in revenues collected through third-party application store and other payment channels. The increase in prepaid expenses and other current assets was mainly attributable to (i) an increase in advance payment made to advertisement suppliers, (ii) an increase in customer advance payment at a third-party payment channel, which is cash deposited at the third-party payment channel by us for the broadcasters to withdraw their revenue sharing, (iii) an increase in game promotions fees paid on behalf of game developers and (iv) an increase in commission fees we paid to third-party application stores and other payment channels for distributing our mobile application and services.

Net cash provided by operating activities amounted to US$57.3 million in 2015, which was primarily attributable to a net income of US$13.7 million, adjusted for non-cash items of US$23.7 million and an increase of US$19.9 million in working capital. The non-cash items primarily included US$17.4 million in share-based compensation expenses and US$6.6 million in depreciation on property and equipment. The increase in working capital was primarily attributable to an increase in accrued expenses and other current liabilities of US$20.7 million, an increase in deferred revenue of US$13.0 million, an increase in accounts payable of US$5.3 million and an increase in other non-current liabilities of US$1.8 million, which was partially offset by an increase in prepaid expenses and other current assets of US$11.2 million, an increase in accounts receivable of US$8.5 million and an increase in amount due from related parties of US$1.2 million. The increase in accrued expenses and other current liabilities was mainly attributable to (i) an increase in payable to employees for exercise of stock options, (ii) an increase in payroll and welfare payable due to increased headcount and increased salaries, and (iii) an increase in marketing promotional fees payable. The increase in deferred revenue was mainly attributable to the increase of our members and membership subscription fees that our members paid in advance, as well as the increase in mobile games revenues and mobile marketing revenues paid in advance. The increase in accounts payable was mainly attributable to the increase in revenue-sharing payable to game developers. The increase in prepaid expenses and other current assets was mainly attributable to (i) an increase in interest receivable, (ii) an increase in advance payment made to third-party game developers, (iii) an increase in VAT resulting primarily from the purchase of property and equipment as well as advertising activities; and (iv) an increase in commission fees we paid to third-party application stores and other payment channels for distributing our mobile application and services.

Net cash used in operating activities amounted to US$5.9 million in 2014, which was primarily attributable to a net loss of US$25.4 million, adjusted for non-cash items of US$9.5 million and increase of US$10.0 million in working capital. The non-cash items primarily included US$6.6 million in share-based compensation expenses and US$2.8 million in depreciation on property and equipment. The increase in working capital was primarily attributable to an increase in deferred revenue of US$12.8 million, an increase in accounts payable of US$4.5 million and an increase in accrued expenses and other current liabilities of US$5.9 million, which was partially offset by an increase in prepaid expenses and other current assets of US$7.5 million and an increase in accounts receivable of US$5.2 million. The increase in deferred revenue was mainly attributable to the increase of our members and membership subscription fees that our members paid in advance, as well as the increase in mobile games revenues paid in advance. The increase in accounts payable was mainly attributable to the increase in revenue-sharing payable to game developers. The increase in accrued expenses and other current liabilities was mainly attributable to (i) an increase in payroll and welfare payable due to an increased headcount and increased salaries, (ii) an increase in marketing promotional fees payable, and (iii) an increase in fees payable for professional services. The increase in prepaid expenses and other current assets is mainly attributable to (i) an increase in VAT resulting primarily from the purchase of property and equipment as well as advertising activities; (ii) an increase in commission fees we paid to third-party application stores and other payment channels for distributing our mobile application and membership subscription services; and (iii) an increase in advance payment made to third-party game developers.

79

Table of Contents

*Investing Activities*

Net cash used in investing activities amounted to US$118.3 million in 2016, which was primarily attributable to purchase of term deposits, payment and prepayment of long-term investments, and purchase of servers, computers and other equipment, partially offset by cash received on maturity of term deposits.

Net cash used in investing activities amounted to US$333.4 million in 2015, which was primarily attributable to purchase of term deposits, purchase of servers, computers and other equipment, and payment and prepayment of long-term equity investments.

Net cash used in investing activities amounted to US$9.5 million in 2014, which was primarily attributable to our purchase of servers, computers and other equipment and payments for leasehold improvements for our new office in Beijing, which we have occupied since June 2014.

*Financing Activities*

Net cash provided by financing activities amounted to US$14,000 in 2016, which was primarily attributable to cash received for exercise of options awarded under our share incentive plans, which was partially offset by a deferred payment on the purchase of fixed assets.

Net cash used in financing activities amounted to US$2.2 million in 2015, which was primarily attributable to payment of our costs incurred in connection with our initial public offering.

Net cash provided by financing activities amounted to US$412.3 million in 2014, which was primarily attributable to proceeds from our issuance of preferred shares to investors and proceeds from our initial public offering.

**Holding Company Structure**

Our company is a holding company with no material operations of its own. We conduct our operations primarily through our wholly-owned subsidiaries and our consolidated affiliated entity and its subsidiaries in China. As a result, our ability to pay dividends depends upon dividends paid by our wholly-owned subsidiaries. If our wholly-owned subsidiaries or any newly formed subsidiaries incur debt on their own behalf in the future, the instruments governing their debt may restrict their ability to pay dividends to us. In addition, our wholly-owned subsidiaries are permitted to pay dividends to us only out of their retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. Under PRC law, each of our wholly-owned PRC subsidiaries and our consolidated affiliated entity is required to set aside at least 10% of its after-tax profits each year, if any, to fund a statutory reserve until such reserve reaches 50% of its registered capital. Although the statutory reserves can be used, among other ways, to increase the registered capital and eliminate future losses in excess of retained earnings of the respective companies, the reserve funds are not distributable as cash dividends except in the event of liquidation. As a result of these PRC laws and regulations, the capital and statutory reserves restricted which represented the amount of net assets of our relevant subsidiaries in PRC not available for distribution were US$109.0 million as of December 31, 2016.

**Capital Expenditures**

Our capital expenditures amounted to US$8.7 million, US$13.5 million and US$7.3 million in 2014, 2015 and 2016, respectively. In the past, our capital expenditures were principally incurred to purchase servers, computers and other office equipment, and to pay for leasehold improvements for our offices. As our business expands, we may purchase new servers, computers and other equipment in the future, as well as make leasehold improvements.

Table of Contents

**C.    Research and Development**

We focus our research and development efforts on the continual improvement and enhancement of our platform's features and services, as well as the design and development of games that are suitable for publishing on our own platform. We have a large team of engineers and developers, which accounted for approximately 40% of our employees as of December 31, 2016. Most of our engineers and developers are based in our headquarters in Beijing.

For the three years ended December 31, 2014, 2015 and 2016, our research and development expenditures, including share-based compensation expenses for research and development staff, were US$9.3 million, US$23.3 million and US$31.4 million, respectively. For the year ended December 31, 2016, our research and development expenditures represented 5.7% of our total revenues. Our research and development expenses primarily consist of salaries and benefits, including share-based compensation expenses, for research and development personnel and rental expenses. Expenditures incurred during the research phase are expensed as incurred. We expect our research and development expenses to increase as we expand our research and development team to develop new features and services for our platform and further enhance our big data analytical capabilities.

**D.    Trend Information**

Other than as disclosed elsewhere in this annual report, we are not aware of any trends, uncertainties, demands, commitments or events for the year ended December 31, 2016 that are reasonably likely to have a material and adverse effect on our net revenues, income, profitability, liquidity or capital resources, or that would cause the disclosed financial information to be not necessarily indicative of future results of operations or financial conditions.

**E.    Off-Balance Sheet Arrangements**

We have not entered into any financial guarantees or other commitments to guarantee the payment obligations of any third parties. We have not entered into any derivative contracts that are indexed to our shares and classified as shareholder's equity or that are not reflected in our consolidated financial statements. Furthermore, we do not have any retained or contingent interest in assets transferred to an unconsolidated entity that serves as credit, liquidity or market risk support to such entity for such assets. We do not have any obligation, including a contingent obligation, arising out of a variable interest in any unconsolidated entity that we hold and material to us, where such entity provides financing, liquidity, market risk or credit risk support to us or engages in leasing, hedging or research and development services with us.

**F.    Contractual Obligations**

We lease certain of our facilities and offices under non-cancellable operating lease agreements. The rental expenses were US$3.0 million, US$3.7 million and US$4.7 million for the years ended December 31, 2014, 2015 and 2016, respectively.

As of December 31, 2016, future minimum commitments under non-cancelable agreements were as follows:

| | Total | 2017 | 2018 | 2019 | 2020 and thereafter |
|---|---|---|---|---|---|
| | | (in US$ thousands) | | | |
| Operating lease | 8,847 | 5,547 | 2,644 | 360 | 296 |

As of December 31, 2016, we were also obligated to pay US$2.9 million for the subscription of partnership interest and equity interest in certain long-term investees under various arrangements.

Other than the operating lease and investment commitments shown above, we did not have any significant other commitments, long-term obligations, or guarantees as of December 31, 2016.

**G.    Safe Harbor**

See "Forward-Looking Information."

81

**Table of Contents**

**Item 6.    Directors, Senior Management and Employees**

**A.    Directors and Senior Management**

The following table sets forth information regarding our executive officers and directors as of the date of this annual report.

| Directors and Executive Officers | Age | Position/Title |
|---|---|---|
| Yan Tang | 38 | Chairman and Chief Executive Officer |
| Yong Li | 42 | Independent Director |
| Sichuan Zhang | 33 | Director and President of U.S. Operations† |
| David Ying Zhang | 43 | Director |
| Joseph C. Tsai | 53 | Director |
| Neil Nanpeng Shen | 49 | Independent Director |
| Feng Yu | 53 | Independent Director |
| Benson Bing Chung Tam | 53 | Independent Director |
| Dave Daqing Qi | 53 | Independent Director |
| Xiaoliang Lei | 33 | Co-president |
| Jonathan Xiaosong Zhang | 53 | Chief Financial Officer |
| Li Wang | 33 | Chief Operating Officer and Co-president |

Note:

†  Ms. Zhang will resign from her position as our President of U.S. Operations effective on April 30, 2017, and she will remain as a director of our company.

*Mr. Yan Tang* is our co-founder and has served as our director and chief executive officer since our inception in July 2011. Mr. Tang was appointed to be the chairman of our board of directors in November 2014. Prior to founding our company, from 2003 to 2011, Mr. Tang worked at NetEase, Inc. (NASDAQ: NTES), or NetEase, initially as editor and later editor-in-chief. Mr. Tang was named by *Fortune Magazine* as one of its "40 Under 40," a list of the most powerful, influential and important business elites under the age of 40, in October 2014. Mr. Tang received his bachelor of science degree from Chengdu University of Technology in China in 2000.

*Mr. Yong Li* is our co-founder and has been our director since April 2012 and our independent director since December 2015. Mr. Li founded Fenbi Inc. (Cayman), a provider of online education services, in May 2011, in which he now serves as a board director and chief executive officer. In April 2012, he founded Beijing Jingguanyu Technology Co., Ltd., a software service company, and has been its chief executive officer since then. From May 2005 to May 2010, Mr. Li was the editor-in-chief and vice president at NetEase, and then the vice president at NetEase and president of NetEase career portal business unit. Between February 2001 and May 2005, Mr. Li served as an executive editor, executive editor-in-chief and then general manager of Global Entrepreneur, a Chinese magazine. Mr. Li is also a director of two privately held companies. Mr. Li received his MBA degree from Peking University in 2004 and bachelor's degree in law from Renmin University in China in 1996.

*Ms. Sichuan Zhang* has been our director since April 2012 and the president of our U.S. operations since June 2014. Ms. Zhang will resign from her position as our President of U.S. Operations effective on April 30, 2017, and she will remain as a director of our company. Ms. Zhang joined the company in July 2011 and was responsible for product design, then marketing strategies and executions. Prior to joining our company, from June 2009 to February 2011, she co-founded 4 Degrees Motion Design, an advertising design firm. She was an art director of Modern Media, a Chinese media company, from January 2009 to May 2009, a senior designer of Phoenix New Media Limited (NYSE: FENG) from January 2008 to January 2009, and a web designer of NetEase from March 2006 to April 2007. Ms. Zhang received her bachelor's degree in South China Normal University in 2005. Ms. Zhang is the wife of Mr. Yan Tang.

*Mr. David Ying Zhang* has been our director since April 2012. Mr. Zhang is a founding managing partner of Matrix Partners China, where he oversees all of the venture capital investment firm's operations. Mr. Zhang is currently also a director of Cheetah Mobile Inc. (NYSE: CMCM). In 2002, Mr. Zhang established and has since expanded WI Harper Group's Beijing operations and co-managed its China portfolios. Prior to joining WI Harper Group, Mr. Zhang worked at Salomon Smith Barney, where he was responsible for analyzing, structuring and marketing companies in the internet, software and semiconductor sectors. Before then, Mr. Zhang worked at ABN AMRO Capital as a senior venture associate. Mr. Zhang received master of science degree in biotechnology and business from Northwestern University in 1999 and bachelor of science degree in clinical science with minor in chemistry from California State University in 1997.

82

**Table of Contents**

*Mr. Joseph C. Tsai* has been our director since February 2016. Mr. Tsai joined Alibaba Group in 1999 as a member of its founding team and has served as Alibaba Group's executive vice chairman since May 2013. He has been a non-executive director of Alibaba Health Information Technology Limited (SEHK: 0241) since September 2015. Mr. Tsai previously served as Alibaba Group's chief financial officer and has been a member of Alibaba Group's board of directors since its formation. From 1995 to 1999, Mr. Tsai worked in Hong Kong with Investor AB, the main investment vehicle of Sweden's Wallenberg family, where he was responsible for Asian private equity investments. Prior to that, Mr. Tsai was vice president and general counsel of Rosecliff, Inc., a management buyout firm based in New York. From 1990 to 1993, Mr. Tsai was an associate attorney in the tax group of Sullivan & Cromwell LLP, a New York-based international law firm. Mr. Tsai serves on the boards of directors of several of Alibaba Group's investee companies. Mr. Tsai is qualified to practice law in the State of New York. He received his bachelor's degree in economics and East Asian studies from Yale College and a juris doctor degree from Yale Law School.

*Mr. Neil Nanpeng Shen* has been our director since May 2014 and our independent director since December 2015.   Mr. Shen is the founding managing partner of Sequoia Capital China. Mr. Shen is a co-founder and director of Ctrip.com International, Ltd. (NASDAQ: CTRP), or Ctrip, a leading online travel services provider in China. Mr. Shen served as the chief financial officer of Ctrip from 2000 to October 2005 and as president from August 2003 to October 2005. Mr. Shen also co-founded Home Inns & Hotels Management Inc. (NASDAQ: HMIN), or Home Inns, a leading economy hotel chain in China. Prior to founding Ctrip and Home Inns, Mr. Shen had worked for more than eight years in the investment banking industry in New York and Hong Kong. Currently, Mr. Shen is the co-chairman of Home Inns, a non-executive director of E-House (China) Holdings Limited (NYSE: EJ), and a director of Qihoo 360 Technology Co. Ltd. (NYSE: QIHU) and Noah Holdings Limited (NYSE: NOAH). Mr. Shen received his master's degree from the Yale University in 1992 and his bachelor's degree from Shanghai Jiao Tong University in 1988.

*Mr. Feng Yu* has been our director since May 2014 and our independent director since December 2015. Mr. Yu is the co-founder and chairman of Yunfeng Capital, a private equity fund established in 2010. Between 2006 and 2008, Mr. Yu was the co-chairman and president of Focus Media Holding Limited, which was previously listed on NASDAQ. Prior to that, in 2003, Mr. Yu founded Shanghai Target Media Co., Ltd., which operated out-of-home television advertising network, and served as its chief executive officer. Mr. Yu currently is also a director of Huayi Brothers Media Group, a company listed on the Shenzhen Stock Exchange (Stock Code: 300027) and Media Asia Group Holdings Limited, a company listed on the Hong Kong Stock Exchange (Stock Code: 8075). Mr. Yu is also an independent director of ZhongAn Online P&C Insurance Co., Ltd. and Beijing Vantone Real Estate Co., Ltd. listed on the Shenzhen Stock Exchange (Stock Code: 600246). Mr. Yu received an EMBA degree from China Europe International Business School in 2001, master's degree in philosophy from Fudan University in 1991 and a bachelor's degree in philosophy from the same university in 1986.

*Mr. Benson Bing Chung Tam* has served as our independent director since December 2014. Mr. Tam is a chartered accountant. He is the founder and chairman of Venturous Group, a global CEO network based in Beijing. From 2002 to February 2012, Mr. Tam was a partner and head of technology investments at Fidelity Growth Partners Asia (formerly named Fidelity Asia Ventures). Prior to joining Fidelity Growth Partners Asia, Mr. Tam was a partner of Electra Partners Asia from 1998 to 2002, and was the founding director of Hellman & Friedman Asia from 1992 to 1998. Mr. Tam worked in M&A corporate finance at S.G. Warburg from 1989 to 1992. Mr. Tam is currently a director of certain privately held companies. Mr. Tam received his master's degree in computer science from Oxford University in 1986 and his bachelor's degree in civil engineering from Imperial College of London University in 1984.

*Dr. Dave Daqing Qi* has served as our independent director since December 2014. Dr. Qi is a professor of accounting and the former associate dean of the Cheung Kong Graduate School of Business. He began teaching at the Cheung Kong Graduate School of Business in 2002 and was the founding director of the Executive MBA program. Prior to that, Dr. Qi was an associate professor at the School of Accounting of the Chinese University of Hong Kong. Dr. Qi also serves as director of a number of public companies, such as Sohu.com (NASDAQ: SOHU), iKang Healthcare Group (NASDAQ: KANG), Jutal Offshore Oil Services Limited (HKEx: 3303) and Reorient Group Limited (HKEx: 0376), as well as Wanda Commercial Properties Co., Limited. He received his Ph.D. degree in accounting from the Eli Broad Graduate School of management of Michigan State University in 1996, MBA degree from the University of Hawaii at Manoa in 1992 and bachelor of science and bachelor of arts degrees from Fudan University in 1985 and 1987, respectively. Dr. Qi is currently a member of the American Accounting Association.

83

Table of Contents

*Mr. Xiaoliang Lei* is our co-founder and has been our co-president since June 2014. Mr. Lei is responsible for product development. Prior to co-founding our company, Mr. Lei was the product management staff then manager at NetEase, from 2008 to 2011. Mr. Lei was an editor in charge of content development and team management at 21CN Game Channel, a game information exchange platform in China from 2004 to 2008. Mr. Lei received his bachelor of science degree in software engineering from South China University of Technology in 2004.

*Mr. Jonathan Xiaosong Zhang* has served as our chief financial officer since May 2014. From July 2010 to April 2014, Mr. Zhang served as the chief financial officer of iSoftStone Holdings Limited, and was the company's independent director between February 2010 and July 2010. Prior to joining iSoftStone Holdings Limited, Mr. Zhang served as the chief financial officer of several companies, including BJB Career Education Company Limited from June 2009 to June 2010, and Vimicro International Corporation (NASDAQ: VIMC) from September 2004 to January 2007. From 2000 to 2004, Mr. Zhang worked as a manager and then a senior manager at the Beijing office of PricewaterhouseCoopers. From 1995 to 1999, Mr. Zhang was an auditor and then a senior auditor at the Los Angeles office of KPMG LLP. Mr. Zhang is also an independent director, the chairman of audit committee, and a member of the compensation committee and the nominating and corporate governance committee of Tarena International Inc. (NASDAQ: TEDU). Mr. Zhang received his master's degree in accountancy from the University of Illinois in 1994, his master's degree in meteorology from Saint Louis University in 1992, and his bachelor's degree in meteorology from Peking University in 1986. Mr. Zhang is a Certified Public Accountant in the State of California.

*Mr. Li Wang* has been our chief operation officer since June 2014 and our co-president since April 2017. Mr. Wang joined the company as our operation director in July 2011. Prior to joining us, Mr. Wang was the managing director of Laoluo English Training School, a start-up education service business from November 2008 to May 2011. He was the general administration staff at NEC China Co., Ltd. from April 2005 to April 2007. Mr. Wang received a bachelor's degree in management from Beijing University of Aeronautics and Astronautics in China in 2004.

## B.    Compensation

For the fiscal year ended December 31, 2016, we paid an aggregate of approximately US$6.8 million in cash to our executive officers, and we paid an aggregate of approximately US$290,000 in cash to our non-executive directors. We have not set aside or accrued any amount to provide pension, retirement or other similar benefits to our executive officers and directors. In accordance with the PRC law, our PRC subsidiary and consolidated affiliated entity and its subsidiaries are required by law to make contributions equal to certain percentages of each employee's salary for his or her pension insurance, medical insurance, unemployment insurance and other statutory benefits and a housing provident fund.

### Share Incentive Plans

### *2012 Plan*

In November 2012, we adopted a share incentive plan, or the 2012 Plan, which was amended and restated in October 2013. The maximum aggregate number of shares which may be issued pursuant to all awards under the 2012 Plan is 44,758,220 Class A ordinary shares. With the adoption of our 2014 Plan, we no longer issue incentive shares under the 2012 Plan.

As of March 31, 2017, options to purchase 30,787,026 Class A ordinary shares (excluding those that have been forfeited) had been granted under the 2012 Plan, of which options to purchase an aggregate of 14,574,278 Class A ordinary shares remained outstanding. The following paragraphs summarize the principal terms of the 2012 Plan.

*Plan Administration.* Our board of directors or one or more committees consisting solely of directors designated by our board will administer the 2012 Plan. The committee or the full board of directors, as applicable, will determine the participants to receive awards, the type and number of awards to be granted to each participant, and the terms and conditions of each grant. The board or such committee(s) may also delegate, to the extent permitted by applicable laws, to one or more officers of our company, its powers under the 2012 Plan to determine the officers and employees who will receive awards, the number of such awards, and the terms and conditions thereof. Subject to the limitations under the 2012 Plan, the plan administrator from time to time may authorize, generally or in specific cases only, for the benefit of any participant, any adjustment in exercise or purchase price, vesting schedule, and regranting of awards by waiver or by other legally valid means.

Table of Contents

*Award Agreement.* Awards granted under the 2012 Plan are evidenced by an award agreement that sets forth terms, provisions and restrictions for each award, which may include the type of award, the term of the award, vesting provisions, the exercise or purchase price, and the provisions applicable in the event that the recipient's employment or service terminates. Under the plan, each recipient of option award shall duly sign a power of attorney delegating the voting rights and signing rights of ordinary shares issued upon the exercise of the option award.

*Eligibility.* We may grant awards to our officers, directors, employees, consultants and advisors of our company.

*Acceleration of Awards upon Change in Control.* If a change in control of our company occurs, the plan administrator may, in its sole discretion, accelerate the awards so that they may immediately vest without any forfeiture restrictions, unless the plan administrator has otherwise provided for substitution, assumption, exchange or other continuation or settlement of the award.

*Vesting Schedule.* In general, the plan administrator determines the vesting schedule, which is specified in the relevant award agreement.

*Exercise of Options.* The plan administrator determines the exercise price for each option award, which is stated in the award agreement and shall in no case be lower than the par value of our ordinary shares. Once vested, an option award will remain exercisable until the date of expiration or termination, unless otherwise provided by the plan administrator. However, each option award shall expire no more than 10 years after its date of grant.

*Transfer Restrictions.* Awards may not be transferred in any manner by the recipient, save for certain exceptions including transfers to our company, transfers by gift to an affiliate or an immediately family member, transfer by will or the laws of descent and distribution, and other exceptions provided for by the plan administrator.

*Amendment and Termination of the 2012 Plan.* Subject to any shareholder approval, our board of directors may, at any time, terminate or, from time to time, amend, modify or suspend this 2012 Plan. Unless terminated earlier, the 2012 Plan will terminate at the close of business on October 31, 2022.

### 2014 Plan

We adopted the 2014 share incentive plan, or the 2014 Plan, in November 2014. The maximum aggregate number of shares which may be issued pursuant to all awards under the 2014 Plan is initially 14,031,194 Class A ordinary shares. Beginning in 2017, the number of shares reserved for future issuances under the 2014 Plan will be increased by a number equal to 1.5% of the total number of outstanding shares on the last day of the immediately preceding calendar year, or such lesser number of Class A ordinary shares as determined by our board of directors, on the first day of each calendar year during the term of the 2014 Plan. As a result, the maximum aggregate number of shares which may be issued pursuant to all awards under the 2014 Plan has been increased to 19,865,420 Class A ordinary shares. As of March 31, 2017, we have granted options to purchase 17,654,048 Class A ordinary shares and 340,001 restricted share units under our 2014 Plan, of which options to purchase an aggregate of 13,686,533 Class A ordinary shares remained outstanding and 237,500 restricted share units remained outstanding. The following paragraphs summarize the terms of the 2014 Plan.

*Types of Awards.* The 2014 Plan permits the awards of options, restricted shares and restricted share units.

*Plan Administration.* Our board or a committee of one or more members of our board duly authorized for the purpose of the 2014 Plan can act as the plan administrator.

85

Table of Contents

*Award Agreement.* Options, restricted shares or restricted share units granted under the 2014 Plan are evidenced by an award agreement that sets forth the terms, conditions and limitations for each grant.

*Eligibility.* We may grant awards to our employees, directors, consultants, or other individuals as determined, authorized and approved by the plan administrator. However, we may grant options that are intended to qualify as incentive share options only to our employees and employees of our parent companies and subsidiaries.

*Acceleration of Awards upon Change in Control.* If a change in control, liquidation or dissolution of our company occurs, the plan administrator may, in its sole discretion, provide for (i) all awards outstanding to terminate at a specific time in the future and give each participant the right to exercise the vested portion of such awards during a specific period of time, or (ii) the purchase of any award for an amount of cash equal to the amount that could have been attained upon the exercise of such award, or (iii) the replacement of such award with other rights or property selected by the plan administrator in its sole discretion, or (iv) payment of award in cash based on the value of Class A ordinary shares on the date of the change-in-control transaction plus reasonable interest.

*Exercise of Options.* The plan administrator determines the exercise price for each award, which is stated in the award agreement. The vested portion of option will expire if not exercised prior to the tenth anniversary after the date of a grant, unless extended by the plan administrator.

*Exercise Price of Options.* The exercise price in respect of any option shall be determined by the plan administrator and set forth in the award agreement which may be a fixed or variable price related to the fair market value of the shares. The exercise price per share subject to an option may be amended or adjusted in the absolute discretion of the plan administrator, the determination of which shall be final, binding and conclusive.

*Vesting Schedule.* In general, the plan administrator determines the vesting schedule, which is set forth in the award agreement.

*Transfer Restrictions.* Awards may not be transferred in any manner by the recipient other than by will or the laws of descent and distribution, except as otherwise provided by the plan administrator.

*Termination.* Unless terminated earlier, the 2014 Plan will terminate automatically in 2024.

The following table summarizes, as of March 31, 2017, the outstanding options under the 2012 Plan and 2014 Plan granted to certain officers, directors, employees and consultants.

| Name | Class A Ordinary Shares Underlying Outstanding Options | Exercise Price (US$/Share) | Date of Grant | Date of Expiration |
|---|---|---|---|---|
| Yan Tang | 4,500,000 | 0.1404 | October 10, 2013 | October 9, 2023 |
| | * | 0.0002 | October 29, 2014 | October 28, 2024 |
| | * | 0.0002 | April 22, 2015 | April 21, 2025 |
| | * | 0.0002 | March 31, 2016 | March 30, 2026 |
| | * | 0.0002 | December 30, 2016 | December 29, 2026 |
| | * | 0.0002 | March 7, 2017 | March 6, 2027 |
| Sichuan Zhang | * | 0.0327 | November 1, 2012 | October 31, 2022 |
| | * | 0.1404 | October 10, 2013 | October 9, 2023 |
| | * | 0.0002 | December 30, 2016 | December 29, 2026 |
| David Ying Zhang | * | 0.1404 | October 10, 2013 | October 9, 2023 |
| Xiaoliang Lei | * | 0.1404 | October 10, 2013 | October 9, 2023 |
| | * | 0.0002 | October 29, 2014 | October 28, 2024 |
| | * | 0.0002 | April 22, 2015 | April 21, 2025 |
| | * | 0.0002 | March 31, 2016 | March 30, 2026 |
| | * | 0.0002 | December 30, 2016 | December 29, 2026 |
| | * | 0.0002 | March 7, 2017 | March 6, 2027 |
| Jonathan Xiaosong Zhang | * | 0.1404 | March 1, 2014 | February 28, 2024 |
| | * | 0.0002 | October 29, 2014 | October 28, 2024 |
| | * | 0.0002 | April 22, 2015 | April 21, 2025 |
| | * | 0.0002 | March 31, 2016 | March 30, 2026 |
| | * | 0.0002 | December 30, 2016 | December 29, 2026 |
| | * | 0.0002 | March 7, 2017 | March 6, 2027 |

Table of Contents

| Name | Class A Ordinary Shares Underlying Outstanding Options | Exercise Price (US$/Share) | Date of Grant | Date of Expiration |
|---|---|---|---|---|
| Li Wang | * | 0.0327 | November 1, 2012 | October 31, 2022 |
| | * | 0.1404 | October 10, 2013 | October 9, 2023 |
| | * | 0.0002 | October 29, 2014 | October 28, 2024 |
| | * | 0.0002 | April 22, 2015 | April 21, 2025 |
| | * | 0.0002 | March 31, 2016 | March 30, 2026 |
| | * | 0.0002 | December 30, 2016 | December 29, 2026 |
| | * | 0.0002 | March 7, 2017 | March 6, 2027 |
| Other individuals as a group | 852,250 | 0.0327 | November 1, 2012 | October 31, 2022 |
| | 1,186,856 | 0.1404 | October 10, 2013 | October 9, 2023 |
| | 628,716 | 0.1404 | March 1, 2014 | February 28, 2024 |
| | 1,127,796 | 0.0002 | October 29, 2014 | October 28, 2024 |
| | 983,669 | 0.0002 | April 22, 2015 | April 21, 2025 |
| | 1,297,930 | 0.0002 | May 4, 2015 | May 3, 2025 |
| | 144,826 | 0.0002 | August 13, 2015 | August 12, 2025 |
| | 956,513 | 0.0002 | October 15, 2015 | October 14, 2025 |
| | 70,688 | 0.0002 | November 13, 2015 | November 12, 2025 |
| | 2,130,000 | 0.0002 | June 16, 2016 | June 15, 2026 |
| | 1,181,250 | 0.0002 | July 6, 2016 | July 5, 2026 |
| | 220,000 | 0.0002 | October 15, 2016 | October 14, 2026 |
| | 296,000 | 0.0002 | December 30, 2016 | December 29, 2026 |
| | 28,000 | 0.0002 | January 3, 2017 | January 2, 2027 |
| Total | 28,260,811 | | | |

---

* Aggregate number of shares represented by all grants of options or restricted share units to the person account for less than 1% of our total outstanding ordinary shares on an as-converted basis.

The following table summarizes, as of March 31, 2017, the outstanding restricted share units granted to certain directors under the 2014 Plan.

| Name | Restricted Share Units for Class A Ordinary Shares | Date of Grant | Date of Expiration |
|---|---|---|---|
| Benson Bing Chung Tam | * | May 17, 2016 | May 16, 2026 |
| | * | March 7, 2017 | March 6, 2027 |
| Dave Daqing Qi | * | May 17, 2016 | May 16, 2026 |
| | * | March 7, 2017 | March 6, 2027 |
| Total | 237,500 | | |

### BVI Plan

In January 2015, Momo Technology Overseas Holding Company Limited, or Momo BVI, our wholly-owned BVI subsidiary, adopted a share incentive plan, or the BVI Plan. The maximum number of ordinary shares issuable pursuant to awards granted under the BVI Plan is 30,000,000. The BVI Plan is administered by the board of directors of Momo BVI or one or more committees thereof, which shall determine the participants to receive awards, the type and number of awards to be granted to each participant, and the terms and conditions of each grant. Under the BVI Plan, Momo BVI may grant options, restricted shares or unrestricted ordinary shares to directors of Momo BVI, officers or employees of Momo BVI or its affiliates, or consultants to Momo BVI or its affiliates.

87

Table of Contents

In 2015, Momo BVI granted options to purchase a total of 10,550,000 of its shares to employees and an executive of Momo Information Technologies Corp., its wholly-owned subsidiary incorporated in Delaware, with exercise prices ranging from US$0.10 to US$0.11 per share. Of such awards, options to purchase an aggregate of 8,000,000 shares remained outstanding as of March 31, 2017.

**Employment Agreements and Indemnification Agreements**

We have entered into employment agreements with each of our executive officers. Under these agreements, each of our executive officers is employed for a specified time period. We may terminate employment for cause, at any time, without advance notice or remuneration, for certain acts of the executive officer, such as conviction or plea of guilty to a felony or any crime involving moral turpitude, negligent or dishonest acts to our detriment, or misconduct or a failure to perform agreed duties. We may also terminate an executive officer's employment without cause upon three-month advance written notice. In such case of termination by us, we will provide severance payments to the executive officer as expressly required by applicable law of the jurisdiction where the executive officer is based. The executive officer may resign at any time with a three-month advance written notice.

Each executive officer has agreed to hold, both during and after the termination or expiry of his or her employment agreement, in strict confidence and not to use, except as required in the performance of his or her duties in connection with the employment or pursuant to applicable law, any of our confidential information or trade secrets, any confidential information or trade secrets of our clients or prospective clients, or the confidential or proprietary information of any third party received by us and for which we have confidential obligations. The executive officers have also agreed to disclose in confidence to us all inventions, designs and trade secrets which they conceive, develop or reduce to practice during the executive officer's employment with us and to assign all right, title and interest in them to us, and assist us in obtaining and enforcing patents, copyrights and other legal rights for these inventions, designs and trade secrets.

In addition, each executive officer has agreed to be bound by non-competition and non-solicitation restrictions during the term of his or her employment and typically for one year following the last date of employment. Specifically, each executive officer has agreed not to (i) approach our suppliers, clients, customers or contacts or other persons or entities introduced to the executive officer in his or her capacity as a representative of us for the purpose of doing business with such persons or entities that will harm our business relationships with these persons or entities; (ii) assume employment with or provide services to any of our competitors, or engage, whether as principal, partner, licensor or otherwise, any of our competitors, without our express consent; or (iii) seek directly or indirectly, to solicit the services of any of our employees who is employed by us on or after the date of the executive officer's termination, or in the year preceding such termination, without our express consent.

We have also entered into indemnification agreements with each of our directors and executive officers. Under these agreements, we agree to indemnify our directors and executive officers against certain liabilities and expenses incurred by such persons in connection with claims made by reason of their being a director or officer of our company.

**C.    Board Practices**

**Board of Directors**

Our board of directors consists of nine directors. A director is not required to hold any shares in our company to qualify to serve as a director. A director who is in any way, whether directly or indirectly, interested in a contract or transaction or proposed contract or transaction with our company must declare the nature of his or her interest at a meeting of the directors. Subject to applicable NASDAQ Stock Market Rules and disqualification by the chairman of the relevant board meeting, a director may vote in respect of any contract or transaction or proposed contract or transaction notwithstanding that he or she may be interested therein, and if he or she does so his or her vote shall be counted and he or she may be counted in the quorum at the relevant board meeting at which such contract or transaction or proposed contract or transaction is considered. The directors may exercise all the powers of the company to borrow money, to mortgage or charge its undertaking, property and uncalled capital, and to issue debentures or other securities whenever money is borrowed or as security for any debt, liability or obligation of the company or of any third party. None of our non-executive directors has a service contract with us that provides for benefits upon termination of service.

88

**Table of Contents**

**Committees of the Board of Directors**

We have established an audit committee, a compensation committee and a nominating and corporate governance committee under the board of directors. We have adopted a charter for each of the three committees. Each committee's members and functions are described below.

*Audit Committee*

Our audit committee consists of Benson Bing Chung Tam, Dr. Dave Daqing Qi and Yong Li. Mr. Tam is the chairman of our audit committee. We have determined that each member satisfies the "independence" requirements of the NASDAQ Stock Market Rules and Rule 10A-3 under the Exchange Act, and that each of Mr. Tam and Dr. Qi qualifies as an "audit committee financial expert." The audit committee oversees our accounting and financial reporting processes and the audits of the financial statements of our company. The audit committee is responsible for, among other things:

- appointing the independent auditors and pre-approving all auditing and non-auditing services permitted to be performed by the independent auditors;

- reviewing with the independent auditors any audit problems or difficulties and management's response;

- discussing the annual audited financial statements with management and the independent auditors;

- reviewing the adequacy and effectiveness of our accounting and internal control policies and procedures and any steps taken to monitor and control major financial risk exposures;

- reviewing and approving all proposed related party transactions;

- meeting separately and periodically with management and the independent auditors; and

- monitoring compliance with our code of business conduct and ethics, including reviewing the adequacy and effectiveness of our procedures to ensure proper compliance.

*Compensation Committee*

Our compensation committee consists of Yong Li, Benson Bing Chung Tam and Dr. Dave Daqing Qi. Mr. Li is the chairman of our compensation committee. We have determined that each member satisfies the "independence" requirements of the NASDAQ Stock Market Rules. The compensation committee assists the board in reviewing and approving the compensation structure, including all forms of compensation, relating to our directors and executive officers. Our chief executive officer may not be present at any committee meeting during which his compensation is deliberated. The compensation committee is responsible for, among other things:

- reviewing and approving, or recommending to the board for its approval, the compensation for our chief executive officer and other executive officers;

- reviewing and recommending to the board for determination with respect to the compensation of our non-employee directors;

- reviewing periodically and approving any incentive compensation or equity plans, programs or similar arrangements; and

89

**Table of Contents**

- selecting compensation consultant, legal counsel or other adviser only after taking into consideration all factors relevant to that person's independence from management.

### *Nominating and Corporate Governance Committee*

Our nominating and corporate governance committee consists of Yong Li, Benson Bing Chung Tam and Dr. Dave Daqing Qi. Mr. Li is the chairperson of our nominating and corporate governance committee. We have determined that each member satisfies the "independence" requirements of the NASDAQ Stock Market Rules. The nominating and corporate governance committee assists the board of directors in selecting individuals qualified to become our directors and in determining the composition of the board and its committees. The nominating and corporate governance committee is responsible for, among other things:

- selecting and recommending to the board nominees for election by the shareholders or appointment by the board;

- reviewing annually with the board the current composition of the board with regards to characteristics such as independence, knowledge, skills, experience and diversity;

- making recommendations on the frequency and structure of board meetings and monitoring the functioning of the committees of the board; and

- advising the board periodically with regards to significant developments in the law and practice of corporate governance as well as our compliance with applicable laws and regulations, and making recommendations to the board on all matters of corporate governance and on any remedial action to be taken.

### Duties of Directors

Under Cayman Islands law, our directors have a fiduciary duty to act honestly, in good faith and with a view to our best interests. Our directors also owe to our company a duty to act with skill and care. It was previously considered that a director need not exhibit in the performance of his duties a greater degree of skill than may reasonably be expected from a person of his knowledge and experience. However, English and Commonwealth courts have moved towards an objective standard with regard to the required skill and care and these authorities are likely to be followed in the Cayman Islands. In fulfilling their duty of care to us, our directors must ensure compliance with our memorandum and articles of association, as amended and restated from time to time, and the class rights vested thereunder in the holders of the shares. Our company has the right to seek damages if a duty owed by our directors is breached.

Our board of directors has all the powers necessary for managing, and for directing and supervising, our business affairs. The functions and powers of our board of directors include, among others:

- convening shareholders' annual general meetings and reporting its work to shareholders at such meetings;

- declaring dividends and distributions;

- appointing officers and determining the term of office of the officers;

- exercising the borrowing powers of our company and mortgaging the property of our company; and

- approving the transfer of shares in our company, including the registration of such shares in our share register.

90

Table of Contents

**Terms of Directors and Executive Officers**

Our officers are elected by and serve at the discretion of the board of directors. Our directors are not subject to a term of office and hold office until such time as they are removed from office by ordinary resolution of the shareholders or by the unanimous written resolution of all the shareholders. A director will cease to be a director automatically if, among other things, the director (i) becomes bankrupt or makes any arrangement or composition with his creditors; (ii) dies or is found by our company to be or becomes of unsound mind; (iii) resigns his or her office by notice in writing to our company; (iv) without special leave of absence from our board of directors, is absent from meetings of our board of directors for three consecutive meetings and the board resolves that his or her office be vacated; or (v) is removed from office pursuant to any other provision of our memorandum and articles of association.

**D.    Employees**

We had 456, 779 and 924 employees as of December 31, 2014, 2015 and 2016, respectively. Geographically, as of December 31, 2016, we had 738 employees in Beijing, 95 employees in Chengdu, 77 employees in Shanghai, 11 employees in Guangzhou and three employees in the United States. The following table sets forth the numbers of our employees categorized by function as of December 31, 2016.

| | As of December 31, 2016 |
|---|---|
| **Function:** | |
| Research and development | 367 |
| Customer service, sales and marketing | 337 |
| Operations | 122 |
| General administration | 98 |
| **Total** | 924 |

In addition to our full-time employees, we used 415 contract workers dispatched to us by staffing agencies as of December 31, 2016. These contract workers are primarily responsible for content management and monitoring and for customer service.

As required by laws and regulations in China, we participate in various employee social security plans that are organized by municipal and provincial governments, including housing, pension, medical insurance and unemployment insurance. We are required under Chinese law to make contributions to employee benefit plans at specified percentages of the salaries, bonuses and certain allowances of our employees, up to a maximum amount specified by the local government from time to time.

We typically enter into standard confidentiality and employment agreements with our management and service development personnel. These contracts include a standard non-compete covenant that prohibits the employee from competing with us, directly or indirectly, during his or her employment and for two years after the termination of his or her employment, provided that we pay compensation equal to a certain percentage of the employee's salary during the restriction period in accordance with applicable laws.

We believe that we maintain a good working relationship with our employees, and we have not experienced any labor disputes. None of our employees are represented by labor unions.

**E.    Share Ownership**

For information regarding the share ownership of our directors and officers, see "Item 7. Major Shareholders and Related Party Transactions—A. Major Shareholders." For information as to stock options granted to our directors, executive officers and other employees, see "Item 6. Directors, Senior Management and Employees—B. Compensation—Share Incentive Plans."

**Item 7.    Major Shareholders and Related Party Transactions**

**A.    Major Shareholders**

The following table sets forth information with respect to the beneficial ownership of our shares as of March 31, 2017 by:

•    each of our current directors and executive officers; and

91

**Table of Contents**

- each person known to us to own beneficially more than 5% of our shares.

Percentage of beneficial ownership is based on a total of 394,312,495 outstanding ordinary shares of our company as of the date of March 31, 2017, comprising (i) 308,426,125 Class A ordinary shares, excluding the 7,446,257 Class A ordinary shares issued to our depositary bank for bulk issuance of ADSs reserved for future issuances upon the exercise or vesting of awards granted under our share incentive plans, and (ii) 85,886,370 Class B ordinary shares.

Beneficial ownership is determined in accordance with the rules and regulations of the SEC. These rules generally provide that a person is the beneficial owner of securities if such person has or shares the power to vote or direct the voting of securities, or to dispose or direct the disposition of securities or has the right to acquire such powers within 60 days. In computing the number of shares beneficially owned by a person and the percentage ownership of that person, we have included shares that the person has the right to acquire within 60 days, including through the exercise of any option, warrant or other right or the conversion of any other security, in both the numerator and the denominator. These shares, however, are not included in the computation of the percentage ownership of any other person.

| | Shares Beneficially Owned | | Ordinary Shares Beneficially Owned | Voting Power |
| Directors and executive officers**: | Class A Ordinary Shares | Class B Ordinary Shares | %(1) | %(2) |
|---|---|---|---|---|
| Yan Tang(3) | 13,231,306 | 85,886,370 | 24.8 | 74.4 |
| Yong Li(4) | 14,646,899 | — | 3.7 | 1.3 |
| Sichuan Zhang(5) | 13,231,306 | 85,886,370 | 24.8 | 74.4 |
| David Ying Zhang(6) | 42,598,741 | — | 10.8 | 3.6 |
| Joseph C. Tsai(7) | — | — | — | — |
| Neil Nanpeng Shen(8) | 12,071,130 | — | 3.1 | 1.0 |
| Feng Yu(9) | 11,643,820 | — | 3.0 | 1.0 |
| Benson Bing Chung Tam(10) | — | — | — | — |
| Dave Daqing Qi(11) | — | — | — | — |
| Xiaoliang Lei(12) | 10,222,911 | — | 2.6 | 0.9 |
| Jonathan Xiaosong Zhang(13) | * | — | * | * |
| Li Wang(14) | * | — | * | * |
| All directors and executive officers as a group | 109,964,956 | 85,886,370 | 48.4 | 82.3 |
| **Principal Shareholders:** | | | | |
| Gallant Future Holdings Limited(15) | 8,000,000 | 85,886,370 | 23.8 | 74.3 |
| Matrix Partners China II Hong Kong Limited(16) | 41,719,433 | — | 10.6 | 3.6 |

Notes:
* Less than 1% of our total outstanding Class A and Class B ordinary shares.
** Except for Messrs. Yong Li, David Ying Zhang, Joseph C. Tsai, Neil Nanpeng Shen, Feng Yu, Mr. Benson Bing Chung Tam and Mr. Dave Daqing Qi, the business address for our executive officers and directors is 20th Floor, Block B, Tower 2, Wangjing SOHO, No.1 Futongdong Street, Chaoyang District, Beijing 100102, People's Republic of China.
(1) Percentage ownership is calculated by dividing the number of Class A and Class B ordinary shares beneficially owned by a given person or group by the sum of (i) 394,312,495 ordinary shares and (ii) and the number of shares such person or group has the right to acquire upon exercise of option, warrant or other right within 60 days after March 31, 2017. Our Class B ordinary shares are convertible at any time by the holder thereof into Class A ordinary shares on a one-for-one basis.
(2) For each person and group included in this column, percentage of voting power is calculated by dividing the voting power beneficially owned by such person or group by the voting power of all of our Class A and Class B ordinary shares as a single class. Each holder of Class A ordinary shares is entitled to one vote per share and each holder of our Class B ordinary shares is entitled to ten votes per share on all matters submitted to them for vote.
(3) Includes (i) 8,000,000 Class A ordinary shares represented by ADSs and 85,886,370 Class B ordinary shares held by Gallant Future Holdings Limited, (ii) 4,393,806 Class A ordinary shares that Mr. Tang is entitled to acquire within 60 days from March 31, 2017 upon exercise of share options held by him under our share incentive plans, and (iii) 837,500 Class A ordinary shares that Ms. Sichuan Zhang, the wife of Mr. Tang, is entitled to acquire within 60 days from March 31, 2017 upon exercise of share options held by Ms. Zhang under our share incentive plans. Gallant Future Holdings Limited is incorporated in the British Virgin Islands and is wholly owned by a family trust controlled by Mr. Tang.

92

**Table of Contents**

(4)    Represents 14,646,899 Class A ordinary shares held by Joyous Harvest Holdings Limited, a company incorporated in the British Virgin Islands and wholly owned by a family trust controlled by Mr. Li. The business address of Mr. Li is 5/F, Block A, Lingxinghang Center, No. 8, Guangshun South Avenue, Chaoyang District, Beijing.

(5)    Includes (i) 8,000,000 Class A ordinary shares represented by ADSs and 85,886,370 Class B ordinary shares held by Gallant Future Holdings Limited, a British Virgin Islands company that is wholly owned by a family trust controlled by Mr. Yan Tang, the husband of Ms. Zhang, (ii) 4,393,806 Class A ordinary shares that Mr. Tang is entitled to acquire within 60 days from March 31, 2017 upon exercise of share options held by him under our share incentive plans, and (iii) 837,500 Class A ordinary shares that Ms. Zhang is entitled to acquire within 60 days from March 31, 2017 upon exercise of share options held by her under our share incentive plans.

(6)    Represents (i) 32,770,897 Class A ordinary shares held by Matrix Partners China II Hong Kong Limited, and (ii) 8,948,536 Class A ordinary shares represented by ADSs held by Matrix Partners China II Hong Kong Limited, as reported on the Amendment No. 5 to Schedule 13D filed by Matrix Partners China II Hong Kong Limited, among others, on April 7, 2017, (iii) 310,558 Class A ordinary shares represented by ADSs beneficially owned by Mr. Zhang, and (iii) Class A ordinary shares that Mr. Zhang is entitled to acquire within 60 days from March 31, 2017 upon exercise of share options held by him under our share incentive plans. The percentage of beneficial ownership in this annual report was calculated based on the total number of our Class A and Class B ordinary shares outstanding as of March 31, 2017. Matrix Partners China II Hong Kong Limited is a limited company incorporated in Hong Kong. Matrix Partners China II Hong Kong Limited is controlled and 90%-owned by Matrix Partners China II, L.P., and the remaining 10% shares is held by Matrix Partners China II-A, L.P. The general partner of Matrix Partners China II, L.P. and Matrix Partners China II-A, L.P. is Matrix China II GP GP, Ltd. The directors of Matrix China II GP GP, Ltd. are David Ying Zhang, Timothy A. Barrows, David Su and Yibo Shao. The business address of Mr. Zhang is Suite 2601, Taikang Financial Tower, No. 38 Yard East 3rd Ring Road North, Chaoyang District, Beijing 100026, People's Republic of China.

(7)    The business address of Mr. Tsai is 26/F, Tower 1, Times Square, 1 Matheson Street, Causeway Bay, Hong Kong.

(8)    Represents, as reported on the Amendment No. 1 to Schedule 13D jointly filed by the Sequoia Funds (as defined below) on March 9, 2017: (i) 1,341,237 Class A ordinary shares held by SCC Growth I Holdco A, Ltd., a Cayman Islands exempted company, (ii) 7,376,801 Class A ordinary shares held by Sequoia Capital China GF Holdco III-A, Ltd., a Cayman Islands exempted company, and (iii) 3,353,092 Class A ordinary shares held by SC China Growth III Co-Investment 2014-A, L.P., a Cayman Islands exempted limited partnership. The percentage of beneficial ownership in this annual report was calculated based on the total number of our Class A and Class B ordinary shares outstanding as of March 31, 2017. SCC Growth I Holdco A, Ltd., Sequoia Capital China GF Holdco III-A, Ltd. and SC China Growth III Co-Investment 2014-A, L.P. are herein collectively referred to as the Sequoia Funds. The shareholders of SCC Growth I Holdco A, Ltd. are Sequoia Capital China Growth Fund I, L.P., Sequoia Capital China Growth Partners Fund I, L.P. and Sequoia Capital China GF Principals Fund I, L.P. (collectively, the "GF I Funds"). The general partner of each of the GF I Funds is Sequoia Capital China Growth Fund Management I, L.P., whose general partner is SC China Holding Limited. The sole shareholder of Sequoia Capital China GF Holdco III-A, Ltd. is Sequoia Capital China Growth Fund III, L.P. The general partner of Sequoia Capital China Growth Fund III, L.P. is SC China Growth III Management, L.P., whose general partner is SC China Holding Limited. The general partner of SC China Growth III Co-Investment 2014-A, L.P. is SC China Growth III Management L.P., whose general partner is SC China Holding Limited. SC China Holding Limited is wholly owned by SNP China Enterprises Limited, a company wholly owned by Mr. Shen. As a result, Mr. Shen may be deemed to share voting and investment power with respect to the shares held by the Sequoia Funds. The business address of Mr. Shen is Room 3606, China Central Place Tower 3, 77 Jianguo Road Chaoyang District, Beijing 100027, China.

(9)    Represents 11,643,820 Class A ordinary shares held by Rich Moon Limited. Rich Moon Limited is 77.8% owned by Yunfeng Fund II, L.P., or YF Fund II, and 22.2% owned by Yunfeng Moon Co-invest, L.P., or YF Moon. The general partner of YF Fund II is Yunfeng Investment II, L.P. and the general partner of YF Moon is Yunfeng Moon Co-Invest GP, Ltd. Both general partners are in turn managed by their general partner, Yunfeng Investment GP II, Ltd. Mr. Yu has the sole power to direct the voting and disposition of shares of our company directly or indirectly held by Yunfeng Investment GP II, Ltd. The business address of Mr. Yu is Suite 3206, One Exchange Square, 8 Connaught Place, Central, Hong Kong.

(10)    The business address of Mr. Tam is Room 1-4-2503, No. 2 East Xibahe, Chaoyang District, Beijing, China.

(11)    The business address of Dr. Qi is Room 332, Tower E3, Oriental Plaza, 1 East Chang An Avenue, Dong Cheng District, Beijing 100738, China.

(12)    Represents (i) Class A ordinary shares that Mr. Lei is entitled to acquire within 60 days from March 31, 2017 upon exercise of share options held by him under our share incentive plans, and (ii) 5,000,000 Class A ordinary shares represented by ADSs and 9,087,116 Class A ordinary shares held by First Optimal Holdings Limited, a company incorporated in the British Virgin Islands and wholly owned by a family trust controlled by Mr. Lei.

(13)    Represents Class A ordinary shares that Mr. Zhang is entitled to acquire within 60 days from March 31, 2017 upon exercise of share options held by him under our share incentive plans.

(14)    Represents Class A ordinary shares that Mr. Wang has the right to acquire within 60 days from March 31, 2017 upon exercise of share options held by him under our share incentive plans.

(15)    Represents 8,000,000 Class A ordinary shares represented by ADSs and 85,886,370 Class B ordinary shares held by Gallant Future Holdings Limited, a company incorporated in the British Virgin Islands and wholly owned by a family trust controlled by Mr. Yan Tang. Mr. Tang has sole power to direct the voting and disposition of shares of our company directly or indirectly held by Gallant Future Holdings Limited. The registered address of Gallant Future Holdings Limited is Sertus Chambers, P.O. Box 905, Quasticky Building, Road Town, Tortola, British Virgin Islands.

**Table of Contents**

(16)  Represents (i) 32,770,897 Class A ordinary shares held by Matrix Partners China II Hong Kong Limited and (ii) 8,948,536 Class A ordinary shares represented by ADSs held by Matrix Partners China II Hong Kong Limited, as reported on the Amendment No. 5 to Schedule 13D filed by Matrix Partners China II Hong Kong Limited, among others, on April 7, 2017. The percentage of beneficial ownership in this annual report was calculated based on the total number of our Class A and Class B ordinary shares outstanding as of March 31, 2017. Matrix Partners China II Hong Kong Limited is a limited company incorporated in Hong Kong. Matrix Partners China II Hong Kong Limited is controlled and 90%-owned by Matrix Partners China II, L.P., and the remaining 10% shares is held by Matrix Partners China II-A, L.P. The general partner of Matrix Partners China II, L.P. and Matrix Partners China II-A, L.P. is Matrix China II GP GP, Ltd. The directors of Matrix China II GP GP, Ltd. are David Ying Zhang, Timothy A. Barrows, David Su and Yibo Shao. Mr. Zhang, Mr. Barrows, Mr. Su and Mr. Shao share power to direct the voting and disposition of shares of our company directly or indirectly held by Matrix China II GP GP, Ltd. The registered address of Matrix Partners China II Hong Kong Limited is Suite 3701, 37/F, Jardine House, 1 Connaught Place, Central, Hong Kong.

To our knowledge, on the same basis of calculation as above, approximately 62.7% of our total outstanding Class A ordinary shares were held by one record shareholder in the United States, namely, Deutsche Bank Trust Company Americas, the depositary of our ADS program, which held 247,062,762 Class A ordinary shares represented by 123,531,381 ADSs, including 7,446,256 Class A ordinary shares underlying 3,723,128 ADSs that it held on reserve for our company for the purposes of future issuances upon the exercise or vesting of awards granted under our share incentive plans.

The number of beneficial owners of our ADSs in the United States is likely to be much larger than the number of record holders of our ordinary shares in the United States.

Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares. Holders of Class A ordinary shares are entitled to one vote per share, while holders of Class B ordinary shares are entitled to ten votes per share. We are not aware of any arrangement that may, at a subsequent date, result in a change of control of our company. None of our major shareholders have different voting rights apart from any Class B ordinary shares that they may hold in our company.

**B.    Related Party Transactions**

**Contractual Arrangements with Beijing Momo and Its Shareholders**

PRC laws and regulations currently limit foreign ownership of companies that engage in a value-added telecommunications service business in China. As a result, we operate our relevant business through contractual arrangements between Beijing Momo IT, our PRC subsidiary, Beijing Momo and the shareholders of Beijing Momo. For a description of these contractual arrangements, see "Item 4. Information on the Company—C. Organizational Structure—Contractual Arrangements with Beijing Momo."

**Transactions with our Founders**

On April 22, 2014, Joyous Harvest Holdings Limited, First Optimal Holdings Limited and Fast Prosperous Holdings Limited, which are companies wholly-owned by family trusts controlled by Yong Li, Xiaoliang Lei and Zhiwei Li, three of our founders, respectively, surrendered a total of 15,651,589 ordinary shares to our company at no consideration. On the same date, we declared a special dividend of US$64.5 million in aggregate to these shareholders, of which US$58.0 million was paid in May 2014. US$6.5 million remained unpaid to these shareholders as of the date of this annual report. The special dividend was approved by the shareholders.

Pursuant to the third amended and restated shareholders' agreement dated May 15, 2014 executed in connection with the private placement of our Series D preferred shares, each of our founders including Messrs. Yan Tang, Yong Li, Xiaoliang Lei and Zhiwei Li agreed to subject the ordinary shares respectively held by their 100% beneficially owned BVI companies, Gallant Future Holdings Limited, Joyous Harvest Holdings Limited, First Optimal Holdings Limited and Fast Prosperous Holdings Limited, to our repurchase rights upon termination of employment of the founders with us. The shares subject to our repurchase rights include 96,886,370 ordinary shares then held by Gallant Future Holdings Limited, 16,846,899 ordinary shares then held by Joyous Harvest Holdings Limited, 9,587,116 ordinary shares then held by First Optimal Holdings Limited and 8,028,026 ordinary shares then held by Fast Prosperous Holdings Limited. If a founder terminates his employment or consulting relationship with us before April 17, 2015, we are entitled to repurchase 50% of the shares beneficially owned by such founder through the BVI holding company at a price of US$0.0001 per share or the lowest price permitted under applicable laws. If the termination takes place after April 17, 2015 but before April 17, 2016, we are entitled to repurchase 25% of such shares on the same terms. Our repurchase rights over the ordinary shares held by Joyous Harvest Holdings Limited has terminated upon the completion of our initial public offering in December 2014 and our repurchase rights over the ordinary shares held by Gallant Future Holdings Limited, First Optimal Holdings Limited and Fast Prosperous Holdings Limited have expired on April 17, 2016.

**Table of Contents**

**Transactions with Affiliates of a Major Shareholder**

In 2015, we provided mobile marketing services to Hangzhou Alimama Technology Co., Ltd. and purchased cloud computing services from Alibaba Cloud Computing Ltd. For the year ended December 31, 2015, the total amount of service fees from Hangzhou Alimama Technology Co., Ltd. was US$6.0 million, and the total amount of service fees to Alibaba Cloud Computing Ltd. was US$0.3 million.

In 2016, we (i) provided mobile marketing services to Hangzhou Alimama Technology Co., Ltd., Zhejiang Tmall Technology Co., Ltd. and Taobao (China) Software Co., Ltd.; (ii) received mobile game revenue generated through Guangzhou Aijiuyou Informational Technology Co., Ltd. and Guangzhou UC Network Technology Co., Ltd., (iii) purchased cloud computing services from Alibaba Cloud Computing Ltd. and (iv) purchased marketing services from Taobao (China) Software Co., Ltd. For the year ended December 31, 2016, the total amount of service fees from Hangzhou Alimama Technology Co., Ltd., Zhejiang Tmall Technology Co., Ltd. and Taobao (China) Software Co., Ltd. were US$42,000, US$0.8 million and US$0.2 million, respectively. The total amount of mobile game revenue generated through Guangzhou Aijiuyou Informational Technology Co., Ltd. and Guangzhou UC Network Technology Co., Ltd. were US$0.4 million and US$9,000, respectively, and the total amount of service fees to Alibaba Cloud Computing Ltd. and Taobao (China) Software Co., Ltd. were US$3.4 million and US$0.3 million, respectively. Hangzhou Alimama Technology Co., Ltd., Alibaba Cloud Computing Ltd., Zhejiang Tmall Technology Co., Ltd., Guangzhou Aijiuyou Informational Technology Co., Ltd., Guangzhou UC Network Technology Co., Ltd. and Taobao (China) Software Co., Ltd. are affiliates of Alibaba Investment Limited, one of our major shareholders.

**Transactions with Certain Other Related Parties**

In 2016, we provided mobile marketing services to Shanghai Xisue Network Technology Co., Ltd. For the year ended December 31, 2016, the total amount of service fees from Shanghai Xisue Network Technology Co., Ltd. was US$0.9 million. Shanghai Xisue Network Technology Co., Ltd. is an affiliate of Xish International Limited, a company in which we own 17.3% equity interest and have appointed a member to its board of directors.

For the year ended December 31, 2016, we paid revenue sharing of live video service in the aggregate amount of US$3.9 million to Hunan Qindao Cultural Spread Ltd., a company in which we own 26.4% equity interest.

In 2014, we entered into a game agreement with Shanghai Touch Future Network Technology Co., Ltd. in which we own a 20.0% equity interest. For the year ended December 31, 2016, the total amount of remittances to Shanghai Touch Future Network Technology Co., Ltd. was US$0.3 million.

**Registration Rights**

Pursuant to the third amended and restated shareholders agreement that we entered into on May 15, 2014 with all our then shareholders in connection with our issuance of Series D preferred shares prior to our initial public offering, we have granted certain registration rights to holders of our registrable securities, which include our ordinary shares issued or issuable upon conversion of our preferred shares, ordinary shares issued as a dividend for our preferred shares, or any other ordinary shares thereafter owned or acquired by purchasers of our preferred shares in our pre-IPO private placements, subject to certain exceptions. Set forth below is a description of the registration rights granted under the agreement.

***Demand Registration Rights.*** Holders of at least 10% of registrable securities have the right to demand in writing, at any time after the effectiveness of a registration statement for our initial public offering, that we file a registration statement to register their registrable securities and other holders of registrable securities who choose to participate in the offering. We, however, are not obligated to effect a demand registration if we have already effected (i) two demand registrations or (ii) one registration pursuant to the same demand registration rights or the F-3 registration rights within the six-month period preceding the date of such request. We have the right to defer the filing of a registration statement up to 90 days if our board of directors determines in good faith that the registration at such time would be materially detrimental to us and our shareholders, provided that we may not utilize this right more than twice in any 12-month period.

95

Table of Contents

*Form F-3 Registration Rights.* When we are eligible for registration on Form F-3, upon a written request from the holders of at least 10% of the registrable securities then outstanding, we must file a registration statement on Form F-3 covering the offer and sale of the registrable securities by the requesting shareholders and other holders of registrable securities who choose to participate in the offering. There is no limit on the number of the registration made pursuant to this registration right. We, however, are not obligated to effect such registration if, among other things, (i) the aggregate anticipated price of such offering is less than US$1,000,000, or (ii) we have, within six months period preceding the date of such request, already effected a registration pursuant to an exercise of demand registration rights or piggyback registration rights. We may defer filing of a registration statement on Form F-3 no more than once during any twelve month period for up to 60 days if our board of directors determines in good faith that filing such registration statement will be materially detrimental to us and our shareholders.

*Piggyback Registration Rights.* If we propose to file a registration statement for a public offering of our securities other than relating to a demand registration right, F-3 registration right, an employee benefit plan or a corporate reorganization, then we must offer holders of registrable securities an opportunity to include in this registration all or any part of their registrable securities. The underwriters of any underwritten offering may in good faith allocate the shares to be included in the registration statement first to us, and second to each requesting holder of registrable securities on a pro rata basis, subject to certain limitations.

*Expenses of Registration.* We will pay all registration expenses and all participating holders of registrable securities will pay the underwriting discounts and selling commissions relating to any demand, Form F-3, or piggyback registration. However, we are not obligated to pay any expenses relating to a demand registration if the registration request is subsequently withdrawn at the request of holders of a majority of the registrable securities to be registered, subject to certain exceptions.

*Termination of Obligations.* The registration rights set forth above shall terminate on the earlier of (i) the date that is five years after the completion of our initial public offering, (ii) the date of the completion of a liquidation event, or (iii) as to any holder of registrable securities, the time when all registrable securities held by such holder may be sold in any three-month period without restriction pursuant to Rule 144 under the Securities Act.

## Employment Agreements and Indemnification Agreements

See "Item 6. Directors, Senior Management and Employees—B. Compensation—Employment Agreements and Indemnification Agreements."

## Share Incentive Plans

"Item 6. Directors, Senior Management and Employees—B. Compensation—Share Incentive Plans."

**C.    Interests of Experts and Counsel**

Not applicable.

**Item 8.    Financial Information**

**A.    Consolidated Statements and Other Financial Information**

We have appended consolidated financial statements filed as part of this annual report.

96

Table of Contents

**Legal Proceedings**

Other than a civil complaint in China, we are currently not a party to any material legal or administrative proceedings. On October 22, 2015, we were served a civil complaint by Guangzhou Tian He People's Court in which the plaintiff claimed that Xiaoyao Xiyou, a game that we operated and currently operate, infringed upon the plaintiff's copyright in works of literature and art of a game, constituting unfair competition. The plaintiff demanded that we cease the infringement and pay compensation and legal costs totalling approximately RMB10 million (US$1.4 million). We may from time to time be subject to various legal or administrative claims and proceedings arising in the ordinary course of business. Litigation or any other legal or administrative proceeding, regardless of the outcome, is likely to result in substantial cost and diversion of our resources, including our management's time and attention. See also "Item 3. Key Information on the Company—D. Risk Factors—Risks Related to Our Business and Industry—We have been and may be subject to intellectual property infringement claims or other allegations by third parties for information or content displayed on, retrieved from or linked to our platform, or distributed to our users, which may materially and adversely affect our business, financial condition and prospects" and "Item 3. Key Information on the Company—D. Risk Factors—Risks Related to Doing Business in China—If we fail to obtain and maintain the requisite licenses and approvals required under the complex regulatory environment applicable to our businesses in China, or if we are required to take compliance actions that are time-consuming or costly, our business, financial condition and results of operations may be materially and adversely affected."

**Dividend Policy**

Our board of directors has discretion on whether to distribute dividends, subject to our memorandum and articles of association and certain restrictions under Cayman Islands law, namely that our company may only pay dividends out of profits or share premium, and provided always that it is able to pay its debts as they fall due in the ordinary course of business. In addition, our shareholders may by ordinary resolution declare a dividend, but no dividend may exceed the amount recommended by our directors. Even if our board of directors decides to pay dividends, the form, frequency and amount will depend upon our future operations and earnings, capital requirements and surplus, general financial condition, contractual restrictions and other factors that the board of directors may deem relevant.

With shareholders' approval, we declared a special dividend to certain holders of our ordinary shares in the amount of US$64.5 million in April 2014, of which US$58.0 million was paid. The special dividend was paid out of our share premium. We do not have any present plan to pay any cash dividends on our ordinary shares in the foreseeable future. We currently intend to retain most, if not all, of our available funds and any future earnings to operate and expand our business.

We are a holding company registered by way of continuation into the Cayman Islands. We may rely on dividends from our subsidiary in China for our cash requirements, including any payment of dividends to our shareholders. PRC regulations may restrict the ability of our PRC subsidiary to pay dividends to us. See "Item 4. Information on the Company—B. Business Overview—Regulation—Regulations Relating to Dividend Distribution" and "—Regulation—Regulations Relating to Taxation."

If we pay any dividends, we will pay our ADS holders to the same extent as holders of our ordinary shares, subject to the terms of the deposit agreement, including the fees and expenses payable thereunder. See "Item 12. Description of Securities Other than Equity Securities—D. American Depositary Shares." Cash dividends on our Class A ordinary shares, if any, will be paid in U.S. dollars.

**B.    Significant Changes**

Except as disclosed elsewhere in this annual report, we have not experienced any significant changes since the date of our audited consolidated financial statements included in this annual report.

**Item 9.    The Offer and Listing**

**A.    Offering and Listing Details**

Our ADSs have been listed on The NASDAQ Global Select Market since December 11, 2014. Our ADSs currently trade on The NASDAQ Global Select Market under the symbol "MOMO." One ADS represented two Class A ordinary shares.

Table of Contents

The following table provides the high and low trading prices for our ADSs on the NASDAQ Global Select Market for the time periods indicated.

| | Trading Price | |
|---|---|---|
| | **High** | **Low** |
| **Annual Highs and Lows** | | |
| 2014 | 17.50 | 10.82 |
| 2015 | 19.89 | 9.50 |
| 2016 | 28.44 | 6.72 |
| **Quarterly Highs and Lows** | | |
| First Quarter 2015 | 13.63 | 9.70 |
| Second Quarter 2015 | 19.89 | 9.50 |
| Third Quarter 2015 | 17.00 | 10.55 |
| Fourth Quarter 2015 | 16.59 | 12.16 |
| First Quarter 2016 | 16.07 | 6.72 |
| Second Quarter 2016 | 16.74 | 9.68 |
| Third Quarter 2016 | 25.62 | 8.88 |
| Fourth Quarter 2016 | 28.44 | 16.73 |
| First Quarter 2017 | 36.18 | 18.30 |
| **Monthly Highs and Lows** | | |
| October 2016 | 27.00 | 21.41 |
| November 2016 | 28.44 | 19.50 |
| December 2016 | 21.72 | 16.73 |
| January 2017 | 23.64 | 18.30 |
| February 2017 | 27.83 | 22.30 |
| March 2017 | 36.18 | 26.10 |
| April 2017 (through April 25, 2017) | 39.25 | 32.32 |

**B.     Plan of Distribution**

Not applicable.

**C.     Markets**

Our ADSs have been listed on NASDAQ Global Select Market since December 11, 2014 under the symbol "MOMO."

**D.     Selling Shareholders**

Not applicable.

**E.     Dilution**

Not applicable.

**F.     Expenses of the Issue**

Not applicable.

**Item 10.     Additional Information**

**A.     Share Capital**

Not applicable.

**B.     Memorandum and Articles of Association**

We incorporate by reference into this annual report the description of our second amended and restated memorandum and articles of association contained in our F-1 registration statement (File No. 333-199996), as amended, initially filed with the SEC on November 7, 2014. The second amended and restated memorandum and articles of association was adopted by our shareholders by unanimous resolutions on the November 28, 2014, and became effective upon completion of our initial public offering of our Class A ordinary shares represented by ADSs.

**Table of Contents**

**C.    Material Contracts**

We have not entered into any material contracts other than in the ordinary course of business and other than those described in "Item 4. Information on the Company" or elsewhere in this annual report on Form 20-F.

**D.    Exchange Controls**

See "Item 4. Information on the Company—B. Business Overview—Regulation—Regulations Relating to Foreign Exchange."

**E.    Taxation**

**Cayman Islands Taxation**

The Cayman Islands currently levies no taxes on individuals or corporations based upon profits, income, gains or appreciation and there is no taxation in the nature of inheritance tax or estate duty. There are no other taxes likely to be material to us levied by the government of the Cayman Islands except for stamp duties which may be applicable on instruments executed in, or after execution brought within the jurisdiction of the Cayman Islands. The Cayman Islands is not party to any double tax treaties that are applicable to any payments made to or by our company. There are no exchange control regulations or currency restrictions in the Cayman Islands.

**People's Republic of China Taxation**

Under the PRC Enterprise Income Tax Law, or the EIT Law, which became effective on January 1, 2008, an enterprise established outside the PRC with "de facto management bodies" within the PRC is considered a "resident enterprise" for PRC enterprise income tax purposes and is generally subject to a uniform 25% enterprise income tax rate on its worldwide income.

On April 22, 2009, the State Administration of Taxation, or the SAT, issued the Notice Regarding the Determination of Chinese-Controlled Overseas Incorporated Enterprises as PRC Tax Resident Enterprise on the Basis of De Facto Management Bodies, or SAT Circular 82, which provides certain specific criteria for determining whether the "de facto management body" of a PRC controlled enterprise that is incorporated offshore is located in China. Further to SAT Circular 82, on July 27, 2011, the SAT issued the Administrative Measures for Enterprise Income Tax of Chinese-Controlled Offshore Incorporated Resident Enterprises (Trial), or SAT Bulletin 45, to provide more guidance on the implementation of SAT Circular 82; the bulletin became effective on September 1, 2011 and was further amended on October 1, 2016. SAT Bulletin 45 clarified certain issues in the areas of resident status determination, post-determination administration and competent tax authorities procedures. According to SAT Circular 82, an offshore incorporated enterprise controlled by a PRC enterprise or a PRC enterprise group will be considered as a PRC tax resident enterprise by virtue of having its "de facto management body" in China only if all of the following conditions are met: (a) the senior management and core management departments in charge of its daily operations function have their presence mainly in the PRC; (b) its financial and human resources decisions are subject to determination or approval by persons or bodies in the PRC; (c) its major assets, accounting books, company seals, and minutes and files of its board and shareholders' meetings are located or kept in the PRC; and (d) more than half of the enterprise's directors or senior management with voting rights habitually reside in the PRC. Although SAT Circular 82 and SAT Bulletin 45 only apply to offshore incorporated enterprises controlled by PRC enterprises or PRC enterprise groups and not those controlled by PRC individuals or foreigners, the determination criteria set forth therein may reflect the SAT's general position on how the term "de facto management body" could be applied in determining the tax resident status of offshore enterprises, regardless of whether they are controlled by PRC enterprises, individuals or foreigners.

99

**Table of Contents**

We do not believe Momo Inc. meets all of the criteria described above. We believe that none of Momo Inc. and its subsidiaries outside of China is a PRC tax resident enterprise, because none of them is controlled by a PRC enterprise or PRC enterprise group, and because their records (including the resolutions of its board of directors and the resolutions of shareholders) are maintained outside the PRC. However, as the tax resident status of an enterprise is subject to determination by the PRC tax authorities and uncertainties remain with respect to the interpretation of the term "de facto management body" when applied to our offshore entities, we may be considered as a resident enterprise and may therefore be subject to PRC enterprise income tax at 25% on our global income. In addition, if the PRC tax authorities determine that our company is a PRC resident enterprise for PRC enterprise income tax purposes, dividends paid by us to non-PRC holders may be subject to PRC withholding tax, and gains realized on the sale or other disposition of ADSs or ordinary shares may be subject to PRC tax, at a rate of 10% in the case of non-PRC enterprises or 20% in the case of non-PRC individuals (in each case, subject to the provisions of any applicable tax treaty), if such dividends or gains are deemed to be from PRC sources. Any such tax may reduce the returns on your investment in the ADSs.

If we are considered a "non-resident enterprise" by the PRC tax authorities, the dividends paid to us by our PRC subsidiaries will be subject to a 10% withholding tax. The EIT Law also imposes a withholding income tax of 10% on dividends distributed by an foreign invested enterprise to its immediate holding company outside of China, if such immediate holding company is considered as a non-resident enterprise without any establishment or place within China or if the received dividends have no connection with the establishment or place of such immediate holding company within China, unless such immediate holding company's jurisdiction of incorporation has a tax treaty with China that provides for a different withholding arrangement. The Cayman Islands, where our Company is incorporated does not have such tax treaty with China. Our US subsidiary is not an immediate holding company of any of our PRC subsidiaries. Under the Arrangement Between the PRC and the Hong Kong Special Administrative Region on the Avoidance of Double Taxation and Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital, the dividend withholding tax rate may be reduced to 5%, if a Hong Kong resident enterprise that receives a dividend is considered a non-PRC tax resident enterprise and holds at least 25% of the equity interests in the PRC enterprise distributing the dividends, subject to approval of the PRC local tax authority. However, if the Hong Kong resident enterprise is not considered to be the beneficial owner of such dividends under applicable PRC tax regulations, such dividends may remain subject to withholding tax at a rate of 10%. Accordingly, Momo Technology HK Company Limited may be able to enjoy the 5% withholding tax rate for the dividends it receives from its PRC subsidiaries if it satisfies the relevant conditions under tax rules and regulations, and obtains the approvals as required.

According to the Notice on Strengthening Administration of Enterprise Income Tax for Share Transfers by Non-PRC Resident Enterprises issued by the PRC State Administration of Taxation on December 10, 2009, with retroactive effect from January 1, 2008, or SAT Circular 698, where a non-resident enterprise transfers the equity interests in a PRC resident enterprise indirectly through a disposition of equity interests in an overseas holding company (other than a purchase and sale of shares issued by a PRC resident enterprise in public securities market), or an Indirect Transfer, and such overseas holding company is located in a tax jurisdiction that: (a) has an effective tax rate less than 12.5% or (b) does not tax foreign income of its residents, the non-resident enterprise, as the seller, shall report such Indirect Transfer to the competent tax authority of the PRC resident enterprise within 30 days of execution of the equity transfer agreement for such Indirect Transfer. The PRC tax authority will examine the true nature of the Indirect Transfer, and if the tax authority considers that the foreign investor has adopted an abusive arrangement without reasonable commercial purposes and for the purpose of avoiding or reducing PRC tax, they will disregard the existence of the overseas holding company that is used for tax planning purposes and re-characterize the Indirect Transfer. As a result, gains derived from such Indirect Transfer may be subject to PRC withholding tax at the rate of up to 10%. SAT Circular 698 also points out that when a non-resident enterprise transfers its equity interests in a PRC resident enterprise to its related parties at a price lower than the fair market value, the competent tax authorities have the power to make a reasonable adjustment on the taxable income of the transaction.

On February 3, 2015, the SAT issued a Public Notice [2015] No. 7, or Public Notice 7, to supersede existing provisions in relation to the Indirect Transfer as set forth in Circular 698, while the other provisions of Circular 698 remain in force. Public Notice 7 introduces a new tax regime that is significantly different from that under Circular 698. Public Notice extends its tax jurisdiction to capture not only Indirect Transfer as set forth under Circular 698 but also transactions involving transfer of immovable property in China and assets held under the establishment and place in China of a foreign company through the offshore transfer of a foreign intermediate holding company. Public Notice 7 also addresses transfer of the equity interest in a foreign intermediate holding company widely. In addition, Public Notice 7 provides clearer criteria than Circular 698 on how to assess reasonable commercial purposes and introduces safe harbor scenarios applicable to internal group restructurings. However, it also brings challenges to both the foreign transferor and transferee of the Indirect Transfer as they have to make self-assessment on whether the transaction should be subject to PRC tax and to file or withhold the PRC tax accordingly.

100

**Table of Contents**

There are few guidances and practical experience as to the application of Circular 698 and Public Notice 7. Where non-resident investors were involved in our private equity financing, if such transactions were determined by the tax authorities to lack reasonable commercial purpose, we and our non-resident investors may become at risk of being taxed under Circular 698 and Public Notice 7 and may be required to expend valuable resources to comply with Circular 698 and Public Notice 7 or to establish that we should not be taxed under Circular 698 and Public Notice 7, which may have a material adverse effect on our financial condition and results of operations or the non-resident investors' investments in us.

The PRC tax authorities have the discretion under SAT Circular 59, Circular 698 and Public Notice 7 to make adjustments to the taxable capital gains based on the difference between the fair value of the equity interests transferred and the cost of investment. We may pursue acquisitions in the future that may involve complex corporate structures. If we are considered a non-resident enterprise under the PRC Enterprise Income Tax Law and if the PRC tax authorities make adjustments to the taxable income of the transactions under SAT Circular 59, Circular 698 and Public Notice 7, our income tax costs associated with such potential acquisitions will be increased, which may have an adverse effect on our financial condition and results of operations.

**United States Federal Income Tax Considerations**

The following discussion is a summary of United States federal income tax considerations relating to the ownership and disposition of our ADSs or ordinary shares by a U.S. Holder (as defined below) that holds our ADSs or ordinary shares as "capital assets" (generally, property held for investment) under the United States Internal Revenue Code of 1986, as amended, or the Code. This discussion is based upon existing United States federal tax law, which is subject to differing interpretations or change, possibly with retroactive effect. No ruling has been sought from the Internal Revenue Service, or the IRS, with respect to any United States federal income tax consequences described below, and there can be no assurance that the IRS or a court will not take a contrary position. This discussion does not discuss all aspects of United States federal income taxation that may be important to particular investors in light of their individual investment circumstances, including investors subject to special tax rules that may differ significantly from those discussed below (including for example, financial institutions, insurance companies, regulated investment companies, real estate investment trusts, broker-dealers, traders in securities that elect mark-to-market treatment, tax-exempt organizations (including private foundations), holders who are not U.S. Holders, holders who own (directly, indirectly or constructively) 10% or more of our voting stock, holders who acquire their ADSs or ordinary shares pursuant to any employee share option or otherwise as compensation, investors that will hold their ADSs or ordinary shares as part of a straddle, hedge, conversion, constructive sale or other integrated transaction for United States federal income tax purposes, or investors that have a functional currency other than the United States dollar). This discussion, moreover, does not address the United States federal estate, gift, Medicare or alternative minimum tax, or any non-United States, state, or local tax considerations of the ownership and disposition of our ADSs or ordinary shares. Each U.S. Holder is urged to consult its tax advisor regarding the United States federal, state, local, non-United States income, and other tax considerations of an investment in our ADSs or ordinary shares.

**General**

For purposes of this discussion, a "U.S. Holder" is a beneficial owner of our ADSs or ordinary shares that is, for United States federal income tax purposes, (i) an individual who is a citizen or resident of the United States, (ii) a corporation (or other entity treated as a corporation for United States federal income tax purposes) created in, or organized under the law of, the United States or any state thereof or the District of Columbia, (iii) an estate the income of which is includible in gross income for United States federal income tax purposes regardless of its source, or (iv) a trust (A) the administration of which is subject to the primary supervision of a United States court and which has one or more United States persons who have the authority to control all substantial decisions of the trust or (B) that has otherwise validly elected to be treated as a United States person under the Code.

If a partnership (or other entity treated as a partnership for United States federal income tax purposes) is a beneficial owner of our ADSs or ordinary shares, the tax treatment of a partner in the partnership will generally depend upon the status of the partner and the activities of the partnership. Partnerships holding our ADSs or ordinary shares and their partners are urged to consult their tax advisors regarding an investment in our ADSs or ordinary shares.

101

**Table of Contents**

For United States federal income tax purposes, it is generally expected that a U.S. Holder of ADSs will be treated as the beneficial owner of the underlying shares represented by the ADSs. The remainder of this discussion assumes that a U.S. Holder of our ADSs will be treated in this manner. Accordingly, deposits or withdrawals of ordinary shares for ADSs will generally not be subject to United States federal income tax.

*Passive Foreign Investment Company Considerations*

A non-United States corporation, such as our company, will be classified as a "passive foreign investment company," or PFIC, for United States federal income tax purposes for any taxable year, if either (i) 75% or more of its gross income for such year consists of certain types of "passive" income or (ii) 50% or more of the value of its assets (determined on the basis of a quarterly average) during such year is attributable to assets that produce or are held for the production of passive income (the "asset test"). For this purpose, cash and assets readily convertible into cash are categorized as passive assets, and the company's goodwill and other unbooked intangibles associated with our active business are taken into account as nonpassive assets. Passive income generally includes, among other things, dividends, interest, rents, royalties, and gains from the disposition of passive assets. We will be treated as owning a proportionate share of the assets and earning a proportionate share of the income of any other corporation in which we own, directly or indirectly, more than 25% (by value) of the stock.

Although the law in this regard is not entirely clear, we treat Beijing Momo as being owned by us for United States federal income tax purposes, because we control its management decisions and we are entitled to substantially all of the economic benefits associated with this entity, and, as a result, we consolidate the results of its operations in our consolidated U.S. GAAP financial statements. If it were determined, however, that we do not own the stock of Beijing Momo for United States federal income tax purposes, we would likely be treated as a PFIC for the taxable year ended December 31, 2016 and would anticipate being a PFIC for future taxable years. Assuming that we are the owner of Beijing Momo for United States federal income tax purposes and based upon our income and assets and the value of our ADSs, we do not believe that we were a PFIC for the taxable year ended December 31, 2016 and do not anticipate becoming a PFIC in the foreseeable future.

While we do not anticipate being a PFIC in the current taxable year or the foreseeable future, there can be no assurance in this regard because the determination of whether we will be or become a PFIC is a factual determination made annually that will depend, in part, upon the composition of our income and assets. Fluctuations in the market price of our ADSs may cause us to become a PFIC for the current or subsequent taxable years because the value of our assets for purposes of the asset test, including the value of our goodwill and unbooked intangibles, may be determined by reference to the market price of our ADSs from time to time (which may be volatile). In estimating the value of our goodwill and other unbooked intangibles, we have taken into account our current market capitalization. If our market capitalization subsequently declines, we may be or become classified as a PFIC for the current taxable year or future taxable years. In addition, the composition of our income and our assets will be affected by how, and how quickly, we spend our liquid assets. Under circumstances where our revenue from activities that produce passive income significantly increase relative to our revenue from activities that produce non-passive income, or where we determine not to deploy significant amounts of cash for active purposes, our risk of becoming classified as a PFIC may substantially increase.

Furthermore, because there are uncertainties in the application of the relevant rules, it is possible that the IRS may challenge our classification of certain income or assets as non-passive, or our valuation of our goodwill and other unbooked intangibles, each of which may result in our company becoming classified as a PFIC for the current or subsequent taxable years. For example, the IRS may challenge the classification of certain of our non-passive revenues as passive royalty income, which would result in a portion of our goodwill as being treated as a passive asset. If we are classified as a PFIC for any year during which a U.S. Holder holds our ADSs or ordinary shares, we generally will continue to be treated as a PFIC for all succeeding years during which such U.S. Holder holds our ADSs or ordinary shares.

The discussion below under "Dividends" and "Sale or Other Disposition of ADSs or Ordinary Shares" is written on the basis that we will not be classified as a PFIC for United States federal income tax purposes. The United States federal income tax rules that apply if we are treated as a PFIC are generally discussed below under "Passive Foreign Investment Company Rules."

102

**Table of Contents**

*Dividends*

Subject to the discussion below under "Passive Foreign Investment Company Rules," any cash distributions (including the amount of any PRC tax withheld) paid on our ADSs or ordinary shares out of our current or accumulated earnings and profits, as determined under United States federal income tax principles, will generally be includible in the gross income of a U.S. Holder as dividend income on the day actually or constructively received by the U.S. Holder, in the case of ordinary shares, or by the depositary, in the case of ADSs. Because we do not intend to determine our earnings and profits on the basis of United States federal income tax principles, any distribution we pay will generally be treated as a "dividend" for United States federal income tax purposes. A non-corporate U.S. Holder will be subject to tax on dividend income from a "qualified foreign corporation" at a lower applicable capital gains rate rather than the marginal tax rates generally applicable to ordinary income provided that certain holding period requirements are met. A non-United States corporation (other than a corporation that is classified as a PFIC for the taxable year in which the dividend is paid or the preceding taxable year) will generally be considered to be a qualified foreign corporation (i) if it is eligible for the benefits of a comprehensive tax treaty with the United States which the Secretary of Treasury of the United States determines is satisfactory for purposes of this provision and which includes an exchange of information program, or (ii) with respect to any dividend it pays on stock (or ADSs in respect of such stock) which is readily tradable on an established securities market in the United States. Our ADSs are listed on the NASDAQ Global Select Market, which is an established securities market in the United States, and the ADSs are readily tradable. Thus, the dividends we pay on our ADSs are expected to satisfy the conditions required for the reduced tax rates, but there can be no assurance that our ADSs will continue to be considered readily tradable on an established securities market in later years. Since we do not expect that our ordinary shares will be listed on an established securities market, it is unclear whether dividends that we pay on our ordinary shares that are not represented by ADSs will meet the conditions required for the reduced tax rate. However, in the event we are deemed to be a PRC resident enterprise under the PRC Enterprise Income Tax Law (see "People's Republic of China Taxation" above), we may be eligible for the benefits of the United States-PRC income tax treaty. If we are eligible for such benefits (which the Secretary of the Treasury of the United States has determined is satisfactory for this purpose), dividends we pay on our ADSs or ordinary shares, regardless of whether such shares are represented by the ADSs, would be eligible for the reduced rates of taxation. U.S. Holders are urged to consult their tax advisors regarding the availability of the reduced tax rate on dividends with respect to our ADSs or ordinary shares in their particular circumstances. Dividends received on our ADSs or ordinary shares will not be eligible for the dividends-received deduction allowed to corporations.

Dividends will generally be treated as income from foreign sources for United States foreign tax credit purposes and will generally constitute passive category income. In the event that we are deemed to be a PRC resident enterprise under the PRC Enterprise Income Tax Law, a U.S. Holder may be subject to PRC withholding taxes on dividends paid on our ADSs or ordinary shares. Depending on the U.S. Holder's individual facts and circumstances, a U.S. Holder may be eligible, subject to a number of complex limitations, to claim a foreign tax credit not in excess of any applicable treaty rate in respect of any foreign withholding taxes imposed on dividends received on our ADSs or ordinary shares. A U.S. Holder who does not elect to claim a foreign tax credit for foreign tax withheld may instead claim a deduction, for United States federal income tax purposes, in respect of such withholding, but only for a year in which such holder elects to do so for all creditable foreign income taxes. The rules governing the foreign tax credit are complex and their outcome depends in large part on the U.S. Holder's individual facts and circumstances. Accordingly, U.S. Holders are urged to consult their tax advisors regarding the availability of the foreign tax credit under their particular circumstances.

*Sale or Other Disposition of ADSs or Ordinary Shares*

Subject to the discussion below under "Passive Foreign Investment Company Rules," a U.S. Holder will generally recognize capital gain or loss upon the sale or other disposition of ADSs or ordinary shares in an amount equal to the difference between the amount realized upon the disposition and the U.S. Holder's adjusted tax basis in such ADSs or ordinary shares. Any capital gain or loss will be long-term if the ADSs or ordinary shares have been held for more than one year and will generally be United States-source gain or loss for United States foreign tax credit purposes. Long-term capital gains of non-corporate taxpayers are currently eligible for reduced rates taxation. In the event that gain from the disposition of the ADSs or ordinary shares is subject to tax in the PRC, such gain may be treated as PRC-source gain under the United States-PRC income tax treaty. The deductibility of a capital loss may be subject to limitations. U.S. Holders are urged to consult their tax advisors regarding the tax consequences if a foreign tax is imposed on a disposition of our ADSs or ordinary shares, including the availability of the foreign tax credit under their particular circumstances.

103

Table of Contents

*Passive Foreign Investment Company Rules*

If we are classified as a PFIC for any taxable year during which a U.S. Holder holds our ADSs or ordinary shares, and unless the U.S. Holder makes a mark-to-market election (as described below), the U.S. Holder will generally be subject to special tax rules that have a penalizing effect, regardless of whether we remain a PFIC, on (i) any excess distribution that we make to the U.S. Holder (which generally means any distribution paid during a taxable year to a U.S. Holder that is greater than 125 percent of the average annual distributions paid in the three preceding taxable years or, if shorter, the U.S. Holder's holding period for the ADSs or ordinary shares), and (ii) any gain realized on the sale or other disposition, including a pledge, of ADSs or ordinary shares. Under the PFIC rules:

- the excess distribution or gain will be allocated ratably over the U.S. Holder's holding period for the ADSs or ordinary shares;

- the amount allocated to the current taxable year and any taxable years in the U.S. Holder's holding period prior to the first taxable year in which we are classified as a PFIC (each, a "pre-PFIC year"), will be taxable as ordinary income;

- the amount allocated to each prior taxable year, other than a pre-PFIC year, will be subject to tax at the highest tax rate in effect applicable to the U.S. Holder for that year; and

- an additional tax equal to the interest charge generally applicable to underpayments of tax will be imposed on the tax attributable to each prior taxable year, other than a pre-PFIC year.

If we are a PFIC for any taxable year during which a U.S. Holder holds our ADSs or ordinary shares and any of our subsidiaries is also a PFIC, such U.S. Holder would be treated as owning a proportionate amount (by value) of the shares of the lower-tier PFIC for purposes of the application of these rules. U.S. Holders are urged to consult their tax advisors regarding the application of the PFIC rules to any of our subsidiaries.

As an alternative to the foregoing rules, a U.S. Holder of "marketable stock" in a PFIC may make a mark-to-market election with respect to such stock, provided that such stock is "regularly traded" within the meaning of applicable United States Treasury regulations. For those purposes, our ADSs, but not our ordinary shares are treated as marketable stock on the NASDAQ Global Select Market. We believe that our ADSs should qualify as being regularly traded, but no assurances may be given in this regard. If a U.S. Holder makes this election, the U.S. Holder will generally (i) include as ordinary income for each taxable year that we are a PFIC the excess, if any, of the fair market value of ADSs held at the end of the taxable year over the adjusted tax basis of such ADSs and (ii) deduct as an ordinary loss the excess, if any, of the adjusted tax basis of the ADSs over the fair market value of such ADSs held at the end of the taxable year, but such deduction will only be allowed to the extent of the amount previously included in income as a result of the mark-to-market election. The U.S. Holder's adjusted tax basis in the ADSs would be adjusted to reflect any income or loss resulting from the mark-to-market election. If a U.S. Holder makes a mark-to-market election in respect of a corporation classified as a PFIC and such corporation ceases to be classified as a PFIC, the U.S. Holder will not be required to take into account the gain or loss described above during any period that such corporation is not classified as a PFIC. If a U.S. Holder makes a mark-to-market election, any gain such U.S. Holder recognizes upon the sale or other disposition of our ADSs in a year when we are a PFIC will be treated as ordinary income and any loss will be treated as ordinary loss, but such loss will only be treated as ordinary loss to the extent of the net amount previously included in income as a result of the mark-to-market election.

Because a mark-to-market election cannot be made for any lower-tier PFICs that we may own, a U.S. Holder may continue to be subject to the PFIC rules with respect to such U.S. Holder's indirect interest in any investments held by us that are treated as an equity interest in a PFIC for United States federal income tax purposes.

104

Table of Contents

We do not intend to provide information necessary for U.S. Holders to make qualified electing fund elections which, if available, would result in tax treatment different from the general tax treatment for PFICs described above.

If a U.S. Holder owns our ADSs or ordinary shares during any taxable year that we are a PFIC, the U.S. Holder must generally file an annual IRS Form 8621 or such other form as is required by the United States Treasury Department. Each U.S. Holder is urged to consult its tax advisor concerning the United States federal income tax consequences of holding and disposing ADSs or ordinary shares if we are or become treated as a PFIC, including the possibility of making a mark-to-market election and the unavailability of the election to treat us as a qualified electing fund.

### Information Reporting

Certain U.S. Holders are required to report information to the IRS relating to an interest in "specified foreign financial assets," including shares issued by a non-United States corporation, for any year in which the aggregate value of all specified foreign financial assets exceeds US$50,000 (or a higher dollar amount prescribed by the IRS), subject to certain exceptions (including an exception for shares held in custodial accounts maintained with a United States financial institution). These rules also impose penalties if a U.S. Holder is required to submit such information to the IRS and fails to do so.

In addition, U.S. Holders may be subject to information reporting to the IRS with respect to dividends on and proceeds from the sale or other disposition of our ADSs or ordinary shares. Each U.S. Holder is advised to consult with its tax advisor regarding the application of the United States information reporting rules to their particular circumstances.

### F.    Dividends and Paying Agents

Not applicable.

### G.    Statement by Experts

Not applicable.

### H.    Documents on Display

We previously filed with the SEC our registration statement on Form F-1, as amended, and the related prospectus under the Securities Act of 1933, with respect to our Class A ordinary shares. We are subject to the periodic reporting and other informational requirements of the Exchange Act. Under the Exchange Act, we are required to file reports and other information with the SEC. Specifically, we are required to file annually a Form 20-F within four months after the end of each fiscal year, which is December 31. Copies of reports and other information, when so filed, may be inspected without charge and may be obtained at prescribed rates at the public reference facilities maintained by the SEC at 100 F Street, N.E., Room 1580, Washington, D.C. 20549. The public may obtain information regarding the Washington, D.C. Public Reference Room by calling the Commission at 1-800-SEC-0330. The SEC also maintains a website at *www.sec.gov* that contains reports, proxy and information statements, and other information regarding registrants that make electronic filings with the SEC using its EDGAR system. As a foreign private issuer, we are exempt from the rules under the Exchange Act prescribing the furnishing and content of quarterly reports and proxy statements, and officers, directors and principal shareholders are exempt from the reporting and short-swing profit recovery provisions contained in Section 16 of the Exchange Act.

We will furnish Deutsche Bank Trust Company Americas, the depositary of our ADSs, with our annual reports, which will include a review of operations and annual audited consolidated financial statements prepared in conformity with U.S. GAAP, and all notices of shareholders' meetings and other reports and communications that are made generally available to our shareholders. The depositary will make such notices, reports and communications available to holders of ADSs and, upon our request, will mail to all record holders of ADSs the information contained in any notice of a shareholders' meeting received by the depositary from us.

Table of Contents

In accordance with NASDAQ Stock Market Rule 5250(d), we will post this annual report on Form 20-F on our website at *http://ir.immomo.com*. In addition, we will provide hardcopies of our annual report free of charge to shareholders and ADS holders upon request.

I.      **Subsidiary Information**

Not applicable.

**Item 11.        Quantitative and Qualitative Disclosures about Market Risk**

**Interest Rate Risk**

Our exposure to interest rate risk primarily relates to the interest income generated by excess cash, which is mostly held in interest-bearing bank deposits. We generated interest income of US$722 thousand, US$7.8 million and US$8.2 million for the years ended December 31, 2014, 2015 and 2016, respectively. We had cash and cash equivalents of US$651.3 million as of December 31, 2016. Assuming such amount of cash and cash equivalents were held entirely in interest-bearing bank deposits, a hypothetical one percentage point (100 basis-point) decrease in interest rates would decrease our interest income from these interest-bearing bank deposits for one year by approximately US$6.5 million. Interest-earning instruments carry a degree of interest rate risk. We have not been exposed to, nor do we anticipate being exposed to, material risks due to changes in market interest rates. However, our future interest income may fall short of expectations due to changes in market interest rates.

**Foreign Exchange Risk**

Our revenues and costs are mostly denominated in RMB, and a significant portion of our financial assets are also denominated in RMB, whereas our reporting currency is the U.S. dollar. The Renminbi is not freely convertible into foreign currencies for capital account transactions. The value of the Renminbi against the U.S. dollar and other currencies is affected by, among other things, changes in China's political and economic conditions and China's foreign exchange policies. On July 21, 2005, the PRC government changed its decade-old policy of pegging the value of the RMB to the U.S. dollar, and the Renminbi appreciated more than 20% against the U.S. dollar over the following three years. Between July 2008 and June 2010, this appreciation halted and the exchange rate between the RMB and the U.S. dollar remained within a narrow band. Since June 2010, the RMB has fluctuated against the U.S. dollar, at times significantly and unpredictably. In August 2015, the People's Bank of China changed the way it calculates the mid-point price of Renminbi against the U.S. dollar, requiring the market-makers who submit for reference rates to consider the previous day's closing spot rate, foreign-exchange demand and supply as well as changes in major currency rates. The value of the Renminbi depreciated approximately 5.8% against the U.S. dollar in 2015 and further by approximately 6.3% in 2016. It is difficult to predict whether the depreciation will continue and how market forces or PRC or U.S. government policy may impact the exchange rate between the RMB and the U.S. dollar in the future. To date, we have not entered into any hedging transactions in an effort to reduce our exposure to foreign currency exchange risk.

Our net revenues, as denominated in RMB, was RMB3,707.4 million in 2016. Assuming that we convert the full amount of our net revenues in 2016 into U.S. dollars, a 10% appreciation of the U.S. dollar against RMB, from a rate of RMB6.7029 to US$1.00, which was the average RMB to U.S. dollars exchange rate in 2016, to a rate of RMB7.3732 to US$1.00, will result in a decrease of US$50.3 million in our net revenues in 2016. Conversely, a 10% depreciation of the U.S. dollar against the RMB, from a rate of RMB6.7029 to US$1.00 to a rate of RMB6.0326 to US$1.00, will result in an increase of US$61.5 million in our net revenues in 2016.

Our net income, as denominated in RMB, was RMB1,214.7 million in 2016. Assuming that we convert the full amount of our net income in 2016 into U.S. dollars, a 10% appreciation of the U.S. dollar against RMB, from a rate of RMB6.7029 to US$1.00 to a rate of RMB7.3732 to US$1.00, will result in a decrease of US$15.9 million in our net income in 2016. Conversely, a 10% depreciation of the U.S. dollar against the RMB, from a rate of RMB6.7029 to US$1.00 to a rate of RMB6.0326 to US$1.00, will result in an increase of US$20.7 million in our net income in 2016.

106

Table of Contents

**Item 12.        Description of Securities Other than Equity Securities**

**A.        Debt Securities**

Not applicable.

**B.        Warrants and Rights**

Not applicable.

**C.        Other Securities**

Not applicable.

**D.        American Depositary Shares**

**Fees and Charges Our ADS holders May Have to Pay**

Deutsche Bank Trust Company Americas, the depositary of our ADS program, collects its fees for delivery and surrender of ADSs directly from investors depositing shares or surrendering ADSs for the purpose of withdrawal or from intermediaries acting for them. The depositary collects fees for making distributions to investors by deducting those fees from the amounts distributed or by selling a portion of distributable property to pay the fees. The depositary may collect its annual fee for depositary services by deductions from cash distributions or by directly billing investors or by charging the book-entry system accounts of participants acting for them. The depositary may generally refuse to provide fee-attracting services until its fees for those services are paid. The depositary's principal office at which the ADSs will be administered is located at 60 Wall Street, New York, NY 10005, USA. The principal executive office of the depositary is located at 60 Wall Street, New York, NY 10005, USA.

| Service | Fees |
|---|---|
| • To any person to which ADSs are issued or to any person to which a distribution is made in respect of ADS distributions pursuant to stock dividends or other free distributions of stock, bonus distributions, stock splits or other distributions (except where converted to cash) | Up to US$0.05 per ADS issued |
| • Cancellation of ADSs, including termination of the deposit agreement | Up to US$0.05 per ADS cancelled |
| • Distribution of cash dividends | Up to US$0.05 per ADS held |
| • Distribution of cash entitlements (other than cash dividends) and/or cash proceeds, including proceeds from the sale of rights, securities and other entitlements | Up to US$0.05 per ADS held |
| • Distribution of ADSs pursuant to exercise of rights. | Up to US$0.05 per ADS held |
| • Depositary services | Up to US$0.05 per ADS held on the applicable record date(s) established by the depositary bank |

**Fees and Other Payments Made by the Depositary to Us**

The depositary has agreed to reimburse us annually for our expenses incurred in connection with the administration and maintenance of our ADS facility including, but not limited to, investor relations expenses, other program related expenses related to our ADS facility and the travel expense of our key personnel in connection with such programs. The depositary has also agreed to provide additional payments to us based on the applicable performance indicators relating to our ADS facility. There are limits on the amount of expenses for which the depositary will reimburse us, but the amount of reimbursement available to us is not necessarily tied to the amount of fees the depositary collects from investors. For the year ended December 31, 2016, we were entitled to receive approximately US$1.1 million (after withholding tax) from the depositary as reimbursement for our expenses incurred in connection with, among other things, investor relationship programs related to the ADS facility and the travel expense of our key personnel in connection with such programs. This amount has been fully paid to us as of the date of this annual report.

107

**Table of Contents**

**PART II**

**Item 13.**    **Defaults, Dividend Arrearages and Delinquencies**

None.

**Item 14.**    **Material Modifications to the Rights of Security Holders and Use of Proceeds**

The following "Use of Proceeds" information relates to our initial public offering of 18,400,000 ADSs representing 36,800,000 of our Class A ordinary shares, including 2,400,000 ADSs representing 4,800,000 Class A ordinary shares sold pursuant to the full exercise of over-allotment option by the underwriters, at an initial offering price of US$13.50 per ADS, which was completed in December 2014.

After deducting the total expenses of approximately US$17.4 million and other expenses of approximately US$4.4 million, we received net proceeds of approximately US$226.7 million from our initial public offering. Concurrently with the initial public offering, we completed a private placement and received an additional US$60.0 million. As of December 31, 2016, we had used an insignificant amount of net proceeds received from the initial public offering because the net cash provided by our operations was sufficient to cover our capital needs.

None of the net proceeds from our initial public offering were directly or indirectly paid to the directors, officers, general partners of our company or their associates, persons owning 10% or more of our ordinary shares, or our affiliates.

**Item 15.**    **Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our chief executive officer and chief financial officer, has performed an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) as of the end of the period covered by this report, as required by Rule 13a-15(b) under the Exchange Act.

Based upon that evaluation, our management has concluded that, as of December 31, 2016, our disclosure controls and procedures were effective in ensuring that the information required to be disclosed by us in the reports that we file and furnish under the Exchange Act was recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and that the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate, to allow timely decisions regarding required disclosure.

**Management's Annual Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) under the Exchange Act. Our management evaluated the effectiveness of our internal control over financial reporting, as required by Rule 13a-15(c) of the Exchange Act, based on criteria established in the framework in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, our management has concluded that our internal control over financial reporting was effective as of December 31, 2016.

Table of Contents

Designing and implementing an effective financial reporting system is a continuous effort that requires us to devote significant resources to maintain a financial reporting system that adequately satisfies our reporting obligations. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. In addition, projections of any evaluation of effectiveness of our internal control over financial reporting to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.

**Attestation Report of the Registered Public Accounting Firm**

This annual report on Form 20-F does not include an attestation report of our independent registered public accounting firm because we qualified as an "emerging growth company" as defined under the JOBS Act as of December 31, 2016.

**Changes in Internal Control over Financial Reporting**

There were no significant changes in our internal controls over financial reporting during the year ended December 31, 2016 that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting. We may identify additional control deficiencies in the future. Should we discover such deficiencies, we intend to remediate them as soon as possible.

**Item 16A.    Audit Committee Financial Expert**

Our board of directors has determined that each of Mr. Benson Bing Chung Tam and Dr. Dave Daqing Qi, independent directors (under the standards set forth in NASDAQ Stock Market Rule 5605(a)(2) and Rule 10A-3 under the Exchange Act) and members of our audit committee, is an audit committee financial expert.

**Item 16B.    Code of Ethics**

Our board of directors has adopted a code of ethics that applies to our directors, officers and employees, including certain provisions that specifically apply to our senior officers, including our chief executive officer, chief financial officer, other chief senior officers, senior finance officer, controller, senior vice presidents, vice presidents and any other persons who perform similar functions for us. We have filed our code of business conduct and ethics as Exhibit 99.1 to our registration statement on Form F-1 (File Number 333-199996), as amended, initially filed with the SEC on November 7, 2014. The code is also available on our official website under the corporate governance section at our investor relations website *http://ir.immomo.com*.

**Item 16C.    Principal Accountant Fees and Services**

The following table sets forth the aggregate fees by categories specified below in connection with certain professional services rendered by Deloitte Touche Tohmatsu Certified Public Accountants LLP, our principal external accounting firm, for the periods indicated.

|  | 2015 | 2016 |
|---|---|---|
| Audit fees[1] | US$800,000 | US$1,100,000 |
| Audit-related fees[2] | US$  — | US$  20,000 |
| Tax fees[3] | US$ 44,157 | US$  40,105 |

(1)    "Audit fees" represents the aggregate fees billed for each of the fiscal years listed for professional services rendered by our principal accounting firm for the audit of our annual financial statements or services that are normally provided by the auditors in connection with statutory and regulatory filings or engagements.

(2)    "Audit-related fees" represents the aggregate fees billed for professional services rendered by our principal accounting firm for the assurance and related services, which mainly included the audit and review of financial statements and are not reported under "Audit Fees" above.

(3)    "Tax fees" represents the aggregate fees billed for professional services rendered by our principal accounting firm for tax compliance, tax advice and tax planning.

The policy of our audit committee is to pre-approve all audit and non-audit services provided by Deloitte Touche Tohmatsu Certified Public Accountants LLP, including audit services, audit-related services and tax services as described above, other than those for *de minimis* services which are approved by the audit committee prior to the completion of the audit.

**Table of Contents**

**Item 16D.**     **Exemptions from the Listing Standards for Audit Committees**

Not applicable.


**Item 16E.**     **Purchases of Equity Securities by the Issuer and Affiliated Purchasers**

None.


**Item 16F.**     **Change in Registrant's Certifying Accountant**

Not applicable.


**Item 16G.**     **Corporate Governance**

NASDAQ Stock Market Rule 5620 requires each issuer to hold an annual meeting of shareholders no later than one year after the end of the issuer's fiscal year-end. However, NASDAQ Stock Market Rule 5615(a)(3) permits foreign private issuers like us to follow "home country practice" in certain corporate governance matters. Maples and Calder (Hong Kong) LLP, our Cayman Islands counsel, has provided a letter to the NASDAQ Stock Market certifying that under Cayman Islands law, we are not required to hold annual shareholders meetings every year. We followed home country practice and did not hold an annual meeting of shareholders in 2016. We may, however, hold annual shareholders meetings in the future.

Other than the annual meeting practice described above, there are no significant differences between our corporate governance practices and those followed by U.S. domestic companies under NASDAQ Stock Market Rules.


**Item 16H.**     **Mine Safety Disclosure**

Not applicable.

110

**Table of Contents**

**PART III**

**Item 17.**        **Financial Statements**

We have elected to provide financial statements pursuant to Item 18.

**Item 18.**        **Financial Statements**

The consolidated financial statements of Momo Inc., its subsidiaries and its consolidated affiliated entity and its subsidiaries are included at the end of this annual report.

**Item 19.**        **Exhibits**

| Exhibit Number | Description of Document |
|---|---|
| 1.1 | Second amended and restated memorandum and articles of association of the Registrant (incorporated by reference to Exhibit 3.2 of our registration statement on Form F-1, as amended (file no. 333-199996), filed with the SEC on November 28, 2014) |
| 2.1 | Registrant's specimen American depositary receipt (included in Exhibit 2.3) |
| 2.2 | Registrant's specimen certificate for ordinary shares (incorporated by reference to Exhibit 4.2 of our registration statement on Form F-1, as amended (file no. 333-199996), filed with the SEC on November 28, 2014) |
| 2.3 | Deposit agreement dated December 10, 2014 among the Registrant, the depositary and holders and beneficial owners of American depositary shares evidenced by American depositary receipts issued thereunder (incorporated by reference to Exhibit 4.3 of our registration statement on Form S-8 filed with the SEC on January 30, 2015) |
| 4.1 | Third amended and restated shareholders agreement among the Registrant, shareholders of the Registrant and other parties thereto, dated May 15, 2014 (incorporated by reference to Exhibit 4.4 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014) |
| 4.2 | Amended and restated 2012 share incentive plan (incorporated by reference to Exhibit 10.1 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014) |
| 4.3 | 2014 share incentive plan (incorporated by reference to Exhibit 10.2 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014) |
| 4.4 | Series D preferred share purchase agreement by and among the Registrant, SCC Growth I Holdco A, Ltd. (formerly known as Sequoia Capital China Investment Holdco II Ltd.), Sequoia Capital China GF Holdco III-A, Ltd., SC China Growth III Co-Investment 2014-A, L.P., Rich Moon Limited and Tiger Global Eight Holdings, as investors, and other parties thereto, dated April 22, 2014 (incorporated by reference to Exhibit 10.4 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014) |
| 4.5 | Form of indemnification agreement between the Registrant and each of its directors and executive officers (incorporated by reference to Exhibit 10.5 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014) |
| 4.6 | Form of employment agreement between the Registrant and each of its Executive Officers (incorporated by reference to Exhibit 10.6 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014) |
| 4.7 | Business operation agreement by and among Beijing Momo IT, Beijing Momo and its shareholders, dated April 18, 2012, and confirmation letter by Yan Tang, dated June 9, 2014 (incorporated by reference to Exhibit 10.7 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014) |
| 4.8 | Exclusive cooperation agreement by and between Beijing Momo IT and Beijing Momo, and a supplemental agreement thereto dated August 31, 2014 (incorporated by reference to Exhibit 10.8 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014) |
| 4.9 | Exclusive cooperation agreement by and between Beijing Momo IT and Chengdu Momo, and a supplemental agreement thereto, dated August 31, 2014 (incorporated by reference to Exhibit 10.9 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014) |

111

**Table of Contents**

| Exhibit Number | Description of Document |
| --- | --- |
| 4.11* | Exclusive cooperation agreement by and between Beijing Momo IT and Tianjin Heer, and a supplemental agreement thereto, dated May 1, 2016 |
| 4.12 | Exclusive call option agreement by and among Beijing Momo IT, Beijing Momo and each of its shareholders, dated April 18, 2014 (incorporated by reference to Exhibit 10.10 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014) |
| 4.13 | Power of attorney by each shareholder of Beijing Momo, dated April 18, 2014 (incorporated by reference to Exhibit 10.11 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014) |
| 4.14 | Equity interest pledge agreement by and among Beijing Momo IT, Beijing Momo and each of its shareholders, dated April 18, 2014 (incorporated by reference to Exhibit 10.12 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014) |
| 4.15 | Spousal consent letter by the spouse of each of Yong Li, Zhiwei Li and Yan Tang (incorporated by reference to Exhibit 10.13 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014) |
| 4.16 | Shareholder confirmation letter by each of the shareholders of Beijing Momo, dated April 18, 2014 (incorporated by reference to Exhibit 10.14 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014) |
| 8.1* | List of subsidiaries and consolidated entities of the Registrant |
| 11.1 | Code of business conduct and ethics of the Registrant (incorporated by reference to Exhibit 99.1 of our Registration Statement on Form F-1 (file no. 333-199996) filed with the Securities and Exchange Commission on November 7, 2014) |
| 12.1* | Certification by Principal Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 12.2* | Certification by Principal Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 13.1** | Certification by Principal Executive Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 13.2** | Certification by Principal Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 15.1* | Consent of Maples and Calder (Hong Kong) LLP |
| 15.2* | Consent of Han Kun Law Offices |
| 15.3* | Consent of Deloitte Touche Tohmatsu Certified Public Accountants LLP, an independent registered public accounting firm |
| 101.INS* | XBRL Instance Document |
| 101.SCH* | XBRL Taxonomy Extension Schema Document |
| 101.CAL* | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF* | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB* | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE* | XBRL Taxonomy Extension Presentation Linkbase Document |

\*      Filed herewith
\*\*    Furnished herewith

**Table of Contents**

**SIGNATURES**

The registrant hereby certifies that it meets all of the requirements for filing its annual report on Form 20-F and that it has duly caused and authorized the undersigned to sign this annual report on its behalf.

**Momo Inc.**

By: _____   /s/ Yan Tang

Name: Yan Tang

Title:   Chairman and Chief

Executive Officer

Date: April 26, 2017

113

**Table of Contents**

Table of Contents

**MOMO INC.**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**

| CONTENTS | PAGE(S) |
|---|---|
| REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM | F-2 |
| CONSOLIDATED BALANCE SHEETS AS OF DECEMBER 31, 2015 AND 2016 | F-3 |
| CONSOLIDATED STATEMENTS OF OPERATIONS FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016 | F-4 |
| CONSOLIDATED STATEMENTS OF COMPREHENSIVE (LOSS) INCOME FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016 | F-5 |
| CONSOLIDATED STATEMENTS OF CHANGES IN (DEFICIT) EQUITY FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016 | F-6 |
| CONSOLIDATED STATEMENTS OF CASH FLOWS FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016 | F-7 |
| NOTES TO CONSOLIDATED FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016 | F-8 - F-61 |

F-1

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

TO THE BOARD OF DIRECTORS AND
SHAREHOLDERS OF MOMO INC.

We have audited the accompanying consolidated balance sheets of Momo Inc. (the "Company"), its subsidiaries, its variable interest entity ("VIE"), and its VIE's subsidiaries (collectively, the "Group") as of December 31, 2015 and 2016 and the related consolidated statements of operations, comprehensive (loss) income, changes in (deficit) equity and cash flows for the three years in the period ended December 31, 2016. These financial statements are the responsibility of the Group's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. The Group is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Group's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall consolidated financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of the Group as of December 31, 2015 and 2016, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2016, in conformity with accounting principles generally accepted in the United States of America.

/s/ Deloitte Touche Tohmatsu Certified Public Accountants LLP
Beijing, the People's Republic of China

April 26, 2017

F-2

**Table of Contents**

**MOMO INC.**

**CONSOLIDATED BALANCE SHEETS**
**(In thousands of U.S. dollars, except share and share related data, or otherwise noted)**

| | As of December 31, | |
| --- | ---: | ---: |
| | 2015 | 2016 |
| **Assets** | | |
| Current assets | | |
| Cash and cash equivalents | $169,469 | $257,564 |
| Term deposits | 300,000 | 393,759 |
| Accounts receivable, net of allowance for doubtful accounts of $nil and $nil as of December 31, 2015 and 2016 respectively | 14,896 | 36,078 |
| Amount due from related parties | 1,175 | 88 |
| Prepaid expenses and other current assets | 18,297 | 32,592 |
| Deferred tax assets, current | — | 72 |
| Total current assets | 503,837 | 720,153 |
| Property and equipment, net | 16,259 | 13,932 |
| Rental deposits | 743 | 920 |
| Long term investments | 19,318 | 31,932 |
| Other non-current assets | 2,000 | 2,593 |
| Deferred tax assets, non-current | — | 208 |
| Total assets | 542,157 | 769,738 |
| **Liabilities and equity** | | |
| Current liabilities | | |
| Accounts payable (including accounts payable of the consolidated VIE without recourse to the Company of $9,040 and $36,812 as of December 31, 2015 and 2016, respectively) | 10,445 | 40,457 |
| Deferred revenue (including deferred revenue of the consolidated VIE without recourse to the Company of $28,274 and $41,277 as of December 31, 2015 and 2016, respectively) | 28,274 | 41,277 |
| Accrued expenses and other current liabilities (including accrued expenses and other current liabilities of the consolidated VIE without recourse to the Company of $1,954 and $6,632 as of December 31, 2015 and 2016, respectively) | 26,694 | 39,965 |
| Amount due to related parties (including amount due to related parties of the consolidated VIE without recourse to the Company of $nil and $1,510 as of December 31, 2015 and 2016, respectively) | 6,532 | 8,117 |
| Income tax payable (including income tax payable of the consolidated VIE without recourse to the Company of $nil and $3,881 as of December 31, 2015 and 2016, respectively) | — | 3,881 |
| Total current liabilities | 71,945 | 133,697 |
| Other non-current liabilities | 1,826 | 2,022 |
| Total liabilities | 73,771 | 135,719 |
| Commitments and contingencies (Note14) | | |
| Equity | | |
| Class A ordinary shares ($0.0001 par value; 800,000,000 and 800,000,000 shares authorized as of December 31, 2015 and 2016 respectively; 286,865,033 and 292,062,065 shares issued and outstanding as of December 31, 2015 and 2016, respectively) | 31 | 32 |
| Class B ordinary shares ($0.0001 par value; 100,000,000 and 100,000,000 shares authorized as of December 31, 2015 and 2016, respectively; 96,886,370 and 96,886,370 shares issued and outstanding as of December 31, 2015 and 2016, respectively) | 10 | 10 |
| Treasury stock | (64,494) | (64,494) |
| Additional paid-in capital | 631,474 | 663,498 |
| (Accumulated deficit)/Retained earnings | (94,109) | 51,141 |
| Accumulated other comprehensive loss | (4,526) | (16,168) |
| Total equity | 468,386 | 634,019 |
| Total liabilities and equity | $542,157 | $769,738 |

The accompanying notes are an integral part of these consolidated financial statements.

F-3

**Table of Contents**

**MOMO INC.**

**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In thousands of U.S. dollars, except share and share related data, or otherwise noted)**

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2016 |
| Net revenues | $ 44,755 | $ 133,988 | $ 553,098 |
| Cost and expenses: | | | |
| Cost of revenues (including share-based compensation of $155, $915 and $2,785 in 2014, 2015 and 2016, respectively) | (15,762) | (30,312) | (241,463) |
| Research and development (including share-based compensation of $674, $3,502 and $5,646 in 2014, 2015 and 2016, respectively) | (9,264) | (23,265) | (31,399) |
| Sales and marketing (including share-based compensation of $736, $3,780 and $5,880 in 2014, 2015 and 2016, respectively) | (35,538) | (52,631) | (97,173) |
| General and administrative (including share-based compensation of $5,073, $9,185 and $17,395 in 2014, 2015 and 2016, respectively) | (10,354) | (22,879) | (38,983) |
| Total cost and expenses | (70,918) | (129,087) | (409,018) |
| Other operating income | 26 | 713 | 406 |
| (Loss) Income from operations | (26,137) | 5,614 | 144,486 |
| Interest income | 722 | 7,805 | 8,194 |
| Impairment loss on long-term investments | — | — | (5,765) |
| (Loss) Income before income tax and share of income on equity method investments | (25,415) | 13,419 | 146,915 |
| Income tax expense | — | (92) | (5,136) |
| (Loss) Income before share of income on equity method investments | (25,415) | 13,327 | 141,779 |
| Share of income on equity method investments | — | 370 | 3,471 |
| Net (loss) income attributable to Momo Inc. | (25,415) | 13,697 | 145,250 |
| Deemed dividend to preferred shareholders | (57,663) | — | — |
| Net (loss) income attributable to ordinary shareholders | $ (83,078) | $ 13,697 | $ 145,250 |
| Net (loss) income per share attributable to ordinary shareholders | | | |
| Basic | $ (0.97) | $ 0.04 | $ 0.38 |
| Diluted | $ (0.97) | $ 0.03 | $ 0.36 |
| Weighted average shares used in calculating net (loss) income per ordinary share | | | |
| Basic | 85,293,775 | 342,646,282 | 377,335,923 |
| Diluted | 85,293,775 | 401,396,548 | 407,041,165 |

The accompanying notes are an integral part of these consolidated financial statements.

F-4

**Table of Contents**

**MOMO INC.**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE (LOSS) INCOME**
**(In thousands of U.S. dollars, except share and share related data)**

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2016 |
| Net (loss) income attributable to Momo Inc. | $(25,415) | $13,697 | $145,250 |
| Other comprehensive loss, net of tax: | | | |
| Foreign currency translation adjustment | (1,185) | (3,499) | (11,642) |
| Comprehensive (loss) income attributable to Momo Inc. | $(26,600) | $10,198 | $133,608 |

The accompanying notes are an integral part of these consolidated financial statements.

F-5

Table of Contents

MOMO INC.

CONSOLIDATED STATEMENTS OF CHANGES IN (DEFICIT) EQUITY
(In thousands of U.S. dollars, except share and share related data)

| | Ordinary shares | | Additional paid-in capital | Treasury stock | Subscription receivable | (Accumulated deficit)/ Retained earning | Accumulated other comprehensive income (loss) | Total shareholders' (deficit) equity |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Shares | Amount | | | | | | |
| Balance as of January 1, 2014 | 147,000,000 | $ 15 | $ 1,710 | — | $ (15) | $ (24,728) | $ 158 | $ (22,860) |
| Net loss | — | — | — | — | — | (25,415) | — | (25,415) |
| Share-based compensation | — | — | 6,638 | — | — | — | — | 6,638 |
| Repurchase of ordinary shares | (15,651,589) | — | — | (64,494) | — | — | — | (64,494) |
| Issuance of ordinary shares upon Initial public offering ("IPO"), net of offering costs of $4,361 | 45,688,888 | 5 | 286,646 | — | — | — | — | 286,651 |
| Conversion of participating convertible redeemable preferred shares to ordinary shares | 200,718,811 | 20 | 318,684 | — | — | — | — | 318,704 |
| Deemed dividend to preferred shareholders | — | — | — | — | — | (57,663) | — | (57,663) |
| Subscription Receivable | — | — | — | — | 15 | — | — | 15 |
| Foreign currency translation adjustment | — | — | — | — | — | — | (1,185) | (1,185) |
| Balance as of December 31, 2014 | 377,756,110 | $ 40 | $ 613,678 | $(64,494) | $ — | $ (107,806) | $ (1,027) | $ 440,391 |
| Net income | — | — | — | — | — | 13,697 | — | 13,697 |
| Share-based compensation | — | — | 17,382 | — | — | — | — | 17,382 |
| Issuance of ordinary shares in connection with exercise of options and vesting of restricted share units | 5,995,293 | 1 | 414 | — | — | — | — | 415 |
| Foreign currency translation adjustment | — | — | — | — | — | — | (3,499) | (3,499) |
| Balance as of December 31, 2015 | 383,751,403 | $ 41 | $ 631,474 | $(64,494) | $ — | $ (94,109) | $ (4,526) | $ 468,386 |
| Net income | — | — | — | — | — | 145,250 | — | 145,250 |
| Share-based compensation | — | — | 31,706 | — | — | — | — | 31,706 |
| Issuance of ordinary shares in connection with exercise of options and vesting of restricted share units | 5,197,032 | 1 | 318 | — | — | — | — | 319 |
| Foreign currency translation adjustment | — | — | — | — | — | — | (11,642) | (11,642) |
| Balance as of December 31, 2016 | 388,948,435 | $ 42 | $ 663,498 | $(64,494) | $ — | $ 51,141 | $ (16,168) | $ 634,019 |

The accompanying notes are an integral part of these consolidated financial statements.

F-6

**Table of Contents**

**MOMO INC.**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In thousands of U.S. dollars, except share and share related data)**

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2016 |
| Cash flows from operating activities | | | |
| Net (loss) income | $ (25,415) | $ 13,697 | $ 145,250 |
| Adjustments to reconcile net (loss) income to net cash (used in) provided by operating activities | | | |
| Depreciation of property and equipment | 2,805 | 6,646 | 8,404 |
| Share-based compensation | 6,638 | 17,382 | 31,706 |
| Share of income on equity method investments | — | (370) | (3,471) |
| Impairment loss on long-term investments | — | — | 5,765 |
| Loss on disposal of property and equipment | 64 | 5 | 15 |
| Changes in operating assets and liabilities | | | |
| Accounts receivable | (5,205) | (8,538) | (22,978) |
| Prepaid expenses and other current assets | (7,489) | (11,247) | (15,634) |
| Amount due from related parties | 198 | (1,218) | 1,037 |
| Rental deposits | (797) | 38 | (304) |
| Accounts payable | 4,494 | 5,274 | 32,019 |
| Income tax payable | — | — | 3,946 |
| Deferred revenue | 12,825 | 12,996 | 15,546 |
| Accrued expenses and other current liabilities | 5,949 | 20,671 | 15,456 |
| Deferred tax assets, current | — | — | (73) |
| Amount due to related parties | — | 88 | 1,642 |
| Deferred tax assets, non-current | — | — | (211) |
| Other non-current liabilities | — | 1,828 | 196 |
| Net cash (used in) provided by operating activities | (5,933) | 57,252 | 218,311 |
| Cash flows from investing activities | | | |
| Purchase of property and equipment | (8,740) | (13,521) | (7,026) |
| Proceeds from disposal of property and equipment | — | — | 63 |
| Payment for long term investments | (809) | (17,859) | (14,542) |
| Prepayment for long term investments | — | (2,000) | (2,635) |
| Purchase of term deposits | — | (450,000) | (509,612) |
| Cash received on maturity of term deposits | — | 150,000 | 415,404 |
| Net cash used in investing activities | (9,549) | (333,380) | (118,348) |
| Cash flows from financing activities | | | |
| Proceeds from issuance of convertible redeemable participating preferred shares | 211,750 | — | — |
| Repurchase of convertible redeemable participating preferred shares | (30,750) | — | — |
| Proceeds from issuance of ordinary shares | 291,012 | — | — |
| Payment for IPO costs | (1,727) | (2,634) | — |
| Capital contribution from shareholders | 15 | — | — |
| Repurchase of ordinary shares | (58,044) | — | — |
| Deferred payment of purchase of property and equipment | — | — | (319) |
| Proceeds from exercise of share options | — | 401 | 333 |
| Net cash provided by (used in) financing activities | 412,256 | (2,233) | 14 |
| Effect of exchange rate on cash and cash equivalents | (1,180) | (3,138) | (11,882) |
| Net increase (decrease) in cash and cash equivalents | 395,594 | (281,499) | 88,095 |
| Cash and cash equivalents at the beginning of year | 55,374 | 450,968 | 169,469 |
| Cash and cash equivalents at the end of year | $450,968 | $ 169,469 | $ 257,564 |
| Non-cash investing and financing activities | | | |
| Payable for purchase of property and equipment | 1,105 | 765 | 623 |
| Payable for deferred IPO cost | 2,634 | — | — |
| Payable for repurchase of ordinary shares | 6,450 | 6,450 | 6,450 |

The accompanying notes are an integral part of these consolidated financial statements.

**Table of Contents**

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**1.    ORGANIZATION AND PRINCIPAL ACTIVITIES**

Momo Inc. (the "Company", formerly known as Momo Technology Company Limited) is the holding company for a group of companies, which is incorporated in the British Virgin Islands ("BVI") on November 23, 2011. In July 2014, the Company was redomiciled in the Cayman Islands ("Cayman") as an exempted company registered under the laws of the Cayman Islands, and was renamed Momo Inc. The Company, its subsidiaries, its consolidated variable interest entity ("VIE") and VIE's subsidiaries (collectively the "Group") are principally engaged in providing mobile-based social networking services. The Group started its operation in July 2011. The Group started its monetization in the third quarter of 2013, by offering a platform for live video services, value-added service, mobile games and mobile marketing services.

As of December 31, 2016, details of the Company's subsidiaries, VIE and VIE's subsidiaries are as follows:

|  | Date of incorporation | Place of incorporation | Percentage of economic ownership |
|---|---|---|---|
| *Subsidiaries* | | | |
| Momo Technology HK Company Limited ("Momo HK") | December 5, 2011 | Hong Kong | 100% |
| Beijing Momo Information Technology Co., Ltd. ("Beijing Momo IT") | March 9, 2012 | PRC | 100% |
| Momo Technology Overseas Holding Company Limited ("Momo BVI") | March 5, 2014 | BVI | 100% |
| Momo Information Technologies Corp. ("Momo US") | March 7, 2014 | US | 100% |
| *VIE* | | | |
| Beijing Momo Technology Co., Ltd. ("Beijing Momo") | July 7, 2011 | PRC | N/A* |
| *VIE's subsidiaries* | | | |
| Chengdu Momo Technology Co., Ltd. ("Chengdu Momo") | May 9, 2013 | PRC | N/A* |
| Shanghai Momo Technology Co., Ltd. ("Shanghai Momo") | January 19, 2015 | PRC | N/A* |
| Chengdu Biyou Technology Co., Ltd. ("Chengdu Biyou") | October 16, 2015 | PRC | N/A* |
| Tianjin Heer Technology co., ltd ("Tianjin Heer") | March 7, 2016 | PRC | N/A* |
| Momo Pictures Co., Ltd. | November 11, 2016 | PRC | N/A* |
| QOOL Media (Tianjin) Co., Ltd | November 16, 2016 | PRC | N/A* |

\*    These entities are controlled by the Company pursuant to the contractual arrangements disclosed below.

The Company was established on November 23, 2011 with share capital of $15, which was 65% owned by Mr. Yan Tang, 20% owned by Mr. Yong Li, 8% owned by Mr. Xiaoliang Lei, and 7% owned by Mr. Zhiwei Li, (Yan Tang, Yong Li, Xiaoliang Lei and Zhiwei Li are collectively referred to as "Founders") as a vehicle for the group reorganization.

The Group commenced its business in China in July 2011 through Beijing Momo which has subsequently become the Group's VIE through the contractual arrangements described below in "the VIE arrangements".

Beijing Momo was established by the Founders in Beijing, the People's Republic of China ("PRC"), as a limited liability company on July 7, 2011, which was 65% owned by Mr. Yan Tang, 20% owned by Mr. Yong Li, 8% owned by Mr. Xiaoliang Lei, and 7% owned by Mr. Zhiwei Li. Beijing Momo and its subsidiaries principally engaged in the provision of substantially all of the Group's services in the PRC.

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**1.   ORGANIZATION AND PRINCIPAL ACTIVITIES - continued**

The Company owns 100% of the equity interests in Momo HK, an intermediate holding company incorporated in Hong Kong on December 5, 2011, which owns 100% of the equity interests in Beijing Momo IT, a wholly foreign-owned enterprise ("WFOE"), incorporated in the PRC by the Company on March 9, 2012.

The Company entered into a group reorganization by way of entering into a series of contractual arrangements between its WFOE, VIE and the Company on April 18, 2012. Immediately after the reorganization, the Founders controlled the Company, WFOE and Beijing Momo; therefore, the reorganization was accounted for as a transaction among entities under common control. Accordingly, the accompanying audited consolidated financial statements have been prepared by using historical cost basis and include the assets, liabilities, revenue, expenses and cash flows that were directly attributable to Beijing Momo for all periods presented.

In December 2014, the Company completed its IPO and a concurrent private placement, upon which the Company's ordinary shares were divided into Class A ordinary shares and Class B ordinary shares. Holders of Class A ordinary shares are entitled to one vote per share, while holders of Class B ordinary shares are entitled to ten votes per share. Each Class B ordinary share is convertible into one Class A ordinary share at any time by the holder thereof, while Class A ordinary shares are not convertible to Class B ordinary shares under any circumstances. The Company newly issued 45,688,888 Class A ordinary shares, consist of (i) 36,800,000 Class A ordinary shares offered through the IPO, and (ii) 8,888,888 Class A ordinary shares issued in connection with the concurrent private placement. All of the Company's Series A, Series B, Series C and Series D shares were automatically converted upon IPO into 200,718,811 Class A ordinary shares.

The VIE arrangements

PRC regulations currently limit direct foreign ownership of business entities providing value-added telecommunications services, advertising services and internet services in the PRC where certain licenses are required for the provision of such services. To comply with these PRC regulations, Beijing Momo IT and Beijing Momo's shareholders entered into various contractual arrangements whereby the shareholders' claim to the economic benefits of Beijing Momo and their ability to control the activities of Beijing Momo were transferred to Beijing Momo IT.

The Group provides substantially all of its services in China through Beijing Momo, Chengdu Momo and Tianjin Heer, which hold the operating licenses and approvals to enable the Group to provide such mobile internet content services in the PRC. The equity interests of Beijing Momo are legally held by certain employees and shareholders of the Company ("Nominee Shareholders").

F-9

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**1.    ORGANIZATION AND PRINCIPAL ACTIVITIES - continued**

The VIE arrangements - continued

The Company obtained control over Beijing Momo through Beijing Momo IT on April 18, 2012 by entering into a series of contractual arrangements between Beijing Momo IT, Beijing Momo and its Nominee Shareholders that enable the Company to (1) have power to direct the activities that most significantly affects the economic performance of the VIE, and (2) receive the economic benefits of the VIE that could be significant to the VIE. Accordingly, the Company is considered the primary beneficiary of the VIE and has consolidated the VIE's financial results of operations, assets and liabilities in the Company's consolidated financial statements. In making the conclusion that the Company is the primary beneficiary of the VIE, the Company's rights under the Power of Attorney also provide the Company's abilities to direct the activities that most significantly impact the VIE's economic performance. The Company also believes that this ability to exercise control ensures that the VIE will continue to execute and renew the Exclusive Technology Consulting and Management Services Agreement and pay service fees to the Company. By charging service fees in whatever amounts the Company deems fit, and by ensuring that the Exclusive Technology Consulting and Management Services Agreement is executed and renewed indefinitely, the Company has the rights to receive substantially all of the economic benefits from the VIE.

To further strengthen the Company's corporate structure, the Group amended its Power of Attorney, Exclusive Call Option Agreement and Equity Interest Pledge Agreement with the Nominee Shareholders and also entered into the Spousal Consent Letters with the Nominee Shareholders in April 2014, and amended the Exclusive Cooperation Agreements and Supplemental Agreements in August 2014. There was no substantial change to the term and condition of the VIE agreements and the change had no impact on to the Company's VIE consolidation. The following is a summary of the contractual agreements that the Company, through Beijing Momo IT, entered into with Beijing Momo and its Nominee Shareholders, as amended and entered into on April 18, 2014 and August 31, 2014:

Agreements that provide the Company effective control over the VIE:

(1)    Power of Attorney

Pursuant to the Power of Attorney, the Nominee Shareholders of Beijing Momo each irrevocably appointed Beijing Momo IT as the attorney-in-fact to act on their behalf on all matters pertaining to Beijing Momo and to exercise all of their rights as a shareholder of Beijing Momo, including but not limited to convene, attend and vote on their behalf at shareholders' meetings, designate and appoint directors and senior management members. Beijing Momo IT may authorize or assign its rights under this appointment to a person as approved by its board of directors at its sole discretion. Each power of attorney will remain in force until the shareholder ceases to hold any equity interest in Beijing Momo. The Company believes the Powers of Attorney can demonstrate the power of its PRC subsidiary (Beijing Momo IT) to direct how the VIE should conduct its daily operations.

F-10

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**1.    ORGANIZATION AND PRINCIPAL ACTIVITIES - continued**

The VIE arrangements - continued

Agreements that provide the Company effective control over the VIE: - continued

(2)    Exclusive Call Option Agreement

Under the Exclusive Call Option Agreement among Beijing Momo IT, Beijing Momo and Nominee Shareholders of Beijing Momo, each of the Nominee Shareholders irrevocably granted Beijing Momo IT or its designated representative(s) an exclusive option to purchase, to the extent permitted under PRC law, all or part of his, her or its equity interests in Beijing Momo at the consideration equal to the nominal price or at lowest price as permitted by PRC laws.

Beijing Momo IT or its designated representative(s) have sole discretion as to when to exercise such options, either in part or in full. Without Beijing Momo IT's written consent, the Nominee Shareholders of Beijing Momo shall not transfer, donate, pledge, or otherwise dispose any equity interests of Beijing Momo in any way. In addition, any consideration paid by Beijing Momo IT to the Nominee Shareholders of Beijing Momo in exercising the option shall be transferred back to Beijing Momo IT or its designated representative(s). This agreement could be terminated when all the shareholders' equity were acquired by the WFOE or its designated representative(s) subject to the law of People's Republic of China.

In addition, Beijing Momo irrevocably granted Beijing Momo IT an exclusive and irrevocable option to purchase any or all of the assets owned by Beijing Momo at the lowest price permitted under PRC law. Without Beijing Momo IT's prior written consent, Beijing Momo and its Nominee Shareholders will not sell, transfer, mortgage or otherwise dispose of Beijing Momo's material assets, legal or beneficial interests or revenues of more than RMB500,000 or allow an encumbrance on any interest in Beijing Momo.

(3)    Spousal Consent Letters

On April 18, 2014, each spouse of the married Nominee Shareholders of Beijing Momo entered into a Spousal Consent Letter, which unconditionally and irrevocably agreed that the equity interests in Beijing Momo held by and registered in the name of their spouse will be disposed of pursuant to the Equity Interest Pledge Agreement, the Exclusive Call Option Agreement, and the Power of Attorney. Each spouse agreed not to assert any rights over the equity interests in Beijing Momo held by their spouse. In addition, in the event that the spouse obtains any equity interests in Beijing Momo held by their spouse for any reason, they agreed to be bound by the contractual arrangements.

F-11

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

1.    **ORGANIZATION AND PRINCIPAL ACTIVITIES - continued**

The VIE arrangements - continued

Agreements that transfer economic benefits to the Company:

(1)    Exclusive Cooperation Agreements and Supplemental Agreements

In August 2014, Beijing Momo IT entered into an Exclusive Cooperation Agreements and a Supplemental Agreement with Beijing Momo and Chengdu Momo, respectively, to supersede the Exclusive Technology Consulting and Management Services Agreements signed in April 2012 by Beijing Momo IT and Beijing Momo. In May 2016, Beijing Momo IT entered into an Exclusive Cooperation Agreement and a Supplemental Agreement with Tianjin Heer. Pursuant to the agreements, Beijing Momo IT has the exclusive right to provide, among other things, licenses, copyrights, technical and non-technical services to Beijing Momo, Chengdu Momo and Tianjin Heer and receive service fees and license fees as consideration. Beijing Momo, Chengdu Momo and Tianjin Heer will maintain a pre-determined level of operating profit and remit the excess operating profit, if any, to Beijing Momo IT as the consideration of the licenses, copyrights, technical and non-technical services provided by Beijing Momo IT. The agreements will remain effective for 10 years. At the sole discretion of Beijing Momo IT, the agreements could be renewed on applicable expirations dates, or Beijing Momo IT, Beijing Momo, Chengdu Momo and Tianjin Heer could enter into other exclusive agreements.

For the years ended December 31, 2014, 2015 and 2016, Beijing Momo IT charged Beijing Momo, Chengdu Momo and Tianjin Heer a service fee of $35,188, $112,043 and $319,018 at the WFOE's discretion, respectively.

Since Beijing Momo IT has effectively controlled Beijing Momo through Power of Attorney, Equity Interest Pledge Agreement and Exclusive Call Option Agreement, Beijing Momo IT has the right to adjust the service fees at its sole discretion. The agreement shall remain effective for ten years. At the discretion of Beijing Momo IT, this agreement could be renewed on applicable expiration dates, or Beijing Momo IT and Beijing Momo could enter into another exclusive agreement.

(2)    Equity Interest Pledge Agreement

Under the equity interest pledge agreement among Beijing Momo IT and each of the Nominee Shareholders of Beijing Momo, the Nominee Shareholders pledged all of their equity interests in Beijing Momo to Beijing Momo IT to guarantee Beijing Momo's and its shareholders' payment obligations arising from the Exclusive Technology Consulting and Management Service Agreement, Business Operation Agreement and Exclusive Call Option Agreement, including but not limited to, the payments due to Beijing Momo IT for services provided.

F-12

**Table of Contents**

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

1.   **ORGANIZATION AND PRINCIPAL ACTIVITIES - continued**

The VIE arrangements - continued

Agreementsthat transfer economic benefits to the Company: - continued

(2)   Equity Interest Pledge Agreement - continued

If Beijing Momo or any of its Nominee Shareholders breaches its contractual obligations under the above agreements, Beijing Momo IT, as the pledgee, will be entitled to certain rights and entitlements, including receiving priority proceeds from the auction or sale of whole or part of the pledged equity interests of Beijing Momo in accordance with PRC legal procedures. During the term of the pledge, the shareholders of Beijing Momo shall cause Beijing Momo not to distribute any dividends and if they receive any dividends generated by the pledged equity interests, they shall transfer such received amounts to an account designated by Beijing Momo IT according to the instruction of Beijing Momo IT.

The pledge will remain binding until Beijing Momo and its Nominee Shareholders has fully performed all their obligations under the Exclusive Cooperation Agreements and Supplemental Agreements, Business Operations Agreement and Exclusive Call Option Agreement.

(3)   Business Operations Agreement

Under the Business Operations Agreement among Beijing Momo IT, Beijing Momo and the Nominee Shareholders of Beijing Momo, without the prior written consent of Beijing Momo IT or its designated representative(s), Beijing Momo shall not conduct any transaction that may substantially affect the assets, business, operation or interest of Beijing Momo IT. Beijing Momo and Nominee Shareholders shall also follow Beijing Momo IT's instructions on management of Beijing Momo's daily operation, finance and employee matters and appoint the nominee(s) designated by Beijing Momo IT as the director(s) and senior management members of Beijing Momo. In the event that any agreements between Beijing Momo IT and Beijing Momo terminates, Beijing Momo IT has the sole discretion to determine whether to continue any other agreements with Beijing Momo. Beijing Momo IT is entitled to any dividends or other interests declared by Beijing Momo and the shareholders of Beijing Momo have agreed to promptly transfer such dividends or other interests to Beijing Momo IT. The agreement shall remain effective for 10 years. At the discretion of Beijing Momo IT, this agreement will be renewed on applicable expiration dates, or Beijing Momo IT and Beijing Momo will enter into another exclusive agreement.

Through these contractual agreements, the Company has the ability to effectively control the VIE and is also able to receive substantially all the economic benefits of the VIE.

F-13

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**1.   ORGANIZATION AND PRINCIPAL ACTIVITIES - continued**

Risk in relation to the VIE structure

The Company believes that Beijing Momo IT and Beijing Momo's contractual arrangements with the VIE are in compliance with PRC law and are legally enforceable. The shareholders of Beijing Momo are also shareholders of the Company and therefore have no current interest in seeking to act contrary to the contractual arrangements. However, uncertainties in the PRC legal system could limit the Company's ability to enforce these contractual arrangements and if the shareholders of the VIE were to reduce their interest in the Company, their interests may diverge from that of the Company and that may potentially increase the risk that they would seek to act contrary to the contractual terms, for example by influencing the VIE not to pay the service fees when required to do so.

However, the Company cannot assure that when conflicts of interest arise, the shareholders will act in the best interests of the Company or that conflicts of interests will be resolved in the Company's favor. Currently, the Company does not have existing arrangements to address potential conflicts of interest the shareholders of the VIE may encounter in their capacity as the beneficial owners and director of the VIE on the one hand, and as beneficial owners and directors or officer of the Company, on the other hand. The Company believes the shareholders of the VIE will not act contrary to any of the contractual arrangements and the Exclusive Call Option Agreement provides the Company with a mechanism to remove the shareholders as the beneficial shareholders of the VIE should they act to the detriment of the Company. The Company relies on the VIE's shareholders, as directors and officer of the Company, to fulfill their fiduciary duties and abide by laws of the PRC and the Cayman and act in the best interest of the Company. If the Company cannot resolve any conflicts of interest or disputes between the Company and the VIE's shareholders, the Company would have to rely on legal proceedings, which could result in disruption of its business, and there is substantial uncertainty as to the outcome of any such legal proceedings.

The Company's ability to control the VIE also depends on the Power of Attorney. Beijing Momo IT and Beijing Momo have to vote on all matters requiring shareholder approval in the VIE. As noted above, the Company believes this power of attorney is legally enforceable but may not be as effective as direct equity ownership.

In addition, if the legal structure and contractual arrangements were found to be in violation of any existing PRC laws and regulations, the PRC government could:

- revoke the Group's business and operating licenses;

- require the Group to discontinue or restrict operations;

- restrict the Group's right to collect revenues;

- block the Group's websites;

- require the Group to restructure the operations in such a way as to compel the Group to establish a new enterprise, re-apply for the necessary licenses or relocate our businesses, staff and assets;

- impose additional conditions or requirements with which the Group may not be able to comply; or

- take other regulatory or enforcement actions against the Group that could be harmful to the Group's business.

F-14

**Table of Contents**

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

1.    **ORGANIZATION AND PRINCIPAL ACTIVITIES - continued**

Risk in relation to the VIE structure - continued

The imposition of any of these penalties may result in a material and adverse effect on the Group's ability to conduct the Group's business. In addition, if the imposition of any of these penalties causes the Group to lose the rights to direct the activities of the VIE or the right to receive their economic benefits, the Group would no longer be able to consolidate the VIE. The Group does not believe that any penalties imposed or actions taken by the PRC government would result in the liquidation of the Company, Beijing Momo IT, or the VIE.

The following consolidated financial statements amounts and balances of the VIE were included in the accompanying consolidated financial statements after the elimination of intercompany balances and transactions as of and for the years ended December 31:

| | As of December 31, | |
| --- | --- | --- |
| | 2015 | 2016 |
| Cash and cash equivalents | $ 60,526 | $ 36,855 |
| Accounts receivable, net of allowance for doubtful accounts of $nil and $nil as of December 31, 2015 and 2016, respectively | 14,896 | 36,078 |
| Amount due from related parties | 1,175 | 88 |
| Prepaid expenses and other current assets | 9,495 | 20,613 |
| Deferred tax assets, current | — | 72 |
| Total current assets | 86,092 | 93,706 |
| Property and equipment, net | 1,538 | 1,854 |
| Rental deposits | 244 | 325 |
| Other non-current assets | — | 2,593 |
| Long term investments | 19,318 | 26,541 |
| Deferred tax assets, non-current | — | 208 |
| Total assets | 107,192 | 125,227 |
| Accounts payable | 9,040 | 36,812 |
| Deferred revenue | 28,274 | 41,277 |
| Accrued expenses and other current liabilities | 1,954 | 6,632 |
| Amounts due to related parties | — | 1,510 |
| Income tax payable | — | 3,881 |
| Total current liabilities | 39,268 | 90,112 |
| Total liabilities | $ 39,268 | $ 90,112 |

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2016 |
| Net revenues | $44,755 | $133,988 | $553,098 |
| Net income | $32,945 | $118,404 | $340,366 |
| Net cash provided by operating activities | $40,383 | $124,786 | $360,433 |
| Net cash used in investing activities | $(1,921) | $(19,435) | $(11,027) |
| Net cash used in financing activities | $ — | $ — | $ — |

The unrecognized revenue-producing assets that are held by the VIE are primarily self-developed intangible assets such as domain names, trademark and various licenses which are un-recognized at consolidated balance sheets.

F-15

**Table of Contents**

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**1.    ORGANIZATION AND PRINCIPAL ACTIVITIES - continued**

Risk in relation to the VIE structure - continued

The VIE contributed an aggregate of 100%, 100% and 100% of the consolidated net revenues for the years ended December 31, 2014, 2015 and 2016, respectively. As of the fiscal years ended December 31, 2015 and 2016, the VIE accounted for an aggregate of 19.8% and 16.3%, respectively, of the consolidated total assets, and 53.2% and 66.4%, respectively, of the consolidated total liabilities. The assets that were not associated with the VIE primarily consist of cash and cash equivalents, and term deposits.

There are no consolidated VIE's assets that are collateral for the VIE's obligations and can only be used to settle the VIE's obligations. There are no creditors (or beneficial interest holders) of the VIE that have recourse to the general credit of the Company or any of its consolidated subsidiaries. There are no terms in any arrangements, considering both explicit arrangements and implicit variable interests, that require the Company or its subsidiaries to provide financial support to the VIE. However, if the VIE ever needs financial support, the Company or its subsidiaries may, at its option and subject to statutory limits and restrictions, provide financial support to its VIE through loans to the shareholders of the VIE or entrustment loans to the VIE. Relevant PRC laws and regulations restrict the VIE from transferring a portion of its net assets, equivalent to the balance of its statutory reserve and its share capital, to the Company in the form of loans and advances or cash dividends. Please refer to Note 18 for disclosure of restricted net assets. The Group may lose the ability to use and enjoy assets held by the VIE that are important to the operation of business if the VIE declares bankruptcy or becomes subject to a dissolution or liquidation proceeding.

**2.    SIGNIFICANT ACCOUNTING POLICIES**

Basis of presentation

The consolidated financial statements of the Group have been prepared in accordance with the accounting principles generally accepted in the United States of America ("U.S. GAAP").

Basis of consolidation

The consolidated financial statements of the Group include the financial statements of Momo Inc., its subsidiaries, its VIE and VIE's subsidiaries. All inter-company transactions and balances have been eliminated upon consolidation.

F-16

**Table of Contents**

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**2.    SIGNIFICANT ACCOUNTING POLICIES - continued**

Use of estimates

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and revenues, cost and expenses in the financial statements and accompanying notes. Significant accounting estimates reflected in the Group's consolidated financial statements include revenue recognition, the useful lives and impairment of property and equipment, valuation allowance for deferred tax assets, share-based compensation and fair value of the ordinary shares and convertible redeemable participating preferred shares.

Cash and cash equivalents

Cash and cash equivalents consist of cash on hand and highly liquid investments, which are unrestricted from withdrawal or use, or which have original maturities of three months or less when purchased.

Term deposits

Term deposits consist of bank deposits with an original maturity of over three months.

Accounts receivable

Accounts receivable primarily represents the cash due from third-party application stores and other payment channels and advertising customers, net of allowance for doubtful accounts. The Group makes estimates for the allowance for doubtful accounts based upon its assessment of various factors, including the age of accounts receivable balances, credit quality of third-party application stores and other payment channels and advertising customers, current economic conditions and other factors that may affect their ability to pay. An allowance for doubtful accounts is recorded in the period in which a loss is determined to be probable. As of December 31, 2015 and 2016, the Company has determined the risk of uncollected receivable is remote.

Financial instruments

Financial instruments of the Group primarily consist of cash and cash equivalents, term deposits, accounts receivable, cost method investments, available-for-sale investments, accounts payable, deferred revenue, income tax payable, amount due from related parties and amount due to related parties.

Cash and cash equivalents are recorded at fair value based on the quoted market price in an active market. The carrying values of term deposits, accounts receivable, accounts payable, deferred revenue, income tax payable, amount due from related parties and amount due to related parties approximate their fair values due to short-term maturities. It is not practical to estimate the fair value of the Group's cost method investments because of the lack of quoted market price and the inability to estimate fair value without incurring excessive costs. Available-for-sale investments are reported at fair value, which is discussed in Note 8.

**Table of Contents**

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**2.   SIGNIFICANT ACCOUNTING POLICIES - continued**

Foreign currency risk

The Renminbi ("RMB") is not a freely convertible currency. The State Administration for Foreign Exchange, under the authority of the People's Bank of China, controls the conversion of RMB into foreign currencies. The value of the RMB is subject to changes in central government policies and to international economic and political developments affecting supply and demand in the China Foreign Exchange Trading System market. Cash and cash equivalents of the Group included aggregate amounts of $75,759 and $245,853 as of December 31, 2015 and 2016, respectively, which were denominated in RMB.

Concentration of credit risk

Financial instruments that potentially expose the Group to concentration of credit risk consist primarily of cash and cash equivalents, term deposits and accounts receivable. The Group places their cash with financial institutions with high-credit ratings and quality.

Third-party application stores and other payment channels accounting for 10% or more of accounts receivables are as follows:

|  | As of December 31, | |
| --- | --- | --- |
|  | 2015 | 2016 |
| A | 31% | 40% |
| B | 8% | 22% |
| C | 1% | 15% |

No user or advertising customer accounted for 10% or more of accounts receivables for the years ended December 31, 2015 and 2016, respectively.

Concentration of revenue

The following table summarizes sales generated from games that individually accounting for 10% or more of net revenues:

|  | For the years ended December 31, | | |
| --- | --- | --- | --- |
|  | 2014 | 2015 | 2016 |
| Game D | 14% | 2% | less than 1% |

No user or advertising customer accounted for 10% or more of net revenues for the years ended December 31, 2014, 2015 and 2016, respectively.

**Table of Contents**

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**2.    SIGNIFICANT ACCOUNTING POLICIES - continued**

Cost method investments

For investments in an investee over which the Company does not have significant influence, the Company carries the investment at cost and recognizes income as any dividends declared from distribution of investee's earnings. The Company reviews the cost method investments for impairment whenever events or changes in circumstances indicate that the carrying value may no longer be recoverable. An impairment loss is recognized in earnings equal to the difference between the investment's cost and its fair value at the balance sheet date of the reporting period for which the assessment is made. The fair value of the investment would then become the new cost basis of the investment.

Equity method investments

The investee company over which the Group has the ability to exercise significant influence, but does not have a controlling interest are accounted for using the equity method. Significant influence is generally considered to exist when the Group has an ownership interest in the voting stock of the investee between 20% and 50%. Other factors, such as representation in the investee's Board of Directors, voting rights and the impact of commercial arrangements, are also considered in determining whether the equity method of accounting is appropriate. For the investment in limited partnerships, where the Group holds less than a 20% equity or voting interest, the Group's influence over the partnership operating and financial policies is determined to be more than minor. Accordingly, the Group accounts for these investments as equity method investments.

Under the equity method of accounting, the affiliated company's accounts are not reflected within the Group's consolidated balance sheets and statements of operations; however, the Group's share of the earnings or losses of the affiliated company is reflected in the caption "share income on equity method investments" in the consolidated statements of operations.

An impairment change is recorded if the carrying amount of the investment exceeds its fair value and this condition is determined to be other-than-temporary.

The Group estimates the fair value of the investee company based on comparable quoted price for similar investment in active market, if applicable, or discounted cash flow approach which requires significant judgments, including the estimation of future cash flows, which is dependent on internal forecasts, the estimation of long term growth rate of a company's business, the estimation of the useful life over which cash flows will occur, and the determination of the weighted average cost of capital.

Available-for-sale Investments

For investments in investees' stocks which are determined to be debt securities, the Group accounts for them as long-term available-for-sale investments when they are not classified as either trading or held-to-maturity investments.

Available-for-sale investments are reported at fair value, with unrealized gains and losses recorded in accumulated other comprehensive income (loss) as a component of shareholders' equity. Realized gains and losses and provision for decline in value judged to be other than temporary, if any, are recognized in the consolidated statements of operations.

F-19

**Table of Contents**

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**2.    SIGNIFICANT ACCOUNTING POLICIES - continued**

Available-for-sale Investments - continued

The Group continually reviews its available-for-sale investments to determine whether a decline in fair value below the carrying value is other than temporary. The primary factors the Group considers in its determination are the length of time that the fair value of the investment is below the Group's carrying value; the financial condition, operating performance and the prospects of the available-for-sale investee; and other specific information such as recent financing rounds. If the decline in fair value is deemed to be other than temporary, the carrying value of the available-for-sale investee is written down to fair value. The Group estimated the fair value of these investee companies based on discounted cash flow approach which requires significant judgments, including the estimation of future cash flows, which is dependent on internal forecasts, the estimation of long term growth rate of a company's business, the estimation of the useful life over which cash flows will occur, and the determination of the weighted average cost of capital.

Property and equipment, net

Property and equipment are stated at cost less accumulated depreciation. Depreciation is calculated on a straight-line basis over the following estimated useful lives:

| | |
|---|---|
| Office equipment | 3-5 years |
| Computer equipment | 3 years |
| Vehicles | 5 years |
| Leasehold improvement | Shorter of the lease term or estimated useful lives |

Impairment of long-lived assets

The Group reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may no longer be recoverable. When these events occur, the Group measures impairment by comparing the carrying value of the long-lived assets to the estimated undiscounted future cash flows expected to result from the use of the assets and their eventual disposition. If the sum of the expected undiscounted cash flow is less than the carrying amount of the assets, the Group would recognize an impairment loss based on the fair value of the assets.

Fair value

Fair value is the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. When determining the fair value measurements for assets and liabilities required or permitted to be recorded at fair value, the Group considers the principal or most advantageous market in which it would transact and it considers assumptions that market participants would use when pricing the asset or liability.

Authoritative literature provides a fair value hierarchy that requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value. An asset or liability categorization within the fair value hierarchy is based upon the lowest level of input that is significant to the fair value measurement as follows:

F-20

**Table of Contents**

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**2.    SIGNIFICANT ACCOUNTING POLICIES - continued**

Fair value - continued

*Level 1*

Level 1 applies to assets or liabilities for which there are quoted prices in active markets for identical assets or liabilities.

*Level 2*

Level 2 applies to assets or liabilities for which there are inputs other than quoted prices included within Level 1 that are observable for the assets or liabilities such as quoted prices for similar assets or liabilities in active markets; quoted prices for identical assets or liabilities in markets with insufficient volume or infrequent transactions (less active markets); or model-derived valuations in which significant inputs are observable or can be derived principally from, or corroborated by, observable market data.

*Level 3*

Level 3 applies to assets or liabilities for which there are unobservable inputs to the valuation methodology that are significant to the measurement of the fair value of the assets or liabilities.

Revenue recognition

The Group recognizes revenue when a persuasive evidence of an arrangement exists, delivery has occurred, the sales price is fixed or determinable, and collectability is reasonably assured. The Group principally derives its revenue from live video service, value-added services, mobile marketing services, mobile games and other services.

(a)    Live video service

The Group provides live video service whereby users can enjoy live performances and interact with the broadcasters for free, and have the option of purchasing in-show virtual items. Broadcasters can either host the performance on their own or join a broadcaster agency. Users purchase virtual gifts from the Group and present them simultaneously to broadcasters to show their support. The Group determines the virtual items price and generates revenue from sales of virtual gifts upon purchase. Under the arrangements with broadcasters or broadcaster agencies, the Group shares with them a portion of the revenues derived from the sales of virtual gifts. Revenues derived from the sale of virtual gifts are recorded on a gross basis as the Group has determined that it acts as the principal to fulfill all obligations related to the live video services. The portion paid to broadcasters and/or broadcaster agencies is recognized as cost of revenues.

Net revenues of $nil, $1,231 and $376,925 were recognized for live video services for the years ended December 31, 2014, 2015 and 2016, respectively.

F-21

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

2.    **SIGNIFICANT ACCOUNTING POLICIES - continued**

Revenue recognition - continued

(b)    Value-added services

Value-added services revenues include membership subscription revenue and virtual gift service revenues. Membership subscription is a service package which enables members to enjoy additional functions and privileges. The contract period for the membership subscription ranges from one month to one year. All membership subscription is nonrefundable. The Group collects membership subscription in advance and records it as deferred revenue. Revenue is recognized ratably over the contract period for the membership subscription services.

Virtual gift services was launched in 2016 to enhance users' experience of interaction and social networking with each other. Users purchase virtual gifts and send the virtual gifts simultaneously to other users. Revenue recognized related to virtual gift services is insignificant for each of the year presented.

Net revenues of $29,756, $58,462 and $67,603 were recognized for value-added services for the years ended December 31, 2014, 2015 and 2016, respectively.

(c)    Mobile marketing

The Group provides advertising and marketing solutions to customers for promotion of their brands and conduction of effective marketing activities through its mobile application.

Display-based mobile marketing services

For display-based online advertising services such as banners and location-based advertising on the mobile applications, the Group recognizes revenue ratably over the period that the advertising is provided commencing on the date the customer's advertisement is displayed, or on the number of times that the advertisement has been displayed for cost per thousand impressions advertising arrangements.

Performance-based mobile marketing services

The Group enables advertising customers to place link on its mobile platform on a pay-for-effectiveness basis, which is referred to as the cost for performance model. The Group charges fees to advertising customers based on the effectiveness of advertising links, which is measured by active clicks. Revenue is estimated by the Group based on its internal data, which is confirmed with respective customers, or is recognized based on a fixed unit price.

The Group's revenue transactions are based on standard business terms and conditions, which are recognized net of agency rebates, if applicable.

Net revenues of $1,975, $38,885 and $66,339 were recognized for mobile marketing for the years ended December 31, 2014, 2015 and 2016, respectively.

F-22

**Table of Contents**

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**2.    SIGNIFICANT ACCOUNTING POLICIES - continued**

Revenue recognition - continued

(d)    Mobile games

The Group publishes both licensed mobile games developed by third-party game developers and its self-developed games to the game players through its mobile application.

*Licensed mobile games*

The Group generates revenue from offering services of mobile games developed by third-party game developers. All of the licensed games can be accessed and played by game players directly through the Group's mobile game platform. The Group primarily views the game developers to be its customers and considers its responsibility under its agreements with the game developers to be promotion of the game developers' games. The Group generally collects payments from game players in connection with the sale of in-game currencies and remits certain agreed-upon percentages of the proceeds to the game developers and records revenue net of remittances. Purchases of in-game currencies are not refundable after they have been sold unless there is unused in-game currencies at the time a game is discontinued. Typically, a game will only be discontinued when the monthly revenue generated by a game becomes consistently insignificant. The Group does not currently expect to pay any material cash refunds to game players or game developers in connection with a discontinued game.

*Licensed mobile games - Non-exclusive mobile games services*

The Group enters into non-exclusive agreements with the game developers and offers the Group's mobile game platform for the mobile games developed by the game developers. The Group has determined that it has no additional performance obligation to the developers or game players upon players' completion of the corresponding in-game purchase. Therefore, revenues from the sale of in-game currencies are primarily recorded net of remittances to game developers and commission fees made to third-party application stores and other payment channels and deferred until the estimated consumption date by individual game (i.e., the estimated date in-game currencies are consumed within the game), which is typically within a short period of time ranging from zero to six days after the purchase of the in-game currencies.

F-23

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**2.    SIGNIFICANT ACCOUNTING POLICIES - continued**

Revenue recognition - continued

(d)    Mobile games - continued

*Licensed mobile games - Exclusive mobile games services*

The Group enters into exclusive agreements with the game developers and provides the Group's mobile game platform for the mobile games developed by the game developers. Under the exclusive agreements, the players can access to the games only through the Group's platform. The Group has determined that it is obligated to provide mobile games services to game players who purchased virtual items to gain an enhanced game-playing experience over an average period of player relationship. Hence, the Group believes that its performance for, and obligation to, the game developers correspond to the game developers' services to the players. The Group does not have access to the data on the consumption details and the types of virtual items purchased by the game players. Therefore, the Group cannot estimate the economic life of the virtual item. However, the Group maintains data of when a particular player purchases the virtual items and logs into the games. The Group has adopted a policy to recognize revenues net of remittances to game developers and commission fees made to third-party application stores and other payment channels over the estimated period of player relationship on a game-by-game basis. As of December 31, 2015 and 2016, the Group operated seven and six games under exclusive arrangements and the estimated periods of the player relationship is in a range of 20 to 75 and 20 to 99 days, respectively.

*Self-developed mobile game*

In February 2015, the Group launched one self-developed game on its platform and started to generate revenues by in-game sales of virtual item. The Group has determined that an obligation exists to the players who purchased the virtual items to gain an enhanced game-playing experience over the playing period of the paying players, and accordingly, recognized the revenues ratably over the estimated average period of player relationship starting from the point in time when the players purchase the virtual items, and all other revenue recognition criteria are met. As of December 31, 2015 and 2016, the Group operated one and six self-developed mobile games and the estimated periods of the player relationship is 56 days and in a range of 20 to 110 days, respectively.

Revenues derived from the self-developed game are recorded on a gross basis as the Group acts as a principal to fulfill all obligations related to the mobile game operation. Commission fees paid to third-party application stores and other payment channels are recorded as cost of revenues.

Net revenues of $11,237, $31,082 and $35,453 were recognized for mobile games for the years ended December 31, 2014, 2015 and 2016, respectively.

F-24

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**2.    SIGNIFICANT ACCOUNTING POLICIES - continued**

Revenue recognition - continued

(e)    Other service

Other service primarily includes Duobao service and paid emoticons.

Advertising barter transactions

The Group engages in barter transactions where it trades advertising resources with certain third parties for other advertising resources and goods. The Group recognizes revenues and expenses at fair value only if the fair value of the services exchanged in the transaction is determinable based on the Group's own historical practice of receiving cash or other consideration that is readily convertible to a known amount of cash for similar advertising resources from customers unrelated to the party in the barter transaction. When the fair value of the transactions is not determinable due to the lack of the Group's similar historical practice, the advertising barter transactions shall be recorded based on the carrying amount of the advertising surrendered which is the estimated cost to be incurred, or the fair value of the assets received. Advertising barter transactions were insignificant for all the years presented.

Deferred revenue

Deferred revenue primarily includes cash received in advance from users and advertising customers. The unused cash balances remaining in users' and advertising customers' accounts are recorded as a liability. Deferred revenue related to prepayments from users and advertising customers will be recognized as revenue when all of the revenue recognition criteria are met.

Cost of revenues

Cost of revenues consist of expenditures incurred in the generation of the Group's revenues, including but not limited to revenue sharing with the broadcasters and broadcaster agencies related to live video service, commission fee paid to third-party application stores and other payment channels except for those paid related to licensed mobile games which are recorded net of revenue, bandwidth costs, salaries and benefits paid to employee, short messaging service charges and depreciation. These costs are expensed as incurred except for the direct and incremental platform commission fees to third-party application stores and other payment channels which are deferred in "Prepaid expenses and other current assets" on the consolidated balance sheets. The deferred platform commissions are recognized in the consolidated statements of operations in "Cost of revenues" in the period in which the related revenues are recognized.

F-25

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**2.    SIGNIFICANT ACCOUNTING POLICIES - continued**

Government subsidies

The Group records government subsidies as other income when received from local government authority and they are not subject to any further performance obligations or future returns. When government subsidies are received and include future performance obligations, the Group recognizes those as liabilities until the performances obligations have been met at which time, those are recognized as other income. Government subsidies recorded as other income amounted to $nil, $nil and $293 for the years ended December 31, 2014, 2015 and 2016.

Research and development expenses

Research and development expenses primarily consist of (i) salaries and benefits for research and development personnel, and (ii) office rental, general expenses and depreciation expenses associated with the research and development activities. The Group's research and development activities primarily consist of the research and development of new features for its mobile platform and its self-developed mobile games. The Group has expensed all research and development expenses when incurred.

Value added taxes ("VAT")

Entities that are VAT general taxpayers are allowed to offset qualified input VAT paid to suppliers against their output VAT liabilities. Net VAT balance between input VAT and output VAT is recorded in accrued expenses and other current liabilities on the consolidated balance sheets. VAT is also reported as a deduction to revenue when incurred and amounted to $5,436, $16,951 and $55,353 for the years ended December 31, 2014, 2015 and 2016, respectively.

Income taxes

Current income taxes are provided for in accordance with the laws of the relevant tax authorities. Deferred income taxes are recognized when temporary differences exist between the tax bases of assets and liabilities and their reported amounts in the consolidated financial statements. Net operating loss carry forwards and credits are applied using enacted statutory tax rates applicable to future years. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more-likely-than-not that a portion of or all of the deferred tax assets will not be realized. The components of the deferred tax assets and liabilities are individually classified as current and non-current based on their characteristics.

The impact of an uncertain income tax position on the income tax return is recognized at the largest amount that is more-likely than- not to be sustained upon audit by the relevant tax authority. An uncertain income tax position will not be recognized if it has less than a 50% likelihood of being sustained. Interest and penalties on income taxes will be classified as a component of the provisions for income taxes. The Group recognized income tax expense amounted to $nil, $92 and $5,136 for the years ended December 31, 2014, 2015 and 2016, respectively.

F-26

**Table of Contents**

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**2.    SIGNIFICANT ACCOUNTING POLICIES - continued**

Foreign currency translation

The functional and reporting currency of the Company is the United States dollar ("U.S. dollar"). The financial records of the Group's subsidiaries, VIE and VIE's subsidiaries located in the PRC are maintained in their local currencies, the RMB, which are also the functional currencies of these entities.

Monetary assets and liabilities denominated in currencies other than the functional currency are translated into the functional currency at the rates of exchange in place at the balance sheet date. Transactions in currencies other than the functional currency during the year are converted into the functional currency at the applicable rates of exchange prevailing when the transactions occurred. Transaction gains and losses are recognized in the consolidated statement of operations.

The Group's entities with functional currency of RMB, translate their operating results and financial positions into the U.S. dollar, the Group's reporting currency. Assets and liabilities are translated using the exchange rates in effect on the balance sheet date. Revenues, expenses, gains and losses are translated using the average rate for the year. Translation adjustments are reported as cumulative translation adjustments and are shown as a separate component of comprehensive loss.

Operating leases

Leases where the rewards and risks of ownership of assets primarily remain with the lessor are accounted for as operating leases. Payments made under operating leases are charged to the consolidated statements of operations on a straight-line basis over the lease periods.

Advertising expenses

The Group expenses advertising expenses as incurred. Total advertising expenses incurred were $27,408, $27,793 and $55,188 for the years ended December 31, 2014, 2015 and 2016, respectively, and have been included in sales and marketing expenses in the consolidated statements of operations.

Comprehensive (loss) income

Comprehensive (loss) income includes net (loss) income, unrealized gain or loss on available-for-sale investments and foreign currency translation adjustments. Comprehensive (loss) income is reported in the consolidated statements of comprehensive (loss) income.

Share-based compensation

Share-based payment transactions with employees and executives are measured based on the grant date fair value of the equity instrument issued and recognized as compensation expense net of a forfeiture rate on a straight-line basis, over the requisite service period, with a corresponding impact reflected in additional paid-in capital.

Share awards issued to consultants are measured at fair value at the earlier of the commitment date or the date the services are completed and recognized over the period the services are provided.

F-27

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**2.    SIGNIFICANT ACCOUNTING POLICIES - continued**

Share-based compensation - continued

The estimate of forfeiture rate will be adjusted over the requisite service period to the extent that actual forfeiture rate differs, or is expected to differ, from such estimates. Changes in estimated forfeiture rate will be recognized through a cumulative catch-up adjustment in the period of change.

Changes in the terms or conditions of share options are accounted as a modification under which the Group calculates whether there is any excess of the fair value of the modified option over the fair value of the original option immediately before its terms are modified, measured based on the share price and other pertinent factors at the modification date. For vested options, the Group recognizes incremental compensation cost in the period of the modification occurred and for unvested options, the Group recognizes, over the remaining requisite service period, the sum of the incremental compensation cost and the remaining unrecognized compensation cost for the original award on the modification date.

Earnings (loss) per share

Basic earnings (loss) per ordinary share is computed by dividing net income (loss) attributable to ordinary shareholders by the weighted average number of ordinary shares outstanding during the period.

The Group's convertible redeemable participating preferred shares are participating securities as they participate in undistributed earnings on an as-if-converted basis. The Group determined that the nonvested restricted shares are participating securities as the holders of the nonvested restricted shares have a nonforfeitable right to receive dividends with all ordinary shares but the nonvested restricted shares do not have a contractual obligation to fund or otherwise absorb the Company's losses. Accordingly, the Group uses the two-class method whereby undistributed net income is allocated on a pro rata basis to the ordinary shares, preferred shares and nonvested restricted shares to the extent that each class may share in income for the period; whereas the undistributed net loss for the period is allocated to ordinary shares only because the convertible redeemable participating preferred shares and nonvested restricted shares are not contractually obligated to share the loss.

Diluted earnings (loss) per ordinary share reflect the potential dilution that could occur if securities were exercised or converted into ordinary shares. The Group had convertible redeemable participating preferred shares, share options and restricted share units, which could potentially dilute basic earnings (loss) per share in the future. To calculate the number of shares for diluted earnings (loss) per ordinary share, the effect of the convertible redeemable participating preferred shares is computed using the as-if-converted method; the effect of the share options and restricted share units is computed using the treasury stock method.

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**2.    SIGNIFICANT ACCOUNTING POLICIES - continued**

Recent accounting pronouncements not yet adopted

In May 2014, the FASB issued, ASU 2014-09, "Revenue from Contracts with Customers (Topic 606)". The guidance substantially converges final standards on revenue recognition between the FASB and the International Accounting Standards Board providing a framework on addressing revenue recognition issues and, upon its effective date, replaces almost all exiting revenue recognition guidance, including industry-specific guidance, in current U.S. generally accepted accounting principles.

The core principle of the guidance is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. To achieve that core principle, an entity should apply the following steps:

- Step 1: Identify the contract (s) with a customer.

- Step 2: Identify the performance obligations in the contract.

- Step 3: Determine the transaction price.

- Step 4: Allocate the transaction price to the performance obligations in the contract.

- Step 5: Recognize revenue when (or as) the entity satisfies a performance obligation.

In August 2015, FASB issued its final standard formally amending the effective date of the new revenue recognition guidance. The amendments in this ASU are effective for annual reporting periods beginning after December 15, 2017, including interim periods within that reporting period. Earlier application is permitted only as of annual reporting periods beginning after December 15, 2016, including interim reporting periods within that reporting period. The new revenue guidance may be applied retrospectively to each prior period presented or retrospectively with the cumulative effect recognized as of the date of adoption.

The Group is in the process of evaluating the impact of adoption of this guidance on its consolidated financial statements.

F-29

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**2.    SIGNIFICANT ACCOUNTING POLICIES - continued**

Recent accounting pronouncements not yet adopted - continued

In November, 2015, the FASB issued a new pronouncement ASU 2015-17 which changes how deferred taxes are classified on organizations' balance sheets.

The ASU eliminates the current requirement for organizations to present deferred tax liabilities and assets as current and noncurrent in a classified balance sheet. Instead, organizations will be required to classify all deferred tax assets and liabilities as noncurrent.

The amendments apply to all organizations that present a classified balance sheet. For public companies, the amendments are effective for financial statements issued for annual periods beginning after December 15, 2016, and interim periods within those annual periods. Earlier application is permitted for all entities as of the beginning of an interim or annual reporting period. This ASU may be applied prospectively to all deferred tax liabilities and assets or retrospectively to all periods presented. The Group does not expect the adoption of this guidance will have a significant effect on the Group's consolidated financial statements.

In January, 2016, the FASB issued a new pronouncement ASU 2016-01 which is intended to improve the recognition and measurement of financial instruments. The ASU affects public and private companies, not-for-profit organizations, and employee benefit plans that hold financial assets or owe financial liabilities.

The new guidance makes targeted improvements to existing U.S. GAAP by:

- Requiring equity investments (except those accounted for under the equity method of accounting, or those that result in consolidation of the investee) to be measured at fair value with changes in fair value recognized in net income;

- Requiring public business entities to use the exit price notion when measuring the fair value of financial instruments for disclosure purposes;

- Requiring separate presentation of financial assets and financial liabilities by measurement category and form of financial asset (i.e., securities or loans and receivables) on the balance sheet or the accompanying notes to the financial statements;

- Eliminating the requirement to disclose the fair value of financial instruments measured at amortized cost for organizations that are not public business entities;

- Eliminating the requirement for public business entities to disclose the method(s) and significant assumptions used to estimate the fair value that is required to be disclosed for financial instruments measured at amortized cost on the balance sheet; and

- Requiring a reporting organization to present separately in other comprehensive income the portion of the total change in the fair value of a liability resulting from a change in the instrument-specific credit risk (also referred to as "own credit") when the organization has elected to measure the liability at fair value in accordance with the fair value option for financial instruments.

F-30

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**2.    SIGNIFICANT ACCOUNTING POLICIES - continued**

Recent accounting pronouncements not yet adopted - continued

The new guidance is effective for public companies for fiscal years beginning after December 15, 2017, including interim periods within those fiscal years. The new guidance permits early adoption of the own credit provision. Adoption of the amendment must be applied by means of a cumulative-effect adjustment to the balance sheet as of the beginning of the fiscal year of adoption, except for amendments related to equity instruments that do not have readily determinable fair values which should be applied prospectively. The Group does not expect the adoption of this guidance will have a significant effect on the Group's consolidated financial statements.

In February 2016, the FASB issued ASU No. 2016-02, Leases (Topic 842). The guidance supersedes existing guidance on accounting for leases with the main difference being that operating leases are to be recorded in the statement of financial position as right-of-use assets and lease liabilities, initially measured at the present value of the lease payments. For operating leases with a term of 12 months or less, a lessee is permitted to make an accounting policy election not to recognize lease assets and liabilities. For public business entities, the guidance is effective for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years. Early application of the guidance is permitted. In transition, entities are required to recognize and measure leases at the beginning of the earliest period presented using a modified retrospective approach. The Group is currently evaluating the impact the adoption of ASU No. 2016-02 will have on its consolidated financial statements, but the Group expects that most existing operating lease commitments will be recognized as operating lease obligations and right-of-use assets as a result of this adoption.

In March 2016, the FASB issued ASU 2016-09, Compensation - Stock Compensation (Topic 718). The new guidance simplifies certain aspects related to income taxes, statement of cash flows, and forfeitures when accounting for share-based payment transactions. This new guidance was effective for the Company for the first reporting period beginning after December 15, 2016, with earlier adoption permitted. Certain of the amendments related to timing of the recognition of tax benefits and tax withholding requirements should be applied using a modified retrospective transition method. Amendments related to the presentation of the statement of cash flows should be applied retrospectively. All other provisions may be applied on a prospective or modified retrospective basis. The Group is in the process of evaluating the impact that this guidance will have on its consolidated financial statements.

F-31

**Table of Contents**

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**3.   ACCOUNTS RECEIVABLE, NET**

Accounts receivable, net consisted of the following:

|  | As of December 31, | |
|---|---|---|
|  | 2015 | 2016 |
| Accounts receivable | $ 14,896 | $ 36,078 |
| Less: allowance for doubtful accounts | — | — |
| Accounts receivable, net | $ 14,896 | $ 36,078 |

**4.   PREPAID EXPENSES AND OTHER CURRENT ASSETS**

Prepaid expenses and other current assets consisted of the following:

|  | As of December 31, | |
|---|---|---|
|  | 2015 | 2016 |
| Advance to advertisement suppliers | $   296 | $ 5,331 |
| Customer advance at a third-party payment channel (i) | — | 4,845 |
| Interest receivable | 5,412 | 4,821 |
| Deferred platform commission cost | 2,424 | 4,571 |
| Input VAT (ii) | 3,485 | 2,968 |
| Prepaid income tax and other expenses | 1,620 | 2,964 |
| Game promotions fees paid on behalf of game developers | — | 2,250 |
| Advance to game developers | 4,200 | 1,550 |
| Others | 860 | 3,292 |
|  | $18,297 | $32,592 |

(i)     Customer advance at a third party payment channel is the cash deposited in a third party payment channel by the Group for the broadcasters to withdraw their revenue sharing.

(ii)    Input VAT mainly occurred from the purchasing of goods for other services, property and equipment and advertising activities. It is subject to verification by related tax authorities before offsetting the VAT output.

**Table of Contents**

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

5.    **LONG TERM INVESTMENTS**

| | As of December 31, | |
| --- | --- | --- |
| | 2015 | 2016 |
| Equity method investments | | |
| Jingwei Chuangteng (Hangzhou) L.P. (i) | $ 3,836 | $ 4,191 |
| Beijing Autobot Venture Capital L.P. (ii) | 4,898 | 6,736 |
| Hangzhou Aqua Ventures Investment Management L.P. (iii) | 7,632 | 9,187 |
| Hunan Qindao Cultural Spread Ltd. (viii) | — | 2,016 |
| Others (iv) | 1,060 | 702 |
| Cost method investments | | |
| Zya, Inc. (v) | — | 1,005 |
| Others (vi) | 1,892 | 829 |
| Available-for-sale investments | | |
| Xish International Limited (vii) | — | 4,386 |
| Hunan Qindao Cultural Spread Ltd. (viii) | — | 2,880 |
| | $19,318 | $31,932 |

Equity method investments

(i)    On January 9, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Jingwei Chuangteng (Hangzhou) L.P. ("Jingwei"). According to the partnership agreement, the Group committed to subscribe 4.9% partnership interest in Jingwei for $4,744. Due to Jingwei's further rounds of financing, the Group's partnership interest was diluted to 3.1% and 2.4% as of December 31, 2015 and 2016, respectively. Of the committed subscription amount, $3,586 had been paid as of December 31, 2016. The Group recognized its share of partnership profit in Jingwei of $366 and $633 during the year ended December 31, 2015 and 2016, respectively.

(ii)   On February 13, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Beijing Autobot Venture Capital L.P. ("Autobot"). According to the partnership agreement, the Group committed to subscribe 31.9% partnership interest in Autobot for $4,823. Autobot had further rounds of financing, of which the Group subscribed for $1,529. Due to Autobot's further round of financing, the Group's partnership interest was diluted to 29.7% and 26.7% as of December 31, 2015 and 2016, respectively. The committed subscription and further round of financing subscription amount, $6,352 had been paid for the year ended December 31, 2016. The Group recognized its share of partnership profit in Autobot of $274 and $771 during the year ended December 31, 2015 and 2016, respectively.

F-33

**Table of Contents**

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**5.    LONG TERM INVESTMENTS - continued**

Equity method investments – continued

(iii)    On August 18, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Hangzhou Aqua Ventures Investment Management L.P. ("Aqua"). According to the partnership agreement, the Group committed to subscribe 42.7% partnership interest for $7,930. The committed subscription amount had been fully paid as of December 31, 2016. The Group recognized its share of partnership loss and profit in Aqua of $89 and $2,134 during the years ended December 31, 2015 and 2016, respectively.

(iv)    Others represents other equity method investments with individual carrying amount less than $1,000 as of December 31, 2015 and 2016, respectively. The Group performed an impairment analysis for these investments and recorded impairment loss of $nil, $nil and $186 during the years ended December 31, 2014, 2015 and 2016, respectively.

Cost method investments

(v)    On December 13, 2016, the Group acquired 15.6% equity interest in Zya, Inc., a Delaware corporation. The total consideration of $1,005 was paid in 2016. The Group applied cost method to account for the investment due to the lack of ability to exercise significant influence.

(vi)    During the years ended December 31, 2015 and 2016, the Group acquired certain equity interests in third-party private companies. The Group accounted for these investments under cost method because the Group ownership percentage is less than 20% and the Group determined that it does not have the ability to exercise significant influence. The Group determined the impairment on the above investments was $nil, $nil and $965 during the years ended December 31, 2014, 2015 and 2016, respectively.

Available-for-sale investments

(vii)    On January 21, 2016, the Group entered into a preferred share subscription agreement to acquire 17.3% equity of Xish International Limited ("Xish") for a total consideration of $9,000, which had been paid as of December 31, 2016. The investment was classified as available-for-sale security as the Group determined that the preferred shares were debt securities due to the redemption option available to the investor and measured the investment subsequently at fair value. The Group recognized an impairment loss of $4,614 during the year ended December 31, 2016. Please refer to Note 8 for additional information on the fair value measurement related to the impairment loss.

(viii)    On June 8, 2016, the Group entered into a share purchase agreement to acquire 16.0% equity interest of Hunan Qindao Cultural Spread Ltd. ("Qindao") for a total consideration of $4,441, of which $3,001 had been paid as of December 31, 2016. The investment was classified as available-for-sale security as the Group determined that the preferred shares were debt securities due to the redemption option available to the investor and measured the investment subsequently at fair value. No unrealized holding gains of $nil was reported in other comprehensive income for the year ended December 31, 2016.

F-34

**Table of Contents**

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

5.    **LONG TERM INVESTMENTS - continued**

Available-for-sale investments – continued

On November 17, 2016, the Group entered into another share purchase agreement with two shareholders of Qindao and acquired additional 10.4% equity interests of Qindao for a total consideration of $2,429, of which $2,007 had been paid as of December 31, 2016. The Group accounted for this investment in common share using the equity method as the Group determined that it can exercise significant influence over Qindao.

6.    **PROPERTY AND EQUIPMENT, NET**

Property and equipment, net consisted of the following:

|  | As of December 31, | |
|---|---|---|
|  | 2015 | 2016 |
| Computer equipment | $ 20,177 | $ 23,763 |
| Office equipment | 3,073 | 4,370 |
| Vehicles | 34 | 31 |
| Leasehold improvement | 2,914 | 2,800 |
| Less: accumulated depreciation | (10,440) | (18,844) |
| Exchange difference | 501 | 1,812 |
|  | $16,259 | $ 13,932 |

Depreciation expenses charged to the consolidated statements of operations for the years ended December 31, 2014, 2015 and 2016 were $2,805, $6,646 and $8,404 respectively.

7.    **ACCRUED EXPENSES AND OTHER CURRENT LIABILITIES**

Accrued expenses and other current liabilities consisted of the following:

|  | As of December 31, | |
|---|---|---|
|  | 2015 | 2016 |
| Accrued payroll and welfare | $ 7,406 | $18,982 |
| Payable for advertisement | 2,718 | 9,871 |
| Other tax payables | 1,517 | 4,694 |
| VAT payable | 550 | 1,919 |
| Accrued professional services fee | 1,506 | 1,438 |
| Payable to employees for exercise of share options | 11,297 | — |
| Others | 1,700 | 3,061 |
| Total | $26,694 | $39,965 |

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

8.  **FAIR VALUE**

Measured on recurring basis

The Group measures its financial assets and liabilities including cash and cash equivalents and available-for-sale investments at fair value on a recurring basis as of December 31, 2015 and 2016. Cash and cash equivalents are classified within Level 1 of the fair value hierarchy because they are valued based on the quoted market price in an active market. Available-for-sale investments are debt securities and are measured at fair value on a recurring basis with changes in fair value recorded in unrealized holding gains and losses reported in other comprehensive income.

As of December 31, 2016, information about inputs for the fair value measurements of the Group's assets that are measured at fair value on a recurring basis in periods subsequent to their initial recognition is as follows:

| Description | 2016 | Fair Value Measurement as of December 31, Quoted Prices in Active Market for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| Cash and cash equivalents | $257,564 | $257,564 | — | $ — |
| Available-for-sale investments | 7,266 | — | — | 7,266 |
| Total | $264,830 | $257,564 | — | $ 7,266 |

The Group measured the fair value of its available for sales investments using the income approach and consider those as Level 3 measurement because the Group used unobservable inputs to determine their fair values. Specifically, the Group estimates the fair value of these investments based on the discounted cash flow approach which requires significant judgments, including the estimation of future cash flows, which is dependent on internal forecasts, the estimation of long term growth rate of a company's business, the estimation of the useful life over which cash flows will occur, and the determination of the weighted average cost of capital. Significant increases (decreases) in any of those inputs in isolation would result in a significantly lower (higher) fair value measurement.

**Table of Contents**

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**8.   FAIR VALUE - continued**

Measured on recurring basis - continued

Additional information about the reconciliation of the fair value measurement of available-for-sale investments using significant unobservable inputs (level 3) on a recurring basis are is as follows:

| | |
|---|---|
| Balance as of December 31, 2015 | $    — |
| Purchase | 12,001 |
| Other-than-temporary loss recognized | (4,614) |
| Foreign exchange difference | (121) |
| Balance as of December 31, 2016 | $ 7,266 |

Measured on nonrecurring basis

The Group measures its long-term investments (excluding long-term available for sale investments) at fair value on a nonrecurring basis whenever events or changes in circumstances indicate that the carrying value may not be recoverable. As of December 31, 2015 and 2016, the Group performed an impairment test on its cost and equity method investees and recorded an impairment loss of $nil and $1,151, respectively. Such impairment is considered a level 3 fair value measurement because the Group used unobservable inputs such as the respective investee's growth rate and discount rate. The Group also measures its other non-financial assets such as property and equipment at fair value only if there were determined to be impaired on an other than temporary basis.

**9.   INCOME TAXES**

Cayman

In July 2014, the Company was redomiciled in the Cayman Islands as an exempted company registered under the laws of the Cayman Islands. Under the current laws of the Cayman Islands, it is not subject to tax on either income or capital gain.

BVI

Momo BVI is a tax-exempted company incorporated in the BVI.

The United States ("US")

Momo US is incorporated in the US and is subject to state income tax and federal income tax at different tax rates, depending upon taxable income levels. Momo US did not have taxable income and no income tax expense was provided for the year ended December 31, 2016.

F-37

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**9.   INCOME TAXES - continued**

Hong Kong

Momo HK was established in Hong Kong and is subject to Hong Kong Profits Tax at 16.5% on its profits of business carried on in Hong Kong.

PRC

In August 2014, Beijing Momo IT was qualified as a software enterprise. As such, Beijing Momo IT will be exempt from income taxes for two years beginning in its first profitable year which was from 2015 to 2016 followed by a tax rate of 12.5% for the succeeding three years which is from 2017 to 2019.

As of December 31, 2016, Chengdu Momo was in the process of filing the western China development enterprise status. The Group believes Chengdu Momo will most likely be qualified as western China development enterprise and accordingly be entitled to a preferential income tax rate of 15% in the year 2016. As a result, the Group applied 15% to determine the tax liabilities for Chengdu Momo.

The other entities incorporated in the PRC are subject to an enterprise income tax at a rate of 25%.

Since January 1, 2011, the relevant tax authorities of the Group's subsidiaries have not conducted a tax examination on the Group's PRC entities. In accordance with relevant PRC tax administration laws, tax years from 2014 to 2016 of the Group's PRC subsidiary, VIE and VIE's subsidiaries, remain subject to tax audits as of December 31, 2016, at the tax authority's discretion.

Under the EIT Law and its implementation rules which became effective on January 1, 2008, dividends generated after January 1, 2008 and payable by foreign-invested enterprise in the PRC to its foreign investors who are non-resident enterprises are subject to a 10% withholding tax, unless any such foreign investor's jurisdiction of incorporation has a tax treaty with PRC that provides for a different withholding arrangement. Under the taxation arrangement between the PRC and Hong Kong, a qualified Hong Kong tax resident which is the "beneficial owner" and directly holds 25% or more of the equity interest in a PRC resident enterprise is entitled to a reduced withholding tax rate of 5%. Cayman, where the Company is incorporated, does not have a tax treaty with PRC.

Uncertainties exist with respect to how the current income tax law in the PRC applies to the Group's overall operations, and more specifically, with regard to tax residency status. The EIT Law includes a provision specifying that legal entities organized outside of the PRC will be considered residents for Chinese income tax purposes if the place of effective management or control is within the PRC. The implementation rules to the EIT Law provide that non-resident legal entities will be considered China residents if substantial and overall management and control over the manufacturing and business operations, personnel, accounting, properties, etc., occurs within the PRC. Despite the present uncertainties resulting from the limited PRC tax guidance on the issue, the Group does not believe that the legal entities organized outside of the PRC within the Group should be treated as residents for EIT law purposes. If the PRC tax authorities subsequently determine that the Company and its subsidiaries registered outside the PRC should be deemed resident enterprises, the Company and its subsidiaries registered outside the PRC will be subject to the PRC income taxes, at a rate of 25%.

F-38

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**9.    INCOME TAXES - continued**

PRC - continued

If any entity within the Group that is outside the PRC were to be a non-resident for PRC tax purposes dividends paid to it out of profits earned after January 1, 2008 would be subject to a withholding tax at a rate of 10%, subject to reduction by an applicable tax treaty with the PRC.

Aggregate undistributed earnings of the Company's subsidiaries located in the PRC that are available for distribution at December 31, 2016 are considered to be indefinitely reinvested and accordingly, no provision has been made for the Chinese dividend withholding taxes that would be payable upon the distribution of those amounts to any entity within the Group that is outside the PRC.

The Group does not have any present plan to pay any cash dividends on its ordinary shares in the foreseeable future. It intends to retain most of its available funds and any future earnings for use in the operation and expansion of its business. As of December 31, 2016, the Group has not declared any dividends.

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amount of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Significant components of the Group's deferred tax assets and liabilities are as follows:

| | As of December 31, | |
| --- | --- | --- |
| | 2015 | 2016 |
| Current deferred tax assets: | | |
| Impairment of loss on long term investments | $   — | $    72 |
| Less: valuation allowance | — | — |
| Current deferred tax assets, net | — | 72 |
| Non-current deferred tax assets: | | |
| Advertising expense | 2,651 | — |
| Net operating tax losses carry-forward | 2,881 | 2,852 |
| Impairment of on long term investments | — | 208 |
| Less: valuation allowance | (5,532) | (2,852) |
| Non-current deferred tax assets, net | $   — | $   208 |

The Group considers the following factors, among other matters, when determining whether some portion or all of the deferred tax assets will more likely than not be realized: the nature, frequency and severity of losses, forecasts of future profitability, the duration of statutory carry-forward periods, the Group's experience with tax attributes expiring unused and tax planning alternatives. The Group's ability to realize deferred tax assets depends on its ability to generate sufficient taxable income within the carry-forward periods provided for in the tax law.

F-39

**Table of Contents**

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

9.   **INCOME TAXES - continued**

PRC - continued

As of December 31, 2016, the tax loss carry-forward for Beijing Momo's subsidiaries amounted to $105, which would expire on various dates between December 31, 2020 and December 31, 2021. As of December 31, 2016, the tax loss carryforward for Momo HK amounted to $178, which would be carried forward indefinitely and set off against its future taxable profits. As of December 31, 2016, the tax loss carry-forward for Momo US amounted to $7,992, which would be carried forward for twenty years. The Group does not file combined or consolidated tax returns, therefore, losses from individual subsidiaries or the VIE may not be used to offset other subsidiaries' or VIE's earnings within the Group. Valuation allowance is considered on each individual subsidiary and legal entity basis. Valuation allowances have been established in respect of certain deferred tax assets as it is considered more likely than not that the relevant deferred tax assets will not be realized in the foreseeable future.

Reconciliation between the expense (benefit) of income taxes computed by applying the PRC tax rate to (loss) income before income taxes and the actual provision for income taxes is as follows:

|  | For the years ended December 31, | | |
|---|---|---|---|
|  | 2014 | 2015 | 2016 |
| Net (loss) income before provision for income tax | $(25,415) | $13,419 | $146,915 |
| PRC statutory tax rate | 25% | 25% | 25% |
| Income tax (benefit) expense at statutory tax rate | (6,354) | 3,355 | 36,729 |
| Permanent differences | 99 | (144) | (75) |
| Change in valuation allowance | 4,560 | (2,315) | (2,680) |
| Effect of income tax rate difference in other jurisdictions | 1,695 | 2,754 | 7,941 |
| Effect of tax holidays and preferential tax rates | — | (3,558) | (36,779) |
| Provision for income tax | $  — | $  92 | $  5,136 |

No significant unrecognized tax benefit was identified for the years ended December 31, 2014, 2015 and 2016. The Group did not incur any interest and penalties related to potential underpaid income tax expenses and also believed that uncertainty in income taxes did not have a significant impact on the unrecognized tax benefits within next twelve months.

F-40

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**10.    ORDINARY SHARES**

On November 23, 2011, the Company was authorized to issue a maximum 500,000,000 shares of a single class and issued 147,000,000 ordinary shares with a par value of $0.0001.

On April 12, 2012, the authorized 500,000,000 shares were divided into 446,545,450 ordinary shares and 53,454,550 preferred shares in connection with the issuance of Series A-1 and A-2 convertible redeemable participating preferred shares.

In April 2012, the Company's four founding shareholders entered into an arrangement with the investor in conjunction with the issuance of Series A convertible redeemable participating preferred shares, whereby all of their 147,000,000 ordinary shares ("Founders' shares") became subject to service and transfer restrictions. Such Founders' shares are subject to repurchase by the Company upon early termination of four years of employment of four founders from April 2012. Notwithstanding the foregoing, the Founders shall exercise all rights and privileges of a holder of ordinary shares of the Company with respect to the Founders' shares. The Founders shall be deemed to be the holder for purposes of receiving any dividends that may be paid with respect to the Founders' shares and for the purpose of exercising any voting rights relating to the Founders' shares, even if some or all of Founders' shares have not yet vested and been released from the repurchase rights. Please refer to Note 12 for disclosure of nonvested restricted shares.

On June 11, 2012, the Company decreased its authorized ordinary shares from 446,545,450 shares to 426,747,470 shares in connection with the issuance of Series A-3 convertible redeemable participating preferred shares.

On July 13, 2012, the Company decreased its authorized ordinary shares from 426,747,470 shares to 366,789,830 shares in connection with the issuance of Series B convertible redeemable participating preferred shares.

On September 12, 2012, a 10-for-1 stock split for all ordinary shares, Series A-1, A-2 and A-3 and Series B convertible redeemable participating preferred shares was approved by the shareholders. While the stock split increased the number of shares for each stockholder, the percentage of their ownership in the Company was not affected. This share split has been retrospectively reflected for all periods presented. In addition, the Company increased its authorized ordinary shares from 366,789,830 to 371,684,330 in connection with the preferred share transfer between investors.

On October 8, 2013, the Company was authorized to issue a maximum 1,000,000,000 shares, which was divided into 835,675,688 ordinary shares and 164,324,312 preferred shares in connection with the issuance of Series C convertible redeemable participating preferred shares.

On April 22, 2014, the Company was authorized to issue a maximum 1,000,000,000 shares, which was divided into 799,281,189 ordinary shares and 200,718,811 preferred shares in connection with the issuance of Series D convertible redeemable participating preferred shares.

F-41

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**10.    ORDINARY SHARES - continued**

On April 22, 2014, certain ordinary shareholders who are also the senior management of the Company donated an aggregate of 15,651,589 ordinary shares to the Company with no consideration. On the same date, the Group declared a special dividend to these shareholders at an aggregated amount of $64,494, among which $58,044 was paid in May 2014. The remaining $5,775 and $675 were recorded as amount due to related parties-current and accrued expenses and other current liabilities respectively, as of December 31, 2016. Please refer to Note 15 for disclosure of related party balances and transactions. The Company treated the whole transaction as a repurchase of ordinary shares of which the repurchase price is considerably lower than the fair value of ordinary share. All such shares were recorded as treasury stock.

On November 28, 2014, the Company was authorized to issue a maximum 1,000,000,000 ordinary shares, which was divided into 800,000,000 Class A Ordinary Shares, 100,000,000 Class B Ordinary Shares and 100,000,000 shares of such class designated as the Board may determine.

On December 16, 2014, the Company completed its IPO and a concurrent private placement upon which the Company's ordinary shares were divided into Class A ordinary shares and Class B ordinary shares. The Company newly issued 45,688,888 Class A ordinary shares, consisting of (i) 36,800,000 Class A ordinary shares offered through IPO, and (ii) 8,888,888 Class A ordinary shares issued in connection with the concurrent private placement. All of the Company's Series A, Series B, Series C and Series D preferred shares were automatically converted into 200,718,811 Class A ordinary shares.

In 2015 and 2016, 5,995,293 and 5,197,032 ordinary shares were issued in connection with the exercise of options and vesting of restricted share units previously granted to employees, executives and consultants under the Company's share incentive plans (see Note 12), respectively.

As of December 31, 2016, there were 292,062,065 Class A ordinary shares and 96,886,370 Class B ordinary shares issued and outstanding, par value $0.0001 per share.

**11.    CONVERTIBLE REDEEMABLE PARTICIPATING PREFERRED SHARES**

On April 12, 2012, the Group entered into the preferred share purchase agreements with a group of investors to issue an aggregate of 53,454,550 convertible redeemable participating preferred shares Series A-1 ("Series A-1") and convertible redeemable participating preferred shares Series A-2 ("Series A-2") to a group of investors for an aggregate consideration of $2,100.

On June 11, 2012, the Group entered into the preferred share purchase agreements with a group of investors to issue an aggregate of 19,797,980 convertible redeemable participating preferred shares Series A-3 ("Series A-3") (Series A-1, Series A-2 and Series A-3 are collectively referred to as "Series A") to a group of investors for a consideration of $4,000.

F-42

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**11.    CONVERTIBLE REDEEMABLE PARTICIPATING PREFERRED SHARES - continued**

On July 13, 2012, the Group entered into the preferred share purchase agreements with a group of investors to issue an aggregate of 55,063,140 convertible redeemable participating preferred shares Series B ("Series B") to a group of investors for a consideration of $18,006.

In July 2012, the Group redesignated 4,894,500 Series A-1 preferred shares held by an old investor into Series B preferred shares, and the old investor then transferred 4,894,500 Series B preferred shares to a new investor at the purchase price of $0.286 per share for a total consideration of $1,400 in cash. Also in January 2013, the Group redesignated another 10,079,373 Series A-1 preferred shares of the same old investor into Series B preferred shares, and the old investor then transferred 10,079,373 Series B preferred shares to the same new investor at the purchase price of $0.425 per share for a total consideration of $4,280 in cash. The Group did not receive any proceeds for the transfer between the old investor and the new investor, nor receive any consideration for the redesignation for the shares transferred. The Group accounted for such redesignation as an extinguishment of 4,894,500 and 10,079,373 Series A-1 preferred shares repurchased and recorded $1,361 and $2,766 as deem dividend for the years ended December 31, 2012 and 2013, respectively, based on the difference between the fair value of the consideration transferred to the new investor (i.e., fair value of Series B preferred shares) and the carrying amount of such Series A-1 preferred shares.

On October 8, 2013, the Group entered into the preferred share purchase agreements with a group of investors to issue an aggregate of 36,008,642 convertible redeemable participating preferred shares Series C ("Series C") to a group of investors for a consideration of $45,000.

On April 22, 2014, the Group entered into the preferred share purchase agreements with a group of investors to issue an aggregate of 43,693,356 convertible redeemable participating preferred shares Series D ("Series D") to a group of investors for a consideration of $211,750.

On April 22, 2014, the Group entered into the agreements to repurchase 7,298,857 shares of Series A-1 preferred shares from one shareholder for a consideration of $30,750, which was paid in May 2014. The repurchase amount of $30,293 is in excess of the carrying amount of such Series A-1 preferred shares as of April 22, 2014 and was considered as deemed dividend to Series A-1 preferred shareholder and recorded in the accumulated deficit. All the preferred shares repurchased were cancelled on the same date.

On December 16, 2014, Series A, Series B, Series C and Series D preferred shares had been automatically converted into 200,718,811 Class A ordinary shares after the closing of IPO.

Key terms of the preferred shares are summarized as follows:

Voting rights

Shareholders of the preferred shares are entitled to the number of votes equal to the number of ordinary shares into which such preferred shares could be converted at the record date.

F-43

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**11.    CONVERTIBLE REDEEMABLE PARTICIPATING PREFERRED SHARES - continued**

Dividends

Whenever a dividend is declared by the board of directors of the Company, the preferred shares holders shall receive, in preference to any dividend on any ordinary shares a cumulative dividend in an amount equal to 8% annually of the Original Issue Price, which was defined as $0.04714, $0.13469, $0.20204, $0.327, $1.2497 and $4.84627 per share for Series A-1, A-2, A-3, B, C and D preferred shares, respectively, as adjusted for stock splits, stock dividends, etc., and shall also participate on an as converted basis with respect to any dividends payable to the ordinary shares. The sequence of dividend participating right of all series of preferred shares was as follows:

(1) Series D
(2) Series C
(3) Series B
(4) Series A-3
(5) Series A-1, A-2

Liquidation preference

In the event of any liquidation, dissolution or winding up of the Company, either voluntary or involuntary, distributions to the shareholders of the Company shall be made in the following manners:

(i)    Before any distribution or payment shall be made to the holders of any ordinary shares, Series A preferred shares, Series B preferred shares or Series C preferred shares, each holder of Series D preferred shares shall be entitled to receive an amount equal to one hundred and thirty percent (130%) of the Original Issue Price of Series D preferred shares (adjusted for any share splits, share dividends, combinations, recapitalizations and similar transactions), plus all dividends accrued and unpaid with respect thereto (as adjusted for any share splits, share dividends, combinations, recapitalizations and similar transactions) per Series D preferred share then held by such holder.

(ii)    After distribution or payment in full of the amount distributable or payable pursuant to (i) and before any distribution or payment shall be made to the holders of any ordinary shares, Series A preferred shares or Series B preferred shares, each holder of Series C preferred shares shall be entitled to receive an amount equal to one hundred and thirty percent (130%) of the Original Issue Price of Series C preferred shares (adjusted for any share splits, share dividends, combinations, recapitalizations and similar transactions), plus all dividends accrued and unpaid with respect thereto (as adjusted for any share splits, share dividends, combinations, recapitalizations and similar transactions) per Series C preferred share then held by such holder.

F-44

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**11.    CONVERTIBLE REDEEMABLE PARTICIPATING PREFERRED SHARES - continued**

Liquidation preference - continued

(iii)    After distribution or payment in full of the amount distributable or payable pursuant to (i) and (ii) and before any distribution or payment shall be made to the holders of any ordinary shares or Series A preferred shares, each holder of Series B preferred shares shall be entitled to receive an amount equal to one hundred percent (100%) of the Original Issue Price of Series B (adjusted for any share splits, share dividends, combinations, recapitalizations and similar transactions), plus all dividends accrued and unpaid with respect thereto (as adjusted for any share splits, share dividends, combinations, recapitalizations and similar transactions) per Series B preferred share then held by such holder.

(iv)    After distribution or payment in full of the amount distributable or payable pursuant to (i), (ii) and (iii) and before any distribution or payment shall be made to the holders of any ordinary shares, Series A-1 preferred shares or Series A-2 preferred shares, each holder of Series A-3 preferred shares shall be entitled to receive an amount equal to one hundred percent (100%) of the Original Issue Price of Series A-3 (adjusted for any share splits, share dividends, combinations, recapitalizations and similar transactions), plus all dividends accrued and unpaid with respect thereto (as adjusted for any share splits, share dividends, combinations, recapitalizations and similar transactions) per Series A-3 preferred share then held by such holder.

(v)    After distribution or payment in full of the amount distributable or payable pursuant to (i), (ii), (iii) and (iv) and before any distribution or payment shall be made to the holders of any ordinary shares, each holder of Series A-1 preferred shares and each holder of Series A-2 preferred shares shall be entitled to receive on a pari passu basis an amount equal to one hundred fifty percent (150%) of the Original Issue Price of Series A-1 or the Original Issue Price of Series A-2 (as the case may be) (adjusted for any share splits, share dividends, combinations, recapitalizations and similar transactions), plus all dividends accrued and unpaid with respect thereto (as adjusted for any share splits, share dividends, combinations, recapitalizations and similar transactions) per Series A-1 preferred share or Series A-2 preferred share, as the case may be, then held by such holder.

(vi)    After distribution or payment in full of the amount distributable or payable on the preferred shares pursuant to (i), (ii), (iii), (iv) and (v), the remaining assets of the Company available for distribution to shareholders shall first be used to pay any accrued but unpaid dividends on other shares and then be distributed ratably among the holders of outstanding ordinary shares and holders of preferred shares on an as-converted basis.

F-45

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**11.    CONVERTIBLE REDEEMABLE PARTICIPATING PREFERRED SHARES - continued**

Redemption

At any time after (i) the fourth (4) anniversary of the closing of the Series D preferred share issuance, each holder of the then outstanding Series D preferred shares, or (ii) October 8, 2017, each holder of the then outstanding Series C preferred shares, or (iii) December 31, 2016, each holder of the then outstanding Series A preferred shares and Series B preferred shares, may require that the Company redeem all of its preferred shares.

The redemption price for each Series A-1 and Series A-2 preferred share shall be equal to a price per preferred share which is one hundred and fifty percent (150%) of the applicable Initial Purchase Price (equal to the applicable Original Issue Price), plus all declared or accrued but unpaid dividends thereon up until the date of redemption (adjusted for any share splits, share dividends, combinations, recapitalizations or similar transactions).

The redemption price for Series A-3, Series B, Series C and Series D preferred shares shall be equal to a price per share which is one hundred and twenty-five percent (125%) of the applicable Initial Purchase Price (equal to the applicable Original Issue Price), plus all declared or accrued but unpaid dividends thereon up until the date of redemption (adjusted for any share splits, share dividends, combinations, recapitalizations or similar transactions).

The Group assesses the probability of redemption and accrues proper accretion over the period from the date of issuance to the earliest redemption date of Series A-1, Series A-2, Series A-3, Series B, Series C and Series D preferred shares using the effective interest rate method.

The Group recognized $57,663, $nil and $nil as deemed dividend on Series A, Series B, Series C and Series D preferred shares accretion of redemption premium for the years ended December 31, 2014, 2015 and 2016, respectively.

Conversion

Each preferred share shall be convertible, at the option of the holder thereof, at any time after the original date of issuance, into such number of fully paid and nonassessable ordinary shares as determined by dividing the applicable Original Issue Price by then-effective conversion price.

The initial conversion ratio was one for one. The conversion price has a standard anti-dilution adjustment term for items such as stock splits and recapitalization. It also has a down-round provision, under which when the Company issues any additional shares at a price per share that is lower than the conversion price per share then in effect, the conversion price per share is adjusted down. There have been no such adjustments to the conversion price.

Each preferred share would automatically be converted into ordinary shares at the then effective conversion price, upon the closing of a Qualified IPO.

F-46

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**11.   CONVERTIBLE REDEEMABLE PARTICIPATING PREFERRED SHARES - continued**

Conversion - continued

"Qualified IPO" means a firm commitment underwritten registered public offering by the Company of its ordinary Shares on the NASDAQ National Market System in the United States or Hong Kong or any other exchange in any other jurisdiction (on any combination of such exchanges and jurisdictions) acceptable to the majority preferred shareholders to the Company with aggregate offering proceeds (before deduction of fees, commissions or expenses) to the Company and selling shareholders, if any, of not less than $50,000 (or any cash proceeds of other currency of equivalent value).

The Company has determined that there was no beneficial conversion feature attributable to the various series of preferred shares because the initial conversion prices was higher than the fair value of the Company's ordinary shares on issue date of each series shares.

**12.   SHARE-BASED COMPENSATION**

*Share options granted by the Company*

In November 2012, the Company adopted a share incentive plan ("2012 Plan"), which was amended in October 2013. The maximum aggregate number of shares which may be issued pursuant to all awards under the 2012 Plan is 44,758,220 ordinary shares.

In November, 2014, the Company adopted the 2014 share incentive plan ("2014 Plan"), pursuant to which a maximum aggregate of 14,031,194 Class A ordinary shares may be issued pursuant to all awards granted thereunder. Starting from 2017, the number of shares reserved for future issuances under the 2014 Plan will be increased by a number equal to 1.5% of the total number of outstanding shares on the last day of the immediately preceding calendar year, or such lesser number of Class A ordinary shares as determined by the Company's board of directors, on the first day of each calendar year during the term of the 2014 Plan. With the adoption of the 2014 Plan, the Company will no longer grant any incentive shares under the 2012 Plan. The time and condition to exercise options will be determined by the Board or a committee of the Board. The term of the options may not exceed ten years from the date of the grant, except for the situation of amendment, modification and termination. Under the 2014 Plan, share options are subject to vesting schedules ranging from two to four years.

F-47

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**12.   SHARE-BASED COMPENSATION - continued**

*Share options granted by the Company* - continued

The following table summarizes the option activity for the year ended December 31, 2016:

| | Number of options | | Weighted average exercise price per option | Weighted average remaining contractual life (years) | | Aggregated intrinsic value |
|---|---|---|---|---|---|---|
| Outstanding, December 31, 2015 | 31,084,006 | $ | 0.0767 | 8.14 | $ | 246,597 |
| Granted | 7,577,122 | $ | 0.0002 | | | |
| Exercised | (5,147,032) | $ | 0.0618 | | | |
| Forfeited/cancel | (1,907,630) | $ | 0.0226 | | | |
| Outstanding, December 31, 2016 | 31,606,466 | $ | 0.0641 | 7.63 | | 288,439 |
| Exercisable at December 31, 2016 | 15,313,350 | $ | 0.0924 | 6.76 | $ | 139,314 |

There were 15,313,350 vested options, and 15,053,681 options expected to vest as of December 31, 2016. For options expected to vest, the weighted-average exercise price was $0.0384 as of December 31, 2016 and aggregate intrinsic value was $133,569, $154,465 and $137,765 as of December 31, 2014, 2015 and 2016, respectively.

The weighted-average grant-date fair value of the share options granted during the years 2014, 2015, and 2016 was $4.9994, $5.9341 and $6.2405, respectively. Total intrinsic value of options exercised for the years ended December 31, 2014, 2015 and 2016 was $nil, $45,885 and $45,581, respectively. The total fair value of options vested during the years ended December 31, 2014, 2015 and 2016 was $1,396, $13,680 and $27,171, respectively.

In May 2015, the Company accelerated the vesting to permit immediate exercise of 235,000 outstanding employee share options granted under the 2012 Plan. The incremental cost resulting from the modification amounted to $162 for the acceleration for the year end of December 31, 2015.

In July 2016, the Company cancelled 187,500 outstanding employee share options granted under the 2014 Plan for one employee. As a result, the Company immediately recognized the unvested compensation cost attributable to the canceled award amounting to $1,532 in 2016.

The fair value of options granted was estimated on the date of grant using the binomial tree pricing model before the Company completed its IPO and the Black-Sholes pricing model after the Company completed its IPO, respectively, with the following assumptions used for grants during the applicable periods:

| | Risk-free interest rate of return | Contractual term | Volatility | Dividend yield | Exercise price | |
|---|---|---|---|---|---|---|
| 2012 | 2.31% | 10 years | 61.7% | — | $ | 0.0327 |
| 2013 | 3.09% | 10 years | 54.4% | — | $ | 0.1404 |
| 2014 | 2.44%~3.25% | 10 years | 53.7%~57.5% | — | | $0.0002~$0.1404 |
| 2015 | 2.15%~2.19% | 10 years | 55.3%~55.7% | — | $ | 0.0002 |
| 2016 | 1.75%~2.70% | 10 years | 52.5%~55.3% | — | $ | 0.0002 |

F-48

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**12.    SHARE-BASED COMPENSATION - continued**

*Share options granted by the Company* - continued

(1)    Risk-free interest rate

Risk-free interest rate was estimated based on the yield to maturity of China international government bonds with a maturity period close to the expected term of the options.

(2)    Contractual term

The Company used the original contractual term.

(3)    Volatility

The volatility of the underlying ordinary shares during the life of the options was estimated based on the historical stock price volatility of comparable listed companies over a period comparable to the expected term of the options.

(4)    Dividend yield

The dividend yield was estimated by the Group based on its expected dividend policy over the expected term of the options.

(5)    Exercise price

The exercise price of the options was determined by the Group's board of directors.

(6)    Fair value of underlying ordinary shares

Before the closing of the IPO, the estimated fair value of the ordinary shares underlying the options as of the respective grant dates was determined based on a retrospective valuation, which used management's best estimate for projected cash flows as of each valuation date. After the closing of the IPO, the fair value of the ordinary shares is determined as the closing sales price of the Shares as quoted on the principal exchange or system.

For employee and executives share options, the Group recorded share-based compensation of $5,848, $16,026 and $28,096 during the years ended December 31, 2014, 2015 and 2016, respectively, based on the fair value on the grant dates over the requisite service period of award according to the vesting schedule for employee share option.

For non-employee share options the Group recorded share-based compensation of $437, $756 and $3,103 during the years ended December 31, 2014, 2015 and 2016, respectively, based on the fair value at the commitment date and recognized over the period the service is provided.

As of December 31, 2016, total unrecognized compensation expense relating to unvested share options was $68,656, which will be recognized over 2.74 years. The weighted-average remaining contractual term of options outstanding is 7.63 years.

F-49

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**12.    SHARE-BASED COMPENSATION - continued**

*Share options granted by Momo BVI*

On January 3, 2015, Momo BVI, a wholly-owned subsidiary of the Group, approved Momo BVI Share Incentive Plan that provides for the issuance of not exceeding 30,000,000 share options. The option plan has a term of ten years unless earlier terminated by Momo BVI's board of directors.

During the year ended December 31, 2015, Momo BVI granted 10,550,000 share options to its employees and executives with exercise prices ranging from $0.10 to $0.11 per share and vesting period of 4 years.

The following table summarizes the option activity for the year ended December 31, 2016:

| | Number of options | Weighted average exercise price per option | Weighted average remaining contractual life (years) | Aggregated intrinsic value |
|---|---|---|---|---|
| Outstanding , December 31, 2015 | 10,200,000 | $    0.1080 | 9.26 | $    20 |
| Granted | — | — | | |
| Exercised | — | — | | |
| Forfeited | (2,200,000) | $    0.1055 | | |
| Outstanding at end of period | 8,000,000 | $    0.1088 | 8.19 | $    10 |
| Exercisable at December 31, 2016 | 3,458,333 | $    0.1086 | 8.13 | $    5 |

There were 3,458,333 vested options, and 4,224,375 options expected to vest as of December 31, 2016. For options expected to vest, the weighted-average exercise price is $0.1089 as of December 31, 2016 and aggregate intrinsic value was $nil, $18 and $5 as of December 31, 2014, 2015 and 2016, respectively.

The weighted-average grant-date fair value of the share options granted during the years 2014, 2015, and 2016 was $nil, $0.0544, and $nil, respectively. Total intrinsic value of options exercised for the years ended December 31, 2014, 2015 and 2016 was $nil, $nil and $nil, respectively. The total fair value of options vested during the years ended December 31, 2014, 2015 and 2016 was $nil, $nil and $185, respectively.

The fair value of options granted was estimated on the date of grant using the Black-Sholes pricing model with the following assumptions used for grants during the applicable periods:

| | Risk-free interest rate of return | Contractual term | Volatility | Dividend yield | Exercise price |
|---|---|---|---|---|---|
| 2015 | 1.55%~1.82% | 10 years | 55.3%~57.2% | — | $0.10~$0.11 |

F-50

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**12.   SHARE-BASED COMPENSATION - continued**

*Share options granted by Momo BVI* – continued

(1)   Risk-free interest rate

Risk-free interest rate was estimated based on the yield to maturity of US government bonds with a maturity period close to the expected term of the options.

(2)   Contractual term

Momo BVI used the original contractual term.

(3)   Volatility

The volatility of the underlying ordinary shares during the life of the options was estimated based on the historical stock price volatility of comparable listed companies over a period comparable to the expected term of the options.

(4)   Dividend yield

The dividend yield was estimated by Momo BVI based on its expected dividend policy over the expected term of the options.

(5)   Exercise price

The exercise price of the options was determined by Momo BVI's board of directors.

(6)   Fair value of underlying ordinary shares

The estimated fair value of the ordinary shares underlying the options as of the grant date was determined based on a contemporaneous valuation.

For employee and executives share options, Momo BVI recorded share-based compensation of $98 and $112 during the years ended December 31, 2015 and 2016, based on the fair value on the grant dates over the requisite service period of award according to the vesting schedule for employee share option.

As of December 31, 2016, total unrecognized compensation expense relating to unvested share options was $221, which will be recognized over 2.24 years. The weighted-average remaining contractual term of options outstanding is 8.19 years.

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**12.    SHARE-BASED COMPENSATION - continued**

*Non-vested restricted shares*

In April 2012, the Company's four founding shareholders entered into an arrangement with the investor in conjunction with the issuance of Series A preferred shares, whereby all of their 147,000,000 ordinary shares ("Founders' shares") became subject to service and transfer restrictions. Such Founders' shares are subject to repurchase by the Company upon early termination of their four years of employment. The repurchase price is the par value of the ordinary shares. 25% of the Founders' shares shall be vested annually. The restricted share agreements were subsequently amended on June 11, 2012 and July 18, 2012, respectively. Pursuant to the agreements, 25% of the Founders' shares shall vest upon the closing of issuance of Series B preferred shares and the remaining 75% shall be vested monthly in equal installments over the next 36 months. This arrangement has been accounted for as a grant of restricted stock awards subject to service vesting conditions. Because the modification does not affect any of the other terms or conditions of the award, presumably the fair value before and after the modification is the same.

On May 15, 2014, the Company's four founding shareholders entered into an agreement with the investors to renew the arrangement. The Company considered the amendment of agreement as a modification of vesting of the restricted shares. Pursuant to the agreement, the Company shall be entitled to repurchase 50% and 25% of such shares in the case that founders terminate their employments with the Company before April 17, 2015 and during the period from April 17, 2015 to April 17, 2016, respectively, at a price of US$0.0001 per share or the lowest price permitted under applicable laws. Therefore, the Company considered that 50% of the total restricted shares were vested immediately on the amendment date and 25% shall be vested annually on April 17 in the next two years ending April 17, 2016. Before the modification date, May 15, 2014, there were 131,348,411 ordinary shares, of which 45,937,500 were unvested restricted shares. As the result of modification, 19,736,705 vested ordinary shares were classified to unvested restricted shares on the modification date and the corresponding compensation costs for these unvested restricted shares were amortized over the remaining service period. Because the modification does not affect any of the other terms or conditions of the award, the fair value of the restricted shares before and after the modification is the same.

F-52

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**12.   SHARE-BASED COMPENSATION - continued**

*Non-vested restricted shares* - continued

A summary of non-vested restricted share activity during the years ended December 31, 2014, 2015 and 2016 is presented below:

|  | Number of shares |
|---|---:|
| Outstanding as of January 1, 2014 | 58,187,500 |
| Granted | — |
| Modification | 19,736,705 |
| Vested | (20,673,449) |
| Outstanding as of December 31, 2014 | 57,250,756 |
| Granted | — |
| Forfeited | — |
| Vested | (28,625,378) |
| Outstanding as of December 31, 2015 | 28,625,378 |
| Granted | — |
| Forfeited | — |
| Vested | (28,625,378) |
| Outstanding as of December 31, 2016 | — |

The weighted average grant date fair value of the non-vested restricted shares was $0.01 per share and the aggregated fair value was $1,470. The total fair value of non-vested restricted shares vested during the years ended December 31, 2014, 2015 and 2016 was $9, $286 and $286, respectively.

The Company recorded compensation expense of $335, $180 and $52 during the years ended December 31, 2014, 2015 and 2016, respectively, related to non-vested restricted shares.

As of December 31, 2016, total unrecognized compensation expense relating to the non-vested restricted shares was $nil.

*Restricted share units ("RSUs")*

On December 11, 2014, the Company granted a total of 40,001 shares of RSUs to independent directors under the 2014 Plan. The restricted share units will vest in accordance with the vesting schedule set out in the RSUs award agreement, which is 50% of the RSUs shall vest at the end of every six months since the grant date.

**Table of Contents**

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**12.    SHARE-BASED COMPENSATION - continued**

*Restricted share units ("RSUs")* - continued

On May 17, 2016, the Company granted a total of 200,000 shares of RSUs to independent directors under the 2014 Plan and vesting period of 4 years, which began from December 11, 2015.

The Company will forfeit the unvested portion of the RSUs if the grantees terminate their service during the vesting period.

The fair value of these RSUs is measured on the grant date based on the market price of the ordinary share on the grant date. The following table summarizes information regarding the share units granted:

|  | Number of shares |
|---|---|
| Outstanding as of January 1, 2015 | 40,001 |
| Granted | — |
| Forfeited | — |
| Vested | (40,001) |
| Outstanding as of December 31, 2015 | — |
| Granted | 200,000 |
| Forfeited | — |
| Vested | (50,000) |
| Outstanding as of December 31, 2016 | 150,000 |

The weighted-average grant-date fair value of the restricted share units granted during the years 2014, 2015, and 2016 was $8.51, $nil, and $6.50, respectively. Total intrinsic value of the restricted share units exercised for the years ended December 31, 2014, 2015 and 2016 was $nil, $301 and $511, respectively. The total fair value of the restricted share units vested during the years ended December 31, 2014, 2015 and 2016 was $nil, $340 and $325, respectively. The aggregated fair value of RSUs was $340 and $1,299, respectively, for the grant date of December 11, 2014 and May 17, 2016.

The Group recorded share-based compensation of $18, $322 and $343 for RSUs for the years ended December 31, 2014, 2015 and 2016, respectively, based on the fair value on the grant dates over the requisite service period of award using the straight-line method.

As of December 1, 2016, total unrecognized compensation expense relating to unvested RSUs was $956, which will be recognized over 2.95 years. The weighted-average remaining contractual term of RSUs outstanding is 8.94 years.

F-54

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**13.    NET INCOME (LOSS) PER SHARE**

For the years ended December 31, 2014, 2015 and 2016, the Group has determined that its convertible redeemable participating preferred shares are participating securities as the preferred shares participate in undistributed earnings on an as-if-converted basis. The holders of the preferred shares are entitled to receive dividends on a pro rata basis, as if their shares had been converted into ordinary shares. The Group determined that the nonvested restricted shares are participating securities as the holders of the nonvested restricted shares have a nonforfeitable right to receive dividends with all ordinary shares but the nonvested restricted shares do not have a contractual obligation to fund or otherwise absorb the Company's losses. Accordingly, the Group uses the two-class method of computing net loss per share, for ordinary shares, nonvested restricted shares and preferred shares according to the participation rights in undistributed earnings.

The calculation of net loss per share is as follows:

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2016 |
| Numerator: | | | |
| Net (loss) income attributable to MomoInc. | $(25,415) | $13,697 | $145,250 |
| Deemed dividend to Series A-1 and Series A-2 shares | (30,910) | — | — |
| Deemed dividend to Series A-3 shares | (544) | — | — |
| Deemed dividend to Series B shares | (3,116) | — | — |
| Deemed dividend to Series C shares | (5,596) | — | — |
| Deemed dividend to Series D shares | (17,497) | — | — |
| Undistributed earnings allocated to Series A shares | — | — | — |
| Undistributed earnings allocated to Series B shares | — | — | — |
| Undistributed earnings allocated to Series C shares | — | — | — |
| Undistributed earnings allocated to Series D shares | — | — | — |
| Undistributed earnings allocated to participating nonvested restricted shares | — | (1,339) | (3,197) |
| Net (loss) income attributed to ordinary shareholders for computing net (loss) income per ordinary share-basic and diluted | $(83,078) | $12,358 | $142,053 |

F-55

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**13.    NET INCOME (LOSS) PER SHARE - continued**

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2016 |
| Denominator: | | | |
| Denominator for computing net (loss) income per share-basic: | | | |
| Weighted average ordinary shares outstanding used in computing net (loss) income per ordinary share-basic | 85,293,775 | 342,646,282 | 377,335,923 |
| Weighted average shares used in computing net (loss) income per participating nonvested restricted share | 60,951,591 | 37,118,622 | 8,493,244 |
| Weighted average shares used in computing net income per Series A-1 and Series A-2 share | 32,176,676 | — | — |
| Weighted average shares used in computing net income per Series A-3 Share | 18,990,997 | — | — |
| Weighted average shares used in computing net income per Series B share | 67,182,243 | — | — |
| Weighted average shares used in computing net income per Series C Share | 34,540,898 | — | — |
| Weighted average shares used in computing net income per Series D share | 28,348,231 | — | — |
| Denominator for computing net (loss) income per share-diluted: | | | |
| Weighted average shares outstanding used in computing net (loss) income per ordinary share-diluted | 85,293,775 | 401,396,548(i) | 407,041,165(ii) |
| Net (loss) income per ordinary share attributable to Momo Inc. - basic | $ (0.97) | $ 0.04 | $ 0.38 |
| Net income per participating nonvested restricted share | $ — | $ 0.04 | $ 0.38 |
| Net income per Series A-1 and Series A-2 share | $ 0.96 | $ — | $ — |
| Net income per Series A-3 share | $ 0.03 | $ — | $ — |
| Net income per Series B share | $ 0.05 | $ — | $ — |
| Net income per Series C share | $ 0.16 | $ — | $ — |
| Net income per Series D share | $ 0.62 | $ — | $ — |
| Net (loss) income per ordinary share attributable to Momo Inc. - diluted | $ (0.97) | $ 0.03 | $ 0.36 |

F-56

**Table of Contents**

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**13.    NET INCOME (LOSS) PER SHARE - continued**

The following table summarizes potential ordinary shares outstanding excluded from the computation of diluted net loss or income per ordinary share for the years ended December 31, 2014, 2015 and 2016, because their effect is anti-dilutive:

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2016 |
| Share issuable upon exercise of share options | 21,831,082 | 904,489 | 152,500 |
| Share issuable upon exercise of RSUs | — | 15,001 | 50,000 |
| Share issuable upon vesting of nonvested restricted shares | 60,951,591 | — | — |
| Share issuable upon conversion of Series A-1 and Series A-2 shares | 32,176,676 | — | — |
| Share issuable upon conversion of Series A-3 shares | 18,990,997 | — | — |
| Share issuable upon conversion of Series B shares | 67,182,243 | — | — |
| Share issuable upon conversion of Series C shares | 34,540,898 | — | — |
| Share issuable upon conversion of Series D shares | 28,348,231 | — | — |

(i)    For the year 2015, an incremental weighted average number of 35,759,066 nonvested restricted shares and an incremental weighted average number of 22,991,200 ordinary shares from the assumed exercise of share options and vesting of restricted share units using the treasury stock method were included.

(ii)    For the year 2016, an incremental weighted average number of 7,155,060 nonvested restricted shares and an incremental weighted average number of 22,550,182 ordinary shares from the assumed exercise of share options and vesting of restricted share units using the treasury stock method were included.

**14.    COMMITMENTS AND CONTINGENCIES**

Lease commitment

The Group leases certain office premises under non-cancellable leases. These leases expire through 2019 and are renewable upon negotiation. Rental expenses under operating leases for the years ended December 31, 2014, 2015 and 2016 were $2,995, $3,715 and $4,743, respectively.

Future minimum payments under non-cancellable operating leases as of December 31, 2016 were as follows:

| | |
| --- | --- |
| 2017 | $5,547 |
| 2018 | 2,644 |
| 2019 | 360 |
| 2020 | 296 |
| Total | $8,847 |

F-57

**Table of Contents**

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**14.    COMMITMENTS AND CONTINGENCIES - continued**

Investment commitments

The Group was obligated to subscribe $2,702 and $2,942 for partnership interest and equity interest of certain long-term investees under various arrangements as of December 31, 2015 and 2016, respectively.

Contingencies

On October 22, 2015, the Group was served a civil complaint by Guangzhou Tian He People's Court in which the plaintiff claimed that Xiaoyao Xiyou, a game that the Group operated and currently operates, infringed upon the plaintiff's copyright in works of literature and art of a game, constituting unfair competition. The plaintiff demanded that the Group to cease the infringement and pay compensation and legal costs totalling approximately $1,440. The trail was began proceeding in 2016. The next court hearing date was not determined as of December 31, 2016.

The Group believes the claim made by the plaintiff is without merit, and the Group intends to defend vigorously in the case. Although the outcome of litigation is inherently uncertain, the Group does not believe the possibility of loss is probable. The Group is unable to estimate a range of loss, if any, that could result if there would be an adverse final decision, and the Group has not accrued a liability for the matter.

**15.    RELATED PARTY BALANCES AND TRANSACTIONS**

| Name of the related party | Relationship with the Group |
|---|---|
| Hangzhou Alimama Technology Co., Ltd. | Affiliates of a Major Shareholder |
| Guangzhou UC Network Technology Co., Ltd. | Affiliates of a Major Shareholder |
| Guangzhou Aijiuyou Informational Technology Co., Ltd. | Affiliates of a Major Shareholder |
| Alibaba Cloud Computing Ltd. | Affiliates of a Major Shareholder |
| Taobao (China) Software Co., Ltd | Affiliates of a Major Shareholder |
| Zhejiang Tmall Technology Co., Ltd. | Affiliates of a Major Shareholder |
| Shanghai Touch Future Network Technology Co., Ltd. | Equity method investment |
| Hunan Qindao Cultural Spread Ltd. | Available-for-sale investment |
| Shanghai Xisue Network Technology Co., Ltd. | Affiliate of an available-for-sale investment |

(1)    Amount due from related parties-current

| | As of December 31, | |
|---|---|---|
| | 2015 | 2016 |
| Hangzhou Alimama Technology Co., Ltd. | $    876 | $    2 |
| Shanghai Touch Future Network Technology Co., Ltd. | 299 | — |
| Guangzhou UC Network Technology Co., Ltd. | — | 5 |
| Guangzhou Aijiuyou Informational Technology Co., Ltd. | — | 81 |
| Total | $    1,175 | $    88 |

F-58

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**15.   RELATED PARTY BALANCES AND TRANSACTIONS - continued**

(2)   Amount due to related parties - current

|  | As of December 31, | |
|---|---|---|
|  | 2015 | 2016 |
| Amount due to ordinary shareholders (i) | $6,450 | $5,862 |
| Hunan Qindao Cultural Spread Ltd. | — | 1,281 |
| Alibaba Cloud Computing Ltd. | 82 | 629 |
| Shanghai Touch Future Network Technology Co., Ltd. | — | 229 |
| Taobao (China) Software Co., Ltd. | — | 116 |
| Total | $6,532 | $8,117 |

(i)   The amounts of $6,450 and $5,775 as of December 31, 2015 and 2016 represent the unpaid repurchase amount by the Group to its ordinary shareholders. Please refer to Note 10 for repurchase of ordinary shares.

(3)   Sales to related parties

|  | For the years ended December 31, | | |
|---|---|---|---|
|  | 2014 | 2015 | 2016 |
| Shanghai Xisue Network Technology Co., Ltd. (ii) | $ — | $ — | $ 922 |
| Zhejiang Tmall Technology Co., Ltd. (ii) | — | — | 820 |
| Guangzhou Aijiuyou Informational Technology Co., Ltd. (iii) | — | — | 400 |
| Taobao (China) Software Co., Ltd. (ii) | — | — | 249 |
| Hangzhou Alimama Technology Co., Ltd. (ii) | — | 6,002 | 42 |
| Guangzhou UC Network Technology Co., Ltd. (iii) | — | — | 9 |
| Total | $ — | $ 6,002 | $ 2,442 |

(ii)   The sales to related parties represented mobile marketing services provided.

(iii)   The sales to related parties represented mobile game revenue generated through those game operating companies.

(4)   Purchase from related parties

|  | For the years ended December 31, | | |
|---|---|---|---|
|  | 2014 | 2015 | 2016 |
| Hunan Qindao Cultural Spread Ltd. (iv) | $ — | $ — | $ 3,929 |
| Alibaba Cloud Computing Ltd. (v) | — | 322 | 3,360 |
| Shanghai Touch future Network Technology Co., Ltd. | — | — | 347 |
| Taobao (China) Software Co., Ltd. | — | — | 323 |
| Total | $ — | $ 322 | $ 7,959 |

F-59

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

15. **RELATED PARTY BALANCES AND TRANSACTIONS - continued**

(4)    Purchase from related parties - continued

(iv)    The purchase from Hunan Qindao Cultural Spread Ltd. is the revenue sharing with broadcaster agencies of live video service.

(v)    The purchase from Alibaba Cloud Computing Ltd. is mainly related to its cloud computing services.

16. **SEGMENT INFORMATION**

The Group's chief operating decision maker has been identified as the Chief Executive Officer ("CEO"), who reviews consolidated results when making decisions about allocating resources and assessing performance of the Group. The Group's revenue and net income are substantially derived from live video service, value-added services, mobile marketing services, mobile games and other services. The Group does not have discrete financial information of costs and expenses between various services in its internal reporting, and reports costs and expenses by nature as a whole. Therefore, the Group has one operating segment.

The table below is only presented at the revenue level with no allocations of direct or indirect cost and expenses. The Group operates in the PRC; most of the Group's long-lived assets are located in the PRC and all services are provided in the PRC.

Components of revenues are presented in the following table:

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2016 |
| Live video service | $    — | $   1,231 | $376,925 |
| Value-added service | 29,756 | 58,462 | 67,603 |
| Mobile marketing | 1,975 | 38,885 | 66,339 |
| Mobile games | 11,237 | 31,082 | 35,453 |
| Other services | 1,787 | 4,328 | 6,778 |
| Total | $44,755 | $133,988 | $553,098 |

17. **EMPLOYEE BENEFIT PLAN**

Full time employees of the Group in the PRC participate in a government-mandated defined contribution plan pursuant to which certain pension benefits, medical care, unemployment insurance, employee housing fund and other welfare benefits are provided to employees. The Group accrues for these benefits based on certain percentages of the employees' salaries. The total provisions for such employee benefits were $2,635, $6,487 and $9,081 for the years ended December 31, 2014, 2015 and 2016, respectively.

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 AND 2016**
**(In U.S. dollars in thousands, except share data)**

**18.    STATUTORY RESERVES AND RESTRICTED NET ASSETS**

In accordance with the Regulations on Enterprises with Foreign Investment of China and their articles of association, the Group's subsidiaries and VIE located in the PRC, being foreign invested enterprises established in the PRC, are required to provide for certain statutory reserves. These statutory reserve funds include one or more of the following: (i) a general reserve, (ii) an enterprise expansion fund or discretionary reserve fund, and (iii) a staff bonus and welfare fund. Subject to certain cumulative limits, the general reserve fund requires a minimum annual appropriation of 10% of after-tax profit (as determined under accounting principles generally accepted in China at each year-end); the other fund appropriations are at the subsidiaries' or the affiliated PRC entities' discretion. These statutory reserve funds can only be used for specific purposes of enterprise expansion, staff bonus and welfare, and are not distributable as cash dividends except in the event of liquidation of our subsidiaries, our affiliated PRC entities and their respective subsidiaries. The Group's subsidiaries and VIE are required to allocate at least 10% of their after tax profits to the general reserve until such reserve has reached 50% of their respective registered capital.

Appropriations to the enterprise expansion reserve and the staff welfare and bonus reserve are to be made at the discretion of the board of directors of each of the Group's subsidiaries.

The appropriations to these reserves by the Group's PRC subsidiary, VIE and VIE's subsidiaries were $nil, $553 and $17,969 for the years ended December 31, 2014, 2015 and 2016.

Relevant PRC laws and regulations restrict the WFOE, VIE and VIE's subsidiaries from transferring a portion of their net assets, equivalent to the balance of their statutory reserves and their paid in capital, to the Company in the form of loans, advances or cash dividends. The WFOE's accumulated profits may be distributed as dividends to the Company without the consent of a third party. The VIE and VIE's subsidiaries' revenues and accumulated profits may be transferred to the Company through contractual arrangements without the consent of a third party. Under applicable PRC law, loans from PRC companies to their offshore affiliated entities require governmental approval, and advances by PRC companies to their offshore affiliated entities must be supported by bona fide business transactions. The capital and statutory reserves restricted which represented the amount of net assets of the Group's PRC subsidiary, VIE and VIE's subsidiaries in the Group not available for distribution were $93,537, $91,008 and $108,977 as of December 31, 2014, 2015 and 2016, respectively.

**19.    SUBSEQUENT EVENTS**

New acquisition

In February 2017, the Group entered into an agreement to acquire 100% equity interest of Zhejiang Digital Network Technology Co., Ltd to develop live video service business. The total cash consideration is $5,478, of which $4,760 has been paid. The acquisition was completed on March, 31, 2017. The Group is in the process of evaluating the accounting treatment on this acquisition.

Newly issued share options

In March 2017, the Company granted 2,217,004 share options to its executives with an exercise price of $0.0002 per share and 100,000 RSUs to its independent directors, with the vesting period of 4 years. The Group is in the process of finalizing the fair value assessment.

**Exhibit 4.11**
**This is an English translation of the original Chinese text.**

**EXCLUSIVE COOPERATION**
**AGREEMENT**

**Tianjin Heer Technology Co., Ltd.**
**and**
**Beijing Momo Information Technology Co., Ltd.**

1/8

# EXCLUSIVE COOPERATION AGREEMENT

This Cooperation Agreement (this "**Agreement**"), signed and effective on May 1, 2016 (**"Effective Date"**), is concluded by and between the parties listed below:

Tianjin Heer Technology Co., Ltd. ("**Tianjin Heer**"),

Beijing Momo Information Technology Co., Ltd. ("**Beijing Momo IT**")

## BACKGROUND

**Whereas**, **Tianjin Heer** is responsible for operating the **Live Video Business** in China by obtaining and maintaining the Internet Content Provider ("ICP") license and Internet Culture Business License required to operate **Hani Live Video App** in China.

**Whereas**, **Tianjin Heer** acquires the software **Licensing** and **Services** of **Beijing Momo IT** to carry out the **Live Video Business** in China.

**Whereas**, this **Agreement** sets forth the terms and conditions under which **Beijing Momo IT** has agreed to provide, and **Tianjin Heer** has agreed to receive, the **Licensing** and the **Services**;

**Whereas**, the capitalized terms used and not otherwise defined in this **Agreement** are defined in Article 1 of this **Agreement**;

Now, therefore, in consideration of the mutual promises, covenants, conditions and terms set forth herein, **the Parties** agree as follows:

## 1    DEFINITIONS.

Capitalized terms used in this **Agreement** have the meanings set forth in this Article 1 or as otherwise defined in the context of the relevant provisions.

"**Live Video Business**" means all the online live video and interactive service business provided by **Tianjin Heer** through **Hani Live Video App** in China.

"**Hani Live Video App**" is a real-time social Live Video application software designed with iOS and Android version.

"**Momo App**" means the location-based mobile social networking software.

"**Effective Date**" is May 1, 2016.

2/8

**"Governing Laws"** is defined in Section 6.a.

**"Licensing"** means **Beijing Momo IT** agrees to grant the use right of **Hani Live Video App** to **Tianjin Heer** under this **Agreement** (licensing details will be set forth in the Supplemental Agreement to this **Agreement**). Beijing Momo IT agrees to register the copyright of **Hani Live Video App** under Tianjin Heer for operating purpose, while **Beijing Momo IT** still has de facto control. Beijing Momo IT also authorizes **Tianjin Heer** to operate its **Live Video Business** through the embedded **Hani Live Video App** in **Momo App** during the **Term** of this Agreement.

**"Services"** means those technical and non-technical services to be provided by **Beijing Momo IT** to **Tianjin Heer** under this **Agreement**. Technical services include: (i) maintenance, upgrade and technical amendment of **Hani Live Video App**; (ii) connection of **Hani Live Video App** with **Momo App**, technical maintenance of Hani Live Video module embedded in **Momo App**, guarantee of the normal operation of the **Live Video Business** of **Tianjin Heer** in **Momo App**; (iii) obtaining and analysis, information security, complete storage and back-up of user data of **Hani Live Video App**; (iv) technical support and maintenance relating to hardware and software; (v) testing and management of platform and network security; (vi) relevant after-sale technical services, including on-site installation and debugging of network equipment/hardware, compatibility guidance, training and day-to-day consulting, etc. Non-technical services include: i) planning and implementation of marketing and advertising services; (ii) business negotiation, training and management of live video staff; (iii) sales and payment channel management and development; (iv) call center management;(v) administrative services including legal, finance, HR and admin services; and (vi) other services as the **Parties** may agree from time to time.

**"License Fee"** is defined in Section 4.

**"Service Fee"** is defined in Section 4.

**"Term"** is defined in Section 2.a.

2    **TERM AND TERMINATION.**

    a.    **Term.** The term of this **Agreement** will begin on the **Effective Date** and will remain effective for ten (10) years. After the effective period, **Beijing Momo IT** may decide at its own discretion if this **Agreement** will be renewed and how long it will be renewed for ("**Term**").

    b.    **Termination for Convenience. Beijing Momo IT** may terminate this **Agreement** upon thirty (30) days' prior written notice. **Tianjin Heer** shall not terminate this **Agreement** at an earlier time under any circumstances.

3    **EXCLUSIVE COOPERATION AND INTELLECTUAL PROPERTY RIGHTS.**

a.    During the **Term**, **Beijing Momo IT** shall provide the **Licensing** and **Services** to **Tianjin Heer** as agreed by the Parties. During the **Term** of this Agreement, **Beijing Momo IT** shall act as the exclusive partner of **Tianjin Heer**, and without **Beijing Momo IT**'s consent, **Tianjin Heer** is not entitled to accept any licensing or services from other third parties that are the same as or similar to the **Licensing** or the **Services**.

b.    **Beijing Momo IT** shall enjoy sole and exclusive rights and interests in and to all the intellectual property rights developed under this **Agreement**, including but not limited to copyright, patent right, right of patent application, software, knowhow and business secrets.

4    **LICENSE FEE, SERVICE FEE AND PAYMENT.**

a.    Pursuant to this **Agreement**, **Beijing Momo IT** grants to **Tianjin Heer** the use right of **Hani Live Video App**, which is researched and developed by **Beijing Momo IT**. **Tianjin Heer** intends to pay **Beijing Momo IT** a license fee (**"License Fee"**) in consideration of the rights granted. The calculation methodology of the **License Fee** will be set forth in the Supplemental Agreement to this **Agreement**.

b.    Pursuant to this **Agreement** and **Tianjin Heer**'s request from time to time, **Beijing Momo IT** provides **Tianjin Heer** with the **Services**. **Tianjin Heer** intends to pay **Beijing Momo IT** a level of compensation commensurate with the value of the **Services** it provides (**"Service Fee"**), which are essential and fundamental to the economic success or failure of **Tianjin Heer**'s business in China.

c.    To ensure the high quality of the **Licensing** and the **Services**, **Beijing Momo IT** agrees to be compensated for the **Licensing** and the **Services** only if **Tianjin Heer** achieves a pre-determined level of operating profit, initially agreed to be three point five percent (3.5%) (**"Expected Profit Rate"**) of total operating revenue derived by **Tianjin Heer**. The calculation of the **License Fee** and the **Service Fee** shall be premised on the condition that **Tianjin Heer**'s operating profit rate will not be lower than the **Expected Profit Rate**. If **Tianjin Heer** achieves a level of operating profit above the **Expected Profit Rate**, the excess operating profit will be remitted to **Beijing Momo IT** in the form of **License Fee** and **Service Fee**. The calculation methodology and fee rate of each item of the **License Fee** and **Service Fee** will be set forth in the Supplemental Agreement to this **Agreement**. If **Tianjin Heer** is unable to achieve the **Expected Profit Rate** due to **Beijing Momo IT**'s failure in providing the high quality services, **Beijing Momo IT** will not be entitled to any **License Fee** or **Service Fee**. The **Parties** agree to re-assess and discuss the **Expected Profit Rate** from time to time.

Operating profit rate = (Revenues – Cost of revenues – Sales tax and surcharges –Sales expense – general and administrative expenses – research and development expenses) / Revenues.

4/8

d.  **Payment.** a statement for the **License Fee** and the **Service Fee** shall be submitted on a monthly basis. The **Parties** agrees to pay the total amounts shown as due within sixty (60) days from the end of each month. The **Parties** agree to pay or offset the amounts from time to time, as requested by either **Party**.

e.  **Currency.** All computations and payments made pursuant to this Article 4 shall be in Chinese RMB. A netting of any amount payable under this **Agreement** against existing accounts payable and accounts receivable shall be an acceptable manner of payment, effective as of the date of the netting recorded on the books of the **Parties**.

f.  **Retrospection.** The **Parties** agree the **License Fee** and the **Service Fee** defined in this Section shall be retrospective to the **Parties** from April 1, 2016.

## 5  TAXES.

a.  **Beijing Momo IT's Tax Responsibility. Beijing Momo IT** is liable for any value-added tax, excise tax, tariff, duty or any other similar tax imposed by any governmental authority arising from the performance of **Services** under this **Agreement**.

b.  **Tianjin Heer's Tax Responsibility. Tianjin Heer** is liable for any value-added tax, excise tax, tariff, duty or any other similar tax imposed by any governmental authority arising from its performance of this **Agreement**.

## 6  COMPLIANCE WITH LAWS.

a.  **Compliance.** Each Party will perform its obligations under this **Agreement** in a manner that complies with all laws applicable to that Party's business. Without limiting the foregoing, the Parties will respectively identify and comply with all laws applicable to the Parties including: (a) laws requiring the procurement of inspections, certificates and approvals needed to perform the **Services**, and (b) laws regarding healthcare, workplace safety, immigration, labor standards, wage and hour laws, insurance, data protection and privacy (collectively, "**Governing Laws**").

b.  **Change in Law.** The Parties will work together to identify the effect of changes in laws on this **Agreement**, and will promptly discuss the changes to the terms and provisions of this **Agreement**, if any, required to comply with all laws.

## 7  CONSTRUCTION.

a.  **Severability.** If any provision of this **Agreement** is held by a court of competent jurisdiction to be contrary to law, then the remaining provisions of this **Agreement**, to the extent the specific performance is practicable, will remain in full force and effect.

5/8

b. **Applicable Law.** This **Agreement** shall be construed and enforced in accordance with the laws of the People's Republic of China without regard to the conflict of law principles thereof.

c. **Resolution of Disputes.** This **Agreement** shall be governed by the laws of the People's Republic of China. All disputes arising from the conclusion, performance or interpretation of this **Agreement** shall be settled by the Parties through consultation. If the consultation fails, the disputes shall be referred to China International Economic and Trade Arbitration Commission for arbitration. The place of arbitration shall be in Beijing. The arbitral award shall be final and binding upon both Parties.

Each of **Beijing Momo IT** and **Tianjin Heer** has caused this **Agreement** to be signed by its duly authorized representative to be effective as of the **Effective Date**.

By Authorized Signatory:

_____

Title:_____
[Stamped with corporate seal of Tianjin Heer Technology Co., Ltd.]
For and on behalf of
Tianjin Heer Technology Co., Ltd.

By Authorized Signatory:

_____

Title:_____
[Stamped with corporate seal of Beijing Momo Information Technology Co., Ltd.]
For and on behalf of
Beijing Momo Information Technology Co., Ltd.

6/8

**Supplemental Agreement**

Party A: Tianjin Heer Technology Co., Ltd.
Address: Rm 303, 3/F, Building 9, Ecologic Construction Apartment, South to Zhongbin Avenue, West to Zhongcheng Avenue, Sino-Singapore Eco-City, Binhai New Zone, Tianjin, P. R. China

Party B: Beijing Momo Information Technology Co., Ltd.
Address: Rm 232005, 20F, Building B, Tower 2, No. 1 East Futong Avenue, Wangjing SOHO, Chaoyang District, Beijing, P. R. China

An Exclusive Cooperation Agreement (the "Original Agreement") was concluded between Party A and Party B (the "Parties") on May 1, 2016. Based on amicable negotiations under the principles of equality, voluntariness, honesty and mutual benefits, the Parties agree on this Supplemental Agreement on the basis of the Original Agreement with respect to the matters during the period of cooperation in accordance with the Contract Law of the PRC and other relevant laws and regulations.

1.    Supplementary Terms

a)    According to Section 1 of the Original Agreement, Party B licenses to Party A the use right of Hani Live Video App, which is researched and developed by Party B, starting from the effective date of this Supplemental agreement, including but not limited to the following versions and subsequent updates and upgrades thereof:

Hani Live Video App iOS V1.0
Hani Live Video App V1.0

Under the license: (i) Party B will be responsible for the development, design and maintenance of Hani Live Video App systems and platforms, and additions and upgrades of the software functions; (ii) Party B licenses Party A to operate Hani Live Video App, and for this purpose register Hani Live Video App to under the name of Party A, but Party B will reserve its ownership of Hani Live Video App.

b)    According to Section 1 of the Original Agreement, Party B licenses Party A to conduct Live Video Business through Hani Live Video module embedded in Momo App during the Term of the Original Agreement (including but not limited to the following versions and subsequent updates and upgrades thereof):

| | |
|---|---|
| Momo App iOS V5.1 | Momo App Android V5.1 |
| Momo App iOS V5.4 | Momo App Android V5.4 |
| Momo App iOS V5.7 | Momo App Android V5.7 |
| Momo App iOS V5.8 | Momo App Android V5.8 |
| Momo App iOS V6.0 | Momo App Android V6.0 |
| Momo App iOS V6.2 | Momo App Android V6.2 |

7/8

c)     Under the license: (i) Party B will be responsible for the design, development and maintenance of Momo App systems and platforms, and additions and upgrades of the software functions; (ii) Party B licenses Party A to conduct Live Video Business through Hani Live Video module embedded in Momo App for users' paid or free use.

d)     According to Article 4.a of the Original Agreement, Party A shall pay Party B a License Fee in consideration for the use of Hani Live Video App. The License Fee will be twelve point five percent (12.5%) of the revenue from Party A's primary business.

e)     The Parties agree to re-assess and discuss the calculation methodology of the License Fee from time to time.

f)     Without written consent of Party B, Party A shall not distribute, sublicense, offer to any third party, transfer or disclose such use right, or try to develop, modify or decompile on the basis of Party B's software. Party A agrees that Party B has all the exclusive ownership and interests of Party B, including all intellectual property, know-how, right of improvements and other rights and interests relating to such software product. Under no circumstances shall Party A be directly or indirectly involved in any activities that may impair Party B's ownership and interests in and to such software.

2.     The above are the supplementary terms entered into by the Parties on the basis of the original Agreement upon mutual negotiations without affecting the terms of the Original Agreement. The Parties shall strictly comply with the Exclusive Cooperation Agreement concluded on May 1, 2016.

3.     This Supplemental Agreement is an integral part of the Exclusive Cooperation Agreement concluded by the Parties on May 1, 2016. The Parties confirm and agree that the License Fee set forth in this Supplemental Agreement shall be retrospective and applicable to the Parties from April 1, 2016. This Supplemental Agreement is made in two (2) sets original counterparts with equal validity. Party A and Party B each have one set of the originals. This Agreement shall take effect as of the date when both Parties leave their respective signature and seal on it.

By Authorized Signatory:

_____

Title:_____

[Stamped with corporate seal of Tianjin Heer Technology Co., Ltd.]

For and on behalf of

Tianjin Heer Technology Co., Ltd.

By Authorized Signatory:

_____

Title:_____

[Stamped with corporate seal of Beijing Momo Information Technology Co., Ltd.]

For and on behalf of

Beijing Momo Information Technology Co., Ltd.

8/8

**Exhibit 8.1**

**List of Subsidiaries and Consolidated Entities of the Registrant**

| Subsidiaries | Place of Incorporation |
|---|---|
| Momo Technology HK Company Limited | Hong Kong |
| Beijing Momo Information Technology Co., Ltd. | PRC |
| Momo Technology Overseas Holding Company Limited. | British Virgin Islands |
| Momo Information Technologies Corp. | U.S. |
| **Consolidated Affiliated Entity** | |
| Beijing Momo Technology Co., Ltd. | PRC |
| **Subsidiaries of the Consolidated Affiliated Entity** | |
| Chengdu Momo Technology Co., Ltd. | PRC |
| Shanghai Momo Technology Co., Ltd. | PRC |
| Tianjin Heer Technology Co., Ltd. | PRC |
| Chengdu Biyou Technology Co., Ltd. | PRC |
| Momo Pictures Co., Ltd. | PRC |
| QOOL Media (Tianjin) Co., Ltd. | PRC |
| Zhejiang Shengdian Digital Network Technology Co., Ltd. | PRC |

**Exhibit 12.1**

**Certification by the Principal Executive Officer**
**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Yan Tang, certify that:

1. I have reviewed this annual report on Form 20-F of Momo Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4. The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date: April 26, 2017

By: /s/ Yan Tang
Name: Yan Tang
Title: Chairman and Chief Executive Officer

**Exhibit 12.2**

**Certification by the Principal Financial Officer**
**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Jonathan Xiaosong Zhang, certify that:

1. I have reviewed this annual report on Form 20-F of Momo Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4. The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date: April 26, 2017

By:     /s/ Jonathan Xiaosong Zhang
        Name: Jonathan Xiaosong Zhang
        Title:  Chief Financial Officer

**Exhibit 13.1**

**Certification by the Principal Executive Officer
Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of Momo Inc. (the "Company") on Form 20-F for the year ended December 31, 2016 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Yan Tang, Chairman and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: April 26, 2017

By: /s/ Yan Tang
 Name: Yan Tang
 Title: Chairman and Chief Executive Officer

**Exhibit 13.2**

**Certification by the Principal Financial Officer**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of Momo Inc. (the "Company") on Form 20-F for the year ended December 31, 2016 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Jonathan Xiaosong Zhang, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: April 26, 2017

By: /s/ Jonathan Xiaosong Zhang
    Name: Jonathan Xiaosong Zhang
    Title: Chief Financial Officer

**Exhibit 15.1**

**Our ref:**    MJL/692329-000001/10958822v2
**Direct**    +852 3690 7490
**Email**    michael.li@maplesandcalder.com

Momo Inc.
20th Floor, Block B, Tower 2
Wangjing SOHO
No.1 Futongdong Street
Chaoyang District
Beijing 100102
People's Republic of China

26 April 2017

Dear Sirs

**Momo Inc.**

We have acted as legal advisers as to the laws of the Cayman Islands to Momo Inc., an exempted limited liability company incorporated in the Cayman Islands (the "**Company**"), in connection with the filing by the Company with the United States Securities and Exchange Commission (the "**SEC**") of an Annual Report on Form 20-F for the year ended 31 December 2016 (the "**Annual Report**"), which will be filed with the SEC in the month of April 2017.

We consent to the reference to our firm under the heading "Item 16G. Corporate Governance" in the Annual Report and further consent to the incorporation by reference into the registration statement on Form S-8 (File No. 333-201769) dated January 30, 2015, pertaining to the Company's Amended and Stated 2012 Share Incentive Plan and 2014 Share Incentive Plan, and the registration statement on Form S-8 (File No. 333-215366) dated December 30, 2016, pertaining to the Company's 2014 Share Incentive Plan, of the summary of our opinion under the heading "Item 16G. Corporate Governance" in the Annual Report. We also consent to the filing with the SEC of this consent letter as an exhibit to the Annual Report.

In giving such consent, we do not thereby admit that we come within the category of persons whose consent is required under Section 7 of the Securities Act of 1933, or under the Securities Exchange Act of 1934, in each case, as amended, or the regulations promulgated thereunder.

Yours faithfully,

/s/ Maples and Calder (Hong Kong) LLP

**Exhibit 15.2**

April 26, 2017

Momo Inc. (the "Company")
20th Floor, Block B
Tower 2, Wangjing SOHO
No.1 Futongdong Street
Chaoyang District, Beijing 100102
People's Republic of China

Ladies and Gentlemen:

We have acted as legal advisors as to the laws of the People's Republic of China to the Company in connection with the filing by the Company with the United States Securities and Exchange Commission of an annual report on Form 20-F for the fiscal year ended December 31, 2016 and any amendments thereto (the "Annual Report"). We hereby consent to the use and reference to our name and our opinions and views in the Annual Report, and further consent to the incorporation by reference of the summaries of our opinions in the Annual Report into the Company's registration statement on Form S-8 (File No. 333-201769) dated January 30, 2015, pertaining to the Company's Amended and Stated 2012 Share Incentive Plan and 2014 Share Incentive Plan, and the registration statement on Form S-8 (File No. 333-215366) dated December 30, 2016, pertaining to the Company's 2014 Share Incentive Plan.

We further consent to the filing of this letter as an exhibit to the Annual Report.

Sincerely yours,

/s/ Han Kun Law Offices
Han Kun Law Offices

**Exhibit 15.3**

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the incorporation by reference in the Registration Statements No. 333-201769 and No. 333-215366 on Form S-8 of our report dated April 26, 2017, relating to the consolidated financial statements of Momo Inc., its subsidiaries, its variable interest entity ("VIE"), and its VIE's subsidiaries (collectively, the "Group"), appearing in the Annual Report on Form 20-F of Momo Inc. for the year ended December 31, 2016.

/s/ Deloitte Touche Tohmatsu Certified Public Accountants LLP
Beijing, the People's Republic of China
April 26, 2017

| **Document and Entity Information** | **12 Months Ended Dec. 31, 2016 shares** |
|---|---|
| **Document Information [Line Items]** | |
| Document Type | 20-F |
| Amendment Flag | false |
| Document Period End Date | Dec. 31, 2016 |
| Document Fiscal Year Focus | 2016 |
| Document Fiscal Period Focus | FY |
| Trading Symbol | MOMO |
| Entity Registrant Name | Momo Inc. |
| Entity Central Index Key | 0001610601 |
| Current Fiscal Year End Date | --12-31 |
| Entity Well-known Seasoned Issuer | Yes |
| Entity Current Reporting Status | Yes |
| Entity Voluntary Filers | No |
| Entity Filer Category | Accelerated Filer |
| Class A Common Stock [Member] | |
| **Document Information [Line Items]** | |
| Entity Common Stock, Shares Outstanding | 292,062,065 |
| Class B Common Stock [Member] | |
| **Document Information [Line Items]** | |
| Entity Common Stock, Shares Outstanding | 96,886,370 |

| Consolidated Balance Sheets - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Current assets** | | |
| Cash and cash equivalents | $ 257,564 | $ 169,469 |
| Term deposits | 393,759 | 300,000 |
| Accounts receivable, net of allowance for doubtful accounts of $nil and $nil as of December 31, 2015 and 2016 respectively | 36,078 | 14,896 |
| Amount due from related parties | 88 | 1,175 |
| Prepaid expenses and other current assets | 32,592 | 18,297 |
| Deferred tax assets, current | 72 | |
| Total current assets | 720,153 | 503,837 |
| Property and equipment, net | 13,932 | 16,259 |
| Rental deposits | 920 | 743 |
| Long term investments | 31,932 | 19,318 |
| Other non-current assets | 2,593 | 2,000 |
| Deferred tax assets, non-current | 208 | |
| Total assets | 769,738 | 542,157 |
| **Current liabilities** | | |
| Accounts payable (including accounts payable of the consolidated VIE without recourse to the Company of $9,040 and $36,812 as of December 31, 2015 and 2016, respectively) | 40,457 | 10,445 |
| Deferred revenue (including deferred revenue of the consolidated VIE without recourse to the Company of $28,274 and $41,277 as of December 31, 2015 and 2016, respectively) | 41,277 | 28,274 |
| Accrued expenses and other current liabilities (including accrued expenses and other current liabilities of the consolidated VIE without recourse to the Company of $1,954 and $6,632 as of December 31, 2015 and 2016, respectively) | 39,965 | 26,694 |
| Amount due to related parties (including amount due to related parties of the consolidated VIE without recourse to the Company of $nil and $1,510 as of December 31, 2015 and 2016, respectively) | 8,117 | 6,532 |
| Income tax payable (including income tax payable of the consolidated VIE without recourse to the Company of $nil and $3,881 as of December 31, 2015 and 2016, respectively) | 3,881 | |
| Total current liabilities | 133,697 | 71,945 |
| Other non-current liabilities | 2,022 | 1,826 |
| Total liabilities | 135,719 | 73,771 |
| Commitments and contingencies (Note14) | | |
| **Equity** | | |
| Treasury stock | (64,494) | (64,494) |
| Additional paid-in capital | 663,498 | 631,474 |
| (Accumulated deficit)/Retained earnings | 51,141 | (94,109) |
| Accumulated other comprehensive loss | (16,168) | (4,526) |
| Total equity | 634,019 | 468,386 |
| Total liabilities and equity | 769,738 | 542,157 |
| Class A Common Stock [Member] | | |
| **Equity** | | |
| Ordinary shares, value | 32 | 31 |
| Class B Common Stock [Member] | | |
| **Equity** | | |

Ordinary shares, value    $ 10    $ 10

| **Consolidated Balance Sheets (Parenthetical) - USD ($) $ in Thousands** | **Dec. 31, 2016** | **Dec. 31, 2015** |
|---|---|---|
| Allowance for doubtful accounts | $ 0 | $ 0 |
| Accounts payable of consolidated VIE without recourse | 40,457 | 10,445 |
| Deferred revenue of consolidated VIE without recourse | 41,277 | 28,274 |
| Accrued expenses and other current liabilities of consolidated VIE without recourse | 39,965 | 26,694 |
| Amount due to related parties of the consolidated VIE without recourse the Company | 8,117 | $ 6,532 |
| Income tax payable of the consolidated VIE without recourse | $ 3,881 | |
| Class A Common Stock [Member] | | |
| Ordinary shares, par value | $ 0.0001 | $ 0.0001 |
| Ordinary shares, shares authorized | 800,000,000 | 800,000,000 |
| Ordinary shares, shares issued | 292,062,065 | 286,865,033 |
| Ordinary shares, shares outstanding | 292,062,065 | 286,865,033 |
| Class B Common Stock [Member] | | |
| Ordinary shares, par value | $ 0.0001 | $ 0.0001 |
| Ordinary shares, shares authorized | 100,000,000 | 100,000,000 |
| Ordinary shares, shares issued | 96,886,370 | 96,886,370 |
| Ordinary shares, shares outstanding | 96,886,370 | 96,886,370 |
| VIE "Beijing Momo" [Member] | | |
| Allowance for doubtful accounts | $ 0 | $ 0 |
| Accounts payable of consolidated VIE without recourse | 36,812 | 9,040 |
| Deferred revenue of consolidated VIE without recourse | 41,277 | 28,274 |
| Accrued expenses and other current liabilities of consolidated VIE without recourse | 6,632 | 1,954 |
| Amount due to related parties of the consolidated VIE without recourse the Company | 1,510 | |
| Income tax payable of the consolidated VIE without recourse | $ 3,881 | $ 0 |

| Consolidated Statements of Operations - USD ($) $ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Income Statement [Abstract]** | | | |
| Net revenues | $ 553,098 | $ 133,988 | $ 44,755 |
| **Cost and expenses:** | | | |
| Cost of revenues (including share-based compensation of $155, $915 and $2,785 in 2014, 2015 and 2016, respectively) | (241,463) | (30,312) | (15,762) |
| Research and development (including share-based compensation of $674, $3,502 and $5,646 in 2014, 2015 and 2016, respectively) | (31,399) | (23,265) | (9,264) |
| Sales and marketing (including share-based compensation of $736, $3,780 and $5,880 in 2014, 2015 and 2016, respectively) | (97,173) | (52,631) | (35,538) |
| General and administrative (including share-based compensation of $5,073, $9,185 and $17,395 in 2014, 2015 and 2016, respectively) | (38,983) | (22,879) | (10,354) |
| Total cost and expenses | (409,018) | (129,087) | (70,918) |
| Other operating income | 406 | 713 | 26 |
| (Loss) Income from operations | 144,486 | 5,614 | (26,137) |
| Interest income | 8,194 | 7,805 | 722 |
| Impairment loss on long-term investments | (5,765) | | |
| (Loss) Income before income tax and share of income on equity method investments | 146,915 | 13,419 | (25,415) |
| Income tax expense | (5,136) | (92) | 0 |
| (Loss) Income before share of income on equity method investments | 141,779 | 13,327 | (25,415) |
| Share of income on equity method investments | 3,471 | 370 | |
| Net (loss) income attributable to Momo Inc. | 145,250 | 13,697 | (25,415) |
| Deemed dividend to preferred shareholders | | | (57,663) |
| Net (loss) income attributable to ordinary shareholders | $ 145,250 | $ 13,697 | $ (83,078) |
| **Net (loss) income per share attributable to ordinary shareholders** | | | |
| Basic | $ 0.38 | $ 0.04 | $ (0.97) |
| Diluted | $ 0.36 | $ 0.03 | $ (0.97) |
| **Weighted average shares used in calculating net (loss) income per ordinary share** | | | |
| Basic | 377,335,923 | 342,646,282 | 85,293,775 |
| Diluted | 407,041,165 [1] | 401,396,548 [2] | 85,293,775 |

[1] For the year 2016, an incremental weighted average number of 7,155,060 nonvested restricted shares and an incremental weighted average number of 22,550,182 ordinary shares from the assumed exercise of share options and vesting of restricted share units using the treasury stock method were included

[2] For the year 2015, an incremental weighted average number of 35,759,066 nonvested restricted shares and an incremental weighted average number of 22,991,200 ordinary shares from the assumed exercise of share options and vesting of restricted share units using the treasury stock method were included.

| Consolidated Statements of Operations (Parenthetical) - USD ($) $ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| Share-based compensation | $ 31,706 | $ 17,382 | $ 6,638 |
| Cost Of Revenues [Member] | | | |
| Share-based compensation | 2,785 | 915 | 155 |
| Research And Development [Member] | | | |
| Share-based compensation | 5,646 | 3,502 | 674 |
| Sales And Marketing [Member] | | | |
| Share-based compensation | 5,880 | 3,780 | 736 |
| General And Administrative [Member] | | | |
| Share-based compensation | $ 17,395 | $ 9,185 | $ 5,073 |

| Consolidated Statements of Comprehensive (Loss) Income - USD ($) $ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Statement of Comprehensive Income [Abstract]** | | | |
| Net (loss) income attributable to Momo Inc. | $ 145,250 | $ 13,697 | $ (25,415) |
| **Other comprehensive loss, net of tax:** | | | |
| Foreign currency translation adjustment | (11,642) | (3,499) | (1,185) |
| Comprehensive (loss) income attributable to Momo Inc. | $ 133,608 | $ 10,198 | $ (26,600) |

| Consolidated Statements of Changes in (Deficit) Equity - USD ($) $ in Thousands | Total | Common Stock [Member] | Additional Paid-in Capital [Member] | Treasury Stock [Member] | Subscription Receivable [Member] | (Accumulated Deficit)/ Retained Earning [Member] | Accumulated Other Comprehensive Income (Loss) [Member] |
|---|---|---|---|---|---|---|---|
| Balance at Dec. 31, 2013 | $ (22,860) | $ 15 | $ 1,710 | | $ (15) | $ (24,728) | $ 158 |
| Balance, Shares at Dec. 31, 2013 | | 147,000,000 | | | | | |
| Net Income (loss) | (25,415) | | | | | (25,415) | |
| Share-based compensation | 6,638 | | 6,638 | | | | |
| Repurchase of ordinary shares | (64,494) | | | $ (64,494) | | | |
| Repurchase of ordinary shares, Shares | | (15,651,589) | | | | | |
| Issuance of ordinary shares in connection with exercise of options and vesting of restricted share units | 286,651 | $ 5 | 286,646 | | | | |
| Issuance of ordinary shares in connection with exercise of options and vesting of restricted share units | | 45,688,888 | | | | | |
| Conversion of participating convertible redeemable preferred shares to ordinary shares | 318,704 | $ 20 | 318,684 | | | | |
| Conversion of participating convertible redeemable preferred shares to ordinary shares, Shares | | 200,718,811 | | | | | |
| Deemed dividend to preferred shareholders | (57,663) | | | | | (57,663) | |
| Subscription Receivable | 15 | | | | $ 15 | | |
| Foreign currency translation adjustment | (1,185) | | | | | | (1,185) |
| Balance at Dec. 31, 2014 | 440,391 | $ 40 | 613,678 | (64,494) | | (107,806) | (1,027) |
| Balance, Shares at Dec. 31, 2014 | | 377,756,110 | | | | | |
| Net Income (loss) | 13,697 | | | | | 13,697 | |
| Share-based compensation | 17,382 | | 17,382 | | | | |
| Issuance of ordinary shares in connection with exercise of options and vesting of restricted share units | $ 415 | $ 1 | 414 | | | | |
| Issuance of ordinary shares in connection with exercise of options and vesting of restricted share units | 5,995,293 | 5,995,293 | | | | | |
| Foreign currency translation adjustment | $ (3,499) | | | | | | (3,499) |
| Balance at Dec. 31, 2015 | 468,386 | $ 41 | 631,474 | (64,494) | | (94,109) | (4,526) |

| | | | | | | |
|---|---|---|---|---|---|---|
| Balance, Shares at Dec. 31, 2015 | | 383,751,403 | | | | |
| Net Income (loss) | 145,250 | | | | 145,250 | |
| Share-based compensation | 31,706 | | 31,706 | | | |
| Issuance of ordinary shares in connection with exercise of options and vesting of restricted share units | $ 319 | $ 1 | 318 | | | |
| Issuance of ordinary shares in connection with exercise of options and vesting of restricted share units | 5,197,032 | 5,197,032 | | | | |
| Foreign currency translation adjustment | $ (11,642) | | | | | (11,642) |
| Balance at Dec. 31, 2016 | $ 634,019 | $ 42 | $ 663,498 | $ (64,494) | $ 51,141 | $ (16,168) |
| Balance, Shares at Dec. 31, 2016 | | 388,948,435 | | | | |

| Consolidated Statements of Changes in (Deficit) Equity (Parenthetical) $ in Thousands | 12 Months Ended Dec. 31, 2014 USD ($) |
|---|---|
| **Statement of Stockholders' Equity [Abstract]** | |
| Issuance of ordinary shares, Offering cost | $ 4,361 |

| Consolidated Statements of Cash Flows - USD ($) $ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Cash flows from operating activities** | | | |
| Net (loss) income | $ 145,250 | $ 13,697 | $ (25,415) |
| **Adjustments to reconcile net (loss) income to net cash (used in) provided by operating activities** | | | |
| Depreciation of property and equipment | 8,404 | 6,646 | 2,805 |
| Share-based compensation | 31,706 | 17,382 | 6,638 |
| Share of income on equity method investments | (3,471) | (370) | |
| Impairment loss on long-term investments | 5,765 | | |
| Loss on disposal of property and equipment | 15 | 5 | 64 |
| **Changes in operating assets and liabilities** | | | |
| Accounts receivable | (22,978) | (8,538) | (5,205) |
| Prepaid expenses and other current assets | (15,634) | (11,247) | (7,489) |
| Amount due from related parties | 1,037 | (1,218) | 198 |
| Rental deposits | (304) | 38 | (797) |
| Accounts payable | 32,019 | 5,274 | 4,494 |
| Income tax payable | 3,946 | | |
| Deferred revenue | 15,546 | 12,996 | 12,825 |
| Accrued expenses and other current liabilities | 15,456 | 20,671 | 5,949 |
| Deferred tax assets, current | (73) | | |
| Amount due to related parties | 1,642 | 88 | |
| Deferred tax assets, non-current | (211) | | |
| Other non-current liabilities | 196 | 1,828 | |
| Net cash (used in) provided by operating activities | 218,311 | 57,252 | (5,933) |
| **Cash flows from investing activities** | | | |
| Purchase of property and equipment | (7,026) | (13,521) | (8,740) |
| Proceeds from disposal of property and equipment | 63 | | |
| Payment for long term investments | (14,542) | (17,859) | (809) |
| Prepayment for long term investments | (2,635) | (2,000) | |
| Purchase of term deposits | (509,612) | (450,000) | |
| Cash received on maturity of term deposits | 415,404 | 150,000 | |
| Net cash used in investing activities | (118,348) | (333,380) | (9,549) |
| **Cash flows from financing activities** | | | |
| Proceeds from issuance of convertible redeemable participating preferred shares | | | 211,750 |
| Repurchase of convertible redeemable participating preferred shares | | | (30,750) |
| Proceeds from issuance of ordinary shares | | | 291,012 |
| Payment for IPO costs | | (2,634) | (1,727) |
| Capital contribution from shareholders | | | 15 |
| Repurchase of ordinary shares | | | (58,044) |
| Deferred payment of purchase of property and equipment | (319) | | |
| Proceeds from exercise of share options | 333 | 401 | |
| Net cash provided by (used in) financing activities | 14 | (2,233) | 412,256 |
| Effect of exchange rate on cash and cash equivalents | (11,882) | (3,138) | (1,180) |

| | | | |
|---|---|---|---|
| Net increase (decrease) in cash and cash equivalents | 88,095 | (281,499) | 395,594 |
| Cash and cash equivalents at the beginning of year | 169,469 | 450,968 | 55,374 |
| Cash and cash equivalents at the end of year | 257,564 | 169,469 | 450,968 |
| **Non-cash investing and financing activities** | | | |
| Payable for purchase of property and equipment | 623 | 765 | 1,105 |
| Payable for deferred IPO cost | | | 2,634 |
| Payable for repurchase of ordinary shares | $ 6,450 | $ 6,450 | $ 6,450 |

| **Organization and Principal Activities** | **12 Months Ended**<br>**Dec. 31, 2016** |
|---|---|

**Text Block [Abstract]**

Organization and Principal Activities

1.  **ORGANIZATION AND PRINCIPAL ACTIVITIES**

Momo Inc. (the "Company", formerly known as Momo Technology Company Limited) is the holding company for a group of companies, which is incorporated in the British Virgin Islands ("BVI") on November 23, 2011. In July 2014, the Company was redomiciled in the Cayman Islands ("Cayman") as an exempted company registered under the laws of the Cayman Islands, and was renamed Momo Inc. The Company, its subsidiaries, its consolidated variable interest entity ("VIE") and VIE's subsidiaries (collectively the "Group") are principally engaged in providing mobile-based social networking services. The Group started its operation in July 2011. The Group started its monetization in the third quarter of 2013, by offering a platform for live video services, value-added service, mobile games and mobile marketing services.

As of December 31, 2016, details of the Company's subsidiaries, VIE and VIE's subsidiaries are as follows:

| | Date of incorporation | Place of incorporation | Percentage of economic ownership |
|---|---|---|---|
| *Subsidiaries* | | | |
| Momo Technology HK Company Limited ("Momo HK") | December 5, 2011 | Hong Kong | 100% |
| Beijing Momo Information Technology Co., Ltd. ("Beijing Momo IT") | March 9, 2012 | PRC | 100% |
| Momo Technology Overseas Holding Company Limited ("Momo BVI") | March 5, 2014 | BVI | 100% |
| Momo Information Technologies Corp. ("Momo US") | March 7, 2014 | US | 100% |
| *VIE* | | | |
| Beijing Momo Technology Co., Ltd. ("Beijing Momo") | July 7, 2011 | PRC | N/A* |
| *VIE's subsidiaries* | | | |
| Chengdu Momo Technology Co., Ltd. ("Chengdu Momo") | May 9, 2013 | PRC | N/A* |
| Shanghai Momo Technology Co., Ltd. ("Shanghai Momo") | January 19, 2015 | PRC | N/A* |
| Chengdu Biyou Technology Co., Ltd. ("Chengdu Biyou") | October 16, 2015 | PRC | N/A* |
| Tianjin Heer Technology co., ltd ("Tianjin Heer") | March 7, 2016 | PRC | N/A* |
| Momo Pictures Co., Ltd. | November 11, 2016 | PRC | N/A* |
| QOOL Media (Tianjin) Co., Ltd | November 16, 2016 | PRC | N/A* |

* These entities are controlled by the Company pursuant to the contractual arrangements disclosed below.

The Company was established on November 23, 2011 with share capital of $15, which was 65% owned by Mr. Yan Tang, 20% owned by Mr. Yong Li, 8% owned by Mr. Xiaoliang Lei, and 7% owned by Mr. Zhiwei Li, (Yan Tang, Yong Li, Xiaoliang Lei and Zhiwei Li are collectively referred to as "Founders") as a vehicle for the group reorganization.

The Group commenced its business in China in July 2011 through Beijing Momo which has subsequently become the Group's VIE through the contractual arrangements described below in "the VIE arrangements".

Beijing Momo was established by the Founders in Beijing, the People's Republic of China ("PRC"), as a limited liability company on July 7, 2011, which was 65% owned by Mr. Yan Tang, 20% owned by Mr. Yong Li, 8% owned by Mr. Xiaoliang Lei, and 7% owned by Mr. Zhiwei Li. Beijing Momo and its subsidiaries principally engaged in the provision of substantially all of the Group's services in the PRC.

The Company owns 100% of the equity interests in Momo HK, an intermediate holding company incorporated in Hong Kong on December 5, 2011, which owns 100% of the equity interests in Beijing Momo IT, a wholly foreign-owned enterprise ("WFOE"), incorporated in the PRC by the Company on March 9, 2012.

The Company entered into a group reorganization by way of entering into a series of contractual arrangements between its WFOE, VIE and the Company on April 18, 2012. Immediately after the reorganization, the Founders controlled the Company, WFOE and Beijing Momo; therefore, the reorganization was accounted for as a transaction among entities

under common control. Accordingly, the accompanying audited consolidated financial statements have been prepared by using historical cost basis and include the assets, liabilities, revenue, expenses and cash flows that were directly attributable to Beijing Momo for all periods presented.

In December 2014, the Company completed its IPO and a concurrent private placement, upon which the Company's ordinary shares were divided into Class A ordinary shares and Class B ordinary shares. Holders of Class A ordinary shares are entitled to one vote per share, while holders of Class B ordinary shares are entitled to ten votes per share. Each Class B ordinary share is convertible into one Class A ordinary share at any time by the holder thereof, while Class A ordinary shares are not convertible to Class B ordinary shares under any circumstances. The Company newly issued 45,688,888 Class A ordinary shares, consist of (i) 36,800,000 Class A ordinary shares offered through the IPO, and (ii) 8,888,888 Class A ordinary shares issued in connection with the concurrent private placement. All of the Company's Series A, Series B, Series C and Series D shares were automatically converted upon IPO into 200,718,811 Class A ordinary shares.

The VIE arrangements

PRC regulations currently limit direct foreign ownership of business entities providing value-added telecommunications services, advertising services and internet services in the PRC where certain licenses are required for the provision of such services. To comply with these PRC regulations, Beijing Momo IT and Beijing Momo's shareholders entered into various contractual arrangements whereby the shareholders' claim to the economic benefits of Beijing Momo and their ability to control the activities of Beijing Momo were transferred to Beijing Momo IT.

The Group provides substantially all of its services in China through Beijing Momo, Chengdu Momo and Tianjin Heer, which hold the operating licenses and approvals to enable the Group to provide such mobile internet content services in the PRC. The equity interests of Beijing Momo are legally held by certain employees and shareholders of the Company ("Nominee Shareholders").

The Company obtained control over Beijing Momo through Beijing Momo IT on April 18, 2012 by entering into a series of contractual arrangements between Beijing Momo IT, Beijing Momo and its Nominee Shareholders that enable the Company to (1) have power to direct the activities that most significantly affects the economic performance of the VIE, and (2) receive the economic benefits of the VIE that could be significant to the VIE. Accordingly, the Company is considered the primary beneficiary of the VIE and has consolidated the VIE's financial results of operations, assets and liabilities in the Company's consolidated financial statements. In making the conclusion that the Company is the primary beneficiary of the VIE, the Company's rights under the Power of Attorney also provide the Company's abilities to direct the activities that most significantly impact the VIE's economic performance. The Company also believes that this ability to exercise control ensures that the VIE will continue to execute and renew the Exclusive Technology Consulting and Management Services Agreement and pay service fees to the Company. By charging service fees in whatever amounts the Company deems fit, and by ensuring that the Exclusive Technology Consulting and Management Services Agreement is executed and renewed indefinitely, the Company has the rights to receive substantially all of the economic benefits from the VIE.

To further strengthen the Company's corporate structure, the Group amended its Power of Attorney, Exclusive Call Option Agreement and Equity Interest Pledge Agreement with the Nominee Shareholders and also entered into the Spousal Consent Letters with the Nominee Shareholders in April 2014, and amended the Exclusive Cooperation Agreements and Supplemental Agreements in August 2014. There was no substantial change to the term and condition of the VIE agreements and the change had no impact on to the Company's VIE consolidation. The following is a summary of the contractual agreements that the Company, through Beijing Momo IT, entered into with Beijing Momo and its Nominee Shareholders, as amended and entered into on April 18, 2014 and August 31, 2014:

Agreements that provide the Company effective control over the VIE:

(1)  Power of Attorney

Pursuant to the Power of Attorney, the Nominee Shareholders of Beijing Momo each irrevocably appointed Beijing Momo IT as the attorney-in-fact to act on their behalf on all matters pertaining to Beijing Momo and to exercise all of their rights as a shareholder of Beijing Momo, including but not limited to convene, attend and vote on their behalf at shareholders' meetings, designate and appoint directors and senior management members. Beijing Momo IT may authorize or assign its rights under this appointment to a person as approved by its board of directors at its sole discretion. Each power of attorney will remain in force until the shareholder ceases to hold any equity interest in Beijing Momo. The Company believes the Powers of Attorney can demonstrate the power of its PRC

subsidiary (Beijing Momo IT) to direct how the VIE should conduct its daily operations.

(2)  Exclusive Call Option Agreement

Under the Exclusive Call Option Agreement among Beijing Momo IT, Beijing Momo and Nominee Shareholders of Beijing Momo, each of the Nominee Shareholders irrevocably granted Beijing Momo IT or its designated representative(s) an exclusive option to purchase, to the extent permitted under PRC law, all or part of his, her or its equity interests in Beijing Momo at the consideration equal to the nominal price or at lowest price as permitted by PRC laws.

Beijing Momo IT or its designated representative(s) have sole discretion as to when to exercise such options, either in part or in full. Without Beijing Momo IT's written consent, the Nominee Shareholders of Beijing Momo shall not transfer, donate, pledge, or otherwise dispose any equity interests of Beijing Momo in any way. In addition, any consideration paid by Beijing Momo IT to the Nominee Shareholders of Beijing Momo in exercising the option shall be transferred back to Beijing Momo IT or its designated representative(s). This agreement could be terminated when all the shareholders' equity were acquired by the WFOE or its designated representative(s) subject to the law of People's Republic of China.

In addition, Beijing Momo irrevocably granted Beijing Momo IT an exclusive and irrevocable option to purchase any or all of the assets owned by Beijing Momo at the lowest price permitted under PRC law. Without Beijing Momo IT's prior written consent, Beijing Momo and its Nominee Shareholders will not sell, transfer, mortgage or otherwise dispose of Beijing Momo's material assets, legal or beneficial interests or revenues of more than RMB500,000 or allow an encumbrance on any interest in Beijing Momo.

(3)  Spousal Consent Letters

On April 18, 2014, each spouse of the married Nominee Shareholders of Beijing Momo entered into a Spousal Consent Letter, which unconditionally and irrevocably agreed that the equity interests in Beijing Momo held by and registered in the name of their spouse will be disposed of pursuant to the Equity Interest Pledge Agreement, the Exclusive Call Option Agreement, and the Power of Attorney. Each spouse agreed not to assert any rights over the equity interests in Beijing Momo held by their spouse. In addition, in the event that the spouse obtains any equity interests in Beijing Momo held by their spouse for any reason, they agreed to be bound by the contractual arrangements.

Agreements that transfer economic benefits to the Company:

(1)  Exclusive Cooperation Agreements and Supplemental Agreements

In August 2014, Beijing Momo IT entered into an Exclusive Cooperation Agreements and a Supplemental Agreement with Beijing Momo and Chengdu Momo, respectively, to supersede the Exclusive Technology Consulting and Management Services Agreements signed in April 2012 by Beijing Momo IT and Beijing Momo. In May 2016, Beijing Momo IT entered into an Exclusive Cooperation Agreement and a Supplemental Agreement with Tianjin Heer. Pursuant to the agreements, Beijing Momo IT has the exclusive right to provide, among other things, licenses, copyrights, technical and non-technical services to Beijing Momo, Chengdu Momo and Tianjin Heer and receive service fees and license fees as consideration. Beijing Momo, Chengdu Momo and Tianjin Heer will maintain a pre-determined level of operating profit and remit the excess operating profit, if any, to Beijing Momo IT as the consideration of the licenses, copyrights, technical and non-technical services provided by Beijing Momo IT. The agreements will remain effective for 10 years. At the sole discretion of Beijing Momo IT, the agreements could be renewed on applicable expirations dates, or Beijing Momo IT, Beijing Momo, Chengdu Momo and Tianjin Heer could enter into other exclusive agreements.

For the years ended December 31, 2014, 2015 and 2016, Beijing Momo IT charged Beijing Momo, Chengdu Momo and Tianjin Heer a service fee of $35,188, $112,043 and $319,018 at the WFOE's discretion, respectively.

Since Beijing Momo IT has effectively controlled Beijing Momo through Power of Attorney, Equity Interest Pledge Agreement and Exclusive Call Option Agreement, Beijing Momo IT has the right to adjust the service fees at its sole discretion. The agreement shall remain effective for ten years. At the discretion of Beijing Momo IT, this agreement could be renewed on applicable expiration dates, or Beijing Momo IT and Beijing Momo could enter into another exclusive

agreement.

(2)  Equity Interest Pledge Agreement

Under the equity interest pledge agreement among Beijing Momo IT and each of the Nominee Shareholders of Beijing Momo, the Nominee Shareholders pledged all of their equity interests in Beijing Momo to Beijing Momo IT to guarantee Beijing Momo's and its shareholders' payment obligations arising from the Exclusive Technology Consulting and Management Service Agreement, Business Operation Agreement and Exclusive Call Option Agreement, including but not limited to, the payments due to Beijing Momo IT for services provided. If Beijing Momo or any of its Nominee Shareholders breaches its contractual obligations under the above agreements, Beijing Momo IT, as the pledgee, will be entitled to certain rights and entitlements, including receiving priority proceeds from the auction or sale of whole or part of the pledged equity interests of Beijing Momo in accordance with PRC legal procedures. During the term of the pledge, the shareholders of Beijing Momo shall cause Beijing Momo not to distribute any dividends and if they receive any dividends generated by the pledged equity interests, they shall transfer such received amounts to an account designated by Beijing Momo IT according to the instruction of Beijing Momo IT.

The pledge will remain binding until Beijing Momo and its Nominee Shareholders has fully performed all their obligations under the Exclusive Cooperation Agreements and Supplemental Agreements, Business Operations Agreement and Exclusive Call Option Agreement.

(3)  Business Operations Agreement

Under the Business Operations Agreement among Beijing Momo IT, Beijing Momo and the Nominee Shareholders of Beijing Momo, without the prior written consent of Beijing Momo IT or its designated representative(s), Beijing Momo shall not conduct any transaction that may substantially affect the assets, business, operation or interest of Beijing Momo IT. Beijing Momo and Nominee Shareholders shall also follow Beijing Momo IT's instructions on management of Beijing Momo's daily operation, finance and employee matters and appoint the nominee(s) designated by Beijing Momo IT as the director(s) and senior management members of Beijing Momo. In the event that any agreements between Beijing Momo IT and Beijing Momo terminates, Beijing Momo IT has the sole discretion to determine whether to continue any other agreements with Beijing Momo. Beijing Momo IT is entitled to any dividends or other interests declared by Beijing Momo and the shareholders of Beijing Momo have agreed to promptly transfer such dividends or other interests to Beijing Momo IT. The agreement shall remain effective for 10 years. At the discretion of Beijing Momo IT, this agreement will be renewed on applicable expiration dates, or Beijing Momo IT and Beijing Momo will enter into another exclusive agreement.

Through these contractual agreements, the Company has the ability to effectively control the VIE and is also able to receive substantially all the economic benefits of the VIE.

Risk in relation to the VIE structure

The Company believes that Beijing Momo IT and Beijing Momo's contractual arrangements with the VIE are in compliance with PRC law and are legally enforceable. The shareholders of Beijing Momo are also shareholders of the Company and therefore have no current interest in seeking to act contrary to the contractual arrangements. However, uncertainties in the PRC legal system could limit the Company's ability to enforce these contractual arrangements and if the shareholders of the VIE were to reduce their interest in the Company, their interests may diverge from that of the Company and that may potentially increase the risk that they would seek to act contrary to the contractual terms, for example by influencing the VIE not to pay the service fees when required to do so.

However, the Company cannot assure that when conflicts of interest arise, the shareholders will act in the best interests of the Company or that conflicts of interests will be resolved in the Company's favor. Currently, the Company does not have existing arrangements to address potential conflicts of interest the shareholders of the VIE may encounter in their capacity as the beneficial owners and director of the VIE on the one hand, and as beneficial owners and directors or officer of the Company, on the other hand. The Company believes the shareholders of the VIE will not act contrary to any of the contractual arrangements and the Exclusive Call Option Agreement provides the Company with a mechanism to remove the shareholders as the beneficial shareholders of the VIE should they act to the detriment of the Company. The Company relies on the VIE's shareholders, as directors and officer of the

Company, to fulfill their fiduciary duties and abide by laws of the PRC and the Cayman and act in the best interest of the Company. If the Company cannot resolve any conflicts of interest or disputes between the Company and the VIE's shareholders, the Company would have to rely on legal proceedings, which could result in disruption of its business, and there is substantial uncertainty as to the outcome of any such legal proceedings.

The Company's ability to control the VIE also depends on the Power of Attorney. Beijing Momo IT and Beijing Momo have to vote on all matters requiring shareholder approval in the VIE. As noted above, the Company believes this power of attorney is legally enforceable but may not be as effective as direct equity ownership.

In addition, if the legal structure and contractual arrangements were found to be in violation of any existing PRC laws and regulations, the PRC government could:

- revoke the Group's business and operating licenses;

- require the Group to discontinue or restrict operations;

- restrict the Group's right to collect revenues;

- block the Group's websites;

- require the Group to restructure the operations in such a way as to compel the Group to establish a new enterprise, re-apply for the necessary licenses or relocate our businesses, staff and assets;

- impose additional conditions or requirements with which the Group may not be able to comply; or

- take other regulatory or enforcement actions against the Group that could be harmful to the Group's business.

The imposition of any of these penalties may result in a material and adverse effect on the Group's ability to conduct the Group's business. In addition, if the imposition of any of these penalties causes the Group to lose the rights to direct the activities of the VIE or the right to receive their economic benefits, the Group would no longer be able to consolidate the VIE. The Group does not believe that any penalties imposed or actions taken by the PRC government would result in the liquidation of the Company, Beijing Momo IT, or the VIE.

The following consolidated financial statements amounts and balances of the VIE were included in the accompanying consolidated financial statements after the elimination of intercompany balances and transactions as of and for the years ended December 31:

| | As of December 31, | |
| --- | --- | --- |
| | 2015 | 2016 |
| Cash and cash equivalents | $ 60,526 | $ 36,855 |
| Accounts receivable, net of allowance for doubtful accounts of $nil and $nil as of December 31, 2015 and 2016, respectively | 14,896 | 36,078 |
| Amount due from related parties | 1,175 | 88 |
| Prepaid expenses and other current assets | 9,495 | 20,613 |
| Deferred tax assets, current | — | 72 |
| Total current assets | 86,092 | 93,706 |
| Property and equipment, net | 1,538 | 1,854 |
| Rental deposits | 244 | 325 |
| Other non-current assets | — | 2,593 |
| Long term investments | 19,318 | 26,541 |
| Deferred tax assets, non-current | — | 208 |
| Total assets | 107,192 | 125,227 |
| Accounts payable | 9,040 | 36,812 |
| Deferred revenue | 28,274 | 41,277 |
| Accrued expenses and other current liabilities | 1,954 | 6,632 |
| Amounts due to related parties | — | 1,510 |
| Income tax payable | — | 3,881 |
| Total current liabilities | 39,268 | 90,112 |
| Total liabilities | $ 39,268 | $ 90,112 |

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2016 |
| Net revenues | $44,755 | $133,988 | $553,098 |
| Net income | $32,945 | $118,404 | $340,366 |
| Net cash provided by operating activities | $40,383 | $124,786 | $360,433 |
| Net cash used in investing activities | $(1,921) | $(19,435) | $(11,027) |
| Net cash used in financing activities | $ — | $ — | $ — |

The unrecognized revenue-producing assets that are held by the VIE are primarily self-developed intangible assets such as domain names, trademark and various licenses which are un-recognized at consolidated balance sheets.

The VIE contributed an aggregate of 100%, 100% and 100% of the consolidated net revenues for the years ended December 31, 2014, 2015 and 2016, respectively. As of the fiscal years ended December 31, 2015 and 2016, the VIE accounted for an aggregate of 19.8% and 16.3%, respectively, of the consolidated total assets, and 53.2% and 66.4%, respectively, of the consolidated total liabilities. The assets that were not associated with the VIE primarily consist of cash and cash equivalents, and term deposits.

There are no consolidated VIE's assets that are collateral for the VIE's obligations and can only be used to settle the VIE's obligations. There are no creditors (or beneficial interest holders) of the VIE that have recourse to the general credit of the Company or any of its consolidated subsidiaries. There are no terms in any arrangements, considering both explicit arrangements and implicit variable interests, that require the Company or its subsidiaries to provide financial support to the VIE. However, if the VIE ever needs financial support, the Company or its subsidiaries may, at its option and subject to statutory limits and restrictions, provide financial support to its VIE through loans to the shareholders of the VIE or entrustment loans to the VIE. Relevant PRC laws and regulations restrict the VIE from transferring a portion of its net assets, equivalent to the balance of its statutory reserve and its share capital, to the Company in the form of loans and advances or cash dividends. Please refer to Note 18 for disclosure of restricted net assets. The Group may lose the ability to use and enjoy assets held by the VIE that are important to the operation of business if the VIE declares bankruptcy or becomes subject to a dissolution or liquidation proceeding.

| Significant Accounting Policies | 12 Months Ended Dec. 31, 2016 |
|---|---|

**Accounting Policies [Abstract]**

Significant Accounting Policies

**2.  SIGNIFICANT ACCOUNTING POLICIES**

Basis of presentation

The consolidated financial statements of the Group have been prepared in accordance with the accounting principles generally accepted in the United States of America ("U.S. GAAP").

Basis of consolidation

The consolidated financial statements of the Group include the financial statements of Momo Inc., its subsidiaries, its VIE and VIE's subsidiaries. All inter-company transactions and balances have been eliminated upon consolidation.

Use of estimates

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and revenues, cost and expenses in the financial statements and accompanying notes. Significant accounting estimates reflected in the Group's consolidated financial statements include revenue recognition, the useful lives and impairment of property and equipment, valuation allowance for deferred tax assets, share-based compensation and fair value of the ordinary shares and convertible redeemable participating preferred shares.

Cash and cash equivalents

Cash and cash equivalents consist of cash on hand and highly liquid investments, which are unrestricted from withdrawal or use, or which have original maturities of three months or less when purchased.

Term deposits

Term deposits consist of bank deposits with an original maturity of over three months.

Accounts receivable

Accounts receivable primarily represents the cash due from third-party application stores and other payment channels and advertising customers, net of allowance for doubtful accounts. The Group makes estimates for the allowance for doubtful accounts based upon its assessment of various factors, including the age of accounts receivable balances, credit quality of third-party application stores and other payment channels and advertising customers, current economic conditions and other factors that may affect their ability to pay. An allowance for doubtful accounts is recorded in the period in which a loss is determined to be probable. As of December 31, 2015 and 2016, the Company has determined the risk of uncollected receivable is remote.

Financial instruments

Financial instruments of the Group primarily consist of cash and cash equivalents, term deposits, accounts receivable, cost method investments, available-for-sale investments, accounts payable, deferred revenue, income tax payable, amount due from related parties and amount due to related parties.

Cash and cash equivalents are recorded at fair value based on the quoted market price in an active market. The carrying values of term deposits, accounts receivable, accounts payable, deferred revenue, income tax payable, amount due from related parties and amount due to related parties approximate their fair values due to short-term maturities. It is not practical to estimate the fair value of the Group's cost method investments because of the lack of quoted market price and the inability to estimate fair value without incurring excessive costs. Available-for-sale investments are reported at fair value, which is discussed in Note 8.

Foreign currency risk

The Renminbi ("RMB") is not a freely convertible currency. The State Administration for Foreign Exchange, under the authority of the People's Bank of China, controls the conversion of RMB into foreign currencies. The value of the RMB is subject to changes in central government policies and to international economic and political developments affecting supply and demand in the China Foreign Exchange Trading System market. Cash and cash equivalents of the Group included aggregate amounts of $75,759 and $245,853 as of December 31, 2015 and 2016, respectively, which were denominated in RMB.

### Concentration of credit risk

Financial instruments that potentially expose the Group to concentration of credit risk consist primarily of cash and cash equivalents, term deposits and accounts receivable. The Group places their cash with financial institutions with high-credit ratings and quality.

Third-party application stores and other payment channels accounting for 10% or more of accounts receivables are as follows:

|  | As of December 31, | |
|---|---|---|
|  | 2015 | 2016 |
| A | 31% | 40% |
| B | 8% | 22% |
| C | 1% | 15% |

No user or advertising customer accounted for 10% or more of accounts receivables for the years ended December 31, 2015 and 2016, respectively.

### Concentration of revenue

The following table summarizes sales generated from games that individually accounting for 10% or more of net revenues:

|  | For the years ended December 31, | | |
|---|---|---|---|
|  | 2014 | 2015 | 2016 |
| Game D | 14% | 2% | less than 1% |

No user or advertising customer accounted for 10% or more of net revenues for the years ended December 31, 2014, 2015 and 2016, respectively.

### Cost method investments

For investments in an investee over which the Company does not have significant influence, the Company carries the investment at cost and recognizes income as any dividends declared from distribution of investee's earnings. The Company reviews the cost method investments for impairment whenever events or changes in circumstances indicate that the carrying value may no longer be recoverable. An impairment loss is recognized in earnings equal to the difference between the investment's cost and its fair value at the balance sheet date of the reporting period for which the assessment is made. The fair value of the investment would then become the new cost basis of the investment.

### Equity method investments

The investee company over which the Group has the ability to exercise significant influence, but does not have a controlling interest are accounted for using the equity method. Significant influence is generally considered to exist when the Group has an ownership interest in the voting stock of the investee between 20% and 50%. Other factors, such as representation in the investee's Board of Directors, voting rights and the impact of commercial arrangements, are also considered in determining whether the equity method of accounting is appropriate. For the investment in limited partnerships, where the Group holds less than a 20% equity or voting interest, the Group's influence over the partnership operating and financial policies is determined to be more than minor. Accordingly, the Group accounts for these investments as equity method investments.

Under the equity method of accounting, the affiliated company's accounts are not reflected within the Group's consolidated balance sheets and statements of operations; however, the Group's share of the earnings or losses of the affiliated company is reflected in the caption "share income on equity method investments" in the consolidated statements of operations.

An impairment change is recorded if the carrying amount of the investment exceeds its fair value and this condition is determined to be other-than-temporary.

The Group estimates the fair value of the investee company based on comparable quoted price for similar investment in active market, if applicable, or discounted cash flow approach which requires significant judgments, including the estimation of future cash flows, which is dependent on internal forecasts, the estimation of long term growth rate of a company's business, the estimation of the useful life over which cash flows will occur, and the determination of the weighted average cost of capital.

### Available-for-sale Investments

For investments in investees' stocks which are determined to be debt securities, the Group accounts for them as long-term available-for-sale investments when they are not classified as

either trading or held-to-maturity investments.

Available-for-sale investments are reported at fair value, with unrealized gains and losses recorded in accumulated other comprehensive income (loss) as a component of shareholders' equity. Realized gains and losses and provision for decline in value judged to be other than temporary, if any, are recognized in the consolidated statements of operations.

The Group continually reviews its available-for-sale investments to determine whether a decline in fair value below the carrying value is other than temporary. The primary factors the Group considers in its determination are the length of time that the fair value of the investment is below the Group's carrying value; the financial condition, operating performance and the prospects of the available-for-sale investee; and other specific information such as recent financing rounds. If the decline in fair value is deemed to be other than temporary, the carrying value of the available-for-sale investee is written down to fair value. The Group estimated the fair value of these investee companies based on discounted cash flow approach which requires significant judgments, including the estimation of future cash flows, which is dependent on internal forecasts, the estimation of long term growth rate of a company's business, the estimation of the useful life over which cash flows will occur, and the determination of the weighted average cost of capital.

Property and equipment, net

Property and equipment are stated at cost less accumulated depreciation. Depreciation is calculated on a straight-line basis over the following estimated useful lives:

| | |
|---|---|
| Office equipment | 3-5 years |
| Computer equipment | 3 years |
| Vehicles | 5 years |
| Leasehold improvement | Shorter of the lease term or estimated useful lives |

Impairment of long-lived assets

The Group reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may no longer be recoverable. When these events occur, the Group measures impairment by comparing the carrying value of the long-lived assets to the estimated undiscounted future cash flows expected to result from the use of the assets and their eventual disposition. If the sum of the expected undiscounted cash flow is less than the carrying amount of the assets, the Group would recognize an impairment loss based on the fair value of the assets.

Fair value

Fair value is the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. When determining the fair value measurements for assets and liabilities required or permitted to be recorded at fair value, the Group considers the principal or most advantageous market in which it would transact and it considers assumptions that market participants would use when pricing the asset or liability.

Authoritative literature provides a fair value hierarchy that requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value. An asset or liability categorization within the fair value hierarchy is based upon the lowest level of input that is significant to the fair value measurement as follows:

*Level 1*

Level 1 applies to assets or liabilities for which there are quoted prices in active markets for identical assets or liabilities.

*Level 2*

Level 2 applies to assets or liabilities for which there are inputs other than quoted prices included within Level 1 that are observable for the assets or liabilities such as quoted prices for similar assets or liabilities in active markets; quoted prices for identical assets or liabilities in markets with insufficient volume or infrequent transactions (less active markets); or model-derived valuations in which significant inputs are observable or can be derived principally from, or corroborated by, observable market data.

*Level 3*

Level 3 applies to assets or liabilities for which there are unobservable inputs to the valuation methodology that are significant to the measurement of the fair value of the assets or liabilities.

Revenue recognition

The Group recognizes revenue when a persuasive evidence of an arrangement exists, delivery has occurred, the sales price is fixed or determinable, and collectability is reasonably assured. The Group principally derives its revenue from live video service, value-added services, mobile marketing services, mobile games and other services.

(a)  Live video service

The Group provides live video service whereby users can enjoy live performances and interact with the broadcasters for free, and have the option of purchasing in-show virtual items. Broadcasters can either host the performance on their own or join a broadcaster agency. Users purchase virtual gifts from the Group and present them simultaneously to broadcasters to show their support. The Group determines the virtual items price and generates revenue from sales of virtual gifts upon purchase. Under the arrangements with broadcasters or broadcaster agencies, the Group shares with them a portion of the revenues derived from the sales of virtual gifts. Revenues derived from the sale of virtual gifts are recorded on a gross basis as the Group has determined that it acts as the principal to fulfill all obligations related to the live video services. The portion paid to broadcasters and/or broadcaster agencies is recognized as cost of revenues.

Net revenues of $nil, $1,231 and $376,925 were recognized for live video services for the years ended December 31, 2014, 2015 and 2016, respectively.

(b)  Value-added services

Value-added services revenues include membership subscription revenue and virtual gift service revenues. Membership subscription is a service package which enables members to enjoy additional functions and privileges. The contract period for the membership subscription ranges from one month to one year. All membership subscription is nonrefundable. The Group collects membership subscription in advance and records it as deferred revenue. Revenue is recognized ratably over the contract period for the membership subscription services.

Virtual gift services was launched in 2016 to enhance users' experience of interaction and social networking with each other. Users purchase virtual gifts and send the virtual gifts simultaneously to other users. Revenue recognized related to virtual gift services is insignificant for each of the year presented.

Net revenues of $29,756, $58,462 and $67,603 were recognized for value-added services for the years ended December 31, 2014, 2015 and 2016, respectively.

(c)  Mobile marketing

The Group provides advertising and marketing solutions to customers for promotion of their brands and conduction of effective marketing activities through its mobile application.

Display-based mobile marketing services

For display-based online advertising services such as banners and location-based advertising on the mobile applications, the Group recognizes revenue ratably over the period that the advertising is provided commencing on the date the customer's advertisement is displayed, or on the number of times that the advertisement has been displayed for cost per thousand impressions advertising arrangements.

Performance-based mobile marketing services

The Group enables advertising customers to place link on its mobile platform on a pay-for-effectiveness basis, which is referred to as the cost for performance model. The Group charges fees to advertising customers based on the effectiveness of advertising links, which is measured by active clicks. Revenue is estimated by the Group based on its internal data, which is confirmed with respective customers, or is recognized based on a fixed unit price.

The Group's revenue transactions are based on standard business terms and conditions, which are recognized net of agency rebates, if applicable.

Net revenues of $1,975, $38,885 and $66,339 were recognized for mobile marketing for the years ended December 31, 2014, 2015 and 2016, respectively.

(d)  Mobile games

The Group publishes both licensed mobile games developed by third-party game developers and its self-developed games to the game players through its mobile application.

*Licensed mobile games*

The Group generates revenue from offering services of mobile games developed by third-party game developers. All of the licensed games can be accessed and played by game players directly through the Group's mobile game platform. The Group primarily views the game developers to be its customers and considers its responsibility under its agreements with the game developers to be promotion of the game developers' games. The Group generally collects payments from game players in connection with the sale of in-game currencies and remits certain agreed-upon percentages of the proceeds to the game developers and records revenue net of remittances. Purchases of in-game currencies are not refundable after they have been sold unless there is unused in-game currencies at the time a game is discontinued. Typically, a game will only be discontinued when the monthly revenue generated by a game becomes consistently insignificant. The Group does not currently expect to pay any material cash refunds to game players or game developers in connection with a discontinued game.

*Licensed mobile games - Non-exclusive mobile games services*

The Group enters into non-exclusive agreements with the game developers and offers the Group's mobile game platform for the mobile games developed by the game developers. The Group has determined that it has no additional performance obligation to the developers or game players upon players' completion of the corresponding in-game purchase. Therefore, revenues from the sale of in-game currencies are primarily recorded net of remittances to game developers and commission fees made to third-party application stores and other payment channels and deferred until the estimated consumption date by individual game (i.e., the estimated date in-game currencies are consumed within the game), which is typically within a short period of time ranging from zero to six days after the purchase of the in-game currencies.

*Licensed mobile games - Exclusive mobile games services*

The Group enters into exclusive agreements with the game developers and provides the Group's mobile game platform for the mobile games developed by the game developers. Under the exclusive agreements, the players can access to the games only through the Group's platform. The Group has determined that it is obligated to provide mobile games services to game players who purchased virtual items to gain an enhanced game-playing experience over an average period of player relationship. Hence, the Group believes that its performance for, and obligation to, the game developers correspond to the game developers' services to the players. The Group does not have access to the data on the consumption details and the types of virtual items purchased by the game players. Therefore, the Group cannot estimate the economic life of the virtual item. However, the Group maintains data of when a particular player purchases the virtual items and logs into the games. The Group has adopted a policy to recognize revenues net of remittances to game developers and commission fees made to third-party application stores and other payment channels over the estimated period of player relationship on a game-by-game basis. As of December 31, 2015 and 2016, the Group operated seven and six games under exclusive arrangements and the estimated periods of the player relationship is in a range of 20 to 75 and 20 to 99 days, respectively.

*Self-developed mobile game*

In February 2015, the Group launched one self-developed game on its platform and started to generate revenues by in-game sales of virtual item. The Group has determined that an obligation exists to the players who purchased the virtual items to gain an enhanced game-playing experience over the playing period of the paying players, and accordingly, recognized the revenues ratably over the estimated average period of player relationship starting from the point in time when the players purchase the virtual items, and all other revenue recognition criteria are met. As of December 31, 2015 and 2016, the Group operated one and six self-developed mobile games and the estimated periods of the player relationship is 56 days and in a range of 20 to 110 days, respectively.

Revenues derived from the self-developed game are recorded on a gross basis as the Group acts as a principal to fulfill all obligations related to the mobile game operation. Commission fees paid to third-party application stores and other payment channels are recorded as cost of revenues.

Net revenues of $11,237, $31,082 and $35,453 were recognized for mobile games for the years ended December 31, 2014, 2015 and 2016, respectively.

(e)  Other service

Other service primarily includes Duobao service and paid emoticons.

Advertising barter transactions

The Group engages in barter transactions where it trades advertising resources with certain third parties for other advertising resources and goods. The Group recognizes revenues and expenses at fair value only if the fair value of the services exchanged in the transaction is determinable based on the Group's own historical practice of receiving cash or other consideration that is readily convertible to a known amount of cash for similar advertising resources from customers unrelated to the party in the barter transaction. When the fair value of the transactions is not determinable due to the lack of the Group's similar historical practice, the advertising barter transactions shall be recorded based on the carrying amount of the advertising surrendered which is the estimated cost to be incurred, or the fair value of the assets received. Advertising barter transactions were insignificant for all the years presented.

Deferred revenue

Deferred revenue primarily includes cash received in advance from users and advertising customers. The unused cash balances remaining in users' and advertising customers' accounts are recorded as a liability. Deferred revenue related to prepayments from users and advertising customers will be recognized as revenue when all of the revenue recognition criteria are met.

Cost of revenues

Cost of revenues consist of expenditures incurred in the generation of the Group's revenues, including but not limited to revenue sharing with the broadcasters and broadcaster agencies related to live video service, commission fee paid to third-party application stores and other payment channels except for those paid related to licensed mobile games which are recorded net of revenue, bandwidth costs, salaries and benefits paid to employee, short messaging service charges and depreciation. These costs are expensed as incurred except for the direct and incremental platform commission fees to third-party application stores and other payment channels which are deferred in "Prepaid expenses and other current assets" on the consolidated balance sheets. The deferred platform commissions are recognized in the consolidated statements of operations in "Cost of revenues" in the period in which the related revenues are recognized.

Government subsidies

The Group records government subsidies as other income when received from local government authority and they are not subject to any further performance obligations or future returns. When government subsidies are received and include future performance obligations, the Group recognizes those as liabilities until the performances obligations have been met at which time, those are recognized as other income. Government subsidies recorded as other income amounted to $nil, $nil and $293 for the years ended December 31, 2014, 2015 and 2016.

Research and development expenses

Research and development expenses primarily consist of (i) salaries and benefits for research and development personnel, and (ii) office rental, general expenses and depreciation expenses associated with the research and development activities. The Group's research and development activities primarily consist of the research and development of new features for its mobile platform and its self-developed mobile games. The Group has expensed all research and development expenses when incurred.

Value added taxes ("VAT")

Entities that are VAT general taxpayers are allowed to offset qualified input VAT paid to suppliers against their output VAT liabilities. Net VAT balance between input VAT and output VAT is recorded in accrued expenses and other current liabilities on the consolidated balance sheets. VAT is also reported as a deduction to revenue when incurred and amounted to $5,436, $16,951 and $55,353 for the years ended December 31, 2014, 2015 and 2016, respectively.

Income taxes

Current income taxes are provided for in accordance with the laws of the relevant tax authorities. Deferred income taxes are recognized when temporary differences exist between the tax bases of assets and liabilities and their reported amounts in the consolidated financial statements. Net operating loss carry forwards and credits are applied using enacted statutory tax rates applicable to future years. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more-likely-than-not that a portion of or all of the deferred tax assets will not be realized. The components of the deferred tax assets and liabilities are individually classified as current and non-current based on their characteristics.

The impact of an uncertain income tax position on the income tax return is recognized at the largest amount that is more-likely than- not to be sustained upon audit by the relevant tax authority. An uncertain income tax position will not be recognized if it has less than a 50%

likelihood of being sustained. Interest and penalties on income taxes will be classified as a component of the provisions for income taxes. The Group recognized income tax expense amounted to $nil, $92 and $5,136 for the years ended December 31, 2014, 2015 and 2016, respectively.

Foreign currency translation

The functional and reporting currency of the Company is the United States dollar ("U.S. dollar"). The financial records of the Group's subsidiaries, VIE and VIE's subsidiaries located in the PRC are maintained in their local currencies, the RMB, which are also the functional currencies of these entities.

Monetary assets and liabilities denominated in currencies other than the functional currency are translated into the functional currency at the rates of exchange in place at the balance sheet date. Transactions in currencies other than the functional currency during the year are converted into the functional currency at the applicable rates of exchange prevailing when the transactions occurred. Transaction gains and losses are recognized in the consolidated statement of operations.

The Group's entities with functional currency of RMB, translate their operating results and financial positions into the U.S. dollar, the Group's reporting currency. Assets and liabilities are translated using the exchange rates in effect on the balance sheet date. Revenues, expenses, gains and losses are translated using the average rate for the year. Translation adjustments are reported as cumulative translation adjustments and are shown as a separate component of comprehensive loss.

Operating leases

Leases where the rewards and risks of ownership of assets primarily remain with the lessor are accounted for as operating leases. Payments made under operating leases are charged to the consolidated statements of operations on a straight-line basis over the lease periods.

Advertising expenses

The Group expenses advertising expenses as incurred. Total advertising expenses incurred were $27,408, $27,793 and $55,188 for the years ended December 31, 2014, 2015 and 2016, respectively, and have been included in sales and marketing expenses in the consolidated statements of operations.

Comprehensive (loss) income

Comprehensive (loss) income includes net (loss) income, unrealized gain or loss on available-for-sale investments and foreign currency translation adjustments. Comprehensive (loss) income is reported in the consolidated statements of comprehensive (loss) income.

Share-based compensation

Share-based payment transactions with employees and executives are measured based on the grant date fair value of the equity instrument issued and recognized as compensation expense net of a forfeiture rate on a straight-line basis, over the requisite service period, with a corresponding impact reflected in additional paid-in capital.

Share awards issued to consultants are measured at fair value at the earlier of the commitment date or the date the services are completed and recognized over the period the services are provided.
The estimate of forfeiture rate will be adjusted over the requisite service period to the extent that actual forfeiture rate differs, or is expected to differ, from such estimates. Changes in estimated forfeiture rate will be recognized through a cumulative catch-up adjustment in the period of change.

Changes in the terms or conditions of share options are accounted as a modification under which the Group calculates whether there is any excess of the fair value of the modified option over the fair value of the original option immediately before its terms are modified, measured based on the share price and other pertinent factors at the modification date. For vested options, the Group recognizes incremental compensation cost in the period of the modification occurred and for unvested options, the Group recognizes, over the remaining requisite service period, the sum of the incremental compensation cost and the remaining unrecognized compensation cost for the original award on the modification date.

Earnings (loss) per share

Basic earnings (loss) per ordinary share is computed by dividing net income (loss) attributable to ordinary shareholders by the weighted average number of ordinary shares outstanding during the period.

The Group's convertible redeemable participating preferred shares are participating securities

as they participate in undistributed earnings on an as-if-converted basis. The Group determined that the nonvested restricted shares are participating securities as the holders of the nonvested restricted shares have a nonforfeitable right to receive dividends with all ordinary shares but the nonvested restricted shares do not have a contractual obligation to fund or otherwise absorb the Company's losses. Accordingly, the Group uses the two-class method whereby undistributed net income is allocated on a pro rata basis to the ordinary shares, preferred shares and nonvested restricted shares to the extent that each class may share in income for the period; whereas the undistributed net loss for the period is allocated to ordinary shares only because the convertible redeemable participating preferred shares and nonvested restricted shares are not contractually obligated to share the loss.

Diluted earnings (loss) per ordinary share reflect the potential dilution that could occur if securities were exercised or converted into ordinary shares. The Group had convertible redeemable participating preferred shares, share options and restricted share units, which could potentially dilute basic earnings (loss) per share in the future. To calculate the number of shares for diluted earnings (loss) per ordinary share, the effect of the convertible redeemable participating preferred shares is computed using the as-if-converted method; the effect of the share options and restricted share units is computed using the treasury stock method.

<u>Recent accounting pronouncements not yet adopted</u>

In May 2014, the FASB issued, ASU 2014-09, "Revenue from Contracts with Customers (Topic 606)". The guidance substantially converges final standards on revenue recognition between the FASB and the International Accounting Standards Board providing a framework on addressing revenue recognition issues and, upon its effective date, replaces almost all exiting revenue recognition guidance, including industry-specific guidance, in current U.S. generally accepted accounting principles.

The core principle of the guidance is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. To achieve that core principle, an entity should apply the following steps:

- Step 1: Identify the contract (s) with a customer.

- Step 2: Identify the performance obligations in the contract.

- Step 3: Determine the transaction price.

- Step 4: Allocate the transaction price to the performance obligations in the contract.

- Step 5: Recognize revenue when (or as) the entity satisfies a performance obligation.

In August 2015, FASB issued its final standard formally amending the effective date of the new revenue recognition guidance. The amendments in this ASU are effective for annual reporting periods beginning after December 15, 2017, including interim periods within that reporting period. Earlier application is permitted only as of annual reporting periods beginning after December 15, 2016, including interim reporting periods within that reporting period. The new revenue guidance may be applied retrospectively to each prior period presented or retrospectively with the cumulative effect recognized as of the date of adoption.

The Group is in the process of evaluating the impact of adoption of this guidance on its consolidated financial statements.

In November, 2015, the FASB issued a new pronouncement ASU 2015-17 which changes how deferred taxes are classified on organizations' balance sheets.

The ASU eliminates the current requirement for organizations to present deferred tax liabilities and assets as current and noncurrent in a classified balance sheet. Instead, organizations will be required to classify all deferred tax assets and liabilities as noncurrent.

The amendments apply to all organizations that present a classified balance sheet. For public companies, the amendments are effective for financial statements issued for annual periods beginning after December 15, 2016, and interim periods within those annual periods. Earlier application is permitted for all entities as of the beginning of an interim or annual reporting period. This ASU may be applied prospectively to all deferred tax liabilities and assets or retrospectively to all periods presented. The Group does not expect the adoption of this guidance will have a significant effect on the Group's consolidated financial statements.

In January, 2016, the FASB issued a new pronouncement ASU 2016-01 which is intended to improve the recognition and measurement of financial instruments. The ASU affects public and private companies, not-for-profit organizations, and employee benefit plans that hold financial assets or owe financial liabilities.

The new guidance makes targeted improvements to existing U.S. GAAP by:

- Requiring equity investments (except those accounted for under the equity method of accounting, or those that result in consolidation of the investee) to be measured at fair value with changes in

fair value recognized in net income;

- Requiring public business entities to use the exit price notion when measuring the fair value of financial instruments for disclosure purposes;

- Requiring separate presentation of financial assets and financial liabilities by measurement category and form of financial asset (i.e., securities or loans and receivables) on the balance sheet or the accompanying notes to the financial statements;

- Eliminating the requirement to disclose the fair value of financial instruments measured at amortized cost for organizations that are not public business entities;

- Eliminating the requirement for public business entities to disclose the method(s) and significant assumptions used to estimate the fair value that is required to be disclosed for financial instruments measured at amortized cost on the balance sheet; and

- Requiring a reporting organization to present separately in other comprehensive income the portion of the total change in the fair value of a liability resulting from a change in the instrument-specific credit risk (also referred to as "own credit") when the organization has elected to measure the liability at fair value in accordance with the fair value option for financial instruments.

The new guidance is effective for public companies for fiscal years beginning after December 15, 2017, including interim periods within those fiscal years. The new guidance permits early adoption of the own credit provision. Adoption of the amendment must be applied by means of a cumulative-effect adjustment to the balance sheet as of the beginning of the fiscal year of adoption, except for amendments related to equity instruments that do not have readily determinable fair values which should be applied prospectively. The Group does not expect the adoption of this guidance will have a significant effect on the Group's consolidated financial statements.

In February 2016, the FASB issued ASU No. 2016-02, Leases (Topic 842). The guidance supersedes existing guidance on accounting for leases with the main difference being that operating leases are to be recorded in the statement of financial position as right-of-use assets and lease liabilities, initially measured at the present value of the lease payments. For operating leases with a term of 12 months or less, a lessee is permitted to make an accounting policy election not to recognize lease assets and liabilities. For public business entities, the guidance is effective for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years. Early application of the guidance is permitted. In transition, entities are required to recognize and measure leases at the beginning of the earliest period presented using a modified retrospective approach. The Group is currently evaluating the impact the adoption of ASU No. 2016-02 will have on its consolidated financial statements, but the Group expects that most existing operating lease commitments will be recognized as operating lease obligations and right-of-use assets as a result of this adoption.

In March 2016, the FASB issued ASU 2016-09, Compensation - Stock Compensation (Topic 718). The new guidance simplifies certain aspects related to income taxes, statement of cash flows, and forfeitures when accounting for share-based payment transactions. This new guidance was effective for the Company for the first reporting period beginning after December 15, 2016, with earlier adoption permitted. Certain of the amendments related to timing of the recognition of tax benefits and tax withholding requirements should be applied using a modified retrospective transition method. Amendments related to the presentation of the statement of cash flows should be applied retrospectively. All other provisions may be applied on a prospective or modified retrospective basis. The Group is in the process of evaluating the impact that this guidance will have on its consolidated financial statements.

| Accounts Receivable, Net | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |

**Receivables [Abstract]**

Accounts Receivable, Net

**3. ACCOUNTS RECEIVABLE, NET**

Accounts receivable, net consisted of the following:

| | As of December 31, | |
|---|---|---|
| | 2015 | 2016 |
| Accounts receivable | $ 14,896 | $ 36,078 |
| Less: allowance for doubtful accounts | — | — |
| Accounts receivable, net | $ 14,896 | $ 36,078 |

**Prepaid Expenses and Other Current Assets**

**Deferred Costs, Capitalized, Prepaid, and Other Assets Disclosure [Abstract]**

Prepaid Expenses and Other Current Assets

**12 Months Ended**

**Dec. 31, 2016**

4.  **PREPAID EXPENSES AND OTHER CURRENT ASSETS**

Prepaid expenses and other current assets consisted of the following:

|  | As of December 31, | |
| --- | --- | --- |
|  | 2015 | 2016 |
| Advance to advertisement suppliers | $   296 | $  5,331 |
| Customer advance at a third-party payment channel (i) | — | 4,845 |
| Interest receivable | 5,412 | 4,821 |
| Deferred platform commission cost | 2,424 | 4,571 |
| Input VAT (ii) | 3,485 | 2,968 |
| Prepaid income tax and other expenses | 1,620 | 2,964 |
| Game promotions fees paid on behalf of game developers | — | 2,250 |
| Advance to game developers | 4,200 | 1,550 |
| Others | 860 | 3,292 |
|  | $18,297 | $32,592 |

(i)  Customer advance at a third party payment channel is the cash deposited in a third party payment channel by the Group for the broadcasters to withdraw their revenue sharing.

(ii)  Input VAT mainly occurred from the purchasing of goods for other services, property and equipment and advertising activities. It is subject to verification by related tax authorities before offsetting the VAT output.

**Long Term Investments**

**12 Months Ended**

**Dec. 31, 2016**

**Investments Schedule [Abstract]**

Long Term Investments

5. **LONG TERM INVESTMENTS**

|  | As of December 31, | |
|---|---|---|
|  | 2015 | 2016 |
| Equity method investments | | |
| Jingwei Chuangteng (Hangzhou) L.P. (i) | $ 3,836 | $ 4,191 |
| Beijing Autobot Venture Capital L.P. (ii) | 4,898 | 6,736 |
| Hangzhou Aqua Ventures Investment Management L.P. (iii) | 7,632 | 9,187 |
| Hunan Qindao Cultural Spread Ltd. (viii) | — | 2,016 |
| Others (iv) | 1,060 | 702 |
| Cost method investments | | |
| Zya, Inc. (v) | — | 1,005 |
| Others (vi) | 1,892 | 829 |
| Available-for-sale investments | | |
| Xish International Limited (vii) | — | 4,386 |
| Hunan Qindao Cultural Spread Ltd. (viii) | — | 2,880 |
|  | $19,318 | $31,932 |

Equity method investments

(i)  On January 9, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Jingwei Chuangteng (Hangzhou) L.P. ("Jingwei"). According to the partnership agreement, the Group committed to subscribe 4.9% partnership interest in Jingwei for $4,744. Due to Jingwei's further rounds of financing, the Group's partnership interest was diluted to 3.1% and 2.4% as of December 31, 2015 and 2016, respectively. Of the committed subscription amount, $3,586 had been paid as of December 31, 2016. The Group recognized its share of partnership profit in Jingwei of $366 and $633 during the year ended December 31, 2015 and 2016, respectively.

(ii)  On February 13, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Beijing Autobot Venture Capital L.P. ("Autobot"). According to the partnership agreement, the Group committed to subscribe 31.9% partnership interest in Autobot for $4,823. Autobot had further rounds of financing, of which the Group subscribed for $1,529. Due to Autobot's further round of financing, the Group's partnership interest was diluted to 29.7% and 26.7% as of December 31, 2015 and 2016, respectively. The committed subscription and further round of financing subscription amount, $6,352 had been paid for the year ended December 31, 2016. The Group recognized its share of partnership profit in Autobot of $274 and $771 during the year ended December 31, 2015 and 2016, respectively.

(iii)  On August 18, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Hangzhou Aqua Ventures Investment Management L.P. ("Aqua"). According to the partnership agreement, the Group committed to subscribe 42.7% partnership interest for $7,930. The committed subscription amount had been fully paid as of December 31, 2016. The Group recognized its share of partnership loss and profit in Aqua of $89 and $2,134 during the years ended December 31, 2015 and 2016, respectively.

(iv)  Others represents other equity method investments with individual carrying amount less than $1,000 as of December 31, 2015 and 2016, respectively. The Group performed an impairment analysis for these investments and recorded impairment loss of $nil, $nil and $186 during the years ended December 31, 2014, 2015 and 2016, respectively.

Cost method investments

(v)  On December 13, 2016, the Group acquired 15.6% equity interest in Zya, Inc., a Delaware corporation. The total consideration of $1,005 was paid in 2016. The Group applied cost method to account for the investment due to the lack of ability to exercise significant influence.

(vi)  During the years ended December 31, 2015 and 2016, the Group acquired certain equity interests in third-party private companies. The Group accounted for these investments under cost method because the Group ownership percentage is less than 20% and the Group determined that it does not have the ability to exercise significant influence. The Group determined the impairment on the above investments was $nil, $nil and $965 during the years ended December 31, 2014, 2015 and 2016, respectively.

Available-for-sale investments

(vii) On January 21, 2016, the Group entered into a preferred share subscription agreement to acquire 17.3% equity of Xish International Limited ("Xish") for a total consideration of $9,000, which had been paid as of December 31, 2016. The investment was classified as available-for-sale security as the Group determined that the preferred shares were debt securities due to the redemption option available to the investor and measured the investment subsequently at fair value. The Group recognized an impairment loss of $4,614 during the year ended December 31, 2016. Please refer to Note 8 for additional information on the fair value measurement related to the impairment loss.

(viii) On June 8, 2016, the Group entered into a share purchase agreement to acquire 16.0% equity interest of Hunan Qindao Cultural Spread Ltd. ("Qindao") for a total consideration of $4,441, of which $3,001 had been paid as of December 31, 2016. The investment was classified as available-for-sale security as the Group determined that the preferred shares were debt securities due to the redemption option available to the investor and measured the investment subsequently at fair value. No unrealized holding gains of $nil was reported in other comprehensive income for the year ended December 31, 2016.

On November 17, 2016, the Group entered into another share purchase agreement with two shareholders of Qindao and acquired additional 10.4% equity interests of Qindao for a total consideration of $2,429, of which $2,007 had been paid as of December 31, 2016. The Group accounted for this investment in common share using the equity method as the Group determined that it can exercise significant influence over Qindao.

|  | **12 Months Ended** |
|---|---|
| **Property and Equipment, Net** | **Dec. 31, 2016** |

**Property, Plant and Equipment [Abstract]**

Property and Equipment, Net

6.  **PROPERTY AND EQUIPMENT, NET**

Property and equipment, net consisted of the following:

|  | As of December 31, | |
|---|---|---|
|  | 2015 | 2016 |
| Computer equipment | $ 20,177 | $ 23,763 |
| Office equipment | 3,073 | 4,370 |
| Vehicles | 34 | 31 |
| Leasehold improvement | 2,914 | 2,800 |
| Less: accumulated depreciation | (10,440) | (18,844) |
| Exchange difference | 501 | 1,812 |
|  | $16,259 | $ 13,932 |

Depreciation expenses charged to the consolidated statements of operations for the years ended December 31, 2014, 2015 and 2016 were $2,805, $6,646 and $8,404 respectively.

| Accrued Expenses and Other Current Liabilities | 12 Months Ended Dec. 31, 2016 |
|---|---|

**Payables and Accruals [Abstract]**

Accrued Expenses and Other Current Liabilities

**7.  ACCRUED EXPENSES AND OTHER CURRENT LIABILITIES**

Accrued expenses and other current liabilities consisted of the following:

|  | As of December 31, | |
|---|---|---|
|  | 2015 | 2016 |
| Accrued payroll and welfare | $ 7,406 | $18,982 |
| Payable for advertisement | 2,718 | 9,871 |
| Other tax payables | 1,517 | 4,694 |
| VAT payable | 550 | 1,919 |
| Accrued professional services fee | 1,506 | 1,438 |
| Payable to employees for exercise of share options | 11,297 | — |
| Others | 1,700 | 3,061 |
| Total | $26,694 | $39,965 |

|  | **12 Months Ended** |
|---|---|
| **Fair Value** | **Dec. 31, 2016** |

**Fair Value Disclosures [Abstract]**

Fair Value

8.  **FAIR VALUE**

Measured on recurring basis

The Group measures its financial assets and liabilities including cash and cash equivalents and available-for-sale investments at fair value on a recurring basis as of December 31, 2015 and 2016. Cash and cash equivalents are classified within Level 1 of the fair value hierarchy because they are valued based on the quoted market price in an active market. Available-for-sale investments are debt securities and are measured at fair value on a recurring basis with changes in fair value recorded in unrealized holding gains and losses reported in other comprehensive income.

As of December 31, 2016, information about inputs for the fair value measurements of the Group's assets that are measured at fair value on a recurring basis in periods subsequent to their initial recognition is as follows:

| | | Fair Value Measurement as of December 31, | | |
|---|---|---|---|---|
| Description | 2016 | Quoted Prices in Active Market for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| Cash and cash equivalents | $257,564 | $257,564 | — | $ — |
| Available-for-sale investments | 7,266 | — | — | 7,266 |
| Total | $264,830 | $257,564 | — | $ 7,266 |

The Group measured the fair value of its available for sales investments using the income approach and consider those as Level 3 measurement because the Group used unobservable inputs to determine their fair values. Specifically, the Group estimates the fair value of these investments based on the discounted cash flow approach which requires significant judgments, including the estimation of future cash flows, which is dependent on internal forecasts, the estimation of long term growth rate of a company's business, the estimation of the useful life over which cash flows will occur, and the determination of the weighted average cost of capital. Significant increases (decreases) in any of those inputs in isolation would result in a significantly lower (higher) fair value measurement.

Additional information about the reconciliation of the fair value measurement of available-for-sale investments using significant unobservable inputs (level 3) on a recurring basis are is as follows:

| | |
|---|---|
| Balance as of December 31, 2015 | $ — |
| Purchase | 12,001 |
| Other-than-temporary loss recognized | (4,614) |
| Foreign exchange difference | (121) |
| Balance as of December 31, 2016 | $ 7,266 |

Measured on nonrecurring basis

The Group measures its long-term investments (excluding long-term available for sale investments) at fair value on a nonrecurring basis whenever events or changes in circumstances indicate that the carrying value may not be recoverable. As of December 31, 2015 and 2016, the Group performed an impairment test on its cost and equity method investees and recorded an impairment loss of $nil and $1,151, respectively. Such impairment is considered a level 3 fair value measurement because the Group used unobservable inputs such as the respective investee's growth rate and discount rate. The Group also measures its other non-financial assets such as property and equipment at fair value only if there were determined to be impaired on an other than temporary basis.

**Income Taxes**

**12 Months Ended**

**Dec. 31, 2016**

**Income Tax Disclosure [Abstract]**

Income Taxes

9.   **INCOME TAXES**

Cayman

In July 2014, the Company was redomiciled in the Cayman Islands as an exempted company registered under the laws of the Cayman Islands. Under the current laws of the Cayman Islands, it is not subject to tax on either income or capital gain.

BVI

Momo BVI is a tax-exempted company incorporated in the BVI.

The United States ("US")

Momo US is incorporated in the US and is subject to state income tax and federal income tax at different tax rates, depending upon taxable income levels. Momo US did not have taxable income and no income tax expense was provided for the year ended December 31, 2016.

Hong Kong

Momo HK was established in Hong Kong and is subject to Hong Kong Profits Tax at 16.5% on its profits of business carried on in Hong Kong.

PRC

In August 2014, Beijing Momo IT was qualified as a software enterprise. As such, Beijing Momo IT will be exempt from income taxes for two years beginning in its first profitable year which was from 2015 to 2016 followed by a tax rate of 12.5% for the succeeding three years which is from 2017 to 2019.

As of December 31, 2016, Chengdu Momo was in the process of filing the western China development enterprise status. The Group believes Chengdu Momo will most likely be qualified as western China development enterprise and accordingly be entitled to a preferential income tax rate of 15% in the year 2016. As a result, the Group applied 15% to determine the tax liabilities for Chengdu Momo.

The other entities incorporated in the PRC are subject to an enterprise income tax at a rate of 25%.

Since January 1, 2011, the relevant tax authorities of the Group's subsidiaries have not conducted a tax examination on the Group's PRC entities. In accordance with relevant PRC tax administration laws, tax years from 2014 to 2016 of the Group's PRC subsidiary, VIE and VIE's subsidiaries, remain subject to tax audits as of December 31, 2016, at the tax authority's discretion.

Under the EIT Law and its implementation rules which became effective on January 1, 2008, dividends generated after January 1, 2008 and payable by foreign-invested enterprise in the PRC to its foreign investors who are non-resident enterprises are subject to a 10% withholding tax, unless any such foreign investor's jurisdiction of incorporation has a tax treaty with PRC that provides for a different withholding arrangement. Under the taxation arrangement between the PRC and Hong Kong, a qualified Hong Kong tax resident which is the "beneficial owner" and directly holds 25% or more of the equity interest in a PRC resident enterprise is entitled to a reduced withholding tax rate of 5%. Cayman, where the Company is incorporated, does not have a tax treaty with PRC.

Uncertainties exist with respect to how the current income tax law in the PRC applies to the Group's overall operations, and more specifically, with regard to tax residency status. The EIT Law includes a provision specifying that legal entities organized outside of the PRC will be considered residents for Chinese income tax purposes if the place of effective management or control is within the PRC. The implementation rules to the EIT Law provide that non-resident legal entities will be considered China residents if substantial and overall management and control over the manufacturing and business operations, personnel, accounting, properties, etc., occurs within the PRC. Despite the present uncertainties resulting from the limited PRC tax guidance on the issue, the Group does not believe that the legal entities organized outside of the PRC within the Group should be treated as residents for EIT law purposes. If the PRC tax authorities subsequently determine that the Company and its subsidiaries registered outside the PRC should be deemed resident enterprises, the Company and its subsidiaries registered outside the PRC will be subject to the PRC income taxes, at a rate of 25%.

If any entity within the Group that is outside the PRC were to be a non-resident for PRC tax purposes dividends paid to it out of profits earned after January 1, 2008 would be subject to a withholding tax at a rate of 10%, subject to reduction by an applicable tax treaty with the PRC.

Aggregate undistributed earnings of the Company's subsidiaries located in the PRC that are

available for distribution at December 31, 2016 are considered to be indefinitely reinvested and accordingly, no provision has been made for the Chinese dividend withholding taxes that would be payable upon the distribution of those amounts to any entity within the Group that is outside the PRC.

The Group does not have any present plan to pay any cash dividends on its ordinary shares in the foreseeable future. It intends to retain most of its available funds and any future earnings for use in the operation and expansion of its business. As of December 31, 2016, the Group has not declared any dividends.

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amount of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Significant components of the Group's deferred tax assets and liabilities are as follows:

| | As of December 31, | |
| --- | --- | --- |
| | 2015 | 2016 |
| Current deferred tax assets: | | |
| Impairment of loss on long term investments | $ — | $ 72 |
| Less: valuation allowance | — | — |
| Current deferred tax assets, net | — | 72 |
| Non-current deferred tax assets: | | |
| Advertising expense | 2,651 | — |
| Net operating tax losses carry-forward | 2,881 | 2,852 |
| Impairment of on long term investments | — | 208 |
| Less: valuation allowance | (5,532) | (2,852) |
| Non-current deferred tax assets, net | $ — | $ 208 |

The Group considers the following factors, among other matters, when determining whether some portion or all of the deferred tax assets will more likely than not be realized: the nature, frequency and severity of losses, forecasts of future profitability, the duration of statutory carry-forward periods, the Group's experience with tax attributes expiring unused and tax planning alternatives. The Group's ability to realize deferred tax assets depends on its ability to generate sufficient taxable income within the carry-forward periods provided for in the tax law.

As of December 31, 2016, the tax loss carry-forward for Beijing Momo's subsidiaries amounted to $105, which would expire on various dates between December 31, 2020 and December 31, 2021. As of December 31, 2016, the tax loss carryforward for Momo HK amounted to $178, which would be carried forward indefinitely and set off against its future taxable profits. As of December 31, 2016, the tax loss carry-forward for Momo US amounted to $7,992, which would be carried forward for twenty years. The Group does not file combined or consolidated tax returns, therefore, losses from individual subsidiaries or the VIE may not be used to offset other subsidiaries' or VIE's earnings within the Group. Valuation allowance is considered on each individual subsidiary and legal entity basis. Valuation allowances have been established in respect of certain deferred tax assets as it is considered more likely than not that the relevant deferred tax assets will not be realized in the foreseeable future.

Reconciliation between the expense (benefit) of income taxes computed by applying the PRC tax rate to (loss) income before income taxes and the actual provision for income taxes is as follows:

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2016 |
| Net (loss) income before provision for income tax | $(25,415) | $13,419 | $146,915 |
| PRC statutory tax rate | 25% | 25% | 25% |
| Income tax (benefit) expense at statutory tax rate | (6,354) | 3,355 | 36,729 |
| Permanent differences | 99 | (144) | (75) |
| Change in valuation allowance | 4,560 | (2,315) | (2,680) |
| Effect of income tax rate difference in other jurisdictions | 1,695 | 2,754 | 7,941 |
| Effect of tax holidays and preferential tax rates | — | (3,558) | (36,779) |
| Provision for income tax | $ — | $ 92 | $ 5,136 |

No significant unrecognized tax benefit was identified for the years ended December 31, 2014, 2015 and 2016. The Group did not incur any interest and penalties related to potential underpaid income tax expenses and also believed that uncertainty in income taxes did not have a significant impact on the unrecognized tax benefits within next twelve months.

| **Ordinary Shares** | **12 Months Ended** |
| --- | --- |
| | **Dec. 31, 2016** |

**Equity [Abstract]**

Ordinary Shares

### 10. ORDINARY SHARES

On November 23, 2011, the Company was authorized to issue a maximum 500,000,000 shares of a single class and issued 147,000,000 ordinary shares with a par value of $0.0001.

On April 12, 2012, the authorized 500,000,000 shares were divided into 446,545,450 ordinary shares and 53,454,550 preferred shares in connection with the issuance of Series A-1 and A-2 convertible redeemable participating preferred shares.

In April 2012, the Company's four founding shareholders entered into an arrangement with the investor in conjunction with the issuance of Series A convertible redeemable participating preferred shares, whereby all of their 147,000,000 ordinary shares ("Founders' shares") became subject to service and transfer restrictions. Such Founders' shares are subject to repurchase by the Company upon early termination of four years of employment of four founders from April 2012. Notwithstanding the foregoing, the Founders shall exercise all rights and privileges of a holder of ordinary shares of the Company with respect to the Founders' shares. The Founders shall be deemed to be the holder for purposes of receiving any dividends that may be paid with respect to the Founders' shares and for the purpose of exercising any voting rights relating to the Founders' shares, even if some or all of Founders' shares have not yet vested and been released from the repurchase rights. Please refer to Note 12 for disclosure of nonvested restricted shares.

On June 11, 2012, the Company decreased its authorized ordinary shares from 446,545,450 shares to 426,747,470 shares in connection with the issuance of Series A-3 convertible redeemable participating preferred shares.

On July 13, 2012, the Company decreased its authorized ordinary shares from 426,747,470 shares to 366,789,830 shares in connection with the issuance of Series B convertible redeemable participating preferred shares.

On September 12, 2012, a 10-for-1 stock split for all ordinary shares, Series A-1, A-2 and A-3 and Series B convertible redeemable participating preferred shares was approved by the shareholders. While the stock split increased the number of shares for each stockholder, the percentage of their ownership in the Company was not affected. This share split has been retrospectively reflected for all periods presented. In addition, the Company increased its authorized ordinary shares from 366,789,830 to 371,684,330 in connection with the preferred share transfer between investors.

On October 8, 2013, the Company was authorized to issue a maximum 1,000,000,000 shares, which was divided into 835,675,688 ordinary shares and 164,324,312 preferred shares in connection with the issuance of Series C convertible redeemable participating preferred shares.

On April 22, 2014, the Company was authorized to issue a maximum 1,000,000,000 shares, which was divided into 799,281,189 ordinary shares and 200,718,811 preferred shares in connection with the issuance of Series D convertible redeemable participating preferred shares.
On April 22, 2014, certain ordinary shareholders who are also the senior management of the Company donated an aggregate of 15,651,589 ordinary shares to the Company with no consideration. On the same date, the Group declared a special dividend to these shareholders at an aggregated amount of $64,494, among which $58,044 was paid in May 2014. The remaining $5,775 and $675 were recorded as amount due to related parties-current and accrued expenses and other current liabilities respectively, as of December 31, 2016. Please refer to Note 15 for disclosure of related party balances and transactions. The Company treated the whole transaction as a repurchase of ordinary shares of which the repurchase price is considerably lower than the fair value of ordinary share. All such shares were recorded as treasury stock.

On November 28, 2014, the Company was authorized to issue a maximum 1,000,000,000 ordinary shares, which was divided into 800,000,000 Class A Ordinary Shares, 100,000,000 Class B Ordinary Shares and 100,000,000 shares of such class designated as the Board may determine.

On December 16, 2014, the Company completed its IPO and a concurrent private placement upon which the Company's ordinary shares were divided into Class A ordinary shares and Class B ordinary shares. The Company newly issued 45,688,888 Class A ordinary shares, consisting of (i) 36,800,000 Class A ordinary shares offered through IPO, and (ii) 8,888,888 Class A ordinary shares issued in connection with the concurrent private placement. All of the Company's Series A, Series B, Series C and Series D preferred shares were automatically converted into 200,718,811 Class A ordinary shares.

In 2015 and 2016, 5,995,293 and 5,197,032 ordinary shares were issued in connection with the exercise of options and vesting of restricted share units previously granted to employees, executives and consultants under the Company's share incentive plans (see Note 12), respectively.

As of December 31, 2016, there were 292,062,065 Class A ordinary shares and 96,886,370 Class B

ordinary shares issued and outstanding, par value $0.0001 per share.

| Convertible Redeemable Participating Preferred Shares | 12 Months Ended |
| --- | --- |
| | Dec. 31, 2016 |

**Text Block [Abstract]**

Convertible Redeemable Participating Preferred Shares

**11. CONVERTIBLE REDEEMABLE PARTICIPATING PREFERRED SHARES**

On April 12, 2012, the Group entered into the preferred share purchase agreements with a group of investors to issue an aggregate of 53,454,550 convertible redeemable participating preferred shares Series A-1 ("Series A-1") and convertible redeemable participating preferred shares Series A-2 ("Series A-2") to a group of investors for an aggregate consideration of $2,100.

On June 11, 2012, the Group entered into the preferred share purchase agreements with a group of investors to issue an aggregate of 19,797,980 convertible redeemable participating preferred shares Series A-3 ("Series A-3") (Series A-1, Series A-2 and Series A-3 are collectively referred to as "Series A") to a group of investors for a consideration of $4,000.

On July 13, 2012, the Group entered into the preferred share purchase agreements with a group of investors to issue an aggregate of 55,063,140 convertible redeemable participating preferred shares Series B ("Series B") to a group of investors for a consideration of $18,006.

In July 2012, the Group redesignated 4,894,500 Series A-1 preferred shares held by an old investor into Series B preferred shares, and the old investor then transferred 4,894,500 Series B preferred shares to a new investor at the purchase price of $0.286 per share for a total consideration of $1,400 in cash. Also in January 2013, the Group redesignated another 10,079,373 Series A-1 preferred shares of the same old investor into Series B preferred shares, and the old investor then transferred 10,079,373 Series B preferred shares to the same new investor at the purchase price of $0.425 per share for a total consideration of $4,280 in cash. The Group did not receive any proceeds for the transfer between the old investor and the new investor, nor receive any consideration for the redesignation for the shares transferred. The Group accounted for such redesignation as an extinguishment of 4,894,500 and 10,079,373 Series A-1 preferred shares repurchased and recorded $1,361 and $2,766 as deem dividend for the years ended December 31, 2012 and 2013, respectively, based on the difference between the fair value of the consideration transferred to the new investor (i.e., fair value of Series B preferred shares) and the carrying amount of such Series A-1 preferred shares.

On October 8, 2013, the Group entered into the preferred share purchase agreements with a group of investors to issue an aggregate of 36,008,642 convertible redeemable participating preferred shares Series C ("Series C") to a group of investors for a consideration of $45,000.

On April 22, 2014, the Group entered into the preferred share purchase agreements with a group of investors to issue an aggregate of 43,693,356 convertible redeemable participating preferred shares Series D ("Series D") to a group of investors for a consideration of $211,750.

On April 22, 2014, the Group entered into the agreements to repurchase 7,298,857 shares of Series A-1 preferred shares from one shareholder for a consideration of $30,750, which was paid in May 2014. The repurchase amount of $30,293 is in excess of the carrying amount of such Series A-1 preferred shares as of April 22, 2014 and was considered as deemed dividend to Series A-1 preferred shareholder and recorded in the accumulated deficit. All the preferred shares repurchased were cancelled on the same date.

On December 16, 2014, Series A, Series B, Series C and Series D preferred shares had been automatically converted into 200,718,811 Class A ordinary shares after the closing of IPO.

Key terms of the preferred shares are summarized as follows:

Voting rights

Shareholders of the preferred shares are entitled to the number of votes equal to the number of ordinary shares into which such preferred shares could be converted at the record date.

Dividends

Whenever a dividend is declared by the board of directors of the Company, the preferred shares holders shall receive, in preference to any dividend on any ordinary shares a cumulative dividend in an amount equal to 8% annually of the Original Issue Price, which was defined as $0.04714, $0.13469, $0.20204, $0.327, $1.2497 and $4.84627 per share for Series A-1, A-2, A-3, B, C and D preferred shares, respectively, as adjusted for stock splits, stock dividends, etc., and shall also participate on an as converted basis with respect to any dividends payable to the ordinary shares. The sequence of dividend participating right of all series of preferred shares was as follows:

(1) Series D
(2) Series C
(3) Series B
(4) Series A-3

(5) Series A-1, A-2

Liquidation preference

In the event of any liquidation, dissolution or winding up of the Company, either voluntary or involuntary, distributions to the shareholders of the Company shall be made in the following manners:

(i)   Before any distribution or payment shall be made to the holders of any ordinary shares, Series A preferred shares, Series B preferred shares or Series C preferred shares, each holder of Series D preferred shares shall be entitled to receive an amount equal to one hundred and thirty percent (130%) of the Original Issue Price of Series D preferred shares (adjusted for any share splits, share dividends, combinations, recapitalizations and similar transactions), plus all dividends accrued and unpaid with respect thereto (as adjusted for any share splits, share dividends, combinations, recapitalizations and similar transactions) per Series D preferred share then held by such holder.

(ii)   After distribution or payment in full of the amount distributable or payable pursuant to (i) and before any distribution or payment shall be made to the holders of any ordinary shares, Series A preferred shares or Series B preferred shares, each holder of Series C preferred shares shall be entitled to receive an amount equal to one hundred and thirty percent (130%) of the Original Issue Price of Series C preferred shares (adjusted for any share splits, share dividends, combinations, recapitalizations and similar transactions), plus all dividends accrued and unpaid with respect thereto (as adjusted for any share splits, share dividends, combinations, recapitalizations and similar transactions) per Series C preferred share then held by such holder.

(iii)   After distribution or payment in full of the amount distributable or payable pursuant to (i) and (ii) and before any distribution or payment shall be made to the holders of any ordinary shares or Series A preferred shares, each holder of Series B preferred shares shall be entitled to receive an amount equal to one hundred percent (100%) of the Original Issue Price of Series B (adjusted for any share splits, share dividends, combinations, recapitalizations and similar transactions), plus all dividends accrued and unpaid with respect thereto (as adjusted for any share splits, share dividends, combinations, recapitalizations and similar transactions) per Series B preferred share then held by such holder.

(iv)   After distribution or payment in full of the amount distributable or payable pursuant to (i), (ii) and (iii) and before any distribution or payment shall be made to the holders of any ordinary shares, Series A-1 preferred shares or Series A-2 preferred shares, each holder of Series A-3 preferred shares shall be entitled to receive an amount equal to one hundred percent (100%) of the Original Issue Price of Series A-3 (adjusted for any share splits, share dividends, combinations, recapitalizations and similar transactions), plus all dividends accrued and unpaid with respect thereto (as adjusted for any share splits, share dividends, combinations, recapitalizations and similar transactions) per Series A-3 preferred share then held by such holder.

(v)   After distribution or payment in full of the amount distributable or payable pursuant to (i), (ii), (iii) and (iv) and before any distribution or payment shall be made to the holders of any ordinary shares, each holder of Series A-1 preferred shares and each holder of Series A-2 preferred shares shall be entitled to receive on a pari passu basis an amount equal to one hundred fifty percent (150%) of the Original Issue Price of Series A-1 or the Original Issue Price of Series A-2 (as the case may be) (adjusted for any share splits, share dividends, combinations, recapitalizations and similar transactions), plus all dividends accrued and unpaid with respect thereto (as adjusted for any share splits, share dividends, combinations, recapitalizations and similar transactions) per Series A-1 preferred share or Series A-2 preferred share, as the case may be, then held by such holder.

(vi)   After distribution or payment in full of the amount distributable or payable on the preferred shares pursuant to (i), (ii), (iii), (iv) and (v), the remaining assets of the Company available for distribution to shareholders shall first be used to pay any accrued but unpaid dividends on other shares and then be distributed ratably among the holders of outstanding ordinary shares and holders of preferred shares on an as-converted basis.

Redemption

At any time after (i) the fourth (4) anniversary of the closing of the Series D preferred share issuance, each holder of the then outstanding Series D preferred shares, or (ii) October 8, 2017, each holder of the then outstanding Series C preferred shares, or (iii) December 31, 2016, each holder of the then outstanding Series A preferred shares and Series B preferred shares, may require that the Company redeem all of its preferred shares.

The redemption price for each Series A-1 and Series A-2 preferred share shall be equal to a price per preferred share which is one hundred and fifty percent (150%) of the applicable Initial Purchase Price (equal to the applicable Original Issue Price), plus all declared or accrued but unpaid dividends thereon up until the date of redemption (adjusted for any share splits, share dividends, combinations, recapitalizations or similar transactions).

The redemption price for Series A-3, Series B, Series C and Series D preferred shares shall be equal to a price per share which is one hundred and twenty-five percent (125%) of the applicable Initial Purchase Price (equal to the applicable Original Issue Price), plus all declared or accrued but unpaid dividends thereon up until the date of redemption (adjusted for any share splits, share dividends, combinations, recapitalizations or similar transactions).

The Group assesses the probability of redemption and accrues proper accretion over the period from the date of issuance to the earliest redemption date of Series A-1, Series A-2, Series A-3, Series B, Series C and Series D preferred shares using the effective interest rate method.

The Group recognized $57,663, $nil and $nil as deemed dividend on Series A, Series B, Series C and Series D preferred shares accretion of redemption premium for the years ended December 31, 2014, 2015 and 2016, respectively.

<u>Conversion</u>

Each preferred share shall be convertible, at the option of the holder thereof, at any time after the original date of issuance, into such number of fully paid and nonassessable ordinary shares as determined by dividing the applicable Original Issue Price by then-effective conversion price.

The initial conversion ratio was one for one. The conversion price has a standard anti-dilution adjustment term for items such as stock splits and recapitalization. It also has a down-round provision, under which when the Company issues any additional shares at a price per share that is lower than the conversion price per share then in effect, the conversion price per share is adjusted down. There have been no such adjustments to the conversion price.

Each preferred share would automatically be converted into ordinary shares at the then effective conversion price, upon the closing of a Qualified IPO.
"Qualified IPO" means a firm commitment underwritten registered public offering by the Company of its ordinary Shares on the NASDAQ National Market System in the United States or Hong Kong or any other exchange in any other jurisdiction (on any combination of such exchanges and jurisdictions) acceptable to the majority preferred shareholders to the Company with aggregate offering proceeds (before deduction of fees, commissions or expenses) to the Company and selling shareholders, if any, of not less than $50,000 (or any cash proceeds of other currency of equivalent value).

The Company has determined that there was no beneficial conversion feature attributable to the various series of preferred shares because the initial conversion prices was higher than the fair value of the Company's ordinary shares on issue date of each series shares.

**Share-Based Compensation**

**Disclosure of Compensation Related Costs, Share-based Payments [Abstract]**

Share-Based Compensation

**12 Months Ended**

**Dec. 31, 2016**

## 12. SHARE-BASED COMPENSATION

### Share options granted by the Company

In November 2012, the Company adopted a share incentive plan ("2012 Plan"), which was amended in October 2013. The maximum aggregate number of shares which may be issued pursuant to all awards under the 2012 Plan is 44,758,220 ordinary shares.

In November, 2014, the Company adopted the 2014 share incentive plan ("2014 Plan"), pursuant to which a maximum aggregate of 14,031,194 Class A ordinary shares may be issued pursuant to all awards granted thereunder. Starting from 2017, the number of shares reserved for future issuances under the 2014 Plan will be increased by a number equal to 1.5% of the total number of outstanding shares on the last day of the immediately preceding calendar year, or such lesser number of Class A ordinary shares as determined by the Company's board of directors, on the first day of each calendar year during the term of the 2014 Plan. With the adoption of the 2014 Plan, the Company will no longer grant any incentive shares under the 2012 Plan. The time and condition to exercise options will be determined by the Board or a committee of the Board. The term of the options may not exceed ten years from the date of the grant, except for the situation of amendment, modification and termination. Under the 2014 Plan, share options are subject to vesting schedules ranging from two to four years.

The following table summarizes the option activity for the year ended December 31, 2016:

|  | Number of options | Weighted average exercise price per option | Weighted average remaining contractual life (years) | Aggregated intrinsic value |
|---|---|---|---|---|
| Outstanding, December 31, 2015 | 31,084,006 | $ 0.0767 | 8.14 | $ 246,597 |
| Granted | 7,577,122 | $ 0.0002 |  |  |
| Exercised | (5,147,032) | $ 0.0618 |  |  |
| Forfeited/cancel | (1,907,630) | $ 0.0226 |  |  |
| Outstanding, December 31, 2016 | 31,606,466 | $ 0.0641 | 7.63 | 288,439 |
| Exercisable at December 31, 2016 | 15,313,350 | $ 0.0924 | 6.76 | $ 139,314 |

There were 15,313,350 vested options, and 15,053,681 options expected to vest as of December 31, 2016. For options expected to vest, the weighted-average exercise price was $0.0384 as of December 31, 2016 and aggregate intrinsic value was $133,569, $154,465 and $137,765 as of December 31, 2014, 2015 and 2016, respectively.

The weighted-average grant-date fair value of the share options granted during the years 2014, 2015, and 2016 was $4.9994, $5.9341 and $6.2405, respectively. Total intrinsic value of options exercised for the years ended December 31, 2014, 2015 and 2016 was $nil, $45,885 and $45,581, respectively. The total fair value of options vested during the years ended December 31, 2014, 2015 and 2016 was $1,396, $13,680 and $27,171, respectively.

In May 2015, the Company accelerated the vesting to permit immediate exercise of 235,000 outstanding employee share options granted under the 2012 Plan. The incremental cost resulting from the modification amounted to $162 for the acceleration for the year end of December 31, 2015.

In July 2016, the Company cancelled 187,500 outstanding employee share options granted under the 2014 Plan for one employee. As a result, the Company immediately recognized the unvested compensation cost attributable to the canceled award amounting to $1,532 in 2016.

The fair value of options granted was estimated on the date of grant using the binomial tree pricing model before the Company completed its IPO and the Black-Sholes pricing model after the Company completed its IPO, respectively, with the following assumptions used for grants during the applicable periods:

|  | Risk-free interest rate of return | Contractual term | Volatility | Dividend yield | Exercise price |
|---|---|---|---|---|---|
| 2012 | 2.31% | 10 years | 61.7% | — | $ 0.0327 |
| 2013 | 3.09% | 10 years | 54.4% | — | $ 0.1404 |

| | | | | | |
|---|---|---|---|---|---|
| 2014 | 2.44%~3.25% | 10 years | 53.7%~57.5% | — | $0.0002~$0.1404 |
| 2015 | 2.15%~2.19% | 10 years | 55.3%~55.7% | — | $ 0.0002 |
| 2016 | 1.75%~2.70% | 10 years | 52.5%~55.3% | — | $ 0.0002 |

(1) Risk-free interest rate

Risk-free interest rate was estimated based on the yield to maturity of China international government bonds with a maturity period close to the expected term of the options.

(2) Contractual term

The Company used the original contractual term.

(3) Volatility

The volatility of the underlying ordinary shares during the life of the options was estimated based on the historical stock price volatility of comparable listed companies over a period comparable to the expected term of the options.

(4) Dividend yield

The dividend yield was estimated by the Group based on its expected dividend policy over the expected term of the options.

(5) Exercise price

The exercise price of the options was determined by the Group's board of directors.

(6) Fair value of underlying ordinary shares

Before the closing of the IPO, the estimated fair value of the ordinary shares underlying the options as of the respective grant dates was determined based on a retrospective valuation, which used management's best estimate for projected cash flows as of each valuation date. After the closing of the IPO, the fair value of the ordinary shares is determined as the closing sales price of the Shares as quoted on the principal exchange or system.

For employee and executives share options, the Group recorded share-based compensation of $5,848, $16,026 and $28,096 during the years ended December 31, 2014, 2015 and 2016, respectively, based on the fair value on the grant dates over the requisite service period of award according to the vesting schedule for employee share option.

For non-employee share options the Group recorded share-based compensation of $437, $756 and $3,103 during the years ended December 31, 2014, 2015 and 2016, respectively, based on the fair value at the commitment date and recognized over the period the service is provided.

As of December 31, 2016, total unrecognized compensation expense relating to unvested share options was $68,656, which will be recognized over 2.74 years. The weighted-average remaining contractual term of options outstanding is 7.63 years.

***Share options granted by Momo BVI***

On January 3, 2015, Momo BVI, a wholly-owned subsidiary of the Group, approved Momo BVI Share Incentive Plan that provides for the issuance of not exceeding 30,000,000 share options. The option plan has a term of ten years unless earlier terminated by Momo BVI's board of directors.

During the year ended December 31, 2015, Momo BVI granted 10,550,000 share options to its employees and executives with exercise prices ranging from $0.10 to $0.11 per share and vesting period of 4 years.

The following table summarizes the option activity for the year ended December 31, 2016:

| | Number of options | Weighted average exercise price per option | Weighted average remaining contractual life (years) | Aggregated intrinsic value |
|---|---|---|---|---|
| Outstanding , December 31, 2015 | 10,200,000 | $ 0.1080 | 9.26 | $ 20 |
| Granted | — | — | | |
| Exercised | — | — | | |
| Forfeited | (2,200,000) | $ 0.1055 | | |
| Outstanding at end of period | 8,000,000 | $ 0.1088 | 8.19 | $ 10 |
| Exercisable at December 31, 2016 | 3,458,333 | $ 0.1086 | 8.13 | $ 5 |

There were 3,458,333 vested options, and 4,224,375 options expected to vest as of December 31, 2016. For options expected to vest, the weighted-average exercise price is $0.1089 as of December 31, 2016 and aggregate intrinsic value was $nil, $18 and $5 as of December 31, 2014, 2015 and 2016, respectively.

The weighted-average grant-date fair value of the share options granted during the years 2014, 2015,

and 2016 was $nil, $0.0544, and $nil, respectively. Total intrinsic value of options exercised for the years ended December 31, 2014, 2015 and 2016 was $nil, $nil and $nil, respectively. The total fair value of options vested during the years ended December 31, 2014, 2015 and 2016 was $nil, $nil and $185, respectively.

The fair value of options granted was estimated on the date of grant using the Black-Sholes pricing model with the following assumptions used for grants during the applicable periods:

| | Risk-free interest rate of return | Contractual term | Volatility | Dividend yield | Exercise price |
|---|---|---|---|---|---|
| 2015 | 1.55%~1.82% | 10 years | 55.3%~57.2% | — | $0.10~$0.11 |

(1) Risk-free interest rate

Risk-free interest rate was estimated based on the yield to maturity of US government bonds with a maturity period close to the expected term of the options.

(2) Contractual term

Momo BVI used the original contractual term.

(3) Volatility

The volatility of the underlying ordinary shares during the life of the options was estimated based on the historical stock price volatility of comparable listed companies over a period comparable to the expected term of the options.

(4) Dividend yield

The dividend yield was estimated by Momo BVI based on its expected dividend policy over the expected term of the options.

(5) Exercise price

The exercise price of the options was determined by Momo BVI's board of directors.

(6) Fair value of underlying ordinary shares

The estimated fair value of the ordinary shares underlying the options as of the grant date was determined based on a contemporaneous valuation.

For employee and executives share options, Momo BVI recorded share-based compensation of $98 and $112 during the years ended December 31, 2015 and 2016, based on the fair value on the grant dates over the requisite service period of award according to the vesting schedule for employee share option.

As of December 31, 2016, total unrecognized compensation expense relating to unvested share options was $221, which will be recognized over 2.24 years. The weighted-average remaining contractual term of options outstanding is 8.19 years.

***Non-vested restricted shares***

In April 2012, the Company's four founding shareholders entered into an arrangement with the investor in conjunction with the issuance of Series A preferred shares, whereby all of their 147,000,000 ordinary shares ("Founders' shares") became subject to service and transfer restrictions. Such Founders' shares are subject to repurchase by the Company upon early termination of their four years of employment. The repurchase price is the par value of the ordinary shares. 25% of the Founders' shares shall be vested annually. The restricted share agreements were subsequently amended on June 11, 2012 and July 18, 2012, respectively. Pursuant to the agreements, 25% of the Founders' shares shall vest upon the closing of issuance of Series B preferred shares and the remaining 75% shall be vested monthly in equal installments over the next 36 months. This arrangement has been accounted for as a grant of restricted stock awards subject to service vesting conditions. Because the modification does not affect any of the other terms or conditions of the award, presumably the fair value before and after the modification is the same.

On May 15, 2014, the Company's four founding shareholders entered into an agreement with the investors to renew the arrangement. The Company considered the amendment of agreement as a modification of vesting of the restricted shares. Pursuant to the agreement, the Company shall be entitled to repurchase 50% and 25% of such shares in the case that founders terminate their employments with the Company before April 17, 2015 and during the period from April 17, 2015 to April 17, 2016, respectively, at a price of US$0.0001 per share or the lowest price permitted under applicable laws. Therefore, the Company considered that 50% of the total restricted shares were vested immediately on the amendment date and 25% shall be vested annually on April 17 in the next two years ending April 17, 2016. Before the modification date, May 15, 2014, there were 131,348,411 ordinary shares, of which 45,937,500 were unvested restricted shares. As the result of modification, 19,736,705 vested ordinary shares were classified to unvested restricted shares on the modification date and the corresponding compensation costs for these unvested restricted shares were amortized over the remaining service period. Because the modification does not affect any of the other terms or

conditions of the award, the fair value of the restricted shares before and after the modification is the same.

A summary of non-vested restricted share activity during the years ended December 31, 2014, 2015 and 2016 is presented below:

|  | Number of shares |
|---|---|
| Outstanding as of January 1, 2014 | 58,187,500 |
| Granted | — |
| Modification | 19,736,705 |
| Vested | (20,673,449) |
| Outstanding as of December 31, 2014 | 57,250,756 |
| Granted | — |
| Forfeited | — |
| Vested | (28,625,378) |
| Outstanding as of December 31, 2015 | 28,625,378 |
| Granted | — |
| Forfeited | — |
| Vested | (28,625,378) |
| Outstanding as of December 31, 2016 | — |

The weighted average grant date fair value of the non-vested restricted shares was $0.01 per share and the aggregated fair value was $1,470. The total fair value of non-vested restricted shares vested during the years ended December 31, 2014, 2015 and 2016 was $9, $286 and $286, respectively.

The Company recorded compensation expense of $335, $180 and $52 during the years ended December 31, 2014, 2015 and 2016, respectively, related to non-vested restricted shares.

As of December 31, 2016, total unrecognized compensation expense relating to the non-vested restricted shares was $nil.

### Restricted share units ("RSUs")

On December 11, 2014, the Company granted a total of 40,001 shares of RSUs to independent directors under the 2014 Plan. The restricted share units will vest in accordance with the vesting schedule set out in the RSUs award agreement, which is 50% of the RSUs shall vest at the end of every six months since the grant date.

On May 17, 2016, the Company granted a total of 200,000 shares of RSUs to independent directors under the 2014 Plan and vesting period of 4 years, which began from December 11, 2015.

The Company will forfeit the unvested portion of the RSUs if the grantees terminate their service during the vesting period.

The fair value of these RSUs is measured on the grant date based on the market price of the ordinary share on the grant date. The following table summarizes information regarding the share units granted:

|  | Number of shares |
|---|---|
| Outstanding as of January 1, 2015 | 40,001 |
| Granted | — |
| Forfeited | — |
| Vested | (40,001) |
| Outstanding as of December 31, 2015 | — |
| Granted | 200,000 |
| Forfeited | — |
| Vested | (50,000) |
| Outstanding as of December 31, 2016 | 150,000 |

The weighted-average grant-date fair value of the restricted share units granted during the years 2014, 2015, and 2016 was $8.51, $nil, and $6.50, respectively. Total intrinsic value of the restricted share units exercised for the years ended December 31, 2014, 2015 and 2016 was $nil, $301 and $511, respectively. The total fair value of the restricted share units vested during the years ended December 31, 2014, 2015 and 2016 was $nil, $340 and $325, respectively. The aggregated fair value of RSUs was $340 and $1,299, respectively, for the grant date of December 11, 2014 and May 17, 2016.

The Group recorded share-based compensation of $18, $322 and $343 for RSUs for the years ended December 31, 2014, 2015 and 2016, respectively, based on the fair value on the grant dates over the requisite service period of award using the straight-line method.

As of December 1, 2016, total unrecognized compensation expense relating to unvested RSUs was $956, which will be recognized over 2.95 years. The weighted-average remaining contractual term of

RSUs outstanding is 8.94 years.

**Net Income (Loss) Per Share**

**12 Months Ended**

**Dec. 31, 2016**

**Earnings Per Share [Abstract]**

Net Income (Loss) Per Share

**13. NET INCOME (LOSS) PER SHARE**

For the years ended December 31, 2014, 2015 and 2016, the Group has determined that its convertible redeemable participating preferred shares are participating securities as the preferred shares participate in undistributed earnings on an as-if-converted basis. The holders of the preferred shares are entitled to receive dividends on a pro rata basis, as if their shares had been converted into ordinary shares. The Group determined that the nonvested restricted shares are participating securities as the holders of the nonvested restricted shares have a nonforfeitable right to receive dividends with all ordinary shares but the nonvested restricted shares do not have a contractual obligation to fund or otherwise absorb the Company's losses. Accordingly, the Group uses the two-class method of computing net loss per share, for ordinary shares, nonvested restricted shares and preferred shares according to the participation rights in undistributed earnings.

The calculation of net loss per share is as follows:

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2016 |
| Numerator: | | | |
| Net (loss) income attributable to MomoInc. | $(25,415) | $13,697 | $145,250 |
| Deemed dividend to Series A-1 and Series A-2 shares | (30,910) | — | — |
| Deemed dividend to Series A-3 shares | (544) | — | — |
| Deemed dividend to Series B shares | (3,116) | — | — |
| Deemed dividend to Series C shares | (5,596) | — | — |
| Deemed dividend to Series D shares | (17,497) | — | — |
| Undistributed earnings allocated to Series A shares | — | — | — |
| Undistributed earnings allocated to Series B shares | — | — | — |
| Undistributed earnings allocated to Series C shares | — | — | — |
| Undistributed earnings allocated to Series D shares | — | — | — |
| Undistributed earnings allocated to participating nonvested restricted shares | — | (1,339) | (3,197) |
| Net (loss) income attributed to ordinary shareholders for computing net (loss) income per ordinary share-basic and diluted | $(83,078) | $12,358 | $142,053 |

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2016 |
| Denominator: | | | |
| Denominator for computing net (loss) income per share-basic: | | | |
| Weighted average ordinary shares outstanding used in computing net (loss) income per ordinary share-basic | 85,293,775 | 342,646,282 | 377,335,923 |
| Weighted average shares used in computing net (loss) income per participating nonvested restricted share | 60,951,591 | 37,118,622 | 8,493,244 |
| Weighted average shares used in computing net income per Series A-1 and Series A-2 share | 32,176,676 | — | — |
| Weighted average shares used in computing net income per Series A-3 Share | 18,990,997 | — | — |
| Weighted average shares used in computing net income per Series B share | 67,182,243 | — | — |
| Weighted average shares used in computing net income per Series C Share | 34,540,898 | — | — |
| Weighted average shares used in computing net income per Series D share | 28,348,231 | — | — |
| Denominator for computing net (loss) income per share-diluted: | | | |

| | | | | | |
|---|---|---|---|---|---|
| Weighted average shares outstanding used in computing net (loss) income per ordinary share-diluted | | 85,293,775 | | 401,396,548(i) | 407,041,165(ii) |
| Net (loss) income per ordinary share attributable to Momo Inc. - basic | $ | (0.97) | $ | 0.04 | $ 0.38 |
| Net income per participating nonvested restricted share | $ | — | $ | 0.04 | $ 0.38 |
| Net income per Series A-1 and Series A-2 share | $ | 0.96 | $ | — | $ — |
| Net income per Series A-3 share | $ | 0.03 | $ | — | $ — |
| Net income per Series B share | $ | 0.05 | $ | — | $ — |
| Net income per Series C share | $ | 0.16 | $ | — | $ — |
| Net income per Series D share | $ | 0.62 | $ | — | $ — |
| Net (loss) income per ordinary share attributable to Momo Inc. - diluted | $ | (0.97) | $ | 0.03 | $ 0.36 |

The following table summarizes potential ordinary shares outstanding excluded from the computation of diluted net loss or income per ordinary share for the years ended December 31, 2014, 2015 and 2016, because their effect is anti-dilutive:

| | For the years ended December 31, | | |
|---|---|---|---|
| | 2014 | 2015 | 2016 |
| Share issuable upon exercise of share options | 21,831,082 | 904,489 | 152,500 |
| Share issuable upon exercise of RSUs | — | 15,001 | 50,000 |
| Share issuable upon vesting of nonvested restricted shares | 60,951,591 | — | — |
| Share issuable upon conversion of Series A-1 and Series A-2 shares | 32,176,676 | — | — |
| Share issuable upon conversion of Series A-3 shares | 18,990,997 | — | — |
| Share issuable upon conversion of Series B shares | 67,182,243 | — | — |
| Share issuable upon conversion of Series C shares | 34,540,898 | — | — |
| Share issuable upon conversion of Series D shares | 28,348,231 | — | — |

(i)  For the year 2015, an incremental weighted average number of 35,759,066 nonvested restricted shares and an incremental weighted average number of 22,991,200 ordinary shares from the assumed exercise of share options and vesting of restricted share units using the treasury stock method were included.

(ii) For the year 2016, an incremental weighted average number of 7,155,060 nonvested restricted shares and an incremental weighted average number of 22,550,182 ordinary shares from the assumed exercise of share options and vesting of restricted share units using the treasury stock method were included.

**Commitments and Contingencies**

**12 Months Ended**

**Dec. 31, 2016**

**Commitments and Contingencies Disclosure [Abstract]**

Commitments and Contingencies

### 14. COMMITMENTS AND CONTINGENCIES

Lease commitment

The Group leases certain office premises under non-cancellable leases. These leases expire through 2019 and are renewable upon negotiation. Rental expenses under operating leases for the years ended December 31, 2014, 2015 and 2016 were $2,995, $3,715 and $4,743, respectively.

Future minimum payments under non-cancellable operating leases as of December 31, 2016 were as follows:

| | |
|---|---|
| 2017 | $5,547 |
| 2018 | 2,644 |
| 2019 | 360 |
| 2020 | 296 |
| Total | $8,847 |

Investment commitments

The Group was obligated to subscribe $2,702 and $2,942 for partnership interest and equity interest of certain long-term investees under various arrangements as of December 31, 2015 and 2016, respectively.

Contingencies

On October 22, 2015, the Group was served a civil complaint by Guangzhou Tian He People's Court in which the plaintiff claimed that Xiaoyao Xiyou, a game that the Group operated and currently operates, infringed upon the plaintiff's copyright in works of literature and art of a game, constituting unfair competition. The plaintiff demanded that the Group to cease the infringement and pay compensation and legal costs totalling approximately $1,440. The trail was began proceeding in 2016. The next court hearing date was not determined as of December 31, 2016.

The Group believes the claim made by the plaintiff is without merit, and the Group intends to defend vigorously in the case. Although the outcome of litigation is inherently uncertain, the Group does not believe the possibility of loss is probable. The Group is unable to estimate a range of loss, if any, that could result if there would be an adverse final decision, and the Group has not accrued a liability for the matter.

| Related Party Balances and Transactions | 12 Months Ended Dec. 31, 2016 |
|---|---|

**Related Party Transactions [Abstract]**

Related Party Balances and Transactions

**15. RELATED PARTY BALANCES AND TRANSACTIONS**

| Name of the related party | Relationship with the Group |
|---|---|
| Hangzhou Alimama Technology Co., Ltd. | Affiliates of a Major Shareholder |
| Guangzhou UC Network Technology Co., Ltd. | Affiliates of a Major Shareholder |
| Guangzhou Aijiuyou Informational Technology Co., Ltd. | Affiliates of a Major Shareholder |
| Alibaba Cloud Computing Ltd. | Affiliates of a Major Shareholder |
| Taobao (China) Software Co., Ltd | Affiliates of a Major Shareholder |
| Zhejiang Tmall Technology Co., Ltd. | Affiliates of a Major Shareholder |
| Shanghai Touch Future Network Technology Co., Ltd. | Equity method investment |
| Hunan Qindao Cultural Spread Ltd. | Available-for-sale investment |
| Shanghai Xisue Network Technology Co., Ltd. | Affiliate of an available-for-sale investment |

(1) Amount due from related parties-current

| | As of December 31, | |
|---|---|---|
| | 2015 | 2016 |
| Hangzhou Alimama Technology Co., Ltd. | $ 876 | $ 2 |
| Shanghai Touch Future Network Technology Co., Ltd. | 299 | — |
| Guangzhou UC Network Technology Co., Ltd. | — | 5 |
| Guangzhou Aijiuyou Informational Technology Co., Ltd. | — | 81 |
| Total | $ 1,175 | $ 88 |

(2) Amount due to related parties - current

| | As of December 31, | |
|---|---|---|
| | 2015 | 2016 |
| Amount due to ordinary shareholders (i) | $ 6,450 | $ 5,862 |
| Hunan Qindao Cultural Spread Ltd. | — | 1,281 |
| Alibaba Cloud Computing Ltd. | 82 | 629 |
| Shanghai Touch Future Network Technology Co., Ltd. | — | 229 |
| Taobao (China) Software Co., Ltd. | — | 116 |
| Total | $ 6,532 | $ 8,117 |

(i) The amounts of $6,450 and $5,775 as of December 31, 2015 and 2016 represent the unpaid repurchase amount by the Group to its ordinary shareholders. Please refer to Note 10 for repurchase of ordinary shares.

(3) Sales to related parties

| | For the years ended December 31, | | |
|---|---|---|---|
| | 2014 | 2015 | 2016 |
| Shanghai Xisue Network Technology Co., Ltd. (ii) | $ — | $ — | $ 922 |
| Zhejiang Tmall Technology Co., Ltd. (ii) | — | — | 820 |
| Guangzhou Aijiuyou Informational Technology Co., Ltd. (iii) | — | — | 400 |
| Taobao (China) Software Co., Ltd. (ii) | — | — | 249 |
| Hangzhou Alimama Technology Co., Ltd. (ii) | — | 6,002 | 42 |
| Guangzhou UC Network Technology Co., Ltd. (iii) | — | — | 9 |
| Total | $ — | $ 6,002 | $ 2,442 |

(ii) The sales to related parties represented mobile marketing services provided.

(iii) The sales to related parties represented mobile game revenue generated through those game operating companies.

(4) Purchase from related parties

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2016 |
| Hunan Qindao Cultural Spread Ltd. (iv) | $ — | $ — | $ 3,929 |
| Alibaba Cloud Computing Ltd. (v) | — | 322 | 3,360 |
| Shanghai Touch future Network Technology Co., Ltd. | — | — | 347 |
| Taobao (China) Software Co., Ltd. | — | — | 323 |
| Total | $ — | $ 322 | $ 7,959 |

(iv)   The purchase from Hunan Qindao Cultural Spread Ltd. is the revenue sharing with broadcaster agencies of live video service.

(v)   The purchase from Alibaba Cloud Computing Ltd. is mainly related to its cloud computing services.

| Segment Information | 12 Months Ended |
| --- | --- |
| | Dec. 31, 2016 |

## Segment Reporting [Abstract]

Segment Information

**16. SEGMENT INFORMATION**

The Group's chief operating decision maker has been identified as the Chief Executive Officer ("CEO"), who reviews consolidated results when making decisions about allocating resources and assessing performance of the Group. The Group's revenue and net income are substantially derived from live video service, value-added services, mobile marketing services, mobile games and other services. The Group does not have discrete financial information of costs and expenses between various services in its internal reporting, and reports costs and expenses by nature as a whole. Therefore, the Group has one operating segment.

The table below is only presented at the revenue level with no allocations of direct or indirect cost and expenses. The Group operates in the PRC; most of the Group's long-lived assets are located in the PRC and all services are provided in the PRC.

Components of revenues are presented in the following table:

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2016 |
| Live video service | $ — | $ 1,231 | $376,925 |
| Value-added service | 29,756 | 58,462 | 67,603 |
| Mobile marketing | 1,975 | 38,885 | 66,339 |
| Mobile games | 11,237 | 31,082 | 35,453 |
| Other services | 1,787 | 4,328 | 6,778 |
| Total | $44,755 | $133,988 | $553,098 |

**Employee Benefit Plan**

**12 Months Ended**

**Dec. 31, 2016**

**Compensation and Retirement Disclosure [Abstract]**

Employee Benefit Plan

**17. EMPLOYEE BENEFIT PLAN**

Full time employees of the Group in the PRC participate in a government-mandated defined contribution plan pursuant to which certain pension benefits, medical care, unemployment insurance, employee housing fund and other welfare benefits are provided to employees. The Group accrues for these benefits based on certain percentages of the employees' salaries. The total provisions for such employee benefits were $2,635, $6,487 and $9,081 for the years ended December 31, 2014, 2015 and 2016, respectively.

| **Statutory Reserves and Restricted Net Assets** | **12 Months Ended**<br>**Dec. 31, 2016** |

**Receivables [Abstract]**

Statutory Reserves and Restricted Net Assets

**18.  STATUTORY RESERVES AND RESTRICTED NET ASSETS**

In accordance with the Regulations on Enterprises with Foreign Investment of China and their articles of association, the Group's subsidiaries and VIE located in the PRC, being foreign invested enterprises established in the PRC, are required to provide for certain statutory reserves. These statutory reserve funds include one or more of the following: (i) a general reserve, (ii) an enterprise expansion fund or discretionary reserve fund, and (iii) a staff bonus and welfare fund. Subject to certain cumulative limits, the general reserve fund requires a minimum annual appropriation of 10% of after-tax profit (as determined under accounting principles generally accepted in China at each year-end); the other fund appropriations are at the subsidiaries' or the affiliated PRC entities' discretion. These statutory reserve funds can only be used for specific purposes of enterprise expansion, staff bonus and welfare, and are not distributable as cash dividends except in the event of liquidation of our subsidiaries, our affiliated PRC entities and their respective subsidiaries. The Group's subsidiaries and VIE are required to allocate at least 10% of their after tax profits to the general reserve until such reserve has reached 50% of their respective registered capital.

Appropriations to the enterprise expansion reserve and the staff welfare and bonus reserve are to be made at the discretion of the board of directors of each of the Group's subsidiaries.

The appropriations to these reserves by the Group's PRC subsidiary, VIE and VIE's subsidiaries were $nil, $553 and $17,969 for the years ended December 31, 2014, 2015 and 2016.

Relevant PRC laws and regulations restrict the WFOE, VIE and VIE's subsidiaries from transferring a portion of their net assets, equivalent to the balance of their statutory reserves and their paid in capital, to the Company in the form of loans, advances or cash dividends. The WFOE's accumulated profits may be distributed as dividends to the Company without the consent of a third party. The VIE and VIE's subsidiaries' revenues and accumulated profits may be transferred to the Company through contractual arrangements without the consent of a third party. Under applicable PRC law, loans from PRC companies to their offshore affiliated entities require governmental approval, and advances by PRC companies to their offshore affiliated entities must be supported by bona fide business transactions. The capital and statutory reserves restricted which represented the amount of net assets of the Group's PRC subsidiary, VIE and VIE's subsidiaries in the Group not available for distribution were $93,537, $91,008 and $108,977 as of December 31, 2014, 2015 and 2016, respectively.

| **Subsequent Events** | **12 Months Ended** |
| | **Dec. 31, 2016** |

**Subsequent Events [Abstract]**

Subsequent Events

19. **SUBSEQUENT EVENTS**

New acquisition

In February 2017, the Group entered into an agreement to acquire 100% equity interest of Zhejiang Digital Network Technology Co., Ltd to develop live video service business. The total cash consideration is $5,478, of which $4,760 has been paid. The acquisition was completed on March, 31, 2017. The Group is in the process of evaluating the accounting treatment on this acquisition.

Newly issued share options

In March 2017, the Company granted 2,217,004 share options to its executives with an exercise price of $0.0002 per share and 100,000 RSUs to its independent directors, with the vesting period of 4 years. The Group is in the process of finalizing the fair value assessment.

| Significant Accounting Policies (Policies) | 12 Months Ended Dec. 31, 2016 |
|---|---|

Basis of presentation

**Basis of presentation**

The consolidated financial statements of the Group have been prepared in accordance with the accounting principles generally accepted in the United States of America ("U.S. GAAP").

Basis of consolidation

**Basis of consolidation**

The consolidated financial statements of the Group include the financial statements of Momo Inc., its subsidiaries, its VIE and VIE's subsidiaries. All inter-company transactions and balances have been eliminated upon consolidation.

Use of estimates

**Use of estimates**

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and revenues, cost and expenses in the financial statements and accompanying notes. Significant accounting estimates reflected in the Group's consolidated financial statements include revenue recognition, the useful lives and impairment of property and equipment, valuation allowance for deferred tax assets, share-based compensation and fair value of the ordinary shares and convertible redeemable participating preferred shares.

Cash and cash equivalents

**Cash and cash equivalents**

Cash and cash equivalents consist of cash on hand and highly liquid investments, which are unrestricted from withdrawal or use, or which have original maturities of three months or less when purchased.

Term deposits

**Term deposits**

Term deposits consist of bank deposits with an original maturity of over three months.

Accounts receivable

**Accounts receivable**

Accounts receivable primarily represents the cash due from third-party application stores and other payment channels and advertising customers, net of allowance for doubtful accounts. The Group makes estimates for the allowance for doubtful accounts based upon its assessment of various factors, including the age of accounts receivable balances, credit quality of third-party application stores and other payment channels and advertising customers, current economic conditions and other factors that may affect their ability to pay. An allowance for doubtful accounts is recorded in the period in which a loss is determined to be probable. As of December 31, 2015 and 2016, the Company has determined the risk of uncollected receivable is remote.

Financial instruments

**Financial instruments**

Financial instruments of the Group primarily consist of cash and cash equivalents, term deposits, accounts receivable, cost method investments, available-for-sale investments, accounts payable, deferred revenue, income tax payable, amount due from related parties and amount due to related parties.

Cash and cash equivalents are recorded at fair value based on the quoted market price in an active market. The carrying values of term deposits, accounts receivable, accounts payable, deferred revenue, income tax payable, amount due from related parties and amount due to related parties approximate their fair values due to short-term maturities. It is not practical to estimate the fair value of the Group's cost method investments because of the lack of quoted market price and the inability to estimate fair value without incurring excessive costs. Available-for-sale investments are reported at fair value, which is discussed in Note 8.

Foreign currency risk

**Foreign currency risk**

The Renminbi ("RMB") is not a freely convertible currency. The State Administration for Foreign Exchange, under the authority of the People's Bank of China, controls the conversion of RMB into foreign currencies. The value of the RMB is subject to changes in central government policies and to international economic and political developments affecting supply and demand in the China Foreign Exchange Trading System market. Cash and cash equivalents of the Group included aggregate amounts of $75,759 and $245,853 as of December 31, 2015 and 2016, respectively, which were denominated in RMB.

Cost method investments

**Cost method investments**

For investments in an investee over which the Company does not have significant influence, the

Company carries the investment at cost and recognizes income as any dividends declared from distribution of investee's earnings. The Company reviews the cost method investments for impairment whenever events or changes in circumstances indicate that the carrying value may no longer be recoverable. An impairment loss is recognized in earnings equal to the difference between the investment's cost and its fair value at the balance sheet date of the reporting period for which the assessment is made. The fair value of the investment would then become the new cost basis of the investment.

## Equity method investments

The investee company over which the Group has the ability to exercise significant influence, but does not have a controlling interest are accounted for using the equity method. Significant influence is generally considered to exist when the Group has an ownership interest in the voting stock of the investee between 20% and 50%. Other factors, such as representation in the investee's Board of Directors, voting rights and the impact of commercial arrangements, are also considered in determining whether the equity method of accounting is appropriate. For the investment in limited partnerships, where the Group holds less than a 20% equity or voting interest, the Group's influence over the partnership operating and financial policies is determined to be more than minor. Accordingly, the Group accounts for these investments as equity method investments.

Under the equity method of accounting, the affiliated company's accounts are not reflected within the Group's consolidated balance sheets and statements of operations; however, the Group's share of the earnings or losses of the affiliated company is reflected in the caption "share income on equity method investments" in the consolidated statements of operations.

An impairment change is recorded if the carrying amount of the investment exceeds its fair value and this condition is determined to be other-than-temporary.

The Group estimates the fair value of the investee company based on comparable quoted price for similar investment in active market, if applicable, or discounted cash flow approach which requires significant judgments, including the estimation of future cash flows, which is dependent on internal forecasts, the estimation of long term growth rate of a company's business, the estimation of the useful life over which cash flows will occur, and the determination of the weighted average cost of capital.

## Available-for-sale Investments

For investments in investees' stocks which are determined to be debt securities, the Group accounts for them as long-term available-for-sale investments when they are not classified as either trading or held-to-maturity investments.

Available-for-sale investments are reported at fair value, with unrealized gains and losses recorded in accumulated other comprehensive income (loss) as a component of shareholders' equity. Realized gains and losses and provision for decline in value judged to be other than temporary, if any, are recognized in the consolidated statements of operations.
The Group continually reviews its available-for-sale investments to determine whether a decline in fair value below the carrying value is other than temporary. The primary factors the Group considers in its determination are the length of time that the fair value of the investment is below the Group's carrying value; the financial condition, operating performance and the prospects of the available-for-sale investee; and other specific information such as recent financing rounds. If the decline in fair value is deemed to be other than temporary, the carrying value of the available-for-sale investee is written down to fair value. The Group estimated the fair value of these investee companies based on discounted cash flow approach which requires significant judgments, including the estimation of future cash flows, which is dependent on internal forecasts, the estimation of long term growth rate of a company's business, the estimation of the useful life over which cash flows will occur, and the determination of the weighted average cost of capital.

## Property and equipment, net

Property and equipment are stated at cost less accumulated depreciation. Depreciation is calculated on a straight-line basis over the following estimated useful lives:

| | |
|---|---|
| Office equipment | 3-5 years |
| Computer equipment | 3 years |
| Vehicles | 5 years |
| Leasehold improvement | Shorter of the lease term or estimated useful lives |

## Impairment of long-lived assets

The Group reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may no longer be recoverable. When these events occur, the Group measures impairment by comparing the carrying value of the long-lived assets to the estimated undiscounted future cash flows expected to result from the use of the assets and their eventual disposition. If the sum of the expected undiscounted cash flow is less than the carrying amount of the assets, the Group would recognize an impairment loss based on the fair value of the assets.

## Fair value

Fair value is the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. When determining the fair value measurements for assets and liabilities required or permitted to be recorded at fair value, the Group considers the principal or most advantageous market in which it would transact and it considers assumptions that market participants would use when pricing the asset or liability.

Authoritative literature provides a fair value hierarchy that requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value. An asset or liability categorization within the fair value hierarchy is based upon the lowest level of input that is significant to the fair value measurement as follows:

*Level 1*

Level 1 applies to assets or liabilities for which there are quoted prices in active markets for identical assets or liabilities.

*Level 2*

Level 2 applies to assets or liabilities for which there are inputs other than quoted prices included within Level 1 that are observable for the assets or liabilities such as quoted prices for similar assets or liabilities in active markets; quoted prices for identical assets or liabilities in markets with insufficient volume or infrequent transactions (less active markets); or model-derived valuations in which significant inputs are observable or can be derived principally from, or corroborated by, observable market data.

*Level 3*

Level 3 applies to assets or liabilities for which there are unobservable inputs to the valuation methodology that are significant to the measurement of the fair value of the assets or liabilities.

## Revenue recognition

The Group recognizes revenue when a persuasive evidence of an arrangement exists, delivery has occurred, the sales price is fixed or determinable, and collectability is reasonably assured. The Group principally derives its revenue from live video service, value-added services, mobile marketing services, mobile games and other services.

(a) Live video service

The Group provides live video service whereby users can enjoy live performances and interact with the broadcasters for free, and have the option of purchasing in-show virtual items. Broadcasters can either host the performance on their own or join a broadcaster agency. Users purchase virtual gifts from the Group and present them simultaneously to broadcasters to show their support. The Group determines the virtual items price and generates revenue from sales of virtual gifts upon purchase. Under the arrangements with broadcasters or broadcaster agencies, the Group shares with them a portion of the revenues derived from the sales of virtual gifts. Revenues derived from the sale of virtual gifts are recorded on a gross basis as the Group has determined that it acts as the principal to fulfill all obligations related to the live video services. The portion paid to broadcasters and/or broadcaster agencies is recognized as cost of revenues.

Net revenues of $nil, $1,231 and $376,925 were recognized for live video services for the years ended December 31, 2014, 2015 and 2016, respectively.

(b) Value-added services

Value-added services revenues include membership subscription revenue and virtual gift service revenues. Membership subscription is a service package which enables members to enjoy additional functions and privileges. The contract period for the membership subscription ranges from one month to one year. All membership subscription is nonrefundable. The Group collects membership subscription in advance and records it as deferred revenue. Revenue is recognized ratably over the contract period for the membership subscription services.

virtual gift services was launched in 2016 to enhance users' experience of interaction and social networking with each other. Users purchase virtual gifts and send the virtual gifts simultaneously to other users. Revenue recognized related to virtual gift services is insignificant for each of the year presented.

Net revenues of $29,756, $58,462 and $67,603 were recognized for value-added services for the years ended December 31, 2014, 2015 and 2016, respectively.

(c)   Mobile marketing

The Group provides advertising and marketing solutions to customers for promotion of their brands and conduction of effective marketing activities through its mobile application.

<u>Display-based mobile marketing services</u>

For display-based online advertising services such as banners and location-based advertising on the mobile applications, the Group recognizes revenue ratably over the period that the advertising is provided commencing on the date the customer's advertisement is displayed, or on the number of times that the advertisement has been displayed for cost per thousand impressions advertising arrangements.

<u>Performance-based mobile marketing services</u>

The Group enables advertising customers to place link on its mobile platform on a pay-for-effectiveness basis, which is referred to as the cost for performance model. The Group charges fees to advertising customers based on the effectiveness of advertising links, which is measured by active clicks. Revenue is estimated by the Group based on its internal data, which is confirmed with respective customers, or is recognized based on a fixed unit price.

The Group's revenue transactions are based on standard business terms and conditions, which are recognized net of agency rebates, if applicable.

Net revenues of $1,975, $38,885 and $66,339 were recognized for mobile marketing for the years ended December 31, 2014, 2015 and 2016, respectively.

(d)   Mobile games

The Group publishes both licensed mobile games developed by third-party game developers and its self-developed games to the game players through its mobile application.

*Licensed mobile games*

The Group generates revenue from offering services of mobile games developed by third-party game developers. All of the licensed games can be accessed and played by game players directly through the Group's mobile game platform. The Group primarily views the game developers to be its customers and considers its responsibility under its agreements with the game developers to be promotion of the game developers' games. The Group generally collects payments from game players in connection with the sale of in-gamecurrencies and remits certain agreed-upon percentages of the  proceeds to the game developers and records revenue net of remittances. Purchases of in-game currencies are not refundable after they have been sold unless there is unused in-game currencies at the time a game is discontinued. Typically, a game will only be discontinued when the monthly revenue generated by a game becomes consistently insignificant. The Group does not currently expect to pay any material cash refunds to game players or game developers in connection with a discontinued game.

*Licensed mobile games - Non-exclusive mobile games services*

The Group enters into non-exclusive agreements with the game developers and offers the Group's mobile game platform for the mobile games developed by the game developers. The Group has determined that it has no additional performance obligation to the developers or game players upon players' completion of the corresponding in-game purchase. Therefore, revenues from the sale of in-game currencies are primarily recorded net of remittances to game developers and commission fees made to third-party application stores and other payment channels and deferred until the estimated consumption date by individual game (i.e., the estimated date in-game currencies are consumed within the game), which is typically within a short period of time ranging from zero to six days after the purchase of the in-game currencies.

*Licensed mobile games - Exclusive mobile games services*

The Group enters into exclusive agreements with the game developers and provides the Group's mobile game platform for the mobile games developed by the

game developers. Under the exclusive agreements, the players can access to the games only through the Group's platform. The Group has determined that it is obligated to provide mobile games services to game players who purchased virtual items to gain an enhanced game-playing experience over an average period of player relationship. Hence, the Group believes that its performance for, and obligation to, the game developers correspond to the game developers' services to the players. The Group does not have access to the data on the consumption details and the types of virtual items purchased by the game players. Therefore, the Group cannot estimate the economic life of the virtual item. However, the Group maintains data of when a particular player purchases the virtual items and logs into the games. The Group has adopted a policy to recognize revenues net of remittances to game developers and commission fees made to third-party application stores and other payment channels over the estimated period of player relationship on a game-by-game basis. As of December 31, 2015 and 2016, the Group operated seven and six games under exclusive arrangements and the estimated periods of the player relationship is in a range of 20 to 75 and 20 to 99 days, respectively.

*Self-developed mobile game*

In February 2015, the Group launched one self-developed game on its platform and started to generate revenues by in-game sales of virtual item. The Group has determined that an obligation exists to the players who purchased the virtual items to gain an enhanced game-playing experience over the playing period of the paying players, and accordingly, recognized the revenues ratably over the estimated average period of player relationship starting from the point in time when the players purchase the virtual items, and all other revenue recognition criteria are met. As of December 31, 2015 and 2016, the Group operated one and six self-developed mobile games and the estimated periods of the player relationship is 56 days and in a range of 20 to 110 days, respectively.

Revenues derived from the self-developed game are recorded on a gross basis as the Group acts as a principal to fulfill all obligations related to the mobile game operation. Commission fees paid to third-party application stores and other payment channels are recorded as cost of revenues.

Net revenues of $11,237, $31,082 and $35,453 were recognized for mobile games for the years ended December 31, 2014, 2015 and 2016, respectively.

(e)  Other service

Other service primarily includes Duobao service and paid emoticons.

Advertising barter transactions

The Group engages in barter transactions where it trades advertising resources with certain third parties for other advertising resources and goods. The Group recognizes revenues and expenses at fair value only if the fair value of the services exchanged in the transaction is determinable based on the Group's own historical practice of receiving cash or other consideration that is readily convertible to a known amount of cash for similar advertising resources from customers unrelated to the party in the barter transaction. When the fair value of the transactions is not determinable due to the lack of the Group's similar historical practice, the advertising barter transactions shall be recorded based on the carrying amount of the advertising surrendered which is the estimated cost to be incurred, or the fair value of the assets received. Advertising barter transactions were insignificant for all the years presented.

Deferred revenue

Deferred revenue primarily includes cash received in advance from users and advertising customers. The unused cash balances remaining in users' and advertising customers' accounts are recorded as a liability. Deferred revenue related to prepayments from users and advertising customers will be recognized as revenue when all of the revenue recognition criteria are met.

Cost of revenues

Cost of revenues consist of expenditures incurred in the generation of the Group's revenues, including but not limited to revenue sharing with the broadcasters and broadcaster agencies related to live video service, commission fee paid to third-party application stores and other payment channels except for those paid related to licensed mobile games which are recorded net of revenue, bandwidth costs, salaries and benefits paid to employee, short messaging service charges and depreciation. These costs are expensed as incurred except for the direct and incremental platform commission fees to third-party application stores and other payment channels which are deferred in "Prepaid expenses and other current assets" on the consolidated balance sheets. The deferred

platform commissions are recognized in the consolidated statements of operations in "Cost of revenues" in the period in which the related revenues are recognized.

**Government subsidies**

Government subsidies

The Group records government subsidies as other income when received from local government authority and they are not subject to any further performance obligations or future returns. When government subsidies are received and include future performance obligations, the Group recognizes those as liabilities until the performances obligations have been met at which time, those are recognized as other income. Government subsidies recorded as other income amounted to $nil, $nil and $293 for the years ended December 31, 2014, 2015 and 2016.

**Research and development expenses**

Research and development expenses

Research and development expenses primarily consist of (i) salaries and benefits for research and development personnel, and (ii) office rental, general expenses and depreciation expenses associated with the research and development activities. The Group's research and development activities primarily consist of the research and development of new features for its mobile platform and its self-developed mobile games. The Group has expensed all research and development expenses when incurred.

**Value added taxes ("VAT")**

Value added taxes ("VAT")

Entities that are VAT general taxpayers are allowed to offset qualified input VAT paid to suppliers against their output VAT liabilities. Net VAT balance between input VAT and output VAT is recorded in accrued expenses and other current liabilities on the consolidated balance sheets. VAT is also reported as a deduction to revenue when incurred and amounted to $5,436, $16,951 and $55,353 for the years ended December 31, 2014, 2015 and 2016, respectively.

**Income taxes**

Income taxes

Current income taxes are provided for in accordance with the laws of the relevant tax authorities. Deferred income taxes are recognized when temporary differences exist between the tax bases of assets and liabilities and their reported amounts in the consolidated financial statements. Net operating loss carry forwards and credits are applied using enacted statutory tax rates applicable to future years. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more-likely-than-not that a portion of or all of the deferred tax assets will not be realized. The components of the deferred tax assets and liabilities are individually classified as current and non-current based on their characteristics.

The impact of an uncertain income tax position on the income tax return is recognized at the largest amount that is more-likely than- not to be sustained upon audit by the relevant tax authority. An uncertain income tax position will not be recognized if it has less than a 50% likelihood of being sustained. Interest and penalties on income taxes will be classified as a component of the provisions for income taxes. The Group recognized income tax expense amounted to $nil, $92 and $5,136 for the years ended December 31, 2014, 2015 and 2016, respectively.

**Foreign currency translation**

Foreign currency translation

The functional and reporting currency of the Company is the United States dollar ("U.S. dollar"). The financial records of the Group's subsidiaries, VIE and VIE's subsidiaries located in the PRC are maintained in their local currencies, the RMB, which are also the functional currencies of these entities.

Monetary assets and liabilities denominated in currencies other than the functional currency are translated into the functional currency at the rates of exchange in place at the balance sheet date. Transactions in currencies other than the functional currency during the year are converted into the functional currency at the applicable rates of exchange prevailing when the transactions occurred. Transaction gains and losses are recognized in the consolidated statement of operations.

The Group's entities with functional currency of RMB, translate their operating results and financial positions into the U.S. dollar, the Group's reporting currency. Assets and liabilities are translated using the exchange rates in effect on the balance sheet date. Revenues, expenses, gains and losses are translated using the average rate for the year. Translation adjustments are reported as cumulative translation adjustments and are shown as a separate component of comprehensive loss.

**Operating leases**

Operating leases

Leases where the rewards and risks of ownership of assets primarily remain with the lessor are accounted for as operating leases. Payments made under operating leases are charged to the consolidated statements of operations on a straight-line basis over the lease periods.

## Advertising expenses

Advertising expenses

The Group expenses advertising expenses as incurred. Total advertising expenses incurred were $27,408, $27,793 and $55,188 for the years ended December 31, 2014, 2015 and 2016, respectively, and have been included in sales and marketing expenses in the consolidated statements of operations.

## Comprehensive (loss) income

Comprehensive (loss) income

Comprehensive (loss) income includes net (loss) income, unrealized gain or loss on available-for-sale investments and foreign currency translation adjustments. Comprehensive (loss) income is reported in the consolidated statements of comprehensive (loss) income.

## Share-based compensation

Share-based compensation

Share-based payment transactions with employees and executives are measured based on the grant date fair value of the equity instrument issued and recognized as compensation expense net of a forfeiture rate on a straight-line basis, over the requisite service period, with a corresponding impact reflected in additional paid-in capital.

Share awards issued to consultants are measured at fair value at the earlier of the commitment date or the date the services are completed and recognized over the period the services are provided.
The estimate of forfeiture rate will be adjusted over the requisite service period to the extent that actual forfeiture rate differs, or is expected to differ, from such estimates. Changes in estimated forfeiture rate will be recognized through a cumulative catch-up adjustment in the period of change.

Changes in the terms or conditions of share options are accounted as a modification under which the Group calculates whether there is any excess of the fair value of the modified option over the fair value of the original option immediately before its terms are modified, measured based on the share price and other pertinent factors at the modification date. For vested options, the Group recognizes incremental compensation cost in the period of the modification occurred and for unvested options, the Group recognizes, over the remaining requisite service period, the sum of the incremental compensation cost and the remaining unrecognized compensation cost for the original award on the modification date.

## Earnings (loss) per share

Earnings (loss) per share

Basic earnings (loss) per ordinary share is computed by dividing net income (loss) attributable to ordinary shareholders by the weighted average number of ordinary shares outstanding during the period.

The Group's convertible redeemable participating preferred shares are participating securities as they participate in undistributed earnings on an as-if-converted basis. The Group determined that the nonvested restricted shares are participating securities as the holders of the nonvested restricted shares have a nonforfeitable right to receive dividends with all ordinary shares but the nonvested restricted shares do not have a contractual obligation to fund or otherwise absorb the Company's losses. Accordingly, the Group uses the two-class method whereby undistributed net income is allocated on a pro rata basis to the ordinary shares, preferred shares and nonvested restricted shares to the extent that each class may share in income for the period; whereas the undistributed net loss for the period is allocated to ordinary shares only because the convertible redeemable participating preferred shares and nonvested restricted shares are not contractually obligated to share the loss.

Diluted earnings (loss) per ordinary share reflect the potential dilution that could occur if securities were exercised or converted into ordinary shares. The Group had convertible redeemable participating preferred shares, share options and restricted share units, which could potentially dilute basic earnings (loss) per share in the future. To calculate the number of shares for diluted earnings (loss) per ordinary share, the effect of the convertible redeemable participating preferred shares is computed using the as-if-converted method; the effect of the share options and restricted share units is computed using the treasury stock method.

## Recent accounting pronouncements not yet adopted

Recent accounting pronouncements not yet adopted

In May 2014, the FASB issued, ASU 2014-09, "Revenue from Contracts with Customers (Topic 606)". The guidance substantially converges final standards on revenue recognition between the FASB and the International Accounting Standards Board providing a framework on addressing revenue recognition issues and, upon its effective date, replaces almost all exiting revenue recognition guidance, including industry-specific guidance, in current U.S. generally accepted accounting principles.

The core principle of the guidance is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. To achieve that core principle, an entity should apply the following steps:

- Step 1: Identify the contract (s) with a customer.

- Step 2: Identify the performance obligations in the contract.

- Step 3: Determine the transaction price.

- Step 4: Allocate the transaction price to the performance obligations in the contract.

- Step 5: Recognize revenue when (or as) the entity satisfies a performance obligation.

  In August 2015, FASB issued its final standard formally amending the effective date of the new revenue recognition guidance. The amendments in this ASU are effective for annual reporting periods beginning after December 15, 2017, including interim periods within that reporting period. Earlier application is permitted only as of annual reporting periods beginning after December 15, 2016, including interim reporting periods within that reporting period. The new revenue guidance may be applied retrospectively to each prior period presented or retrospectively with the cumulative effect recognized as of the date of adoption.

  The Group is in the process of evaluating the impact of adoption of this guidance on its consolidated financial statements.

  In November, 2015, the FASB issued a new pronouncement ASU 2015-17 which changes how deferred taxes are classified on organizations' balance sheets.

  The ASU eliminates the current requirement for organizations to present deferred tax liabilities and assets as current and noncurrent in a classified balance sheet. Instead, organizations will be required to classify all deferred tax assets and liabilities as noncurrent.

  The amendments apply to all organizations that present a classified balance sheet. For public companies, the amendments are effective for financial statements issued for annual periods beginning after December 15, 2016, and interim periods within those annual periods. Earlier application is permitted for all entities as of the beginning of an interim or annual reporting period. This ASU may be applied prospectively to all deferred tax liabilities and assets or retrospectively to all periods presented. The Group does not expect the adoption of this guidance will have a significant effect on the Group's consolidated financial statements.

  In January, 2016, the FASB issued a new pronouncement ASU 2016-01 which is intended to improve the recognition and measurement of financial instruments. The ASU affects public and private companies, not-for-profit organizations, and employee benefit plans that hold financial assets or owe financial liabilities.

  The new guidance makes targeted improvements to existing U.S. GAAP by:

- Requiring equity investments (except those accounted for under the equity method of accounting, or those that result in consolidation of the investee) to be measured at fair value with changes in fair value recognized in net income;

- Requiring public business entities to use the exit price notion when measuring the fair value of financial instruments for disclosure purposes;

- Requiring separate presentation of financial assets and financial liabilities by measurement category and form of financial asset (i.e., securities or loans and receivables) on the balance sheet or the accompanying notes to the financial statements;

- Eliminating the requirement to disclose the fair value of financial instruments measured at amortized cost for organizations that are not public business entities;

- Eliminating the requirement for public business entities to disclose the method(s) and significant assumptions used to estimate the fair value that is required to be disclosed for financial instruments measured at amortized cost on the balance sheet; and

- Requiring a reporting organization to present separately in other comprehensive income the portion of the total change in the fair value of a liability resulting from a change in the instrument-specific credit risk (also referred to as "own credit") when the organization has elected to measure the liability at fair value in accordance with the fair value option for financial instruments.

  The new guidance is effective for public companies for fiscal years beginning after December 15, 2017, including interim periods within those fiscal years. The new guidance permits early adoption of the own credit provision. Adoption of the amendment must be applied by means of a cumulative-effect adjustment to the balance sheet as of the beginning of the fiscal year of adoption, except for amendments related to equity instruments that do not have readily determinable fair values which should be applied prospectively. The Group does

not expect the adoption of this guidance will have a significant effect on the Group's consolidated financial statements.

In February 2016, the FASB issued ASU No. 2016-02, Leases (Topic 842). The guidance supersedes existing guidance on accounting for leases with the main difference being that operating leases are to be recorded in the statement of financial position as right-of-use assets and lease liabilities, initially measured at the present value of the lease payments. For operating leases with a term of 12 months or less, a lessee is permitted to make an accounting policy election not to recognize lease assets and liabilities. For public business entities, the guidance is effective for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years. Early application of the guidance is permitted. In transition, entities are required to recognize and measure leases at the beginning of the earliest period presented using a modified retrospective approach. The Group is currently evaluating the impact the adoption of ASU No. 2016-02 will have on its consolidated financial statements, but the Group expects that most existing operating lease commitments will be recognized as operating lease obligations and right-of-use assets as a result of this adoption.

In March 2016, the FASB issued ASU 2016-09, Compensation - Stock Compensation (Topic 718). The new guidance simplifies certain aspects related to income taxes, statement of cash flows, and forfeitures when accounting for share-based payment transactions. This new guidance was effective for the Company for the first reporting period beginning after December 15, 2016, with earlier adoption permitted. Certain of the amendments related to timing of the recognition of tax benefits and tax withholding requirements should be applied using a modified retrospective transition method. Amendments related to the presentation of the statement of cash flows should be applied retrospectively. All other provisions may be applied on a prospective or modified retrospective basis. The Group is in the process of evaluating the impact that this guidance will have on its consolidated financial statements.

Accounts Receivable [Member]

Concentration of credit risk and revenue

Concentration of credit risk

Financial instruments that potentially expose the Group to concentration of credit risk consist primarily of cash and cash equivalents, term deposits and accounts receivable. The Group places their cash with financial institutions with high-credit ratings and quality.

Third-party application stores and other payment channels accounting for 10% or more of accounts receivables are as follows:

|  | As of December 31, | |
|  | 2015 | 2016 |
| --- | --- | --- |
| A | 31% | 40% |
| B | 8% | 22% |
| C | 1% | 15% |

No user or advertising customer accounted for 10% or more of accounts receivables for the years ended December 31, 2015 and 2016, respectively.

Revenues [Member]

Concentration of credit risk and revenue

Concentration of revenue

The following table summarizes sales generated from games that individually accounting for 10% or more of net revenues:

|  | For the years ended December 31, | | |
|  | 2014 | 2015 | 2016 |
| --- | --- | --- | --- |
| Game D | 14% | 2% | less than 1% |

No user or advertising customer accounted for 10% or more of net revenues for the years ended December 31, 2014, 2015 and 2016, respectively.

| **Organization and Principal Activities (Tables)** | **12 Months Ended** |
|---|---|
| | **Dec. 31, 2016** |

**Text Block [Abstract]**

Schedule of Subsidiaries, VIE and VIE's Subsidiaries

As of December 31, 2016, details of the Company's subsidiaries, VIE and VIE's subsidiaries are as follows:

| | Date of incorporation | Place of incorporation | Percentage of economic ownership |
|---|---|---|---|
| *Subsidiaries* | | | |
| Momo Technology HK Company Limited ("Momo HK") | December 5, 2011 | Hong Kong | 100% |
| Beijing Momo Information Technology Co., Ltd. ("Beijing Momo IT") | March 9, 2012 | PRC | 100% |
| Momo Technology Overseas Holding Company Limited ("Momo BVI") | March 5, 2014 | BVI | 100% |
| Momo Information Technologies Corp. ("Momo US") | March 7, 2014 | US | 100% |
| *VIE* | | | |
| Beijing Momo Technology Co., Ltd. ("Beijing Momo") | July 7, 2011 | PRC | N/A* |
| *VIE's subsidiaries* | | | |
| Chengdu Momo Technology Co., Ltd. ("Chengdu Momo") | May 9, 2013 | PRC | N/A* |
| Shanghai Momo Technology Co., Ltd. ("Shanghai Momo") | January 19, 2015 | PRC | N/A* |
| Chengdu Biyou Technology Co., Ltd. ("Chengdu Biyou") | October 16, 2015 | PRC | N/A* |
| Tianjin Heer Technology co., ltd ("Tianjin Heer") | March 7, 2016 | PRC | N/A* |
| Momo Pictures Co., Ltd. | November 11, 2016 | PRC | N/A* |
| QOOL Media (Tianjin) Co., Ltd | November 16, 2016 | PRC | N/A* |

* These entities are controlled by the Company pursuant to the contractual arrangements disclosed below.

Schedule of Amounts and Balances of VIE Included in Consolidated Financial Statements After Elimination of Intercompany Balances and Transactions

The following consolidated financial statements amounts and balances of the VIE were included in the accompanying consolidated financial statements after the elimination of intercompany balances and transactions as of and for the years ended December 31:

| | As of December 31, | |
|---|---|---|
| | 2015 | 2016 |
| Cash and cash equivalents | $ 60,526 | $ 36,855 |
| Accounts receivable, net of allowance for doubtful accounts of $nil and $nil as of December 31, 2015 and 2016, respectively | 14,896 | 36,078 |
| Amount due from related parties | 1,175 | 88 |
| Prepaid expenses and other current assets | 9,495 | 20,613 |
| Deferred tax assets, current | — | 72 |
| Total current assets | 86,092 | 93,706 |
| Property and equipment, net | 1,538 | 1,854 |
| Rental deposits | 244 | 325 |
| Other non-current assets | — | 2,593 |
| Long term investments | 19,318 | 26,541 |
| Deferred tax assets, non-current | — | 208 |
| Total assets | 107,192 | 125,227 |
| Accounts payable | 9,040 | 36,812 |
| Deferred revenue | 28,274 | 41,277 |
| Accrued expenses and other current liabilities | 1,954 | 6,632 |
| Amounts due to related parties | — | 1,510 |
| Income tax payable | — | 3,881 |

| Total current liabilities | 39,268 | 90,112 |
|---|---|---|
| Total liabilities | $ 39,268 | $ 90,112 |

|  | For the years ended December 31, | | |
|---|---|---|---|
|  | 2014 | 2015 | 2016 |
| Net revenues | $44,755 | $133,988 | $553,098 |
| Net income | $32,945 | $118,404 | $340,366 |
| Net cash provided by operating activities | $40,383 | $124,786 | $360,433 |
| Net cash used in investing activities | $(1,921) | $(19,435) | $(11,027) |
| Net cash used in financing activities | $ — | $ — | $ — |

| **Significant Accounting Policies (Tables)** | **12 Months Ended Dec. 31, 2016** |
|---|---|

**Estimated Useful Lives**

Depreciation is calculated on a straight-line basis over the following estimated useful lives:

| Office equipment | 3-5 years |
|---|---|
| Computer equipment | 3 years |
| Vehicles | 5 years |
| Leasehold improvement | Shorter of the lease term or estimated useful lives |

**Accounts Receivable [Member]**

**Schedules of Concentration of Risk, by Risk Factor**

Third-party application stores and other payment channels accounting for 10% or more of accounts receivables are as follows:

| | As of December 31, | |
|---|---|---|
| | 2015 | 2016 |
| A | 31% | 40% |
| B | 8% | 22% |
| C | 1% | 15% |

**Revenues [Member]**

**Schedules of Concentration of Risk, by Risk Factor**

The following table summarizes sales generated from games that individually accounting for 10% or more of net revenues:

| | For the years ended December 31, | | |
|---|---|---|---|
| | 2014 | 2015 | 2016 |
| Game D | 14% | 2% | less than 1% |

**Accounts Receivable, Net**
**(Tables)**

**12 Months Ended**

**Dec. 31, 2016**

**Receivables [Abstract]**

Schedule of Accounts Receivable, Net

Accounts receivable, net consisted of the following:

|  | As of December 31, | |
|---|---|---|
|  | 2015 | 2016 |
| Accounts receivable | $ 14,896 | $ 36,078 |
| Less: allowance for doubtful accounts | — | — |
| Accounts receivable, net | $ 14,896 | $ 36,078 |

**Prepaid Expenses and Other
Current Assets (Tables)**

**12 Months Ended**

**Dec. 31, 2016**

**Deferred Costs, Capitalized, Prepaid, and
Other Assets Disclosure [Abstract]**

Schedule of Prepaid Expenses and Other
Current Assets

Prepaid expenses and other current assets consisted of the following:

|  | As of December 31, | |
| --- | --- | --- |
|  | 2015 | 2016 |
| Advance to advertisement suppliers | $ 296 | $ 5,331 |
| Customer advance at a third-party payment channel (i) | — | 4,845 |
| Interest receivable | 5,412 | 4,821 |
| Deferred platform commission cost | 2,424 | 4,571 |
| Input VAT (ii) | 3,485 | 2,968 |
| Prepaid income tax and other expenses | 1,620 | 2,964 |
| Game promotions fees paid on behalf of game developers | — | 2,250 |
| Advance to game developers | 4,200 | 1,550 |
| Others | 860 | 3,292 |
|  | $18,297 | $32,592 |

(i)  Customer advance at a third party payment channel is the cash deposited in a third party payment channel by the Group for the broadcasters to withdraw their revenue sharing.

(ii) Input VAT mainly occurred from the purchasing of goods for other services, property and equipment and advertising activities. It is subject to verification by related tax authorities before offsetting the VAT output.

**Long Term Investments (Tables)**

**Investments Schedule [Abstract]**

Summary of Equity and Cost Method Investments

**12 Months Ended**

**Dec. 31, 2016**

|  | As of December 31, | |
|---|---|---|
|  | 2015 | 2016 |
| **Equity method investments** | | |
| Jingwei Chuangteng (Hangzhou) L.P. (i) | $ 3,836 | $ 4,191 |
| Beijing Autobot Venture Capital L.P. (ii) | 4,898 | 6,736 |
| Hangzhou Aqua Ventures Investment Management L.P. (iii) | 7,632 | 9,187 |
| Hunan Qindao Cultural Spread Ltd. (viii) | — | 2,016 |
| Others (iv) | 1,060 | 702 |
| **Cost method investments** | | |
| Zya, Inc. (v) | — | 1,005 |
| Others (vi) | 1,892 | 829 |
| **Available-for-sale investments** | | |
| Xish International Limited (vii) | — | 4,386 |
| Hunan Qindao Cultural Spread Ltd. (viii) | — | 2,880 |
|  | $19,318 | $31,932 |

Equity method investments

(i) On January 9, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Jingwei Chuangteng (Hangzhou) L.P. ("Jingwei"). According to the partnership agreement, the Group committed to subscribe 4.9% partnership interest in Jingwei for $4,744. Due to Jingwei's further rounds of financing, the Group's partnership interest was diluted to 3.1% and 2.4% as of December 31, 2015 and 2016, respectively. Of the committed subscription amount, $3,586 had been paid as of December 31, 2016. The Group recognized its share of partnership profit in Jingwei of $366 and $633 during the year ended December 31, 2015 and 2016, respectively.

(ii) On February 13, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Beijing Autobot Venture Capital L.P. ("Autobot"). According to the partnership agreement, the Group committed to subscribe 31.9% partnership interest in Autobot for $4,823. Autobot had further rounds of financing, of which the Group subscribed for $1,529. Due to Autobot's further round of financing, the Group's partnership interest was diluted to 29.7% and 26.7% as of December 31, 2015 and 2016, respectively. The committed subscription and further round of financing subscription amount, $6,352 had been paid for the year ended December 31, 2016. The Group recognized its share of partnership profit in Autobot of $274 and $771 during the year ended December 31, 2015 and 2016, respectively.

(iii) On August 18, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Hangzhou Aqua Ventures Investment Management L.P. ("Aqua"). According to the partnership agreement, the Group committed to subscribe 42.7% partnership interest for $7,930. The committed subscription amount had been fully paid as of December 31, 2016. The Group recognized its share of partnership loss and profit in Aqua of $89 and $2,134 during the years ended December 31, 2015 and 2016, respectively.

(iv) Others represents other equity method investments with individual carrying amount less than $1,000 as of December 31, 2015 and 2016, respectively. The Group performed an impairment analysis for these investments and recorded impairment loss of $nil, $nil and $186 during the years ended December 31, 2014, 2015 and 2016, respectively.

Cost method investments

(v) On December 13, 2016, the Group acquired 15.6% equity interest in Zya, Inc., a Delaware corporation. The total consideration of $1,005 was paid in 2016. The Group applied cost method to account for the investment due to the lack of ability to exercise significant influence.

(vi) During the years ended December 31, 2015 and 2016, the Group acquired certain equity interests in third-party private companies. The Group accounted for these investments under cost method because the Group ownership percentage is less than 20% and the Group determined that it does not have the ability to exercise significant influence. The Group determined the impairment on the above investments was $nil, $nil and $965 during the years ended December 31, 2014, 2015 and 2016, respectively.

Available-for-sale investments

(vii) On January 21, 2016, the Group entered into a preferred share subscription agreement to acquire 17.3% equity of Xish International Limited ("Xish") for a total consideration of $9,000, which had been paid as of December 31, 2016. The investment was classified as available-for-sale security as the Group determined that the preferred shares were debt securities due to the redemption option available to the investor and measured the investment subsequently at fair value. The Group recognized an impairment loss of $4,614 during the year ended December 31, 2016. Please refer to Note 8 for additional information on the fair value measurement related to the impairment loss.

(viii) On June 8, 2016, the Group entered into a share purchase agreement to acquire 16.0% equity interest of Hunan Qindao Cultural Spread Ltd. ("Qindao") for a total consideration of $4,441, of which $3,001 had been paid as of December 31, 2016. The investment was classified as available-for-sale security as the Group determined that the preferred shares were debt securities due to the redemption option available to the investor and measured the investment subsequently at fair value. No unrealized holding gains of $nil was reported in other comprehensive income for the year ended December 31, 2016.

**Property and Equipment, Net (Tables)**

**12 Months Ended**

**Dec. 31, 2016**

**Property, Plant and Equipment [Abstract]**

Schedule of Property and Equipment, Net

Property and equipment, net consisted of the following:

| | As of December 31, | |
| --- | --- | --- |
| | 2015 | 2016 |
| Computer equipment | $ 20,177 | $ 23,763 |
| Office equipment | 3,073 | 4,370 |
| Vehicles | 34 | 31 |
| Leasehold improvement | 2,914 | 2,800 |
| Less: accumulated depreciation | (10,440) | (18,844) |
| Exchange difference | 501 | 1,812 |
| | $16,259 | $ 13,932 |

**Accrued Expenses and Other
Current Liabilities (Tables)**

**12 Months Ended**

**Dec. 31, 2016**

**Payables and Accruals [Abstract]**

Schedule of Accrued Expenses and Other Current
Liabilities

Accrued expenses and other current liabilities consisted of the
following:

| | As of December 31, | |
| --- | --- | --- |
| | 2015 | 2016 |
| Accrued payroll and welfare | $ 7,406 | $18,982 |
| Payable for advertisement | 2,718 | 9,871 |
| Other tax payables | 1,517 | 4,694 |
| VAT payable | 550 | 1,919 |
| Accrued professional services fee | 1,506 | 1,438 |
| Payable to employees for exercise of share options | 11,297 | — |
| Others | 1,700 | 3,061 |
| Total | $26,694 | $39,965 |

|  | **12 Months Ended** |
|---|---|
| **Fair Value (Tables)** | **Dec. 31, 2016** |

**Fair Value Disclosures [Abstract]**

Schedule of Assets Measured at Fair Value on Recurring Basis

As of December 31, 2016, information about inputs for the fair value measurements of the Group's assets that are measured at fair value on a recurring basis in periods subsequent to their initial recognition is as follows:

| | Fair Value Measurement as of December 31, | | | |
|---|---|---|---|---|
| Description | 2016 | Quoted Prices in Active Market for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| Cash and cash equivalents | $257,564 | $257,564 | — | $ — |
| Available-for-sale investments | 7,266 | — | — | 7,266 |
| Total | $264,830 | $257,564 | — | $ 7,266 |

Schedule of Reconciliation of Fair Value Measurement of Available-for-Sale Investments Using Significant Unobservable Inputs on a Recurring Basis

Additional information about the reconciliation of the fair value measurement of available-for-sale investments using significant unobservable inputs (level 3) on a recurring basis are is as follows:

| | |
|---|---|
| Balance as of December 31, 2015 | $ — |
| Purchase | 12,001 |
| Other-than-temporary loss recognized | (4,614) |
| Foreign exchange difference | (121) |
| Balance as of December 31, 2016 | $ 7,266 |

**Income Taxes (Tables)**

**12 Months Ended**

**Dec. 31, 2016**

**Income Tax Disclosure [Abstract]**

Components of Group's Deferred Tax Assets and Liabilities

Significant components of the Group's deferred tax assets and liabilities are as follows:

| | As of December 31, | |
| --- | --- | --- |
| | 2015 | 2016 |
| Current deferred tax assets: | | |
| Impairment of loss on long term investments | $ — | $ 72 |
| Less: valuation allowance | — | — |
| Current deferred tax assets, net | — | 72 |
| Non-current deferred tax assets: | | |
| Advertising expense | 2,651 | — |
| Net operating tax losses carry-forward | 2,881 | 2,852 |
| Impairment of on long term investments | — | 208 |
| Less: valuation allowance | (5,532) | (2,852) |
| Non-current deferred tax assets, net | $ — | $ 208 |

Schedule of Reconciliation between Income Taxes Expense (Benefit) to (Loss) Income before Income Taxes and Actual Provision for Income Taxes

Reconciliation between the expense (benefit) of income taxes computed by applying the PRC tax rate to (loss) income before income taxes and the actual provision for income taxes is as follows:

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2016 |
| Net (loss) income before provision for income tax | $(25,415) | $13,419 | $146,915 |
| PRC statutory tax rate | 25% | 25% | 25% |
| Income tax (benefit) expense at statutory tax rate | (6,354) | 3,355 | 36,729 |
| Permanent differences | 99 | (144) | (75) |
| Change in valuation allowance | 4,560 | (2,315) | (2,680) |
| Effect of income tax rate difference in other jurisdictions | 1,695 | 2,754 | 7,941 |
| Effect of tax holidays and preferential tax rates | — | (3,558) | (36,779) |
| Provision for income tax | $ — | $ 92 | $ 5,136 |

| **Share-Based Compensation (Tables)** | **12 Months Ended Dec. 31, 2016** |
|---|---|

### Summary of Non-Vested Restricted Share Activity

A summary of non-vested restricted share activity during the years ended December 31, 2014, 2015 and 2016 is presented below:

|  | Number of shares |
|---|---|
| Outstanding as of January 1, 2014 | 58,187,500 |
| Granted | — |
| Modification | 19,736,705 |
| Vested | (20,673,449) |
| Outstanding as of December 31, 2014 | 57,250,756 |
| Granted | — |
| Forfeited | — |
| Vested | (28,625,378) |
| Outstanding as of December 31, 2015 | 28,625,378 |
| Granted | — |
| Forfeited | — |
| Vested | (28,625,378) |
| Outstanding as of December 31, 2016 | — |

### Summary of Restricted Share Units Granted

The following table summarizes information regarding the share units granted:

|  | Number of shares |
|---|---|
| Outstanding as of January 1, 2015 | 40,001 |
| Granted | — |
| Forfeited | — |
| Vested | (40,001) |
| Outstanding as of December 31, 2015 | — |
| Granted | 200,000 |
| Forfeited | — |
| Vested | (50,000) |
| Outstanding as of December 31, 2016 | 150,000 |

### Company Share Incentive Plan [Member]

### Summary of Option Activity

The following table summarizes the option activity for the year ended December 31, 2016:

|  | Number of options | Weighted average exercise price per option | Weighted average remaining contractual life (years) | Aggregated intrinsic value |
|---|---|---|---|---|
| Outstanding, December 31, 2015 | 31,084,006 | $ 0.0767 | 8.14 | $ 246,597 |
| Granted | 7,577,122 | $ 0.0002 | | |
| Exercised | (5,147,032) | $ 0.0618 | | |
| Forfeited/cancel | (1,907,630) | $ 0.0226 | | |
| Outstanding, December 31, 2016 | 31,606,466 | $ 0.0641 | 7.63 | 288,439 |
| Exercisable at December 31, 2016 | 15,313,350 | $ 0.0924 | 6.76 | $ 139,314 |

### Schedule of Assumptions Used to Estimate Fair Value of Stock Options Granted

The fair value of options granted was estimated on the date of grant using the binomial tree pricing model before the Company completed its IPO and the Black-Sholes pricing model after the Company completed its IPO, respectively, with the following assumptions used for grants during the applicable periods:

|  | Risk-free interest rate of return | Contractual term | Volatility | Dividend yield | Exercise price |
|---|---|---|---|---|---|
| 2012 | 2.31% | 10 years | 61.7% | — | $ 0.0327 |
| 2013 | 3.09% | 10 years | 54.4% | — | $ 0.1404 |
| 2014 | 2.44%~3.25% | 10 years | 53.7%~57.5% | — | $0.0002~$0.1404 |
| 2015 | 2.15%~2.19% | 10 years | 55.3%~55.7% | — | $ 0.0002 |
| 2016 | 1.75%~2.70% | 10 years | 52.5%~55.3% | — | $ 0.0002 |

Momo BVI Share Incentive Plan [Member]

Summary of Option Activity

The following table summarizes the option activity for the year ended December 31, 2016:

| | Number of options | Weighted average exercise price per option | Weighted average remaining contractual life (years) | Aggregated intrinsic value |
|---|---|---|---|---|
| Outstanding , December 31, 2015 | 10,200,000 | $ 0.1080 | 9.26 | $ 20 |
| Granted | — | — | | |
| Exercised | — | — | | |
| Forfeited | (2,200,000) | $ 0.1055 | | |
| Outstanding at end of period | 8,000,000 | $ 0.1088 | 8.19 | $ 10 |
| Exercisable at December 31, 2016 | 3,458,333 | $ 0.1086 | 8.13 | $ 5 |

Schedule of Assumptions Used to Estimate Fair Value of Stock Options Granted

The fair value of options granted was estimated on the date of grant using the Black-Sholes pricing model with the following assumptions used for grants during the applicable periods:

| | Risk-free interest rate of return | Contractual term | Volatility | Dividend yield | Exercise price |
|---|---|---|---|---|---|
| 2015 | 1.55%~1.82% | 10 years | 55.3%~57.2% | — | $0.10~$0.11 |

| **Net Income (Loss) Per Share (Tables)** | **12 Months Ended** |
| --- | --- |
| | **Dec. 31, 2016** |

**Earnings Per Share [Abstract]**

Calculation of Net Loss Per Share

The calculation of net loss per share is as follows:

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2016 |
| Numerator: | | | |
| Net (loss) income attributable to MomoInc. | $(25,415) | $13,697 | $145,250 |
| Deemed dividend to Series A-1 and Series A-2 shares | (30,910) | — | — |
| Deemed dividend to Series A-3 shares | (544) | — | — |
| Deemed dividend to Series B shares | (3,116) | — | — |
| Deemed dividend to Series C shares | (5,596) | — | — |
| Deemed dividend to Series D shares | (17,497) | — | — |
| Undistributed earnings allocated to Series A shares | — | — | — |
| Undistributed earnings allocated to Series B shares | — | — | — |
| Undistributed earnings allocated to Series C shares | — | — | — |
| Undistributed earnings allocated to Series D shares | — | — | — |
| Undistributed earnings allocated to participating nonvested restricted shares | — | (1,339) | (3,197) |
| Net (loss) income attributed to ordinary shareholders for computing net (loss) income per ordinary share-basic and diluted | $(83,078) | $12,358 | $142,053 |

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2016 |
| Denominator: | | | |
| Denominator for computing net (loss) income per share-basic: | | | |
| Weighted average ordinary shares outstanding used in computing net (loss) income per ordinary share-basic | 85,293,775 | 342,646,282 | 377,335,923 |
| Weighted average shares used in computing net (loss) income per participating nonvested restricted share | 60,951,591 | 37,118,622 | 8,493,244 |
| Weighted average shares used in computing net income per Series A-1 and Series A-2 share | 32,176,676 | — | — |
| Weighted average shares used in computing net income per Series A-3 Share | 18,990,997 | — | — |
| Weighted average shares used in computing net income per Series B share | 67,182,243 | — | — |
| Weighted average shares used in computing net income per Series C Share | 34,540,898 | — | — |
| Weighted average shares used in computing net income per Series D | | | |

| | | | | |
|---|---|---|---|---|
| share | | 28,348,231 | | |
| Denominator for computing net (loss) income per share-diluted: | | | | |
| Weighted average shares outstanding used in computing net (loss) income per ordinary share-diluted | | 85,293,775 | 401,396,548(i) | 407,041,165(ii) |
| Net (loss) income per ordinary share attributable to Momo Inc. - basic | $ | (0.97) | $ 0.04 | $ 0.38 |
| Net income per participating nonvested restricted share | $ | — | $ 0.04 | $ 0.38 |
| Net income per Series A-1 and Series A-2 share | $ | 0.96 | $ — | $ — |
| Net income per Series A-3 share | $ | 0.03 | $ — | $ — |
| Net income per Series B share | $ | 0.05 | $ — | $ — |
| Net income per Series C share | $ | 0.16 | $ — | $ — |
| Net income per Series D share | $ | 0.62 | $ — | $ — |
| Net (loss) income per ordinary share attributable to Momo Inc. - diluted | $ | (0.97) | $ 0.03 | $ 0.36 |

(i)  For the year 2015, an incremental weighted average number of 35,759,066 nonvested restricted shares and an incremental weighted average number of 22,991,200 ordinary shares from the assumed exercise of share options and vesting of restricted share units using the treasury stock method were included.

(ii)  For the year 2016, an incremental weighted average number of 7,155,060 nonvested restricted shares and an incremental weighted average number of 22,550,182 ordinary shares from the assumed exercise of share options and vesting of restricted share units using the treasury stock method were included.

**Summary of Potential Ordinary Shares Outstanding Excluded from Computation of Diluted Net Loss Per Ordinary Share**

The following table summarizes potential ordinary shares outstanding excluded from the computation of diluted net loss or income per ordinary share for the years ended December 31, 2014, 2015 and 2016, because their effect is anti-dilutive:

| | For the years ended December 31, | | |
|---|---|---|---|
| | 2014 | 2015 | 2016 |
| Share issuable upon exercise of share options | 21,831,082 | 904,489 | 152,500 |
| Share issuable upon exercise of RSUs | — | 15,001 | 50,000 |
| Share issuable upon vesting of nonvested restricted shares | 60,951,591 | — | — |
| Share issuable upon conversion of Series A-1 and Series A-2 shares | 32,176,676 | — | — |
| Share issuable upon conversion of Series A-3 shares | 18,990,997 | — | — |
| Share issuable upon conversion of Series B shares | 67,182,243 | — | — |
| Share issuable upon conversion of Series C shares | 34,540,898 | — | — |
| Share issuable upon conversion of Series D shares | 28,348,231 | — | — |

**Commitments and
Contingencies (Tables)**

**12 Months Ended
Dec. 31, 2016**

**Commitments and Contingencies Disclosure [Abstract]**

Schedule of Future Minimum Payments under Non-
Cancellable Operating Leases

Future minimum payments under non-cancellable operating leases as
of December 31, 2016 were as follows:

| | |
|---|---:|
| 2017 | $5,547 |
| 2018 | 2,644 |
| 2019 | 360 |
| 2020 | 296 |
| Total | $8,847 |

| **Related Party Balances and Transactions (Tables)** | **12 Months Ended Dec. 31, 2016** |
| --- | --- |

**Related Party Transactions [Abstract]**

Schedule of Related Party Transactions

(1) Amount due from related parties-current

| | As of December 31, | |
| --- | --- | --- |
| | 2015 | 2016 |
| Hangzhou Alimama Technology Co., Ltd. | $ 876 | $ 2 |
| Shanghai Touch Future Network Technology Co., Ltd. | 299 | — |
| Guangzhou UC Network Technology Co., Ltd. | — | 5 |
| Guangzhou Aijiuyou Informational Technology Co., Ltd. | — | 81 |
| Total | $ 1,175 | $ 88 |

(2) Amount due to related parties - current

| | As of December 31, | |
| --- | --- | --- |
| | 2015 | 2016 |
| Amount due to ordinary shareholders (i) | $ 6,450 | $ 5,862 |
| Hunan Qindao Cultural Spread Ltd. | — | 1,281 |
| Alibaba Cloud Computing Ltd. | 82 | 629 |
| Shanghai Touch Future Network Technology Co., Ltd. | — | 229 |
| Taobao (China) Software Co., Ltd. | — | 116 |
| Total | $ 6,532 | $ 8,117 |

(i) The amounts of $6,450 and $5,775 as of December 31, 2015 and 2016 represent the unpaid repurchase amount by the Group to its ordinary shareholders. Please refer to Note 10 for repurchase of ordinary shares.

(3) Sales to related parties

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2016 |
| Shanghai Xisue Network Technology Co., Ltd. (ii) | $ — | $ — | $ 922 |
| Zhejiang Tmall Technology Co., Ltd. (ii) | — | — | 820 |
| Guangzhou Aijiuyou Informational Technology Co., Ltd. (iii) | — | — | 400 |
| Taobao (China) Software Co., Ltd. (ii) | — | — | 249 |
| Hangzhou Alimama Technology Co., Ltd. (ii) | — | 6,002 | 42 |
| Guangzhou UC Network Technology Co., Ltd. (iii) | — | — | 9 |
| Total | $ — | $ 6,002 | $ 2,442 |

(ii) The sales to related parties represented mobile marketing services provided.

(iii) The sales to related parties represented mobile game revenue generated through those game operating companies.

(4) Purchase from related parties

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | 2016 |
| Hunan Qindao Cultural Spread Ltd. (iv) | $ — | $ — | $ 3,929 |
| Alibaba Cloud Computing Ltd. (v) | — | 322 | 3,360 |
| Shanghai Touch future Network Technology Co., Ltd. | — | — | 347 |
| Taobao (China) Software Co., Ltd. | — | — | 323 |
| Total | $ — | $ 322 | $ 7,959 |

(iv) The purchase from Hunan Qindao Cultural Spread Ltd. is the revenue sharing with broadcaster agencies of live video service.

(v) The purchase from Alibaba Cloud Computing Ltd. is mainly related to its cloud computing services.

**Segment Information (Tables)**

**12 Months Ended**

**Dec. 31, 2016**

**Segment Reporting [Abstract]**

Components of Revenues

Components of revenues are presented in the following table:

| | For the years ended December 31, | | |
|---|---|---|---|
| | 2014 | 2015 | 2016 |
| Live video service | $    — | $  1,231 | $376,925 |
| Value-added service | 29,756 | 58,462 | 67,603 |
| Mobile marketing | 1,975 | 38,885 | 66,339 |
| Mobile games | 11,237 | 31,082 | 35,453 |
| Other services | 1,787 | 4,328 | 6,778 |
| Total | $44,755 | $133,988 | $553,098 |

| Organization and Principal Activities - Additional Information (Detail) $ in Thousands | Dec. 16, 2014 shares | Jul. 07, 2011 | 1 Months Ended May 31, 2016 | Dec. 31, 2014 shares | Aug. 31, 2014 | 12 Months Ended Dec. 31, 2016 USD ($) asset_group related_party Term shares | Dec. 31, 2016 CNY (¥) asset_group related_party Term shares | Dec. 31, 2015 USD ($) shares | Dec. 31, 2014 USD ($) | Nov. 23, 2011 USD ($) |
|---|---|---|---|---|---|---|---|---|---|---|
| **Variable Interest Entity [Line Items]** | | | | | | | | | | |
| Date of Incorporation | | | | | | Nov. 23, 2011 | Nov. 23, 2011 | | | |
| Share capital \| $ | | | | | | | | | | $ 15 |
| Ordinary shares conversion basis | | | | | | Each Class B ordinary share is convertible into one Class A ordinary share at any time by the holder thereof, while Class A ordinary shares are not convertible to Class B ordinary shares under any circumstances. | Each Class B ordinary share is convertible into one Class A ordinary share at any time by the holder thereof, while Class A ordinary shares are not convertible to Class B ordinary shares under any circumstances. | | | |
| Ordinary shares, new issues | | | | | | 5,197,032 | 5,197,032 | 5,995,293 | | |
| Percentage of VIEs revenues to the consolidated net revenues | | | | | | 100.00% | 100.00% | 100.00% | 100.00% | |
| Percentage of VIEs assets to the consolidated total assets | | | | | | 16.30% | 16.30% | 19.80% | | |
| Percentage of VIEs liability to the consolidated total liabilities | | | | | | 66.40% | 66.40% | 53.20% | | |
| Number of consolidated VIE's assets that are collateral for the VIE's obligations \| asset_group | | | | | | 0 | 0 | | | |
| VIEs creditors having recourse to general credit of the Company \| related_party | | | | | | 0 | 0 | | | |
| Number of terms under arrangement with VIEs to provide financial support \| Term | | | | | | 0 | 0 | | | |
| Class A Common Stock [Member] | | | | | | | | | | |
| **Variable Interest Entity [Line Items]** | | | | | | | | | | |
| Ordinary shares, voting rights | | | | | | One vote per share | One vote per share | | | |
| Ordinary shares, new issues | 45,688,888 | | | 45,688,888 | | | | | | |

**Class B Common Stock [Member]**

**Variable Interest Entity [Line Items]**

| | | | | |
|---|---|---|---|---|
| Ordinary shares, voting rights | | | Ten votes per share | Ten votes per share |

**IPO [Member] | Class A Common Stock [Member]**

**Variable Interest Entity [Line Items]**

| | | | |
|---|---|---|---|
| Ordinary shares, new issues | 36,800,000 | 36,800,000 | |
| Convertible preferred stock shares converted | 200,718,811 | 200,718,811 | |

**Private Placement [Member] | Class A Common Stock [Member]**

**Variable Interest Entity [Line Items]**

| | | | |
|---|---|---|---|
| Ordinary shares, new issues | 8,888,888 | 8,888,888 | |

**Mr. Yan Tang [Member]**

**Variable Interest Entity [Line Items]**

| | |
|---|---|
| Percentage ownership in share capital | 65.00% |

**Mr. Yong Li [Member]**

**Variable Interest Entity [Line Items]**

| | |
|---|---|
| Percentage ownership in share capital | 20.00% |

**Mr. Xiaoliang Lei [Member]**

**Variable Interest Entity [Line Items]**

| | |
|---|---|
| Percentage ownership in share capital | 8.00% |

**Mr. Zhiwei Li [Member]**

**Variable Interest Entity [Line Items]**

| | |
|---|---|
| Percentage ownership in share capital | 7.00% |

**Business Operations Agreement [Member]**

**Variable Interest Entity [Line Items]**

| | | |
|---|---|---|
| Effective years of agreement | 10 years | 10 years |

**Exclusive Cooperation Agreements and Supplemental Agreements [Member]**

**Variable Interest Entity [Line Items]**

| | | | |
|---|---|---|---|
| Service fee | $ | $ 319,018 | $ 112,043 $ 35,188 |

**VIE "Beijing Momo" [Member]**

**Variable Interest Entity [Line Items]**

| | | | |
|---|---|---|---|
| Date of Incorporation [1] | | Jul. 07, 2011 | Jul. 07, 2011 |
| Maximum call option agreement threshold value \| ¥ | | ¥ 500,000 | |
| **VIE "Beijing Momo" [Member] \| Mr. Yan Tang [Member]** | | | |
| **Variable Interest Entity [Line Items]** | | | |
| Capital contribution percentage, subsidiaries | 65.00% | | |
| **VIE "Beijing Momo" [Member] \| Mr. Yong Li [Member]** | | | |
| **Variable Interest Entity [Line Items]** | | | |
| Capital contribution percentage, subsidiaries | 20.00% | | |
| **VIE "Beijing Momo" [Member] \| Mr. Xiaoliang Lei [Member]** | | | |
| **Variable Interest Entity [Line Items]** | | | |
| Capital contribution percentage, subsidiaries | 8.00% | | |
| **VIE "Beijing Momo" [Member] \| Mr. Zhiwei Li [Member]** | | | |
| **Variable Interest Entity [Line Items]** | | | |
| Capital contribution percentage, subsidiaries | 7.00% | | |
| **Momo HK [Member]** | | | |
| **Variable Interest Entity [Line Items]** | | | |
| Date of Incorporation | | Dec. 05, 2011 | Dec. 05, 2011 |
| Percentage of economic ownership | | 100.00% | 100.00% |
| **Beijing Momo IT [Member]** | | | |
| **Variable Interest Entity [Line Items]** | | | |
| Date of Incorporation | | Mar. 09, 2012 | Mar. 09, 2012 |
| Percentage of economic ownership | | 100.00% | 100.00% |
| **Beijing Momo IT [Member] \| Exclusive Cooperation Agreements and Supplemental Agreements [Member]** | | | |
| **Variable Interest Entity [Line Items]** | | | |
| Effective years of agreement | 10 years | | |
| Chengdu Momo Technology Company Limited Investment | | | |

[Member] | Exclusive Cooperation Agreements and Supplemental Agreements [Member]

**Variable Interest Entity [Line Items]**

| | |
|---|---|
| Effective years of agreement | 10 years |

Tianjin Heer Technology Co. Ltd [Member] | Exclusive Cooperation Agreements and Supplemental Agreements [Member]

**Variable Interest Entity [Line Items]**

| | |
|---|---|
| Effective years of agreement | 10 years |

[1] These entities are controlled by the Company pursuant to the contractual arrangements disclosed below.

| Organization and Principal Activities - Schedule of Subsidiaries, VIE and VIE's Subsidiaries (Detail) | 12 Months Ended Dec. 31, 2016 | |
|---|---|---|
| **Variable Interest Entity [Line Items]** | | |
| Date of Incorporation | Nov. 23, 2011 | |
| Momo HK [Member] | | |
| **Variable Interest Entity [Line Items]** | | |
| Date of Incorporation | Dec. 05, 2011 | |
| Place of Incorporation | Hong Kong | |
| Percentage of economic ownership | 100.00% | |
| Beijing Momo IT [Member] | | |
| **Variable Interest Entity [Line Items]** | | |
| Date of Incorporation | Mar. 09, 2012 | |
| Place of Incorporation | PRC | |
| Percentage of economic ownership | 100.00% | |
| Momo BVI [Member] | | |
| **Variable Interest Entity [Line Items]** | | |
| Date of Incorporation | Mar. 05, 2014 | |
| Place of Incorporation | BVI | |
| Percentage of economic ownership | 100.00% | |
| Momo US [Member] | | |
| **Variable Interest Entity [Line Items]** | | |
| Date of Incorporation | Mar. 07, 2014 | |
| Place of Incorporation | US | |
| Percentage of economic ownership | 100.00% | |
| VIE "Beijing Momo" [Member] | | |
| **Variable Interest Entity [Line Items]** | | |
| Date of Incorporation | Jul. 07, 2011 | [1] |
| Place of Incorporation | PRC | [1] |
| Chengdu Momo [Member] | | |
| **Variable Interest Entity [Line Items]** | | |
| Date of Incorporation | May 09, 2013 | [1] |
| Place of Incorporation | PRC | [1] |
| Shanghai Momo [Member] | | |
| **Variable Interest Entity [Line Items]** | | |
| Date of Incorporation | Jan. 19, 2015 | [1] |
| Place of Incorporation | PRC | [1] |
| Chengdu Biyou [Member] | | |
| **Variable Interest Entity [Line Items]** | | |
| Date of Incorporation | Oct. 16, 2015 | [1] |
| Place of Incorporation | PRC | [1] |
| Tianjin Heer [Member] | | |
| **Variable Interest Entity [Line Items]** | | |

| | | |
|---|---|---|
| Date of Incorporation | Mar. 07, 2016 | [1] |
| Place of Incorporation | PRC | [1] |
| Momo Pictures Co. Ltd. [Member] | | |
| **Variable Interest Entity [Line Items]** | | |
| Date of Incorporation | Nov. 11, 2016 | [1] |
| Place of Incorporation | PRC | [1] |
| QOOL Media,Tianjin [Member] | | |
| **Variable Interest Entity [Line Items]** | | |
| Date of Incorporation | Nov. 16, 2016 | [1] |
| Place of Incorporation | PRC | [1] |

[1] These entities are controlled by the Company pursuant to the contractual arrangements disclosed below.

Case 1:19-cv-04433-GBD    Document 41-3    Filed 01/24/20    Page 283 of 342

| Organization and Principal Activities - Schedule of Amounts and Balances of VIE Included in Consolidated Financial Statements After Elimination of Intercompany Balances and Transactions (Detail) - USD ($) $ in Thousands | 12 Months Ended | | | |
|---|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 |
| **Variable Interest Entity [Line Items]** | | | | |
| Cash and cash equivalents | $ 257,564 | $ 169,469 | $ 450,968 | $ 55,374 |
| Accounts receivable, net of allowance for doubtful accounts of $nil and $nil as of December 31, 2015 and 2016, respectively | 36,078 | 14,896 | | |
| Amount due from related parties | 88 | 1,175 | | |
| Prepaid expenses and other current assets | 32,592 | 18,297 | | |
| Deferred tax assets, current | 72 | | | |
| Total current assets | 720,153 | 503,837 | | |
| Property and equipment, net | 13,932 | 16,259 | | |
| Rental deposits | 920 | 743 | | |
| Other non-current assets | 2,593 | 2,000 | | |
| Long term investments | 31,932 | 19,318 | | |
| Deferred tax assets, non-current | 208 | | | |
| Total assets | 769,738 | 542,157 | | |
| Accounts payable | 40,457 | 10,445 | | |
| Deferred revenue | 41,277 | 28,274 | | |
| Accrued expenses and other current liabilities | 39,965 | 26,694 | | |
| Amounts due to related parties | 8,117 | 6,532 | | |
| Total current liabilities | 133,697 | 71,945 | | |
| Total liabilities | 135,719 | 73,771 | | |
| Net revenues | 553,098 | 133,988 | 44,755 | |
| Net income | 145,250 | 13,697 | (25,415) | |
| VIE "Beijing Momo" [Member] | | | | |
| **Variable Interest Entity [Line Items]** | | | | |
| Cash and cash equivalents | 36,855 | 60,526 | | |
| Accounts receivable, net of allowance for doubtful accounts of $nil and $nil as of December 31, 2015 and 2016, respectively | 36,078 | 14,896 | | |
| Amount due from related parties | 88 | 1,175 | | |
| Prepaid expenses and other current assets | 20,613 | 9,495 | | |
| Deferred tax assets, current | 72 | | | |
| Total current assets | 93,706 | 86,092 | | |
| Property and equipment, net | 1,854 | 1,538 | | |
| Rental deposits | 325 | 244 | | |
| Other non-current assets | 2,593 | | | |
| Long term investments | 26,541 | 19,318 | | |
| Deferred tax assets, non-current | 208 | | | |
| Total assets | 125,227 | 107,192 | | |
| Accounts payable | 36,812 | 9,040 | | |

| | | | |
|---|---|---|---|
| Deferred revenue | 41,277 | 28,274 | |
| Accrued expenses and other current liabilities | 6,632 | 1,954 | |
| Amounts due to related parties | 1,510 | | |
| Income tax payable | 3,881 | | |
| Total current liabilities | 90,112 | 39,268 | |
| Total liabilities | 90,112 | 39,268 | |
| Net revenues | 553,098 | 133,988 | 44,755 |
| Net income | 340,366 | 118,404 | 32,945 |
| Net cash provided by operating activities | 360,433 | 124,786 | 40,383 |
| Net cash used in investing activities | (11,027) | (19,435) | (1,921) |
| Net cash used in financing activities | $ 0 | $ 0 | $ 0 |

| Organization and Principal Activities - Schedule of Amounts and Balances of VIE Included in Consolidated Financial Statements After Elimination of Intercompany Balances and Transactions (Parenthetical) (Detail) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Variable Interest Entity [Line Items]** | | |
| Allowance for doubtful accounts | $ 0 | $ 0 |
| VIE "Beijing Momo" [Member] | | |
| **Variable Interest Entity [Line Items]** | | |
| Allowance for doubtful accounts | $ 0 | $ 0 |

| Significant Accounting Policies - Additional Information (Detail) $ in Thousands | 12 Months Ended | | | |
|---|---|---|---|---|
| | Dec. 31, 2016 USD ($) Agreement Customer Product | Dec. 31, 2015 USD ($) Agreement Customer Product | Dec. 31, 2014 USD ($) Customer | Dec. 31, 2013 USD ($) |
| **Accounting Policies [Line Items]** | | | | |
| Bank deposits maturity | 3 months | | | |
| Cash and cash equivalents | $ 257,564 | $ 169,469 | $ 450,968 | $ 55,374 |
| Net revenues recognized | 553,098 | 133,988 | 44,755 | |
| Other operating income | 406 | 713 | 26 | |
| Value added tax incurred | 55,353 | 16,951 | 5,436 | |
| Income tax expenses | 5,136 | 92 | 0 | |
| Advertising expense | $ 55,188 | 27,793 | 27,408 | |
| Minimum [Member] | | | | |
| **Accounting Policies [Line Items]** | | | | |
| Percentage of ownership, equity method investment | 20.00% | | | |
| Maximum [Member] | | | | |
| **Accounting Policies [Line Items]** | | | | |
| Percentage of ownership, equity method investment | 50.00% | | | |
| Membership Subscription [Member] | | | | |
| **Accounting Policies [Line Items]** | | | | |
| Contract period, minimum | 1 month | | | |
| Contract period, maximum | 1 year | | | |
| Mobile Marketing [Member] | | | | |
| **Accounting Policies [Line Items]** | | | | |
| Net revenues recognized | $ 66,339 | $ 38,885 | 1,975 | |
| Self Developed Mobile Game [Member] | | | | |
| **Accounting Policies [Line Items]** | | | | |
| Estimated usage life of product/service | 56 days | | | |
| Number of games | Product | 6 | 1 | | |
| Self Developed Mobile Game [Member] | Minimum [Member] | | | | |
| **Accounting Policies [Line Items]** | | | | |
| Estimated usage life of product/service | 20 days | | | |
| Self Developed Mobile Game [Member] | Maximum [Member] | | | | |
| **Accounting Policies [Line Items]** | | | | |
| Estimated usage life of product/service | 110 days | | | |
| Mobile Games [Member] | | | | |
| **Accounting Policies [Line Items]** | | | | |
| Net revenues recognized | $ 35,453 | $ 31,082 | 11,237 | |
| Number of games | Agreement | 6 | 7 | | |
| Mobile Games [Member] | Minimum [Member] | | | | |
| **Accounting Policies [Line Items]** | | | | |
| Estimated usage life of product/service | 20 days | 20 days | | |
| Mobile Games [Member] | Maximum [Member] | | | | |

**Accounting Policies [Line Items]**

| | | | |
|---|---|---|---|
| Estimated usage life of product/service | 99 days | 75 days | |

Live Video Service [Member]

**Accounting Policies [Line Items]**

| | | | |
|---|---|---|---|
| Net revenues recognized | $ 376,925 | $ 1,231 | 0 |

Value-added Services [Member]

**Accounting Policies [Line Items]**

| | | | |
|---|---|---|---|
| Net revenues recognized | 67,603 | 58,462 | 29,756 |

Government Subsidies

**Accounting Policies [Line Items]**

| | | | |
|---|---|---|---|
| Other operating income | $ 293 | $ 0 | $ 0 |

User Concentration Risk [Member] | Accounts Receivable [Member]

**Accounting Policies [Line Items]**

| | | | |
|---|---|---|---|
| Number of users or advertising customer accounted for 10% or more of total revenues | Customer | 0 | 0 | |

User Concentration Risk [Member] | Revenues [Member]

**Accounting Policies [Line Items]**

| | | | |
|---|---|---|---|
| Number of users or advertising customer accounted for 10% or more of total revenues | Customer | 0 | 0 | 0 |

China, Yuan Renminbi

**Accounting Policies [Line Items]**

| | | | |
|---|---|---|---|
| Cash and cash equivalents | $ 245,853 | $ 75,759 | |

| Significant Accounting Policies - Schedule of Third-Party Application Stores and Other Payment Channels Accounting Receivables (Detail) - Accounts Receivable [Member] - Credit Concentration Risk [Member] | 12 Months Ended | |
|---|---|---|
| | **Dec. 31, 2016** | **Dec. 31, 2015** |
| Third-party Payment Channel A [Member] | | |
| **Concentration Risk [Line Items]** | | |
| Concentration risk, percentage | 40.00% | 31.00% |
| Third-party Payment Channel B [Member] | | |
| **Concentration Risk [Line Items]** | | |
| Concentration risk, percentage | 22.00% | 8.00% |
| Third-party Payment Channel C [Member] | | |
| **Concentration Risk [Line Items]** | | |
| Concentration risk, percentage | 15.00% | 1.00% |

| Significant Accounting Policies - Schedule of Concentration of Revenue (Detail) - Revenues [Member] - Game D [Member] - Product Concentration Risk [Member] | 12 Months Ended | | |
| --- | --- | --- | --- |
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Concentration Risk [Line Items]** | | | |
| Concentration risk, percentage | | 2.00% | 14.00% |
| Maximum [Member] | | | |
| **Concentration Risk [Line Items]** | | | |
| Concentration risk, percentage | 1.00% | | |

| Significant Accounting Policies - Schedule of Estimated Useful Lives of Property and Equipment (Detail) | 12 Months Ended Dec. 31, 2016 |
|---|---|
| Computer Equipment [Member] | |
| **Property, Plant and Equipment [Line Items]** | |
| Property and equipment, estimated useful life | 3 years |
| Vehicles [Member] | |
| **Property, Plant and Equipment [Line Items]** | |
| Property and equipment, estimated useful life | 5 years |
| Leasehold Improvement [Member] | |
| **Property, Plant and Equipment [Line Items]** | |
| Property and equipment, estimated useful life | Shorter of the lease term or estimated useful lives |
| Minimum [Member] \| Office Equipment [Member] | |
| **Property, Plant and Equipment [Line Items]** | |
| Property and equipment, estimated useful life | 3 years |
| Maximum [Member] \| Office Equipment [Member] | |
| **Property, Plant and Equipment [Line Items]** | |
| Property and equipment, estimated useful life | 5 years |

| Accounts Receivable, Net - Schedule of Accounts Receivable, Net (Detail) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Financing Receivable, Additional Disclosures [Abstract]** | | |
| Accounts receivable | $ 36,078 | $ 14,896 |
| Less: allowance for doubtful accounts | 0 | 0 |
| Accounts receivable, net | $ 36,078 | $ 14,896 |

| Prepaid Expenses and Other Current Assets - Schedule of Prepaid Expenses and Other Current Assets (Detail) - USD ($) $ in Thousands | | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|---|
| **Deferred Costs, Capitalized, Prepaid, and Other Assets Disclosure [Abstract]** | | | |
| Advance to advertisement suppliers | | $ 5,331 | $ 296 |
| Customer advance at a third-party payment channel | [1] | 4,845 | |
| Interest receivable | | 4,821 | 5,412 |
| Deferred platform commission cost | | 4,571 | 2,424 |
| Input VAT | [2] | 2,968 | 3,485 |
| Prepaid income tax and other expenses | | 2,964 | 1,620 |
| Game promotions fees paid on behalf of game developers | | 2,250 | |
| Advance to game developers | | 1,550 | 4,200 |
| Others | | 3,292 | 860 |
| Prepaid expenses and other current assets | | $ 32,592 | $ 18,297 |

[1] Customer advance at a third party payment channel is the cash deposited in a third party payment channel by the Group for the broadcasters to withdraw their revenue sharing.

[2] Input VAT mainly occurred from the purchasing of goods for other services, property and equipment and advertising activities. It is subject to verification by related tax authorities before offsetting the VAT output.

| Long Term Investments - Summary of Equity and Cost Method Investments (Detail) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 | Aug. 18, 2015 | Feb. 13, 2015 | Jan. 09, 2015 |
|---|---|---|---|---|---|
| **Investment [Line Items]** | | | | | |
| Long term Investments | $ 31,932 | $ 19,318 | | | |
| Zya, Inc. [Member] | | | | | |
| **Investment [Line Items]** | | | | | |
| Cost method investments | [1] 1,005 | | | | |
| Other Cost Method Investment [Member] | | | | | |
| **Investment [Line Items]** | | | | | |
| Cost method investments | [2] 829 | 1,892 | | | |
| Xish International Limited | | | | | |
| **Investment [Line Items]** | | | | | |
| Available-for-sale investments | [3] 4,386 | | | | |
| Hunan Qindao Cultural Spread Ltd. [Member] | | | | | |
| **Investment [Line Items]** | | | | | |
| Available-for-sale investments | [4] 2,880 | | | | |
| Jingwei Chuangteng (Hangzhou) L.P. [Member] | | | | | |
| **Investment [Line Items]** | | | | | |
| Equity method investments | 4,191 | [5] 3,836 | [5] | | $ 4,744 |
| Beijing Autobot Venture Capital L.P. [Member] | | | | | |
| **Investment [Line Items]** | | | | | |
| Equity method investments | 6,736 | [6] 4,898 | [6] | $ 4,823 | |
| Hangzhou Aqua Ventures Investment Management L.P. [Member] | | | | | |
| **Investment [Line Items]** | | | | | |
| Equity method investments | 9,187 | [7] 7,632 | [7] $ 7,930 | | |
| Hunan Qindao Cultural Spread Ltd. [Member] | | | | | |
| **Investment [Line Items]** | | | | | |
| Equity method investments | [4] 2,016 | | | | |
| Other Equity Method Investments [Member] | | | | | |
| **Investment [Line Items]** | | | | | |
| Equity method investments | [8] $ 702 | $ 1,060 | | | |

[1] On December 13, 2016, the Group acquired 15.6% equity interest in Zya, Inc., a Delaware corporation. The total consideration of $1,005 was paid in 2016. The Group applied cost method to account for the investment due to the lack of ability to exercise significant influence.

[2] During the years ended December 31, 2015 and 2016, the Group acquired certain equity interests in third-party private companies. The Group accounted for these investments under cost method because the Group ownership percentage is less than 20% and the Group determined that it does not have the ability to exercise significant influence. The Group determined the impairment on the above investments was $nil, $nil and $965 during the years ended December 31, 2014, 2015 and 2016, respectively.

[3] On January 21, 2016, the Group entered into a preferred share subscription agreement to acquire 17.3% equity of Xish International Limited ("Xish") for a total consideration of $9,000, which had been paid as of December 31, 2016. The

investment was classified as available-for-salesecurity as the Group determined that the preferred shares were debt securities due to the redemption option available to the investor and measured the investment subsequently at fair value. The Group recognized an impairment loss of $4,614 during the year ended December 31, 2016. Please refer to Note 8 for additional information on the fair value measurement related to the impairment loss.

[4] On June 8, 2016, the Group entered into a share purchase agreement to acquire 16.0% equity interest of Hunan Qindao Cultural Spread Ltd. ("Qindao") for a total consideration of $4,441, of which $3,001 had been paid as of December 31, 2016. The investment was classified as available-for-sale security as the Group determined that the preferred shares were debt securities due to the redemption option available to the investor and measured the investment subsequently at fair value. No unrealized holding gains of $nil was reported in other comprehensive income for the year ended December 31, 2016.

[5] On January 9, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Jingwei Chuangteng (Hangzhou) L.P. ("Jingwei"). According to the partnership agreement, the Group committed to subscribe 4.9% partnership interest in Jingwei for $4,744. Due to Jingwei's further rounds of financing, the Group's partnership interest was diluted to 3.1% and 2.4% as of December 31, 2015 and 2016, respectively. Of the committed subscription amount, $3,586 had been paid as of December 31, 2016. The Group recognized its share of partnership profit in Jingwei of $366 and $633 during the year ended December 31, 2015 and 2016, respectively.

[6] On February 13, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Beijing Autobot Venture Capital L.P. ("Autobot"). According to the partnership agreement, the Group committed to subscribe 31.9% partnership interest in Autobot for $4,823. Autobot had further rounds of financing, of which the Group subscribed for $1,529. Due to Autobot's further round of financing, the Group's partnership interest was diluted to 29.7% and 26.7% as of December 31, 2015 and 2016, respectively. The committed subscription and further round of financing subscription amount, $6,352 had been paid for the year ended December 31, 2016. The Group recognized its share of partnership profit in Autobot of $274 and $771 during the year ended December 31, 2015 and 2016, respectively.

[7] On August 18, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Hangzhou Aqua Ventures Investment Management L.P. ("Aqua"). According to the partnership agreement, the Group committed to subscribe 42.7% partnership interest for $7,930. The committed subscription amount had been fully paid as of December 31, 2016. The Group recognized its share of partnership loss and profit in Aqua of $89 and $2,134 during the years ended December 31, 2015 and 2016, respectively.

[8] Others represents other equity method investments with individual carrying amount less than $1,000 as of December 31, 2015 and 2016, respectively. The Group performed an impairment analysis for these investments and recorded impairment loss of $nil, $nil and $186 during the years ended December 31, 2014, 2015 and 2016, respectively.

| Long Term Investments - Summary of Equity and Cost Method Investments (Parenthetical) (Detail) - USD ($) | 12 Months Ended | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Nov. 17, 2016 | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 | Jun. 08, 2016 | Jan. 21, 2016 | Aug. 18, 2015 | Feb. 13, 2015 | Jan. 09, 2015 |
| **Investment [Line Items]** | | | | | | | | | |
| Share of income (loss) on equity method investments | | $ 3,471,000 | $ 370,000 | | | | | | |
| Impairment loss on long-term investments | | $ 5,765,000 | | | | | | | |
| **Maximum [Member]** | | | | | | | | | |
| **Investment [Line Items]** | | | | | | | | | |
| Percentage of ownership | | 50.00% | | | | | | | |
| **Zya, Inc. [Member]** | | | | | | | | | |
| **Investment [Line Items]** | | | | | | | | | |
| Total consideration paid accounted using cost method | | $ 1,005,000 | | | | | | | |
| Cost method investments ownership percentage | | 15.60% | | | | | | | |
| **Other Cost Method Investment [Member]** | | | | | | | | | |
| **Investment [Line Items]** | | | | | | | | | |
| Impairment loss on long-term investments | | $ 965,000 | $ 0 | $ 0 | | | | | |
| **Other Cost Method Investment [Member] | Maximum [Member]** | | | | | | | | | |
| **Investment [Line Items]** | | | | | | | | | |
| Cost method investments ownership percentage | | 20.00% | 20.00% | | | | | | |
| **Xish International Limited** | | | | | | | | | |
| **Investment [Line Items]** | | | | | | | | | |
| Percentage of shares acquired recorded as available for sale debt security | | | | | | 17.30% | | | |
| Share purchase agreement, consideration paid | | $ 9,000,000 | | | | | | | |
| Impairment loss on long-term investments | | 4,614,000 | | | | | | | |
| **Jingwei Chuangteng (Hangzhou) L.P. [Member]** | | | | | | | | | |
| **Investment [Line Items]** | | | | | | | | | |
| Equity method investments | | $ 4,191,000 [1] | $ 3,836,000 [1] | | | | | | $ 4,744,000 |
| Percentage of ownership | | 2.40% | 3.10% | | | | | | 4.90% |
| Share of income (loss) on equity method investments | | $ 633,000 | $ 366,000 | | | | | | |
| Payment of equity method investment | | 3,586,000 | | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| **Beijing Autobot Venture Capital L.P. [Member]** | | | | | |
| **Investment [Line Items]** | | | | | |
| Equity method investments | | $6,736,000 [2] | 4,898,000 [2] | | $4,823,000 |
| Equity method investments, further financing | | | $1,529,000 | | |
| Percentage of ownership | | 26.70% | 29.70% | | 31.90% |
| Share of income (loss) on equity method investments | | $771,000 | $274,000 | | |
| Payment of equity method investment | | 6,352,000 | | | |
| **Hangzhou Aqua Ventures Investment Management L.P. [Member]** | | | | | |
| **Investment [Line Items]** | | | | | |
| Equity method investments | | 9,187,000 [3] | 7,632,000 [3] | | $7,930,000 |
| Percentage of ownership | | | | | 42.70% |
| Share of income (loss) on equity method investments | | 2,134,000 | (89,000) | | |
| **Hunan Qindao Cultural Spread Ltd. [Member]** | | | | | |
| **Investment [Line Items]** | | | | | |
| Equity method investments [4] | | 2,016,000 | | | |
| Percentage of ownership | 10.40% | | | | |
| Share purchase agreement, total consideration | $2,429,000 | | | | |
| Payment of equity method investment | | 2,007,000 | | | |
| Percentage of shares acquired recorded as available for sale debt security | | | | 16.00% | |
| Share purchase agreement acquired total consideration | | | | $4,441,000 | |
| Share purchase agreement, consideration paid | | 3,001,000 | | | |
| Unrealized holding gains | | 0 | | | |
| **Other Equity Method Investments [Member]** | | | | | |
| **Investment [Line Items]** | | | | | |
| Equity method investments [5] | | 702,000 | 1,060,000 | | |
| Impairment loss on long-term investments | | 186,000 | 0 | $0 | |
| **Other Equity Method Investments [Member] \| Maximum [Member]** | | | | | |
| **Investment [Line Items]** | | | | | |
| Equity method investments | | $1,000,000 | $1,000,000 | | |

[1] On January 9, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Jingwei Chuangteng (Hangzhou) L.P. ("Jingwei"). According to the partnership agreement, the Group committed to subscribe 4.9% partnership interest in Jingwei for $4,744. Due to Jingwei's further rounds of financing, the Group's partnership interest was diluted to 3.1% and 2.4% as of December 31, 2015 and 2016, respectively. Of the committed subscription amount, $3,586 had been paid as of December 31, 2016. The Group recognized its share of partnership profit in Jingwei of $366 and $633 during the year ended December 31, 2015 and 2016, respectively.

[2] On February 13, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Beijing Autobot Venture Capital L.P. ("Autobot"). According to the partnership agreement, the Group committed to subscribe 31.9% partnership interest in Autobot for $4,823. Autobot had further rounds of financing, of which the Group subscribed for $1,529. Due to Autobot's further round of financing, the Group's partnership interest was diluted to 29.7% and 26.7% as of December 31, 2015 and 2016, respectively. The committed subscription and further round of financing subscription amount, $6,352 had been paid for the year ended December 31, 2016. The Group recognized its share of partnership profit in Autobot of $274 and $771 during the year ended December 31, 2015 and 2016, respectively.

[3] On August 18, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Hangzhou Aqua Ventures Investment Management L.P. ("Aqua"). According to the partnership agreement, the Group committed to subscribe 42.7% partnership interest for $7,930. The committed subscription amount had been fully paid as of December 31, 2016. The Group recognized its share of partnership loss and profit in Aqua of $89 and $2,134 during the years ended December 31, 2015 and 2016, respectively.

[4] On June 8, 2016, the Group entered into a share purchase agreement to acquire 16.0% equity interest of Hunan Qindao Cultural Spread Ltd. ("Qindao") for a total consideration of $4,441, of which $3,001 had been paid as of December 31, 2016. The investment was classified as available-for-sale security as the Group determined that the preferred shares were debt securities due to the redemption option available to the investor and measured the investment subsequently at fair value. No unrealized holding gains of $nil was reported in other comprehensive income for the year ended December 31, 2016.

[5] Others represents other equity method investments with individual carrying amount less than $1,000 as of December 31, 2015 and 2016, respectively. The Group performed an impairment analysis for these investments and recorded impairment loss of $nil, $nil and $186 during the years ended December 31, 2014, 2015 and 2016, respectively.

| Property and Equipment, Net - Schedule of Property and Equipment, Net (Detail) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Property, Plant and Equipment [Line Items]** | | |
| Less: accumulated depreciation | $ (18,844) | $ (10,440) |
| Exchange difference | 1,812 | 501 |
| Total | 13,932 | 16,259 |
| Computer Equipment [Member] | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Property and equipment, gross | 23,763 | 20,177 |
| Office Equipment [Member] | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Property and equipment, gross | 4,370 | 3,073 |
| Vehicles [Member] | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Property and equipment, gross | 31 | 34 |
| Leasehold Improvement [Member] | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Property and equipment, gross | $ 2,800 | $ 2,914 |

| Property and Equipment, Net - Additional information (Detail) - USD ($) $ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Property, Plant and Equipment [Abstract]** | | | |
| Depreciation expense | $ 8,404 | $ 6,646 | $ 2,805 |

| Accrued Expenses and Other Current Liabilities - Schedule of Accrued Expenses and Other Current Liabilities (Detail) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Payables and Accruals [Abstract]** | | |
| Accrued payroll and welfare | $ 18,982 | $ 7,406 |
| Payable for advertisement | 9,871 | 2,718 |
| Other tax payables | 4,694 | 1,517 |
| VAT payable | 1,919 | 550 |
| Accrued professional services fee | 1,438 | 1,506 |
| Payable to employees for exercise of share options | | 11,297 |
| Others | 3,061 | 1,700 |
| Total | $ 39,965 | $ 26,694 |

| Fair Value - Schedule of Assets Measured at Fair Value on Recurring Basis (Detail) $ in Thousands | Dec. 31, 2016 USD ($) |
|---|---|
| **Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]** | |
| Available-for-sale investments | $ 7,266 |
| Fair Value, Measurements, Recurring [Member] | |
| **Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]** | |
| Cash and cash equivalents | 257,564 |
| Available-for-sale investments | 7,266 |
| Total | 264,830 |
| Fair Value, Measurements, Recurring [Member] \| Quoted Prices in Active Market for Identical Assets (Level 1) [Member] | |
| **Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]** | |
| Cash and cash equivalents | 257,564 |
| Total | 257,564 |
| Fair Value, Measurements, Recurring [Member] \| Significant Unobservable Inputs (Level 3) [Member] | |
| **Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]** | |
| Available-for-sale investments | 7,266 |
| Total | $ 7,266 |

| Fair Value - Schedule of Reconciliation of Fair Value Measurement of Available-for-Sale Investments Using Significant Unobservable Inputs on a Recurring Basis (Detail) $ in Thousands | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 USD ($) |
| **Fair Value Disclosures [Abstract]** | |
| Purchase | $ 12,001 |
| Other-than-temporary loss recognized | (4,614) |
| Foreign exchange difference | (121) |
| Ending balance | $ 7,266 |

| **Fair Value - Additional Information (Detail) - USD ($) $ in Thousands** | **12 Months Ended** | |
| --- | --- | --- |
| | **Dec. 31, 2016** | **Dec. 31, 2015** |
| Significant Unobservable Inputs (Level 3) [Member] | | |
| **Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]** | | |
| Impairment loss on investments | $ 1,151 | $ 0 |

| Income Taxes - Additional Information (Detail) - USD ($) | 1 Months Ended | | 12 Months Ended | | |
|---|---|---|---|---|---|
| | Dec. 31, 2016 | Aug. 31, 2014 | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Income Tax Contingency [Line Items]** | | | | | |
| Income tax expense | | | $ 5,136,000 | $ 92,000 | $ 0 |
| Significant unrecognized tax benefit | $ 0 | | 0 | 0 | 0 |
| Interest related to penalties | | | 0 | 0 | 0 |
| Significant impact on the unrecognized tax benefits for next twelve months | 0 | | $ 0 | $ 0 | $ 0 |
| Earliest Tax Year [Member] | | | | | |
| **Income Tax Contingency [Line Items]** | | | | | |
| Tax years subject to tax audits | | | 2014 | | |
| Latest Tax Year [Member] | | | | | |
| **Income Tax Contingency [Line Items]** | | | | | |
| Tax years subject to tax audits | | | 2016 | | |
| Momo US [Member] | | | | | |
| **Income Tax Contingency [Line Items]** | | | | | |
| Tax loss carry forward | 7,992,000 | | $ 7,992,000 | | |
| Tax loss carry forward period | | | 20 years | | |
| Momo HK [Member] | | | | | |
| **Income Tax Contingency [Line Items]** | | | | | |
| Tax loss carry forward | 178,000 | | $ 178,000 | | |
| Beijing Momo IT, Beijing Momo and Chengdu Momo [Member] | | | | | |
| **Income Tax Contingency [Line Items]** | | | | | |
| Tax loss carry forward | $ 105,000 | | $ 105,000 | | |
| Beijing Momo IT, Beijing Momo and Chengdu Momo [Member] \| Earliest Tax Year [Member] | | | | | |
| **Income Tax Contingency [Line Items]** | | | | | |
| Tax loss carry forward, expiration date | | | Dec. 31, 2020 | | |
| Beijing Momo IT, Beijing Momo and Chengdu Momo [Member] \| Latest Tax Year [Member] | | | | | |
| **Income Tax Contingency [Line Items]** | | | | | |
| Tax loss carry forward, expiration date | | | Dec. 31, 2021 | | |
| United States [Member] \| Momo US [Member] | | | | | |
| **Income Tax Contingency [Line Items]** | | | | | |
| Taxable income | | | $ 0 | | |
| Income tax expense | | | $ 0 | | |
| Hong Kong [Member] \| Beneficial Owner [Member] \| Minimum [Member] | | | | | |
| **Income Tax Contingency [Line Items]** | | | | | |
| Equity interest in a PRC-resident enterprise | 25.00% | | 25.00% | | |
| Hong Kong [Member] \| Momo HK [Member] | | | | | |

**Income Tax Contingency [Line Items]**

| | | | | |
|---|---|---|---|---|
| Profit tax rate | | 16.50% | | |
| PRC [Member] | | | | |
| **Income Tax Contingency [Line Items]** | | | | |
| Income tax expense | $ 0 | | | |
| Withholding income tax rate for dividends distributed by the PRC subsidiaries | | 10.00% | | |
| PRC statutory tax rate | | 25.00% | 25.00% | 25.00% |
| Dividend declared | $ 0 | $ 0 | | |
| PRC [Member] \| Chengdu Momo Technology Company Limited Investment [Member] | | | | |
| **Income Tax Contingency [Line Items]** | | | | |
| Percentage of reduced tax rate | | 15.00% | | |
| PRC [Member] \| Beneficial Owner [Member] | | | | |
| **Income Tax Contingency [Line Items]** | | | | |
| Withholding income tax rate for dividends distributed by the PRC subsidiaries | | 5.00% | | |
| PRC [Member] \| Other Entities [Member] | | | | |
| **Income Tax Contingency [Line Items]** | | | | |
| Effective income tax rate | | 25.00% | | |
| PRC [Member] \| Beijing Momo IT [Member] \| 2015 - 2016 [Member] | | | | |
| **Income Tax Contingency [Line Items]** | | | | |
| Tax exemption period | 2 years | | | |
| PRC [Member] \| Beijing Momo IT [Member] \| 2017 - 2019 [Member] | | | | |
| **Income Tax Contingency [Line Items]** | | | | |
| Reduced tax rate period | 3 years | | | |
| Percentage of reduced tax rate | 12.50% | | | |

| Income Taxes - Components of Group's Deferred Tax Assets and Liabilities (Detail) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Current deferred tax assets:** | | |
| Impairment of loss on long term investments | $ 72 | |
| Less: valuation allowance | 0 | $ 0 |
| Current deferred tax assets, net | 72 | |
| **Non-current deferred tax assets:** | | |
| Advertising expense | | 2,651 |
| Net operating tax losses carry-forward | 2,852 | 2,881 |
| Impairment of on long term investments | 208 | |
| Less: valuation allowance | (2,852) | $ (5,532) |
| Non-current deferred tax assets, net | $ 208 | |

| Income Taxes - Schedule of Reconciliation between Income Taxes Expense (Benefit) to (Loss) Income before Income Taxes and Actual Provision for Income Taxes (Detail) - USD ($) | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Income Taxes And Tax Related [Line Items]** | | | |
| Net (loss) income before provision for income tax | $ 146,915,000 | $ 13,419,000 | $ (25,415,000) |
| Income tax (benefit) expense at statutory tax rate | 36,729,000 | 3,355,000 | (6,354,000) |
| Permanent differences | (75,000) | (144,000) | 99,000 |
| Change in valuation allowance | (2,680,000) | (2,315,000) | 4,560,000 |
| Effect of income tax rate difference in other jurisdictions | 7,941,000 | 2,754,000 | 1,695,000 |
| Effect of tax holidays and preferential tax rates | (36,779,000) | (3,558,000) | |
| Provision for income tax | $ 5,136,000 | $ 92,000 | $ 0 |
| PRC [Member] | | | |
| **Income Taxes And Tax Related [Line Items]** | | | |
| PRC statutory tax rate | 25.00% | 25.00% | 25.00% |
| Provision for income tax | $ 0 | | |

Note: In the header the first value column is labeled "Dec. 31, 2016" and there appear to be two "Dec. 31, 2016" labels in the source; the data columns correspond to Dec. 31, 2016, Dec. 31, 2015, and Dec. 31, 2014.

| Ordinary Shares - Additional Information (Detail) $ / shares in Units, $ in Thousands | Dec. 16, 2014 shares | Apr. 22, 2014 USD ($) shares | Sep. 12, 2012 shares | Dec. 31, 2014 shares | 1 Months Ended May 31, 2014 USD ($) | 12 Months Ended Dec. 31, 2016 USD ($) $ / shares shares | Dec. 31, 2015 USD ($) $ / shares shares | Dec. 31, 2014 shares | Nov. 28, 2014 shares | Dec. 31, 2013 shares |
|---|---|---|---|---|---|---|---|---|---|---|
| **Class of Stock [Line Items]** | | | | | | | | | | |
| Ordinary shares, shares authorized | | 799,281,189 | 371,684,330 | | | | | | 1,000,000,000 | |
| Ordinary shares, shares issued | | | | | | | | | | |
| Ordinary shares, par value \| $ / shares | | | | | | | | | | |
| Shares authorized | | 1,000,000,000 | | | | | | | | |
| Convertible redeemable preferred shares, shares authorized | | 200,718,811 | | | | | | | | |
| Stock split ratio for ordinary shares | | | 10 | | | | | | | |
| Amounts due to related parties, current \| $ | | | | | | $ 8,117 | $ 6,532 | | | |
| Issuance of ordinary shares in connection with exercise of options and vesting of share units | | | | | | 5,197,032 | 5,995,293 | | | |
| **Class A Common Stock [Member]** | | | | | | | | | | |
| **Class of Stock [Line Items]** | | | | | | | | | | |
| Ordinary shares, shares authorized | | | | | | 800,000,000 | 800,000,000 | | 800,000,000 | |
| Ordinary shares, shares issued | | | | | | 292,062,065 | 286,865,033 | | | |
| Ordinary shares, par value \| $ / shares | | | | | | $ 0.0001 | $ 0.0001 | | | |
| Issuance of ordinary shares in connection with exercise of options and vesting of share units | 45,688,888 | | | 45,688,888 | | | | | | |
| Convertible preferred stock shares converted to ordinary shares | 200,718,811 | | | | | | | | | |
| Ordinary shares, shares outstanding | | | | | | 292,062,065 | 286,865,033 | | | |
| **Class A Common Stock [Member] \| IPO [Member]** | | | | | | | | | | |
| **Class of Stock [Line Items]** | | | | | | | | | | |
| Issuance of ordinary shares in connection with exercise of options and vesting of share units | 36,800,000 | | | 36,800,000 | | | | | | |
| **Class A Common Stock [Member] \| Private Placement [Member]** | | | | | | | | | | |
| **Class of Stock [Line Items]** | | | | | | | | | | |
| Issuance of ordinary shares in connection with exercise of options and vesting of share units | 8,888,888 | | | 8,888,888 | | | | | | |
| **Class B Common Stock [Member]** | | | | | | | | | | |
| **Class of Stock [Line Items]** | | | | | | | | | | |
| Ordinary shares, shares authorized | | | | | | 100,000,000 | 100,000,000 | | 100,000,000 | |
| Ordinary shares, shares issued | | | | | | 96,886,370 | 96,886,370 | | | |
| Ordinary shares, par value \| $ / shares | | | | | | $ 0.0001 | $ 0.0001 | | | |
| Ordinary shares, shares outstanding | | | | | | 96,886,370 | 96,886,370 | | | |
| **Undesignated Ordinary Shares [Member]** | | | | | | | | | | |

**Class of Stock [Line Items]**

| | | | | | |
|---|---|---|---|---|---|
| Ordinary shares, shares authorized | | | | 100,000,000 | |

Common Stock [Member]

**Class of Stock [Line Items]**

| | | | | | |
|---|---|---|---|---|---|
| Number of shares donated to the company | 15,651,589 | | | | |
| Amounts due to related parties, current \| $ | | $ 5,775 | | | |
| Accrued expenses and other current liabilities \| $ | | $ 675 | | | |
| Issuance of ordinary shares in connection with exercise of options and vesting of share units | | 5,197,032 | 5,995,293 | 45,688,888 | |
| Ordinary shares, shares outstanding | 377,756,110 | 388,948,435 | 383,751,403 | 377,756,110 | 147,000,00 |

Dividend Declared [Member] | Common Stock [Member]

**Class of Stock [Line Items]**

| | | |
|---|---|---|
| Dividend amount \| $ | $ 64,494 | |

Dividend Paid [Member] | Common Stock [Member]

**Class of Stock [Line Items]**

| | | |
|---|---|---|
| Dividend amount \| $ | | $ 58,044 |
| Dividend payable date | | 2014-05 |

| Convertible Redeemable Participating Preferred Shares - Additional Information (Detail) | Dec. 16, 2014 shares | Apr. 22, 2014 USD ($) shares | Oct. 08, 2013 USD ($) shares | Jul. 31, 2013 USD ($) $ / shares shares | Jul. 31, 2012 USD ($) $ / shares shares | Jul. 13, 2012 USD ($) shares | Jun. 11, 2012 USD ($) shares | Apr. 12, 2012 USD ($) shares | 1 Months Ended Dec. 31, 2014 shares | 12 Dec. 31, 2016 USD ($) | Dec. 31, 2015 USD ($) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Temporary Equity [Line Items]** | | | | | | | | | | | |
| Deem dividend | | | | | | | | | | | $ |
| Initial conversion ratio | | | | | | | | | 1 | | |
| Qualified IPO, minimum proceeds | | | | | | | | | $ 50,000,000 | | |
| Series A-1 and Series A-2 Convertible Redeemable Participating Preferred Shares [Member] | | | | | | | | | | | |
| **Temporary Equity [Line Items]** | | | | | | | | | | | |
| Deem dividend | | | | | | | | | | | $ |
| Percentage of distributions shall be made to preferred shareholders in event of liquidation | | | | | | | | | 150.00% | 1 | |
| Percentage of redemption price on initial purchase price | | | | | | | | | 150.00% | | |
| Series A-3 Convertible Redeemable Participating Preferred Shares [Member] | | | | | | | | | | | |
| **Temporary Equity [Line Items]** | | | | | | | | | | | |
| Deem dividend | | | | | | | | | | | $ |
| Percentage of distributions shall be made to preferred shareholders in event of liquidation | | | | | | | | | 100.00% | 1 | |
| Percentage of redemption price on initial purchase price | | | | | | | | | 125.00% | | |
| Series A-3 Convertible Redeemable Participating Preferred Shares [Member] \| Dividend Declared [Member] | | | | | | | | | | | |
| **Temporary Equity [Line Items]** | | | | | | | | | | | |
| Preferred shares, dividend rate | | | | | | | | | | | 8 |
| Convertible participating redeemable preferred shares, subscription price \| $ / shares | | | | | | | | | | | $ |
| Series B Convertible Redeemable Participating Preferred Shares [Member] | | | | | | | | | | | |
| **Temporary Equity [Line Items]** | | | | | | | | | | | |
| Convertible redeemable participating preferred stock, issued per conversion \| shares | | | | 10,079,373 | 4,894,500 | | | | | | |
| Deem dividend | | | | | | | | | | | $ |
| Percentage of distributions shall be made to preferred shareholders in event of liquidation | | | | | | | | | 100.00% | 1 | |

| | | | |
|---|---|---|---|
| Percentage of redemption price on initial purchase price | | | 125.00% |
| **Series B Convertible Redeemable Participating Preferred Shares [Member] | Dividend Declared [Member]** | | | |
| **Temporary Equity [Line Items]** | | | |
| Preferred shares, dividend rate | | | 8 |
| Convertible participating redeemable preferred shares, subscription price | $ / shares | | | | $ |
| **Series A-1 Convertible Redeemable Participating Preferred Shares [Member]** | | | |
| **Temporary Equity [Line Items]** | | | |
| Convertible preferred stock shares converted | shares | | 10,079,373 4,894,500 | |
| Deem dividend | $ 30,293,000 | | |
| Repurchase of preferred shares | 7,298,857 | | |
| Repurchase of preferred shares, value | $ 30,750,000 | | |
| **Series A-1 Convertible Redeemable Participating Preferred Shares [Member] | Dividend Declared [Member]** | | | |
| **Temporary Equity [Line Items]** | | | |
| Preferred shares, dividend rate | | | 8 |
| Convertible participating redeemable preferred shares, subscription price | $ / shares | | | | $ |
| **Series B Preferred Stock Redesignated From Series A-1 Preferred Stock [Member]** | | | |
| **Temporary Equity [Line Items]** | | | |
| Deem dividend | | | |
| **Series C Convertible Redeemable Participating Preferred Shares [Member]** | | | |
| **Temporary Equity [Line Items]** | | | |
| Deem dividend | | | $ 5 |
| Percentage of distributions shall be made to preferred shareholders in event of liquidation | | 130.00% | 1 |
| Percentage of redemption price on initial purchase price | | | 125.00% |
| **Series C Convertible Redeemable Participating Preferred Shares [Member] | Dividend Declared [Member]** | | | |
| **Temporary Equity [Line Items]** | | | |
| Preferred shares, dividend rate | | | 8 |
| Convertible participating redeemable preferred shares, subscription price | $ / shares | | | | $ |
| **Series D Convertible Redeemable Participating** | | | |

Preferred Shares [Member]

**Temporary Equity [Line Items]**

| | |
|---|---|
| Deem dividend | $ 1 |
| Percentage of distributions shall be made to preferred shareholders in event of liquidation | 130.00% 1 |
| Percentage of redemption price on initial purchase price | 125.00% |

Series D Convertible Redeemable Participating Preferred Shares [Member] | Dividend Declared [Member]

**Temporary Equity [Line Items]**

| | |
|---|---|
| Preferred shares, dividend rate | 8 |
| Convertible participating redeemable preferred shares, subscription price | $ / shares | $ |

Series A-2 Convertible Redeemable Participating Preferred Shares [Member] | Dividend Declared [Member]

**Temporary Equity [Line Items]**

| | |
|---|---|
| Preferred shares, dividend rate | 8 |
| Convertible participating redeemable preferred shares, subscription price | $ / shares | $ |

Preferred Stock Other Than Series B Preferred Stock Redesignated From Series A-1 Preferred Stock [Member]

**Temporary Equity [Line Items]**

| | | |
|---|---|---|
| Deem dividend | $ 0 $ 0 | $ 5 |

Investor [Member] | Series B Convertible Redeemable Participating Preferred Shares [Member]

**Temporary Equity [Line Items]**

| | | |
|---|---|---|
| Convertible redeemable participating preferred stock, shares issued | shares | 10,079,373 | 4,894,500 |
| Aggregate proceeds from issuance of convertible redeemable participating preferred shares | $ 4,280,000 | $ 1,400,000 |
| Convertible redeemable participating preferred stock, issued price per share | $ / shares | $ 0.425 | $ 0.286 |

Private Placement [Member] | Series A-1 and Series A-2 Convertible Redeemable Participating Preferred Shares [Member]

**Temporary Equity [Line Items]**

| | |
|---|---|
| Convertible redeemable participating preferred stock, shares issued | shares | 53,454,550 |
| Aggregate proceeds from | |

issuance of convertible redeemable participating preferred shares

$ 2,100,000

Private Placement [Member] | Series A-3 Convertible Redeemable Participating Preferred Shares [Member]

**Temporary Equity [Line Items]**

Convertible redeemable participating preferred stock, shares issued | shares

19,797,980

Aggregate proceeds from issuance of convertible redeemable participating preferred shares

$ 4,000,000

Private Placement [Member] | Series B Convertible Redeemable Participating Preferred Shares [Member]

**Temporary Equity [Line Items]**

Convertible redeemable participating preferred stock, shares issued | shares

55,063,140

Aggregate proceeds from issuance of convertible redeemable participating preferred shares

$ 18,006,000

Private Placement [Member] | Series C Convertible Redeemable Participating Preferred Shares [Member]

**Temporary Equity [Line Items]**

Convertible redeemable participating preferred stock, shares issued | shares

36,008,642

Aggregate proceeds from issuance of convertible redeemable participating preferred shares

$ 45,000,000

Private Placement [Member] | Series D Convertible Redeemable Participating Preferred Shares [Member]

**Temporary Equity [Line Items]**

Convertible redeemable participating preferred stock, shares issued | shares

43,693,356

Aggregate proceeds from issuance of convertible redeemable participating preferred shares

$ 211,750,000

IPO [Member] | Class A Common Stock [Member]

**Temporary Equity [Line Items]**

Convertible preferred stock shares converted | shares

200,718,811                                    200,718,811

| Share-Based Compensation - Additional Information (Detail) - USD ($) | | | | | | | 1 Months Ended | | | 12 Months Ended | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Dec. 01, 2016 | May 17, 2016 | Jan. 03, 2015 | Dec. 11, 2014 | May 15, 2014 | Jul. 31, 2016 | May 31, 2015 | Nov. 30, 2014 | Apr. 30, 2012 | Dec. 31, 2016 | Dec. 31, 2015 | De 2 |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | | | | | | | | | | |
| Number of options, Forfeited/Cancelled | | | | | | | | | | 1,907,630 | | |
| Share-based compensation | | | | | | | | | | $ 31,706,000 | $ 17,382,000 | $ 6,6 |
| Weighted average remaining contractual term options outstanding | | | | | | | | | | 7 years 7 months 17 days | 8 years 1 month 21 days | |
| Number of options, granted | | | | | | | | | | 7,577,122 | | |
| Ordinary shares, shares issued | | | | | | | | | 147,000,000 | | | |
| Ordinary shares, par value | | | | | | | | | | | | |
| Class A Common Stock [Member] | | | | | | | | | | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | | | | | | | | | | |
| Ordinary shares, shares issued | | | | | | | | | | 292,062,065 | 286,865,033 | |
| Ordinary shares, par value | | | | | | | | | | $ 0.0001 | $ 0.0001 | |
| Non-Vested Restricted Shares [Member] | | | | | | | | | | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | | | | | | | | | | |
| Share-based compensation | | | | | | | | | | $ 52,000 | $ 180,000 | $ 33: |
| Unrecognized compensation expense | | | | | | | | | | $ 0 | | |
| Ordinary shares, shares issued | | | | 131,348,411 | | | | | 147,000,000 | | | |
| Modification of vesting of shares, description | | | | | | | | | | The Company shall be entitled to repurchase 50% and 25% of such shares in the case that founders terminate their employments with the Company before April 17, 2015 and during the period from April 17, 2015 to April 17, 2016, respectively, at a price of US$0.0001 per share or the lowest price permitted under applicable laws. Therefore, the Company considered | | |

that 50% of the total restricted shares were vested immediately on the amendment date and 25% shall be vested annually on April 17 in the next two years ending April 17, 2016. Before the modification date, May 15, 2014, there were 131,348,411 ordinary shares, of which 45,937,500 were unvested restricted shares. As the result of modification, 19,736,705 vested ordinary shares were classified to unvested restricted shares on the modification date and the corresponding compensation costs for these unvested restricted shares were amortized over the remaining service period.

| | | | | |
|---|---|---|---|---|
| Unvested restricted shares | 45,937,500 | | 28,625,378 | 57,2: |
| Unvested restricted shares, modification | 19,736,705 | | | 19,7: |
| Ordinary shares, par value | $ 0.0001 | | | |
| Fair value of RSUs, per share | | | $ 0.01 | |
| Fair value of RSUs | | | $ 1,470,000 | |
| Total fair value of non-vested restricted shares vested | | | 286,000 | $ 286,000 | $ 9,0 |

Non-Vested Restricted Shares [Member] | Share-based Compensation Award, Tranche One [Member]

**Share-based Compensation Arrangement by Share-based Payment Award [Line Items]**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Share based payment vesting percentage | | | 50.00% | | 25.00% | | | |
| Non-Vested Restricted Shares [Member] \| Share-based Compensation Award, Tranche Two [Member] | | | | | | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | | | | | | |
| Options, vesting period | | | 2 years | | 36 months | | | |
| Share based payment vesting percentage | | | 25.00% | | 75.00% | | | |
| RSUs [Member] | | | | | | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | | | | | | |
| Share-based compensation | | | | | | $ 343,000 | $ 322,000 | $ 18, |
| Unrecognized compensation expense | $ 956,000 | | | | | | | |
| Shares recognition period | 2 years 11 months 12 days | | | | | | | |
| Weighted average remaining contractual term options outstanding | 8 years 11 months 9 days | | | | | | | |
| Fair value of RSUs, per share | | | | | | $ 6.50 | $ 0.00 | $ 8.5 |
| Fair value of RSUs | $ 1,299,000 | $ 340,000 | | | | $ 325,000 | $ 340,000 | $ 0 |
| Intrinsic value of restricted share units exercised | | | | | | $ 511,000 | 301,000 | 0 |
| 2012 Plan [Member] | | | | | | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | | | | | | |
| Maximum aggregate number of shares issued | | | | | | 44,758,220 | | |
| Number of share options granted | | | | 0 | | | | |
| Options vested | | | | | | 15,313,350 | | |
| Options expected to vest | | | | | | 15,053,681 | | |
| Options expected to vest, weighted-average exercise price | | | | | | $ 0.0384 | | |
| Options expected to vest, Aggregate intrinsic value | | | | | | $ 137,765,000 | $ 154,465,000 | $ 133,? |
| Weighted average fair value per option at grant date, Granted | | | | | | $ 6.2405 | $ 5.9341 | $ 4.9 |
| Total intrinsic value of options exercised | | | | | | $ 45,581,000 | $ 45,885,000 | $ 0 |
| Total fair value of options vested | | | | | | $ 27,171,000 | 13,680,000 | 1,39? |
| Number of share options under accelerated vesting to permit immediate exercise | | | | 235,000 | | | | |
| Incremental cost for acceleration of vesting to permit immediate exercise | | | | | | 162,000 | | |
| 2012 Plan [Member] \| Employee and Executives Share Option [Member] | | | | | | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | | | | | | |
| Share-based compensation | | | | | | 16,026,000 | 5,848 | |
| 2012 Plan [Member] \| Non Employee Share Options | | | | | | | | |

[Member]

**Share-based Compensation Arrangement by Share-based Payment Award [Line Items]**

Share-based compensation | | 756,000 | 437,0

2014 Plan [Member]

**Share-based Compensation Arrangement by Share-based Payment Award [Line Items]**

Share based compensation arrangements expiration Period | | 10 years

Incremental cost for acceleration of vesting to permit immediate exercise | | $ 1,532,000

Number of options, Forfeited/Cancelled | 187,500

Unrecognized compensation expense | | $ 68,656,000

Shares recognition period | | 2 years 8 months 27 days

Weighted average remaining contractual term options outstanding | | 7 years 7 months 17 days

2014 Plan [Member] | Class A Common Stock [Member]

**Share-based Compensation Arrangement by Share-based Payment Award [Line Items]**

Maximum aggregate number of shares issued | 14,031,194

Increase in number of shares reserved for future issuances | | 1.50%

Number of shares reserved for future issuances, description | | Starting from 2017, the number of shares reserved for future issuances under the 2014 Plan will be increased by a number equal to 1.5% of the total number of outstanding shares on the last day of the immediately preceding calendar year, or such lesser number of Class A ordinary shares as determined by the Company's board of directors, on the first day of each calendar year during the term of the 2014

Plan.

| | | |
|---|---|---|
| 2014 Plan [Member] \| Maximum [Member] | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | |
| Options, vesting period | | 4 years |
| 2014 Plan [Member] \| Minimum [Member] | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | |
| Options, vesting period | | 2 years |
| 2014 Plan [Member] \| RSUs [Member] | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | |
| Options, vesting period | 4 years | |
| 2014 Plan [Member] \| RSUs [Member] \| Share-based Compensation Award, Tranche Three [Member] | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | |
| Options, vesting period | 6 months | |
| Share based payment vesting percentage | 50.00% | |
| 2014 Plan [Member] \| RSUs [Member] \| Independent Directors [Member] | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | |
| Number of share options granted | 200,000 | 40,001 |
| 2014 Plan [Member] \| Employee and Executives Share Option [Member] | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | |
| Share-based compensation | | $ 28,096,000 |
| 2014 Plan [Member] \| Non Employee Share Options [Member] | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | |
| Share-based compensation | | $ 3,103,000 |
| Momo BVI Share Incentive Plan [Member] | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | |
| Options vested | | 3,458,333 |
| Options expected to vest | | 4,224,375 |
| Options expected to vest, weighted-average exercise price | | $ 0.1089 |
| Options expected to vest, Aggregate intrinsic value | | $ 5,000    $ 18,000    $ 0 |
| Weighted average fair value per option at grant date, Granted | | $ 0.0000    $ 0.0544    $ 0.0 |

| | | | | |
|---|---|---|---|---|
| Total intrinsic value of options exercised | | | $ 0 | $ 0 | $ 0 |
| Total fair value of options vested | | | $ 185,000 | $ 0 | $ 0 |
| Number of options, Forfeited/Cancelled | | | 2,200,000 | | |
| Unrecognized compensation expense | | | $ 221,000 | | |
| Shares recognition period | | | 2 years 2 months 27 days | | |
| Weighted average remaining contractual term options outstanding | | | 8 years 2 months 9 days | 9 years 3 months 4 days | |
| Share incentive plan, term of plan | 10 years | | | | |

**Momo BVI Share Incentive Plan [Member] | Maximum [Member]**

**Share-based Compensation Arrangement by Share-based Payment Award [Line Items]**

| | | | | |
|---|---|---|---|---|
| Maximum aggregate number of shares issued | 30,000,000 | | | | |

**Momo BVI Share Incentive Plan [Member] | Employee and Executives Share Option [Member]**

**Share-based Compensation Arrangement by Share-based Payment Award [Line Items]**

| | | | | |
|---|---|---|---|---|
| Options, vesting period | | | | 4 years | |
| Share-based compensation | | | $ 112,000 | $ 98,000 | |
| Number of options, granted | | | | 10,550,000 | |
| Exercise price of share options granted, lower range | | | | $ 0.10 | |
| Exercise price of share options granted, upper range | | | | $ 0.11 | |

| Share-Based Compensation - Summary of Options Activity (Detail) - USD ($) $ / shares in Units, $ in Thousands | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | |
| Number of options, Outstanding beginning balance | 31,084,006 | |
| Number of options, granted | 7,577,122 | |
| Number of options, Exercised | (5,147,032) | |
| Number of options, Forfeited/cancel | (1,907,630) | |
| Number of options, Outstanding ending balance | 31,606,466 | 31,084,006 |
| Number of options, Exercisable | 15,313,350 | |
| Weighted average exercise price per option, Outstanding beginning balance | $ 0.0767 | |
| Weighted average exercise price per option, Granted | 0.0002 | |
| Weighted average exercise price per option, Exercised | 0.0618 | |
| Weighted average exercise price per option, Forfeited | 0.0226 | |
| Weighted average exercise price per option, Outstanding ending balance | 0.0641 | $ 0.0767 |
| Weighted average exercise price per option, Exercisable | $ 0.0924 | |
| Weighted average remaining contractual life, Outstanding beginning balance | 7 years 7 months 17 days | 8 years 1 month 21 days |
| Weighted average remaining contractual term options outstanding | 7 years 7 months 17 days | 8 years 1 month 21 days |
| Weighted average remaining contractual life, Exercisable | 6 years 9 months 4 days | |
| Aggregated intrinsic value, Outstanding beginning balance | $ 246,597 | |
| Aggregated intrinsic value, Outstanding ending balance | 288,439 | $ 246,597 |
| Aggregated intrinsic value, Exercisable | $ 139,314 | |
| Momo BVI Share Incentive Plan [Member] | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | |
| Number of options, Outstanding beginning balance | 10,200,000 | |
| Number of options, Forfeited/cancel | (2,200,000) | |
| Number of options, Outstanding ending balance | 8,000,000 | 10,200,000 |
| Number of options, Exercisable | 3,458,333 | |
| Weighted average exercise price per option, Outstanding beginning balance | $ 0.1080 | |
| Weighted average exercise price per option, Forfeited | 0.1055 | |
| Weighted average exercise price per option, Outstanding ending balance | 0.1088 | $ 0.1080 |
| Weighted average exercise price per option, Exercisable | $ 0.1086 | |
| Weighted average remaining contractual life, Outstanding beginning balance | 8 years 2 months 9 days | 9 years 3 months 4 days |
| Weighted average remaining contractual term options outstanding | 8 years 2 months 9 days | 9 years 3 months 4 days |
| Weighted average remaining contractual life, Exercisable | 8 years 1 month 17 days | |
| Aggregated intrinsic value, Outstanding beginning balance | $ 20 | |
| Aggregated intrinsic value, Outstanding ending balance | 10 | $ 20 |

Aggregated intrinsic value, Exercisable                                    $ 5

| Share-Based Compensation - Schedule of Assumptions Used to Estimate Fair Value of Stock Options Granted (Detail) - $ / shares | 12 Months Ended | | | | |
|---|---|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 | Dec. 31, 2012 |
| 2012 Plan [Member] | | | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | | | |
| Risk-free interest rate of return | | | | 3.09% | 2.31% |
| Risk-free interest rate of return, minimum | | | 2.44% | | |
| Risk-free interest rate of return, maximum | | | 3.25% | | |
| Contractual term | | | 10 years | 10 years | 10 years |
| Volatility | | | | 54.40% | 61.70% |
| Volatility, minimum | | | 53.70% | | |
| Volatility, maximum | | | 57.50% | | |
| Dividend yield | | | 0.00% | 0.00% | 0.00% |
| Exercise price | | | | $ 0.1404 | $ 0.0327 |
| 2014 Plan [Member] | | | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | | | |
| Risk-free interest rate of return, minimum | 1.75% | 2.15% | | | |
| Risk-free interest rate of return, maximum | 2.70% | 2.19% | | | |
| Contractual term | 10 years | 10 years | | | |
| Volatility, minimum | 52.50% | 55.30% | | | |
| Volatility, maximum | 55.30% | 55.70% | | | |
| Dividend yield | 0.00% | 0.00% | | | |
| Exercise price | $ 0.0002 | $ 0.0002 | | | |
| Momo BVI Share Incentive Plan [Member] | | | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | | | |
| Risk-free interest rate of return, minimum | | 1.55% | | | |
| Risk-free interest rate of return, maximum | | 1.82% | | | |
| Contractual term | | 10 years | | | |
| Volatility, minimum | | 55.30% | | | |
| Volatility, maximum | | 57.20% | | | |
| Dividend yield | | 0.00% | | | |
| Minimum [Member] | 2012 Plan [Member] | | | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | | | |
| Exercise price | | $ 0.0002 | | | |
| Minimum [Member] | Momo BVI Share Incentive Plan [Member] | | | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | | | |
| Exercise price | | $ 0.10 | | | |
| Maximum [Member] | 2012 Plan [Member] | | | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | | | |

Exercise price $ 0.1404

Maximum [Member] | Momo BVI Share Incentive Plan [Member]

**Share-based Compensation Arrangement by Share-based Payment Award [Line Items]**

Exercise price $ 0.11

| Share-Based Compensation - Summary of Non-Vested Restricted Share Activity (Detail) - Non-Vested Restricted Shares [Member] - shares | 12 Months Ended | | | |
|---|---|---|---|---|
| | May 15, 2014 | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | | |
| Number of shares, Outstanding beginning balance | | 28,625,378 | 57,250,756 | 58,187,500 |
| Number of shares, Granted | | 0 | 0 | 0 |
| Number of shares, Modification | 19,736,705 | | | 19,736,705 |
| Number of shares, Forfeited | | 0 | 0 | |
| Number of shares, Vested | | (28,625,378) | (28,625,378) | (20,673,449) |
| Number of shares, Outstanding ending balance | 45,937,500 | | 28,625,378 | 57,250,756 |

| Share-Based Compensation - Summary of Restricted Share Units Granted (Detail) - RSUs [Member] - shares | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | |
| Number of shares, Outstanding beginning balance | | 40,001 |
| Granted | 200,000 | |
| Forfeited | 0 | 0 |
| Vested | (50,000) | (40,001) |
| Number of shares, Outstanding ending balance | 150,000 | |

| Net Income (Loss) Per Share - Calculation of Net Loss Per Share (Detail) - USD ($) $ / shares in Units, $ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Numerator:** | | | |
| Net (loss) income attributable to Momo Inc. | $ 145,250 | $ 13,697 | $ (25,415) |
| Deemed dividend | | | (57,663) |
| Net (loss) income attributed to ordinary shareholders for computing net (loss) income per ordinary share-basic and diluted | $ 142,053 | $ 12,358 | $ (83,078) |
| **Denominator for computing net (loss) income per share-basic:** | | | |
| Weighted average ordinary shares outstanding used in computing net (loss) income per ordinary share-basic | 377,335,923 | 342,646,282 | 85,293,775 |
| **Denominator for computing net (loss) income per share-diluted:** | | | |
| Weighted average shares outstanding used in computing net (loss)income per ordinary share-diluted | 407,041,165 [1] | 401,396,548 [2] | 85,293,775 |
| **Net loss per ordinary share attributable to Momo Inc - basic** | | | |
| Net (loss) income per ordinary share attributable to Momo Inc. - basic | $ 0.38 | $ 0.04 | $ (0.97) |
| **Net loss per ordinary share attributable to Momo Inc - diluted** | | | |
| Net (loss) income per ordinary share attributable to Momo Inc.- diluted | $ 0.36 | $ 0.03 | $ (0.97) |
| **Non-Vested Restricted Shares [Member]** | | | |
| **Numerator:** | | | |
| Undistributed earnings | $ (3,197) | $ (1,339) | |
| **Denominator for computing net (loss) income per share-basic:** | | | |
| Weighted average ordinary shares outstanding used in computing net (loss) income per ordinary share-basic | 8,493,244 | 37,118,622 | 60,951,591 |
| **Net loss per ordinary share attributable to Momo Inc - basic** | | | |
| Net (loss) income per ordinary share attributable to Momo Inc. - basic | $ 0.38 | $ 0.04 | |
| **Series A-1 and Series A-2 Convertible Redeemable Participating Preferred Shares [Member]** | | | |
| **Numerator:** | | | |
| Deemed dividend | | | $ (30,910) |
| **Denominator for computing net (loss) income per share-basic:** | | | |
| Weighted average ordinary shares outstanding used in computing net (loss) income per ordinary share-basic | | | 32,176,676 |
| **Net loss per ordinary share attributable to Momo Inc - basic** | | | |
| Net (loss) income per ordinary share attributable to Momo Inc. - basic | | | $ 0.96 |
| **Series A-3 Convertible Redeemable Participating Preferred Shares [Member]** | | | |
| **Numerator:** | | | |
| Deemed dividend | | | $ (544) |
| **Denominator for computing net (loss) income per share-basic:** | | | |
| Weighted average ordinary shares outstanding used in computing net (loss) income per ordinary share-basic | | | 18,990,997 |
| **Net loss per ordinary share attributable to Momo Inc - basic** | | | |
| Net (loss) income per ordinary share attributable to Momo Inc. - basic | | | $ 0.03 |

Series B Convertible Redeemable Participating Preferred Shares [Member]

| | |
|---|---|
| **Numerator:** | |
| Deemed dividend | $ (3,116) |
| **Denominator for computing net (loss) income per share-basic:** | |
| Weighted average ordinary shares outstanding used in computing net (loss) income per ordinary share-basic | 67,182,243 |
| **Net loss per ordinary share attributable to Momo Inc - basic** | |
| Net (loss) income per ordinary share attributable to Momo Inc. - basic | $ 0.05 |

Series C Convertible Redeemable Participating Preferred Shares [Member]

| | |
|---|---|
| **Numerator:** | |
| Deemed dividend | $ (5,596) |
| **Denominator for computing net (loss) income per share-basic:** | |
| Weighted average ordinary shares outstanding used in computing net (loss) income per ordinary share-basic | 34,540,898 |
| **Net loss per ordinary share attributable to Momo Inc - basic** | |
| Net (loss) income per ordinary share attributable to Momo Inc. - basic | $ 0.16 |

Series D Convertible Redeemable Participating Preferred Shares [Member]

| | |
|---|---|
| **Numerator:** | |
| Deemed dividend | $ (17,497) |
| **Denominator for computing net (loss) income per share-basic:** | |
| Weighted average ordinary shares outstanding used in computing net (loss) income per ordinary share-basic | 28,348,231 |
| **Net loss per ordinary share attributable to Momo Inc - basic** | |
| Net (loss) income per ordinary share attributable to Momo Inc. - basic | $ 0.62 |

[1] For the year 2016, an incremental weighted average number of 7,155,060 nonvested restricted shares and an incremental weighted average number of 22,550,182 ordinary shares from the assumed exercise of share options and vesting of restricted share units using the treasury stock method were included

[2] For the year 2015, an incremental weighted average number of 35,759,066 nonvested restricted shares and an incremental weighted average number of 22,991,200 ordinary shares from the assumed exercise of share options and vesting of restricted share units using the treasury stock method were included.

| Net Income (Loss) Per Share - Summary of Potential Ordinary Shares Outstanding Excluded from Computation of Diluted Net Loss Per Ordinary Share (Detail) - shares | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Share Options [Member]** | | | |
| **Antidilutive Securities Excluded from Computation of Earnings Per Share [Line Items]** | | | |
| Potential ordinary shares outstanding excluded from the computation of diluted net loss per ordinary share | 152,500 | 904,489 | 21,831,082 |
| **RSUs [Member]** | | | |
| **Antidilutive Securities Excluded from Computation of Earnings Per Share [Line Items]** | | | |
| Potential ordinary shares outstanding excluded from the computation of diluted net loss per ordinary share | 50,000 | 15,001 | |
| **Non-Vested Restricted Shares [Member]** | | | |
| **Antidilutive Securities Excluded from Computation of Earnings Per Share [Line Items]** | | | |
| Potential ordinary shares outstanding excluded from the computation of diluted net loss per ordinary share | | | 60,951,591 |
| **Series A-1 and Series A-2 Convertible Redeemable Participating Preferred Shares [Member]** | | | |
| **Antidilutive Securities Excluded from Computation of Earnings Per Share [Line Items]** | | | |
| Potential ordinary shares outstanding excluded from the computation of diluted net loss per ordinary share | | | 32,176,676 |
| **Series A-3 Convertible Redeemable Participating Preferred Shares [Member]** | | | |
| **Antidilutive Securities Excluded from Computation of Earnings Per Share [Line Items]** | | | |
| Potential ordinary shares outstanding excluded from the computation of diluted net loss per ordinary share | | | 18,990,997 |
| **Series B Convertible Redeemable Participating Preferred Shares [Member]** | | | |
| **Antidilutive Securities Excluded from Computation of Earnings Per Share [Line Items]** | | | |
| Potential ordinary shares outstanding excluded from the computation of diluted net loss per ordinary share | | | 67,182,243 |
| **Series C Convertible Redeemable Participating Preferred Shares [Member]** | | | |
| **Antidilutive Securities Excluded from Computation of Earnings Per Share [Line Items]** | | | |
| Potential ordinary shares outstanding excluded from the computation of diluted net loss per ordinary share | | | 34,540,898 |
| **Series D Convertible Redeemable Participating Preferred Shares [Member]** | | | |
| **Antidilutive Securities Excluded from Computation of Earnings Per Share [Line Items]** | | | |
| Potential ordinary shares outstanding excluded from the computation of diluted net loss per ordinary share | | | 28,348,231 |

| **Net Income (Loss) Per Share - Calculation of Net Loss Per Share (Parenthetical) (Detail) - shares** | **12 Months Ended** | |
|---|---|---|
| | **Dec. 31, 2016** | **Dec. 31, 2015** |
| Non-Vested Restricted Shares [Member] | | |
| **Earnings Per Share, Basic, by Common Class, Including Two Class Method [Line Items]** | | |
| Incremental weighted average number of shares | 7,155,060 | 35,759,066 |
| Share Options [Member] | | |
| **Earnings Per Share, Basic, by Common Class, Including Two Class Method [Line Items]** | | |
| Incremental weighted average number of shares | 22,550,182 | 22,991,200 |

| Commitments and Contingencies - Additional Information (Detail) - USD ($) $ in Thousands | 12 Months Ended | | | |
|---|---|---|---|---|
| | Oct. 22, 2015 | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Operating Leased Assets [Line Items]** | | | | |
| Lease expiration year | | | | 2019 |
| Rental expenses under operating leases | | $ 4,743 | $ 3,715 | $ 2,995 |
| Compensation and legal costs | $ 1,440 | | | |
| Partnership Interest [Member] | | | | |
| **Operating Leased Assets [Line Items]** | | | | |
| Equity method investments equity contribution obligation | | $ 2,942 | $ 2,702 | |

| Commitments and Contingencies - Schedule of Future Minimum Payments under Non-Cancellable Operating Leases (Detail) $ in Thousands | Dec. 31, 2016 USD ($) |
|---|---|
| **Leases [Abstract]** | |
| 2017 | $ 5,547 |
| 2018 | 2,644 |
| 2019 | 360 |
| 2020 | 296 |
| Total | $ 8,847 |

| **Related Party Balances and Transactions - Schedule of Amount Due from Related Parties-current (Detail) - USD ($) $ in Thousands** | **Dec. 31, 2016** | **Dec. 31, 2015** |
|---|---|---|
| **Related Party Transaction [Line Items]** | | |
| Amount due from related parties | $ 88 | $ 1,175 |
| Hangzhou Alimama Technology Co., Ltd. [Member] | | |
| **Related Party Transaction [Line Items]** | | |
| Amount due from related parties | 2 | 876 |
| Shanghai Touch Future Network Technology Co., Ltd. [Member] | | |
| **Related Party Transaction [Line Items]** | | |
| Amount due from related parties | | $ 299 |
| Guangzhou UC Network Technology Co., Ltd. [Member] | | |
| **Related Party Transaction [Line Items]** | | |
| Amount due from related parties | 5 | |
| Guangzhou Aijiuyou Informational Technology Co., Ltd. [Member] | | |
| **Related Party Transaction [Line Items]** | | |
| Amount due from related parties | $ 81 | |

| Related Party Balances and Transactions - Schedule of Amount Due to Related Parties-current (Detail) - USD ($) $ in Thousands | | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|---|
| **Related Party Transaction [Line Items]** | | | |
| Amount due to related parties | | $ 8,117 | $ 6,532 |
| Ordinary Shareholders [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Amount due to related parties | [1] | 5,862 | 6,450 |
| Hunan Qindao Cultural Spread Ltd. [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Amount due to related parties | | 1,281 | |
| Alibaba Cloud Computing Limited Investment [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Amount due to related parties | | 629 | $ 82 |
| Shanghai Touch Future Network Technology Co., Ltd. [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Amount due to related parties | | 229 | |
| Taobao (China) Software Co., Ltd. [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Amount due to related parties | | $ 116 | |

[1] The amounts of $6,450 and $5,775 as of December 31, 2015 and 2016 represent the unpaid repurchase amount by the Group to its ordinary shareholders. Please refer to Note 10 for repurchase of ordinary shares.

| Related Party Balances and Transactions - Schedule of Amount Due to Related Parties-current (Parenthetical) (Detail) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Related Party Transaction [Line Items]** | | |
| Amount due to related parties | $ 8,117 | $ 6,532 |
| Ordinary Shareholders [Member] | | |
| **Related Party Transaction [Line Items]** | | |
| Amount due to related parties | [1] 5,862 | 6,450 |
| Unpaid Repurchase [Member] \| Ordinary Shareholders [Member] | | |
| **Related Party Transaction [Line Items]** | | |
| Amount due to related parties | $ 5,775 | $ 6,450 |

[1] The amounts of $6,450 and $5,775 as of December 31, 2015 and 2016 represent the unpaid repurchase amount by the Group to its ordinary shareholders. Please refer to Note 10 for repurchase of ordinary shares.

| Related Party Balances and Transactions - Schedule of Sales to Related Parties (Detail) - USD ($) $ in Thousands | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 |
| **Related Party Transaction [Line Items]** | | |
| Sales to related parties | $ 2,442 | $ 6,002 |
| Shanghai Xisue Network Technology Co., Ltd. [Member] | | |
| **Related Party Transaction [Line Items]** | | |
| Sales to related parties | [1] 922 | |
| Zhejiang Tmall Technology Co., Ltd. [Member] | | |
| **Related Party Transaction [Line Items]** | | |
| Sales to related parties | [1] 820 | |
| Guangzhou Aijiuyou Informational Technology Co., Ltd. [Member] | | |
| **Related Party Transaction [Line Items]** | | |
| Sales to related parties | [2] 400 | |
| Taobao (China) Software Co., Ltd. [Member] | | |
| **Related Party Transaction [Line Items]** | | |
| Sales to related parties | [1] 249 | |
| Hangzhou Alimama Technology Co., Ltd. [Member] | | |
| **Related Party Transaction [Line Items]** | | |
| Sales to related parties | [1] 42 | $ 6,002 |
| Guangzhou UC Network Technology Co., Ltd. [Member] | | |
| **Related Party Transaction [Line Items]** | | |
| Sales to related parties | [2] $ 9 | |

[1] The sales to related parties represented mobile marketing services provided.

[2] The sales to related parties represented mobile game revenue generated through those game operating companies.

| Related Party Balances and Transactions - Schedule of Purchase from Related Parties (Detail) - USD ($) $ in Thousands | 12 Months Ended | |
| --- | --- | --- |
| | Dec. 31, 2016 | Dec. 31, 2015 |
| **Related Party Transaction [Line Items]** | | |
| Purchase from related parties | $ 7,959 | $ 322 |
| Hunan Qindao Cultural Spread Ltd. [Member] | | |
| **Related Party Transaction [Line Items]** | | |
| Purchase from related parties | [1] 3,929 | |
| Alibaba Cloud Computing Limited Investment [Member] | | |
| **Related Party Transaction [Line Items]** | | |
| Purchase from related parties | [2] 3,360 | $ 322 |
| Shanghai Touch Future Network Technology Co., Ltd. [Member] | | |
| **Related Party Transaction [Line Items]** | | |
| Purchase from related parties | 347 | |
| Taobao (China) Software Co., Ltd. [Member] | | |
| **Related Party Transaction [Line Items]** | | |
| Purchase from related parties | $ 323 | |

[1] The purchase from Hunan Qindao Cultural Spread Ltd. is the revenue sharing with broadcaster agencies of live video service.

[2] The purchase from Alibaba Cloud Computing Ltd. is mainly related to its cloud computing services.

| Segment Information - Additional Information (Detail) | 12 Months Ended Dec. 31, 2016 Segment |
|---|---|
| **Segment Reporting [Abstract]** | |
| Number of operating segments | 1 |

| Segment Information - Components of Revenues (Detail) - USD ($) $ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Revenue from External Customer [Line Items]** | | | |
| Total revenues | $ 553,098 | $ 133,988 | $ 44,755 |
| Live Video Service [Member] | | | |
| **Revenue from External Customer [Line Items]** | | | |
| Total revenues | 376,925 | 1,231 | 0 |
| Value-added Services [Member] | | | |
| **Revenue from External Customer [Line Items]** | | | |
| Total revenues | 67,603 | 58,462 | 29,756 |
| Mobile Marketing [Member] | | | |
| **Revenue from External Customer [Line Items]** | | | |
| Total revenues | 66,339 | 38,885 | 1,975 |
| Mobile Games [Member] | | | |
| **Revenue from External Customer [Line Items]** | | | |
| Total revenues | 35,453 | 31,082 | 11,237 |
| Other Services [Member] | | | |
| **Revenue from External Customer [Line Items]** | | | |
| Total revenues | $ 6,778 | $ 4,328 | $ 1,787 |

| Employee Benefit Plan - Additional Information (Detail) - USD ($) $ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Postemployment Benefits [Abstract]** | | | |
| Provisions for employee benefits | $ 9,081 | $ 6,487 | $ 2,635 |

| Statutory Reserves and Restricted Net Assets - Additional Information (Detail) - USD ($) $ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Organization, Consolidation and Presentation of Financial Statements [Abstract]** | | | |
| Required minimum percentage of annual appropriations | 10.00% | | |
| General reserve as a percentage of registered capital up to which after-tax profit shall be transferred | 50.00% | | |
| Appropriations to statutory reserves | $ 17,969 | $ 553 | $ 0 |
| Capital reserves not available for distribution | 108,977 | 91,008 | 93,537 |
| Statutory reserves not available for distribution | $ 108,977 | $ 91,008 | $ 93,537 |

| Subsequent Events - Additional Information (Detail) - USD ($) $ / shares in Units, $ in Thousands | 1 Months Ended | | 12 Months Ended |
| --- | --- | --- | --- |
| | Mar. 31, 2017 | Feb. 28, 2017 | Dec. 31, 2016 |
| **Subsequent Events [Line Items]** | | | |
| Exercise price of share options granted | | | $ 0.0002 |
| RSUs [Member] | | | |
| **Subsequent Events [Line Items]** | | | |
| Number of shares, Granted | | | 200,000 |
| Zhejiang Digital Network Technology Co., Ltd [Member] | | | |
| **Subsequent Events [Line Items]** | | | |
| Cash consideration paid | | | $ 4,760 |
| Subsequent Event [Member] | Executive Officer [Member] | | | |
| **Subsequent Events [Line Items]** | | | |
| Number of share options granted | 2,217,004 | | |
| Exercise price of share options granted | $ 0.0002 | | |
| Subsequent Event [Member] | RSUs [Member] | Independent Directors [Member] | | | |
| **Subsequent Events [Line Items]** | | | |
| Number of shares, Granted | 100,000 | | |
| Share based compensation arrangements vesting period | 4 years | | |
| Subsequent Event [Member] | Zhejiang Digital Network Technology Co., Ltd [Member] | | | |
| **Subsequent Events [Line Items]** | | | |
| Percentage of acquired equity interest | | 100.00% | |
| Total cash consideration | | $ 5,478 | |