# EXHIBIT E

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# Form 20-F

---

**(Mark One)**

☐ **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934**

**or**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2018.**

**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from          to**

**or**

☐ **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Date of event requiring this shell company report**

**For the transition period from _____ to _____**

**Commission file number: 001-36765**

---

# Momo Inc.
**(Exact name of Registrant as specified in its charter)**

---

**N/A**
**(Translation of Registrant's name into English)**

**Cayman Islands**
**(Jurisdiction of incorporation or organization)**

**20th Floor, Block B**
**Tower 2, Wangjing SOHO**
**No.1 Futongdong Street**
**Chaoyang District, Beijing 100102**
**People's Republic of China**
**(Address of principal executive offices)**

**Jonathan Xiaosong Zhang, Chief Financial Officer**
**Telephone: +86-10-5731-0567**
**Email: ir@immomo.com**
**20th Floor, Block B**
**Tower 2, Wangjing SOHO**
**No.1 Futongdong Street**
**Chaoyang District, Beijing 100102**
**People's Republic of China**
**(Name, Telephone, Email and/or Facsimile number and Address of Company Contact Person)**

**Securities registered or to be registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| American depositary shares (each American depositary share representing two Class A ordinary share, par value US$0.0001 per share) | The NASDAQ Stock Market LLC (The NASDAQ Global Select Market) |

| Class A ordinary shares, par value US$0.0001 per share* | The NASDAQ Stock Market LLC (The NASDAQ Global Select Market) |

\*  Not for trading, but only in connection with the listing on The NASDAQ Global Select Market of American depositary shares.

**Securities registered or to be registered pursuant to Section 12(g) of the Act:**

**None**
**(Title of Class)**

**Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:**

**None**
**(Title of Class)**

_____

Indicate the number of outstanding shares of each of the Issuer's classes of capital or common stock as of the close of the period covered by the annual report. **333,512,014 Class A ordinary shares and 80,364,466 Class B ordinary shares, par value US$0.0001 per share, as of December 31, 2018.**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☒    No ☐

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.    Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).    Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or an emerging growth company. See definition of "large accelerated filer," "accelerated filer," and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Emerging growth company | ☐ |

If a an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act. ☐

†  The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☒    International Financial Reporting Standards as issued by the International Accounting Standards Board ☐    Other ☐

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow.    Item 17 ☐    Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☒

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.    Yes ☐    No ☐

Table of Contents

## TABLE OF CONTENTS

| | | |
|---|---|---|
| INTRODUCTION | | 1 |
| FORWARD-LOOKING INFORMATION | | 1 |
| PART I | | 2 |
| Item 1. | Identity of Directors, Senior Management and Advisers | 2 |
| Item 2. | Offer Statistics and Expected Timetable | 2 |
| Item 3. | Key Information | 2 |
| Item 4. | Information on the Company | 38 |

Item 4A.   Unresolved Staff Comments                                                              62
Item 5.    Operating and Financial Review and Prospects                                          62
Item 6.    Directors, Senior Management and Employees                                            83
Item 7.    Major Shareholders and Related Party Transactions                                     92
Item 8.    Financial Information                                                                 97
Item 9.    The Offer and Listing                                                                 99
Item 10.   Additional Information                                                                99
Item 11.   Quantitative and Qualitative Disclosures about Market Risk                           106
Item 12.   Description of Securities Other than Equity Securities                               107
PART II                                                                                        108
Item 13.   Defaults, Dividend Arrearages and Delinquencies                                     108
Item 14.   Material Modifications to the Rights of Security Holders and Use of Proceeds         108
Item 15.   Controls and Procedures                                                             109
Item 16A.  Audit Committee Financial Expert                                                    111
Item 16B.  Code of Ethics                                                                      111
Item 16C.  Principal Accountant Fees and Services                                             112
Item 16D.  Exemptions from the Listing Standards for Audit Committees                          112
Item 16E.  Purchases of Equity Securities by the Issuer and Affiliated Purchasers             112
Item 16F.  Change in Registrant's Certifying Accountant                                        112
Item 16G.  Corporate Governance                                                                112
Item 16H.  Mine Safety Disclosure                                                              112
PART III                                                                                       113
Item 17.   Financial Statements                                                                113
Item 18.   Financial Statements                                                                113
Item 19.   Exhibits                                                                            113
SIGNATURES                                                                                     117

i

Table of Contents

## INTRODUCTION

In this annual report, except where the context otherwise requires and for purposes of this annual report only:

- "$," "dollars," "US$" or "U.S. dollars" refers to the legal currency of the United States;

- "ADSs" refers to our American depositary shares, each representing two Class A ordinary shares, par value US$0.0001 per share;

- "China" or the "PRC" refers to the People's Republic of China, and solely for the purpose of this annual report, excludes Hong Kong, Macau and Taiwan;

- "MAUs" refers to monthly active users. We define Momo MAUs during a given calendar month as Momo users who were daily active users for at least one day during the 30-day period counting back from the last day of such calendar month. Momo daily active users are users who accessed our platform through mobile devices and utilized any of the functions on our platform on a given day.

- "Momo Inc.," "we," "us," "our company," or "our" refers to our holding company Momo Inc., its subsidiaries and its consolidated affiliated entity and its subsidiaries;

- "ordinary shares" prior to the completion of our initial public offering in December 2014 refers to our ordinary shares of par value US$0.0001 per share, and upon and after the completion of our initial public offering refers to our Class A and Class B ordinary shares, par value US$0.0001 per share; and

- "RMB" or "Renminbi" refers to the legal currency of China.

## FORWARD-LOOKING INFORMATION

This annual report on Form 20-F contains forward-looking statements that reflect our current expectations and views of future events. These statements are made under the "safe harbor" provisions of the U.S. Private Securities Litigation Reform Act of 1995. You can identify these forward-looking statements by words or phrases such as "may," "could," "should," "would," "will," "expect," "anticipate," "aim," "estimate," "intend," "plan," "believe," "likely to," "project," "continue," "potential" or other similar expressions. We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our financial condition, results of operations, business strategy and financial needs. These forward-looking statements include, but are not limited to, statements about:

- our goals and strategies;

- our future business development, financial condition and results of operations;

- the expected growth of mobile social networking platforms, live video services, mobile marketing services, mobile games and online entertainment services in China;

- our expectations regarding demand for and market acceptance of our services;

- our expectations regarding our user base and level of user engagement;

- our monetization strategies;

- our plans to invest in our technology infrastructure;

- competition in our industry; and

- relevant government policies and regulations relating to our industry.

1

Table of Contents

You should not place undue reliance on these forward-looking statements and you should read these statements in conjunction other sections of this annual report, in particular the risk factors disclosed in "Item 3. Key Information—D. Risk Factors." These statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from those expressed or implied by the forward-looking statements. Moreover, we operate in a rapidly evolving environment. New risks emerge from time to time and it is impossible for our management to predict all risk factors, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ from those contained in any forward-looking statement. The forward-looking statements made in this annual report relate only to events or information as of the date on which the statements are made in this annual report. We do not undertake any obligation to update or revise the forward-looking statements except as required under applicable law.

## PART I

**Item 1.        Identity of Directors, Senior Management and Advisers**

Not applicable.

**Item 2.        Offer Statistics and Expected Timetable**

Not applicable.

**Item 3.        Key Information**

**A.    Selected Financial Data**

The following table presents the selected consolidated financial information of our company. The selected consolidated statements of comprehensive (loss) income data for the years ended December 31, 2016, 2017 and 2018 and the selected consolidated balance sheets data as of December 31, 2017 and 2018 have been derived from our audited consolidated financial statements included in this annual report beginning on page F-1. The selected consolidated statements of comprehensive (loss) income data for the years ended December 31, 2014 and 2015 and the selected consolidated balance sheets data as of December 31, 2014, 2015 and 2016 have been derived from our audited consolidated financial statements not included in this annual report. Our audited consolidated financial statements are prepared and presented in accordance with accounting principles generally accepted in the United States, or U.S. GAAP. Our historical results do not necessarily indicate results expected for any future period. You should read the following selected financial data in conjunction with the consolidated financial statements and related notes and "Item 5. Operating and Financial Review and Prospects" included elsewhere in this annual report.

| | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2014 RMB | 2015 RMB | 2016 RMB | 2017 RMB | 2018 RMB | 2018 US$ |
| | (in thousands, except share and share-related data) | | | | | |
| **Selected Data of Consolidated Statements of Operations** | | | | | | |
| **Net Revenues**[1] | 275,762 | 843,119 | 3,707,358 | 8,886,390 | 13,408,421 | 1,950,174 |
| **Cost and expenses**[2] | | | | | | |
| Cost of revenues | (97,129) | (190,900) | (1,619,327) | (4,373,377) | (7,182,897) | (1,044,709) |
| Research and development expenses | (57,054) | (146,292) | (208,647) | (346,144) | (760,644) | (110,631) |
| Sales and marketing expenses | (219,249) | (330,883) | (647,238) | (1,467,376) | (1,812,262) | (263,583) |
| General and administrative expenses | (63,939) | (144,135) | (259,712) | (422,005) | (640,023) | (93,087) |
| **Total cost and expenses** | (437,371) | (812,210) | (2,734,924) | (6,608,902) | (10,395,826) | (1,512,010) |
| Other operating income | 160 | 4,474 | 2,659 | 156,764 | 253,697 | 36,899 |
| **(Loss) Income from operations** | (161,449) | 35,383 | 975,093 | 2,434,252 | 3,266,292 | 475,063 |

2

Table of Contents

| | Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2018 |

| | RMB | RMB | RMB | RMB | RMB | US$ |
|---|---|---|---|---|---|---|
| | | | (in thousands, except share and share-related data) | | | |
| Interest income | 4,443 | 49,037 | 54,603 | 145,568 | 272,946 | 39,698 |
| Interest expense | — | — | — | — | (56,503) | (8,218) |
| Impairment loss on long-term investments | — | — | (39,283) | (30,085) | (43,200) | (6,283) |
| (Loss) Income before income tax and share of income on equity method investments | (157,006) | 84,420 | 990,413 | 2,549,735 | 3,439,535 | 500,260 |
| Income tax expenses | — | (561) | (34,638) | (445,001) | (699,648) | (101,760) |
| (Loss) Income before share of income on equity method investments | (157,006) | 83,859 | 955,775 | 2,104,734 | 2,739,887 | 398,500 |
| Share of income on equity method investments | — | 2,375 | 23,194 | 39,729 | 48,660 | 7,077 |
| Net (loss) income | (157,006) | 86,234 | 978,969 | 2,144,463 | 2,788,547 | 405,577 |
| Less: net loss attributable to non-controlling interest | — | — | — | (3,635) | (27,228) | (3,960) |
| Net (loss) income attributable to Momo Inc. | (157,006) | 86,234 | 978,969 | 2,148,098 | 2,815,775 | 409,537 |
| Deemed dividend to preferred shareholders | (357,673) | — | — | — | — | — |
| Net (loss) income attributable to ordinary shareholders | (514,679) | 86,234 | 978,969 | 2,148,098 | 2,815,775 | 409,537 |
| Net (loss) income per share attributable to ordinary shareholders | | | | | | |
| Basic | (6.03) | 0.23 | 2.54 | 5.44 | 6.92 | 1.01 |
| Diluted | (6.03) | 0.21 | 2.41 | 5.17 | 6.59 | 0.96 |
| Weighted average shares used in computing net (loss) income per ordinary share | | | | | | |
| Basic | 85,293,775 | 342,646,282 | 377,335,923 | 394,549,323 | 407,009,875 | 407,009,875 |
| Diluted | 85,293,775 | 401,396,548 | 407,041,165 | 415,265,078 | 433,083,643 | 433,083,643 |

Notes:

(1) Components of our net revenues are presented in the following table:

| | 2014 RMB | 2015 RMB | 2016 RMB | 2017 RMB | 2018 RMB | 2018 US$ |
|---|---|---|---|---|---|---|
| | | | (in thousands) | | | |
| Live video service | — | 7,846 | 2,534,604 | 7,429,906 | 10,709,491 | 1,557,631 |
| Value-added service | 183,378 | 367,405 | 449,781 | 695,798 | 1,883,150 | 273,893 |
| Mobile marketing | 12,150 | 245,337 | 441,644 | 514,279 | 500,321 | 72,769 |
| Mobile games | 69,230 | 195,411 | 236,238 | 241,388 | 130,392 | 18,965 |
| Other services | 11,004 | 27,120 | 45,091 | 5,019 | 185,067 | 26,916 |
| Total | 275,762 | 843,119 | 3,707,358 | 8,886,390 | 13,408,421 | 1,950,174 |

3

Table of Contents

(2) Share-based compensation expenses were allocated in cost and expenses as follows:

| | 2014 RMB | 2015 RMB | 2016 RMB | 2017 RMB | 2018 RMB | 2018 US$ |
|---|---|---|---|---|---|---|
| | | | (in thousands) | | | |
| Cost of revenues | 954 | 5,772 | 18,521 | 13,547 | 21,661 | 3,150 |
| Research and development expenses | 4,148 | 22,046 | 37,455 | 59,190 | 152,806 | 22,225 |
| Sales and marketing expenses | 4,531 | 23,767 | 39,139 | 79,032 | 142,927 | 20,788 |
| General and administrative expenses | 31,291 | 57,857 | 115,724 | 183,204 | 263,419 | 38,313 |
| Total | 40,924 | 109,442 | 210,839 | 334,973 | 580,813 | 84,476 |

The following table presents our selected consolidated balance sheet data as of December 31, 2014, 2015, 2016, 2017 and 2018.

| | 2014 RMB | 2015 RMB | 2016 RMB | 2017 RMB | 2018 RMB | 2018 US$ |
|---|---|---|---|---|---|---|
| | | | (in thousands) | | | |
| **Selected Consolidated Balance Sheet Data:** | | | | | | |
| Cash and cash equivalents | 2,798,078 | 1,097,783 | 1,788,268 | 4,462,194 | 2,468,034 | 358,961 |
| Total assets | 2,968,926 | 3,511,985 | 5,344,283 | 8,471,188 | 18,965,538 | 2,758,423 |
| Total liabilities | 236,470 | 477,871 | 942,289 | 1,719,088 | 7,942,679 | 1,155,214 |
| Total equity | 2,732,456 | 3,034,114 | 4,401,994 | 6,752,100 | 11,022,859 | 1,603,209 |

**Changing in Reporting Currency and Exchange Rate Information**

Our business is primarily conducted in China and almost all of our revenues are denominated in RMB. Effectively from the fourth quarter of 2018, we changed our reporting currency from U.S. dollar to RMB. The change in reporting currency is to improve investors' ability to evaluate our financial results against other comparable publicly traded companies in the industry. Prior to the fourth quarter of 2018, we reported our annual and quarterly consolidated balance sheets and consolidated statements of income and comprehensive income and shareholder's equity and cash flows in U.S. dollar. In this annual report, the financial results for the year ended December 31, 2018 are stated in RMB. The related financial statements prior to the current period have been recast to reflect RMB as the reporting currency for comparison to the financial results for the year ended December 31, 2018.

Current period amounts in this annual report are translated into U.S. dollars for the convenience of the readers. The conversion of RMB into U.S. dollars in this annual report is based on the noon buying rate in New York City for cable transfers in RMB as certified for customs purposes by the Federal Reserve Board. Unless otherwise stated, all translations of RMB into U.S. dollars were made at the rate at RMB6.8755 to US$1.00, the exchange rate as set forth in the H.10 statistical release of the Board of Governors of the Federal Reserve System in effect as of December 31, 2018. We make no representation that any RMB or U.S. dollar amounts could have been, or could be, converted into U.S. dollars or RMB, as the case may be , at any particular rate, or at all. The PRC government imposes control over its foreign currency reserves in part through direct regulation of the conversion of RMB into foreign exchange and through restrictions on foreign trade.

**B.    Capitalization and Indebtedness**

Not applicable.

**C.    Reasons for the Offer and Use of Proceeds**

Not applicable.

<div align="center">4</div>

Table of Contents

**D.    Risk Factors**

**Risks Related to Our Business and Industry**

*If we fail to retain our existing users, further grow our user base, or if user engagement on our platform declines, our business and operating results may be materially and adversely affected.*

The size of our user base and the level of our user engagement are critical to our success. Although our MAUs generally grew over time since our inception, there were times when our user base failed to grow as we expected. For example, the growth rate of our MAUs significantly decreased in 2015 primarily due to the reduced growth of number of smartphone users in China, and upgrades to our platform that were difficult for some of our users to adapt to. There is no guarantee that our MAUs will continue to grow at a desirable rate or at all. Growing our user base and increasing the overall level of user engagement on our social networking platform and in particular our live video service, which currently contributes a majority of our revenues, are critical to our business. If our user growth rate slows down, as it did in 2015, our success will become increasingly dependent on our ability to retain existing users and enhance user engagement on our platform. If our Momo mobile application is no longer one of the social networking tools that people frequently use, or if people do not perceive our services to be interesting or useful, we may not be able to attract users or increase the frequency or degree of their engagement. A number of user-oriented instant communication products that achieved early popularity have since seen the size of their user base or level of user engagement decline, in some cases precipitously. There is no guarantee that we will not experience a similar erosion of our user base or user engagement level in the future. A number of factors could negatively affect user retention, growth and engagement, including if:

- we are unable to attract new users to our platform or retain existing ones;
- we fail to introduce new and improved services, or if we introduce services that are not favorably received by users;
- we are unable to combat spam on or inappropriate or abusive use of our platform, which may lead to negative public perception of us and our brand;
- technical or other problems prevent us from delivering our services in a rapid and reliable manner or otherwise adversely affect the user experience;
- we suffer from negative publicity, fail to maintain our brand or if our reputation is damaged;
- we fail to address user concerns related to privacy and communication, safety, security or other factors;
- there are adverse changes in our services that are mandated by, or that we elect to make to address, legislation, regulations or government policies; and
- the growth of number of smartphone users in China stalls.

If we are unable to grow our user base or enhance user engagement, our platform will become less attractive to our users, customers and platform partners, which would have a material and adverse impact on our business and operating results.

*We cannot guarantee that the monetization strategies we have adopted will be successfully implemented or generate sustainable revenues and profits.*

As online social networking and online entertainment industries in China are relatively young, prevailing monetization models similar to ours have yet to be proven to be sustainable, and it may be more difficult to predict user and customer behaviors and demands compared to other established industries. Our monetization model has been evolving. We began to generate revenues in the second half of 2013 primarily through membership subscriptions and also game publishing and other services, but we continue to explore and implement new monetization models. While membership

subscriptions contributed a majority of our revenues prior to 2016, live video service, which we launched in September 2015 and adopted a virtual items-based revenue model, has replaced membership subscription as our major source of revenues in 2016, 2017 and 2018. The services that we currently provide, including live video service, value-added service (comprising membership subscriptions and virtual gift service), mobile marketing services, mobile games, and other services, contributed approximately 79.9%, 14.0%, 3.7%, 1.0% and 1.4%, respectively, of our net revenues in 2018. Apart from live video services, from time to time we have launched new services on our platform, explored new monetization models and broadened our revenue sources, and we expect to continue to do so. For example, in February 2015, we launched our first self-developed game on our platform, which generated revenues through in-game purchases of virtual items. In the second quarter of 2015, we launched our in-feed marketing solutions powered by a proprietary self-served advertising system, and started to offer brand-oriented display ads and action-driven ad products such as app downloads. In the fourth quarter of 2016, we launched a virtual gift service which allows our users to purchase and send virtual gifts to other users outside of live video service. In 2018, we produced a television program. However, there is no assurance that any of these and other new monetization models would be profitable or sustainable. If our strategic initiatives do not enhance our ability to monetize our existing services or enable us to develop new approaches to monetization, we may not be able to maintain or increase our revenues and profits or recover any associated costs.

5

Table of Contents

We may in the future introduce new services to further diversify our revenue streams, including services with which we have little or no prior development or operating experience. If these new or enhanced services fail to engage users, customers or platform partners, we may fail to attract or retain users or to generate sufficient revenues to justify our investments, and our business and operating results may suffer as a result.

***We operate in a highly dynamic market, which makes it difficult to evaluate our future prospects.***

The market for social networking platforms is relatively new, highly dynamic and may not develop as expected. Our users, customers and platform partners may not fully understand the value of our services, and potential new users, customers and platform partners may have difficulty distinguishing our services from those of our competitors. Convincing potential users, customers and platform partners of the value of our services is critical to the growth of our user base and the success of our business.

We launched our Momo mobile application in August 2011. The operating history and our evolving monetization strategies make it difficult to assess our future prospects or forecast our future results. You should consider our business and prospects in light of the risks and challenges we encounter or may encounter in this developing and rapidly evolving market. These risks and challenges include our ability to, among other things:

- expand our paying user base for the various services offered by our platform, including live video service, value-added service, mobile games and others;

- develop and deploy diversified and distinguishable features and services for our users, customers and platform partners;

- convince customers of the benefits of our marketing services compared to alternative forms of marketing, and continue to increase the efficiency of our mobile marketing solutions and expand our network of marketers;

- develop or implement strategic initiatives to monetize our platform;

- develop beneficial relationship with key strategic partners, talented broadcasters and talent agencies for our live video service;

- develop a reliable, scalable, secure, high-performance technology infrastructure that can efficiently handle increased usage;

- successfully compete with other companies, some of which have substantially greater resources and market power than us, that are currently in, or may in the future enter, our industry, or duplicate the features of our services;

- attract, retain and motivate talented employees; and

- defend ourselves against litigation, regulatory, intellectual property, privacy or other claims.

If we fail to educate potential users, customers and platform partners about the value of our services, if the market for our platform does not develop as we expect or if we fail to address the needs of this dynamic market, our business will be harmed. Failure to adequately address these or other risks and challenges could harm our business and cause our operating results to suffer.

6

Table of Contents

***We currently generate a substantial majority of our revenues from our live video service. We may not be able to continue to grow or continue to achieve profitability from such service.***

In September 2015, we launched our live video service with a virtual items-based revenue model, whereby users can enjoy live performances and interact with the broadcasters for free, and have the option of purchasing in-show virtual items. We have achieved initial success for this service, which contributed RMB2,534.6 million, RMB7,429.9 million and RMB10,709.5 million (US$1,557.6 million) to, or 68.4%, 83.6% and 79.9% of, our net revenues in 2016, 2017 and 2018, respectively. While we plan to continue to invest significantly in expanding our live video service, we may not be able to continue to achieve the level of profitability based on the virtual items-based revenue model, as we have limited experience in operating such service. In addition, popular broadcasters or talent agencies may cease to use our service and we may be unable to attract new talents that can attract users or cause such users to increase the amount of time spent on our platform or the amount of money spent on in-show virtual items.

Although we believe we have a large and diversified pool of talented broadcasters, talent agencies as well as paying users (which allows us to manage the risk of revenue concentration) and have entered into multi-year exclusivity agreements with popular broadcasters, if a large number of our broadcasters, particularly popular broadcasters, were to leave our platform for competing platforms at the same time, if we are unable to negotiate acceptable business terms with popular broadcasters or talent agencies, or if a large number of our users decided to use live video services provided by our competitors, we might not be able to expand the user base of our live video service and achieve or maintain the level of revenues and profitability as we currently anticipate. Broadcasters provide live video service on our platform as an individual or as a member of a talent agency. The talent agencies recruit, train and retain the broadcasters. We are committed to provide strong support and resources to broadcasters and talent agencies to offer high-quality content. We are also committed to closely cooperate and develop long-term relationship with broadcasters and talent agencies. However, under our current arrangements with our broadcasters and talent agencies, we share with them a portion of the revenues we derive from the sales of in-show virtual items in our live video service. Payments of revenue sharing to broadcasters and talent agencies for our live video service constitute a major portion of our cost of revenues. If we are required to share a larger portion of our revenues with the broadcasters and talent agencies for competition purpose, our results of profitability may be adversely impacted.

**We may not be able to successfully maintain and increase the number of paying users for the various services we offer on our platform.**

Our future growth depends on our ability to convert our users into paying users of our services, including live video service, value-added service, mobile games and other services, and our ability to retain our existing paying users. However, we cannot assure you that we will be successful in any of the foregoing initiatives, nor can we assure you that we will be able to successfully compete with current and new competitors on attracting paying users. We had 17.7 million paying users in 2018 for our live video service and value-added services on Momo application, compared to 13.7 million in 2017 and 8.0 million in 2016 without double counting the overlap of each year. We also had 4.1 million paying users on Tantan application from June 1, 2018 to December 31, 2018. Our efforts to provide greater incentives for our users to pay for our various services may not continue to succeed. Our paying users may discontinue their spending on our services because they may no longer serve our paying users' needs, or simply because the interests and preferences of these users shift. If we cannot successfully maintain or increase the number of our paying users, our business, results of operations and prospects will be adversely affected.

**The loss of marketers, or reduction in spending by marketers, could harm our business.**

Our mobile marketing services generated 11.9%, 5.8% and 3.7% of our revenues in 2016, 2017 and 2018, respectively. Currently our mobile marketing services primarily comprise in-feed marketing solutions and brand-oriented display ads. As is common in the industry, our marketers do not have long-term advertising commitments with us. Many of our marketers spend only a relatively small portion of their overall advertising budgets with us. In addition, marketers may view some of our products as experimental and unproven. Marketers may not continue to do business with us, or they may advertise with us based on terms unfavorable to us, if we do not deliver our marketing solutions in an effective manner, or if they do not believe that their investment in advertising with us will generate a competitive return relative to other alternatives. For example, failure to maintain or increase the quantity or quality of ads shown to users, or a decrease in user engagement may cause marketers to reduce or cease their spending on our mobile marketing services.

<center>7</center>

**Table of Contents**

**Our business is dependent on the strength of our brands and market perception of our brand.**

In China, we market our services under the brands "陌陌" or "Momo" and "探探" or "Tantan." Our business and financial performance are highly dependent on the strength and the market perception of our brands and services. A well-recognized brand is critical to increasing our user base and, in turn, facilitating our efforts to monetize our services and enhancing our attractiveness to customers. From time to time, we conduct marketing activities across various media to enhance our brands and to guide public perception of our brands and services. In order to create and maintain brand awareness and brand loyalty, to influence public perception and to retain existing and attract new mobile users, customers and platform partners, we may need to substantially increase our marketing expenditures. We cannot assure you, however, that these activities will be successful or that we will be able to achieve the brand promotion effect we expect.

In addition, people may not understand the value of our platform, and there may be a misperception that Momo is used solely as a tool to randomly meet or date strangers. Convincing potential new users, customers and platform partners of the value of our services is critical to increasing the number of our users, customers and platform partners and to the success of our business.

**Content posted or displayed on our social networking platform, including the live video shows hosted by us or our users, may be found objectionable by PRC regulatory authorities and may subject us to penalties and other severe consequences.**

The PRC government has adopted regulations governing internet and wireless access and the distribution of information over the internet and wireless telecommunications networks. Under these regulations, internet content providers and internet publishers are prohibited from posting or displaying over the internet or wireless networks content that, among other things, violates the principle of the PRC constitution, laws and regulations, impairs the national dignity of China or the public interest, or is obscene, superstitious, fraudulent or defamatory. Furthermore, internet content providers are also prohibited from displaying content that may be deemed by relevant government authorities as instigating ethnical hatred and harming ethnical unity, harming the national religious policy, "socially destabilizing" or leaking "state secrets" of the PRC. Failure to comply with these requirements may result in the revocation of licenses to provide internet content or other licenses, the closure of the concerned platforms and reputational harm. The operator may also be held liable for any censored information displayed on or linked to their platform.

We have designed and implemented procedures to monitor content on our social networking platform, including the live video shows hosted by us or our users, in order to comply with relevant laws and regulations. However, it may not be possible to determine in all cases the types of content that could result in our liability as a distributor of such content and, if any of the content posted or displayed on our social networking platform is deemed by

the PRC government to violate any content restrictions, we would not be able to continue to display such content and could become subject to penalties, including confiscation of income, fines, suspension of business and revocation of required licenses, which could materially and adversely affect our business, financial condition and results of operations.

We may also be subject to potential liability for any unlawful actions by our users on our platform. It may be difficult to determine the type of content or actions that may result in liability to us and, if we are found to be liable, we may be prevented from operating our business in China. Moreover, the costs of compliance with these regulations may continue to increase as a result of more content being made available by an increasing number of users of our social networking platform, which may adversely affect our results of operations. Although we have adopted internal procedures to monitor content and to remove offending content once we become aware of any potential or alleged violation, we may not be able to identify all the content that may violate relevant laws and regulations or third-party intellectual property rights. Even if we manage to identify and remove offensive content, we may still be held liable.

***Our acquisition of Tantan, and the subsequent integration of Tantan into our business, creates significant challenges which may affect our ability to realize the benefits of the acquisition and have a material adverse effect on our business, reputation, results of operations and financial condition.***

In May 2018, we completed the acquisition of Tantan, a Chinese social and dating app for approximately 5.3 million newly issued Class A ordinary shares of the Company and US$613.2 million in cash. While we currently expect Tantan to remain a stand-alone brand and to largely operate independently, the process of integrating certain aspects of Tantan's operations into our own operations is still continuing and could result in unforeseen operating difficulties, divert significant management attention and require significant resources that would otherwise have been available for the ongoing development of our existing operations. Challenges and risks from the Tantan acquisition include, among others:

- the difficulty in retaining Tantan's users following the acquisition;

8

Table of Contents

- the need to integrate certain operations, systems, technologies, and personnel of Tantan, the inefficiencies that may result if such integration is delayed or not implemented as expected, and unforeseen difficulties and expenditures that may arise in connection with such integration;

- the difficulty in successfully evaluating and utilizing Tantan's technology and features;

- the difficulty in integrating potentially contrasting corporate cultures and management philosophies;

- diversion of our management's and personnel's attention from our existing businesses and initiatives;

- the difficulty in retaining employees following the acquisition;

- the difficulties relating to achieving the expected synergies of the transaction;

- the incurrence of unforeseen obligations or liabilities, which may entail significant expense; and

- the difficulty in integrating Tantan's financial reporting, which may affect our ability to maintain effective controls and procedures over our consolidated financial reporting.

Moreover, we may not be able to achieve our intended strategic goals or attain the synergies from the transaction. If we are unable to successfully integrate Tantan and manage the larger business, or are unable to achieve the expected benefits of the transaction, we may be required to record substantial impairment charges to goodwill. Any such negative development could have a material adverse effect on our business, reputation, results of operations and financial condition.

***The mobile social and dating industry is an evolving and competitive market, with low switching costs and a consistent stream of new products and entrants, and innovation by Tantan's competitors may disrupt its business.***

The mobile social and dating industry in China is evolving and competitive, and has experienced a consistent stream of new products and market entrants within recent years. Tantan's competitors may hold a stronger competitive positions in certain geographical regions or with certain user demographics that we currently serve or may serve in the future. These advantages could enable these competitors to offer features and services that are more appealing to current users and potential users than our features and services or to respond more quickly and/or cost-effectively than us to new or changing opportunities.

In addition, within the mobile social and dating industry generally, costs for consumers to switch between products and apps are low, and consumers have demonstrated a propensity to try new approaches to connecting with people. As a result, new products, entrants and business models are likely to continue to emerge. It is possible that a new app could gain rapid scale at the expense of existing brands through harnessing a new technology or distribution channel, creating a new approach to connecting people or some other means. If we are not able to compete effectively against our current or future competitors and other apps, products and services that may emerge, the size and level of engagement of our user base may decrease, which could have a material adverse effect on our business, financial condition and results of operations.

***We may be unsuccessful in monetizing Tantan's social and dating services.***

Tantan is a relatively new mobile social and dating app with a limited operating history and track record of monetization of its services. The success of the Tantan acquisition will be significantly affected by our ability to continue to grow the monetization of Tantan. However, we may be unable to do so due to, among other reasons, Tantan's users ceasing to use mobile technology for dating and socializing, Tantan's users opting to forgo paid services

on the app, perceived or actual privacy concerns, the introduction of new regulations on the use and monetization of user data, and the introduction of competition offering lower cost services or additional or different features. If we are unable to successfully monetize Tantan's business, we may be unable to achieve the expected benefits of the Tantan acquisition, which could have a material adverse effect on our business, reputation, results of operations and financial condition.

9

Table of Contents

*Tantan's growth and profitability rely, in part, on its ability to attract and retain users, which involves considerable expenditure. Any failure in these efforts could adversely affect our business, financial condition and results of operations.*

Tantan commenced monetization of its business in July 2017, and historically has not been profitable. In order to continue to grow its business and eventually become profitable, Tantan will need to continue to attract and retain users for Tantan's app, which will involve considerable expenditures. Historically, Tantan has had to increase its selling and marketing expenses over time in order to attract and retain users and sustain its growth in users.

Tantan's marketing expenditures consist primarily of investments in paid marketing channels to acquire more users and drive traffic to the app. To continue to reach potential users and grow the Tantan business, we must identify and devote more of Tantan's overall marketing expenditures to new and evolving marketing channels, which may include mobile and virtual platforms. The opportunities in and sophistication of newer marketing channels generally are relatively undeveloped and unproven, making it difficult to assess returns on investment associated with such channels, and there can be no assurance that we will be able to continue to appropriately manage and fine-tune our marketing efforts in response to these and other trends in the industry. Any failure to do so could have a material adverse effect on our business, reputation, results of operations and financial condition.

*Negative publicity may harm our brand and reputation and have a material adverse effect on our business and operating results.*

Negative publicity involving us, our users, our management, our social networking platform or our business model may tarnish our reputation and materially and adversely harm our brand and our business. We cannot assure you that we will be able to defuse negative publicity about us, our management and/or our services to the satisfaction of our investors, users, customers and platform partners. There has been negative publicity about our company and the misuse of our services, which has adversely affected our brand, public image and reputation. Such negative publicity, especially when it is directly addressed against us, may also require us to engage in defensive media campaigns. This may cause us to increase our marketing expenses and divert our management's attention and may adversely impact our business and results of operations.

Any legal action, regardless of its merits, could be time consuming and could divert the attention of our management away from our business and a failure of any legal action may bring negative impact on our reputation and cause a loss of our brand equity, which would reduce the use of our platform and demand for our services. Moreover, any attempts to rebuild our reputation and restore the value of our brand may be costly and time consuming, and such efforts may not ultimately be successful.

*User misconduct and misuse of our platform may adversely impact our brand image, and we may be held liable for information or content displayed on, retrieved from or linked to our platform, which may materially and adversely affect our business and operating results.*

Our platform allows mobile users to freely contact and communicate with people nearby, and our live video service allows users to host and view live shows. Because we do not have full control over how and what users will use our platform to communicate, our platform may be misused by individuals or groups of individuals to engage in immoral, disrespectful, fraudulent or illegal activities. For example, on a daily basis we detect spam accounts through which illegal or inappropriate content is posted and illegal or fraudulent activities are conducted. Media reports and internet forums have covered some of these incidents, which have in some cases generated negative publicity about our brand and platform. We have implemented control procedures to detect and block illegal or inappropriate content and illegal or fraudulent activities conducted through the misuse of our platform, but such procedures may not prevent all such content from being broadcasted or posted or activities from being carried out. Moreover, as we have limited control over real-time and offline behaviors of our users, to the extent such behaviors are associated with our platform, our ability to protect our brand image and reputation may be limited. Our business and the public perception of our brand may be materially and adversely affected by misuse of our platform.

In addition, if any of our users suffers or alleges to have suffered physical, financial or emotional harm following contact initiated on our platform, we may face civil lawsuits or other liabilities initiated by the affected user, or governmental or regulatory actions against us. In response to allegations of illegal or inappropriate activities conducted through our platform or any negative media coverage about us, PRC government authorities may intervene and hold us liable for non-compliance with PRC laws and regulations concerning the dissemination of information on the internet and subject us to administrative penalties or other sanctions, such as requiring us to restrict or discontinue some of the features and services provided on our mobile application. Therefore, our business may be subject to investigations or subsequent penalties if contents generated by our users are deemed to be illegal or inappropriate under PRC laws and regulations. See "—Risks Related to Doing Business in China—If we fail to obtain and maintain the requisite licenses and approvals required under the complex regulatory environment applicable to our businesses in China, or if we are required to take compliance actions that are time-consuming or costly, our business, financial condition and results of operations may be materially and adversely affected." As a result, our business may suffer, our user base, revenues and profitability may be materially and adversely affected, and the price of our ADSs may decline.

10

Table of Contents

*The market in which we operate is fragmented and highly competitive. If we are unable to compete effectively for users or user engagement, our business and operating results may be materially and adversely affected.*

As a social networking platform that provides multiple services, including live video service, value-added service, mobile marketing services and

other services, we are subject to intense competition from providers of similar services, as well as potential new types of online services. Our competitors may have substantially more cash, traffic, technical, broadcasters, business networks and other resources, as well as broader product or service offerings and can leverage their relationships based on other products or services to gain a larger share of marketing budgets. We may be unable to compete successfully against these competitors or new market entrants, which may adversely affect our business and financial performance.

We believe that our ability to compete effectively depends upon many factors both within and beyond our control, including:

- the popularity, usefulness, ease of use, performance and reliability of our services compared to those of our competitors, and the research and development abilities of us and our competitors;

- changes mandated by, or that we elect to make to address, legislation, regulations or government policies, some of which may have a disproportionate effect on us;

- acquisitions or consolidation within our industry, which may result in more formidable competitors;

- our ability to monetize our services;

- our ability to attract, retain, and motivate talented employees;

- our ability to manage and grow our operations cost-effectively; and

- our reputation and brand strength relative to our competitors.

***If we fail to keep up with technological developments and evolving user expectations, we may fail to maintain or attract users, customers or platform partners, and our business and operating results may be materially and adversely affected.***

We operate in a market characterized by rapidly changing technologies, evolving industry standards, new product and service announcements, new generations of product enhancements and changing user expectations. Accordingly, our performance and the ability to further monetize the services on our platform will depend on our ability to adapt to these rapidly changing technologies and industry standards, and our ability to continually innovate in response to both evolving demands of the marketplace and competitive services. There may be occasions when we may not be as responsive as our competitors in adapting our services to changing industry standards and the needs of our users. Historically, new features may be introduced by one player in the industry, and if they are perceived as attractive to users, they are often quickly copied and improved upon by others.

Introducing new technologies into our systems involves numerous technical challenges, substantial amounts of capital and personnel resources and often takes many months to complete. For example, the market for mobile devices in China is highly fragmented, and the lower resolution, functionality, operating system compatibility and memory currently associated with the kaleidoscopic models of mobile devices in the Chinese marketplace may make the use of our services through these devices more difficult and impair the user experience. We intend to continue to devote resources to the development of additional technologies and services. We may not be able to effectively integrate new technologies on a timely basis or at all, which may decrease user satisfaction with our services. Such technologies, even if integrated, may not function as expected or may be unable to attract and retain a substantial number of mobile device users to use our Momo mobile application. We also may not be able to protect such technology from being copied by our competitors. Our failure to keep pace with rapid technological changes may cause us to fail to retain or attract users or generate revenues, and could have a material and adverse effect on our business and operating results.

11

Table of Contents

***If we fail to effectively manage our growth and control our costs and expenses, our business and operating results could be harmed.***

We have experienced rapid growth in our business and operations and expansion of our platform since our inception in 2011, which places significant demands on our management, operational and financial resources. However, given the rapidly evolving market in which we compete, we may encounter difficulties as we establish and expand our operations, product development, sales and marketing, and general and administrative capabilities. We face significant competition for talented employees from other high-growth companies, which include both publicly traded and privately held companies, and we may not be able to hire new talents quickly enough to meet our needs and support our operations. If we fail to effectively manage our hiring needs and successfully integrate our new hires, our efficiency and ability to meet our forecasts and our employee morale, productivity and retention could suffer, and our business and operating results could be adversely affected.

We expect our costs and expenses to continue to increase in the future as we seek to broaden our user base and increase user engagement, and develop and implement new features and services. In addition, our cost and expenses, such as our research and development expenses, sales and marketing expenses and general and administrative expenses, have grown rapidly as we expanded our business. Historically, our costs and expenses have increased each year, and we expect to continue to incur increasing costs and expenses to support our anticipated future growth. Continued growth could also strain our ability to maintain reliable service levels for our users and customers, develop and improve our operational, financial, legal and management controls, and enhance our reporting systems and procedures. If we are unable to generate adequate revenues and to manage our expenses, we may again incur significant losses in the future and may not be able to maintain profitability. Our expenses may grow faster than our revenues, and our expenses may be greater than we anticipate. Managing our growth will require significant expenditures and the allocation of valuable management resources. If we fail to achieve the necessary level of efficiency in our organization as we grow, our business, operating results and financial condition could be harmed.

***We may not be able to remain profitable, and the consolidation of the results of operations of Tantan with ours may negatively impact our financial performance and results of operations.***

We believe that our future revenue growth will depend on, among other factors, the popularity of social networking applications and our ability to

attract new users, increase user engagement, effectively design and implement monetization strategies, develop new services and compete effectively and successfully, as well as our ability to successfully monetize Tantan's operations. In addition, our ability to sustain profitability is affected by various factors, many of which are beyond our control, such as the continuous development of social networking, live video services, mobile marketing services, and mobile games in China. We may again incur losses in the near future due to our continued investments in services, technologies, research and development and our continued sales and marketing initiatives. Changes in the macroeconomic and regulatory environment or competitive dynamics and our inability to respond to these changes in a timely and effective manner may also impact our profitability. Furthermore, we completed our acquisition of Tantan in May 2018, and consolidate Tantan's results starting in the second quarter of 2018. Tantan commenced monetization of its business in July 2017 and historically has not been profitable. If Tantan continues to incur losses, this may also affect our ability to remain profitable. Accordingly, you should not rely on the revenues of any prior quarterly or annual period as an indication of our future performance.

***Privacy concerns relating to our services and the use of user information could negatively impact our user base or user engagement, or subject us to governmental regulation and other legal obligations, which could have a material and adverse effect on our business and operating results.***

We collect user profile, user location and other personal data from our users in order to better understand our users and their needs and to support our social interest graph engine and our big data analytical capabilities for more targeted services such as interest- or location-based user groups and mobile marketing services. Concerns about the collection, use, disclosure or security of personal information, chat history or other privacy-related matters, even if unfounded, could damage our reputation, cause us to lose users, customers and platform partners and subject us to regulatory investigations, all of which may adversely affect our business. While we strive to comply with applicable data protection laws and regulations, as well as our privacy policies pursuant to our terms of use and other obligations we may have with respect to privacy and data protection, any failure or perceived failure to comply with these laws, regulations or policies may result, and in some cases have resulted, in inquiries and other proceedings or actions against us by government agencies or others, as well as negative publicity and damage to our reputation and brand, each of which could cause us to lose users, customers and platform partners and have an adverse effect on our business and operating results.

12

Table of Contents

Any system failure or compromise of our security that results in the unauthorized access to or release of the data or chat history of our users, customers or platform partners could significantly limit the adoption of our services, as well as harm our reputation and brand. We expect to continue expending significant resources to protect against security breaches. The risk that these types of events could seriously harm our business is likely to increase as we expand the number of services we offer and increase the size of our user base.

Our practices may become inconsistent with new laws or regulations concerning data protection, or the interpretation and application of existing consumer and data protection laws or regulations, which is often uncertain and in flux. If so, in addition to the possibility of fines, this could result in an order requiring that we change our practices, which could have an adverse effect on our business and operating results. For example, the European Union General Data Protection Regulation ("GDPR"), which came into effect on May 25, 2018, includes operational requirements for companies that receive or process personal data of residents of the European Economic Area. The GDPR establishes new requirements applicable to the processing of personal data, affords new data protection rights to individuals and imposes penalties for serious data breaches. Individuals also have a right to compensation under the GDPR for financial or non-financial losses. Although we do not conduct any business in the European Economic Area, in the event that residents of the European Economic Area access our website and input protected information, we may become subject to provisions of the GDPR. Complying with new laws and regulations could cause us to incur substantial costs or require us to change our business practices in a manner materially adverse to our business. See also "—Risks Related to Doing Businesses in China—Uncertainties in the interpretation and enforcement of PRC laws and regulations could limit the legal protections available to you and us."

***The continuing and collaborative efforts of our senior management and key employees are crucial to our success, and our business may be harmed if we were to lose their services.***

We depend on the continued contributions of our senior management, especially the executive officers listed in "Item 6. Directors, Senior Management and Employees—A. Directors and Senior Management" section of this annual report, and other key employees, many of whom are difficult to replace. The loss of the services of any of our executive officers or other key employees could materially harm our business. Competition for qualified talents in China is intense. Our future success is dependent on our ability to attract a significant number of qualified employees and retain existing key employees. If we are unable to do so, our business and growth may be materially and adversely affected and the trading price of our ADSs could suffer. Our need to significantly increase the number of our qualified employees and retain key employees may cause us to materially increase compensation-related costs, including stock-based compensation.

***We may not be able to adequately protect our intellectual property, which could cause us to be less competitive and third-party infringements of our intellectual property rights may adversely affect our business.***

We rely on a combination of patent, copyright, trademark and trade secret laws and restrictions on disclosure to protect our intellectual property rights. See also "Item 4. Information on the Company—B. Business Overview." Despite our efforts to protect our proprietary rights, third parties may attempt to copy or otherwise obtain and use our intellectual property or seek court declarations that they do not infringe upon our intellectual property rights. Monitoring unauthorized use of our intellectual property is difficult and costly, and we cannot be certain that the steps we have taken will prevent misappropriation of our intellectual property. From time to time, we may have to resort to litigation to enforce our intellectual property rights, which could result in substantial costs and diversion of our resources.

There have been instances where third parties have cloned and launched counterfeits of our Momo mobile application on app stores or internet forums. Some of these counterfeits, once installed inadvertently by mobile users, were reported to automatically download and install other applications to these users' mobile phones, charging them various fees. These counterfeits may mislead mobile users and negatively affect their perception of our application. Moreover, we may have to expend resources in connection with any legal actions that we take to curb these counterfeiting activities in order

to protect our intellectual property rights, user experience and brand perception.

13

Table of Contents

***We have been and may be subject to intellectual property infringement claims or other allegations by third parties for information or content displayed on, retrieved from or linked to our platform, or distributed to our users, which may materially and adversely affect our business, financial condition and prospects.***

We have been, and may in the future be, subject to intellectual property infringement claims or other allegations by third parties for services we provide or for information or content displayed on, retrieved from or linked to our platform, or distributed to our users, which may materially and adversely affect our business, financial condition and prospects.

Companies in the internet, technology and media industries are frequently involved in litigation based on allegations of infringement of intellectual property rights, unfair competition, invasion of privacy, defamation and other violations of other parties' rights. The validity, enforceability and scope of protection of intellectual property rights in internet-related industries, particularly in China, are uncertain and still evolving. We have faced, from time to time, and expect to face in the future, allegations that we have infringed the trademarks, copyrights, patents and other intellectual property rights of third parties, including our competitors, or allegations that we are involved in unfair trade practices. For example, on October 22, 2015, we were served a civil complaint by Guangzhou Tian He People's Court in which the plaintiff claimed that *Xiaoyao Xiyou*, a game that we previously operated and have ceased operating since November 2017, infringed upon the plaintiff's copyright in works of literature and art of a game, constituting unfair competition. The plaintiff demanded that we cease the infringement and pay compensation and legal costs totaling approximately RMB10 million (US$1.5 million). On August 31, 2017, Guangzhou Tian He People's Court ruled a civil judgement of first-instance, which ordered us and the developer of *Xiaoyao Xiyou* to cease the infringement and pay compensation in the amount of RMB5.0 million (US$0.8 million) to the plaintiff. The developer of *Xiaoyao Xiyou* filed an appeal to the Guangzhou Intellectual Property Court. On September 27, 2018, Guangzhou Intellectual Property Court ruled a civil judgement of final-instance, which ordered us and the developer of *Xiaoyao Xiyou* to cease the infringement and pay compensation in the amount of RMB4.0 million (US$0.6 million) to the plaintiff. We paid the compensation in full to the plaintiff on October 10, 2018. The plaintiff filed a re-trial application with the Guangdong Provincial Higher People's Court for revoking the civil judgement of final-instance ruled by the Guangzhou Intellectual Property Court and remaining the civil judgement of first-instance ruled by the Guangzhou Tian He People's Court. The re-trail hearing has yet to be carried out as of the date of this annual report. On February 20, 2019, we were served four civil complaints by Shenzhen Intermediate People's Court in which the plaintiff claimed that our app infringed upon the plaintiff's four patents. The plaintiff demanded that we cease the infringement and compensate its loss and legal costs totaling approximately RMB 4 million (US$0.6 million) in relation to the four patents under the four complaints. The hearings have yet to be carried out as of the date of this annual report. See "Item 8. Financial Information— A. Consolidated Statements and Other Financial Information—Legal Proceedings." As we face increasing competition and as litigation becomes a more common method for resolving commercial disputes in China, we face a higher risk of being the subject of intellectual property infringement claims.

We allow users to upload text, graphics, audio, video and other content to our platform and download, share, link to and otherwise access games and other content on our platform. We have procedures designed to reduce the likelihood that content might be used without proper licenses or third-party consents. However, these procedures may not be effective in preventing the unauthorized posting of copyrighted content. Therefore, we may face liability for copyright or trademark infringement, defamation, unfair competition, libel, negligence, and other claims based on the nature and content of the materials that are delivered, shared or otherwise accessed through our platform.

Defending intellectual property litigation is costly and can impose a significant burden on our management and employees, and there can be no assurances that favorable final outcomes will be obtained in all cases. Such claims, even if they do not result in liability, may harm our reputation. Any resulting liability or expenses, or changes required to our platform to reduce the risk of future liability, may have a material adverse effect on our business, financial condition and prospects.

14

Table of Contents

***User growth and engagement depend upon effective interoperation with mobile operating systems, networks, mobile devices and standards that we do not control.***

We make our services available across a variety of mobile operating systems and devices. We are dependent on the interoperability of our services with popular mobile devices and mobile operating systems that we do not control, such as Android, iOS and Windows. Any changes in such mobile operating systems or devices that degrade the functionality of our services or give preferential treatment to competitive services could adversely affect usage of our services. Further, if the number of platforms for which we develop our services increases, which is typically seen in a dynamic and fragmented mobile services market such as China, it will result in an increase in our costs and expenses. In order to deliver high-quality services, it is important that our services work well across a range of mobile operating systems, networks, mobile devices and standards that we do not control. We may not be successful in developing relationships with key participants in the mobile industry or in developing services that operate effectively with these operating systems, networks, devices and standards. In the event that it is difficult for our users to access and use our services, particularly on their mobile devices, our user growth and user engagement could be harmed, and our business and operating results could be adversely affected.

***Our operations depend on the performance of the internet infrastructure and fixed telecommunications networks in China.***

Almost all access to the internet in China is maintained through state-owned telecommunication operators under the administrative control and regulatory supervision of the Ministry of Industry and Information Technology, or the MIIT. Moreover, we primarily rely on a limited number of telecommunication service providers to provide us with data communications capacity through local telecommunications lines and internet data centers

to host our servers. We have limited access to alternative networks or services in the event of disruptions, failures or other problems with China's internet infrastructure or the fixed telecommunications networks provided by telecommunications service providers. Web traffic in China has experienced significant growth during the past few years. Effective bandwidth and server storage at internet data centers in large cities such as Beijing are scarce. With the expansion of our business, we may be required to upgrade our technology and infrastructure to keep up with the increasing traffic on our platform. We cannot assure you that the internet infrastructure and the fixed telecommunications networks in China will be able to support the demands associated with the continued growth in internet usage. If we cannot increase our capacity to deliver our online services, we may not be able to keep up with the increases in traffic we anticipate from our expanding user base, and the adoption of our services may be hindered, which could adversely impact our business and our ADS price.

In addition, we have no control over the costs of the services provided by telecommunications service providers. If the prices we pay for telecommunications and internet services rise significantly, our results of operations may be materially and adversely affected. Furthermore, if internet access fees or other charges to internet users increase, some users may be prevented from accessing the mobile internet and thus cause the growth of mobile internet users to decelerate. Such deceleration may adversely affect our ability to continue to expand our user base.

***Our business and operating results may be harmed by service disruptions, cybersecurity related threats or by our failure to timely and effectively scale and adapt our existing technology and infrastructure.***

People use our platform for real-time communication, socializing, entertainment and information. We have experienced, and may in the future experience, service disruptions, outages and other performance problems due to a variety of factors, including infrastructure changes and cybersecurity related threats as follows:

- our technology, system, networks and our users' devices have been subject to, and may continue to be the target of, cyber-attacks, computer viruses, malicious code, phishing attacks or information security breaches that could result in an unauthorized release, gathering, monitoring, misuse, loss or destruction of confidential, proprietary and other information of ours, our employees or sensitive information provided by our users, or otherwise disrupt our, our users' or other third parties' business operations;

- we periodically encounter attempts to create false accounts or use our platform to send targeted and untargeted spam messages to our users, or take other actions on our platform for purposes such as spamming or spreading misinformation, and we may not be able to repel spamming attacks;

- the use of encryption and other security measures intended to protect our systems and confidential data may not provide absolute security, and losses or unauthorized access to or releases of confidential information may still occur;

<div align="center">15</div>

Table of Contents

- our security measures may be breached due to employee error, malfeasance or unauthorized access to sensitive information by our employees, who may be induced by outside third parties, and we may not be able to anticipate any breach of our security or to implement adequate preventative measures; and

- we may be subject to information technology system failures or network disruptions caused by natural disasters, accidents, power disruptions, telecommunications failures, acts of terrorism or war, computer viruses, physical or electronic break-ins, or other events or disruptions.

Any disruption or failure in our services and infrastructure could also hinder our ability to handle existing or increased traffic on our platform or cause us to lose content stored on our platform, which could significantly harm our business and our ability to retain existing users and attract new users.

As the number of our users increases and our users generate more content on our platform, we may be required to expand and adapt our technology and infrastructure to continue to reliably store and analyze this content. It may become increasingly difficult to maintain and improve the performance of our services, especially during peak usage times, as our services become more complex and our user traffic increases. If our users are unable to access Momo mobile application in a timely fashion, or at all, our user experience may be compromised and the users may seek other mobile social networking tools to meet their needs, and may not return to Momo or use Momo as often in the future, or at all. This would negatively impact our ability to attract users and maintain the level of user engagement.

***Existing or future strategic alliances, long-term investments and acquisitions may have a material and adverse effect on our business, reputation and results of operations.***

We have made and intend to continue to make long-term investments in third-party companies. From time to time we evaluate and enter into discussions regarding potential long-term investments. Our existing and any future long-term investments could have a material impact on our financial condition and results of operations. If our long-term investments are unable to implement or remediate the necessary controls, procedures and policies, do not perform as we have expected or become less valuable to our business due to a change in our overall business strategy or other reasons, we may not be able to realize the anticipated benefits of investments and we may have to incur unanticipated liabilities, expenses, impairment charges or write-offs.

We may also in the future enter into strategic alliances with various third parties. Strategic alliances with third parties could subject us to a number of risks, including risks associated with sharing proprietary information, non-performance by a counterparty and an increase in expenses incurred in establishing new strategic alliances, any of which may materially and adversely affect our business. We may have little ability to control or monitor their actions and to the extent strategic third parties suffer negative publicity or harm to their reputation from events relating to their business, we may also suffer negative publicity or harm to our reputation by virtue of our association with such third parties.

In addition, we may acquire additional assets, technologies or businesses that are complementary to our existing business. Future acquisitions and the subsequent integration of new assets and businesses into our own would require significant attention from our management and could result in a diversion of resources from our existing business, which in turn could have an adverse effect on our business operations. Acquired assets or businesses may not generate the financial or operating results we expect. Moreover, the costs of identifying and consummating acquisitions may be significant. In addition to possible shareholders' approval, we may also have to obtain approvals and licenses from the governmental authorities in the PRC for the acquisitions and comply with applicable PRC laws and regulations, which could result in increased costs and delays. Acquisitions could result in the use of substantial amounts of cash, potentially dilutive issuances of equity securities, the incurrence of debt, the incurrence of significant goodwill impairment charges, amortization expenses for other intangible assets and exposure to potential unknown liabilities of the acquired business. Such use of cash may add significant liquidity pressure on us by materially reducing our existing cash balance and adversely affecting our working capital. The sale of equity or equity linked securities may further dilute our existing shareholders. Debt financings may subject us to restrictive covenants limiting or restricting our ability to take specific actions, such as incurring additional debt, making capital expenditures or declaring dividends.

16

Table of Contents

In February 2018, we reached a definitive agreement with Tantan Limited, or Tantan, a social and dating app in China, and all of its shareholders, pursuant to which we agreed to acquire 100% fully diluted equity stake in Tantan for a combination of share consideration and cash. The acquisition of Tantan, which closed in May 2018, exposes us to potential uncertainties and risks. For our acquisition of Tantan, we paid a combination of share consideration and cash, including approximately 5.3 million newly issued Class A ordinary shares of us and US$613.2 million in cash. As Tantan was founded in 2014 and has a short operating track record, it would be difficult for us to assess its future prospect or forecast its future results and thus we may not be able to achieve the objective of our acquisition of Tantan if Tantan's business does not develop as we expect. In addition, if Tantan continues to incur losses in the future, we would have to consolidate its losses as its sole shareholder, the occurrence of which would adversely affect our future profitability. After the consummation of the acquisition, we may face difficulties in integrating the internal control and financial reporting of Tantan and may incur unanticipated costs and expenses relating to such integration.

***We rely on assumptions and estimates to calculate certain key operating metrics, and real or perceived inaccuracies in such metrics may harm our reputation and negatively affect our business.***

The respective number of monthly active users of Momo and Tantan is calculated using internal company data that has not been independently verified. While the number of monthly active users is based on what we believe to be reasonable calculations for the applicable periods of measurement, there are inherent challenges in measuring usage and user engagement across our large user base. We treat each account as a separate user for the purposes of calculating our monthly active users, because it may not always be possible to identify people that have set up more than one account. Accordingly, the calculations of our monthly active users may not accurately reflect the actual number of people using Momo and Tantan.

Our measures of user growth and user engagement may differ from estimates published by third parties or from similarly titled metrics used by our competitors due to differences in methodology. If customers or platform partners do not perceive our user metrics to be accurate representations of our user base or user engagement, or if we discover material inaccuracies in our user metrics, our reputation may be harmed and customers and platform partners may be less willing to allocate their resources or spending to Momo or Tantan, which could negatively affect our business and operating results.

***We have granted, and expect to continue to grant, share options under our share incentive plans, which may result in increased share-based compensation expenses.***

We have adopted three share incentive plans as of the date of this annual report for the purpose of granting share-based compensation awards to employees, directors and consultants to incentivize their performance and align their interests with ours. In November 2012, we adopted a share incentive plan, or the 2012 Plan, which was amended and restated in October 2013. In November 2014, we adopted the 2014 share incentive plan, or the 2014 Plan, pursuant to which a maximum aggregate of 14,031,194 Class A ordinary shares may be issued pursuant to all awards granted thereunder. Beginning in 2017, the number of shares reserved for future issuances under the 2014 Plan will be increased by a number equal to 1.5% of the total number of outstanding shares on the last day of the immediately preceding calendar year, or such lesser number of Class A ordinary shares as determined by our board of directors on the first day of each calendar year during the term of the 2014 Plan. With the adoption of the 2014 Plan, we will no longer grant any incentive shares under the 2012 Plan. In addition, in January 2015, Momo Technology Overseas Holding Company Limited, or Momo BVI, our wholly-owned BVI subsidiary, adopted a share incentive plan, or the BVI Plan. In March 2015, Tantan adopted the 2015 Share Incentive Plan, or the Tantan 2015 Plan, and in July 2018, Tantan adopted the 2018 Share Incentive Plan, or the Tantan 2018 Plan. With the adoption of the Tantan 2018 Plan, we will no longer grant any incentive awards under the Tantan 2015 Plan. As of March 31, 2019, options to purchase 28,769,414 Class A ordinary shares (excluding those already forfeited) had been granted under the 2012 Plan, 5,466,618 of which remained outstanding. In addition, as of March 31, 2019, options to purchase 23,462,705 Class A ordinary shares (excluding those already forfeited and cancelled) and 440,001 restricted share units had been granted under the 2014 Plan, of which 15,404,425 options remained outstanding and 187,500 restricted share units remained outstanding. As of March 31, 2019, options to purchase an aggregate of nil shares of Momo BVI under the BVI Plan remained outstanding. As of March 31, 2019, there were 22,046,890 ordinary shares of Tantan outstanding, and options to purchase 1,308,541 ordinary shares of Tantan (excluding those that have been forfeited) had been granted under the Tantan 2015 Plan, all of which remained outstanding, and options to purchase 4,160,240 ordinary shares of Tantan (excluding those that have been forfeited) had been granted under the Tantan 2018 Plan, all of which remained outstanding. See "Item 6. Directors, Senior Management and Employees—B. Compensation" for a detailed discussion. We expect to incur share-based compensation expenses of RMB749.3 million, RMB683.2 million and RMB715.5 million in 2019 and 2020, and after 2020, respectively, in connection with the currently outstanding share-based awards, and we may grant additional share-based awards under our share incentive plans, which will further increase our share-based compensation expenses. We believe the granting of share-based awards is of significant importance to our ability to attract and retain our employees, and we will continue to grant share-based awards to employees in the future. As a result, our expenses associated with share-based compensation may increase, which may have an adverse effect on our results of operations.

17

**Table of Contents**

***If we fail to implement and maintain an effective system of internal controls, we may be unable to accurately report our results of operations or prevent fraud or fail to meet our reporting obligations, and investor confidence and the market price of our ADSs may be materially and adversely affected.***

We are subject to reporting obligations under the U.S. securities laws. The Securities and Exchange Commission, or the SEC, as required by Section 404 of the Sarbanes-Oxley Act of 2002, has adopted rules requiring every public company to include a report of management in its annual report that contains management's assessment of the effectiveness of such company's internal controls over financial reporting. In addition, an independent registered public accounting firm must attest to and report on the effectiveness of the company's internal control over financial reporting.

Our management has concluded that our internal controls over financial reporting were effective as of December 31, 2018. Our independent registered public accounting firm has issued an attestation report, which has concluded that our internal control over financial reporting was effective in all material aspects as of December 31, 2018. However, if we fail to maintain effective internal controls over financial reporting in the future, our management and our independent registered public accounting firm may not be able to conclude that we have effective internal controls over financial reporting at a reasonable assurance level. This could result in a loss of investor confidence in the reliability of our financial conditions which in turn could negatively impact the trading price of our ADSs and result in lawsuits being filed against us by our shareholders or otherwise harm our reputation. Furthermore, we have incurred and anticipate that we will continue to incur considerable costs and use significant management time and other resources in an effort to comply with Section 404 and other requirements of the Sarbanes-Oxley Act.

***We have limited insurance coverage.***

The insurance industry in China is still at an early stage of development and business and litigation insurance products offered in China are limited. Other than the directors and officers liability insurance, we do not maintain any third-party liability, property, business interruption or key-man life insurance. The costs of insuring for these risks and the difficulties associated with acquiring such insurance on commercially reasonable terms make it impractical for us to have such insurance. In addition, any insurance policies that we maintain may not adequately cover our actual loss and we may not be able to successfully claim our losses under the insurance policies at all or on a timely basis. Any business disruption, litigation or natural disaster may cause us to incur substantial costs and divert our resources.

***We face risks related to health epidemics and natural disasters.***

Our business could be adversely affected by the effects of epidemics. In recent years, there have been outbreaks of epidemics in China and globally. Our business operations could be disrupted if one of our employees is suspected of having H1N1 flu, avian flu or another epidemic, since it could require our employees to be quarantined and/or our offices to be disinfected. In addition, our results of operations could be adversely affected to the extent that the outbreak harms the Chinese economy in general and the mobile internet industry in particular.

We are also vulnerable to natural disasters and other calamities. Although we have servers that are hosted in an offsite location, our backup system does not capture data on a real-time basis and we may be unable to recover certain data in the event of a server failure. We cannot assure you that any backup systems will be adequate to protect us from the effects of fire, floods, typhoons, earthquakes, power loss, telecommunications failures, break-ins, war, riots, terrorist attacks or similar events. Any of the foregoing events may give rise to server interruptions, breakdowns, system failures, technology platform failures or internet failures, which could cause the loss or corruption of data or malfunctions of software or hardware as well as adversely affect our ability to provide services on our platform.

**Table of Contents**

**Risks Related to Our Corporate Structure**

***If the PRC government finds that the agreements that establish the structure for operating our businesses in China do not comply with PRC regulations on foreign investment in internet and other related businesses, or if these regulations or their interpretation change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations.***

Current PRC laws and regulations impose certain restrictions or prohibitions on foreign ownership of companies that engage in internet and other related businesses, including the provision of internet content and online game operations. Specifically, foreign ownership of an internet content provider may not exceed 50%. Internet content and online game operations, which are critical to our business, are provided through a number of our PRC incorporated consolidated affiliated entities. Contractual arrangements between us and the consolidated affiliated entities and their respective shareholders allow us to exert effective control over each of these consolidated affiliated entities and enable us to obtain substantially all of the economic benefits arising from these consolidated affiliated entities and consolidate their financial results into our results of operations. Although the structure we have adopted is consistent with the longstanding industry practice and is commonly adopted by comparable companies in China, the PRC government may not agree that these contractual arrangements comply with existing PRC licensing, registration or other regulatory requirements or policies, or requirements or policies that may be adopted in the future.

In the opinion of our PRC counsel, Han Kun Law Offices, the ownership structure of our PRC subsidiaries and consolidated affiliated entities are in compliance with existing PRC laws, rules and regulations. There are, however, substantial uncertainties regarding the interpretation and application of current or future PRC laws and regulations. Thus, we cannot assure you that the PRC government will not ultimately take a view contrary to the opinion of our PRC counsel. If we are found to be in violation of any PRC laws or regulations or if the contractual arrangements among our PRC subsidiaries, our consolidated affiliated entities and their respective shareholders are determined to be illegal or invalid by the PRC court, arbitral tribunal or regulatory authorities, the relevant governmental authorities would have broad discretion in dealing with such violation, including, without limitation:

- revoke our business and operating licenses;

- require us to discontinue or restrict operations;

- restrict our right to collect revenues;

- block our websites;

- require us to restructure the operations in such a way as to compel us to establish a new enterprise, re-apply for the necessary licenses or relocate our businesses, staff and assets;

- impose additional conditions or requirements with which we may not be able to comply; or

- take other regulatory or enforcement actions against us that could be harmful to our business.

The imposition of any of these penalties may result in a material and adverse effect on our ability to conduct our business. In addition, if the imposition of any of these penalties causes us to lose the rights to direct the activities of our consolidated affiliated entities and their subsidiaries or the right to receive their economic benefits, we would no longer be able to consolidate our consolidated affiliated entities and their subsidiaries. We do not believe that any penalties imposed or actions taken by the PRC government would result in the liquidation of our company, our PRC subsidiaries, or our consolidated affiliated entities and their subsidiaries.

***We rely on contractual arrangements with our consolidated affiliated entities and their respective shareholders for our operations in China, which may not be as effective in providing operational control as direct ownership.***

Due to the PRC restrictions or prohibitions on foreign ownership of internet and other related businesses in China, we operate our business in China through a number of our consolidated affiliated entities, in which we have no ownership interest. We rely on a series of contractual arrangements with our consolidated affiliated entities and their respective shareholders, including the powers of attorney, to control and operate its business.

19

Table of Contents

Our ability to control the consolidated affiliated entities depends on the powers of attorney, pursuant to which our PRC subsidiaries can vote on all matters requiring shareholder approval in the consolidated affiliated entities. We believe this power of attorney is legally enforceable but may not be as effective as direct equity ownership. These contractual arrangements are intended to provide us with effective control over our consolidated affiliated entities and allow us to obtain economic benefits from them. See "Item 4. Information on the Company—C. Organizational Structure—Contractual Arrangements with Our Consolidated Affiliated Entities and Their Respective Shareholders" for more details about these contractual arrangements.

Although we have been advised by our PRC counsel, Han Kun Law Offices, that these contractual arrangements are valid, binding and enforceable under existing PRC laws and regulations, these contractual arrangements may not be as effective in providing control over our consolidated affiliated entities as direct ownership. If our consolidated affiliated entities or their respective shareholders fail to perform their respective obligations under the contractual arrangements, we may incur substantial costs and expend substantial resources to enforce our rights. All of these contractual arrangements are governed by and interpreted in accordance with PRC law, and disputes arising from these contractual arrangements will be resolved through arbitration in China. However, the legal system in China, particularly as it relates to arbitration proceedings, is not as developed as in other jurisdictions, such as the United States. See "—Risks Related to Doing Business in China—Uncertainties in the interpretation and enforcement of PRC laws and regulations could limit the legal protections available to you and us." There are very few precedents and little official guidance as to how contractual arrangements in the context of a variable interest entity, or a consolidated affiliated entity, should be interpreted or enforced under PRC law. There remain significant uncertainties regarding the ultimate outcome of arbitration should legal action become necessary. These uncertainties could limit our ability to enforce these contractual arrangements. In addition, arbitration awards are final and can only be enforced in PRC courts through arbitration award recognition proceedings, which could cause additional expenses and delays. In the event we are unable to enforce these contractual arrangements or we experience significant delays or other obstacles in the process of enforcing these contractual arrangements, we may not be able to exert effective control over our consolidated affiliated entities and may lose control over the assets owned by our consolidated affiliated entities. As a result, we may be unable to consolidate our consolidated affiliated entities in our consolidated financial statements, our ability to conduct our business may be negatively affected, and our business operations could be severely disrupted, which could materially and adversely affect our results of operations and financial condition.

***We may lose the ability to use and enjoy assets held by our consolidated affiliated entities that are important to the operation of our business if consolidated affiliated entities declares bankruptcy or becomes subject to a dissolution or liquidation proceeding.***

Our consolidated affiliated entities hold certain assets that are important to our business operations, including the value-added telecommunication service license concerning the internet information service, or the ICP license, the internet culture operation license and the internet audio/video program transmission license. Under our contractual arrangements, the respective shareholders of our consolidated affiliated entities may not voluntarily liquidate our consolidated affiliated entities or approve them to sell, transfer, mortgage or dispose of their respective assets or legal or beneficial interests exceeding certain threshold in the business in any manner without our prior consent. However, in the event that the shareholders breach this obligation and voluntarily liquidate our consolidated affiliated entities, or our consolidated affiliated entities declare bankruptcy, or all or part of their assets become subject to liens or rights of third-party creditors, we may be unable to continue some or all of our business operations, which could materially and adversely affect our business, financial condition and results of operations. Furthermore, if our consolidated affiliated entities undergo a voluntary or involuntary liquidation proceeding, their respective shareholders or unrelated third-party creditors may claim rights to some or all of its assets, thereby hindering our ability to operate our business, which could materially and adversely affect our business, financial condition and results of operations.

***Contractual arrangements we have entered into with our consolidated affiliated entities may be subject to scrutiny by the PRC tax authorities. A***

*finding that we owe additional taxes could significantly reduce our consolidated net income and the value of your investment.*

Pursuant to applicable PRC laws and regulations, arrangements and transactions among related parties may be subject to audit or challenge by the PRC tax authorities. We may be subject to adverse tax consequences if the PRC tax authorities determine that the contractual arrangements among our PRC subsidiaries, our consolidated affiliated entities and their respective shareholders are not on an arm's length basis and therefore constitute favorable transfer pricing. As a result, the PRC tax authorities could require that our consolidated affiliated entities adjust their taxable income upward for PRC tax purposes. Such an adjustment could adversely affect us by increasing our consolidated affiliated entities' tax expenses without reducing the tax expenses of our PRC subsidiaries, subjecting our consolidated affiliated entities to late payment fees and other penalties for under-payment of taxes, and resulting in our PRC subsidiaries' loss of their preferential tax treatment. Our consolidated results of operations may be adversely affected if our consolidated affiliated entities' tax liabilities increase or if it is subject to late payment fees or other penalties.

20

Table of Contents

*If the chops of our PRC subsidiaries and our consolidated affiliated entities are not kept safely, are stolen or are used by unauthorized persons or for unauthorized purposes, the corporate governance of these entities could be severely and adversely compromised.*

In China, a company chop or seal serves as the legal representation of the company towards third parties even when unaccompanied by a signature. Each legally registered company in China is required to maintain a company chop, which must be registered with the local Public Security Bureau. In addition to this mandatory company chop, companies may have several other chops which can be used for specific purposes. The chops of our PRC subsidiaries and our consolidated affiliated entities are generally held securely by personnel designated or approved by us in accordance with our internal control procedures. To the extent those chops are not kept safe, are stolen or are used by unauthorized persons or for unauthorized purposes, the corporate governance of these entities could be severely and adversely compromised and those corporate entities may be bound to abide by the terms of any documents so chopped, even if they were chopped by an individual who lacked the requisite power and authority to do so.

*The shareholders of our consolidated affiliated entities may have potential conflicts of interest with us, which may materially and adversely affect our business.*

Some of the shareholders of our consolidated affiliated entities are also our directors or officers. Conflicts of interest may arise between the roles of these individuals as directors or officers of our company and as shareholders of our consolidated affiliated entities. We rely on these individuals to abide by the laws of the Cayman Islands, which provide that directors and officers owe a fiduciary duty to our company to act in good faith and in the best interest of our company and not to use their positions for personal gain. The shareholders of our consolidated affiliated entities have executed powers of attorney to appoint our PRC subsidiaries, or a person designated by our PRC subsidiaries to vote on their behalf and exercise voting rights as shareholders of our consolidated affiliated entities. We cannot assure you that when conflicts arise, shareholders of our consolidated affiliated entities will act in the best interest of our company or that conflicts will be resolved in our favor. If we cannot resolve any conflicts of interest or disputes between us and these shareholders, we would have to rely on legal proceedings, which may be expensive, time-consuming and disruptive to our operations. There is also substantial uncertainty as to the outcome of any such legal proceedings.

*We may rely on dividends paid by our PRC subsidiaries to fund cash and financing requirements. Any limitation on the ability of our PRC subsidiaries to pay dividends to us could have a material adverse effect on our ability to conduct our business and to pay dividends to holders of the ADSs and our ordinary shares.*

We are a holding company, and we may rely on dividends to be paid by our PRC subsidiaries for our cash and financing requirements, including the funds necessary to pay dividends and other cash distributions to the holders of the ADSs and our ordinary shares and service any debt we may incur. If our PRC subsidiaries incur debt on their own behalf in the future, the instruments governing the debt may restrict their ability to pay dividends or make other distributions to us.

Under PRC laws and regulations, a wholly foreign-owned enterprises in the PRC, such as Beijing Momo Information Technology Co., Ltd., or Beijing Momo IT, may pay dividends only out of its accumulated profits as determined in accordance with PRC accounting standards and regulations. In addition, a wholly foreign-owned enterprise is required to set aside at least 10% of its after-tax profits each year, after making up previous years' accumulated losses, if any, to fund certain statutory reserve funds, until the aggregate amount of such a fund reaches 50% of its registered capital. At the discretion of the board of director of the wholly foreign-owned enterprise, it may allocate a portion of its after-tax profits based on PRC accounting standards to staff welfare and bonus funds. These reserve funds and staff welfare and bonus funds are not distributable as cash dividends. Any limitation on the ability of our wholly-owned PRC subsidiary to pay dividends or make other distributions to us could materially and adversely limit our ability to grow, make investments or acquisitions that could be beneficial to our business, pay dividends, or otherwise fund and conduct our business.

21

Table of Contents

**Risks Related to Doing Business in China**

*Uncertainties in the interpretation and enforcement of PRC laws and regulations could limit the legal protections available to you and us.*

The PRC legal system is based on written statutes and court decisions have limited precedential value. The PRC legal system evolves rapidly, and the interpretations of many laws, regulations and rules may contain inconsistencies and enforcement of these laws, regulations and rules involves uncertainties.

From time to time, we may have to resort to administrative and court proceedings to enforce our legal rights. However, since PRC judicial and administrative authorities have significant discretion in interpreting and implementing statutory and contractual terms, it may be more difficult to predict the outcome of a judicial or administrative proceeding than in more developed legal systems. Furthermore, the PRC legal system is based, in part, on government policies and internal rules, some of which are not published in a timely manner, or at all, but which may have retroactive effect. As a result, we may not always be aware of any potential violation of these policies and rules. Such unpredictability towards our contractual, property (including intellectual property) and procedural rights could adversely affect our business and impede our ability to continue our operations.

***We face uncertainties with respect to the implementation of the Foreign Investment Law and how it may impact the viability of our current corporate structure, corporate governance and business operations.***

On March 15, 2019, the National People's Congress approved the Foreign Investment Law, which will take effect on January 1, 2020 and replace the Sino-Foreign Equity Joint Venture Enterprise Law, the Sino-Foreign Cooperative Joint Venture Enterprise Law and the Foreign Owned Enterprise Law, together with their implementation rules and ancillary regulations, to become the legal foundation for foreign investment in the PRC. The Foreign Investment Law embodies an expected PRC regulatory trend to rationalize its foreign investment regulatory regime in line with prevailing international practice and the legislative efforts to unify the corporate legal requirements for both foreign and domestic investments. Under the Foreign Investment Law, "foreign investment" refers to the investment activities directly or indirectly conducted by foreign individuals, enterprises or other entities in China. The Foreign Investment Law stipulates three forms of foreign investment, and does not explicitly stipulate contractual arrangements as a form of foreign investment. However, the Foreign Investment Law provides a catch-all provision under the definition of "foreign investment" to include investments made by foreign investors in China through means stipulated by laws or administrative regulations, or other methods prescribed by the State Council. Therefore, there are possibilities that future laws, administrative regulations or provisions prescribed by the State Council may regard contractual arrangements as a form of foreign investment, at which time it would be uncertain as to whether foreign investment via contractual arrangements would be deemed to be in violation of the foreign investment access requirements and how the above-mentioned contractual arrangements would be regulated. There is no guarantee that the contractual arrangements and our business will not be materially and adversely affected in the future due to changes in PRC laws and regulations. If future laws, administrative regulations or provisions prescribed by the State Council mandate further actions to be completed by companies with existing contractual arrangements, we may face substantial uncertainties as to whether such actions can be timely completed, or at all. Failure to take timely and appropriate measures to cope with any of these or similar regulatory compliance challenges could materially and adversely affect our current corporate structure and business operations.

***If we fail to obtain and maintain the requisite licenses and approvals required under the complex regulatory environment applicable to our businesses in China, or if we are required to take compliance actions that are time-consuming or costly, our business, financial condition and results of operations may be materially and adversely affected.***

The internet and mobile industries in China are highly regulated. Beijing Momo Technology Co., Ltd., or Beijing Momo, and its subsidiaries are required to obtain and maintain applicable licenses and approvals from different regulatory authorities in order to provide their current services. Under the current PRC regulatory scheme, a number of regulatory agencies, including but not limited to the State Administration of Press, Publication, Radio, Film and Television, or SARFT, the Ministry of Culture, or MOC, Ministry of Industry and Information Technology, or MIIT, and the State Council Information Office, or SCIO, jointly regulate all major aspects of the internet industry, including the mobile internet and mobile games businesses. Operators must obtain various government approvals and licenses for relevant mobile business.

22

Table of Contents

We have obtained the ICP licenses for provision of internet information services, internet culture operation license for operation of online games, and internet audio/video program transmission license for our live video service. These licenses are essential to the operation of our business and are generally subject to regular government review or renewal. However, we cannot assure you that we can successfully renew these licenses in a timely manner or that these licenses are sufficient to conduct all of our present or future business. In addition, we cannot assure you that we will be able to secure any additional licenses that we may need to conduct our operations.

We are also required to obtain an internet publishing license from SARFT in order to publish online games through the mobile networks. As of the date of this annual report, we have yet to obtain an internet publishing license, and are in the process of preparing the application documents. We have entered into several cooperation agreements with entities holding the internet publishing license in order to publish online games. Each mobile game is also required to be approved by SARFT prior to the commencement of its operations in China. As of the date of this annual report, we have obtained approvals from the SARFT for all of the 12 games. In the event of any failure to meet the above-mentioned requirements, we may no longer be able to offer games on our platform, which would have an adverse effect on our business and results of operations. All domestic online games must be filed with the MOC within 30 days after operation, and all imported online games must be approved by the MOC. As of March 31, 2019, 11 of the 12 online games we offered had completed the filing with the MOC. If we fail to complete, obtain or maintain any of the required licenses or approvals or make the necessary filings, we may be subject to various penalties, such as confiscation of the net revenues that were generated through online games, the imposition of fines and the discontinuation or restriction of our operations of online games.

Failure to complete, obtain or maintain any of the required licenses or approvals or make the necessary filings has resulted in, and may in the future result in, us being subjected to various penalties, such as confiscation of the net revenues that were generated through the unlicensed internet or mobile activities, the imposition of fines and the discontinuation or restriction of our operations. Any such penalties may disrupt our business operations and materially and adversely affect our business, financial condition and results of operations.

***Regulation and censorship of information disseminated over the mobile and internet in China may adversely affect our business and subject us to liability for content posted on our platform.***

Internet companies in China are subject to a variety of existing and new rules, regulations, policies, and license and permit requirements. In connection with enforcing these rules, regulations, policies and requirements, relevant government authorities may suspend services by, or revoke licenses of, any internet or mobile content service provider that is deemed to provide illicit or pornographic information or content online or on mobile

devices, and such activities may be intensified in connection with any ongoing government campaigns to eliminate prohibited content online. The competent government authorities, including the State Internet Information Office, the Ministry of Industry and Information Technology and the Ministry of Public Security, may crack down on illicit and pornographic information and content in the internet information services industry from time to time. Applicable sanctions, including fines, revocation of online publishing and online video licenses, and criminal prosecution, may be imposed on the provider of such information or content or its responsible officers.

We endeavor to eliminate illicit and pornographic information and content from our platform. We have made substantial investments in resources to monitor content that users post on our platform and the way in which our users engage with each other through our platform. Since our inception, we have terminated tens of million user accounts because we viewed content generated by those users to be indecent and we terminated a substantial percentage of new user accounts in order to eliminate spam, fictitious accounts and indecent content from our platform. We use a variety of methods to ensure our platform remains a healthy and positive experience for our users, including a designated content management team, licensed third-party software, and our own data analytics software. Although we employ these methods to filter our users and content posted by our users, we cannot be sure that our internal content control efforts will be sufficient to remove all content that may be viewed as indecent or otherwise non-compliant with PRC law and regulations. Government standards and interpretations as to what constitutes illicit and pornographic online information, content or behavior are subject to interpretation and may change. Government standards and interpretations may change in a manner that could render our current monitoring efforts insufficient. The Chinese government has wide discretion in regulating online activities and, irrespective of our efforts to control the content on our platform, government campaigns and other actions to reduce illicit and pornographic content and activities could subject us to negative press or regulatory challenges and sanctions, including fines, the suspension or revocation of our licenses to operate in China or a ban of our platform, including closure of one or more parts of or our entire business. Further, our senior management could be held criminally liable if we are deemed to be profiting from illicit and pornographic content on our platform. Although our business and operations have not been materially adversely affected by government campaigns or any other regulatory actions in the past, we cannot assure you that our business and operations will be immune from government actions or sanctions in the future. If government actions or sanctions are brought against us, or if there are widespread rumors that government actions or sanctions have been brought against us, our reputation could be harmed, we may lose users, customers or platform partners, our revenues and results of operation may be materially and adversely affected and the price of our ADSs could be dramatically reduced.

<div align="center">23</div>

Table of Contents

### Adverse changes in economic and political policies of the PRC government could have a material and adverse effect on overall economic growth in China, which could materially and adversely affect our business.

Our revenues are substantially generated in China. Accordingly, our results of operations, financial condition and prospects are influenced by economic, political and legal developments in China. Economic reforms begun in the late 1970s have resulted in significant economic growth. However, any economic reform policies or measures in China may from time to time be modified or revised. China's economy differs from the economies of most developed countries in many respects, including with respect to the amount of government involvement, level of development, growth rate, control of foreign exchange and allocation of resources. While the PRC economy has experienced significant growth in the past 30 years, growth has been uneven across different regions and between economic sectors. The PRC government exercises significant control over China's economic growth through strategically allocating resources, controlling the payment of foreign currency-denominated obligations, setting monetary policy and providing preferential treatment to particular industries or companies. Although the Chinese economy has grown significantly in the past decade, that growth may not continue, as evidenced by the slowing of the growth of the Chinese economy since 2012. Any adverse changes in economic conditions in China, in the policies of the Chinese government or in the laws and regulations in China could have a material adverse effect on the overall economic growth of China. Such developments could adversely affect our business and operating results, lead to reduction in demand for our services and adversely affect our competitive position.

### Under the PRC Enterprise Income Tax Law, we may be classified as a PRC "resident enterprise," which could result in unfavorable tax consequences to us and our shareholders and have a material adverse effect on our results of operations and the value of your investment.

Under the PRC Enterprise Income Tax Law, or the EIT Law, which became effective on January 1, 2008, as amended on September 1, 2011, February 24, 2017 and further amended on December 29, 2018, an enterprise established outside the PRC with "de facto management bodies" within the PRC is considered a "resident enterprise" for PRC enterprise income tax purposes and is generally subject to a uniform 25% enterprise income tax rate on its worldwide income. In 2009, the State Administration of Taxation, or the SAT, issued the Notice Regarding the Determination of Chinese-Controlled Overseas Incorporated Enterprises as PRC Tax Resident Enterprise on the Basis of De Facto Management Bodies, or SAT Circular 82, which provides certain specific criteria for determining whether the "de facto management body" of a PRC-controlled enterprise that is incorporated offshore is located in China. Further to SAT Circular 82, on July 27, 2011, the SAT issued the Administrative Measures for Enterprise Income Tax of Chinese-Controlled Offshore Incorporated Resident Enterprises (Trial), or SAT Bulletin 45, to provide more guidance on the implementation of SAT Circular 82; the bulletin became effective on September 1, 2011. SAT Bulletin 45 clarified certain issues in the areas of resident status determination, post-determination administration and competent tax authorities' procedures.

According to SAT Circular 82, an offshore incorporated enterprise controlled by a PRC enterprise or a PRC enterprise group will be considered as a PRC tax resident enterprise by virtue of having its "de facto management body" in China and will be subject to PRC enterprise income tax on its worldwide income only if all of the following conditions are met: (a) the senior management and core management departments in charge of its daily operations function have their presence mainly in the PRC; (b) its financial and human resources decisions are subject to determination or approval by persons or bodies in the PRC; (c) its major assets, accounting books, company seals, and minutes and files of its board and shareholders' meetings are located or kept in the PRC; and (d) more than half of the enterprise's directors or senior management with voting rights habitually reside in the PRC. SAT Bulletin 45 specifies that when provided with a copy of Chinese tax resident determination certificate from a resident Chinese controlled offshore incorporated enterprise, the payer should not withhold 10% income tax when paying the Chinese-sourced dividends, interest, royalties, among others, to the Chinese controlled offshore incorporated enterprise.

<div align="center">24</div>

Table of Contents

Although SAT Circular 82 and SAT Bulletin 45 only apply to offshore incorporated enterprises controlled by PRC enterprises or PRC enterprise groups and not those controlled by PRC individuals or foreigners, the determination criteria set forth therein may reflect the SAT's general position on how the term "de facto management body" could be applied in determining the tax resident status of offshore enterprises, regardless of whether they are controlled by PRC enterprises, individuals or foreigners.

If the PRC tax authorities determine that we or any of our non-PRC subsidiaries is a PRC resident enterprise for PRC enterprise income tax purposes, then we or any such non-PRC subsidiary could be subject to PRC tax at a rate of 25% on its world-wide income, which could materially reduce our net income. In addition, we will also be subject to PRC enterprise income tax reporting obligations.

If the PRC tax authorities determine that our company is a PRC resident enterprise for PRC enterprise income tax purposes, gains realized on the sale or other disposition of ADSs or ordinary shares may be subject to PRC tax, at a rate of 10% in the case of non-PRC enterprise holders or 20% in the case of non-PRC individual holders, if such gains are deemed to be from PRC sources. In addition, any payments of dividends or interest on the ADSs, ordinary shares may be subject to PRC withholding tax at a rate of 10% in the case of non-PRC enterprise holders or 20% in the case of non-PRC individual holders, if such dividends or interest payments are deemed to be from PRC sources. Any PRC tax liability may be reduced under applicable tax treaties. However, it is unclear whether if we are considered a PRC resident enterprise, holders of our ADSs, ordinary shares will be able to claim the benefit of income tax treaties between China and other countries.

Further, if we are required to withhold PRC tax from interest payments on the ADSs, we may be required, subject to certain exceptions, to pay additional amounts as will result in receipt by holders of ADSs of such amounts as would have been received had no such withholding been required. The requirement to pay additional amounts will increase the cost of servicing interest payments on the ADSs and could have an adverse effect on our financial condition.

***We face uncertainty with respect to indirect transfer of equity interests in PRC resident enterprises by their non-PRC holding companies.***

We face uncertainties regarding the reporting on and consequences of previous private equity financing transactions involving the transfer and exchange of shares in our company by non-resident investors. According to the Notice on Strengthening Administration of Enterprise Income Tax for Share Transfers by Non-PRC Resident Enterprises issued by the PRC State Administration of Taxation on December 10, 2009, with retroactive effect from January 1, 2008, or SAT Circular 698, where a non-resident enterprise transfers the equity interests in a PRC resident enterprise indirectly through a disposition of equity interests in an overseas holding company (other than a purchase and sale of shares issued by a PRC resident enterprise in public securities market), or an Indirect Transfer, and such overseas holding company is located in a tax jurisdiction that: (a) has an effective tax rate less than 12.5% or (b) does not tax foreign income of its residents, the non-resident enterprise, as the seller, shall report such Indirect Transfer to the competent tax authority of the PRC resident enterprise within 30 days of execution of the equity transfer agreement for such Indirect Transfer. The PRC tax authority will examine the true nature of the Indirect Transfer, and if the tax authority considers that the foreign investor has adopted an abusive arrangement without reasonable commercial purposes and for the purpose of avoiding or reducing PRC tax, they will disregard the existence of the overseas holding company that is used for tax planning purposes and re-characterize the Indirect Transfer. As a result, gains derived from such Indirect Transfer may be subject to PRC withholding tax at the rate of up to 10%. SAT Circular 698 also points out that when a non-resident enterprise transfers its equity interests in a PRC resident enterprise to its related parties at a price lower than the fair market value, the competent tax authorities have the power to make a reasonable adjustment on the taxable income of the transaction.

On February 3, 2015, the SAT issued a Public Notice 2015 No. 7, or Public Notice 7, to supersede existing provisions in relation to the Indirect Transfer as set forth in Circular 698, while the other provisions of Circular 698 remain in force. Public Notice 7 introduces a new tax regime that is significantly different from that under Circular 698. Public Notice extends its tax jurisdiction to capture not only Indirect Transfer as set forth under Circular 698 but also transactions involving transfer of immovable property in China and assets held under the establishment and place in China of a foreign company through the offshore transfer of a foreign intermediate holding company. Public Notice 7 also addresses the transfer of the equity interest in a foreign intermediate holding company widely. In addition, Public Notice 7 provides clearer criteria than Circular 698 on how to assess reasonable commercial purposes and introduces safe harbor scenarios applicable to internal group restructurings. However, it also brings challenges to both the foreign transferor and transferee (or other person who is obligated to pay for the transfer) of the Indirect Transfer as they have to make self-assessment on whether the transaction should be subject to PRC tax and to file or withhold the PRC tax accordingly. In October 2017, the SAT issued the Announcement of the State Administration of Taxation on Issues Concerning the Withholding of Non-resident Enterprise Income Tax at Source, or Bulletin 37, which came into effect on December 1, 2017. The Bulletin 37 replaced and superseded, among other circulars, Circular 698, and further clarifies the practice and procedures of the withholding of non-resident enterprise income tax. Where a non-resident enterprise transfers taxable assets indirectly by disposing of the equity interests of an overseas holding company, which constitutes an Indirect Transfer, the non-resident enterprise as either the transferor or the transferee, or the PRC entity that directly owns the taxable assets, may report such Indirect Transfer to the relevant tax authority.

25

Table of Contents

Where non-resident investors were involved in our private equity financing, if such transactions were determined by the tax authorities to lack reasonable commercial purpose, we and our non-resident investors may become at risk of being taxed under Bulletin 37 and Public Notice 7 and may be required to expend valuable resources to comply with Bulletin 37 and Public Notice 7 or to establish that we should not be taxed under Bulletin 37 and Public Notice 7, which may have a material adverse effect on our financial condition and results of operations or the non-resident investors' investments in us.

The PRC tax authorities have the discretion under SAT Circular 59, Bulletin 37 and Public Notice 7 to make adjustments to the taxable capital gains based on the difference between the fair value of the equity interests transferred and the cost of investment. We may pursue acquisitions in the future that may involve complex corporate structures. If we are considered a non-resident enterprise under the PRC Enterprise Income Tax Law and if the PRC

tax authorities make adjustments to the taxable income of the transactions under SAT Circular 59, Bulletin 37 and Public Notice 7, our income tax costs associated with such potential acquisitions will be increased, which may have an adverse effect on our financial condition and results of operations.

***China's M&A Rules and certain other PRC regulations establish complex procedures for some acquisitions of Chinese companies by foreign investors, which could make it more difficult for us to pursue growth through acquisitions in China.***

The Regulations on Mergers and Acquisitions of Domestic Enterprises by Foreign Investors, or the M&A Rules, and other recently adopted regulations and rules concerning mergers and acquisitions established additional procedures and requirements that could make merger and acquisition activities by foreign investors more time consuming and complex. For example, the M&A Rules require that MOFCOM be notified in advance of any change-of-control transaction in which a foreign investor takes control of a PRC domestic enterprise, if (i) any important industry is concerned, (ii) such transaction involves factors that impact or may impact national economic security, or (iii) such transaction will lead to a change in control of a domestic enterprise which holds a famous trademark or PRC time-honored brand. Moreover, the Anti-Monopoly Law promulgated by the Standing Committee of the National People's Congress on August 30, 2007 and effective as of August 1, 2008 requires that transactions which are deemed concentrations and involve parties with specified turnover thresholds (i.e., during the previous fiscal year, (i) the total global turnover of all operators participating in the transaction exceeds RMB10 billion and at least two of these operators each had a turnover of more than RMB400 million within China, or (ii) the total turnover within China of all the operators participating in the concentration exceeded RMB2 billion, and at least two of these operators each had a turnover of more than RMB400 million within China) must be cleared by MOFCOM before they can be completed. In addition, on February 3, 2011, the General Office of the State Council promulgated a Notice on Establishing the Security Review System for Mergers and Acquisitions of Domestic Enterprises by Foreign Investors, or the Circular 6, which officially established a security review system for mergers and acquisitions of domestic enterprises by foreign investors. Further, on August 25, 2011, MOFCOM promulgated the Regulations on Implementation of Security Review System for the Merger and Acquisition of Domestic Enterprises by Foreign Investors, or the MOFCOM Security Review Regulations, which became effective on September 1, 2011, to implement the Circular 6. Under Circular 6, a security review is required for mergers and acquisitions by foreign investors having "national defense and security" concerns and mergers and acquisitions by which foreign investors may acquire the "de facto control" of domestic enterprises with "national security" concerns. Under the MOFCOM Security Review Regulations, MOFCOM will focus on the substance and actual impact of the transaction when deciding whether a specific merger or acquisition is subject to security review. If MOFCOM decides that a specific merger or acquisition is subject to security review, it will submit it to the Inter-Ministerial Panel, an authority established under the Circular 6 led by the National Development and Reform Commission, or NDRC, and MOFCOM under the leadership of the State Council, to carry out security review. The regulations prohibit foreign investors from bypassing the security review by structuring transactions through trusts, indirect investments, leases, loans, control through contractual arrangements or offshore transactions. There is no explicit provision or official interpretation stating that the merging or acquisition of a company engaged in the mobile games business requires security review, and there is no requirement that acquisitions completed prior to the promulgation of the Security Review Circular are subject to MOFCOM review.

26

Table of Contents

In the future, we may grow our business by acquiring complementary businesses. Complying with the requirements of the above-mentioned regulations and other relevant rules to complete such transactions could be time consuming, and any required approval processes, including obtaining approval from the MOFCOM or its local counterparts may delay or inhibit our ability to complete such transactions. It is unclear whether our business would be deemed to fall into the industry that raises "national defense and security" or "national security" concerns. However, MOFCOM or other government agencies may publish explanations in the future determining that our business is in an industry subject to the security review, in which case our future acquisitions in the PRC, including those by way of entering into contractual control arrangements with target entities, may be closely scrutinized or prohibited.

***PRC regulations relating to offshore investment activities by PRC residents may limit our PRC subsidiary's ability to increase its registered capital or distribute profits to us or otherwise expose us to liability and penalties under PRC law.***

The SAFE promulgated the Circular on Relevant Issues Relating to Domestic Resident's Investment and Financing and Roundtrip Investment through Special Purpose Vehicles, or SAFE Circular 37, in July 2014 that requires PRC residents or entities to register with SAFE or its local branch in connection with their establishment or control of an offshore entity established for the purpose of overseas investment or financing. In addition, such PRC residents or entities must update their SAFE registrations when the offshore special purpose vehicle undergoes material events relating to any change of basic information (including change of such PRC citizens or residents, name and operation term), increases or decreases in investment amount, transfers or exchanges of shares, or mergers or divisions. SAFE Circular 37 has been issued to replace the Notice on Relevant Issues Concerning Foreign Exchange Administration for PRC Residents Engaging in Financing and Roundtrip Investments via Overseas Special Purpose Vehicles, or SAFE Circular 75.

If our shareholders who are PRC residents or entities do not complete their registration with the local SAFE branches, our PRC subsidiary may be prohibited from distributing its profits and proceeds from any reduction in capital, share transfer or liquidation to us, and we may be restricted in our ability to contribute additional capital to our PRC subsidiary. Moreover, failure to comply with the SAFE registration described above could result in liability under PRC laws for evasion of applicable foreign exchange restrictions.

To our knowledge, Messrs. Yan Tang, Yong Li, Zhiwei Li and Xiaoliang Lei have completed SAFE registration in connection with our financings and share transfer. However, we cannot compel all of our beneficial owners to comply with SAFE registration requirements. As a result, we cannot assure you that all of our shareholders or beneficial owners who are PRC residents or entities have complied with, and will in the future make or obtain any applicable registrations or approvals required by, SAFE regulations. Failure by such shareholders or beneficial owners to comply with SAFE regulations, or failure by us to amend the foreign exchange registrations of our PRC subsidiary, could subject us to fines or legal sanctions, restrict our overseas or cross-border investment activities, limit our subsidiaries' ability to make distributions or pay dividends or affect our ownership structure, which could adversely affect our business and prospects.

*Failure to comply with PRC regulations regarding the registration requirements for employee stock ownership plans or share option plans may subject the PRC plan participants or us to fines and other legal or administrative sanctions.*

In February 2012, SAFE promulgated the Notices on Issues Concerning the Foreign Exchange Administration for Domestic Individuals Participating in Stock Incentive Plans of Overseas Publicly-Listed Companies, or Circular 7, which replaced the Application Procedures of Foreign Exchange Administration for Domestic Individuals Participating in Employee Stock Ownership Plans or Stock Option Plans of Overseas Publicly-Listed Companies issued by SAFE on March 28, 2007. Under the Circular 7 and other relevant rules and regulations, PRC residents who participate in stock incentive plan in an overseas publicly-listed company are required to register with SAFE or its local branches and complete certain other procedures. Participants of a stock incentive plan who are PRC residents must retain a qualified PRC agent, which could be a PRC subsidiary of such overseas publicly listed company or another qualified institution selected by such PRC subsidiary, to conduct the SAFE registration and other procedures with respect to the stock incentive plan on behalf of its participants. Such participants must also retain an overseas entrusted institution to handle matters in connection with their exercise of stock options, the purchase and sale of corresponding stocks or interests and fund transfers. In addition, the PRC agent is required to amend the SAFE registration with respect to the stock incentive plan if there is any material change to the stock incentive plan, the PRC agent or the overseas entrusted institution or other material changes. We and our PRC employees who have been granted stock options are subject to these regulations. Failure of our PRC stock option holders to complete their SAFE registrations may subject these PRC residents to fines and legal sanctions and may also limit our ability to contribute additional capital into our PRC subsidiary, limit our PRC subsidiary's ability to distribute dividends to us, or otherwise materially adversely affect our business.

27

**Table of Contents**

*PRC regulation of loans to, and direct investment in, PRC entities by offshore holding companies and governmental control of currency conversion may restrict or prevent us from using offshore funds to make loans to our PRC subsidiary and consolidated affiliated entity and its subsidiaries, or to make additional capital contributions to our PRC subsidiary.*

We are an offshore holding company conducting our operations in China through our PRC subsidiary and consolidated affiliated entity and its subsidiaries. We may make loans to our PRC subsidiary and consolidated affiliated entity and its subsidiaries, or we may make additional capital contributions to our PRC subsidiary, or we may establish new PRC subsidiaries and make capital contributions to these new PRC subsidiaries, or we may acquire offshore entities with business operations in China in an offshore transaction.

Most of these ways are subject to PRC regulations and approvals. For example, loans by us to our wholly-owned PRC subsidiary to finance their activities cannot exceed statutory limits and must be registered with the local counterpart of SAFE. If we decide to finance our wholly-owned PRC subsidiaries by means of capital contributions, these capital contributions must be filed with the MOFCOM or its local counterpart. Due to the restrictions imposed on loans in foreign currencies extended to any PRC domestic companies, we are not likely to make such loans to Beijing Momo, which is PRC domestic company. Further, we are not likely to finance the activities of Beijing Momo by means of capital contributions due to regulatory restrictions relating to foreign investment in PRC domestic enterprises engaged in mobile internet services, online games and related businesses.

On August 29, 2008, SAFE promulgated the Circular on the Relevant Operating Issues Concerning the Improvement of the Administration of the Payment and Settlement of Foreign Currency Capital of Foreign-Invested Enterprises, or SAFE Circular 142, regulating the conversion by a foreign-invested enterprise of foreign currency registered capital into Renminbi by restricting how the converted Renminbi may be used. SAFE Circular 142 provides that Renminbi capital converted from foreign currency registered capital of a foreign-invested enterprise may only be used for purposes within the business scope approved by the applicable governmental authority and may not be used for equity investments within the PRC. In addition, SAFE strengthened its oversight of the flow and use of the Renminbi capital converted from the foreign currency registered capital of a foreign-invested company. The use of such Renminbi capital may not be altered without SAFE approval, and such Renminbi capital may not in any case be used to repay Renminbi loans if the proceeds of such loans have not been used. Violations of SAFE Circular 142 could result in severe monetary or other penalties. Furthermore, SAFE promulgated a circular on November 9, 2010, known as Circular 59, which tightens the examination of the authenticity of settlement of net proceeds from overseas offerings. SAFE further promulgated the Circular on Further Clarification and Regulation of the Issues Concerning the Administration of Certain Capital Account Foreign Exchange Businesses, or Circular 45, on November 9, 2011, which expressly prohibits foreign-invested enterprises from using registered capital settled in Renminbi converted from foreign currencies to grant loans through entrustment arrangements with a bank, repay inter-company loans or repay bank loans that have been transferred to a third party. Circular 142, Circular 59 and Circular 45 may significantly limit our ability to transfer the net proceeds from our overseas offerings, including our initial public offering consummated in December 2014, to our PRC subsidiary and to convert such proceeds into Renminbi, which may adversely affect our liquidity and our ability to fund and expand our business in the PRC.

On April 8, 2015, SAFE promulgated the Circular on Reforming the Management Approach Regarding the Foreign Exchange Capital Settlement of Foreign-invested Enterprises, or SAFE Circular 19, which upon its effective date as of June 1, 2015, superseded the SAFE Circular 142. Circular 19 provides that, among other things, the foreign-invested company may convert the foreign currency in its capital account into RMB on a "at will" basis and the RMB funds so converted can be used for equity investments provided that equity investment is included in the business scope of such foreign-invested company.

On June 9, 2016, SAFE promulgated the Circular on Reforming and Regulation of Administrative Policy on Settlement of Foreign Exchange of Capital Account, or SAFE Circular 16, which became effective on June 9, 2016. According to SAFE Circular 16, the foreign exchange capital of FIEs, foreign debt and funds raised through offshore listings may be settled on a discretionary basis, and can be settled at banks. The proportion of such discretionary settlement is temporarily determined as 100%. The RMB converted from relevant foreign exchange shall be kept in a designated account, and if a domestic enterprise needs to make further payment from such account, it still must provide supporting documents and go through the review process with the banks.

28

**Table of Contents**

*Fluctuation in exchange rate may have a material adverse effect on the value of your investment.*

Substantially all of our revenues and costs are denominated in RMB. The conversion of RMB into foreign currencies, including U.S. dollars, is based on rates set by the People's Bank of China. In July 2005, the PRC government changed its decades-old policy of pegging the value of the RMB to the U.S. dollar, and the RMB appreciated more than 20% against the U.S. dollar over the following three years. Between July 2008 and June 2010, this appreciation halted and the exchange rate between the RMB and the U.S. dollar remained within a narrow band. Since June 2010, the RMB has fluctuated against the U.S. dollar, at times significantly and unpredictably. It is difficult to predict how market forces or PRC or U.S. government policy may impact the exchange rate between the RMB and the U.S. dollar in the future. On November 30, 2015, the Executive Board of the International Monetary Fund (IMF) completed the regular five-year review of the basket of currencies that make up the Special Drawing Right, or the SDR, and decided that with effect from October 1, 2016, RMB is determined to be a freely usable currency and will be included in the SDR basket as a fifth currency, along with the U.S. dollar, the Euro, the Japanese yen and the British pound. In the fourth quarter of 2016, the RMB has depreciated significantly in the backdrop of a surging U.S. dollar and persistent capital outflows of China. This depreciation halted in 2017, and the RMB appreciated approximately 7% against the U.S. dollar during this one-year period. Since February 2018, the RMB has depreciated significantly, over 8% against the U.S. dollar. With the development of the foreign exchange market and progress towards interest rate liberalization and RMB internationalization, the PRC government may in the future announce further changes to the exchange rate system, and we cannot assure you that the RMB will not appreciate or depreciate significantly in value against the U.S. dollar in the future. It is difficult to predict how market forces or PRC or U.S. government policy may impact the exchange rate between the RMB and the U.S. dollar in the future.

Significant revaluation of the RMB may have a material and adverse effect on your investment. To the extent that we need to convert U.S. dollars into RMB for capital expenditures and working capital and other business purposes, appreciation of the RMB against the U.S. dollar would have an adverse effect on the RMB amount we would receive from the conversion. Conversely, if we decide to convert RMB into U.S. dollars for the purpose of making payments for dividends on our ordinary shares or ADSs, strategic acquisitions or investments or other business purposes, appreciation of the U.S. dollar against the RMB would have a negative effect on the U.S. dollar amount available to us. In addition, a significant depreciation of the RMB against the U.S. dollar may significantly reduce the U.S. dollar equivalent of our earnings, which in turn could adversely affect the price of our ADSs.

Very limited hedging options are available in China to reduce our exposure to exchange rate fluctuations. To date, we have not entered into any hedging transactions in an effort to reduce our exposure to foreign currency exchange risk. While we may decide to enter into hedging transactions in the future, the availability and effectiveness of these hedges may be limited and we may not be able to adequately hedge our exposure or to hedge our exposure at all. In addition, our currency exchange losses may be magnified by PRC exchange control regulations that restrict our ability to convert RMB into foreign currency. As a result, fluctuations in exchange rates may have a material adverse effect on your investment.

*Our leased property interests may be defective and our right to lease the properties affected by such defects may be challenged, which could cause significant disruption to our business.*

Under PRC laws, all lease agreements are required to be registered with the local housing authorities. We presently lease 26 premises in China, and all the landlords of these premises have completed the registration of their ownership rights and the landlords of two of these premises have completed the registration of our lease with the relevant authority. Failure to complete these required registrations may expose our landlords, lessors and us to potential monetary fines. If these registrations are not obtained in a timely manner or at all, we may be subject to monetary fines or may have to relocate our offices and incur the associated losses.

29

**Table of Contents**

*The audit reports included in this annual report have been prepared by our independent registered public accounting firm whose work may not be inspected fully by the Public Company Accounting Oversight Board and, as such, you may be deprived of the benefits of such inspection.*

Our independent registered public accounting firm that issues the audit reports included in our annual reports filed with the U.S. Securities and Exchange Commission, as auditors of companies that are traded publicly in the United States and a firm registered with the Public Company Accounting Oversight Board (United States), or the PCAOB, is required by the laws of the United States to undergo regular inspections by the PCAOB to assess its compliance with the laws of the United States and professional standards.

Because we have substantial operations within the PRC and the PCAOB is currently unable to conduct inspections of the work of our independent registered public accounting firm as it relates to those operations without the approval of the Chinese authorities, our independent registered public accounting firm is not currently inspected fully by the PCAOB. This lack of PCAOB inspections in the PRC prevents the PCAOB from regularly evaluating our independent registered public accounting firm's audits and its quality control procedures. As a result, investors may be deprived of the benefits of PCAOB inspections.

On May 24, 2013, PCAOB announced that it had entered into a Memorandum of Understanding on Enforcement Cooperation with the China Securities Regulatory Commission, or the CSRC, and the Ministry of Finance which establishes a cooperative framework between the parties for the production and exchange of audit documents relevant to investigations in the United States and China. On inspection, it appears that the PCAOB continues to be in discussions with the Mainland China regulators to permit inspections of audit firms that are registered with PCAOB in relation to the audit of Chinese companies that trade on U.S. exchanges. On December 7, 2018, the SEC and the PCAOB issued a joint statement highlighting continued challenges faced by the U.S. regulators in their oversight of financial statement audits of U.S.-listed companies with significant operations in China. The joint statement reflects a heightened interest in this issue. However, it remains unclear what further actions the SEC and PCAOB will take and its impact on Chinese companies listed in the U.S..

Inspections of other firms that the PCAOB has conducted outside the PRC have identified deficiencies in those firms' audit procedures and quality control procedures, which may be addressed as part of the inspection process to improve future audit quality.

The inability of the PCAOB to conduct full inspections of auditors in the PRC makes it more difficult to evaluate the effectiveness of our independent registered public accounting firm's audit procedures or quality control procedures as compared to auditors outside the PRC that are subject to PCAOB inspections. Investors may lose confidence in our reported financial information and procedures and the quality of our financial statements.

***If the settlement reached between the SEC and the Big Four PRC-based accounting firms (including the Chinese affiliate of our independent registered public accounting firm), concerning the manner in which the SEC may seek access to audit working papers from audits in China of US-listed companies, is not or cannot be performed in a manner acceptable to authorities in China and the US, we could be unable to timely file future financial statements in compliance with the requirements of the Exchange Act.***

In late 2012, the SEC commenced administrative proceedings under Rule 102(e) of its Rules of Practice and also under the Sarbanes-Oxley Act of 2002 against the mainland Chinese affiliates of the "Big Four" accounting firms (including the mainland Chinese affiliate of our independent registered public accounting firm). A first instance trial of the proceedings in July 2013 in the SEC's internal administrative court resulted in an adverse judgment against the firms. The administrative law judge proposed penalties on the Chinese accounting firms including a temporary suspension of their right to practice before the SEC, although that proposed penalty did not take effect pending review by the Commissioners of the SEC. On February 6, 2015, before a review by the Commissioner had taken place, the Chinese accounting firms reached a settlement with the SEC whereby the proceedings were stayed. Under the settlement, the SEC accepted that future requests by the SEC for the production of documents would normally be made to the CSRC. The Chinese accounting firms would receive requests matching those under Section 106 of the Sarbanes-Oxley Act of 2002, and would be required to abide by a detailed set of procedures with respect to such requests, which in substance require them to facilitate production via the CSRC. The CSRC for its part initiated a procedure whereby, under its supervision and subject to its approval, requested classes of documents held by the accounting firms could be sanitized of problematic and sensitive content so as to render them capable of being made available by the CSRC to US regulators.

30

Table of Contents

Under the terms of the settlement, the underlying proceeding against the four PRC-based accounting firms was deemed dismissed with prejudice at the end of four years starting from the settlement date, which was on February 6, 2019. Despite the final ending of the proceedings, the presumption is that all parties will continue to apply the same procedures: i.e. the SEC will continue to make its requests for the production of documents to the CSRC, and the CSRC will normally process those requests applying the sanitisation procedure. We cannot predict whether, in cases where the CSRC does not authorize production of requested documents to the SEC, the SEC will further challenge the four PRC-based accounting firms' compliance with U.S. law. If additional challenges are imposed on the Chinese affiliates of the "big four" accounting firms, we could be unable to timely file future financial statements in compliance with the requirements of the Exchange Act.

In the event that the SEC restarts the administrative proceedings, depending upon the final outcome, listed companies in the United States with major PRC operations may find it difficult or impossible to retain auditors in respect of their operations in the PRC, which could result in financial statements being determined to not be in compliance with the requirements of the Exchange Act, including possible delisting. Moreover, any negative news about any such future proceedings against these accounting firms may cause investor uncertainty regarding China-based, United States-listed companies and the market price of our ADSs may be adversely affected.

If the Chinese affiliate of our independent registered public accounting firm were denied, even temporarily, the ability to practice before the SEC and we were unable to timely find another registered public accounting firm to audit and issue an opinion on our financial statements, our financial statements could be determined not to be in compliance with the requirements of the Exchange Act. Such a determination could ultimately lead to the delisting of our ordinary shares from the NYSE or deregistration from the SEC, or both, which would substantially reduce or effectively terminate the trading of our ADSs in the United States.

## Risks Related to Our ADSs

***The trading price of our ADSs is likely to be volatile, which could result in substantial losses to investors.***

The price of our ADSs has been and is likely to continue to be volatile and could fluctuate widely due to factors beyond our control. This may happen because of broad market and industry factors, like the performance and fluctuation of the market prices of other companies with business operations located mainly in China that have listed their securities in the United States. A number of Chinese companies have listed their securities on U.S. stock markets. The securities of some of these companies have experienced significant volatility, including price declines in connection with their initial public offerings. The trading performances of these Chinese companies' securities after their offerings may affect the attitudes of investors toward Chinese companies listed in the United States in general and consequently may impact the trading performance of our ADSs, regardless of our actual operating performance. Furthermore, the stock market in general has experienced extreme price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of companies like us. These broad market and industry fluctuations may adversely affect the market price of our ADSs. Volatility or a lack of positive performance in our ADS price may also adversely affect our ability to retain key employees, most of whom have been granted options or other equity incentives.

In addition to market and industry factors, the price and trading volume for our ADSs may be highly volatile for factors specific to our own operations, including the following:

- variations in our revenues, earnings, cash flow and data related to our user base or user engagement;

- announcements of new investments, acquisitions, strategic partnerships or joint ventures by us or our competitors;

- announcements of new products, services and expansions by us or our competitors;

- changes in financial estimates by securities analysts;

- detrimental adverse publicity about us, our services or our industry;

- additions or departures of key personnel;

31

Table of Contents

- release of lock-up or other transfer restrictions on our outstanding equity securities or sales of additional equity securities; and

- potential litigation or regulatory investigations.

Any of these factors may result in large and sudden changes in the volume and price at which our ADSs will trade.

In the past, shareholders of public companies have often brought securities class action suits against those companies following periods of instability in the market price of their securities. If we were involved in a class action suit, it could divert a significant amount of our management's attention and other resources from our business and operations and require us to incur significant expenses to defend the suit, which could harm our results of operations. Any such class action suit, whether or not successful, could harm our reputation and restrict our ability to raise capital in the future. In addition, if a claim is successfully made against us, we may be required to pay significant damages, which could have a material adverse effect on our financial condition and results of operations.

***If securities or industry analysts do not publish research or reports about our business, or if they adversely change their recommendations regarding our ADSs, the market price for our ADSs and trading volume could decline.***

The trading market for our ADSs will be influenced by research or reports that industry or securities analysts publish about our business. If one or more analysts who cover us downgrade our ADSs, the market price for our ADSs would likely decline. If one or more of these analysts cease to cover us or fail to regularly publish reports on us, we could lose visibility in the financial markets, which in turn could cause the market price or trading volume for our ADSs to decline.

***Substantial future sales or the expectation of substantial sales of our ADSs in the public market could cause the price of our ADSs to decline.***

Sales of our ADSs in the public market, or the perception that these sales could occur, could cause the market price of our ADSs to decline. Such sales also might make it more difficult for us to sell equity or equity-related securities in the future at a time and price that we deem appropriate. If any existing shareholder or shareholders sell a substantial amount of ADSs, the prevailing market price for our ADSs could be adversely affected. In addition, if we pay for our future acquisitions in whole or in part with additionally issued ordinary shares, your ownership interests in our company would be diluted and this, in turn, could have a material and adverse effect on the price of our ADSs.

***Because we may not continue to pay dividends in the foreseeable future, you must rely on price appreciation of our ADSs for return on your investment.***

Although we declared special cash dividends to holders of our ordinary shares in March 2019, we may not continue to do so regularly, or at all. Therefore, you may need to rely on price appreciation of our ADSs as the sole source for return on your investment.

Our board of directors has complete discretion as to whether to distribute dividends subject to our memorandum and articles of association and certain restrictions under Cayman Islands law. In addition, our shareholders may by ordinary resolution declare a dividend, but no dividend may exceed the amount recommended by our directors. Even if our board of directors decides to declare and pay dividends, the timing, amount and form of future dividends, if any, will depend on, among other things, our future results of operations and cash flow, our capital requirements and surplus, the amount of distributions, if any, received by us from our subsidiaries, our financial condition, contractual restrictions and other factors deemed relevant by our board of directors. Accordingly, the return on your investment in our ADSs will likely depend entirely upon any future price appreciation of our ADSs. There is no guarantee that our ADSs will appreciate in value or even maintain the price at which you purchased the ADSs. You may not realize a return on your investment in our ADSs and you may even lose your entire investment in our ADSs.

32

Table of Contents

***Your interests may not always align with those of our shareholders, including our principal shareholder.***

You are also reminded that your interests may not always align with those of other shareholders, including our principal shareholders. Mr. Yan Tang, our co-founder, chairman and chief executive officer, has considerable influence over important corporate matters. We have adopted a dual-class voting structure in which our ordinary shares consist of Class A ordinary shares and Class B ordinary shares. Holders of Class A ordinary shares are entitled to one vote per share in respect of matters requiring the votes of shareholders, while holders of Class B ordinary shares are entitled to ten votes per share. Each Class B ordinary share is convertible into one Class A ordinary share at any time by the holder thereof, while Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances. Due to the disparate voting powers associated with our two classes of ordinary shares, Mr. Tang beneficially owned a total of 70.9% of the aggregate voting power of our company as of March 31, 2019. As a result of his majority voting power, Mr. Tang has considerable influence over matters such as electing directors and approving material mergers, acquisitions or other

business combination transactions. This concentrated control will limit the ability of holders of our Class A ordinary shares and ADSs to influence corporate matters and could also discourage others from pursuing any potential merger, takeover or other change of control transactions, which could have the effect of depriving the holders of our Class A ordinary shares and our ADSs of the opportunity to sell their shares at a premium over the prevailing market price. We cannot assure you that actions taken by our principal shareholders will completely align with your interests, or that any conflicts of interest will be resolved in a way beneficial to you.

***We may be classified as a passive foreign investment company, or PFIC, under U.S. tax law, which could result in adverse U.S. federal income tax consequences to U.S. holders of our ADSs or ordinary shares.***

Under United States federal income tax law, we will be classified as a PFIC for any taxable year if either (i) 75% or more of our gross income for the taxable year is "passive" income or (ii) 50% or more of the value of our assets (determined on the basis of a quarterly average) is attributable to assets that produce or are held for the production of passive income (the "asset test"). Although the law in this regard is unclear, we treat Beijing Momo as being owned by us for U.S. federal income tax purposes, not only because we exercise effective control over the operation of this entity but also because we are entitled to substantially all of its economic benefits, and, as a result, we consolidate its results of operations in our consolidated U.S. GAAP financial statements. If it were determined, however, that we are not the owner of Beijing Momo for U.S. federal income tax purposes, we would likely be treated as a PFIC for the taxable year ended December 31, 2018 and would anticipate being a PFIC for future taxable years. Assuming that we are the owner of Beijing Momo for United States federal income tax purposes and based upon our income and assets and the value of our ADSs, we do not believe that we were a PFIC for the taxable year ended December 31, 2018 and do not anticipate becoming a PFIC in the foreseeable future.

However, because PFIC status is a factual determination made annually after the close of each taxable year on the basis of the composition of our income and assets, there can be no assurance that we will not be a PFIC for the current taxable year or any future taxable year. Fluctuations in the market price of our ADSs may cause us to become a PFIC for the current or subsequent taxable years because the value of our assets for purposes of the asset test, including the value of our goodwill and unbooked intangibles, may be determined by reference to the market price of our ADSs from time to time (which may be volatile). In estimating the value of our goodwill and other unbooked intangibles, we have taken into account our current market capitalization. If our market capitalization subsequently declines, we may be or become classified as a PFIC for the current taxable year or future taxable years. In addition, the overall level of our passive assets will be affected by how, and how quickly, we spend our liquid assets. Under circumstances where our revenue from activities that produce passive income significantly increase relative to our revenue from activities that produce non-passive income, or where we determine not to deploy significant amounts of cash for active purposes, our risk of becoming classified as a PFIC may substantially increase. Furthermore, because there are uncertainties in the application of the relevant rules, it is possible that the Internal Revenue Service, or the IRS, may challenge our classification of certain income or assets as non-passive, or our valuation of our goodwill and other unbooked intangibles, each of which may result in our company becoming classified as a PFIC for the current or subsequent taxable years.

If we were to be or become classified as a PFIC, a U.S. Holder (as defined in "Item 10. Additional Information—E. Taxation—United States Federal Income Tax Considerations") will generally be subject to reporting requirements and may incur significantly increased U.S. federal income tax on gain recognized on the sale or other disposition of the ADSs or ordinary shares and on the receipt of distributions on the ADSs or ordinary shares to the extent such gain or distribution is treated as an "excess distribution" under the U.S. federal income tax rules. Further, if we were a PFIC for any year during which a U.S. Holder held our ADSs or ordinary shares, we generally would continue to be treated as a PFIC for all succeeding years during which such U.S. Holder held our ADSs or ordinary shares. You are urged to consult your tax advisor concerning the U.S. federal income tax consequences of holding and disposing of ADSs or ordinary shares if we are or become classified as a PFIC. For more information see "Item 10. Additional Information—E. Taxation—United States Federal Income Tax Considerations—Passive Foreign Investment Company Rules."

Table of Contents

***Our memorandum and articles of association contain anti-takeover provisions that could have a material adverse effect on the rights of holders of our Class A ordinary shares and ADSs.***

Our currently effective second amended and restated memorandum and articles of association contain provisions to limit the ability of others to acquire control of our company or cause us to engage in change-of-control transactions. These provisions could have the effect of depriving our shareholders of an opportunity to sell their shares at a premium over prevailing market prices by discouraging third parties from seeking to obtain control of our company in a tender offer or similar transaction. Our dual-class voting structure gives disproportionate voting power to the Class B ordinary shares held by Gallant Future Holdings Limited and New Heritage Global Limited, both of which are wholly owned by a family trust controlled by Yan Tang, our co-founder, chairman and chief executive officer. In addition, our board of directors has the authority, without further action by our shareholders, to issue preferred shares in one or more series and to fix their designations, powers, preferences, privileges, and relative participating, optional or special rights and the qualifications, limitations or restrictions, including dividend rights, conversion rights, voting rights, terms of redemption and liquidation preferences, any or all of which may be greater than the rights associated with our Class A ordinary shares, in the form of ADS or otherwise. Preferred shares could be issued quickly with terms calculated to delay or prevent a change in control of our company or make removal of management more difficult. If our board of directors decides to issue preferred shares, the price of our ADSs may fall and the voting and other rights of the holders of our Class A ordinary shares and ADSs may be materially and adversely affected.

***Provisions of our convertible senior notes could discourage an acquisition of us by a third party.***

In July 2018, we issued $725 million principal amount of convertible senior notes due 2025. Certain provisions of our convertible senior notes could make it more difficult or more expensive for a third party to acquire us. The indenture for our convertible senior notes define a "fundamental change" to include, among other things: (i) any person or group becoming a direct or indirect beneficial owner of our company's ordinary share capital (including ordinary share capital held in the form of ADSs) representing more than 50% of the voting power of our ordinary share capital or more than 50% of our outstanding Class A ordinary shares (including Class A ordinary shares held in the form of ADSs); (ii) any recapitalization, reclassification or change of our Class A ordinary shares or ADSs as a result of which these securities would be converted into, or exchanged for, stock, other securities, other property or assets or any share exchange, consolidation or merger of our company pursuant to which our Class A ordinary shares or ADSs will be

converted into cash, securities or other property or any sale, lease or other transfer in one transaction or a series of transaction of all or substantially all of our consolidated assets, taken as a whole, to any person other than one of our subsidiaries; (iii) the approval of any plan or proposal for the liquidation or dissolution of our company by our shareholders; (iv) our ADSs ceasing to be listed or quoted on any of The New York Stock Exchange, The NASDAQ Global Select Market or The NASDAQ Global Market (or any of their respective successors); or (v) any change in or amendment to the laws, regulations and rules in the PRC or the official interpretation or official application thereof that prohibits us from operating substantially all of our business operations and prevents us from continuing to derive substantially all of the economic benefits from our business operations. Upon the occurrence of a fundamental change, holders of these notes will have the right, at their option, to require us to repurchase all of their notes or any portion of the principal amount of such notes in principal amounts of US$1,000 or integral multiples thereof. In the event of a fundamental change, we may also be required to issue additional ADSs upon conversion of our convertible notes.

**You may face difficulties in protecting your interests, and your ability to protect your rights through U.S. courts may be limited, because we are registered by way of continuation under Cayman Islands law.**

We are an exempted company limited by shares registered under the laws of the Cayman Islands. Our corporate affairs are governed by our memorandum and articles of association, the Companies Law (2018 Revision) of the Cayman Islands and the common law of the Cayman Islands. The rights of shareholders to take action against the directors, actions by minority shareholders and the fiduciary responsibilities of our directors to us under Cayman Islands law are to a large extent governed by the common law of the Cayman Islands. The common law of the Cayman Islands is derived in part from comparatively limited judicial precedent in the Cayman Islands as well as from the common law of England, the decisions of whose courts are of persuasive authority, but are not binding, on a court in the Cayman Islands. The rights of our shareholders and the fiduciary responsibilities of our directors under Cayman Islands law are not as clearly established as they would be under statutes or judicial precedent in some jurisdictions in the United States. In particular, the Cayman Islands has a less developed body of securities laws than the United States. Some U.S. states, such as Delaware, have more fully developed and judicially interpreted bodies of corporate law than the Cayman Islands. In addition, Cayman Islands companies may not have standing to initiate a shareholder derivative action in a federal court of the United States.

34

Table of Contents

Shareholders of Cayman Islands exempted companies like us have no general rights under Cayman Islands law to inspect corporate records or to obtain copies of lists of shareholders of these companies. Our directors have discretion under our articles of association to determine whether or not, and under what conditions, our corporate records may be inspected by our shareholders, but are not obliged to make them available to our shareholders. This may make it more difficult for you to obtain the information needed to establish any facts necessary for a shareholder motion or to solicit proxies from other shareholders in connection with a proxy contest.

As a result of all of the above, shareholders may have more difficulty in protecting their interests in the face of actions taken by management, members of the board of directors or controlling shareholders than they would as public shareholders of a company incorporated in the United States.

**Certain judgments obtained against us by our shareholders may not be enforceable.**

We are a Cayman Islands company and most of our assets are located outside of the United States. Substantially all of our current operations are conducted in China. In addition, a majority of our current directors and officers are nationals and residents of countries other than the United States. Most of the assets of these persons are located outside the United States. As a result, it may be difficult or impossible for you to effect service of process within the United States upon us or these persons or to bring an action against us or against these individuals in the United States in the event that you believe that your rights have been infringed under the U.S. federal securities laws or otherwise. Even if you are successful in bringing an action of this kind, the laws of the Cayman Islands and of China may render you unable to enforce a judgment against our assets or the assets of our directors and officers. There is no statutory enforcement in the Cayman Islands of judgments obtained in the federal or state courts of the United States (and the Cayman Islands are not a party to any treaties for the reciprocal enforcement or recognition of such judgments), a judgment obtained in such jurisdiction will be recognized and enforced in the courts of the Cayman Islands at common law, without any re-examination of the merits of the underlying dispute, by an action commenced on the foreign judgment debt in the Grand Court of the Cayman Islands, provided such judgment (a) is given by a foreign court of competent jurisdiction, (b) imposes on the judgment debtor a liability to pay a liquidated sum for which the judgment has been given, (c) is final, (d) is not in respect of taxes, a fine or a penalty, and (e) was not obtained in a manner and is not of a kind the enforcement of which is contrary to natural justice or the public policy of the Cayman Islands. However, the Cayman Islands courts are unlikely to enforce a judgment obtained from the U.S. courts under civil liability provisions of the U.S. federal securities law if such judgment is determined by the courts of the Cayman Islands to give rise to obligations to make payments that are penal or punitive in nature. Because such a determination has not yet been made by a court of the Cayman Islands, it is uncertain whether such civil liability judgments from U.S. courts would be enforceable in the Cayman Islands.

**We are a foreign private issuer within the meaning of the rules under the Exchange Act, and as such we are exempt from certain provisions applicable to United States domestic public companies.**

Because we are a foreign private issuer under the Exchange Act, we are exempt from certain provisions of the securities rules and regulations in the United States that are applicable to U.S. domestic issuers, including:

- the rules under the Exchange Act requiring the filing of quarterly reports on Form 10-Q or current reports on Form 8-K with the SEC;

- the sections of the Exchange Act regulating the solicitation of proxies, consents, or authorizations in respect of a security registered under the Exchange Act;

- the sections of the Exchange Act requiring insiders to file public reports of their stock ownership and trading activities and liability for insiders who profit from trades made in a short period of time; and

- the selective disclosure rules by issuers of material nonpublic information under Regulation FD.

**Table of Contents**

We are required to file an annual report on Form 20-F within four months of the end of each fiscal year. In addition, we intend to publish our results on a quarterly basis through press releases, distributed pursuant to the rules and regulations of the NASDAQ Global Select Market. Press releases relating to financial results and material events will also be furnished to the SEC on Form 6-K. However, the information we are required to file with or furnish to the SEC will be less extensive and less timely compared to that required to be filed with the SEC by U.S. domestic issuers. As a result, you may not be afforded the same protections or information, which would be made available to you, were you investing in a U.S. domestic issuer. As a Cayman Islands company listed on the NASDAQ Global Select Market, we are subject to the NASDAQ Global Select Market corporate governance listing standards. However, NASDAQ Global Select Market rules permit a foreign private issuer like us to follow the corporate governance practices of its home country. Certain corporate governance practices in the Cayman Islands, which is our home country, may differ significantly from the NASDAQ Global Select Market corporate governance listing standards. To the extent that we choose to utilize the home country exemption for corporate governance matters, our shareholders may be afforded less protection than they otherwise would under the NASDAQ Global Select Market corporate governance listing standards applicable to U.S. domestic issuers. We follow home country practice with respect to annual shareholders meetings and did not hold an annual meeting of shareholders in 2018. As a result, you may not be afforded the same protections or information, which would be made available to you, were you investing in a U.S. domestic issuer.

***We are a "controlled company" within the meaning of the Nasdaq Stock Market Rules and, as a result, will and may rely on certain exemptions from certain corporate governance requirements that provide protection to shareholders of other companies.***

We are a "controlled company" as defined under the Nasdaq Stock Market Rules because Yan Tang, our co-founder, chairman and chief executive officer, beneficially owns more than 50% of our total voting power. For so long as we remain a controlled company under that definition, we are permitted to elect to rely on certain exemptions from corporate governance rules. We currently rely on an exemption from the rule that a majority of the board of directors must be independent directors. Currently, a majority of the members of our board of directors are not independent directors. As a result, you will not have the same protection afforded to shareholders of companies that are subject to the above-mentioned corporate governance requirement. We may rely on other available exemptions from corporate governance rules in the future.

***The voting rights of holders of ADSs are limited by the terms of the deposit agreement, and you may not be able to exercise your right to vote your Class A ordinary shares.***

As a holder of our ADSs, you will only be able to exercise the voting rights with respect to the underlying Class A ordinary shares in accordance with the provisions of the deposit agreement. Under the deposit agreement, you must vote by giving voting instructions to the depositary. Upon receipt of your voting instructions, the depositary will vote the underlying Class A ordinary shares in accordance with these instructions. You will not be able to directly exercise your right to vote with respect to the underlying shares unless you register the underlying shares in your own name. Under our currently effective second amended and restated memorandum and articles of association, the minimum notice period required for convening a general meeting is 10 days, exclusive of the day on which notice is given and the day of the meeting. When a general meeting is convened, you may not receive sufficient advance notice to register the shares underlying your ADSs in your own name to allow you to vote with respect to any specific matter. If we ask for your instructions, the depositary will notify you of the upcoming vote and will arrange to deliver our voting materials to you. We cannot assure you that you will receive the voting materials in time to ensure that you can instruct the depositary to vote your shares. In addition, the depositary and its agents are not responsible for failing to carry out voting instructions or for their manner of carrying out your voting instructions. This means that you may not be able to exercise your right to vote and you may have no legal remedy if the shares underlying your ADSs are not voted as you requested.

***The depositary for our ADSs will give us a discretionary proxy to vote our Class A ordinary shares underlying your ADSs if you do not instruct the depositary to vote your shares, except in limited circumstances, which could adversely affect your interests.***

Under the deposit agreement for the ADSs, if you do not instruct the depositary to vote your shares, the depositary will give us a discretionary proxy to vote our Class A ordinary shares underlying your ADSs at shareholders' meetings unless:

- we have failed to timely provide the depositary with notice of meeting and related voting materials;

- we have instructed the depositary that we do not wish a discretionary proxy to be given;

**Table of Contents**

- we have informed the depositary that there is substantial opposition as to a matter to be voted on at the meeting;

- a matter to be voted on at the meeting would have a material adverse impact on shareholders; or

- the voting at the meeting is to be made on a show of hands.

The effect of this discretionary proxy is that if you do not instruct the depositary to vote your shares, you cannot prevent our Class A ordinary shares underlying your ADSs from being voted, except under the circumstances described above. This may make it more difficult for holders of ADSs to influence the management of our company. Holders of our Class A ordinary shares are not subject to this discretionary proxy.

***You may not receive dividends or other distributions on our Class A ordinary shares and you may not receive any value for them, if it is illegal or impractical to make them available to you.***

The depositary of our ADSs has agreed to pay to you the cash dividends or other distributions it or the custodian receives on Class A ordinary shares or other deposited securities underlying our ADSs, after deducting its fees and expenses. You will receive these distributions in proportion to the number of Class A ordinary shares your ADSs represent. However, the depositary is not responsible if it decides that it is unlawful or impractical to make a distribution available to any holders of ADSs. For example, it would be unlawful to make a distribution to a holder of ADSs if it consists of securities that require registration under the Securities Act but that are not properly registered or distributed under an applicable exemption from registration. The depositary may also determine that it is not feasible to distribute certain property through the mail. Additionally, the value of certain distributions may be less than the cost of mailing them. In these cases, the depositary may determine not to distribute such property. We have no obligation to register under U.S. securities laws any ADSs, ordinary shares, rights or other securities received through such distributions. We also have no obligation to take any other action to permit the distribution of ADSs, ordinary shares, rights or anything else to holders of ADSs. This means that you may not receive distributions we make on our Class A ordinary shares or any value for them if it is illegal or impractical for us to make them available to you. These restrictions may cause a material decline in the value of our ADSs.

***You may experience dilution of your holdings due to inability to participate in rights offerings.***

We may, from time to time, distribute rights to our shareholders, including rights to acquire securities. Under the deposit agreement, the depositary will not distribute rights to holders of ADSs unless the distribution and sale of rights and the securities to which these rights relate are either exempt from registration under the Securities Act with respect to all holders of ADSs, or are registered under the provisions of the Securities Act. The depositary may, but is not required to, attempt to sell these undistributed rights to third parties, and may allow the rights to lapse. We may be unable to establish an exemption from registration under the Securities Act, and we are under no obligation to file a registration statement with respect to these rights or underlying securities or to endeavor to have a registration statement declared effective. Accordingly, holders of ADSs may be unable to participate in our rights offerings and may experience dilution of their holdings as a result.

***You may be subject to limitations on transfer of your ADSs.***

Your ADSs are transferable on the books of the depositary. However, the depositary may close its books at any time or from time to time when it deems expedient in connection with the performance of its duties. The depositary may close its books from time to time for a number of reasons, including in connection with corporate events such as a rights offering, during which time the depositary needs to maintain an exact number of ADS holders on its books for a specified period. The depositary may also close its books in emergencies, and on weekends and public holidays. The depositary may refuse to deliver, transfer or register transfers of our ADSs generally when our share register or the books of the depositary are closed, or at any time if we or the depositary thinks it is advisable to do so because of any requirement of law or of any government or governmental body, or under any provision of the deposit agreement, or for any other reason.

<div align="center">37</div>

Table of Contents

Item 4.        **Information on the Company**

A.    **History and Development of the Company**

We started our operations in July 2011 when our founders established Beijing Momo Technology Co., Ltd., or Beijing Momo, in China. In order to facilitate foreign investment in our company, we incorporated our holding company under the name of Momo Technology Company Limited in the British Virgin Islands in November 2011. In July 2014, Momo Technology Company Limited was redomiciled in the Cayman Islands as an exempted company registered under the laws of the Cayman Islands, and was renamed Momo Inc. The following outlines other major changes to our corporate structure in recent years.

- In March 2017, we acquired 100% equity interest of Zhejiang Shengdian Digital Network Technology Co., Ltd., or Zhejiang Shengdian, upon which it became a subsidiary of Beijing Momo. Zhejiang Shengdian now holds our internet audio/video program transmission license.

- In June 2017, we established Beijing Santi Cloud Union Technology Co., Ltd., or Santi Cloud Union, a company which is 51% owned by Beijing Momo.

- In July 2017, we established Loudi Momo Technology Co., Ltd., or Loudi Momo, as a wholly-owned subsidiary of Beijing Momo.

- In September 2017, we established Changsha Heer Network Technology Co., Ltd., or Changsha Heer, as a wholly-owned subsidiary of Beijing Momo, and Beijing Santi Cloud Time Technology Co., Ltd., or Santi Cloud Time, as a wholly-owned subsidiary of Santi Cloud Union.

- In February 2018, we established QOOL Media Hong Kong Limited, or QOOL Media HK, a company which was initially 70% owned by Momo Technology HK Company Limited. In August 2018, the shareholders of QOOL Media HK transferred all their equity interests in QOOL Media HK to QOOL Media Inc., or QOOL Media Cayman.

- In February 2018, we reached a definitive agreement with Tantan Limited, or Tantan, and all of its shareholders, pursuant to which we agreed to acquire 100% fully diluted equity stake in Tantan for a combination of share consideration and cash, including approximately 5.3 million newly issued Class A ordinary shares of our company and US$613.2 million in cash.

- In March 2018, we established Hainan Momo Pictures Co., Ltd., or Hainan Momo Pictures, as a wholly-owned subsidiary of Momo Pictures Co., Ltd., or Momo Pictures.

- In May 2018, we successfully completed our acquisition of Tantan and acquired a 100% fully diluted equity stake in Tantan. To facilitate the closing of this transaction, we borrowed a bank loan facility from a domestic commercial bank in May 2018 with the total amount of drawdown at US$300.0 million, a fixed interest rate of 4.5% per annum and a period of two years. We repaid the bank loan in full in July 2018.

38

**Table of Contents**

- In April 2018, we established Hainan Miaoka Network Technology Co., Ltd., or Hainan Miaoka, and Hainan Yilingliuer Network Technology Co., Ltd., or Hainan Yilingliuer, as our consolidated affiliated entities.

- In May 2018, we established Beijing Yiliulinger Information Technology Co., Ltd., or Beijing Yiliulinger, as a wholly-owned subsidiary of Beijing Momo Information Technology Co., Ltd., or Beijing Momo IT.

- In July 2018, we established QOOL Media Cayman, a company which is 79. 6% owned by us.

- In July 2018, we issued $725 million principal amount of convertible senior notes due 2025. The notes will bear interest at a rate of 1.25% per year, payable semiannually on January 1 and July 1 of each year. Holders of the notes have the right to convert their notes into our ADSs based on an initial conversion rate of 15.4776 of our ADSs per $1,000 principal amount of notes (which is equivalent to an initial conversion price of approximately US$64.61 per ADS). The conversion rate for the notes is subject to adjustment upon the occurrence of certain events. We will not have the right to redeem the notes prior to maturity, except in the event of certain changes to the laws or their application or interpretation. Holders of the notes will have the right to require us to repurchase all or part of their notes in cash on July 1, 2023, or in the event of certain fundamental changes. The notes will mature on July 1, 2025, unless previously repurchased, redeemed or converted in accordance with their terms prior to such date.

- In December 2018, we established QOOL Media Technology (Tianjin) Co., Ltd., or QOOL Media Technology, as a wholly-owned subsidiary of QOOL Media HK.

- In March 2019, we established Beijing Fancy Reader Technology Co., Ltd., or Beijing Fancy Reader, as our consolidated affiliated entity.

- In March 2019, we established Hainan Heer Network Technology Co., Ltd., or Hainan Heer, as a wholly-owned subsidiary of Beijing Momo.

- From May 2018 to April 2019, we entered into a series of contractual arrangements with Tantan Culture Development (Beijing) Co., Ltd., or Tantan Culture, Hainan Miaoka, Hainan Yilingliuer, Beijing Fancy Reader and QOOL Media (Tianjin) Co., Ltd., or Tianjin QOOL Media, and their respective shareholders, through which we exert control over these entities and their subsidiaries and consolidate their operating results in our financial statements. See "—C. Organizational Structure—Contractual Arrangements with our consolidated affiliated entities."

In December 2014, we completed our initial public offering and listed our ADSs on the NASDAQ Global Select Market under the symbol "MOMO."

Our principal executive offices are located at 20th Floor, Block B, Tower 2, Wangjing SOHO, No.1 Futongdong Street, Chaoyang District, Beijing 100102, People's Republic of China. Our telephone number at this address is +86-10-5731-0567. Our registered office in the Cayman Islands is located at P.O. Box 309, Ugland House, Grand Cayman KY1-1104, Cayman Islands. Our agent for service of process in the United States is Law Debenture Corporate Services Inc., 801 2nd Avenue, Suite 403, New York, NY 10017.

**B.    Business Overview**

We operate Momo, one of China's leading mobile-based social and entertainment platforms. We enable users to discover new relationships, expand their social connections and build meaningful interactions. We connect people and facilitate interactions based on location, interests and a variety of recreational activities including live talent shows, short videos, social games as well as other video- and audio-based interactive experiences, such as live chats and mobile karaoke experience. In May 2018, we completed our acquisition of Tantan, a leading social and dating application for younger generation. Tantan, whose primary users consist of young Chinese singles, is designed to help its users to find and establish romantic connections, as well as meet interesting people.

We have built a large user base on Momo since its launch in 2011. Momo's MAUs increased to 113.3 million in December 2018 from 99.1 million in December 2017 and 81.1 million in December 2016. The increase of Momo's MAUs in 2018 was primarily attributable to the enriched product and content offerings and our marketing activities. We had 4.1 million paying users on Tantan application from June 1, 2018 to December 31, 2018.

39

**Table of Contents**

Our Momo and Tantan mobile applications can be downloaded and used free of charge, and we generate our revenues from the various services we offer on our platforms. Our revenues increased significantly from RMB3,707.4 million in 2016 to RMB8,886.4 million in 2017 and further to RMB13,408.4 million (US$1,950.2 million) in 2018. We currently generate our revenues from live video service, value-added service, mobile marketing services, mobile games and other services. Our live video service, which was launched in September 2015 and allows users to purchase and send in-show virtual gifts to other users hosting live shows, currently contributes to the largest share of our revenues, generating 79.9% of our net revenues in 2018. We generated 12.1%, 7.8% and 14.0% of our net revenues from value-added services in 2016, 2017 and 2018, respectively, in relation to the membership subscription packages of Momo and Tantan that provide members with additional functions and privileges on our platforms and, starting in the fourth quarter of 2016, virtual gift service, which allows our users to purchase and send virtual gifts to other users outside of the live video service. Mobile marketing services, mobile games and other services contributed 11.9%, 6.4% and 1.2%, respectively, of our revenues in 2016, 5.8%, 2.7% and 0.1%, respectively, of our revenues in 2017 and 3.7%, 1.0% and 1.4%, respectively, of our revenues in 2018. We had a net income of RMB979.0 million, RMB2,144.5 million and RMB2,788.5 million (US$405.6 million) in 2016, 2017 and 2018, respectively.

**The Momo Platform**

Our Momo platform includes our Momo mobile application and a variety of related properties, features, functionalities, tools and services that we provide to users, customers and platform partners. The Momo mobile application, which is available on Android and iOS platforms, enables users to discover new relationships, expand their social connections and build meaningful interactions. We connect people and facilitate interactions based on location, interests and a variety of recreational activities including live talent shows, short videos, social games as well as other video- and audio-based interactive experiences, such as live chats and mobile karaoke experience. Momo offers a personal and lively way for users to discover interesting people, and facilitates the connecting, communicating, interacting, and content sharing with others. Momo features various social and entertainment features, including Nearby functions, live video, short video service, interest groups and other live interactive experiences. Communications within our platform are supported by multi-media instant messaging tools and other audio- and video-based communication tools and services. Momo's social features are increasingly integrated with video and audio functions to offer more fun and entertaining contents and to enhance and encourage social interactions between users.

Key features and functionalities offered by the Momo platform include the following:

### Nearby People

*Nearby People* allows users to find out their approximate distance from each other in real time and is one of the primary tools through which users can establish and expand their social relationships on our platform.

*Nearby People* presents a curated list of nearby users with their profile pictures, relative distances and the time they last checked-in on Momo. The list of nearby people is ordered by our algorithm, which primarily considers the physical proximity and the recency of check-in of the users. All users can customize the list by viewing nearby people by gender, age and some other attributes. Users can initiate contact with nearby users by sending greeting messages and selecting to follow their accounts in order to receive notifications on their status updates. A user who receives a greeting message may then reply and choose to become a Momo friend of the initiator by also following such user. Users can adjust their privacy settings to avoid being seen by strangers or to appear invisible. Our application also allows users to block other users and report inappropriate behaviors.

### Nearby Posts

*Nearby Posts* is an important entry point for users to discover and interact with other users via content sharing and consumption by providing users with a stream of feeds, including photos, videos, music, recorded karaoke songs and other status updates posted by other users. The order of the feeds is defined by our algorithm which computes a number of different factors including physical proximity of the content creator, how recent that post is shared as well as how likely it is for a specific user to interact with such post based on our big data and machine learning technologies. Users can interact with such feeds in a number of different ways such as liking and commenting on the content, as well as checking out the profile pages of the content creators, sending private message and following the creator.

40

Table of Contents

### Live Video

The *Live Video* function allows users to live stream a variety of content and activities including talent shows such as singing, dancing and talk shows, as well as casual chatting between broadcasters and viewers. Unlike traditional on-demand video experiences, our live video function allows the viewers to interact with the broadcasters on a real-time basis, thus facilitating a much more dynamic social experience. For example, a user can request a song from the live broadcaster and a broadcaster can connect a viewer to his or her live video channel through video calls. To provide fun and interactive experience between live broadcasters and viewers, the *Live Video* function offers interesting features such as customized filters and lenses as well as virtual gifts and associated special effects, some of which are enabled by facial recognition and augmented reality technology. For example, a user can pay to put virtual animated images over a broadcaster's head or face to create an interesting visual effect. Viewers of live video shows may interact with broadcasters using text messages or by sending virtual gifts purchased with virtual currency. In addition to live video channels, our streaming service also supports audio only mode, in order to lower the barriers for broadcasters and users to participate in real-time interactive experience through our live channels.

### Other Live Video and Audio Interactive Experiences

We have started to introduce a collection of non-talent show related *live video and audio interactive experiences* backed by streaming technology since 2017. By designing the user interface differently from that in the "live video" service, which primarily facilitates the one-to-many kind of broadcasting mode, we can better support social interactions among our users in a one-to-one and many-to-many kind of video and audio communication environment. Key experiences we offer include *Quick Chat*, *Parties* and *Chatroom*. *Quick Chat* is a one-to-one chatting experience available in both video and audio formats. *Parties* is a group audio and video chat experience usually with moderators organizing recreational activities among the participating users. *Chatroom* is an audio only group chat experience. We introduced mobile karaoke experience into the *Chatroom* in 2018. Because Karaoke is a popular offline social and entertainment activity in China, it has quickly gained popularity among our users, making the *Chatroom* experience one of the major social experiences in terms of usage on our platform. In addition, our streaming service also enables users to play social games while chatting with others on a live basis. For example, we launched *Were Wolf* in 2017. Inspired by the popular offline dinner party game "Mafia," the game allows users to engage in group live chat and play different roles according to the story line of the game. Since the beginning of 2018, we have expanded the use cases of the *Were Wolf* game channels to a variety of other social games supported by audio chat experience.

### "Follow" Functions

The *Follow* tab aggregates content that a user chooses to follow and video content our algorithm "thinks" the user might want to follow based on our big data analytics. There are two subsections within the tab. The "Follow" section under the *Follow* tab contains a stream of feeds created by people followed by the user while the "Recommended" section features popular short video content that our recommendation engine, based on our big data

analytics, believes the user might like or suggests the user to follow. The algorithm of the recommendation engine computes and makes recommendations based on a variety of factors including users' personal preferences as well as the overall popularity of a specific short video clip.

### Other Functions

*Other Functions* on our platform include instant messaging, user profile page, Diandian and group functions.

*Diandian. Diandian* is a one-to-one matching function that helps our users discover people that they might be interested in. When activated, our recommendation engine will push a pool of potential matches to a user based on certain algorithms. The user may then interact with the pushes to show if he or she is interested in the recommendation. Only users who have mutually shown interests to each other may become Momo friends and message each other.

*Group functions*. Our application allows users to create and/or participate in groups created across points of interest and based on locations. Each group is given a shared Momo discussion page on which group members can discuss their common interests, post their photos, exchange messages and organize other online and offline events. Individuals can connect with each other regarding common interests.

### User Profile Page

If a user is interested in finding out more about another user on our platform, he or she can review the *User Profile* page, which is a function that we offer to provide a quick snapshot of a user. Information featured on this page includes profile pictures, account status such as activeness, popularity and wealth level, detailed personal information such as name, age, hometown, horoscope, occupation, relationship status, groups joined, interests and favorite books and movies, the user's historical posts and videos shared, the broadcasters that the user follows, as well as the user's travel footprints. The profile page also contains a summary providing insights to a user's behavioral characteristics. The User Profile Page is integrated with nearly all the other product modules such as the Nearby People, Nearby Posts, Diandian, Live Video and others.

41

Table of Contents

### Instant Messaging

Our application is supported by instant messaging function, which allows users to communicate with each other using various forms of messages and expressions including text, emoticons, voice recordings, pictures and video messages, or to engage in real-time communication through audio and video chat function. One of the key features of our instant messaging function is that the dialog window presents the distance between the two parties in real time. Senders can see whether their messages have been delivered to or read by the recipient. Our instant messaging feature also allows users to turn voice messages into text, share their location information, invite other users to games, and send virtual gifts and red envelopes to each other.

## Tantan

Tantan is a leading social and dating app in China. Tantan, whose primary users consist of young mobile internet users, is designed to help its users find and establish romantic connections, as well as meet interesting people. Tantan had 4.1 million paying users for the period from June 1, 2018 to December 31, 2018 and has become one of the leading choices for young mobile internet users in China to find relationships.

We believe that Tantan strategically complements our Momo platform. First, Tantan's users are younger on average than Momo's users, allowing us to expand our footprint among younger demographics. Second, whereas the Momo platform has been primarily focused on connecting people in a broader sense among larger groups and communities, Tantan is primarily focused on one-to-one matching for romantic purposes. Additionally, compared to Momo, Tantan is a younger brand with strong potential to grow its user base and revenues. We believe that our acquisition of Tantan helps us enrich our product line, expand our user base, broaden our social scenarios and strengthen our leading position in China's open social market.

Tantan's users can enjoy many of the core features of Tantan for free, including swiping through a pool of users to find potential matches and communicating with the matches through instant messaging tool on the app. However, to enjoy certain premium features, a user must pay a monthly subscription fee or purchase the premium features on an ala carte basis. For example, in order to use unlimited number of the "swipe right" feature which indicates "like," a Tantan user must pay to subscribe to VIP membership, which was launched in early 2018. In order to get access to a list of users who have "swiped right" on the user, a Tantan user needs to pay to subscribe the "See Who Liked Me" feature, which was launched in July 2018. Tantan users and subscribers may also purchase, on a pay-per-use basis, certain other premium features, such as Super Exposure and Super Likes, which all aim at increasing the paying users' exposure to other Tantan users.

## Monetization Opportunities

We started monetization in July 2013. We currently generate revenues primarily from live video service, value-added service, mobile marketing services, mobile games, and other services.

### Live Video Service

We launched our live video service in September 2015, allowing users to purchase and send in-show virtual gifts to other users hosting live shows as broadcasters. Initially, the service adopted an online live concert format whereby certain talented performers were invited to put on live music shows in a professional studio environment. Such shows were broadcasted live in one to four sessions on a daily basis and at pre-announced times. In the fourth quarter of 2015, we opened more live channels in order to enable more performers to put on talent shows to entertain and interact with their audience. The broadcasters are able to "go live" and connect with their audience via their mobile phones, while audience members are able to interact on a real time basis with the broadcasters and other fellow viewers by texting for free or purchasing and sending virtual gifts. We share a portion of the revenues generated with the broadcasters or the talent agencies. Until April 2016, we only offered the service to a limited number of talented performers pre-selected carefully by us. In April 2016, we opened up the service to all the users of our platform so that each one of them can become a broadcaster if they wish. Broadcasters provide live video service on our platform as an individual or as a member of a talent agency. Certain broadcasters are also

paying users on our platform. The talent agencies recruit, train and retain the broadcasters. We are committed to provide strong support and resources to broadcasters and talent agencies to offer high-quality content. We are also committed to closely cooperate and develop long-term relationship with broadcasters and talent agencies. Currently, live video service contributes the largest share of our revenues, generating 68.4%, 83.6% and 79.9% of our net revenues in 2016, 2017 and 2018, respectively.

42

Table of Contents

### Value-added Service

Our value-added service primarily consists of subscription services that provide paying users with additional features and functions as well as privileges on Momo and Tantan and, starting in the fourth quarter of 2016, virtual gift services, which allow Momo users to purchase and send virtual gifts to other users outside of the live video service. We generated 12.1%, 7.8 % and 14.0% of our net revenues from value-added services in 2016, 2017 and 2018, respectively.

### Value-added Service on Momo

*Membership Subscription.* We provide enhanced membership privileges to Momo users who subscribe to our membership package by paying membership fees. Momo's memberships are currently divided into two tiers, basic and premium. Enhanced privileges for all members include VIP logos, higher limits on the maximum number of users group and the number of users that the member can follow, access to certain special emoticons, the ability to add a short video and a voice recording to the profile page and to see a list of recent visitors to their profile page, and certain other special features unavailable to the non-members. Additional privileges for our premium members include the abilities to check out visitors to their message boards and to remove advertisements from their feeds.

*Virtual Gift Service.* We launched our virtual gift service on the Momo platform in the fourth quarter of 2016 to enhance users' social experience. For example, users can purchase and send virtual gifts to other users to increase the response rate to their greetings in Nearby people function. Within the many group chatting experiences that we offer, users can also send each other virtual gifts to facilitate relationship building. We generate revenue from the sales of the virtual gifts.

### Value-added Service on Tantan

Tantan offers a variety of premium features and services that users can purchase either through a subscription package or on a pay-per-use basis. For example, a Tantan user can pay to subscribe the VIP membership to enjoy certain privileges such as using unlimited number of the "right swipe" feature, access to "Super Likes," special badge and location roaming. In addition, a Tantan user can pay to subscribe the "See Who Liked Me" feature, which gives the user access to a list of users who have "swiped right" on that user. Tantan users and subscribers may also purchase, on a pay-per-use basis, certain other premium features, such as Super Exposure and Super Likes, which all aim at increasing the paying users' exposure to other Tantan users.

### Mobile Marketing Services

We seek to provide advertising and marketing solutions to enable our customers to promote their brands and conduct effective marketing activities. We provide our customers with analytical tools to enable them to track and improve the effectiveness of their marketing campaigns on our platform. Our advertising and marketing customers include brand marketers, local merchants, application developers and publishers as well as other small and medium-sized businesses and individuals. Our mobile marketing services currently include the following:

*In-feed marketing solutions.* We offer advertising units that appear as feeds on Momo platform features such as Nearby People and Nearby Post. Powered by a self-serve advertising system with a real-time bidding mechanism, our in-feed marketing solutions are performance-based and serve a wide range of marketers including application developers, local businesses, brand owners, as well as other small and medium-sized businesses and individuals. We offer advertising units in various formats, including text-based content, pictures, video clips and function that enables direct application downloads. In addition, our advertising system also allows customers to target certain cohorts of users based on their geographic locations, gender, age, type of mobile operating systems and some other parameters. Our customers can use a combination of the various formats and targeting capabilities to create their marketing campaigns more effectively.

43

Table of Contents

*Display ads.* We offer a variety of marketing products in display format, including full screen banner ads that appear before the application is loaded, banners on frequently visited pages and other sponsored images displayed elsewhere within our application. Unlike the in-feed ad units, the display ad units are not sold through the bidding system.

We also offer integrated marketing packages that include multiple advertising units such as feeds, banners, video ads and sponsorships in order to serve a broader sets of marketing objectives of our marketing customers. As the features and functionalities of our platform continue to evolve, we may continue to add new ad format and marketing solutions to our mobile marketing product portfolios. Mobile marketing services contributed 11.9%, 5.8% and 3.7% of our revenues in 2016, 2017 and 2018, respectively.

### Mobile Games

As a social networking platform, we intend to offer games that have strong features which we believe will not only increase the interactions between users, but also broaden our revenue sources. Such games may be developed by third parties, with whom we share revenues generated by in-game purchases of virtual items, or developed in-house. We have been scaling back from jointly operated mobile games and instead focusing on self-developed games in order to better align the games offered on our platform with the positioning and strength of Momo as a location-based social platform. Mobile games contributed 6.4%, 2.7% and 1.0% of our revenues in 2016, 2017 and 2018, respectively.

### *Other Services*

Our other services have included paid emoticons, gift mall sales and a TV variety show that we co-produced. Other services have also included other revenue generating services that are immaterial in revenue contribution, or are not considered as part of our strategic focus. Other services contributed 1.2%, 0.1% and 1.4% of our revenues in 2016, 2017 and 2018, respectively.

### Technology

Our research and development efforts focus on product development, architecture and technological infrastructures, as well as the security and integrity of our platform to protect our user data.

Our product development endeavors revolve around continuous innovations to help users discover and make new connections as well as building effective interactions. As our user base continues to expand and consumer behaviors constantly evolve, the social demands from the users become increasingly diversified. We make significant investments in technology to optimize our existing products and services and to develop new ones so that we can expand the social use offerings to satisfy the diversifying user demands.

In addition, we are also investing in building and maintaining the technological infrastructures to support the delivery and usage of our products and services in a fast and efficient manner within a safe and secured environment.

### Content Management and Monitoring

As an operator of social platforms, we view content management and monitoring as a critical part of our operations. As of the date of this annual report, Momo and Tantan collectively have a dedicated team of over 1,126 personnel reviewing and handling content on our mobile platform for compliance with applicable laws and regulations. They are aided by both proprietary and third-party software and technologies to sweep our platforms and the data being transmitted on a real-time basis around-the-clock. We monitor and screen user information and user generated content against a spam list, which is a list of content and behaviors that we have determined are likely to be indicative of inappropriate or illegal content or illegal activities. Additionally, our users can also easily report fraud if they come across suspicious content, and each user complaint is processed by our content management and monitoring system.

44

Table of Contents

### Branding and Marketing

Our brand building activities generally comprise purchasing online advertising in the form of texts, banners and videos, placing TV commercials and public relations efforts. We also conduct branding and promotional activities through offline events. In addition, we acquire users for our platforms directly through online marketing channels including mobile advertising platforms such as ByteDance, application stores, search engines and other online advertising networks.

### Intellectual Property

We rely on a combination of patent, copyright, trademark and trade secret laws and restrictions on disclosure to protect our intellectual property rights. As of December 31, 2018, we had 13 pending patent applications filed with the State Intellectual Property Office of the PRC. We had registered 398 trademarks and had applied for 262 trademarks with the Trademark Office of the State Administration for Industry & Commerce of the PRC. We had registered 128 software copyrights and 74 copyrights with the PRC National Copyright Administration. We had also registered 83 domain names, including *immomo.com*, *wemomo.com*, *immomogame.com* and *momocdn.com*.

### Seasonality

Historically, there were noticeable downward trends in user activities on our Momo platform as well as revenue growth in the weeks prior to and after the Chinese Lunar New Year. However, due to our limited operating history, the seasonal trends that we have experienced in the past may not apply to, or be indicative of, our future operating results.

### Competition

As a mobile social networking platform that also provides live video service, we are subject to intense competition from providers of similar services, as well as potential new types of online services.

Our competitors may have substantially more cash, traffic, technical, performer and other resources, as well as broader product or service offerings and can leverage their relationships based on other products or services to gain a larger share of marketing budgets from customers. We believe that our ability to compete effectively depends upon many factors, including the size, composition and engagement of our user base, our ad targeting capabilities, our pool of popular live broadcasters, market acceptance of our mobile marketing services and online entertainment services, our marketing and selling

efforts, and the strength and reputation of our brand. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business and Industry—The market in which we operate is fragmented and highly competitive. If we are unable to compete effectively for users or user engagement, our business and operating results may be materially and adversely affected." We also experience significant competition for highly skilled personnel, including management, engineers, designers and product managers. Our growth strategy depends in part on our ability to retain our existing personnel and add additional highly skilled employees. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business and Industry—The continuing and collaborative efforts of our senior management and key employees are crucial to our success, and our business may be harmed if we were to lose their services."

**Insurance**

We do not maintain property insurance, business interruption insurance or general third-party liability insurance, nor do we maintain key-man life insurance.

**Regulations**

This section sets forth a summary of the most significant rules and regulations that affect our business activities in China or our shareholders' rights to receive dividends and other distributions from us.

*Corporate Laws and Foreign Investment Law*

The establishment, operation and management of corporate entities in China are governed by the Company Law of the PRC, or the Company Law, effective in 1994, as amended in 1999, 2004, 2005 and 2013, respectively. The Company Law is applicable to our PRC subsidiaries and consolidated affiliated entities unless the PRC laws on foreign investment have stipulated otherwise.

Table of Contents

On March 15, 2019, the National People's Congress approved the Foreign Investment Law, which will take effect on January 1, 2020 and replace the trio of existing laws regulating foreign investment in China, namely, *the Sino-foreign Equity Joint Venture Enterprise Law, the Sino-foreign Cooperative Joint Venture Enterprise Law* and *the Foreign Owned Enterprise Law*, together with their implementation rules and ancillary regulations. According to the Foreign Investment Law, "foreign investment" refers to the investment activities directly or indirectly conducted by one or more natural persons, business entities, or other organizations of a foreign country (collectively referred to as "foreign investors") in China, which includes investments made by foreign investors in China through means stipulated by laws or administrative regulations or other methods prescribed by the State Council. Based on the Foreign Investment Law, it is possible that the prospective laws, administrative regulations or provisions of the State Council may deem contractual arrangements as a way of foreign investment.

According to the Foreign Investment Law, the State Council will publish a catalogue for special administrative measure, or the "negative list," to provide the scope of "restricted" or "prohibited" industries that have certain restrictions on foreign investment such as market entry clearance. Foreign investment activities in industries not included in the "negative list" are granted national treatment. The "negative list" has yet to be published and it is unclear as to whether a new "negative list" will be published at the time when Foreign Investment Law comes into effect or whether such new "negative list" will be different from the current "negative list" that became effective on July 28, 2018.

We operate our businesses in China through a number our consolidated affiliated entities which are controlled by our PRC subsidiaries through a series of contractual arrangements. Our consolidated affiliated entities hold internet content provider, or ICP, licenses to provide value-added telecommunication services, which is an industry in which foreign investment is "restricted" under the currently effective "negative list."

*Regulations Relating to Telecommunications Services*

In September 2000, the State Council issued the Regulations on Telecommunications of China, or the Telecommunications Regulations, to regulate telecommunication activities in China. The telecommunications industry in China is governed by a licensing system based on the classifications of the telecommunications services set forth under the Telecommunications Regulations.

The Ministry of Industry and Information Technology, together with the provincial-level communications administrative bureaus, supervises and regulates the telecommunications industry in China. The Telecommunications Regulations divide the telecommunications services into two categories: infrastructure telecommunications services and value-added telecommunications services. The operation of value-added telecommunications services is subject to the examination, approval and licenses granted by the Ministry of Industry and Information Technology or its provincial-level communications administrative bureaus. According to the Catalog of Classification of Telecommunications Businesses effective in March 2016, provision of information services through the internet, such as the operation of our *immomo.com* website, is classified as value-added telecommunications services.

*Regulations Relating to Foreign Investment in Value-Added Telecommunications Industry*

According to the Administrative Rules for Foreign Investment in Telecommunications Enterprises issued by the State Council effective in January 2002, as amended in September 2008 and February 2016, a foreign investor may hold no more than a 50% equity interest in a value-added telecommunications services provider in China and such foreign investor must have experience in providing value-added telecommunications services overseas and maintain a good track record. Due to these regulations, we operate our website through Beijing Momo and its subsidiaries. The most updated version of Guiding Catalog for Foreign Investment Industries, which was promulgated by the MOFCOM and the National Development and Reform Commission and became effective from July 28, 2018, or the Guiding Catalog, imposes the 50% restrictions on foreign ownership in value-added telecommunications business except for e-commerce business as well.

46

Table of Contents

The Circular on Strengthening the Administration of Foreign Investment in and Operation of Value-added Telecommunications Business, or the Circular, issued by the former Ministry of Information Industry in July 2006, reiterated the regulations on foreign investment in telecommunications businesses, which require foreign investors to set up foreign-invested enterprises and obtain an internet content provider, or ICP, license to conduct any value-added telecommunications business in China. Under the Circular, a domestic company that holds an ICP license is prohibited from leasing, transferring or selling the license to foreign investors in any form, and from providing any assistance, including providing resources, sites or facilities, to foreign investors that conduct value-added telecommunications business illegally in China. Furthermore, certain relevant assets, such as the relevant trademarks and domain names that are used in the value-added telecommunications business must be owned by the local ICP license holder or its shareholders. The Circular further requires each ICP license holder to have the necessary facilities for its approved business operations and to maintain such facilities in the regions covered by its license. In addition, all value-added telecommunications service providers are required to maintain network and information security in accordance with the standards set forth under the relevant PRC regulations. If an ICP license holder fails to comply with the requirements in the Circular and also fails to remedy such non-compliance within a specified period of time, the Ministry of Industry and Information Technology or its local counterparts have the discretion to take administrative measures against such license holder, including revoking its ICP license. Beijing Momo, the operator of our website, owns the relevant domain names and registered trademarks and has the necessary personnel to operate the website.

### *Regulations on Broadcasting Audio/Video Programs through the Internet*

On April 13, 2005, the State Council announced Several Decisions on Investment by Non-state-owned Companies in Culture-related Business in China. These decisions encourage and support non-state-owned companies to enter certain culture-related business in China, subject to restrictions and prohibitions for investment in audio/video broadcasting, website news and certain other businesses by non-state-owned companies. These decisions authorize the SARFT and the Ministry of Culture to adopt detailed implementing rules according to these decisions.

On December 20, 2007, the SARFT and the MIIT jointly issued the Rules for the Administration of Internet Audio and Video Program Services, commonly known as Circular 56, which came into effect as of January 31, 2008 and was amended on August 28, 2015. Circular 56 reiterates the requirement set forth in the Audio/Video Broadcasting Rules that online audio/video service providers must obtain a license from the SARFT. Furthermore, Circular 56 requires all online audio/video service providers to be either wholly state-owned or state-controlled. According to relevant official answers to press questions published on the SARFT's website dated February 3, 2008, officials from the SARFT and the MIIT clarified that online audio/video service providers that already had been operating lawfully prior to the issuance of Circular 56 may re-register and continue to operate without becoming state-owned or controlled, provided that such providers have not engaged in any unlawful activities. This exemption will not be granted to online audio/video service providers established after Circular 56 was issued. Such policies have been reflected in the Application Procedure for Audio/Video Program Transmission License.

On April 1, 2010, the SARFT issued the Internet Audio/Video Program Services Categories (Provisional), or the Provisional Categories, as further amended on March 10, 2017, which classified internet audio/video programs into four categories.

In 2009, the SARFT released a Notice on Strengthening the Administration of Online Audio/Video Content. This notice reiterated, among other things, that all movies and television shows released or published online must comply with relevant regulations on the administration of radio, film and television. In other words, these movies and television shows, whether produced in the PRC or overseas, must be pre-approved by SARFT, and the distributors of these movies and television shows must obtain an applicable permit before releasing any such movie or television show. In 2012, the SARFT and the State Internet Information Office of the PRC issued a Notice on Improving the Administration of Online Audio/Video Content Including Internet Drama and Micro Films. In 2014, SARFT released a Supplemental Notice on Improving the Administration of Online Audio/Video Content Including Internet Drama and Micro Films. This notice stresses that entities producing online audio/video content, such as internet dramas and micro films, must obtain a permit for radio and television program production and operation, and that online audio/video content service providers should not release any internet dramas or micro films that were produced by any entity lacking such permit. For internet dramas or micro films produced and uploaded by individual users, the online audio/video service providers transmitting such content will be deemed responsible as a producer. Further, under this notice, online audio/video service providers can only transmit content uploaded by individuals whose identity has been verified and such content shall comply with the relevant content management rules. This notice also requires that online audio/video content, including internet drama and micro films, be filed with the relevant authorities before release.

47

Table of Contents

On April 25, 2016, the SARFT promulgated the Provisions on the Administration of Private Network and Targeted Transmission Audio/Video Program Services, which became effective as of June 1, 2016 and applies to the provision of radio, TV programs and other audio/video programs to targeted audience on TV and all types of handheld electronic equipment. The Provision covers the internet and other information networks as targeted transmission channels, including the provision of content, integrated broadcast control, transmission and distribution and other activities conducted in such forms as Internet protocol television (IPTV), private network mobile TV and Internet TV. Anyone who provides private network and targeted transmission audio/video program services must obtain an audio/video program transmission license, with a term of three years, issued by the SARFT and operate its business pursuant to the scope as provided in such license. Foreign-invested enterprises are not allowed to engage in the above referenced business.

On July 1, 2016, the MOC promulgated Notice on Strengthening the Administration of Network Performance, which regulates the behavior of

entities operating network performance and performers. Entities operating network performance shall be responsible for the service and content post on their website which are provided by performers, perfect the content management mechanism, and shut down the channel and stop the spreading as soon as realize any network performance in violation of relevant laws and regulations. Network performers shall be responsible for their performances and shall not perform any program containing violence, pornography, or other similarly prohibited elements. The cultural administration authorities or cultural market enforcement authorities of relevant government supervise entities operating network performance and shall investigate all entities operating network performance in their thoroughly and publish any fine or action results or blacklist in time.

On September 2, 2016, the SARFT issued a Notice on Problems regarding Strengthening the Administration of Internet Audio/Video Programs Live Broadcasting Services, which provides that the provision of audio/video live broadcasting of important political, military, economic, social, cultural, sports and other activities and events requires an audio/video program transmission license which covers item (5) under internet audio/video program services category I, and the provision of audio/video live broadcasting of cultural activities by general social organizations, sports events and like activities requires an audio/video program transmission license which covers item (7) under internet audio/video program services category II.

On November 4, 2016, the Cyberspace Administration of China promulgated the Provisions on the Administration of Online Live Broadcasting Services, which became effective as of December 1, 2016. Such Provisions provides that anyone who provides online live broadcasting services through online performances, internet video/audio programs and so forth, shall obtain relevant qualifications as required by laws and regulations.

In November 2016, the SARFT issued a Notice on Strengthening the Administration of Audio/Video Programs Transmission on Weibo, Wechat and Other Internet Social Networking Platforms, which further clarifies that anyone who operates internet audio/video services through Weibo, Wechat and other internet social networking platforms must obtain an audio/video program transmission license and operate its business pursuant to the scope as provided in such license.

As of the date of this annual report, we hold an internet audio/video program transmission license through Zhejiang Shengdian, a wholly-owned subsidiary that we acquired in March 2017.

### Regulations on Online Comics and Internet Cultural Products

The Interim Administrative Provisions on Internet Culture was promulgated by MOC on February 17, 2011 and became effective on April 1, 2011. Pursuant to the Interim Administrative Provisions on Internet Culture, online comics are deemed to be online culture products, and any entity engaged in producing, transmitting and distributing online culture products shall apply for an internet culture operation license that includes the business scope of actual online activities. As of the date of this annual report, we have obtained an internet culture operation license and received the approval to expand the scope of the license to cover the operation of comic and animation products.

### Regulations on Internet Publication and Cultural Products

The Administrative Measures for Internet Publication Service, or Internet Publication Measures, were jointly promulgated by the SARFT and the MIIT on February 4, 2016 and became effective on March 10, 2016. The Internet Publication Measures superseded the Tentative Measures for Internet Publication Administration, which were jointly promulgated by the SARFT and the MIIT in 2002. The Internet Publication Measures define internet publication service and internet publication item, and publication of internet publication item via the internet requires an internet publishing license. Pursuant to the Internet Publication Measures, online game constitutes an internet publication item and therefore, an online game operator shall obtain an internet publishing license so that it can directly offer its online games to the public in the PRC. As of the date of this annual report, we have not yet obtained an internet publishing license, and are in the process of preparing the application documents.

<div align="center">48</div>

Table of Contents

### Regulations on Online Games and Foreign Ownership Restrictions

Pursuant to the Guidance Catalog, the internet culture business (other than online music business) falls within the category of industries prohibiting foreign investment. On February 17, 2011, the Ministry of Culture issued the revised Interim Provisions on the Administration of Internet Culture, or the Internet Culture Interim Provisions, effective as of April 1, 2011 and amended on December 15, 2017. According to the Internet Culture Interim Provisions, "internet cultural products" are defined as including the online games specially produced for Internet and games reproduced or provided through Internet. Provision of operating Internet cultural products and related services is subject to the approval of the Ministry of Culture or its provincial counterpart.

On June 3, 2010, the Ministry of Culture promulgated the Provisional Administration Measures of Online Games, or the Online Game Measures, which came into effect on August 1, 2010. The Online Game Measures governs the research, development and operation of online games and the issuance and trading services of virtual currency. Under the Online Game Measures, all operators of online games, issuers of virtual currencies and providers of virtual currency trading services, or Online Game Business Operators, are required to obtain internet culture operation licenses. An internet culture operation license is valid for three years and in case of renewal, the renewal application should be submitted 30 days prior to the expiry date of such license.

In addition, Online Game Business Operators should request the valid identity certificate of game users for registration, and notify the public 60 days ahead of the termination of any online game operations or the transfer of online game operational rights. Online game business operators are also prohibited from (i) setting compulsory battles in the online games without game users' consent; (ii) advertising or promoting the online games that contain prohibited content, such as anything that compromise state security or divulges state secrets; and (iii) inducing game users to input legal currencies or virtual currencies to gain online game products or services, by way of random draw or other incidental means. The Online Game Measures also states that the state cultural administration authorities will formulate the compulsory clauses of a standard online game service agreement, which have been promulgated on July 29, 2010 and are required to be incorporated into the service agreement entered into between online game business

operators and game users, with no conflicts with the rest of clauses in such service agreements.

On July 11, 2008, the General Office of the State Council promulgated the Regulation on Main Functions, Internal Organization and Staffing of the General Administration of Press and Publication, or the Regulation on Three Provisions. On September 14, 2009, the Central Organization Establishment Commission issued the corresponding interpretations, or the Interpretations on Three Provisions. The Regulation on Three Provisions and the Interpretation on Three Provisions granted the Ministry of Culture overall jurisdiction to regulate the online game industry, and granted the General Administration of Press and Publication the authority to issue approvals for the internet publication of online games. Specifically, (i) the Ministry of Culture is empowered to administrate online games (other than the pre-examination and approval before internet publication of online games); (ii) subject to the Ministry of Culture's overall administration, General Administration of Press and Publication is responsible for the pre-examination and approval of the internet publication of online games; and (iii) once an online game is launched, the online game will be only administrated and regulated by the Ministry of Culture. As of March 31, 2019, 11 of the 12 online games we offered had completed the filing with the Ministry of Culture. If we fail to complete, obtain or maintain any of the required licenses or approvals or make the necessary filings, we may be subject to various penalties, such as confiscation of the net revenues that were generated through online games, the imposition of fines and the discontinuation or restriction of our operations of online games.

On September 28, 2009, the General Administration of Press and Publication, the National Copyright Administration and the National Working Group to Eliminate Pornography and Illegal Publications jointly issued the Circular on Consistent Implementation of the Stipulation on the Three Provisions of the State Council and the Relevant Interpretations of the State Commission for Public Sector Reform and the Further Strengthening of the Pre-examination and approval of Online Games and the Approval and Examination of Imported Online Games, or the GAPP Notice. The GAPP Notice explicitly prohibits foreign investors from directly or indirectly engaging in online game business in China, including through consolidated affiliated entities. Foreign investors are not allowed to indirectly control or participate in PRC operating companies' online game operations, whether (i) by establishing other joint ventures, entering into contractual arrangements or providing technical support for such operating companies; or (ii) in a disguised form such as by incorporating or directing user registration, user account management or game card consumption into online game platforms that are ultimately controlled or owned by foreign companies. The GAPP Notice reiterates that the General Administration of Press and Publication is responsible for the examination and approval of the import and publication of online games and states that providing downloading services of the online game contents to the public through the internet is considered a publication activity, which is subject to approval from the General Administration of Press and Publication. Violations of the GAPP Notice will result in severe penalties. For detailed analysis, see "Risk Factors—Risks Related to Our Corporate Structure—If the PRC government finds that the agreements that establish the structure for operating our businesses in China do not comply with PRC regulations on foreign investment in internet and other related businesses, or if these regulations or their interpretation change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations."

49

Table of Contents

On May 24, 2016, the SARFT promulgated the Circular on the Administration over Mobile Game Publishing Services, which became effective as of July 1, 2016. The Circular provides that game publishing service entities shall be responsible for examining the contents of their games and applying for game publication numbers. To apply for publication of domestically-developed mobile puzzle games that are not related to political, military, national or religious topics or contents and have no or simple story lines, entities shall submit the required documents to provincial publication administrative departments at least 20 working days prior to the expected date of online publication (public beta). Entities applying for publication of domestically-developed mobile games that are not included in abovementioned category shall go through stricter procedures, including submitting manager accounts for content review and testing accounts for game anti-indulgence system. Game publishing service entities must set up a specific page to display the information approved by the SARFT, including copyright owner of the game, publishing service entity, approval number, publication number and others, and shall take charge of examining and recording daily updates of the game. For mobile games (including pre-installed mobile games) that have been published and operated online before implementation of this Circular, to maintain the publication and operation of such games online, relevant approval procedures shall be made up by the game publishing service entities and enterprises with the provincial publication administrative departments before December 31, 2016 as required by this Circular. Otherwise, they shall cease to be published or operated online.

### Regulation on Information Security

The Standing Committee of the National People's Congress promulgated the Cyber Security Law of the PRC, or the Cyber Security Law, which became effective on June 1, 2017, to protect cyberspace security and order. Pursuant to the Cyber Security Law, any individual or organization using the network must comply with the constitution and the applicable laws, follow the public order and respect social moralities, and must not endanger cyber security, or engage in activities by making use of the network that endanger the national security, honor and interests, or infringe on the fame, privacy, intellectual property and other legitimate rights and interests of others. The Cyber Security Law sets forth various security protection obligations for network operators, which are defined as "owners and administrators of networks and network service providers," including, among others, complying with a series of requirements of tiered cyber protection systems; verifying users' real identity; localizing the personal information and important data gathered and produced by key information infrastructure operators during operations within the PRC; and providing assistance and support to government authorities where necessary for protecting national security and investigating crimes. To comply with these laws and regulations, we have adopted security policies and measures to protect our cyber system and user information.

### Regulations Relating to Internet Content and Information Security

The Administrative Measures on Internet Information Services specify that internet information services regarding news, publications, education, medical and health care, pharmacy and medical appliances, among other things, are to be examined, approved and regulated by the relevant authorities. Internet information providers are prohibited from providing services beyond those included in the scope of their ICP licenses or filings. Furthermore, these measures clearly specify a list of prohibited content. Internet information providers are prohibited from producing, copying, publishing or distributing information that is humiliating or defamatory to others or that infringes the lawful rights and interests of others. Internet information providers that violate the prohibition may face criminal charges or administrative sanctions by the PRC authorities. Internet information providers must monitor and control the information posted on their websites. If any prohibited content is found, they must remove the offensive content immediately,

keep a record of it and report it to the relevant authorities. Beijing Momo, as an ICP license holder, is subject to these measures.

50

Table of Contents

Internet information in China is also regulated and restricted from a national security standpoint. The Standing Committee of the National People's Congress has enacted the Decisions on Maintaining Internet Security, which may subject violators to criminal punishment in China for any effort to: (i) gain improper entry into a computer or system of strategic importance; (ii) disseminate politically disruptive information; (iii) leak state secrets; (iv) spread false commercial information; or (v) infringe intellectual property rights. The Ministry of Public Security has promulgated measures that prohibit use of the internet in ways which, among other things, result in a leakage of state secrets or a spread of socially destabilizing content. As an ICP license holder, Beijing Momo is subject to the laws and regulations relating to information security.

In August 2013, the MOC issued the Administration Measures on Content Review by Internet Culture Operating Entities, or the Content Review Measures, which became effective on December 1, 2013. According to the Content Review Measures, an internet culture operating entity shall censor and review its products and services to be provided to the public to ensure that such products and services do not contain any content prohibited by law, and the censor record shall be kept for at least two years. Internet culture operating entities shall adopt technical measures to conduct real-time censor over the products and services, set up internal content control department and establish content control policies. If the internet culture operating entity identifies any illegal content, it shall immediately suspend the products or services containing such content and preserve relevant record, and, in the event that such illegal content might lead to material issues, report to provincial branch of MOC.

### Regulations on Anti-fatigue Compliance System and Real-name Registration System

On April 15, 2007, eight PRC government authorities, including the General Administration of Press and Publication, the Ministry of Education, the Ministry of Public Security and the Ministry of Industry and Information Technology, jointly issued the Notice on Protecting Minors Mental and Physical Health and Implementation of Online Game Anti-fatigue System, which requires the implementation of an anti-fatigue compliance system and a real-name registration system by all PRC online game operators. Under the anti-fatigue compliance system, three hours or less of continuous playing by minors, defined as game players under 18 years of age, is considered to be "healthy", three to five hours is deemed "fatiguing", and five hours or more is deemed "unhealthy." Game operators are required to reduce the value of in-game benefits to a game player by half if it discovers that the amount of a time a game player spends online has reached the "fatiguing" level, and to zero in the case of the "unhealthy" level.

To identify whether a game player is a minor and thus subject to the anti-fatigue compliance system, a real-name registration system should be adopted to require online game players to register their real identity information before playing online games. Pursuant to a notice issued by the relevant eight government authorities on July 1, 2011, online game operators must submit the identity information of game players to the National Citizen Identity Information Center, a subordinate public institution of the Ministry of Public Security, for verification as of October 1, 2011.

### Regulations Relating to Internet Information Services and Content of Internet Information

In September 2000, the State Council issued the Administrative Measures on Internet Information Services, or the Internet Measures, which is amended on January 8, 2011, to regulate the provision of information services to online users through the internet. According to the Internet Measures, internet information services are divided into two categories: services of an operative nature and services of a non-operative nature. Our business conducted through our immomo.com website involves operating internet information services, which requires us to obtain an ICP license. If an internet information service provider fails to obtain an ICP license, the relevant local branch of the Ministry of Industry and Information Technology may levy fines, confiscate its income or even block its website. When the ICP service involves areas of news, publication, education, medical treatment, health, pharmaceuticals and medical equipment, and if required by law or relevant regulations, specific approval from the respective regulatory authorities must be obtained prior to applying for the ICP license from the Ministry of Industry and Information Technology or its provincial level counterpart. Our affiliated PRC entity, Beijing Momo, currently holds an ICP license issued by Beijing Communications Administration, a local branch of the Ministry of Industry and Information Technology. Our ICP license will expire in January 2022.

51

Table of Contents

### Regulations Relating to Privacy Protection

As an internet content provider, we are subject to regulations relating to protection of privacy. In recent years, PRC government authorities have enacted laws and regulations on internet use to protect personal information from any unauthorized disclosure. The Administrative Measures on Internet Information Services prohibit ICP service operators from insulting or slandering a third party or infringing upon the lawful rights and interests of a third party. Under the Several Provisions on Regulating the Market Order of Internet Information Services, issued by the Ministry of Industry and Information Technology in 2011, an ICP service operator may not collect any user personal information or provide such information to third parties without the consent of a user. An ICP service operator must expressly inform the users of the method, content and purpose for the collection and processing of such user personal information and may only collect such information necessary for the provision of its services. An ICP service operator is also required to properly keep the user personal information, and in case of any leak or likely leak of the user personal information, the ICP service operator must take immediate remedial measures and, in severe circumstances, to make an immediate report to the telecommunications regulatory authority. In addition, pursuant to the Decision on Strengthening the Protection of Online Information issued by the Standing Committee of the National People's Congress in December 2012 and the Order for the Protection of Telecommunication and Internet User Personal Information issued by the Ministry of Industry and Information Technology in July 2013, any collection and use of user personal information must be subject to the consent of the user, abide by the principles of legality, rationality and necessity and be within the specified purposes, methods and scopes. An ICP service operator must also keep such

information strictly confidential, and is further prohibited from divulging, tampering or destroying of any such information, or selling or providing such information to other parties. Any violation of the above decision or order may subject the ICP service operator to warnings, fines, confiscation of illegal gains, revocation of licenses, cancelation of filings, closedown of websites or even criminal liabilities. We are subject to these regulations as an online business operator.

### Regulations Relating to Taxation

In January 2008, the PRC Enterprise Income Tax Law took effect. The PRC Enterprise Income Tax Law applies a uniform 25% enterprise income tax rate to both foreign-invested enterprises and domestic enterprises, except where tax incentives are granted to special industries and projects. Under the PRC Enterprise Income Tax Law and its implementation regulations, dividends generated from the business of a PRC subsidiary after January 1, 2008 and payable to its foreign investor may be subject to a withholding tax rate of 10% if the PRC tax authorities determine that the foreign investor is a non-resident enterprise, unless there is a tax treaty with China that provides for a preferential withholding tax rate. Distributions of earnings generated before January 1, 2008 are exempt from PRC withholding tax.

Under the PRC Enterprise Income Tax Law, an enterprise established outside China with "de facto management bodies" within China is considered a "resident enterprise" for PRC enterprise income tax purposes and is generally subject to a uniform 25% enterprise income tax rate on its worldwide income. A circular issued by the State Administration of Taxation in April 2009 regarding the standards used to classify certain Chinese-invested enterprises controlled by Chinese enterprises or Chinese enterprise groups and established outside of China as "resident enterprises" clarified that dividends and other income paid by such PRC "resident enterprises" will be considered PRC-source income and subject to PRC withholding tax, currently at a rate of 10%, when paid to non-PRC enterprise shareholders. This circular also subjects such PRC "resident enterprises" to various reporting requirements with the PRC tax authorities. Under the implementation regulations to the PRC Enterprise Income Tax Law, a "de facto management body" is defined as a body that has material and overall management and control over the manufacturing and business operations, personnel and human resources, finances and properties of an enterprise. In addition, the tax circular mentioned above specifies that certain PRC-invested overseas enterprises controlled by a Chinese enterprise or a Chinese enterprise group in the PRC will be classified as PRC resident enterprises if the following are located or resided in the PRC: senior management personnel and departments that are responsible for daily production, operation and management; financial and personnel decision making bodies; key properties, accounting books, the company seal, and minutes of board meetings and shareholders' meetings; and half or more of the senior management or directors who have the voting rights.

52

Table of Contents

Pursuant to the Arrangement between Mainland China and the Hong Kong Special Administrative Region for the Avoidance of Double Taxation and Tax Evasion on Income, the withholding tax rate in respect to the payment of dividends by a PRC enterprise to a Hong Kong enterprise is reduced to 5% from a standard rate of 10% if the Hong Kong enterprise directly holds at least 25% of the PRC enterprise. Pursuant to the Notice of the State Administration of Taxation on the Issues concerning the Application of the Dividend Clauses of Tax Agreements, or Circular 81, a Hong Kong resident enterprise must meet the following conditions, among others, in order to enjoy the reduced withholding tax: (i) it must be a company; (ii) it must directly own the required percentage of equity interests and voting rights in the PRC resident enterprise; and (iii) it must have directly owned such required percentage in the PRC resident enterprise throughout the 12 months prior to receiving the dividends. Furthermore, the Administrative Measures for Non-Resident Taxpayer to Enjoy Treatments under Tax Treaties, which became effective in November 2015, require that non-resident taxpayers may enjoy treatments under tax treaties on their own during the tax filings by themselves or through withholding agents, and be subject to administration by relevant tax authorities afterwards. There are also other conditions for enjoying the reduced withholding tax rate according to other relevant tax rules and regulations. Accordingly, Momo Technology HK Company Limited may be able to benefit from the 5% withholding tax rate for the dividends it receives from Beijing Momo, if it satisfies the conditions prescribed under Circular 81 and other relevant tax rules and regulations, and obtain the approvals as required. However, according to Circular 81, if the relevant tax authorities consider the transactions or arrangements we have are for the primary purpose of enjoying a favorable tax treatment, the relevant tax authorities may adjust the favorable withholding tax in the future.

In January 2009, the SAT promulgated the Provisional Measures for the Administration of Withholding of Enterprise Income Tax for Non-resident Enterprises, or the Non-resident Enterprises Measures, pursuant to which entities that have direct obligation to make certain payments to a non-resident enterprise shall be the relevant tax withholders for such non-resident enterprise. Further, the Non-resident Enterprises Measures provides that, in case of an equity transfer between two non-resident enterprises which occurs outside China, the non-resident enterprise which receives the equity transfer payment shall, by itself or engage an agent to, file tax declaration with the PRC tax authority located at place of the PRC company whose equity has been transferred, and the PRC company whose equity has been transferred shall assist the tax authorities to collect taxes from the relevant non-resident enterprise. On April 30, 2009, the MOF and the SAT jointly issued the Notice on Issues Concerning Process of Enterprise Income Tax in Enterprise Restructuring Business, or Circular 59. On December 10, 2009, the SAT issued the Notice on Strengthening the Administration of the Enterprise Income Tax concerning Proceeds from Equity Transfers by Non-resident Enterprises, or Circular 698. Both Circular 59 and Circular 698 became effective retroactively as of January 1, 2008. By promulgating and implementing these two circulars, the PRC tax authorities have enhanced their scrutiny over the direct or indirect transfer of equity interests in a PRC resident enterprise by a non-resident enterprise.

On February 3, 2015, the SAT issued a Public Notice on Several Issues Relating to Enterprise Income Tax on Transfer of Assets between Non-resident Enterprises, or Public Notice 7, to supersede existing provisions in relation to the Indirect Transfer as set forth in Circular 698, while the other provisions of Circular 698 remain in force. Public Notice 7 introduces a new tax regime that is significantly different from that under Circular 698. Public Notice extends its tax jurisdiction to capture not only Indirect Transfer as set forth under Circular 698 but also transactions involving transfer of immovable property in China and assets held under the establishment and place, in China of a foreign company through the offshore transfer of a foreign intermediate holding company. Public Notice 7 also addresses transfer of the equity interest in a foreign intermediate holding company widely. In addition, Public Notice 7 provides clearer criteria than Circular 698 on how to assess reasonable commercial purposes and introduces safe harbor scenarios applicable to internal group restructurings. However, it also brings challenges to both the foreign transferor and transferee of the Indirect Transfer as they have to make self-assessment on whether the transaction should be subject to PRC tax and to file or withhold the PRC tax accordingly. In October 2017, the SAT issued the Announcement of the State Administration of Taxation on Issues Concerning the Withholding of Non-resident Enterprise Income Tax at Source, or Bulletin 37, which came into effect on December 1, 2017. The Bulletin 37 replaced and superseded, among other

circulars, the Non-resident Enterprises Measures and Circular 698, and further clarifies the practice and procedures of the withholding of non-resident enterprise income tax. Where a non-resident enterprise transfers taxable assets indirectly by disposing of the equity interests of an overseas holding company, which is an Indirect Transfer, the non-resident enterprise as either the transferor or the transferee, or the PRC entity that directly owns the taxable assets, may report such Indirect Transfer to the relevant tax authority.

Where non-resident investors were involved in our private equity financing, if such transactions were determined by the tax authorities to lack reasonable commercial purpose, we and our non-resident investors may become at risk of being taxed under Bulletin 37 and Public Notice 7 and may be required to expend valuable resources to comply with Bulletin 37 and Public Notice 7 or to establish that we should not be taxed under Bulletin 37 and Public Notice 7.

The PRC tax authorities have the discretion under SAT Circular 59, Bulletin 37 and Public Notice 7 to make adjustments to the taxable capital gains based on the difference between the fair value of the equity interests transferred and the cost of investment.

<div align="center">53</div>

Table of Contents

### *Value Added Tax*

On January 1, 2012, the Chinese State Council officially launched a pilot value-added tax ("VAT") reform program, or Pilot Program, applicable to businesses in selected industries. Businesses in the Pilot Program would pay VAT instead of business tax. The Pilot Industries in Shanghai included industries involving the leasing of tangible movable property, transportation services, research and development and technical services, information technology services, cultural and creative services, logistics and ancillary services, certification and consulting services. Revenues generated by advertising services, a type of "cultural and creative services," are subject to the VAT tax rate of 6%. According to official announcements made by competent authorities in Beijing and Guangdong province, Beijing launched the same Pilot Program on September 1, 2012, and Guangdong province launched it on November 1, 2012. On May 24, 2013, the Ministry of Finance, or the MoF, and the State Administration of Taxation, or the SAT, issued the Circular on Tax Policies in the Nationwide Pilot Collection of Value Added Tax in Lieu of Business Tax in the Transportation Industry and Certain Modern Services Industries, or the Circular 37. The scope of certain modern services industries under the Circular 37 extends to the inclusion of radio and television services. On August 1, 2013, the Pilot Program was implemented throughout China. On December 12, 2013, the MoF and the SAT issued the Circular on the Inclusion of the Railway Transport Industry and Postal Service Industry in the Pilot Collection of Value-added Tax in Lieu of Business Tax, or Circular 106. Among the other things, Circular 106 abolished Circular 37, and refined the policies for the Pilot Program. On April 29, 2014, the MoF and the SAT issued the Circular on the Inclusion of Telecommunications Industry in the Pilot Collection of Value-added Tax in Lieu of Business Tax. On March 23, 2016, the MoF and the SAT issued the Circular on Comprehensively Promoting the Pilot Program of the Collection of Value-added Tax in Lieu of Business Tax. Effective from May 1, 2016, the PRC tax authorities collect VAT in lieu of Business Tax in all regions and industries. All of our entities were subject to VAT at the rate of 6% for services provided and 16% for goods sold which are not listed in Article 2 Sub-article 2 of the Provisional Regulations on Value Added Tax of the PRC as of December 31, 2018.

### *Regulations Relating to Copyright and Trademark Protection*

China has adopted legislation governing intellectual property rights, including copyrights and trademarks. China is a signatory to major international conventions on intellectual property rights and is subject to the Agreement on Trade Related Aspects of Intellectual Property Rights as a result of its accession to the World Trade Organization in December 2001.

*Copyright.* The National People's Congress amended the Copyright Law in 2001 and 2010 to widen the scope of works and rights that are eligible for copyright protection. The amended Copyright Law extends copyright protection to Internet activities, products disseminated over the Internet and software products. In addition, there is a voluntary registration system administered by the China Copyright Protection Center. To address copyright infringement related to content posted or transmitted over the internet, the National Copyright Administration and former Ministry of Information Industry jointly promulgated the Administrative Measures for Copyright Protection Related to the Internet in April 2005. These measures became effective in May 2005. To comply with these laws and regulations, we have implemented internal procedures to monitor and review the content we have been licensed from content providers before they are released on our platform and remove any infringing content promptly after we receive notice of infringement from the legitimate rights holder.

On December 20, 2001, the State Council promulgated the new Regulations on Computer Software Protection, effective from January 1, 2002, which are intended to protect the rights and interests of the computer software copyright holders and encourage the development of software industry and information economy. In the PRC, software developed by PRC citizens, legal persons or other organizations is automatically protected immediately after its development, without an application or approval. Software copyright may be registered with the designated agency and if registered, the certificate of registration issued by the software registration agency will be the primary evidence of the ownership of the copyright and other registered matters. On February 20, 2002, the National Copyright Administration of the PRC introduced the Measures on Computer Software Copyright Registration, which outline the operational procedures for registration of software copyright, as well as registration of software copyright license and transfer contracts. The Copyright Protection Center of China is mandated as the software registration agency under the regulations.

The State Council and the National Copyright Administration have promulgated various rules and regulations and rules relating to protection of software in China, including the Regulations on Protection of Computer Software promulgated by State Council on January 30, 2013 and effective since March 1, 2013, and the Measures for Registration of Copyright of Computer Software promulgated by SARFT on February 20, 2002 and effective since the same date. According to these rules and regulations, software owners, licensees and transferees may register their rights in software with the National Copyright Administration or its local branches and obtain software copyright registration certificates. Although such registration is not mandatory under PRC law, software owners, licensees and transferees are encouraged to go through the registration process and registered software rights may be entitled to better protections. As of December 31, 2018, we had registered 128 software copyrights in China.

<div align="center">54</div>

Table of Contents

*Trademark*. The PRC Trademark Law, adopted in 1982 and revised in 1993, 2001 and 2013 respectively, protects the proprietary rights to registered trademarks. The Trademark Office under the State Administration for Industry and Commerce handles trademark registrations and may grant a term of ten years for registered trademarks, which may be extended for another ten years upon request. Trademark license agreements shall be filed with the Trademark Office for record. In addition, if a registered trademark is recognized as a well-known trademark, the protection of the proprietary right of the trademark holder may reach beyond the specific class of the relevant products or services. As of December 31, 2018, we had 398 registered trademarks and 262 trademark applications in China.

### Regulations Relating to Foreign Exchange

Pursuant to the Regulations on the Administration of Foreign Exchange issued by the State Council and effective in 1996, as amended in January 1997 and August 2008, respectively, current account transactions, such as the sale or purchase of goods, are not subject to PRC governmental approvals. Certain organizations in the PRC, including foreign-invested enterprises, may purchase, sell and/or remit foreign currencies at certain banks authorized to conduct foreign exchange business upon providing valid commercial documents. However, approval of the PRC State Administration of Foreign Exchange, or SAFE, is required for capital account transactions.

In August 2008, SAFE issued a circular on the conversion of foreign currency into Renminbi by a foreign-invested company that regulates how the converted Renminbi may be used, or the SAFE Circular 142. The circular requires that the registered capital of a foreign-invested enterprise converted into Renminbi from foreign currencies may only be utilized for purposes within its business scope. For example, such converted amounts may not be used for investments in or acquisitions of other companies, which can inhibit the ability of companies to consummate such transactions. In addition, SAFE strengthened its oversight of the flow and use of the Renminbi registered capital of foreign-invested enterprises converted from foreign currencies. The use of such Renminbi capital may not be changed without SAFE's approval, and may not in any case be used to repay Renminbi loans if the proceeds of such loans have not been utilized. Furthermore, SAFE promulgated a circular in November 2010, which, among other things, requires the authenticity of settlement of net proceeds from offshore offerings to be closely examined and the net proceeds to be settled in the manner described in the offering documents. Violations may result in severe penalties, such as heavy fines.

In November 2012, SAFE promulgated the Circular of Further Improving and Adjusting Foreign Exchange Administration Policies on Foreign Direct Investment which substantially amends and simplifies the current foreign exchange procedure. Pursuant to this circular, the opening of various special purpose foreign exchange accounts (e.g. pre-establishment expenses account, foreign exchange capital account, guarantee account), the reinvestment of RMB proceeds by foreign investors in the PRC, and remittance of foreign exchange profits and dividends by a foreign-invested enterprise to its foreign shareholders no longer require the approval or verification of SAFE, and multiple capital accounts for the same entity may be opened in different provinces, which was not possible before. In addition, SAFE promulgated the Circular on Printing and Distributing the Provisions on Foreign Exchange Administration over Domestic Direct Investment by Foreign Investors and the Supporting Documents in May 2013, which specifies that the administration by SAFE or its local branches over direct investment by foreign investors in the PRC shall be conducted by way of registration and banks shall process foreign exchange business relating to the direct investment in the PRC based on the registration information provided by SAFE and its branches.

In April 8, 2015, SAFE promulgated the Circular on Reforming the Management Approach Regarding the Foreign Exchange Capital Settlement of Foreign-invested Enterprises, which will, upon its effective date as of June 1, 2015, supersedes the SAFE Circular 142. This circular provides that, among other things, the foreign-invested company may convert the foreign currency in its capital account into RMB on a "at will" basis and the RMB funds so converted can be used for equity investments provided that equity investment is included in the business scope of such foreign-invested company.

On June 9, 2016, SAFE promulgated the Circular on Reforming and Regulation of Administrative Policy on Settlement of Foreign Exchange of Capital Account, or SAFE Circular 16, which became effective on June 9, 2016. According to SAFE Circular 16, the foreign exchange capital of FIEs, foreign debt and funds raised through offshore listing may be settled on a discretionary basis, and can be settled at the banks. The proportion of such discretionary settlement is temporarily determined as 100%. The RMB converted from relevant foreign exchange will be kept in a designated account, and if a domestic enterprise needs to make further payment from such account, it still must provide supporting documents and go through the review process with the banks.

Table of Contents

Furthermore, SAFE Circular 16 reiterates that the use of capital by domestic enterprises must adhere to the principles of authenticity and self-use within the business scope of enterprises. The foreign exchange income of capital account and RMB obtained by domestic enterprise from foreign exchange settlement must not be used (i) directly or indirectly for payment beyond the business scope of the enterprises or payment prohibited by relevant laws and regulations; (ii) directly or indirectly for investment in securities and investment in wealth management products except for principal-guaranteed bank wealth management products, unless otherwise provided by relevant laws and regulations; (iii) directly or indirectly for extending entrusted loans to non-affiliate enterprises, unless permitted by the scope of business; and/or (iv) for construction or purchase of real estate that is not for self-use, except for foreign-invested real estate enterprises.

### Regulations Relating to Labor

Pursuant to the PRC Labor Law effective in 1995 and the PRC Labor Contract Law effective in 2008, a written labor contract is required when an employment relationship is established between an employer and an employee. Other labor-related regulations and rules of the PRC stipulate the maximum number of working hours per day and per week as well as the minimum wages. An employer is required to set up occupational safety and

sanitation systems, implement the national occupational safety and sanitation rules and standards, educate employees on occupational safety and sanitation, prevent accidents at work and reduce occupational hazards.

In the PRC, workers dispatched by an employment agency are normally engaged in temporary, auxiliary or substitute work. Pursuant to the PRC Labor Contract Law, an employment agency is the employer for workers dispatched by it and shall perform an employer's obligations toward them. The employment contract between the employment agency and the dispatched workers, and the placement agreement between the employment agency and the company that receives the dispatched workers shall be in writing. Furthermore, the company that accepts the dispatched workers shall be jointly and severally liable for any damage caused to the dispatched workers due to violation of the Labor Contract Law by the employment agencies arising from their contracts with dispatched workers. An employer is obligated to sign an indefinite term labor contract with an employee if the employer continues to employ the employee after two consecutive fixed-term labor contracts. The employer also has to pay compensation to the employee if the employer terminates an indefinite term labor contract. Except where the employer proposes to renew a labor contract by maintaining or raising the conditions of the labor contract and the employee is not agreeable to the renewal, an employer is required to compensate the employee when a definite term labor contract expires. Furthermore, under the Regulations on Paid Annual Leave for Employees issued by the State Council in December 2007 and effective as of January 2008, an employee who has served an employer for more than one year and less than ten years is entitled to a five-day paid vacation, those whose service period ranges from 10 to 20 years is entitled to a 10-day paid vacation, and those who has served for more than 20 years is entitled to a 15-day paid vacation. An employee who does not use such vacation time at the request of the employer shall be compensated at three times their normal salaries for each waived vacation day.

Pursuant to the Regulations on Occupational Injury Insurance effective in 2004, as amended in 2010, and the Interim Measures concerning the Maternity Insurance for Enterprise Employees effective in 1995, PRC companies must pay occupational injury insurance premiums and maternity insurance premiums for their employees. Pursuant to the Interim Regulations on the Collection and Payment of Social Insurance Premiums effective in 1999 and the Interim Measures concerning the Administration of the Registration of Social Insurance effective in 1999, basic pension insurance, medical insurance and unemployment insurance are collectively referred to as social insurance. Both PRC companies and their employees are required to contribute to the social insurance plans. Pursuant to the Regulations on the Administration of Housing Fund effective in 1999, as amended in 2002, PRC companies must register with applicable housing fund management centers and establish a special housing fund account in an entrusted bank. Both PRC companies and their employees are required to contribute to the housing funds.

<div align="center">56</div>

Table of Contents

According to the Social Insurance Law, an employer that fails to make social insurance contributions may be ordered to pay the required contributions within a stipulated deadline and be subject to a late fee. If the employer still fails to rectify the failure to make social insurance contributions within the stipulated deadline, it may be subject to a fine ranging from one to three times the amount overdue. According to the Regulations on Administration of Housing Fund, an enterprise that fails to make housing fund contributions may be ordered to rectify the noncompliance and pay the required contributions within a stipulated deadline; otherwise, an application may be made to a local court for compulsory enforcement.

### Regulations Relating to Dividend Distribution

Wholly foreign-owned companies in the PRC may pay dividends only out of their accumulated profits after tax as determined in accordance with PRC accounting standards. Remittance of dividends by a wholly foreign-owned enterprise out of China is subject to examination by the banks designated by SAFE. Wholly foreign-owned companies may not pay dividends unless they set aside at least 10% of their respective accumulated profits after tax each year, if any, to fund certain reserve funds, until such time as the accumulative amount of such fund reaches 50% of the wholly foreign-owned company's registered capital. These reserve funds are not distributable as cash dividends.

### SAFE Regulations on Offshore Special Purpose Companies Held by PRC Residents or Citizens

SAFE Circular on Relevant Issues Relating to Domestic Resident's Investment and Financing and Roundtrip Investment through Special Purpose Vehicles, or Circular 37, issued by SAFE and effective in July 2014, regulates foreign exchange matters in relation to the use of special purpose vehicles, or SPVs, by PRC residents or entities to seek offshore investment and financing and conduct round trip investment in China. Under Circular 37, a SPV refers to an offshore entity established or controlled, directly or indirectly, by PRC residents or entities for the purpose of seeking offshore financing or making offshore investment, using legitimate domestic or offshore assets or interests, while "round trip investment" refers to the direct investment in China by PRC residents or entities through SPVs, namely, establishing foreign-invested enterprises to obtain the ownership, control rights and management rights. Circular 37 requires that, before making contribution into an SPV, PRC residents or entities are required to complete foreign exchange registration with the SAFE or its local branch. SAFE Circular 37 further provides that option or share-based incentive tool holders of a non-listed SPV can exercise the options or share incentive tools to become a shareholder of such non-listed SPV, subject to registration with SAFE or its local branch.

PRC residents or entities who have contributed legitimate domestic or offshore interests or assets to SPVs but have yet to obtain SAFE registration before the implementation of the Circular 37 shall register their ownership interests or control in such SPVs with SAFE or its local branch. An amendment to the registration is required if there is a material change in the SPV registered, such as any change of basic information (including change of such PRC residents, name and operation term), increases or decreases in investment amount, transfers or exchanges of shares, or mergers or divisions. Failure to comply with the registration procedures set forth in Circular 37, or making misrepresentation on or failure to disclose controllers of foreign-invested enterprise that is established through round-trip investment, may result in restrictions on the foreign exchange activities of the relevant foreign-invested enterprises, including payment of dividends and other distributions, such as proceeds from any reduction in capital, share transfer or liquidation, to its offshore parent or affiliate, and the capital inflow from the offshore parent, and may also subject relevant PRC residents or entities to penalties under PRC foreign exchange administration regulations.

We have completed the foreign exchange registration of PRC resident shareholders for Mr. Yan Tang, Mr. Yong Li and Mr. Xiaoliang Lei with respect to our financings and share transfer.

***M&A Rule and Overseas Listing***

In August 2006, six PRC regulatory agencies, including China Securities Regulatory Commission, or CSRC, jointly adopted the Provisions Regarding Mergers and Acquisitions of Domestic Enterprises by Foreign Investors, or the M&A Rule, which became effective in September 2006. This M&A Rule purports to require, among other things, offshore SPVs, formed for listing purposes through acquisition of PRC domestic companies and controlled by PRC companies or individuals, to obtain the approval of the CSRC prior to publicly listing their securities on an overseas stock exchange. We believe that CSRC approval is not required in the context of our initial public offering as we are not a special purpose vehicle formed for listing purpose through acquisition of domestic companies that are controlled by our PRC individual shareholders, as we acquired contractual control rather than equity interests in our domestic affiliated entities.

<div align="center">57</div>

Table of Contents

However, we cannot assure you that the relevant PRC government agency, including the CSRC, would reach the same conclusion as we do. If the CSRC or other PRC regulatory agency subsequently determines that we need to obtain the CSRC's approval for our initial public offering or if CSRC or any other PRC government authorities will promulgate any interpretation or implementing rules before our listing that would require CSRC or other governmental approvals for our initial public offering, we may face sanctions by the CSRC or other PRC regulatory agencies. In such event, these regulatory agencies may impose fines and penalties on our operations in the PRC, limit our operating privileges in the PRC, delay or restrict the repatriation of the proceeds from our initial public offering into the PRC, or take other actions that could have a material adverse effect on our business, financial condition, results of operations, and prospects, as well as the trading price of our ADSs.

***SAFE Regulations on Employee Share Options***

Pursuant to the Notice on Issues Concerning the Foreign Exchange Administration for Domestic Individuals Participating in Stock Incentive Plan of Overseas Publicly Listed Company, or Circular 7, issued by SAFE in February 2012, employees, directors, supervisors and other senior management participating in any stock incentive plan of an overseas publicly listed company who are PRC citizens or who are non-PRC citizens residing in China for a continuous period of not less than one year, subject to a few exceptions, are required to register with SAFE through a domestic qualified agent, which could be a PRC subsidiary of such overseas listed company, and complete certain other procedures. Failure to complete the SAFE registrations may subject them to fines and legal sanctions and may also limit our ability to contribute additional capital into our wholly foreign-owned subsidiaries in China and limit these subsidiaries' ability to distribute dividends to us.

In addition, the State Administration for Taxation has issued certain circulars concerning employee share options or restricted shares. Under these circulars, the employees working in the PRC who exercise share options or are granted restricted shares will be subject to PRC individual income tax. The PRC subsidiaries of such overseas listed company have obligations to file documents related to employee share options or restricted shares with relevant tax authorities and to withhold individual income taxes of those employees who exercise their share options. If the employees fail to pay or the PRC subsidiaries fail to withhold their income taxes according to relevant laws and regulations, the PRC subsidiaries may face sanctions imposed by the tax authorities or other PRC government authorities. These registrations and filings are a matter of foreign exchange control and tax procedure and the grant of share incentive awards to employees is not subject to the government's discretionary approval. Compliance with PRC regulations on employee incentive plans has not had, and we believe will not in the future have, any material adverse effect on the implementation of our 2012 Plan and 2014 Plan.

**C.    Organizational Structure**

The following diagram illustrates our corporate structure, including our subsidiaries, consolidated affiliated entity and its subsidiaries as of the date of this annual report.

<div align="center">58</div>

Table of Contents





Notes:

(1)    We exercise effective control over Beijing Momo through contractual arrangements among Beijing Momo IT, Beijing Momo and Messrs. Yan Tang, Yong Li, Xiaoliang Lei and Zhiwei Li, each of whom holds 72.0%, 16.0%, 6.4% and 5.6% of the equity interest in Beijing Momo, respectively. Except for Zhiwei Li, the shareholders of Beijing Momo are our shareholders, directors or officers.

(2)    Ningbo Hongyi Equity Investment L.P. is a limited partnership organized in September 2015. We invested in it and became a limited partner starting from February 2018.

(3)    We exercise effective control over Tantan Culture through contractual arrangements among Tantan Technology (Beijing) Co., Ltd., or Tantan Technology, Tantan Culture and Beijing Momo.

(4)    We exercise effective control over Hainan Miaoka through contractual arrangements among Beijing Yiliulinger, Hainan Miaoka and Messrs. Xiaoliang Lei and Li Wang, each of whom holds 50% and 50% of the equity interest in Hainan Miaoka, respectively. The shareholders of Hainan Miaoka are our shareholders, directors or officers.

59

**Table of Contents**

(5)    We exercise effective control over Hainan Yilingliuer, through contractual arrangements among Beijing Yiliulinger, Hainan Yilingliuer and Messrs. Xiaoliang Lei and Li Wang, each of whom holds 50% and 50% of the equity interest in Hainan Yilingliuer, respectively. The shareholders of Hainan Yilingliuer are our shareholders, directors or officers.

(6)    We exercise effective control over Beijing Fancy Reader through contractual arrangements among Beijing Momo IT, Beijing Fancy Reader and Mr. Taizhong Wang, who holds 100% of the equity interest in Beijing Fancy Reader.

(7)    QOOL Media (Tianjin) Co., Ltd. was established in November 2016. We exercise effective control over Tianjin QOOL Media through contractual arrangements among Tianjin QOOL Media, QOOL Media Technology (Tianjin) Co., Ltd., and Tianjin Mingqiao Media Partnership (Limited Partner), or Tianjin Mingqiao, each of which holds 70% and 30% of the equity interest in Tianjin QOOL Media, respectively, and Mr. Chen Feng and Mr. Ridan Da, who are two partners of Tianjin Mingqiao. One of the shareholders of Tianjin QOOL Media, namely QOOL Media Technology (Tianjin) Co., Ltd., is a subsidiary of ours.

**Contractual Arrangements with Our Consolidated Affiliated Entities and Their Respective Shareholders**

PRC laws and regulations place certain restrictions on foreign investment in and ownership of internet-based businesses. Accordingly, we conduct our operations in China principally through Beijing Momo and its subsidiaries, Tantan Culture, Hainan Miaoka, Hainan Yilingliuer, Beijing Fancy Reader and Tianjin QOOL Media. Beijing Momo IT entered into contractual arrangements with Beijing Momo, Beijing Fancy Reader and their respective shareholders. Beijing Yiliulinger, a wholly owned subsidiary of Beijing Momo IT, entered into contractual arrangements with Hainan Miaoka, Hainan Yilingliuer and their respective shareholders. QOOL Media Technology (Tianjin) Co., Ltd. entered into contractual arrangements with Tianjin QOOL Media and its shareholders. Tantan Technology entered into contractual arrangements with Tantan Culture and its shareholder. Beijing Momo, Tantan Culture, Hainan Miaoka, Hainan Yilingliuer, Beijing Fancy Reader and Tianjin QOOL Media are all of our consolidated affiliated entities.

The contractual arrangements allow us to:

- exercise effective control over our consolidated affiliated entities;

- receive substantially all of the economic benefits of our consolidated affiliated entities; and

- have an option to purchase all or part of the equity interests in our consolidated affiliated entities when and to the extent permitted by PRC law.

As a result of these contractual arrangements, we are the primary beneficiary of our consolidated affiliated entities and their subsidiaries, and, therefore, have consolidated the financial results of our consolidated affiliated entities and their subsidiaries in our consolidated financial statements in accordance with U.S. GAAP.

The following is a summary of the currently effective contractual arrangements by and among our wholly-owned subsidiary, Beijing Momo IT, Beijing Momo and the shareholders of Beijing Momo. We also entered into contractual arrangements with Tantan Culture, Hainan Miaoka, Hainan Yilingliuer, Beijing Fancy Reader and Tianjin QOOL Media. The contractual arrangements entered into by our other PRC subsidiaries with our other consolidated affiliated entities and their respective shareholders contain substantially the same terms as described below.

*Business operation agreement.* Under the business operation agreement entered into among Beijing Momo IT, Beijing Momo and the shareholders of Beijing Momo on April 18, 2012, as supplemented on June 9, 2014, the shareholders of Beijing Momo agreed that Beijing Momo would not enter into any transaction that could materially or adversely affect its assets, business, interests or operations without prior written consent from Beijing Momo IT, including conducting business beyond the usual and normal scope, entering into any loan or other debtor-creditor relationship with third party, selling or disposing of assets or rights, including intellectual property rights, and creating guarantees or any other security on any of its assets or intellectual property rights in favor of a third party. In addition, the shareholders of Beijing Momo agreed to vote for or appoint nominees designated by Beijing Momo IT to serve as Beijing Momo's directors, chairman, general managers, financial controllers and other senior managers. Furthermore, Beijing Momo's shareholders agreed to accept and implement proposals set forth by Beijing Momo IT regarding employment, day-to-day business operations and financial management. Beijing Momo IT is entitled to any dividends or other interests declared by Beijing Momo and the shareholders of Beijing Momo have agreed to promptly transfer such dividends or other interests to Beijing Momo IT. These agreements have an initial term of ten years from the date of execution, and may be extended at the discretion of Beijing Momo IT. Beijing Momo IT may terminate this agreement at any time by giving a prior written notice to Beijing Momo and its shareholders. Neither Beijing Momo nor its shareholders may terminate this agreement.

60

**Table of Contents**

*Exclusive call option agreements*. Under the exclusive call option agreements between Beijing Momo IT, Beijing Momo and each of the shareholders of Beijing Momo entered into on April 18, 2012, and amended and restated on April 18, 2014, each of the shareholders of Beijing Momo irrevocably granted Beijing Momo IT an exclusive option to purchase, to the extent permitted under PRC law, all or part of their equity interests in Beijing Momo for a nominal price of RMB10 or the lowest price permitted under PRC law. In addition, Beijing Momo irrevocably granted Beijing Momo IT an exclusive and irrevocable option to purchase any or all of the assets owned by Beijing Momo at the lowest price permitted under PRC law. Without Beijing Momo IT's prior written consent, Beijing Momo and its shareholders will not sell, transfer, mortgage or otherwise dispose of Beijing Momo's material assets, legal or beneficial interests or revenues of more than RMB500,000, or allow an encumbrance on any interest in Beijing Momo. These agreements will remain effective until all equity interests held in Beijing Momo by its shareholders are transferred or assigned to Beijing Momo IT.

*Equity interest pledge agreements*. Under the equity interest pledge agreements between Beijing Momo IT, Beijing Momo and the shareholders of Beijing Momo entered into on April 18, 2012, and amended and restated on April 18, 2014, the shareholders of Beijing Momo pledged all of their equity interests in Beijing Momo (including any equity interest subsequently acquired) to Beijing Momo IT to guarantee the performance by Beijing Momo and its shareholders of their respective obligations under the contractual arrangements, including the payments due to Beijing Momo IT for services provided. If Beijing Momo or any of its shareholders breach their obligations under these contractual arrangements, Beijing Momo IT, as the pledgee, will be entitled to certain rights and remedies, including priority in receiving the proceeds from the auction or disposal of the pledged equity interests in Beijing Momo. Beijing Momo IT has the right to receive dividends generated by the pledged equity interests during the term of the pledge. The pledge becomes effective on the date when the pledge of equity interests contemplated under the agreement is registered with the relevant local administration for industry and commerce and will remain binding until Beijing Momo and its shareholders discharge all their obligations under the contractual arrangements. We have registered the equity interest pledge agreements with Chaoyang Branch of Beijing Administration for Industry and Commerce in Beijing.

*Powers of attorney*. Pursuant to the powers of attorney entered into on April 18, 2012 and amended and restated on April 18, 2014, each shareholder of Beijing Momo irrevocably appointed Beijing Momo IT as their attorney-in-fact to act for all matters pertaining to Beijing Momo and to exercise all of their rights as shareholders of Beijing Momo, including attending shareholders' meetings and designating and appointing legal representatives, directors and senior management members of Beijing Momo. Beijing Momo IT may authorize or assign its rights under this appointment to any other person or entity at its sole discretion without prior notice to or prior consent from the shareholders of Beijing Momo. Each power of attorney remains in force until the shareholder ceases to hold any equity interest in Beijing Momo.

*Spousal consent letters*. Under the spousal consent letters, each spouse of the married shareholders of Beijing Momo unconditionally and irrevocably agreed that the equity interest in Beijing Momo held by and registered in the name of their spouse will be disposed of pursuant to the equity interest pledge agreement, the exclusive call option agreement, and the power of attorney. Each spouse agreed not to assert any rights over the equity interest in Beijing Momo held by their spouse. In addition, in the event that the spouses obtain any equity interest in Beijing Momo held by their spouse for any reason, they agreed to be bound by the contractual arrangements.

*Exclusive cooperation agreements.* Beijing Momo IT entered into an exclusive cooperation agreement and a supplemental agreement with Beijing Momo and Chengdu Momo, respectively, on August 31, 2014 to supersede the exclusive technology consulting and management services agreement signed in April 2012 between Beijing Momo IT and Beijing Momo. In May 2016 and December 2017, Beijing Momo IT entered into an exclusive

cooperation agreement and a supplemental agreement with Tianjin Heer and Loudi Momo, respectively. Pursuant to the aforesaid exclusive cooperation agreements, each as amended, Beijing Momo IT has the exclusive right to provide, among other things, licenses, copyrights, technical and non-technical services to Beijing Momo, Chengdu Momo, Tianjin Heer and Loudi Momo and receive service fees and license fees as consideration. Beijing Momo, Chengdu Momo, Tianjin Heer and Loudi Momo will maintain a pre-determined level of operating profit and remit any excess operating profit to Beijing Momo IT as consideration for the licenses, copyrights, technical and non-technical services provided by Beijing Momo IT. Each agreement has an initial term of ten years from the date of execution, and may be extended at the sole discretion of Beijing Momo IT. Beijing Momo IT may terminate the agreement at any time with a 30-day notice to Beijing Momo, Chengdu Momo, Tianjin Heer and Loudi Momo, as applicable, but Beijing Momo, Chengdu Momo, Tianjin Heer and Loudi Momo may not terminate the agreement.

61

Table of Contents

In the opinion of Han Kun Law Offices, our PRC counsel:

- the ownership structures of Beijing Momo IT and Beijing Momo will not result in any violation of PRC laws or regulations currently in effect; and

- the contractual arrangements among Beijing Momo IT, Beijing Momo and the shareholders of Beijing Momo governed by PRC law are valid, binding and enforceable, and do not and will not result in any violation of PRC laws or regulations currently in effect.

However, there are substantial uncertainties regarding the interpretation and application of current and future PRC laws, regulations and rules. Accordingly, the PRC regulatory authorities may in the future take a view that is contrary to the above opinion of our PRC counsel. If the PRC government finds that the agreements that establish the structure for operating our business do not comply with PRC government restrictions on foreign investment in our businesses, we could be subject to severe penalties, including being prohibited from continuing operations. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Corporate Structure—If the PRC government finds that the agreements that establish the structure for operating our businesses in China do not comply with PRC regulations on foreign investment in internet and other related businesses, or if these regulations or their interpretation change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations," and "Item 3. Key Information—D. Risk Factors—Risks Related to Doing Business in China—Uncertainties in the interpretation and enforcement of PRC laws and regulations could limit the legal protections available to you and us."

Beijing Momo IT also entered into an exclusive cooperation agreement and a supplemental agreement with Chengdu Momo, Tianjin Heer and Loudi Momo on August 31, 2014, May 1, 2016 and December 1, 2017, respectively, which agreements are substantially similar to the ones entered into between Beijing Momo IT and Beijing Momo described above.

#### D.    Property, Plant and Equipment

Our headquarters and our principal service development facilities are located in Beijing. We leased an aggregate of approximately 38,729 square meters of office space in Beijing, Chengdu, Tianjin, Shanghai, Guangzhou, Kuala Lumpur and San Jose as of March 31, 2019. These leases vary in duration from seven months to five years.

The servers that we use to provide our services are primarily maintained at various third-party internet data centers in Beijing.

#### Item 4A.    Unresolved Staff Comments

None.

#### Item 5.    Operating and Financial Review and Prospects

*The following discussion of our financial condition and results of operations is based upon, and should be read in conjunction with, our audited consolidated financial statements and the related notes included in this annual report on Form 20-F. This report contains forward-looking statements. See "Forward-Looking Information." In evaluating our business, you should carefully consider the information provided under the caption "Item 3. Key Information—D. Risk Factors" in this annual report on Form 20-F. We caution you that our businesses and financial performance are subject to substantial risks and uncertainties.*

62

Table of Contents

#### A.    Operating Results

#### Major Factors Affecting Our Results of Operations

*User Growth*. Our revenues are driven by the number of our paying users for the various services we offer to users, including live video service, value-added service, online games and other services. For 2018, we generated our revenues primarily from live video service, value-added service, mobile marketing and mobile games. The number of paying users for our live video service and value-added services on Momo application, without double counting the overlap, increased from 8.0 million in 2016 to 13.7 million in 2017 and further to 17.7 million in 2018. The number of paying users on Tantan application was 4.1 million from June 2018 to December 2018. The number of our paying users is affected by the growth in our active user base, our ability to convert a greater portion of our users into paying users, and strategies we pursue to achieve active user growth at reasonable costs and expenses.

Momo MAUs increased from 81.1 million in December 2016 to 99.1 million in December 2017 and further to 113.3 million in December 2018.

*User Engagement*. Changes in user engagement could affect our revenues and financial results. Active user engagement powered by diverse functionalities and rich contents is essential for our ability to generate revenues from the various services we offer to users, including our live video business, value-added service, among others.

*Monetization*. We started monetization in the second half of 2013 by introducing mobile games and membership services to our users, and we are continuing to refine the ways to monetize our service offerings without adversely affecting user experience. In 2015, we started to offer premium membership services, in-feed marketing solutions and live video service and in the fourth quarter of 2016, we launched a virtual gift service which allows our users to purchase and send virtual gifts to other users outside of live video service, which all contributed to our revenue growth. In 2018, we produced a television program. Our live video service currently contributes to the largest share of our revenues, generating 79.9% of our net revenues in 2018. For mobile games, we started to scale back from licensed mobile game services and instead focus on self-developed games in early 2017 in order to better align the games offered on our platform with the positioning and strength of Momo as a location-based social platform. Our future revenue growth will be affected by our ability to effectively execute our monetization strategies.

*Investment in Technology Infrastructure and Talent*. Our technology infrastructure is critical for us to retain and attract users, customers and platform partners. We must continue to upgrade and expand our technology infrastructure to keep pace with the growth of our business, to develop new features and services for our platform and to further enhance our big data analytical capabilities.

Our employee headcount has increased significantly as our business has grown and we expect this trend to continue for the foreseeable future. The number of our employees increased from 924 as of December 31, 2016 to 1,244 as of December 31, 2017 and further to 2,147 as of December 31, 2018. There is strong demand in China's internet industry for talented and experienced personnel from fast-growing, large-scale social networking platforms. We must recruit, retain and motivate talented employees while controlling our personnel-related expenses, including share-based compensation expenses.

## Taxation

### Cayman Islands

We are registered by way of continuation into the Cayman Islands. Under the current law of the Cayman Islands, we are not subject to income or capital gains tax in the Cayman Islands. In addition, our payment of dividends to our shareholders, if any, is not subject to withholding tax in the Cayman Islands.

### British Virgin Islands

Our subsidiaries incorporated in the British Virgin Islands are tax-exempted companies.

Table of Contents

### United States

Our subsidiaries incorporated in the United States are subject to state income tax and federal income tax. In December 2017, the U.S. government enacted comprehensive tax legislation commonly referred to as the Tax Cuts and Jobs Act, or the Tax Act. The Tax Act makes broad and complex changes to the U.S. tax code including, but not limited to, (i) reducing the U.S. federal corporate tax rate, (ii) requiring a one-time transition tax on certain un-repatriated earnings of foreign subsidiaries that are payable over eight years, and (iii) bonus depreciation that will allow for full expensing of qualified property. The impact of the Tax Act is not material to our operation and resulted in a decrease in income tax rate from 35% before January 1, 2018 to 21% after January 1, 2018 for tax and income earned as determined in accordance with the relevant tax rules and regulations. As our U.S. subsidiaries did not have any taxable income, no income tax expense was provided for in the year ended December 31, 2018.

### Hong Kong

Our subsidiaries domiciled in Hong Kong are subject to a two-tiered income tax rate for taxable income earned in Hong Kong effectively since April 1, 2018. The first 2 million Hong Kong dollars of profits earned by the company are subject to be taxed at an income tax rate of 8.25%, while the remaining profits will continue to be taxed at the existing tax rate, 16.5%. In 2016, 2017 and 2018, no provision for Hong Kong tax was made in our consolidated financial statements, as our Hong Kong subsidiaries had not generated any assessable income.

### People's Republic of China

Pursuant to the EIT Law, which became effective on January 1, 2008, foreign-invested enterprises and domestic companies are subject to enterprise income tax at a uniform rate of 25%. In August 2014, Beijing Momo IT was qualified as a software enterprise. As such, Beijing Momo IT will be exempt from income taxes for two years beginning in its first profitable year (i.e. 2015 and 2016) followed by a tax rate of 12.5% for the succeeding three years (i.e. from 2017 to 2019). Chengdu Momo was qualified as a Western China Development Enterprise and the income tax rate was 15% in 2015, 2016 and 2017. According to No. 23 announcement of the State Administration of Taxation of PRC in April 2018, Chengdu Momo was no longer required to submit the preferential tax rate application to the tax authority, but only required to keep the relevant materials for future tax inspection instead. Based on the historically experience, we believe Chengdu Momo will most likely continue to be qualified as a Western China Development Enterprise and accordingly be entitled to a preferential income tax rate of 15%. Therefore, we applied 15% to determine the tax liabilities for Chengdu Momo in the year ended December 31, 2018. Santi Cloud Union was qualified as a high and new technology enterprise in 2018, and was therefore subject to a preferential

enterprise income tax rate of 15% from 2018 through 2020. The other entities incorporated in the PRC were subject to an enterprise income tax at a rate of 25%.

We have recognized income tax expense of RMB34.6 million, RMB445.0 million and RMB699.6 million for the years ended December 31, 2016, 2017 and 2018, respectively.

Effective January 1, 2012, the PRC Ministry of Finance and the State Administration of Taxation launched a Business Tax to Value-Added Tax Transformation Pilot Program, or the VAT Pilot Program, which imposes VAT in lieu of business tax for certain "modern service industries" in certain regions and eventually expands to nation-wide in 2013. According to the implementation circulars released by the Ministry of Finance and the State Administration of Taxation on the VAT Pilot Program, the "modern service industries" include research, development and technology services, information technology services, cultural innovation services, logistics support, lease of corporeal properties, attestation and consulting services. Effective from May 1, 2016, PRC tax authorities collect VAT in lieu of business tax in all regions and industries. All of our entities were subject to VAT at rate of 6% for services provided and 17% for goods sold which are not listed in Article 2 Sub-article 2 of the Provisional Regulations on Value Added Tax of the PRC as of December 31, 2018. With the imposition of VAT in lieu of business tax, our revenues are subject to VAT payable on goods sold or taxable services provided by a general VAT taxpayer for a taxable period, which is the net balance of the output VAT for the period after crediting the input VAT for the period. Hence, the amount of VAT payable does not result directly from output VAT generated from goods sold or taxable services provided. In addition, according to the prevailing PRC tax regulations, the input VAT caused by purchasing goods or services can be credited against output VAT by general taxpayer when calculating VAT payable, provided that the general taxpayer obtained and verified the relevant VAT special invoices corresponding to the cost or expenditures within a defined time period. All of our entities have obtained the VAT special invoices as the deduction vouchers, and therefore, we have adopted the net presentation of VAT.

64

Table of Contents

Pursuant to applicable PRC laws and regulations, arrangements and transactions among related parties may be subject to audit or challenge by the PRC tax authorities. We may be subject to adverse tax consequences and our consolidated results of operations may be adversely affected if the PRC tax authorities determine that the contractual arrangements among our PRC subsidiary, Beijing Momo and its shareholders or its subsidiaries are not on an arm's length basis and therefore constitute favorable transfer pricing. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Corporate Structure—Contractual arrangements we have entered into with our consolidated affiliated entities may be subject to scrutiny by the PRC tax authorities. A finding that we owe additional taxes could significantly reduce our consolidated net income and the value of your investment."

### Reorganization of Operating Segments

In 2018, we reorganized our operating segments from a single operating segment into three operating segments, namely Momo' service lines, Tantan's service lines and QOOL's service line. The change in operating segments reflects our acquisition of Tantan and QOOL's new entertainment business. Our chief operating decision maker assesses the performance of our company and makes decisions in respect of the allocation of our resources by analyzing the operating results of these operating segments separately. Prior to our acquisition of Tantan, Tantan's financial information was not consolidated to ours. Therefore, Tantan's service lines did not have comparable financial information in 2016 and 2017. QOOL started its entertainment business such as the TV content production in 2018, so its comparable financial information in 2016 and 2017 accounted insignificant portion to our consolidated financial statements.

### Results of Operations

The following table sets forth a summary of our consolidated results of operations for the periods indicated, both in absolute amounts and as percentages of our total net revenues. This information should be read together with our consolidated financial statements and related notes included elsewhere in this annual report. The results of operations in any period are not necessarily indicative of the results that may be expected for any future period.

| | Year Ended December 31, | | | | | |
| | 2016 | | 2017 | | 2018 | |
| | RMB | % | RMB | % | RMB | % |
| | (in thousands, except for percentages) | | | | | |
| **Net revenues** | 3,707,358 | 100.0 | 8,886,390 | 100.0 | 13,408,421 | 100.0 |
| Live video service | 2,534,604 | 68.4 | 7,429,906 | 83.6 | 10,709,491 | 79.9 |
| Value-added service | 449,781 | 12.1 | 695,798 | 7.8 | 1,883,150 | 14.0 |
| Mobile marketing services | 441,644 | 11.9 | 514,279 | 5.8 | 500,321 | 3.7 |
| Mobile games | 236,238 | 6.4 | 241,388 | 2.7 | 130,392 | 1.0 |
| Other services | 45,091 | 1.2 | 5,019 | 0.1 | 185,067 | 1.4 |
| **Cost and expenses** | | | | | | |
| Cost of revenues | (1,619,327) | (43.7) | (4,373,377) | (49.2) | (7,182,897) | (53.6) |
| Research and development expenses | (208,647) | (5.6) | (346,144) | (3.9) | (760,644) | (5.7) |
| Sales and marketing expenses | (647,238) | (17.5) | (1,467,376) | (16.5) | (1,812,262) | (13.5) |
| General and administrative expenses | (259,712) | (7.0) | (422,005) | (4.7) | (640,023) | (4.8) |
| **Total cost and expenses** | (2,734,924) | (73.8) | (6,608,902) | (74.3) | (10,395,826) | (77.6) |
| Other operating income | 2,659 | 0.1 | 156,764 | 1.8 | 253,697 | 1.9 |
| **Income from operations** | 975,093 | 26.3 | 2,434,252 | 27.4 | 3,266,292 | 24.4 |
| Interest income | 54,603 | 1.5 | 145,568 | 1.6 | 272,946 | 2.0 |
| Interest expense | — | — | — | — | (56,503) | (0.4) |
| Impairment loss on long-term investments | (39,283) | (1.1) | (30,085) | (0.3) | (43,200) | (0.3) |
| **Income before income tax and share of income on equity method investments** | 990,413 | 26.7 | 2,549,735 | 28.7 | 3,439,535 | 25.7 |
| Income tax expense | (34,638) | (0.9) | (445,001) | (5.0) | (699,648) | (5.2) |
| **Income before share of income on equity method investments** | 955,775 | 25.8 | 2,104,734 | 23.7 | 2,739,887 | 20.4 |
| Share of income on equity method investments | 23,194 | 0.6 | 39,729 | 0.4 | 48,660 | 0.4 |

| Net income | | 978,969 | 26.4 | 2,144,463 | 24.1 | 2,788,547 | 20.9 |

***Comparison of the Years Ended December 31, 2016, 2017 and 2018***

### *Net revenues*

We currently generate revenues primarily from live video service, value-added service, mobile marketing services, mobile games, and other services. Revenues from live video service, value-added service and other services are presented net of value-added taxes and surcharges. Mobile marketing services are presented net of agency rebates, value-added taxes and surcharges. Mobile games revenues include revenues generated from mobile games developed by third-party game developers and from self-developed mobile games. Mobile games revenues generated by third-party game developers are presented net of revenue sharing with game developers, commission fees made to third-party application stores and other payment channels, value-added taxes and surcharges. Mobile games revenues derived from self-developed games are recorded on a gross basis. Net revenues increased from RMB3,707.4 million in 2016 to RMB8,886.4 million in 2017, and further to RMB13,408.4 million (US$1,950.2 million) in 2018, primarily driven by the significant increase in net revenues from live video service and value-added service.

**Table of Contents**

### *Live video service*

We started to offer live video services on our Momo platform in September 2015. We generate revenues when users purchase and send in-show virtual items to broadcasters. Initially, the service adopted an online live concert format whereby we invited certain talented performers to put on live music shows in a professional studio environment. Such shows were broadcasted live in one to four sessions on a daily basis and at pre-announced times. In the fourth quarter of 2015, we opened more live channels in order to enable more performers to put on talent shows to entertain and interact with their audience. Until April 2016, we only offered the service to a limited number of talented performers pre-selected carefully by us. In April 2016, we opened up the service to all the users of our platform so that each one of them can become a broadcaster if they wish. Our live video service revenues further increased from RMB2,534.6 million in 2016 to RMB7,429.9 million in 2017 and RMB10,709.5 million (US$1,557.6 million) in 2018, primarily due to the increase in paying users and the increase in the average revenues per paying user resulting from our continued effort to enhance content attractiveness, optimize product features, improve user experience, and introduce interactive streaming channels to grow our user base and develop their willingness to pay for live video service.

### *Value-added service*

Value-added service primarily comprises membership subscription and virtual gift service. Both Momo and Tantan users can become members by paying membership fees per contract period, which ranges from one month to one year. Both Momo and Tantan members are entitled to additional functionalities and privileges on Momo and Tantan mobile applications, respectively. We started to offer virtual gift service on Momo platform in the fourth quarter of 2016 to enhance users' interaction and social networking with each other. We start to report revenues from membership subscription and virtual gift services together as value-added services since 2016.

*2018 compared to 2017.* Revenues from our value-added service increased 170.6% to RMB1,883.2 million (US$273.9 million) in 2018 from RMB695.8 million in 2017, primarily attributable to the continuous growth of the virtual gift business on Momo mobile application driven by more paying social scenarios introduced to enhance the social experience of Momo users, and to a lesser extent, the contribution of Tantan's membership subscription revenue consolidated since June 2018.

*2017 compared to 2016.* Revenues from our value-added service increased 54.7% to RMB695.8 million in 2017 from RMB449.8 million in 2016, primarily due to the increase in the number of paying users as we offered virtual gift service to enrich communication experience among users.

### *Mobile marketing services*

Our mobile marketing services currently include in-feed marketing solutions powered by a proprietary self-serve advertising system, brand-oriented display ads, and advertising services provided through third-party partnerships.

*2018 compared to 2017.* Mobile marketing services revenues decreased 2.7% to RMB500.3 million (US$72.8 million) in 2018 from RMB514.3 million in 2017, primarily due to the decrease of our advertising and marketing customer demands.

*2017 compared to 2016.* Mobile marketing services revenues increased 16.4% to RMB514.3 million in 2017 from RMB441.6 million in 2016, primarily due to an increase in revenues from our brand-oriented display ads as a result of better sell-through of our existing advertisement inventories as we provided new ad format and marketing solutions to our clients.

### *Mobile games*

As of December 31, 2018, we had three types of mobile game services, namely non-exclusive licensed mobile game services, exclusive licensed mobile game services and self-developed mobile game services. We offer our mobile game platform for mobile games developed by third-party game developers non-exclusively or exclusively, and we share user payments with such game developers. In addition to licensed mobile games, we also operate self-developed mobile games on our mobile game platform. As of December 31, 2018, we operated nine non-exclusive licensed games, two exclusive licensed games and four self-developed games. We expect the number of games operated on our platform to fluctuate quarter by quarter. Our revenues from mobile games depend on the number of paying users, which ultimately is determined by our ability to select and offer engaging games tailored to our platform and our user profiles.

**Table of Contents**

*2018 compared to 2017*. Our mobile games revenues decreased 46.0% to RMB130.4 million (US$19.0 million) in 2018 from RMB241.4 million in 2017, primarily due to the decrease in our paying users.

*2017 compared to 2016*. Our mobile games revenues slightly increased 2.2% to RMB241.4 million in 2017 from RMB236.2 million in 2016, primarily due to an increase in revenue from a new self-developed game which we launched in the second quarter of 2016 and for which we recognized revenue on a gross basis, partially offset by a decrease in paying users and revenue from other existing licensed games as we have recently started to scale back from licensed mobile game services and instead focus on self-developed games.

### Other services

Our other services include television content production service, paid emoticons, gift mall sales and certain quasi-lucky draw game service. We ceased to provide gift mall services and paid emoticons in November 2016 and the quasi-lucky draw game service in January 2017, due to the adjustment of our strategic priorities.

*2018 compared to 2017*. Other services revenues increased to RMB185.1 million (US$26.9 million) in 2018 from RMB5.0 million in 2017, primarily attributable to revenues of RMB169.6 million (US$24.7 million) generated from advertisement revenue sharing upon broadcasting of one produced television program.

*2017 compared to 2016*. Other services revenues decreased 88.9% to RMB5.0 million in 2017 from RMB45.1 million in 2016, primarily due to the winding down of the quasi-lucky draw game service and paid emoticons services in 2017.

### Cost and expenses

#### Cost of revenues

Cost of revenues consists primarily of costs associated with the operation and maintenance of our platform, including revenue sharing, production costs in connection with television content, commission fees, bandwidth costs, labor costs, depreciation and other costs.

Revenue sharing primarily includes payments to broadcasters and talent agencies for our live video service, virtual gift recipients for our virtual gift service, and self-developed mobile game subcontractors. Commission fees are payments made to third-party application stores and other payment channels for distributing our live video service, value-added service, self-developed mobile games and our mobile marketing services. Users can make payments for such services through third-party application stores and other payment channels. These third-party application stores and other payment channels typically charge a handling fee for their services. Bandwidth costs, including internet data center and content delivery network fees, consist of fees that we pay to telecommunication carriers and other service providers for telecommunication services, hosting our servers at their internet data centers, and providing content and application delivery services. Labor costs consist of salaries and benefits, including share-based compensation expenses, for our employees involved in the operation of our platform. Depreciation mainly consists of depreciation cost on our servers, computers and other equipment. Other costs mainly consist of production costs in connection with our television content. We expect our cost of revenues to increase in the future as we continue to expand our services, as well as to enhance the capability and reliability of our infrastructure to support user growth and increased activity on our platform.

The following table sets forth the components of our cost of revenues by amounts and percentages of our total cost of revenues for the periods presented:

| | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2016** | | **2017** | | **2018** | |
| | **RMB** | **%** | **RMB** | **%** | **RMB** | **%** |
| | (in thousands, except for percentages) | | | | | |
| **Cost of revenues:** | | | | | | |
| Revenue sharing | 1,168,384 | 72.2 | 3,523,281 | 80.6 | 5,701,563 | 79.4 |
| Production cost in connection with television content | — | — | — | — | 429,215 | 6.0 |
| Bandwidth costs | 115,645 | 7.1 | 235,813 | 5.4 | 303,507 | 4.2 |
| Commission fees | 144,577 | 8.9 | 309,767 | 7.1 | 278,528 | 3.9 |
| Labor costs | 70,106 | 4.3 | 109,042 | 2.5 | 176,461 | 2.5 |
| Depreciation and amortization | 39,411 | 2.4 | 59,548 | 1.4 | 140,621 | 2.0 |
| Other costs | 81,204 | 5.1 | 135,926 | 3.0 | 153,002 | 2.0 |
| **Total cost of revenues** | 1,619,327 | 100.0 | 4,373,377 | 100.0 | 7,182,897 | 100.0 |

**Table of Contents**

*2018 compared to 2017.* Our cost of revenues increased from RMB4,373.4 million in 2017 to RMB7,182.9 million (US$1,044.7 million) in 2018. The increase was primarily due to a RMB2,178.3 million increase in revenue sharing from an increase in live video service revenue and virtual gift service revenue, a RMB429.2 million increase in the production costs in connection with television content, a RMB81.1 million increase in depreciation and amortization costs, a RMB67.7 million increase in bandwidth costs due to a larger scale of live video services, value-added services, social games as well as other video- and audio-based interactive functions, a RMB67.4 million increase in labor costs resulting from an increase in the number of employees involved in the operations of our Momo and Tantan platforms, partially offset by a RMB31.2 million decrease in commission fees paid to payment channels due to the decreased average commission rate charged by those channels.

*2017 compared to 2016*. Our cost of revenues increased from RMB1,619.3 million in 2016 to RMB4,373.4 million in 2017, primarily due to a RMB2,354.9 million increase in revenue sharing resulting from an increase in live video service revenue and virtual gift service revenue, a RMB165.2 million increase in commission fees resulting from an increase in fees to payment channels due to a higher volume of cash collection through such channels, a RMB120.1 million increase in bandwidth costs due to larger scale of live video service, short video services, social games as well as other video- and audio-based interactive functions, a RMB38.9 million increase in labor costs resulting from an increase in the number of employees involved in the operation of our platform and a RMB20.1 million increase in depreciation and amortization costs, which were driven by additional services and functions introduced on the Momo platform.

*Research and development expenses*

Research and development expenses consist primarily of salaries and benefits, including share-based compensation expenses, for research and development personnel and rental expenses associated with research and development activities. Expenditures incurred during the research phase are expensed as incurred. We expect our research and development expenses to increase as we expand our research and development team to develop new features and services for our platform and to further enhance our big data analytical capabilities.

*2018 compared to 2017*. Our research and development expenses increased by 119.7% from RMB346.1 million in 2017 to RMB760.6 million (US$110.6 million) in 2018. This increase was primarily due to a RMB361.3 million increase in salaries and benefits for research and development personnel. Our research and development headcount increased from 552 as of December 31, 2017 to 1,172 as of December 31, 2018.

*2017 compared to 2016*. Our research and development expenses increased by 65.9% from RMB208.6 million in 2016 to RMB346.1 million in 2017. This increase was primarily due to a RMB125.5 million increase in salaries and benefits for research and development personnel. Our research and development headcount increased from 367 as of December 31, 2016 to 552 as of December 31, 2017.

*Sales and marketing expenses*

Sales and marketing expenses consist primarily of general marketing and promotional expenses, as well as salaries and benefits, including share-based compensation expenses, for our sales and marketing personnel. We expect our sales and marketing expenses to increase as we plan to enhance our brand awareness, attract new users and promote our new services.

*2018 compared to 2017*. Our sales and marketing expenses increased by 23.5% from RMB1,467.4 million in 2017 to RMB1,812.3 million (US$263.6 million) in 2018, primarily due to a RMB200.1 million increased marketing and promotional expenses to attract users and promote our live video services, a RMB91.5 million increase in salaries and other benefits for our sales and marketing personnel, and a RMB39.6 million increase in amortization expenses related to intangible assets from business acquisitions.

*2017 compared to 2016*. Our sales and marketing expenses increased by 126.7% from RMB647.2 million in 2016 to RMB1,467.4 million in 2017, primarily due to a RMB668.5 million increased expenses as we stepped up marketing efforts to enhance our brand awareness, attract users and promote our live video service and a RMB91.5 million increase in salaries and other benefits for our sales and marketing personnel.

68

Table of Contents

*General and administrative expenses*

General and administrative expenses consist primarily of salaries and other benefits, including share-based compensation expense, professional fees and rental expenses. We expect our general and administrative expenses to increase as our business grows.

*2018 compared to 2017*. Our general and administrative expenses increased from RMB422.0 million in 2017 to RMB640.0 million (US$93.1 million) in 2018. This increase was primarily due to an increase in personnel related costs, including share-based compensation expenses as a result of our rapidly expanding talent pool.

*2017 compared to 2016*. Our general and administrative expenses increased from RMB259.7 million in 2016 to RMB422.0 million in 2017. This increase was primarily due to the increase in personnel related salaries and other benefits, including share-based compensation expenses, as a result of our rapidly expanding talent pool and the increase of auditing and other professional service expenses.

*Net income*

*2018 compared to 2017*. Primarily as a result of the foregoing, our net income increased from RMB2,144.5 million in 2017 to RMB2,788.5 million (US$405.6 million) in 2018.

*2017 compared to 2016*. Primarily as a result of the foregoing, our net income increased from RMB979.0 million in 2016 to RMB2,144.5 million in 2017.

**Segment Revenues**

The following table sets forth our revenues by segment and year-over-year change rate for the periods indicated:

| | Year ended December 31, | | |
|---|---|---|---|
| | **2016** | **2017** | **2018** |

| | RMB | RMB | YoY% | RMB | US$ | YoY% |
|---|---|---|---|---|---|---|
| | | | (in thousands, except percentages) | | | |
| Revenues: | | | | | | |
| Momo | 3,707,358 | 8,884,823 | 140 | 12,812,421 | 1,863,489 | 44 |
| Tantan | — | — | — | 417,998 | 60,795 | N/A |
| QOOL | — | 1,567 | N/A | 178,002 | 25,889 | 11,259 |

*Momo.* Momo revenues increased from RMB3,707.4 million in 2016 to RMB8,884.8 million in 2017, and further to RMB12,812.4 million (US$1,863.5 million) in 2018, primarily driven by the significant increase in net revenues from live video service and value-added service.

*Tantan.* Tantan revenues was RMB418.0 million (US$60.8 million) in 2018, which mainly included value -added service revenue. After our acquisition of Tantan, we consolidated its financial information into ours.

*QOOL.* QOOL revenues increased from nil in 2016 to RMB1.6 million in 2017, and further to RMB178.0 million (US$25.9 million) in 2018. This increase was mainly attributable to revenues generated from advertisement revenue sharing upon broadcasting of one produced television program in 2018.

### Segment Operating Costs and Expenses

The following table sets forth our operating costs and expenses by segment and year-over-year change rate for the periods indicated:

| | Year ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2016 | 2017 | | 2018 | | |
| | RMB | RMB | YoY% | RMB | US$ | YoY% |
| | | | (in thousands, except percentages) | | | |
| Operating Costs and Expenses: | | | | | | |
| Momo | 2,734,924 | 6,595,045 | 141 | 8,928,568 | 1,298,606 | 35 |
| Tantan | — | — | — | 963,486 | 140,133 | N/A |
| QOOL | — | 13,857 | N/A | 503,772 | 73,271 | 3,536 |

69

Table of Contents

*Momo.* Operating costs and expenses of Momo mainly consist of revenue sharing, salaries and benefits, marketing and promotion expenses, bandwidth costs, professional fees and commission fees.

*Cost of revenues.* The cost of revenues of Momo in 2018 were RMB6,573.0 million (US$956.0 million) representing a 50% year over year increase, primarily due to an increase in revenue sharing from an increase in live video service revenue and virtual gift service revenue, an increase in labor costs resulting from an increase in the number of employees, an increase in bandwidth costs due to a larger scale of live video services, value-added services, social games as well as other video- and audio-based interactive functions, partially offset by a decrease in commission fees paid to payment channels due to decreased average commission rate charged by those channels.

*Research and development expense.* The research and development expenses of Momo increased by 77% from RMB346.1 million in 2017 to RMB614.1 million (US$89.3 million) in 2018, primarily due to an increase in salaries and benefits for research and development personnel.

*Sales and marketing expenses.* The sales and marketing expenses of Momo decreased by 13% from RMB1,457.7 million in 2017 to RMB1,269.5 million (US$ 184.6 million ) in 2018, primarily due to saving in marketing and promotional expenses.

*General and administrative expense.* The general and administrative expenses of Momo increased by 13% from RMB417.9 million in 2017 to RMB472.0 million (US$68.7 million) in 2018, primarily due to an increase in personnel related costs, including share-based compensation expenses as a result of our rapidly expanding talent pool.

Operating costs and expenses of Momo were RMB6,595.0 million in 2017, compared to RMB2,734.9 million in 2016. The increase was primarily due to increases in revenue sharing, marketing and promotion expenses, salaries and benefits, commission fees and bandwidth costs.

*Tantan.* Operating costs and expenses of Tantan mainly consist of marketing and promotion expenses, labor costs, commission fees, bandwidth costs, depreciation and other costs.

*Cost of revenues.* The cost of revenues of Tantan in 2018 were RMB174.9 million (US$25.4 million), which consisted primarily of costs associated with the operation and maintenance of Tantan platform, including commission fees, bandwidth costs, depreciation and labor costs.

*Research and development expenses.* The research and development expenses of Tantan in 2018 were RMB146.6 million (US$21.3 million), which consisted primarily of salaries and benefits for research and development personnel.

*Sales and marketing expenses.* The sales and marketing expenses of Tantan in 2018 were RMB520.1 million (US$75.7 million), which consisted primarily of campaigns with third parties to acquire more users and drive traffic to the app as well as salaries and benefits for sales and marketing personnel.

*General and administrative expenses*. The general and administrative expenses of Tantan in 2018 were RMB121.9 million (US$17.7 million), which consisted primarily of salaries and other benefits, including share-based compensation expense and professional fees.

**QOOL.** Operating costs and expenses of QOOL mainly consist of production costs in connection with television content, staff related costs, and marketing and promotion expenses.

*Cost of revenues*. The cost of revenues of QOOL in 2018 were RMB435.1 million (US$63.3 million), which consisted primarily of production costs in connection with our television content.

*Sales and marketing expenses*. The sales and marketing expenses of QOOL were RMB22.6 million (US$3.3 million) in 2018, which consisted primarily of television content-related promotional marketing expenses.

*General and administrative expenses*. The general and administrative expenses of QOOL were RMB46.1 million (US$6.7 million) in 2018, which consisted primarily of personnel related costs.

<div align="center">70</div>

**Table of Contents**

**Inflation**

Since our inception, inflation in China has not materially impacted our results of operations. According to the National Bureau of Statistics of China, the year-over-year percent changes in the consumer price index for December 2016, 2017 and 2018 were increases of 2.1%, 1.8% and 1.9%, respectively. Although we have not in the past been materially affected by inflation since our inception, we can provide no assurance that we will not be affected in the future by higher rates of inflation in China.

**Critical Accounting Policies**

We prepare our financial statements in conformity with U.S. GAAP, which requires us to make estimates and assumptions that affect our reporting of, among other things, assets and liabilities, revenues and expenses and contingent assets and liabilities. We continually evaluate these estimates and assumptions based on the most recently available information, our own historical experience and other factors that we believe to be relevant under the circumstances. Since our financial reporting process inherently relies on the use of estimates and assumptions, our actual results could differ from what we expect. This is especially true with some accounting policies that require higher degrees of judgment than others in their application. We consider the policies discussed below to be critical to an understanding of our audited consolidated financial statements because they involve the greatest reliance on our management's judgment.

*Revenue Recognition*

*Adoption of Accounting Standard Codification, or the ASC, "Revenue from Contracts with Customers"*

In May 2014, the Financial Accounting Standards Board, or the FASB, issued ASU No. 2014-09, Revenue from Contracts with Customers (Topic 606), or the Topic 606, as modified by subsequently issued ASUs 2015-14, 2016-08, 2016-10, 2016-12 and 2016-20 (collectively ASU 2014-09).

On January 1, 2018, we adopted Topic 606 by applying the modified retrospective method to contracts that were not completed as of January 1, 2018. Results for the reporting periods beginning after January 1, 2018 are presented under Topic 606 while prior period amounts are not adjusted and continue to be reported in accordance with our historical accounting under Topic 605. The adoption of Topic 606 did not have a material impact on the our consolidated results of operations, financial position or cash flows but resulted in additional disclosures regarding the nature, amount, timing and uncertainty of revenue and cash flows arising from contracts with customers.

We principally derive our revenues from live video service, value-added service, mobile marketing services, mobile games, and other services. We recognize revenue when control of the promised goods or services are transferred to the customers, in an amount that reflects the consideration that expects to receive in exchange for those goods or services. We applied the five steps method outlined in Topic 606 to all revenue streams. In addition, the standard requires disclosures of the nature, amount, timing and uncertainty of revenue and cash flows arising from contracts with customers.

For the years ended December 31, 2016, 2017 and 2018, all the revenue for the periods was recognized from contracts with customers. Our revenue is reported net of discount, value added tax and surcharges.

<div align="center">71</div>

**Table of Contents**

*Live video service*. We principally provide live video service whereby users can enjoy live performance and interact with the broadcasters for free during the performance. Broadcasters can either host the performance on their own or join a talent agency. We generate revenue from sales of virtual items to our users. We design, create and offer various virtual items for sales to users with pre-determined stand-alone selling price, which if users chose to, can be purchased and presented to the broadcasters to show their support during their live video performance. We have a recharge system for users to purchase our virtual currency that can then be used to purchase virtual items on our platform. Users can recharge via various third-party application stores and other payment channels. Virtual currency is non-refundable and does not have any expiration date. Based on the turnover history of virtual currency, we determined that the virtual currency was often consumed soon after it was purchased and accordingly, we concluded that any breakage

would be insignificant. Unconsumed virtual currency is recorded as deferred revenue. Virtual currency used to purchase virtual items is recognized as revenue according to the prescribed revenue recognition policies of virtual items addressed below unless otherwise stated. All virtual items are non-refundable, consumed at a point-in-time and expire in a few days after the purchase. Under arrangements entered into with broadcasters and talent agencies, we share a portion of the revenues derived from the sales of virtual items with them ("Revenue Sharing").

We have evaluated and determined that we are the principal and we view the users to be our customers. Specifically, we control the virtual items before they are transferred to users. Our control is evidenced by our sole ability to monetize the virtual items before they are transferred to users, and is further supported by us being primarily responsible to the users for the delivery of the virtual items as well as having full discretion in establishing pricing for the virtual items. Accordingly, we report our live video service revenues on a gross basis with amounts billed to users for the virtual items recorded as revenues and the Revenue Sharing paid to broadcasters and talent agencies recorded as cost of revenues. Sales proceeds are initially recorded as deferred revenue and recognized as revenue based on the consumption of the virtual items. We have determined that the virtual items represent one performance obligation in the live video service. Revenue related to each of the virtual item is recognized at the point in time when the virtual item is transferred directly to the relevant broadcasters and consumed by them. Although some virtual items have expiry dates, we consider that the impact of breakage for the virtual items is insignificant as historical data shows that virtual items are consumed shortly after they are released to users and the forfeiture rate remains relatively low for the periods presented. We do not have further performance obligations to the users after the virtual items are consumed.

Users also have the right to purchase various combinations of virtual items in the live video, which are generally capable of being distinct. Specifically, we enter into certain contracts with our users where virtual item coupons are granted to users simultaneously with a purchase of a virtual item. The virtual item coupons can be used by the users to exchange for free virtual items in the future. Such virtual item coupons typically expire a few days after being granted. We have determined that the virtual item coupons represent a material right under Topic 606 which is recognized as a separate performance obligation at the outset of the arrangement. Judgment is required to determine the stand-alone selling price for each distinct virtual item and virtual item coupons. We allocate the consideration to each distinct virtual item and virtual item coupon based on their relative stand-alone selling prices. In instances where stand-alone selling price is not directly observable as we do not sell the virtual items separately, we determine the stand-alone selling price based on pricing strategies, market factors and strategic objectives. We recognize revenue for each of the distinct virtual item in accordance with the revenue recognition method discussed above unless otherwise stated. Revenue for the virtual item coupons are recognized when the virtual items purchased with the virtual item coupons are consumed. Although virtual item coupons have expiry dates, we consider that the impact of breakage for the virtual item coupons is insignificant as historical data shows that virtual item coupons are consumed shortly after they are released to users and the forfeiture rate remains relatively low for the periods presented.

We do not provide any right of return and do not provide any other credit or incentive to our users.

*Value-added Service.* Value-added services revenues mainly include membership subscription revenue and virtual gift service revenue. Membership subscription is a service package which enables members to enjoy additional functions and privileges. The contract period for the membership subscription ranges from one month to one year. All membership subscription is nonrefundable. We have determined that membership subscription services represent one performance obligation. We collect membership subscription in advance and record it as deferred revenue. Revenue is recognized ratably over the contract period as the membership subscription services are delivered.

<div align="center">72</div>

Table of Contents

We launched virtual gift service in 2016 to enhance users' experience of interaction and social networking with each other. Users purchase virtual items and send the virtual items to other users. We share a portion of the revenues derived from the sales of virtual items with the recipient of the virtual item. All virtual items are nonrefundable, consumed point-in-time and expired in a few days after the purchase. Although some virtual items have expiry dates, we consider that the impact of breakage for the virtual items is insignificant as historical data shows that the virtual items are consumed shortly after they are release to users, and the forfeiture rate remains relatively low for the periods presented. We collect the cash from the purchase of virtual items and recognized the sales of virtual items when the performance obligation is satisfied. We have determined that we have one single performance obligation which is the display of the virtual items for the users who purchase them. Revenues derived from the sale of virtual items are recorded on a gross basis as we have determined that we are the principal in providing the virtual gift services for the same reasons outlined in the revenue recognition policy for the live video services. The portion paid to gift recipients is recognized as cost of revenues.

*Mobile marketing.* We provide advertising and marketing solutions to customers for promotion of their brands and conduction of effective marketing activities through their mobile applications.

*Display-based mobile marketing services*

For display-based online advertising services such as banners- and location-based advertising on mobile applications, we have determined that our mobile marketing services represent one performance obligation. Accordingly, we recognize mobile marketing revenue ratably over the period that the advertising is provided relevant commencing on the date the relevent customer's advertisement is displayed, or based on the number of times that the advertisement has been displayed for cost per thousand impressions advertising arrangements.

*Performance-based mobile marketing services*

We also enable advertising customers to place links, on our mobile platform on a pay-for-effectiveness basis, which is referred to as the cost for performance model. We charge fees to advertising customers based on the effectiveness of advertising links, which is measured by active clicks. We have determined that our mobile marketing services represent one performance obligation. Accordingly, we recognize mobile marketing revenue based on sales of effective clicks. We estimated the revenues based on our internal data, which is confirmed with respective customers periodically, or recognize the revenue based on a fixed unit price.

Our revenue transactions are based on standard business terms and conditions, which are recognized net of agency rebates, if applicable.

*Mobile Games.* We publish licensed mobile games developed by third-party game developers and our self-developed mobile games to game players through our mobile application.

### Licensed mobile games services

We generate revenue from offering services of mobile games developed by third-party game developers. All of the licensed games can be accessed and played by game players directly through our mobile game platform. We primarily view the game developers to be our customers and considers our performance obligation under the agreements with the game developers to be the promotion of the game developers' games. We generally collect payments from game players in connection with the sale of in-game currencies and remits certain agreed-upon percentages of the proceeds to the game developers. Purchases of in-game currencies are not refundable after they have been sold unless there are unused in-game currencies at the time a game is discontinued. Typically, a game will only be discontinued when the monthly revenue generated by a game becomes consistently insignificant. We do not currently expect to pay any material cash refunds to game players or game developers in connection with a discontinued game. The majority of the licensed mobile games revenue is derived from non-exclusive mobile games services further discussed below.

### Non-exclusive licensed mobile games services

We enter into non-exclusive agreements with the game developers and offers our mobile game platform for the mobile games developed by the game developers. We have single performance obligation which includes offering their mobile game platform for the game developers. We have determined that we are not the principal in the transaction and accordingly, revenues derived from the sale of in-game currencies are recorded net of remittances to game developers and commission fees made to third-party application stores and other payment channels. Revenue is further recognized at the end of the estimated consumption date by individual game (i.e., the estimated date in-game currencies are consumed within the game), which is typically within a short period of time ranging from two to three days after the purchase of the in-game currencies.

<center>73</center>

**Table of Contents**

### Self-developed mobile games

In February 2015, we launched one self-developed game on its platform and started to generate revenues by in-game sales of virtual items. We have determined that we have a single performance obligation to the players who purchased the virtual items to gain an enhanced game-playing experience over the playing period of the paying players. Accordingly, we recognize revenues ratably over the estimated average period of player relationship starting from the point in time when the players purchase the virtual items and once all other revenue recognition criteria are met. We operated eight and four self-developed mobile games as of December 31, 2017 and 2018, respectively. The estimated periods of the player relationship ranged from 56 to 79 days as of December 31, 2017, and was 77 days as of December 31, 2018. We have determined that we are the principle in fulfilling all obligations related to the mobile game operations for self-developed games. Accordingly, we recognized revenues on a gross basis. Commission fees paid to third-party application stores and other payment channels are recorded as cost of revenues.

*Other Services.* Revenues from other services in the year ended December 31, 2018 mainly consisted of revenues generated from advertisement resulting from the broadcasting of one television program produced by us. During the year ended December 31, 2018, we entered into an agreement with a television station, under which we are responsible for the production of the television program content, which was completed by December 31, 2018. The television station was responsible for providing advertising and marketing solutions to customers in addition to broadcasting television program content. Revenue generated from the above is in the form of advertising fees, shared between the television station and us based on a pre-determined percentage stated in the agreement. We determined that our television content production service represented one performance obligation. The broadcasting of the content was completed in the year ended December 31, 2018 and the revenue was recognized ratably during the period when the content was broadcasted on the television station.

## Consolidation of Affiliated Entities

PRC regulations currently limit direct foreign ownership of business entities providing value-added telecommunications services, advertising services and internet services in the PRC where certain licenses are required for the provision of such services. To comply with these PRC regulations, we conduct a substantial majority of our business through our VIEs and their subsidiaries.

Our wholly-owned PRC subsidiaries, or the WFOEs, hold the power to direct the activities of our VIEs and their subsidiaries that most significantly affect our economic performance and bears the economic risks and receives the economic benefits of our VIEs and their subsidiaries through a series of contractual agreements with VIEs and/or their nominee shareholders, including:

- Exclusive cooperation agreements, as supplemented;

- Equity interest pledge agreement;

- Business operation agreement;

- Exclusive call option agreement;

- Powers of attorney; and

Based on the advice of Han Kun Law Offices, our PRC legal counsel, we believe the above contractual agreements are currently legally enforceable under PRC law and regulations.

More specifically, through these contractual agreements, we believe that the nominee shareholders of our VIEs do not have the direct or indirect ability to make decisions regarding the activities of our VIEs that could have a significant impact on the economic performance of our VIEs because all of the voting rights of our VIEs' nominee shareholders have been contractually transferred to our VIEs. Therefore, we have effective control over our VIEs. In addition, we believe that our ability to exercise effective control, together with the exclusive cooperation agreements, as supplemented, exclusive call option agreement and equity interest pledge agreement, give us the rights to receive substantially all of the economic benefits from our VIEs. Hence, we believe that the nominee shareholders of our VIEs do not have the rights to receive the expected residual returns of our VIEs, as such rights have been transferred to our VIEs. We evaluated the rights we obtained through entering into these contractual agreements and concluded we have the power to direct the activities that most significantly affect our VIEs' economic performance and also have the rights to receive the economic benefits of our VIEs that could be significant to our VIEs.

74

Table of Contents

Accordingly, we are the primary beneficiary of our VIEs and have consolidated the financial results of our VIEs and their subsidiaries in our consolidated financial statements.

However, uncertainties in the PRC legal system could limit our ability to enforce these contractual arrangements and if the shareholders of our VIEs were to reduce their shareholdings in our company, their interests may diverge from our interests, which may increase the risk that they would act contrary to the contractual arrangements, such as causing our VIEs to not pay service fees under the contractual arrangements when required to do so. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Corporate Structure—We rely on contractual arrangements with our consolidated affiliated entities and their respective shareholders for our operations in China, which may not be as effective in providing operational control as direct ownership."

*Income Taxes*

In preparing our consolidated financial statements, we must estimate our income taxes in each of the jurisdictions in which we operate. We estimate our actual tax exposure and assess temporary differences resulting from different treatment of items for tax and accounting purposes. These differences result in deferred tax assets and liabilities, which we include in our consolidated balance sheet. We must then assess the likelihood that we will recover our deferred tax assets from future taxable income. If we believe that recovery is not likely, we must establish a valuation allowance. To the extent we establish a valuation allowance or increase this allowance, we must include an expense within the tax provision in our consolidated statement of operations. We adopted ASU No. 2015-17, Balance Sheet Classification of Deferred Taxes, or ASU 2015-17, in the first quarter of 2017 and classified all deferred taxes assets and liabilities as noncurrent as of December 31, 2017 and 2018. We did not retrospectively apply the changes to the prior years.

Management must exercise significant judgment to determine our provision for income taxes, our deferred tax assets and liabilities and any valuation allowance recorded against our net deferred tax assets. We base the valuation allowance on our estimates of taxable income in each jurisdiction in which we operate and the period over which our deferred tax assets will be recoverable. If actual results differ from these estimates or we adjust these estimates in future periods, we may need to establish an additional valuation allowance, which could materially impact our financial position and results of operations.

U.S. GAAP requires that an entity recognize the impact of an uncertain income tax position on the income tax return at the largest amount that is more likely than not to be sustained upon audit by the relevant tax authority. If we ultimately determine that payment of these liabilities will be unnecessary, we will reverse the liability and recognize a tax benefit during that period. Conversely, we record additional tax charges in a period in which we determine that a recorded tax liability is less than the expected ultimate assessment. We did not recognize any significant unrecognized tax benefits during the periods presented in this annual report.

Uncertainties exist with respect to the application of the New EIT Law to our operations, specifically with respect to our tax residency status. The New EIT Law specifies that legal entities organized outside of the PRC will be considered residents for PRC income tax purposes if their "de facto management bodies" are located within the PRC. The New EIT Law's implementation rules define the term "de facto management bodies" as "establishments that carry out substantial and overall management and control over the manufacturing and business operations, personnel, accounting, properties, etc. of an enterprise."

Because of the uncertainties resulted from limited PRC tax guidance on the issue, it is uncertain whether our legal entities organized outside of the PRC constitute residents under the New EIT Law. If one or more of our legal entities organized outside of the PRC were characterized as PRC tax residents, the impact would adversely affect our results of operations. See "Item 3. Key Information—D. Risk Factors—Risks Related to Doing Business in China."

*The Useful Lives of Property and Equipment and Intangible Assets*

Property and equipment are stated at historical cost less accumulated depreciation. Depreciation is computed using the straight-line method over the estimated useful lives of the assets, generally from three to five years. Intangible assets acquired through business acquisitions are recognized as assets separate from goodwill if they satisfy either the "contractual-legal" or "separability" criterion. Judgment is required to determine the estimated useful lives of assets, especially for intangible assets arising from the acquisitions, including determining how long existing intangible assets can benefit us. Changes in these estimates and assumptions could materially impact our financial position and results of operations.

75

Table of Contents

*Impairment of Long-Lived Assets Other Than Goodwill*

We review our long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may no longer be recoverable. When these events occur, we measure impairment by comparing the carrying value of the long-lived assets to the estimated undiscounted future cash flows expected to result from the use of the assets and their eventual disposition. If the sum of the expected undiscounted cash flow is less than the carrying amount of the assets, we would recognize an impairment loss based on the fair value of the assets.

We recorded impairment losses of RMB nil, RMB1.3 million and RMB nil for long-lived assets other than goodwill for the years ended December 31, 2016, 2017 and 2018, respectively.

*Impairment of Goodwill*

Goodwill represents the excess of the purchase price over the fair value of identifiable net assets acquired in business combinations. Goodwill is not amortized but is tested for impairment annually, or more frequently if events or changes in circumstances indicate that it might be impaired.

Goodwill is tested for impairment at the reporting unit level on an annual basis and between annual tests, if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value. These events or circumstances could include a significant change in the stock prices, business climate, legal factors, operating performance indicators, competition, or sale or disposition of a significant portion of a reporting unit.

Application of the goodwill impairment test requires judgment, including the identification of reporting units, assignment of assets and liabilities to reporting units, assignment of goodwill to reporting units, and determination of the fair value of each reporting unit. The estimation of fair value of each reporting unit using a discounted cash flow methodology also requires significant judgments, including estimation of future cash flows, which is dependent on internal forecasts, estimation of the long-term rate of growth for our business, estimation of the useful life over which cash flows will occur, and determination of our weighted average cost of capital. The estimates used to calculate the fair value of a reporting unit change from year to year based on operating results and market conditions. Changes in these estimates and assumptions could materially affect the determination of fair value and goodwill impairment for the reporting unit.

In order to test goodwill for impairment, we first assess qualitative factors to determine whether it is "more likely than not" that the fair value of a reporting unit is less than its carrying amount as a basis for determining whether it is necessary to perform the two-step goodwill impairment test. If it is more likely than not that the fair value of a reporting unit is less than its carrying amount, goodwill is then tested following a two-step process. The first step compares the fair value of each reporting unit to its carrying amount, including goodwill. If the fair value of each reporting unit exceeds its carrying amount, goodwill is not considered to be impaired and the second step will not be required. If the carrying amount of a reporting unit exceeds its fair value, the second step compares the implied fair value of goodwill to the carrying value of a reporting unit's goodwill.

The implied fair value of goodwill is determined in a manner similar to accounting for a business combination with the allocation of the assessed fair value determined in the first step to the assets and liabilities of the reporting unit. The excess of the fair value of the reporting unit over the amounts assigned to the assets and liabilities is the implied fair value of goodwill. An impairment loss is recognized for any excess in the carrying value of goodwill over the implied fair value of goodwill.

We recorded RMB nil, RMB nil and RMB nil impairment losses during the years ended December 31, 2016, 2017 and 2018, respectively. We did not have goodwill at any of our reporting units that are at risk of impairment at December 31, 2017 and 2018.

*Business combinations*

Business combinations are recorded using the acquisition method of accounting in accordance with Accounting Standards Codification, or the ASC, 805 "Business Combinations". The cost of an acquisition is measured as the aggregate of the acquisition date fair value of the assets transferred to the sellers and liabilities incurred by us and equity instruments issued. Identifiable assets and liabilities acquired or assumed are measured separately at their fair values as of the acquisition date, irrespective of the extent of any noncontrolling interests. The purchase price of business acquisition is allocated to the tangible assets, liabilities, identifiable intangible assets acquired and non-controlling interest, if any, based on their estimated fair values as of the acquisition date. The excess of the purchase price over those fair values is recorded as goodwill. Acquisition-related expenses and restructuring costs are expensed as incurred.

We adopted Accounting Standard Update, or ASU, 2017-01 "Business Combination (Topic 805): Clarifying the Definition of a Business" on January 1, 2018 and applied the new definition of a business prospectively for acquisitions made subsequent to December 31, 2017. Upon the adoption of ASU 2017-01, a new screen test is introduced to evaluate whether a transaction should be accounted for as an acquisition and/or disposal of a business versus assets. In order for a purchase to be considered an acquisition of a business, and receive business combination accounting treatment, the set of transferred assets and activities must include, at a minimum, an input and a substantive process that together significantly contribute to the ability to create outputs. If substantially all of the fair value of the gross assets acquired is concentrated in a single identifiable asset or a group of similar identifiable assets, then the set of transferred assets and activities is not a business. The adoption of this standard requires future purchases to be evaluated under the new framework.

*Long-term investments*

Our long-term investments primarily consist of equity securities without readily determinable fair values and equity method investments.

76

*Equity securities without readily determinable fair value*

We adopted ASC Topic 321, Investments—Equity Securities, or ASC 321, on January 1, 2018. Prior to 2018, we carried at cost our investments in investees that do not have readily determinable fair value and over which we do not have significant influence, in accordance with ASC Subtopic 325-20, Investments-Other: Cost Method Investments. We regularly evaluate the impairment of the cost method investments based on the performance and financial position of the investee as well as other evidence of market value. Such evaluation includes, but is not limited to, reviewing the investee's cash position, recent financing, projected and historical financial performance. An impairment loss is recognized in earnings equal to the excess of the investment's cost over its fair value at the balance sheet date of the reporting period for which the assessment is made. The fair value would then become the new cost basis of the investment.

Subsequent to our adoption of ASC 321, for equity securities without readily determinable fair value and that do not qualify for the existing practical expedient used in ASC Topic 820, Fair Value Measurements and Disclosures, or ASC 820, we elected to use the measurement alternative to measure those investments. Under that method, we measure that investment at cost, less any impairment, plus or minus changes resulting from observable price changes in orderly transactions for identical or similar investments of the same issuer, if any.

Pursuant to ASC 321, for those equity securities that we elect to use the measurement alternative, we make a qualitative assessment of whether the investment is impaired at each reporting date. If a qualitative assessment indicates that the investment is impaired, we have to estimate the investment's fair value in accordance with the principles of ASC 820. If the fair value is less than the investment's carrying value, we recognize an impairment loss in net income equal to the difference between the carrying value and fair value.

### Equity method investments

The investee companies over which we have the ability to exercise significant influence, but do not have a controlling interest are accounted for using the equity method. Significant influence is generally considered to exist when we have an ownership interest in the voting stock of the investee between 20% and 50%. Other factors, such as representation in the investee's board of directors, voting rights and the impact of commercial arrangements, are also considered in determining whether the equity method of accounting is appropriate. For the investment in limited partnerships, where we hold less than a 20% equity or voting interest, our influence over the partnership operating and financial policies is determined to be more than minor. Accordingly, we account for these investments as equity method investments.

Under the equity method of accounting, the affiliated company's accounts are not reflected within our consolidated balance sheets and statements of operations; however, our share of the earnings or losses of the affiliated company is reflected in the caption "share of income on equity method investments" in the consolidated statements of operations.

An impairment change is recorded if the carrying amount of the investment exceeds its fair value and this condition is determined to be other-than-temporary.

We estimate the fair value of the investee company based on comparable quoted price for similar investment in active market, if applicable, or discounted cash flow approach which requires significant judgments, including the estimation of future cash flows, which is dependent on internal forecasts, the estimation of long term growth rate of a company's business, the estimation of the useful life over which cash flows will occur, and the determination of the weighted average cost of capital.

We recorded impairment losses of RMB39.3 million, RMB30.1 million and RMB43.2 million (US$6.3 million) for long-term investments during the years ended December 31, 2016, 2017 and 2018, respectively.

77

Table of Contents

### Share-based Compensation

Share-based payment transactions with employees and executives are measured based on the grant date fair value of the equity instrument issued and recognized as compensation expense net of a forfeiture rate on a straight-line basis, over the requisite service period, with a corresponding impact reflected in additional paid-in capital.

We classify share-based compensation with cash settlement features as liabilities. The percentage of the fair value that is accrued as compensation cost at the end of each period equal the percentage of the requisite service that has been rendered at that date. We recognize the changes in fair value of the liability classified award that occur during the requisite service period as compensation cost over that period. These awards typically vest over a period of four years, but may fully vest due to the achievement of certain performance conditions. We recognize the share-based compensation expense on an accelerated basis if it is probable that the performance condition will be achieved.

We measure share awards issued to consultants at fair value at the earlier of the commitment date or the date the services are completed and recognized over the period the services are provided.

The estimate of forfeiture rate is adjusted over the requisite service period to the extent that actual forfeiture rate differs, or is expected to differ, from such estimates. We recognize changes in estimated forfeiture rate through a cumulative catch-up adjustment in the period of change.

Changes in the terms or conditions of share options are accounted as a modification. We calculate the excess of the fair value of the modified option over the fair value of the original option immediately before the modification, measured based on the share price and other pertinent factors at the modification date. For vested options, we recognize incremental compensation cost in the period that the modification occurred. For unvested options, we recognize, over the remaining requisite service period, the sum of the incremental compensation cost and the remaining unrecognized compensation cost for the original award on the modification date.

Determining the fair value of share-based awards requires significant judgment. We estimate the fair value of share options using the Black-Scholes valuation model

or binomial tree pricing model, which requires inputs such as the fair value of our ordinary shares, risk-free interest rate, expected dividend yield, expected life and expected volatility.

**Recent Accounting Pronouncements**

A list of recent accounting pronouncements that are relevant to us is included in note 2 to our consolidated financial statements, which are included in this annual report.

**B.    Liquidity and Capital Resources**

As of December 31, 2018, we have financed our operations primarily through net cash provided by operating activities, as well as the issuance of equity and convertible note securities. As of December 31, 2016, 2017 and 2018, we had RMB1,788.3 million, RMB4,462.2 million and RMB2,468.0 million (US$359.0 million), respectively, in cash and cash equivalents. Our cash and cash equivalents primarily consist of cash on hand and highly liquid investments, which are unrestricted from withdrawal or use, or which have original maturities of three months or less when purchased. We believe that our current cash and cash equivalents and our anticipated cash flows from operations will be sufficient to meet our anticipated working capital requirements and capital expenditures for the next 12 months. We may, however, need additional capital in the future to fund our continued operations.

In the future, we may rely significantly on dividends and other distributions paid by our PRC subsidiary for our cash and financing requirements. There may be restrictions on the dividends and other distributions by our PRC subsidiary. The PRC tax authorities may require us to adjust our taxable income under the contractual arrangements that our PRC subsidiary currently has in place with our consolidated affiliated entity in a way that could materially and adversely affect the ability of our PRC subsidiary to pay dividends and make other distributions to us. In addition, under PRC laws and regulations, our PRC subsidiary may pay dividends only out of its accumulated profits as determined in accordance with PRC accounting standards and regulations. Our PRC subsidiary is required to set aside at least 10% of its accumulated after-tax profits each year, if any, to fund a statutory reserve fund, until the aggregate amount of such fund reaches 50% of its respective registered capital. At its discretion, our PRC subsidiary may allocate a portion of its after-tax profits based on PRC accounting standards to staff welfare and bonus funds. The reserve fund and the staff welfare and bonus funds cannot be distributed as cash dividends. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Corporate Structure—We may rely on dividends paid by our PRC subsidiaries to fund cash and financing requirements. Any limitation on the ability of our PRC subsidiaries to pay dividends to us could have a material adverse effect on our ability to conduct our business and to pay dividends to holders of the ADSs and our ordinary shares." Furthermore, our investments made as registered capital and additional paid-in capital of our PRC subsidiary, consolidated affiliated entity and its subsidiaries are also subject to restrictions on their distribution and transfer according to PRC laws and regulations.

As a result, our PRC subsidiaries, consolidated affiliated entities and their subsidiaries in China are restricted in their ability to transfer their net assets to us in the form of cash dividends, loans or advances. As of December 31, 2018, the amount of the restricted net assets, which represents registered capital and additional paid-in capital cumulative appropriations made to statutory reserves, was RMB1,477.3 million (US$214.9 million). As of December 31, 2018, we held cash and cash equivalents of RMB460.0 million (US$66.9 million) in aggregate outside of the PRC and RMB2,008.0 million (US$292.0 million) in aggregate in the PRC, of which RMB2,007.8 million (US$292.0 million) was denominated in RMB and RMB132,050 (US$19,206) was denominated in U.S. dollars. Of such cash and cash equivalents held in the PRC, our PRC subsidiary held cash and cash equivalents in the amount of RMB131,983 (US$19,196) and RMB505.4 million (US$73.5 million), and our consolidated affiliated entity and its subsidiaries held cash and cash equivalents in the amount of RMB66 (US$10) and RMB1,502.4 million (US$218.5 million).

<center>78</center>

[Table of Contents]

As an offshore holding company, we are permitted under PRC laws and regulations to provide funding from the proceeds of our offshore fund raising activities to our PRC subsidiary only through loans or capital contributions, and to our consolidated affiliated entity and its subsidiaries only through loans, in each case subject to the satisfaction of the applicable government registration and approval requirements. See "Item 3. Key Information—D. Risk Factors—Risks Related to Doing Business in China—PRC regulation of loans to, and direct investment in, PRC entities by offshore holding companies and governmental control of currency conversion may restrict or prevent us from using offshore funds to make loans to our PRC subsidiaries and consolidated affiliated entities and their subsidiaries, or to make additional capital contributions to our PRC subsidiaries." As a result, there is uncertainty with respect to our ability to provide prompt financial support to our PRC subsidiaries and consolidated affiliated entities when needed. Notwithstanding the foregoing, our PRC subsidiaries may use their own retained earnings (rather than RMB converted from foreign currency denominated capital) to provide financial support to our consolidated affiliated entities either through entrustment loans from our PRC subsidiaries to our consolidated affiliated entities or direct loans to such consolidated affiliated entities' nominee shareholders, which would be contributed to the consolidated variable entities as capital injections. Such direct loans to the nominee shareholders would be eliminated in our consolidated financial statements against the consolidated affiliated entities' share capital.

Our full-time employees in the PRC participate in a government-mandated contribution plan pursuant to which certain pension benefits, medical care, unemployment insurance, employee housing fund and other welfare benefits are provided to such employees. We accrue for these benefits based on certain percentages of the employees' salaries. The total provisions for such employee benefits were RMB60.4 million, RMB95.2 million and RMB167.0 million (US$24.3 million) in 2016, 2017 and 2018, respectively. We expect our contribution towards such employee benefits to increase in the future as we continue to expand our workforce and as salary levels of our employees continue to increase.

The following table sets forth a summary of our cash flows for the periods indicated:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2017 | 2018 |
| | (in RMB thousands) | | |
| Net cash provided by operating activities | 1,466,290 | 2,886,107 | 3,327,718 |
| Net cash used in investing activities | (800,919) | (188,174) | (10,034,004) |
| Net cash provided by financing activities | 124 | 2,833 | 4,687,951 |
| Effect of exchange rate changes | 24,990 | (26,840) | 24,175 |
| Net increase in (decrease by) cash and cash equivalents | 690,485 | 2,673,926 | (1,994,160) |

| | | | |
|---|---|---|---|
| Cash and cash equivalents at beginning of period | 1,097,783 | 1,788,268 | 4,462,194 |
| Cash and cash equivalents at end of period | 1,788,268 | 4,462,194 | 2,468,034 |

*Anticipated Use of Cash*

We intend to continue to invest in our research and development capabilities to grow our user base and enhance user experience. We intend to continue to market our services, promote our brand, strengthen our customer service capabilities and enhance monetization. In order to support our overall business expansion, we also expect to continue to make investments in our corporate facilities and information technology infrastructure. We may pursue strategic alliances and acquisitions that complement our social networking platform. We plan to fund these expenditures with cash and cash equivalents that we have. On March 12, 2019, we declared a special cash dividend in the amount of US$0.62 per ADS, or US$0.31 per ordinary share. The aggregate amount of cash dividends to be paid is approximately US$128 million, which will be funded by surplus cash on our balance sheet.

<div align="center">79</div>

Table of Contents

*Operating Activities*

Net cash provided by operating activities amounted to RMB3,327.7 million (US$484.0 million) in 2018, which was primarily attributable to a net income of RMB2,788.5 million (US$405.6 million), adjusted for non-cash items of RMB814.8 million (US$118.5 million) and a decrease of RMB275.6 million (US$40.1 million) in working capital. The non-cash items primarily include RMB580.8 million (US$84.5 million) in share-based compensation expenses, RMB148.2 million (US$21.6 million) in depreciation of property and equipment and RMB93.0 million (US$13.5 million) in amortization of intangible assets. The decrease in working capital was primarily attributable to an increase in accounts receivable of RMB440.6 million (US$64.1 million) and an increase in prepaid expense and other current assets of RMB67.3 million (US$9.8 million), partially offset by an increase in accounts payable of RMB233.7 million (US$34.0 million) and an increase in accrued expenses and other current liabilities of RMB51.9 million (US$7.5 million). The increase in accounts receivable was mainly attributable to the shared revenue receivable from the distributor of our television content. The increase in prepaid expense and other current asset was mainly attributable to (i) an increase in customer payment to our account through third-party channels and cash deposited at the third-party payment channels by us for the broadcasters and virtual gift recipients to withdraw their revenue sharing and (ii) an increase in input VAT due to larger amount of revenue sharing with broadcaster agency and purchasing of advertising activities, partially offset by a decrease in advance payment made to suppliers for advertising fees and live video broadcasting service fees. The increase in accounts payable was mainly attributable to an increase in revenue-sharing payable to live broadcasters and broadcaster agencies. The increase in accrued expenses and other current liabilities was mainly attributable to (i) an increase in marketing promotional fees payable and (ii) an increase in payroll and welfare payable due to increased headcount and increased salaries and bonus.

Net cash provided by operating activities amounted to RMB2,886.1 million in 2017, which was primarily attributable to a net income of RMB2,144.5 million, adjusted for non-cash items of RMB411.0 million and an increase of RMB330.7 million in working capital. The non-cash items primarily included RMB335.0 million in share-based compensation expenses, RMB78.9 million in depreciation on property and equipment and RMB30.1 million in impairment loss on long-term investments, partially offset by RMB39.7 million share of income on equity method investment. The increase in working capital was primarily attributable to an increase in accrued expenses and other current liabilities of RMB292.1 million, an increase in accounts payable of RMB174.3 million, an increase in income tax payable of RMB152.3 million and an increase in deferred revenue of RMB135.4 million, partially offset by an increase in prepaid expense and other current assets of RMB306.8 million. The increase in accrued expenses and other current liabilities was mainly attributable to (i) an increase in payroll and welfare payable due to increased headcount and increased salaries and bonus, (ii) an increase in the balance of users' virtual accounts, and (iii) and increase in marketing promotional fees payable. The increase in accounts payable was mainly attributable to (i) an increase in revenue-sharing payable to live broadcasters, and (ii) an increase in bandwidth cost payable to IT service suppliers. The increase in income tax payable was mainly because we generated higher profit in 2017 and the tax holiday of one of our major profit generating entities changed from 100% exemption to 50% exemption of income tax in 2017. The increase in deferred revenue was mainly attributable to the increase in live video service revenues paid in advance. The increase in prepaid expenses and other current assets was mainly attributable to (i) an increase in customer payment to our account through third-party channels and cash deposited at the third-party payment channels by us for the broadcasters to withdraw their revenue sharing, (ii) an increase in advance payment made to suppliers for advertising fees and live video broadcasting service fees and (iii) an increase in rental fees we prepaid for our expanding office space.

<div align="center">80</div>

Table of Contents

Net cash provided by operating activities amounted to RMB1,466.3 million in 2016, which was primarily attributable to a net income of RMB979.0 million, adjusted for non-cash items of RMB282.9 million and an increase of RMB204.4 million in working capital. The non-cash items primarily included RMB210.8 million in share-based compensation expenses, RMB55.8 million in depreciation of property and equipment and RMB39.3 million in impairment loss on long-term investments, partially offset by RMB23.2 million of investing income. The increase in working capital was primarily attributable to an increase in accounts payable of RMB213.5 million, an increase in accrued expenses and other current liabilities of RMB103.9 million and an increase in deferred revenue of RMB103.4 million, which was partially offset by an increase in accounts receivable of RMB154.0 million and an increase in prepaid expenses and other current assets of RMB105.0 million. The increase in accounts payable was mainly attributable to the increase in revenue-sharing payable to live broadcasters and game developers. The increase in accrued expenses and other current liabilities was mainly attributable to (i) an increase in payroll and welfare payable due to increased headcount and increased salaries, and (ii) an increase in marketing promotional fees payable, partially offset by a decrease in payable to employees for exercise of stock options. The increase in deferred revenue was mainly attributable to the increase of number of paying users for our live video service, the increase of our members and membership subscription fees that our members paid in advance, as well as the increase in mobile marketing revenues and mobile games revenues paid in advance. The increase in accounts receivable was mainly attributable to an increase in revenues collected through third-party application store and other payment channels. The increase in prepaid expenses and other current assets was mainly attributable to (i) an increase in advance payment made to advertisement suppliers, (ii) an increase in

customer advance payment at a third-party payment channel, which is cash deposited at the third-party payment channel by us for the broadcasters to withdraw their revenue sharing, (iii) an increase in game promotions fees paid on behalf of game developers and (iv) an increase in commission fees we paid to third-party application stores and other payment channels for distributing our mobile application and services.

### *Investing Activities*

Net cash used in investing activities amounted to RMB10,034.0 million (US$1,459.4 million) in 2018, which was primarily due to the purchase of term deposits and short-term investments, payment for business acquisition of Tantan, purchase of servers, computers and other equipment, and payment and prepayment of long-term investments, partially offset by cash received on maturity of term deposits and short-term investments.

Net cash used in investing activities amounted to RMB188.2 million in 2017, which was primarily attributable to purchase of term deposits and short term investments, purchase of servers, computers and other equipment, payments for leasehold improvements, payment and prepayment of long-term investments, and payments for acquired intangible assets, partially offset by cash received on maturity of term deposits and sales of short term investment.

Net cash used in investing activities amounted to RMB800.9 million in 2016, which was primarily attributable to purchase of term deposits, payment and prepayment of long-term investments, and purchase of servers, computers and other equipment, partially offset by cash received on maturity of term deposits.

### *Financing Activities*

Net cash generated from financing activities amounted to RMB4,688.0 million (US$681.8 million) in 2018, which was primarily attributable to cash received from issuance of convertible notes and a bank loan, partially offset by cash repayment of the bank loan.

Net cash provided by financing activities amounted to RMB2.8 million in 2017, which was primarily attributable to cash received for exercise of options awarded under our share incentive plans, which was partially offset by a deferred payment on the purchase of fixed assets.

Net cash provided by financing activities amounted to RMB0.1 million in 2016, which was primarily attributable to cash received for exercise of options awarded under our share incentive plans, which was partially offset by a deferred payment on the purchase of fixed assets.

<center>81</center>

Table of Contents

### Holding Company Structure

Our company is a holding company with no material operations of its own. We conduct our operations primarily through our subsidiaries and our consolidated affiliated entities and their subsidiaries in China. As a result, our ability to pay dividends depends upon dividends paid by our subsidiaries. If our subsidiaries or any newly formed subsidiaries incur debt on their own behalf in the future, the instruments governing their debt may restrict their ability to pay dividends to us. In addition, our subsidiaries are permitted to pay dividends to us only out of their retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. Under PRC law, each of our PRC subsidiaries and our consolidated affiliated entities is required to set aside at least 10% of their after-tax profits each year, if any, to fund a statutory reserve until such reserve reaches 50% of their registered capital. Although the statutory reserves can be used, among other ways, to increase the registered capital and eliminate future losses in excess of retained earnings of the respective companies, the reserve funds are not distributable as cash dividends except in the event of liquidation. As a result of these PRC laws and regulations, the capital and statutory reserves restricted which represented the amount of net assets of our relevant subsidiaries in PRC not available for distribution were RMB1,477.3 million (US$214.9 million) as of December 31, 2018.

### Capital Expenditures

Our capital expenditures amounted to RMB46.8 million, RMB218.6 million and RMB242.8 million (US$35.3 million) in 2016, 2017 and 2018, respectively. In the past, our capital expenditures were principally incurred to purchase servers, computers and other office equipment, and to pay for leasehold improvements for our offices. As our business expands, we may purchase new servers, computers and other equipment in the future, as well as make leasehold improvements.

### C.    Research and Development

We focus our research and development efforts on the continual improvement and enhancement of our platform's features and services, as well as the design and development of games that are suitable for publishing on our own platform. We have a large team of engineers and developers, which accounted for approximately 55% of our employees as of December 31, 2018. Most of our engineers and developers are based in our headquarters in Beijing.

For the three years ended December 31, 2016, 2017 and 2018, our research and development expenditures, including share-based compensation expenses for research and development personnel, were RMB208.6 million, RMB346.1 million and RMB760.6 million (US$110.6 million), respectively. For the year ended December 31, 2018, our research and development expenditures represented 5.7% of our total revenues. Our research and development expenses primarily consist of salaries and benefits, including share-based compensation expenses, for research and development personnel and technical service fees. Expenditures incurred during the research phase are expensed as incurred. We expect our research and development expenses to increase as we expand our research and development team to develop new features and services for our platform and further enhance our big data analytical capabilities.

**D.     Trend Information**

Other than as disclosed elsewhere in this annual report, we are not aware of any trends, uncertainties, demands, commitments or events for the year ended December 31, 2018 that are reasonably likely to have a material and adverse effect on our net revenues, income, profitability, liquidity or capital resources, or that would cause the disclosed financial information to be not necessarily indicative of future results of operations or financial conditions.

**E.     Off-Balance Sheet Arrangements**

We have not entered into any financial guarantees or other commitments to guarantee the payment obligations of any third parties. We have not entered into any derivative contracts that are indexed to our shares and classified as shareholder's equity or that are not reflected in our consolidated financial statements. Furthermore, we do not have any retained or contingent interest in assets transferred to an unconsolidated entity that serves as credit, liquidity or market risk support to such entity for such assets. We do not have any obligation, including a contingent obligation, arising out of a variable interest in any unconsolidated entity that we hold and material to us, where such entity provides financing, liquidity, market risk or credit risk support to us or engages in leasing, hedging or research and development services with us.

82

**Table of Contents**

**F.     Contractual Obligations**

We lease certain of our facilities and offices under non-cancellable operating lease agreements. The rental expenses were RMB31.6 million, RMB58.9 million and RMB78.7 million (US$11.4 million) for the years ended December 31, 2016, 2017 and 2018, respectively.

As of December 31, 2018, future minimum commitments under non-cancelable agreements were as follows:

| | Total | 2019 | 2020 | 2021 | 2022 and thereafter |
|---|---|---|---|---|---|
| | | | (in RMB thousands) | | |
| Operating lease | 217,443 | 99,133 | 82,697 | 26,980 | 8,633 |

As of December 31, 2018, we are obligated to pay RMB47.5 million for the subscription of equity interest in long-term investees.

Other than the operating lease and investment commitment shown above, we did not have any significant other commitments, long-term obligations, or guarantees as of December 31, 2018.

**G.     Safe Harbor**

See "Forward-Looking Information."

**Item 6.     Directors, Senior Management and Employees**

**A.     Directors and Senior Management**

The following table sets forth information regarding our executive officers and directors as of the date of this annual report.

| Directors and Executive Officers | Age | Position/Title |
|---|---|---|
| Yan Tang | 40 | Chairman and Chief Executive Officer |
| Yong Li | 44 | Independent Director |
| David Ying Zhang | 45 | Director |
| Benson Bing Chung Tam | 55 | Independent Director |
| Dave Daqing Qi | 55 | Independent Director |
| Li Wang | 35 | Director, President and Chief Operating Officer |
| Yongming Wu | 44 | Independent Director |
| Xiaoliang Lei | 35 | President of Game Operations |
| Jonathan Xiaosong Zhang | 55 | Chief Financial Officer |
| Chunlai Wang | 32 | Chief Technology Officer |

*Mr. Yan Tang* is our co-founder and has served as our director and chief executive officer since our inception in July 2011. Mr. Tang was appointed to be the chairman of our board of directors in November 2014. Prior to founding our company, from 2003 to 2011, Mr. Tang worked at NetEase, Inc. (NASDAQ: NTES), or NetEase, initially as editor and later editor-in-chief. Mr. Tang was named by *Fortune Magazine* as one of its "40 Under 40," a list of the most powerful, influential and important business elites under the age of 40, in October 2014. Mr. Tang received his bachelor of science degree from Chengdu University of Technology in China in 2000.

*Mr. Yong Li* is our co-founder and has been our director since April 2012 and our independent director since December 2015. Mr. Li founded Fenbi Inc. (Cayman), a provider of online education services, in May 2011, in which he now serves as a board director and chief executive officer. In April 2012, he founded Beijing Jingguanyu Technology Co., Ltd., a software service company, and has been its chief executive officer since then. From May 2005 to May 2010, Mr. Li was the editor-in-chief and vice president at NetEase, and then the vice president at NetEase and president of NetEase career portal business unit. Between February 2001 and May 2005, Mr. Li served as an executive editor, executive editor-in-chief and then general manager of Global

Entrepreneur, a Chinese magazine. Mr. Li is also a director of two privately held companies. Mr. Li received his MBA degree from Peking University in 2004 and bachelor's degree in law from Renmin University in China in 1996.

83

Table of Contents

*Mr. David Ying Zhang* has been our director since April 2012. Mr. Zhang is a founding managing partner of Matrix Partners China, where he oversees all of the venture capital investment firm's operations. In 2002, Mr. Zhang established and has since expanded WI Harper Group's Beijing operations and co-managed its China portfolios. Prior to joining WI Harper Group, Mr. Zhang worked at Salomon Smith Barney, where he was responsible for analyzing, structuring and marketing companies in the internet, software and semiconductor sectors. Before then, Mr. Zhang worked at ABN AMRO Capital as a senior venture associate. Mr. Zhang received master of science degree in biotechnology and business from Northwestern University in 1999 and bachelor of science degree in clinical science with minor in chemistry from California State University in 1997.

*Mr. Benson Bing Chung Tam* has served as our independent director since December 2014. Mr. Tam is a chartered accountant. In March 2012, Mr. Tam founded Venturous Group, a global CEO network based in Beijing, and has been serving as its chairman since then. From 2002 to February 2012, Mr. Tam was a partner and head of technology investments at Fidelity Growth Partners Asia (formerly named Fidelity Asia Ventures), where he led a team of five professionals focused on technology investment. Prior to joining Fidelity Growth Partners Asia, Mr. Tam was a partner of Electra Partners Asia from 1998 to 2002, and was the founding director of Hellman & Friedman Asia from 1992 to 1998. Mr. Tam worked in M&A corporate finance at S.G. Warburg from 1989 to 1992. Mr. Tam has been a Chartered Accountant since 1989. Mr. Tam currently also serves as a director of certain privately held companies. Mr. Tam received his master's degree in computer science from Oxford University in 1986 and his bachelor's degree in civil engineering from Imperial College of London University in 1984.

*Dr. Dave Daqing Qi* has served as our independent director since December 2014. Dr. Qi is a professor of accounting and the former associate dean of the Cheung Kong Graduate School of Business. He began teaching at the Cheung Kong Graduate School of Business in 2002 and was the founding director of the Executive MBA program. Prior to that, Dr. Qi was an associate professor at the School of Accounting of the Chinese University of Hong Kong. Dr. Qi also serves as director of a number of public companies, such as Sohu.com (NASDAQ: SOHU), Jutal Offshore Oil Services Limited (HKEx: 3303), Yunfeng Financial Group Limited (HKEx: 0376), Sinomedia Holding Limited (HKEx: 0623), Boison Finance Group Limited (HKEx: 0888) and Dalian Haidao International Holding Limited (HKEx: 6862). He received his Ph.D. degree in accounting from the Eli Broad Graduate School of management of Michigan State University in 1996, MBA degree from the University of Hawaii at Manoa in 1992 and bachelor of science and bachelor of arts degrees from Fudan University in 1985 and 1987, respectively.

*Mr. Li Wang* has been our chief operating officer since June 2014 and our president since April 2018. Mr. Wang joined the company as our operation director in July 2011. Prior to joining us, Mr. Wang was the managing director of Laoluo English Training School, a start-up education service business from November 2008 to May 2011. He was the general administration staff at NEC China Co., Ltd. from April 2005 to April 2007. Mr. Wang received a bachelor's degree in management from Beijing University of Aeronautics and Astronautics in China in 2004.

*Mr. Yongming Wu* has been our independent director since December 2018. Mr. Wu is also a director and founding partner of Vision Plus Capital and a co-founder of Alibaba Group. Mr. Wu founded Vision Plus Capital in 2015 and has led several key business segments of Alibaba Group.

*Mr. Xiaoliang Lei* is our co-founder and has been the president of our game operations since April 2018. Mr. Lei is responsible for game operations. Prior to co-founding our company, Mr. Lei was the product management staff then manager at NetEase, from 2008 to 2011. Mr. Lei was an editor in charge of content development and team management at 21CN Game Channel, a game information exchange platform in China from 2004 to 2008. Mr. Lei received his bachelor of science degree in software engineering from South China University of Technology in 2004.

*Mr. Jonathan Xiaosong Zhang* has served as our chief financial officer since May 2014. From July 2010 to April 2014, Mr. Zhang served as the chief financial officer of iSoftStone Holdings Limited (NYSE: ISS), and was the company's independent director between February 2010 and July 2010. Prior to joining iSoftStone Holdings Limited, Mr. Zhang served as the chief financial officer of several companies, including BJB Career Education Company Limited from June 2009 to June 2010, and Vimicro International Corporation (NASDAQ: VIMC) from September 2004 to January 2007. From 2000 to 2004, Mr. Zhang worked as a manager and then a senior manager at the Beijing office of PricewaterhouseCoopers. From 1995 to 1999, Mr. Zhang was an auditor and then a senior auditor at the Los Angeles office of KPMG LLP. Mr. Zhang is also an independent director, the chairman of audit committee, and a member of the compensation committee and the nominating and corporate governance committee of Tarena International Inc. (NASDAQ: TEDU). Mr. Zhang served as an independent director and chairman of the audit committee of Sungy Mobile Limited (NASDAQ: GOMO) between November 2013 and July 2014. Mr. Zhang received his master's degree in accountancy from the University of Illinois in 1994, his master's degree in meteorology from Saint Louis University in 1992, and his bachelor's degree in meteorology from Peking University in 1986. Mr. Zhang is a Certified Public Accountant in the State of California.

84

Table of Contents

*Mr. Chunlai Wang* has been our chief technology officer since August 2017. Mr. Wang served as our vice president of technology since April 2015. From June 2014 to April 2015, Mr. Wang served as our technology director. Before that, he had been in charge of our technology team since June 2013 and had been actively involved in the development of our key technological infrastructures since he joined us in February 2012. Prior to joining us, Mr. Wang served as an engineer and a senior engineer in NetEase from September 2010 to February 2012. From March 2009 to September 2010, he co-founded a business dedicated to semantic search services. Mr. Wang received his master's degree in engineering from Peking University in July 2013 and his bachelor's degree from Beijing Jiaotong University in June 2009.

**B.      Compensation**

For the fiscal year ended December 31, 2018, we paid an aggregate of approximately RMB114.8 million (US$16.7 million) in cash to our executive officers, and we paid an aggregate of approximately RMB0.6 million (US$90,000.0) in cash to our non-executive directors. We have not set aside or accrued any amount to provide pension, retirement or other similar benefits to our executive officers and directors. In accordance with the PRC law, our PRC subsidiary and consolidated affiliated entity and its subsidiaries are required by law to make contributions equal to certain percentages of each employee's salary for his or her pension insurance, medical insurance, unemployment insurance and other statutory benefits and a housing provident fund.

**Share Incentive Plans**

*2012 Plan*

In November 2012, we adopted a share incentive plan, or the 2012 Plan, which was amended and restated in October 2013. The maximum aggregate number of shares which may be issued pursuant to all awards under the 2012 Plan is 44,758,220 Class A ordinary shares. With the adoption of our 2014 Plan, we no longer issue incentive shares under the 2012 Plan.

As of March 31, 2019, options to purchase 28,769,414 Class A ordinary shares (excluding those that have been forfeited) had been granted under the 2012 Plan, of which options to purchase an aggregate of 5,466,618 Class A ordinary shares remained outstanding. The following paragraphs summarize the principal terms of the 2012 Plan.

*Plan Administration.* Our board of directors or one or more committees consisting solely of directors designated by our board will administer the 2012 Plan. The committee or the full board of directors, as applicable, will determine the participants to receive awards, the type and number of awards to be granted to each participant, and the terms and conditions of each grant. The board or such committee(s) may also delegate, to the extent permitted by applicable laws, to one or more officers of our company, its powers under the 2012 Plan to determine the officers and employees who will receive awards, the number of such awards, and the terms and conditions thereof. Subject to the limitations under the 2012 Plan, the plan administrator from time to time may authorize, generally or in specific cases only, for the benefit of any participant, any adjustment in exercise or purchase price, vesting schedule, and re-granting of awards by waiver or by other legally valid means.

*Award Agreement.* Awards granted under the 2012 Plan are evidenced by an award agreement that sets forth terms, provisions and restrictions for each award, which may include the type of award, the term of the award, vesting provisions, the exercise or purchase price, and the provisions applicable in the event that the recipient's employment or service terminates. Under the plan, each recipient of option award shall duly sign a power of attorney delegating the voting rights and signing rights of ordinary shares issued upon the exercise of the option award.

*Eligibility.* We may grant awards to our officers, directors, employees, consultants and advisors of our company.

*Acceleration of Awards upon Change in Control.* If a change in control of our company occurs, the plan administrator may, in its sole discretion, accelerate the awards so that they may immediately vest without any forfeiture restrictions, unless the plan administrator has otherwise provided for substitution, assumption, exchange or other continuation or settlement of the award.

*Vesting Schedule.* In general, the plan administrator determines the vesting schedule, which is specified in the relevant award agreement.

*Exercise of Options.* The plan administrator determines the exercise price for each option award, which is stated in the award agreement and shall in no case be lower than the par value of our ordinary shares. Once vested, an option award will remain exercisable until the date of expiration or termination, unless otherwise provided by the plan administrator. However, each option award shall expire no more than 10 years after its date of grant.

Table of Contents

*Transfer Restrictions.* Awards may not be transferred in any manner by the recipient, save for certain exceptions including transfers to our company, transfers by gift to an affiliate or an immediately family member, transfer by will or the laws of descent and distribution, and other exceptions provided for by the plan administrator.

*Amendment and Termination of the 2012 Plan.* Subject to any shareholder approval, our board of directors may, at any time, terminate or, from time to time, amend, modify or suspend this 2012 Plan. Unless terminated earlier, the 2012 Plan will terminate at the close of business on October 31, 2022.

*2014 Plan*

We adopted the 2014 share incentive plan, or the 2014 Plan, in November 2014. The maximum aggregate number of shares which may be issued pursuant to all awards under the 2014 Plan is initially 14,031,194 Class A ordinary shares. Beginning in 2017, the number of shares reserved for future issuances under the 2014 Plan will be increased by a number equal to 1.5% of the total number of outstanding shares on the last day of the immediately preceding calendar year, or such lesser number of Class A ordinary shares as determined by our board of directors, on the first day of each calendar year during the term of the 2014 Plan. As a result, the maximum aggregate number of shares which may be issued pursuant to all awards under the 2014 Plan has been increased to 32,049,945 Class A ordinary shares. As of March 31, 2019, we have granted options to purchase 23,462,705 Class A ordinary shares (excluding those that have been forfeited and cancelled) and 440,001 restricted share units under our 2014 Plan, of which options to purchase an aggregate of 15,404,425 Class A ordinary shares remained outstanding and 187,500 restricted share units remained outstanding. The following paragraphs summarize the terms of the 2014 Plan.

*Types of Awards.* The 2014 Plan permits the awards of options, restricted shares and restricted share units.

*Plan Administration.* Our board or a committee of one or more members of our board duly authorized for the purpose of the 2014 Plan can act as the plan administrator.

*Award Agreement.* Options, restricted shares or restricted share units granted under the 2014 Plan are evidenced by an award agreement that sets forth the terms, conditions and limitations for each grant.

*Eligibility.* We may grant awards to our employees, directors, consultants, or other individuals as determined, authorized and approved by the plan administrator. However, we may grant options that are intended to qualify as incentive share options only to our employees and employees of our parent companies and subsidiaries.

*Acceleration of Awards upon Change in Control.* If a change in control, liquidation or dissolution of our company occurs, the plan administrator may, in its sole discretion, provide for (i) all awards outstanding to terminate at a specific time in the future and give each participant the right to exercise the vested portion of such awards during a specific period of time, or (ii) the purchase of any award for an amount of cash equal to the amount that could have been attained upon the exercise of such award, or (iii) the replacement of such award with other rights or property selected by the plan administrator in its sole discretion, or (iv) payment of award in cash based on the value of Class A ordinary shares on the date of the change-in-control transaction plus reasonable interest.

*Exercise of Options.* The plan administrator determines the exercise price for each award, which is stated in the award agreement. The vested portion of option will expire if not exercised prior to the tenth anniversary after the date of a grant, unless extended by the plan administrator.

*Exercise Price of Options.* The exercise price in respect of any option shall be determined by the plan administrator and set forth in the award agreement which may be a fixed or variable price related to the fair market value of the shares. The exercise price per share subject to an option may be amended or adjusted in the absolute discretion of the plan administrator, the determination of which shall be final, binding and conclusive.

*Vesting Schedule.* In general, the plan administrator determines the vesting schedule, which is set forth in the award agreement.

*Transfer Restrictions.* Awards may not be transferred in any manner by the recipient other than by will or the laws of descent and distribution, except as otherwise provided by the plan administrator.

*Termination.* Unless terminated earlier, the 2014 Plan will terminate automatically in 2024.

86

Table of Contents

The following table summarizes, as of March 31, 2019, the outstanding options under the 2012 Plan and 2014 Plan granted to certain officers, directors, employees and consultants.

| Name | Class A Ordinary Shares Underlying Outstanding Options | Exercise Price (US$/Share) | Date of Grant | Date of Expiration |
|---|---|---|---|---|
| Yan Tang | * | 0.1404 | October 10, 2013 | October 9, 2023 |
| | * | 0.0002 | October 29, 2014 | October 28, 2024 |
| | * | 0.0002 | April 22, 2015 | April 21, 2025 |
| | * | 0.0002 | March 31, 2016 | March 30, 2026 |
| | * | 0.0002 | December 30, 2016 | December 29, 2026 |
| | * | 0.0002 | March 7, 2017 | March 6, 2027 |
| | * | 0.0002 | May 2, 2018 | May 1, 2028 |
| David Ying Zhang | * | 0.1404 | October 10, 2013 | October 9, 2023 |
| Li Wang | * | 0.0002 | October 29, 2014 | October 28, 2024 |
| | * | 0.0002 | April 22, 2015 | April 21, 2025 |
| | * | 0.0002 | March 31, 2016 | March 30, 2026 |
| | * | 0.0002 | December 30, 2016 | December 29, 2026 |
| | * | 0.0002 | March 7, 2017 | March 6, 2027 |
| | * | 0.0002 | May 2, 2018 | May 1, 2028 |
| Xiaoliang Lei | * | 0.1404 | October 10, 2013 | October 9, 2023 |
| | * | 0.0002 | October 29, 2014 | October 28, 2024 |
| | * | 0.0002 | April 22, 2015 | April 21, 2025 |
| | * | 0.0002 | March 31, 2016 | March 30, 2026 |
| | * | 0.0002 | December 30, 2016 | December 29, 2026 |
| | * | 0.0002 | March 7, 2017 | March 6, 2027 |
| | * | 0.0002 | May 2, 2018 | May 1, 2028 |
| Jonathan Xiaosong Zhang | * | 0.0002 | October 29, 2014 | October 28, 2024 |
| | * | 0.0002 | April 22, 2015 | April 21, 2025 |
| | * | 0.0002 | March 31, 2016 | March 30, 2026 |
| | * | 0.0002 | December 30, 2016 | December 29, 2026 |
| | * | 0.0002 | March 7, 2017 | March 6, 2027 |

| Name | Class A Ordinary Shares Underlying Outstanding Options | Exercise Price (US$/Share) | Date of Grant | Date of Expiration |
|---|---|---|---|---|
| | * | 0.0002 | May 2, 2018 | May 1, 2028 |
| Chunlai Wang | * | 0.0327 | November 1, 2012 | October 31, 2022 |
| | * | 0.1404 | October 10, 2013 | October 9, 2023 |
| | * | 0.0002 | October 29, 2014 | October 28, 2024 |
| | * | 0.0002 | April 22, 2015 | April 21, 2025 |
| | * | 0.0002 | June 16, 2016 | June 15, 2026 |
| | * | 0.0002 | May 17, 2017 | May 16, 2027 |
| | * | 0.0002 | September 1, 2017 | August 31, 2027 |
| | * | 0.0002 | May 2, 2018 | May 1, 2028 |
| Other individuals as a group | 149,166 | 0.0327 | November 1, 2012 | October 31, 2022 |
| | 770,280 | 0.1404 | October 10, 2013 | October 9, 2023 |
| | 550,000 | 0.1404 | March 1, 2014 | February 28, 2024 |
| | 456,962 | 0.0002 | October 29, 2014 | October 28, 2024 |
| | 136,351 | 0.0002 | April 22, 2015 | April 21, 2025 |
| | 376,266 | 0.0002 | May 4, 2015 | May 3, 2025 |
| | 97,722 | 0.0002 | August 13, 2015 | August 12, 2025 |
| | 241,000 | 0.0002 | October 15, 2015 | October 14, 2025 |
| | 28,438 | 0.0002 | November 13, 2015 | November 12, 2025 |
| | 0 | 0.0002 | March 31, 2016 | March 30, 2026 |
| | 846,870 | 0.0002 | June 16, 2016 | June 15, 2026 |
| | 523,856 | 0.0002 | July 6, 2016 | July 5, 2026 |
| | 53,426 | 0.0002 | October 15, 2016 | October 14, 2026 |
| | 158,002 | 0.0002 | December 30, 2016 | December 29, 2026 |
| | 10,000 | 0.0002 | January 3, 2017 | January 2, 2027 |
| | 246,164 | 0.0002 | April 13, 2017 | April 12, 2027 |

87

Table of Contents

| Name | Class A Ordinary Shares Underlying Outstanding Options | Exercise Price (US$/Share) | Date of Grant | Date of Expiration |
|---|---|---|---|---|
| | 1,317,158 | 0.0002 | May 17, 2017 | May 16, 2027 |
| | 51,700 | 0.0002 | July 13, 2017 | July 12, 2027 |
| | 135,000 | 0.0002 | September 1, 2017 | August 31, 2027 |
| | 52,926 | 0.0002 | October 13, 2017 | October 12, 2027 |
| | 227,346 | 0.0002 | December 5, 2017 | December 4, 2027 |
| | 86,250 | 0.0002 | December 29, 2017 | December 28, 2027 |
| | 98,000 | 0.0002 | April 13, 2018 | April 12, 2028 |
| | 1,968,998 | 0.0002 | May 2, 2018 | May 1, 2028 |
| | 298,500 | 0.0002 | July 13, 2018 | July 12, 2028 |
| | 81,000 | 0.0002 | October 15, 2018 | October 14, 2028 |
| | 216,000 | 0.0002 | December 29, 2018 | December 28, 2028 |
| Total | 20,871,043 | | | |

\* Aggregate number of shares represented by all grants of options or restricted share units to the person account for less than 1% of our total outstanding ordinary shares on an as-converted basis.

The following table summarizes, as of March 31, 2019, the outstanding restricted share units granted to certain directors under the 2014 Plan.

| Name | Restricted Share Units for Class A Ordinary Shares | Date of Grant |
|---|---|---|
| Benson Bing Chung Tam | * | May 17, 2016 |
| | * | March 7, 2017 |
| | * | May 2, 2018 |
| Dave Daqing Qi | * | May 17, 2016 |
| | * | March 7, 2017 |
| | * | May 2, 2018 |
| Total | 187,500 | |

### BVI Plan

In January 2015, Momo Technology Overseas Holding Company Limited, or Momo BVI, our wholly-owned BVI subsidiary, adopted a share incentive plan, or the BVI Plan. The maximum number of ordinary shares issuable pursuant to awards granted under the BVI Plan is 30,000,000. The BVI Plan is administered by the board of directors of Momo BVI or one or more committees thereof, which shall determine the participants to receive awards, the type and number of awards to be granted to each participant, and the terms and conditions of each grant. Under the BVI Plan, Momo BVI may grant

options, restricted shares or unrestricted ordinary shares to directors of Momo BVI, officers or employees of Momo BVI or its affiliates, or consultants to Momo BVI or its affiliates.

In 2015, Momo BVI granted options to purchase a total of 10,550,000 of its shares to employees and an executive of Momo Information Technologies Corp., its wholly-owned subsidiary incorporated in Delaware, with exercise prices ranging from US$0.10 to US$0.11 per share. Of such awards, options to purchase an aggregate of nil shares remained outstanding as of March 31, 2019.

*Tantan 2015 Plan*

In March 2015, Tantan adopted the 2015 Share Incentive Plan, pursuant to which a maximum aggregate of 1,000,000 ordinary shares are issuable upon exercise of awards. The board of directors of Tantan may in its discretion make adjustments to the numbers of ordinary shares to be issued. In April 2016 and March 2017, the board of directors of Tantan approved to adjust the maximum aggregate number of ordinary shares issuable upon exercise of awards to 2,000,000 and 2,793,812, respectively. The Tantan 2015 Plan is administered by the board of directors of Tantan or any committee or director appointed by the board of directors of Tantan, which shall determine the grantees to receive awards, the type and number of awards to be granted to each grantee, and the terms and conditions of each grant. Under the Tantan 2015 Plan, Tantan may grant options, ordinary shares, cash or other rights or benefits to its directors, officers, employees, consultants or "related entities" as defined in the Tantan 2015 Plan. As of March 31, 2019, options to purchase 1,308,541 ordinary shares of Tantan (excluding those already forfeited) granted under the Tantan 2015 Plan remained outstanding.

Table of Contents

*Tantan 2018 Plan*

In July 2018, Tantan adopted the 2018 Share Incentive Plan, pursuant to which the maximum aggregate number of ordinary shares to be issued was initially 5,963,674, plus the number of ordinary shares additionally authorized for issuance under the Tantan 2015 Plan, in an amount equal to (i) the number of ordinary shares that were not granted pursuant to the Tantan 2015 Plan, plus (ii) the number of ordinary shares that were granted pursuant to the Tantan 2015 Plan that have expired without having been exercised in full or have otherwise become not exercisable. The Tantan 2018 Plan is administered by the board of directors of Tantan or a committee designated by the board of directors of Tantan, which shall determine the participants to receive awards, the type and number of awards to be granted to each participant, and the terms and conditions of each grant. Under the Tantan 2018 Plan, Tantan may grant options, restricted shares or restricted share units to its directors, officers, employees, consultants, shareholders, subsidiaries or "related entities" as defined in the Tantan 2018 Plan. The term of the options granted under the Tantan 2018 Plan may not exceed ten years from the date of grant, except for any amendment, modification and termination of the Tantan 2018 Plan approved by its board. As of March 31, 2019, options to purchase 4,160,240 ordinary shares of Tantan (excluding those already forfeited) granted under the Tantan 2018 Plan remained outstanding.

**Employment Agreements and Indemnification Agreements**

We have entered into employment agreements with each of our executive officers. Under these agreements, each of our executive officers is employed for a specified time period. We may terminate employment for cause, at any time, without advance notice or remuneration, for certain acts of the executive officer, such as conviction or plea of guilty to a felony or any crime involving moral turpitude, negligent or dishonest acts to our detriment, or misconduct or a failure to perform agreed duties. We may also terminate an executive officer's employment without cause upon three-month advance written notice. In such case of termination by us, we will provide severance payments to the executive officer as expressly required by applicable law of the jurisdiction where the executive officer is based. The executive officer may resign at any time with a three-month advance written notice.

Each executive officer has agreed to hold, both during and after the termination or expiry of his or her employment agreement, in strict confidence and not to use, except as required in the performance of his or her duties in connection with the employment or pursuant to applicable law, any of our confidential information or trade secrets, any confidential information or trade secrets of our clients or prospective clients, or the confidential or proprietary information of any third party received by us and for which we have confidential obligations. The executive officers have also agreed to disclose in confidence to us all inventions, designs and trade secrets which they conceive, develop or reduce to practice during the executive officer's employment with us and to assign all right, title and interest in them to us, and assist us in obtaining and enforcing patents, copyrights and other legal rights for these inventions, designs and trade secrets.

In addition, each executive officer has agreed to be bound by non-competition and non-solicitation restrictions during the term of his or her employment and typically for one year following the last date of employment. Specifically, each executive officer has agreed not to (i) approach our suppliers, clients, customers or contacts or other persons or entities introduced to the executive officer in his or her capacity as a representative of us for the purpose of doing business with such persons or entities that will harm our business relationships with these persons or entities; (ii) assume employment with or provide services to any of our competitors, or engage, whether as principal, partner, licensor or otherwise, any of our competitors, without our express consent; or (iii) seek directly or indirectly, to solicit the services of any of our employees who is employed by us on or after the date of the executive officer's termination, or in the year preceding such termination, without our express consent.

We have also entered into indemnification agreements with each of our directors and executive officers. Under these agreements, we agree to indemnify our directors and executive officers against certain liabilities and expenses incurred by such persons in connection with claims made by reason of their being a director or officer of our company.

Table of Contents

**C.    Board Practices**

**Board of Directors**

Our board of directors consists of seven directors. A director is not required to hold any shares in our company to qualify to serve as a director. A director who is in any way, whether directly or indirectly, interested in a contract or transaction or proposed contract or transaction with our company must declare the nature of his or her interest at a meeting of the directors. Subject to applicable NASDAQ Stock Market Rules and disqualification by the chairman of the relevant board meeting, a director may vote in respect of any contract or transaction or proposed contract or transaction notwithstanding that he or she may be interested therein, and if he or she does so his or her vote shall be counted and he or she may be counted in the quorum at the relevant board meeting at which such contract or transaction or proposed contract or transaction is considered. The directors may exercise all the powers of the company to borrow money, to mortgage or charge its undertaking, property and uncalled capital, and to issue debentures or other securities whenever money is borrowed or as security for any debt, liability or obligation of the company or of any third party. None of our non-executive directors has a service contract with us that provides for benefits upon termination of service.

**Committees of the Board of Directors**

We have established an audit committee, a compensation committee and a nominating and corporate governance committee under the board of directors. We have adopted a charter for each of the three committees. Each committee's members and functions are described below.

*Audit Committee*

Our audit committee consists of Benson Bing Chung Tam, Dr. Dave Daqing Qi and Yong Li. Mr. Tam is the chairman of our audit committee. We have determined that each member satisfies the "independence" requirements of the NASDAQ Stock Market Rules and Rule 10A-3 under the Exchange Act, and that each of Mr. Tam and Dr. Qi qualifies as an "audit committee financial expert." The audit committee oversees our accounting and financial reporting processes and the audits of the financial statements of our company. The audit committee is responsible for, among other things:

- appointing the independent auditors and pre-approving all auditing and non-auditing services permitted to be performed by the independent auditors;

- reviewing with the independent auditors any audit problems or difficulties and management's response;

- discussing the annual audited financial statements with management and the independent auditors;

- reviewing the adequacy and effectiveness of our accounting and internal control policies and procedures and any steps taken to monitor and control major financial risk exposures;

- reviewing and approving all proposed related party transactions;

- meeting separately and periodically with management and the independent auditors; and

- monitoring compliance with our code of business conduct and ethics, including reviewing the adequacy and effectiveness of our procedures to ensure proper compliance.

*Compensation Committee*

Our compensation committee consists of Yong Li, Benson Bing Chung Tam and Dr. Dave Daqing Qi. Mr. Li is the chairman of our compensation committee. We have determined that each member satisfies the "independence" requirements of the NASDAQ Stock Market Rules. The compensation committee assists the board in reviewing and approving the compensation structure, including all forms of compensation, relating to our directors and executive officers. Our chief executive officer may not be present at any committee meeting during which his compensation is deliberated. The compensation committee is responsible for, among other things:

- reviewing and approving, or recommending to the board for its approval, the compensation for our chief executive officer and other executive officers;

- reviewing and recommending to the board for determination with respect to the compensation of our non-employee directors;

90

Table of Contents

- reviewing periodically and approving any incentive compensation or equity plans, programs or similar arrangements; and

- selecting compensation consultant, legal counsel or other adviser only after taking into consideration all factors relevant to that person's independence from management.

*Nominating and Corporate Governance Committee*

Our nominating and corporate governance committee consists of Yong Li, Benson Bing Chung Tam and Dr. Dave Daqing Qi. Mr. Li is the chairperson of our nominating and corporate governance committee. We have determined that each member satisfies the "independence" requirements of the NASDAQ Stock Market Rules. The nominating and corporate governance committee assists the board of directors in selecting individuals qualified to become our directors and in determining the composition of the board and its committees. The nominating and corporate governance committee is responsible for, among other things:

- selecting and recommending to the board nominees for election by the shareholders or appointment by the board;

- reviewing annually with the board the current composition of the board with regards to characteristics such as independence, knowledge,

skills, experience and diversity;

- making recommendations on the frequency and structure of board meetings and monitoring the functioning of the committees of the board; and

- advising the board periodically with regards to significant developments in the law and practice of corporate governance as well as our compliance with applicable laws and regulations, and making recommendations to the board on all matters of corporate governance and on any remedial action to be taken.

**Duties of Directors**

Under Cayman Islands law, our directors have a fiduciary duty to act honestly, in good faith and with a view to our best interests. Our directors also owe to our company a duty to act with skill and care. It was previously considered that a director need not exhibit in the performance of his duties a greater degree of skill than may reasonably be expected from a person of his knowledge and experience. However, English and Commonwealth courts have moved towards an objective standard with regard to the required skill and care and these authorities are likely to be followed in the Cayman Islands. In fulfilling their duty of care to us, our directors must ensure compliance with our memorandum and articles of association, as amended and restated from time to time, and the class rights vested thereunder in the holders of the shares. Our company has the right to seek damages if a duty owed by our directors is breached.

Our board of directors has all the powers necessary for managing, and for directing and supervising, our business affairs. The functions and powers of our board of directors include, among others:

- convening shareholders' annual general meetings and reporting its work to shareholders at such meetings;

- declaring dividends and distributions;

- appointing officers and determining the term of office of the officers;

- exercising the borrowing powers of our company and mortgaging the property of our company; and

- approving the transfer of shares in our company, including the registration of such shares in our share register.

**Terms of Directors and Executive Officers**

Our officers are elected by and serve at the discretion of the board of directors. Our directors are not subject to a term of office and hold office until such time as they are removed from office by ordinary resolution of the shareholders or by the unanimous written resolution of all the shareholders. A director will cease to be a director automatically if, among other things, the director (i) becomes bankrupt or makes any arrangement or composition with his creditors; (ii) dies or is found by our company to be or becomes of unsound mind; (iii) resigns his or her office by notice in writing to our company; (iv) without special leave of absence from our board of directors, is absent from meetings of our board of directors for three consecutive meetings and the board resolves that his or her office be vacated; or (v) is removed from office pursuant to any other provision of our memorandum and articles of association.

91

Table of Contents

**D.    Employees**

We had 924, 1,244 and 2,147 employees as of December 31, 2016, 2017 and 2018, respectively. Geographically, as of December 31, 2018, we had 1,925 employees in Beijing, 89 employees in Chengdu, 92 employees in Shanghai, 22 employees in Guangzhou, 16 employees in Tianjin, one employee in Hainan and two employee in the United States. The following table sets forth the numbers of our employees categorized by function as of December 31, 2018.

| | As of December 31, 2018 |
|---|---|
| **Function:** | |
| Research and development | 1,172 |
| Customer service, sales and marketing | 403 |
| Operations and cost | 317 |
| General administration | 255 |
| **Total** | 2,147 |

In addition to our full-time employees, we used 960 contract workers dispatched to us by staffing agencies as of December 31, 2018. These contract workers are primarily responsible for content management and monitoring and for customer service.

As required by laws and regulations in China, we participate in various employee social security plans that are organized by municipal and provincial governments, including housing, pension, medical insurance and unemployment insurance. We are required under Chinese law to make contributions to employee benefit plans at specified percentages of the salaries, bonuses and certain allowances of our employees, up to a maximum amount specified by the local government from time to time.

We typically enter into standard confidentiality and employment agreements with our management and service development personnel. These contracts include a standard non-compete covenant that prohibits the employee from competing with us, directly or indirectly, during his or her employment and for two years after the termination of his or her employment, provided that we pay compensation equal to a certain percentage of the

employee's salary during the restriction period in accordance with applicable laws.

We believe that we maintain a good working relationship with our employees, and we have not experienced any labor disputes. None of our employees are represented by labor unions.

## E.    Share Ownership

For information regarding the share ownership of our directors and officers, see "Item 7. Major Shareholders and Related Party Transactions—A. Major Shareholders." For information as to stock options granted to our directors, executive officers and other employees, see "Item 6. Directors, Senior Management and Employees—B. Compensation—Share Incentive Plans."

## Item 7.    Major Shareholders and Related Party Transactions

## A.    Major Shareholders

The following table sets forth information with respect to the beneficial ownership of our shares as of March 31, 2019 by:

- each of our current directors and executive officers; and

- each person known to us to own beneficially more than 5% of our shares.

Percentage of beneficial ownership is based on a total of 414,698,540 outstanding ordinary shares of our company as of the date of March 31, 2019, comprising (i) 334,334,074 Class A ordinary shares, excluding the 9,579,726 Class A ordinary shares issued to our depositary bank for bulk issuance of ADSs reserved for future issuances upon the exercise or vesting of awards granted under our share incentive plans, and (ii) 80,364,466 Class B ordinary shares.

92

Table of Contents

Beneficial ownership is determined in accordance with the rules and regulations of the SEC. These rules generally provide that a person is the beneficial owner of securities if such person has or shares the power to vote or direct the voting of securities, or to dispose or direct the disposition of securities or has the right to acquire such powers within 60 days. In computing the number of shares beneficially owned by a person and the percentage ownership of that person, we have included shares that the person has the right to acquire within 60 days, including through the exercise of any option, warrant or other right or the conversion of any other security, in both the numerator and the denominator. These shares, however, are not included in the computation of the percentage ownership of any other person.

| | Shares Beneficially Owned | | Ordinary Shares Beneficially Owned | Voting Power |
| --- | --- | --- | --- | --- |
| Directors and executive officers**: | Class A Ordinary Shares | Class B Ordinary Shares | % (1) | % (2) |
| Yan Tang(3) | 7,137,131 | 80,364,466 | 20.8 | 70.9 |
| Yong Li(4) | 10,446,899 | — | 2.5 | 0.9 |
| David Ying Zhang(5) | * | — | * | * |
| Benson Bing Chung Tam(6) | * | — | * | * |
| Dave Daqing Qi(7) | * | — | * | * |
| Xiaoliang Lei(8) | 9,392,355 | — | 2.3 | 0.8 |
| Jonathan Xiaosong Zhang(9) | * | — | * | * |
| Li Wang(10) | * | — | * | * |
| Yongming Wu(11) | * | — | * | * |
| Chunlai Wang(12) | * | — | * | * |
| All directors and executive officers as a group | 32,580,949 | 80,364,466 | 26.7 | 73.0 |
| | | | | |
| **Principal Shareholders:** | | | | |
| Gallant Future Holdings Limited(13) | 2,003,520 | 72,364,466 | 17.9 | 63.8 |
| Renaissance entities(14) | 22,891,406 | — | 5.5 | 2.0 |

Notes:

\*     Less than 1% of our total outstanding Class A and Class B ordinary shares.

\*\*    Except for Messrs. Yong Li, David Ying Zhang, Mr. Benson Bing Chung Tam, Mr. Dave Daqing Qi and Mr. Yongming Wu, the business address for our executive officers and directors is 20th Floor, Block B, Tower 2, Wangjing SOHO, No.1 Futongdong Street, Chaoyang District, Beijing 100102, People's Republic of China.

(1)    Percentage ownership is calculated by dividing the number of Class A and Class B ordinary shares beneficially owned by a given person or group by the sum of (i) 414,698,540 ordinary shares and (ii) and the number of shares such person or group has the right to acquire upon exercise of option, warrant or other right within 60 days after March 31, 2019. Our Class B ordinary shares are convertible at any time by the holder thereof into Class A ordinary shares on a one-for-one basis.

(2)    For each person and group included in this column, percentage of voting power is calculated by dividing the voting power beneficially owned by such person or group by the voting power of all of our Class A and Class B ordinary shares as a single class. Each holder of Class A ordinary

shares is entitled to one vote per share and each holder of our Class B ordinary shares is entitled to ten votes per share on all matters submitted to them for vote.

(3)  Represent (i) 2,003,520 Class A ordinary shares represented by ADSs and 72,364,466 Class B ordinary shares held by Gallant Future Holdings Limited, (ii) 8,000,000 Class B ordinary shares held by New Heritage Global Limited, (iii) 4,296,111 Class A ordinary shares that Mr. Tang is entitled to acquire within 60 days from March 31, 2019 upon exercise of share options held by him under our share incentive plans, and (iv) 837,500 Class A ordinary shares that Mr. Tang's spouse is entitled to acquire within 60 days from March 31, 2019 upon exercise of share options held by her under our share incentive plans. Gallant Future Holdings Limited is incorporated in the British Virgin Islands and is wholly owned by a family trust controlled by Mr. Tang. New Heritage Global Limited is a limited company incorporated in the British Virgin Islands and is wholly beneficially owned by Mr. Tang through a family trust.

(4)  Represents (i) 8,046,899 Class A ordinary shares held by Joyous Harvest Holdings Limited, a company incorporated in the British Virgin Islands and wholly owned by a family trust controlled by Mr. Li, and (ii) 2,400,000 Class A ordinary shares represented by ADSs beneficially owned by Mr. Li. The business address of Mr. Li is 5/F, Block A, Lingxinghang Center, No. 8, Guangshun South Avenue, Chaoyang District, Beijing.

93

Table of Contents

(5)  Represents (i) 2,000,001 Class A ordinary shares and ADSs held by Matrix Partners China II Hong Kong Limited, as reported on the Amendment No. 8 to Schedule 13D filed by Matrix Partners China II Hong Kong Limited, among others, on March 21, 2018, and (ii) the number of Class A ordinary shares represented by ADSs beneficially owned by Mr. Zhang. The percentage of beneficial ownership in this annual report was calculated based on the total number of our Class A and Class B ordinary shares outstanding as of March 31, 2019. Matrix Partners China II Hong Kong Limited is a limited company incorporated in Hong Kong. Matrix Partners China II Hong Kong Limited is controlled and 90%-owned by Matrix Partners China II, L.P., and the remaining 10% shares is held by Matrix Partners China II-A, L.P. The general partner of Matrix Partners China II, L.P. and Matrix Partners China II-A, L.P. is Matrix China II GP GP, Ltd. The directors of Matrix China II GP GP, Ltd. are David Ying Zhang, Timothy A. Barrows, David Su and Yibo Shao. The business address of Mr. Zhang is Suite 2601, Taikang Financial Tower, No. 38 Yard East 3rd Ring Road North, Chaoyang District, Beijing 100026, People's Republic of China.

(6)  Represents Class A ordinary shares held by Mr. Tam and Class A ordinary shares that Mr. Tam is entitled to acquire within 60 days from March 31, 2019 upon the exercise of share options held by Mr. Tam under our share incentive plans. The business address of Mr. Tam is Room 1-4-2503, No. 2 East Xibahe, Chaoyang District, Beijing, China.

(7)  Represents Class A ordinary shares and ADSs held by Mr. Qi and Class A ordinary shares that Mr. Qi is entitled to acquire within 60 days from March 31, 2019 upon the exercise of share options held by Mr. Qi under our share incentive plans. The business address of Dr. Qi is Room 332, Tower E3, Oriental Plaza, 1 East Chang An Avenue, Dong Cheng District, Beijing 100738, China.

(8)  Represents (i) 1,301,719 Class A ordinary shares that Mr. Lei is entitled to acquire within 60 days from March 31, 2019 upon exercise of share options held by him under our share incentive plans, (ii) 3,520 Class A ordinary shares represented by ADSs beneficially owned by Mr. Lei and (iii) 8,087,116 Class A ordinary shares held by First Optimal Holdings Limited, a company incorporated in the British Virgin Islands and wholly owned by a family trust controlled by Mr. Lei.

(9)  Represents Class A ordinary shares that Mr. Zhang is entitled to acquire within 60 days from March 31, 2019 upon exercise of share options held by him under our share incentive plans and Class A ordinary shares represented by ADSs beneficially owned by Mr. Zhang.

(10)  Represents Class A ordinary shares that Mr. Wang is entitled to acquire within 60 days from March 31, 2019 upon exercise of share options held by him under our share incentive plans and Class A ordinary shares represented by ADSs beneficially owned by Mr. Wang.

(11)  The business address of Mr. Wu is 8 Shenton Way, AXA Tower, #45-01, Singapore 068811.

(12)  Represents Class A ordinary shares that Mr. Wang is entitled to acquire within 60 days from March 31, 2019 upon exercise of share options held by him under our share incentive plans and Class A ordinary shares represented by ADSs beneficially owned by Mr. Wang.

(13)  Represents 2,003,520 Class A ordinary shares represented by ADSs and 72,364,466 Class B ordinary shares held by Gallant Future Holdings Limited. Gallant Future Holdings Limited is a company incorporated in the British Virgin Islands and wholly owned by a family trust controlled by Mr. Yan Tang. Mr. Tang has sole power to direct the voting and disposition of shares of our company directly or indirectly held by Gallant Future Holdings Limited. The registered address of Gallant Future Holdings Limited is Sertus Chambers, P.O. Box 905, Quasticky Building, Road Town, Tortola, British Virgin Islands.

(14)  The number of Class A ordinary shares beneficially owned is as of February 12, 2019 as reported in a Schedule 13G filed by Renaissance Technologies LLC, or RTC, and Renaissance Technologies Holdings Corporation, or RTHC, and consists of 11,445,703 Class A ordinary shares represented by American depositary shares held by RTC. RTC is a limited liability company incorporated in Delaware whose majority ownership is owned by RTHC, a corporation incorporated in Delaware. Each of RTC and RTHC is an investment adviser in accordance with §240.13d-1(b)(1)(ii)(E). The business address of both RTC and RTHC is 800 Third Avenue, New York, New York 10022.

To our knowledge, on the same basis of calculation as above, approximately 92.5% of our total outstanding Class A ordinary shares were held by one record shareholder in the United States, namely, Deutsche Bank Trust Company Americas, the depositary of our ADS program, which held 318,783,714 Class A ordinary shares represented by 159,391,857 ADSs, including 9,579,726 Class A ordinary shares underlying 4,789,863 ADSs that it held on reserve for our company for the purposes of future issuances upon the exercise or vesting of awards granted under our share incentive plans.

The number of beneficial owners of our ADSs in the United States is likely to be much larger than the number of record holders of our ordinary shares in the United States.

Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares. Holders of Class A ordinary shares are entitled to one vote per share, while holders of Class B ordinary shares are entitled to ten votes per share. We are not aware of any arrangement that may, at a subsequent date, result in a change of control of our company. None of our major shareholders have different voting rights apart from any Class B ordinary shares that they may hold in our company.

94

**B.    Related Party Transactions**

**Contractual Arrangements with Beijing Momo and Its Shareholders**

PRC laws and regulations currently limit foreign ownership of companies that engage in a value-added telecommunications service business in China. As a result, we operate our relevant business through contractual arrangements between Beijing Momo IT, our PRC subsidiary, Beijing Momo and the shareholders of Beijing Momo. For a description of these contractual arrangements, see "Item 4. Information on the Company—C. Organizational Structure—Contractual Arrangements with Beijing Momo."

**Transactions with our Founders**

On April 22, 2014, Joyous Harvest Holdings Limited, First Optimal Holdings Limited and Fast Prosperous Holdings Limited, which are companies wholly-owned by family trusts controlled by Yong Li, Xiaoliang Lei and Zhiwei Li, three of our founders, respectively, surrendered a total of 15,651,589 ordinary shares to our company at no consideration. On the same date, we declared a special dividend of RMB402.3 million in aggregate to these shareholders, of which RMB361.8 million was paid in May 2014. RMB44.3 million (US$6.5 million) remained unpaid to these shareholders of which RMB39.7 million (US$5.8 million) was due to related parties as of the date of this annual report. The special dividend was approved by the shareholders.

Pursuant to the third amended and restated shareholders' agreement dated May 15, 2014 executed in connection with the private placement of our Series D preferred shares, each of our founders including Messrs. Yan Tang, Yong Li, Xiaoliang Lei and Zhiwei Li agreed to subject the ordinary shares respectively held by their 100% beneficially owned BVI companies, Gallant Future Holdings Limited, Joyous Harvest Holdings Limited, First Optimal Holdings Limited and Fast Prosperous Holdings Limited, to our repurchase rights upon termination of employment of the founders with us. The shares subject to our repurchase rights include 96,886,370 ordinary shares then held by Gallant Future Holdings Limited, 16,846,899 ordinary shares then held by Joyous Harvest Holdings Limited, 9,587,116 ordinary shares then held by First Optimal Holdings Limited and 8,028,026 ordinary shares then held by Fast Prosperous Holdings Limited. If a founder terminates his employment or consulting relationship with us before April 17, 2015, we are entitled to repurchase 50% of the shares beneficially owned by such founder through the BVI holding company at a price of US$0.0001 per share or the lowest price permitted under applicable laws. If the termination takes place after April 17, 2015 but before April 17, 2016, we are entitled to repurchase 25% of such shares on the same terms. Our repurchase rights over the ordinary shares held by Joyous Harvest Holdings Limited has terminated upon the completion of our initial public offering in December 2014 and our repurchase rights over the ordinary shares held by Gallant Future Holdings Limited, First Optimal Holdings Limited and Fast Prosperous Holdings Limited have expired on April 17, 2016.

**Transactions with Affiliates of a Major Shareholder**

In 2016, we (i) provided mobile marketing services to Hangzhou Alimama Technology Co., Ltd., Zhejiang Tmall Technology Co., Ltd. and Taobao (China) Software Co., Ltd.; (ii) received mobile game revenue generated through Guangzhou Aijiuyou Informational Technology Co., Ltd. and Guangzhou UC Network Technology Co., Ltd.; (iii) purchased cloud computing services from Alibaba Cloud Computing Ltd. and (iv) purchased marketing services from Taobao (China) Software Co., Ltd. For the year ended December 31, 2016, the total amount of service fees from Hangzhou Alimama Technology Co., Ltd., Zhejiang Tmall Technology Co., Ltd and Taobao (China) Software Co., Ltd were RMB0.3 million, RMB5.5 million, and RMB1.7 million, respectively. The total amount of mobile game revenue generated through Guangzhou Aijiuyou Informational Technology Co., Ltd. and Guangzhou UC Network Technology Co., Ltd. were RMB2.7 million and RMB61,000, respectively, and the total amount of service fees to Alibaba Cloud Computing Ltd. and Taobao (China) Software Co., Ltd. were RMB22.5 million and RMB2.2 million, respectively. Hangzhou Alimama Technology Co., Ltd., Alibaba Cloud Computing Ltd., Zhejiang Tmall Technology Co., Ltd., Guangzhou Aijiuyou Informational Technology Co., Ltd., Guangzhou UC Network Technology Co., Ltd. and Taobao (China) Software Co., Ltd. are affiliates of Alibaba Investment Limited, one of our major shareholders.

95

In 2017, we (i) provided mobile marketing services to Hangzhou Alimama Technology Co., Ltd., Zhejiang Tmall Technology Co., Ltd. and Hangzhou Yihong Advertisement Co., Ltd.; (ii) received mobile game revenue generated through Guangzhou Aijiuyou Informational Technology Co., Ltd.; (iii) purchased cloud computing services from Alibaba Cloud Computing Ltd.; (iv) purchased marketing services from Taobao (China) Software Co., Ltd. and (v) shared mobile game revenue with Guangzhou Jianyue Information Technology Co., Ltd. For the year ended December 31, 2017, the total amount of service fees from Hangzhou Alimama Technology Co., Ltd., Zhejiang Tmall Technology Co., Ltd and Hangzhou Yihong Advertisement Co., Ltd. were RMB2.3 million, RMB0.5 million and RMB17.7 million, respectively. The total amount of mobile game revenue generated through Guangzhou Aijiuyou Informational Technology Co., Ltd. were RMB1.2 million. The total amount of service fees to Alibaba Cloud Computing Ltd. and Taobao (China) Software Co., Ltd. were RMB74.7 million and RMB2.3 million, respectively, and the total revenue sharing with Guangzhou Jianyue Information Technology Co., Ltd. was RMB0.8 million. Hangzhou Alimama Technology Co., Ltd., Zhejiang Tmall Technology Co., Ltd., Hangzhou Yihong Advertisement Co., Ltd., Guangzhou Aijiuyou Informational Technology Co., Ltd., Alibaba Cloud Computing Ltd., Taobao (China) Software Co., Ltd. and Guangzhou Jianyue Information Technology Co., Ltd. are affiliates of Alibaba Investment Limited, one of our major shareholders until November 2017.

**Transactions with Certain Other Related Parties**

In 2016, we provided mobile marketing services to Shanghai Xisue Network Technology Co., Ltd. For the year ended December 31, 2016, the total amount of service fees from Shanghai Xisue Network Technology Co., Ltd. was RMB6.0 million. Shanghai Xisue Network Technology Co., Ltd. is an affiliate of Xish International Limited, a company in which we own 17.3% equity interest and have appointed a member to its board of directors.

We paid revenue sharing of live video and other services in the aggregate amount of RMB26.8 million, RMB201.1 million and RMB429.3 million (US$62.4 million) to Hunan Qindao Cultural Spread Ltd., a company in which we own 26.4% equity interest, and its subsidiaries, for the year ended December 31, 2016, 2017 and 2018 , respectively.

In 2014, we entered into a game agreement with Shanghai Touch future Network Technology Co., Ltd. in which we own a 20.0% equity interest. For the year ended December 31, 2016, the total amount of remittances to Shanghai Touch future Network Technology Co., Ltd. was RMB2.3 million.

In 2018, we paid revenue sharing of live video service in the aggregate amount of RMB2.0 million (US$0.3 million) to Beijing Shiyue Haofeng Media Co. Ltd., a company in which we own 30% of its equity interests.

## Registration Rights

Pursuant to the third amended and restated shareholders agreement that we entered into on May 15, 2014 with all our then shareholders in connection with our issuance of Series D preferred shares prior to our initial public offering, we have granted certain registration rights to holders of our registrable securities, which include our ordinary shares issued or issuable upon conversion of our preferred shares, ordinary shares issued as a dividend for our preferred shares, or any other ordinary shares thereafter owned or acquired by purchasers of our preferred shares in our pre-IPO private placements, subject to certain exceptions. Set forth below is a description of the registration rights granted under the agreement.

*Demand Registration Rights.* Holders of at least 10% of registrable securities have the right to demand in writing, at any time after the effectiveness of a registration statement for our initial public offering, that we file a registration statement to register their registrable securities and other holders of registrable securities who choose to participate in the offering. We, however, are not obligated to effect a demand registration if we have already effected (i) two demand registrations or (ii) one registration pursuant to the same demand registration rights or the F-3 registration rights within the six-month period preceding the date of such request. We have the right to defer the filing of a registration statement up to 90 days if our board of directors determines in good faith that the registration at such time would be materially detrimental to us and our shareholders, provided that we may not utilize this right more than twice in any 12-month period.

*Form F-3 Registration Rights.* When we are eligible for registration on Form F-3, upon a written request from the holders of at least 10% of the registrable securities then outstanding, we must file a registration statement on Form F-3 covering the offer and sale of the registrable securities by the requesting shareholders and other holders of registrable securities who choose to participate in the offering. There is no limit on the number of the registration made pursuant to this registration right. We, however, are not obligated to effect such registration if, among other things, (i) the aggregate anticipated price of such offering is less than US$1,000,000, or (ii) we have, within six months period preceding the date of such request, already effected a registration pursuant to an exercise of demand registration rights or piggyback registration rights. We may defer filing of a registration statement on Form F-3 no more than once during any twelve month period for up to 60 days if our board of directors determines in good faith that filing such registration statement will be materially detrimental to us and our shareholders.

<center>96</center>

Table of Contents

*Piggyback Registration Rights.* If we propose to file a registration statement for a public offering of our securities other than relating to a demand registration right, F-3 registration right, an employee benefit plan or a corporate reorganization, then we must offer holders of registrable securities an opportunity to include in this registration all or any part of their registrable securities. The underwriters of any underwritten offering may in good faith allocate the shares to be included in the registration statement first to us, and second to each requesting holder of registrable securities on a pro rata basis, subject to certain limitations.

*Expenses of Registration.* We will pay all registration expenses and all participating holders of registrable securities will pay the underwriting discounts and selling commissions relating to any demand, Form F-3, or piggyback registration. However, we are not obligated to pay any expenses relating to a demand registration if the registration request is subsequently withdrawn at the request of holders of a majority of the registrable securities to be registered, subject to certain exceptions.

*Termination of Obligations.* The registration rights set forth above shall terminate on the earlier of (i) the date that is five years after the completion of our initial public offering, (ii) the date of the completion of a liquidation event, or (iii) as to any holder of registrable securities, the time when all registrable securities held by such holder may be sold in any three-month period without restriction pursuant to Rule 144 under the Securities Act.

## Employment Agreements and Indemnification Agreements

See "Item 6. Directors, Senior Management and Employees—B. Compensation—Employment Agreements and Indemnification Agreements."

## Share Incentive Plans

"Item 6. Directors, Senior Management and Employees—B. Compensation—Share Incentive Plans."

## C.    Interests of Experts and Counsel

Not applicable.

## Item 8.    Financial Information

## A.    Consolidated Statements and Other Financial Information

We have appended consolidated financial statements filed as part of this annual report.

<center>97</center>

Table of Contents

**Legal Proceedings**

Other than five civil complaints raised against us in China, we are currently not a party to any material legal or administrative proceedings. On October 22, 2015, we were served a civil complaint by Guangzhou Tian He People's Court in which the plaintiff claimed that *Xiaoyao Xiyou*, a game that we previously operated and have ceased operating since November 2017, infringed upon the plaintiff's copyright in works of literature and art of a game, constituting unfair competition. The plaintiff demanded that we cease the infringement and pay compensation and legal costs totaling approximately RMB10 million (US$1.5 million). On August 31, 2017, Guangzhou Tian He People's Court ruled a civil judgement of first-instance, which ordered us and the developer of *Xiaoyao Xiyou* to cease the infringement and pay compensation in the amount of RMB5.0 million (US$0.8 million) to the plaintiff. The developer of *Xiaoyao Xiyou* filed an appeal to Guangzhou Intellectual Property Court. On September 27, 2018, Guangzhou Intellectual Property Court ruled a civil judgement of final-instance, which ordered us and the developer of *Xiaoyao Xiyou* to cease the infringement and pay compensation in the amount of RMB4.0 million (US$0.6 million) to the plaintiff. We paid the compensation in full to the plaintiff on October 10, 2018. The plaintiff filed a re-trial application to the Guangdong Provincial Higher People's Court for revoking the civil judgement of final-instance ruled by the Guangzhou Tian He People's Court. The re-trial hearing has yet to be carried out as of the date of this annual report. On February 20, 2019, we were served four civil complaints by Shenzhen Intermediate People's Court in which the plaintiff claimed that our app infringed upon the plaintiff's four patents. The plaintiff demanded that we cease the infringement and compensate its loss and legal costs totaling approximately RMB 4 million (US$0.6 million) in relation to the four patents under the four complaints. The hearings have yet to be carried out as of the date of this annual report. We may from time to time be subject to various legal or administrative claims and proceedings arising in the ordinary course of business. Litigation or any other legal or administrative proceeding, regardless of the outcome, is likely to result in substantial cost and diversion of our resources, including our management's time and attention. See also "Item 3. Key Information on the Company—D. Risk Factors—Risks Related to Our Business and Industry—We have been and may be subject to intellectual property infringement claims or other allegations by third parties for information or content displayed on, retrieved from or linked to our platform, or distributed to our users, which may materially and adversely affect our business, financial condition and prospects." and "Item 3. Key Information on the Company—D. Risk Factors—Risks Related to Doing Business in China—If we fail to obtain and maintain the requisite licenses and approvals required under the complex regulatory environment applicable to our businesses in China, or if we are required to take compliance actions that are time-consuming or costly, our business, financial condition and results of operations may be materially and adversely affected."

**Dividend Policy**

Our board of directors has discretion on whether to distribute dividends, subject to our memorandum and articles of association and certain restrictions under Cayman Islands law, namely that our company may only pay dividends out of profits or share premium, and provided always that it is able to pay its debts as they fall due in the ordinary course of business. In addition, our shareholders may by ordinary resolution declare a dividend, but no dividend may exceed the amount recommended by our directors. Even if our board of directors decides to pay dividends, the form, frequency and amount will depend upon our future operations and earnings, capital requirements and surplus, general financial condition, contractual restrictions and other factors that the board of directors may deem relevant.

With shareholders' approval, we declared a special dividend to certain holders of our ordinary shares in the amount of RMB402.3 million (US$64.5 million) in April 2014, of which RMB361.8 million (US$58.0 million) was paid. The special dividend was paid out of our share premium. Our board of directors declared a special cash dividend in the amount of US$0.62 per ADS, or US$0.31 per ordinary share, in March 2019. The cash dividend will be paid on April 30, 2019 to shareholders of record at the close of business on April 5, 2019. The ex-dividend date was April 4, 2019. The aggregate amount of cash dividends to be paid is approximately US$128 million, which will be funded by surplus cash on our balance sheet. Our board of directors decides the timing, amount and form of any future dividends, if any, based on, among other things, our future results of operations and cash flow, our capital requirements and surplus, the amount of distributions, if any, received by us from our subsidiaries, our financial condition, contractual restrictions and other factors deemed relevant by our board of directors. We had declared special cash dividends in the past and may do so in the future. However, we do not have any committed plan to pay cash dividends in the foreseeable future. We intend to retain most of our available funds and any future earnings for use in the operation and expansion of our business. As of December 31, 2018, we did not declare any dividends.

We are a holding company registered by way of continuation into the Cayman Islands. We may rely on dividends from our subsidiary in China for our cash requirements, including any payment of dividends to our shareholders. PRC regulations may restrict the ability of our PRC subsidiary to pay dividends to us. See "Item 4. Information on the Company—B. Business Overview—Regulation—Regulations Relating to Dividend Distribution" and "—Regulation—Regulations Relating to Taxation."

Table of Contents

If we pay any dividends, we will pay our ADS holders to the same extent as holders of our ordinary shares, subject to the terms of the deposit agreement, including the fees and expenses payable thereunder. See "Item 12. Description of Securities Other than Equity Securities—D. American Depositary Shares." Cash dividends on our Class A ordinary shares, if any, will be paid in U.S. dollars.

**B.    Significant Changes**

Except as disclosed elsewhere in this annual report, we have not experienced any significant changes since the date of our audited consolidated financial statements included in this annual report.

**Item 9.        The Offer and Listing**

**A.    Offering and Listing Details**

Our ADSs have been listed on The NASDAQ Global Select Market since December 11, 2014. Our ADSs currently trade on The NASDAQ Global Select Market under the symbol "MOMO." One ADS represented two Class A ordinary shares.

**B.    Plan of Distribution**

Not applicable.

**C.    Markets**

Our ADSs have been listed on NASDAQ Global Select Market since December 11, 2014 under the symbol "MOMO."

**D.    Selling Shareholders**

Not applicable.

**E.    Dilution**

Not applicable.

**F.    Expenses of the Issue**

Not applicable.

**Item 10.    Additional Information**

**A.    Share Capital**

Not applicable.

**B.    Memorandum and Articles of Association**

We incorporate by reference into this annual report the description of our second amended and restated memorandum and articles of association contained in our F-1 registration statement (File No. 333-199996), as amended, initially filed with the SEC on November 7, 2014. The second amended and restated memorandum and articles of association was adopted by our shareholders by unanimous resolutions on November 28, 2014, and became effective upon completion of our initial public offering of our Class A ordinary shares represented by ADSs.

**C.    Material Contracts**

We have not entered into any material contracts other than in the ordinary course of business and other than those described in "Item 4. Information on the Company" or elsewhere in this annual report on Form 20-F.

99

Table of Contents

**D.    Exchange Controls**

See "Item 4. Information on the Company—B. Business Overview—Regulation—Regulations Relating to Foreign Exchange."

**E.    Taxation**

**Cayman Islands Taxation**

The Cayman Islands currently levies no taxes on individuals or corporations based upon profits, income, gains or appreciation and there is no taxation in the nature of inheritance tax or estate duty. There are no other taxes likely to be material to us levied by the government of the Cayman Islands except for stamp duties which may be applicable on instruments executed in, or after execution brought within the jurisdiction of the Cayman Islands. The Cayman Islands is not party to any double tax treaties that are applicable to any payments made to or by our company. There are no exchange control regulations or currency restrictions in the Cayman Islands.

**People's Republic of China Taxation**

Under the PRC Enterprise Income Tax Law, or the EIT Law, which became effective on January 1, 2008, as amended on September 1, 2011, February 24, 2017 and further amended on December 29, 2018, an enterprise established outside the PRC with "de facto management bodies" within the PRC is considered a "resident enterprise" for PRC enterprise income tax purposes and is generally subject to a uniform 25% enterprise income tax rate on its worldwide income.

On April 22, 2009, the State Administration of Taxation, or the SAT, issued the Notice Regarding the Determination of Chinese-Controlled Overseas Incorporated Enterprises as PRC Tax Resident Enterprise on the Basis of De Facto Management Bodies, or SAT Circular 82, which provides certain specific criteria for determining whether the "de facto management body" of a PRC controlled enterprise that is incorporated offshore is located in China. Further to SAT Circular 82, on July 27, 2011, the SAT issued the Administrative Measures for Enterprise Income Tax of Chinese-Controlled Offshore Incorporated Resident Enterprises (Trial), or SAT Bulletin 45, to provide more guidance on the implementation of SAT Circular 82; the bulletin became effective on September 1, 2011 and was further amended on October 1, 2016. SAT Bulletin 45 clarified certain issues in the areas of resident status determination, post-determination administration and competent tax authorities procedures. According to SAT Circular 82, an offshore incorporated enterprise controlled by a PRC enterprise or a PRC enterprise group will be considered as a PRC tax resident enterprise by virtue of having its "de facto management body" in China only if all of the following conditions are met: (a) the senior management and core management departments in charge of its daily operations function have their presence mainly in the PRC; (b) its financial and human resources decisions are subject to determination or approval by persons or bodies in the PRC; (c) its major assets, accounting books, company seals, and minutes and files of its board and shareholders' meetings are located or kept in the PRC; and (d) more than half of the enterprise's directors or senior management with voting rights habitually reside in the PRC. Although SAT Circular 82 and SAT Bulletin 45 only apply to offshore incorporated enterprises controlled by PRC enterprises or PRC enterprise groups and not those controlled by PRC individuals or foreigners, the determination criteria set forth therein may reflect the SAT's general position on how the term "de facto management body" could be applied in determining the tax resident status of offshore enterprises, regardless of whether they are controlled by PRC enterprises, individuals or foreigners.

We do not believe Momo Inc. meets all of the criteria described above. We believe that none of Momo Inc. and its subsidiaries outside of China is a PRC tax resident enterprise, because none of them is controlled by a PRC enterprise or PRC enterprise group, and because their records (including the resolutions of its board of directors and the resolutions of shareholders) are maintained outside the PRC. However, as the tax resident status of an enterprise is subject to determination by the PRC tax authorities and uncertainties remain with respect to the interpretation of the term "de facto management body" when applied to our offshore entities, we may be considered as a resident enterprise and may therefore be subject to PRC enterprise income tax at 25% on our global income. In addition, if the PRC tax authorities determine that our company is a PRC resident enterprise for PRC enterprise income tax purposes, dividends paid by us to non-PRC holders may be subject to PRC withholding tax, and gains realized on the sale or other disposition of ADSs or ordinary shares may be subject to PRC tax, at a rate of 10% in the case of non-PRC enterprises or 20% in the case of non-PRC individuals (in each case, subject to the provisions of any applicable tax treaty), if such dividends or gains are deemed to be from PRC sources. Any such tax may reduce the returns on your investment in the ADSs.

<center>100</center>

Table of Contents

If we are considered a "non-resident enterprise" by the PRC tax authorities, the dividends paid to us by our PRC subsidiaries will be subject to a 10% withholding tax. The EIT Law also imposes a withholding income tax of 10% on dividends distributed by an foreign invested enterprise to its immediate holding company outside of China, if such immediate holding company is considered as a non-resident enterprise without any establishment or place within China or if the received dividends have no connection with the establishment or place of such immediate holding company within China, unless such immediate holding company's jurisdiction of incorporation has a tax treaty with China that provides for a different withholding arrangement. The Cayman Islands, where our Company is incorporated does not have such tax treaty with China. Our US subsidiary is not an immediate holding company of any of our PRC subsidiaries. Under the Arrangement Between the PRC and the Hong Kong Special Administrative Region on the Avoidance of Double Taxation and Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital, the dividend withholding tax rate may be reduced to 5%, if a Hong Kong resident enterprise that receives a dividend is considered a non-PRC tax resident enterprise and holds at least 25% of the equity interests in the PRC enterprise distributing the dividends, subject to approval of the PRC local tax authority. However, if the Hong Kong resident enterprise is not considered to be the beneficial owner of such dividends under applicable PRC tax regulations, such dividends may remain subject to withholding tax at a rate of 10%. Accordingly, Momo Technology HK Company Limited may be able to enjoy the 5% withholding tax rate for the dividends it receives from its PRC subsidiaries if it satisfies the relevant conditions under tax rules and regulations, and obtains the approvals as required.

According to the Notice on Strengthening Administration of Enterprise Income Tax for Share Transfers by Non-PRC Resident Enterprises issued by the PRC State Administration of Taxation on December 10, 2009, with retroactive effect from January 1, 2008, or SAT Circular 698, where a non-resident enterprise transfers the equity interests in a PRC resident enterprise indirectly through a disposition of equity interests in an overseas holding company (other than a purchase and sale of shares issued by a PRC resident enterprise in public securities market), or an Indirect Transfer, and such overseas holding company is located in a tax jurisdiction that: (a) has an effective tax rate less than 12.5% or (b) does not tax foreign income of its residents, the non-resident enterprise, as the seller, shall report such Indirect Transfer to the competent tax authority of the PRC resident enterprise within 30 days of execution of the equity transfer agreement for such Indirect Transfer. The PRC tax authority will examine the true nature of the Indirect Transfer, and if the tax authority considers that the foreign investor has adopted an abusive arrangement without reasonable commercial purposes and for the purpose of avoiding or reducing PRC tax, they will disregard the existence of the overseas holding company that is used for tax planning purposes and re-characterize the Indirect Transfer. As a result, gains derived from such Indirect Transfer may be subject to PRC withholding tax at the rate of up to 10%. SAT Circular 698 also points out that when a non-resident enterprise transfers its equity interests in a PRC resident enterprise to its related parties at a price lower than the fair market value, the competent tax authorities have the power to make a reasonable adjustment on the taxable income of the transaction.

On February 3, 2015, the SAT issued a Public Notice on Several Issues Relating to Enterprise Income Tax on Transfer of Assets between Non-resident Enterprises, or Public Notice 7, to supersede existing provisions in relation to the Indirect Transfer as set forth in Circular 698, while the other provisions of Circular 698 remain in force. Public Notice 7 introduces a new tax regime that is significantly different from that under Circular 698. Public Notice extends its tax jurisdiction to capture not only Indirect Transfer as set forth under Circular 698 but also transactions involving transfer of immovable property in China and assets held under the establishment and place in China of a foreign company through the offshore transfer of a foreign intermediate holding company. Public Notice 7 also addresses transfer of the equity interest in a foreign intermediate holding company widely. In addition, Public Notice 7 provides clearer criteria than Circular 698 on how to assess reasonable commercial purposes and introduces safe harbor scenarios applicable to internal group restructurings. However, it also brings challenges to both the foreign transferor and transferee of the Indirect Transfer as they have to make self-assessment on whether the transaction should be subject to PRC tax and to file or withhold the PRC tax accordingly. In October 2017, the SAT issued the Announcement of the State Administration of Taxation on Issues Concerning the Withholding of Non-resident

Enterprise Income Tax at Source, or Bulletin 37, which came into effect on December 1, 2017. The Bulletin 37 replaced and superseded, among other circulars, Circular 698, and further clarifies the practice and procedure of the withholding of non-resident enterprise income tax. Where a non-resident enterprise transfers taxable assets indirectly by disposing of the equity interests of an overseas holding company, which is an Indirect Transfer, the non-resident enterprise as either the transferor or the transferee, or the PRC entity that directly owns the taxable assets, may report such Indirect Transfer to the relevant tax authority.

Where non-resident investors were involved in our private equity financing, if such transactions were determined by the tax authorities to lack reasonable commercial purpose, we and our non-resident investors may become at risk of being taxed under Bulletin 37 and Public Notice 7 and may be required to expend valuable resources to comply with Bulletin 37 and Public Notice 7 or to establish that we should not be taxed under Bulletin 37 and Public Notice 7, which may have a material adverse effect on our financial condition and results of operations or the non-resident investors' investments in us.

101

Table of Contents

The PRC tax authorities have the discretion under SAT Circular 59, Bulletin 37 and Public Notice 7 to make adjustments to the taxable capital gains based on the difference between the fair value of the equity interests transferred and the cost of investment. We may pursue acquisitions in the future that may involve complex corporate structures. If we are considered a non-resident enterprise under the PRC Enterprise Income Tax Law and if the PRC tax authorities make adjustments to the taxable income of the transactions under SAT Circular 59, Bulletin 37 and Public Notice 7, our income tax costs associated with such potential acquisitions will be increased, which may have an adverse effect on our financial condition and results of operations.

## United States Federal Income Tax Considerations

The following discussion is a summary of United States federal income tax considerations relating to the ownership and disposition of our ADSs or ordinary shares by a U.S. Holder (as defined below) that holds our ADSs or ordinary shares as "capital assets" (generally, property held for investment) under the United States Internal Revenue Code of 1986, as amended, or the Code. This discussion is based upon existing United States federal tax law, which is subject to differing interpretations or change, possibly with retroactive effect. No ruling has been sought from the Internal Revenue Service, or the IRS, with respect to any United States federal income tax consequences described below, and there can be no assurance that the IRS or a court will not take a contrary position. This discussion does not discuss all aspects of United States federal income taxation that may be important to particular investors in light of their individual investment circumstances, including investors subject to special tax rules that may differ significantly from those discussed below (including for example, financial institutions, insurance companies, regulated investment companies, real estate investment trusts, broker-dealers, traders in securities that elect mark-to-market treatment, tax-exempt organizations (including private foundations), holders who are not U.S. Holders, holders who own (directly, indirectly or constructively) 10% or more of our stock (by vote or value), holders who acquire their ADSs or ordinary shares pursuant to any employee share option or otherwise as compensation, investors that will hold their ADSs or ordinary shares as part of a straddle, hedge, conversion, constructive sale or other integrated transaction for United States federal income tax purposes, investors required to accelerate the recognition of any item of gross income with respect to our ADSs or ordinary shares as a result of such income being recognized on an applicable financial statement; or investors that have a functional currency other than the United States dollar). This discussion, moreover, does not address the United States federal estate, gift, Medicare or alternative minimum tax, or any non-United States, state, or local tax considerations of the ownership and disposition of our ADSs or ordinary shares. Each U.S. Holder is urged to consult its tax advisor regarding the United States federal, state, local, non-United States income, and other tax considerations of an investment in our ADSs or ordinary shares.

## General

For purposes of this discussion, a "U.S. Holder" is a beneficial owner of our ADSs or ordinary shares that is, for United States federal income tax purposes, (i) an individual who is a citizen or resident of the United States, (ii) a corporation (or other entity treated as a corporation for United States federal income tax purposes) created in, or organized under the law of, the United States or any state thereof or the District of Columbia, (iii) an estate the income of which is includible in gross income for United States federal income tax purposes regardless of its source, or (iv) a trust (A) the administration of which is subject to the primary supervision of a United States court and which has one or more United States persons who have the authority to control all substantial decisions of the trust or (B) that has otherwise validly elected to be treated as a United States person under the Code.

If a partnership (or other entity treated as a partnership for United States federal income tax purposes) is a beneficial owner of our ADSs or ordinary shares, the tax treatment of a partner in the partnership will generally depend upon the status of the partner and the activities of the partnership. Partnerships holding our ADSs or ordinary shares and their partners are urged to consult their tax advisors regarding an investment in our ADSs or ordinary shares.

For United States federal income tax purposes, it is generally expected that a U.S. Holder of ADSs will be treated as the beneficial owner of the underlying shares represented by the ADSs. The remainder of this discussion assumes that a U.S. Holder of our ADSs will be treated in this manner. Accordingly, deposits or withdrawals of ordinary shares for ADSs will generally not be subject to United States federal income tax.

102

Table of Contents

### Passive Foreign Investment Company Considerations

A non-United States corporation, such as our company, will be classified as a "passive foreign investment company," or PFIC, for United States federal income tax purposes for any taxable year, if either (i) 75% or more of its gross income for such year consists of certain types of "passive" income

or (ii) 50% or more of the value of its assets (determined on the basis of a quarterly average) during such year is attributable to assets that produce or are held for the production of passive income (the "asset test"). For this purpose, cash and assets readily convertible into cash are categorized as passive assets, and the company's goodwill and other unbooked intangibles associated with our active business are taken into account as nonpassive assets. Passive income generally includes, among other things, dividends, interest, rents, royalties, and gains from the disposition of passive assets. We will be treated as owning a proportionate share of the assets and earning a proportionate share of the income of any other corporation in which we own, directly or indirectly, 25% or more (by value) of the stock.

Although the law in this regard is not entirely clear, we treat Beijing Momo as being owned by us for United States federal income tax purposes, because we control its management decisions and we are entitled to substantially all of the economic benefits associated with this entity, and, as a result, we consolidate the results of its operations in our consolidated U.S. GAAP financial statements. If it were determined, however, that we do not own the stock of Beijing Momo for United States federal income tax purposes, we would likely be treated as a PFIC for the taxable year ended December 31, 2018 and would anticipate being a PFIC for future taxable years. Assuming that we are the owner of Beijing Momo for United States federal income tax purposes and based upon our income and assets and the value of our ADSs, we do not believe that we were a PFIC for the taxable year ended December 31, 2018 and do not anticipate becoming a PFIC in the foreseeable future.

While we do not anticipate being a PFIC in the current taxable year or the foreseeable future, there can be no assurance in this regard because the determination of whether we will be or become a PFIC is a factual determination made annually that will depend, in part, upon the composition of our income and assets. Fluctuations in the market price of our ADSs may cause us to become a PFIC for the current or subsequent taxable years because the value of our assets for purposes of the asset test, including the value of our goodwill and unbooked intangibles, may be determined by reference to the market price of our ADSs from time to time (which may be volatile). In estimating the value of our goodwill and other unbooked intangibles, we have taken into account our current market capitalization. If our market capitalization subsequently declines, we may be or become classified as a PFIC for the current taxable year or future taxable years. In addition, the composition of our income and our assets will be affected by how, and how quickly, we spend our liquid assets. Under circumstances where our revenue from activities that produce passive income significantly increase relative to our revenue from activities that produce non-passive income, or where we determine not to deploy significant amounts of cash for active purposes, our risk of becoming classified as a PFIC may substantially increase.

Furthermore, because there are uncertainties in the application of the relevant rules, it is possible that the IRS may challenge our classification of certain income or assets as non-passive, or our valuation of our goodwill and other unbooked intangibles, each of which may result in our company becoming classified as a PFIC for the current or subsequent taxable years. For example, the IRS may challenge the classification of certain of our non-passive revenues as passive royalty income, which would result in a portion of our goodwill as being treated as a passive asset. If we are classified as a PFIC for any year during which a U.S. Holder holds our ADSs or ordinary shares, we generally will continue to be treated as a PFIC for all succeeding years during which such U.S. Holder holds our ADSs or ordinary shares.

The discussion below under "Dividends" and "Sale or Other Disposition of ADSs or Ordinary Shares" is written on the basis that we will not be classified as a PFIC for United States federal income tax purposes. The United States federal income tax rules that apply if we are treated as a PFIC are generally discussed below under "Passive Foreign Investment Company Rules."

<div align="center">103</div>

Table of Contents

### Dividends

Subject to the discussion below under "Passive Foreign Investment Company Rules," any cash distributions (including the amount of any PRC tax withheld) paid on our ADSs or ordinary shares out of our current or accumulated earnings and profits, as determined under United States federal income tax principles, will generally be includible in the gross income of a U.S. Holder as dividend income on the day actually or constructively received by the U.S. Holder, in the case of ordinary shares, or by the depositary, in the case of ADSs. Because we do not intend to determine our earnings and profits on the basis of United States federal income tax principles, any distribution we pay will generally be treated as a "dividend" for United States federal income tax purposes. A non-corporate U.S. Holder will be subject to tax on dividend income from a "qualified foreign corporation" at a lower applicable capital gains rate rather than the marginal tax rates generally applicable to ordinary income provided that certain holding period requirements are met. A non-United States corporation (other than a corporation that is classified as a PFIC for the taxable year in which the dividend is paid or the preceding taxable year) will generally be considered to be a qualified foreign corporation (i) if it is eligible for the benefits of a comprehensive tax treaty with the United States which the Secretary of Treasury of the United States determines is satisfactory for purposes of this provision and which includes an exchange of information program, or (ii) with respect to any dividend it pays on stock (or ADSs in respect of such stock) which is readily tradable on an established securities market in the United States. Our ADSs are listed on the NASDAQ Global Select Market, which is an established securities market in the United States, and the ADSs are readily tradable. Thus, the dividends we pay on our ADSs are expected to satisfy the conditions required for the reduced tax rates, but there can be no assurance that our ADSs will continue to be considered readily tradable on an established securities market in later years. Since we do not expect that our ordinary shares will be listed on an established securities market, it is unclear whether dividends that we pay on our ordinary shares that are not represented by ADSs will meet the conditions required for the reduced tax rate. However, in the event we are deemed to be a PRC resident enterprise under the PRC Enterprise Income Tax Law (see "People's Republic of China Taxation" above), we may be eligible for the benefits of the United States-PRC income tax treaty. If we are eligible for such benefits (which the Secretary of the Treasury of the United States has determined is satisfactory for this purpose), dividends we pay on our ADSs or ordinary shares, regardless of whether such shares are represented by the ADSs, would be eligible for the reduced rates of taxation. U.S. Holders are urged to consult their tax advisors regarding the availability of the reduced tax rate on dividends with respect to our ADSs or ordinary shares in their particular circumstances. Dividends received on our ADSs or ordinary shares will not be eligible for the dividends-received deduction allowed to corporations.

Dividends will generally be treated as income from foreign sources for United States foreign tax credit purposes and will generally constitute passive category income. In the event that we are deemed to be a PRC resident enterprise under the PRC Enterprise Income Tax Law, a U.S. Holder may be subject to PRC withholding taxes on dividends paid on our ADSs or ordinary shares. Depending on the U.S. Holder's individual facts and circumstances, a U.S. Holder may be eligible, subject to a number of complex limitations, to claim a foreign tax credit not in excess of any applicable treaty

rate in respect of any foreign withholding taxes imposed on dividends received on our ADSs or ordinary shares. A U.S. Holder who does not elect to claim a foreign tax credit for foreign tax withheld may instead claim a deduction, for United States federal income tax purposes, in respect of such withholding, but only for a year in which such holder elects to do so for all creditable foreign income taxes. The rules governing the foreign tax credit are complex and their outcome depends in large part on the U.S. Holder's individual facts and circumstances. Accordingly, U.S. Holders are urged to consult their tax advisors regarding the availability of the foreign tax credit under their particular circumstances.

### *Sale or Other Disposition of ADSs or Ordinary Shares*

Subject to the discussion below under "Passive Foreign Investment Company Rules," a U.S. Holder will generally recognize capital gain or loss upon the sale or other disposition of ADSs or ordinary shares in an amount equal to the difference between the amount realized upon the disposition and the U.S. Holder's adjusted tax basis in such ADSs or ordinary shares. Any capital gain or loss will be long-term if the ADSs or ordinary shares have been held for more than one year and will generally be United States-source gain or loss for United States foreign tax credit purposes. Long-term capital gains of non-corporate taxpayers are currently eligible for reduced rates taxation. In the event that gain from the disposition of the ADSs or ordinary shares is subject to tax in the PRC, such gain may be treated as PRC-source gain under the United States-PRC income tax treaty. The deductibility of a capital loss may be subject to limitations. U.S. Holders are urged to consult their tax advisors regarding the tax consequences if a foreign tax is imposed on a disposition of our ADSs or ordinary shares, including the availability of the foreign tax credit under their particular circumstances.

<div align="center">104</div>

Table of Contents

### *Passive Foreign Investment Company Rules*

If we are classified as a PFIC for any taxable year during which a U.S. Holder holds our ADSs or ordinary shares, and unless the U.S. Holder makes a mark-to-market election (as described below), the U.S. Holder will generally be subject to special tax rules that have a penalizing effect, regardless of whether we remain a PFIC, on (i) any excess distribution that we make to the U.S. Holder (which generally means any distribution paid during a taxable year to a U.S. Holder that is greater than 125 percent of the average annual distributions paid in the three preceding taxable years or, if shorter, the U.S. Holder's holding period for the ADSs or ordinary shares), and (ii) any gain realized on the sale or other disposition, including a pledge, of ADSs or ordinary shares. Under the PFIC rules:

- the excess distribution or gain will be allocated ratably over the U.S. Holder's holding period for the ADSs or ordinary shares;

- the amount allocated to the current taxable year and any taxable years in the U.S. Holder's holding period prior to the first taxable year in which we are classified as a PFIC (each, a "pre-PFIC year"), will be taxable as ordinary income;

- the amount allocated to each prior taxable year, other than a pre-PFIC year, will be subject to tax at the highest tax rate in effect applicable to the U.S. Holder for that year; and

- an additional tax equal to the interest charge generally applicable to underpayments of tax will be imposed on the tax attributable to each prior taxable year, other than a pre-PFIC year.

If we are a PFIC for any taxable year during which a U.S. Holder holds our ADSs or ordinary shares and any of our subsidiaries is also a PFIC, such U.S. Holder would be treated as owning a proportionate amount (by value) of the shares of the lower-tier PFIC for purposes of the application of these rules. U.S. Holders are urged to consult their tax advisors regarding the application of the PFIC rules to any of our subsidiaries.

As an alternative to the foregoing rules, a U.S. Holder of "marketable stock" in a PFIC may make a mark-to-market election with respect to such stock, provided that such stock is "regularly traded" within the meaning of applicable United States Treasury regulations. For those purposes, our ADSs, but not our ordinary shares, are treated as marketable stock on the NASDAQ Global Select Market. We believe that our ADSs should qualify as being regularly traded, but no assurances may be given in this regard. If a U.S. Holder makes this election, the U.S. Holder will generally (i) include as ordinary income for each taxable year that we are a PFIC the excess, if any, of the fair market value of ADSs held at the end of the taxable year over the adjusted tax basis of such ADSs and (ii) deduct as an ordinary loss the excess, if any, of the adjusted tax basis of the ADSs over the fair market value of such ADSs held at the end of the taxable year, but such deduction will only be allowed to the extent of the amount previously included in income as a result of the mark-to-market election. The U.S. Holder's adjusted tax basis in the ADSs would be adjusted to reflect any income or loss resulting from the mark-to-market election. If a U.S. Holder makes a mark-to-market election in respect of a corporation classified as a PFIC and such corporation ceases to be classified as a PFIC, the U.S. Holder will not be required to take into account the gain or loss described above during any period that such corporation is not classified as a PFIC. If a U.S. Holder makes a mark-to-market election, any gain such U.S. Holder recognizes upon the sale or other disposition of our ADSs in a year when we are a PFIC will be treated as ordinary income and any loss will be treated as ordinary loss, but such loss will only be treated as ordinary loss to the extent of the net amount previously included in income as a result of the mark-to-market election.

Because a mark-to-market election cannot be made for any lower-tier PFICs that we may own, a U.S. Holder may continue to be subject to the PFIC rules with respect to such U.S. Holder's indirect interest in any investments held by us that are treated as an equity interest in a PFIC for United States federal income tax purposes.

We do not intend to provide information necessary for U.S. Holders to make qualified electing fund elections which, if available, would result in tax treatment different from the general tax treatment for PFICs described above.

If a U.S. Holder owns our ADSs or ordinary shares during any taxable year that we are a PFIC, the U.S. Holder must generally file an annual IRS Form 8621 or such other form as is required by the United States Treasury Department. Each U.S. Holder is urged to consult its tax advisor concerning the United States federal income tax consequences of holding and disposing ADSs or ordinary shares if we are or become treated as a PFIC, including the possibility of making a mark-to-market election and the unavailability of the election to treat us as a qualified electing fund.

**F.    Dividends and Paying Agents**

Not applicable.

105

Table of Contents

**G.    Statement by Experts**

Not applicable.

**H.    Documents on Display**

We previously filed with the SEC our registration statement on Form F-1, as amended, and the related prospectus under the Securities Act of 1933, with respect to our Class A ordinary shares. We are subject to the periodic reporting and other informational requirements of the Exchange Act. Under the Exchange Act, we are required to file reports and other information with the SEC. Specifically, we are required to file annually a Form 20-F within four months after the end of each fiscal year, which is December 31. Copies of reports and other information, when so filed, may be inspected without charge and may be obtained at prescribed rates at the public reference facilities maintained by the SEC at 100 F Street, N.E., Room 1580, Washington, D.C. 20549. The public may obtain information regarding the Washington, D.C. Public Reference Room by calling the Commission at 1-800-SEC-0330. The SEC also maintains a website at *www.sec.gov* that contains reports, proxy and information statements, and other information regarding registrants that make electronic filings with the SEC using its EDGAR system. As a foreign private issuer, we are exempt from the rules under the Exchange Act prescribing the furnishing and content of quarterly reports and proxy statements, and officers, directors and principal shareholders are exempt from the reporting and short-swing profit recovery provisions contained in Section 16 of the Exchange Act.

We will furnish Deutsche Bank Trust Company Americas, the depositary of our ADSs, with our annual reports, which will include a review of operations and annual audited consolidated financial statements prepared in conformity with U.S. GAAP, and all notices of shareholders' meetings and other reports and communications that are made generally available to our shareholders. The depositary will make such notices, reports and communications available to holders of ADSs and, upon our request, will mail to all record holders of ADSs the information contained in any notice of a shareholders' meeting received by the depositary from us.

In accordance with NASDAQ Stock Market Rule 5250(d), we will post this annual report on Form 20-F on our website at *http://ir.immomo.com*. In addition, we will provide hardcopies of our annual report free of charge to shareholders and ADS holders upon request.

**I.    Subsidiary Information**

Not applicable.

**Item 11.    Quantitative and Qualitative Disclosures about Market Risk**

**Interest Rate Risk**

Our exposure to interest rate risk primarily relates to the interest income generated by excess cash, which is mostly held in interest-bearing bank deposits. We generated interest income of RMB54.6 million, RMB145.6 million and RMB272.9 million (US$39.7 million) for the years ended December 31, 2016, 2017 and 2018, respectively. We had cash, cash equivalents and term deposits of RMB11,292.6 million (US$1,642.4 million) as of December 31, 2018. Assuming such amount of cash and cash equivalents were held entirely in interest-bearing bank deposits, a hypothetical one percentage point (100 basis -point) decrease in interest rates would decrease our interest income from these interest-bearing bank deposits for one year by approximately RMB112.9 million (US$16.4 million). Interest-earning instruments carry a degree of interest rate risk. We have not been exposed to, nor do we anticipate being exposed to, material risks due to changes in market interest rates. However, our future interest income may fall short of expectations due to changes in market interest rates.

**Foreign Exchange Risk**

Our revenues and costs are mostly denominated in RMB, and a significant portion of our financial assets are also denominated in RMB. Prior to October 1, 2018, our reporting currency was the U.S. dollar and our financial information that used RMB as the functional currency had been translated into U.S. dollars in our consolidated financial statements prepared before October 1, 2018. Effective from October 1, 2018, we changed our reporting currency from U.S. dollar to RMB. Due to foreign currency translation adjustments, we had a foreign currency translation adjustment of RMB272.9 million, RMB117.5 million and RMB313.6 million (US$45.6 million) in 2016, 2017 and 2018, respectively. Appreciation or depreciation in the value of the RMB relative to the U.S. dollar would affect our financial results reported in U.S. dollar terms without giving effect to any underlying change in our business or results of operations.

106

Table of Contents

We do not believe that we currently have any significant direct foreign exchange risk and have not used any derivative financial instruments to hedge exposure to such risk. Although in general our exposure to foreign exchange risks should be limited, the value of your investment in our ADSs will still be affected by the exchange rate between U.S. dollar and RMB because the value of our business is effectively denominated in RMB, while our ADSs

will be traded in U.S. dollars. On July 21, 2005, the PRC government changed its decade-old policy of pegging the value of the RMB to the U.S. dollar, and the Renminbi appreciated more than 20% against the U.S. dollar over the following three years. Between July 2008 and June 2010, this appreciation halted and the exchange rate between the RMB and the U.S. dollar remained within a narrow band. Since June 2010, the RMB has fluctuated against the U.S. dollar, at times significantly and unpredictably. In August 2015, the People's Bank of China changed the way it calculates the mid-point price of Renminbi against the U.S. dollar, requiring the market-makers who submit for reference rates to consider the previous day's closing spot rate, foreign-exchange demand and supply as well as changes in major currency rates. The value of the Renminbi depreciated approximately 5.8% against the U.S. dollar in 2015 and further by approximately 6.3% in 2016. It is difficult to predict whether the depreciation will continue and how market forces or PRC or U.S. government policy may impact the exchange rate between the RMB and the U.S. dollar in the future. To date, we have not entered into any hedging transactions in an effort to reduce our exposure to foreign currency exchange risk.

As of December 31, 2018, we had U.S. dollar-denominated cash and cash equivalents and term deposits of US$535.9 million. If the U.S. dollar had appreciated or depreciated by 10% against the RMB, our U.S. dollar-denominated cash and cash equivalents and time deposits as of December 31, 2018 would have increased or decreased by RMB368.5 million in RMB terms.

## Item 12.    Description of Securities Other than Equity Securities

### A.    Debt Securities

Not applicable.

### B.    Warrants and Rights

Not applicable.

### C.    Other Securities

Not applicable.

### D.    American Depositary Shares

**Fees and Charges Our ADS holders May Have to Pay**

Deutsche Bank Trust Company Americas, the depositary of our ADS program, collects its fees for delivery and surrender of ADSs directly from investors depositing shares or surrendering ADSs for the purpose of withdrawal or from intermediaries acting for them. The depositary collects fees for making distributions to investors by deducting those fees from the amounts distributed or by selling a portion of distributable property to pay the fees. The depositary may collect its annual fee for depositary services by deductions from cash distributions or by directly billing investors or by charging the book-entry system accounts of participants acting for them. The depositary may generally refuse to provide fee-attracting services until its fees for those services are paid. The depositary's principal office at which the ADSs will be administered is located at 60 Wall Street, New York, NY 10005, USA. The principal executive office of the depositary is located at 60 Wall Street, New York, NY 10005, USA.

107

**Table of Contents**

| Service | Fees |
|---|---|
| • To any person to which ADSs are issued or to any person to which a distribution is made in respect of ADS distributions pursuant to stock dividends or other free distributions of stock, bonus distributions, stock splits or other distributions (except where converted to cash) | Up to US$0.05 per ADS issued |
| • Cancelation of ADSs, including termination of the deposit agreement | Up to US$0.05 per ADS canceled |
| • Distribution of cash dividends | Up to US$0.05 per ADS held |
| • Distribution of cash entitlements (other than cash dividends) and/or cash proceeds, including proceeds from the sale of rights, securities and other entitlements | Up to US$0.05 per ADS held |
| • Distribution of ADSs pursuant to exercise of rights. | Up to US$0.05 per ADS held |
| • Depositary services | Up to US$0.05 per ADS held on the applicable record date(s)established by the depositary bank |

**Fees and Other Payments Made by the Depositary to Us**

The depositary has agreed to reimburse us annually for our expenses incurred in connection with the administration and maintenance of our ADS facility including, but not limited to, investor relations expenses, other program related expenses related to our ADS facility and the travel expense of our key personnel in connection with such programs. The depositary has also agreed to provide additional payments to us based on the applicable performance indicators relating to our ADS facility. There are limits on the amount of expenses for which the depositary will reimburse us, but the amount of reimbursement available to us is not necessarily tied to the amount of fees the depositary collects from investors. For the year ended December 31, 2018, we were entitled to receive approximately RMB11.7 million (US$1.7 million) (after withholding tax) from the depositary as reimbursement for our expenses incurred in connection with, among other things, investor relationship programs related to the ADS facility and the travel expense of our key

personnel in connection with such programs. This amount has been fully paid to us as of the date of this annual report.

## PART II

**Item 13.        Defaults, Dividend Arrearages and Delinquencies**

None.

**Item 14.        Material Modifications to the Rights of Security Holders and Use of Proceeds**

The following "Use of Proceeds" information relates to our initial public offering of 18,400,000 ADSs representing 36,800,000 of our Class A ordinary shares, including 2,400,000 ADSs representing 4,800,000 Class A ordinary shares sold pursuant to the full exercise of over-allotment option by the underwriters, at an initial offering price of US$13.50 per ADS, which was completed in December 2014.

After deducting the total expenses of approximately US$17.4 million and other expenses of approximately US$4.4 million, we received net proceeds of approximately US$226.7 million from our initial public offering. Concurrently with the initial public offering, we completed a private placement and received an additional US$60.0 million. As of December 31, 2018, we had used an insignificant amount of net proceeds received from the initial public offering because the net cash provided by our operations was sufficient to cover our capital needs.

None of the net proceeds from our initial public offering were directly or indirectly paid to the directors, officers, general partners of our company or their associates, persons owning 10% or more of our ordinary shares, or our affiliates.

108

Table of Contents

**Item 15.        Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our chief executive officer and chief financial officer, has performed an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) as of the end of the period covered by this report, as required by Rule 13a-15(b) under the Exchange Act.

Based upon that evaluation, our management has concluded that, as of December 31, 2018, our disclosure controls and procedures were effective in ensuring that the information required to be disclosed by us in the reports that we file and furnish under the Exchange Act was recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and that the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate, to allow timely decisions regarding required disclosure.

**Management's Annual Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) under the Exchange Act. Our management evaluated the effectiveness of our internal control over financial reporting, as required by Rule 13a-15(c) of the Exchange Act, based on criteria established in the framework in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Our evaluation did not include Tantan Limited which was acquired in May 2018 and whose total assets and net revenues constituted 31.1% of our consolidated total assets as of December 31, 2018 and 3.1% of our consolidated net revenues for the year ended December 31, 2018, respectively. Based on this evaluation, our management has concluded that our internal control over financial reporting was effective as of December 31, 2018.

Designing and implementing an effective financial reporting system is a continuous effort that requires us to devote significant resources to maintain a financial reporting system that adequately satisfies our reporting obligations. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. In addition, projections of any evaluation of effectiveness of our internal control over financial reporting to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.

Our independent registered public accounting firm, Deloitte Touche Tohmatsu Certified Public Accountants LLP, has issued an attestation report on our internal control over financial reporting. That attestation report appears below.

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

TO THE BOARD OF DIRECTORS AND SHAREHOLDERS OF MOMO INC.

**Opinion on Internal Control over Financial Reporting**

We have audited the internal control over financial reporting of Momo Inc. (the "Company") its subsidiaries, its variable interest entities ("VIEs"), and its VIEs' subsidiaries (collectively, the "Group") as of December 31, 2018, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by COSO.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated financial statements as of and for the year ended December 31, 2018, of the Group and our report dated April 26, 2019, expressed an unqualified opinion on those consolidated financial statements and included an explanatory paragraph regarding the change of reporting currency from U.S. dollars to Renminbi and convenience translation of

Renminbi amounts into United States dollar amounts.

As described in the Management's Annual Report on Internal Control over Financial Reporting, management excluded from its assessment the internal control over financial reporting at Tantan Limited, which was acquired in May 2018 and whose financial statements constitute 31.1% of total assets and 3.1% of net revenues of the consolidated financial statement amounts as of and for the year ended December 31, 2018. Accordingly, our audit did not include the internal control over financial reporting at Tantan Limited.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

109

Table of Contents

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Deloitte Touche Tohmatsu Certified Public Accountants LLP
Beijing, the People's Republic of China

April 26, 2019

110

Table of Contents

**Changes in Internal Control over Financial Reporting**

There were no significant changes in our internal controls over financial reporting during the year ended December 31, 2018 that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting. We may identify additional control deficiencies in the future. Should we discover such deficiencies, we intend to remediate them as soon as possible.

**Item 16A.    Audit Committee Financial Expert**

Our board of directors has determined that each of Mr. Benson Bing Chung Tam and Dr. Dave Daqing Qi, independent directors (under the standards set forth in NASDAQ Stock Market Rule 5605(a)(2) and Rule 10A-3 under the Exchange Act) and members of our audit committee, is an audit committee financial expert.

**Item 16B.    Code of Ethics**

Our board of directors has adopted a code of ethics that applies to our directors, officers and employees, including certain provisions that specifically apply to our senior officers, including our chief executive officer, chief financial officer, other chief senior officers, senior finance officer, controller, senior vice presidents, vice presidents and any other persons who perform similar functions for us. We have filed our code of business conduct and ethics as Exhibit 99.1 to our registration statement on Form F-1 (File Number 333-199996), as amended, initially filed with the SEC on November 7, 2014. The code is also available on our official website under the corporate governance section at our investor relations website

111

**Table of Contents**

**Item 16C.    Principal Accountant Fees and Services**

The following table sets forth the aggregate fees by categories specified below in connection with certain professional services rendered by Deloitte Touche Tohmatsu Certified Public Accountants LLP, our principal external accounting firm, for the periods indicated.

|  | 2017 | 2018 |
|---|---|---|
|  | (in RMB thousands) | |
| Audit fees[1] | 10,911 | 15,575 |
| Audit-related fees[2] | — | — |
| Tax fees[3] | 610 | 1,074 |

Notes:

(1)    "Audit fees" represents the aggregate fees billed for each of the fiscal years listed for professional services rendered by our principal accounting firm for the audit of our annual financial statements or services that are normally provided by the auditors in connection with statutory and regulatory filings or engagements.

(2)    "Audit-related fees" represents the aggregate fees billed for professional services rendered by our principal accounting firm for the assurance and related services, which mainly included the audit and review of financial statements and are not reported under "Audit Fees" above.

(3)    "Tax fees" represents the aggregate fees billed for professional services rendered by our principal accounting firm for tax compliance, tax advice and tax planning.

The policy of our audit committee is to pre-approve all audit and non-audit services provided by Deloitte Touche Tohmatsu Certified Public Accountants LLP, including audit services, audit-related services and tax services as described above, other than those for *de minimis* services which are approved by the audit committee prior to the completion of the audit.

**Item 16D.    Exemptions from the Listing Standards for Audit Committees**

Not applicable.

**Item 16E.    Purchases of Equity Securities by the Issuer and Affiliated Purchasers**

None.

**Item 16F.    Change in Registrant's Certifying Accountant**

Not applicable.

**Item 16G.    Corporate Governance**

NASDAQ Stock Market Rule 5620 requires each issuer to hold an annual meeting of shareholders no later than one year after the end of the issuer's fiscal year-end. However, NASDAQ Stock Market Rule 5615(a)(3) permits foreign private issuers like us to follow "home country practice" in certain corporate governance matters. Maples and Calder (Hong Kong) LLP, our Cayman Islands counsel, has provided a letter to the NASDAQ Stock Market certifying that under Cayman Islands law, we are not required to hold annual shareholders meetings every year. We followed home country practice and did not hold an annual meeting of shareholders in 2018. We may, however, hold annual shareholders meetings in the future.

We also rely on an exemption afforded to controlled companies. We are a "controlled company" as defined under the Nasdaq Stock Market Rules because Yan Tang, our co-founder, chairman and chief executive officer, beneficially owns more than 50% of our total voting power. For so long as we remain a controlled company under that definition, we are permitted to elect to rely on certain exemptions from corporate governance rules. We currently rely on an exemption from the rule that a majority of the board of directors must be independent directors. Currently, a majority of the members of our board of directors are not independent directors.

Other than the practice described above, there are no significant differences between our corporate governance practices and those followed by U.S. domestic companies under NASDAQ Stock Market Rules.

**Item 16H.    Mine Safety Disclosure**

Not applicable.

112

**Table of Contents**

**PART III**

**Item 17.    Financial Statements**

We have elected to provide financial statements pursuant to Item 18.

**Item 18.    Financial Statements**

For the years ended December 31, 2018, we identified three operating segments, including Momo' service lines, Tantan's service lines and QOOL's service line. We primarily operate in the PRC and substantially all of our long-lived assets are located in the PRC. Our chief operating decision maker evaluates our performance based on each reporting segment's net revenue, operating cost and expenses, operating income, as well as net income.

The consolidated financial statements of our company and our three operating segments are included at the end of this annual report.

**Item 19.    Exhibits**

| Exhibit Number | Description of Document |
|---|---|
| 1.1 | Second amended and restated memorandum and articles of association of the Registrant (incorporated by reference to Exhibit 3.2 of our registration statement on Form F-1, as amended (file no. 333-199996), filed with the SEC on November 28, 2014) |
| 2.1 | Registrant's specimen American depositary receipt (included in Exhibit 2.3) |
| 2.2 | Registrant's specimen certificate for ordinary shares (incorporated by reference to Exhibit 4.2 of our registration statement on Form F-1, as amended (file no. 333-199996), filed with the SEC on November 28, 2014) |
| 2.3 | Deposit agreement dated December 10, 2014 among the Registrant, the depositary and holders and beneficial owners of American depositary shares evidenced by American depositary receipts issued thereunder (incorporated by reference to Exhibit 4.3 of our registration statement on Form S-8 filed with the SEC on January 30, 2015) |
| 4.1 | Third amended and restated shareholders agreement among the Registrant, shareholders of the Registrant and other parties thereto, dated May 15, 2014 (incorporated by reference to Exhibit 4.4 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014) |
| 4.2 | Amended and restated 2012 share incentive plan (incorporated by reference to Exhibit 10.1 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014) |
| 4.3 | 2014 share incentive plan (incorporated by reference to Exhibit 10.2 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014) |
| 4.4 | Series D preferred share purchase agreement by and among the Registrant, SCC Growth I Holdco A, Ltd. (formerly known as Sequoia Capital China Investment Holdco II Ltd.), Sequoia Capital China GF Holdco III-A, Ltd., SC China Growth III Co-Investment 2014-A, L.P., Rich Moon Limited and Tiger Global Eight Holdings, as investors, and other parties thereto, dated April 22, 2014 (incorporated by reference to Exhibit 10.4 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014) |
| 4.5 | Form of indemnification agreement between the Registrant and each of its directors and executive officers (incorporated by reference to Exhibit 10.5 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014) |
| 4.6 | Form of employment agreement between the Registrant and each of its Executive Officers (incorporated by reference to Exhibit 10.6 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014) |
| 4.7 | Business operation agreement by and among Beijing Momo IT, Beijing Momo and its shareholders, dated April 18, 2012, and confirmation letter by Yan Tang, dated June 9, 2014 (incorporated by reference to Exhibit 10.7 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014) |

113

**Table of Contents**

| | |
|---|---|
| 4.8 | Exclusive cooperation agreement by and between Beijing Momo IT and Beijing Momo, and a supplemental agreement thereto dated August 31, 2014 (incorporated by reference to Exhibit 10.8 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014) |
| 4.9 | Exclusive cooperation agreement by and between Beijing Momo IT and Chengdu Momo, and a supplemental agreement thereto, dated August 31, 2014 (incorporated by reference to Exhibit 10.9 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014) |
| 4.11 | Exclusive cooperation agreement by and between Beijing Momo IT and Tianjin Heer, and a supplemental agreement thereto, dated May 1, 2016 (incorporated by reference to Exhibit 4.11 of our annual report on Form 20-F (file no. 001-36765) filed with the SEC on April 26, 2017) |
| 4.12 | Exclusive call option agreement by and among Beijing Momo IT, Beijing Momo and each of its shareholders, dated April 18, 2014 (incorporated by reference to Exhibit 10.10 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014) |
| 4.13 | Power of attorney by each shareholder of Beijing Momo, dated April 18, 2014 (incorporated by reference to Exhibit 10.11 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014) |
| 4.14 | Equity interest pledge agreement by and among Beijing Momo IT, Beijing Momo and each of its shareholders, dated April 18, 2014 |

(incorporated by reference to Exhibit 10.12 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014)

4.15     Spousal consent letter by the spouse of each of Yong Li, Zhiwei Li and Yan Tang (incorporated by reference to Exhibit 10.13 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014)

4.16     Shareholder confirmation letter by each of the shareholders of Beijing Momo, dated April  18, 2014 (incorporated by reference to Exhibit 10.14 of our registration statement on Form F-1 (file no. 333-199996) filed with the SEC on November 7, 2014)

4.17     Definitive agreement(s) with Tantan Limited, dated February  23, 2018 (incorporated by reference to Exhibit 4.17 of our annual report on Form 20-F (file no. 001-36765) filed with the SEC on April 26, 2018)

4.18     Exclusive cooperation agreement between Beijing Momo IT and Loudi Momo, dated December  1, 2017 (incorporated by reference to Exhibit 4.18 of our annual report on Form 20-F (file no. 001-36765) filed with the SEC on April 26, 2018)

4.19     Supplemental agreement to the exclusive cooperation agreement between Beijing Momo IT and Loudi Momo, dated December  1, 2017 (incorporated by reference to Exhibit 4.19 of our annual report on Form 20-F (file no. 001-36765) filed with the SEC on April 26, 2018)

4.20*     Indenture between the Registrant and The Bank of New York Mellon dated July 2, 2018

4.21*     Exclusive business operation agreement by and among Tantan Technology and Tantan Culture, dated May 27, 2015

4.22*     Equity interest pledge agreement by and among Tantan Technology (Beijing) Co., Ltd., Tantan Culture and its shareholder, dated May 9, 2018

4.23*     Exclusive option agreement by and among Tantan Technology (Beijing) Co., Ltd., Tantan Culture and its shareholder, dated May 9, 2018

4.24*     Power of attorney by shareholder of Tantan Culture, dated May 9, 2018

4.25*     Business operation agreement by and among Beijing Yiliulinger, Hainan Miaoka and its shareholders, dated June 1, 2018

4.26*     Power of attorney by Xiaoliang Lei and Li Wang, the shareholders of Hainan Miaoka, dated June 1, 2018

4.27*     Exclusive cooperation agreement entered into by Beijing Yiliulinger, Hainan Miaoka, and a supplemental agreement thereto, dated June 1, 2018

4.28*     Exclusive option agreement by and among Beijing Yiliulinger, Hainan Miaoka and Xiaoliang Lei and Li Wang, the shareholders of Hainan Miaoka, dated June 1, 2018

4.29*     Shareholder confirmation letter by Xiaoliang lei and Li Wang, the shareholders of Hainan Miaoka, dated June 1, 2018

4.30*     Equity interest pledge agreement by and among Beijing Yiliulinger, Hainan Miaoka and Xiaoliang Lei and Li Wang, the shareholders of Hainan Miaoka, dated June 1, 2018

114

**Table of Contents**

4.31*     Business operation agreement by and among Beijing Yiliulinger, Hainan Yilingliuer and its shareholders, dated June 1, 2018

4.32*     Power of attorney by Xiaoliang Lei and Li Wang, the shareholders of Hainan Yilingliuer, dated June 1, 2018

4.33*     Exclusive cooperation agreement entered into by Beijing Yiliulinger, Hainan Yilingliuer, and a supplemental agreement thereto, dated June 1, 2018

4.34*     Exclusive option agreement by and among Beijing Yiliulinger, Hainan Yilingliuer and Xiaoliang Lei and Li Wang, the shareholders of Hainan Yilingliuer, dated June 1, 2018

4.35*     Shareholder confirmation letter by Xiaoliang Lei and Li Wang, the shareholders of Hainan Yilingliuer, dated June 1, 2018

4.36*     Equity interest pledge agreement by and among Beijing Yiliulinger, Hainan Yilingliuer and Xiaoliang Lei and Li Wang, the shareholders of Hainan Yilingliuer, dated June 1, 2018

4.37*     Business cooperation agreement by and between QOOL Media Technology (Tianjin) Co., Ltd. and Tianjin QOOL Media, dated December 18, 2018

4.38*     Exclusive option agreement by and among QOOL Media Technology (Tianjin) Co., Ltd. and Beijing Momo and Tianjin Mingqiao, the shareholders of Tianjin QOOL Media, dated December 18, 2018

4.39*     Equity interest pledge agreement by and among QOOL Media Technology (Tianjin) Co., Ltd. and Beijing Momo and Tianjin Mingqiao, the shareholders of Tianjin QOOL Media, dated December 18, 2018

4.40*     Power of attorney by Beijing Momo and Tianjin Mingqiao, the shareholders of Tianjin QOOL Media, dated December 18, 2018

4.41*     Shareholder confirmation letter by Beijing Momo and Tianjin Mingqiao, the shareholders of Tianjin QOOL Media, dated December 18, 2018

4.42*     Exclusive cooperation agreement by and between QOOL Media Technology (Tianjin) Co., Ltd. and Tianjin QOOL Media, dated December 18, 2018

4.43*     Business operation agreement by and among Beijing Momo IT, Beijing Fancy Reader and its shareholder, dated April 1, 2019

4.44*     Power of attorney by Taizhong Wang, the shareholder of Beijing Fancy Reader, dated April 1, 2019

4.45*     Exclusive cooperation agreement by and between Beijing Momo IT and Beijing Fancy Reader, dated April 1, 2019

4.46*     Exclusive option agreement by and between Beijing Momo IT and Taizhong Wang, the shareholder of Beijing Fancy Reader, dated April 1, 2019

| | |
|---|---|
| 4.47* | Shareholder confirmation letter by Taizhong Wang, the shareholder of Beijing Fancy Reader, dated April 1, 2019 |
| 4.48* | Equity interest pledge agreement by and among Beijing Momo IT, Beijing Fancy Reader and its shareholder, dated April 1, 2019 |

115

**Table of Contents**

| | |
|---|---|
| 8.1* | List of subsidiaries and consolidated entities of the Registrant |
| 11.1 | Code of business conduct and ethics of the Registrant (incorporated by reference to Exhibit 99.1 of our Registration Statement on Form F-1 (file no. 333-199996) filed with the Securities and Exchange Commission on November 7, 2014) |
| 12.1* | Certification by Principal Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 12.2* | Certification by Principal Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 13.1** | Certification by Principal Executive Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 13.2** | Certification by Principal Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 15.1* | Consent of Maples and Calder (Hong Kong) LLP |
| 15.2* | Consent of Han Kun Law Offices |
| 15.3* | Consent of Deloitte Touche Tohmatsu Certified Public Accountants LLP, an independent registered public accounting firm |
| 101.INS* | XBRL Instance Document |
| 101.SCH* | XBRL Taxonomy Extension Schema Document |
| 101.CAL* | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF* | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB* | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE* | XBRL Taxonomy Extension Presentation Linkbase Document |

\*      Filed herewith
\*\*     Furnished herewith

116

**Table of Contents**

## SIGNATURES

The registrant hereby certifies that it meets all of the requirements for filing its annual report on Form 20-F and that it has duly caused and authorized the undersigned to sign this annual report on its behalf.

Momo Inc.

By:    /s/ Yan Tang

Name:  Yan Tang
Title:   Chairman and Chief Executive Officer

Date: April 26, 2019

117

**Table of Contents**

## MOMO INC.

### INDEX TO CONSOLIDATED FINANCIAL STATEMENTS
### FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018

| CONTENTS | PAGE(S) |
|---|---|
| REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM | F-2 |

CONSOLIDATED BALANCE SHEETS
    AS OF DECEMBER 31, 2017 AND 2018                                                                          F-3

CONSOLIDATED STATEMENTS OF OPERATIONS
    FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018                                        F-4

CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME
    FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018                                        F-5

CONSOLIDATED STATEMENTS OF CHANGES IN EQUITY
    FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018                                        F-6

CONSOLIDATED STATEMENTS OF CASH FLOWS
    FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018                                        F-7

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
    FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018                                   F-8 - F-56

F-1

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**
TO THE BOARD OF DIRECTORS AND SHAREHOLDERS OF MOMO INC.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Momo Inc. (the "Company"), its subsidiaries, its variable interest entities ("VIEs"), and its VIEs' subsidiaries (collectively, the "Group") as of December 31, 2017 and 2018, the related consolidated statements of operations, comprehensive income, changes in equity, and cash flows, for each of the three years in the period ended December 31, 2018, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Group as of December 31, 2017 and 2018, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2018, in conformity with accounting principles generally accepted in the United States of America.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated April 26, 2019, expressed an unqualified opinion on the Company's internal control over financial reporting.

**Convenience translation**

As discussed in Note 2, the Company changed its reporting currency from United States dollar to Renminbi effective October 1, 2018. Our audits also comprehended the translation of Renminbi amounts into United States dollar amounts and, in our opinion, such translation has been made in conformity with the basis stated in Note 2. Such United States dollar amounts are presented solely for the convenience of readers in the United States of America.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Group's consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Deloitte Touche Tohmatsu Certified Public Accountants LLP
Beijing, the People's Republic of China

April 26, 2019

We have served as the Company's auditor since 2014.

F-2

Table of Contents

**MOMO INC.**

**CONSOLIDATED BALANCE SHEETS**
**(In thousands, except share and share related data, or otherwise noted)**

| | As of December 31, | | |
|---|---|---|---|
| | 2017 | 2018 | 2018 |
| | RMB | RMB | US$ |
| **Assets** | | | |
| Current assets | | | |
| Cash and cash equivalents | 4,462,194 | 2,468,034 | 358,961 |
| Term deposits | 2,432,016 | 8,824,610 | 1,283,486 |
| Accounts receivable, net of allowance for doubtful accounts of RMB585 and RMB nil as of December 31, 2017 and 2018, respectively | 257,633 | 719,606 | 104,662 |
| Amount due from related parties | 33,460 | — | — |
| Prepaid expenses and other current assets | 538,182 | 620,979 | 90,318 |
| Short-term investment | 10,500 | — | — |
| Total current assets | 7,733,985 | 12,633,229 | 1,837,427 |
| Property and equipment, net | 258,704 | 387,532 | 56,364 |
| Intangible assets | 48,553 | 1,036,986 | 150,823 |
| Rental deposits | 17,249 | 24,192 | 3,519 |
| Long-term investments | 288,471 | 447,465 | 65,081 |
| Other non-current assets | 55,271 | 71,519 | 10,402 |
| Deferred tax assets | 46,825 | 57,786 | 8,405 |
| Goodwill | 22,130 | 4,306,829 | 626,402 |
| Total assets | 8,471,188 | 18,965,538 | 2,758,423 |
| **Liabilities and equity** | | | |
| Current liabilities | | | |
| Accounts payable (including accounts payable of the consolidated VIEs without recourse to the Company of RMB357,437 and RMB 549,173 as of December 31, 2017 and 2018, respectively) | 484,945 | 718,362 | 104,481 |
| Deferred revenue (including deferred revenue of the consolidated VIEs without recourse to the Company of RMB421,528 and RMB 441,392 as of December 31, 2017 and 2018, respectively) | 422,028 | 441,892 | 64,271 |
| Accrued expenses and other current liabilities (including accrued expenses and other current liabilities of the consolidated VIEs without recourse to the Company of RMB200,406 and RMB 304,363 as of December 31, 2017 and 2018, respectively) | 571,333 | 846,710 | 123,148 |
| Amount due to related parties (including amount due to related parties of the consolidated VIEs without recourse to the Company of RMB188 and RMB 43,213 as of December 31, 2017 and 2018, respectively) | 37,760 | 82,948 | 12,064 |
| Income tax payable (including income tax payable of the consolidated VIEs without recourse to the Company of RMB76,549 and RMB 113,733 as of December 31, 2017 and 2018, respectively) | 175,887 | 137,090 | 19,939 |
| Deferred consideration in connection with business acquisitions (including deferred consideration in connection with business acquisitions of the consolidated VIEs without recourse to the Company of RMB nil and RMB nil as of December 31, 2017 and 2018, respectively) | — | 469,274 | 68,253 |
| Total current liabilities | 1,691,953 | 2,696,276 | 392,156 |
| Deferred tax liabilities | 12,138 | 259,247 | 37,706 |
| Convertible senior notes | — | 4,877,116 | 709,347 |
| Other non-current liabilities | 14,997 | 110,040 | 16,005 |
| Total liabilities | 1,719,088 | 7,942,679 | 1,155,214 |
| Commitments and contingencies (Note 16) | | | |
| Equity | | | |
| Class A ordinary shares ($0.0001 par value; 800,000,000 and 800,000,000 shares authorized as of December 31, 2017 and 2018, respectively; 314,060,843 and 333,512,014 shares issued and outstanding as of December 31, 2017 and 2018, respectively) | 206 | 219 | 32 |
| Class B ordinary shares ($0.0001 par value; 100,000,000 and 100,000,000 shares authorized as of December 31, 2017 and 2018, respectively; 84,364,466 and 80,364,466 shares issued and outstanding as of December 31, 2017 and 2018, respectively) | 54 | 51 | 7 |
| Treasury stock | (402,267) | (402,267) | (58,507) |
| Additional paid-in capital | 4,472,666 | 5,657,838 | 822,898 |
| Retained earnings | 2,545,379 | 5,361,154 | 779,749 |
| Accumulated other comprehensive income | 117,525 | 313,564 | 45,606 |
| Noncontrolling interest | 18,537 | 92,300 | 13,424 |
| Total equity | 6,752,100 | 11,022,859 | 1,603,209 |
| Total liabilities and equity | 8,471,188 | 18,965,538 | 2,758,423 |

The accompanying notes are an integral part of these consolidated financial statements.

F-3

**Table of Contents**

MOMO INC.

**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In thousands, except share and share related data, or otherwise noted)**

| | For the years ended December 31, | | | |
|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2018 |
| | RMB | RMB | RMB | US$ |
| Net revenues | 3,707,358 | 8,886,390 | 13,408,421 | 1,950,174 |
| Cost and expenses: | | | | |
| Cost of revenues (including share-based compensation of RMB18,521, RMB13,547 and RMB 21,661 in 2016, 2017 and 2018, respectively) | (1,619,327) | (4,373,377) | (7,182,897) | (1,044,709) |
| Research and development (including share-based compensation of RMB37,455, RMB59,190 and RMB 152,806 in 2016, 2017 and 2018, respectively) | (208,647) | (346,144) | (760,644) | (110,631) |
| Sales and marketing (including share-based compensation of RMB39,139, RMB79,032 and RMB 142,927 in 2016, 2017 and 2018, respectively) | (647,238) | (1,467,376) | (1,812,262) | (263,583) |
| General and administrative (including share-based compensation of RMB115,724, RMB183,204 and RMB 263,419 in 2016, 2017 and 2018, respectively) | (259,712) | (422,005) | (640,023) | (93,087) |
| Total cost and expenses | (2,734,924) | (6,608,902) | (10,395,826) | (1,512,010) |
| Other operating income | 2,659 | 156,764 | 253,697 | 36,899 |
| Income from operations | 975,093 | 2,434,252 | 3,266,292 | 475,063 |
| Interest income | 54,603 | 145,568 | 272,946 | 39,698 |
| Interest expense | — | — | (56,503) | (8,218) |
| Impairment loss on long-term investments | (39,283) | (30,085) | (43,200) | (6,283) |
| Income before income tax and share of income on equity method investments | 990,413 | 2,549,735 | 3,439,535 | 500,260 |
| Income tax expense | (34,638) | (445,001) | (699,648) | (101,760) |
| Income before share of income on equity method investments | 955,775 | 2,104,734 | 2,739,887 | 398,500 |
| Share of income on equity method investments | 23,194 | 39,729 | 48,660 | 7,077 |
| Net income | 978,969 | 2,144,463 | 2,788,547 | 405,577 |
| Less: net loss attributable to non-controlling interest | — | (3,635) | (27,228) | (3,960) |
| Net income attributable to Momo Inc. | 978,969 | 2,148,098 | 2,815,775 | 409,537 |
| Net income attributable to ordinary shareholders | 978,969 | 2,148,098 | 2,815,775 | 409,537 |
| Net income per share attributable to ordinary shareholders | | | | |
| Basic | 2.54 | 5.44 | 6.92 | 1.01 |
| Diluted | 2.41 | 5.17 | 6.59 | 0.96 |
| Weighted average shares used in calculating net income per ordinary share | | | | |
| Basic | 377,335,923 | 394,549,323 | 407,009,875 | 407,009,875 |
| Diluted | 407,041,165 | 415,265,078 | 433,083,643 | 433,083,643 |

The accompanying notes are an integral part of these consolidated financial statements.

F-4

**Table of Contents**

MOMO INC.

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**
**(In thousands, except share and share related data)**

| | For the years ended December 31, | | | |
|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2018 |
| | RMB | RMB | RMB | US$ |
| Net income | 978,969 | 2,144,463 | 2,788,547 | 405,577 |
| Other comprehensive (loss) income, net of tax: | | | | |
| Foreign currency translation adjustment | 175,963 | (155,368) | 198,654 | 28,893 |
| Comprehensive income | 1,154,932 | 1,989,095 | 2,987,201 | 434,470 |
| Less: comprehensive loss attributed to the non-controlling interest | — | (3,635) | (24,613) | (3,580) |
| Comprehensive income attributable to Momo Inc. | 1,154,932 | 1,992,730 | 3,011,814 | 438,050 |

The accompanying notes are an integral part of these consolidated financial statements.

F-5

**MOMO INC.**

**CONSOLIDATED STATEMENTS OF CHANGES IN EQUITY**
**(In thousands, except share and share related data)**

| | Ordinary shares Shares | Ordinary shares Amount | Additional paid-in capital | Treasury stock | (Accumulated deficit)/ Retained earning | Accumulated other comprehensive income | Non-controlling interests | Total shareholders' equity |
|---|---|---|---|---|---|---|---|---|
| | | RMB | RMB | RMB | RMB | RMB | RMB | RMB |
| Balance as of January 1, 2016 | 383,751,403 | 250 | 3,920,890 | (402,267) | (581,688) | 96,930 | — | 3,034,115 |
| Net income | — | — | — | — | 978,969 | — | — | 978,969 |
| Share-based compensation | — | — | 210,839 | — | — | — | — | 210,839 |
| Issuance of ordinary shares in connection with exercise of options and vesting of restricted share units | 5,197,032 | 4 | 2,104 | — | — | — | — | 2,108 |
| Foreign currency translation adjustment | — | — | — | — | — | 175,963 | — | 175,963 |
| Balance as of December 31, 2016 | 388,948,435 | 254 | 4,133,833 | (402,267) | 397,281 | 272,893 | — | 4,401,994 |
| Net income | — | — | — | — | 2,148,098 | — | (3,635) | 2,144,463 |
| Share-based compensation | — | — | 334,973 | — | — | — | — | 334,973 |
| Issuance of ordinary shares in connection with exercise of options and vesting of restricted share units | 9,476,874 | 6 | 3,860 | — | — | — | — | 3,866 |
| Addition in noncontrolling interest of a subsidiary | — | — | — | — | — | — | 22,172 | 22,172 |
| Foreign currency translation adjustment | — | — | — | — | — | (155,368) | — | (155,368) |
| Balance as of December 31, 2017 | 398,425,309 | 260 | 4,472,666 | (402,267) | 2,545,379 | 117,525 | 18,537 | 6,752,100 |
| Net income | — | — | — | — | 2,815,775 | — | (27,228) | 2,788,547 |
| Share-based compensation | — | — | 398,493 | — | — | — | 95,543 | 494,036 |
| Capital injection from noncontrolling interest shareholder of Ningbo Hongyi Equity Investment L.P. | — | — | — | — | — | — | 22 | 22 |
| Issuance of ordinary shares in connection with exercise of options and vesting of restricted share units | 10,122,318 | 7 | 5,278 | — | — | — | — | 5,285 |
| Transfer of noncontrolling interest of QOOL HK | — | — | (2,811) | — | — | — | 2,811 | — |
| Share issued connection with the acquisition of Tantan Limited | 5,328,853 | 3 | 784,212 | — | — | — | — | 784,215 |
| Foreign currency translation adjustment | — | — | — | — | — | 196,039 | 2,615 | 198,654 |
| Balance as of December 31, 2018 | 413,876,480 | 270 | 5,657,838 | (402,267) | 5,361,154 | 313,564 | 92,300 | 11,022,859 |

The accompanying notes are an integral part of these consolidated financial statements.

F-6

Table of Contents

**MOMO INC.**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In thousands, except share and share related data)**

| | For the years ended December 31, 2016 | 2017 | 2018 | 2018 |
|---|---|---|---|---|
| | RMB | RMB | RMB | US$ |
| Cash flows from operating activities | | | | |
| Net income | 978,969 | 2,144,463 | 2,788,547 | 405,577 |
| Adjustments to reconcile net income to net cash provided by operating activities | | | | |
| Depreciation of property and equipment | 55,845 | 78,885 | 148,238 | 21,560 |
| Amortization of intangible assets | — | 4,784 | 93,030 | 13,531 |
| Share-based compensation | 210,839 | 334,973 | 580,813 | 84,476 |
| Share of income on equity method investments | (23,194) | (39,729) | (48,660) | (7,077) |
| Impairment loss on long-term investments | 39,283 | 30,085 | 43,200 | 6,283 |
| Impairment loss on intangible assets | — | 1,266 | — | — |
| Loss (gain) on disposal of property and equipment | 107 | 112 | (1,283) | (187) |
| Provision (reversal) of allowance for doubtful accounts | — | 585 | (585) | (85) |
| Changes in operating assets and liabilities | | | | |

| | | | | |
|---|---|---|---|---|
| Accounts receivable | (154,000) | (7,725) | (440,644) | (64,089) |
| Prepaid expenses and other current assets | (104,992) | (306,838) | (67,304) | (9,789) |
| Amount due from related parties | 6,998 | (32,846) | 33,463 | 4,867 |
| Deferred tax assets | (1,942) | (44,883) | (10,961) | (1,594) |
| Rental deposits | (2,022) | (10,902) | (3,817) | (555) |
| Other non-current assets | — | (5,234) | (45,534) | (6,623) |
| Accounts payable | 213,521 | 174,290 | 233,713 | 33,992 |
| Income tax payable | 26,948 | 152,277 | (38,791) | (5,642) |
| Deferred revenue | 103,432 | 135,443 | (14,249) | (2,072) |
| Accrued expenses and other current liabilities | 103,936 | 292,054 | 51,903 | 7,549 |
| Amount due to related parties | 11,113 | (16,070) | 43,024 | 6,258 |
| Deferred tax liability | — | (969) | (22,923) | (3,334) |
| Other non-current liabilities | 1,449 | 2,086 | 6,538 | 951 |
| Net cash provided by operating activities | 1,466,290 | 2,886,107 | 3,327,718 | 483,997 |
| Cash flows from investing activities | | | | |
| Purchase of property and equipment | (46,839) | (218,627) | (242,843) | (35,320) |
| Proceeds from disposal of property and equipment | 418 | 59 | 2,214 | 322 |
| Payment for long-term investments | (96,365) | (53,928) | (65,125) | (9,472) |
| Prepayment for long-term investments | (18,000) | (50,000) | (55,000) | (7,999) |
| Payment for acquired intangible assets | — | (18,979) | — | — |
| Payment for business acquisition, net of cash acquired | — | — | (3,318,841) | (482,705) |
| Purchase of term deposits | (3,378,030) | (4,028,058) | (20,287,302) | (2,950,666) |
| Cash received on maturity of term deposits | 2,737,897 | 4,191,859 | 13,922,393 | 2,024,928 |
| Payment for short-term investments | — | (15,700) | (457,200) | (66,497) |
| Cash received from sales of short-term investment | — | 5,200 | 467,700 | 68,024 |
| Net cash used in investing activities | (800,919) | (188,174) | (10,034,004) | (1,459,385) |
| Cash flows from financing activities | | | | |
| Capital contribution from non-controlling interest shareholder | — | 490 | 12 | 2 |
| Deferred payment of purchase of property and equipment | (2,084) | (1,496) | (8,562) | (1,245) |
| Proceeds from exercise of share options | 2,208 | 3,839 | 5,313 | 773 |
| Proceeds from bank loan | — | — | 1,913,190 | 278,262 |
| Repayment of bank loan | — | — | (2,041,680) | (296,950) |
| Proceeds from issuance of convertible notes, net of issuance cost of RMB114,382 | — | — | 4,819,678 | 700,993 |
| Net cash provided by financing activities | 124 | 2,833 | 4,687,951 | 681,835 |
| Effect of exchange rate changes | 24,990 | (26,840) | 24,175 | 3,515 |
| Net increase (decrease) in cash and cash equivalents | 690,485 | 2,673,926 | (1,994,160) | (290,038) |
| Cash and cash equivalents at the beginning of year | 1,097,783 | 1,788,268 | 4,462,194 | 648,999 |
| Cash and cash equivalents at the end of year | 1,788,268 | 4,462,194 | 2,468,034 | 358,961 |
| Non-cash investing and financing activities | | | | |
| Payable for purchase of property and equipment | 4,321 | 47,267 | 49,407 | 7,186 |
| Payable for repurchase of ordinary shares | 44,782 | 41,966 | 44,347 | 6,450 |
| Deferred consideration in connection with business acquisition | — | — | 469,274 | 68,253 |
| Ordinary shares issued for the acquisition of Tantan Limited. | — | — | 784,215 | 122,350 |

The accompanying notes are an integral part of these consolidated financial statements.

F-7

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

1. **ORGANIZATION AND PRINCIPAL ACTIVITIES**

Momo Inc. (the "Company") is the holding company for a group of companies, which is incorporated in the British Virgin Islands ("BVI") on November 23, 2011. In July 2014, the Company was redomiciled in the Cayman Islands ("Cayman") as an exempted company registered under the laws of the Cayman Islands, and was renamed Momo Inc. The Company, its subsidiaries, which include the wholly-foreign owned enterprises ("WFOEs"), its consolidated variable interest entities ("VIEs") and VIEs' subsidiaries (collectively the "Group") are principally engaged in providing mobile-based social and entertainment services. The Group started its operation in July 2011. The Group started its monetization in the third quarter of 2013, by offering a platform for live video services, value-added services, mobile marketing services, mobile games and other services.

In May 2018, the Company completed the acquisition of 100% equity stake of Tantan Limited ("Tantan"). Tantan is a leading social and dating app for the younger generation that was founded in 2014. Tantan is designed to help its users find and establish romantic connections as well as meet

interesting people. The total consideration consisted of cash consideration of RMB 3,930,246 (US$613,181) and 5,328,853 Class A ordinary shares of the Company. Refer to Note 3 for further details.

As of December 31, 2018, details of the Company's major subsidiaries, VIEs and VIEs' subsidiaries are as follows:

*Major subsidiaries*
Momo Technology HK Company Limited ("Momo HK")
Beijing Momo Information Technology Co., Ltd. ("Beijing Momo IT")
Momo Technology Overseas Holding Company Limited ("Momo BVI")
Momo Information Technologies Corp. ("Momo US")
Qool Media HongKong Limited ("QOOL HK")
Tantan Limited ("Tantan")
Tantan Hong Kong Limited ("Tantan HK")
Tantan Social Inc. ("Tantan US")
Tantan Technology (Beijing) Co., Ltd. ("Tantan Technology")
QOOL Media Inc. ("QOOL Inc.")
QOOL Media Technology (Tianjin) Co., Ltd. ("QOOL Media")
*Major VIEs*
Beijing Momo Technology Co., Ltd. ("Beijing Momo") *
QOOL Media (Tianjin) Co., Ltd. ("QOOL Tianjin") *
Tantan Culture Development (Beijing) Co., Ltd. ("Tantan Culture") *
*Major VIEs' subsidiaries*
Chengdu Momo Technology Co., Ltd. ("Chengdu Momo") *
Tianjin Heer Technology Co., Ltd. ("Tianjin Heer") *
Loudi Momo Technology Co., Ltd. ("Loudi Momo") *

\* These entities are controlled by the Company pursuant to the contractual arrangements disclosed below.

F-8

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

1. **ORGANIZATION AND PRINCIPAL ACTIVITIES - continued**

The VIE arrangements

The People's Republic of China ("PRC") regulations currently limit direct foreign ownership of business entities providing value-added telecommunications services, advertising services and internet services in the PRC where certain licenses are required for the provision of such services. The Group provides substantially all of its services in China through certain PRC domestic companies, which hold the operating licenses and approvals to enable the Group to provide such mobile internet content services in the PRC. Specifically, these PRC domestic companies that are material to the Company's business are Beijing Momo, Chengdu Momo, Tianjin Heer, Loudi Momo, QOOL Tianjin and Tantan Culture. The equity interests of these PRC domestic companies are held by PRC citizens or by PRC entities owned and/or controlled by PRC citizens.

The Company obtained control over its VIEs by entering into a series of contractual arrangements with the VIEs and their equity holders (the "Nominee Shareholders"), which enable the Company to (1) have power to direct the activities that most significantly affects the economic performance of the VIEs, and (2) receive the economic benefits of the VIEs that could be significant to the VIEs. Accordingly, the Company is considered the primary beneficiary of VIEs and has consolidated the VIEs' financial results of operations, assets and liabilities in the Company's consolidated financial statements. In making the conclusion that the Company is the primary beneficiary of the VIEs, the Company's rights under the Power of Attorney also provide the Company's abilities to direct the activities that most significantly impact the VIEs economic performance. The Company also believes that this ability to exercise control ensures that the VIEs will continue to execute and renew the Exclusive Cooperation Agreements and pay service fees to the Company. By charging service fees in whatever amounts the Company deems fit, and by ensuring that the Exclusive Cooperation Agreements is executed and renewed indefinitely, the Company has the rights to receive substantially all of the economic benefits from the VIEs.

Details of the typical structure of the Company's significant VIEs are set forth below:

Agreements that provide the Company effective control over the VIEs:

(1)     Power of Attorney

Pursuant to the Power of Attorney, the Nominee Shareholders of the VIEs each irrevocably appointed respective WFOEs as the attorney-in-fact to act on their behalf on all matters pertaining to the VIEs and to exercise all of their rights as a shareholder of the VIEs, including but not limited to convene, attend and vote on their behalf at shareholders' meetings, designate and appoint directors and senior management members. The WFOEs may authorize or assign their rights under this appointment to a person as approved by its board of directors at its sole discretion. Each power of attorney will remain in force until the shareholder ceases to hold any equity interest in the VIEs. The Company believes the Powers of Attorney can demonstrate the power of its WFOEs to direct how the VIEs should conduct their daily

operations.

F-9

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

1.   **ORGANIZATION AND PRINCIPAL ACTIVITIES - continued**

The VIE arrangements - continued

Agreementsthat provide the Company effective control over the VIEs: - continued

(2)    Exclusive Call Option Agreement

Under the Exclusive Call Option Agreement among the WFOEs, the VIEs and their Nominee Shareholders, each of the Nominee Shareholders irrevocably granted the respective WFOE or its designated representative(s) an exclusive option to purchase, to the extent permitted under PRC law, all or part of his, her or its equity interests in the VIEs at the consideration equal to the nominal price or at lowest price as permitted by PRC laws.

The WFOEs or their designated representative(s) have sole discretion as to when to exercise such options, either in part or in full. Without the WFOEs' written consent, the Nominee Shareholders of the VIEs shall not transfer, donate, pledge, or otherwise dispose any equity interests of the VIEs in any way. In addition, any consideration paid by the WFOEs to the Nominee Shareholders of the VIEs in exercising the option shall be transferred back to the respective WFOE or its designated representative(s). This agreement could be terminated when all the shareholders' equity were acquired by the WFOEs or their designated representative(s) subject to the law of People's Republic of China.

In addition, the VIEs irrevocably granted the WFOEs an exclusive and irrevocable option to purchase any or all of the assets owned by the VIEs at the lowest price permitted under PRC law. Without the WFOEs' prior written consent, the VIEs and their Nominee Shareholders will not sell, transfer, mortgage or otherwise dispose of the VIEs' material assets, legal or beneficial interests or revenues of more than certain amount or allow an encumbrance on any interest in the VIEs.

(3)    Spousal Consent Letters

Each spouse of the married Nominee Shareholders of the VIEs entered into a Spousal Consent Letter, which unconditionally and irrevocably agreed that the equity interests in the VIEs held by and registered in the name of their spouse will be disposed of pursuant to the Equity Interest Pledge Agreement, the Exclusive Call Option Agreement, and the Power of Attorney. Each spouse agreed not to assert any rights over the equity interests in the VIEs held by their spouse. In addition, in the event that the spouse obtains any equity interests in the VIEs held by their spouse for any reason, they agreed to be bound by the contractual arrangements.

Agreements that transfer economic benefits to the Company:

(1)    Exclusive Cooperation Agreements

Each relevant VIEs has entered into an exclusive technology services agreement or an exclusive services agreement with the respective WFOEs, pursuant to which the relevant WFOEs provides exclusive services to the VIEs. In exchange, the VIEs pay a service fee to the WFOEs, the amount of which shall be determined, to the extent permitted by applicable PRC laws as proposed by the WFOEs, resulting in a transfer of substantially all of the profits from the VIEs to the WFOEs.

F-10

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

1.   **ORGANIZATION AND PRINCIPAL ACTIVITIES - continued**

The VIE arrangements - continued

Agreementsthat transfer economic benefits to the Company: - continued

(2)    Equity Interest Pledge Agreement

Under the equity interest pledge agreement among the WFOEs and each of the Nominee Shareholders of the VIEs, the Nominee Shareholders pledged all of their equity interests in the VIEs to the respective WFOEs to guarantee the VIEs' and their shareholders' payment obligations arising from the Exclusive Cooperation Agreements, Business Operation Agreement and the Exclusive Call Option Agreement, including but

not limited to, the payments due to the respective WFOEs for services provided.

If any VIEs or any of their Nominee Shareholders breaches their contractual obligations under the above agreements, the respective WFOEs, as the pledgee, will be entitled to certain rights and entitlements, including receiving priority proceeds from the auction or sale of whole or part of the pledged equity interests of the VIEs in accordance with PRC legal procedures. During the term of the pledge, the shareholders of the VIEs shall cause the VIEs not to distribute any dividends and if they receive any dividends generated by the pledged equity interests, they shall transfer such received amounts to an account designated by the respective parties according to the instruction of the respective WFOEs.

The pledge will remain binding until the VIEs and their Nominee Shareholders have fully performed all their obligations under the Exclusive Cooperation Agreements, Business Operations Agreement and Exclusive Call Option Agreement.

(3)     Business Operations Agreement

Under the Business Operations Agreement among the WFOEs, the VIEs and the Nominee Shareholders of the VIEs, without the prior written consent of the WFOEs or their designated representative(s), the VIEs shall not conduct any transaction that may substantially affect the assets, business, operation or interest of the WFOEs. The VIEs and Nominee Shareholders shall also follow the WFOEs' instructions on management of the VIEs' daily operation, finance and employee matters and appoint the nominee(s) designated by the WFOEs as the director(s) and senior management members of the VIEs. In the event that any agreements between the WFOEs and the VIEs terminates, the WFOEs have the sole discretion to determine whether to continue any other agreements with the VIEs. The WFOEs are entitled to any dividends or other interests declared by the VIEs and the shareholders of the VIEs have agreed to promptly transfer such dividends or other interests to the WFOEs. The agreement shall remain effective for 10 years. At the discretion of the WFOEs, this agreement will be renewed on applicable expiration dates, or the WFOEs and the VIEs will enter into another exclusive agreement.

Through these contractual agreements, the Company has the ability to effectively control the VIEs and is also able to receive substantially all the economic benefits of the VIEs.

F-11

**Table of Contents**

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

1.     **ORGANIZATION AND PRINCIPAL ACTIVITIES - continued**

Risk in relation to the VIE structure

The Company believes that the WFOEs' contractual arrangements with the VIEs are in compliance with PRC law and are legally enforceable. The shareholders of the VIEs are also shareholders of the Company and therefore have no current interest in seeking to act contrary to the contractual arrangements. However, uncertainties in the PRC legal system could limit the Company's ability to enforce these contractual arrangements and if the shareholders of the VIEs were to reduce their interest in the Company, their interests may diverge from that of the Company and that may potentially increase the risk that they would seek to act contrary to the contractual terms, for example by influencing the VIEs not to pay the service fees when required to do so.

However, the Company cannot assure that when conflicts of interest arise, the shareholders will act in the best interests of the Company or that conflicts of interests will be resolved in the Company's favor. Currently, the Company does not have existing arrangements to address potential conflicts of interest the shareholders of the VIEs may encounter in their capacity as the beneficial owners and director of the VIEs on the one hand, and as beneficial owners and directors or officer of the Company, on the other hand. The Company believes the shareholders of the VIEs will not act contrary to any of the contractual arrangements and the Exclusive Call Option Agreement provides the Company with a mechanism to remove the shareholders as the beneficial shareholders of the VIEs should they act to the detriment of the Company. The Company relies on the VIEs' shareholders, as directors and officer of the Company, to fulfill their fiduciary duties and abide by laws of the PRC and the Cayman and act in the best interest of the Company. If the Company cannot resolve any conflicts of interest or disputes between the Company and the VIEs' shareholders, the Company would have to rely on legal proceedings, which could result in disruption of its business, and there is substantial uncertainty as to the outcome of any such legal proceedings.

The Company's ability to control the VIEs also depends on the Power of Attorney. The WFOEs and VIEs have to vote on all matters requiring shareholder approval in the VIEs. As noted above, the Company believes this power of attorney is legally enforceable but may not be as effective as direct equity ownership.

In addition, if the legal structure and contractual arrangements were found to be in violation of any existing PRC laws and regulations, the PRC government could:

• revoke the Group's business and operating licenses;

• require the Group to discontinue or restrict operations;

• restrict the Group's right to collect revenues;

• block the Group's websites;

• require the Group to restructure the operations in such a way as to compel the Group to establish a new enterprise, re-apply for the necessary licenses or relocate our businesses, staff and assets;

- impose additional conditions or requirements with which the Group may not be able to comply; or

- take other regulatory or enforcement actions against the Group that could be harmful to the Group's business.

F-12

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

1.   **ORGANIZATION AND PRINCIPAL ACTIVITIES - continued**

Risk in relation to the VIE structure - continued

The imposition of any of these penalties may result in a material and adverse effect on the Group's ability to conduct the Group's business. In addition, if the imposition of any of these penalties causes the Group to lose the rights to direct the activities of the VIEs or the right to receive their economic benefits, the Group would no longer be able to consolidate the VIEs. The Group does not believe that any penalties imposed or actions taken by the PRC government would result in the liquidation of the Company, WFOEs, or the VIEs.

The following consolidated financial statements amounts and balances of the VIEs were included in the accompanying consolidated financial statements after the elimination of intercompany balances and transactions as of and for the years ended December 31:

|  | As of December 31, | |
| --- | --- | --- |
|  | 2017 | 2018 |
|  | RMB | RMB |
| Cash and cash equivalents | 410,611 | 1,502,395 |
| Accounts receivable, net of allowance for doubtful accounts of RMB585 and RMB nil as of December 31, 2017 and 2018, respectively | 257,633 | 719,606 |
| Amount due from related parties | 33,460 | — |
| Prepaid expenses and other current assets | 371,220 | 425,974 |
| Short-term investment | 10,500 | — |
| Total current assets | 1,083,424 | 2,647,975 |
| Property and equipment, net | 52,568 | 72,539 |
| Intangible assets | 48,554 | 42,821 |
| Rental deposits | 10,471 | 11,619 |
| Other non-current assets | 50,000 | 67,480 |
| Long-term investments | 281,935 | 447,465 |
| Deferred tax assets | 6,908 | 52,887 |
| Goodwill | 22,130 | 22,130 |
| Total assets | 1,555,990 | 3,364,916 |
| Accounts payable | 357,437 | 549,173 |
| Deferred revenue | 421,528 | 441,392 |
| Accrued expenses and other current liabilities | 200,406 | 304,363 |
| Amounts due to related parties | 188 | 43,213 |
| Income tax payable | 76,549 | 113,733 |
| Total current liabilities | 1,056,108 | 1,451,874 |
| Deferred tax liabilities | 12,138 | 10,705 |
| Total liabilities | 1,068,246 | 1,462,579 |

|  | For the years ended December 31, | | |
| --- | --- | --- | --- |
|  | 2016 | 2017 | 2018 |
|  | RMB | RMB | RMB |
| Net revenues | 3,707,358 | 8,886,390 | 13,408,421 |
| Net income | 2,268,098 | 4,890,438 | 6,292,183 |
| Net cash provided by operating activities | 2,401,340 | 4,997,183 | 5,913,709 |
| Net cash used in investing activities | (73,224) | (174,333) | (151,546) |
| Net cash provided by financing activities | — | 490 | — |

The unrecognized revenue-producing assets that are held by the VIEs are primarily self-developed intangible assets such as domain names, trademark and various licenses which are un-recognized at the consolidated balance sheets.

F-13

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

**1.   ORGANIZATION AND PRINCIPAL ACTIVITIES - continued**

Risk in relation to the VIE structure - continued

The VIEs contributed an aggregate of 100% of the consolidated net revenues for each of the years ended December 31, 2016, 2017 and 2018, respectively. As of the fiscal years ended December 31, 2017 and 2018, the VIEs accounted for an aggregate of 18.4% and 17.7%, respectively, of the consolidated total assets, and 62.1% and 18.4%, respectively, of the consolidated total liabilities. The assets that were not associated with the VIEs primarily consist of cash and cash equivalents, term deposits, intangible assets and goodwill.

There are no consolidated VIEs' assets that are collateral for the VIEs' obligations and can only be used to settle the VIEs' obligations. There are no creditors (or beneficial interest holders) of the VIEs that have recourse to the general credit of the Company or any of its consolidated subsidiaries. There are no terms in any arrangements, considering both explicit arrangements and implicit variable interests that require the Company or its subsidiaries to provide financial support to the VIEs. However, if the VIEs ever need financial support, the Company or its subsidiaries may, at its option and subject to statutory limits and restrictions, provide financial support to its VIEs through loans to the shareholders of the VIEs or entrustment loans to the VIEs. Relevant PRC laws and regulations restrict the VIEs from transferring a portion of their net assets, equivalent to the balance of their statutory reserve and their share capital, to the Company in the form of loans and advances or cash dividends. Please refer to Note 20 for disclosure of restricted net assets. The Group may lose the ability to use and enjoy assets held by the VIEs that are important to the operation of business if the VIEs declare bankruptcy or become subject to a dissolution or liquidation proceeding.

**2.   SIGNIFICANT ACCOUNTING POLICIES**

Basis of presentation

The consolidated financial statements of the Group have been prepared in accordance with the accounting principles generally accepted in the United States of America ("U.S. GAAP").

Basis of consolidation

The consolidated financial statements of the Group include the financial statements of Momo Inc., its subsidiaries, its VIEs and VIEs' subsidiaries. All inter-company transactions and balances have been eliminated upon consolidation.

Use of estimates

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and revenues, cost and expenses in the financial statements and accompanying notes. Significant accounting estimates reflected in the Group's consolidated financial statements include revenue recognition, the acquisition's purchase price allocation, the useful lives and impairment of property and equipment and intangible assets, the impairment of goodwill, the valuation allowance for deferred tax assets, and share-based compensation.

F-14

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

**2.   SIGNIFICANT ACCOUNTING POLICIES - continued**

Cash and cash equivalents

Cash and cash equivalents consist of cash on hand and highly liquid investments, which are unrestricted from withdrawal or use, or which have original maturities of three months or less when purchased.

Term deposits

Term deposits consist of bank deposits with an original maturity of over three months.

Accounts receivable

Accounts receivable primarily represents the cash due from third-party application stores and other payment channels and advertising customers, net of allowance for doubtful accounts. The Group makes estimates for the allowance for doubtful accounts based upon its assessment of various factors, including the age of accounts receivable balances, credit quality of third-party application stores and other payment channels, advertising customers and other customers, current economic conditions and other factors that may affect their ability to pay. An allowance for doubtful

accounts is recorded in the period in which a loss is determined to be probable.

Financial instruments

Financial instruments of the Group primarily consist of cash and cash equivalents, term deposits, accounts receivable, equity securities without readily determinable fair value, accounts payable, deferred revenue, income tax payable, amount due from related parties and amount due to related parties.

Cash and cash equivalents are recorded at fair value based on the quoted market price in an active market. The carrying values of term deposits, accounts receivable, accounts payable, deferred revenue, income tax payable, amount due from related parties and amount due to related parties approximate their fair values due to short-term maturities. It is not practical to estimate the fair value of the Group's equity securities without readily determinable fair value because of the lack of quoted market price and the inability to estimate fair value without incurring excessive costs.

Foreign currency risk

The Renminbi ("RMB") is not a freely convertible currency. The State Administration for Foreign Exchange, under the authority of the People's Bank of China, controls the conversion of RMB into foreign currencies. The value of the RMB is subject to changes in central government policies and to international economic and political developments affecting supply and demand in the China Foreign Exchange Trading System market. Cash and cash equivalents of the Group included aggregate amounts of RMB4,116 million and RMB2,008 million as of December 31, 2017 and 2018, respectively, which were denominated in RMB.

F-15

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

2.    **SIGNIFICANT ACCOUNTING POLICIES - continued**

Concentration of credit risk

Financial instruments that potentially expose the Group to concentration of credit risk consist primarily of cash and cash equivalents, term deposits and accounts receivable. The Group places their cash with financial institutions with high-credit ratings and quality.

Third-party application stores and other payment channels accounting for 10% or more of accounts receivables are as follows:

|   | As of December 31, | |
|---|---|---|
|   | 2017 | 2018 |
| A | 23% | 14% |
| B | 19% | 12% |
| C | 21% | 0% |

Users or customers accounting for 10% or more of accounts receivables is as follows:

|   | As of December 31, | |
|---|---|---|
|   | 2017 | 2018 |
| D | 0% | 59% |

Concentration of revenue

No user or customer accounted for 10% or more of net revenues for the years ended December 31, 2016, 2017 and 2018, respectively.

Business combinations

Business combinations are recorded using the acquisition method of accounting in accordance with Accounting Standards Codification ("ASC") 805 "Business Combinations". The cost of an acquisition is measured as the aggregate of the acquisition date fair value of the assets transferred to the sellers and liabilities incurred by the Company and equity instruments issued. Identifiable assets and liabilities acquired or assumed are measured separately at their fair values as of the acquisition date, irrespective of the extent of any noncontrolling interests. The purchase price of business acquisition is allocated to the tangible assets, liabilities, identifiable intangible assets acquired and non-controlling interest, if any, based on their estimated fair values as of the acquisition date. The excess of the purchase price over those fair values is recorded as goodwill. Acquisition-related expenses and restructuring costs are expensed as incurred.

The Company adopted Accounting Standard Update ("ASU") 2017-01 "Business Combination (Topic 805): Clarifying the Definition of a Business" on January 1, 2018 and applied the new definition of a business prospectively for acquisitions made subsequent to December 31, 2017. Upon the adoption of ASU 2017-01, a new screen test is introduced to evaluate whether a transaction should be accounted for as an acquisition and/or disposal of a business versus assets. In order for a purchase to be considered an acquisition of a business, and receive business combination accounting treatment, the set of transferred assets and activities must include, at a minimum, an input and a substantive process that together significantly contribute to the ability to create outputs. If substantially all of the fair value of the gross assets acquired is concentrated in a single identifiable asset or a group of similar identifiable assets, then the set of transferred assets and activities is not a business. The adoption of this

standard requires future purchases to be evaluated under the new framework.

F-16

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

**2.    SIGNIFICANT ACCOUNTING POLICIES - continued**

Equity securities without readily determinable fair value

The Company adopted ASC Topic 321, Investments—Equity Securities ("ASC 321") on January 1, 2018. Prior to 2018, the Company carried at cost its investments in investees that do not have readily determinable fair value and over which the Company does not have significant influence, in accordance with ASC Subtopic 325-20, Investments-Other: Cost Method Investments. Management regularly evaluates the impairment of the cost method investments based on the performance and financial position of the investee as well as other evidence of market value. Such evaluation includes, but is not limited to, reviewing the investee's cash position, recent financing, projected and historical financial performance. An impairment loss is recognized in earnings equal to the excess of the investment's cost over its fair value at the balance sheet date of the reporting period for which the assessment is made. The fair value would then become the new cost basis of the investment.

Subsequent to the Company's adoption of ASC 321 for equity securities without readily determinable fair value that do not qualify for the existing practical expedient available in ASC Topic 820, *Fair Value Measurements and Disclosures* ("ASC 820"), the Company elected to use the measurement alternative to measure those investments at cost, less any impairment, plus or minus changes resulting from observable price changes in orderly transactions for identical or similar investments of the same issuer, if any.

Pursuant to ASC 321, for those equity securities that the Company elects to use the measurement alternative, the Company makes a qualitative assessment of whether the investment is impaired at each reporting date. If a qualitative assessment indicates that the investment is impaired, the Company has to estimate the investment's fair value in accordance with the principles of ASC 820. If the fair value is less than the investment's carrying value, the Company recognizes an impairment loss in net income equal to the difference between the carrying value and fair value.

Equity method investments

The investee companies over which the Group has the ability to exercise significant influence, but does not have a controlling interest are accounted for using the equity method. Significant influence is generally considered to exist when the Group has an ownership interest in the voting stock of the investee between 20% and 50%. Other factors, such as representation in the investee's Board of Directors, voting rights and the impact of commercial arrangements, are also considered in determining whether the equity method of accounting is appropriate. For the investment in limited partnerships, where the Group holds less than a 20% equity or voting interest, the Group's influence over the partnership operating and financial policies is determined to be more than minor. Accordingly, the Group accounts for these investments as equity method investments.

Under the equity method of accounting, the affiliated company's accounts are not reflected within the Group's consolidated balance sheets and statements of operations; however, the Group's share of the earnings or losses of the affiliated company is reflected in the caption "share of income on equity method investments" in the consolidated statements of operations.

An impairment change is recorded if the carrying amount of the investment exceeds its fair value and this condition is determined to be other-than-temporary.

The Group estimates the fair value of the investee company based on comparable quoted price for similar investment in active market, if applicable, or discounted cash flow approach which requires significant judgments, including the estimation of future cash flows, which is dependent on internal forecasts, the estimation of long term growth rate of a company's business, the estimation of the useful life over which cash flows will occur, and the determination of the weighted average cost of capital.

Available-for-sale investments

For investments in investees' stocks which are determined to be debt securities, the Group accounts for them as long-term available-for-sale investments when they are not classified as either trading or held-to-maturity investments.

Available-for-sale investments are reported at fair value, with unrealized gains and losses recorded in accumulated other comprehensive income (loss) as a component of shareholders' equity. Realized gains and losses and provision for decline in value judged to be other than temporary, if any, are recognized in the consolidated statements of operations.

F-17

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**

**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

2. **SIGNIFICANT ACCOUNTING POLICIES - continued**

Available-for-sale investments - continued

The Group continually reviews its available-for-sale investments to determine whether a decline in fair value below the carrying value is other than temporary. The primary factors the Group considers in its determination are the length of time that the fair value of the investment is below the Group's carrying value; the financial condition, operating performance and the prospects of the available-for-sale investee; and other specific information such as recent financing rounds. If the decline in fair value is deemed to be other than temporary, the carrying value of the available-for-sale investee is written down to fair value. The Group estimated the fair value of these investee companies based on discounted cash flow approach which requires significant judgments, including the estimation of future cash flows, which is dependent on internal forecasts, the estimation of long term growth rate of a company's business, the estimation of the useful life over which cash flows will occur, and the determination of the weighted average cost of capital.

Property and equipment, net

Property and equipment are stated at cost less accumulated depreciation. Depreciation is calculated on a straight-line basis over the following estimated useful lives:

| | |
|---|---|
| Office equipment | 3-5 years |
| Computer equipment | 3 years |
| Vehicles | 5 years |
| Leasehold improvement | Shorter of the lease term or estimated useful lives |

Intangible assets

Intangible assets acquired through business acquisitions are recognized as assets separate from goodwill if they satisfy either the "contractual-legal" or "separability" criterion. Purchased intangible assets and intangible assets arising from acquisitions are recognized and measured at fair value upon acquisition. Separately identifiable intangible assets that have determinable lives continue to be amortized over their estimated useful lives using the straight-line method as follows:

| | |
|---|---|
| Copyright | 1 year |
| License | 3.2-10 years |
| Technology | 3 years |
| User base | 5 years |
| Trade name | 10 years |

Impairment of long-lived assets with finite lives

The Group reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may no longer be recoverable. When these events occur, the Group measures impairment by comparing the carrying value of the long-lived assets to the estimated undiscounted future cash flows expected to result from the use of the assets and their eventual disposition. If the sum of the expected undiscounted cash flow is less than the carrying amount of the assets, the Group recognizes an impairment loss based on the fair value of the assets.

F-18

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

2. **SIGNIFICANT ACCOUNTING POLICIES - continued**

Goodwill

Goodwill represents the excess of the purchase consideration over the fair value of the identifiable tangible and intangible assets acquired and liabilities assumed of the acquired entity as a result of the Company's acquisitions of interests in its subsidiaries. Goodwill is not amortized but is tested for impairment on an annual basis, or more frequently if events or changes in circumstances indicate that it might be impaired. The Company has an option to first assess qualitative factors to determine whether it is necessary to perform the two-step quantitative goodwill impairment test. In the qualitative assessment, the Company considers primary factors such as industry and market considerations, overall financial performance of the reporting unit, and other specific information related to the operations. Based on the qualitative assessment, if it is more likely than not that the fair value of each reporting unit is less than the carrying amount, the quantitative impairment test is performed.

In performing the two-step quantitative impairment test, the first step compares the fair values of each reporting unit to its carrying amount, including goodwill. If the fair value of each reporting unit exceeds its carrying amount, goodwill is not considered to be impaired and the second

step will not be required. If the carrying amount of a reporting unit exceeds its fair value, the second step compares the implied fair value of goodwill to the carrying value of a reporting unit's goodwill. The implied fair value of goodwill is determined in a manner similar to accounting for a business combination with the allocation of the assessed fair value determined in the first step to the assets and liabilities of the reporting unit. The excess of the fair value of the reporting unit over the amounts assigned to the assets and liabilities is the implied fair value of goodwill. This allocation process is only performed for the purposes of evaluating goodwill impairment and does not result in an entry to adjust the value of any assets or liabilities. Application of a goodwill impairment test requires significant management judgment, including the identification of reporting units, assigning assets, liabilities and goodwill to reporting units, and determining the fair value of each reporting unit.

Convertible senior notes

The Group determines the appropriate accounting treatment of its convertible senior notes in accordance with the terms in relation to the conversion feature, call and put options, and beneficial conversion feature. After considering the impact of such features, the Group may account for such instrument as a liability in its entirety, or separate the instrument into debt and equity components following the respective guidance described under ASC 815 "Derivatives and Hedging" and ASC 470 "Debt". The debt discount, if any, together with the related issuance cost are subsequently amortized as interest expense, using the effective interest method, from the issuance date to the earliest maturity date. Interest expenses are recognized in the consolidated statement of operation in the period in which they are incurred.

Fair value

Fair value is the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. When determining the fair value measurements for assets and liabilities required or permitted to be recorded at fair value, the Group considers the principal or most advantageous market in which it would transact and it considers assumptions that market participants would use when pricing the asset or liability.

Authoritative literature provides a fair value hierarchy that requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value. An asset or liability categorization within the fair value hierarchy is based upon the lowest level of input that is significant to the fair value measurement as follows:

*Level 1*

Level 1 applies to assets or liabilities for which there are quoted prices in active markets for identical assets or liabilities.

*Level 2*

Level 2 applies to assets or liabilities for which there are inputs other than quoted prices included within Level 1 that are observable for the assets or liabilities such as quoted prices for similar assets or liabilities in active markets; quoted prices for identical assets or liabilities in markets with insufficient volume or infrequent transactions (less active markets); or model-derived valuations in which significant inputs are observable or can be derived principally from, or corroborated by, observable market data.

F-19

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

2.  **SIGNIFICANT ACCOUNTING POLICIES - continued**

Fair value - continued

*Level 3*

Level 3 applies to assets or liabilities for which there are unobservable inputs to the valuation methodology that are significant to the measurement of the fair value of the assets or liabilities.

Revenue recognition

*Adoption of ASC, "Revenue from Contracts with Customers"*

In May 2014, the Financial Accounting Standards Board ("FASB") issued ASU No. 2014-09, Revenue from Contracts with Customers (Topic 606) ("Topic 606") as modified by subsequently issued ASUs 2015-14, 2016-08, 2016-10, 2016-12 and 2016-20 (collectively "ASU 2014-09").

On January 1, 2018, the Group adopted Topic 606 by applying the modified retrospective method to contracts that were not completed as of January 1, 2018. Results for the reporting periods beginning after January 1, 2018 are presented under Topic 606 while prior period amounts are not adjusted and continue to be reporting in accordance with the Group's historical accounting under Topic 605. The adoption of Topic 606 did not have a material impact on the Group's consolidated results of operations, financial position or cash flows but resulted in additional disclosures regarding the nature, amount, timing and uncertainty of revenue and cash flows arising from contracts with customers.

The Group principally derives its revenue from live video services, value-added services, mobile marketing services, mobile games and other services. The Group recognizes revenue when control of the promised goods or services are transferred to the customers, in an amount that reflects the consideration that the Group expects to receive in exchange for those goods or services. The Group applied the five steps method outlined in

Topic 606 to all revenue streams. In addition, the standard requires disclosures of the nature, amount, timing and uncertainty of revenue and cash flows arising from contracts with customers.

For the years ended December 31, 2016, 2017 and 2018, all the revenue for the periods was recognized from contracts with customers. The Group's revenue is reported net of discounts, value added tax and surcharges.

The following table provides information about disaggregated revenue by types, including a reconciliation of the disaggregated revenue with the Group's reportable segments:

|  | For the year ended December 31, 2018 | | |
|  | Momo | Tantan | QOOL |
|  | RMB | RMB | RMB |
| Live video service | 10,709,491 | — | — |
| Value-added services | 1,465,152 | 417,998 | — |
| Mobile marketing | 500,321 | — | — |
| Mobile games | 130,392 | — | — |
| Other services | 7,065 | — | 178,002 |
| Total | 12,812,421 | 417,998 | 178,002 |

|  | For the year ended December 31, 2017 | | |
|  | Momo | Tantan | QOOL |
|  | RMB | RMB | RMB |
| Live video service | 7,429,906 | — | — |
| Value-added services | 695,798 | — | — |
| Mobile marketing | 514,279 | — | — |
| Mobile games | 241,388 | — | — |
| Other services | 3,452 | — | 1,567 |
| Total | 8,884,823 | — | 1,567 |

F-20

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

2.    **SIGNIFICANT ACCOUNTING POLICIES - continued**

Revenue recognition - continued

|  | For the year ended December 31, 2016 | | |
|  | Momo | Tantan | QOOL |
|  | RMB | RMB | RMB |
| Live video service | 2,534,604 | — | — |
| Value-added services | 449,781 | — | — |
| Mobile marketing | 441,644 | — | — |
| Mobile games | 236,238 | — | — |
| Other services | 45,091 | — | — |
| Total | 3,707,358 | — | — |

(a)    Live video service

The Group is principally engaged in providing live video services whereby users can enjoy live performances and interact with the broadcasters for free during the performance. Broadcasters can either host the performance on their own or join a talent agency. The Group generates revenue from sales of virtual items to its customers. The Group designs, creates and offers various virtual items for sales to users with pre-determined stand-alone selling price, which if users chose to, can be purchased and be presented to the broadcasters to show their support during their live video performance. The Group has a recharge system for users to purchase the Group's virtual currency that can then be used to purchase virtual items on the Group's platform. Users can recharge via various third-party application stores and other payment channels. Virtual currency is non-refundable and does not have any expiration date. Based on the turnover history of virtual currency, the Group determined that the virtual currency is often consumed soon after it is purchased and accordingly, the Group concluded that any breakage would be insignificant. Unconsumed virtual currency is recorded as deferred revenue. Virtual currencies used to purchase virtual items are recognized as revenue according to the prescribed revenue recognition policies of virtual items addressed below unless otherwise stated. All virtual items are non-refundable, consumed at a point-in-time and expire in a few days after the purchase. Under arrangements entered into with broadcasters and talent agencies, the Group shares a portion of the revenues derived from the sales of virtual items with them ("Revenue Sharing").

The Group has evaluated and determined that it is the principal and views the users to be its customers. Specifically, the Group controls the

virtual items before they are transferred to users. Its control is evidenced by the Group's sole ability to monetize the virtual items before they are transferred to users, and is further supported by the Group being primarily responsible to the users for the delivery of the virtual items as well as having full discretion in establishing pricing for the virtual items. Accordingly, the Group reports its live video service revenues on a gross basis with amounts billed to users for the virtual items recorded as revenues and the Revenue Sharing paid to broadcasters and talent agencies recorded as cost of revenues. Sales proceeds are initially recorded as deferred revenue and recognized as revenue based on the consumption of the virtual items. The Group has determined that the virtual items represent one performance obligation in the live video service. Revenue related to each of the virtual items is recognized at the point in time when the virtual item is transferred directly to the broadcasters and consumed by them. Although some virtual items have expiry dates, the Group considers that the impact of breakage for the virtual items is insignificant as historical data shows that virtual items are consumed shortly after they are released to users and the forfeiture rate remains relatively low for the periods presented. The Group does not have further performance obligations to the user after the virtual items are consumed.

F-21

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

**2.    SIGNIFICANT ACCOUNTING POLICIES - continued**

Revenue recognition - continued

(a)    Live video service - continued

Users also have the right to purchase various combinations of virtual items in the live video, which are generally capable of being distinct. Specifically, the Group enters into certain contracts with its users where virtual item coupons are granted to users simultaneously with a purchase of a virtual item. The virtual item coupon can be used by the users to exchange for free virtual items in the future. Such virtual item coupons typically expire a few days after being granted. The Group has determined that the virtual item coupons represent a material right under Topic 606 which is recognized as a separate performance obligation at the outset of the arrangement. Judgment is required to determine the standalone selling price for each distinct virtual item and virtual item coupon. The Group allocates the consideration to each distinct virtual item and virtual item coupon based on their relative standalone selling prices. In instances where standalone selling price is not directly observable as the Group does not sell the virtual items separately, the Group determines the standalone selling price based on pricing strategies, market factors and strategic objectives. The Group recognizes revenue for each of the distinct virtual item in accordance with the revenue recognition method discussed above unless otherwise stated. Revenue for the virtual item coupons are recognized when the virtual items purchased with the virtual item coupons are consumed. Although virtual item coupons have expiry dates, the Group considers that the impact of breakage for the virtual items is insignificant as historical data shows that virtual currency coupons are consumed shortly after they are released to users and the forfeiture rate remains relatively low for the periods presented.

The Group does not provide any right of return and does not provide any other credit or incentive to its users.

F-22

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

**2.    SIGNIFICANT ACCOUNTING POLICIES - continued**

Revenue recognition - continued

(b)    Value-added services

Value-added services revenues mainly include membership subscription revenue and virtual gift service revenue. Membership subscription is a service package which enables members to enjoy additional functions and privileges. The contract period for the membership subscription ranges from one month to one year. All membership subscription is nonrefundable. The Group has determined that its membership subscription services represent one performance obligation. The Group collects membership subscription in advance and records it as deferred revenue. Revenue is recognized ratably over the contract period as the membership subscription services are delivered.

Virtual gift service was launched in 2016 to enhance users' experience of interaction and social networking with each other. Users are able to purchase virtual items and send them to other users. The Group shares a portion of the revenues derived from the sales of virtual items with the recipient of the virtual item. All virtual items are nonrefundable, consumed at a point-in-time and expire a few days after the purchase. Although some virtual items have expiry dates, the Group considers that the impact of breakage for the virtual items is insignificant as historical data shows that virtual items are consumed shortly after they are released to users, and the forfeiture rate remains relatively low for

the periods presented. The Group collects the cash from the purchase of virtual items and recognized the sales of virtual items when the performance obligation is satisfied. The Group has determined that it has one single performance obligation which is the display of the virtual item for the users who purchase them. Revenues derived from the sale of virtual items are recorded on a gross basis as the Group has determined that it is the principal in providing the virtual gift services for the same reasons outlined in the revenue recognition policy for its live video services. The portion paid to gift recipients is recognized as cost of revenues.

(c)  Mobile marketing

The Group provides advertising and marketing solutions to customers for promotion of their brands and conduction of effective marketing activities through its mobile application.

Display-based mobile marketing services

For display-based online advertising services such as banners and location-based advertising on the mobile applications, the Group has determined that its mobile marketing services represent one performance obligation. Accordingly, the Group recognizes mobile marketing revenue ratably over the period that the advertising is provided commencing on the date the customer's advertisement is displayed, or based on the number of times that the advertisement has been displayed for cost per thousand impressions advertising arrangements.

Performance-based mobile marketing services

The Group also enables advertising customers to place link on its mobile platform on a pay-for-effectiveness basis, which is referred to as the cost for performance model. The Group charges fees to advertising customers based on the effectiveness of advertising links, which is measured by active clicks. The Group has determined that its mobile marketing services represent one performance obligation. Accordingly, the Group recognizes mobile marketing revenue based on sales of effective clicks. Revenue is estimated by the Group based on its internal data, which is confirmed with respective customers periodically, or is recognized based on a fixed unit price.

The Group's mobile marketing revenues are recognized net of agency rebates, if applicable. Agency rebates have not been material for the years ended December 31, 2016, 2017 and 2018.

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

2.  **SIGNIFICANT ACCOUNTING POLICIES - continued**

Revenue recognition - continued

(d)  Mobile games

The Group publishes both licensed mobile games developed by third-party game developers and its self-developed games to the game players through its mobile application.

*Licensed mobile games*

The Group generates revenue from offering services of mobile games developed by third-party game developers. All of the licensed games can be accessed and played by game players directly through the Group's mobile game platform. The Group primarily views the game developers to be its customers and considers its responsibility under its agreements with the game developers to be the promotion of the game developers' games. The Group generally collects payments from game players in connection with the sale of in-game currencies and remits certain agreed-upon percentages of the proceeds to the game developers. Purchases of in-game currencies are not refundable after they have been sold unless there is unused in-game currencies at the time a game is discontinued. Typically, a game will only be discontinued when the monthly revenue generated by a game becomes consistently insignificant. The Group does not currently expect to pay any material cash refunds to game players or game developers in connection with a discontinued game. The majority of the licensed mobile games revenue is derived from non-exclusive mobile games services further discussed below.

*Licensed mobile games - Non-exclusive mobile games services*

The Group enters into non-exclusive agreements with the game developers and offers the Group's mobile game platform for the mobile games developed by the game developers. The Group considers its performance obligation under its arrangements with the game developers to be the offering of its mobile game platform for the game developers. The Group has determined that it has no additional performance obligation to the developers or game players upon the players completion of the corresponding in-game purchase. Therefore, the Group has determined that it is not the principal in the transaction and accordingly, revenues derived from the sale of in-game currencies are recorded net of remittances to game developers and commission fees made to third-party application stores and other payment channels. Revenue is further recognized at the end of the estimated consumption date by individual game (i.e., the estimated date in-game currencies are consumed within the game), which is typically within a short period of time ranging from two to three days after the purchase of the in-game currencies.

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

**2.   SIGNIFICANT ACCOUNTING POLICIES - continued**

Revenue recognition - continued

(d)   Mobile games - continued

*Self-developed mobile game*

In February 2015, the Group launched one self-developed game on its platform and started to generate revenues by in-game sales of virtual items. The Group has determined that it has a single performance obligation to the players who purchased the virtual items to gain an enhanced game-playing experience over the playing period of the paying players. Accordingly, the Group recognizes revenues ratably over the estimated average period of player relationship starting from the point in time when the players purchase the virtual items and once all other revenue recognition criteria are met. The Group operated eight and four self-developed mobile games in 2017 and 2018, respectively. The estimated periods of the player relationship ranged from 56 to 79 days as of December 31, 2017, and was 77 days as of December 31, 2018, respectively.

The Group has determined that it is the principal in fulfilling all obligations related to the mobile game operations for self-developed games. Accordingly, revenues are recognized on a gross basis. Commission fees paid to third-party application stores and other payment channels are recorded as cost of revenues.

(e)   Other services

Revenues from other services in the year ended December 31, 2018 mainly consisted of revenues generated from advertisement resulting from the broadcasting of one television program produced by the Group. During the year ended December 31, 2018, the Group signed an agreement with a television station, under which the Group is responsible for the production of the television program content, which was completed by December 31, 2018. The television station was responsible for providing advertising and marketing solutions to customers in addition to broadcasting the television program content. Revenue generated from the above is in the form of the advertising fees, shared between the television station and the Group based on a pre-determined percentage stated in the agreement. The Group determined that its television content production service represented one performance obligation. The broadcasting of the content was completed in the year ended December 31, 2018 and the revenue was recognized ratably during the period when the content was broadcasted on the television station.

Practical expedients and exemptions

The Group's contracts have an original duration of one year or less. Accordingly, the Group does not disclose the value of unsatisfied performance obligations. Additionally, the Group generally expenses sales commissions when incurred because the amortization period would have been one year or less. These costs are recorded within selling and marketing expenses.

Contract balances

Contract balances include accounts receivable and deferred revenue. Accounts receivable represent cash due from third-party application stores and other payment channels as well as from advertising customers and are recorded when the right to consideration is unconditional. The allowance for doubtful accounts reflects the best estimate of probable losses inherent to the account receivable balance. The Group recorded no impairment charges related to contract assets in the period. Deferred revenue primarily includes cash received from paying users related to the Group's live video service and value-added service as well as cash received from the Group's advertising customer. Deferred revenue is recognized as revenue over the estimated service period or when all of the revenue recognition criteria have been met. Revenue recognized in 2018 that was included in the deferred revenue balance as of January 1, 2018 was RMB 422,028.

Cost of revenues

Cost of revenues consist of expenditures incurred in the generation of the Group's revenues, including but not limited to revenue sharing with the broadcasters and talent agencies resulting from the sale of virtual items, production cost in connection the television content, bandwidth costs, commission fee paid to third-party application stores and other payment channels except for those paid related to licensed mobile games which are recorded net of revenue, salaries and benefits paid to employee, depreciation and amortization. These costs are expensed as incurred except for the direct and incremental platform commission fees to third-party application stores and other payment channels and production cost in connection with the television content which are deferred in "Prepaid expenses and other current assets" on the consolidated balance sheets. Such deferred costs are recognized in the consolidated statements of operations in "Cost of revenues" in the period in which the related revenues are recognized.

Government subsidies

For the government subsidies not subject to further performance obligations or future returns, the Group records the amounts as other income when received from local government authority. Whereas for the government subsidies with certain future performance obligations, the Group recognizes those as liabilities when received until the performances obligations have been met at which time, those are recognized as other income. Government subsidies recorded as other income amounted to RMB2,000, RMB141,688 and RMB223,995 for the years ended December 31, 2016, 2017 and 2018.

F-25

**Table of Contents**

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
(in thousands, except share data)

**2.    SIGNIFICANT ACCOUNTING POLICIES - continued**

Research and development expenses

Research and development expenses primarily consist of (i) salaries and benefits for research and development personnel, and (ii) technological service fee, office rental and depreciation expenses associated with the research and development activities. The Group's research and development activities primarily consist of the research and development of new features for its mobile platform and its self-developed mobile games. The Group has expensed all research and development expenses when incurred.

Value added taxes ("VAT")

Entities that are VAT general taxpayers are allowed to offset qualified input VAT paid to suppliers against their output VAT liabilities. Net VAT balance between input VAT and output VAT is recorded in accrued expenses and other current liabilities on the consolidated balance sheets. VAT is also reported as a deduction to revenue when incurred and amounted to RMB367,635, RMB812,249 and RMB1,136,034 for the years ended December 31, 2016, 2017 and 2018, respectively.

Income taxes

Current income taxes are provided for in accordance with the laws of the relevant tax authorities. Deferred income taxes are recognized when temporary differences exist between the tax bases of assets and liabilities and their reported amounts in the consolidated financial statements. Net operating loss carry forwards and credits are applied using enacted statutory tax rates applicable to future years. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more-likely-than-not that a portion of or all of the deferred tax assets will not be realized.

The impact of an uncertain income tax position on the income tax return is recognized at the largest amount that is more-likely than- not to be sustained upon audit by the relevant tax authority. An uncertain income tax position will not be recognized if it has less than a 50% likelihood of being sustained. Interest and penalties on income taxes will be classified as a component of the provisions for income taxes.

Foreign currency translation and change in reporting currency

The reporting currency of the Company is the Renminbi ("RMB"). The functional currency of the Company is the US dollar ("US$"). The Company's operations are principally conducted through the subsidiaries, its VIEs and VIEs' subsidiaries located in the PRC where the local currency is the functional currency.

Monetary assets and liabilities denominated in currencies other than the functional currency are translated into the functional currency at the rates of exchange in place at the balance sheet date. Transactions in currencies other than the functional currency during the year are converted into the functional currency at the applicable rates of exchange prevailing when the transactions occurred. Transaction gains and losses are recognized in the consolidated statement of operations.

Assets and liabilities of the Group companies are translated from their respective functional currencies to the reporting currency at the exchange rates at the balance sheet dates, equity accounts are translated at historical exchange rates and revenues and expenses are translated at the average exchange rates in effect during the reporting period. The resulting foreign currency translation adjustment are recorded in other comprehensive income (loss).

Starting from the fourth quarter of 2018, the Group changed its reporting currency from US$ to RMB, to reduce the impact of increased volatility of the RMB to US$ exchange rate on the Group's reported operating results. The aligning of the reporting currency with the underlying operations will better depict the Group's results of operations for each period. The related financial statements prior to October 1, 2018 have been recasted to RMB as if the financial statements originally had been presented in RMB since the earliest periods presented. The change in reporting currency resulted in cumulative foreign currency translation adjustment to the Group's comprehensive income amounted to a gain of RMB175,963, a loss of RMB155,368 and a gain of RMB198,654 for the years ended December 31, 2016, 2017 and 2018, respectively.

F-26

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
(in thousands, except share data)

**2.    SIGNIFICANT ACCOUNTING POLICIES - continued**

Foreign currency translation and change in reporting currency - continued

Translations of amounts from RMB into US$ for the convenience of the reader were calculated at the noon buying rate of US$1.00 = RMB6.8755 on the last trading day of 2018 (December 31, 2018) representing the certificated exchange rate published by the Federal Reserve Board. No

representation is made that the RMB amounts could have been, or could be, converted, realized or settled into US$ at such rate, or at any other rates.

Operating leases

Leases where the rewards and risks of ownership of assets primarily remain with the lessor are accounted for as operating leases. Payments made under operating leases are charged to the consolidated statements of operations on a straight-line basis over the lease periods.

Advertising expenses

The Group expenses advertising expenses as incurred. Total advertising expenses incurred were RMB367,532, RMB1,036,053 and RMB1,236,167 for the years ended December 31, 2016, 2017 and 2018, respectively, and have been included in sales and marketing expenses in the consolidated statements of operations.

Comprehensive income

Comprehensive income includes net income, unrealized gain or loss on available-for-sale investments and foreign currency translation adjustments. Comprehensive income is reported in the consolidated statements of comprehensive income.

Share-based compensation

Share-based payment transactions with employees and executives are measured based on the grant date fair value of the equity instrument issued and recognized as compensation expense net of a forfeiture rate on a straight-line basis, over the requisite service period, with a corresponding impact reflected in additional paid-in capital.

Share-based compensation with cash settlement features is classified as liabilities. The percentage of the fair value that is accrued as compensation cost at the end of each period is based on the percentage of the requisite service that has been rendered at that date. Changes in fair value of the liability classified award that occur during the requisite service period is recognized as compensation cost over that period. These awards typically vest over a period of four years, but may fully vest due to the achievement of certain performance conditions. Share-based compensation expense is recognized on an accelerated basis if it is probable that the performance conditions will be achieved during the vesting period.

Share awards issued to consultants are measured at fair value at the earlier of the commitment date or the date the services are completed and recognized over the period the services are provided.

The estimate of forfeiture rate is adjusted over the requisite service period to the extent that actual forfeiture rate differs, or is expected to differ, from such estimates. Changes in estimated forfeiture rate is recognized through a cumulative catch-up adjustment in the period of change.

Changes in the terms or conditions of share options are accounted as a modification. The Group calculates the excess of the fair value of the modified option over the fair value of the original option immediately before the modification, measured based on the share price and other pertinent factors at the modification date. For vested options, the Group recognizes incremental compensation cost in the period that the modification occurred. For unvested options, the Group recognizes, over the remaining requisite service period, the sum of the incremental compensation cost and the remaining unrecognized compensation cost for the original award on the modification date.

F-27

**Table of Contents**

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

2.    **SIGNIFICANT ACCOUNTING POLICIES - continued**

Earnings per share

Basic earnings per ordinary share is computed by dividing net income attributable to ordinary shareholders by the weighted average number of ordinary shares outstanding during the period.

The Group determined that the nonvested restricted shares are participating securities as the holders of the nonvested restricted shares have a nonforfeitable right to receive dividends with all ordinary shares but the nonvested restricted shares do not have a contractual obligation to fund or otherwise absorb the Group's losses. Accordingly, the Group uses the two-class method whereby undistributed net income is allocated on a pro rata basis to the ordinary shares and nonvested restricted shares to the extent that each class may share the income for the period; whereas the undistributed net loss for the period is allocated to ordinary shares only because the nonvested restricted shares are not contractually obligated to share the loss.

Diluted earnings per ordinary share reflect the potential dilution that could occur if securities were exercised or converted into ordinary shares. The Group had share options, restricted share units and convertible senior notes, which could potentially dilute basic earnings per share in the future. To calculate the number of shares for diluted earnings per ordinary share, the effect of the share options and restricted share units is computed using the treasury stock method, and the effect of the convertible senior notes is computed using the as-if-converted method.

Recent accounting pronouncements adopted

On January 1, 2018, the Company adopted Topic 606. Under the standard, revenue is recognized when a customer obtains control of promised goods or services in an amount that reflects the consideration the entity expects to receive in exchange for those goods or services. In addition, the

standard requires disclosures of the nature, amount, timing and uncertainty of revenue and cash flows arising from contracts with customers. The Company applied the five step method outlined in Topic 606 to all revenue streams and elected to adopt the standard using the modified retrospective method. Refer to Note 2, Revenue recognition for further details.

In January 2016, the FASB issued a new pronouncement ASU 2016-01 Financial Instruments-Overall: Recognition and Measurement of Financial Assets and Financial Liabilities. The ASU also provides a new measurement alternative for equity investments that do not have readily determinable fair values and do not qualify for the net asset value practical expedient. The ASU requires equity investments (except those accounted for under the equity method of accounting or those that result in consolidation of the investee) to be measured at fair value with changes in fair value recognized in net income. The ASU also requires an entity to present separately in other comprehensive income the portion of the total change in the fair value of a liability resulting from a change in the instrument-specific credit risk when the entity has elected to measure the liability at fair value in accordance with the fair value option for financial instruments.

ASU 2016-01 was further amended in February 2018 by ASU 2018-03, "Technical Corrections and Improvements to Financial Instruments—Overall (Subtopic 825-10): Recognition and Measurement of Financial Assets and Financial Liabilities". This update was issued to clarify certain narrow aspects of the guidance concerning the recognition of financial assets and liabilities established in ASU 2016-01. This includes an amendment to clarify that an entity measuring an equity security using the measurement alternative may change its measurement approach to a fair valuation method in accordance with Topic 820, Fair Value Measurement, through an irrevocable election that would apply to that security and all identical or similar investments of the same issued.

ASU 2016-01 and ASU 2018-03 are effective for public companies for fiscal years beginning after December 15, 2017, including interim periods within those fiscal years. The new guidance permits early adoption for certain provisions. Adoption of the amendment must be applied by means of a cumulative-effect adjustment to the balance sheet as of the beginning of the fiscal year of adoption, except for amendments related to equity instruments that do not have readily determinable fair values which should be applied prospectively. The Group adopted ASU 2016-01 and ASU 2018-03 under the modified retrospective method in the fiscal year of 2018. The adoption of 2016-01 and ASU 2018-03 did not have a significant impact on the Company's consolidated results of operations, financial position or cash flows.

F-28

Table of Contents

MOMO INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018
(in thousands, except share data)

2.    SIGNIFICANT ACCOUNTING POLICIES - continued

Recent accounting pronouncements adopted - continued

In November 2016, the FASB issued ASU 2016-18: Statement of Cash Flows (Topic 230): Restricted Cash. The amendments in this Update require that a statement of cash flows explain the change during the period in the total of cash, cash equivalents, and amounts generally described as restricted cash or restricted cash equivalents. Therefore, amounts generally described as restricted cash and restricted cash equivalents should be included with cash and cash equivalents when reconciling the beginning-of-period and end-of-period total amounts shown on the statement of cash flows. The amendments in this Update do not provide a definition of restricted cash or restricted cash equivalents. The amendments in this Update are effective for public business entities for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years. Early adoption is permitted, including adoption in an interim period. The amendments in this Update should be applied using a retrospective transition method to each period presented. The Group adopted ASU 2016-18 under the retrospective method in the fiscal year of 2018. The adoption of 2016-18 did not have a significant impact on the Company's cash flows for the years ended December 31, 2016, 2017 and 2018.

In January 2017, the FASB issued ASU 2017-01: Business Combinations (Topic 805): Clarifying the Definition of a Business. The Update requires that when substantially all of the fair value of the gross assets acquired (or disposed of) is concentrated in a single identifiable asset or a group of similar identifiable assets, the set is not a business. This screen reduces the number of transactions that need to be further evaluated. If the screen is not met, the amendments in this update (1) require that to be considered a business, a set must include, at a minimum, an input and a substantive process that together significantly contribute to the ability to create output and (2) remove the evaluation of whether a market participant could replace missing elements. Public business entities should apply the amendments in this Update to annual periods beginning after December 15, 2017, including interim periods within those periods. Early application of the amendments in this update is allowed. The amendments in this Update should be applied prospectively on or after the effective date. No disclosures are required at transition. The Group adopted this guidance on January 1, 2018. The adoption did not have significant impact on the Company's consolidated results of operations, financial position or cash flows.

Recent accounting pronouncements not yet adopted

In February 2016, the FASB issued ASU No. 2016-02, Leases ("ASU 2016-02"). ASU 2016-02 specifies the accounting for leases. For operating leases, ASU 2016-02 requires a lessee to recognize a right-of-use asset and a lease liability, initially measured at the present value of the lease payments, in its balance sheet. The standard also requires a lessee to recognize a single lease cost, calculated so that the cost of the lease is allocated over the lease term, on a generally straight-line basis. ASU 2016-02 is effective for public business entities for annual reporting periods and interim periods within those years beginning after December 15, 2018. The Group will adopt ASU 2016-02 on January 1, 2019 using the modified retrospective method. The Group will elect the package of practical expedients permitted under the transition guidance, which allows the Group to carry forward the historical lease classification and, the assessment whether a contract is or contains a lease and initial direct costs for any leases that exist prior to adoption of the new standard. The Group will also elect the practical expedient not to separate lease and non-lease components for certain classes of underlying assets and the short-term lease exemption for contracts with lease terms of 12 months or less. Certain operating leases related to offices and internet data center ("IDC") facilities will be subject to ASU 2016-02 and right-of-use assets and lease liabilities will be

recognized on the Group's consolidated balance sheet. The Company currently believes the most significant change will be related to the recognition of right-of-use assets and lease liabilities on the Company's balance sheet for certain in-scope operating leases. The Company does not expect any material impact on net assets and the consolidated statement of comprehensive income as a result of adopting the new standard.

In June 2016, the FASB issued ASU No. 2016-13, Financial Instruments-Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments ("ASU 2016-13") which requires the measurement and recognition of expected credit losses for financial assets held at amortized cost. ASU 2016-13 replaces the existing incurred loss impairment model with an expected loss methodology, which will result in more timely recognition of credit losses. ASU 2016-13 is effective for annual reporting periods, and interim periods within those years, beginning after December 15, 2019. The Company is currently in the process of evaluating the impact of the adoption of ASU 2016-13 on its consolidated financial statements.

F-29

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

2.    **SIGNIFICANT ACCOUNTING POLICIES - continued**

Recent accounting pronouncements not yet adopted - continued

In June 2018, the FASB issued ASU No. 2018-07, Compensation—Stock Compensation (Topic 718): Improvements to Nonemployee Share-Based Payment Accounting to simplify the accounting for share-based payments to nonemployees ("ASU 2018-07") by aligning it with the accounting for share-based payments to employees, with certain exceptions. Under the guidance, the measurement of equity-classified nonemployee awards will be fixed at the grant date, which may lower their cost and reduce volatility in the income statement. The guidance is effective for public business entities in annual periods beginning after December 15, 2018, and interim periods within those years. Early adoption is permitted, including in an interim period. The Group will adopt ASU 2018-07 on January 1, 2019 using grant date fair value to measure equity-classified nonemployee awards. The Group does not expect that the adoption of ASU 2018-07 will have a significant impact on the Group's consolidated financial statements.

In August 2018, the FASB issued ASU No. 2018-13, Fair Value Measurement (Topic 820): Disclosure Framework—Changes to the Disclosure Requirements for Fair Value Measurement ("ASU 2018-13") which eliminates, adds and modifies certain disclosure requirements for fair value measurements. Under the guidance, public companies will be required to disclose the range and weighted average used to develop significant unobservable inputs for Level 3 fair value measurements. The guidance is effective for all entities for fiscal years beginning after December 15, 2019 and for interim periods within those fiscal years, but entities are permitted to early adopt either the entire standard or only the provisions that eliminate or modify the requirements. The Company is currently in the process of evaluating the impact of the adoption of ASU 2018-13 on its consolidated financial statements.

In March 2019, the FASB issued ASU 2019-02, Improvements to Accounting for Costs of Films and License Agreements for Program Materials ("ASU 2019-02") which improves GAAP by aligning the accounting for production costs of an episodic television series with the accounting for production costs of films by removing the content distinction for capitalization. In addition, ASU 2019-02 requires that an entity test a film or license agreement for program material within the scope of ASC 920-350 for impairment at a film group level when the film or license agreement is predominantly monetized with other films and/or license agreements. The presentation and disclosure requirements in ASU 2019-02 also increase the transparency of information provided to users of financial statements about produced and licensed content. This update will be effective for the Company's fiscal years beginning after December 15, 2019, and interim periods within those fiscal years. Early adoption is permitted. The Group is in the process of evaluating the impact of adoption of this guidance on its consolidated financial statements.

3.    **ACQUISITIONS**

Acquisition of Tantan Limited

On May 31, 2018, the Group acquired 100% equity interest of Tantan, a leading social and dating app for the younger generation that was founded in 2014. The Group believes that the acquisition of Tantan helps to enrich its product line, expands its user base and strengthens its leading position in China's open social market.

The consideration consisted of RMB3,930,246 of cash, of which RMB3,460,972 was paid as of December 31, 2018. The consideration also included 5,328,853 newly issued Class A ordinary shares of the Company which were fully issued as of the acquisition date.

| | |
|---|---:|
| Cash consideration | 3,930,246 |
| Fair value of ordinary shares issued | 784,215 |
| Total consideration | 4,714,461 |

F-30

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

3.   **ACQUISITION - continued**

Acquisition of Tantan Limited - continued

The transaction was accounted for as a business combination using the purchase method of accounting. The purchase price allocation of the transaction was determined by the Group with the assistance of an independent valuation firm, and the purchase price allocation to assets acquired and liabilities assumed as of the date of acquisition was as follows:

| | Indicated Value | Estimated useful lives |
|---|---|---|
| | RMB | |
| **Net tangible assets:** | | |
| Cash and cash equivalents and short term investment | 154,671 | |
| Accounts receivable | 20,079 | |
| Other current asset | 22,833 | |
| Property and equipment, net | 46,160 | |
| Other non-current asset | 3,030 | |
| **Intangible assets** | | |
| Trade name | 640,600 | 10 years |
| Technology | 26,100 | 3 years |
| User base | 342,500 | 5 years |
| Total assets | 1,255,973 | |
| Accounts payable | (21,037) | |
| Other current liabilities | (262,533) | |
| Deferred tax liabilities | (252,300) | |
| Goodwill | 3,994,358 | |
| Total consideration | 4,714,461 | |

The goodwill was mainly attributable to intangible assets that cannot be recognized separately as identifiable assets under U.S. GAAP, and comprise (a) the assembled work force and (b) the expected but unidentifiable business growth as a result of the synergy resulting from the acquisition.

The following information summarizes the results of operation attributable to the acquisition included in the Group's consolidated statement of operations since the acquisition date:

| | Year ended December 31, 2018 |
|---|---|
| | RMB |
| Net revenue | 417,998 |
| Net loss | 519,206 |

F-31

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

3.   **ACQUISITIONS - continued**

Pro forma information of acquisitions

The following unaudited pro forma information summarizes the results of operations of the Group for the years ended December 31, 2017 and 2018 assuming that the acquisition of Tantan occurred on January 1, 2017. The following pro forma financial information is not necessarily indicative of the results that would have occurred had the acquisition been completed at the beginning of the periods as indicated, nor is it indicative of future operating results:

| | Years ended December 31, | |
|---|---|---|
| | 2017 | 2018 |
| | (Unaudited) | (Unaudited) |
| | RMB | RMB |
| Pro forma net revenue | 8,887,543 | 13,511,439 |
| Pro forma net income attributable to ordinary shareholders of Momo Inc. | 1,627,664 | 2,383,646 |
| Pro forma net income per ordinary share - basic | 4.13 | 5.86 |
| Pro forma net income per ordinary share - diluted | 3.92 | 5.50 |

**4.   PREPAID EXPENSES AND OTHER CURRENT ASSETS**

Prepaid expenses and other current assets consisted of the following:

|  | As of December 31, | |
|---|---|---|
|  | 2017 | 2018 |
|  | RMB | RMB |
| Deposit at third-party payment channels (i) | 190,238 | 258,039 |
| Advance to suppliers (ii) | 140,022 | 94,100 |
| Interest receivable | 54,920 | 87,057 |
| Input VAT (iii) | 24,164 | 69,075 |
| Prepaid income tax and other expenses | 52,499 | 55,084 |
| Deferred platform commission cost | 27,925 | 36,189 |
| Advance to game developers | 6,012 | 8,463 |
| Game promotions fees paid on behalf of game developers | 17,840 | 3,069 |
| Others | 24,562 | 9,903 |
|  | 538,182 | 620,979 |

(i)    Deposit at third party payment channels are mainly the cash deposited in certain third party payment channels by the Group for the broadcasters and the gift recipients who received the virtual items to withdraw their revenue sharing and the customer payment to the Group's account through the third party payment channels.

(ii)    Advance to suppliers were primarily for advertising fees, live video broadcasting service fees and other professional service fees.

(iii)    Input VAT mainly occurred from the purchasing of goods or other services, property and equipment and advertising activities. It is subject to verification by related tax authorities before offsetting the VAT output.

F-32

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

**5.   LONG-TERM INVESTMENTS**

|  | As of December 31, | |
|---|---|---|
|  | 2017 | 2018 |
|  | RMB | RMB |
| Equity method investments | | |
| Jingwei Chuangteng (Hangzhou) L.P. (i) | 48,273 | 64,441 |
| Beijing Autobot Venture Capital L.P. (ii) | 55,162 | 57,392 |
| Hangzhou Aqua Ventures Investment Management L.P. (iii) | 84,492 | 105,289 |
| Chengdu Tianfu Qianshi Equity Investment Partnership L.P. (iv) | — | 20,586 |
| Others (viii) | 20,753 | 21,632 |
| Equity securities without readily determinable fair values | | |
| Hunan Qindao Cultural Spread Ltd. (v) | 30,000 | 30,000 |
| Hangzhou Faceunity Technology Limited (vi) | — | 70,000 |
| Haining Yijiayi Culture Co., Ltd (vii) | — | 25,000 |
| Others (viii) | 49,791 | 53,125 |
|  | 288,471 | 447,465 |

Equity securities without readily determinable fair value were accounted as cost method investments prior to adopting ASC 321. The Group performed impairment analysis for equity method investments, equity securities without readily determinable fair values periodically. Impairment loss of RMB39,283, RMB 30,085 and RMB 43,200 was recorded for the long-term investments during the years ended December 31, 2016, 2017 and 2018, respectively.

(i)    On January 9, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Jingwei Chuangteng (Hangzhou) L.P. ("Jingwei"). According to the partnership agreement, the Group committed to subscribe 4.9% partnership interest in Jingwei for RMB30,000, which had been paid as of December 31, 2017. Due to Jingwei's further rounds of financing, the Group's partnership interest was diluted to 2.4% as of December 31, 2017 and 2018. The Group recognized its share of partnership profit in Jingwei of RMB4,245, RMB11,677 and RMB16,168 during the year ended December 31, 2016, 2017 and 2018, respectively.

(ii)    On February 13, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Beijing Autobot Venture Capital L.P. ("Autobot"). According to the partnership agreement, the Group committed to subscribe 31.9% partnership interest in Autobot for RMB30,000. Autobot had further rounds of financing, of which the Group subscribed for RMB10,000. Due to

Autobot's further round of financing, the Group's partnership interest was diluted to 26.7% as of December 31, 2017 and 2018. The committed subscription and further round of financing subscription amount, RMB40,000, was paid as of December 31, 2016. The Group recognized its share of partnership profit in Autobot of RMB5,039, RMB8,392 and RMB2,230 during the year ended December 31, 2016, 2017 and 2018, respectively.

(iii)     On August 18, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Hangzhou Aqua Ventures Investment Management L.P. ("Aqua"). According to the partnership agreement, the Group committed to subscribe 42.7% partnership interest for RMB50,000. The committed subscription amount had been fully paid as of December 31, 2016. The Group recognized its share of partnership profit in Aqua of RMB14,346, RMB20,709 and RMB20,797 during the years ended December 31, 2016, 2017 and 2018, respectively.

(iv)     On September 12, 2018, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Chengdu Tianfu Qianshi Equity Investment Partnership L.P. ("Tianfu"). According to the partnership agreement, the Group committed to subscribe 6.8% partnership interest for RMB30,000, of which RMB12,000 had been paid as of December 31, 2018. The Group recognized its share of partnership profit in Tianfu of RMB nil, RMB nil and RMB8,586 during the years ended December 31, 2016, 2017 and 2018, respectively.

F-33

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

5.     **LONG-TERM INVESTMENTS - continued**

(v)     On June 8, 2016, the Group entered into a share purchase agreement to acquire 16.0% preferred shares of Hunan Qindao Cultural Spread Ltd. ("Qindao") for a total consideration of RMB30,000, which was fully paid off as of December 31, 2017. The investment was classified as available-for-sale security as the Group determined that the preferred shares were debt securities due to the redemption option available to the investor and measured the investment subsequently at fair value. No unrealized holding gains was reported in other comprehensive income for the year ended December 31, 2016. On July 7, 2017, the Group signed a supplemental agreement with Qindao to waive the redemption right. The investment was reclassified to equity security as a result of the supplemental agreement.

(vi)     On January 17, 2018, the Group entered into a preferred share subscription agreement to acquire 10% equity of Hangzhou Faceunity Technology Limited ("Faceunity") for a total consideration of RMB70,000, which had been paid as of December 31, 2018. As the investment was neither a debt security nor an in-substance common stock, it was accounted as an equity securities without readily determinable fair values and measured at fair value using the measurement alternative.

(vii)     On August 2, 2018, the Group invested in Haining Yijiayi Culture Co., Ltd ("Yijiayi") and acquired 5% equity for a total consideration of RMB25,000, which had been paid as of December 31, 2018. As the investment was neither a debt security nor an in-substance common stock, it was accounted as an equity securities without readily determinable fair values and measured at fair value using the measurement alternative.

(viii)     Others represent equity method investments or equity securities without readily determinable fair values that are individually insignificant.

6.     **PROPERTY AND EQUIPMENT, NET**

Property and equipment, net consisted of the following:

| | As of December 31, | |
| --- | --- | --- |
| | 2017 | 2018 |
| | RMB | RMB |
| Computer equipment | 296,559 | 513,448 |
| Office equipment | 79,470 | 115,048 |
| Vehicles | 1,230 | 3,599 |
| Leasehold improvement | 67,440 | 94,340 |
| Less: accumulated depreciation | (186,002) | (338,868) |
| Exchange difference | 7 | (35) |
| | 258,704 | 387,532 |

Depreciation expenses charged to the consolidated statements of operations for the years ended December 31, 2016, 2017 and 2018 were RMB55,845, RMB78,885 and RMB148,238, respectively.

F-34

Table of Contents

MOMO INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

7.  **INTANGIBLE ASSETS, NET**

Intangible assets, net consisted of the following:

|  | As of December 31, | |
|---|---|---|
|  | 2017 | 2018 |
|  | RMB | RMB |
| Trade name | — | 687,164 |
| Active user | — | 367,396 |
| Technology | — | 27,997 |
| License | 52,433 | 52,433 |
| Game copyright | 2,170 | 2,170 |
| Less: accumulated amortization and impairment | (6,050) | (99,080) |
| Exchange difference | — | (1,094) |
| Net book value | 48,553 | 1,036,986 |

Amortization expenses and impairment loss charged to the consolidated statements of operations for the years ended December 31, 2016, 2017 and 2018 were RMB nil, RMB6,050 and RMB93,030, respectively.

The estimated aggregate amortization expenses for each of the five succeeding fiscal years and thereafter are as follows:

| For the year ended December 31, | Amounts |
|---|---|
|  | RMB |
| 2019 | 157,260 |
| 2020 | 157,260 |
| 2021 | 151,121 |
| 2022 | 147,209 |
| 2023 | 104,346 |
| Thereafter | 319,790 |
| Total | 1,036,986 |

8.  **GOODWILL**

|  | As of December 31, 2018 | | |
|---|---|---|---|
|  | Momo | Tantan | Total |
|  | RMB | RMB | RMB |
| Balance, as of January 1, 2017 | — | — | — |
| Acquisition of other | 22,130 | — | 22,130 |
| Balance, as of December 31, 2017 | 22,130 | — | 22,130 |
| Acquisition of Tantan Limited (Note 3) | — | 3,994,358 | 3,994,358 |
| Foreign exchange differences | — | 290,341 | 290,341 |
| Balance, as of December 31, 2018 | 22,130 | 4,284,699 | 4,306,829 |

To assess potential impairment of goodwill, the Group performs an assessment of the carrying value of the reporting units at least on an annual basis or when events occur or circumstances change that would more likely than not reduce the estimated fair value of the reporting units below its carrying value. The Group performed a goodwill impairment analysis as of December 31, 2018. When determining the fair value of both the Momo and Tantan reporting units, the Group used a discounted cash flow model that included a number of significant unobservable inputs. Key assumptions used to determine the estimated fair value include: (a) internal cash flows forecasts including expected revenue growth, operating margins and estimated capital needs, (b) an estimated terminal value using a terminal year long-term future growth rate determined based on the growth prospects of the reporting units; and (c) a discount rate that reflects the weighted-average cost of capital adjusted for the relevant risk associated with the Momo and Tantan reporting units' operations and the uncertainty inherent in the Group's internally developed forecasts. Based on the Group's assessment as of December 31, 2018, the fair value of both business reporting units exceeded their carrying value.

F-35

MOMO INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

9.   ACCRUED EXPENSES AND OTHER CURRENT LIABILITIES

Accrued expenses and other current liabilities consisted of the following:

| | As of December 31, | |
| --- | --- | --- |
| | 2017 | 2018 |
| | RMB | RMB |
| Accrued payroll and welfare | 224,618 | 302,117 |
| Payable for advertisement | 122,211 | 254,872 |
| Balance of users' virtual accounts | 92,228 | 112,488 |
| Other tax payables | 61,529 | 99,964 |
| Accrued professional services and rental fee | 23,041 | 38,415 |
| VAT payable | 10,040 | 9,208 |
| Others | 37,666 | 29,646 |
| Total | 571,333 | 846,710 |

10.   CONVERTIBLE SENIOR NOTES

In July 2018, the Company issued RMB4,985 million (US$725 million) of convertible senior notes (the "Notes") which will mature in on July 1, 2025. The Notes will be convertible into the Company's American depositary shares ("ADSs"), at the option of the holders, based on an initial conversion rate of 15.4776 of the Company's ADSs per US$1,000 principal amount of Notes (which is equivalent to an initial conversion price of approximately US$64.61 per ADS and represents an approximately 42.5% conversion premium over the closing trading price of the Company's ADSs on June 26, 2018, which was US$45.34 per ADS). The conversion rate for the Notes is subject to adjustments upon the occurrence of certain events.

The holders of the Notes may convert their notes, in integral multiples of US$1,000 principal amount, at any time prior to the day immediately preceding the maturity date. The Company will not have the right to redeem the Notes prior to maturity, except in the event of certain changes to the tax laws or their application or interpretation. The holders of the Notes will have the right to require the Company to repurchase all or part of their Notes in cash on July 1, 2023, or in the event of certain fundamental changes. As of December 31, 2018, no Notes were converted into the Company's ADSs.

The Notes bear interest at a rate of 1.25% per year and will be payable semiannually.

As of December 31, 2018, the carrying value of the Notes was RMB 4,877,116. The balance at December 31, 2018 included unamortized issuance costs of RMB107,622. The debt issuance costs are being amortized through interest expense over the period from July 2, 2018, the date of issuance, to July 1, 2025, the date of expiration, using the effective interest rate method which was 1.61% for the year ended December 31, 2018. Amortization and interest expenses related to the convertible senior notes amounted to RMB38,491 during the year ended December 31, 2018.

The conversion option meets the definition of a derivative. However, since the conversion option is considered indexed to the Company's own stock and classified in stockholders' equity, the scope exception is met, accordingly the bifurcation of the conversion option from the Notes is not required. There is no beneficial conversion feature attributable to the Notes as the set conversion prices for the Notes are greater than the respective fair values of the ordinary share price at date of issuance.

The feature of mandatory redemption upon maturity is clearly and closely related to the debt host and this feature does not need to be bifurcated.

Based on above, the Company accounted for the Notes in accordance with ASC 470, as a single instrument under long-term debt. Issuance costs related to the Notes is recorded in consolidated balance sheet as a direct deduction from the principal amount of the Notes.

F-36

Table of Contents

MOMO INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018
(in thousands, except share data)

11.   FAIR VALUE

Measured on recurring basis

The Group measures its financial assets and liabilities including cash and cash equivalents at fair value on a recurring basis as of December 31, 2017 and 2018. Cash and cash equivalents are classified within Level 1 of the fair value hierarchy because they are valued based on the quoted market price in an active market.

As of December 31, 2017 and 2018, information about inputs for the fair value measurements of the Group's assets that are measured at fair value on a recurring basis in periods subsequent to their initial recognition is as follows:

| | Fair Value Measured as of December 31, |
| --- | --- |
| | Quoted Prices in Active | Significant |

| Description | 2017 RMB | Quoted Prices in Active Market for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| Cash and cash equivalents | 4,462,194 | 4,462,194 | — | — |
| Total | 4,462,194 | 4,462,194 | — | — |

|  | | Fair Value Measured as of December 31, | | |
|---|---|---|---|---|
| Description | 2018 RMB | Quoted Prices in Active Market for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| Cash and cash equivalents | 2,468,034 | 2,468,034 | — | — |
| Total | 2,468,034 | 2,468,034 | — | — |

Additional information about the reconciliation of the fair value measurement of long-term investments using significant unobservable inputs (level 3) on a recurring basis are is as follows:

|  | RMB |
|---|---|
| Balance as of December 31, 2016 | 50,452 |
| Purchase | 10,000 |
| Other-than-temporary loss recognized | (30,085) |
| Reclassification to equity securities without readily determinable fair value (i) | (30,000) |
| Foreign exchange difference | (367) |
| Balance as of December 31, 2017 | — |
| Balance as of December 31, 2018 | — |

(i)    The investment in Qindao was reclassified from long-term investments to equity securities without readily determinable fair value as of result of the waiver of redemption right in July 2017. Please refer to Note 5 for additional information on the reclassification.

F-37

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

11.    **FAIR VALUE - continued**

Measured on nonrecurring basis

The Group measures its equity method investments at fair value on a nonrecurring basis whenever events or changes in circumstances indicate that the carrying value may not be recoverable. As of December 31, 2017 and 2018, the Group performed an impairment test on its equity method investees and recorded an impairment loss of RMB nil and RMB nil, respectively.

Such impairments are considered level 3 fair value measurements because the Group used unobservable inputs such as the management projection of discounted future cash flow and the discount rate.

For goodwill impairment testing, refer to Note 8 for details.

12.    **INCOME TAXES**

Cayman

In July 2014, the Company was redomiciled in the Cayman Islands as an exempted company registered under the laws of the Cayman Islands. Under the current laws of the Cayman Islands, it is not subject to tax on either income or capital gain.

BVI

Momo BVI is a tax-exempted company incorporated in the BVI.

The United States ("US")

Momo US and Tantan US are incorporated in the U.S.A.

In December 2017, the U.S. government enacted comprehensive tax legislation commonly referred to as the Tax Cuts and Jobs Act (the "Tax Act"). The Tax Act makes broad and complex changes to the U.S. tax code including, but not limited to, (1) reducing the U.S. federal corporate tax rate, (2) requiring a one-time transition tax on certain unrepatriated earnings of foreign subsidiaries that is payable over eight years, and (3) bonus depreciation that will allow for full expensing of qualified property. The impact of the Tax Act is not material to the Group's operation and resulted in a decrease in income tax rate from 35% before January I, 2018 to 21% after January 1, 2018 for tax and income earned as determined in accordance with the relevant tax rules and regulations.

Hong Kong

The Company's subsidiaries domiciled in Hong Kong are subject to a two-tiered income tax rate for taxable income earned in Hong Kong effectively since April 1, 2018. The first 2 million Hong Kong dollars of profits earned by the company are subject to be taxed at an income tax rate of 8.25%, while the remaining profits will continue to be taxed at the existing tax rate, 16.5%.

PRC

In August 2014, Beijing Momo IT was qualified as a software enterprise. As such, Beijing Momo IT will be exempt from income taxes for two years beginning in its first profitable year which was from 2015 to 2016 followed by a tax rate of 12.5% for the succeeding three years which is from 2017 to 2019.

According to No. 23 announcement of the State Administration of Taxation of PRC in April 2018, Chengdu Momo is no longer required to submit the preferential tax rate application to the tax authority, but only required to keep the relevant materials for future tax inspection instead. Based on the historically experience, the Group believes Chengdu Momo will most likely to be qualified as western China development enterprise and accordingly be entitled to a preferential income tax rate of 15% for the year 2018. As a result, the Group applied 15% to determine the tax liabilities for Chengdu Momo.

In October 2018, Beijing Santi Cloud Union Technology Co., Ltd. ("Santi Cloud Union") qualified as a High and New Technology enterprise ("HNTE"). As such, Santi Cloud Union enjoyed a preferential tax rate of 15% from 2018 to 2020. Santi Cloud Union was in accumulated loss position for the year ended December 31, 2018.

The other entities incorporated in the PRC are subject to an enterprise income tax at a rate of 25%.

<center>F-38</center>

**Table of Contents**

<center>

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

</center>

12.  **INCOME TAXES - continued**

PRC - continued

Since January 1, 2011, the relevant tax authorities of the Group's subsidiaries have not conducted a tax audit on the Group's PRC entities. In accordance with relevant PRC tax administration laws, tax years from 2015 to 2017 of the Group's PRC subsidiaries, VIEs and VIEs' subsidiaries, remain subject to tax audits as of December 31, 2018, at the tax authority's discretion.

Under the Enterprise Income Tax Law (the "EIT Law") and its implementation rules which became effective on January 1, 2008, dividends generated after January 1, 2008 and payable by foreign-invested enterprise in the PRC to its foreign investors who are non-resident enterprises are subject to a 10% withholding tax, unless any such foreign investor's jurisdiction of incorporation has a tax treaty with PRC that provides for a different withholding arrangement. Under the taxation arrangement between the PRC and Hong Kong, a qualified Hong Kong tax resident which satisfies the criteria of "beneficial owner" and directly holds 25% or more of the equity interest in a PRC resident enterprise is entitled to a reduced withholding tax rate of 5% for dividends generated in the PRC. Cayman, where the Company is incorporated, does not have a tax treaty with PRC.

Uncertainties exist with respect to how the current income tax law in the PRC applies to the Group's overall operations, and more specifically, with regard to tax residency status. The EIT Law includes a provision specifying that legal entities organized outside of the PRC will be considered residents for Chinese income tax purposes if the place of effective management or control is within the PRC. The implementation rules to the EIT Law provide that non-resident legal entities will be considered China residents if substantial and overall management and control over the manufacturing and business operations, personnel, accounting, properties, etc., occurs within the PRC. Despite the present uncertainties resulting from the limited PRC tax guidance on the issue, the Group does not believe that the legal entities organized outside of the PRC within the Group should be treated as residents for EIT law purposes. If the PRC tax authorities subsequently determine that the Company and its subsidiaries registered outside the PRC should be deemed resident enterprises, the Company and its subsidiaries registered outside the PRC will be subject to the PRC income taxes, at a rate of 25%.

If any entity within the Group that is outside the PRC were to be a non-resident for PRC tax purposes dividends paid to it out of profits earned after January 1, 2008 would be subject to a withholding tax at a rate of 10%, subject to reduction by an applicable tax treaty with the PRC.

Aggregate undistributed earnings of the Company's PRC subsidiaries and the VIEs that are available for reinvestment. Upon distribution of such earnings, the Company will be subject to the PRC EIT, the amount of which is impractical to estimate. The Company did not record any withholding tax on any of the aforementioned undistributed earnings because the relevant subsidiaries and the VIEs do not intend to declare dividends and the Company intends to permanently reinvest it within the PRC. Additionally, no deferred tax liability was recorded for taxable temporary differences attributable to the undistributed earnings because the Company believes the undistributed earnings can be distributed in a manner that would not be subject to income tax.

F-39

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

**12.    INCOME TAXES - continued**

PRC - continued

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amount of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. The Group did not retrospectively apply the changes to prior years. Significant components of the Group's deferred tax assets and liabilities are as follows:

| | As of December 31, | |
| --- | --- | --- |
| | 2017 | 2018 |
| | RMB | RMB |
| Deferred tax assets: | | |
|     Advertising expense | 38,760 | 221,113 |
|     Net operating tax losses carry-forward | 25,792 | 103,060 |
|     Impairment on long-term investments and game copyright | 2,599 | 11,336 |
|     Accrued expenses | 5,466 | 43,631 |
|     Less: valuation allowance | (25,792) | (321,354) |
| Deferred tax assets, net | 46,825 | 57,786 |
| Deferred tax liabilities: | | |
|     Intangible assets acquired | 12,138 | 259,247 |
| Deferred tax liabilities, net | 12,138 | 259,247 |

The Group considers the following factors, among other matters, when determining whether some portion or all of the deferred tax assets will more likely than not be realized: the nature, frequency and severity of losses, forecasts of future profitability, the duration of statutory carry-forward periods, the Group's experience with tax attributes expiring unused and tax planning alternatives. The Group's ability to realize deferred tax assets depends on its ability to generate sufficient taxable income within the carry-forward periods provided for in the tax law.

As of December 31, 2018, the tax loss carry-forward for the Company's subsidiaries domiciled in PRC, VIEs, and VIEs' subsidiaries amounted to RMB264,709. The tax losses in PRC can be carried forward for five years to offset future taxable profit, and the period was extended to 10 years for entities qualified as HNTE in 2018 and thereafter. The tax losses of entities in the PRC will begin to expire in 2020, if not utilized.

As of December 31, 2018, the tax loss carryforward for the Company's subsidiaries domiciled in Hong Kong amounted to RMB109,697, which would be carried forward indefinitely and set off against its future taxable profits.

As of December 31, 2018, the tax loss carry-forward for the Company's subsidiaries domiciled in US amounted to RMB70,055. RMB 61,774 was generated from the years before 2018, which can be carried back two years and forward twenty years. The remaining RMB 8,281 was generated in the year ended December 31, 2018, which can be carried forward indefinitely but cannot be carried back, and can be used to offset only 80 percent of the taxable income.

F-40

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

**12.    INCOME TAXES - continued**

PRC - continued

The Group does not file combined or consolidated tax returns, therefore, losses from individual subsidiaries or the VIEs may not be used to offset other subsidiaries' or VIEs' earnings within the Group. Valuation allowance is considered on each individual subsidiary and legal entity basis. Valuation allowances have been established in respect of certain deferred tax assets as it is considered more likely than not that the relevant deferred tax assets will not be realized in the foreseeable future.

Reconciliation between income tax expense computed by applying the PRC EIT rate of 25% to income before income taxes and the actual provision for income tax is as follows:

|  | For the years ended December 31, | | |
|---|---|---|---|
|  | 2016 | 2017 | 2018 |
|  | RMB | RMB | RMB |
| Net income before provision for income tax | 990,413 | 2,549,735 | 3,439,535 |
| PRC statutory tax rate | 25% | 25% | 25% |
| Income tax expense at statutory tax rate | 247,603 | 637,434 | 859,884 |
| Permanent differences | (516) | (446) | 20,135 |
| Change in valuation allowance | (16,034) | 5,990 | 98,862 |
| Effect of income tax rate difference in other jurisdictions | 54,242 | 80,085 | 156,136 |
| Effect of tax holidays and preferential tax rates | (250,657) | (278,062) | (435,369) |
| Provision for income tax | 34,638 | 445,001 | 699,648 |

If Beijing Momo IT and Chengdu Momo did not enjoy income tax exemptions and preferential tax rates for the years ended December 31, 2016, 2017 and 2018, the increase in income tax expenses and resulting net income per share amounts would be as follows:

|  | For the years ended December 31, | | |
|---|---|---|---|
|  | 2016 | 2017 | 2018 |
|  | RMB | RMB | RMB |
| Increase in income tax expenses | 250,657 | 278,062 | 435,369 |
| Net income per ordinary share attributable to Momo Inc. - basic | 1.87 | 4.74 | 5.85 |
| Net income per ordinary share attributable to Momo Inc. - diluted | 1.74 | 4.50 | 5.59 |

No significant unrecognized tax benefit was identified for the years ended December 31, 2016, 2017 and 2018. The Group did not incur any interest and penalties related to potential underpaid income tax expenses and also believed that uncertainty in income taxes did not have a significant impact on the unrecognized tax benefits within next twelve months.

F-41

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

**13.    ORDINARY SHARES**

In 2016, 2017 and 2018, 5,197,032, 9,476,874 and 10,122,318 ordinary shares were issued in connection with the exercise of options and vesting of restricted share units previously granted to employees, executives and consultants under the Company's share incentive plans (see Note 14), respectively.

In May 2018, 5,328,853 ordinary shares were issued as part of consideration for the acquisition of Tantan. See Note 3.

As of December 31, 2018, there were 333,512,014 Class A ordinary shares and 80,364,466 Class B ordinary shares issued and outstanding, par value $0.0001 per share.

**14.    SHARE-BASED COMPENSATION**

*Share options granted by the Company*

In November 2012, the Company adopted a share incentive plan ("2012 Plan"), which was amended in October 2013. The maximum aggregate number of shares which may be issued pursuant to all awards under the 2012 Plan is 44,758,220 ordinary shares.

In November, 2014, the Company adopted the 2014 share incentive plan ("2014 Plan"), pursuant to which a maximum aggregate of 14,031,194 Class A ordinary shares may be issued pursuant to all awards granted thereunder. Starting from 2017, the number of shares reserved for future issuances under the 2014 Plan will be increased by a number equal to 1.5% of the total number of outstanding shares on the last day of the immediately preceding calendar year, or such lesser number of Class A ordinary shares as determined by the Company's board of directors, on the first day of each calendar year during the term of the 2014 Plan. With the adoption of the 2014 Plan, the Company will no longer grant any incentive shares under the 2012 Plan. The time and condition to exercise options will be determined by the Board or a committee of the Board. The term of the options may not exceed ten years from the date of the grant, except for the situation of amendment, modification and termination. Under the 2014 Plan, share options are subject to vesting schedules ranging from two to four years.

F-42

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

**14.  SHARE-BASED COMPENSATION - continued**

*Share options granted by the Company* - continued

The following table summarizes the option activity for the year ended December 31, 2018:

| | Number of options | Weighted average exercise price per option (US$) | Weighted average remaining contractual life (years) | Aggregated intrinsic Value (US$) |
|---|---|---|---|---|
| Outstanding as of January 1, 2018 | 26,969,291 | 0.0536 | 7.40 | 328,658 |
| Granted | 5,502,868 | 0.0002 | | |
| Exercised | (10,028,568) | 0.0800 | | |
| Forfeited | (660,488) | 0.0002 | | |
| Outstanding as of December 31, 2018 | 21,783,103 | 0.0296 | 7.36 | 258,030 |
| Exercisable as of December 31, 2018 | 10,227,313 | 0.0628 | 5.98 | 120,807 |

There were 10,227,313 vested options, and 10,477,208 options expected to vest as of December 31, 2018. For options expected to vest, the weighted-average exercise price was US$0.0002 as of December 31, 2018 and aggregate intrinsic value was US$136,006 and US$124,415 as of December 2017 and 2018, respectively.

The weighted-average grant-date fair value of the share options granted during the years 2016, 2017, and 2018 was US$6.24, US$17.41 and US$17.75, respectively. Total intrinsic value of options exercised for the years ended December 31, 2016, 2017 and 2018 was US$45,581, US$154,233 and US$209,797, respectively. The total fair value of options vested during the years ended December 31, 2016, 2017 and 2018 was US$27,171, US$37,979 and US$59,226, respectively.

In July 2016, the Company canceled 187,500 outstanding employee share options granted under the 2014 Plan for one employee. As a result, the Company immediately recognized the unvested compensation cost attributable to the canceled award amounting to RMB10,002 in 2016.

The fair value of options granted was estimated on the date of grant using the Black-Sholes pricing model after the Company completed its IPO, with the following assumptions used for grants during the applicable periods:

| | Risk-free interest rate of return | Contractual term | Volatility | Dividend yield | Exercise price (US$) |
|---|---|---|---|---|---|
| 2016 | 1.75%~2.70% | 10 years | 52.5%~55.3% | — | 0.0002 |
| 2017 | 2.47%~2.87% | 10 years | 50.7%~54.0% | — | 0.0002 |
| 2018 | 3.16%~3.66% | 10 years | 50.0%~50.7% | — | 0.0002 |

F-43

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

**14.  SHARE-BASED COMPENSATION - continued**

*Share options granted by the Company* - continued

(1)  Risk-free interest rate

Risk-free interest rate was estimated based on the yield to maturity of China international government bonds with a maturity period close to the expected term of the options.

(2)  Contractual term

The Company used the original contractual term.

(3)  Volatility

The volatility of the underlying ordinary shares during the life of the options was estimated based on the historical stock price volatility of comparable listed companies over a period comparable to the expected term of the options.

(4)  Dividend yield

The dividend yield was estimated by the Group based on its expected dividend policy over the expected term of the options.

(5)    Exercise price

The exercise price of the options was determined by the Group's board of directors.

The fair value of the ordinary shares is determined as the closing sales price of the ordinary shares as quoted on the principal exchange or system. For employee and executives share options, the Group recorded share-based compensation of RMB186,687, RMB286,119 and RMB377,241 during the years ended December 31, 2016, 2017 and 2018, respectively, based on the fair value on the grant dates over the requisite service period of award according to the vesting schedule for employee share option.

For non-employee share options the Group recorded share-based compensation of RMB20,767, RMB44,277 and RMB14,360 during the years ended December 31, 2016, 2017 and 2018, respectively, based on the fair value at the commitment date and recognized over the period the service is provided.

As of December 31, 2018, total unrecognized compensation expense relating to unvested share options was RMB1,054,778, which will be recognized over a weighted average period of 2.81 years. The weighted-average remaining contractual term of options outstanding is 7.36 years.

F-44

Table of Contents

MOMO INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018
(in thousands, except share data)

14.    SHARE-BASED COMPENSATION - continued

*Non-vested restricted shares granted by the Company*

In April 2012, the Company's four founding shareholders entered into an arrangement with the investor in conjunction with the issuance of Series A preferred shares, whereby all of their 147,000,000 ordinary shares ("Founders' shares") became subject to service and transfer restrictions. Such Founders' shares are subject to repurchase by the Company upon early termination of their four years of employment. The repurchase price is the par value of the ordinary shares. 25% of the Founders' shares shall be vested annually. The restricted share agreements were subsequently amended on June 11, 2012 and July 18, 2012, respectively. Pursuant to the agreements, 25% of the Founders' shares shall vest upon the closing of issuance of Series B preferred shares and the remaining 75% shall be vested monthly in equal installments over the next 36 months. This arrangement has been accounted for as a grant of restricted stock awards subject to service vesting conditions. Because the modification does not affect any of the other terms or conditions of the award, presumably the fair value before and after the modification is the same. The restrictions on the ordinary shares were fully released and such shares became fully vested in 2016.

On May 15, 2014, the Company's four founding shareholders entered into an agreement with the investors to renew the arrangement. The Company considered the amendment of agreement as a modification of vesting of the restricted shares. Pursuant to the agreement, the Company shall be entitled to repurchase 50% and 25% of such shares in the case that founders terminate their employments with the Company before April 17, 2015 and during the period from April 17, 2015 to April 17, 2016, respectively, at a price of US$0.0001 per share or the lowest price permitted under applicable laws. Therefore, the Company considered that 50% of the total restricted shares were vested immediately on the amendment date and 25% shall be vested annually on April 17 in the next two years ending April 17, 2016. Before the modification date, May 15, 2014, there were 131,348,411 ordinary shares, of which 45,937,500 were unvested restricted shares. As the result of modification, 19,736,705 vested ordinary shares were classified to unvested restricted shares on the modification date and the corresponding compensation costs for these unvested restricted shares were amortized over the remaining service period. Because the modification does not affect any of the other terms or conditions of the award, the fair value of the restricted shares before and after the modification is the same.

A summary of non-vested restricted share activity during the years ended December 31, 2016, 2017 and 2018 is presented below:

|  | Number of shares |
|---|---|
| Outstanding as of January 1, 2016 | 28,625,378 |
| Granted | — |
| Modification | — |
| Vested | (28,625,378) |
| Outstanding as of December 31, 2016 | — |

The weighted average grant date fair value of the non-vested restricted shares was US$0.01 per share and the aggregated fair value was US$1,470. The total fair value of non-vested restricted shares vested during the years ended December 31, 2016, 2017 and 2018 was US$286, US$ nil and US$ nil, respectively.

The Company recorded compensation expense of RMB348, RMB nil and RMB nil during the years ended December 31, 2016, 2017 and 2018, respectively, related to non-vested restricted shares.

As of December 31, 2018, total unrecognized compensation expense relating to the non-vested restricted shares was RMB nil.

F-45

Table of Contents

MOMO INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

14.    **SHARE-BASED COMPENSATION - continued**

*Restricted share units ("RSUs") granted by the Company*

On December 11, 2014, the Company granted a total of 40,001 shares of RSUs to independent directors under the 2014 Plan. The restricted share units will vest in accordance with the vesting schedule set out in the RSUs award agreement, which is 50% of the RSUs shall vest at the end of every six months since the grant date.

On May 17, 2016, March 7, 2017 and May 2, 2018, the Company further granted 200,000, 100,000 and 100,000 shares of RSUs, respectively, to the independent directors under the 2014 Plan with a vesting period of 4 years.

The Company will forfeit the unvested portion of the RSUs if the grantees terminate their service during the vesting period.

The Group recorded share-based compensation of RMB2,295, RMB4,173 and RMB6,609 for RSUs for the years ended December 31, 2016, 2017 and 2018, respectively, based on the fair value on the grant dates over the requisite service period of award using the straight-line method.

As of December 31, 2018, total unrecognized compensation expense relating to unvested RSUs was RMB17,979 which will be recognized over a weighted average period of 2.69 years.

F-46

Table of Contents

MOMO INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

14.    **SHARE-BASED COMPENSATION - continued**

*Share options granted by Tantan Limited*

In March, 2015, Tantan Limited adopted the 2015 share incentive plan ("2015 Plan"), pursuant to which a maximum aggregate of 1,000,000 shares may be issued pursuant to awards may be authorized, but unissued ordinary shares. The Board of Directors may in its discretion make adjustments to the numbers of shares. In April 2016 and March 2017, the Board of Directors of Tantan approved to adjust the numbers of shares to a maximum aggregate of 2,000,000 and 2,793,812, respectively.

In July, 2018, Tantan Limited adopted the 2018 share incentive plan ("2018 Plan"), pursuant to which the maximum aggregate number of shares which may be issued shall initially be 5,963,674 ordinary shares, plus that number of ordinary shares authorized for issuance under the 2015 Plan, in an amount equal to (i) the number of ordinary shares that were not granted pursuant to the 2015 Plan, plus (ii) the number of ordinary shares that were granted pursuant to the 2015 Plan that have expired without having been exercised in full or have otherwise become unexercisable. The time and condition to exercise options will be determined by Tantan's Board. The term of the options may not exceed ten years from the date of the grant, except for the situation of amendment, modification and termination.

Options classified as equity awards

The following table summarizes the option activity for the year ended December 31, 2018:

|  | Number of options | Weighted average exercise price per option (US$) | Weighted average remaining contractual life (years) | Aggregated intrinsic value (US$) |
|---|---|---|---|---|
| Outstanding as of the acquisition date | 1,507,488 | 0.9062 | 7.07 | 45,969 |
| Granted | 575,629 | 21.4461 |  |  |
| Exercised | — | — |  |  |
| Forfeited | (186,531) | 0.7616 |  |  |
| Outstanding as of December 31, 2018 | 1,896,586 | 7.1544 | 7.45 | 35,666 |
| Exercisable as of December 31, 2018 | 358,281 | 1.0547 | 6.48 | 8,923 |

There were 358,281 vested options, and 1,353,711 options expected to vest as of December 31, 2018. For options expected to vest, the weighted-average exercise price was US$8.58 as of December 31, 2018 and the aggregate intrinsic value amounted to US$23,534 as of December 31, 2018.

The weighted-average grant-date fair value of the share options granted during the year ended December 31, 2018 was US$14.99. Total intrinsic value of options exercised for the year ended December 31, 2018 was US$ nil. The total fair value of options vested during the year ended December 31, 2018 was US$7,600.

The fair value of each option granted was estimated on the date of grant using the binomial tree pricing model with the following assumptions used for grants during the applicable periods:

| | Risk-free interest rate of return | Contractual term | Volatility | Dividend yield | Exercise price (US$) |
|---|---|---|---|---|---|
| During the year ended December 31, 2018 | 3.58% | 10 years | 55.4% | — | 1.6-25.0 |

F-47

---

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

**14.    SHARE-BASED COMPENSATION - continued**

***Share options granted by Tantan Limited*** - continued

Options classified as equity awards - continued

(1)    Risk-free interest rate

Risk-free interest rate was estimated based on the yield to maturity of China international government bonds with a maturity period close to the expected term of the options.

(2)    Contractual term

Tantan Limited used the original contractual term.

(3)    Volatility

The volatility of the underlying ordinary shares during the life of the options was estimated based on the historical stock price volatility of comparable listed companies over a period comparable to the expected term of the options.

(4)    Dividend yield

The dividend yield was estimated by Tantan Limited based on its expected dividend policy over the expected term of the options.

(5)    Exercise price

The exercise price of the options was determined by the Tantan Limited's board of directors.

(6)    Fair value of underlying ordinary shares

The estimated fair value of the ordinary shares underlying the options as of the respective grant dates was determined based on a retrospective valuation, which used management's best estimate for projected cash flows as of each valuation date.

For share options classified as equity awards, Tantan Limited recorded share-based compensation of RMB94,977 during the year ended December 31, 2018 , based on the fair value of the grant dates over the requisite service period of award according to the vesting schedule for employee share option.

As of December 31, 2018, total unrecognized compensation expense relating to unvested share options was RMB236,053 which will be recognized over a weighted average period of 2.79 years. The weighted-average remaining contractual term of options outstanding is 7.45 years.

F-48

---

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

**14.    SHARE-BASED COMPENSATION - continued**

***Share options granted by Tantan Limited*** - continued

Options classified as liability awards

In August 2018, Tantan Limited granted 3,578,205 share options to its founders under the 2018 Plan. The founders have the right to request Tantan Limited to redeem for cash the vested options upon the termination of the founders' employment at a price based on a fixed equity value of Tantan

Limited. Therefore, the awards are classified as liability on the consolidated balance sheet due to their cash settlement feature. The options include a four years vesting condition whereas options vest ratably at the end of each year. Accordingly, the awards are re-measured at each reporting date with a corresponding charge to stock-based compensation expense and are amortized over four years. The share options also include a performance condition in which the founders have the right to receive fully vested options immediately upon achieving certain performance conditions. As of December 31, 2018, the Group assessed and concluded that it is not probable that the achievement of the performance condition will be met prior to the end of the four years vesting term.

No liability classified options were vested, and 3,578,205 options were outstanding and expected to vest as of December 31, 2018. For options expected to vest, the weighted-average exercise price was US$0.002 and the aggregate intrinsic value amounted to US$92,883 as of December 31, 2018. The weighted-average grant-date fair value of the share options granted for the year ended December 31, 2018 was US$37.15.

The fair value of each option granted was estimated using the binomial tree pricing model with the following assumptions used during the applicable periods:

| | Risk-free interest rate of return | Contractual term | Volatility | Dividend yield | Exercise price (US$) |
|---|---|---|---|---|---|
| During the year ended December 31, 2018 | 3.39%~3.58% | 10 years | 55.4%~55.6% | — | 0.002 |

(1) Risk-free interest rate

Risk-free interest rate was estimated based on the yield to maturity of China international government bonds with a maturity period close to the expected term of the options.

(2) Contractual term

Tantan Limited used the original contractual term.

(3) Volatility

The volatility of the underlying ordinary shares during the life of the options was estimated based on the historical stock price volatility of comparable listed companies over a period comparable to the expected term of the options.

(4) Dividend yield

The dividend yield was estimated by Tantan Limited based on its expected dividend policy over the expected term of the options.

(5) Exercise price

The exercise price of the options was determined by the Board of Directors of Tantan Limited.

(6) Fair value of underlying ordinary shares

The estimated fair value of the ordinary shares underlying the options as of the respective grant dates was determined based on a retrospective valuation, which used management's best estimate for projected cash flows as of each valuation date.

F-49

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

14. **SHARE-BASED COMPENSATION - continued**

***Share options granted by Tantan Limited*** - continued

Options classified as liability awards - continued

For share options classified as liability awards, Tantan Limited recorded share-based compensation of RMB86,778 during the year ended December 31, 2018, based on the fair value at the grant date and adjusted subsequently at each reporting dates.

As of December 31, 2018, total unrecognized compensation expense relating to unvested share options was RMB818,092, which is expected to be recognized over a weighted average period of 3.62 years. Total unrecognized compensation expenses and recognition period may be adjusted for future changes in estimated forfeitures, and the probability and time of achieving the performance condition .The weighted-average remaining contractual term of options outstanding is 9.62 years.

15. **NET INCOME PER SHARE**

For the year ended December 31, 2016, the Group determined that the nonvested restricted shares are participating securities as the holders of the nonvested restricted shares have a nonforfeitable right to receive dividends with all ordinary shares but the nonvested restricted shares do not have a contractual obligation to fund or otherwise absorb the Group's losses. Accordingly, the Group uses the two-class method of computing net income per share, for ordinary shares and nonvested restricted shares according to the participation rights in undistributed earnings.

The calculation of net income per share is as follows:

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2017 | 2018 |
| | RMB | RMB | RMB |
| Numerator: | | | |
| Net income attributable to Momo Inc. | 978,969 | 2,148,098 | 2,815,775 |
| Undistributed earnings allocated to participating nonvested restricted shares | (21,550) | — | — |
| Net income attributed to ordinary shareholders for computing net income per ordinary share-basic and diluted | 957,419 | 2,148,098 | 2,815,775 |

F-50

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

**15.    NET INCOME PER SHARE - continued**

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2017 | 2018 |
| | RMB | RMB | RMB |
| Denominator: | | | |
| Denominator for computing net income per share-basic: | | | |
| Weighted average ordinary shares outstanding used in computing net income per ordinary share-basic | 377,335,923 | 394,549,323 | 407,009,875 |
| Weighted average shares used in computing net income per participating nonvested restricted share | 8,493,244 | — | — |
| Denominator for computing net income per share-diluted: | | | |
| Weighted average shares outstanding used in computing net income per ordinary share-diluted | 407,041,165 | 415,265,078 | 433,083,643(i) |
| Net income per ordinary share attributable to Momo Inc. - basic | 2.54 | 5.44 | 6.92 |
| Net income per participating nonvested restricted share | 2.54 | — | — |
| Net income per ordinary share attributable to Momo Inc. - diluted | 2.41 | 5.17 | 6.59 |

The following table summarizes potential ordinary shares outstanding excluded from the computation of diluted net income per ordinary share for the years ended December 31, 2016, 2017 and 2018, because their effect is anti-dilutive:

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2017 | 2018 |
| Share issuable upon exercise of share options | 152,500 | 768,266 | 1,117,334 |
| Share issuable upon exercise of RSUs | 50,000 | — | — |

(i)    The calculation of the weighted average number of ordinary shares for the purpose of diluted net income per share has considered the effect of certain potentially dilutive securities. For the year ended December 31, 2016, an incremental weighted average number of 7,155,060 nonvested restricted shares and an incremental weighted average number of 22,550,182 ordinary shares from the assumed exercise of share options and vesting of RSUs using the treasury stock method were included.

For the year ended December 31, 2017, an incremental weighted average number of 20,715,755 ordinary shares from the assumed exercise of share options and RSUs were included.

For the year ended December 31, 2018, an incremental weighted average number of 14,821,852 ordinary shares from the assumed exercise of share options and RSUs and an incremental weighted average number of 11,251,916 ordinary shares resulting from the assumed conversion of convertible senior notes were included.

**16.    COMMITMENTS AND CONTINGENCIES**

Lease commitment

The Group leases certain office premises under non-cancellable leases. These leases expire through 2022 and are renewable upon negotiation. Rental expenses under operating leases for the years ended December 31, 2016, 2017 and 2018 were RMB31,554, RMB58,861 and RMB78,713, respectively.

Future minimum payments under non-cancellable operating leases as of December 31, 2018 were as follows:

| | RMB |
| --- | --- |
| 2019 | 99,133 |
| 2020 | 82,697 |

| | |
|---|---:|
| 2021 | 26,980 |
| 2022 | 8,633 |
| Total | 217,443 |

F-51

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

**16.   COMMITMENTS AND CONTINGENCIES - continued**

Investment commitments

The Group was obligated to subscribe RMB30,001 and RMB47,500 for partnership interest and equity interest of certain long-term investees under various arrangements as of December 31, 2017 and 2018, respectively.

Contingencies

The Group is subject to legal proceedings in the ordinary course of business. The Group does not believe that any currently pending legal or administrative proceeding to which the Group is a party will have a material effect on its business or financial condition.

**17.   RELATED PARTY BALANCES AND TRANSACTIONS**

| Major related parties | Relationship with the Group |
|---|---:|
| Hangzhou Alimama Technology Co., Ltd. (i) | Affiliates of a Major Shareholder |
| Guangzhou UC Network Technology Co., Ltd. (i) | Affiliates of a Major Shareholder |
| Guangzhou Aijiuyou Informational Technology Co., Ltd. (i) | Affiliates of a Major Shareholder |
| Alibaba Cloud Computing Ltd. (i) | Affiliates of a Major Shareholder |
| Taobao (China) Software Co., Ltd. (i) | Affiliates of a Major Shareholder |
| Zhejiang Tmall Technology Co., Ltd. (i) | Affiliates of a Major Shareholder |
| Hangzhou Yihong Advertisement Co., Ltd. (i) | Affiliates of a Major Shareholder |
| Guangzhou Jianyue Information Technology Co., Ltd. (i) | Affiliates of a Major Shareholder |
| Shanghai Xisue Network Technology Co., Ltd. | Affiliate of a long-term investee |
| Hunan Qindao Network Media Technology Co., Ltd. | Affiliate of a long-term investee |
| Hunan Qindao Cultural Spread Ltd. | Long-term investee |
| Shanghai Touch Future Network Technology Co., Ltd. | Long-term investee |
| Beijing Shiyue Haofeng Media Co. Ltd. | Long-term investee |

(i)    The parent company of these entities ceased to be a major shareholder of the Group in November 2017.

(1)   Amount due from related parties-current

| | As of December 31, | |
|---|---:|---:|
| | 2017 | 2018 |
| | RMB | RMB |
| Hunan Qindao Network Media Technology Co., Ltd. (ii) | 33,460 | — |
| Total | 33,460 | — |

(ii)    The amount of RMB33,460 as of December 31, 2017 represented the advance payment of revenue sharing of live video service made to Hunan Qindao Network Media Technology Co., Ltd.

F-52

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

**17.   RELATED PARTY BALANCES AND TRANSACTIONS - continued**

(2)   Amount due to related parties - current

|  | As of December 31, | |
|---|---|---|
|  | 2017 | 2018 |
|  | RMB | RMB |
| Hunan Qindao Network Media Technology Co., Ltd. (iii) | 32 | 43,178 |
| Amount due to ordinary shareholders (iv) | 37,572 | 39,704 |
| Others | 156 | 66 |
| Total | 37,760 | 82,948 |

(iii)   The amount of RMB43,178 as of December 31, 2018 primarily represented the unpaid revenue sharing of live video service to Hunan Qindao Network Media Technology Co., Ltd.

(iv)   The amount of RMB37,572 and RMB39,704 as of December 31, 2017 and 2018 primarily included the unpaid repurchase amount by the Group to its ordinary shareholders.

(3)   Sales to related parties

|  | For the years ended December 31, | | |
|---|---|---|---|
|  | 2016 | 2017 | 2018 |
|  | RMB | RMB | RMB |
| Hangzhou Yihong Advertisement Co., Ltd. (v) | — | 17,659 | — |
| Hangzhou Alimama Technology Co., Ltd. (v) | 273 | 2,309 | — |
| Guangzhou Aijiuyou Informational Technology Co., Ltd. (vi) | 2,660 | 1,242 | — |
| Zhejiang Tmall Technology Co., Ltd. (v) | 5,462 | 500 | — |
| Shanghai Xisue Network Technology Co., Ltd. (v) | 5,981 | — | — |
| Taobao (China) Software Co., Ltd. (v) | 1,698 | — | — |
| Others | 61 | 12 | — |
| Total | 16,135 | 21,722 | — |

(v)   The sales to related parties represented mobile marketing services provided.

(vi)   The sales to related parties represented mobile game revenue generated through those game operating companies.

(4)   Purchase from related parties

|  | For the years ended December 31, | | |
|---|---|---|---|
|  | 2016 | 2017 | 2018 |
|  | RMB | RMB | RMB |
| Hunan Qindao Network Media Technology Co., Ltd. (vii) | 26,759 | 139,406 | 429,345 |
| Beijing Shiyue Haofeng Media Co., Ltd. (vii) | — | — | 2,005 |
| Alibaba Cloud Computing Ltd. (viii) | 22,534 | 74,705 | — |
| Hunan Qindao Cultural Spread Ltd. (vii) | — | 61,676 | — |
| Taobao (China) Software Co., Ltd. | 2,169 | 2,283 | — |
| Guangzhou Jianyue Information Technology Co., Ltd. | — | 803 | — |
| Shanghai Touch Future Network Technology Co., Ltd. | 2,335 | — | — |
| Total | 53,797 | 278,873 | 431,350 |

(vii)   The purchases from Hunan Qindao Network Media Technology Co., Ltd., Beijing Shiyue Haofeng Media Co., Ltd. and Hunan Qindao Cultural Spread Ltd. mainly represent the revenue sharing with talent agencies of live video service.

(viii)   The purchase from Alibaba Cloud Computing Ltd. is mainly related to its cloud computing services.

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

**18.   SEGMENT INFORMATION**

The Group's chief operating decision maker has been identified as the Chief Executive Officer ("CEO") who reviews financial information of operating segments based on US GAAP amounts when making decisions about allocating resources and assessing performance of the Group.

During the years ended December 31, 2016 and 2017, the Group operated and managed its business as a single reporting segment, which included

the provision of live video service, value-added services, mobile marketing services, mobile games and other services. The Group did not have discrete financial information of costs and expenses between various services in its internal reporting, and reported costs and expenses by nature as a whole. Therefore, the Group had one operating segment. During the year ended December 31, 2018, as a result of the Tantan acquisition discussed in Note 3, the Group determined that Tantan met the criteria for separate reportable segment given its financial information is separately reviewed by the Group's CEO. Additionally, the Group started its entertainment business that included TV content production through one of its subsidiary QOOL, for which the Group's CEO started to review discrete financial information. As a result, the Group determined that for the year ended December 31, 2018, it operated in three operating segments namely Momo, Tantan and QOOL. Momo's services mostly include live video services, value-added service, mobile marketing services and mobile games derived from the Momo's platform. Tantan's services mostly include value-added services provided on Tantan's platform. QOOL services mainly include advertisement services generated from the Group's broadcasting of content television.

The Group primarily operates in the PRC and substantially all of the Group's long-lived assets are located in the PRC.

The Group's chief operating decision maker evaluates performance based on each reporting segment's net revenue, operating cost and expenses, operating income and net income. Prior to Tantan acquisition, Tantan's financial information was not consolidated to the Group's financial statements, therefore Tantan's service lines do not have comparable financial information in 2016 and 2017. QOOL started its entertainment business since 2017 and the comparable financial information in 2016 and 2017 account for an insignificant portion to the Group's consolidated financial statements. Net revenues, operating cost and expenses, operating income, and net income by segment for the years ended December 31, 2016, 2017 and 2018 were as follows:

| | For the year ended December 31, 2016 | | | |
| --- | --- | --- | --- | --- |
| | Momo | Tantan | QOOL | Consolidated |
| | RMB | RMB | RMB | RMB |
| Net revenues: | 3,707,358 | — | — | 3,707,358 |
| Cost and expenses: | | | | |
| Cost of revenues | (1,619,327) | — | — | (1,619,327) |
| Research and development | (208,647) | — | — | (208,647) |
| Sales and marketing | (647,238) | — | — | (647,238) |
| General and administrative | (259,712) | — | — | (259,712) |
| Total cost and expenses | (2,734,924) | — | — | (2,734,924) |
| Other operating income | 2,659 | — | — | 2,659 |
| Income from operations | 975,093 | — | — | 975,093 |
| Interest income | 54,603 | — | — | 54,603 |
| Impairment loss on long-term investments | (39,283) | — | — | (39,283) |
| Income tax expense | (34,638) | — | — | (34,638) |
| Share of income on equity method investments | 23,194 | — | — | 23,194 |
| Net income | 978,969 | — | — | 978,969 |

F-54

Table of Contents

MOMO INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018
(in thousands, except share data)

18.    SEGMENT INFORMATION - continued

| | For the year ended December 31, 2017 | | | |
| --- | --- | --- | --- | --- |
| | Momo | Tantan | QOOL | Consolidated |
| | RMB | RMB | RMB | RMB |
| Net revenues: | 8,884,823 | — | 1,567 | 8,886,390 |
| Cost and expenses: | | | | |
| Cost of revenues | (4,373,377) | — | — | (4,373,377) |
| Research and development | (346,144) | — | — | (346,144) |
| Sales and marketing | (1,457,658) | — | (9,718) | (1,467,376) |
| General and administrative | (417,866) | — | (4,139) | (422,005) |
| Total cost and expenses | (6,595,045) | — | (13,857) | (6,608,902) |
| Other operating income | 156,764 | — | — | 156,764 |
| Income (loss) from operations | 2,446,542 | — | (12,290) | 2,434,252 |
| Interest income | 145,568 | — | — | 145,568 |
| Impairment loss on long-term investments | (30,085) | — | — | (30,085) |
| Income tax expense | (445,001) | — | — | (445,001) |
| Share of income on equity method investments | 39,729 | — | — | 39,729 |
| Net income (loss) | 2,156,753 | — | (12,290) | 2,144,463 |

For the year ended December 31, 2018

| | Momo | Tantan | QOOL | Consolidated |
|---|---|---|---|---|
| | RMB | RMB | RMB | RMB |
| Net revenues: | 12,812,421 | 417,998 | 178,002 | 13,408,421 |
| Cost and expenses: | | | | |
| Cost of revenues | (6,572,954) | (174,858) | (435,085) | (7,182,897) |
| Research and development | (614,064) | (146,580) | — | (760,644) |
| Sales and marketing | (1,269,493) | (520,161) | (22,608) | (1,812,262) |
| General and administrative | (472,057) | (121,887) | (46,079) | (640,023) |
| Total cost and expenses | (8,928,568) | (963,486) | (503,772) | (10,395,826) |
| Other operating income | 252,458 | 173 | 1,066 | 253,697 |
| Income (loss) from operations | 4,136,311 | (545,315) | (324,704) | 3,266,292 |
| Interest income | 268,583 | 4,285 | 78 | 272,946 |
| Interest expense | (56,503) | — | — | (56,503) |
| Impairment loss on long-term investments | (43,200) | — | — | (43,200) |
| Income tax expense | (716,729) | 21,824 | (4,743) | (699,648) |
| Share of income on equity method investments | 48,660 | — | — | 48,660 |
| Net income (loss) | 3,637,122 | (519,206) | (329,369) | 2,788,547 |

## 19. EMPLOYEE BENEFIT PLAN

Full time employees of the Group in the PRC participate in a government-mandated defined contribution plan pursuant to which certain pension benefits, medical care, unemployment insurance, employee housing fund and other welfare benefits are provided to employees. The Group accrues for these benefits based on certain percentages of the employees' salaries. The total provisions for such employee benefits were RMB60,403, RMB95,150 and RMB166,998 for the years ended December 31, 2016, 2017 and 2018, respectively.

F-55

Table of Contents

**MOMO INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - continued**
**FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 AND 2018**
**(in thousands, except share data)**

## 20. STATUTORY RESERVES AND RESTRICTED NET ASSETS

In accordance with the Regulations on Enterprises with Foreign Investment of China and their articles of association, the Group's subsidiaries and VIEs located in the PRC, being foreign invested enterprises established in the PRC, are required to provide for certain statutory reserves. These statutory reserve funds include one or more of the following: (i) a general reserve, (ii) an enterprise expansion fund or discretionary reserve fund, and (iii) a staff bonus and welfare fund. Subject to certain cumulative limits, the general reserve fund requires a minimum annual appropriation of 10% of after-tax profit (as determined under accounting principles generally accepted in China at each year-end); the other fund appropriations are at the subsidiaries' or the affiliated PRC entities' discretion. These statutory reserve funds can only be used for specific purposes of enterprise expansion, staff bonus and welfare, and are not distributable as cash dividends except in the event of liquidation of our subsidiaries, our affiliated PRC entities and their respective subsidiaries. The Group's subsidiaries, VIEs and VIEs' subsidiaries are required to allocate at least 10% of their after tax profits to the general reserve until such reserve has reached 50% of their respective registered capital.

Appropriations to the enterprise expansion reserve and the staff welfare and bonus reserve are to be made at the discretion of the board of directors of each of the Group's subsidiaries.

The appropriations to these reserves by the Group's PRC subsidiaries, VIEs and VIEs' subsidiaries were RMB119,308, RMB185,270 and RMB5,194 for the years ended December 31, 2016, 2017 and 2018.

Relevant PRC laws and regulations restrict the WFOEs, VIEs and VIEs' subsidiaries from transferring a portion of their net assets, equivalent to the balance of their statutory reserves and their paid in capital, to the Company in the form of loans, advances or cash dividends. The WFOEs' accumulated profits may be distributed as dividends to the Company without the consent of a third party. The VIEs and VIEs' subsidiaries' revenues and accumulated profits may be transferred to the Company through contractual arrangements without the consent of a third party. Under applicable PRC law, loans from PRC companies to their offshore affiliated entities require governmental approval, and advances by PRC companies to their offshore affiliated entities must be supported by bona fide business transactions. The capital and statutory reserves restricted which represented the amount of net assets of the Group's PRC subsidiaries, VIEs and VIEs' subsidiaries in the Group not available for distribution were RMB677,213, RMB862,484 and RMB1,477,339 as of December 31, 2016, 2017 and 2018, respectively.

## 21. SUBSEQUENT EVENTS

Special cash dividend

On March 12, 2019, the Company declared a special cash dividend in the amount of US$0.62 per ADS, or US$0.31 per ordinary share. The cash dividend will be paid on April 30, 2019 to shareholders of record at the close of business on April 5, 2019. The ex-dividend date will be April 4, 2019. The aggregate amount of cash dividends to be paid is approximately US$128 million, which will be funded by surplus cash on the Company's balance sheet.

Newly granted share options and RSUs

In April 2019, the Company granted 3,219,296 share options to its employees and executives with an exercise price of $0.0002 per share and 130,000 RSUs to its directors, with the vesting period of four years. The Group is in the process of finalizing the fair value assessment.

F-56

Newly granted share options and RSUs

In April 2019, the Company granted 3,219,296 share options to its employees and executives with an exercise price of $0.0002 per share and 130,000 RSUs to its directors, with the vesting period of four years. The Group is in the process of finalizing the fair value assessment.

F-56

**Exhibit 4.20**

**EXECUTION VERSION**

MOMO INC.

AND

THE BANK OF NEW YORK MELLON,

as Trustee

INDENTURE

Dated as of July 2, 2018

1.25% Convertible Senior Notes due 2025

## TABLE OF CONTENTS

PAGE

ARTICLE 1
DEFINITIONS

Section 1.01.    *Definitions*    1
Section 1.02.    *References to Interest*    11

ARTICLE 2
ISSUE, DESCRIPTION, EXECUTION, REGISTRATION AND EXCHANGE OF NOTES

Section 2.01.    *Designation and Amount*    12
Section 2.02.    *Form of Notes*    12
Section 2.03.    *Date and Denomination of Notes; Payments of Interest and Defaulted Amounts*    13
Section 2.04.    *Execution, Authentication and Delivery of Notes*    14
Section 2.05.    *Exchange and Registration of Transfer of Notes; Restrictions on Transfer; Depositary*    15
Section 2.06.    *Mutilated, Destroyed, Lost or Stolen Notes*    22
Section 2.07.    *Temporary Notes*    23
Section 2.08.    *Cancellation of Notes Paid, Converted, Etc*    23
Section 2.09.    *CUSIP Numbers*    24
Section 2.10.    *Additional Notes; Repurchases*    24

ARTICLE 3
SATISFACTION AND DISCHARGE

Section 3.01.    *Satisfaction and Discharge*    24

ARTICLE 4
PARTICULAR COVENANTS OF THE COMPANY

Section 4.01.    *Payment of Principal and Interest*    25
Section 4.02.    *Maintenance of Office or Agency*    25
Section 4.03.    *Appointments to Fill Vacancies in Trustee's Office*    25
Section 4.04.    *Provisions as to Paying Agent*    26
Section 4.05.    *Existence*    27
Section 4.06.    *Rule 144A Information Requirement and Annual Reports*    27
Section 4.07.    *Additional Amounts.*    29
Section 4.08.    *Stay, Extension and Usury Laws*    31
Section 4.09.    *Compliance Certificate; Statements as to Defaults*    31
Section 4.10.    *Further Instruments and Acts*    32

ARTICLE 5
LISTS OF HOLDERS AND REPORTS BY THE COMPANY AND THE TRUSTEE

Section 5.01.    *Lists of Holders*    32
Section 5.02.    *Preservation and Disclosure of Lists*    32

ARTICLE 6
DEFAULTS AND REMEDIES

| | | |
|---|---|---|
| Section 6.01. | *Events of Default* | 32 |
| Section 6.02. | *Acceleration; Rescission and Annulment* | 33 |
| Section 6.03. | *Additional Interest* | 34 |
| Section 6.04. | *Payments of Notes on Default; Suit Therefor* | 35 |
| Section 6.05. | *Application of Monies Collected by Trustee* | 37 |
| Section 6.06. | *Proceedings by Holders* | 38 |
| Section 6.07. | *Proceedings by Trustee* | 39 |
| Section 6.08. | *Remedies Cumulative and Continuing* | 39 |
| Section 6.09. | *Direction of Proceedings and Waiver of Defaults by Majority of Holders* | 39 |
| Section 6.10. | *Notice of Defaults and Events of Default* | 40 |
| Section 6.11. | *Undertaking to Pay Costs* | 40 |

ARTICLE 7

CONCERNING THE TRUSTEE

| | | |
|---|---|---|
| Section 7.01. | *Duties and Responsibilities of Trustee* | 40 |
| Section 7.02. | *Reliance on Documents, Opinions, Etc* | 43 |
| Section 7.03. | *No Responsibility for Recitals, Etc* | 45 |
| Section 7.04. | *Trustee, Paying Agents, Conversion Agents or Note Registrar May Own Notes* | 45 |
| Section 7.05. | *Monies and ADSs to Be Held in Trust* | 45 |
| Section 7.06. | *Compensation and Expenses of Trustee* | 45 |
| Section 7.07. | *Officers' Certificate as Evidence* | 46 |
| Section 7.08. | *Eligibility of Trustee* | 47 |
| Section 7.09. | *Resignation or Removal of Trustee* | 47 |
| Section 7.10. | *Acceptance by Successor Trustee* | 48 |
| Section 7.11. | *Succession by Merger, Etc* | 48 |
| Section 7.12. | *Trustee's Application for Instructions from the Company* | 49 |

ARTICLE 8

CONCERNING THE HOLDERS

| | | |
|---|---|---|
| Section 8.01. | *Action by Holders* | 49 |
| Section 8.02. | *Proof of Execution by Holders* | 49 |
| Section 8.03. | *Who Are Deemed Absolute Owners* | 50 |
| Section 8.04. | *Company-Owned Notes Disregarded* | 50 |
| Section 8.05. | *Revocation of Consents; Future Holders Bound* | 51 |

ii

ARTICLE 9

HOLDERS' MEETINGS

| | | |
|---|---|---|
| Section 9.01. | *Purpose of Meetings* | 51 |
| Section 9.02. | *Call of Meetings by Trustee* | 51 |
| Section 9.03. | *Call of Meetings by Company or Holders* | 52 |
| Section 9.04. | *Qualifications for Voting* | 52 |
| Section 9.05. | *Regulations* | 52 |
| Section 9.06. | *Voting* | 53 |
| Section 9.07. | *No Delay of Rights by Meeting* | 53 |

ARTICLE 10

SUPPLEMENTAL INDENTURES

| | | |
|---|---|---|
| Section 10.01. | *Supplemental Indentures Without Consent of Holders* | 53 |
| Section 10.02. | *Supplemental Indentures with Consent of Holders* | 54 |
| Section 10.03. | *Effect of Supplemental Indentures* | 55 |
| Section 10.04. | *Notation on Notes* | 55 |
| Section 10.05. | *Evidence of Compliance of Supplemental Indenture to Be Furnished Trustee* | 56 |

ARTICLE 11

CONSOLIDATION, MERGER, SALE, CONVEYANCE AND LEASE

| | | |
|---|---|---|
| Section 11.01. | *Company May Consolidate, Etc. on Certain Terms* | 56 |
| Section 11.02. | *Successor Corporation to Be Substituted* | 56 |
| Section 11.03. | *Opinion of Counsel to Be Given to Trustee* | 57 |

ARTICLE 12

IMMUNITY OF INCORPORATORS, STOCKHOLDERS, OFFICERS AND DIRECTORS

| | | |
|---|---|---|
| Section 12.01. | *Indenture and Notes Solely Corporate Obligations* | 57 |

ARTICLE 13

INTENTIONALLY OMITTED

ARTICLE 14
CONVERSION OF NOTES

| Section 14.01. | *Conversion Privilege* | 57 |
| Section 14.02. | *Conversion Procedure; Settlement Upon Conversion.* | 58 |
| Section 14.03. | *Increased Conversion Rate Applicable to Certain Notes Surrendered in Connection with Make-Whole Fundamental Changes* | 60 |
| Section 14.04. | *Adjustment of Conversion Rate* | 63 |
| Section 14.05. | *Adjustments of Prices* | 72 |
| Section 14.06. | *Ordinary Shares to Be Fully Paid* | 72 |
| Section 14.07. | *Effect of Recapitalizations, Reclassifications and Changes of the Ordinary Shares.* | 72 |
| Section 14.08. | *Certain Covenants* | 74 |

iii

| Section 14.09. | *Responsibility of Trustee* | 74 |
| Section 14.10. | *Notice to Holders Prior to Certain Actions* | 75 |
| Section 14.11. | *Stockholder Rights Plans* | 76 |
| Section 14.12. | *Termination of Depositary Receipt Program* | 76 |

ARTICLE 15
REPURCHASE OF NOTES AT OPTION OF HOLDERS

| Section 15.01. | *Repurchase at Option of Holders.* | 76 |
| Section 15.02. | *Repurchase at Option of Holders Upon a Fundamental Change* | 78 |
| Section 15.03. | *Withdrawal of Repurchase Notice or Fundamental Change Repurchase Notice* | 81 |
| Section 15.04. | *Deposit of Repurchase Price or Fundamental Change Repurchase Price* | 81 |
| Section 15.05. | *Covenant to Comply with Applicable Laws Upon Repurchase of Notes* | 82 |

ARTICLE 16
OPTIONAL REDEMPTION

| Section 16.01. | *Optional Redemption for Changes in the Tax Laws of the Relevant Taxing Jurisdiction* | 82 |

ARTICLE 17
MISCELLANEOUS PROVISIONS

| Section 17.01. | *Provisions Binding on Company's Successors* | 84 |
| Section 17.02. | *Official Acts by Successor Corporation* | 84 |
| Section 17.03. | *Addresses for Notices, Etc* | 84 |
| Section 17.04. | *Governing Law; Jurisdiction* | 85 |
| Section 17.05. | *Submission to Jurisdiction; Service of Process* | 86 |
| Section 17.06. | *Evidence of Compliance with Conditions Precedent; Certificates and* Opinions of Counsel to Trustee | 86 |
| Section 17.07. | *Legal Holidays* | 87 |
| Section 17.08. | *No Security Interest Created* | 87 |
| Section 17.09. | *Benefits of Indenture* | 87 |
| Section 17.10. | *Table of Contents, Headings, Etc* | 87 |
| Section 17.11. | *Execution in Counterparts* | 87 |
| Section 17.12. | *Severability* | 87 |
| Section 17.13. | *Waiver of Jury Trial* | 87 |
| Section 17.14. | *Force Majeure* | 87 |
| Section 17.15. | *Calculations* | 88 |

**EXHIBIT**

| Exhibit A | | A |
| | Form of Note | -1 |
| Exhibit B | | B- |
| | Form of Authorization Certificate | 1 |

iv

INDENTURE dated as of July 2, 2018 between MOMO INC., a Cayman Islands exempted company, as issuer (the "**Company**," as more fully set forth in Section 1.01) and THE BANK OF NEW YORK MELLON, a banking organization organized and existing under the laws of the State of New York, as trustee (the "**Trustee**," as more fully set forth in Section 1.01).

W I T N E S S E T H :

WHEREAS, for its lawful corporate purposes, the Company has duly authorized the issuance of its 1.25% Convertible Senior Notes due 2025 (the "**Notes**"), initially in an aggregate principal amount not to exceed US$650,000,000 (as increased by an amount equal to the aggregate principal amount of any additional Notes purchased by the Initial Purchasers pursuant to the exercise of their option to purchase additional Notes as set forth in the Purchase

Agreement), subject to Section 2.10, and in order to provide the terms and conditions upon which the Notes are to be authenticated, issued and delivered, the Company has duly authorized the execution and delivery of this Indenture; and

WHEREAS, the Form of Note, the certificate of authentication to be borne by each Note, the Form of Notice of Conversion, the Form of Fundamental Change Repurchase Notice, the Form of Repurchase Notice and the Form of Assignment and Transfer to be borne by the Notes are to be substantially in the forms hereinafter provided; and

WHEREAS, all acts and things necessary to make the Notes, when executed by the Company and authenticated and delivered by the Trustee, as in this Indenture provided, the valid, binding and legal obligations of the Company, and this Indenture a valid agreement according to its terms, have been done and performed, and the execution of this Indenture and the issuance hereunder of the Notes have in all respects been duly authorized.

NOW, THEREFORE, THIS INDENTURE WITNESSETH:

That in order to declare the terms and conditions upon which the Notes are, and are to be, authenticated, issued and delivered, and in consideration of the premises and of the purchase and acceptance of the Notes by the Holders thereof, the Company covenants and agrees with the Trustee for the equal and proportionate benefit of the respective Holders from time to time of the Notes (except as otherwise provided below), as follows:

ARTICLE 1
DEFINITIONS

Section 1.01. *Definitions.* The terms defined in this Section 1.01 (except as herein otherwise expressly provided or unless the context otherwise requires) for all purposes of this Indenture and of any indenture supplemental hereto shall have the respective meanings specified in this Section 1.01. The words "herein," "hereof," "hereunder," and words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision. The terms defined in this Article include the plural as well as the singular.

"**Additional ADSs**" shall have the meaning specified in Section 14.03(a).

"**Additional Amounts**" shall have the meaning specified in Section 4.07(a).

"**Additional Interest**" means all amounts, if any, payable pursuant to Section 4.06(d), Section 4.06(e) and Section 6.03, as applicable.

"**ADS**" means an American Depositary Share, issued pursuant to the Deposit Agreement, representing two Ordinary Shares of the Company as of the date of this Indenture, and deposited with the ADS Custodian.

"**ADS Custodian**" means Deutsche Bank AG, Hong Kong Branch, with respect to the ADSs delivered pursuant to the Deposit Agreement, or any successor entity thereto.

"**ADS Depositary**" means Deutsche Bank Trust Company Americas, as depositary for the ADSs.

"**ADS Price**" shall have the meaning specified in Section 14.03(b).

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control," when used with respect to any specified Person means the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**Agents**" means the Paying Agent, the Transfer Agent, the Note Registrar and the Conversion Agent.

"**Applicable PRC Rate**" means (i) in the case of deduction or withholding of People's Republic of China income tax, 10%, (ii) in the case of deduction or withholding of People's Republic of China value added tax (including any related local levies), 6.72%, or (iii) in the case of deduction or withholding of both People's Republic of China income tax and People's Republic of China value added tax (including any related local levies), 16.72%.

"**BNY Mellon Group**" shall have the meaning specified in Section 4.02.

"**Board of Directors**" means the board of directors of the Company or a committee of such board duly authorized to act for it hereunder.

"**Board Resolution**" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors, and to be in full force and effect on the date of such certification, and delivered to the Trustee.

"**Business Day**" means, with respect to any Note, each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banking institutions in the State of New York or the Cayman Islands are authorized or obligated by law or executive order to close.

2

"**Capital Stock**" means, for any entity, any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) stock issued by that entity.

"**Change in Tax Law**" shall have the meaning specified in Section 16.01.

"**Clause A Distribution**" shall have the meaning specified in Section 14.04(c).

"**Clause B Distribution**" shall have the meaning specified in Section 14.04(c).

"**Clause C Distribution**" shall have the meaning specified in Section 14.04(c).

"**close of business**" means 5:00 p.m. (New York City time).

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Commission**" means the U.S. Securities and Exchange Commission.

"**Common Equity**" of any Person means ordinary share capital or common stock of such Person that is generally entitled (a) to vote in the election of directors of such Person or (b) if such Person is not a corporation, to vote or otherwise participate in the selection of the governing body, partners, managers or others that will control the management or policies of such Person.

"**Company**" shall have the meaning specified in the first paragraph of this Indenture, and subject to the provisions of Article 11, shall include its successors and assigns.

"**Company Notice**" shall have the meaning specified in Section 15.01(a).

"**Company Order**" means a written order of the Company, signed by an Officer of the Company and delivered to the Trustee.

"**Consolidated Affiliated Entity**" means, with respect to any Person, any corporation, association or other entity which is or is required to be consolidated with such Person under Accounting Standards Codification subtopic 810-10, Consolidation: Overall (including any changes, amendments or supplements thereto) or, if such person prepares its financial statements in accordance with accounting principles other than the accounting principles generally accepted in the United States of America, the equivalent of Accounting Standards Codification subtopic 810-10, Consolidation: Overall under such accounting principles.

"**Conversion Agent**" shall have the meaning specified in Section 4.02.

"**Conversion Date**" shall have the meaning specified in Section 14.02(c).

"**Conversion Obligation**" shall have the meaning specified in Section 14.01.

"**Conversion Rate**" shall have the meaning specified in Section 14.01.

3

"**Corporate Trust Office**" means the corporate trust office of the Trustee at which at any time its corporate trust business shall be administered, which office at the date hereof is located at 101 Barclay Street, New York, NY 10286, USA, Attention: Global Corporate Trust – Momo Inc., or such other address as the Trustee may designate from time to time by notice to the Holders and the Company, or the principal corporate trust office of any successor trustee (or such other address as such successor trustee may designate from time to time by notice to the Holders and the Company).

"**Default**" means any event that is, or after notice or passage of time, or both, would be, an Event of Default.

"**Defaulted Amounts**" means any amounts on any Note (including, without limitation, the Redemption Price, the Repurchase Price, the Fundamental Change Repurchase Price, principal and interest) that are payable but are not punctually paid or duly provided for.

"**Deposit Agreement**" means the deposit agreement dated as of December 10, 2014 by and among the Company, the ADS Depositary and the holders and beneficial owners of the ADSs delivered thereunder or, if amended or supplemented as provided therein, as so amended or supplemented.

"**Depositary**" means, with respect to each Global Note, the Person specified in Section 2.05(c) and Section 2.05(e) as the Depositary with respect to such Notes, until a successor shall have been appointed and become such pursuant to the applicable provisions of this Indenture, and thereafter, "**Depositary**" shall mean or include such successor.

"**Distributed Property**" shall have the meaning specified in Section 14.04(c).

"**Effective Date**" shall have the meaning specified in Section 14.03(c).

"**Event of Default**" shall have the meaning specified in Section 6.01.

"**Ex-Dividend Date**" means the first date on which the ADSs trade on the applicable exchange or in the applicable market, regular way, without the right to receive the issuance, dividend or distribution in question, from the Company or, if applicable, from the seller of the ADSs on such exchange or market (in the form of due bills or otherwise) as determined by such exchange or market.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"**Expiring Rights**" means any rights, options or warrants to purchase Ordinary Shares or ADSs that expire on or prior to the Maturity Date.

"**FATCA**" shall have the meaning specified in Section 4.07(a)(i)(D).

"**Form of Assignment and Transfer**" shall mean the "Form of Assignment and Transfer" attached as Attachment 4 to the Form of Note attached hereto as Exhibit A.

<div align="center">4</div>

"**Form of Fundamental Change Repurchase Notice**" shall mean the "Form of Fundamental Change Repurchase Notice" attached as Attachment 2 to the Form of Note attached hereto as Exhibit A.

"**Form of Notice of Conversion**" shall mean the "Form of Notice of Conversion" attached as Attachment 1 to the Form of Note attached hereto as Exhibit A.

"**Form of Repurchase Notice**" shall mean the "Form of Repurchase Notice" attached as Attachment 3 to the Form of Note attached hereto as Exhibit A.

"**Fractional ADS**" shall have the meaning specified in Section 14.02(a).

"**Fundamental Change**" shall be deemed to have occurred at the time after the Notes are originally issued if any of the following occurs:

(a) (A) A "person" or "group" within the meaning of Section 13(d) of the Exchange Act, other than the Company, its Subsidiaries, the employee benefit plans of the Company and its Subsidiaries and Permitted Holders, files a Schedule TO or any schedule, form or report under the Exchange Act disclosing that such person or group has become the direct or indirect "beneficial owner," as defined in Rule 13d-3 under the Exchange Act, of the Company's ordinary share capital (including ordinary share capital held in the form of ADSs) representing more than 50% of the voting power of the Company's ordinary share capital or (B) a "person" or "group" within the meaning of Section 13(d) of the Exchange Act, other than the Company, its Subsidiaries and the employee benefit plans of the Company and its Subsidiaries, files a Schedule TO or any schedule, form or report under the Exchange Act disclosing that such person or group has become the direct or indirect "beneficial owner," as defined in Rule 13d-3 under the Exchange Act, of more than 50% of the outstanding Ordinary Shares (including Ordinary Shares held in the form of ADSs);

(b) the consummation of (A) any recapitalization, reclassification or change of the Ordinary Shares or the ADSs (other than changes resulting from a subdivision or combination) as a result of which the Ordinary Shares or the ADSs would be converted into, or exchanged for, stock, other securities, other property or assets; (B) any share exchange, consolidation or merger of the Company pursuant to which the Ordinary Shares or the ADSs will be converted into cash, securities or other property; or (C) any sale, lease or other transfer in one transaction or a series of transactions of all or substantially all of the consolidated assets of the Company and its Subsidiaries and Consolidated Affiliated Entities, taken as a whole, to any Person other than one of the Company's Subsidiaries; *provided*, *however*, that a transaction described in clause (B) in which the holders of all classes of the Company's ordinary share capital (including ordinary share capital held in the form of ADSs) immediately prior to such transaction own, directly or indirectly, more than 50% of all classes of Common Equity of the continuing or surviving corporation or transferee or the parent thereof immediately after such transaction in substantially the same proportions vis-a-vis each other as such ownership immediately prior to such transaction shall not be a Fundamental Change pursuant to this clause (b);

<div align="center">5</div>

(c) the shareholders of the Company approve any plan or proposal for the liquidation or dissolution of the Company;

(d) the ADSs (or other Common Equity or ADSs in respect of Common Equity underlying the Notes) cease to be listed or quoted on any of The New York Stock Exchange, The NASDAQ Global Select Market or The NASDAQ Global Market (or any of their respective successors); or

(e) any change in or amendment to the laws, regulations and rules of the People's Republic of China or the official interpretation or official application thereof (a "**Change in Law**") that results in (x) the Company, its Subsidiaries and its Consolidated Affiliated Entities (collectively, the "**Company Group**") (as in existence immediately subsequent to such Change in Law), as a whole, being legally prohibited from operating substantially all of the business operations conducted by the Company Group (as in existence immediately prior to such Change in Law) as of the last date of the period described in the Company's consolidated financial statements for the most recent fiscal quarter and (y) the Company's being unable to continue to derive substantially all of the economic benefits from the business operations conducted by the Company Group (as in existence immediately prior to such Change in Law) in the same manner as reflected in the Company's consolidated financial statements for the most recent fiscal quarter;

*provided*, *however*, that a transaction or transactions described in clause (a) or (b) above shall not constitute a Fundamental Change, if at least 90% of the consideration received or to be received by holders of the ADSs, excluding cash payments for Fractional ADSs, in connection with such transaction or transactions consists of shares of Common Equity or ADSs in respect of Common Equity that are listed or quoted on any of The New York Stock Exchange, The NASDAQ Global Select Market or The NASDAQ Global Market (or any of their respective successors) or will be so listed or quoted when issued or exchanged in connection with such transaction or transactions and as a result of such transaction or transactions the Notes become convertible into such consideration, excluding cash payments for Fractional ADSs.

"**Fundamental Change Company Notice**" shall have the meaning specified in Section 15.02(c).

"**Fundamental Change Repurchase Date**" shall have the meaning specified in Section 15.02(a).

"**Fundamental Change Repurchase Notice**" shall have the meaning specified in Section 15.02(b)(i).

"**Fundamental Change Repurchase Price**" shall have the meaning specified in Section 15.02(a).

"**Global Note**" shall have the meaning specified in Section 2.05(b).

"**Holder,**" as applied to any Note, or other similar terms (but excluding the term "beneficial holder"), shall mean any Person in whose name at the time a particular Note is registered on the Note Register.

6

"**Indenture**" means this instrument as originally executed or, if amended or supplemented as herein provided, as so amended or supplemented.

"**Initial Purchasers**" means J.P. Morgan Securities LLC, Credit Suisse Securities (USA) LLC and Morgan Stanley & Co. International plc.

"**Interest Payment Date**" means each January 1 and July 1 of each year, beginning on January 1, 2019.

"**Last Reported Sale Price**" of the ADSs on any date means the closing sale price per ADS (or if no closing sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices) on that date as reported in composite transactions for the principal U.S. national or regional securities exchange on which the ADSs are traded. If the ADSs are not listed for trading on a U.S. national or regional securities exchange on the relevant date, the "**Last Reported Sale Price**" shall be the last quoted bid price for the ADSs in the over-the-counter market on the relevant date as reported by OTC Markets Group Inc. or a similar organization. If the ADSs are not so quoted, the "**Last Reported Sale Price**" shall be the average of the mid-point of the last bid and ask prices for the ADSs on the relevant date from each of at least three nationally recognized independent investment banking firms selected by the Company for this purpose.

"**Make-Whole Fundamental Change**" means any transaction or event described in clause (a), (b), (d) or (e) of the definition of Fundamental Change (determined after giving effect to any exceptions to or exclusions from such definition, including in the *proviso* immediately succeeding clause (e) of the definition thereof, but without regard to the *proviso* in clause (b) of the definition thereof).

"**Maturity Date**" means July 1, 2025.

"**Merger Event**" shall have the meaning specified in Section 14.07(a).

"**Note**" or "**Notes**" shall have the meaning specified in the first paragraph of the recitals of this Indenture.

"**Notes Fungibility Date**" means the date, if any, following the Resale Restriction Termination Date on which all of the Rule 144A Notes and all of the Regulation S Notes are no longer Restricted Securities, do not bear the restrictive legend required by Section 2.05(c), are fungible for U.S. securities law purposes and are assigned an identical, unrestricted CUSIP number.

"**Note Register**" shall have the meaning specified in Section 2.05(a).

"**Note Registrar**" shall have the meaning specified in Section 2.05(a).

"**Notice of Conversion**" shall have the meaning specified in Section 14.02(b).

7

"**Offering Memorandum**" means the preliminary offering memorandum dated June 26, 2018, as supplemented by the pricing term sheet dated June 26, 2018, relating to the offering and sale of the Notes.

"**Officer**" means, with respect to the Company, the President, the Chief Executive Officer, the Treasurer, the Secretary, any Executive or Senior Vice President or any Vice President (whether or not designated by a number or numbers or word or words added before or after the title "Vice President").

"**Officers' Certificate**," when used with respect to the Company, means a certificate that is delivered to the Trustee and that is signed by (a) two Officers of the Company or (b) one Officer of the Company and one of any Assistant Treasurer, any Assistant Secretary or the Controller of the Company. Each such certificate shall include the statements provided for in Section 17.06 if and to the extent required by the provisions of such Section. One of the Officers giving an Officers' Certificate pursuant to Section 4.09 shall be the principal executive, financial or accounting officer of the Company.

"**open of business**" means 9:00 a.m. (New York City time).

"**Opinion of Counsel**" means an opinion in writing signed by legal counsel and in a form reasonably acceptable to the Trustee, who may be counsel to the Company, or other counsel acceptable to the Trustee, that is delivered to the Trustee. Each such opinion shall include the statements provided for in Section 17.06 if and to the extent required by the provisions of such Section 17.06.

"**Ordinary Shares**" means Class A ordinary shares of the Company, par value US$0.0001 per share, at the date of this Indenture, subject to Section 14.07.

"**outstanding,**" when used with reference to Notes, shall, subject to the provisions of Section 8.04, mean, as of any particular time, all Notes authenticated and delivered by the Trustee under this Indenture, except:

(a) Notes theretofore canceled by the Note Registrar or accepted by the Note Registrar for cancellation;

(b) Notes, or portions thereof, that have become due and payable and in respect of which monies in the necessary amount shall have been deposited with the Trustee or with any Paying Agent (other than the Company) or shall have been set aside and segregated in trust by the Company (if the Company shall act as its own Paying Agent);

(c) Notes that have been paid pursuant to Section 2.06 or Notes in lieu of which, or in substitution for which, other Notes shall have been

authenticated and delivered pursuant to the terms of Section 2.06 unless proof satisfactory to the Trustee is presented that any such Notes are held by protected purchasers in due course;

(d) Notes converted pursuant to Article 14 and required to be cancelled pursuant to Section 2.08;

8

(e) Notes redeemed pursuant to Article 16; and

(f) Notes repurchased by the Company pursuant to the third sentence of Section 2.10.

"**Paying Agent**" shall have the meaning specified in Section 4.02.

"**Permitted Holder**" means (i) Yan Tang, (ii) the spouse and lineal descendants and spouses of lineal descendants of Yan Tang, (iii) the estates or legal representatives of any person named in clauses (i) or (ii), (iv) trusts established for the benefit of any person named in clauses (i) or (ii) and (v) any entity solely owned and controlled, directly or indirectly, by one or more of the foregoing.

"**Person**" means an individual, a corporation, a limited liability company, an association, a partnership, a joint venture, a joint stock company, a trust, an unincorporated organization or a government or an agency or a political subdivision thereof.

"**Physical Notes**" means permanent certificated Notes in registered form issued in denominations of US$1,000 principal amount and multiples thereof.

"**Predecessor Note**" of any particular Note means every previous Note evidencing all or a portion of the same debt as that evidenced by such particular Note; and, for the purposes of this definition, any Note authenticated and delivered under Section 2.06 in lieu of or in exchange for a mutilated, lost, destroyed or stolen Note shall be deemed to evidence the same debt as the mutilated, lost, destroyed or stolen Note that it replaces.

"**Purchase Agreement**" means that certain Purchase Agreement, dated as of June 26, 2018, among the Company and the Initial Purchasers.

"**Record Date**" means, with respect to any dividend, distribution or other transaction or event in which the holders of the Ordinary Shares (directly or in the form of ADSs) (or other applicable security) have the right to receive any cash, securities or other property or in which the Ordinary Shares (directly or in the form of ADSs) (or such other security) are exchanged for or converted into any combination of cash, securities or other property, the date fixed for determination of security holders entitled to receive such cash, securities or other property (whether such date is fixed by the Board of Directors, statute, contract or otherwise).

"**Redemption Date**" shall have the meaning specified in Section 16.01.

"**Redemption Reference Date**" shall have the meaning specified in Section 14.03(g).

"**Redemption Reference Price**" shall have the meaning specified in Section 16.01.

"**Redemption Price**" shall have the meaning specified in Section 16.01.

"**Reference Property**" shall have the meaning specified in Section 14.07(a).

9

"**Regular Record Date**," with respect to any Interest Payment Date, shall mean the December 15 or June 15 (whether or not such day is a Business Day) immediately preceding the applicable January 1 or July 1 Interest Payment Date, respectively.

"**Regulation S**" means Regulation S under the Securities Act or any successor to such regulation.

"**Regulation S Notes**" means the Notes initially offered and sold outside the United States pursuant to Regulation S.

"**Relevant Jurisdiction**" shall have the meaning specified in Section 4.07(a).

"**Relevant Taxing Jurisdiction**" shall have the meaning specified in Section 4.07(a).

"**Repurchase Date**" shall have the meaning specified in Section 15.01(a).

"**Repurchase Expiration Time**" shall have the meaning specified in Section 15.01(a).

"**Repurchase Notice**" shall have the meaning specified in Section 15.01(a).

"**Repurchase Price**" shall have the meaning specified in Section 15.01(a).

"**Resale Restriction Termination Date**" shall have the meaning specified in Section 2.05(c).

"**Responsible Officer**" means, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee, including any vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is

referred because of such Person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Indenture.

"**Restricted Securities**" shall have the meaning specified in Section 2.05(c).

"**Rule 144A**" means Rule 144A as promulgated under the Securities Act.

"**Rule 144A Notes**" means the notes initially offered and sold pursuant to Rule 144A.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Significant Subsidiary**" means a Subsidiary of the Company that meets the definition of "significant subsidiary" in Article 1, Rule 1-02 of Regulation S-X under the Exchange Act. Each of the Company's Consolidated Affiliated Entities will be deemed to be a "subsidiary" for purposes of the definition of "significant subsidiary" in Article 1, Rule 1-02 of Regulation S-X.

"**Spin-Off**" shall have the meaning specified in Section 14.04(c).

10

"**Subsidiary**" means, with respect to any Person, any corporation, association, partnership or other business entity of which more than 50% of the total voting power of shares of Capital Stock or other interests (including partnership interests) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, general partners or trustees thereof is at the time owned or controlled, directly or indirectly, by (i) such Person; (ii) such Person and one or more Subsidiaries of such Person; or (iii) one or more Subsidiaries of such Person.

"**Successor Company**" shall have the meaning specified in Section 11.01(a).

"**Trading Day**" means a day on which (i) trading in the ADSs (or other security for which a closing sale price must be determined) generally occurs on The NASDAQ Global Select Market or, if the ADSs (or such other security) are not then listed on The NASDAQ Global Select Market, on the principal other U.S. national or regional securities exchange on which the ADSs (or such other security) are then listed or, if the ADSs (or such other security) are not then listed on a U.S. national or regional securities exchange, on the principal other market on which the ADSs (or such other security) are then traded and (ii) a Last Reported Sale Price for the ADSs (or closing sale price for such other security) is available on such securities exchange or market; *provided* that if the ADSs (or such other security) are not so listed or traded, "**Trading Day**" means a Business Day.

"**transfer**" shall have the meaning specified in Section 2.05(c) and Section 2.05(e), as applicable.

"**Trigger Event**" shall have the meaning specified in Section 14.04(c).

"**Trust Indenture Act**" means the Trust Indenture Act of 1939, as amended, as it was in force at the date of execution of this Indenture; *provided, however*, that in the event the Trust Indenture Act of 1939 is amended after the date hereof, the term "Trust Indenture Act" shall mean, to the extent required by such amendment, the Trust Indenture Act of 1939, as so amended.

"**Trustee**" means the Person named as the "**Trustee**" in the first paragraph of this Indenture until a successor trustee shall have become such pursuant to the applicable provisions of this Indenture, and thereafter "**Trustee**" shall mean or include each Person who is then a Trustee hereunder.

"**unit of Reference Property**" shall have the meaning specified in Section 14.07(a).

"**U.S. Person**" shall have the meaning as such term is defined under Regulation S.

"**Valuation Period**" shall have the meaning specified in Section 14.04(c).

Section 1.02. *References to Interest.* Unless the context otherwise requires, any reference to interest on, or in respect of, any Note in this Indenture shall be deemed to include Additional Interest if, in such context, Additional Interest is, was or would be payable pursuant to any of Section 4.06(d), Section 4.06(e) and Section 6.03. Unless the context otherwise requires, any express mention of Additional Interest in any provision hereof shall not be construed as excluding Additional Interest in those provisions hereof where such express mention is not made.

11

ARTICLE 2
ISSUE, DESCRIPTION, EXECUTION, REGISTRATION AND EXCHANGE OF NOTES

Section 2.01. *Designation and Amount.* The Notes shall be designated as the "1.25% Convertible Senior Notes due 2025." The aggregate principal amount of Notes that may be authenticated and delivered under this Indenture is initially limited to US$650,000,000 (as increased by an amount equal to the aggregate principal amount of any additional Notes purchased by the Initial Purchasers pursuant to the exercise of their option to purchase additional Notes as set forth in the Purchase Agreement), subject to Section 2.10 and except for Notes authenticated and delivered upon registration or transfer of, or in exchange for, or in lieu of other Notes pursuant to Section 2.05, Section 2.06, Section 2.07, Section 10.04, Section 14.02 and Section 15.04.

Section 2.02. *Form of Notes.* The Notes and the Trustee's certificate of authentication to be borne by such Notes shall be substantially in the respective forms set forth in Exhibit A, the terms and provisions of which shall constitute, and are hereby expressly incorporated in and made a part of this Indenture. To the extent applicable, the Company and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.

Any Global Note may be endorsed with or have incorporated in the text thereof such legends or recitals or changes not inconsistent with the provisions of this Indenture as may be required by the Depositary, or as may be required to comply with any applicable law or any regulation thereunder or with the rules and regulations of any securities exchange or automated quotation system upon which the Notes may be listed or traded or designated for issuance or to conform with any usage with respect thereto, or to indicate any special limitations or restrictions to which any particular Notes are subject.

Any of the Notes may have such letters, numbers or other marks of identification and such notations, legends or endorsements as the Officers executing the same may approve (execution thereof to be conclusive evidence of such approval) and as are not inconsistent with the provisions of this Indenture, or as may be required to comply with any law or with any rule or regulation made pursuant thereto or with any rule or regulation of any securities exchange or automated quotation system on which the Notes may be listed or designated for issuance, or to conform to usage or to indicate any special limitations or restrictions to which any particular Notes are subject.

Each Global Note shall represent such principal amount of the outstanding Notes as shall be specified therein and shall provide that it shall represent the aggregate principal amount of outstanding Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be increased or reduced to reflect redemptions, repurchases, cancellations, conversions, transfers or exchanges permitted hereby. Any endorsement of the Global Note to reflect the amount of any increase or decrease in the amount of outstanding Notes represented thereby shall be made by the Trustee or the Note Registrar in such manner and upon instructions given by the Holder of such Notes in accordance with this Indenture. Payment of principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, and accrued and unpaid interest on, the Global Note shall be made to the Holder of such Note on the date of payment, unless a record date or other means of determining Holders eligible to receive payment is provided for herein.

12

Section 2.03. *Date and Denomination of Notes; Payments of Interest and Defaulted Amounts.* (a) The Notes shall be issuable in registered form without coupons in denominations of US$1,000 principal amount and integral multiples thereof. Each Note shall be dated the date of its authentication and shall bear interest from the date specified on the face of such Note. Accrued interest on the Notes shall be computed on the basis of a 360-day year composed of twelve 30-day months and, for partial months, on the basis of actual days elapsed over a 30-day month.

(b) The Person in whose name any Note (or its Predecessor Note) is registered on the Note Register at the close of business on any Regular Record Date with respect to any Interest Payment Date shall be entitled to receive the interest payable on such Interest Payment Date. Interest shall be payable at the office or agency of the Company maintained by the Company for such purposes in the Borough of Manhattan, The City of New York, which shall initially be the Corporate Trust Office. The Company shall pay interest (i) on any Physical Notes (A) to Holders holding Physical Notes having an aggregate principal amount of US$5,000,000 or less, by check mailed (at the Company's expense) to the Holders of these Notes at their address as it appears in the Note Register and (B) to Holders holding Physical Notes having an aggregate principal amount of more than US$5,000,000, either by check mailed (at the Company's expense) to such Holders or, upon application by such Holder to the Trustee not later than the relevant Regular Record Date, by wire transfer in immediately available funds to that Holder's account within the United States, which application shall remain in effect until the Holder notifies, in writing, the Trustee to the contrary or (ii) on any Global Note by wire transfer of immediately available funds to the account of the Depositary or its nominee.

(c) Any Defaulted Amounts shall forthwith cease to be payable to the Holder on the relevant payment date but shall accrue interest per annum at the rate per annum borne by the Notes *plus* one percent, subject to the enforceability thereof under applicable law, from, and including, such relevant payment date, and such Defaulted Amounts together with such interest thereon shall be paid by the Company, at its election in each case, as provided in clause (i) or (ii) below:

(i) The Company may elect to make payment of any Defaulted Amounts to the Persons in whose names the Notes (or their respective Predecessor Notes) are registered at the close of business on a special record date for the payment of such Defaulted Amounts, which shall be fixed in the following manner. The Company shall notify the Trustee in writing of the amount of the Defaulted Amounts proposed to be paid on each Note and the date of the proposed payment (which shall be not less than 25 days after the receipt by the Trustee of such notice, unless the Trustee in its sole discretion shall consent to an earlier date), and at the same time the Company shall deposit with the Trustee an amount of money equal to the aggregate amount to be paid in respect of such Defaulted Amounts or shall make arrangements satisfactory to the Trustee for such deposit on or prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the Persons entitled to such Defaulted Amounts as in this clause provided. Thereupon the Company shall fix a special record date for the payment of such Defaulted Amounts which shall be not more than 15 days and not less than 10 days prior to the date of the proposed payment, and not less than 10 days after the receipt by the Trustee of the notice of the proposed payment. The Company shall promptly notify the Trustee of such special record date and the Trustee, in the name and at the expense of the Company, shall cause notice of the proposed payment of such Defaulted Amounts and the special record date therefor to be mailed, first-class postage prepaid (at the Company's expense), to each Holder at its address as it appears in the Note Register, not less than 10 days prior to such special record date. Notice of the proposed payment of such Defaulted Amounts and the special record date therefor having been so mailed, such Defaulted Amounts shall be paid to the Persons in whose names the Notes (or their respective Predecessor Notes) are registered at the close of business on such special record date and shall no longer be payable pursuant to the following clause (ii) of this Section 2.03 (c).

13

(ii) The Company may make payment of any Defaulted Amounts in any other lawful manner not inconsistent with the requirements of any securities exchange or automated quotation system on which the Notes may be listed or designated for issuance, and upon such notice as may be required by such exchange or automated quotation system, if, after notice given by the Company to the Trustee of the proposed payment pursuant to this clause, such manner of payment shall be deemed practicable by the Trustee.

Section 2.04. *Execution, Authentication and Delivery of Notes.* The Notes shall be signed in the name and on behalf of the Company by the manual or facsimile signature of its Chief Executive Officer, President, Chief Financial Officer, Treasurer, Secretary or any of its Executive or Senior Vice Presidents. With the delivery of this Indenture, the Company is furnishing, and from time to time thereafter may furnish, a certificate substantially in the

form of Exhibit B (an "**Authorization Certificate**") identifying and certifying the incumbency and specimen (and/or facsimile) signatures of its active authorized Officers. Until the Trustee receives a subsequent Authorization Certificate, the Trustee shall be entitled to conclusively rely on the last Authorization Certificate delivered to it for purposes of determining the relevant authorized Officers. Typographical and other minor errors or defects in any signature shall not affect the validity or enforceability of any Note which has been duly authenticated and delivered by the Trustee.

At any time and from time to time after the execution and delivery of this Indenture, the Company may deliver Notes executed by the Company to the Trustee for authentication, together with a Company Order for the authentication and delivery of such Notes, and the Trustee in accordance with such Company Order shall authenticate and deliver such Notes, without any further action by the Company hereunder.

14

The Company Order shall specify the amount of Notes to be authenticated (including the initial amount of Rule 144A Notes and the initial amount of Regulation S Notes), the applicable rate at which interest will accrue on such Notes, the date on which the original issuance of such Notes is to be authenticated, the date from which interest will begin to accrue, the date or dates on which interest on such Notes will be payable and the date on which the principal of such Notes will be payable and other terms relating to such Notes. The Trustee shall thereupon authenticate and deliver said Notes to or upon the written order of the Company (as set forth in such Company Order).

The Trustee shall have the right to decline to authenticate and deliver any Notes under this Section (a) unless and until it receives from the Company a Company Order instructing it to so authenticate and deliver such Notes; (b) if the Trustee determines that such action may not lawfully be taken; or (c) if the Trustee determines that such action would expose to Trustee to personal liability, unless indemnity and/or security satisfactory to the Trustee against such liability is provided to the Trustee.

Only such Notes as shall bear thereon a certificate of authentication substantially in the form set forth on the form of Note attached as Exhibit A hereto, executed manually or by facsimile by an authorized officer of the Trustee, shall be entitled to the benefits of this Indenture or be valid or obligatory for any purpose. Such certificate by the Trustee upon any Note executed by the Company shall be conclusive evidence that the Note so authenticated has been duly authenticated and delivered hereunder and that the Holder is entitled to the benefits of this Indenture.

In case any Officer of the Company who shall have signed any of the Notes shall cease to be such Officer before the Notes so signed shall have been authenticated and delivered by the Trustee, or disposed of by the Company, such Notes nevertheless may be authenticated and delivered or disposed of as though the Person who signed such Notes had not ceased to be such Officer of the Company; and any Note may be signed on behalf of the Company by such Persons as, at the actual date of the execution of such Note, shall be the Officers of the Company, although at the date of the execution of this Indenture any such Person was not such an Officer.

Section 2.05. *Exchange and Registration of Transfer of Notes; Restrictions on Transfer; Depositary.* (a) The Company shall cause to be kept at the Corporate Trust Office a register (the register maintained in such office or in any other office or agency of the Company designated pursuant to Section 4.02, the "**Note Register**") in which, subject to such reasonable regulations as it may prescribe, the Company shall provide for the registration of Notes and of transfers of Notes. Such register shall be in written form or in any form capable of being converted into written form within a reasonable period of time. The Bank of New York Mellon is hereby initially appointed the "**Note Registrar**" for the purpose of registering Notes and transfers of Notes as herein provided. The Company may appoint one or more co-Note Registrars in accordance with Section 4.02.

Prior to the Notes Fungibility Date, upon surrender for registration of transfer of any Rule 144A Note or Regulation S Note, as the case may be, to the Note Registrar or any co-Note Registrar, and satisfaction of the requirements for such transfer set forth in this Section 2.05, the Company shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Rule 144A Notes or Regulation S Notes, as the case may be, of any authorized denominations and of a like aggregate principal amount and bearing such restrictive legends as may be required by this Indenture. Following the Notes Fungibility Date, upon surrender for registration of transfer of any Note to the Note Registrar or any co-Note Registrar, and satisfaction of the requirements for such transfer set forth in this Section 2.05, the Company shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes of any authorized denominations and of a like aggregate principal amount and not bearing the restrictive legends required by Section 2.05(c).

15

Prior to the Notes Fungibility Date, Rule 144A Notes and Regulation S Notes, as the case may be, may be exchanged for other Rule 144A Notes or Regulation S Notes, as the case may be, of any authorized denominations and of a like aggregate principal amount, upon surrender of the Rule 144A Notes or Regulation S Notes, as the case may be, to be exchanged at any such office or agency maintained by the Company pursuant to Section 4.02. Whenever any Rule 144A Notes or Regulation S Notes, as the case may be, are so surrendered for exchange, the Company shall execute, and the Trustee shall authenticate and deliver, the Rule 144A Notes or Regulation S Notes, as the case may be, that the Holder making the exchange is entitled to receive, bearing registration numbers not contemporaneously outstanding. Following the Notes Fungibility Date, Notes may be exchanged for other Notes of any authorized denominations and of a like aggregate principal amount but not bearing the restrictive legend required by Section 2.05(c), upon surrender of the Notes to be exchanged at any such office or agency maintained by the Company pursuant to Section 4.02. Whenever any Notes are so surrendered for exchange, the Company shall execute, and the Trustee shall authenticate and deliver, the Notes that the Holder making the exchange is entitled to receive, bearing registration numbers not contemporaneously outstanding.

All Notes presented or surrendered for registration of transfer or for exchange, repurchase or conversion shall (if so required by the Company, the Trustee, the Note Registrar or any co-Note Registrar) be duly endorsed, or be accompanied by a written instrument or instruments of transfer in form satisfactory to the Company and duly executed, by the Holder thereof or its attorney-in-fact duly authorized in writing.

No service charge shall be imposed by the Company, the Transfer Agent, the Note Registrar, any co-Note Registrar or the Paying Agent for any exchange or registration of transfer of Notes, but the Company may require a Holder to pay a sum sufficient to cover any documentary, stamp, issue, transfer or similar tax required in connection therewith as a result of the name of the Holder of new Notes issued upon such exchange or registration of transfer being different from the name of the Holder of the old Notes surrendered for exchange or registration of transfer. The Company shall pay the ADS Depositary's fees for issuance of the ADSs.

None of the Company, the Trustee, the Note Registrar or any co-Note Registrar shall be required to exchange or register a transfer of (i) any Notes surrendered for conversion or, if a portion of any Note is surrendered for conversion, such portion thereof surrendered for conversion, (ii) any Notes, or a portion of any Note, surrendered for repurchase (and not withdrawn) in accordance with Article 15 or (iii) any Notes selected for redemption in accordance with Article 16.

16

All Notes issued upon any registration of transfer or exchange of Notes in accordance with this Indenture shall be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture as the Notes surrendered upon such registration of transfer or exchange.

(b) So long as the Notes are eligible for book-entry settlement with the Depositary, unless otherwise required by law, subject to the fourth paragraph from the end of Section 2.05(c) all Notes shall be represented by one or more Notes in global form (each, a "**Global Note**") registered in the name of the Depositary or the nominee of the Depositary. The transfer and exchange of beneficial interests in a Global Note that does not involve the issuance of a Physical Note shall be effected through the Depositary in accordance with this Indenture (including the restrictions on transfer set forth herein) and the procedures of the Depositary therefor. Prior to the Notes Fungibility Date, the Rule 144A Notes shall be represented by one or more Global Notes and the Regulation S Notes shall be represented by one or more separate Global Notes. Following the Notes Fungibility Date, the Rule 144A Notes and the Regulation S Notes may be represented by one or more of the same Global Notes.

(c) Every Note that bears or is required under this Section 2.05(c) to bear the legend set forth in this Section 2.05(c) (together with any ADSs (including the Ordinary Shares represented thereby) delivered upon conversion of the Notes that are required to bear the legend set forth in Section 2.05 (d), collectively, the "**Restricted Securities**") shall be subject to the restrictions on transfer set forth in this Section 2.05(c) (including the legend set forth below), unless such restrictions on transfer shall be eliminated or otherwise waived by written consent of the Company, and the Holder of each such Restricted Security, by such Holder's acceptance thereof, agrees to be bound by all such restrictions on transfer. As used in this Section 2.05(c) and Section 2.05(d), the term "**transfer**" encompasses any sale, pledge, transfer or other disposition whatsoever of any Restricted Security.

Until the date (the "**Resale Restriction Termination Date**") that is the later of (1) the date that is one year after the last date of original issuance of the Notes, or such shorter period of time as permitted by Rule 144 under the Securities Act or any successor provision thereto, and (2) such later date, if any, as may be required by applicable law, any certificate evidencing such Note (and all securities issued in exchange therefor or substitution thereof, other than ADSs (including the Ordinary Shares represented thereby) issued upon conversion thereof, which shall bear the legend set forth in Section 2.05(d), if applicable) shall bear a legend in substantially the following form (unless such Notes have been transferred pursuant to a registration statement that has become or been declared effective under the Securities Act and that continues to be effective at the time of such transfer, or pursuant to the exemption from registration provided by Rule 144 under the Securities Act or any similar provision then in force under the Securities Act, or unless otherwise agreed by the Company in writing, with notice thereof to the Trustee):

THIS SECURITY, THE AMERICAN DEPOSITARY SHARES DELIVERABLE UPON CONVERSION OF THIS SECURITY AND THE ORDINARY SHARES REPRESENTED THEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER:

(1) REPRESENTS THAT IT AND ANY ACCOUNT FOR WHICH IT IS ACTING IS (A) A "QUALIFIED INSTITUTIONAL BUYER" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) OR (B) NOT A U.S. PERSON AND LOCATED OUTSIDE THE UNITED STATES (WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT) AND THAT IT EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO EACH SUCH ACCOUNT AND THAT IT AND ANY SUCH ACCOUNT IS NOT AN AFFILIATE OF MOMO INC. (THE "**COMPANY**"), AND

17

(2) AGREES FOR THE BENEFIT OF THE COMPANY THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS SECURITY OR ANY BENEFICIAL INTEREST HEREIN PRIOR TO THE DATE THAT IS THE LATER OF (X) ONE YEAR AFTER THE LAST ORIGINAL ISSUE DATE HEREOF OR SUCH SHORTER PERIOD OF TIME AS PERMITTED BY RULE 144 UNDER THE SECURITIES ACT OR ANY SUCCESSOR PROVISION THERETO AND (Y) SUCH LATER DATE, IF ANY, AS MAY BE REQUIRED BY APPLICABLE LAW, EXCEPT:

(A) TO THE COMPANY OR ANY SUBSIDIARY THEREOF, OR

(B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT, OR

(C) TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, OR

(D) TO A NON-U.S. PERSON LOCATED OUTSIDE THE UNITED STATES IN ACCORDANCE WITH REGULATION S UNDER THE SECURITIES ACT, OR

(E) PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE).

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH (2)(E) ABOVE, THE COMPANY, THE DEPOSITARY AND THE TRUSTEE RESERVE THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

18

NO AFFILIATE (AS DEFINED IN RULE 144 UNDER THE SECURITIES ACT) OF THE COMPANY OR PERSON THAT HAS BEEN AN AFFILIATE (AS DEFINED IN RULE 144 UNDER THE SECURITIES ACT) OF THE COMPANY DURING THE THREE IMMEDIATELY PRECEDING MONTHS MAY PURCHASE, OTHERWISE ACQUIRE OR OWN THIS NOTE OR A BENEFICIAL INTEREST HEREIN.

No transfer of any Note prior to the Resale Restriction Termination Date will be registered by the Note Registrar unless the applicable box on the Form of Assignment and Transfer has been checked.

Any Note (or security issued in exchange or substitution therefor) as to which such restrictions on transfer shall have expired in accordance with their terms may, upon surrender of such Note for exchange to the Note Registrar in accordance with the provisions of this Section 2.05, be exchanged for a new Note or Notes, of like tenor and aggregate principal amount, which shall not bear the restrictive legend required by this Section 2.05(c) and shall not be assigned a restricted CUSIP number. The Company shall be entitled to instruct the Trustee in writing to so surrender any Global Note as to which such restrictions on transfer shall have expired in accordance with their terms for exchange, and, upon such instruction, the Trustee shall so surrender such Global Note for exchange; and any new Global Note so exchanged therefor shall not bear the restrictive legend specified in this Section 2.05(c) and shall not be assigned a restricted CUSIP number. The Company shall promptly notify the Trustee in writing upon the occurrence of the Resale Restriction Termination Date and after a registration statement, if any, with respect to the Notes or the ADSs (including the Ordinary Shares represented thereby) issued upon conversion of the Notes has been declared effective under the Securities Act.

Notwithstanding any other provisions of this Indenture (other than the provisions set forth in this Section 2.05(c)), a Global Note may not be transferred as a whole or in part except (i) by the Depositary to a nominee of the Depositary or by a nominee of the Depositary to the Depositary or another nominee of the Depositary or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary and (ii) for transfers of portions of a Global Note in certificated form made upon request of a member of, or a participant in, the Depositary (for itself or on behalf of a beneficial owner) by written notice given to the Trustee by or on behalf of the Depositary in accordance with customary procedures of the Depositary and in compliance with this Section 2.05(c).

The Depositary shall be a clearing agency registered under the Exchange Act. The Company initially appoints The Depository Trust Company to act as Depositary with respect to each Global Note. Initially, each Global Note shall be issued to the Depositary, registered in the name of Cede & Co., as the nominee of the Depositary, and deposited with the Bank of New York Mellon as custodian for Cede & Co.

If (i) the Depositary notifies the Company at any time that the Depositary is unwilling or unable to continue as depositary for the Global Notes and a successor depositary is not appointed within 90 days, (ii) the Depositary ceases to be registered as a clearing agency under the Exchange Act and a successor depositary is not appointed within 90 days or (iii) an Event of Default with respect to the Notes has occurred and is continuing and a beneficial owner of any Note requests that its beneficial interest therein be issued as a Physical Note, the Company shall execute, and the Trustee, upon receipt of an Officers' Certificate and a Company Order for the authentication and delivery of Notes, shall authenticate and deliver (x) in the case of clause (iii), a Physical Note to such beneficial owner in a principal amount equal to the principal amount of such Note corresponding to such beneficial owner's beneficial interest and (y) in the case of clause (i) or (ii), Physical Notes to each beneficial owner of the related Global Notes (or a portion thereof) in an aggregate principal amount equal to the aggregate principal amount of such Global Notes in exchange for such Global Notes, and upon delivery of the Global Notes to the Note Registrar such Global Notes shall be canceled.

19

Physical Notes issued in exchange for all or a part of the Global Note pursuant to this Section 2.05(c) shall be registered in such names and in such authorized denominations as the Depositary, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Note Registrar. Upon execution and authentication, the Note Registrar shall deliver such Physical Notes to the Persons in whose names such Physical Notes are so registered.

At such time as all interests in a Global Note have been converted, canceled, repurchased, redeemed or transferred, such Global Note shall be, upon receipt thereof, canceled by the Note Registrar in accordance with standing procedures and existing instructions of the Depositary. At any time prior to such cancellation, if any interest in a Global Note is exchanged for Physical Notes, converted, canceled, repurchased, redeemed or transferred to a transferee who receives Physical Notes therefor or any Physical Note is exchanged or transferred for part of such Global Note, the principal amount of such Global Note shall, in accordance with the standing procedures and existing instructions of the Depositary, be appropriately reduced or increased, as the case may be, and an endorsement shall be made on such Global Note, by the Note Registrar, to reflect such reduction or increase.

None of the Company, the Trustee, any agent of the Company or any agent of the Trustee shall have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests of a Global Note or maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

(d) Until the Resale Restriction Termination Date, any certificate representing ADSs (including the Ordinary Shares represented thereby) issued upon conversion of such Note shall bear a legend in substantially the following form (unless the Note or such ADSs (including the Ordinary Shares represented thereby) has been transferred pursuant to a registration statement that has become or been declared effective under the Securities Act and that continues to be effective at the time of such transfer, or pursuant to the exemption from registration provided by Rule 144 or any similar provision then in force under the Securities Act, or such ADS or the Ordinary Shares represented thereby have been issued upon conversion of Notes that have been transferred pursuant to a registration statement that has become or been declared effective under the Securities Act and that continues to be effective at the time of such transfer, or pursuant to the exemption from registration provided by Rule 144 under the Securities Act or any similar provision then in force under the Securities Act, or unless otherwise agreed by the Company with written notice thereof to the Note Registrar and any transfer agent for the ADSs):

THE AMERICAN DEPOSITARY SHARES EVIDENCED HEREBY AND THE ORDINARY SHARES REPRESENTED THEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER:

(1) REPRESENTS THAT IT AND ANY ACCOUNT FOR WHICH IT IS ACTING IS (A) A "QUALIFIED INSTITUTIONAL BUYER" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) OR (B) NOT A U.S. PERSON AND LOCATED OUTSIDE THE UNITED STATES (WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT) AND THAT IT EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO EACH SUCH ACCOUNT AND THAT IT AND ANY SUCH ACCOUNT IS NOT AN AFFILIATE OF MOMO INC. (THE "**COMPANY**"), AND

<center>20</center>

(2) AGREES FOR THE BENEFIT OF THE COMPANY THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS SECURITY OR ANY BENEFICIAL INTEREST HEREIN PRIOR TO THE DATE THAT IS THE LATER OF (X) ONE YEAR AFTER THE LAST ORIGINAL ISSUE DATE OF THE SERIES OF NOTES UPON THE CONVERSION OF WHICH THIS SECURITY WAS ISSUED OR SUCH SHORTER PERIOD OF TIME AS PERMITTED BY RULE 144 UNDER THE SECURITIES ACT OR ANY SUCCESSOR PROVISION THERETO AND (Y) SUCH LATER DATE, IF ANY, AS MAY BE REQUIRED BY APPLICABLE LAW, EXCEPT:

(A) TO THE COMPANY OR ANY SUBSIDIARY THEREOF, OR

(B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT, OR

(C) TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, OR

(D) TO A NON-U.S. PERSON LOCATED OUTSIDE THE UNITED STATES IN ACCORDANCE WITH REGULATION S UNDER THE SECURITIES ACT, OR

(E) PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE).

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH (2)(E) ABOVE, THE COMPANY, THE DEPOSITARY AND THE TRANSFER AGENT FOR THE COMPANY'S AMERICAN DEPOSITARY SHARES RESERVE THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

<center>21</center>

Any such ADSs as to which such restrictions on transfer shall have expired in accordance with their terms may, upon surrender of the certificates representing such ADSs for exchange in accordance with the procedures of the transfer agent for the ADSs, be exchanged for a new certificate or certificates for a like aggregate number of ADSs, which shall not bear the restrictive legend required by this Section 2.05(d).

(e) Any Note or ADS delivered upon the conversion or exchange of any Note that is repurchased or owned by any Affiliate of the Company may not be resold by such Affiliate unless registered under the Securities Act or resold pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act in a transaction that results in such Note or ADS, as the case may be, no longer being a "restricted security" (as defined under Rule 144 under the Securities Act). The Company shall cause any Note that is repurchased or owned by it to be surrendered to the Note Registrar for cancellation in accordance with Section 2.08.

(f) Until the Resale Restriction Termination Date, prior to any sale of Regulation S Notes, the ADSs deliverable upon conversion thereof or the Ordinary Shares represented thereby, to a qualified institutional buyer in compliance with Rule 144A, the Holder thereof shall deliver to the Trustee, Transfer Agent and/or Depositary, as the case may be, written confirmation that the prospective purchaser is a Person such Holder reasonably believes is a "qualified institutional buyer" (within the meaning of Rule 144A) that is purchasing for its own account or for the account of another qualified institutional buyer and to whom notice is given that the transfer is being made in reliance on Rule 144A.

Section 2.06. *Mutilated, Destroyed, Lost or Stolen Notes.* In case any Note shall become mutilated or be destroyed, lost or stolen, the Company in its discretion may execute, and upon its written request the Trustee shall authenticate and deliver, a new Note, bearing a registration number not contemporaneously outstanding, in exchange and substitution for the mutilated Note, or in lieu of and in substitution for the Note so destroyed, lost or stolen. In every case the applicant for a substituted Note shall furnish to the Company and to the Trustee such security and/or indemnity as may be required by them to save each of them harmless from any loss, liability, cost or expense caused by or connected with such substitution, and, in every case of destruction, loss or theft, the applicant shall also furnish to the Company and to the Trustee evidence to their satisfaction of the destruction, loss or theft of such Note and of the ownership thereof.

The Trustee may authenticate any such substituted Note and deliver the same upon the receipt of such security and/or indemnity as the Trustee and the Company may require. No service charge shall be imposed by the Company, the Transfer Agent, the Note Registrar, any co-Note Registrar or the Paying Agent upon the issuance of any substitute Note, but the Company may require a Holder to pay a sum sufficient to cover any documentary, stamp, issue, transfer or similar tax required in connection therewith as a result of the name of the Holder of the new substitute Note being different from the name of the Holder of the old Note that became mutilated or was destroyed, lost or stolen. In case any Note that has matured or is about to mature or has been surrendered for required repurchase or is about to be converted in accordance with Article 14 shall become mutilated or be destroyed, lost or stolen, the Company may, in its sole discretion, instead of issuing a substitute Note, pay or authorize the payment of or convert or authorize the conversion of the same (without surrender thereof except in the case of a mutilated Note), as the case may be, if the applicant for such payment or conversion shall furnish to the Company and to the Trustee such security and/or indemnity as may be required by them to save each of them harmless for any loss, liability, cost or expense caused by or connected with such substitution, and, in every case of destruction, loss or theft, evidence satisfactory to the Company, and the Trustee evidence of their satisfaction of the destruction, loss or theft of such Note and of the ownership thereof.

<center>22</center>

Every substitute Note issued pursuant to the provisions of this Section 2.06 by virtue of the fact that any Note is destroyed, lost or stolen shall constitute an additional contractual obligation of the Company, whether or not the destroyed, lost or stolen Note shall be found at any time, and shall be entitled to all the benefits of (but shall be subject to all the limitations set forth in) this Indenture equally and proportionately with any and all other Notes duly issued hereunder. To the extent permitted by law, all Notes shall be held and owned upon the express condition that the foregoing provisions are exclusive with respect to the replacement, payment, redemption, conversion or repurchase of mutilated, destroyed, lost or stolen Notes and shall preclude any and all other rights or remedies notwithstanding any law or statute existing or hereafter enacted to the contrary with respect to the replacement, payment, redemption, conversion or repurchase of negotiable instruments or other securities without their surrender.

Section 2.07. *Temporary Notes.* Pending the preparation of Physical Notes, the Company may execute and the Trustee shall, upon written request of the Company, authenticate and deliver temporary Notes (printed or lithographed). Temporary Notes shall be issuable in any authorized denomination, and substantially in the form of the Physical Notes but with such omissions, insertions and variations as may be appropriate for temporary Notes, all as may be determined by the Company. Every such temporary Note shall be executed by the Company and authenticated by the Trustee upon the same conditions and in substantially the same manner, and with the same effect, as the Physical Notes. Without unreasonable delay, the Company shall execute and deliver to the Trustee Physical Notes (other than any Global Note) and thereupon any or all temporary Notes (other than any Global Note) may be surrendered in exchange therefor, at each office or agency maintained by the Company pursuant to Section 4.02 and the Trustee shall authenticate and deliver in exchange for such temporary Notes an equal aggregate principal amount of Physical Notes. Such exchange shall be made by the Company at its own expense and without any charge therefor. Until so exchanged, the temporary Notes shall in all respects be entitled to the same benefits and subject to the same limitations under this Indenture as Physical Notes authenticated and delivered hereunder.

Section 2.08. *Cancellation of Notes Paid, Converted, Etc.* The Company shall cause all Notes surrendered for the purpose of payment, repurchase, redemption, registration of transfer or exchange or conversion, if surrendered to any Person other than the Note Registrar (including any of the Company's agents, Subsidiaries or Affiliates), to be delivered and surrendered to the Note Registrar for cancellation. All Notes delivered to the Note Registrar shall be canceled promptly by it, and no Notes shall be authenticated in exchange thereof except as expressly permitted by any of the provisions of this Indenture. The Note Registrar shall dispose of canceled Notes in accordance with its customary procedures and, after such disposition, shall deliver a certificate of such cancellation and disposition to the Company, at the Company's written request in a Company Order.

23

Section 2.09. *CUSIP Numbers.* The Company in issuing the Notes may use "CUSIP" numbers (if then generally in use), and, if so, the Trustee shall use "CUSIP" numbers in all notices issued to Holders as a convenience to such Holders; *provided* that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or on such notice and that reliance may be placed only on the other identification numbers printed on the Notes. The Company shall promptly notify the Trustee in writing of any change in the "CUSIP" numbers. Prior to the Notes Fungibility Date, the Rule 144A Notes and the Regulation S Notes shall have different "CUSIP" numbers. Following the Notes Fungibility Date, the Rule 144A Notes and the Regulation S Notes shall have the same "CUSIP" number.

Section 2.10. *Additional Notes; Repurchases.* The Company may, without the consent of the Holders and notwithstanding Section 2.01, reopen this Indenture and issue additional Notes hereunder with the same terms as the Notes initially issued hereunder (except for any differences in the issue price, the issue date and interest accrued, if any) in an unlimited aggregate principal amount; *provided* that if any such additional Notes are not fungible with the Notes initially issued hereunder for U.S. federal income tax or securities law purposes, such additional Notes shall have a separate CUSIP number from both the Rule 144A Notes and the Regulation S Notes. Prior to the issuance of any such additional Notes, the Company shall deliver to the Trustee a Company Order, an Officers' Certificate and an Opinion of Counsel, such Officers' Certificate and Opinion of Counsel to cover such matters, in addition to those required by Section 17.06, as the Trustee shall reasonably request. In addition, the Company may, to the extent permitted by law, and directly or indirectly (regardless of whether such Notes are surrendered to the Company), repurchase Notes in the open market or otherwise, whether by the Company or through its Subsidiaries or through a private or public tender or exchange offer or through counterparties to private agreements. The Company shall cause any Notes so repurchased to be surrendered to the Note Registrar for cancellation in accordance with Section 2.08. The Company may also enter into cash-settled swaps or other derivatives with respect to the Notes. For the avoidance of doubt, any Notes underlying such cash-settled swaps or other derivatives shall not be required to be surrendered to the Note Registrar for cancellation in accordance with Section 2.08 and will continue to be considered outstanding for purposes of this Indenture, subject to the provisions of Section 8.04.

ARTICLE 3
SATISFACTION AND DISCHARGE

Section 3.01. *Satisfaction and Discharge.* This Indenture shall upon request of the Company contained in an Officers' Certificate cease to be of further effect, and the Trustee, at the expense of the Company, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture, when (a) (i) all Notes theretofore authenticated and delivered (other than (x) Notes which have been destroyed, lost or stolen and which have been replaced or paid as provided in Section 2.06 and (y) Notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Company and thereafter repaid to the Company or discharged from such trust, as provided in Section 4.04(d)) have been delivered to the Note Registrar for cancellation; or (ii) the Company has deposited with the Paying Agent or delivered to Holders, as applicable, after the Notes have become due and payable, whether on the Maturity Date, a Redemption Date, the Repurchase Date, any Fundamental Change Repurchase Date, upon conversion or otherwise, cash or cash and ADSs, if any (solely to satisfy the Company's Conversion Obligation, if applicable), sufficient to pay all of the outstanding Notes and all other sums due and payable under this Indenture by the Company; and (b) the Company has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with. Notwithstanding the satisfaction and discharge of this Indenture, the obligations of the Company to the Trustee under Section 7.06 shall survive.

24

ARTICLE 4
PARTICULAR COVENANTS OF THE COMPANY

Section 4.01. *Payment of Principal and Interest.* The Company covenants and agrees that it will cause to be paid the principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, and accrued and unpaid interest on, each of the Notes at the places, at the respective times and in the manner provided herein and in the Notes.

Section 4.02. *Maintenance of Office or Agency.* The Company will maintain in the Borough of Manhattan, The City of New York, an office or agency (which will be the Corporate Trust Office initially) where the Notes may be surrendered for registration of transfer or exchange or for presentation for payment or repurchase ("**Paying Agent**") or for conversion ("**Conversion Agent**") and where notices and demands to or upon the Company in respect of the Notes and this Indenture may be served. The Company will give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office or the office or agency of the Trustee in the Borough of Manhattan, The City of New York.

The Company may also from time to time designate as co-Note Registrars one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; *provided* that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency in the Borough of Manhattan, The City of New York, for such purposes. The Company will give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency. The terms "**Paying Agent**" and "**Conversion Agent**" include any such additional or other offices or agencies, as applicable.

The Company hereby initially designates The Bank of New York Mellon as the Paying Agent, Note Registrar and Conversion Agent and the Corporate Trust Office and the office or agency of The Bank of New York Mellon in the Borough of Manhattan, The City of New York, each shall be considered as one such office or agency of the Company for each of the aforesaid purposes.

Section 4.03. *Appointments to Fill Vacancies in Trustee's Office.* The Company, whenever necessary to avoid or fill a vacancy in the office of Trustee, will appoint, in the manner provided in Section 7.09, a trustee, so that there shall at all times be a trustee hereunder.

25

Section 4.04. *Provisions as to Paying Agent.* (a) If the Company shall appoint a Paying Agent other than the Trustee, the Company will cause such Paying Agent to execute and deliver to the Trustee an instrument in which such agent shall agree with the Trustee, subject to the provisions of this Section 4.04:

(i) that it will hold all sums held by it as such agent for the payment of the principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, and accrued and unpaid interest on, the Notes for the benefit of the Holders of the Notes;

(ii) that it will give the Trustee prompt notice of any failure by the Company to make any payment of the principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, and accrued and unpaid interest on, the Notes when the same shall be due and payable; and

(iii) that at any time during the continuance of an Event of Default, upon request of the Trustee, it will forthwith pay to the Trustee all sums so held.

The Company shall, on or before each due date of the principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, or accrued and unpaid interest on, the Notes, deposit with the Paying Agent a sum sufficient to pay such principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) or accrued and unpaid interest and (unless such Paying Agent is the Trustee) the Company will promptly notify the Trustee of any failure to take such action; *provided* that such deposit must be received by the Paying Agent by 10:00 a.m., New York City time, one Business Day prior to the relevant due date. The Paying Agent shall not be bound to make any payment until it has received, in immediately available and cleared funds, an amount which shall be sufficient to pay, as applicable, the aggregate amount of principal (including Repurchase Price and Fundamental Change Repurchase Price, if applicable) of, or accrued and unpaid interest on, the Notes when such principal or interest shall become due and payable. The Paying Agent shall not be responsible or liable for any delay in making the payment if it does not receive funds before 10:00 a.m. one Business Day prior to the payment date.

(b) If the Company shall act as its own Paying Agent, it will, on or before each due date of the principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, and accrued and unpaid interest on, the Notes, set aside, segregate and hold in trust for the benefit of the Holders of the Notes a sum sufficient to pay such principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) and accrued and unpaid interest so becoming due and will promptly notify the Trustee in writing of any failure to take such action and of any failure by the Company to make any payment of the principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, or accrued and unpaid interest on, the Notes when the same shall become due and payable.

26

(c) Anything in this Section 4.04 to the contrary notwithstanding, the Company may, at any time, for the purpose of obtaining a satisfaction and discharge of this Indenture, or for any other reason, pay, cause to be paid or deliver to the Trustee all sums or amounts held by the Company in trust or by any Paying Agent as required by this Section 4.04, such sums or amounts to be held by the Trustee upon the trusts herein contained and upon such payment or delivery by the Company or any Paying Agent to the Trustee, the Company or such Paying Agent shall be released from all further liability but only with respect to such sums or amounts.

(d) Any money and ADSs deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the payment of principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, and accrued and unpaid interest on, any Note (or, in the case of ADSs, in satisfaction of the Conversion Obligation) and remaining unclaimed for two years after such principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) or interest has become due and payable shall

be paid or delivered, as the case may be, to the Company on request of the Company contained in an Officers' Certificate, or (if then held by the Company) shall be discharged from such trust; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Company for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such money and ADSs, and all liability of the Company as trustee thereof, shall thereupon cease; *provided*, *however*, that the Trustee or such Paying Agent, before being required to make any such repayment or delivery, may at the expense of the Company cause to be published once, in a newspaper published in the English language, customarily published on each Business Day and of general circulation in The Borough of Manhattan, The City of New York, notice that such money and ADSs remains unclaimed and that, after a date specified therein, which shall not be less than 30 days from the date of such publication, any unclaimed balance of such money and ADSs then remaining will be repaid or delivered to the Company.

Section 4.05. *Existence*. Subject to Article 11, the Company shall do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence.

Section 4.06. *Rule 144A Information Requirement and Annual Reports*. (a) At any time the Company is not subject to Section 13 or 15(d) of the Exchange Act, the Company shall, so long as any of the Notes, any ADSs deliverable upon conversion thereof or any Ordinary Shares underlying ADSs deliverable upon conversion thereof shall, at such time, constitute "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act, promptly provide to the Trustee and shall, upon written request, provide to any Holder, beneficial owner or prospective purchaser of such Notes or the ADSs deliverable upon conversion of such Notes, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act to facilitate the resale of such Notes or ADSs pursuant to Rule 144A. The Company shall take such further action as any Holder or beneficial owner of such Notes or such ADSs may reasonably request to the extent from time to time required to enable such Holder or beneficial owner to sell such Notes or ADSs in accordance with Rule 144A, as such rule may be amended from time to time.

(b) The Company shall provide to the Trustee within 15 days after the same are required to be filed with the Commission, copies of any documents or reports that the Company is required to file with the Commission pursuant to Section 13 or 15(d) of the Exchange Act (giving effect to any applicable grace period provided by Rule 12b-25 under the Exchange Act).

27

(c) Delivery of the reports and documents described in subsection (b) above to the Trustee is for informational purposes only, and the Trustee's receipt of such shall not constitute actual or constructive notice or knowledge of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Trustee is entitled to conclusively rely on an Officers' Certificate).

(d) If, at any time during the six-month period beginning on, and including, the date that is six months after the last date of original issuance of the Notes, the Company fails to timely file any document or report that it is required to file with the Commission pursuant to Section 13 or 15(d) of the Exchange Act, as applicable (after giving effect to all applicable grace periods thereunder and other than reports on Form 6-K), or the Notes are not otherwise freely tradable by Holders other than the Company's Affiliates or Holders that were the Company's Affiliates at any time during the three months immediately preceding (as a result of restrictions pursuant to U.S. securities laws or the terms of this Indenture or the Notes), the Company shall pay Additional Interest on the Notes. Such Additional Interest shall accrue on the Notes at the rate of 0.50% per annum of the principal amount of the Notes outstanding for each day during such period for which the Company's failure to file has occurred and is continuing or the period during which the Notes are not freely tradable, as the case may be. As used in this Section 4.06(d), documents or reports that the Company is required to "file" with the Commission pursuant to Section 13 or 15(d) of the Exchange Act does not include documents or reports that the Company furnishes to the Commission pursuant to Section 13 or 15(d) of the Exchange Act.

(e) If, and for so long as, the restrictive legend on the Notes specified in Section 2.05(c) has not been removed, the Notes are assigned a restricted CUSIP or the Notes are not otherwise freely tradable by Holders other than the Company's Affiliates or Holders that were the Company's Affiliates at any time during the three months immediately preceding (without restrictions pursuant to U.S. securities laws or the terms of this Indenture or the Notes) as of the 370th day after the last date of original issuance of the Notes, the Company shall pay Additional Interest on the Notes at a rate equal to 0.50% per annum of the principal amount of Notes outstanding until the restrictive legend on the Notes has been removed in accordance with Section 2.05(c), the Notes have been assigned an unrestricted CUSIP and the Notes are freely tradable by Holders other than the Company's Affiliates or Holders that were the Company's Affiliates at any time during the three months immediately preceding (without restrictions pursuant to U.S. securities laws or the terms of this Indenture or the Notes).

(f) Additional Interest will be payable in arrears on each Interest Payment Date following accrual in the same manner as regular interest on the Notes.

(g) The Additional Interest that is payable in accordance with Section 4.06(d) or Section 4.06(e) shall be in addition to, and not in lieu of, any Additional Interest that may be payable as a result of the Company's election pursuant to Section 6.03. In no event shall Additional Interest accrue on any day under the terms of this Indenture (taking any Additional Interest payable pursuant to Section 4.06(d) and Section 4.06(e) together with any Additional Interest payable pursuant to Section 6.03) at an annual rate in excess of 0.50%, in the aggregate, for any violation or Default caused by the Company's failure to be current in respect of its Exchange Act reporting obligations.

28

(h) If Additional Interest is payable by the Company pursuant to Section 4.06(d) or Section 4.06(e), the Company shall deliver to the Trustee an Officers' Certificate to that effect stating (i) the amount of such Additional Interest that is payable and (ii) the date on which such Additional Interest is payable. Unless and until a Responsible Officer of the Trustee receives at the Corporate Trust Office such a certificate, the Trustee may assume without inquiry that no such Additional Interest is payable. If the Company has paid such Additional Interest directly to the Persons entitled to it, the Company shall deliver to the Trustee an Officers' Certificate setting forth the particulars of such payment.

Section 4.07. *Additional Amounts*. (a) All payments and deliveries made by, or on behalf of, the Company or any successor to the Company under or with respect to this Indenture and the Notes, including, but not limited to, payments of principal (including, if applicable, the Redemption Price, the

Repurchase Price and the Fundamental Change Repurchase Price), payments of interest and deliveries of ADSs (together with payments of cash for any Fractional ADS) upon conversion of the Notes, shall be made without withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature imposed or levied by or within any jurisdiction in which the Company or any successor to the Company is, for tax purposes, organized or resident or doing business (each, as applicable, a "**Relevant Taxing Jurisdiction**") or through which payment is made or deemed made (together with each Relevant Taxing Jurisdiction, a "**Relevant Jurisdiction**," and in each case, any political subdivision or taxing authority thereof or therein), unless such withholding or deduction is required by law or by regulation or governmental policy having the force of law. In the event that any such withholding or deduction is so required, the Company or any successor to the Company shall pay to each Holder such additional amounts ("**Additional Amounts**") as may be necessary to ensure that the net amount received by the Holder after such withholding or deduction (and after deducting any taxes on the Additional Amounts) shall equal the amounts that would have been received by such Holder had no such withholding or deduction been required; *provided* that no Additional Amounts shall be payable:

(i) for or on account of:

(A) any tax, duty, assessment or other governmental charge that would not have been imposed but for:

(1) the existence of any present or former connection between the Holder or beneficial owner of such Note and the Relevant Jurisdiction, other than merely holding such Note or the receipt of payments thereunder, including, without limitation, such Holder or beneficial owner being or having been a national, domiciliary or resident of such Relevant Jurisdiction or treated as a resident thereof or being or having been physically present or engaged in a trade or business therein or having had a permanent establishment therein;

(2) the presentation of such Note (in cases in which presentation is required) more than 30 days after the later of the date on which the payment of the principal of (including the Redemption Price, the Repurchase Price and Fundamental Change Repurchase Price, if applicable) and interest on, such Note or the delivery of ADSs (together with payment of cash for any Fractional ADS) upon conversion of such Note became due and payable pursuant to the terms thereof or was made or duly provided for;

29

(3) the failure of the Holder or beneficial owner to comply with a timely request from the Company or any successor of the Company, addressed to the Holder, to provide certification, information, documents or other evidence concerning such Holder's or beneficial owner's nationality, residence, identity or connection with the Relevant Jurisdiction, or to make any declaration or satisfy any other reporting requirement relating to such matters, if and to the extent that due and timely compliance with such request is required by statute, regulation or administrative practice of the Relevant Jurisdiction in order to reduce or eliminate any withholding or deduction as to which Additional Amounts would have otherwise been payable; or

(4) the presentation of such Note (in cases in which presentation is required) for payment in the Relevant Jurisdiction, unless such Note could not have been presented for payment elsewhere;

(B) any estate, inheritance, gift, sale, transfer, excise, personal property or similar tax, assessment or other governmental charge;

(C) any tax, duty, assessment or other governmental charge that is payable otherwise than by withholding from payments or deliveries under or with respect to the Notes;

(D) any tax required to be withheld or deducted under Sections 1471 to 1474 of the Code (or any amended or successor versions of such Sections) ("**FATCA**"), any regulations or other official guidance thereunder, any intergovernmental agreement entered into in connection with FATCA, or any law, regulation or other official guidance enacted in any jurisdiction implementing FATCA or an intergovernmental agreement; or

(E) any combination of taxes, duties, assessments or other governmental charges referred to in the preceding clauses (A), (B), (C) or (D); or

(ii) with respect to any payment of the principal of (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) and interest on such Note or the delivery of ADSs (together with payment of cash for any Fractional ADS) upon conversion of such Note to a Holder, if the Holder is a fiduciary, partnership or person other than the sole beneficial owner of that payment to the extent that such payment would be required to be included in the income under the laws of the Relevant Jurisdiction, for tax purposes, of a beneficiary or settlor with respect to the fiduciary, a partner or member of that partnership or a beneficial owner who would not have been entitled to such Additional Amounts had that beneficiary, settlor, partner, member or beneficial owner been the Holder thereof.

30

(b) Any reference in this Indenture or the Notes in any context to the delivery of ADSs (together with payments of cash for any Fractional ADS) upon conversion of the Notes or the payment of principal of (including the Redemption Price, the Repurchase Price and Fundamental Change Repurchase Price, if applicable) and interest on, any Note or any other amount payable with respect to such Note, shall be deemed to include payment of Additional Amounts to the extent that, in such context, Additional Amounts are, were or would be payable with respect to that amount pursuant to this Section 4.07.

(c) If the Company or its successor is required to make any deduction or withholding from any payments or deliveries with respect to the Notes, it will deliver to the Trustee official tax receipts evidencing the remittance to the relevant tax authorities of the amounts so withheld or deducted.

(d) The foregoing obligations shall survive termination or discharge of this Indenture.

Section 4.08. *Stay, Extension and Usury Laws.* The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law that would prohibit or forgive the Company from paying all or any portion of the principal of or interest on the Notes as contemplated herein, wherever enacted, now or at any time hereafter in force, or that may affect the covenants or the performance of this Indenture; and the Company (to the extent it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the

execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 4.09. *Compliance Certificate; Statements as to Defaults.* The Company shall deliver to the Trustee within 120 days after the end of each fiscal year of the Company (beginning with the fiscal year ending on December 31, 2016) an Officers' Certificate stating that a review has been conducted of the Company's activities under this Indenture and the Company has fulfilled its obligations hereunder, and whether the authorized Officers thereof have knowledge of any Default by the Company that occurred during the previous year that is then continuing and, if so, specifying each such Default and the nature thereof.

In addition, the Company shall deliver to the Trustee, as soon as possible, and in any event within 30 days after the Company becomes aware of the occurrence of any Default if such Default is then continuing, an Officers' Certificate setting forth the details of such Default, its status and the action that the Company is taking or proposing to take in respect thereof. The Trustee shall have no responsibility to take any steps to ascertain whether any Event of Default or Default has occurred, and until (i) a Responsible Officer of the Trustee has received an Officers' Certificate regarding such an occurrence, or (ii) the Trustee has received notice from the Holders of at least 25% in aggregate principal amount of the Notes then outstanding regarding such an occurrence, the Trustee is entitled to assume, without liability, that no Event of Default or Default has occurred.

31

Section 4.10. *Further Instruments and Acts.* The Company will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purposes of this Indenture.

ARTICLE 5
LISTS OF HOLDERS AND REPORTS BY THE COMPANY AND THE TRUSTEE

Section 5.01. *Lists of Holders.* The Company covenants and agrees that it will furnish or cause to be furnished to the Trustee, semi-annually, not more than 15 days after each December 15 and June 15 in each year beginning with December 15, 2018, and at such other times as the Trustee may request in writing, within 30 days after receipt by the Company of any such request (or such lesser time as the Trustee may reasonably request in order to enable it to timely provide any notice to be provided by it hereunder), a list in such form as the Trustee may reasonably require of the names and addresses of the Holders as of a date not more than 15 days (or such other date as the Trustee may reasonably request in order to so provide any such notices) prior to the time such information is furnished, except that no such list need be furnished so long as the Bank of New York Mellon is acting as Note Registrar.

Section 5.02. *Preservation and Disclosure of Lists.* The Trustee shall preserve, in as current a form as is reasonably practicable, all information as to the names and addresses of the Holders contained in the most recent list furnished to it as provided in Section 5.01 or maintained by the Trustee in its capacity as Note Registrar, if so acting. The Trustee may destroy any list furnished to it as provided in Section 5.01 upon receipt of a new list so furnished.

ARTICLE 6
DEFAULTS AND REMEDIES

Section 6.01. *Events of Default.* The following events shall be "**Events of Default**" with respect to the Notes:

(a) default in any payment of interest or Additional Amounts, if any, on any Note when due and payable and the default continues for a period of 30 days;

(b) default in the payment of principal of any Note when due and payable on the Maturity Date, upon redemption, upon any required repurchase, upon declaration of acceleration or otherwise;

(c) failure by the Company to comply with its obligation to convert the Notes in accordance with this Indenture upon exercise of a Holder's conversion right and such failure continues for a period of five Business Days;

(d) failure by the Company to issue a Fundamental Change Company Notice in accordance with Section 15.02(c) or notice of a Make-Whole Fundamental Change in accordance with Section 14.03(a), in each case, when due and such failure continues for a period of five Business Days;

(e) failure by the Company to comply with its obligations under Article 11;

32

(f) failure by the Company for 60 days after written notice from the Trustee or by the Trustee at the request of the Holders of at least 25% in aggregate principal amount of the Notes then outstanding has been received by the Company to comply with any of its other agreements contained in the Notes or this Indenture;

(g) default by the Company or any Significant Subsidiary of the Company with respect to any mortgage, agreement or other instrument under which there may be outstanding, or by which there may be secured or evidenced, any indebtedness for money borrowed in excess of US$40 million (or the foreign currency equivalent thereof) in the aggregate of the Company and/or any such Significant Subsidiary, whether such indebtedness now exists or shall hereafter be created (i) resulting in such indebtedness becoming or being declared due and payable or (ii) constituting a failure to pay the principal or interest of any such debt when due and payable at its stated maturity, upon required repurchase, upon declaration of acceleration or otherwise;

(h) a final judgment for the payment of US$40 million (or the foreign currency equivalent thereof) or more (excluding any amounts covered by insurance) rendered against the Company or any Significant Subsidiary of the Company, which judgment is not paid, bonded or otherwise discharged or stayed within 60 days after (i) the date on which the right to appeal thereof has expired if no such appeal has commenced, or (ii) the date on which all rights to appeal have been extinguished;

(i) the Company or any Significant Subsidiary shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to the Company or any such Significant Subsidiary or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of the Company or any such Significant Subsidiary or any substantial part of its property, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall fail generally to pay its debts as they become due; or

(j) an involuntary case or other proceeding shall be commenced against the Company or any Significant Subsidiary seeking liquidation, reorganization or other relief with respect to the Company or such Significant Subsidiary or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of the Company or such Significant Subsidiary or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of 30 consecutive days.

Section 6.02. *Acceleration; Rescission and Annulment*. If one or more Events of Default shall have occurred and be continuing (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body), then, and in each and every such case (other than an Event of Default specified in Section 6.01(i) or Section 6.01(j) with respect to the Company or any of its Significant Subsidiaries), unless the principal of all of the Notes shall have already become due and payable, the Trustee may by notice in writing to the Company, or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding determined in accordance with Section 8.04, by notice in writing to the Company and to the Trustee may, and the Trustee at the request of such Holders accompanied by security and/or indemnity reasonably satisfactory to the Trustee shall, declare 100% of the principal of, and accrued and unpaid interest on, all the Notes to be due and payable immediately, and upon any such declaration the same shall become and shall automatically be immediately due and payable, notwithstanding anything contained in this Indenture or in the Notes to the contrary. If an Event of Default specified in Section 6.01(i) or Section 6.01(j) with respect to the Company or any of its Significant Subsidiaries occurs and is continuing, 100% of the principal of, and accrued and unpaid interest on, all Notes shall become and shall automatically be immediately due and payable without any action on the part of the Trustee. If an Event of Default occurs and is continuing, all agents of the Company appointed under this Indenture will be required to act on the direction of the Trustee.

33

The immediately preceding paragraph, however, is subject to the conditions that if, at any time after the principal of the Notes shall have been so declared due and payable, and before any judgment or decree for the payment of the monies due shall have been obtained or entered as hereinafter provided, the Company shall pay or shall deposit with the Trustee a sum sufficient to pay installments of accrued and unpaid interest upon all Notes and the principal of any and all Notes that shall have become due otherwise than by acceleration (with interest on overdue installments of accrued and unpaid interest to the extent that payment of such interest is enforceable under applicable law, and on such principal at the rate per annum borne by the Notes *plus* one percent) and amounts due to the Trustee pursuant to Section 7.06, and if (1) rescission would not conflict with any judgment or decree of a court of competent jurisdiction and (2) any and all existing Events of Default under this Indenture, other than the nonpayment of the principal of and accrued and unpaid interest on Notes that shall have become due solely by such acceleration, shall have been cured or waived pursuant to Section 6.09, then and in every such case (except as provided in the immediately succeeding sentence) the Holders of a majority in aggregate principal amount of the Notes then outstanding, by written notice to the Company and to the Trustee, may waive all Defaults or Events of Default with respect to the Notes and rescind and annul such declaration and its consequences and such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture; but no such waiver or rescission and annulment shall extend to or shall affect any subsequent Default or Event of Default, or shall impair any right consequent thereon. Notwithstanding anything to the contrary herein, no such waiver or rescission and annulment shall extend to or shall affect any Default or Event of Default resulting from (i) the nonpayment of the principal of, or accrued and unpaid interest on, any Notes, (ii) a failure to repurchase any Notes when required or (iii) a failure to pay or deliver, as the case may be, the consideration due upon conversion of the Notes.

Section 6.03. *Additional Interest*. Notwithstanding anything in this Indenture or in the Notes to the contrary, to the extent the Company elects, the sole remedy for Event of Default relating to the Company's failure to comply with its obligations as set forth in Section 4.06(b) shall after the occurrence of such an Event of Default consist exclusively of the right to receive Additional Interest on the Notes at a rate equal to:

(a) 0.25% per annum of the principal amount of the Notes outstanding for each day during the period beginning on, and including, the date on which such an Event of Default first occurs and ending on the earlier of (i) the date on which such Event of Default is cured or validly waived and (ii) the 90th day immediately following, and including, the date on which such Event of Default first occurred; and

34

(b) if such Event of Default has not been cured or validly waived prior to the 91st day immediately following, and including, the date on which such Event of Default first occurred, 0.50% per annum of the principal amount of the Notes outstanding for each day during the period beginning on, and including, the 91st day immediately following, and including, the date on which such an Event of Default first occurred and ending on the earlier of (i) the date on which such Event of Default is cured or validly waived and (ii) the 180th day immediately following, and including, the date on which such Event of Default first occurred.

Interest payable pursuant to this Section 6.03 shall be in addition to, not in lieu of, any Additional Interest payable pursuant to Section 4.06(d) or Section 4.06(e). In no event shall Additional Interest accrue on the Notes on any day under this Indenture (taking any Additional Interest payable pursuant to this Section 6.03 together with any Additional Interest payable pursuant to Section 4.06(d) and Section 4.06(e)) at an annual rate accruing in

excess of 0.50%, in the aggregate, for any violation or Default caused by the Company's failure to be current in respect of its Exchange Act reporting obligations. If the Company so elects, such Additional Interest shall be payable in the same manner and on the same dates as regular interest on the Notes. On the 181st day after such Event of Default (if the Event of Default with respect to the Company's obligations under Section 4.06(b) is not cured or waived prior to such 181st day), the Notes will be subject to acceleration as provided in Section 6.02. In the event the Company does not elect to pay Additional Interest following an Event of Default in accordance with this Section 6.03 or the Company elected to make such payment but does not pay the Additional Interest when due, the Notes shall be subject to acceleration as provided in Section 6.02.

In order to elect to pay Additional Interest as the sole remedy during the first 180 days after the occurrence of any Event of Default described in the immediately preceding paragraph, the Company must notify in writing all Holders of the Notes, the Trustee and the Paying Agent of such election prior to the beginning of such 180-day period. Upon the failure to timely give such notice, the Notes shall be immediately subject to acceleration as provided in Section 6.02.

Section 6.04. *Payments of Notes on Default; Suit Therefor.* If an Event of Default described in clause (a) or (b) of Section 6.01 shall have occurred, the Company shall, upon demand of the Trustee acting in its own discretion or at the request of Holders of at least 25% in aggregate principal amount of the Notes then outstanding determined in accordance with Section 8.04 and subject to indemnity and/or security reasonably satisfactory to the Trustee, pay to the Trustee, for the benefit of the Holders of the Notes, the whole amount then due and payable on the Notes for principal and interest, if any, with interest on any overdue principal and interest, if any, at the rate per annum borne by the Notes at such time *plus* one percent, and, in addition thereto, such further amount as shall be sufficient to cover any amounts due to the Trustee under Section 7.06. If the Company shall fail to pay such amounts forthwith upon such demand, the Trustee, in its own name and as trustee of an express trust, may institute a judicial proceeding for the collection of the sums so due and unpaid, may prosecute such proceeding to judgment or final decree and may enforce the same against the Company or any other obligor upon the Notes and collect the moneys adjudged or decreed to be payable in the manner provided by law out of the property of the Company or any other obligor upon the Notes, wherever situated.

35

In the event there shall be pending proceedings for the bankruptcy or for the reorganization of the Company or any other obligor on the Notes under Title 11 of the United States Code, or any other applicable law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Company or such other obligor, the property of the Company or such other obligor, or in the event of any other judicial proceedings relative to the Company or such other obligor upon the Notes, or to the creditors or property of the Company or such other obligor, the Trustee, irrespective of whether the principal of the Notes shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Trustee shall have made any demand pursuant to the provisions of this Section 6.04, shall be entitled and empowered, by intervention in such proceedings or otherwise, to file and prove a claim or claims for the whole amount of principal and accrued and unpaid interest, if any, in respect of the Notes, and, in case of any judicial proceedings, to file such proofs of claim and other papers or documents and to take such other actions as it may deem necessary or advisable in order to have the claims of the Trustee (including any claim for the compensation, reasonable expenses, reasonable disbursements and advances of the Trustee, its agents and counsel) and of the Holders allowed in such judicial proceedings relative to the Company or any other obligor on the Notes, its or their creditors, or its or their property, and to collect and receive any monies or other property payable or deliverable on any such claims, and to distribute the same after the deduction of any amounts due to the Trustee under Section 7.06; and any receiver, assignee or trustee in bankruptcy or reorganization, liquidator, custodian or similar official is hereby authorized by each of the Holders to make such payments to the Trustee, as administrative expenses, and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for compensation, reasonable expenses, advances and reasonable disbursements, including agents and counsel fees and expenses, and including any other amounts due to the Trustee under Section 7.06, incurred by it up to the date of such distribution. To the extent that such payment of compensation, reasonable expenses, advances and reasonable disbursements out of the estate in any such proceedings shall be denied for any reason, payment of the same shall be secured by a lien on, and shall be paid out of, any and all distributions, dividends, monies, securities and other property that the Holders of the Notes may be entitled to receive in such proceedings, whether in liquidation or under any plan of reorganization or arrangement or otherwise.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting such Holder or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

All rights of action and of asserting claims under this Indenture, or under any of the Notes, may be enforced by the Trustee without the possession of any of the Notes, or the production thereof at any trial or other proceeding relative thereto, and any such suit or proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall, after provision for the payment of the compensation, reasonable expenses, reasonable disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Holders of the Notes.

36

In any proceedings brought by the Trustee (and in any proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party) the Trustee shall be held to represent all the Holders of the Notes, and it shall not be necessary to make any Holders of the Notes parties to any such proceedings.

In case the Trustee shall have proceeded to enforce any right under this Indenture and such proceedings shall have been discontinued or abandoned because of any waiver pursuant to Section 6.09 or any rescission and annulment pursuant to Section 6.02 or for any other reason or shall have been determined adversely to the Trustee, then and in every such case the Company, the Holders, and the Trustee shall, subject to any determination in such proceeding, be restored respectively to their several positions and rights hereunder, and all rights, remedies and powers of the Company, the Holders, and the Trustee shall continue as though no such proceeding had been instituted.

Section 6.05. *Application of Monies Collected by Trustee.* Any monies collected by the Trustee pursuant to this Article 6 with respect to the Notes shall be applied in the following order, at the date or dates fixed by the Trustee for the distribution of such monies, upon presentation of the several Notes, and stamping thereon the payment, if only partially paid, and upon surrender thereof, if fully paid:

**First**, to the payment of all amounts due the Trustee under Section 7.06 and any payments due to the Paying Agent, the Transfer Agent, the Conversion Agent and the Note Registrar;

**Second**, in case the principal of the outstanding Notes shall not have become due and be unpaid, to the payment of interest on, the Notes in default in the order of the date due of the payments of such interest, with interest (to the extent that such interest has been collected by the Trustee) upon such overdue payments at the rate per annum borne by the Notes at such time (including, without duplication, any additional interest on such overdue payments pursuant to Section 6.04), such payments to be made ratably to the Persons entitled thereto;

**Third**, in case the principal of the outstanding Notes shall have become due, by declaration or otherwise, and be unpaid to the payment of the whole amount (including, if applicable, the payment of the Redemption Price, Repurchase Price or Fundamental Change Repurchase Price and any cash due upon conversion) then owing and unpaid upon the Notes for principal and interest, if any, with interest on the overdue principal and, to the extent that such interest has been collected by the Trustee, upon overdue installments of interest at the rate per annum borne by the Notes at such time *plus* one percent, and in case such monies shall be insufficient to pay in full the whole amounts so due and unpaid upon the Notes, then to the payment of such principal (including, if applicable, the Redemption Price, Repurchase Price or Fundamental Change Repurchase Price and the cash due upon conversion) and interest without preference or priority of principal over interest, or of interest over principal or of any installment of interest over any other installment of interest, or of any Note over any other Note, ratably to the aggregate of such principal (including, if applicable, the Redemption Price, Repurchase Price or Fundamental Change Repurchase Price) and accrued and unpaid interest; and

**Fourth**, to the payment of the remainder, if any, to the Company.

<center>37</center>

Section 6.06. *Proceedings by Holders.* Except to enforce the right to receive payment of principal (including, if applicable, the Redemption Price, the Repurchase Price or Fundamental Change Repurchase Price) or interest when due, or the right to receive payment or delivery of the consideration due upon conversion, no Holder of any Note shall have any right by virtue of or by availing of any provision of this Indenture to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Indenture, or for the appointment of a receiver, trustee, liquidator, custodian or other similar official, or for any other remedy hereunder, unless:

(a) such Holder previously shall have given to the Trustee written notice of an Event of Default and of the continuance thereof, as herein provided;

(b) Holders of at least 25% in aggregate principal amount of the Notes then outstanding shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder;

(c) such Holders shall have offered to the Trustee such security and/or indemnity reasonably satisfactory to it against any loss, liability or expense to be incurred therein or thereby;

(d) the Trustee for 60 days after its receipt of such notice, request and offer of security and/or indemnity, shall have neglected or refused to institute any such action, suit or proceeding; and

(e) no direction that, in the opinion of the Trustee, is inconsistent with such written request shall have been given to the Trustee by the Holders of a majority of the aggregate principal amount of the Notes then outstanding within such 60-day period pursuant to Section 6.09,

it being understood and intended, and being expressly covenanted by the taker and Holder of every Note with every other taker and Holder and the Trustee that no one or more Holders shall have any right in any manner whatever by virtue of or by availing of any provision of this Indenture to affect, disturb or prejudice the rights of any other Holder, or to obtain or seek to obtain priority over or preference to any other such Holder, or to enforce any right under this Indenture, except in the manner herein provided and for the equal, ratable and common benefit of all Holders (except as otherwise provided herein). For the protection and enforcement of this Section 6.06, each and every Holder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

Notwithstanding any other provision of this Indenture and any provision of any Note, the right of any Holder to receive payment or delivery, as the case may be, of (x) the principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, (y) accrued and unpaid interest on, and (z) the consideration due upon conversion of, such Note, on or after the respective due dates expressed or provided for in such Note or in this Indenture, or to institute suit for the enforcement of any such payment or delivery, as the case may be, on or after such respective dates against the Company shall not be impaired or affected without the consent of such Holder.

<center>38</center>

Section 6.07. *Proceedings by Trustee.* In case of an Event of Default, the Trustee may in its discretion proceed to protect and enforce the rights vested in it by this Indenture by such appropriate judicial proceedings as are necessary to protect and enforce any of such rights, either by suit in equity or by action at law or by proceeding in bankruptcy or otherwise, whether for the specific enforcement of any covenant or agreement contained in this Indenture or in aid of the exercise of any power granted in this Indenture, or to enforce any other legal or equitable right vested in the Trustee by this Indenture or by law.

Section 6.08. *Remedies Cumulative and Continuing.* Except as provided in the last paragraph of Section 2.06, all powers and remedies given by this Article 6 to the Trustee or to the Holders shall, to the extent permitted by law, be deemed cumulative and not exclusive of any thereof or of any other powers and remedies available to the Trustee or the Holders of the Notes, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements contained in this Indenture, and no delay or omission of the Trustee or of any Holder of any of the Notes to exercise any right or power accruing upon any Default or Event of Default shall impair any such right or power, or shall be construed to be a waiver of any such Default or Event of Default or any acquiescence therein; and, subject to the provisions of Section 6.06, every power and remedy given by this Article 6 or by law to the Trustee or to the Holders may be exercised from time to time, and as often as shall be deemed expedient, by the Trustee or by the Holders.

Section 6.09. *Direction of Proceedings and Waiver of Defaults by Majority of Holders.* The Holders of a majority of the aggregate principal amount of the Notes at the time outstanding determined in accordance with Section 8.04 shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee with respect to Notes; *provided*, *however*, that (a) such direction shall not be in conflict with any rule of law or with this Indenture, and (b) the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction. The Trustee may refuse to follow any direction that would involve the Trustee in personal liability, or if it is not provided with security and/or indemnity to its reasonable satisfaction. In addition, the Trustee will not be required to expend its own funds under any circumstances. The Holders of a majority in aggregate principal amount of the Notes at the time outstanding determined in accordance with Section 8.04 may on behalf of the Holders of all of the Notes waive any past Default or Event of Default hereunder and its consequences except (i) a default in the payment of accrued and unpaid interest on, or the principal (including, if applicable, the Redemption Price, Repurchase Price or Fundamental Change Repurchase Price) of, the Notes when due that has not been cured pursuant to the provisions of Section 6.02, (ii) a failure by the Company to pay or deliver, or cause to be delivered, as the case may be, the consideration due upon conversion of the Notes or (iii) a default in respect of a covenant or provision hereof which under Article 10 cannot be modified or amended without the consent of each Holder of an outstanding Note affected. Upon any such waiver the Company, the Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder; but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon. Whenever any Default or Event of Default hereunder shall have been waived as permitted by this Section 6.09, said Default or Event of Default shall for all purposes of the Notes and this Indenture be deemed to have been cured and to be not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.

39

Section 6.10. *Notice of Defaults and Events of Default.* If a Default or Event of Default occurs and is continuing and is notified in writing to the Trustee, the Trustee shall, within 90 days after the occurrence and continuance of such Default or Event of Default, mail to all Holders (at the Company's expense) as the names and addresses of such Holders appear upon the Note Register, notice of all Defaults so notified in writing, unless such Defaults shall have been cured or waived before the giving of such notice; *provided* that the Trustee shall not be deemed to have knowledge of any occurrence of a Default or Event unless it has received written notice. Except in the case of a Default in the payment of the principal of (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable), or accrued and unpaid interest on, any of the Notes or a Default in the payment or delivery of the consideration due upon conversion, the Trustee shall be protected in withholding such notice if and so long as the Trustee's board of directors, an executive committee or a committee of Responsible Officers of the Trustee (in its sole discretion) in good faith determines that the withholding of such notice is in the interests of the Holders.

Section 6.11. *Undertaking to Pay Costs.* All parties to this Indenture agree, and each Holder of any Note by its acceptance thereof shall be deemed to have agreed, that any court may, in its discretion, require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit and that such court may in its discretion assess costs, including attorneys' fees and reasonable expenses, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; *provided* that the provisions of this Section 6.11 (to the extent permitted by law) shall not apply to any suit instituted by the Trustee, to any suit instituted by any Holder, or group of Holders, holding in the aggregate more than 10% in principal amount of the Notes at the time outstanding determined in accordance with Section 8.04, or to any suit instituted by any Holder for the enforcement of the payment of the principal of or accrued and unpaid interest on any Note (including, but not limited to, the Redemption Price and the Repurchase Price and Fundamental Change Repurchase Price with respect to the Notes being repurchased as provided in this Indenture) on or after the due date expressed or provided for in such Note or to any suit for the enforcement of the right to convert any Note in accordance with the provisions of Article 14.

ARTICLE 7
CONCERNING THE TRUSTEE

Section 7.01. *Duties and Responsibilities of Trustee.* The Trustee, prior to the occurrence of an Event of Default and after the curing or waiver of all Events of Default that may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations will be read into the Indenture against the Trustee. In case an Event of Default has occurred that has not been cured or waived the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs; *provided* that if an Event of Default occurs and is continuing, the Trustee will be under no obligation to exercise any of the rights or powers under this Indenture at the request or direction of any of the Holders unless such Holders have offered to the Trustee indemnity and/or security reasonably satisfactory to it against the costs, liabilities or reasonable expenses that might be incurred by it in compliance with such request or direction.

40

No provision of this Indenture shall be construed to relieve the Trustee from liability for its own grossly negligent action, its own grossly negligent failure to act or its own willful misconduct, except that:

(a) prior to the occurrence of an Event of Default and after the curing or waiving of all Events of Default that may have occurred:

(i) the duties and obligations of the Trustee shall be determined solely by the express provisions of this Indenture, and the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii) in the absence of bad faith on the part of the Trustee, the Trustee may conclusively and without liability rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; but, in the case of any such certificates or opinions that by any provisions hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of any mathematical calculations or other facts, statements, opinions or

conclusions stated therein);

(b) the Trustee shall not be liable for any error of judgment made in good faith by an Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

(c) the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of not less than a majority of the aggregate principal amount of the Notes at the time outstanding determined as provided in Section 8.04 relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture;

(d) whether or not therein provided, every provision of this Indenture relating to the conduct or affecting the liability of, or affording protection to, the Trustee shall be subject to the provisions of this Section;

(e) the Trustee shall not be liable in respect of any payment (as to the correctness of amount, entitlement to receive or any other matters relating to payment) or notice effected by the Company or any Paying Agent or any records maintained by any co-Note Registrar with respect to the Notes;

41

(f) if any party fails to deliver a notice relating to an event the fact of which, pursuant to this Indenture, requires notice to be sent to the Trustee, the Trustee may conclusively and without liability rely on its failure to receive such notice as reason to act as if no such event occurred;

(g) [RESERVED]

(h) in the event that the Trustee is also acting as Note Registrar, Paying Agent, Conversion Agent or transfer agent hereunder, the rights, immunities, privileges, disclaimers from liability and protections (including the right to compensation and indemnity) afforded to the Trustee pursuant to this Article 7 shall also be afforded to such Note Registrar, Paying Agent, Conversion Agent or transfer agent;

(i) the Trustee shall have no duty to inquire, no duty to determine and no duty to monitor as to the performance of the Company's covenants in this Indenture or the financial performance of the Company; the Trustee shall be entitled to assume, until it has received written notice in accordance with this Indenture, that the Company is properly performing its duties hereunder;

(j) the Trustee shall be under no obligation to enforce any of the provisions of this Indenture unless it is instructed by Holders of at least 25% of the aggregate principal amount of outstanding Notes and is provided with security and/or indemnity reasonably satisfactory to it;

(k) before the Trustee acts or refrains from acting, it may require an Officers' Certificate or an Opinion of Counsel prepared and delivered at the cost of the Company conforming to Section 17.06 and the Trustee and the Agents may rely conclusively on such certificate or opinion and will not be liable for any action it takes or omits to take in good faith in reliance on such Officers' Certificate or Opinion of Counsel;

(l) in connection with the exercise by it of its trusts, powers, authorities or discretions (including, without limitation, any modification, waiver, authorization or determination), the Trustee shall have regard to the general interests of the Holders as a class but shall not have regard to any interests arising from circumstances particular to individual Holders (whatever their number) and in particular, but without limitation, shall not have regard to the consequences of the exercise of its trusts, powers, authorities or discretions for individual Holders (whatever their number) resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any country, state or territory; and

(m) the Trustee is not obliged to do or omit to do anything which in its reasonable opinion, would or may be illegal or would constitute a breach of any fiduciary duty or duty of confidentiality, or any law, rule, regulation, or any decree, order or judgment of any court, or practice, request, direction, notice, announcement or similar action (whether or not having the force of law) of any relevant government, government agency, regulatory authority, stock exchange or self-regulatory organization to which the Trustee is subject. The Trustee may without liability to do anything which is, in its reasonable opinion, necessary to comply with any such law, directive or regulations.

42

None of the provisions contained in this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur personal financial liability in the performance of any of its duties or in the exercise of any of its rights or powers.

Section 7.02. *Reliance on Documents, Opinions, Etc.* Except as otherwise provided in Section 7.01:

(a) the Trustee may conclusively and without liability rely and shall be fully protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, Note, coupon or other paper or document believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties;

(b) any request, direction, order or demand of the Company mentioned herein shall be sufficiently evidenced by an Officers' Certificate (unless other evidence in respect thereof be herein specifically prescribed); and any Board Resolution may be evidenced to the Trustee by a copy thereof certified by the Secretary or an Assistant Secretary of the Company;

(c) the Trustee may consult with counsel and require an Opinion of Counsel and any advice of such counsel or Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in accordance with such advice or Opinion of Counsel;

(d) the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument,

opinion, report, notice, request, direction, consent, order, bond, debenture or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Company, personally or by agent or attorney at the expense of the Company and shall incur no liability of any kind by reason of such inquiry or investigation;

(e) the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, delegates, custodians, nominees or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent, delegate, representative, custodian, nominee or attorney appointed by it with due care hereunder;

(f) the permissive rights of the Trustee enumerated herein shall not be construed as duties;

(g) under no circumstances and notwithstanding any contrary provision included herein, neither the Trustee, the Paying Agent, the Conversion Agent nor the Note Registrar shall be responsible or liable for special, indirect, punitive, or consequential damages or loss of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether any of them have been advised of the likelihood of such loss or damage and regardless of the form of action; this provision shall remain in full force and effect notwithstanding the discharge of the Notes, the termination of this Indenture or the resignation, replacement or removal of the Trustee, the Paying Agent, the Conversion Agent and the Note Registrar; and

43

(h) the Trustee, the Paying Agent, the Conversion Agent and the Note Registrar may refrain from taking any action in any jurisdiction if the taking of such action in that jurisdiction would, in its opinion based upon legal advice in the relevant jurisdiction, be contrary to any law of that jurisdiction or, to the extent applicable, of New York; furthermore, the Trustee may also refrain from taking such action if it would otherwise render it liable to any person in that jurisdiction or New York or if, in its opinion based on such legal advice, it would not have the power to do the relevant thing in that jurisdiction by virtue of any applicable law in that jurisdiction or in New York or if it is determined by any court or other competent authority in that jurisdiction that it does not have such power.

(i) The Company understands that The Bank of New York Mellon Corporation is a global financial organization that operates in and provides services and products to clients through its affiliates, branches, representative offices and/or subsidiaries located in multiple jurisdictions (collectively, the "**BNY Mellon Group**" and each a "**BNY Mellon Entity**"). The BNY Mellon Group may: (i) use and/or centralize in one or more BNY Mellon Entity in connection with its performance of the functions, duties and services provided and any other obligations under this Indenture and/or the Notes and in certain other activities (the "**Centralized Functions**"), including, without limitation, audit, accounting, tax, administration, risk management, credit, legal, compliance, operation, sales and marketing, product communication, relationship management, information technology, records and data storage, performance measurement, data aggregation and the compilation and analysis of information and data regarding the Company (which, for purposes of this sub-Section 7.02(i), includes the name and business contact information for the employees and representatives of the Company and any personal data) and the accounts established pursuant to the transactions contemplated in this Indenture and/or the Notes ("**Client Information**"); and (ii) use third party service providers to store, maintain and process Client Information ("**Outsourced Functions**"). Notwithstanding anything to the contrary contained elsewhere in this Indenture and/or the Notes and solely in connection with the Centralized Functions and/or Outsourced Functions, the Company consents to the: (i) collection, use and storage of, and authorizes the BNY Mellon Group to collect, use and store, Client Information within and outside of any jurisdiction, including without limitation Australia, the European Economic Area, Hong Kong, the PRC, Japan, Singapore, India, the British Virgin Islands and the United States of America; and (ii) disclosure of, and authorizes the BNY Mellon Group to disclose, Client Information to: (A) any other BNY Mellon Entity (and their respective officers, directors and employees); and (B) third-party service providers (but solely in connection with Outsourced Functions) who are required to maintain the confidentiality of Client Information. In addition, the BNY Mellon Group may aggregate Client Information with other data collected and/or calculated by the BNY Mellon Group, and the BNY Mellon Group will own all such aggregated data, provided that the BNY Mellon Group shall not distribute the aggregated data in a format that identifies Client Information with the Company specifically. The Company represents to the BNY Mellon Group that it is authorized to consent to the foregoing and that the disclosure of Client Information in connection with the Centralized Functions and/or Outsourced Functions does not violate any relevant data protection legislation. The Company also consents to the disclosure of Client Information to governmental, tax, regulatory, law enforcement and other authorities in jurisdictions where the BNY Mellon Group operates and otherwise as required by law, rule, or guideline (including any tax and swap trade data reporting regulations).

44

Section 7.03. *No Responsibility for Recitals, Etc.* The recitals, statements, warranties and representations contained herein and in the Notes (except in the Trustee's certificate of authentication) shall be taken as the statements of the Company, and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representations as to the accuracy or correctness of the same or the execution, legality, effectiveness, adequacy, genuineness, validity, enforceability or admissibility in evidence of this Indenture or of the Notes. The Trustee shall not be accountable for the use or application by the Company of any Notes or the proceeds of any Notes authenticated and delivered by the Trustee in conformity with the provisions of this Indenture. Notwithstanding the generality of the foregoing, each Holder shall be solely responsible for making its own independent appraisal of, and investigation into, the financial condition, creditworthiness, condition, affairs, status and nature of the Company, and the Trustee shall not at any time have any responsibility for the same and each Holder shall not rely on the Trustee in respect thereof.

Section 7.04. *Trustee, Paying Agents, Conversion Agents or Note Registrar May Own Notes.* The Trustee, any Paying Agent, any Conversion Agent or Note Registrar, in its individual or any other capacity, may become the owner or pledgee of Notes with the same rights it would have if it were not the Trustee, Paying Agent, Conversion Agent or Note Registrar, and nothing herein shall obligate any of them to account for any profits earned from any business or transactional relationship.

Section 7.05. *Monies to Be Held in Trust.* All monies received by the Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received. Money held by the Trustee in trust or by the Paying Agent hereunder need not be segregated from other funds except to the extent required by law. Neither the Trustee nor the Paying Agent shall be under any liability for interest on any money received by it hereunder.

Section 7.06. *Compensation and Expenses of Trustee.* (a) The Company covenants and agrees to pay to the Trustee from time to time, and the

Trustee shall be entitled to compensation for all services rendered by it hereunder in any capacity (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) as mutually agreed to in writing between the Trustee and the Company, and the Company will pay or reimburse the Trustee upon its request for all reasonable expenses, disbursements and advances reasonably incurred or made by the Trustee in accordance with any of the provisions of this Indenture in any capacity thereunder (including the compensation and the reasonable expenses and disbursements of its agents and counsel and of all Persons not regularly in its employ) except any such expense, disbursement or advance as shall have been caused by its gross negligence or willful misconduct. The Company also covenants to indemnify the Trustee in any capacity under this Indenture and any other document or transaction entered into in connection herewith, and to hold it harmless against, any loss, claim, damage, liability or expense incurred without gross negligence or willful misconduct on the part of the Trustee, its officers, directors, agents or employees, as the case may be, and arising out of or in connection with the acceptance or administration of this Indenture or in any other capacity hereunder, including the costs and expenses of defending themselves against any claim of liability in the premises. The obligations of the Company under this Section 7.06 to compensate or indemnify the Trustee and to pay or reimburse the Trustee for expenses, disbursements and advances shall be secured by a senior claim to which the Notes are hereby made subordinate on all money or property held or collected by the Trustee, except, subject to the effect of Section 6.05, funds held in trust herewith for the benefit of the Holders of particular Notes. The Trustee's right to receive payment of any amounts due under this Section 7.06 shall not be subordinate to any other liability or indebtedness of the Company. The indemnity under this Section 7.06(a) is payable upon demand by the Trustee. The obligation of the Company under this Section 7.06(a) shall survive the satisfaction and discharge of the Notes, the termination or discharge of this Indenture and the resignation, replacement or removal or the Trustee. The indemnification provided in this Section 7.06(a) shall extend to the officers, directors, agents and employees of the Trustee. Subject to Section 7.02(e), any negligence or misconduct of any agent, delegate, attorney or representative, in each case, of the Trustee, shall not affect indemnification of the Trustee.

45

Without prejudice to any other rights available to the Trustee under applicable law, when the Trustee and its agents incur expenses or render services after an Event of Default specified in Section 6.01(i) or Section 6.01(j) occurs, the expenses and the compensation for the services are intended to constitute expenses of administration under any bankruptcy, insolvency or similar laws. If a Default or Event of Default shall have occurred or if the Trustee finds it expedient or necessary or is requested by the Company and/or the Holders to undertake duties which are of an exceptional nature or otherwise outside the scope of the Trustee's normal duties under this Indenture, the Company will pay such additional remuneration as the Company and the Trustee may separately agree in writing.

(b) The Paying Agent, the Conversion Agent and the Note Registrar shall be entitled to the compensation to be agreed upon in writing with the Company for all services rendered by it under this Indenture, and the Company agrees promptly to pay such compensation and to reimburse the Paying Agent, the Conversion Agent and the Note Registrar for its out-of-pocket expenses (including fees and reasonable expenses of counsel) incurred by it in connection with the services rendered by it under this Indenture. The Company hereby agrees to indemnify the Paying Agent, the Conversion Agent and the Note Registrar and their respective officers, directors, agents and employees and any successors thereto for, and to hold it harmless against, any loss, liability or expense (including fees and reasonable expenses of counsel) incurred without gross negligence or willful misconduct on its part arising out of or in connection with its acting as the Paying Agent, the Conversion Agent and the Note Registrar hereunder. The obligations of the Company under this paragraph (b) shall survive the payment of the Notes, the termination or discharge of the Indenture and the resignation, replacement or removal of the Paying Agent, the Conversion Agent and the Note Registrar.

Section 7.07. *Officers' Certificate as Evidence.* Except as otherwise provided in Section 7.01, whenever in the administration of the provisions of this Indenture the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by an Officers' Certificate delivered to the Trustee, and such Officers' Certificate shall be full warrant to the Trustee for any action taken or omitted by it under the provisions of this Indenture upon the faith thereof.

46

Section 7.08. *Eligibility of Trustee.* There shall at all times be a Trustee hereunder which shall be a Person that is eligible pursuant to the Trust Indenture Act to act as such and has a combined capital and surplus of at least US$50,000,000. If such Person publishes reports of condition at least annually, pursuant to law or to the requirements of any supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such Person shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner and with the effect hereinafter specified in this Article.

Section 7.09. *Resignation or Removal of Trustee.* (a) The Trustee may at any time resign by giving 60 days written notice of such resignation to the Company and by mailing notice thereof to the Holders at their addresses as they shall appear on the Note Register. Upon receiving such notice of resignation, the Company shall promptly appoint a successor trustee by written instrument, in duplicate, executed by order of the Board of Directors, one copy of which instrument shall be delivered to the resigning Trustee and one copy to the successor trustee. If no successor trustee shall have been so appointed and have accepted appointment within 30 days after the mailing of such notice of resignation to the Holders, the resigning Trustee may appoint a successor trustee on behalf of and at the expense of the Company or it may petition any court of competent jurisdiction for the appointment of a successor trustee, or any Holder who has been a bona fide holder of a Note or Notes for at least six months may, subject to the provisions of Section 6.11, on behalf of himself or herself and all others similarly situated, petition any such court for the appointment of a successor trustee. Such court may thereupon, after such notice, if any, as it may deem proper and prescribe, appoint a successor trustee.

(b) In case at any time any of the following shall occur:

(i) the Trustee shall cease to be eligible in accordance with the provisions of Section 7.08 and shall fail to resign after written request therefor by the Company or by any such Holder, or

(ii) the Trustee shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation.

Then, in either case, the Company may by a Board Resolution remove the Trustee and appoint a successor trustee by written instrument, in duplicate, executed by order of the Board of Directors, one copy of which instrument shall be delivered to the Trustee so removed and one copy to the successor trustee, or, subject to the provisions of Section 6.11, any Holder who has been a bona fide holder of a Note or Notes for at least six months may, on behalf of himself or herself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor trustee. Such court may thereupon, after such notice, if any, as it may deem proper and prescribe, remove the Trustee and appoint a successor trustee.

47

(c) The Holders of a majority in aggregate principal amount of the Notes at the time outstanding, as determined in accordance with Section 8.04, may at any time remove the Trustee and nominate a successor trustee that shall be deemed appointed as successor trustee unless within ten days after notice to the Company of such nomination the Company objects thereto, in which case the Trustee so removed or any Holder, upon the terms and conditions and otherwise as in Section 7.09(a) provided, may petition any court of competent jurisdiction for an appointment of a successor trustee.

(d) Any resignation or removal of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 7.09 shall become effective upon acceptance of appointment by the successor trustee as provided in Section 7.10.

Section 7.10. *Acceptance by Successor Trustee.* Any successor trustee appointed as provided in Section 7.09 shall execute, acknowledge and deliver to the Company and to its predecessor trustee an instrument accepting such appointment hereunder, and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally named as Trustee herein; but, nevertheless, on the written request of the Company or of the successor trustee, the trustee ceasing to act shall, upon payment of any amounts then due to it pursuant to the provisions of Section 7.06, execute and deliver an instrument transferring to such successor trustee all the rights and powers of the trustee so ceasing to act. Upon request of any such successor trustee, the Company shall execute any and all instruments in writing for more fully and certainly vesting in and confirming to such successor trustee all such rights and powers. Any trustee ceasing to act shall, nevertheless, retain a senior claim to which the Notes are hereby made subordinate on all money or property held or collected by such trustee as such, except for funds held in trust for the benefit of Holders of particular Notes, to secure any amounts then due to it pursuant to the provisions of Section 7.06.

No successor trustee shall accept appointment as provided in this Section 7.10 unless at the time of such acceptance such successor trustee shall be eligible under the provisions of Section 7.08.

Upon acceptance of appointment by a successor trustee as provided in this Section 7.10, each of the Company and the successor trustee, at the written direction and at the expense of the Company shall mail or cause to be mailed notice of the succession of such trustee hereunder to the Holders at their addresses as they shall appear on the Note Register. If the Company fails to mail such notice within ten days after acceptance of appointment by the successor trustee, the successor trustee shall cause such notice to be mailed at the expense of the Company.

Section 7.11. *Succession by Merger, Etc.* Any corporation or other entity into which the Trustee may be merged or converted or with which it may be consolidated, or any corporation or other entity resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any corporation or other entity succeeding to all or substantially all of the corporate trust business of the Trustee (including the administration of this Indenture), shall be the successor to the Trustee hereunder without the execution or filing of any paper or any further act on the part of any of the parties hereto; *provided* that in the case of any corporation or other entity succeeding to all or substantially all of the corporate trust business of the Trustee such corporation or other entity shall be eligible under the provisions of Section 7.08.

48

In case at the time such successor to the Trustee shall succeed to the trusts created by this Indenture, any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee may authenticate such Notes either in the name of any predecessor trustee hereunder or in the name of the successor trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Notes or in this Indenture provided that the certificate of the Trustee shall have; *provided*, *however*, that the right to adopt the certificate of authentication of any predecessor trustee or to authenticate Notes in the name of any predecessor trustee shall apply only to its successor or successors by merger, conversion or consolidation.

Section 7.12. *Trustee's Application for Instructions from the Company.* Any application by the Trustee for written instructions from the Company (other than with regard to any action proposed to be taken or omitted to be taken by the Trustee that affects the rights of the Holders of the Notes under this Indenture) may, at the option of the Trustee, set forth in writing any action proposed to be taken or omitted by the Trustee under this Indenture and the date on and/or after which such action shall be taken or such omission shall be effective. The Trustee shall not be liable for any action taken by, or omission of, the Trustee in accordance with a proposal included in such application on or after the date specified in such application (which date shall not be less than three Business Days after the date any officer that the Company has indicated to the Trustee should receive such application actually receives such application, unless any such officer shall have consented in writing to any earlier date), unless, prior to taking any such action (or the effective date in the case of any omission), the Trustee shall have received written instructions in accordance with this Indenture in response to such application specifying the action to be taken or omitted.

ARTICLE 8
CONCERNING THE HOLDERS

Section 8.01. *Action by Holders.* Whenever in this Indenture it is provided that the Holders of a specified percentage of the aggregate principal amount of the Notes may take any action (including the making of any demand or request, the giving of any notice, consent or waiver or the taking of any other action), the fact that at the time of taking any such action, the Holders of such specified percentage have joined therein may be evidenced (a) by any instrument or any number of instruments of similar tenor executed by Holders in person or by agent or proxy appointed in writing, or (b) by the

record of the Holders voting in favor thereof at any meeting of Holders duly called and held in accordance with the provisions of Article 9, or (c) by a combination of such instrument or instruments and any such record of such a meeting of Holders. Whenever the Company or the Trustee solicits the taking of any action by the Holders of the Notes, the Company or the Trustee may fix, but shall not be required to, in advance of such solicitation, a date as the record date for determining Holders entitled to take such action. The record date if one is selected shall be not more than fifteen days prior to the date of commencement of solicitation of such action.

49

Section 8.02. *Proof of Execution by Holders.* Subject to the provisions of Section 7.01, Section 7.02 and Section 9.05, proof of the execution of any instrument by a Holder or its agent or proxy shall be sufficient if made in accordance with such reasonable rules and regulations as may be prescribed by the Trustee or in such manner as shall be satisfactory to the Trustee. The holding of Notes shall be proved by the Note Register or by a certificate of the Note Registrar. The record of any Holders' meeting shall be proved in the manner provided in Section 9.06.

Section 8.03. *Who Are Deemed Absolute Owners.* The Company, the Trustee, any Paying Agent, any Conversion Agent and any Note Registrar may deem the Person in whose name a Note shall be registered upon the Note Register to be, and may treat it as, the absolute owner of such Note (whether or not such Note shall be overdue and notwithstanding any notation of ownership or other writing thereon made by any Person other than the Company or any Note Registrar) for the purpose of receiving payment of or on account of the principal of and (subject to Section 2.03) accrued and unpaid interest on such Note, for the purpose of conversion of such Note and for all other purposes; and neither the Company nor the Trustee nor any Paying Agent nor any Conversion Agent nor any Note Registrar shall be affected by any notice to the contrary. All such payments or deliveries so made to any Holder for the time being, or upon its order, shall be valid, and, to the extent of the sums or ADSs so paid or delivered, effectual to satisfy and discharge the liability for monies payable or ADSs deliverable upon any such Note. Notwithstanding anything to the contrary in this Indenture or the Notes following an Event of Default, any Holder of a beneficial interest in a Global Note may directly enforce against the Company, without the consent, solicitation, proxy, authorization or any other action of the Depositary or any other Person, such Holder's right to exchange such beneficial interest for a Note in certificated form in accordance with the provisions of this Indenture.

Section 8.04. *Company-Owned Notes Disregarded.* In determining whether the Holders of the requisite aggregate principal amount of Notes have concurred in any direction, consent, waiver or other action under this Indenture, Notes that are owned by the Company, by any Subsidiary or Consolidated Affiliated Entity thereof or by any Affiliate of the Company or any Subsidiary or Consolidated Affiliated Entity thereof shall be disregarded and deemed not to be outstanding for the purpose of any such determination; *provided* that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, consent, waiver or other action only Notes in respect of which a Responsible Officer is notified in writing shall be so disregarded. Notes so owned that have been pledged in good faith may be regarded as outstanding for the purposes of this Section 8.04 if the pledgee shall establish its right to so act with respect to such Notes and that the pledgee is not the Company, a Subsidiary or Consolidated Affiliated Entity thereof or an Affiliate of the Company or a Subsidiary or Consolidated Affiliated Entity thereof. Within five days of acquisition of the Notes by any of the above described persons or entities, the Company shall furnish to the Trustee promptly an Officers' Certificate listing and identifying all Notes, if any, known by the Company to be owned or held by or for the account of any of the above described Persons; and, subject to Section 7.01, the Trustee shall be entitled to accept such Officers' Certificate as conclusive evidence of the facts therein set forth and of the fact that all Notes not listed therein are outstanding for the purpose of any such determination.

50

Section 8.05. *Revocation of Consents; Future Holders Bound.* At any time prior to (but not after) the evidencing to the Trustee, as provided in Section 8.01, of the taking of any action by the Holders of the percentage of the aggregate principal amount of the Notes specified in this Indenture in connection with such action, any Holder of a Note that is shown by the evidence to be included in the Notes the Holders of which have consented to such action may, by filing written notice with the Trustee at its Corporate Trust Office and upon proof of holding as provided in Section 8.02, revoke such action so far as concerns such Note. Except as aforesaid, any such action taken by the Holder of any Note shall be conclusive and binding upon such Holder and upon all future Holders and owners of such Note and of any Notes issued in exchange or substitution therefor or upon registration of transfer thereof, irrespective of whether any notation in regard thereto is made upon such Note or any Note issued in exchange or substitution therefor or upon registration of transfer thereof.

ARTICLE 9
HOLDERS' MEETINGS

Section 9.01. *Purpose of Meetings.* A meeting of Holders may be called at any time and from time to time pursuant to the provisions of this Article 9 for any of the following purposes:

(a) to give any notice to the Company or to the Trustee or to give any directions to the Trustee permitted under this Indenture, or to consent to the waiving of any Default or Event of Default hereunder and its consequences, or to take any other action authorized to be taken by Holders pursuant to any of the provisions of Article 6;

(b) to remove the Trustee and nominate a successor trustee pursuant to the provisions of Article 7;

(c) to consent to the execution of an indenture or indentures supplemental hereto pursuant to the provisions of Section 10.02; or

(d) to take any other action authorized to be taken by or on behalf of the Holders of any specified aggregate principal amount of the Notes under any other provision of this Indenture or under applicable law.

Section 9.02. *Call of Meetings by Trustee.* The Trustee may at any time call a meeting of Holders to take any action specified in Section 9.01, to be held at such time and at such place as the Trustee shall determine. Notice of every meeting of the Holders, setting forth the time and the place of such meeting and in general terms the action proposed to be taken at such meeting and the establishment of any record date pursuant to Section 8.01, shall be mailed to Holders of such Notes at their addresses as they shall appear on the Note Register. Such notice shall also be mailed to the Company. Such

notices shall be mailed not less than 20 nor more than 90 days prior to the date fixed for the meeting.

Any meeting of Holders shall be valid without notice if the Holders of all Notes then outstanding are present in person or by proxy or if notice is waived before or after the meeting by the Holders of all Notes then outstanding, and if the Company and the Trustee are either present by duly authorized representatives or have, before or after the meeting, waived notice.

51

Section 9.03. *Call of Meetings by Company or Holders.* In case at any time the Company, pursuant to a Board Resolution, or the Holders of at least 10% of the aggregate principal amount of the Notes then outstanding, shall have requested the Company to call a meeting of Holders, by written request setting forth in reasonable detail the action proposed to be taken at the meeting, and the Company shall not have mailed the notice of such meeting within 20 days after receipt of such request, then the Trustee or such Holders may determine the time and the place for such meeting and may call such meeting to take any action authorized in Section 9.01, by mailing notice thereof as provided in Section 9.02.

Section 9.04. *Qualifications for Voting.* To be entitled to vote at any meeting of Holders a Person shall (a) be a Holder of one or more Notes on the record date pertaining to such meeting or (b) be a Person appointed by an instrument in writing as proxy by a Holder of one or more Notes on the record date pertaining to such meeting. The only Persons who shall be entitled to be present or to speak at any meeting of Holders shall be the Persons entitled to vote at such meeting and their counsel and any representatives of the Trustee and its counsel and any representatives of the Company and its counsel.

Section 9.05. *Regulations.* Notwithstanding any other provisions of this Indenture, the Trustee may make such reasonable regulations as it may deem advisable for any meeting of Holders, in regard to proof of the holding of Notes and of the appointment of proxies, and in regard to the appointment and duties of inspectors of votes, the submission and examination of proxies, certificates and other evidence of the right to vote, and such other matters concerning the conduct of the meeting as it shall think fit.

The Trustee shall, by an instrument in writing, appoint a temporary chairman of the meeting, unless the meeting shall have been called by the Company or by Holders as provided in Section 9.03, in which case the Company or the Holders calling the meeting, as the case may be, shall in like manner appoint a temporary chairman. A permanent chairman and a permanent secretary of the meeting shall be elected by vote of the Holders of a majority in principal amount of the Notes represented at the meeting and entitled to vote at the meeting.

Subject to the provisions of Section 8.04, at any meeting of Holders each Holder or proxyholder shall be entitled to one vote for each US$1,000 principal amount of Notes held or represented by him or her; *provided*, *however*, that no vote shall be cast or counted at any meeting in respect of any Note challenged as not outstanding and ruled by the chairman of the meeting to be not outstanding. The chairman of the meeting shall have no right to vote other than by virtue of Notes held by it or instruments in writing as aforesaid duly designating it as the proxy to vote on behalf of other Holders. Any meeting of Holders duly called pursuant to the provisions of Section 9.02 or Section 9.03 may be adjourned from time to time by the Holders of a majority of the aggregate principal amount of Notes represented at the meeting, whether or not constituting a quorum, and the meeting may be held as so adjourned without further notice.

Minutes shall be made of all resolutions and proceedings at every meeting and, if purporting to be signed by the chairman of that meeting or of the next succeeding meeting of Holders of the Notes, shall be conclusive evidence of the matters in them. Until the contrary is proved every meeting for which minutes have been so made and signed shall be deemed to have been duly convened and held and all resolutions passed or proceedings transacted at it to have been duly passed and transacted.

52

Section 9.06. *Voting.* The vote upon any resolution submitted to any meeting of Holders shall be by written ballot on which shall be subscribed the signatures of the Holders or of their representatives by proxy and the outstanding principal amount of the Notes held or represented by them. The permanent chairman of the meeting shall appoint two inspectors of votes who shall count all votes cast at the meeting for or against any resolution and who shall make and file with the secretary of the meeting their verified written reports in duplicate of all votes cast at the meeting. A record in duplicate of the proceedings of each meeting of Holders shall be prepared by the secretary of the meeting and there shall be attached to said record the original reports of the inspectors of votes on any vote by ballot taken thereat and affidavits by one or more Persons having knowledge of the facts setting forth a copy of the notice of the meeting and showing that said notice was mailed as provided in Section 9.02. The record shall show the principal amount of the Notes voting in favor of or against any resolution. The record shall be signed and verified by the affidavits of the permanent chairman and secretary of the meeting and one of the duplicates shall be delivered to the Company and the other to the Trustee to be preserved by the Trustee, the latter to have attached thereto the ballots voted at the meeting.

Any record so signed and verified shall be conclusive evidence of the matters therein stated.

Section 9.07. *No Delay of Rights by Meeting.* Nothing contained in this Article 9 shall be deemed or construed to authorize or permit, by reason of any call of a meeting of Holders or any rights expressly or impliedly conferred hereunder to make such call, any hindrance or delay in the exercise of any right or rights conferred upon or reserved to the Trustee or to the Holders under any of the provisions of this Indenture or of the Notes.

ARTICLE 10
SUPPLEMENTAL INDENTURES

Section 10.01. *Supplemental Indentures Without Consent of Holders.* The Company, when authorized by the resolutions of the Board of Directors, and the Trustee, at the Company's expense and direction, may from time to time and at any time enter into an indenture or indentures supplemental hereto for one or more of the following purposes:

(a) to cure any ambiguity, omission, defect or inconsistency;

(b) to provide for the assumption by a Successor Company of the obligations of the Company under this Indenture pursuant to Article 11;

(c) to add guarantees with respect to the Notes;

(d) to secure the Notes;

(e) to add to the covenants or Events of Defaults of the Company for the benefit of the Holders or surrender any right or power conferred upon the Company;

(f) upon the occurrence of any transaction or event described in Section 14.07(a), to (i) provide that the Notes are convertible into Reference Property, subject to Section 14.02, and (ii) effect the related changes to the terms of the Notes described under Section 14.07(a), in each case, in accordance with Section 14.07;

<center>53</center>

(g) to make any change that does not adversely affect the rights of any Holder; or

(h) to conform the provisions of this Indenture or the Notes to the "Description of the Notes" section of the Offering Memorandum.

Upon the written request of the Company, the Trustee is hereby authorized to join with the Company in the execution of any such supplemental indenture, to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee shall not be obligated to, but may in its discretion, enter into any supplemental indenture that affects the Trustee's own rights, duties or immunities under this Indenture or otherwise. The Trustee shall be entitled to seek an Officers' Certificate and an Opinion of Counsel, at the Company's expense, that any such supplemental indenture is authorized and permitted by the terms of this Indenture and not contrary to law.

Any supplemental indenture authorized by the provisions of this Section 10.01 may be executed by the Company and the Trustee without the consent of the Holders of any of the Notes at the time outstanding, notwithstanding any of the provisions of Section 10.02.

Section 10.02. *Supplemental Indentures with Consent of Holders.* With the consent (evidenced as provided in Article 8) of the Holders of at least a majority of the aggregate principal amount of the Notes then outstanding (determined in accordance with Article 8 and including, without limitation, consents obtained in connection with a repurchase of, or tender or exchange offer for, Notes), the Company, when authorized by the resolutions of the Board of Directors, and the Trustee, at the Company's expense, may from time to time and at any time enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or any supplemental indenture or of modifying in any manner the rights of the Holders; *provided*, *however*, that, without the consent of each Holder of an outstanding Note affected, no such supplemental indenture shall:

(a) reduce the amount of Notes whose Holders must consent to an amendment;

(b) reduce the rate of or extend the stated time for payment of interest on any Note;

(c) reduce the principal of or extend the Maturity Date of any Note;

(d) make any change that adversely affects the conversion rights of any Notes;

(e) reduce the Repurchase Price payable on the Repurchase Date, the Fundamental Change Repurchase Price or the Redemption Price of any Note or amend or modify in any manner adverse to the Holders the Company's obligation to make such payments, whether through an amendment or waiver of provisions in the covenants, definitions or otherwise;

(f) make any Note payable in a currency other than U.S. dollars;

<center>54</center>

(g) change the ranking of the Notes;

(h) impair the right of any Holder to receive payment of principal and interest on such Holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such Holder's Note;

(i) change the Company's obligation to pay Additional Amounts on any Note; or

(j) make any change in this Article 10 that requires each Holder's consent or in the waiver provisions in Section 6.02 or Section 6.09.

Upon the written request of the Company, and upon the filing with the Trustee of evidence of the consent of Holders as aforesaid and subject to Section 10.05, the Trustee shall join with the Company in the execution of such supplemental indenture unless (i) the Trustee has not received an Officers' Certificate and an Opinion of Counsel that such supplemental indenture is authorized and permitted by the terms of this Indenture and not contrary to law or (ii) such supplemental indenture affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion, but shall not be obligated to, enter into such supplemental indenture.

Holders do not need under this Section 10.02 to approve the particular form of any proposed supplemental indenture. It shall be sufficient if such

Holders approve the substance thereof. After any supplemental indenture becomes effective under Section 10.01 or Section 10.02, the Company shall mail to the Holders a notice briefly describing such supplemental indenture. However, the failure to give such notice to all the Holders, or any defect in the notice, will not impair or affect the validity of the supplemental indenture.

Section 10.03. *Effect of Supplemental Indentures.* Upon the execution of any supplemental indenture pursuant to the provisions of this Article 10, this Indenture shall be and be deemed to be modified and amended in accordance therewith and the respective rights, limitation of rights, obligations, duties and immunities under this Indenture of the Trustee, the Company and the Holders shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modifications and amendments and all the terms and conditions of any such supplemental indenture shall be and be deemed to be part of the terms and conditions of this Indenture for any and all purposes.

Section 10.04. *Notation on Notes.* Notes authenticated and delivered after the execution of any supplemental indenture pursuant to the provisions of this Article 10 may, at the Company's expense, bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture. If the Company or the Trustee shall so determine, new Notes so modified as to conform, in the opinion of the Trustee and the Board of Directors, to any modification of this Indenture contained in any such supplemental indenture may, at the Company's expense, be prepared and executed by the Company, authenticated by the Trustee and delivered in exchange for the Notes then outstanding, upon surrender of such Notes then outstanding.

55

Section 10.05. *Evidence of Compliance of Supplemental Indenture to Be Furnished Trustee.* In addition to the documents required by Section 17.06, the Trustee shall receive an Officers' Certificate and an Opinion of Counsel as conclusive evidence that any supplemental indenture executed pursuant hereto complies with the requirements of this Article 10 and is permitted or authorized by this Indenture and is not contrary to law.

ARTICLE 11

CONSOLIDATION, MERGER, SALE, CONVEYANCE AND LEASE

Section 11.01. *Company May Consolidate, Etc. on Certain Terms.* Subject to the provisions of Section 11.02, the Company shall not consolidate with, merge with or into, or sell, convey, transfer or lease all or substantially all of its properties and assets to another Person, unless:

(a) the resulting, surviving or transferee Person (the "**Successor Company**"), if not the Company, shall be a corporation organized and existing under the laws of the Cayman Islands, the British Virgin Islands, Bermuda or Hong Kong and the Successor Company (if not the Company) shall expressly assume, by supplemental indenture all of the obligations of the Company under the Notes and this Indenture (including, for the avoidance of doubt, the obligation to pay Additional Amounts pursuant to Section 4.07); and

(b) immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing under this Indenture.

For purposes of this Section 11.01, the sale, conveyance, transfer or lease of all or substantially all of the properties and assets of one or more Subsidiaries of the Company to another Person, which properties and assets, if held by the Company instead of such Subsidiaries, would constitute all or substantially all of the properties and assets of the Company on a consolidated basis, shall be deemed to be the sale, conveyance, transfer or lease of all or substantially all of the properties and assets of the Company to another Person.

Section 11.02. *Successor Corporation to Be Substituted.* In case of any such consolidation, merger, sale, conveyance, transfer or lease and upon the assumption by the Successor Company, by supplemental indenture, executed and delivered to the Trustee and satisfactory in form to the Trustee, of the due and punctual payment of the principal of and accrued and unpaid interest on all of the Notes (including, for the avoidance of doubt, any Additional Amounts), the due and punctual delivery or payment, as the case may be, of any consideration due upon conversion of the Notes (including, for the avoidance of doubt, any Additional Amounts) and the due and punctual performance of all of the covenants and conditions of this Indenture to be performed by the Company, such Successor Company (if not the Company) shall succeed to and, except in the case of a lease of all or substantially all of the Company's properties and assets, shall be substituted for the Company, with the same effect as if it had been named herein as the party of the first part. Such Successor Company thereupon may cause to be signed, and may issue either in its own name or in the name of the Company any or all of the Notes issuable hereunder which theretofore shall not have been signed by the Company and delivered to the Trustee; and, upon the order of such Successor Company instead of the Company and subject to all the terms, conditions and limitations in this Indenture prescribed, the Trustee shall authenticate and shall deliver, or cause to be authenticated and delivered, any Notes that previously shall have been signed and delivered by the Officers of the Company to the Trustee for authentication, and any Notes that such Successor Company thereafter shall cause to be signed and delivered to the Trustee for that purpose. All the Notes so issued shall in all respects have the same legal rank and benefit under this Indenture as the Notes theretofore or thereafter issued in accordance with the terms of this Indenture as though all of such Notes had been issued at the date of the execution hereof. In the event of any such consolidation, merger, sale, conveyance or transfer (but not in the case of a lease), upon compliance with this Article 11 the Person named as the "Company" in the first paragraph of this Indenture (or any successor that shall thereafter have become such in the manner prescribed in this Article 11) may be dissolved, wound up and liquidated at any time thereafter and, except in the case of a lease, such Person shall be released from its liabilities as obligor and maker of the Notes and from its obligations under this Indenture and the Notes.

56

In case of any such consolidation, merger, sale, conveyance, transfer or lease, such changes in phraseology and form (but not in substance) may be made in the Notes thereafter to be issued as may be appropriate.

Section 11.03. *Opinion of Counsel to Be Given to Trustee.* No consolidation, merger, sale, conveyance, transfer or lease shall be effective unless the Trustee shall receive an Officers' Certificate and an Opinion of Counsel as conclusive evidence that any such consolidation, merger, sale, conveyance, transfer or lease and any such assumption and, if a supplemental indenture is required in connection with such transaction, such supplemental indenture, complies with the provisions of this Article 11.

ARTICLE 12
IMMUNITY OF INCORPORATORS, STOCKHOLDERS, OFFICERS AND DIRECTORS

Section 12.01. *Indenture and Notes Solely Corporate Obligations.* No recourse for the payment of the principal of or accrued and unpaid interest on any Note, nor for any claim based thereon or otherwise in respect thereof, and no recourse under or upon any obligation, covenant or agreement of the Company in this Indenture or in any supplemental indenture or in any Note, nor because of the creation of any indebtedness represented thereby, shall be had against any incorporator, stockholder, employee, agent, Officer or director or Subsidiary, as such, past, present or future, of the Company or of any successor corporation, either directly or through the Company or any successor corporation, whether by virtue of any constitution, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise; it being expressly understood that all such liability is hereby expressly waived and released as a condition of, and as a consideration for, the execution of this Indenture and the issue of the Notes.

ARTICLE 13
INTENTIONALLY OMITTED

ARTICLE 14
CONVERSION OF NOTES

Section 14.01. *Conversion Privilege.* Subject to and upon compliance with the provisions of this Article 14, each Holder of a Note shall have the right, at such Holder's option, to convert all or any portion (if the portion to be converted is US$1,000 principal amount or an integral multiple thereof) of such Note at any time prior to the close of business on the second Business Day immediately preceding the Maturity Date into ADSs at an initial conversion rate of 15.4776 ADSs (subject to adjustment as provided in this Article 14, the "**Conversion Rate**") per US$1,000 principal amount of Notes (subject to the settlement provisions of Section 14.02, the "**Conversion Obligation**").

Section 14.02. *Conversion Procedure; Settlement Upon Conversion.*

(a) Upon conversion of any Note, the Company shall cause to be delivered to the converting Holder, in respect of each US$1,000 principal amount of Notes being converted, a number of ADSs equal to the Conversion Rate, together with a cash payment, if applicable, in lieu of any fractional ADSs ("**Fractional ADSs**") (assuming delivery of the maximum number of ADSs due upon conversion that do not represent a fractional ADS) in accordance with subsection (j) of this Section 14.02, on the third Business Day immediately following the relevant Conversion Date. For the avoidance of doubt, neither the Trustee nor any Agent shall have any responsibility to deliver ADSs to any person or deal with cash payments in relation to conversions, except for cash payments in lieu of any fractional ADS.

(b) Subject to Section 14.02(e), before any Holder of a Note shall be entitled to convert a Note as set forth above, such Holder shall (i) in the case of a Global Note, comply with the procedures of the Depositary in effect at that time and, if required, pay funds equal to interest payable on the next Interest Payment Date to which such Holder is not entitled as set forth in Section 14.02(h), and complete, manually sign and deliver a duly completed irrevocable notice to the Conversion Agent as set forth in the Form of Notice of Conversion (or a facsimile thereof) (a "**Notice of Conversion**") and (ii) in the case of a Physical Note (1) complete, manually sign and deliver a duly completed irrevocable Notice of Conversion to the Conversion Agent at the specified office of the Conversion Agent and state in writing therein the principal amount of Notes to be converted and the name or names (with addresses) in which such Holder wishes the certificate or certificates for any ADSs to be delivered upon settlement of the Conversion Obligation to be registered, (2) surrender such Notes, duly endorsed to the Company or in blank (and accompanied by appropriate endorsement and transfer documents), at the specified office of the Conversion Agent, (3) if required, furnish appropriate endorsements and transfer documents and (4) if required, pay funds equal to interest payable on the next Interest Payment Date to which such Holder is not entitled as set forth in Section 14.02(h). The Trustee (and if different, the Conversion Agent) shall notify the Company of any conversion pursuant to this Article 14 on the Conversion Date for such conversion. No Notice of Conversion with respect to any Notes may be delivered and no Notes may be surrendered by a Holder for conversion thereof if such Holder has also delivered a Repurchase Notice or Fundamental Change Repurchase Notice to the Company in respect of such Notes and not validly withdrawn such Repurchase Notice or Fundamental Change Repurchase Notice in accordance with Section 15.03. A Notice of Conversion shall be deposited in duplicate at the office of any Conversion Agent on any Business Day from 9:00 a.m. to 3:00 p.m. at the location of the Conversion Agent to which such Notice of Conversion is delivered. Any Notice of Conversion and any Physical Note (if issued) deposited outside the hours specified or on a day that is not a Business Day at the location of the Conversion Agent shall for all purposes be deemed to have been deposited with that Conversion Agent between 9:00 a.m. and 3:00 p.m. on the next Business Day.

If more than one Note shall be surrendered for conversion at one time by the same Holder, the Conversion Obligation with respect to such Notes shall be computed on the basis of the aggregate principal amount of the Notes (or specified portions thereof to the extent permitted thereby) so surrendered. None of the Agents of the Trustee shall have any responsibility whatsoever with respect to the issuance and delivery of the ADSs to the converting Holder.

(c) A Note shall be deemed to have been converted immediately prior to the close of business on the date (the "**Conversion Date**") that the Holder has complied with the requirements set forth in subsection (b) above. The Company shall issue or cause to be issued, and deliver or cause to be delivered to such Holder, or such Holder's nominee or nominees, certificates or a book-entry transfer through the Depositary for the full number of ADSs to which such Holder shall be entitled in satisfaction of the Company's Conversion Obligation.

(d) In case any Note shall be surrendered for partial conversion, the Company shall execute and instruct the Trustee who shall authenticate and deliver to or upon the written order of the Holder of the Note so surrendered a new Note or Notes in authorized denominations in an aggregate principal amount equal to the unconverted portion of the surrendered Note, without payment of any service charge by the converting Holder but, if required by

the Company or Trustee, with payment of a sum sufficient to cover any transfer tax or similar governmental charge required by law or that may be imposed in connection therewith as a result of the name of the Holder of the new Notes issued upon such conversion being different from the name of the Holder of the old Notes surrendered for such conversion.

(e) If a Holder submits a Note for conversion, the Company shall pay any documentary, stamp, issue, transfer or similar tax due on the delivery of the ADSs upon conversion of the Notes (or the issuance of the underlying Ordinary Shares), unless the tax is due because the Holder requests such ADSs (or such Ordinary Shares) to be issued in a name other than the Holder's name, in which case the Holder shall pay that tax. The Conversion Agent may refuse to deliver the certificates representing the ADSs (or the Ordinary Shares) being issued in a name other than the Holder's name until the Trustee receives a sum sufficient to pay any tax that is due by such Holder in accordance with the immediately preceding sentence. The Company shall pay the ADS Depositary's fees for issuance of the ADSs.

(f) Except as provided in Section 14.04, no adjustment shall be made for dividends on any ADSs delivered upon the conversion of any Note as provided in this Article 14.

(g) Upon the conversion of an interest in a Global Note, the Trustee shall make a notation on such Global Note as to the reduction in the principal amount represented thereby. The Company shall notify the Trustee in writing of any conversion of Notes effected through any Conversion Agent other than the Trustee.

59

(h) Upon conversion, a Holder shall not receive any separate cash payment for accrued and unpaid interest, if any, except as set forth below. The Company's settlement of the Conversion Obligation shall be deemed to satisfy in full its obligation to pay the principal amount of the Note and accrued and unpaid interest, if any, to, but not including, the relevant Conversion Date. As a result, accrued and unpaid interest, if any, to, but not including, the relevant Conversion Date shall be deemed to be paid in full rather than cancelled, extinguished or forfeited. Notwithstanding the foregoing, if Notes are converted after the close of business on a Regular Record Date, Holders of such Notes as of the close of business on such Regular Record Date will receive the full amount of interest payable on such Notes on the corresponding Interest Payment Date notwithstanding the conversion. Notes surrendered for conversion during the period from the close of business on any Regular Record Date to the open of business on the immediately following Interest Payment Date must be accompanied by funds equal to the amount of interest payable on the Notes so converted; *provided* that no such payment shall be required (1) for conversions following the Regular Record Date immediately preceding the Maturity Date; (2) if the Company has specified a Redemption Date that is after a Regular Record Date and on or prior to the Business Day immediately succeeding the corresponding Interest Payment Date (or, if such Interest Payment Date is not a Business Day, the second Business Day immediately succeeding such Interest Payment Date); (3) if the Company has specified a Fundamental Change Repurchase Date that is after a Regular Record Date and on or prior to the Business Day immediately succeeding the corresponding Interest Payment Date (or, if such Interest Payment Date is not a Business Day, the second Business Day immediately succeeding such Interest Payment Date); or (4) to the extent of any Defaulted Amounts, if any Defaulted Amounts exist at the time of conversion with respect to such Note. Therefore, for the avoidance of doubt, all Holders of record on the Regular Record Date immediately preceding the Maturity Date shall receive the full interest payment due on the Maturity Date in cash regardless of whether their Notes have been converted following such Regular Record Date.

(i) The Person in whose name the certificate for any ADSs delivered upon conversion is registered shall be treated as a holder of record of such ADSs as of the close of business on the relevant Conversion Date. Upon a conversion of Notes, such Person shall no longer be a Holder of such Notes surrendered for conversion.

(j) The Company shall not issue any Fractional ADS upon conversion of the Notes and shall instead pay cash in lieu of any Fractional ADS deliverable upon conversion based on the Last Reported Sale Price of the ADSs on the relevant Conversion Date.

(k) In accordance with the Deposit Agreement, the Company shall issue to the ADS Custodian such Ordinary Shares required for the issuance of the ADSs upon conversion of the Notes, plus written delivery instructions (if requested by the ADS Depositary or the ADS Custodian) for such ADSs and any other information or documentation required by the ADS Depositary or the ADS Custodian in connection with each issue of Ordinary Shares and issuance and delivery of ADSs.

Section 14.03. *Increased Conversion Rate Applicable to Certain Notes Surrendered in Connection with Make-Whole Fundamental Changes.* (a) If a Make-Whole Fundamental Change occurs prior to the Maturity Date and a Holder elects to convert its Notes in connection with such Make-Whole Fundamental Change, the Company shall, under the circumstances described below, increase the Conversion Rate for the Notes so surrendered for conversion by a number of additional ADSs (the "**Additional ADSs**"), as described below. A conversion of Notes shall be deemed for these purposes to be "in connection with" such Make-Whole Fundamental Change if the relevant Notice of Conversion is received by the Conversion Agent from, and including, the Effective Date of the Make-Whole Fundamental Change up to, and including, the second Business Day immediately prior to the related Fundamental Change Repurchase Date (or, in the case of a Make-Whole Fundamental Change that would have been a Fundamental Change but for the *proviso* in clause (b) of the definition thereof, the 35th Trading Day immediately following the Effective Date of such Make-Whole Fundamental Change). The Company shall provide written notification to Holders and the Trustee of the Effective Date of any Make-Whole Fundamental Change and issue a press release announcing such Effective Date no later than five Business Days after such Effective Date.

60

(b) Upon surrender of Notes for conversion in connection with a Make-Whole Fundamental Change, the Company shall cause to be delivered ADSs, including the Additional ADSs, in accordance with Section 14.02; *provided*, *however*, that if, at the effective time of a Make-Whole Fundamental Change described in clause (b) of the definition of Fundamental Change, the Reference Property following such Make-Whole Fundamental Change is composed entirely of cash, for any conversion of Notes following the Effective Date of such Make-Whole Fundamental Change, the Conversion Obligation shall be calculated based solely on the ADS Price for the transaction and shall be deemed to be an amount of cash per US$1,000 principal amount of converted Notes equal to the Conversion Rate (including any adjustment for Additional ADSs), *multiplied by* such ADS Price.

(c) The number of Additional ADSs, if any, by which the Conversion Rate shall be increased shall be determined by reference to the table below,

based on the date on which the Make-Whole Fundamental Change occurs or becomes effective (the "**Effective Date**") and the price (the "**ADS Price**") paid (or deemed to be paid) per ADS in the Make-Whole Fundamental Change. If the holders of the ADSs receive in exchange for their ADSs only cash in a Make-Whole Fundamental Change described in clause (b) of the definition of Fundamental Change, the ADS Price shall be the cash amount paid per ADS. Otherwise, the ADS Price shall be the average of the Last Reported Sale Prices of the ADSs over the five Trading Day period ending on, and including, the Trading Day immediately preceding the Effective Date of the Make-Whole Fundamental Change.

(d) The ADS Prices set forth in the column headings of the table below shall be adjusted as of any date on which the Conversion Rate of the Notes is otherwise adjusted. The adjusted ADS Prices shall equal the ADS Prices applicable immediately prior to such adjustment, *multiplied by* a fraction, the numerator of which is the Conversion Rate immediately prior to such adjustment giving rise to the ADS Price adjustment and the denominator of which is the Conversion Rate as so adjusted. The number of Additional ADSs set forth in the table below shall be adjusted in the same manner and at the same time as the Conversion Rate as set forth in Section 14.04.

61

(e) The following table sets forth the number of Additional ADSs to be received per US$1,000 principal amount of Notes pursuant to this Section 14.03 for each ADS Price and Effective Date set forth below:

| | ADS price | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Effective Date** | US$45.34 | US$50.00 | US$55.00 | US$60.00 | US$64.61 | US$80.00 | US$100.00 | US$125.00 | US$150.00 | US$175.00 | US$200.00 | US$250.00 | US$300.00 |
| July 2, 2018 | 6.5779 | 5.5818 | 4.6540 | 3.9227 | 3.3780 | 2.1448 | 1.2795 | 0.7206 | 0.4235 | 0.2521 | 0.1477 | 0.0397 | 0.0000 |
| July 1, 2019 | 6.5779 | 5.5818 | 4.6445 | 3.8825 | 3.3184 | 2.0574 | 1.1934 | 0.6514 | 0.3719 | 0.2153 | 0.1225 | 0.0309 | 0.0000 |
| July 1, 2020 | 6.5779 | 5.5818 | 4.6231 | 3.8230 | 3.2357 | 1.9445 | 1.0873 | 0.5696 | 0.3129 | 0.1741 | 0.0947 | 0.0206 | 0.0000 |
| July 1, 2021 | 6.5779 | 5.5818 | 4.5356 | 3.6940 | 3.0834 | 1.7740 | 0.9431 | 0.4671 | 0.2432 | 0.1276 | 0.0645 | 0.0100 | 0.0000 |
| July 1, 2022 | 6.5779 | 5.4930 | 4.3187 | 3.4368 | 2.8107 | 1.5198 | 0.7531 | 0.3446 | 0.1659 | 0.0795 | 0.0353 | 0.0023 | 0.0000 |
| July 1, 2023 | 6.5779 | 4.9220 | 3.8065 | 2.9672 | 2.3736 | 1.1779 | 0.5200 | 0.2088 | 0.0887 | 0.0364 | 0.0123 | 0.0000 | 0.0000 |
| July 1, 2024 | 6.5779 | 4.6704 | 3.3855 | 2.4467 | 1.8144 | 0.6980 | 0.2365 | 0.0758 | 0.0265 | 0.0080 | 0.0011 | 0.0000 | 0.0000 |
| July 1, 2025 | 6.5779 | 4.5224 | 2.7042 | 1.1890 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 |

The exact ADS Prices and Effective Dates may not be set forth in the table above, in which case:

(i) if the ADS Price is between two ADS Prices in the table above or the Effective Date is between two Effective Dates in the table, the number of Additional ADSs shall be determined by a straight-line interpolation between the number of Additional ADSs set forth for the higher and lower ADS Prices and the earlier and later Effective Dates, as applicable, based on a 365-day year;

(ii) if the ADS Price is greater than US$300.00 per ADS (subject to adjustment in the same manner as the ADS Prices set forth in the column headings of the table above pursuant to subsection (d) above), no Additional ADSs shall be added to the Conversion Rate; and

(iii) if the ADS Price is less than US$45.34 per ADS (subject to adjustment in the same manner as the ADS Prices set forth in the column headings of the table above pursuant to subsection (d) above), no Additional ADSs shall be added to the Conversion Rate.

Notwithstanding the foregoing, in no event shall the Conversion Rate per US$1,000 principal amount of Notes exceed 22.0555 ADSs, subject to adjustment in the same manner as the Conversion Rate pursuant to Section 14.04.

(f) Nothing in this Section 14.03 shall prevent an adjustment to the Conversion Rate pursuant to Section 14.04.

(g) If the Holder elects to convert its Notes in connection with the Company's election to redeem the Notes in respect of a Change in Tax Law pursuant to Section 16.01, the Conversion Rate shall be increased by a number of additional ADSs determined pursuant to this Section 14.03(g). The Company shall settle conversions of Notes as described in Section 14.02 and, for the avoidance of doubt, pay Additional Amounts, if any, with respect to any such conversion.

A conversion shall be deemed to be in connection with the Company's election to redeem the Notes in respect of a Change in Tax Law if such conversion occurs during the period from, and including, the date the Company provides the related notice of redemption to Holders until the close of business on the Business Day immediately preceding the Redemption Date (or, if the Company fails to pay the Redemption Price, such later date on which the Company pays the Redemption Price).

62

Simultaneously with providing such notice of redemption, the Company shall publish a notice containing this information in a newspaper of general circulation in The City of New York or publish the information on the Company's website or through such other public medium as the Company may use at that time.

The number of additional ADSs by which the Conversion Rate will be increased in the event the Company elects to redeem the Notes in respect of a Change in Tax Law will be determined by reference to the table in clause (e) above based on the Redemption Reference Date and the Redemption Reference Price (each as defined below), but determined for purposes of this Section 14.03(g) as if (x) the Holder had elected to convert its Notes in connection with a Make-Whole Fundamental Change, (y) the applicable "Redemption Reference Date" were the "Effective Date" as specified in clause (c) above and (z) the applicable "Redemption Reference Price" were the "ADS price" as specified in clause (c) above. For this purpose, the date on which the Company delivers notice of redemption is the "**Redemption Reference Date**" and the average of the Last Reported Sale Prices of the ADSs over the five Trading Day period immediately preceding the date the Company delivers such notice of redemption is the "**Redemption Reference Price**."

Section 14.04. *Adjustment of Conversion Rate.* If the number of Ordinary Shares represented by the ADSs is changed, after the date of this Indenture, for any reason other than one or more of the events described in this Section 14.04, the Company shall make an appropriate adjustment to the

Conversion Rate such that the number of Ordinary Shares represented by the ADSs upon which conversion of the Notes is based remains the same.

Notwithstanding the adjustment provisions described in this Section 14.04, if the Company distributes to holders of the Ordinary Shares any cash, rights, options, warrants, shares of Capital Stock or similar equity interest, evidences of indebtedness or other assets or property of the Company (but excluding Expiring Rights) and a corresponding distribution is not made to holders of the ADSs, but, instead, the ADSs shall represent, in addition to Ordinary Shares, such cash, rights, options, warrants, shares of Capital Stock or similar equity interest, evidences of indebtedness or other assets or property of the Company, then an adjustment to the Conversion Rate described in this Section 14.04 shall not be made until and unless a corresponding distribution (if any) is made to holders of the ADSs, and such adjustment to the Conversion Rate shall be based on the distribution made to the holders of the ADSs and not on the distribution made to the holders of the Ordinary Shares. However, in the event that the Company issues or distributes to all holders of the Ordinary Shares any Expiring Rights, notwithstanding the immediately preceding sentence, the Company shall adjust the Conversion Rate pursuant to Section 14.04(b) (in the case of Expiring Rights entitling holders of the Ordinary Shares for a period of not more than 45 calendar days after the announcement date of such issuance to subscribe for or purchase Ordinary Shares or ADSs) or Section 14.04(c) (in the case of all other Expiring Rights).

For the avoidance of doubt, if any event described in this Section 14.04 results in a change to the number of Ordinary Shares represented by the ADSs, then such a change shall be deemed to satisfy the Company's obligation to effect the relevant adjustment to the Conversion Rate on account of such an event to the extent such change reflects what a corresponding change to the Conversion Rate would have been on account of such event.

63

The Conversion Rate shall be adjusted from time to time by the Company if any of the following events occurs, except that the Company shall not make any adjustments to the Conversion Rate if Holders of the Notes participate (other than in the case of (x) a share split or share combination or (y) a tender or exchange offer), at the same time and upon the same terms as holders of the ADSs and solely as a result of holding the Notes, in any of the transactions described in this Section 14.04, without having to convert their Notes, as if they held a number of ADSs equal to the Conversion Rate, *multiplied by* the principal amount (expressed in thousands) of Notes held by such Holder. Neither the Trustee nor the Conversion Agent shall have any responsibility to monitor the accuracy of any calculation of any adjustment to the Conversion Rate and the same shall be conclusive and binding on the Holders, absent manifest error. Notice of such adjustment to the Conversion Rate shall be given by the Company promptly to the Holders, the Trustee and the Paying Agent and Conversion Agent and shall be conclusive and binding on the Holders, absent manifest error.

(a) If the Company exclusively issues Ordinary Shares as a dividend or distribution on the Ordinary Shares, or if the Company effects a share split or share combination, the Conversion Rate shall be adjusted based on the following formula:

$$CR_1 = CR_0 \times \frac{OS_1}{OS_0}$$

where,

$CR_0$ = the Conversion Rate in effect immediately prior to the close of business on the Record Date for the ADSs of such dividend or distribution, or immediately prior to the open of business on the effective date of such share split or share combination, as applicable;

$CR_1$ = the Conversion Rate in effect immediately after the close of business on such Record Date or immediately after the open of business on such effective date, as applicable;

$OS_0$ = the number of Ordinary Shares outstanding immediately prior to the close of business on such Record Date or immediately prior to the open of business on such effective date, as applicable; and

$OS_1$ = the number of Ordinary Shares outstanding immediately after giving effect to such dividend, distribution, share split or share combination.

Any adjustment made under this Section 14.04(a) shall become effective immediately after the close of business on the Record Date for the ADSs for such dividend or distribution, or immediately after the open of business on the effective date for such share split or share combination, as applicable. If any dividend or distribution of the type described in this Section 14.04(a) is declared but not so paid or made, the Conversion Rate shall be immediately readjusted, effective as of the date the Board of Directors determines not to pay such dividend or distribution, to the Conversion Rate that would then be in effect if such dividend or distribution had not been declared.

64

(b) If the Company issues to all or substantially all holders of the Ordinary Shares (directly or in the form of ADSs) any rights, options or warrants entitling them, for a period of not more than 45 calendar days after the announcement date of such issuance, to subscribe for or purchase Ordinary Shares (directly or in the form of ADSs) at a price per Ordinary Share that is less than the average of the Last Reported Sale Prices of the Ordinary Shares or the ADSs, as the case may be (*divided by*, in the case of the ADSs, the number of Ordinary Shares then represented by one ADS), for the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the date of announcement of such issuance, the Conversion Rate shall be increased based on the following formula:

$$CR_1 = CR_0 \times \frac{OS_1 + X}{OS_0 + Y}$$

where,

$CR_0$ = the Conversion Rate in effect immediately prior to the close of business on the Record Date for the ADSs for such issuance;

$CR_1$ = the Conversion Rate in effect immediately after the close of business on such Record Date;

$OS_1$ = the number of Ordinary Shares outstanding immediately prior to the close of business on such Record Date;

X = the total number of Ordinary Shares (directly or in the form of ADSs) deliverable pursuant to such rights, options or warrants; and

Y = the number of Ordinary Shares equal to (i) the aggregate price payable to exercise such rights, options or warrants, divided by (ii) the quotient of (a) the average of the Last Reported Sale Prices of the ADSs over the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the date of announcement of the issuance of such rights, options or warrants *divided by* (b) the number of Ordinary Shares then represented by one ADS.

Any increase made under this Section 14.04(b) shall be made successively whenever any such rights, options or warrants are issued and shall become effective immediately after the close of business on the Record Date for the ADSs for such issuance. To the extent that Ordinary Shares or ADSs are not delivered after the expiration of such rights, options or warrants, the Conversion Rate shall be decreased to the Conversion Rate that would then be in effect had the increase with respect to the issuance of such rights, options or warrants been made on the basis of delivery of only the number of Ordinary Shares actually delivered (directly or in the form of ADSs). If such rights, options or warrants are not so issued, the Conversion Rate shall be decreased to the Conversion Rate that would then be in effect if such the Record Date for the ADSs for such issuance had not occurred.

65

For purposes of this Section 14.04(b), in determining whether any rights, options or warrants entitle the holders to subscribe for or purchase Ordinary Shares (directly or in the form of ADSs) at a price per Ordinary Share that is less than such average of the Last Reported Sale Prices of the Ordinary Shares or the ADSs, as the case may be (*divided by*, in the case of the ADSs, the number of Ordinary Shares then represented by one ADS), for the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the date of announcement for such issuance, and in determining the aggregate offering price of such Ordinary Shares or ADSs, there shall be taken into account any consideration received by the Company for such rights, options or warrants and any amount payable on exercise or conversion thereof, the value of such consideration, if other than cash, to be determined by the Board of Directors.

(c) If the Company distributes shares of its Capital Stock, evidences of its indebtedness, other assets or property of the Company or rights, options or warrants to acquire its Capital Stock or other securities, to all or substantially all holders of the Ordinary Shares (directly or in the form of ADSs), excluding (i) dividends, distributions or issuances as to which an adjustment was effected pursuant to Section 14.04(a) or Section 14.04(b), (ii) dividends or distributions paid exclusively in cash as to which an adjustment was effected pursuant to Section 14.04(d), and (iii) Spin-Offs as to which the provisions set forth below in this Section 14.04(c) shall apply (any of such shares of Capital Stock, evidences of indebtedness, other assets or property or rights, options or warrants to acquire Capital Stock or other securities of the Company, the "**Distributed Property**"), then the Conversion Rate shall be increased based on the following formula:

$$CR_1 = CR_0 \times \frac{SP_0}{SP_0 + FMV}$$

where,

$CR_0$ = the Conversion Rate in effect immediately prior to the close of business on the Record Date for the ADSs for such distribution;

$CR_1$ = the Conversion Rate in effect immediately after the close of business on such Record Date;

$SP_0$ = the average of the Last Reported Sale Prices of the ADSs (*divided by* the number of Ordinary Shares then represented by one ADS) over the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the Ex-Dividend Date for such distribution; and

FMV = the fair market value (as determined by the Board of Directors) of the Distributed Property with respect to each outstanding Ordinary Share (directly or in the form of ADSs) on the Record Date for the ADSs for such distribution.

66

Any increase made under the portion of this Section 14.04(c) above shall become effective immediately after the close of business on the Record Date for the ADSs for such distribution. If such distribution is not so paid or made, the Conversion Rate shall be decreased to the Conversion Rate that would then be in effect if such distribution had not been declared. Notwithstanding the foregoing, if "FMV" (as defined above) is equal to or greater than "SP0" (as defined above), in lieu of the foregoing increase, each Holder of a Note shall receive, in respect of each US$1,000 principal amount thereof, at the same time and upon the same terms as holders of the ADSs receive the Distributed Property, the amount and kind of Distributed Property such Holder would have received if such Holder owned a number of ADSs equal to the Conversion Rate in effect on the Record Date for the ADSs for the distribution.

With respect to an adjustment pursuant to this Section 14.04(c) where there has been a payment of a dividend or other distribution on the Ordinary Shares (directly or in the form of ADSs) of shares of Capital Stock of any class or series, or similar equity interest, of or relating to a Subsidiary or other business unit of the Company, that are, or, when issued, will be, listed or admitted for trading on a U.S. national securities exchange (a "**Spin-Off**"), the Conversion Rate shall be increased based on the following formula:

$$CR_1 = CR_0 \times \frac{FMV_0 + MP_0}{MP_0}$$

where,

$CR_0$ = the Conversion Rate in effect immediately prior to the end of the Valuation Period;

$CR_1$ = the Conversion Rate in effect immediately after the end of the Valuation Period;

$FMV_0$ = the average of the Last Reported Sale Prices of the Capital Stock or similar equity interest distributed to holders of the Ordinary Shares (directly or in the form of ADSs) applicable to one Ordinary Share (determined by reference to the definition of Last Reported Sale Price as set forth in Section 1.01 as if references therein to the ADSs were to such Capital Stock or similar equity interest) over the first 10 consecutive Trading Day period after, and including, the Ex-Dividend Date of the Spin-Off (the "**Valuation Period**"); and

$MP_0$ = the average of the Last Reported Sale Prices of the ADSs (*divided by* the number of Ordinary Shares then represented by one ADS) over the Valuation Period.

The adjustment to the Conversion Rate under the preceding paragraph shall occur on the last Trading Day of the Valuation Period; *provided* that in respect of any conversion during the Valuation Period, references in the portion of this Section 14.04(c) related to Spin-Offs to 10 Trading Days shall be deemed to be replaced with such lesser number of Trading Days as have elapsed from, and including, the Ex-Dividend Date of such Spin-Off to, and including, the Conversion Date in determining the Conversion Rate.

67

For purposes of this Section 14.04(c) (and subject in all respect to Section 14.11), rights, options or warrants distributed by the Company to all holders of the Ordinary Shares (directly or in the form of ADSs) entitling them to subscribe for or purchase shares of the Company's Capital Stock, including Ordinary Shares (either initially or under certain circumstances), which rights, options or warrants, until the occurrence of a specified event or events ("**Trigger Event**"): (i) are deemed to be transferred with such Ordinary Shares (directly or in the form of ADSs); (ii) are not exercisable; and (iii) are also issued in respect of future issuances of the Ordinary Shares (directly or in the form of ADSs), shall be deemed not to have been distributed for purposes of this Section 14.04(c) (and no adjustment to the Conversion Rate under this Section 14.04(c) will be required) until the occurrence of the earliest Trigger Event, whereupon such rights, options or warrants shall be deemed to have been distributed and an appropriate adjustment (if any is required) to the Conversion Rate shall be made under this Section 14.04(c). If any such right, option or warrant, including any such existing rights, options or warrants distributed prior to the date of this Indenture, are subject to events, upon the occurrence of which such rights, options or warrants become exercisable to purchase different securities, evidences of indebtedness or other assets, then the date of the occurrence of any and each such event shall be deemed to be the date of distribution and Record Date with respect to new rights, options or warrants with such rights (in which case the existing rights, options or warrants shall be deemed to terminate and expire on such date without exercise by any of the holders thereof). In addition, in the event of any distribution (or deemed distribution) of rights, options or warrants, or any Trigger Event or other event (of the type described in the immediately preceding sentence) with respect thereto that was counted for purposes of calculating a distribution amount for which an adjustment to the Conversion Rate under this Section 14.04(c) was made, (1) in the case of any such rights, options or warrants that shall all have been redeemed or purchased without exercise by any holders thereof, upon such final redemption or purchase (x) the Conversion Rate shall be readjusted as if such rights, options or warrants had not been issued and (y) the Conversion Rate shall then again be readjusted to give effect to such distribution, deemed distribution or Trigger Event, as the case may be, as though it were a cash distribution, equal to the per Ordinary Share redemption or purchase price received by a holder or holders of Ordinary Shares (directly or in the form of ADSs) with respect to such rights, options or warrants (assuming such holder had retained such rights, options or warrants), made to all holders of Ordinary Shares (directly or in the form of ADSs) as of the date of such redemption or purchase, and (2) in the case of such rights, options or warrants that shall have expired or been terminated without exercise by any holders thereof, the Conversion Rate shall be readjusted as if such rights, options and warrants had not been issued.

For purposes of Section 14.04(a), Section 14.04(b) and this Section 14.04(c), if any dividend or distribution to which this Section 14.04(c) is applicable also includes one or both of:

(A) a dividend or distribution of Ordinary Shares (directly or in the form of ADSs) to which Section 14.04(a) is applicable (the "**Clause A Distribution**"); or

(B) a dividend or distribution of rights, options or warrants to which Section 14.04(b) is applicable (the "**Clause B Distribution**"),

then (1) such dividend or distribution, other than the Clause A Distribution and the Clause B Distribution, shall be deemed to be a dividend or distribution to which this Section 14.04(c) is applicable (the "**Clause C Distribution**") and any Conversion Rate adjustment required by this Section 14.04(c) with respect to such Clause C Distribution shall then be made, and (2) the Clause A Distribution and Clause B Distribution shall be deemed to immediately follow the Clause C Distribution and any Conversion Rate adjustment required by Section 14.04(a) and Section 14.04(b) with respect thereto shall then be made, except that, if determined by the Company (I) the "Record Date" of the Clause A Distribution and the Clause B Distribution shall be deemed to be the Record Date of the Clause C Distribution and (II) any Ordinary Shares (directly or in the form of ADSs) included in the Clause A Distribution or Clause B Distribution shall be deemed not to be "outstanding immediately prior to the close of business on such Record Date or immediately after the open of business on such effective date, as applicable" within the meaning of Section 14.04(a) or "outstanding immediately prior to the close of business on such Record Date" within the meaning of Section 14.04(b).

68

(d) If any cash dividend or distribution is made to all or substantially all holders of the Ordinary Shares (directly or in the form of ADSs), the Conversion Rate shall be adjusted based on the following formula:

$$CR_1 = CR_0 \times \frac{SP_0}{SP_0 - C}$$

Where,

$CR_0$ = the Conversion Rate in effect immediately prior to the close of business on the Record Date for the ADSs for such dividend or distribution;

$CR_1$ = the Conversion Rate in effect immediately after the close of business on such Record Date;

$SP_0$   =   the Last Reported Sale Price of the ADSs (*divided by* the number of Ordinary Shares then represented by one ADS) on the Trading Day immediately preceding the Ex-Dividend Date for such dividend or distribution; and

C   =   the amount in cash per Ordinary Share the Company distributes to all or substantially all holders of the Ordinary Shares (directly or in the form of ADSs).

Any increase pursuant to this Section 14.04(d) shall become effective immediately after the close of business on the Record Date for the ADSs for such dividend or distribution. If such dividend or distribution is not so paid, the Conversion Rate shall be decreased, effective as of the date the Board of Directors determines not to make or pay such dividend or distribution, to be the Conversion Rate that would then be in effect if such dividend or distribution had not been declared. Notwithstanding the foregoing, if "C" (as defined above) is equal to or greater than "SP0" (as defined above), in lieu of the foregoing increase, each Holder of a Note shall receive, for each US$1,000 principal amount of Notes, at the same time and upon the same terms as holders of the ADSs, the amount of cash that such Holder would have received if such Holder owned a number of ADSs equal to the Conversion Rate on the Record Date for the ADSs for such cash dividend or distribution.

<div align="center">69</div>

(e) If the Company or any of its Subsidiaries or Consolidated Affiliated Entities makes a payment in respect of a tender or exchange offer for the Ordinary Shares (directly or in the form of ADSs), to the extent that the cash and value of any other consideration included in the payment per Ordinary Share exceeds the average of the Last Reported Sale Prices of the ADSs (*divided by* the number of Ordinary Shares then represented by one ADS) over the 10 consecutive Trading Day period commencing on, and including, the Trading Day next succeeding the date such tender or exchange offer expires, the Conversion Rate shall be increased based on the following formula:

$$CR_1 = CR_0 \times \frac{AC + (SP_1 \times OS_1)}{OS_0 \times SP_1}$$

where,

$CR_0$   =   the Conversion Rate in effect immediately prior to the close of business on the 10th Trading Day immediately following, and including, the Trading Day next succeeding the date such tender or exchange offer expires;

$CR_1$   =   the Conversion Rate in effect immediately after the close of business on the 10th Trading Day immediately following, and including, the Trading Day next succeeding the date such tender or exchange offer expires;

AC   =   the aggregate value of all cash and any other consideration (as determined by the Board of Directors) paid or payable for Ordinary Shares or ADSs, as the case may be, purchased in such tender or exchange offer;

$OS_0$   =   the number of Ordinary Shares outstanding immediately prior to the date such tender or exchange offer expires (prior to giving effect to the purchase of all Ordinary Shares or ADSs, as the case may be, accepted for purchase or exchange in such tender or exchange offer);

$OS_1$   =   the number of Ordinary Shares outstanding immediately after the date such tender or exchange offer expires (after giving effect to the purchase of all Ordinary Shares or ADSs, as the case may be, accepted for purchase or exchange in such tender or exchange offer); and

$SP_1$   =   the average of the Last Reported Sale Prices of the ADSs (*divided by* the number of Ordinary Shares then represented by one ADS) over the 10 consecutive Trading Day period commencing on, and including, the Trading Day next succeeding the date such tender or exchange offer expires.

The adjustment to the Conversion Rate under this Section 14.04(e) shall occur at the close of business on the 10th Trading Day immediately following, and including, the Trading Day next succeeding the date such tender or exchange offer expires; *provided* that in respect of any conversion within the 10 Trading Days immediately following, and including, the Trading Day next succeeding the expiration date of any tender or exchange offer, references in this Section 14.04(e) with respect to 10 Trading Days shall be deemed replaced with such lesser number of Trading Days as have elapsed from, and including, the Trading Day next succeeding the expiration date of such tender or exchange offer to, and including, the Conversion Date in determining the Conversion Rate. For the avoidance of doubt, no adjustment to the Conversion Rate under this Section 14.04(e) shall be made if such adjustment would result in a decrease in the Conversion Rate.

<div align="center">70</div>

(f) [*RESERVED*]

(g) Except as stated herein, the Company shall not adjust the Conversion Rate for the issuance of Ordinary Shares or ADSs or any securities convertible into or exchangeable for Ordinary Shares or ADSs or the right to purchase Ordinary Shares or ADSs or such convertible or exchangeable securities.

(h) In addition to those adjustments required by clauses (a), (b), (c), (d) and (e) of this Section 14.04, and to the extent permitted by applicable law and subject to the applicable rules of The NASDAQ Global Select Market and any other securities exchange on which any of the Company's securities are then listed, the Company from time to time may increase the Conversion Rate by any amount for a period of at least 20 Business Days if the Board of Directors determines that such increase would be in the Company's best interest, and the Company may (but is not required to) increase the Conversion Rate to avoid or diminish any income tax to holders of the Ordinary Shares or the ADSs or rights to purchase Ordinary Shares or ADSs in connection with a dividend or distribution of Ordinary Shares or ADSs (or rights to acquire Ordinary Shares or ADSs) or similar event.

(i) Notwithstanding anything to the contrary in this Article 14, the Conversion Rate shall not be adjusted:

(i) upon the issuance of any Ordinary Shares or ADSs pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on the Company's securities and the investment of additional optional amounts in Ordinary Shares or ADSs under any plan;

(ii) upon the issuance of any Ordinary Shares or ADSs or options or rights to purchase those Ordinary Shares or ADSs pursuant to any present or future employee, director or consultant benefit plan or program of or assumed by the Company or any of the Company's Subsidiaries or Consolidated Affiliated Entities;

(iii) upon the issuance of any Ordinary Shares or ADSs pursuant to any option, warrant, right or exercisable, exchangeable or convertible security not described in clause (ii) of this subsection and outstanding as of the date the Notes were first issued;

(iv) solely for a change in the par value of the Ordinary Shares or ADSs; or

(v) for accrued and unpaid interest, if any.

(j) All calculations and other determinations under this Article 14 shall be made by the Company and shall be made to the nearest one-ten thousandth (1/10,000) of an ADS.

(k) Whenever the Conversion Rate is adjusted as herein provided, the Company shall promptly file with the Trustee (and the Conversion Agent if not the Trustee) an Officers' Certificate setting forth the Conversion Rate after such adjustment and setting forth a brief statement of the facts requiring such adjustment. Unless and until a Responsible Officer of the Trustee shall have received such Officers' Certificate, the Trustee shall not be deemed to have knowledge of any adjustment of the Conversion Rate and may assume without inquiry that the last Conversion Rate of which it has knowledge is still in effect. Promptly after delivery of such certificate, the Company shall prepare a notice of such adjustment of the Conversion Rate setting forth the adjusted Conversion Rate and the date on which each adjustment becomes effective and shall mail such notice of such adjustment of the Conversion Rate to each Holder at its last address appearing on the Note Register of this Indenture. Failure to deliver such notice shall not affect the legality or validity of any such adjustment.

71

(l) For purposes of this Section 14.04, the number of Ordinary Shares at any time outstanding shall not include Ordinary Shares held in the treasury of the Company (directly or in the form of ADSs) so long as the Company does not pay any dividend or make any distribution on Ordinary Shares held in the treasury of the Company (directly or in the form of ADSs), but shall include Ordinary Shares issuable in respect of scrip certificates issued in lieu of fractions of Ordinary Shares.

(m) For purposes of this Section 14.04, the "effective date" means the first date on which the ADSs trade on the applicable exchange or in the applicable market, regular way, reflecting the relevant share split or share combination, as applicable.

Section 14.05. *Adjustments of Prices.* Whenever any provision of this Indenture requires the Company to calculate the Last Reported Sale Prices, the ADS Price for purposes of a Make-Whole Fundamental Change or the Redemption Reference Price for purposes of a redemption of the Notes in connection with a Change in Tax Law over a span of multiple days, the Board of Directors shall make appropriate adjustments to each to account for any adjustment to the Conversion Rate that becomes effective pursuant to Section 14.04, or any event requiring an adjustment to the Conversion Rate pursuant to Section 14.04 where the Record Date, effective date or expiration date, as the case may be, of the event occurs, at any time during the period when such Last Reported Sale Prices or ADS Prices are to be calculated.

Section 14.06. *Ordinary Shares to Be Fully Paid.* The Company shall provide, free from preemptive rights, out of its authorized but unissued Ordinary Shares or Ordinary Shares held in treasury, a sufficient number of Ordinary Shares that corresponds to the number of ADSs due upon conversion of the Notes from time to time as such Notes are presented for conversion (assuming that at the time of computation of such number of Ordinary Shares, all such Notes would be converted by a single Holder).

Section 14.07. *Effect of Recapitalizations, Reclassifications and Changes of the Ordinary Shares.*

(a) In the case of:

(i) any recapitalization, reclassification or change of the Ordinary Shares (other than changes resulting from a subdivision or combination),

(ii) any consolidation, merger, combination or similar transaction involving the Company,

72

(iii) any sale, lease or other transfer to a third party of the consolidated assets of the Company and the Company's Subsidiaries and Consolidated Affiliated Entities substantially as an entirety or

(iv) any statutory share exchange,

in each case, as a result of which the Ordinary Shares would be converted into, or exchanged for, stock, other securities, other property or assets (including cash or any combination thereof) (any such event, a "**Merger Event**"), then, prior to or at the effective time of such Merger Event, the Company or the successor or purchasing Person, as the case may be, shall execute with the Trustee a supplemental indenture permitted under Section 10.01(f) providing that, at and after the effective time of such Merger Event, the right to convert each US$1,000 principal amount of Notes shall be changed into a right to convert such principal amount of Notes into the kind and amount of shares of stock, other securities or other property or assets (including cash or any combination thereof) that a holder of a number of ADSs equal to the Conversion Rate immediately prior to such Merger Event would have owned or been entitled to receive (the "**Reference Property**," with each "**unit of Reference Property**" meaning the kind and amount of Reference Property that a holder of one ADS is entitled to receive) upon such Merger Event; *provided*, *however*, that at and after the effective time of the Merger Event the number of ADSs otherwise deliverable upon conversion of the Notes in accordance with Section 14.02 shall instead be deliverable in the amount and type of Reference Property that a holder of that number of ADSs would have been entitled to receive in such Merger Event.

If the Merger Event causes the Ordinary Shares to be converted into, or exchanged for, the right to receive more than a single type of consideration (determined based in part upon any form of holder election), then (i) the Reference Property into which the Notes will be convertible shall be deemed to be the weighted average of the types and amounts of consideration actually received by the holders of the ADSs and (ii) the unit of Reference Property

for purposes of the immediately preceding paragraph shall refer to the consideration referred to in clause (i) attributable to one ADS. The Company shall provide written notice to Holders, the Trustee and the Conversion Agent (if other than the Trustee) of such weighted average as soon as practicable after such determination is made.

Such supplemental indenture described in the second immediately preceding paragraph shall provide for anti-dilution and other adjustments that shall be as nearly equivalent as is practicable to the adjustments provided for in this Article 14 (it being understood that no such adjustments shall be required with respect to any portion of the Reference Property that does not consist of shares of Common Equity (however evidenced) or depositary receipts in respect thereof). If, in the case of any Merger Event, the Reference Property includes shares of stock, securities or other property or assets (including cash or any combination thereof) of a Person other than the Company or the successor or purchasing Person, as the case may be, in such Merger Event, then such other Person shall also execute such supplemental indenture, and such supplemental indenture shall contain such additional provisions to protect the interests of the Holders of the Notes, including the right of Holders to require the Company to repurchase their Notes upon a Fundamental Change pursuant to Section 15.02 and the right of Holders to require the Company to repurchase their Notes on the Repurchase Date pursuant to Section 15.01, as the Board of Directors shall reasonably consider necessary by reason of the foregoing.

<div align="center">73</div>

(b) [RESERVED]

(c) The Company shall not become a party to any Merger Event unless its terms are consistent with this Section 14.07. None of the foregoing provisions shall affect the right of a holder of Notes to convert its Notes into ADSs as set forth in Section 14.01 and Section 14.02 prior to the effective date of such Merger Event.

(d) The above provisions of this Section shall similarly apply to successive Merger Events.

Section 14.08. *Certain Covenants.* (a) The Company covenants that all ADSs delivered upon conversion of Notes, and all Ordinary Shares represented by such ADSs, will be fully paid and non-assessable by the Company and free from all taxes, liens and charges with respect to the issue thereof.

(b) The Company covenants that, if any ADSs to be provided for the purpose of conversion of Notes hereunder, or any Ordinary Shares represented by such ADSs, require registration with or approval of any governmental authority under any federal or state law before such ADSs may be validly issued upon conversion, the Company will, to the extent then permitted by the rules and interpretations of the Commission, secure such registration or approval, as the case may be.

(c) The Company further covenants that if at any time the ADSs shall be listed on any national securities exchange or automated quotation system the Company will list and keep listed, so long as the ADSs shall be so listed on such exchange or automated quotation system, any ADSs deliverable upon conversion of the Notes.

(d) The Company further covenants to take all actions and obtain all approvals and registrations required with respect to the conversion of the Notes into ADSs and the issuance, and deposit into the ADS facility, of the Ordinary Shares represented by such ADSs. The Company also undertakes to maintain, as long as any Notes are outstanding, the effectiveness of a registration statement on Form F-6 relating to the ADSs and an adequate number of ADSs available for issuance thereunder such that ADSs can be delivered in accordance with the terms of this Indenture, the Notes and the Deposit Agreement upon conversion of the Notes. In addition, the Company further covenants to provide Holders with a reasonably detailed description of the mechanics for the delivery of ADSs upon conversion of Notes as set forth in the Deposit Agreement upon request.

Section 14.09. *Responsibility of Trustee.* The Trustee and any other Conversion Agent shall not at any time be under any duty or responsibility to any Holder to determine the Conversion Rate (or any adjustment thereto) or whether any facts exist that may require any adjustment (including any increase) of the Conversion Rate, or with respect to the nature or extent or calculation of any such adjustment when made, or with respect to the method employed, or herein or in any supplemental indenture provided to be employed, in making the same. The Trustee and any other Conversion Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any ADSs, or of any securities, property or cash that may at any time be issued or delivered upon the conversion of any Note; and the Trustee and any other Conversion Agent make no representations with respect thereto. Neither the Trustee nor any Conversion Agent shall be responsible for any failure of the Company to issue, transfer or deliver any ADSs or stock certificates or other securities or property or cash upon the surrender of any Note for the purpose of conversion, the accuracy or inaccuracy of any mathematical calculation or formulae under this Indenture, whether by the Company or any Person so authorized by the Company for such purpose under this Indenture or the failure by the Company to comply with any of the duties, responsibilities or covenants of the Company contained in this Article. Without limiting the generality of the foregoing, neither the Trustee nor any Conversion Agent shall be under any responsibility to determine the correctness of any provisions contained in any supplemental indenture entered into pursuant to Section 14.07 relating either to the kind or amount of ADSs or securities or property (including cash) receivable by Holders upon the conversion of their Notes after any event referred to in such Section 14.07 or to any adjustment to be made with respect thereto, but, subject to the provisions of Section 7.01, may accept (without any independent investigation) as conclusive evidence of the correctness of any such provisions, and shall be protected in relying upon, the Officers' Certificate (which the Company shall be obligated to file with the Trustee prior to the execution of any such supplemental indenture) with respect thereto.

<div align="center">74</div>

Section 14.10. *Notice to Holders Prior to Certain Actions.* In case of any:

(a) action by the Company or one of its Subsidiaries that would require an adjustment in the Conversion Rate pursuant to Section 14.04 or Section 14.11;

(b) Merger Event; or

(c) voluntary or involuntary dissolution, liquidation or winding-up of the Company or any of its Subsidiaries;

then, in each case (unless notice of such event is otherwise required pursuant to another provision of this Indenture), the Company shall cause to be filed with the Trustee and the Conversion Agent (if other than the Trustee) and to be mailed to each Holder at its address appearing on the Note Register, as promptly as possible but in any event at least 20 days prior to the applicable date hereinafter specified, a notice stating (i) the date on which a record is to be taken for the purpose of such action by the Company or one of its Subsidiaries or, if a record is not to be taken, the date as of which the holders of Ordinary Shares or ADSs, as the case may be, of record are to be determined for the purposes of such action by the Company or one of its Subsidiaries, or (ii) the date on which such Merger Event, dissolution, liquidation or winding-up is expected to become effective or occur, and the date as of which it is expected that holders of Ordinary Shares or ADSs, as the case may be, of record shall be entitled to exchange their Ordinary Shares or ADSs, as the case may be, for securities or other property deliverable upon such Merger Event, dissolution, liquidation or winding-up. Failure to give such notice, or any defect therein, shall not affect the legality or validity of such action by the Company or one of its Subsidiaries, Merger Event, dissolution, liquidation or winding-up.

<div align="center">75</div>

Section 14.11. *Stockholder Rights Plans.* To the extent that the Company has a rights plan in effect upon conversion of the Notes, each ADS delivered upon such conversion shall be entitled to receive (either directly or in respect of the Ordinary Shares underlying such ADSs) the appropriate number of rights, if any, and the certificates representing the ADSs delivered upon such conversion shall bear such legends, if any, in each case as may be provided by the terms of any such stockholder rights plan, as the same may be amended from time to time. However, if, prior to any conversion, the rights have separated from the Ordinary Shares underlying the ADSs in accordance with the provisions of the applicable stockholder rights plan, the Conversion Rate shall be adjusted at the time of separation as if the Company distributed to all or substantially all holders of the Ordinary Shares Distributed Property as provided in Section 14.04(c), subject to readjustment in the event of the expiration, termination or redemption of such rights.

Section 14.12. *Termination of Depositary Receipt Program.* If the Ordinary Shares cease to be represented by American Depositary Shares issued under a depositary receipt program sponsored by the Company, all references in this Indenture to the ADSs shall be deemed to have been replaced by a reference to the number of Ordinary Shares (and other property, if any) represented by the ADSs on the last day on which the ADSs represented the Ordinary Shares and as if the Ordinary Shares and the other property had been distributed to holders of the ADSs on that day. In addition, all references to the Last Reported Sale Price of the ADSs will be deemed to refer to the Last Reported Sale Price of the Ordinary Shares, and other appropriate adjustments, including adjustments to the Conversion Rate, will be made to reflect such change. In making such adjustments, where currency translations between U.S. dollars and any other currency are required, the exchange rate in effect on the date of determination will apply.

<div align="center">ARTICLE 15<br>REPURCHASE OF NOTES AT OPTION OF HOLDERS</div>

Section 15.01. *Repurchase at Option of Holders.*

(a) Each Holder shall have the right, at such Holder's option, to require the Company to repurchase for cash on July 1, 2023 (the "**Repurchase Date**"), all of such Holder's Notes, or any portion thereof that is an integral multiple of US$1,000 principal amount, at a repurchase price (the "**Repurchase Price**") that is equal to 100% of the principal amount of the Notes to be repurchased, *plus* accrued and unpaid interest to, but excluding, the Repurchase Date; *provided* that any such accrued and unpaid interest shall be paid not to the Holders submitting the Notes for repurchase on the Repurchase Date but instead to the Holders of such Notes at the close of business on the Regular Record Date immediately preceding the Repurchase Date. Not later than 20 Business Days prior to the Repurchase Date, the Company shall mail a notice (the "**Company Notice**") by first class mail to the Trustee, to the Paying Agent and to each Holder at its address shown in the Note Register of the Note Registrar (and to beneficial owners as required by applicable law). The Company Notice shall include a form of Repurchase Notice to be completed by a holder and shall state:

(i) the last date on which a Holder may exercise its repurchase right pursuant to this Section 15.01 (the "**Repurchase Expiration Time**");

(ii) the Repurchase Price;

(iii) the Repurchase Date;

<div align="center">76</div>

(iv) the name and address of the Conversion Agent and Paying Agent;

(v) that the Notes with respect to which a Repurchase Notice has been delivered by a Holder may be converted only if the Holder withdraws the Repurchase Notice in accordance with the terms of this Indenture;

(vi) that the Holder shall have the right to withdraw any Notes surrendered prior to the Repurchase Expiration Time; and

(vii) the procedures a Holder must follow to exercise its repurchase rights under this Section 15.01 and a brief description of those rights.

At the Company's request, the Trustee shall give such notice in the Company's name and at the Company's expense; *provided*, *however*, that, in all cases, the text of such Company Notice shall be prepared by the Company.

Simultaneously with providing the Company Notice, the Company shall publish a notice containing the information included in the Company Notice in a newspaper of general circulation in The City of New York or publish such information on the Company's website or through such other public medium as the Company may use at that time.

No failure of the Company to give the foregoing notices and no defect therein shall limit the Holders' repurchase rights or affect the validity of the proceedings for the repurchase of the Notes pursuant to this Section 15.01.

Repurchases of Notes under this Section 15.01 shall be made, at the option of the Holder thereof, upon:

(A) delivery to the Trustee by the Holder of a duly completed notice (the "**Repurchase Notice**") in the form set forth in Attachment 3 to the Form of Note attached hereto as Exhibit A, if the Notes are Physical Notes, or in compliance with the Depositary's procedures for surrendering interests in global notes, if the Notes are Global Notes, in each case during the period beginning at any time from the open of business on the date that is 20 Business Days prior to the Repurchase Date until the close of business on the second Business Day immediately preceding the Repurchase Date; and

(B) delivery of the Notes, if the Notes are Physical Notes, to the Trustee at any time after delivery of the Repurchase Notice (together with all necessary endorsements) at the Corporate Trust Office of the Trustee, or book-entry transfer of the Notes, if the Notes are Global Notes, in compliance with the procedures of the Depositary, in each case such delivery being a condition to receipt by the Holder of the Repurchase Price therefor.

Each Repurchase Notice shall state:

(A) in the case of Physical Notes, the certificate numbers of the Notes to be delivered for repurchase;

77

(B) the portion of the principal amount of the Notes to be repurchased, which must be US$1,000 or an integral multiple thereof; and

(C) that the Notes are to be repurchased by the Company pursuant to the applicable provisions of the Notes and this Indenture;

provided, however, that if the Notes are Global Notes, the Repurchase Notice must comply with appropriate Depositary procedures.

Notwithstanding anything herein to the contrary, any Holder delivering to the Trustee the Repurchase Notice contemplated by this Section 15.01 shall have the right to withdraw, in whole or in part, such Repurchase Notice at any time prior to the close of business on the second Business Day immediately preceding the Repurchase Date by delivery of a duly completed written notice of withdrawal to the Trustee in accordance with Section 15.03.

The Trustee shall promptly notify the Company of the receipt by it of any Repurchase Notice or written notice of withdrawal thereof.

No Repurchase Notice with respect to any Notes may be delivered and no Note may be surrendered for repurchase pursuant to this Section 15.01 by a Holder thereof to the extent such Holder has also delivered a Fundamental Change Repurchase Notice with respect to such Note in accordance with Section 15.02 and not validly withdrawn such Fundamental Change Repurchase Notice in accordance with Section 15.03.

(b) Notwithstanding the foregoing, no Notes may be repurchased by the Company at the option of the Holders on the Repurchase Date if the principal amount of the Notes has been accelerated, and such acceleration has not been rescinded, on or prior to such Repurchase Date (except in the case of an acceleration resulting from a default by the Company in the payment of the Repurchase Price with respect to such Notes). The Trustee will promptly return to the respective Holders thereof any Physical Notes held by it during the acceleration of the Notes (except in the case of an acceleration resulting from a default by the Company in the payment of the Repurchase Price with respect to such Notes), or any instructions for book-entry transfer of the Notes in compliance with the procedures of the Depositary shall be deemed to have been cancelled, and, upon such return or cancellation, as the case may be, the Repurchase Notice with respect thereto shall be deemed to have been withdrawn.

Section 15.02. *Repurchase at Option of Holders Upon a Fundamental Change.* (a) If a Fundamental Change occurs at any time, each Holder shall have the right, at such Holder's option, to require the Company to repurchase for cash all of such Holder's Notes, or any portion thereof that is equal to US$1,000 or an integral multiple of US$1,000, on the Business Day (the "**Fundamental Change Repurchase Date**") notified in writing by the Company as set forth in Section 15.02(c) that is not less than 20 Business Days or more than 35 Business Days following the date of the Fundamental Change Company Notice at a repurchase price equal to 100% of the principal amount thereof, *plus* accrued and unpaid interest thereon to, but excluding, the Fundamental Change Repurchase Date (the "**Fundamental Change Repurchase Price**"), unless the Fundamental Change Repurchase Date falls after a Regular Record Date but on or prior to the Interest Payment Date to which such Regular Record Date relates, in which case the Company shall instead pay the full amount of accrued and unpaid interest to Holders of record as of such Regular Record Date, and the Fundamental Change Repurchase Price shall be equal to 100% of the principal amount of Notes to be repurchased pursuant to this Article 15.

78

(b) Repurchases of Notes under this Section 15.02 shall be made, at the option of the Holder thereof, upon:

(i) delivery to the Trustee by a Holder of a duly completed notice (the "**Fundamental Change Repurchase Notice**") in the form set forth in Attachment 2 to the Form of Note attached hereto as Exhibit A, if the Notes are Physical Notes, or in compliance with the Depositary's procedures for surrendering interests in global notes, if the Notes are Global Notes, in each case on or before the close of business on the second Business Day immediately preceding the Fundamental Change Repurchase Date; and

(ii) delivery of the Notes, if the Notes are Physical Notes, to the Trustee at any time after delivery of the Fundamental Change Repurchase Notice (together with all necessary endorsements for transfer) at the Corporate Trust Office, or book-entry transfer of the Notes, if the Notes are Global Notes, in compliance with the procedures of the Depositary, in each case such delivery being a condition to receipt by the Holder of the Fundamental Change Repurchase Price therefor.

The Fundamental Change Repurchase Notice in respect of any Notes to be repurchased shall state:

(i) in the case of Physical Notes, the certificate numbers of the Notes to be delivered for repurchase;

(ii) the portion of the principal amount of Notes to be repurchased, which must be US$1,000 or an integral multiple thereof; and

(iii) that the Notes are to be repurchased by the Company pursuant to the applicable provisions of the Notes and this Indenture;

provided, however, that if the Notes are Global Notes, the Fundamental Change Repurchase Notice must comply with appropriate Depositary procedures.

Notwithstanding anything herein to the contrary, any Holder delivering to the Trustee the Fundamental Change Repurchase Notice contemplated by this Section 15.02 shall have the right to withdraw, in whole or in part, such Fundamental Change Repurchase Notice at any time prior to the close of business on the second Business Day immediately preceding the Fundamental Change Repurchase Date by delivery of a written notice of withdrawal to the Trustee in accordance with Section 15.03.

The Trustee shall promptly notify the Company of the receipt by it of any Fundamental Change Repurchase Notice or written notice of withdrawal thereof.

No Fundamental Change Repurchase Notice with respect to any Notes may be delivered and no Note may be surrendered by a Holder for repurchase thereof if such Holder has also surrendered a Repurchase Notice in accordance with Section 15.01 and not validly withdrawn such Repurchase Notice in accordance with Section 15.03.

<div align="center">79</div>

(c) On or before the 20th calendar day after the occurrence of the effective date of a Fundamental Change, the Company shall provide to all Holders and the Trustee a written notice (the "**Fundamental Change Company Notice**") of the occurrence of the effective date of the Fundamental Change and of the repurchase right at the option of the Holders arising as a result thereof. In the case of Physical Notes, such notice shall be by first class mail or, in the case of Global Notes, such notice shall be delivered in accordance with the applicable procedures of the Depositary. Simultaneously with providing such notice, the Company shall publish a notice containing the information set forth in the Fundamental Change Company Notice in a newspaper of general circulation in The City of New York or publish such information on the Company's website or through such other public medium as the Company may use at that time. Each Fundamental Change Company Notice shall specify:

(i) the events causing the Fundamental Change;

(ii) the date of the Fundamental Change;

(iii) the last date on which a Holder may exercise the repurchase right pursuant to this Article 15;

(iv) the Fundamental Change Repurchase Price;

(v) the Fundamental Change Repurchase Date;

(vi) the name and address of the Trustee;

(vii) if applicable, the Conversion Rate and any adjustments to the Conversion Rate;

(viii) that the Notes with respect to which a Fundamental Change Repurchase Notice has been delivered by a Holder may be converted only if the Holder withdraws the Fundamental Change Repurchase Notice in accordance with the terms of this Indenture; and

(ix) the procedures that Holders must follow to require the Company to repurchase their Notes.

No failure of the Company to give the foregoing notices and no defect therein shall limit the Holders' repurchase rights or affect the validity of the proceedings for the repurchase of the Notes pursuant to this Section 15.02.

At the Company's request, the Trustee shall give such notice in the Company's name and at the Company's expense; *provided*, *however*, that, in all cases, the text of such Fundamental Change Company Notice shall be prepared by the Company.

<div align="center">80</div>

(d) Notwithstanding the foregoing, no Notes may be repurchased by the Company on any date at the option of the Holders upon a Fundamental Change if the principal amount of the Notes has been accelerated, and such acceleration has not been rescinded, on or prior to such date (except in the case of an acceleration resulting from a default by the Company in the payment of the Fundamental Change Repurchase Price with respect to such Notes). The Trustee will promptly return to the respective Holders thereof any Physical Notes held by it during the acceleration of the Notes (except in the case of an acceleration resulting from a default by the Company in the payment of the Fundamental Change Repurchase Price with respect to such Notes), or any instructions for book-entry transfer of the Notes in compliance with the procedures of the Depositary shall be deemed to have been cancelled, and, upon such return or cancellation, as the case may be, the Fundamental Change Repurchase Notice with respect thereto shall be deemed to have been withdrawn.

Section 15.03. *Withdrawal of Repurchase Notice or Fundamental Change Repurchase Notice.* (a) A Repurchase Notice or Fundamental Change Repurchase Notice may be withdrawn (in whole or in part) by means of a duly completed written notice of withdrawal delivered to the Corporate Trust Office in accordance with this Section 15.03 at any time prior to the close of business on the second Business Day immediately preceding the Repurchase Date or prior to the close of business on the second Business Day immediately preceding the Fundamental Change Repurchase Date, as the case may be, specifying:

(i) the principal amount of the Notes with respect to which such notice of withdrawal is being submitted,

(ii) if Physical Notes have been issued, the certificate number of the Note in respect of which such notice of withdrawal is being submitted, and

(iii) the principal amount, if any, of such Note that remains subject to the original Repurchase Notice or Fundamental Change Repurchase Notice, as the case may be, which portion must be in principal amounts of US$1,000 or an integral multiple of US$1,000;

*provided*, *however*, that if the Notes are Global Notes, the notice must comply with appropriate procedures of the Depositary.

Section 15.04. *Deposit of Repurchase Price or Fundamental Change Repurchase Price.* (a) The Company will deposit with the Trustee (or other Paying Agent appointed by the Company, or if the Company is acting as its own Paying Agent, set aside, segregate and hold in trust as provided in

Section 4.04) on or prior to 10:00 a.m., New York City time, on the Repurchase Date or Fundamental Change Repurchase Date, as the case may be, an amount of money sufficient to repurchase all of the Notes to be repurchased at the appropriate Repurchase Price or Fundamental Change Repurchase Price. Subject to receipt of funds and/or Notes by the Trustee (or other Paying Agent appointed by the Company), payment for Notes surrendered for repurchase (and not withdrawn in accordance with Section 15.03) will be made on the later of (i) the Repurchase Date or Fundamental Change Repurchase Date, as the case may be, (*provided* the Holder has satisfied the conditions in Section 15.01 or Section 15.02, as the case may be) and (ii) the time of book-entry transfer or the delivery of such Note to the Trustee (or other Paying Agent appointed by the Company) by the Holder thereof in the manner required by Section 15.01 or Section 15.02, as applicable, by mailing checks for the amount payable to the Holders of such Notes entitled thereto as they shall appear in the Note Register; *provided*, *however*, that payments to the Depositary shall be made by wire transfer of immediately available funds to the account of the Depositary or its nominee. The Trustee shall, promptly after such payment and upon written demand by the Company, return to the Company any funds in excess of the Repurchase Price or Fundamental Change Repurchase Price, as the case may be.

81

(b) If by 10:00 a.m., New York City time, on the Repurchase Date or Fundamental Change Repurchase Date, as the case may be, the Trustee (or other Paying Agent appointed by the Company) holds money sufficient to make payment on all the Notes or portions thereof that are to be repurchased on such Repurchase Date or Fundamental Change Repurchase Date, as the case may be, then, with respect to the Notes that have been properly surrendered for repurchase and not validly withdrawn, on such Repurchase Date or Fundamental Change Repurchase Date, as the case may be, (i) such Notes will cease to be outstanding, (ii) interest will cease to accrue on such Notes (whether or not book-entry transfer of the Notes has been made or the Notes have been delivered to the Trustee or Paying Agent) and (iii) all other rights of the Holders of such Notes will terminate (other than the right to receive the Repurchase Price or Fundamental Change Repurchase Price, as the case may be).

(c) Upon surrender of a Note that is to be repurchased in part pursuant to Section 15.01 or Section 15.02, the Company shall execute and instruct the Trustee who shall authenticate and deliver to the Holder a new Note in an authorized denomination equal in principal amount to the unrepurchased portion of the Note surrendered.

Section 15.05. *Covenant to Comply with Applicable Laws Upon Repurchase of Notes*. In connection with any repurchase offer, the Company will, if required:

(a) comply with the provisions of Rule 13e-4, Rule 14e-1 and any other tender offer rules under the Exchange Act;

(b) file a Schedule TO or other required schedule under the Exchange Act; and

(c) otherwise comply with all federal and state securities laws in connection with any offer by the Company to repurchase the Notes;

in each case, so as to permit the rights and obligations under this Article 15 to be exercised in the time and in the manner specified in this Article 15.

ARTICLE 16
OPTIONAL REDEMPTION

Section 16.01. *Optional Redemption for Changes in the Tax Law of the Relevant Taxing Jurisdiction*. Other than as described in this Article 16, the Notes may not be redeemed by the Company at its option prior to maturity. If the Company has, or on the next Interest Payment Date would, become obligated to pay to the Holder of any Note Additional Amounts that are more than a *de minimis* amount, as a result of:

(a) any change or amendment on or after June 26, 2018 (or, in the case of a jurisdiction that becomes a Relevant Taxing Jurisdiction after such date, after such later date) in the laws or any rules or regulations of a Relevant Taxing Jurisdiction; or

82

(b) any change on or after June 26, 2018 (or, in the case of a jurisdiction that becomes a Relevant Taxing Jurisdiction after such date, after such later date) in an interpretation, administration or application of such laws, rules or regulations by any legislative body, court, governmental agency, taxing authority or regulatory or administrative authority of such Relevant Taxing Jurisdiction (including the enactment of any legislation and the announcement or publication of any judicial decision or regulatory or administrative interpretation or determination);

(each, a "**Change in Tax Law**"), the Company may, at its option, redeem all but not part of the Notes (except in respect of certain Holders that elect otherwise as described below) at a "**Redemption Price**" equal to 100% of the principal amount plus accrued and unpaid interest, if any, to, but not including the date on which the Notes are redeemed (the "**Redemption Date**"), including, for the avoidance of doubt, any Additional Amounts with respect to such Redemption Price; *provided* that the Company may only redeem the Notes if: (i) the Company cannot avoid such obligations by taking commercially reasonable measures available to the Company (*provided* that changing the jurisdiction of incorporation of the Company shall be deemed not to be a commercially reasonable measure); and (ii) the Company delivers to the Trustee an opinion of outside legal counsel of recognized standing in the Relevant Taxing Jurisdiction and an Officers' Certificate attesting to such Change in Tax Law and obligation to pay Additional Amounts.

Notwithstanding anything to the contrary in this Article 16, neither the Company nor any successor Person may redeem any of the Notes in the case that Additional Amounts are payable in respect of PRC withholding tax at the Applicable PRC Rate or less solely as a result of the Company or its successor Person being considered a PRC tax resident under the PRC Enterprise Income Tax law.

If the Redemption Date occurs after a Regular Record Date and on or prior to the corresponding Interest Payment Date, the Company shall pay the full amount of accrued and unpaid interest, if any, due on such Interest Payment Date to the record holder of the Notes on the Regular Record Date corresponding to such Interest Payment Date, and the Redemption Price payable to the Holder who presents a Note for redemption shall be equal to 100% of the principal amount of such Note, including, for the avoidance of doubt, any Additional Amounts with respect to such Redemption Price.

The Company shall give Holders of Notes not less than 30 days' but no more than 60 days' notice prior to the Redemption Date. Simultaneously with providing such notice, the Company shall publish a notice containing this information in a newspaper of general circulation in The City of New York or publish the information on the Company's website or through such other public medium as the Company may use at that time. The Redemption Date must be a Business Day.

<div align="center">83</div>

Upon receiving such notice of redemption, each Holder shall have the right to elect to not have its Notes redeemed, in which case the Company shall not be obligated to pay any Additional Amounts on any payment with respect to such Notes solely as a result of such Change in Tax Law that resulted in the obligation to pay such Additional Amounts (whether upon conversion, required repurchase in connection with a Fundamental Change or the Repurchase Date, maturity or otherwise, and whether in ADSs, Reference Property or otherwise) after the Redemption Date (or, if the Company fails to pay the Redemption Price on the Redemption Date, such later date on which the Company pays the Redemption Price), and all future payments with respect to such Notes shall be subject to the deduction or withholding of such Relevant Taxing Jurisdiction and taxes required by law to be deducted or withheld as a result of such Change in Tax Law; *provided* that, notwithstanding the foregoing, if a Holder electing not to have its Notes redeemed converts its Notes in connection with the Company's election to redeem the Notes in respect of such Change in Tax Law pursuant to Section 14.03(g) the Company shall be obligated to pay Additional Amounts, if any, with respect to such conversion.

A Holder electing to not have its Notes redeemed must deliver to the Paying Agent a written notice of election so as to be received by the Paying Agent prior to the close of business on the second Business Day immediately preceding the Redemption Date; *provided* that, a Holder that complies with the requirements for conversion in Section 14.02(b) shall be deemed to have delivered a notice of its election to not have its Notes so redeemed. A Holder may withdraw any notice of election (other than such a deemed notice of election in connection with a conversion) by delivering to the Paying Agent a written notice of withdrawal prior to the close of business on the Business Day immediately preceding the Redemption Date (or, if the Company fail to pay the Redemption Price on the Redemption Date, such later date on which the Company pays the Redemption Price). If no election is made or deemed to have been made, the Holder shall have its Notes redeemed without any further action.

No Notes may be redeemed if the principal amount of the Notes has been accelerated, and such acceleration has not been rescinded, on or prior to such date.

<div align="center">ARTICLE 17<br>MISCELLANEOUS PROVISIONS</div>

Section 17.01. *Provisions Binding on Company's Successors.* All the covenants, stipulations, promises and agreements of the Company contained in this Indenture shall bind its successors and assigns whether so expressed or not.

Section 17.02. *Official Acts by Successor Corporation.* Any act or proceeding by any provision of this Indenture authorized or required to be done or performed by any board, committee or Officer of the Company shall and may be done and performed with like force and effect by the like board, committee or officer of any corporation or other entity that shall at the time be the lawful sole successor of the Company.

Section 17.03. *Addresses for Notices, Etc.* Any notice or demand that by any provision of this Indenture is required or permitted to be given or served by the Trustee or by the Holders on the Company shall be deemed to have been sufficiently given or made, for all purposes if given or served by being deposited postage prepaid by registered or certified mail in a post office letter box addressed (until another address is filed by the Company with the Trustee) to Momo Inc., 20th Floor, Block B, Tower 2, Wangjing SOHO, No. 1 Futongdong Street, Chaoyang District, Beijing 100102, People's Republic of China, Attention: General Counsel. Any notice, direction, request or demand hereunder to or upon the Trustee shall be given or served by being deposited postage prepaid by registered or certified mail in a post office letter box addressed to the 101 Barclay Street, Floor 4E, New York, NY 10286, USA, Facsimile No.: +1 212 815 5915, Attention: Global Corporate Trust – Momo Inc. with a copy to The Bank of New York Mellon, Hong Kong Branch, Level 24, Three Pacific Place, 1 Queen's Road East, Hong Kong, Facsimile No.: +852-2295.3283, Attention: Corporate Trust – Momo Inc.

<div align="center">84</div>

So long as and to the extent that the Notes are represented by Global Notes and such Global Notes are held by DTC, notices to owners of beneficial interests in the global notes may be given by delivery of the relevant notice to DTC for communication by it to entitled account holders.

The Trustee, by notice to the Company, may designate additional or different addresses for subsequent notices or communications.

Any notice or communication mailed to a Holder shall be mailed to it by first class mail, postage prepaid, at its address as it appears on the Note Register and shall be sufficiently given to it if so mailed within the time prescribed.

Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders. If a notice or communication is mailed in the manner provided above, it is duly given, whether or not the addressee receives it.

In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice to Holders by mail, then such notification as shall be made with the approval of the Trustee shall constitute a sufficient notification for every purpose hereunder.

Section 17.04. *Governing Law; Jurisdiction.* THIS INDENTURE AND EACH NOTE, AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS INDENTURE AND EACH NOTE, SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

The Company irrevocably consents and agrees, for the benefit of the Holders from time to time of the Notes and the Trustee, that any legal action, suit or proceeding against it with respect to obligations, liabilities or any other matter arising out of or in connection with this Indenture or the Notes may

be brought in the courts of the State of New York or the courts of the United States located in the Borough of Manhattan, New York City, New York and, until amounts due and to become due in respect of the Notes have been paid, hereby irrevocably consents and submits to the non-exclusive jurisdiction of each such court *in personam*, generally and unconditionally with respect to any action, suit or proceeding for itself in respect of its properties, assets and revenues.

85

The Company irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions, suits or proceedings arising out of or in connection with this Indenture brought in the courts of the State of New York or the courts of the United States located in the Borough of Manhattan, New York City, New York and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

Section 17.05. *Submission to Jurisdiction; Service of Process.* The Company irrevocably appoints Law Debenture Corporate Service Inc. as its authorized agent in the Borough of Manhattan in the City of New York upon which process may be served in any such suit or proceeding, and agrees that service of process upon such agent, and written notice of said service to the Company by the person serving the same to Momo Inc., 20th Floor, Block B, Tower 2, Wangjing SOHO, No. 1 Futongdong Street, Chaoyang District, Beijing 100102, People's Republic of China, Attention: General Counsel, shall be deemed in every respect effective service of process upon the Company in any such suit or proceeding. The Company further agrees to take any and all action as may be necessary to maintain such designation and appointment of such agent in full force and effect for a period of five and a half years from the date of this Indenture. If for any reason such agent shall cease to be such agent for service of process, the Company shall forthwith appoint a new agent of recognized standing for service of process in the State of New York and deliver to the Trustee a copy of the new agent's acceptance of that appointment within ten Business Days of such acceptance. Nothing herein shall affect the right of the Trustee, any agent or any Holder to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against the Company in any other court of competent jurisdiction. To the extent that the Company has or hereafter may acquire any sovereign or other immunity from jurisdiction of any court or from any legal process with respect to itself or its property, the Company irrevocably waives such immunity in respect of its obligations hereunder or under any Note.

Section 17.06. *Evidence of Compliance with Conditions Precedent; Certificates and Opinions of Counsel to Trustee.* Upon any application or demand by the Company to the Trustee to take any action under any of the provisions of this Indenture, the Company shall, if requested by the Trustee, furnish to the Trustee an Officers' Certificate stating that such action is permitted by the terms of this Indenture.

Each Officers' Certificate provided for, by or on behalf of the Company in this Indenture and delivered to the Trustee with respect to compliance with this Indenture (other than the Officers' Certificates provided for in Section 4.09) shall include (a) a statement that the person making such certificate is familiar with the requested action and this Indenture; (b) a brief statement as to the nature and scope of the examination or investigation upon which the statement contained in such certificate is based; (c) a statement that, in the judgment of such person, he or she has made such examination or investigation as is necessary to enable him or her to express an informed judgment as to whether or not such action is permitted by this Indenture; and (d) a statement as to whether or not, in the judgment of such person, such action is permitted by this Indenture.

Notwithstanding anything to the contrary in this Section 17.06, if any provision in this Indenture specifically provides that the Trustee shall or may receive an Opinion of Counsel in connection with any action to be taken by the Trustee or the Company hereunder, the Trustee shall be entitled to, or entitled to request, such Opinion of Counsel.

86

Section 17.07. *Legal Holidays.* In any case where any Interest Payment Date, Fundamental Change Repurchase Date, Conversion Date, Repurchase Date or Maturity Date is not a Business Day, then any action to be taken on such date need not be taken on such date, but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, and no interest shall accrue in respect of the delay.

Section 17.08. *No Security Interest Created.* Nothing in this Indenture or in the Notes, expressed or implied, shall be construed to constitute a security interest under the Uniform Commercial Code or similar legislation, as now or hereafter enacted and in effect, in any jurisdiction.

Section 17.09. *Benefits of Indenture.* Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the Holders, the parties hereto, any Paying Agent, any Conversion Agent, any Note Registrar and their successors hereunder, any benefit or any legal or equitable right, remedy or claim under this Indenture.

Section 17.10. *Table of Contents, Headings, Etc.* The table of contents and the titles and headings of the articles and sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part hereof, and shall in no way modify or restrict any of the terms or provisions hereof.

Section 17.11. *Execution in Counterparts.* This Indenture may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute but one and the same instrument.

Section 17.12. *Severability.* In the event any provision of this Indenture or in the Notes shall be invalid, illegal or unenforceable, then (to the extent permitted by law) the validity, legality or enforceability of the remaining provisions shall not in any way be affected or impaired.

Section 17.13. *Waiver of Jury Trial.* EACH OF THE COMPANY AND THE TRUSTEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 17.14. *Force Majeure.* In no event shall the Trustee or the Agents be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages,

accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustee or the Agents, as the case may be, shall use reasonable efforts that are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

87

Section 17.15. *Calculations*. Except as otherwise provided herein, the Company shall be responsible for making all calculations called for under the Notes. These calculations include, but are not limited to, determinations of the Last Reported Sale Prices of the ADSs, accrued interest payable on the Notes, the number of Additional ADSs to be added to the Conversion Rate upon a Make-Whole Fundamental Change, if any, and the Conversion Rate of the Notes. The Company shall make all these calculations in good faith and, absent manifest error, the Company's calculations shall be final and binding on Holders. The Company shall provide a schedule of its calculations to each of the Trustee, the Paying Agent and the Conversion Agent, and each of the Trustee, the Paying Agent and the Conversion Agent is entitled to rely conclusively and without liability upon the accuracy of the Company's calculations without independent verification. The Trustee will forward the Company's calculations to any Holder of Notes upon the request of that Holder at the sole cost and expense of the Company.

[*Remainder of page intentionally left blank*]

88

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the date first written above.

MOMO INC.

By:    /s/ Jonathan Xiaosong Zhang
Name:  Jonathan Xiaosong Zhang
Title:   Chief Financial Officer

THE BANK OF NEW YORK MELLON,
   as Trustee

By:
Name:
Title:

[Signature Page—Indenture]

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the date first written above.

MOMO INC.

By:
Name:
Title:

THE BANK OF NEW YORK MELLON,
   as Trustee

By:    /s/ Eva Tam
Name:  Eva Tam
Title:   Vice President

[*Signature Page to Indenture*]

**EXHIBIT A**

[FORM OF FACE OF NOTE]

[INCLUDE FOLLOWING LEGEND IF A GLOBAL NOTE]

[UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.]

[INCLUDE FOLLOWING LEGEND IF A RESTRICTED SECURITY]

[THIS SECURITY, THE AMERICAN DEPOSITARY SHARES DELIVERABLE UPON CONVERSION OF THIS SECURITY AND THE ORDINARY SHARES REPRESENTED THEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER:

(1) REPRESENTS THAT IT AND ANY ACCOUNT FOR WHICH IT IS ACTING IS (A) A "QUALIFIED INSTITUTIONAL BUYER" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) OR (B) NOT A U.S. PERSON AND LOCATED OUTSIDE THE UNITED STATES (WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT) AND THAT IT EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO EACH SUCH ACCOUNT AND THAT IT AND ANY SUCH ACCOUNT IS NOT AN AFFILIATE OF MOMO INC. (THE "**COMPANY**"), AND

(2) AGREES FOR THE BENEFIT OF THE COMPANY THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS SECURITY OR ANY BENEFICIAL INTEREST HEREIN PRIOR TO THE DATE THAT IS THE LATER OF (X) ONE YEAR AFTER THE LAST ORIGINAL ISSUE DATE HEREOF OR SUCH SHORTER PERIOD OF TIME AS PERMITTED BY RULE 144 UNDER THE SECURITIES ACT OR ANY SUCCESSOR PROVISION THERETO AND (Y) SUCH LATER DATE, IF ANY, AS MAY BE REQUIRED BY APPLICABLE LAW, EXCEPT:

(A) TO THE COMPANY OR ANY SUBSIDIARY THEREOF, OR

A-1

(B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT, OR

(C) TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, OR

(D) TO A NON-U.S. PERSON LOCATED OUTSIDE THE UNITED STATES IN ACCORDANCE WITH REGULATION S UNDER THE SECURITIES ACT, OR

(E) PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE).

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH (2)(E) ABOVE, THE COMPANY, THE DEPOSITARY AND THE TRUSTEE RESERVE THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

NO AFFILIATE (AS DEFINED IN RULE 144 UNDER THE SECURITIES ACT) OF THE COMPANY OR PERSON THAT HAS BEEN AN AFFILIATE (AS DEFINED IN RULE 144 UNDER THE SECURITIES ACT) OF THE COMPANY DURING THE THREE IMMEDIATELY PRECEDING MONTHS MAY PURCHASE, OTHERWISE ACQUIRE OR OWN THIS NOTE OR A BENEFICIAL INTEREST HEREIN.]

A-2

MOMO INC.

1.25% Convertible Senior Note due 2025

No. [          ]                                                     [Initially]¹ US$

CUSIP No. [                    ]

Momo Inc., a company duly organized and validly existing under the laws of the Cayman Islands (the "**Company**," which term includes any successor company or corporation or other entity under the Indenture referred to on the reverse hereof), for value received hereby promises to pay to [CEDE & CO.]² [          ]³, or registered assigns, the principal sum [as set forth in the "Schedule of Exchanges of Notes" attached hereto]⁴ [of US$[          ]]⁵, which amount, taken together with the principal amounts of all other outstanding Notes, shall not, unless permitted by the Indenture, exceed US$650,000,000 in aggregate at any time (or US$750,000,000 if the Initial Purchasers exercise their option to purchase additional Notes in full as set forth in the Purchase Agreement), in accordance with the rules and procedures of the Depositary, on July 1, 2025, and interest thereon as set forth below.

This Note shall bear cash interest at the rate of 1.25% per year from July 2, 2018, or from the most recent date to which interest had been paid or provided for to, but excluding, the next scheduled Interest Payment Date until July 1, 2025. Interest is payable semi-annually in arrears on each January 1 and July 1, commencing on January 1, 2019, to Holders of record at the close of business on the preceding December 15 and June 15 (whether or not such day is a Business Day), respectively. Additional Interest will be payable as set forth in Section 4.06(d), Section 4.06(e) and Section 6.03 of the within-mentioned Indenture, and any reference to interest on, or in respect of, any Note therein shall be deemed to include Additional Interest if, in such context, Additional Interest is, was or would be payable pursuant to any of such Section 4.06(d), Section 4.06(e) and Section 6.03, and any express mention of the payment of Additional Interest in any provision therein shall not be construed as excluding Additional Interest in those provisions thereof where such express mention is not made.

Any Defaulted Amounts shall accrue interest per annum at the rate per annum borne by the Notes *plus* one percent, subject to the enforceability thereof under applicable law, from, and including, the relevant payment date to, but excluding, the date on which such Defaulted Amounts shall have been paid by the Company, at its election, in accordance with Section 2.03(c) of the Indenture.

1    Include if a Global Note.
2    Include if a Global Note.
3    Include if a Physical Note.
4    Include if a Global Note.
5    Include if a Physical note.

A-3

The Company shall pay the principal of and interest on this Note, so long as such Note is a Global Note, in immediately available funds to the Depositary or its nominee, as the case may be, as the registered Holder of such Note. As provided in and subject to the provisions of the Indenture, the Company shall pay the principal of any Notes (other than Notes that are Global Notes) at the office or agency designated by the Company for that purpose. The Company has initially designated the Bank of New York Mellon as its Paying Agent, Conversion Agent and Note Registrar in respect of the Notes and its agency in the Borough of Manhattan, The City of New York, as a place where Notes may be presented for payment or for registration of transfer.

Reference is made to the further provisions of this Note set forth on the reverse hereof, including, without limitation, provisions giving the Holder of this Note the right to convert this Note into ADSs on the terms and subject to the limitations set forth in the Indenture. Such further provisions shall for all purposes have the same effect as though fully set forth at this place.

**This Note, and any claim, controversy or dispute arising under or related to this Note, shall be construed in accordance with and governed by the laws of the State of New York (without regard to the conflicts of laws provisions thereof).**

In the case of any conflict between this Note and the Indenture, the provisions of the Indenture shall control and govern.

This Note shall not be valid or become obligatory for any purpose until the certificate of authentication hereon shall have been signed manually or by facsimile by the Trustee under the Indenture.

[*Remainder of page intentionally left blank*]

A-4

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed.

MOMO INC.

By: _____
Name:
Title:

A-5

Dated:

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

THE BANK OF NEW YORK MELLON
as Trustee, certifies that this is one of the Notes described
in the within-named Indenture.

By:
Name:
Title:

A-6

[FORM OF REVERSE OF NOTE]

MOMO INC.
1.25% Convertible Senior Note due 2025

This Note is one of a duly authorized issue of Notes of the Company, designated as its 1.25% Convertible Senior Notes due 2025 (the "**Notes**"), limited to the aggregate principal amount of US$650,000,000 (as increased by an amount equal to the aggregate principal amount of any additional Notes purchased by the Initial Purchasers pursuant to the exercise of their option to purchase additional Notes as set forth in the Purchase Agreement), subject to Section 2.10 of the Indenture, all issued or to be issued under and pursuant to an Indenture dated as of July 2, 2018 (the "**Indenture**"), between the Company and The Bank of New York Mellon, as trustee (the "**Trustee**"), to which Indenture and all indentures supplemental thereto reference is hereby made for a description of the rights, limitations of rights, obligations, duties, privileges, disclaimers from liability and immunities thereunder of the Trustee, the Company and the Holders of the Notes. Additional Notes may be issued in an unlimited aggregate principal amount, subject to certain conditions specified in the Indenture. The Rule 144A Notes and the Regulation S Notes initially have separate CUSIP numbers and will initially not be fungible.

In the case certain Events of Default, as defined in the Indenture, shall have occurred and be continuing, the principal of, and interest on, all Notes may be declared, by either the Trustee or Holders of at least 25% in aggregate principal amount of Notes then outstanding, and upon said declaration shall become, due and payable, in the manner, with the effect and subject to the conditions and certain exceptions set forth in the Indenture. In the case certain Events of Default relating to a bankruptcy (or similar proceeding) with respect to the Company or a Significant Subsidiary of the Company shall have occurred, the principal of, and interest on, all Notes shall automatically become immediately due and payable, as set forth in the Indenture.

Subject to the terms and conditions of the Indenture, the Company will make all payments in respect of the principal amount on the Maturity Date, the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, as the case may be, to the Holder who surrenders a Note to collect such payments in respect of the Note. The Company will pay cash amounts in money of the United States that at the time of payment is legal tender for payment of public and private debts.

Subject to the terms and conditions of the Indenture, Additional Amounts will be paid in connection with any payments made and deliveries caused to be made by the Company or any successor to the Company under or with respect to the Indenture and the Notes, including, but not limited to, payments of principal (including, if applicable, the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price), payments of interest and deliveries of ADSs (together with payments for any Fractional ADS) upon conversion of the Notes to ensure that the net amount received by the beneficial owner after any applicable withholding or deduction (and after deducting any taxes on the Additional Amounts) will equal the amount that would have been received by such beneficial owner had no such withholding or deduction been required.

A-7

The Indenture contains provisions permitting the Company and the Trustee in certain circumstances, without the consent of the Holders of the Notes, and in certain other circumstances, with the consent of the Holders of not less than a majority in aggregate principal amount of the Notes at the time outstanding, evidenced as in the Indenture provided, to execute supplemental indentures modifying the terms of the Indenture and the Notes as described therein. It is also provided in the Indenture that, subject to certain exceptions, the Holders of a majority in aggregate principal amount of the Notes at the time outstanding may on behalf of the Holders of all of the Notes waive any past Default or Event of Default under the Indenture and its consequences.

No reference herein to the Indenture and no provision of this Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay or cause to be delivered, as the case may be, the principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, accrued and unpaid interest on, and the consideration due upon conversion of, this Note at the place, at the respective times, at the rate and in the lawful money herein prescribed.

The Notes are issuable in registered form without interest coupons in denominations of US$1,000 principal amount and integral multiples thereof. At the office or agency of the Company referred to on the face hereof, and in the manner and subject to the limitations provided in the Indenture, Notes may be exchanged for a like aggregate principal amount of Notes of other authorized denominations, without payment of any service charge but, if required by the Company or Trustee, with payment of a sum sufficient to cover any transfer or similar tax that may be imposed in connection therewith as a result of the name of the Holder of the new Notes issued upon such exchange of Notes being different from the name of the Holder of the old Notes surrendered for such exchange.

The Company may not redeem the Notes prior to the Maturity Date, except in the event of certain Changes in Tax Law as described in Section 16.01 of the Indenture. No sinking fund is provided for the Notes.

The Holder has the right, at such Holder's option, to require the Company to repurchase for cash all of such Holder's Notes or any portion thereof (in principal amounts of US$1,000 or integral multiples thereof) on the Repurchase Date at a price equal to the Repurchase Price.

Upon the occurrence of a Fundamental Change, the Holder has the right, at such Holder's option, to require the Company to repurchase for cash all of such Holder's Notes or any portion thereof (in principal amounts of US$1,000 or integral multiples thereof) on the Fundamental Change Repurchase Date at a price equal to the Fundamental Change Repurchase Price.

Subject to the provisions of the Indenture, the Holder hereof has the right, at its option, prior to the close of business on the second Business Day immediately preceding the Maturity Date, to convert any Notes or portion thereof that is US$1,000 principal amount of Notes or an integral multiple thereof, into ADSs at the Conversion Rate specified in the Indenture, as adjusted from time to time as provided in the Indenture.

Terms used in this Note and defined in the Indenture are used herein as therein defined.

A-8

ABBREVIATIONS

The following abbreviations, when used in the inscription of the face of this Note, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM = as tenants in common

UNIF GIFT MIN ACT = Uniform Gifts to Minors Act

CUST = Custodian

TEN ENT = as tenants by the entireties

JT TEN = joint tenants with right of survivorship and not as tenants in common

Additional abbreviations may also be used though not in the above list.

A-9

SCHEDULE A[6]

SCHEDULE OF EXCHANGES OF NOTES

MOMO INC.
1.25% Convertible Senior Notes due 2025

The initial principal amount of this Global Note is [          ] UNITED STATES DOLLARS (US$[          ]). The following increases or decreases in this Global Note have been made:

| Date of exchange | Amount of decrease in principal amount of this Global Note | Amount of increase in principal amount of this Global Note | Principal amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

---

6    Include if a global note.

A-10

**ATTACHMENT 1**

[FORM OF NOTICE OF CONVERSION]

To: MOMO INC.

THE BANK OF NEW YORK MELLON, as Conversion Agent

DEUTSCHE BANK TRUST COMPANY AMERICAS, as ADS Depositary

The undersigned registered owner of this Note hereby exercises the option to convert this Note, or the portion hereof (that is US$1,000 principal amount or an integral multiple thereof) below designated, into ADSs in accordance with the terms of the Indenture referred to in this Note, and directs that any ADSs deliverable upon such conversion, together with any cash payable for any Fractional ADS, and any Notes representing any unconverted principal amount hereof, be issued and delivered to the registered Holder hereof unless a different name has been indicated below. If any ADSs or any

portion of this Note not converted are to be issued in the name of a Person other than the undersigned, the undersigned will pay all documentary, stamp, issue, transfer or similar taxes, if any, in accordance with Section 14.02(d) and Section 14.02(e) of the Indenture. Any amount required to be paid to the undersigned on account of interest accompanies this Note.

In connection with the conversion of this Note, or the portion hereof below designated, the undersigned acknowledges, represents to and agrees with the Company that the undersigned is not an "affiliate" (as defined in Rule 144 under the Securities Act) of the Company and has not been an "affiliate" (as defined in Rule 144 under the Securities Act) during the three months immediately preceding the date hereof.

[The undersigned further certifies:

1. The undersigned acknowledges (and if the undersigned is acting for the account of another person, that person has confirmed that it acknowledges) that the Restricted Securities received upon conversion of this Note (or securities represented thereby) have not been and are not expected to be registered under the Securities Act.

2. The undersigned further certifies that either:

(a) The undersigned is, and at the time ADSs are delivered in conversion of its Notes will be, the holder of the ADSs and the Ordinary Shares represented thereby, and (i) the undersigned is not a U.S. person (as defined in Regulation S under the Securities Act) and is located outside the United States (within the meaning of Regulation S) and acquired, or have agreed to acquire and will have acquired, the Notes being converted and the ADSs and the Ordinary Shares represented thereby being delivered in the conversion outside the United States and (ii) the undersigned is not in the business of buying and selling securities or, if the undersigned is in such business, the undersigned did not acquire the Notes being converted from the Company or any affiliate thereof in the initial distribution of the Notes.

1

OR

(b) The undersigned is a broker-dealer acting on behalf of its customer; its customer has confirmed to the undersigned that it is, and at the time ADSs are delivered in conversion of our Notes will be, the holder of the ADSs and the Ordinary Shares represented thereby, and (i) it is not a U.S. person (as defined in Regulation S under the Securities Act) and it is located outside the United States (within the meaning of Regulation S) and acquired, or have agreed to acquire and will have acquired, the Notes being converted and the ADSs and the Ordinary Shares represented thereby being delivered in the conversion outside the United States and (ii) it is not in the business of buying and selling securities or, if it is in such business, it did not acquire the Notes being converted from the Company or any affiliate thereof in the initial distribution of the Notes.

OR

(c) The undersigned is a qualified institutional buyer (as defined in Rule 144A under the Securities Act) acting for its own account or for the account of one or more qualified institutional buyers and the undersigned is (or such account or accounts are) the sole beneficial owner(s) of the ADSs to be received upon conversion of the Notes.

3. The undersigned acknowledges that the undersigned (and any such other account) may not continue to hold or retain any interest in Restricted Securities received upon conversion of this Note if the undersigned (or such other account) becomes an Affiliate of the Company.

4. The undersigned agrees (and if the undersigned is acting for the account of another person, that person has confirmed that it agrees) that, unless and until the undersigned (or such other account) is notified by the ADS Depositary that the restrictive legend on such Restricted Security has been removed from such security, the undersigned (and such other account) will not offer, sell, pledge or otherwise transfer the Restricted Security (or securities represented by such Restricted Security) except in accordance with the restrictions set forth in that legend and any applicable securities laws of the United States and any state thereof.][7]

The undersigned hereby instructs the ADS Depositary to register the ADSs in the name of:

1. Name of Beneficial Owner to receive ADSs (English):

2. Address of Beneficial Owner to receive ADSs (English):

3. Name of Registered Holder of the Deposited Shares:

4. Number of Deposited Shares:

5. Number of ADSs to be issued:                                        _____

6. Beneficial Owner's Tax ID Number:                          _____

7. Contact Name and Tel No/email address:                 _____

_____

[7]  Include if a Restricted Security.

2

[The undersigned instructs the Depositary to deliver the ADRs representing the ADSs to the following account:

ADS Receiving Broker ( * are mandatory fields):

a)  DTC Broker Name*:
b)  DTC Broker's Participant Account with DTC*:
c)  DTC Broker Contact Name:
d)  DTC Broker Contact Tel No/email:
e)  Beneficial Owner's Account # with DTC Broker*:


OR


e)  Local Broker Name (have account with DTC Broker)*:

Local Broker Sub-Account # with DTC Broker*:
Local Broker Contact Name:
Local Broker Contact Tel No/email:

ADS Delivering Party:

Name:    Deutsche Bank Trust Company Americas
DTC Account: #2655][8]

**For any ADS settlement inquiries, please contact <u>DBTCA Broker Desk:</u>**

Tel: +1-212-250-9100 (New York) / +44-207-547-6500 (London)
Email: adr@db.com

[8]    Include bracketed language in the conversion Notice if the Note being converted is not a Restricted Security.

3

Dated:    _____    _____

_____
Signature(s)

_____
Signature Guarantee

Signature(s) must be guaranteed by an eligible Guarantor Institution (banks, stock brokers, savings and loan associations and credit unions) with membership in an approved signature guarantee medallion program pursuant to Securities and Exchange Commission Rule 17Ad-15 if ADSs are to be issued, or Notes are to be delivered, other than to and in the name of the registered holder.

Fill in for registration of ADSs if to be issued, and Notes if to be delivered, other than to and in the name of the registered holder:

_____
(Name)

_____
(Street Address)

_____
(City, State and Zip Code)
Please print name and address

Principal amount to be converted (if less than all):
US$            ,000

NOTICE: The above signature(s) of the Holder(s) hereof must correspond with the name as written upon the face of the Note in every particular without alteration or enlargement or any change whatever.

_____

Social Security or Other Taxpayer
Identification Number

4

[FORM OF FUNDAMENTAL CHANGE REPURCHASE NOTICE]

To:  MOMO INC.

THE BANK OF NEW YORK MELLON, as Trustee

The undersigned registered owner of this Note hereby acknowledges receipt of a notice from Momo Inc. (the "**Company**") as to the occurrence of a Fundamental Change with respect to the Company and specifying the Fundamental Change Repurchase Date and requests and instructs the Company to pay to the registered holder hereof in accordance with Section 15.02 of the Indenture referred to in this Note (1) the entire principal amount of this Note, or the portion thereof (that is US$1,000 principal amount or an integral multiple thereof) below designated, and (2) if such Fundamental Change Repurchase Date does not fall during the period after a Regular Record Date and on or prior to the corresponding Interest Payment Date, accrued and unpaid interest thereon to, but excluding, such Fundamental Change Repurchase Date.

In the case of Physical Notes, the certificate numbers of the Notes to be repurchased are as set forth below:

Certificate Number(s): _____

Dated: _____

_____
Signature(s)

_____
Social Security or Other Taxpayer
Identification Number

Principal amount to be repaid (if less than all):
US$        ,000

NOTICE: The above signature(s) of the Holder(s) hereof must correspond with the name as written upon the face of the Note in every particular without alteration or enlargement or any change whatever.

1

[FORM OF REPURCHASE NOTICE]

To:  MOMO INC.

THE BANK OF NEW YORK MELLON, as Trustee

The undersigned registered owner of this Note hereby acknowledges receipt of a notice from Momo Inc. (the "**Company**") regarding the right of Holders to elect to require the Company to repurchase the entire principal amount of this Note, or the portion thereof (that is US$1,000 principal amount or an integral multiple thereof) below designated, in accordance with the applicable provisions of the Indenture referred to in this Note, at the Repurchase Price to the registered Holder hereof.

In the case of certificated Notes, the certificate numbers of the Notes to be purchased are as set forth below:

Certificate Number(s): _____

Dated: _____

_____
Signature(s)

_____
Social Security or Other Taxpayer
Identification Number

Principal amount to be repaid (if less than all):
US$          ,000

NOTICE: The above signature(s) of the Holder(s) hereof must correspond with the name as written upon the face of the Note in every particular without alteration or enlargement or any change whatever.

1

**ATTACHMENT 4**

[FORM OF ASSIGNMENT AND TRANSFER]

For value received                              hereby sell(s), assign(s) and transfer(s) unto                              (Please insert social security or Taxpayer Identification Number of assignee) the within Note, and hereby irrevocably constitutes and appoints                              attorney to transfer the said Note on the books of the Company, with full power of substitution in the premises.

In connection with any transfer of the within Note occurring prior to the Resale Restriction Termination Date, as defined in the Indenture governing such Note, the undersigned confirms that such Note is being transferred:

☐ To Momo Inc. or a subsidiary thereof; or

☐ Pursuant to a registration statement that has become or been declared effective under the Securities Act of 1933, as amended; or

☐ Pursuant to and in compliance with Rule 144A under the Securities Act of 1933, as amended [("**Rule 144A**"), and the undersigned confirms that the undersigned reasonably believes that the transferee of such Note is a "qualified institutional buyer" (within the meaning of Rule 144A) that is purchasing for its own account or for the account of another qualified institutional buyer and the undersigned has provided such transferee notice that the transfer is being made in reliance on Rule 144A][9]; or

☐ Outside the United States in accordance with Regulation S under the Securities Act of 1933, as amended; or

☐ Pursuant to and in compliance with Rule 144 under the Securities Act of 1933, as amended (if available).

---

[9]       Include if Regulation S Note.

1

Dated:   _____

_____

_____

Signature(s)

_____

Signature Guarantee

Signature(s) must be guaranteed by an eligible Guarantor Institution (banks, stock brokers, savings and loan associations and credit unions) with membership in an approved signature guarantee medallion program pursuant to Securities and Exchange Commission Rule 17Ad-15 if Notes are to be delivered, other than to and in the name of the registered holder.

NOTICE: The signature on the assignment must correspond with the name as written upon the face of the Note in every particular without alteration or enlargement or any change whatever.

2

**EXHIBIT B**

[FORM OF AUTHORIZATION CERTIFICATE]

I, [Name], [Title], acting on behalf of Momo Inc. (the "**Company**") hereby certify that:

(A) the persons listed below are (i) authorized Officers of the Company for purposes of the Indenture (the "**Indenture**") dated as of July 2, 2018 between the Company and The Bank of New York Mellon, as trustee, in relation to the 1.25% Convertible Senior Notes due 2025 (the "**Notes**"), (ii) duly elected or appointed, qualified and acting as the holder of the respective office or offices set forth opposite their names and (iii) the duly authorized persons who

executed or will execute the Indenture and the Notes issued pursuant to the Indenture by their manual or facsimile signatures and were at the time of such execution, duly elected or appointed, qualified and acting as the holder of the offices set forth opposite their names;

(B) each of the individuals listed below have the authority to receive call backs at the telephone numbers noted below upon request of The Bank of New York Mellon in connection with the Notes issued pursuant to the Indenture;

(C) each signature appearing below is the person's genuine signature; and

(D) attached hereto as Schedule I is a true, correct and complete specimen of the certificates representing the Notes.

B-1

---

IN WITNESS WHEREOF, I have hereunto executed and delivered this certificate on behalf of the Company as of the date indicated.

Dated: _____

[Name]

By: _____
Name:
Title:

B-2

---

**SCHEDULE I**

| Name | Title, Fax No., Email | Signature | Tel No. |
|------|----------------------|-----------|---------|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

B-3

<div align="right">**Exhibit 4.21**</div>

<div align="center">**Exclusive Business Cooperation Agreement**</div>

This Exclusive Business Cooperation Agreement (this "Agreement") is made and entered into by and between the following parties on May 27, 2015 in Beijing, the People's Republic of China ("China" or the "PRC").

**Party A:**    **Tantan Technology (Beijing) Co., Ltd.**
Address:    B129, Kangjiagou 145, Chaoyang District, Beijing

**Party B:**    **Tantan Culture Development (Beijing) Co., Ltd.**
Address:    (Huateng Beitang Centralized Office Area No. 178757) Suite 1701-1703, Nanmofang Road 37, Chaoyang District, Beijing

Each of Party A and Party B shall be hereinafter referred to as a "Party" respectively, and as the "Parties" collectively.

Whereas,

1.    Party A is a wholly foreign owned enterprise established in China, and has the necessary resources to provide technical and consulting services;

2.    Party B is a company established in China with exclusively domestic capital and is permitted by relevant PRC government authorities to engage in organization of cultural and artistic activities (excluding performance); advertisement design, production, agency and publication; computer graphic design and production; economic and trade consulting; technology development, technology transfer, technology consulting, technology promotion; business planning; investment consulting; and conference services. The businesses conducted by Party B currently and any time during the term of this Agreement are collectively referred to as the "Principal Business";

3.    Party A is willing to provide Party B with technical support, consulting services and other services on exclusive basis in relation to the Principal Business during the term of this Agreement, utilizing its advantages in technology, human resources, and information, and Party B is willing to accept such services provided by Party A or Party A's designee(s), each on the terms set forth herein.

Now, therefore, through mutual discussion, the Parties have reached the following agreements:

<div align="center">1</div>

1.    **Services Provided by Party A**

1.1    Party B hereby appoints Party A as Party B's exclusive services provider to provide Party B with comprehensive technical support, consulting services and other services during the term of this Agreement, in accordance with the terms and conditions of this Agreement, including but not limited to the follows:

(1)    Licensing Party B to use any software legally owned by Party A;

(2)    Development, maintenance and update of software involved in Party B's business;

(3)    Design, installation, daily management, maintenance and updating of network system, hardware and database design;

(4)    Technical support and training for employees of Party B;

(5)    Assisting Party B in consultancy, collection and research of technology and market information (excluding market research business that wholly foreign-owned enterprises are prohibited from conducting under PRC law);

(6)    Providing business management consultation for Party B;

(7)    Providing marketing and promotion services for Party B;

(8)    Providing customer order management and customer services for Party B;

(9)    Leasing of equipments or properties; and

(10)    Other services requested by Party B from time to time to the extent permitted under PRC law.

1.2    Party B agrees to accept all the services provided by Party A. Party B further agrees that unless with Party A's prior written consent, during the term of this Agreement, Party B shall not directly or indirectly accept the same or any similar services provided by any third party and shall not establish similar corporation relationship with any third party regarding the matters contemplated by this Agreement. Party A may appoint other parties, who may enter into certain agreements described in Section 1.3 with Party B, to provide Party B with the services under this Agreement.

<div align="center">2</div>

1.3    Service Providing Methodology

1.3.1    Party A and Party B agree that during the term of this Agreement, where necessary, Party B may enter into further service agreements with Party A or any other party designated by Party A, which shall provide the specific contents, manner, personnel, and fees for the specific services.

1.3.2    To fulfill this Agreement, Party A and Party B agree that during the term of this Agreement, where necessary, Party B may enter into equipment or property leases with Party A or any other party designated by Party A which shall permit Party B to use Party A's

relevant equipment or property based on the needs of the business of Party B.

1.3.3   Party B hereby grants to Party A an irrevocable and exclusive option to purchase from Party B, at Party A's sole discretion, any or all of the assets and business of Party B, to the extent permitted under PRC law, at the lowest purchase price permitted by PRC law. The Parties shall then enter into a separate assets or business transfer agreement, specifying the terms and conditions of the transfer of the assets.

2.   **The Calculation and Payment of the Service Fees**

2.1   The fees payable by Party B to Party A during the term of this Agreement shall be calculated as follows:

2.1.1   Party B shall pay service fee to Party A in each month. The service fee for each month shall consist of management fee and fee for services provided, which shall be determined by the Parties through negotiation after considering:

(1)   Complexity and difficulty of the services provided by Party A;

(2)   Title of and time consumed by employees of Party A providing the services;

(3)   Contents and value of the services provided by Party A;

3

(4)   Market price of the same type of services;

(5)   Operation conditions of the Party B.

2.1.2   Both Parties agree that, in consideration of the services provided by Party A, Party B shall pay Party A fees (the "Service Fees") equal to the net income of Party B, which equals the balance of the gross income less the costs of Party B acceptable to the Parties (the "Net Income"). The Service Fees shall be due and payable on a monthly basis. Within 30 days after the end of each month, Party B shall (a) deliver to Party A the management accounts and operating statistics of Party B for such month, including the Net Income of Party B during such month (the "Monthly Net Income"), and (b) pay such Monthly Net Income to Party A (each such payment, a "Monthly Payment"). Within ninety (90) days after the end of each fiscal year, Party B shall (a) deliver to Party A audited financial statements of Party B for such fiscal year, which shall be audited and certified by an independent certified public accountant approved by Party A, and (b) pay an amount to Party A equal to the shortfall, if any, of the aggregate net income of Party B for such fiscal year, as shown in such audited financial statements, as compared to the aggregate amount of the Monthly Payments paid by Party B to Party A in such fiscal year. Party A and Party B further agree that, according to the actual cooperation between Party A and Party B and the revenue and expenditure situation of Party B, the Parties can reasonably adjust the calculation ratio of the Service Fees provided herein, and Party A is entitled to determine, as its sole discretion, whether to permit Party B to defer the payment of part of Service Fees under certain particular circumstances.

3.   **Intellectual Property Rights and Confidentiality Clauses**

3.1   Party A shall have exclusive and proprietary ownership, rights and interests in any and all intellectual properties arising out of or created during the performance of this Agreement, including but not limited to copyrights, patents, patent applications, software, technical secrets, trade secrets and others. Party B shall execute all appropriate documents, take all appropriate actions, submit all filings and/or applications, render all appropriate assistance and otherwise conduct whatever is necessary as deemed by Party A at its sole discretion for the purposes of vesting any ownership, right or interest of any such intellectual property rights in Party A, and/or perfecting the protections for any such intellectual property rights in Party A.

4

3.2   The Parties acknowledge that the existence and the terms of this Agreement and any oral or written information exchanged between the Parties in connection with the preparation and performance of this Agreement are regarded as confidential information. Each Party shall maintain confidentiality of all such confidential information, and without obtaining the written consent of the other Party, it shall not disclose any relevant confidential information to any third party, except for the information that: (a) is or will be in the public domain (other than through the receiving Party's unauthorized disclosure); (b) is under the obligation to be disclosed pursuant to the applicable laws or regulations, rules of any stock exchange, or orders of the court or other government authorities; or (c) is required to be disclosed by any Party to its shareholders, directors, employees, legal counsels or financial advisors regarding the transaction contemplated hereunder, provided that such shareholders, directors, employees, legal counsels or financial advisors shall be bound by the confidentiality obligations similar to those set forth in this Section. Disclosure of any confidential information by the shareholders, director, employees of or agencies engaged by any Party shall be deemed disclosure of such confidential information by such Party and such Party shall be held liable for breach of this Agreement.

4.   **Representations and Warranties**

4.1   Party A hereby represents, warrants and covenants as follows:

4.1.1   Party A is a wholly foreign owned enterprise legally established and validly existing in accordance with the laws of China; Party A or the service providers designated by Party A will obtain all government permits and licenses for providing the service under this Agreement before providing such services.

4.1.2   Party A has taken all necessary corporate actions, obtained all necessary authorizations as well as all consents and approvals from third parties and government agencies (if required) for the execution, delivery and performance of this Agreement. Party A's

execution, delivery and performance of this Agreement do not violate any explicit requirements under any law or regulation.

    4.1.3    This Agreement constitutes Party A's legal, valid and binding obligations, enforceable against it in accordance with its terms.

4.2    Party B hereby represents, warrants and covenants as follows:

<center>5</center>

    4.2.1    Party B is a company legally established and validly existing in accordance with the laws of China and has obtained and will maintain all permits and licenses for engaging in the Principal Business in a timely manner.

    4.2.2    Party B has taken all necessary corporate actions, obtained all necessary authorizations as well as all consents and approvals from third parties and government agencies (if required) for the execution, delivery and performance of this Agreement. Party B's execution, delivery and performance of this Agreement do not violate any explicit requirements under any law or regulation.

    4.2.3    This Agreement constitutes Party B's legal, valid and binding obligations, and shall be enforceable against it in accordance with its terms.

## 5.    Term of Agreement

5.1    This Agreement shall become effective upon execution by the Parties. Unless terminated in accordance with the provisions of this Agreement or terminated in writing by Party A, this Agreement shall remain effective.

5.2    During the term of this Agreement, each Party shall renew its operation term prior to the expiration thereof so as to enable this Agreement to remain effective. This Agreement shall be terminated upon the expiration of the operation term of a Party if the application for renewal of its operation term is not approved by relevant government authorities.

5.3    The rights and obligations of the Parties under Sections 3, 6, 7 and this Section 5.3 shall survive the termination of this Agreement.

## 6.    Governing Law and Resolution of Disputes

6.1    The execution, effectiveness, construction, performance, amendment and termination of this Agreement and the resolution of disputes hereunder shall be governed by the laws of China.

<center>6</center>

6.2    In the event of any dispute with respect to the construction and performance of this Agreement, the Parties shall first resolve the dispute through friendly negotiations. In the event the Parties fail to reach an agreement on the dispute after either Party's request to the other Party for resolution of the dispute through negotiations, either Party may submit the relevant dispute to the China International Economic and Trade Arbitration Commission for arbitration, in accordance with its arbitration rules. The arbitration shall be conducted in Beijing. The arbitration award shall be final and binding on both Parties.

6.3    Upon the occurrence of any disputes arising from the construction and performance of this Agreement or during the pending arbitration of any dispute, except for the matters under dispute, the Parties shall continue to exercise their respective rights under this Agreement and perform their respective obligations under this Agreement.

## 7.    Breach of Agreement and Indemnification

7.1    If Party B conducts any material breach of any term of this Agreement, Party A shall have right to terminate this Agreement and/or require Party B to indemnify all damages; this Section 7.1 shall not prejudice any other rights of Party A herein.

7.2    Unless otherwise required by applicable laws, Party B shall not have any right to terminate this Agreement in any event.

7.3    Party B shall indemnify and hold harmless Party A from any losses, injuries, obligations or expenses caused by any lawsuit, claims or other demands against Party A arising from or caused by the services provided by Party A to Party B pursuant this Agreement, except where such losses, injuries, obligations or expenses arise from the gross negligence or willful misconduct of Party A.

## 8.    Force Majeure

8.1    In the case of any force majeure events ("Force Majeure") such as earthquake, typhoon, flood, fire, flu, war, strikes or any other events that cannot be predicted and are unpreventable and unavoidable by the affected Party, which directly or indirectly causes the failure of either Party to perform or completely perform this Agreement, then the Party affected by such Force Majeure shall give the other Party written notices without any delay, and shall provide details of such event within 15 days after sending out such notice, explaining the reasons for such failure of, partial or delay of performance.

<center>7</center>

8.2    If such Party claiming Force Majeure fails to notify the other Party and furnish it with proof pursuant to the above provision, such Party shall not be excused from the non-performance of its obligations hereunder. The Party so affected by the event of Force Majeure shall use reasonable efforts to minimize the consequences of such Force Majeure and to promptly resume performance hereunder whenever the causes of such excuse are cured. Should the Party so affected by the event of Force Majeure fail to resume performance hereunder when the causes of such excuse are cured, such Party shall be liable to the other Party.

8.3    In the event of Force Majeure, the Parties shall immediately consult with each other to find an equitable solution and shall use all reasonable endeavours to minimize the consequences of such Force Majeure.

9.    **Notices**

9.1    All notices and other communications required or permitted to be given pursuant to this Agreement shall be delivered personally or sent by registered mail, postage prepaid, by a commercial courier service or by facsimile transmission to the address of such Party set forth below. A confirmation copy of each notice shall also be sent by email. The dates on which notices shall be deemed to have been effectively given shall be determined as follows:

9.1.1    Notices given by personal delivery, by courier service or by registered mail, postage prepaid, shall be deemed effectively given on the date of receipt or refusal at the address specified for notices.

9.1.2    Notices given by facsimile transmission shall be deemed effectively given on the date of successful transmission (as evidenced by an automatically generated confirmation of transmission).

9.2    For the purpose of notices, the addresses of the Parties are as follows:

**Party A:    Tantan Technology (Beijing) Co., Ltd.**
Address:    B129, Kangjiagou 145, Chaoyang District, Beijing
Attn:    Yu Wang
Tel:    +86 10 58201000

8

**Party B:    Tantan Culture Development (Beijing) Co., Ltd.**
Address:    (Huateng Beitang Centralized Office Area No. 178757) Suite 1701-1703, Nanmofang Road 37, Chaoyang District, Beijing
Attn:    Ying Pan
Tel:    +86 10 58201000

9.3    Any Party may at any time change its address for notices by a notice delivered to the other Party in accordance with the terms hereof.

10.    **Assignment**

10.1    Without Party A's prior written consent, Party B shall not assign its rights and obligations under this Agreement to any third party.

10.2    Party B agrees that Party A may assign its obligations and rights under this Agreement to any third party and in case of such assignment, Party A is only required to give written notice to Party B and does not need any consent from Party B for such assignment.

11.    **Severability**

In the event that one or several of the provisions of this Agreement are found to be invalid, illegal or unenforceable in any aspect in accordance with any laws or regulations, the validity, legality or enforceability of the remaining provisions of this Agreement shall not be affected or compromised in any aspect. The Parties shall negotiate in good faith to replace such invalid, illegal or unenforceable provisions with effective provisions that accomplish to the greatest extent permitted by law and the intentions of the Parties, and the economic effect of such effective provisions shall be as close as possible to the economic effect of those invalid, illegal or unenforceable provisions.

12.    **Amendments and Supplements**

Any amendments and supplements to this Agreement shall be in writing. The amendment agreements and supplementary agreements that have been signed by the Parties and relate to this Agreement shall be an integral part of this Agreement and shall have the same legal validity as this Agreement.

13.    **Language and Counterparts**

9

This Agreement is written in both Chinese and English language in two copies, each Party having one copy. The Chinese version and English version shall have equal legal validity.

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Exclusive Business Cooperation Agreement as of the date first above written.

**Party A:    Tantan Technology (Beijing) Co., Ltd. (Seal)**

By:    /s/ Yu Wang
Name:    Yu Wang

Title:        Legal Representative

**Party B:     Tantan Culture Development (Beijing) Co., Ltd. (Seal)**

By:           /s/ Ying Pan
Name:         Ying Pan
Title:        Legal Representative

10

<div align="right">**Exhibit 4.22**</div>

**Equity Interest Pledge Agreement**

This Equity Interest Pledge Agreement (this "Agreement") has been executed by and among the following parties on May 9, 2018 in Beijing, the People's Republic of China ("China" or the "PRC"):

**Party A:**     Tantan Technology (Beijing) Co., Ltd. (hereinafter the "Pledgee"), a wholly foreign owned enterprise, organized and existing under the laws of the PRC, with its address at 1307 Guanghua Road #9, Chaoyang District, Beijing;

**Party B:**     Beijing Momo Technology Co., Ltd. (hereinafter the "Pledgor"), a limited liability company organized and existing under the laws of the PRC, with its address at Room 222002, Floor 20, Building No.6, Courtyard No.1, Futong East Street, Chaoyang District, Beijing, and

**Party C:**     Tantan Culture Development (Beijing) Co., Ltd., a limited liability company organized and existing under the laws of the PRC, with its address at 409 Guanghua Road #9, Chaoyang District, Beijing.

In this Agreement, each of the Pledgee, the Pledgor and Party C shall be referred to as a "Party" respectively, and they shall be collectively referred to as the "Parties".

Whereas:

1.  The Pledgor is a limited liability company. The equity interest pledged by the Pledgor hereunder is RMB 1,261,479 in the registered capital of Party C. Party C is a limited liability company registered in Beijing, China engaging in development and operation of internet products. Party C acknowledges the respective rights and obligations of Pledgor and Pledgee under this Agreement, and intends to provide any necessary assistance in registering the Pledge. To ensure that Party C fully and timely pays the Secured Indebtedness and any or all of the payments under the Transaction Documents payable to the Pledgee, including but not limited to the management fees and service fees provided in the Transaction Documents (whether such fees become due and payable due to the arrival of the maturity date, advance payment requirements or any other reasons), the Pledgor hereby pledges to the Pledgee all of the equity interest hereafter acquired by the Pledgor in Party C;

2.  The Pledgee is a wholly foreign-owned enterprise registered in China. The Pledgee and Party C which is owned by the Pledgor have executed an Exclusive Business Cooperation Agreement (as defined below) in Beijing; Party C, the Pledgee and the Pledgor have executed an Exclusive Option Agreement (as defined below); the Pledgor has executed a Power of Attorney (as defined below) in favor of the Pledgee;

3.  To ensure that Party C and the Pledgor fully perform their obligations under the Exclusive Business Cooperation Agreement, the Exclusive Option Agreement and the Power of Attorney, the Pledgor hereby pledges to the Pledgee all of the equity interest that the Pledgor holds in Party C as security for Party C's and the Pledgor's obligations under the Exclusive Business Cooperation Agreement, the Exclusive Option Agreement and the Power of Attorney.

<div align="center">1</div>

To perform the provisions of the Transaction Documents (as defined below), the Parties have mutually agreed to execute this Agreement upon the following terms.

**1.    Definitions**

Unless otherwise provided herein, the terms below shall have the following meanings:

1.1    Pledge: shall refer to the security interest granted by the Pledgor to the Pledgee pursuant to Section 2 of this Agreement, i.e., the right of the Pledgee to be paid in priority with the Equity Interest based on the monetary valuation that such Equity Interest is converted into or from the proceeds from the auction or sale of the Equity Interest.

1.2    Equity Interest: shall refer to RMB 1,261,479 in the registered capital of Party C, and all of the equity interest hereafter acquired by the Pledgor in Party C.

1.3    Term of the Pledge: shall refer to the term set forth in Section 3 of this Agreement.

1.4    Transaction Documents: shall refer to the Exclusive Business Cooperation Agreement executed by and between Party C and the Pledgee on May 27, 2015 (the "Exclusive Business Cooperation Agreement"), the Exclusive Option Agreement executed by and among Party C, the Pledgee and the Pledgor on May 9, 2018 (the "Exclusive Option Agreement"), Power of Attorney executed on May 9, 2018 by the Pledgor (the "Power of Attorney") and any modification, amendment and restatement to the aforementioned documents.

1.5    Contract Obligations: shall refer to all the obligations of the Pledgor under the Exclusive Option Agreement, the Power of Attorney and this Agreement; all the obligations of Party C under the Exclusive Business Cooperation Agreement, the Exclusive Option Agreement and this Agreement.

1.6    Secured Indebtedness: shall refer to RMB 1,261,479 and all the direct, indirect and derivative losses and losses of anticipated profits, suffered by the Pledgee, incurred as a result of any Event of Default. The amount of such loss shall be calculated in accordance with the reasonable business plan and profit forecast of the Pledgee, the consulting and service fees payable to the Pledgee under the Exclusive Business Cooperation Agreement, all expenses occurred in connection with enforcement by the Pledgee of the Pledgor's and/or Party C's Contract Obligations and etc.

<div align="center">2</div>

1.7    Event of Default: shall refer to any of the circumstances set forth in Section 7 of this Agreement.

1.8    Notice of Default: shall refer to the notice issued by the Pledgee in accordance with this Agreement declaring an Event of Default.

**2.    Pledge**

2.1    The Pledgor agrees to pledge all the Equity Interest as security for performance of the Contract Obligations and payment of the Secured Indebtedness under this Agreement. Party C hereby assents that the Pledgor pledges the Equity Interest to the Pledgee pursuant to this Agreement.

2.2    During the term of the Pledge, the Pledgee is entitled to receive dividends distributed on the Equity Interest. The Pledgor may receive dividends distributed on the Equity Interest only with prior written consent of the Pledgee. Dividends received by the Pledgor on Equity Interest after the deduction of individual income tax paid by the Pledgor shall be, as required by the Pledgee, (1) deposited into an account designated and supervised by the Pledgee and used to secure the Contract Obligations and pay the Secured Indebtedness prior and in preference to making any other payment; or (2) unconditionally donated to the Pledgee or any other person designated by the Pledgee to the extent permitted under the applicable PRC laws.

2.3    The Pledgor may subscribe for a capital increase in Party C only with prior written consent of the Pledgee. Any equity interest obtained by the Pledgor as a result of the Pledgor's subscription of the increased registered capital of the Company shall also be deemed as Equity Interest.

2.4    In the event that Party C is required by PRC law to be liquidated or dissolved, any interest distributed to the Pledgor upon Party C's dissolution or liquidation shall, upon the request of the Pledgee, be (1) deposited into an account designated and supervised by the Pledgee and used to secure the Contract Obligations and pay the Secured Indebtedness prior and in preference to make any other payment; or (2) unconditionally donated to the Pledgee or any other person designated by the Pledgee to the extent permitted under the applicable PRC laws.

**3.    Term of the Pledge**

3.1    The Pledge shall become effective on such date when the pledge of the Equity Interest contemplated herein is registered with the relevant administration for industry and commerce (the "AIC"). The Pledge shall remain effective until all Contract Obligations have been fully performed or all Secured Indebtedness has been fully paid. The Pledgor and Party C shall (1) register the Pledge in the shareholders' register of Party C within 3 business days following the execution of this Agreement, and (2) submit an application to the AIC for the registration of the Pledge of the Equity Interest contemplated herein within two (2) months following the execution of this Agreement. The parties covenant that for the purpose of registration of the Pledge, the parties hereto and all other shareholders of Party C shall submit to the AIC this Agreement or an equity interest pledge contract in the form required by the AIC at the location of Party C which shall truly reflect the information of the Pledge hereunder (the "AIC Pledge Contract"). For matters not specified in the AIC Pledge Contract, the Parties shall be bound by the provisions of this Agreement. The Pledgor and Party C shall submit all necessary documents and complete all necessary procedures, as required by the relevant PRC laws and regulations and the competent AIC, to ensure that the Pledge of the Equity Interest shall be registered with the AIC as soon as possible after submission for filing.

3

3.2    During the Term of the Pledge, in the event the Pledgor and/or Party C fails to perform the Contract Obligations or pay Secured Indebtedness, the Pledgee shall have the right, but not the obligation, to exercise the Pledge in accordance with the provisions of this Agreement.

**4.    Custody of Records for Equity Interest subject to the Pledge**

4.1    During the Term of the Pledge set forth in this Agreement, the Pledgor shall deliver to the Pledgee's custody the capital contribution certificate for the Equity Interest and the shareholders' register containing the Pledge within one week from the execution of this Agreement. The Pledgee shall have custody of such documents during the entire Term of the Pledge set forth in this Agreement.

**5.    Representations and Warranties of the Pledgor and Party C**

As of the execution date of this Agreement, the Pledgor and Party C hereby jointly and severally represent and warrant to the Pledgee that:

5.1    The Pledgor is the sole legal and beneficial owner of the Equity Interest.

5.2    The Pledgee shall have the right to dispose of and transfer the Equity Interest in accordance with the provisions set forth in this Agreement.

5.3    Except for the Pledge, the Pledgor has not placed any security interest or other encumbrance on the Equity Interest.

5.4    The Pledgor and Party C have obtained any and all approvals and consents from the applicable government authorities and third parties (if required) for the execution, delivery and performance of this Agreement.

5.5    The execution, delivery and performance of this Agreement will not: (i) violate any relevant PRC laws; (ii) conflict with Party C's articles of association or other constitutional documents; (iii) result in any breach of or constitute any default under any contract or instrument to which it is a party or by which it is otherwise bound; (iv) result in any violation of any condition for the grant and/or maintenance of any permit or approval granted to any Party; or (v) cause any permit or approval granted to any Party to be suspended, cancelled or attached with additional conditions.

4

**6.    Covenants of the Pledgor and Party C**

6.1    During the term of this Agreement, the Pledgor and Party C hereby jointly and severally covenant to the Pledgee:

6.1.1    The Pledgor shall not transfer the Equity Interest, place or permit the existence of any security interest or other encumbrance on the Equity Interest or any portion thereof, without the prior written consent of the Pledgee, except for the performance of the Transaction Documents;

6.1.2    The Pledgor and Party C shall comply with the provisions of all laws and regulations applicable to the pledge of rights, and within five (5) days of receipt of any notice, order or recommendation issued or prepared by the competent authorities regarding the Pledge, shall present the aforementioned notice, order or recommendation to the Pledgee, and shall comply with the aforementioned notice, order or recommendation or submit objections and representations with respect to the aforementioned matters upon the Pledgee's reasonable request or upon consent of the Pledgee;

6.1.3    The Pledgor and Party C shall promptly notify the Pledgee of any event or notice received by the Pledgor that may have an impact on the Equity Interest or any portion thereof, as well as any event or notice received by the Pledgor that may have an impact on any guarantees and other obligations of the Pledgor arising out of this Agreement.

6.1.4    Party C shall complete the registration procedures for the extension of the operation term within three (3) months prior to the expiration of such term to maintain the validity of this Agreement.

6.2    The Pledgor agrees that the rights acquired by the Pledgee in accordance with this Agreement with respect to the Pledge shall not be interrupted or harmed by the Pledgor or any heirs or representatives of the Pledgor or any other persons through any legal proceedings.

6.3    To protect or perfect the security interest granted by this Agreement for the Contract Obligations and Secured Indebtedness, the Pledgor hereby undertakes to execute in good faith and to cause other parties who have an interest in the Pledge to execute all certificates, agreements, deeds and/or covenants required by the Pledgee. The Pledgor also undertakes to perform and to cause other parties who have an interest in the Pledge to perform actions required by the Pledgee, to facilitate the exercise by the Pledgee of its rights and authority granted thereto by this Agreement, and to enter into all relevant documents regarding ownership of Equity Interest with the Pledgee or designee(s) of the Pledgee (natural persons/legal persons). The Pledgor undertakes to provide the Pledgee within a reasonable time with all notices, the orders and decisions regarding the Pledge that are required by the Pledgee.

5

6.4    The Pledgor hereby undertakes to comply with and perform all guarantees, promises, agreements, representations and conditions under this Agreement. In the event of failure or partial performance of its guarantees, promises, agreements, representations and conditions, the Pledgor shall indemnify the Pledgee for all losses resulting therefrom.

**7.    Event of Breach**

7.1    The following circumstances shall be deemed an Event of Default:

7.1.1    The Pledgor's any breach to any obligations under the Transaction Documents and/or this Agreement.

7.1.2    Party C's any breach to any obligations under the Transaction Documents and/or this Agreement.

7.2    Upon notice or discovery of the occurrence of any circumstances or event that may lead to the aforementioned circumstances described in Section 7.1, the Pledgor and Party C shall immediately notify the Pledgee in writing accordingly.

7.3    Unless an Event of Default set forth in Section 7.1 has been successfully resolved to the Pledgee's satisfaction within twenty (20) days after the Pledgee and /or Party C delivers a notice to the Pledgor requesting ratification of such Event of Default, the Pledgee may issue a Notice of Default to the Pledgor in writing at any time thereafter, demanding the Pledgor to immediately exercise the Pledge in accordance with the provisions of Section 8 of this Agreement.

**8.    Exercise of the Pledge**

8.1    The Pledgee shall issue a written Notice of Default to the Pledgor when it exercises the Pledge.

8.2    Subject to the provisions of Section 7.3, the Pledgee may exercise the right to enforce the Pledge at any time after the issuance of the Notice of Default in accordance with Section 8.1. Once the Pledgee elects to enforce the Pledge, the Pledgor shall cease to be entitled to any rights or interests associated with the Equity Interest.

8.3    After the Pledgee issues a Notice of Default to the Pledgor in accordance with Section 8.1, the Pledgee may exercise any remedy measure under the applicable PRC laws, the Transaction Documents and this Agreement, including but not limited to being paid in priority with the Equity Interest based on the monetary valuation that such Equity Interest is converted into or from the proceeds from the auction or sale of the Equity Interest. The Pledgee shall not be liable for any loss incurred by its duly exercise of such rights and powers.

6

8.4    The proceeds from the exercise of the Pledge by the Pledgee shall be used to pay for taxes and expenses incurred as a result of disposing the Equity Interest and to perform Contract Obligations and pay the Secured Indebtedness to the Pledgee prior and in preference to any other payment. After the payment of the aforementioned amounts, the remaining balance shall be returned to the Pledgor or any other person who have rights to such balance under applicable laws or be deposited to the local notary public office where the Pledgor resides, with all expenses incurred being borne by the Pledgor. To the extent permitted under the applicable PRC laws, the Pledgor shall unconditionally donate the aforementioned proceeds to the Pledgee or any other person designated by the Pledgee.

8.5   The Pledgee may exercise any remedy measure available simultaneously or in any order. The Pledgee may exercise the right to being paid in priority with the Equity Interest based on the monetary valuation that such Equity Interest is converted into or from the proceeds from the auction or sale of the Equity Interest under this Agreement, without exercising any other remedy measure first.

8.6   The Pledgee is entitled to designate an attorney or other representatives to exercise the Pledge on its behalf, and the Pledgor or Party C shall not raise any objection to such exercise.

8.7   When the Pledgee disposes of the Pledge in accordance with this Agreement, the Pledgor and Party C shall provide the necessary assistance to enable the Pledgee to enforce the Pledge in accordance with this Agreement.

## 9.   Breach of Agreement

9.1   If the Pledgor or Party C conducts any material breach of any term of this Agreement, the Pledgee shall have right to terminate this Agreement and/or require the Pledgor or Party C to indemnify all damages; this Section 9 shall not prejudice any other rights of the Pledgee herein;

9.2   The Pledgor or Party C shall not have any right to terminate this Agreement in any event unless otherwise required by the applicable laws.

## 10.   Assignment

10.1   Without the Pledgee's prior written consent, the Pledgor and Party C shall not have the right to assign or delegate their rights and obligations under this Agreement.

7

10.2   This Agreement shall be binding on the Pledgor and his/her successors and permitted assigns, and shall be valid with respect to the Pledgee and each of its successors and assigns.

10.3   At any time, the Pledgee may assign any and all of its rights and obligations under the Transaction Documents and this Agreement to its designee(s), in which case the assigns shall have the rights and obligations of the Pledgee under the Transaction Documents and this Agreement, as if it were the original party to the Transaction Documents and this Agreement.

10.4   In the event of change of the Pledgee due to assignment, the Pledgor and/or Party C shall, at the request of the Pledgee, execute a new pledge agreement with the new pledgee on the same terms and conditions as this Agreement, and register the same with the competent AIC.

10.5   The Pledgor and Party C shall strictly abide by the provisions of this Agreement and other contracts jointly or separately executed by the Parties hereto or any of them, including the Transaction Documents, perform the obligations hereunder and thereunder, and refrain from any action/omission that may affect the effectiveness and enforceability thereof. Any remaining rights of the Pledgor with respect to the Equity Interest pledged hereunder shall not be exercised by the Pledgor except in accordance with the written instructions of the Pledgee.

## 11.   Termination

11.1   Upon the fulfillment of all Contract Obligations and the full payment of all Secured Indebtedness by the Pledgor and Party C, the Pledgee shall release the Pledge under this Agreement upon the Pledgor's request as soon as reasonably practicable and shall assist the Pledgor in de-registering the Pledge from the shareholders' register of Party C and with the competent PRC local administration for industry and commerce.

11.2   The provisions under Sections 9, 13, 14 and 11.2 herein of this Agreement shall survive the expiration or termination of this Agreement.

## 12.   Handling Fees and Other Expenses

All fees and out of pocket expenses relating to this Agreement, including but not limited to legal costs, costs of production, stamp tax and any other taxes and fees, shall be borne by Party C.

## 13.   Confidentiality

The Parties acknowledge that the existence and the terms of this Agreement and any oral or written information exchanged between the Parties in connection with the preparation and performance this Agreement are regarded as confidential information. Each Party shall maintain the confidentiality of all such confidential information, and without obtaining the written consent of the other Party, it shall not disclose any relevant confidential information to any third parties, except for the information that: (a) is or will be in the public domain (other than through the receiving Party's unauthorized disclosure); (b) is under the obligation to be disclosed pursuant to the applicable laws or regulations, rules of any stock exchange, or orders of the court or other government authorities; or (c) is required to be disclosed by any Party to its shareholders, directors, employees, legal counsels or financial advisors regarding the transaction contemplated hereunder, provided that such shareholders, directors, employees, legal counsels or financial advisors shall be bound by the confidentiality obligations similar to those set forth in this Section. Disclosure of any confidential information by the shareholders, director, employees of or agencies engaged by any Party shall be deemed disclosure of such confidential information by such Party and such Party shall be held liable for breach of this Agreement.

8

## 14.   Governing Law and Resolution of Disputes

14.1   The execution, effectiveness, construction, performance, amendment and termination of this Agreement and the resolution of disputes hereunder shall be governed by the laws of China.

14.2   In the event of any dispute with respect to the construction and performance of this Agreement, the Parties shall first resolve the dispute through friendly negotiations. In the event the Parties fail to reach an agreement on the dispute after either Party's request to the other Parties for resolution of the dispute through negotiations, either Party may submit the relevant dispute to Beijing Arbitration Commission for arbitration, in accordance with its Arbitration Rules. The arbitration shall be conducted in Beijing. The arbitration award shall be final and binding on all Parties.

14.3   Upon the occurrence of any disputes arising from the construction and performance of this Agreement or during the pending arbitration of any dispute, except for the matters under dispute, the Parties to this Agreement shall continue to exercise their respective rights under this Agreement and perform their respective obligations under this Agreement.

## 15.   Notices

15.1   All notices and other communications required or permitted to be given pursuant to this Agreement shall be delivered personally or sent by registered mail, prepaid postage, a commercial courier service or facsimile transmission to the address of such party set forth below. A confirmation copy of each notice shall also be sent by E-mail. The dates on which notices shall be deemed to have been effectively given shall be determined as follows:

15.2   Notices given by personal delivery, courier service, registered mail or prepaid postage shall be deemed effectively given on the date of delivery or refusal at the address specified for notices.

9

15.3   Notices given by facsimile transmission shall be deemed effectively given on the date of successful transmission (as evidenced by an automatically generated confirmation of transmission).

15.4   For the purpose of notices, the addresses of the Parties are as follows:

**Party A:**     Tantan Technology (Beijing) Co., Ltd.
Address:        1307 Guanghua Road #9, Chaoyang District, Beijing

**Party B:**     Beijing Momo Technology Co., Ltd.
Address:        Room 222002, Floor 20, Building No.6, Courtyard No.1, Futong East Street, Chaoyang District, Beijing

**Party C:**     Tantan Culture Development (Beijing) Co., Ltd.
Address:        409 Guanghua Road #9, Chaoyang District, Beijing

15.5   Any Party may at any time change its address for notices by a notice delivered to the other Parties in accordance with the terms hereof.

## 16.   Severability

In the event that one or several of the provisions of this Contract are found to be invalid, illegal or unenforceable in any aspect in accordance with any laws or regulations, the validity, legality or enforceability of the remaining provisions of this Contract shall not be affected or compromised in any respect. The Parties shall strive in good faith to replace such invalid, illegal or unenforceable provisions with effective provisions that accomplish to the greatest extent permitted by law and the intentions of the Parties, and the economic effect of such effective provisions shall be as close as possible to the economic effect of those invalid, illegal or unenforceable provisions.

## 17.   Attachments

The attachments set forth herein shall be an integral part of this Agreement.

## 18.   Effectiveness

18.1   This Agreement shall become effective upon execution by the Parties.

18.2   Any amendments, changes and supplements to this Agreement shall be in writing and shall become effective upon completion of the governmental filing procedures (if applicable) after the affixation of the signatures or seals of the Parties.

## 19.   Language and Counterparts

This Agreement is written in Chinese and English in four copies. The Pledgor, the Pledgee and Party C shall hold one copy respectively and the other copy shall be used for registration. In the event there is any discrepancy between the Chinese and English versions, the Chinese version shall prevail.

*The Remainder of this page is intentionally left blank*

10

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Equity Interest Pledge Agreement as of the date first above written.

Party A:  Tantan Technology (Beijing) Co., Ltd.

By:      /seal of Tantan Technology (Beijing) Co., Ltd./
Name:
Title:


Party B:  Beijing Momo Technology Co., Ltd.

By:      /s/ Yan Tang          /common seal/
Name:    Yan Tang
Title:    Legal Representative


Party C:  Tantan Culture Development (Beijing) Co., Ltd.

By:      /seal of Tantan Culture Development (Beijing) Co., Ltd./
Name:
Title:

**Attachments:**

1.    Shareholders' Register of Party C;

2.    The Capital Contribution Certificate for Party C;

3.    Exclusive Business Cooperation Agreement.

4.    Exclusive Option Agreement

5.    Power of Attorney

**Exhibit 4.23**

**Exclusive Option Agreement**

This Exclusive Option Agreement (this "Agreement") is executed by and among the following Parties as of May 9, 2018 in Beijing, the People's Republic of China ("China" or the "PRC"):

**Party A:** Tantan Technology (Beijing) Co., Ltd., a wholly foreign-owned enterprise, organized and existing under the laws of the PRC, with its address at 1307 Guanghua Road #9, Chaoyang District, Beijing;

**Party B:** Beijing Momo Technology Co., Ltd., a limited liability company organized and existing under the laws of the PRC, with its address at Room 222002, Floor 20, Building No.6, Courtyard No.1, Futong East Street, Chaoyang District, Beijing; and

**Party C:** Tantan Culture Development (Beijing) Co., Ltd., a limited liability company organized and existing under the laws of the PRC, with its address at 409 Guanghua Road #9, Chaoyang District, Beijing.

In this Agreement, each of Party A, Party B and Party C shall be referred to as a "Party" respectively, and they shall be collectively referred to as the "Parties".

Whereas:

1.   Party B is a shareholder of Party C and as of the date hereof holds RMB 1,261,479 in the registered capital of Party C.

2.   Party B agrees to grant Party A an exclusive right through this Agreement, and Party A agrees to accept such exclusive right to purchase all or part equity interest held by Party B in Party C.

3.   Party C agrees to grant Party A an exclusive right through this Agreement, and Party A agrees to accept such exclusive right to purchase all or part of the assets of Party C.

Now therefore, upon mutual discussion and negotiation, the Parties have reached the following agreement:

**1.   Sale and Purchase of Equity Interest and Assets**

1.1   Equity Interest Purchase Option

Party B hereby irrevocably grants Party A an irrevocable and exclusive right to purchase, or designate one or more persons (each, a "Designee") to purchase the equity interests in Party C then held by Party B once or at multiple times at any time in part or in whole at Party A's sole and absolute discretion to the extent permitted by Chinese laws and at the price described in Section 1.3 herein (such right being the "Equity Interest Purchase Option"). Except for Party A and the Designee(s), no other person shall be entitled to the Equity Interest Purchase Option or other rights with respect to the equity interests of Party B. Party C hereby agrees to the grant by Party B of the Equity Interest Purchase Option to Party A. The term "person" as used herein shall refer to individuals, corporations, partnerships, partners, enterprises, trusts or non-corporate organizations.

1

1.1.1   Steps for Exercise of the Equity Interest Purchase Option

Subject to the provisions of the laws and regulations of China, Party A may exercise the Equity Interest Purchase Option by issuing a written notice to Party B (the "Equity Interest Purchase Option Notice"), specifying: (a) Party A's or the Designee's decision to exercise the Equity Interest Purchase Option; (b) the portion of equity interests to be purchased by Party A or the Designee from Party B (the "Optioned Interests"); and (c) the date for purchasing the Optioned Interests or the date for the transfer of the Optioned Interests.

1.1.2   Equity Interest Purchase Price

The purchase price of the Optioned Interests (the "Base Price") shall be RMB 10. If PRC law requires a minimum price higher than the Base Price when Party A exercises the Equity Interest Purchase Option, the minimum price regulated by PRC law shall be the purchase price (collectively, the "Equity Interest Purchase Price").

1.1.3   Transfer of Optioned Interests

For each exercise of the Equity Interest Purchase Option:

1.1.3.1   Party B shall cause Party C to promptly convene a shareholders' meeting, at which a resolution shall be adopted approving Party B's transfer of the Optioned Interests to Party A and/or the Designee(s);

1.1.3.2   Party B shall obtain written statements from the other shareholders of Party C giving consent to the transfer of the equity interest to Party A and/or the Designee(s) and waiving any right of first refusal related thereto;

1.1.3.3   Party B shall execute an equity interest transfer contract with respect to each transfer with Party A and/or each Designee (whichever is applicable), in accordance with the provisions of this Agreement and the Equity Interest Purchase Option Notice regarding the Optioned Interests;

1.1.3.4   The relevant Parties shall execute all other necessary contracts, agreements or documents, obtain all necessary government licenses

and permits and take all necessary actions to transfer valid ownership of the Optioned Interests to Party A and/or the Designee(s), unencumbered by any security interests, and cause Party A and/or the Designee(s) to become the registered owner(s) of the Optioned Interests. For the purpose of this Section and this Agreement, "security interests" shall include securities, mortgages, third party's rights or interests, any stock options, acquisition right, right of first refusal, right to offset, ownership retention or other security arrangements, but shall be deemed to exclude any security interest created by this Agreement, Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney. "Party B's Equity Interest Pledge Agreement" as used in this Agreement shall refer to the Interest Pledge Agreement executed by and among Party A, Party B and Party C on the date hereof and any modification, amendment and restatement thereto. "Party B's Power of Attorney" as used in this Agreement shall refer to the Power of Attorney executed by Party B on the date hereof granting Party A with a power of attorney and any modification, amendment and restatement thereto.

2

1.2    Asset Purchase Option

Party C hereby grants to Party A an irrevocable and exclusive option to have Party A or its Designee to purchase from Party C, at Party A's sole discretion, at any time and in accordance with the procedures decided by Party A in its sole discretion, any or all of the assets of Party C, to the extent permitted under PRC law, and at the lowest purchase price permitted by PRC law. The Parties shall then enter into a separate assets transfer agreement, specifying the terms and conditions of the transfer of the assets.

2.    **Covenants**

2.1    Covenants regarding Party C

Party B (as a shareholder of Party C) and Party C hereby covenant as follows:

2.1.1    Without the prior written consent of Party A, they shall not in any manner supplement, change or amend the articles of association of Party C, increase or decrease its registered capital, or change its structure of registered capital in other manners;

2.1.2    They shall maintain Party C's corporate existence in accordance with good financial and business standards and practices, obtain and maintain all necessary government licenses and permits by prudently and effectively operating its business and handling its affairs;

2.1.3    Without the prior written consent of Party A, they shall not at any time following the date hereof, sell, transfer, mortgage or dispose of in any manner any material assets of Party C or legal or beneficial interest in the material business or revenues of Party C of more than RMB500,000, or allow the encumbrance thereon of any security interest;

3

2.1.4    Without the prior written consent of Party A, they shall not incur, inherit, guarantee or suffer the existence of any debt, except for payables incurred in the ordinary course of business other than through loans;

2.1.5    They shall always operate all of Party C's businesses within the normal business scope to maintain the asset value of Party C and refrain from any action/omission that may affect Party C's operating status and asset value;

2.1.6    Without the prior written consent of Party A, they shall not cause Party C to execute any major contract, except the contracts in the ordinary course of business (for the purpose of this subsection, a contract with a price exceeding RMB500,000 shall be deemed a major contract);

2.1.7    Without the prior written consent of Party A, they shall not cause Party C to provide any person with any loan or credit;

2.1.8    They shall provide Party A with information on Party C's business operations and financial condition at Party A's request;

2.1.9    If requested by Party A, they shall procure and maintain insurance in respect of Party C's assets and business from an insurance carrier acceptable to Party A, at an amount and type of coverage typical for companies that operate similar businesses;

2.1.10    Without the prior written consent of Party A, they shall not cause or permit Party C to merge, consolidate with, acquire or invest in any person;

2.1.11    They shall immediately notify Party A of the occurrence or possible occurrence of any litigation, arbitration or administrative proceedings relating to Party C's assets, business or revenue;

2.1.12    To maintain the ownership by Party C of all of its assets, they shall execute all necessary or appropriate documents, take all necessary or appropriate actions, file all necessary or appropriate complaints, and raise necessary or appropriate defenses against all claims;

2.1.13    Without the prior written consent of Party A, they shall ensure that Party C shall not in any manner distribute dividends to its shareholders, provided that upon Party A's written request, Party C shall immediately distribute all distributable profits to its shareholders;

4

2.1.14    At the request of Party A, they shall appoint any person designated by Party A as the director or executive director of Party C.

2.1.15    Without Party A's prior written consent, they shall not engage in any business in competition with Party A or its affiliates; and

2.1.16  Unless otherwise required by PRC law, Party C shall not be dissolved or liquated without prior written consent by Party A.

2.2  Covenants of Party B

Party B hereby covenants as follows:

2.2.1  Without the prior written consent of Party A, Party B shall not sell, transfer, mortgage or dispose of in any other manner any legal or beneficial interest in the equity interests in Party C held by Party B, or allow the encumbrance thereon, except for the interest placed in accordance with Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney;

2.2.2  Without the prior written consent of Party A, Party B shall cause the shareholders' meeting and/or the directors (or the executive director) of Party C not to approve any sale, transfer, mortgage or disposition in any other manner of any legal or beneficial interest in the equity interests in Party C held by Party B, or allow the encumbrance thereon of any security interest, except for the interest placed in accordance with Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney;

2.2.3  Without the prior written consent of Party A, Party B shall cause the shareholders' meeting or the directors (or the executive director) of Party C not to approve the merger or consolidation with any person, or the acquisition of or investment in any person;

2.2.4  Party B shall immediately notify Party A of the occurrence or possible occurrence of any litigation, arbitration or administrative proceedings relating to the equity interests in Party C held by Party B;

2.2.5  Party B shall cause the shareholders' meeting or the directors (or the executive director) of Party C to vote their approval of the transfer of the Optioned Interests as set forth in this Agreement and to take any and all other actions that may be requested by Party A;

2.2.6  To the extent necessary to maintain Party B's ownership in Party C, Party B shall execute all necessary or appropriate documents, take all necessary or appropriate actions, file all necessary or appropriate complaints, and raise necessary or appropriate defenses against all claims;

5

2.2.7  Party B shall appoint any designee of Party A as the director or the executive director of Party C, at the request of Party A;

2.2.8  Party B hereby waives its right of first refusal to the transfer of equity interest by any other shareholder of Party C to Party A (if any), and gives consent to the execution by each other shareholder of Party C with Party A and Party C the exclusive option agreement, the equity interest pledge agreement and the power of attorney similar to this Agreement, Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney, and accepts not to take any action in conflict with such documents executed by the other shareholders;

2.2.9  Party B shall promptly donate any profit, interest, dividend or proceeds of liquidation to Party A or any other person designated by Party A to the extent permitted under the applicable PRC laws; and

2.2.10  Party B shall strictly abide by the provisions of this Agreement and other contracts jointly or separately executed by and among Party B, Party C and Party A, perform the obligations hereunder and thereunder, and refrain from any action/omission that may affect the effectiveness and enforceability thereof. To the extent that Party B has any remaining rights with respect to the equity interests subject to this Agreement hereunder or under Party B's Equity Interest Pledge Agreement or under Party B's Power of Attorney, Party B shall not exercise such rights except in accordance with the written instructions of Party A.

**3.  Representations and Warranties**

Party B and Party C hereby represent and warrant to Party A, jointly and severally, as of the date of this Agreement and each date of the transfer of the Optioned Interests, that:

3.1  They have the power, capacity and authority to execute and deliver this Agreement and any equity interest transfer contracts to which they are parties concerning the Optioned Interests to be transferred thereunder (each, a "Transfer Contract"), and to perform their obligations under this Agreement and any Transfer Contracts. Party B and Party C agree to enter into Transfer Contracts consistent with the terms of this Agreement upon Party A's exercise of the Equity Interest Purchase Option. This Agreement and the Transfer Contracts to which they are parties constitute or will constitute their legal, valid and binding obligations and shall be enforceable against them in accordance with the provisions thereof;

3.2  Party B and Party C have obtained any and all approvals and consents from the competent government authorities and third parties (if required) for the execution, delivery and performance of this Agreement.

6

3.3  The execution and delivery of this Agreement or any Transfer Contracts and the obligations under this Agreement or any Transfer Contracts shall not: (i) cause any violation of any applicable laws of China; (ii) be inconsistent with the articles of association, bylaws or other organizational documents of Party C; (iii) cause the violation of any contracts or instruments to which they are a party or which are binding on them, or constitute any breach under any contracts or instruments to which they are a party or which are binding on them; (iv) cause any violation of any condition for the grant and/or continued effectiveness of any licenses or permits issued to either of them; or (v) cause the suspension or revocation of or imposition of additional conditions to any licenses or permits issued to either of them;

3.4  Party B has a good and merchantable title to the equity interests held by Party B in Party C. Except for Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney, Party B has not placed any security interest on such equity interests;

3.5    Party C has a good and merchantable title to all of its assets, and has not placed any security interest on the aforementioned assets;

3.6    Party C does not have any outstanding debts, except for (i) debt incurred within the normal business scope; and (ii) debts disclosed to Party A for which Party A's written consent has been obtained;

3.7    Party C has complied with all laws and regulations of China applicable to asset acquisitions; and

3.8    There are no pending or threatened litigation, arbitration or administrative proceedings relating to the equity interests in Party C, assets of Party C or Party C.

## 4.    **Effective Date and Term**

This Agreement shall become effective upon execution by the Parties, and remain effective until all equity interests held by Party B in Party C have been transferred or assigned to Party A and/or any other person designated by Party A in accordance with this Agreement.

## 5.    **Governing Law and Resolution of Disputes**

5.1    Governing Law

The execution, effectiveness, construction, performance, amendment and termination of this Agreement and the resolution of disputes hereunder shall be governed by the laws of the PRC.

<div align="center">7</div>

5.2    Methods of Resolution of Disputes

In the event of any dispute with respect to the construction and performance of this Agreement, the Parties shall first resolve the dispute through friendly negotiations. In the event the Parties fail to reach an agreement on the dispute after either Party's request to the other Parties for resolution of the dispute through negotiations, either Party may submit the relevant dispute to Beijing Arbitration Commission for arbitration, in accordance with its arbitration rules. The arbitration shall be conducted in Beijing. The arbitration award shall be final and binding on all Parties.

## 6.    **Taxes and Fees**

Each Party shall pay any and all transfer and registration taxes, expenses and fees incurred thereby or levied thereon in accordance with the laws of China in connection with the preparation and execution of this Agreement and the Transfer Contracts, as well as the consummation of the transactions contemplated under this Agreement and the Transfer Contracts.

## 7.    **Notices**

7.1    All notices and other communications required or permitted to be given pursuant to this Agreement shall be delivered personally or sent by registered mail, prepaid postage, a commercial courier service or facsimile transmission to the address of such Party set forth below. A confirmation copy of each notice shall also be sent by email. The dates on which notices shall be deemed to have been effectively given shall be determined as follows:

7.1.1    Notices given by personal delivery, courier service, registered mail or prepaid postage shall be deemed effectively given on the date of receipt or refusal at the address specified for notices;

7.1.2    Notices given by facsimile transmission shall be deemed effectively given on the date of successful transmission (as evidenced by an automatically generated confirmation of transmission).

7.2    For the purpose of notices, the addresses of the Parties are as follows:

**Party A:**    Tantan Technology (Beijing) Co., Ltd.
Address:    1307 Guanghua Road #9, Chaoyang District, Beijing

**Party B:**    Beijing Momo Technology Co., Ltd.
Address:    Room 222002, Floor 20, Building No.6, Courtyard No.1, Futong East Street, Chaoyang District, Beijing

**Party C:**    Tantan Culture Development (Beijing) Co., Ltd.
Address:    409 Guanghua Road #9, Chaoyang District, Beijing

7.3    Any Party may at any time change its address for notices by a notice delivered to the other Parties in accordance with the terms hereof.

<div align="center">8</div>

## 8.    **Confidentiality**

The Parties acknowledge that the existence and the terms of this Agreement, and any oral or written information exchanged between the Parties in connection with the preparation and performance of this Agreement are regarded as confidential information. Each Party shall maintain confidentiality of all such confidential information, and without obtaining the written consent of other Parties, it shall not disclose any relevant confidential information to any third parties, except for the information that: (a) is or will be in the public domain (other than through the receiving Party's unauthorized disclosure); (b) is under the obligation to be disclosed pursuant to the applicable laws or regulations, rules of any stock exchange, or orders of the court or other government authorities; or (c) is required to be disclosed by any Party to its shareholders, directors, employees, legal counsels or financial advisors regarding the transaction contemplated hereunder, provided that such shareholders, directors,

employees, legal counsels, or financial advisors shall be bound by the confidentiality obligations similar to those set forth in this Section. Disclosure of any confidential information by the shareholders, director, employees of, or agencies engaged by any Party shall be deemed disclosure of such confidential information by such Party and such Party shall be held liable for breach of this Agreement.

9.      **Further Warranties**

The Parties agree to promptly execute documents that are reasonably required for or are conducive to the implementation of the provisions and purposes of this Agreement and take further actions that are reasonably required for or are conducive to the implementation of the provisions and purposes of this Agreement.

10.      **Breach of Agreement**

10.1   If Party B or Party C conducts any material breach of any term of this Agreement, Party A shall have right to terminate this Agreement and/or require Party B or Party C to compensate all damages; this Section 10 shall not prejudice any other rights of Party A herein;

10.2   Party B or Party C shall not have any right to terminate this Agreement in any event unless otherwise required by the applicable laws.

11.      **Miscellaneous**

11.1   Amendments, changes and supplements

Any amendment, change and supplement to this Agreement shall require the execution of a written agreement by all of the Parties.

11.2   Entire agreement

Except for the amendments, supplements or changes in writing executed after the execution of this Agreement, this Agreement shall constitute the entire agreement reached by and among the Parties hereto with respect to the subject matter hereof, and shall supersede all prior oral and written consultations, representations and contracts reached with respect to the subject matter of this Agreement.

9

11.3   Headings

The headings of this Agreement are for convenience only, and shall not be used to interpret, explain or otherwise affect the meanings of the provisions of this Agreement.

11.4   Language

This Agreement is written in both Chinese and English language in three copies, each Party having one copy. The Chinese version and English version shall have equal legal validity.

11.5   Severability

In the event that one or several of the provisions of this Agreement are found to be invalid, illegal or unenforceable in any aspect in accordance with any laws or regulations, the validity, legality or enforceability of the remaining provisions of this Agreement shall not be affected or compromised in any respect. The Parties shall strive in good faith to replace such invalid, illegal or unenforceable provisions with effective provisions that accomplish to the greatest extent permitted by law and the intentions of the Parties, and the economic effect of such effective provisions shall be as close as possible to the economic effect of those invalid, illegal or unenforceable provisions.

11.6   Successors

This Agreement shall be binding on and shall inure to the interest of the respective successors of the Parties and the permitted assigns of such Parties.

11.7   Survival

11.7.1   Any obligations that occur or that are due as a result of this Agreement upon the expiration or early termination of this Agreement shall survive the expiration or early termination thereof.

11.7.2   The provisions of Sections 5, 8, 10 and this Section 11.7 shall survive the termination of this Agreement.

11.8   Waivers

Any Party may waive the terms and conditions of this Agreement, provided that such a waiver must be provided in writing and shall require the signatures of the Parties. No waiver by any Party in certain circumstances with respect to a breach by other Parties shall operate as a waiver by such a Party with respect to any similar breach in other circumstances.

10

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Exclusive Option Agreement as of the date first above written.

**Party A:**   Tantan Technology (Beijing) Co., Ltd.

By:      /seal of Tantan Technology (Beijing) Co., Ltd./               
Name:
Title:

**Party B:**   Beijing Momo Technology Co., Ltd.

By:      /s/ Yan Tang            /common seal/               
Name:   Yan Tang
Title:   Legal Representative

Party C:   Tantan Culture Development (Beijing) Co., Ltd.

By:      /seal of Tantan Culture Development (Beijing) Co., Ltd./          
Name:
Title:

Exhibit 4.24

**Power of Attorney**

Beijing Momo Technology Co., Ltd. (the "Momo"), a limited liability company organized and existing under the laws of the PRC, and a holder of RMB1,261,479 in the registered capital of Tantan Culture Development (Beijing) Co., Ltd. (the "Company") as of the date when the Power of Attorney is executed, hereby irrevocably authorize Tantan Technology (Beijing) Co., Ltd. (the "WFOE") to exercise the following rights relating to all equity interests held by the Momo now and in the future in the Company (the "Shareholding") during the term of this Power of Attorney:

The WFOE is hereby authorized to act on behalf of the Momo as its exclusive agent and attorney with respect to all matters concerning the Shareholding, including without limitation to: 1) attending shareholders' meetings of the Company; 2) exercising all the shareholder's rights and shareholder's voting rights the Momo is entitled to under the laws of China and the Company's Articles of Association, including but not limited to the sale, transfer, pledge or disposition of the Shareholding in part or in whole; and 3) designating and appointing on behalf of the Momo the legal representative, directors, supervisors, chief executive officer and other senior management members of the Company.

Without limiting the generality of the powers granted hereunder, the WFOE shall have the power and authority to, on behalf of the Momo, execute all the documents the Momo shall sign as stipulated in the Exclusive Option Agreement entered into by and among the Momo, the WFOE and the Company on May 9, 2018 and the Equity Pledge Agreement entered into by and among the Momo, the WFOE and the Company on May 9, 2018 (including any modification, amendment and restatement thereto, collectively the "Transaction Documents"), and perform the terms of the Transaction Documents.

All the actions associated with the Shareholding conducted by the WFOE shall be deemed as the Momo's own actions, and all the documents related to the Shareholding executed by the WFOE shall be deemed to be executed by the Momo. The Momo hereby acknowledges and ratifies those actions and/or documents by the WFOE.

The WFOE is entitled to re-authorize or assign its rights related to the aforesaid matters to any other person or entity at its own discretion and without giving prior notice to the Momo or obtaining the Momo's consent.

During the period that the Momo is a shareholder of the Company, this Power of Attorney shall be irrevocable and continuously effective and valid from the date of execution of this Power of Attorney.

During the term of this Power of Attorney, the Momo hereby waives all the rights associated with the Shareholding, which have been authorized to the WFOE through this Power of Attorney, and shall not exercise such rights by itself.

This Power of Attorney is written in Chinese and English. The Chinese version and English version shall have equal legal validity.

Beijing Momo Technology Co., Ltd.

By:    /s/ Yan Tang        /common seal/
Name:  Yan Tang
Title:   Legal Representative

May 9, 2018

Accepted by

Tantan Technology (Beijing) Co., Ltd.

By:    /seal of Tantan Technology (Beijing) Co., Ltd./
Name:
Title:

Acknowledged by

Tantan Culture Development (Beijing) Co., Ltd.

By:    /seal of Tantan Culture Development (Beijing) Co., Ltd./
Name:
Title:

**Exhibit 4.25**

**Business Operation Agreement**

This Business Operation Agreement (this "Agreement"), dated as of June 1, 2018, is made by and among the following parties:

| | |
|---|---|
| Party A: | Beijing Yiliulinger Information Technology Co., Ltd. |
| Address: | Room 305, Building 4, Yard 13, Kaifang East Road, Huairou District, Beijing |
| Legal representative: | Xiaoliang Lei |

| | |
|---|---|
| Party B: | Hainan Miaoka Network Technology Co., Ltd. |
| Address: | Room 201, Building A18, Hainan Ecological Software Park, High-tech Industries Demonstration Zone, Laocheng District, Hainan |
| Legal representative: | Xiaoliang Lei |

Party C:

| | |
|---|---|
| Xiaoliang Lei | (ID Card No. ***) |
| Address: | 20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC |

| | |
|---|---|
| Li Wang | (ID Card No. ***) |
| Address: | 20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC |

(Individually a "Party"; collectively the "Parties")

**WHEREAS:**

A.    Party A is a wholly-owned subsidiaries of wholly foreign-owned enterprise incorporated and validly existing in the People's Republic of China (the "PRC");

B.    Party B is a limited liability company incorporated in the PRC and engaged in technology related investment consultation etc.;

C.    Party A and Party B have established business relation by entering into a certain Exclusive Consulting and Management Services Agreement, under which Party B will make various payments to Party A and therefore Party B's activities in its ordinary course of business will have material effect upon its ability to make relevant payment to Party A; and

D.    Each of the Party C is a shareholder of Party B (collectively, the "Founding Shareholders"), in which each of Xiaoliang LEI and Li Wang holds 50% and 50% of Party B, respectively.

**NOW, THEREFORE**, the Parties, through friendly consultations and based on the principle of equality and mutual benefit, hereby agree as follows:

**1.    Negative Obligations**

In order to guarantee the performance by Party B of the agreement entered into by and between Party A and Party B and all of Party B's obligations towards Party A, the Founding Shareholders hereby acknowledge, agree and jointly warrants that without prior written consent of Party A or any party designated by Party A, Party B shall not engage in any transaction which may have material or adverse effect on any of its assets, businesses, employees, obligations, rights or operations, including without limitation:

1.1    Conduct of any activity outside its ordinary course of business or in a manner inconsistent with its past practice;

1

1.2    Making any borrowing or undertaking any indebtedness from any third party;

1.3    Change or removal of any of its directors or senior officers;

1.4    Sale, acquisition or any other disposal of any assets or rights, including without limitation any intellectual property rights, with any third party;

1.5    Creation of any guarantee or any other security on any of its assets or intellectual properties in favor of any third party, or creation of any encumbrance on any of its assets;

1.6    Change of its articles of association or its scope of business;

1.7    Change of its ordinary course of business or any of its material bylaws;

1.8    Transfer any of its rights or obligations under this Agreement to any third party;

1.9    Making any material change to its business pattern, marketing strategy, business plan or customer relationship; and

1.10   Distribution of any bonus or dividend.

**2.    Business Management and Human Resources Arrangement**

2.1    Party B and the Founding Shareholders hereby jointly agree to accept and strictly implement any proposal made by Party A from time to time regarding employment and removal of Party B's employees, day-to-day business management and financial management system of Party B.

2.2  Party B and the Founding Shareholders hereby jointly agree that the Founding Shareholders elect or appoint, as applicable, any person designated by Party A as Party B's director, chairman, president, chief financial officer and any other executive officers in accordance with relevant laws, regulations and its articles of association.

2.3  Upon termination of his or her employment with Party A, either voluntarily or by Party A, each of the directors or senior officers elected or appointed under Section 2.2 will be simultaneously disqualified to hold any position in Party B; under such circumstance, the Founding Shareholders will elect any other person designated by Party A for such position.

2.4  For purpose of Section 2.3, the Founding Shareholders will take any actions required under relevant laws, articles of association and this Agreement to effect the employment and termination provided under Sections 2.2 and 2.3.

2.5  The Founding Shareholders hereby agree that in conjunction with execution of this Agreement, they will execute an irrevocable power of attorney authorizing Party A to exercise their respective rights as shareholders of Party B and respective voting rights at Party B's shareholders meeting.

## 3.  Other Agreements

3.1  Upon termination or expiration of any agreement between Party A and Party B, Party A may elect to terminate all of its agreements with Party B, including without limitation the Exclusive Consulting and Management Services Agreement.

2

3.2  Considering the business relationship established between Party A and Party B based on the executed Exclusive Consulting and Management Services Agreement, Party B's activities in its ordinary course of business will have material effect upon its ability to make relevant payment to Party A. The Founding Shareholders agree that any bonus, dividend or any other benefit or interest receivable by it as shareholder of Party B will be unconditionally and automatically paid or transferred to Party A.

## 4.  All Agreements and Amendments

4.1  This Agreement and all of the agreements and/or documents referred to or expressly included herein constitute entire agreements among the Parties with respect to the subject matter hereof and supersede all prior agreements, contracts, understandings and communications, written or oral, among the Parties with respect to the same.

4.2  This Agreement may not be amended unless by agreement of the Parties in writing. Any amendment or supplement hereto duly executed by the Parties shall be an integral part of and have the same effect with this Agreement.

## 5.  Governing Law

The execution, validity, performance of this Agreement and resolution of any dispute arising from this Agreement shall be governed by the laws of the PRC.

## 6.  Dispute Resolution

6.1  Should any dispute arise in connection with construction or performance of any provision under this Agreement, the Parties shall seek in good faith to resolve such dispute through negotiations. If the negotiations fail, any of the Parties may submit the dispute to Beijing Arbitration Commission for arbitration in accordance with its arbitration rules then in effect. The arbitration will be in Chinese. The arbitral award shall be final and binding on each of the Parties.

6.2  Except for the matter under dispute, each of the Parties shall continue to perform its obligations under this Agreement in good faith.

## 7.  Notices

All notices made by each of the Parties to exercise any of its rights or perform any of its obligations hereunder shall be in writing and given to the following address in person, by registered mail, prepaid mail, recognized courier service, or by fax.

To Party A:    Beijing Yiliulinger Information Technology Co., Ltd.
Address:       20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC
Telephone:     +86 10-57310567
Attention:     Xiaolaing Lei

To Party B:    Hainan Miaoka Network Technology Co., Ltd.
Address:       20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC
Telephone:     +86 10-57310567
Attention:     Xiaolaing Lei

To Party C:
Xiaolaing Lei
Address:       20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC
Telephone:     +86 10-57310567
Attention:     Xiaolaing Lei

3

Li Wang
Address:    20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC
Telephone:    +86 10-57310567
Attention:    Li Wang

8.    Effectiveness, Term and other terms of this Agreement

8.1    Any written consent, proposal, appointment and any other decision in connection with this Agreement which has material effect on Party B's day-to-day business operations shall be made by Party A's board of shareholders.

8.2    This Agreement shall become effective upon execution by each of the Parties on the date first written above. The term of this Agreement will be ten (10) years unless early terminated by Party A. Upon request from Party A, the Parties may extend the term of this Agreement prior to its expiration or enter into a separate business agreement, each as requested by Party A.

8.3    During the term of this Agreement, none of Party B or Founding Shareholders may terminate this Agreement. Party A shall have the right to terminate this Agreement at any time with notice to Party B and its Shareholders in writing.

8.4    If any term or provision hereof is found illegal or unenforceable under applicable laws, such term or provision shall be deemed deleted from this Agreement without any effect, and the remainder of this Agreement shall remain in force and effect as if such term or provision had never been contained herein. The Parties shall negotiate to replace such deleted term or provision with a lawful and valid term or provision acceptable to each of the Parties.

8.5    Failure to exercise any right, power or privilege hereunder shall not be deemed as waiver thereof. Any single or partial exercise of any right, power or privilege hereunder shall not preclude exercise of any other right, power or privilege under this Agreement.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their duly authorized representatives on the date first written above.

*(The Remainder of this page is intentionally left blank)*

4

This is the Signature Page of Business Operation Agreement between Beijing Yiliulinger Information Technology Co., Ltd., Hainan Miaoka Network Technology Co., Ltd., Xiaoliang Lei and Li Wang,)

Party A: Beijing Yiliulinger Information Technology Co., Ltd.

By:    /s/ Xiaoliang Lei    /common seal/
Title:    Legal representative

Party B: Hainan Miaoka Network Technology Co., Ltd.

By:    /s/Xiaoliang Lei    /common seal/
Title:    Legal representative

Party C:

Xiaoliang Lei

By:    /s/ Xiaoliang Lei

Li Wang

By:    /s/ Li Wang

5

**Exhibit 4.26**

**Power of Attorney**

I, Xiaoliang Lei, a People's Republic of China ("China" or the "PRC") citizen with PRC Identification Card No.: ***, and a holder of RMB500,000 in the registered capital of Hainan Miaoka Network Technology Co., Ltd. (the "Company") as of the date when the Power of Attorney is executed, hereby irrevocably authorize Beijing Yiliulinger Information Technology Co., Ltd. (the "Yiliulinger") to exercise the following rights relating to all equity interests held by me now and in the future in the Company ("My Shareholding") during the term of this Power of Attorney:

The Yiliulinger is hereby authorized to act on behalf of myself as my exclusive agent and attorney with respect to all matters concerning My Shareholding, including without limitation to: 1) attending shareholders' meetings of the Company; 2) exercising all the shareholder's rights and shareholder's voting rights I am entitled to under the laws of China and the Company Articles of Association, including but not limited to the sale, transfer, pledge or disposition of My Shareholding in part or in whole; and 3) designating and appointing on behalf of myself the legal representative, directors, supervisors, chief executive officer and other senior management members of the Company.

Without limiting the generality of the powers granted hereunder, the Yiliulinger shall have the power and authority to, on behalf of myself, execute all the documents I shall sign as stipulated in the Exclusive Option Agreement entered into by and among myself, the Yiliulinger and the Company on June 1, 2018 and the Equity Pledge Agreement entered into by and among me, the Yiliulinger and the Company on June 1, 2018 (including any modification, amendment and restatement thereto, collectively the "Transaction Documents"), and perform the terms of the Transaction Documents.

All the actions associated with My Shareholding conducted by the Yiliulinger shall be deemed as my own actions, and all the documents related to My Shareholding executed by the Yiliulinger shall be deemed to be executed by me. I hereby acknowledge and ratify those actions and/or documents by the Yiliulinger.

The Yiliulinger is entitled to re-authorize or assign its rights related to the aforesaid matters to any other person or entity at its own discretion and without giving prior notice to me or obtaining my consent. If required by PRC laws, the Yiliulinger shall designate a PRC citizen to exercise the aforementioned rights.

During the period that I am a shareholder of the Company, this Power of Attorney shall be irrevocable and continuously effective and valid from the date of execution of this Power of Attorney.

During the term of this Power of Attorney, I hereby waive all the rights associated with My Shareholding, which have been authorized to the Yiliulinger through this Power of Attorney, and shall not exercise such rights by myself.

This Power of Attorney is written in Chinese and English. The Chinese version and English version shall have equal legal validity.

Xiaoliang Lei

By:  /s/ Xiaoliang Lei
June 1, 2018

Accepted by

Beijing Yiliulinger Information Technology Co., Ltd.

By:      /s/ Xiaoliang Lei          /common seal/
Name:   Xiaoliang Lei
Title:    Legal Representative

Acknowledged by:

Hainan Miaoka Network Technology Co., Ltd.

By:      /s/ Xiaoliang Lei          /common seal/
Name:   Xiaoliang Lei
Title:    Legal Representative

**Power of Attorney**

I, Wang Li, a People's Republic of China ("China" or the "PRC") citizen with PRC Identification Card No.: ***, and a holder of RMB500,000 in the registered capital of Hainan Miaoka Network Technology Co., Ltd. (the "Company") as of the date when the Power of Attorney is executed, hereby irrevocably authorize Beijing Yiliulinger Information Technology Co., Ltd. (the "Yiliulinger") to exercise the following rights relating to all equity interests held by me now and in the future in the Company ("My Shareholding") during the term of this Power of Attorney:

The Yiliulinger is hereby authorized to act on behalf of myself as my exclusive agent and attorney with respect to all matters concerning My Shareholding, including without limitation to: 1) attending shareholders' meetings of the Company; 2) exercising all the shareholder's rights and shareholder's voting rights I am entitled to under the laws of China and the Company Articles of Association, including but not limited to the sale, transfer, pledge or disposition of My Shareholding in part or in whole; and 3) designating and appointing on behalf of myself the legal representative, directors, supervisors, chief executive officer and other senior management members of the Company.

Without limiting the generality of the powers granted hereunder, the Yiliulinger shall have the power and authority to, on behalf of myself, execute all the documents I shall sign as stipulated in the Exclusive Option Agreement entered into by and among myself, the Yiliulinger and the Company on June 1, 2018 and the Equity Pledge Agreement entered into by and among me, the Yiliulinger and the Company on June 1, 2018 (including any modification, amendment and restatement thereto, collectively the "Transaction Documents"), and perform the terms of the Transaction Documents.

All the actions associated with My Shareholding conducted by the Yiliulinger shall be deemed as my own actions, and all the documents related to My Shareholding executed by the Yiliulinger shall be deemed to be executed by me. I hereby acknowledge and ratify those actions and/or documents by the Yiliulinger.

The Yiliulinger is entitled to re-authorize or assign its rights related to the aforesaid matters to any other person or entity at its own discretion and without giving prior notice to me or obtaining my consent. If required by PRC laws, the Yiliulinger shall designate a PRC citizen to exercise the aforementioned rights.

During the period that I am a shareholder of the Company, this Power of Attorney shall be irrevocable and continuously effective and valid from the date of execution of this Power of Attorney.

During the term of this Power of Attorney, I hereby waive all the rights associated with My Shareholding, which have been authorized to the Yiliulinger through this Power of Attorney, and shall not exercise such rights by myself.

This Power of Attorney is written in Chinese and English. The Chinese version and English version shall have equal legal validity.

Wang Li

By:  /s/ Wang Li
June 1 , 2018

Accepted by

Beijing Yiliulinger Information Technology Co., Ltd.

By:      /s/ Xiaoliang Lei          /common seal/
Name:    Xiaoliang Lei
Title:    Legal Representative

Acknowledged by:

Hainan Miaoka Network Technology Co., Ltd.

By:      /s/ Xiaoliang Lei          /common seal/
Name:    Xiaoliang Lei
Title:    Legal Representative

**Exhibit 4.27**

# EXCLUSIVE COOPERATION

## AGREEMENT

**Hainan Miaoka Network Technology Co., Ltd.**

**and**

**Beijing Yilliulinger Information Technology Co., Ltd.**

1

---

## EXCLUSIVE COOPERATION AGREEMENT

This Service Agreement ("Agreement"), effective on June 1 ,2018 ("Effective Date"), is concluded by and between Hainan Miaoka Network Technology Co., Ltd. ("Miaoka Network"), a company incorporated under the laws of the People's Republic of China, with its principal place of business at Room 201, Building A18, Hainan Ecological Software Park, High-tech Industries Demonstration Zone, Laocheng District, Hainan and Beijing Yiliulinger Information Technology Co., Ltd. ("Yiliulinger"), a company incorporated under the laws of the People's Republic of China, with its principal place of business at Room 305, Building 4, Yard 13, Kaifang East Road, Huairou District, Beijing (each "a Party" and collectively, "the Parties").

## BACKGROUND

Whereas, Miaoka Network is responsible for obtaining the Internet Content Provider ("ICP") license required to operate Internet Information Services in China.

Whereas, Miaoka Network acquires the Licensing of Intellectual properties (the App and Emoticon in supplemental agreements to this Agreement) as well as the Services of Yiliulinger to carry out Internet Information Services in China.

Whereas, this Agreement sets forth the terms and conditions under which Yiliulinger as agreed to provide, and Miaoka Network has agreed to receive, the Licensing and the Services;

Whereas, the capitalized terms used and not otherwise defined in these recitals are defined in Article 1 of this Agreement;

Now, therefore, in consideration of the mutual promises, covenants, conditions and terms set forth herein, the Parties agree as follows:

## 1 DEFINITIONS.

Capitalized terms used in this Agreement have the meanings set forth in this Article 1 or as otherwise defined in the context of the provision.

"Effective Date" is June 1, 2018.

"Governing Laws" is defined in Section 6.a.

"Licensing" means Yiliulinger agrees to grant the use right of its intellectual properties to Miaoka Network under this Agreement, including the App and Emoticon (licensing details will be set forth in supplemental agreements to this Agreement).

2

---

"Services" means those technical and non-technical services to be provided by Yiliulinger to Miaoka Network under this Agreement. Technical services include: (i) assistance in the maintenance of the App, as well as statistics analysis on the App users; (ii) technical support and maintenance of hardware and software;(iii)call center management services; (iv) after-sale services including training and consulting, etc. Non-technical services include: (i) marketing and advertising services; (ii) sales and payment channel management and development; (iii) administrative services including legal, finance, HR and administration; and (iv) other services as the Parties may agree from time to time.

"License Fee" is defined in Section 4.

"Service Fee" is defined in Section 4.

"Term" is defined in Section 2.a.

## 2 TERM AND TERMINATION.

    a.    Term. The term of this Agreement will begin on the Effective Date and will remain effective for ten (10) years. After the effective period, Yiliulinger may decide if this Agreement will be renewed and how long it will be renewed for("Term").

    b.    Termination for Convenience. Yiliulinger may terminate this Agreement upon thirty (30) days' written notice. Miaoka Network shall not

terminate this Agreement under any circumstances.

c.  Prior Agreements. This Agreement supersedes and terminates any and all prior agreements or contracts, oral or written, entered into between The Parties relating to the subject matter thereof.

## 3 EXCLUSIVE COOPERATION AND INTELLECTUAL PROPERTY RIGHTS.

a.  During the Term, Yiliulinger shall provide the Licensing of intellectual properties and the Services to Miaoka Networkas agreed by the Parties from time to time. Without Yiliulinger.'s consent, Miaoka Networkis not entitled to the right to engage any other third parties to perform, any licensing of intellectual properties and services similar to the Licensing or the Services.

b.  Yiliulinger reserves all the intellectual property rights developed under this agreement, including but not limited to copyright, patent right, right of patent application, knowhow, business secret, etc.

3

## 4 LICENSE FEE, SERVICE FEE AND PAYMENT.

a.  Pursuant to this Agreement, Yiliulinger grants to Mioka Tech. the use right of its intellectual properties including the App and Emoticons. Miaoka Network agrees to pay Yiliulinger a license fee ("License Fee") in consideration of the rights granted. The calculation methodology of the License Fee will be set forth in supplemental agreements to this Agreement.

b.  Pursuant to this Agreement and Miaoka Network's request from time to time, M Yiliulinger provides Miaoka Network with the Services. Miaoka Network intends to pay Yiliulinger a level of compensation commensurate with the value of the Services it provides, which are essential and fundamental to the economic success or failure of Miaoka Network's business in China.

c.  To ensure the high quality of the Licensing and the Services, Yiliulinger agrees to be compensated for the Licensing and the Services only if Miaoka Network achieves a level of operating profit above a certain rate, initially agreed to be three point five percent (3.5%) ("Expected Profit Rate"")of total revenue derived by Yiliulinger for operating the App in China. The License Fee and the Service Fee will be calculated such that after it is paid, Miaoka Network's operating profit rate will not be lower than the Expected Profit Rate ("Service Fee""). If Miaoka Network achieves a level of operating profit above the Expected Profit Rate, the excess profit will be paid to Yiliulinger in the form of License Fee and Service Fee. The calculation methodology of the License Fee and Service Fee will be set forth in supplemental agreements to this Agreement. If Miaoka Networkis unable to achieve the Expected Profit Rate due to Yiliulinger.'s failure in providing the high quality services, Yiliulinger will not be entitled to any License Fee or Service Fee. The Parties agree to review the Expected Profit Rate from time to time.

Operating profit rate = (Revenues-Cost of revenues-Sales tax and surcharges –Sales expense-G&A expense-R&D expense) /Revenues.

d.  Payments Due. Payment notice for the License Fee and the Service Fee shall be presented on a monthly basis. The Parties agrees to pay the total amounts shown as due within sixty (60) days from the end of such month. The Parties agrees to pay or offset the payments from time to time, as requested by either Party.

e.  Currency. All computations and payments made pursuant to this Article 4 shall be in Chinese RMB. A netting of any amount payable under this Agreement against existing accounts payable and accounts receivable shall be an acceptable manner of payment. effective as of the date of the netting on the books of the Parties.

4

f.  Retrospection. The Parties agree the License Fee and the Service Fee defined in this Section shall be retrospective to the Parties from the date June 1 ,2018.

## 5 TAXES.

a.  Yiliulinger 's Tax Responsibility. Yiliulinger is liable for any value-added tax, excise tax, tariff, duty or any other similar tax imposed by any governmental authority arising from the performance of Services under this Agreement.

b.  Miaoka Network's Tax Responsibility. Miaoka Networkis liable for any value-added tax. excise tax, tariff, duty or any other similar tax imposed by any governmental authority arising from its performance of this Agreement.

## 6 COMPLIANCE WITHLAWS.

a.  Compliance. Each Party will perform its obligations under this Agreement in a manner that complies with all laws applicable to that Party's business. Without limiting the foregoing, the Parties will respectively identify and comply with all laws applicable to the Parties including:(a) laws requiring the procurement of inspections, certificates and approvals needed to perform the Services, and (b)laws regarding healthcare, workplace safety, immigration ,labor standars, wage and hour laws, insurance, data protection and privacy ( collectively, "Governing Laws' )

b.  Change in Law. The Parties will work together to identify the effect of changes in laws on this Agreement, and will promptly discuss the changes to the terms and provisions of this Agreement, if any, required to comply with all laws.

## 7 CONSTRUCTION.

a.  Severability. If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to Law, then the remaining provisions of this Agreement. If capable of substantial performance, will remain in full force and effect.

b.  Applicable Law. This Agreement shall be construed and enforced in accordance with the laws of the People's Republic of China without

regard to conflict of laws principles.

c.    Resolution of Disputes. This Agreement shall be governed by the laws of the People's Republic of China. All the disputes arising from the conclusion, performance or interpretation of this Agreement shall be settled by the Parties through consultation.

If the consultation fails, the disputes shall be referred to China International economic and Trade Arbitration Commission for arbitration. The place of arbitration shall be in Beijing. The arbitral award shall be final and binding upon both Parties.

Each of Yiliulinger and Miaoka Network has caused this Agreement to be signed and delivered by its duly authorized representative to be effective as of the Effective Date.

By:    /s/ Xiaoliang Lei    /common seal/                    By:    /s/ Xiaoliang Lei    /common seal/

Title:    Legal Representative                                  Title:    Legal Representative
For and on behalf of                                             For and on behalf of
Hainan Miaoka Network Technology Co., Ltd.              Beijing Yiliulinger Information Technology Co., Ltd.

**Supplemental Agreement**

Party A: Hainan Miaoka Network Technology Co., Ltd.
Address: Room 201, Building A18, Hainan Ecological Software Park, High-tech Industries Demonstration Zone, Laocheng District, Hainan, P.R.China

Party B: Beijing Yiliulinger Information Technology Co., Ltd.
Address: Room 305, 3F, Building 4, East Kaifang Road, Huairou District, Beijing, P.R.China

An Exclusive Cooperation Agreement ("the Agreement") was concluded between Party A and Party B ("the Parties") on June 1, 2018. The Parties agree on this supplemental agreement in accordance with the Contract Law of the PRC and other relevant laws and regulations for mutual benefit.

1.    Supplementary Terms

a)    According to Section 1 of the Agreement, Party B agrees to license the use right of the App (including but not limited to the following version) to Party A starting from the effective date of this supplemental agreement.

| App IOS | App Android V |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

Under the license: (i) Party B is responsible for the design, development and maintenance of the App; (i) Party A is granted with the right to operate the App and to generate income from in-App features sold to users.

According to Article 4. a of the Agreement, Party A agrees to pay Party B a license fee in consideration of the rights granted. The license fee will be twelve point five percent (12.5%) of the gross revenues generated by Party A from the App. The Parties agree to review the pricing of license fee from time to time.

b)    According to Section 1 of the Agreement, Party B agrees to license the use right of Emoticon (Emoticon details are listed in Appendix A) to Party A starting from the effective date of this supplemental agreement.

According to Article 4.a of the Agreement, Party A agrees to pay Party B a license fee in consideration of the rights granted. The license fee will be twelve point five percent (12.5%) of the gross revenues generated by Party A from sales of the emotions. The Parties agree to review the pricing of license fee from time to time.

c)    Without written consent of Party B, Party A shall not sublicense, transfer or disclose the right to any third party, or try to develop, modify or decompile on the basis of Party B's intellectual properties. Party A agrees with all the exclusive ownership and interest of Party B, including all intellectual property, proprietary technology, development rights and other related rights. Party A shall not be involved in any activities that harm the interest of Party B under any circumstances.

2.    Above are the supplementary terms to the Agreement. The Parties shall still comply with the terms of the Agreement concluded on June 1 ,2018, which will not be affected by the supplemental agreement.

3.    This supplemental agreement is an indivisible part of the Agreement concluded by the Parties on June 1 ,2018. The Parties agree that the license fee set forth in this supplemental agreement shall be retrospective from June 1, 2018. This supplemental agreement is made out in two (2) sets of

originals with equal validity. Party A and Party B each have one of the originals. By signing below, the Parties agree to the terms of this supplemental agreement effective from the date of signature.

9

By:   /s/ Xiaoliang Lei    /common seal/

Title:   Legal Representative
For and on behalf of
Hainan Miaoka Network Technology Co., Ltd.

By:   /s/ Xiaoliang Lei    /common seal/

Title:   Legal Representative
For and on behalf of
Beijing Yiliulinger Information Technology Co., Ltd.

10

**Exhibit 4.28**

**Exclusive Option Agreement**

This Exclusive Option Agreement (this "Agreement") is executed by and among the following Parties as of June 1, 2018 in Beijing, the People's Republic of China ("China" or the "PRC"):

**Party A:**   Beijing Yiliulinger Information Technology Co., Ltd., a wholly-owned subsidiaries of wholly foreign owned enterprise, organized and existing under the laws of the PRC, with its address at Room 305, Building 4, Yard 13, Kaifang East Road, Huairou District, Beijing;

**Party B:**   Xiaoliang Lei, a Chinese citizen with Identification No.: ***; and

**Party C:**   Hainan Miaoka Network Technology Co., Ltd., a limited liability company organized and existing under the laws of the PRC, with its address at Room 201, Building A18, Hainan Ecological Software Park, High-tech Industries Demonstration Zone, Laocheng District, Hainan.

In this Agreement, each of Party A, Party B and Party C shall be referred to as a "Party" respectively, and they shall be collectively referred to as the "Parties".

Whereas:

1. Party B is a shareholder of Party C and as of the date hereof holds RMB 500,000 in the registered capital of Party C.

2. Party B agrees to grant Party A an exclusive right through this Agreement, and Party A agrees to accept such exclusive right to purchase all or part equity interest held by Party B in Party C.

3. Party C agrees to grant Party A an exclusive right through this Agreement, and Party A agrees to accept such exclusive right to purchase all or part of the assets of Party C.

Now therefore, upon mutual discussion and negotiation, the Parties have reached the following agreement:

**1.    Sale and Purchase of Equity Interest and Asssets**

1.1    Equity Interest Purchase Option

Party B hereby irrevocably grants Party A an irrevocable and exclusive right to purchase, or designate one or more persons (each, a "Designee") to purchase the equity interests in Party C then held by Party B once or at multiple times at any time in part or in whole at Party A's sole and absolute discretion to the extent permitted by Chinese laws and at the price described in Section 1.1.2 herein (such right being the "Equity Interest Purchase Option"). Except for Party A and the Designee(s), no other person shall be entitled to the Equity Interest Purchase Option or other rights with respect to the equity interests of Party B. Party C hereby agrees to the grant by Party B of the Equity Interest Purchase Option to Party A. The term "person" as used herein shall refer to individuals, corporations, partnerships, partners, enterprises, trusts or non-corporate organizations.

1.1.1    Steps for Exercise of the Equity Interest Purchase Option

Subject to the provisions of the laws and regulations of China, Party A may exercise the Equity Interest Purchase Option by issuing a written notice to Party B (the "Equity Interest Purchase Option Notice"), specifying: (a) Party A's or the Designee's decision to exercise the Equity Interest Purchase Option; (b) the portion of equity interests to be purchased by Party A or the Designee from Party B (the "Optioned Interests"); and (c) the date for purchasing the Optioned Interests or the date for the transfer of the Optioned Interests.

1.1.2    Equity Interest Purchase Price

The purchase price of the Optioned Interests (the "Base Price") shall be RMB 10. If PRC law requires a minimum price higher than the Base Price when Party A exercises the Equity Interest Purchase Option, the minimum price regulated by PRC law shall be the purchase price (collectively, the "Equity Interest Purchase Price").

1.1.3    Transfer of Optioned Interests

For each exercise of the Equity Interest Purchase Option:

1.1.3.1    Party B shall cause Party C to promptly convene a shareholders' meeting, at which a resolution shall be adopted approving Party B's transfer of the Optioned Interests to Party A and/or the Designee(s);

1.1.3.2    Party B shall obtain written statements from the other shareholders of Party C giving consent to the transfer of the equity interest to Party A and/or the Designee(s) and waiving any right of first refusal related thereto;

1.1.3.3    Party B shall execute an equity interest transfer contract with respect to each transfer with Party A and/or each Designee (whichever is applicable), in accordance with the provisions of this Agreement and the Equity Interest Purchase Option Notice regarding the Optioned Interests;

1.1.3.4    The relevant Parties shall execute all other necessary contracts, agreements or documents, obtain all necessary government licenses and permits and take all necessary actions to transfer valid ownership of the Optioned Interests to Party A and/or the Designee(s), unencumbered by any security interests, and cause Party A and/or the Designee(s) to become the registered owner(s) of the Optioned Interests. For the purpose of this Section and this Agreement, "security interests" shall include securities, mortgages, third party's rights or interests, any stock options, acquisition right, right of first refusal, right to offset, ownership retention or other security arrangements, but shall be deemed to exclude any security interest created by this Agreement, Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney. "Party B's Equity Interest Pledge Agreement" as used in this Agreement shall refer to the Interest Pledge Agreement executed by and among Party A, Party B and Party C on the date hereof and any modification, amendment and restatement thereto. "Party B's Power of Attorney" as used in this Agreement shall refer to the Power of Attorney executed by Party B on the date hereof granting Party A with a power of attorney and any modification, amendment and restatement thereto.

1.2    Asset Purchase Option

Party C hereby grants to Party A an irrevocable and exclusive option to have Party A or its Designee to purchase from Party C, at Party A's sole discretion, at any time and in accordance with the procedures decided by Party A in its sole discretion, any or all of the assets of Party C, to the extent permitted under PRC law, and at the lowest purchase price permitted by PRC law. The Parties shall then enter into a separate assets transfer agreement, specifying the terms and conditions of the transfer of the assets.

2.    **Covenants**

2.1    Covenants regarding Party C

Party B (as a shareholder of Party C) and Party C hereby covenant as follows:

2.1.1    Without the prior written consent of Party A, they shall not in any manner supplement, change or amend the articles of association of Party C, increase or decrease its registered capital, or change its structure of registered capital in other manners;

2.1.2    They shall maintain Party C's corporate existence in accordance with good financial and business standards and practices, obtain and maintain all necessary government licenses and permits by prudently and effectively operating its business and handling its affairs;

2.1.3    Without the prior written consent of Party A, they shall not at any time following the date hereof, sell, transfer, mortgage or dispose of in any manner any material assets of Party C or legal or beneficial interest in the material business or revenues of Party C of more than RMB 500,000, or allow the encumbrance thereon of any security interest;

3

2.1.4    Without the prior written consent of Party A, they shall not incur, inherit, guarantee or suffer the existence of any debt, except for payables incurred in the ordinary course of business other than through loans;

2.1.5    They shall always operate all of Party C's businesses within the normal business scope to maintain the asset value of Party C and refrain from any action/omission that may affect Party C's operating status and asset value;

2.1.6    Without the prior written consent of Party A, they shall not cause Party C to execute any major contract, except the contracts in the ordinary course of business (for the purpose of this subsection, a contract with a price exceeding RMB 500,000 shall be deemed a major contract);

2.1.7    Without the prior written consent of Party A, they shall not cause Party C to provide any person with any loan or credit;

2.1.8    They shall provide Party A with information on Party C's business operations and financial condition at Party A's request;

2.1.9    If requested by Party A, they shall procure and maintain insurance in respect of Party C's assets and business from an insurance carrier acceptable to Party A, at an amount and type of coverage typical for companies that operate similar businesses;

2.1.10    Without the prior written consent of Party A, they shall not cause or permit Party C to merge, consolidate with, acquire or invest in any person;

2.1.11    They shall immediately notify Party A of the occurrence or possible occurrence of any litigation, arbitration or administrative proceedings relating to Party C's assets, business or revenue;

2.1.12    To maintain the ownership by Party C of all of its assets, they shall execute all necessary or appropriate documents, take all necessary or appropriate actions, file all necessary or appropriate complaints, and raise necessary or appropriate defenses against all claims;

2.1.13    Without the prior written consent of Party A, they shall ensure that Party C shall not in any manner distribute dividends to its shareholders, provided that upon Party A's written request, Party C shall immediately distribute all distributable profits to its shareholders;

4

2.1.14    At the request of Party A, they shall appoint any person designated by Party A as the director or executive director of Party C.

2.1.15    Without Party A's prior written consent, they shall not engage in any business in competition with Party A or its affiliates; and

2.1.16   Unless otherwise required by PRC law, Party C shall not be dissolved or liquated without prior written consent by Party A.

2.2   <u>Covenants of Party B</u>

Party B hereby covenants as follows:

2.2.1    Without the prior written consent of Party A, Party B shall not sell, transfer, mortgage or dispose of in any other manner any legal or beneficial interest in the equity interests in Party C held by Party B, or allow the encumbrance thereon, except for the interest placed in accordance with Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney;

2.2.2    Without the prior written consent of Party A, Party B shall cause the shareholders' meeting and/or the directors (or the executive director) of Party C not to approve any sale, transfer, mortgage or disposition in any other manner of any legal or beneficial interest in the equity interests in Party C held by Party B, or allow the encumbrance thereon of any security interest, except for the interest placed in accordance with Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney;

2.2.3    Without the prior written consent of Party A, Party B shall cause the shareholders' meeting or the directors (or the executive director) of Party C not to approve the merger or consolidation with any person, or the acquisition of or investment in any person;

2.2.4    Party B shall immediately notify Party A of the occurrence or possible occurrence of any litigation, arbitration or administrative proceedings relating to the equity interests in Party C held by Party B;

2.2.5    Party B shall cause the shareholders' meeting or the directors (or the executive director) of Party C to vote their approval of the transfer of the Optioned Interests as set forth in this Agreement and to take any and all other actions that may be requested by Party A;

2.2.6    To the extent necessary to maintain Party B's ownership in Party C, Party B shall execute all necessary or appropriate documents, take all necessary or appropriate actions, file all necessary or appropriate complaints, and raise necessary or appropriate defenses against all claims;

5

2.2.7    Party B shall appoint any designee of Party A as the director or the executive director of Party C, at the request of Party A;

2.2.8    Party B hereby waives its right of first refusal to the transfer of equity interest by any other shareholder of Party C to Party A (if any), and gives consent to the execution by each other shareholder of Party C with Party A and Party C the exclusive option agreement, the equity interest pledge agreement and the power of attorney similar to this Agreement, Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney, and accepts not to take any action in conflict with such documents executed by the other shareholders;

2.2.9    Party B shall promptly donate any profit, interest, dividend or proceeds of liquidation to Party A or any other person designated by Party A to the extent permitted under the applicable PRC laws; and

2.2.10   Party B shall strictly abide by the provisions of this Agreement and other contracts jointly or separately executed by and among Party B, Party C and Party A, perform the obligations hereunder and thereunder, and refrain from any action/omission that may affect the effectiveness and enforceability thereof. To the extent that Party B has any remaining rights with respect to the equity interests subject to this Agreement hereunder or under Party B's Equity Interest Pledge Agreement or under Party B's Power of Attorney, Party B shall not exercise such rights except in accordance with the written instructions of Party A.

**3.   <u>Representations and Warranties</u>**

Party B and Party C hereby represent and warrant to Party A, jointly and severally, as of the date of this Agreement and each date of the transfer of the Optioned Interests, that:

3.1    They have the power, capacity and authority to execute and deliver this Agreement and any equity interest transfer contracts to which they are parties concerning the Optioned Interests to be transferred thereunder (each, a "Transfer Contract"), and to perform their obligations under this Agreement and any Transfer Contracts. Party B and Party C agree to enter into Transfer Contracts consistent with the terms of this Agreement upon Party A's exercise of the Equity Interest Purchase Option. This Agreement and the Transfer Contracts to which they are parties constitute or will constitute their legal, valid and binding obligations and shall be enforceable against them in accordance with the provisions thereof;

3.2    Party B and Party C have obtained any and all approvals and consents from the competent government authorities and third parties (if required) for the execution, delivery and performance of this Agreement.

6

3.3    The execution and delivery of this Agreement or any Transfer Contracts and the obligations under this Agreement or any Transfer Contracts shall not: (i) cause any violation of any applicable laws of China; (ii) be inconsistent with the articles of association, bylaws or other organizational documents of Party C; (iii) cause the violation of any contracts or instruments to which they are a party or which are binding on them, or constitute any breach under any contracts or instruments to which they are a party or which are binding on them; (iv) cause any violation of any condition for the grant and/or continued effectiveness of any licenses or permits issued to either of them; or (v) cause the suspension or revocation of or imposition of additional conditions to any licenses or permits issued to either of them;

3.4    Party B has a good and merchantable title to the equity interests held by Party B in Party C. Except for Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney, Party B has not placed any security interest on such equity interests;

3.5    Party C has a good and merchantable title to all of its assets, and has not placed any security interest on the aforementioned assets;

3.6    Party C does not have any outstanding debts, except for (i) debt incurred within the normal business scope; and (ii) debts disclosed to Party A for which Party A's written consent has been obtained.

3.7    Party C has complied with all laws and regulations of China applicable to asset acquisitions; and

3.8    There are no pending or threatened litigation, arbitration or administrative proceedings relating to the equity interests in Party C, assets of Party C or Party C.

## 4.    **Effective Date and Term**

This Agreement shall become effective upon execution by the Parties, and remain effective until all equity interests held by Party B in Party C have been transferred or assigned to Party A and/or any other person designated by Party A in accordance with this Agreement.

## 5.    **Governing Law and Resolution of Disputes**

5.1    Governing Law

The execution, effectiveness, construction, performance, amendment and termination of this Agreement and the resolution of disputes hereunder shall be governed by the laws of the PRC.

<div align="center">7</div>

5.2    Methods of Resolution of Disputes

In the event of any dispute with respect to the construction and performance of this Agreement, the Parties shall first resolve the dispute through friendly negotiations. In the event the Parties fail to reach an agreement on the dispute after either Party's request to the other Parties for resolution of the dispute through negotiations, either Party may submit the relevant dispute to Beijing Arbitration Commission for arbitration, in accordance with its arbitration rules. The arbitration shall be conducted in Beijing. The arbitration award shall be final and binding on all Parties.

## 6.    **Taxes and Fees**

Each Party shall pay any and all transfer and registration taxes, expenses and fees incurred thereby or levied thereon in accordance with the laws of China in connection with the preparation and execution of this Agreement and the Transfer Contracts, as well as the consummation of the transactions contemplated under this Agreement and the Transfer Contracts.

## 7.    **Notices**

7.1    All notices and other communications required or permitted to be given pursuant to this Agreement shall be delivered personally or sent by registered mail, prepaid postage, a commercial courier service or facsimile transmission to the address of such Party set forth below. A confirmation copy of each notice shall also be sent by email. The dates on which notices shall be deemed to have been effectively given shall be determined as follows:

7.1.1    Notices given by personal delivery, courier service, registered mail or prepaid postage shall be deemed effectively given on the date of receipt or refusal at the address specified for notices;

7.1.2    Notices given by facsimile transmission shall be deemed effectively given on the date of successful transmission (as evidenced by an automatically generated confirmation of transmission).

7.2    For the purpose of notices, the addresses of the Parties are as follows:

**Party A:**    Beijing Yiliulinger Information Technology Co., Ltd.
Address:    20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:    Ying Zhang
Phone:    010-5731 0733

**Party B:**    Xiaoliang Lei
Address:    20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:    Ying Zhang
Phone:    010-5731 0733

<div align="center">8</div>

**Party C:**    Hainan Miaoka Network Technology Co., Ltd.
Address:    20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:    Ying Zhang
Phone:    010-5731 0733

7.3    Any Party may at any time change its address for notices by a notice delivered to the other Parties in accordance with the terms hereof.

8. **Confidentiality**

The Parties acknowledge that the existence and the terms of this Agreement, and any oral or written information exchanged between the Parties in connection with the preparation and performance of this Agreement are regarded as confidential information. Each Party shall maintain confidentiality of all such confidential information, and without obtaining the written consent of other Parties, it shall not disclose any relevant confidential information to any third parties, except for the information that: (a) is or will be in the public domain (other than through the receiving Party's unauthorized disclosure); (b) is under the obligation to be disclosed pursuant to the applicable laws or regulations, rules of any stock exchange, or orders of the court or other government authorities; or (c) is required to be disclosed by any Party to its shareholders, directors, employees, legal counsels or financial advisors regarding the transaction contemplated hereunder, provided that such shareholders, directors, employees, legal counsels, or financial advisors shall be bound by the confidentiality obligations similar to those set forth in this Section. Disclosure of any confidential information by the shareholders, director, employees of, or agencies engaged by any Party shall be deemed disclosure of such confidential information by such Party and such Party shall be held liable for breach of this Agreement.

9. **Further Warranties**

The Parties agree to promptly execute documents that are reasonably required for or are conducive to the implementation of the provisions and purposes of this Agreement and take further actions that are reasonably required for or are conducive to the implementation of the provisions and purposes of this Agreement.

10. **Breach of Agreement**

10.1    If Party B or Party C conducts any material breach of any term of this Agreement, Party A shall have right to terminate this Agreement and/or require Party B or Party C to compensate all damages; this Section 10 shall not prejudice any other rights of Party A herein;

10.2    Party B or Party C shall not have any right to terminate this Agreement in any event unless otherwise required by the applicable laws.

9

11. **Miscellaneous**

11.1    Amendments, changes and supplements

Any amendment, change and supplement to this Agreement shall require the execution of a written agreement by all of the Parties.

11.2    Entire agreement

Except for the amendments, supplements or changes in writing executed after the execution of this Agreement, this Agreement shall constitute the entire agreement reached by and among the Parties hereto with respect to the subject matter hereof, and shall supersede all prior oral and written consultations, representations and contracts reached with respect to the subject matter of this Agreement.

11.3    Headings

The headings of this Agreement are for convenience only, and shall not be used to interpret, explain or otherwise affect the meanings of the provisions of this Agreement.

11.4    Language

This Agreement is written in both Chinese and English language in three copies, each Party having one copy. The Chinese version and English version shall have equal legal validity.

11.5    Severability

In the event that one or several of the provisions of this Agreement are found to be invalid, illegal or unenforceable in any aspect in accordance with any laws or regulations, the validity, legality or enforceability of the remaining provisions of this Agreement shall not be affected or compromised in any respect. The Parties shall strive in good faith to replace such invalid, illegal or unenforceable provisions with effective provisions that accomplish to the greatest extent permitted by law and the intentions of the Parties, and the economic effect of such effective provisions shall be as close as possible to the economic effect of those invalid, illegal or unenforceable provisions.

11.6    Successors

This Agreement shall be binding on and shall inure to the interest of the respective successors of the Parties and the permitted assigns of such Parties.

10

11.7    Survival

11.7.1    Any obligations that occur or that are due as a result of this Agreement upon the expiration or early termination of this Agreement shall survive the expiration or early termination thereof.

11.7.2    The provisions of Sections 5, 8, 10 and this Section 11.7 shall survive the termination of this Agreement.

11.8    Waivers

Any Party may waive the terms and conditions of this Agreement, provided that such a waiver must be provided in writing and shall require the signatures of the Parties. No waiver by any Party in certain circumstances with respect to a breach by other Parties shall operate as a waiver by such a Party with respect to any similar breach in other circumstances.

11

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Exclusive Option Agreement as of the date first above written.

**Party A:** Beijing Yiliulinger Information Technology Co., Ltd.

By:    /s/ Xiaoiang Lei /common seal/
Name:    Xiaoliang Lei
Title:    Legal Representative

**Party B:** Xiaoliang Lei

By:    /s/ Xiaoliang Lei

**Party C:** Hainan MiaokaNetwork Technology Co., Ltd.

By:    /s/ Xiaoliang Lei /common seal/
Name:    Xiaoliang Lei
Title:    Legal Representative

12

### Exclusive Option Agreement

This Exclusive Option Agreement (this "Agreement") is executed by and among the following Parties as of June 1, 2018 in Beijing, the People's Republic of China ("China" or the "PRC"):

**Party A:**    Beijing Yiliulinger Information Technology Co., Ltd., a wholly-owned subsidiaries of wholly foreign owned enterprise, organized and existing under the laws of the PRC, with its address at Room 305, Building 4, Yard 13, Kaifang East Road, Huairou District, Beijing;

**Party B:**    Wang Li, a Chinese citizen with Identification No.:***; and

**Party C:**    Hainan Miaoka Network Technology Co., Ltd., a limited liability company organized and existing under the laws of the PRC, with its address at Room 201, Building A18, Hainan Ecological Software Park, High-tech Industries Demonstration Zone, Laocheng District, Hainan.

In this Agreement, each of Party A, Party B and Party C shall be referred to as a "Party" respectively, and they shall be collectively referred to as the "Parties".

Whereas:

1.    Party B is a shareholder of Party C and as of the date hereof holds RMB 500,000 in the registered capital of Party C.

2.    Party B agrees to grant Party A an exclusive right through this Agreement, and Party A agrees to accept such exclusive right to purchase all or part equity interest held by Party B in Party C.

3.    Party C agrees to grant Party A an exclusive right through this Agreement, and Party A agrees to accept such exclusive right to purchase all or part of the assets of Party C.

Now therefore, upon mutual discussion and negotiation, the Parties have reached the following agreement:

**1.    Sale and Purchase of Equity Interest and Asssets**

1.1    Equity Interest Purchase Option

Party B hereby irrevocably grants Party A an irrevocable and exclusive right to purchase, or designate one or more persons (each, a "Designee") to purchase the equity interests in Party C then held by Party B once or at multiple times at any time in part or in whole at Party A's sole and absolute discretion to the extent permitted by Chinese laws and at the price described in Section 1.1.2 herein (such right being the "Equity Interest Purchase Option"). Except for Party A and the Designee(s), no other person shall be entitled to the Equity Interest Purchase Option or other rights with respect to the equity interests of Party B. Party C hereby agrees to the grant by Party B of the Equity Interest Purchase Option to Party A. The term "person" as used herein shall refer to individuals, corporations, partnerships, partners, enterprises, trusts or non-corporate organizations.

1

1.1.1 <u>Steps for Exercise of the Equity Interest Purchase Option</u>

Subject to the provisions of the laws and regulations of China, Party A may exercise the Equity Interest Purchase Option by issuing a written notice to Party B (the "Equity Interest Purchase Option Notice"), specifying: (a) Party A's or the Designee's decision to exercise the Equity Interest Purchase Option; (b) the portion of equity interests to be purchased by Party A or the Designee from Party B (the "Optioned Interests"); and (c) the date for purchasing the Optioned Interests or the date for the transfer of the Optioned Interests.

1.1.2 <u>Equity Interest Purchase Price</u>

The purchase price of the Optioned Interests (the "Base Price") shall be RMB 10. If PRC law requires a minimum price higher than the Base Price when Party A exercises the Equity Interest Purchase Option, the minimum price regulated by PRC law shall be the purchase price (collectively, the "Equity Interest Purchase Price").

1.1.3 <u>Transfer of Optioned Interests</u>

For each exercise of the Equity Interest Purchase Option:

1.1.3.1 Party B shall cause Party C to promptly convene a shareholders' meeting, at which a resolution shall be adopted approving Party B's transfer of the Optioned Interests to Party A and/or the Designee(s);

1.1.3.2 Party B shall obtain written statements from the other shareholders of Party C giving consent to the transfer of the equity interest to Party A and/or the Designee(s) and waiving any right of first refusal related thereto;

1.1.3.3 Party B shall execute an equity interest transfer contract with respect to each transfer with Party A and/or each Designee (whichever is applicable), in accordance with the provisions of this Agreement and the Equity Interest Purchase Option Notice regarding the Optioned Interests;

2

1.1.3.4 The relevant Parties shall execute all other necessary contracts, agreements or documents, obtain all necessary government licenses and permits and take all necessary actions to transfer valid ownership of the Optioned Interests to Party A and/or the Designee(s), unencumbered by any security interests, and cause Party A and/or the Designee(s) to become the registered owner(s) of the Optioned Interests. For the purpose of this Section and this Agreement, "security interests" shall include securities, mortgages, third party's rights or interests, any stock options, acquisition right, right of first refusal, right to offset, ownership retention or other security arrangements, but shall be deemed to exclude any security interest created by this Agreement, Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney. "Party B's Equity Interest Pledge Agreement" as used in this Agreement shall refer to the Interest Pledge Agreement executed by and among Party A, Party B and Party C on the date hereof and any modification, amendment and restatement thereto. "Party B's Power of Attorney" as used in this Agreement shall refer to the Power of Attorney executed by Party B on the date hereof granting Party A with a power of attorney and any modification, amendment and restatement thereto.

1.2 <u>Asset Purchase Option</u>

Party C hereby grants to Party A an irrevocable and exclusive option to have Party A or its Designee to purchase from Party C, at Party A's sole discretion, at any time and in accordance with the procedures decided by Party A in its sole discretion, any or all of the assets of Party C, to the extent permitted under PRC law, and at the lowest purchase price permitted by PRC law. The Parties shall then enter into a separate assets transfer agreement, specifying the terms and conditions of the transfer of the assets.

**2. <u>Covenants</u>**

2.1 <u>Covenants regarding Party C</u>

Party B (as a shareholder of Party C) and Party C hereby covenant as follows:

2.1.1 Without the prior written consent of Party A, they shall not in any manner supplement, change or amend the articles of association of Party C, increase or decrease its registered capital, or change its structure of registered capital in other manners;

2.1.2 They shall maintain Party C's corporate existence in accordance with good financial and business standards and practices, obtain and maintain all necessary government licenses and permits by prudently and effectively operating its business and handling its affairs;

2.1.3 Without the prior written consent of Party A, they shall not at any time following the date hereof, sell, transfer, mortgage or dispose of in any manner any material assets of Party C or legal or beneficial interest in the material business or revenues of Party C of more than RMB 500,000, or allow the encumbrance thereon of any security interest;

3

2.1.4 Without the prior written consent of Party A, they shall not incur, inherit, guarantee or suffer the existence of any debt, except for payables incurred in the ordinary course of business other than through loans;

2.1.5 They shall always operate all of Party C's businesses within the normal business scope to maintain the asset value of Party C and refrain from any action/omission that may affect Party C's operating status and asset value;

2.1.6    Without the prior written consent of Party A, they shall not cause Party C to execute any major contract, except the contracts in the ordinary course of business (for the purpose of this subsection, a contract with a price exceeding RMB 500,000 shall be deemed a major contract);

2.1.7    Without the prior written consent of Party A, they shall not cause Party C to provide any person with any loan or credit;

2.1.8    They shall provide Party A with information on Party C's business operations and financial condition at Party A's request;

2.1.9    If requested by Party A, they shall procure and maintain insurance in respect of Party C's assets and business from an insurance carrier acceptable to Party A, at an amount and type of coverage typical for companies that operate similar businesses;

2.1.10    Without the prior written consent of Party A, they shall not cause or permit Party C to merge, consolidate with, acquire or invest in any person;

2.1.11    They shall immediately notify Party A of the occurrence or possible occurrence of any litigation, arbitration or administrative proceedings relating to Party C's assets, business or revenue;

2.1.12    To maintain the ownership by Party C of all of its assets, they shall execute all necessary or appropriate documents, take all necessary or appropriate actions, file all necessary or appropriate complaints, and raise necessary or appropriate defenses against all claims;

2.1.13    Without the prior written consent of Party A, they shall ensure that Party C shall not in any manner distribute dividends to its shareholders, provided that upon Party A's written request, Party C shall immediately distribute all distributable profits to its shareholders;

2.1.14    At the request of Party A, they shall appoint any person designated by Party A as the director or executive director of Party C.

4

2.1.15    Without Party A's prior written consent, they shall not engage in any business in competition with Party A or its affiliates; and

2.1.16    Unless otherwise required by PRC law, Party C shall not be dissolved or liquated without prior written consent by Party A.

2.3    Covenants of Party B

Party B hereby covenants as follows:

2.3.1    Without the prior written consent of Party A, Party B shall not sell, transfer, mortgage or dispose of in any other manner any legal or beneficial interest in the equity interests in Party C held by Party B, or allow the encumbrance thereon, except for the interest placed in accordance with Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney;

2.3.2    Without the prior written consent of Party A, Party B shall cause the shareholders' meeting and/or the directors (or the executive director) of Party C not to approve any sale, transfer, mortgage or disposition in any other manner of any legal or beneficial interest in the equity interests in Party C held by Party B, or allow the encumbrance thereon of any security interest, except for the interest placed in accordance with Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney;

2.3.3    Without the prior written consent of Party A, Party B shall cause the shareholders' meeting or the directors (or the executive director) of Party C not to approve the merger or consolidation with any person, or the acquisition of or investment in any person;

2.3.4    Party B shall immediately notify Party A of the occurrence or possible occurrence of any litigation, arbitration or administrative proceedings relating to the equity interests in Party C held by Party B;

2.3.5    Party B shall cause the shareholders' meeting or the directors (or the executive director) of Party C to vote their approval of the transfer of the Optioned Interests as set forth in this Agreement and to take any and all other actions that may be requested by Party A;

2.3.6    To the extent necessary to maintain Party B's ownership in Party C, Party B shall execute all necessary or appropriate documents, take all necessary or appropriate actions, file all necessary or appropriate complaints, and raise necessary or appropriate defenses against all claims;

2.3.7    Party B shall appoint any designee of Party A as the director or the executive director of Party C, at the request of Party A;

5

2.3.8    Party B hereby waives its right of first refusal to the transfer of equity interest by any other shareholder of Party C to Party A (if any), and gives consent to the execution by each other shareholder of Party C with Party A and Party C the exclusive option agreement, the equity interest pledge agreement and the power of attorney similar to this Agreement, Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney, and accepts not to take any action in conflict with such documents executed by the other shareholders;

2.3.9    Party B shall promptly donate any profit, interest, dividend or proceeds of liquidation to Party A or any other person designated by Party A to the extent permitted under the applicable PRC laws; and

2.3.10    Party B shall strictly abide by the provisions of this Agreement and other contracts jointly or separately executed by and among Party B, Party C and Party A, perform the obligations hereunder and thereunder, and refrain from any action/omission that may affect the effectiveness and enforceability thereof. To the extent that Party B has any remaining rights with respect to the equity interests subject to this Agreement hereunder or under Party B's Equity Interest Pledge Agreement or under Party B's Power of Attorney,

Party B shall not exercise such rights except in accordance with the written instructions of Party A.

3. **Representations and Warranties**

Party B and Party C hereby represent and warrant to Party A, jointly and severally, as of the date of this Agreement and each date of the transfer of the Optioned Interests, that:

3.1   They have the power, capacity and authority to execute and deliver this Agreement and any equity interest transfer contracts to which they are parties concerning the Optioned Interests to be transferred thereunder (each, a "Transfer Contract"), and to perform their obligations under this Agreement and any Transfer Contracts. Party B and Party C agree to enter into Transfer Contracts consistent with the terms of this Agreement upon Party A's exercise of the Equity Interest Purchase Option. This Agreement and the Transfer Contracts to which they are parties constitute or will constitute their legal, valid and binding obligations and shall be enforceable against them in accordance with the provisions thereof;

3.2   Party B and Party C have obtained any and all approvals and consents from the competent government authorities and third parties (if required) for the execution, delivery and performance of this Agreement.

6

3.3   The execution and delivery of this Agreement or any Transfer Contracts and the obligations under this Agreement or any Transfer Contracts shall not: (i) cause any violation of any applicable laws of China; (ii) be inconsistent with the articles of association, bylaws or other organizational documents of Party C; (iii) cause the violation of any contracts or instruments to which they are a party or which are binding on them, or constitute any breach under any contracts or instruments to which they are a party or which are binding on them; (iv) cause any violation of any condition for the grant and/or continued effectiveness of any licenses or permits issued to either of them; or (v) cause the suspension or revocation of or imposition of additional conditions to any licenses or permits issued to either of them;

3.4   Party B has a good and merchantable title to the equity interests held by Party B in Party C. Except for Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney, Party B has not placed any security interest on such equity interests;

3.5   Party C has a good and merchantable title to all of its assets, and has not placed any security interest on the aforementioned assets;

3.6   Party C does not have any outstanding debts, except for (i) debt incurred within the normal business scope; and (ii) debts disclosed to Party A for which Party A's written consent has been obtained.

3.7   Party C has complied with all laws and regulations of China applicable to asset acquisitions; and

3.8   There are no pending or threatened litigation, arbitration or administrative proceedings relating to the equity interests in Party C, assets of Party C or Party C.

4. **Effective Date and Term**

This Agreement shall become effective upon execution by the Parties, and remain effective until all equity interests held by Party B in Party C have been transferred or assigned to Party A and/or any other person designated by Party A in accordance with this Agreement.

5. **Governing Law and Resolution of Disputes**

5.1   Governing Law

The execution, effectiveness, construction, performance, amendment and termination of this Agreement and the resolution of disputes hereunder shall be governed by the laws of the PRC.

5.2   Methods of Resolution of Disputes

In the event of any dispute with respect to the construction and performance of this Agreement, the Parties shall first resolve the dispute through friendly negotiations. In the event the Parties fail to reach an agreement on the dispute after either Party's request to the other Parties for resolution of the dispute through negotiations, either Party may submit the relevant dispute to Beijing Arbitration Commission for arbitration, in accordance with its arbitration rules. The arbitration shall be conducted in Beijing. The arbitration award shall be final and binding on all Parties.

7

6. **Taxes and Fees**

Each Party shall pay any and all transfer and registration taxes, expenses and fees incurred thereby or levied thereon in accordance with the laws of China in connection with the preparation and execution of this Agreement and the Transfer Contracts, as well as the consummation of the transactions contemplated under this Agreement and the Transfer Contracts.

7. **Notices**

7.1   All notices and other communications required or permitted to be given pursuant to this Agreement shall be delivered personally or sent by registered mail, prepaid postage, a commercial courier service or facsimile transmission to the address of such Party set forth below. A confirmation copy of each notice shall also be sent by email. The dates on which notices shall be deemed to have been effectively given shall

be determined as follows:

7.1.1    Notices given by personal delivery, courier service, registered mail or prepaid postage shall be deemed effectively given on the date of receipt or refusal at the address specified for notices;

7.1.2    Notices given by facsimile transmission shall be deemed effectively given on the date of successful transmission (as evidenced by an automatically generated confirmation of transmission).

7.2    For the purpose of notices, the addresses of the Parties are as follows:

**Party A:**    Beijing Yiliulinger Information Technology Co., Ltd.
Address:    20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:    Ying Zhang
Phone:    010-5731 0733

**Party B:**    Li Wang
Address:    20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:    Ying Zhang
Phone:    010-5731 0733

**Party C:**    Hainan Miaoka Network Technology Co., Ltd.
Address:    20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:    Ying Zhang
Phone:    010-5731 0733

8

7.3    Any Party may at any time change its address for notices by a notice delivered to the other Parties in accordance with the terms hereof.

## 8.    Confidentiality

The Parties acknowledge that the existence and the terms of this Agreement, and any oral or written information exchanged between the Parties in connection with the preparation and performance of this Agreement are regarded as confidential information. Each Party shall maintain confidentiality of all such confidential information, and without obtaining the written consent of other Parties, it shall not disclose any relevant confidential information to any third parties, except for the information that: (a) is or will be in the public domain (other than through the receiving Party's unauthorized disclosure); (b) is under the obligation to be disclosed pursuant to the applicable laws or regulations, rules of any stock exchange, or orders of the court or other government authorities; or (c) is required to be disclosed by any Party to its shareholders, directors, employees, legal counsels or financial advisors regarding the transaction contemplated hereunder, provided that such shareholders, directors, employees, legal counsels, or financial advisors shall be bound by the confidentiality obligations similar to those set forth in this Section. Disclosure of any confidential information by the shareholders, director, employees of, or agencies engaged by any Party shall be deemed disclosure of such confidential information by such Party and such Party shall be held liable for breach of this Agreement.

## 9.    Further Warranties

The Parties agree to promptly execute documents that are reasonably required for or are conducive to the implementation of the provisions and purposes of this Agreement and take further actions that are reasonably required for or are conducive to the implementation of the provisions and purposes of this Agreement.

## 10.    Breach of Agreement

10.1    If Party B or Party C conducts any material breach of any term of this Agreement, Party A shall have right to terminate this Agreement and/or require Party B or Party C to compensate all damages; this Section 10 shall not prejudice any other rights of Party A herein;

10.2    Party B or Party C shall not have any right to terminate this Agreement in any event unless otherwise required by the applicable laws.

## 11.    Miscellaneous

11.1    Amendments, changes and supplements

Any amendment, change and supplement to this Agreement shall require the execution of a written agreement by all of the Parties.

9

11.2    Entire agreement

Except for the amendments, supplements or changes in writing executed after the execution of this Agreement, this Agreement shall constitute the entire agreement reached by and among the Parties hereto with respect to the subject matter hereof, and shall supersede all prior oral and written consultations, representations and contracts reached with respect to the subject matter of this Agreement.

11.3    Headings

The headings of this Agreement are for convenience only, and shall not be used to interpret, explain or otherwise affect the meanings of the

provisions of this Agreement.

11.4    Language

This Agreement is written in both Chinese and English language in three copies, each Party having one copy. The Chinese version and English version shall have equal legal validity.

11.5    Severability

In the event that one or several of the provisions of this Agreement are found to be invalid, illegal or unenforceable in any aspect in accordance with any laws or regulations, the validity, legality or enforceability of the remaining provisions of this Agreement shall not be affected or compromised in any respect. The Parties shall strive in good faith to replace such invalid, illegal or unenforceable provisions with effective provisions that accomplish to the greatest extent permitted by law and the intentions of the Parties, and the economic effect of such effective provisions shall be as close as possible to the economic effect of those invalid, illegal or unenforceable provisions.

11.6    Successors

This Agreement shall be binding on and shall inure to the interest of the respective successors of the Parties and the permitted assigns of such Parties.

11.7    Survival

11.7.1    Any obligations that occur or that are due as a result of this Agreement upon the expiration or early termination of this Agreement shall survive the expiration or early termination thereof.

11.7.2    The provisions of Sections 5, 8, 10 and this Section 11.7 shall survive the termination of this Agreement.

10

11.8    Waivers

Any Party may waive the terms and conditions of this Agreement, provided that such a waiver must be provided in writing and shall require the signatures of the Parties. No waiver by any Party in certain circumstances with respect to a breach by other Parties shall operate as a waiver by such a Party with respect to any similar breach in other circumstances.

11

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Exclusive Option Agreement as of the date first above written.

**Party A:** Beijing Yiliulinger Information Technology Co., Ltd.

By:    /s/ Xiaoliang Lei /common seal/
Name:    Xiaoliang Lei
Title:    Legal Representative

**Party B:** Li Wang

By:    /s/ Li Wang

**Party C:** Hainan Miaoka Network Technology Co., Ltd.

By:    /s/ Xiaoliang Lei /common seal/
Name:    Xiaoliang Lei
Title:    Legal Representative

**Exhibit 4.29**

**CONFIRMATION LETTER**

As a shareholder of Hainan Miaoka Network Technology Co., Ltd. (the "**Company**"), I hereby confirm, represent and guarantee that my successor, guardian, creditor, spouse or any other person that may be entitled to assume rights and interests in the equity interest of the Company held by myself upon death, incapacity, divorce or any circumstances that may affect my ability to exercise my shareholder's rights in Company will not, in any manner and in any circumstances, carry out any act that may affect or hinder the fulfillment of my obligations under each of the contractual agreements (including the Equity Interest Pledge Agreement, the Power of Attorney, Exclusive Option Agreement which were executed by myself on June 1, 2018, as well as the Exclusive Technical Consulting and Management Services Agreement and the Business Operation Agreement which were executed by myself on June 1, 2018) (the "**Contractual Agreements**"). I further confirm and undertake that the Contractual Agreements and all of my rights and obligations thereunder shall be equally effective and binding upon my heir and successor.

I hereby further covenant that, I shall unwind the Contractual Agreements as soon as the applicable laws of the People's Republic of China ("**PRC**") allow Beijing Yiliulinger Information Technology Co., Ltd. to operate the business operated by the Company (which includes but not limited to the business of Network Information Service) without the Contractual Agreements. Subject to the applicable PRC laws, I shall return to the Beijing Yiliulinger Information Technology Co., Ltd. or the entity designated by Beijing Yiliulinger Information Technology Co., Ltd. any consideration I receive from Beijing Yiliulinger Information Technology Co., Ltd. for its acquisition of the equity interest of Company at the time when the Contractual Agreements are terminated.

/s/ Xiaoliang Lei
Date: June 1, 2018

---

**CONFIRMATION LETTER**

As a shareholder of Hainan Miaoka Network Technology Co., Ltd. (the "**Company**"), I hereby confirm, represent and guarantee that my successor, guardian, creditor, spouse or any other person that may be entitled to assume rights and interests in the equity interest of the Company held by myself upon death, incapacity, divorce or any circumstances that may affect my ability to exercise my shareholder's rights in Company will not, in any manner and in any circumstances, carry out any act that may affect or hinder the fulfillment of my obligations under each of the contractual agreements (including the Equity Interest Pledge Agreement, the Power of Attorney, Exclusive Option Agreement which were executed by myself on June 1 , 2018, as well as the Exclusive Consulting and Management Services Agreement and the Business Operation Agreement which were executed by myself on June 1 , 2018) (the "**Contractual Agreements**"). I further confirm and undertake that the Contractual Agreements and all of my rights and obligations thereunder shall be equally effective and binding upon my heir and successor.

I hereby further covenant that, I shall unwind the Contractual Agreements as soon as the applicable laws of the People's Republic of China ("**PRC**") allow Beijing Yiliulinger Information Technology Co., Ltd. to operate the business operated by the Company (which includes but not limited to the business of Network Information Service) without the Contractual Agreements. Subject to the applicable PRC laws, I shall return to the Beijing Yiliulinger Information Technology Co., Ltd. or the entity designated by Beijing Yiliulinger Information Technology Co., Ltd. any consideration I receive from Beijing Yiliulinger Information Technology Co., Ltd. for its acquisition of the equity interest of Company at the time when the Contractual Agreements are terminated.

/s/ Wang Li
Date: June 1 , 2018

<div align="right">**Exhibit 4.30**</div>

**Equity Interest Pledge Agreement**

This Equity Interest Pledge Agreement (this "Agreement") has been executed by and among the following parties on June 1, 2018 in Beijing, the People's Republic of China ("China" or the "PRC"):

**Party A:**   Beijing Yiliulinger Information Technology Co., Ltd (hereinafter the "Pledgee"), a wholly-owned subsidiaries of wholly foreign owned enterprise, organized and existing under the laws of the PRC, with its address at Room 305, Building 4, Yard 13, Kaifang East Road, Huairou District, Beijing;

**Party B:**   Xiaoliang Lei (hereinafter the "Pledgor"), a Chinese citizen with Chinese Identification No.: ***; and

**Party C:**   Hainan Miaoka Network Technology Co., Ltd., a limited liability company organized and existing under the laws of the PRC, with its address at Room 201, Building A18, Hainan Ecological Software Park, High-tech Industries Demonstration Zone, Laocheng District, Hainan.

In this Agreement, each of the Pledgee, the Pledgor and Party C shall be referred to as a "Party" respectively, and they shall be collectively referred to as the "Parties".

Whereas:

1.   The Pledgor is a citizen of China who as of the date hereof holds RMB 500,000 in the registered capital of Party C. Party C is a limited liability company registered in Hainan, China, engaging in development and operation of internet products. Party C acknowledges the respective rights and obligations of the Pledgor and the Pledgee under this Agreement, and intends to provide any necessary assistance in registering the Pledge; To ensure that Party C fully and timely pays the Secured Indebtedness and any or all of the payments under the Transaction Documents payable to the Pledgee, including but not limited to the management fees and service fees provided in the Transaction Documents (whether such fees become due and payable due to the arrival of the maturity date, advance payment requirements or any other reasons), the Pledgor hereby pledges to the Pledgee all of the equity interest hereafter acquired by the Pledgor in Party C;

2.   The Pledgee is a wholly-owned subsidiaries of wholly foreign-owned enterprise registered in China. The Pledgee and Party C which is partially owned by the Pledgor have executed an Exclusive Business Cooperation Agreement (as defined below) in Beijing; Party C, the Pledgee and the Pledgor have executed an Exclusive Option Agreement (as defined below); the Pledgor has executed a Power of Attorney (as defined below) in favor of the Pledgee;

<div align="center">1</div>

3.   To ensure that Party C and the Pledgor fully perform their obligations under the Exclusive Business Cooperation Agreement, the Exclusive Option Agreement and the Power of Attorney, the Pledgor hereby pledges to the Pledgee all of the equity interest that the Pledgor holds in Party C as security for Party C's and the Pledgor's obligations under the Exclusive Business Cooperation Agreement, the Exclusive Option Agreement and the Power of Attorney.

To perform the provisions of the Transaction Documents (as defined below), the Parties have mutually agreed to execute this Agreement upon the following terms.

**1.   Definitions**

Unless otherwise provided herein, the terms below shall have the following meanings:

1.1   Pledge: shall refer to the security interest granted by the Pledgor to the Pledgee pursuant to Section 2 of this Agreement, i.e., the right of the Pledgee to be paid in priority with the Equity Interest based on the monetary valuation that such Equity Interest is converted into or from the proceeds from the auction or sale of the Equity Interest.

1.2   Equity Interest: shall refer to RMB 500,000 in the registered capital of Party C, and all of the equity interest hereafter acquired by the Pledgor in Party C.

1.3   Term of the Pledge: shall refer to the term set forth in Section 3 of this Agreement.

1.4   Transaction Documents: shall refer to the Exclusive Consulting and Management Services Agreement executed by and between Party C and the Pledgee on June 1, 2018 (the "Exclusive Business Cooperation Agreement"), the Exclusive Option Agreement executed by and among Party C, the Pledgee and the Pledgor on June 1, 2018 (the "Exclusive Option Agreement"), Power of Attorney executed on June 1, 2018 by the Pledgor (the "Power of Attorney") and any modification, amendment and restatement to the aforementioned documents.

1.5   Contract Obligations: shall refer to all the obligations of the Pledgor under the Exclusive Option Agreement, the Power of Attorney and this Agreement; all the obligations of Party C under the Exclusive Business Cooperation Agreement, the Exclusive Option Agreement and this Agreement.

1.6   Secured Indebtedness: shall refer to RMB 500,000, as well as all the direct, indirect and derivative losses and losses of anticipated profits, suffered by the Pledgee, incurred as a result of any Event of Default. The amount of such loss shall be calculated in accordance with the reasonable business plan and profit forecast of the Pledgee, the consulting and service fees payable to the Pledgee under the Exclusive Business Cooperation Agreement, all expenses occurred in connection with enforcement by the Pledgee of the Pledgor's and/or Party C's Contract Obligations and etc.

<div align="center">2</div>

1.7    Event of Default: shall refer to any of the circumstances set forth in Section 7 of this Agreement.

1.8    Notice of Default: shall refer to the notice issued by the Pledgee in accordance with this Agreement declaring an Event of Default.

**2.    Pledge**

2.1    The Pledgor agrees to pledge all the Equity Interest as security for performance of the Contract Obligations and payment of the Secured Indebtedness under this Agreement. Party C hereby assents that the Pledgor pledges the Equity Interest to the Pledgee pursuant to this Agreement.

2.2    During the term of the Pledge, the Pledgee is entitled to receive dividends distributed on the Equity Interest. The Pledgor may receive dividends distributed on the Equity Interest only with prior written consent of the Pledgee. Dividends received by the Pledgor on Equity Interest after the deduction of individual income tax paid by the Pledgor shall be, as required by the Pledgee, (1) deposited into an account designated and supervised by the Pledgee and used to secure the Contract Obligations and pay the Secured Indebtedness prior and in preference to making any other payment; or (2) unconditionally donated to the Pledgee or any other person designated by the Pledgee to the extent permitted under the applicable PRC laws.

2.3    The Pledgor may subscribe for a capital increase in Party C only with prior written consent of the Pledgee. Any equity interest obtained by the Pledgor as a result of the Pledgor's subscription of the increased registered capital of Party C shall also be deemed as Equity Interest.

2.4    In the event that Party C is required by PRC law to be liquidated or dissolved, any interest distributed to the Pledgor upon Party C's dissolution or liquidation shall, upon the request of the Pledgee, be (1) deposited into an account designated and supervised by the Pledgee and used to secure the Contract Obligations and pay the Secured Indebtedness prior and in preference to make any other payment; or (2) unconditionally donated to the Pledgee or any other person designated by the Pledgee to the extent permitted under the applicable PRC laws.

**3.    Term of the Pledge**

3.1    The Pledge shall become effective on such date when the pledge of the Equity Interest contemplated herein is registered with the relevant administration for industry and commerce (the "AIC"). The Pledge shall remain effective until all Contract Obligations have been fully performed or all Secured Indebtedness has been fully paid. The Pledgor and Party C shall (1) register the Pledge in the shareholders' register of Party C within 3 business days following the execution of this Agreement, and (2) submit an application to the AIC for the registration of the Pledge of the Equity Interest contemplated herein within 30 business days following the execution of this Agreement. The parties covenant that for the purpose of registration of the Pledge, the parties hereto and all other shareholders of Party C shall submit to the AIC this Agreement or an equity interest pledge contract in the form required by the AIC at the location of Party C which shall truly reflect the information of the Pledge hereunder (the "AIC Pledge Contract"). For matters not specified in the AIC Pledge Contract, the Parties shall be bound by the provisions of this Agreement. The Pledgor and Party C shall submit all necessary documents and complete all necessary procedures, as required by the relevant PRC laws and regulations and the competent AIC, to ensure that the Pledge of the Equity Interest shall be registered with the AIC as soon as possible after submission for filing.

3

3.2    During the Term of the Pledge, in the event the Pledgor and/or Party C fails to perform the Contract Obligations or pay Secured Indebtedness, the Pledgee shall have the right, but not the obligation, to exercise the Pledge in accordance with the provisions of this Agreement.

**4.    Custody of Records for Equity Interest subject to the Pledge**

4.1    During the Term of the Pledge set forth in this Agreement, the Pledgor shall deliver to the Pledgee's custody the capital contribution certificate for the Equity Interest and the shareholders' register containing the Pledge within one week from the execution of this Agreement. The Pledgee shall have custody of such documents during the entire Term of the Pledge set forth in this Agreement.

**5.    Representations and Warranties of the Pledgor and Party C**

As of the execution date of this Agreement, the Pledgor and Party C hereby jointly and severally represent and warrant to the Pledgee that:

5.1    The Pledgor is the sole legal and beneficial owner of the Equity Interest.

5.2    The Pledgee shall have the right to dispose of and transfer the Equity Interest in accordance with the provisions set forth in this Agreement.

5.3    Except for the Pledge, the Pledgor has not placed any security interest or other encumbrance on the Equity Interest.

5.4    The Pledgor and Party C have obtained any and all approvals and consents from the applicable government authorities and third parties (if required) for the execution, delivery and performance of this Agreement.

5.5    The execution, delivery and performance of this Agreement will not: (i) violate any relevant PRC laws; (ii) conflict with Party C's articles of association or other constitutional documents; (iii) result in any breach of or constitute any default under any contract or instrument to which it is a party or by which it is otherwise bound; (iv) result in any violation of any condition for the grant and/or maintenance of any permit or approval granted to any Party; or (v) cause any permit or approval granted to any Party to be suspended, cancelled or attached with additional conditions.

4

**6.    Covenants the Pledgor and Party C**

6.1    During the term of this Agreement, the Pledgor and Party C hereby jointly and severally covenant to the Pledgee:

6.1.1    The Pledgor shall not transfer the Equity Interest, place or permit the existence of any security interest or other encumbrance on the Equity Interest or any portion thereof, without the prior written consent of the Pledgee, except for the performance of the Transaction Documents;

6.1.2    The Pledgor and Party C shall comply with the provisions of all laws and regulations applicable to the pledge of rights, and within five (5) days of receipt of any notice, order or recommendation issued or prepared by the competent authorities regarding the Pledge, shall present the aforementioned notice, order or recommendation to the Pledgee, and shall comply with the aforementioned notice, order or recommendation or submit objections and representations with respect to the aforementioned matters upon the Pledgee's reasonable request or upon consent of the Pledgee;

6.1.3    The Pledgor and Party C shall promptly notify the Pledgee of any event or notice received by the Pledgor that may have an impact on the Equity Interest or any portion thereof, as well as any event or notice received by the Pledgor that may have an impact on any guarantees and other obligations of the Pledgor arising out of this Agreement.

6.1.4    Party C shall complete the registration procedures for the extension of the operation term within three (3) months prior to the expiration of such term to maintain the validity of this Agreement.

6.2    The Pledgor agrees that the rights acquired by the Pledgee in accordance with this Agreement with respect to the Pledge shall not be interrupted or harmed by the Pledgor or any heirs or representatives of the Pledgor or any other persons through any legal proceedings.

6.3    To protect or perfect the security interest granted by this Agreement for the Contract Obligations and Secured Indebtedness, the Pledgor hereby undertakes to execute in good faith and to cause other parties who have an interest in the Pledge to execute all certificates, agreements, deeds and/or covenants required by the Pledgee. The Pledgor also undertakes to perform and to cause other parties who have an interest in the Pledge to perform actions required by the Pledgee, to facilitate the exercise by the Pledgee of its rights and authority granted thereto by this Agreement, and to enter into all relevant documents regarding ownership of Equity Interest with the Pledgee or designee(s) of the Pledgee (natural persons/legal persons). The Pledgor undertakes to provide the Pledgee within a reasonable time with all notices, the orders and decisions regarding the Pledge that are required by the Pledgee.

5

6.4    The Pledgor hereby undertakes to comply with and perform all guarantees, promises, agreements, representations and conditions under this Agreement. In the event of failure or partial performance of its guarantees, promises, agreements, representations and conditions, the Pledgor shall indemnify the Pledgee for all losses resulting therefrom.

**7.    Event of Breach**

7.1    The following circumstances shall be deemed an Event of Default:

7.1.1    The Pledgor's any breach to any obligations under the Transaction Documents and/or this Agreement.

7.1.2    Party C's any breach to any obligations under the Transaction Documents and/or this Agreement.

7.2    Upon notice or discovery of the occurrence of any circumstances or event that may lead to the aforementioned circumstances described in Section 7.1, the Pledgor and Party C shall immediately notify the Pledgee in writing accordingly.

7.3    Unless an Event of Default set forth in Section 7.1 has been successfully resolved to the Pledgee's satisfaction within twenty (20) days after the Pledgee and /or Party C delivers a notice to the Pledgor requesting ratification of such Event of Default, the Pledgee may issue a Notice of Default to the Pledgor in writing at any time thereafter, demanding the Pledgor to immediately exercise the Pledge in accordance with the provisions of Section 8 of this Agreement.

**8.    Exercise of the Pledge**

8.1    The Pledgee shall issue a written Notice of Default to the Pledgor when it exercises the Pledge.

8.2    Subject to the provisions of Section 7.3, the Pledgee may exercise the right to enforce the Pledge at any time after the issuance of the Notice of Default in accordance with Section 8.1. Once the Pledgee elects to enforce the Pledge, the Pledgor shall cease to be entitled to any rights or interests associated with the Equity Interest.

8.3    After the Pledgee issues a Notice of Default to the Pledgor in accordance with Section 8.1, the Pledgee may exercise any remedy measure under the applicable PRC laws, the Transaction Documents and this Agreement, including but not limited to being paid in priority with the Equity Interest based on the monetary valuation that such Equity Interest is converted into or from the proceeds from the auction or sale of the Equity Interest. The Pledgee shall not be liable for any loss incurred by its duly exercise of such rights and powers.

6

8.4    The proceeds from the exercise of the Pledge by the Pledgee shall be used to pay for taxes and expenses incurred as a result of disposing the Equity Interest and to perform Contract Obligations and pay the Secured Indebtedness to the Pledgee prior and in preference to any other payment. After the payment of the aforementioned amounts, the remaining balance shall be returned to the Pledgor or any other person who have rights to such balance under applicable laws or be deposited to the local notary public office where the Pledgor resides, with all expenses incurred being borne by the Pledgor. To the extent permitted under the applicable PRC laws, the Pledgor shall unconditionally

donate the aforementioned proceeds to the Pledgee or any other person designated by the Pledgee.

8.5    The Pledgee may exercise any remedy measure available simultaneously or in any order. The Pledgee may exercise the right to being paid in priority with the Equity Interest based on the monetary valuation that such Equity Interest is converted into or from the proceeds from the auction or sale of the Equity Interest under this Agreement, without exercising any other remedy measure first.

8.6    The Pledgee is entitled to designate an attorney or other representatives to exercise the Pledge on its behalf, and the Pledgor or Party C shall not raise any objection to such exercise.

8.7    When the Pledgee disposes of the Pledge in accordance with this Agreement, the Pledgor and Party C shall provide the necessary assistance to enable the Pledgee to enforce the Pledge in accordance with this Agreement.

9.    **Breach of Agreement**

9.1    If the Pledgor or Party C conducts any material breach of any term of this Agreement, the Pledgee shall have right to terminate this Agreement and/or require the Pledgor or Party C to indemnify all damages; this Section 9 shall not prejudice any other rights of the Pledgee herein;

9.2    The Pledgor or Party C shall not have any right to terminate this Agreement in any event unless otherwise required by the applicable laws.

10.    **Assignment**

10.1    Without the Pledgee's prior written consent, the Pledgor and Party C shall not have the right to assign or delegate their rights and obligations under this Agreement.

10.2    This Agreement shall be binding on the Pledgor and his/her successors and permitted assigns, and shall be valid with respect to the Pledgee and each of its successors and assigns.

7

10.3    At any time, the Pledgee may assign any and all of its rights and obligations under the Transaction Documents and this Agreement to its designee(s), in which case the assigns shall have the rights and obligations of the Pledgee under the Transaction Documents and this Agreement, as if it were the original party to the Transaction Documents and this Agreement.

10.4    In the event of change of the Pledgee due to assignment, the Pledgor and/or Party C shall, at the request of the Pledgee, execute a new pledge agreement with the new pledgee on the same terms and conditions as this Agreement, and register the same with the competent AIC.

10.5    The Pledgor and Party C shall strictly abide by the provisions of this Agreement and other contracts jointly or separately executed by the Parties hereto or any of them, including the Transaction Documents, perform the obligations hereunder and thereunder, and refrain from any action/omission that may affect the effectiveness and enforceability thereof. Any remaining rights of the Pledgor with respect to the Equity Interest pledged hereunder shall not be exercised by the Pledgor except in accordance with the written instructions of the Pledgee.

11.    **Termination**

11.1    Upon the fulfillment of all Contract Obligations and the full payment of all Secured Indebtedness by the Pledgor and Party C, the Pledgee shall release the Pledge under this Agreement upon the Pledgor's request as soon as reasonably practicable and shall assist the Pledgor in de-registering the Pledge from the shareholders' register of Party C and with the competent PRC local administration for industry and commerce.

11.2    The provisions under Sections 9, 13, 14 and 11.2 herein of this Agreement shall survive the expiration or termination of this Agreement.

12.    **Handling Fees and Other Expenses**

All fees and out of pocket expenses relating to this Agreement, including but not limited to legal costs, costs of production, stamp tax and any other taxes and fees, shall be borne by Party C.

13.    **Confidentiality**

The Parties acknowledge that the existence and the terms of this Agreement and any oral or written information exchanged between the Parties in connection with the preparation and performance this Agreement are regarded as confidential information. Each Party shall maintain the confidentiality of all such confidential information, and without obtaining the written consent of the other Party, it shall not disclose any relevant confidential information to any third parties, except for the information that: (a) is or will be in the public domain (other than through the receiving Party's unauthorized disclosure); (b) is under the obligation to be disclosed pursuant to the applicable laws or regulations, rules of any stock exchange, or orders of the court or other government authorities; or (c) is required to be disclosed by any Party to its shareholders, directors, employees, legal counsels or financial advisors regarding the transaction contemplated hereunder, provided that such shareholders, directors, employees, legal counsels or financial advisors shall be bound by the confidentiality obligations similar to those set forth in this Section. Disclosure of any confidential information by the shareholders, director, employees of or agencies engaged by any Party shall be deemed disclosure of such confidential information by such Party and such Party shall be held liable for breach of this Agreement.

8

14.    **Governing Law and Resolution of Disputes**

14.1    The execution, effectiveness, construction, performance, amendment and termination of this Agreement and the resolution of disputes hereunder shall be governed by the laws of China.

14.2    In the event of any dispute with respect to the construction and performance of this Agreement, the Parties shall first resolve the dispute through friendly negotiations. In the event the Parties fail to reach an agreement on the dispute after either Party's request to the other Parties for resolution of the dispute through negotiations, either Party may submit the relevant dispute to Beijing Arbitration Commission for arbitration, in accordance with its Arbitration Rules. The arbitration shall be conducted in Beijing. The arbitration award shall be final and binding on all Parties.

14.3    Upon the occurrence of any disputes arising from the construction and performance of this Agreement or during the pending arbitration of any dispute, except for the matters under dispute, the Parties to this Agreement shall continue to exercise their respective rights under this Agreement and perform their respective obligations under this Agreement.

## 15.    Notices

15.1    All notices and other communications required or permitted to be given pursuant to this Agreement shall be delivered personally or sent by registered mail, prepaid postage, a commercial courier service or facsimile transmission to the address of such party set forth below. A confirmation copy of each notice shall also be sent by E-mail. The dates on which notices shall be deemed to have been effectively given shall be determined as follows:

15.2    Notices given by personal delivery, courier service, registered mail or prepaid postage shall be deemed effectively given on the date of delivery or refusal at the address specified for notices.

15.3    Notices given by facsimile transmission shall be deemed effectively given on the date of successful transmission (as evidenced by an automatically generated confirmation of transmission).

9

15.4    For the purpose of notices, the addresses of the Parties are as follows:

**Party A:**    Beijing Yiliulinger Information Technology Co., Ltd.
Address:    20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:    Ying Zhang
Phone:    010-5731 0733

**Party B:**    Xiaoliang Lei
Address:    20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:    Ying Zhang
Phone:    010-5731 0733

**Party C:**    Hainan Miaoka Network Technology Co., Ltd.
Address:    20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:    Ying Zhang
Phone:    010-5731 0733

15.5    Any Party may at any time change its address for notices by a notice delivered to the other Parties in accordance with the terms hereof.

## 16.    Severability

In the event that one or several of the provisions of this Contract are found to be invalid, illegal or unenforceable in any aspect in accordance with any laws or regulations, the validity, legality or enforceability of the remaining provisions of this Contract shall not be affected or compromised in any respect. The Parties shall strive in good faith to replace such invalid, illegal or unenforceable provisions with effective provisions that accomplish to the greatest extent permitted by law and the intentions of the Parties, and the economic effect of such effective provisions shall be as close as possible to the economic effect of those invalid, illegal or unenforceable provisions.

## 17.    Attachments

The attachments set forth herein shall be an integral part of this Agreement.

## 18.    Effectiveness

18.1    This Agreement shall become effective upon execution by the Parties.

18.2    Any amendments, changes and supplements to this Agreement shall be in writing and shall become effective upon completion of the governmental filing procedures (if applicable) after the affixation of the signatures or seals of the Parties.

10

## 19.    Language and Counterparts

This Agreement is written in Chinese and English in four copies. The Pledgor, the Pledgee and Party C shall hold one copy respectively and the other copy shall be used for registration. In the event there is any discrepancy between the Chinese and English versions, the Chinese version shall prevail.

*The Remainder of this page is intentionally left blank*

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Equity Interest Pledge Agreement as of the date first above written.

**Party A:** Beijing Yiliulinger Information Technology Co., Ltd.

By:      /s/ Xiaoliang Lei     /common seal/  
Name:   Xiaoliang Lei  
Title:    Legal Representative

**Party B:** Xiaoliang Lei

By:      /s/ Xiaoliang Lei

**Party C:** Hainan Miaoka Network Technology Co., Ltd.

By:      /s/ Xiaoliang Lei /common seal/  
Name:   Xiaoliang Lei  
Title:    Legal Representative

**Attachments:**

1.    Shareholders' Register of Party C;

2.    The Capital Contribution Certificate for Party C;

3.    Exclusive Business Cooperation Agreement.

4.    Exclusive Option Agreement

5.    Power of Attorney

**Equity Interest Pledge Agreement**

This Equity Interest Pledge Agreement (this "Agreement") has been executed by and among the following parties on June 1, 2018 in Beijing, the People's Republic of China ("China" or the "PRC"):

**Party A:**   Beijing Yiliulinger Information Technology Co., Ltd (hereinafter the "Pledgee"), a wholly-owned subsidiaries of wholly foreign owned enterprise, organized and existing under the laws of the PRC, with its address at Room 305, Building 4, Yard 13**,** Kaifang East Road, Huairou District, Beijing;

**Party B:**   Li Wang (hereinafter the "Pledgor"), a Chinese citizen with Chinese Identification No.: \*\*\*; and

**Party C:**   Hainan Miaoka Network Technology Co., Ltd., a limited liability company organized and existing under the laws of the PRC, with its address at Room 201, Building A18, Hainan Ecological Software Park, High-tech Industries Demonstration Zone, Laocheng District, Hainan.

In this Agreement, each of the Pledgee, the Pledgor and Party C shall be referred to as a "Party" respectively, and they shall be collectively referred to as the "Parties".

Whereas:

1.    The Pledgor is a citizen of China who as of the date hereof holds RMB 500,000 in the registered capital of Party C. Party C is a limited liability company registered in Hainan, China, engaging in development and operation of internet products. Party C acknowledges the respective rights and obligations of the Pledgor and the Pledgee under this Agreement, and intends to provide any necessary assistance in registering the Pledge; To ensure that Party C fully and timely pays the Secured Indebtedness and any or all of the payments under the Transaction Documents payable to the Pledgee, including but not limited to the management fees and service fees provided in the Transaction Documents (whether such fees become due and payable due to the arrival of the maturity date, advance payment requirements or any other reasons), the Pledgor hereby pledges to the Pledgee all of the equity interest hereafter acquired by the Pledgor in Party C;

2.    The Pledgee is a wholly-owned subsidiaries of wholly foreign-owned enterprise registered in China. The Pledgee and Party C which is partially owned by the Pledgor have executed an Exclusive Business Cooperation Agreement (as defined below) in Beijing; Party C, the Pledgee and the Pledgor have executed an Exclusive Option Agreement (as defined below); the Pledgor has executed a Power of Attorney (as defined below) in favor of the Pledgee;

3. To ensure that Party C and the Pledgor fully perform their obligations under the Exclusive Business Cooperation Agreement, the Exclusive Option Agreement and the Power of Attorney, the Pledgor hereby pledges to the Pledgee all of the equity interest that the Pledgor holds in Party C as security for Party C's and the Pledgor's obligations under the Exclusive Business Cooperation Agreement, the Exclusive Option Agreement and the Power of Attorney.

To perform the provisions of the Transaction Documents (as defined below), the Parties have mutually agreed to execute this Agreement upon the following terms.

## 1. Definitions

Unless otherwise provided herein, the terms below shall have the following meanings:

1.1 Pledge: shall refer to the security interest granted by the Pledgor to the Pledgee pursuant to Section 2 of this Agreement, i.e., the right of the Pledgee to be paid in priority with the Equity Interest based on the monetary valuation that such Equity Interest is converted into or from the proceeds from the auction or sale of the Equity Interest.

1.2 Equity Interest: shall refer to RMB 500,000 in the registered capital of Party C, and all of the equity interest hereafter acquired by the Pledgor in Party C.

1.3 Term of the Pledge: shall refer to the term set forth in Section 3 of this Agreement.

1.4 Transaction Documents: shall refer to the Exclusive Consulting and Management Services Agreement executed by and between Party C and the Pledgee on June 1, 2018 (the "Exclusive Business Cooperation Agreement"), the Exclusive Option Agreement executed by and among Party C, the Pledgee and the Pledgor on June 1, 2018 (the "Exclusive Option Agreement"), Power of Attorney executed on June 1, 2018 by the Pledgor (the "Power of Attorney") and any modification, amendment and restatement to the aforementioned documents.

1.5 Contract Obligations: shall refer to all the obligations of the Pledgor under the Exclusive Option Agreement, the Power of Attorney and this Agreement; all the obligations of Party C under the Exclusive Business Cooperation Agreement, the Exclusive Option Agreement and this Agreement.

1.6 Secured Indebtedness: shall refer to RMB 500,000, as well as all the direct, indirect and derivative losses and losses of anticipated profits, suffered by the Pledgee, incurred as a result of any Event of Default. The amount of such loss shall be calculated in accordance with the reasonable business plan and profit forecast of the Pledgee, the consulting and service fees payable to the Pledgee under the Exclusive Business Cooperation Agreement, all expenses occurred in connection with enforcement by the Pledgee of the Pledgor's and/or Party C's Contract Obligations and etc.

2

1.7 Event of Default: shall refer to any of the circumstances set forth in Section 7 of this Agreement.

1.8 Notice of Default: shall refer to the notice issued by the Pledgee in accordance with this Agreement declaring an Event of Default.

## 2. Pledge

2.1 The Pledgor agrees to pledge all the Equity Interest as security for performance of the Contract Obligations and payment of the Secured Indebtedness under this Agreement. Party C hereby assents that the Pledgor pledges the Equity Interest to the Pledgee pursuant to this Agreement.

2.2 During the term of the Pledge, the Pledgee is entitled to receive dividends distributed on the Equity Interest. The Pledgor may receive dividends distributed on the Equity Interest only with prior written consent of the Pledgee. Dividends received by the Pledgor on Equity Interest after the deduction of individual income tax paid by the Pledgor shall be, as required by the Pledgee, (1) deposited into an account designated and supervised by the Pledgee and used to secure the Contract Obligations and pay the Secured Indebtedness prior and in preference to making any other payment; or (2) unconditionally donated to the Pledgee or any other person designated by the Pledgee to the extent permitted under the applicable PRC laws.

2.3 The Pledgor may subscribe for a capital increase in Party C only with prior written consent of the Pledgee. Any equity interest obtained by the Pledgor as a result of the Pledgor's subscription of the increased registered capital of Party C shall also be deemed as Equity Interest.

2.4 In the event that Party C is required by PRC law to be liquidated or dissolved, any interest distributed to the Pledgor upon Party C's dissolution or liquidation shall, upon the request of the Pledgee, be (1) deposited into an account designated and supervised by the Pledgee and used to secure the Contract Obligations and pay the Secured Indebtedness prior and in preference to make any other payment; or (2) unconditionally donated to the Pledgee or any other person designated by the Pledgee to the extent permitted under the applicable PRC laws.

## 3. Term of the Pledge

3.1 The Pledge shall become effective on such date when the pledge of the Equity Interest contemplated herein is registered with the relevant administration for industry and commerce (the "AIC"). The Pledge shall remain effective until all Contract Obligations have been fully performed or all Secured Indebtedness has been fully paid. The Pledgor and Party C shall (1) register the Pledge in the shareholders' register of Party C within 3 business days following the execution of this Agreement, and (2) submit an application to the AIC for the registration of the Pledge of the Equity Interest contemplated herein within 30 business days following the execution of this Agreement. The parties covenant that for the purpose of registration of the Pledge, the parties hereto and all other shareholders of Party C shall submit to the AIC this Agreement or an equity interest pledge contract in the form required by the AIC at the location of Party C which shall truly reflect the

information of the Pledge hereunder (the "AIC Pledge Contract"). For matters not specified in the AIC Pledge Contract, the Parties shall be bound by the provisions of this Agreement. The Pledgor and Party C shall submit all necessary documents and complete all necessary procedures, as required by the relevant PRC laws and regulations and the competent AIC, to ensure that the Pledge of the Equity Interest shall be registered with the AIC as soon as possible after submission for filing.

3

3.2    During the Term of the Pledge, in the event the Pledgor and/or Party C fails to perform the Contract Obligations or pay Secured Indebtedness, the Pledgee shall have the right, but not the obligation, to exercise the Pledge in accordance with the provisions of this Agreement.

**4.    Custody of Records for Equity Interest subject to the Pledge**

4.1    During the Term of the Pledge set forth in this Agreement, the Pledgor shall deliver to the Pledgee's custody the capital contribution certificate for the Equity Interest and the shareholders' register containing the Pledge within one week from the execution of this Agreement. The Pledgee shall have custody of such documents during the entire Term of the Pledge set forth in this Agreement.

**5.    Representations and Warranties of the Pledgor and Party C**

As of the execution date of this Agreement, the Pledgor and Party C hereby jointly and severally represent and warrant to the Pledgee that:

5.1    The Pledgor is the sole legal and beneficial owner of the Equity Interest.

5.2    The Pledgee shall have the right to dispose of and transfer the Equity Interest in accordance with the provisions set forth in this Agreement.

5.3    Except for the Pledge, the Pledgor has not placed any security interest or other encumbrance on the Equity Interest.

5.4    The Pledgor and Party C have obtained any and all approvals and consents from the applicable government authorities and third parties (if required) for the execution, delivery and performance of this Agreement.

5.5    The execution, delivery and performance of this Agreement will not: (i) violate any relevant PRC laws; (ii) conflict with Party C's articles of association or other constitutional documents; (iii) result in any breach of or constitute any default under any contract or instrument to which it is a party or by which it is otherwise bound; (iv) result in any violation of any condition for the grant and/or maintenance of any permit or approval granted to any Party; or (v) cause any permit or approval granted to any Party to be suspended, cancelled or attached with additional conditions.

4

**6.    Covenants the Pledgor and Party C**

6.1    During the term of this Agreement, the Pledgor and Party C hereby jointly and severally covenant to the Pledgee:

6.1.1    The Pledgor shall not transfer the Equity Interest, place or permit the existence of any security interest or other encumbrance on the Equity Interest or any portion thereof, without the prior written consent of the Pledgee, except for the performance of the Transaction Documents;

6.1.2    The Pledgor and Party C shall comply with the provisions of all laws and regulations applicable to the pledge of rights, and within five (5) days of receipt of any notice, order or recommendation issued or prepared by the competent authorities regarding the Pledge, shall present the aforementioned notice, order or recommendation to the Pledgee, and shall comply with the aforementioned notice, order or recommendation or submit objections and representations with respect to the aforementioned matters upon the Pledgee's reasonable request or upon consent of the Pledgee;

6.1.3    The Pledgor and Party C shall promptly notify the Pledgee of any event or notice received by the Pledgor that may have an impact on the Equity Interest or any portion thereof, as well as any event or notice received by the Pledgor that may have an impact on any guarantees and other obligations of the Pledgor arising out of this Agreement.

6.1.4    Party C shall complete the registration procedures for the extension of the operation term within three (3) months prior to the expiration of such term to maintain the validity of this Agreement.

6.2    The Pledgor agrees that the rights acquired by the Pledgee in accordance with this Agreement with respect to the Pledge shall not be interrupted or harmed by the Pledgor or any heirs or representatives of the Pledgor or any other persons through any legal proceedings.

6.3    To protect or perfect the security interest granted by this Agreement for the Contract Obligations and Secured Indebtedness, the Pledgor hereby undertakes to execute in good faith and to cause other parties who have an interest in the Pledge to execute all certificates, agreements, deeds and/or covenants required by the Pledgee. The Pledgor also undertakes to perform and to cause other parties who have an interest in the Pledge to perform actions required by the Pledgee, to facilitate the exercise by the Pledgee of its rights and authority granted thereto by this Agreement, and to enter into all relevant documents regarding ownership of Equity Interest with the Pledgee or designee(s) of the Pledgee (natural persons/legal persons). The Pledgor undertakes to provide the Pledgee within a reasonable time with all notices, the orders and decisions regarding the Pledge that are required by the Pledgee.

5

6.4    The Pledgor hereby undertakes to comply with and perform all guarantees, promises, agreements, representations and conditions under this Agreement. In the event of failure or partial performance of its guarantees, promises, agreements, representations and conditions, the Pledgor shall indemnify the Pledgee for all losses resulting therefrom.

**7.    Event of Breach**

7.1    The following circumstances shall be deemed an Event of Default:

7.1.3    The Pledgor's any breach to any obligations under the Transaction Documents and/or this Agreement.

7.1.4    Party C's any breach to any obligations under the Transaction Documents and/or this Agreement.

7.2    Upon notice or discovery of the occurrence of any circumstances or event that may lead to the aforementioned circumstances described in Section 7.1, the Pledgor and Party C shall immediately notify the Pledgee in writing accordingly.

7.3    Unless an Event of Default set forth in Section 7.1 has been successfully resolved to the Pledgee's satisfaction within twenty (20) days after the Pledgee and /or Party C delivers a notice to the Pledgor requesting ratification of such Event of Default, the Pledgee may issue a Notice of Default to the Pledgor in writing at any time thereafter, demanding the Pledgor to immediately exercise the Pledge in accordance with the provisions of Section 8 of this Agreement.

**8.    Exercise of the Pledge**

8.1    The Pledgee shall issue a written Notice of Default to the Pledgor when it exercises the Pledge.

8.2    Subject to the provisions of Section 7.3, the Pledgee may exercise the right to enforce the Pledge at any time after the issuance of the Notice of Default in accordance with Section 8.1. Once the Pledgee elects to enforce the Pledge, the Pledgor shall cease to be entitled to any rights or interests associated with the Equity Interest.

8.3    After the Pledgee issues a Notice of Default to the Pledgor in accordance with Section 8.1, the Pledgee may exercise any remedy measure under the applicable PRC laws, the Transaction Documents and this Agreement, including but not limited to being paid in priority with the Equity Interest based on the monetary valuation that such Equity Interest is converted into or from the proceeds from the auction or sale of the Equity Interest. The Pledgee shall not be liable for any loss incurred by its duly exercise of such rights and powers.

6

8.4    The proceeds from the exercise of the Pledge by the Pledgee shall be used to pay for taxes and expenses incurred as a result of disposing the Equity Interest and to perform Contract Obligations and pay the Secured Indebtedness to the Pledgee prior and in preference to any other payment. After the payment of the aforementioned amounts, the remaining balance shall be returned to the Pledgor or any other person who have rights to such balance under applicable laws or be deposited to the local notary public office where the Pledgor resides, with all expenses incurred being borne by the Pledgor. To the extent permitted under the applicable PRC laws, the Pledgor shall unconditionally donate the aforementioned proceeds to the Pledgee or any other person designated by the Pledgee.

8.5    The Pledgee may exercise any remedy measure available simultaneously or in any order. The Pledgee may exercise the right to being paid in priority with the Equity Interest based on the monetary valuation that such Equity Interest is converted into or from the proceeds from the auction or sale of the Equity Interest under this Agreement, without exercising any other remedy measure first.

8.6    The Pledgee is entitled to designate an attorney or other representatives to exercise the Pledge on its behalf, and the Pledgor or Party C shall not raise any objection to such exercise.

8.7    When the Pledgee disposes of the Pledge in accordance with this Agreement, the Pledgor and Party C shall provide the necessary assistance to enable the Pledgee to enforce the Pledge in accordance with this Agreement.

**9.    Breach of Agreement**

9.1    If the Pledgor or Party C conducts any material breach of any term of this Agreement, the Pledgee shall have right to terminate this Agreement and/or require the Pledgor or Party C to indemnify all damages; this Section 9 shall not prejudice any other rights of the Pledgee herein;

9.2    The Pledgor or Party C shall not have any right to terminate this Agreement in any event unless otherwise required by the applicable laws.

**10.    Assignment**

10.1    Without the Pledgee's prior written consent, the Pledgor and Party C shall not have the right to assign or delegate their rights and obligations under this Agreement.

10.2    This Agreement shall be binding on the Pledgor and his/her successors and permitted assigns, and shall be valid with respect to the Pledgee and each of its successors and assigns.

7

10.3    At any time, the Pledgee may assign any and all of its rights and obligations under the Transaction Documents and this Agreement to its designee(s), in which case the assigns shall have the rights and obligations of the Pledgee under the Transaction Documents and this Agreement, as if it were the original party to the Transaction Documents and this Agreement.

10.4    In the event of change of the Pledgee due to assignment, the Pledgor and/or Party C shall, at the request of the Pledgee, execute a new pledge agreement with the new pledgee on the same terms and conditions as this Agreement, and register the same with the competent AIC.

10.5   The Pledgor and Party C shall strictly abide by the provisions of this Agreement and other contracts jointly or separately executed by the Parties hereto or any of them, including the Transaction Documents, perform the obligations hereunder and thereunder, and refrain from any action/omission that may affect the effectiveness and enforceability thereof. Any remaining rights of the Pledgor with respect to the Equity Interest pledged hereunder shall not be exercised by the Pledgor except in accordance with the written instructions of the Pledgee.

## 11.   Termination

11.1   Upon the fulfillment of all Contract Obligations and the full payment of all Secured Indebtedness by the Pledgor and Party C, the Pledgee shall release the Pledge under this Agreement upon the Pledgor's request as soon as reasonably practicable and shall assist the Pledgor in de-registering the Pledge from the shareholders' register of Party C and with the competent PRC local administration for industry and commerce.

11.2   The provisions under Sections 9, 13, 14 and 11.2 herein of this Agreement shall survive the expiration or termination of this Agreement.

## 12.   Handling Fees and Other Expenses

All fees and out of pocket expenses relating to this Agreement, including but not limited to legal costs, costs of production, stamp tax and any other taxes and fees, shall be borne by Party C.

## 13.   Confidentiality

The Parties acknowledge that the existence and the terms of this Agreement and any oral or written information exchanged between the Parties in connection with the preparation and performance this Agreement are regarded as confidential information. Each Party shall maintain the confidentiality of all such confidential information, and without obtaining the written consent of the other Party, it shall not disclose any relevant confidential information to any third parties, except for the information that: (a) is or will be in the public domain (other than through the receiving Party's unauthorized disclosure); (b) is under the obligation to be disclosed pursuant to the applicable laws or regulations, rules of any stock exchange, or orders of the court or other government authorities; or (c) is required to be disclosed by any Party to its shareholders, directors, employees, legal counsels or financial advisors regarding the transaction contemplated hereunder, provided that such shareholders, directors, employees, legal counsels or financial advisors shall be bound by the confidentiality obligations similar to those set forth in this Section. Disclosure of any confidential information by the shareholders, director, employees of or agencies engaged by any Party shall be deemed disclosure of such confidential information by such Party and such Party shall be held liable for breach of this Agreement.

8

## 14.   Governing Law and Resolution of Disputes

14.1   The execution, effectiveness, construction, performance, amendment and termination of this Agreement and the resolution of disputes hereunder shall be governed by the laws of China.

14.2   In the event of any dispute with respect to the construction and performance of this Agreement, the Parties shall first resolve the dispute through friendly negotiations. In the event the Parties fail to reach an agreement on the dispute after either Party's request to the other Parties for resolution of the dispute through negotiations, either Party may submit the relevant dispute to Beijing Arbitration Commission for arbitration, in accordance with its Arbitration Rules. The arbitration shall be conducted in Beijing. The arbitration award shall be final and binding on all Parties.

14.3   Upon the occurrence of any disputes arising from the construction and performance of this Agreement or during the pending arbitration of any dispute, except for the matters under dispute, the Parties to this Agreement shall continue to exercise their respective rights under this Agreement and perform their respective obligations under this Agreement.

## 15.   Notices

15.1   All notices and other communications required or permitted to be given pursuant to this Agreement shall be delivered personally or sent by registered mail, prepaid postage, a commercial courier service or facsimile transmission to the address of such party set forth below. A confirmation copy of each notice shall also be sent by E-mail. The dates on which notices shall be deemed to have been effectively given shall be determined as follows:

15.2   Notices given by personal delivery, courier service, registered mail or prepaid postage shall be deemed effectively given on the date of delivery or refusal at the address specified for notices.

15.3   Notices given by facsimile transmission shall be deemed effectively given on the date of successful transmission (as evidenced by an automatically generated confirmation of transmission).

9

15.4   For the purpose of notices, the addresses of the Parties are as follows:

**Party A:**   Beijing Yiliulinger Information Technology Co., Ltd.
Address:   20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:   Ying Zhang
Phone:   010-5731 0733

**Party B:**   Li Wang

Address:    20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:       Ying Zhang
Phone:      010-5731 0733

**Party C:**   Hainan Miaoka Network Technology Co., Ltd.
Address:    20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:       Ying Zhang
Phone:      010-5731 0733

15.5   Any Party may at any time change its address for notices by a notice delivered to the other Parties in accordance with the terms hereof.

**16.    Severability**

In the event that one or several of the provisions of this Contract are found to be invalid, illegal or unenforceable in any aspect in accordance with any laws or regulations, the validity, legality or enforceability of the remaining provisions of this Contract shall not be affected or compromised in any respect. The Parties shall strive in good faith to replace such invalid, illegal or unenforceable provisions with effective provisions that accomplish to the greatest extent permitted by law and the intentions of the Parties, and the economic effect of such effective provisions shall be as close as possible to the economic effect of those invalid, illegal or unenforceable provisions.

**17.    Attachments**

The attachments set forth herein shall be an integral part of this Agreement.

**18.    Effectiveness**

18.1   This Agreement shall become effective upon execution by the Parties.

18.2   Any amendments, changes and supplements to this Agreement shall be in writing and shall become effective upon completion of the governmental filing procedures (if applicable) after the affixation of the signatures or seals of the Parties.

10

**19.    Language and Counterparts**

This Agreement is written in Chinese and English in four copies. The Pledgor, the Pledgee and Party C shall hold one copy respectively and the other copy shall be used for registration. In the event there is any discrepancy between the Chinese and English versions, the Chinese version shall prevail.

*The Remainder of this page is intentionally left blank*

11

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Equity Interest Pledge Agreement as of the date first above written.

**Party A:** Beijing Yiliulinger Information Technology Co., Ltd.

By:    /s/ Xiaoliang Lei /common seal/
Name:  Xiaoliang Lei
Title: Legal Representative

**Party B:** Li Wang

By:  /s/ Li Wang

**Party C:** Hainan Miaoka Network Technology Co., Ltd.

By:    /s/ Xiaoliang Lei /common seal/
Name:  Xiaoliang Lei
Title: Legal Representative

12

**Attachments:**

6.   Shareholders' Register of Party C;

7.   The Capital Contribution Certificate for Party C;

8.   Exclusive Business Cooperation Agreement.

9.   Exclusive Option Agreement

10.    Power of Attorney

13

**Exhibit 4.31**

**Business Operation Agreement**

This Business Operation Agreement (this "Agreement"), dated as of June 1, 2018, is made by and among the following parties:

| | |
|---|---|
| Party A: | Beijing Yiliulinger Information Technology Co., Ltd. |
| Address: | Room 305, Building 4, Yard 13, Kaifang East Road, Huairou District, Beijing |
| Legal representative: | Xiaoliang Lei |

| | |
|---|---|
| Party B: | Hainan Yilingliuer Network Technology Co., Ltd. |
| Address: | Room 201, Building A18, Hainan Ecological Software Park, High-tech Industries Demonstration Zone, Laocheng District, Hainan |
| Legal representative: | Xiaoliang Lei |

Party C:

| | |
|---|---|
| Xiaoliang Lei | (ID Card No. ***) |
| Address: | 20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC |

| | |
|---|---|
| Li Wang | (ID Card No. ***) |
| Address: | 20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC |

(Individually a "Party"; collectively the "Parties")

**WHEREAS:**

A.  Party A is a wholly-owned subsidiaries of wholly foreign-owned enterprise incorporated and validly existing in the People's Republic of China (the "PRC");

B.  Party B is a limited liability company incorporated in the PRC and engaged in technology related investment consultation etc.;

C.  Party A and Party B have established business relation by entering into a certain Exclusive Consulting and Management Services Agreement, under which Party B will make various payments to Party A and therefore Party B's activities in its ordinary course of business will have material effect upon its ability to make relevant payment to Party A; and

D.  Each of the Party C is a shareholder of Party B (collectively, the "Founding Shareholders"), in which each of Xiaoliang LEI and Li Wang holds 50% and 50% of Party B, respectively.

**NOW, THEREFORE**, the Parties, through friendly consultations and based on the principle of equality and mutual benefit, hereby agree as follows:

**1.    Negative Obligations**

In order to guarantee the performance by Party B of the agreement entered into by and between Party A and Party B and all of Party B's obligations towards Party A, the Founding Shareholders hereby acknowledge, agree and jointly warrants that without prior written consent of Party A or any party designated by Party A, Party B shall not engage in any transaction which may have material or adverse effect on any of its assets, businesses, employees, obligations, rights or operations, including without limitation:

1.1    Conduct of any activity outside its ordinary course of business or in a manner inconsistent with its past practice;

1

1.2    Making any borrowing or undertaking any indebtedness from any third party;

1.3    Change or removal of any of its directors or senior officers;

1.4    Sale, acquisition or any other disposal of any assets or rights, including without limitation any intellectual property rights, with any third party;

1.5    Creation of any guarantee or any other security on any of its assets or intellectual properties in favor of any third party, or creation of any encumbrance on any of its assets;

1.6    Change of its articles of association or its scope of business;

1.7    Change of its ordinary course of business or any of its material bylaws;

1.8    Transfer any of its rights or obligations under this Agreement to any third party;

1.9    Making any material change to its business pattern, marketing strategy, business plan or customer relationship; and

1.10    Distribution of any bonus or dividend.

**2.    Business Management and Human Resources Arrangement**

2.1    Party B and the Founding Shareholders hereby jointly agree to accept and strictly implement any proposal made by Party A from time to time

regarding employment and removal of Party B's employees, day-to-day business management and financial management system of Party B.

2.2    Party B and the Founding Shareholders hereby jointly agree that the Founding Shareholders elect or appoint, as applicable, any person designated by Party A as Party B's director, chairman, president, chief financial officer and any other executive officers in accordance with relevant laws, regulations and its articles of association.

2.3    Upon termination of his or her employment with Party A, either voluntarily or by Party A, each of the directors or senior officers elected or appointed under Section 2.2 will be simultaneously disqualified to hold any position in Party B; under such circumstance, the Founding Shareholders will elect any other person designated by Party A for such position.

2.4    For purpose of Section 2.3, the Founding Shareholders will take any actions required under relevant laws, articles of association and this Agreement to effect the employment and termination provided under Sections 2.2 and 2.3.

2.5    The Founding Shareholders hereby agree that in conjunction with execution of this Agreement, they will execute an irrevocable power of attorney authorizing Party A to exercise their respective rights as shareholders of Party B and respective voting rights at Party B's shareholders meeting.

**3.    Other Agreements**

3.1    Upon termination or expiration of any agreement between Party A and Party B, Party A may elect to terminate all of its agreements with Party B, including without limitation the Exclusive Consulting and Management Services Agreement.

2

3.2    Considering the business relationship established between Party A and Party B based on the executed Exclusive Consulting and Management Services Agreement, Party B's activities in its ordinary course of business will have material effect upon its ability to make relevant payment to Party A. The Founding Shareholders agree that any bonus, dividend or any other benefit or interest receivable by it as shareholder of Party B will be unconditionally and automatically paid or transferred to Party A.

**4.    All Agreements and Amendments**

4.1    This Agreement and all of the agreements and/or documents referred to or expressly included herein constitute entire agreements among the Parties with respect to the subject matter hereof and supersede all prior agreements, contracts, understandings and communications, written or oral, among the Parties with respect to the same.

4.2    This Agreement may not be amended unless by agreement of the Parties in writing. Any amendment or supplement hereto duly executed by the Parties shall be an integral part of and have the same effect with this Agreement.

**5.    Governing Law**

The execution, validity, performance of this Agreement and resolution of any dispute arising from this Agreement shall be governed by the laws of the PRC.

**6.    Dispute Resolution**

6.1    Should any dispute arise in connection with construction or performance of any provision under this Agreement, the Parties shall seek in good faith to resolve such dispute through negotiations. If the negotiations fail, any of the Parties may submit the dispute to Beijing Arbitration Commission for arbitration in accordance with its arbitration rules then in effect. The arbitration will be in Chinese. The arbitral award shall be final and binding on each of the Parties.

6.2    Except for the matter under dispute, each of the Parties shall continue to perform its obligations under this Agreement in good faith.

**7.    Notices**

All notices made by each of the Parties to exercise any of its rights or perform any of its obligations hereunder shall be in writing and given to the following address in person, by registered mail, prepaid mail, recognized courier service, or by fax.

| | |
|---|---|
| To Party A: | Beijing Yiliulinger Information Technology Co., Ltd. |
| Address: | 20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC |
| Telephone: | +86 10-57310567 |
| Attention: | Xiaolaing Lei |

| | |
|---|---|
| To Party B: | Hainan Yilingliuer Network Technology Co., Ltd. |
| Address: | 20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC |
| Telephone: | +86 10-57310567 |
| Attention: | Xiaolaing Lei |

To Party C:
Xiaolaing Lei

| | |
|---|---|
| Address: | 20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC |
| Telephone: | +86 10-57310567 |
| Attention: | Xiaolaing Lei |

Li Wang

| | |
|---|---|
| Address: | 20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC |
| Telephone: | +86 10-57310567 |
| Attention: | Li Wang |

8.      Effectiveness, Term and other terms of this Agreement

8.1     Any written consent, proposal, appointment and any other decision in connection with this Agreement which has material effect on Party B's day-to-day business operations shall be made by Party A's board of shareholders.

8.2     This Agreement shall become effective upon execution by each of the Parties on the date first written above. The term of this Agreement will be ten (10) years unless early terminated by Party A. Upon request from Party A, the Parties may extend the term of this Agreement prior to its expiration or enter into a separate business agreement, each as requested by Party A.

8.3     During the term of this Agreement, none of Party B or Founding Shareholders may terminate this Agreement. Party A shall have the right to terminate this Agreement at any time with notice to Party B and its Shareholders in writing.

8.4     If any term or provision hereof is found illegal or unenforceable under applicable laws, such term or provision shall be deemed deleted from this Agreement without any effect, and the remainder of this Agreement shall remain in force and effect as if such term or provision had never been contained herein. The Parties shall negotiate to replace such deleted term or provision with a lawful and valid term or provision acceptable to each of the Parties.

8.5     Failure to exercise any right, power or privilege hereunder shall not be deemed as waiver thereof. Any single or partial exercise of any right, power or privilege hereunder shall not preclude exercise of any other right, power or privilege under this Agreement.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their duly authorized representatives on the date first written above.

*(The Remainder of this page is intentionally left blank)*

4

This is the Signature Page of Business Operation Agreement between Beijing Yiliulinger Information Technology Co., Ltd., Hainan Yilingliuer Network Technology Co., Ltd., Xiaoliang Lei and Li Wang)

Party A:      Beijing Yiliulinger Information Technology Co., Ltd.

By:          /s/ Xiaoliang Lei /common seal/
Title:        Legal representative

Party B:      Hainan Yilingliuer Network Technology Co., Ltd.

By:          /s/ Xiaoliang Lei /common seal/
Title:        Legal representative

Party C:

Xiaoliang Lei

By:          /s/ Xiaoliang Lei

Li Wang

By:          /s/ Li Wang

5

**Confirmation Letter**

WHEREAS:

(1)     Beijing Yiliulinger Information Technology Co., Ltd., Hainan Yilingliuer Network Technology Co., Ltd. ("Momo Technology"), Yan TANG, Yong LI, Xiaoliang LEI, Zhiwei LI, Beijing Jingwei Meichuang Technology Co., Ltd. ("Jingwei") and Shanghai Zihui Investment Management Co., Ltd. ("Zihui") have entered into a Business Operation Agreement (the "Business Agreement") dated June 1, 2018.

(2)     Upon execution of the Business Agreement, each of Yan TANG, Yong LI, Jingwei, Zihui, Xiaoliang LEI and Zhiwei LI holds 52%, 16%, 10%, 10%, 6.4% and 5.6% of Momo Technology, respectively.

(3)     Each of Jingwei and Zihui has transferred to Yan TANG the 10% equity interests of Momo Technology held by him and, upon completion of such

transfer, Yan TANG will hold 72% equity interests of Momo Technology.

NOW, THEREFORE:

The undersigned, Yan TANG (ID Card No. ***), hereby acknowledges that my ownership of 72% equity interests of Momo Technology is subject to the terms and conditions of the Business Agreement and I, in my capacity as a shareholder of Momo Technology, will be subject to the obligations provided under the Business Agreement, each with the view to ensuring due performance of the Business Agreement.

*[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]*

6

*(Signature page)*
**Yan TANG**
/s/ Yan TANG

Date: June 9, 2014

7

<div align="right">**Exhibit 4.32**</div>

**Power of Attorney**

I, Xiaoliang Lei, a People's Republic of China ("China" or the "PRC") citizen with PRC Identification Card No.: \*\*\*, and a holder of RMB5,000,000 in the registered capital of Hainan Yilingliuer Network Technology Co., Ltd. (the "Company") as of the date when the Power of Attorney is executed, hereby irrevocably authorize Beijing Yiliulinger Information Technology Co., Ltd. (the "Yiliulinger") to exercise the following rights relating to all equity interests held by me now and in the future in the Company ("My Shareholding") during the term of this Power of Attorney:

The Yiliulinger is hereby authorized to act on behalf of myself as my exclusive agent and attorney with respect to all matters concerning My Shareholding, including without limitation to: 1) attending shareholders' meetings of the Company; 2) exercising all the shareholder's rights and shareholder's voting rights I am entitled to under the laws of China and the Company Articles of Association, including but not limited to the sale, transfer, pledge or disposition of My Shareholding in part or in whole; and 3) designating and appointing on behalf of myself the legal representative, directors, supervisors, chief executive officer and other senior management members of the Company.

Without limiting the generality of the powers granted hereunder, the Yiliulinger shall have the power and authority to, on behalf of myself, execute all the documents I shall sign as stipulated in the Exclusive Option Agreement entered into by and among myself, the Yiliulinger and the Company on June 1, 2018 and the Equity Pledge Agreement entered into by and among me, the Yiliulinger and the Company on June 1, 2018 (including any modification, amendment and restatement thereto, collectively the "Transaction Documents"), and perform the terms of the Transaction Documents.

All the actions associated with My Shareholding conducted by the Yiliulinger shall be deemed as my own actions, and all the documents related to My Shareholding executed by the Yiliulinger shall be deemed to be executed by me. I hereby acknowledge and ratify those actions and/or documents by the Yiliulinger.

The Yiliulinger is entitled to re-authorize or assign its rights related to the aforesaid matters to any other person or entity at its own discretion and without giving prior notice to me or obtaining my consent. If required by PRC laws, the Yiliulinger shall designate a PRC citizen to exercise the aforementioned rights.

During the period that I am a shareholder of the Company, this Power of Attorney shall be irrevocable and continuously effective and valid from the date of execution of this Power of Attorney.

During the term of this Power of Attorney, I hereby waive all the rights associated with My Shareholding, which have been authorized to the Yiliulinger through this Power of Attorney, and shall not exercise such rights by myself.

<div align="center">1</div>

---

This Power of Attorney is written in Chinese and English. The Chinese version and English version shall have equal legal validity.

<div align="right">

Xiaoliang Lei

By:  /s/ Xiaoliang Lei _____

June 1, 2018

</div>

<div align="center">2</div>

---

Accepted by

Beijing Yiliulinger Information Technology Co., Ltd.

By:      /s/ Xiaoliang Lei/ /common seal/ _____
Name:   Xiaoliang Lei
Title:    Legal Representative

Acknowledged by:

Hainan Yilingliuer Network Technology Co., Ltd.

By:      /s/ Xiaoliang Lei/ /common seal/ _____
Name:   Xiaoliang Lei
Title:    Legal Representative

<div align="center">3</div>

---

**Power of Attorney**

I, Wang Li, a People's Republic of China ("China" or the "PRC") citizen with PRC Identification Card No.: \*\*\*, and a holder of RMB5,000,000 in the registered capital of Hainan Yilingliuer Network Technology Co., Ltd. (the "Company") as of the date when the Power of Attorney is executed, hereby

irrevocably authorize Beijing Yiliulinger Information Technology Co., Ltd. (the "Yiliulinger") to exercise the following rights relating to all equity interests held by me now and in the future in the Company ("My Shareholding") during the term of this Power of Attorney:

The Yiliulinger is hereby authorized to act on behalf of myself as my exclusive agent and attorney with respect to all matters concerning My Shareholding, including without limitation to: 1) attending shareholders' meetings of the Company; 2) exercising all the shareholder's rights and shareholder's voting rights I am entitled to under the laws of China and the Company Articles of Association, including but not limited to the sale, transfer, pledge or disposition of My Shareholding in part or in whole; and 3) designating and appointing on behalf of myself the legal representative, directors, supervisors, chief executive officer and other senior management members of the Company.

Without limiting the generality of the powers granted hereunder, the Yiliulinger shall have the power and authority to, on behalf of myself, execute all the documents I shall sign as stipulated in the Exclusive Option Agreement entered into by and among myself, the Yiliulinger and the Company on June 1, 2018 and the Equity Pledge Agreement entered into by and among me, the Yiliulinger and the Company on June 1, 2018 (including any modification, amendment and restatement thereto, collectively the "Transaction Documents"), and perform the terms of the Transaction Documents.

All the actions associated with My Shareholding conducted by the Yiliulinger shall be deemed as my own actions, and all the documents related to My Shareholding executed by the Yiliulinger shall be deemed to be executed by me. I hereby acknowledge and ratify those actions and/or documents by the Yiliulinger.

The Yiliulinger is entitled to re-authorize or assign its rights related to the aforesaid matters to any other person or entity at its own discretion and without giving prior notice to me or obtaining my consent. If required by PRC laws, the Yiliulinger shall designate a PRC citizen to exercise the aforementioned rights.

During the period that I am a shareholder of the Company, this Power of Attorney shall be irrevocable and continuously effective and valid from the date of execution of this Power of Attorney.

During the term of this Power of Attorney, I hereby waive all the rights associated with My Shareholding, which have been authorized to the Yiliulinger through this Power of Attorney, and shall not exercise such rights by myself.

4

---

This Power of Attorney is written in Chinese and English. The Chinese version and English version shall have equal legal validity.

Wang Li

By: /s/ Wang Li _____

June 1 , 2018

5

---

Accepted by

Beijing Yiliulinger Information Technology Co., Ltd.

By:       /s/ Xiaoliang Lei/ /common seal/ _____
Name:   Xiaoliang Lei
Title:    Legal Representative

Acknowledged by:

Hainan Yilingliuer Network Technology Co., Ltd.

By:       /s/ Xiaoliang Lei /common seal/ _____
Name:   Xiaoliang Lei
Title:    Legal Representative

6

**Exhibit 4.33**

**EXCLUSIVE COOPERATION**

**AGREEMENT**

**Hainan Yilingliuer Network Technology Co., Ltd.**

**and**

**Beijing Yiliulinger Information Technology Co., Ltd.**

1

---

**EXCLUSIVE COOPERATION AGREEMENT**

This Service Agreement ("Agreement"), effective on June 1, 2018 ("Effective Date"), is concluded by and between Hainan Yilingliuer Network Technology Co., Ltd. ("Yilingliuer Network"), a company incorporated under the laws of the People's Republic of China, with its principal place of business at Room 201, Building A18, Hainan Ecological Software Park, High-tech Industries Demonstration Zone, Laocheng District, Hainan and Beijing Yiliulinger Information Technology Co., Ltd. ("Yiliulinger"), a company incorporated under the laws of the People's Republic of China, with its principal place of business at Room 305, Building 4, Yard 13, Kaifang East Road, Huairou District, Beijing (each "a Party" and collectively, "the Parties").

**BACKGROUND**

Whereas, Yilingliuer Network is responsible for Investment Consulting Services in China.

Whereas, Yilingliuer Network acquires the consultation of the investment project in supplemental agreements to this Agreement from Yiliulinger.

Whereas, this Agreement sets forth the terms and conditions under which Yiliulinger as agreed to provide, and Yilingliuer Network has agreed to receive, the Licensing and the Services;

Whereas, the capitalized terms used and not otherwise defined in these recitals are defined in Article 1 of this Agreement;

Now, therefore, in consideration of the mutual promises, covenants, conditions and terms set forth herein, the Parties agree as follows:

**1 DEFINITIONS.**

Capitalized terms used in this Agreement have the meanings set forth in this Article 1 or as otherwise defined in the context of the provision.

"Effective Date" is June 1, 2018.

"Governing Laws" is defined in Section 6.a.

"Services" means investment consulting services to be provided by Yiliulinger to Yilingliuer Network under this Agreement. Investment Consulting services include: (i) marketing and advertising services; (ii) sales and payment channel management and development; (iii) administrative services including legal, finance, HR and administration; and (iv) other services as the Parties may agree from time to time.

2

---

"Service Fee" is defined in Section 4.

"Term" is defined in Section 2.a.

**2 TERM AND TERMINATION.**

 a. Term. The term of this Agreement will begin on the Effective Date and will remain effective for ten (10) years. After the effective period, Yiliulinger may decide if this Agreement will be renewed and how long it will be renewed for ("Term").

 b. Termination for Convenience. Yiliulinger may terminate this Agreement upon thirty (30）days' written notice. Yilingliuer Network shall not terminate this Agreement under any circumstances.

 c. Prior Agreements. This Agreement supersedes and terminates any and all prior agreements or contracts, oral or written, entered into between The Parties relating to the subject matter thereof.

**3 EXCLUSIVE COOPERATION AND INTELLECTUAL PROPERTY RIGHTS.**

 a. During the Term, Yiliulinger shall provide the Services to Yilingliuer Networkas agreed by the Parties from time to time. Without Yiliulinger.'s consent, Yilingliuer Network is not entitled to the right to engage any other third parties to perform any services similar to the Licensing or

the Services.

b.  Yiliulinger reserves all the intellectual property rights developed under this agreement, including but not limited to copyright, patent right, right of patent application, knowhow, business secret, etc.

**4 SERVICE FEE AND PAYMENT.**

a.  Pursuant to this Agreement and Yilingliuer Network's request from time to time, Yiliulinger provides Yilingliuer Network with the Services. Yilingliuer Network intends to pay Yiliulinger a level of compensation commensurate with the value of the Services it provides, which are essential and fundamental to the economic success or failure of Yilingliuer Network's business in China.

<center>3</center>

b.  To ensure the high quality of the Licensing and the Services, Yiliulinger agrees to be compensated for the Licensing and the Services only if Yilingliuer Network achieves a level of operating profit above a certain rate, initially agreed to be three point five percent (3.5%) ("Expected Profit Rate"") of total revenue derived by Yiliulinger for operating the App in China. The Service Fee will be calculated such that after it is paid, Yilingliuer Network's operating profit rate will not be lower than the Expected Profit Rate ("Service Fee""). If Yilingliuer Network achieves a level of operating profit above the Expected Profit Rate, the excess profit will be paid to Yiliulinger in the form of Service Fee. The calculation methodology of the Service Fee will be set forth in supplemental agreements to this Agreement. If Yilingliuer Network is unable to achieve the Expected Profit Rate due to Yiliulinger.'s failure in providing the high quality services, Yiliulinger will not be entitled to any Service Fee. The Parties agree to review the Expected Profit Rate from time to time.

Operating profit rate = (Revenues-Cost of revenues-Sales tax and surcharges –Sales expense-G&A expense-R&D expense) /Revenues.

c.  Payments Due. Payment notice for the Service Fee shall be presented on a monthly basis. The Parties agrees to pay the total amounts shown as due within sixty (60) days from the end of such month. The Parties agrees to pay or offset the payments from time to time, as requested by either Party.

d.  Currency. All computations and payments made pursuant to this Article 4 shall be in Chinese RMB. A netting of any amount payable under this Agreement against existing accounts payable and accounts receivable shall be an acceptable manner of payment. effective as of the date of the netting on the books of the Parties.

e.  Retrospection. The Parties agree the Service Fee defined in this Section shall be retrospective to the Parties from the date June 1, 2018.

**5 TAXES.**

a.  Yiliulinger's Tax Responsibility. Yiliulinger is liable for any value-added tax, excise tax, tariff, duty or any other similar tax imposed by any governmental authority arising from the performance of Services under this Agreement.

b.  Yilingliuer Tech's Tax Responsibility. Yilingliuer Network is liable for any value-added tax. excise tax, tariff, duty or any other similar tax imposed by any governmental authority arising from its performance of this Agreement.

<center>4</center>

**6 COMPLIANCE WITHLAWS.**

a.  Compliance. Each Party will perform its obligations under this Agreement in a manner that complies with all laws applicable to that Party's business. Without limiting the foregoing, the Parties will respectively identify and comply with all laws applicable to the Parties including: (a) laws requiring the procurement of inspections, certificates and approvals needed to perform the Services, and (b) laws regarding healthcare, workplace safety, immigration ,labor standars, wage and hour laws, insurance, data protection and privacy ( collectively, "Governing Laws' )

b.  Change in Law. The Parties will work together to identify the effect of changes in laws on this Agreement, and will promptly discuss the changes to the terms and provisions of this Agreement, if any, required to comply with all laws.

**7 CONSTRUCTION.**

a.  Severability. If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to Law, then the remaining provisions of this Agreement. If capable of substantial performance, will remain in full force and effect.

b.  Applicable Law. This Agreement shall be construed and enforced in accordance with the laws of the People's Republic of China without regard to conflict of laws principles.

c.  Resolution of Disputes. This Agreement shall be governed by the laws of the People's Republic of China. All the disputes arising from the conclusion, performance or interpretation of this Agreement shall be settled by the Parties through consultation.

If the consultation fails, the disputes shall be referred to China International economic and Trade Arbitration Commission for arbitration. The place of arbitration shall be in Beijing. The arbitral award shall be final and binding upon both Parties.

<center>5</center>

Each of Yiliulinger and Yilingliuer Network has caused this Agreement to be signed and delivered by its duly authorized representative to be effective as of the Effective Date.

By:  ___/s/ Xiaoliang Lei /common seal/___          By:  ___/s/ Xiaoliang Lei /common seal/___

Title:  Legal Representative
For and on behalf of
Hainan Yilingliuer Network Technology Co., Ltd.

Title:  Legal Representative
For and on behalf of
Beijing Yiliulinger Information Technology Co., Ltd.

6

**Supplemental Agreement**

Party A: Hainan Yilingliuer Network Technology Co., Ltd.
Address: Room 201, Building A18, Hainan Ecological Software Park, High-tech Industries Demonstration Zone, Laocheng District, Hainan, P.R.China

Party B: Beijing Yiliulinger Information Technology Co., Ltd.
Address: Room 305, 3F, Building 4, East Kaifang Road, Huairou District, Beijing, P.R.China

An Exclusive Cooperation Agreement ("the Agreement") was concluded between Party A and Party B ("the Parties") on June 1,2018. The Parties agree on this supplemental agreement in accordance with the Contract Law of the PRC and other relevant laws and regulations for mutual benefit.

1.    Supplementary Terms

According to Section 1 of the Agreement, Party B agrees to provide investment consulting services to Party A starting from the effective date of this supplemental agreement.

| Investment |
| --- |
|  |
|  |
|  |
|  |

2.    Above are the supplementary terms to the Agreement. The Parties shall still comply with the terms of the Agreement concluded on June 1 ,2018, which will not be affected by the supplemental agreement.

3.    This supplemental agreement is an indivisible part of the Agreement concluded by the Parties on June 1, 2018. This supplemental agreement is made out in two (2) sets of originals with equal validity. Party A and Party B each have one of the originals. By signing below, the Parties agree to the terms of this supplemental agreement effective from the date of signature.

7

By:    /s/ Xiaoliang Lei /common seal/

By:    /s/ Xiaoliang Lei /common seal/

Title:  Legal Representative
For and on behalf of
Hainan Yilingliuer Network Technology Co., Ltd.

Title:  Legal Representative
For and on behalf of
Beijing Yiliulinger Information Technology Co., Ltd.

8

Exhibit 4.34

**Exclusive Option Agreement**

This Exclusive Option Agreement (this "Agreement") is executed by and among the following Parties as of June 1, 2018 in Beijing, the People's Republic of China ("China" or the "PRC"):

**Party A:**    Beijing Yiliulinger Information Technology Co., Ltd., a wholly-owned subsidiaries of wholly foreign owned enterprise, organized and existing under the laws of the PRC, with its address at Room 305, Building 4, Yard 13, Kaifang East Road, Huairou District, Beijing;

**Party B:**    Xiaoliang Lei, a Chinese citizen with Identification No.:***; and

**Party C:**    Hainan Yilingliuer Network Technology Co., Ltd., a limited liability company organized and existing under the laws of the PRC, with its address at Room 201, Building A18, Hainan Ecological Software Park, High-tech Industries Demonstration Zone, Laocheng District, Hainan.

In this Agreement, each of Party A, Party B and Party C shall be referred to as a "Party" respectively, and they shall be collectively referred to as the "Parties".

Whereas:

1.    Party B is a shareholder of Party C and as of the date hereof holds RMB 5,000,000 in the registered capital of Party C.

2.    Party B agrees to grant Party A an exclusive right through this Agreement, and Party A agrees to accept such exclusive right to purchase all or part equity interest held by Party B in Party C.

3.    Party C agrees to grant Party A an exclusive right through this Agreement, and Party A agrees to accept such exclusive right to purchase all or part of the assets of Party C.

Now therefore, upon mutual discussion and negotiation, the Parties have reached the following agreement:

**1.    Sale and Purchase of Equity Interest and Asssets**

1.1    Equity Interest Purchase Option

Party B hereby irrevocably grants Party A an irrevocable and exclusive right to purchase, or designate one or more persons (each, a "Designee") to purchase the equity interests in Party C then held by Party B once or at multiple times at any time in part or in whole at Party A's sole and absolute discretion to the extent permitted by Chinese laws and at the price described in Section 1.1.2 herein (such right being the "Equity Interest Purchase Option"). Except for Party A and the Designee(s), no other person shall be entitled to the Equity Interest Purchase Option or other rights with respect to the equity interests of Party B. Party C hereby agrees to the grant by Party B of the Equity Interest Purchase Option to Party A. The term "person" as used herein shall refer to individuals, corporations, partnerships, partners, enterprises, trusts or non-corporate organizations.

1.1.1    Steps for Exercise of the Equity Interest Purchase Option

Subject to the provisions of the laws and regulations of China, Party A may exercise the Equity Interest Purchase Option by issuing a written notice to Party B (the "Equity Interest Purchase Option Notice"), specifying: (a) Party A's or the Designee's decision to exercise the Equity Interest Purchase Option; (b) the portion of equity interests to be purchased by Party A or the Designee from Party B (the "Optioned Interests"); and (c) the date for purchasing the Optioned Interests or the date for the transfer of the Optioned Interests.

1.1.2    Equity Interest Purchase Price

The purchase price of the Optioned Interests (the "Base Price") shall be RMB 10. If PRC law requires a minimum price higher than the Base Price when Party A exercises the Equity Interest Purchase Option, the minimum price regulated by PRC law shall be the purchase price (collectively, the "Equity Interest Purchase Price").

1.1.3    Transfer of Optioned Interests

For each exercise of the Equity Interest Purchase Option:

1.1.3.1    Party B shall cause Party C to promptly convene a shareholders' meeting, at which a resolution shall be adopted approving Party B's transfer of the Optioned Interests to Party A and/or the Designee(s);

1.1.3.2    Party B shall obtain written statements from the other shareholders of Party C giving consent to the transfer of the equity interest to Party A and/or the Designee(s) and waiving any right of first refusal related thereto;

1.1.3.3    Party B shall execute an equity interest transfer contract with respect to each transfer with Party A and/or each Designee (whichever is applicable), in accordance with the provisions of this Agreement and the Equity Interest Purchase Option Notice regarding the Optioned Interests;

1.1.3.4    The relevant Parties shall execute all other necessary contracts, agreements or documents, obtain all necessary government licenses and permits and take all necessary actions to transfer valid ownership of the Optioned Interests to Party A and/or the Designee(s), unencumbered by any security interests, and cause Party A and/or the Designee(s) to become the registered owner(s) of the

Optioned Interests. For the purpose of this Section and this Agreement, "security interests" shall include securities, mortgages, third party's rights or interests, any stock options, acquisition right, right of first refusal, right to offset, ownership retention or other security arrangements, but shall be deemed to exclude any security interest created by this Agreement, Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney. "Party B's Equity Interest Pledge Agreement" as used in this Agreement shall refer to the Interest Pledge Agreement executed by and among Party A, Party B and Party C on the date hereof and any modification, amendment and restatement thereto. "Party B's Power of Attorney" as used in this Agreement shall refer to the Power of Attorney executed by Party B on the date hereof granting Party A with a power of attorney and any modification, amendment and restatement thereto.

1.2    Asset Purchase Option

Party C hereby grants to Party A an irrevocable and exclusive option to have Party A or its Designee to purchase from Party C, at Party A's sole discretion, at any time and in accordance with the procedures decided by Party A in its sole discretion, any or all of the assets of Party C, to the extent permitted under PRC law, and at the lowest purchase price permitted by PRC law. The Parties shall then enter into a separate assets transfer agreement, specifying the terms and conditions of the transfer of the assets.

**2.    Covenants**

2.1    Covenants regarding Party C

Party B (as a shareholder of Party C) and Party C hereby covenant as follows:

2.1.1    Without the prior written consent of Party A, they shall not in any manner supplement, change or amend the articles of association of Party C, increase or decrease its registered capital, or change its structure of registered capital in other manners;

2.1.2    They shall maintain Party C's corporate existence in accordance with good financial and business standards and practices, obtain and maintain all necessary government licenses and permits by prudently and effectively operating its business and handling its affairs;

2.1.3    Without the prior written consent of Party A, they shall not at any time following the date hereof, sell, transfer, mortgage or dispose of in any manner any material assets of Party C or legal or beneficial interest in the material business or revenues of Party C of more than RMB 5,000,000, or allow the encumbrance thereon of any security interest;

3

2.1.4    Without the prior written consent of Party A, they shall not incur, inherit, guarantee or suffer the existence of any debt, except for payables incurred in the ordinary course of business other than through loans;

2.1.5    They shall always operate all of Party C's businesses within the normal business scope to maintain the asset value of Party C and refrain from any action/omission that may affect Party C's operating status and asset value;

2.1.6    Without the prior written consent of Party A, they shall not cause Party C to execute any major contract, except the contracts in the ordinary course of business (for the purpose of this subsection, a contract with a price exceeding RMB 5,000,000 shall be deemed a major contract);

2.1.7    Without the prior written consent of Party A, they shall not cause Party C to provide any person with any loan or credit;

2.1.8    They shall provide Party A with information on Party C's business operations and financial condition at Party A's request;

2.1.9    If requested by Party A, they shall procure and maintain insurance in respect of Party C's assets and business from an insurance carrier acceptable to Party A, at an amount and type of coverage typical for companies that operate similar businesses;

2.1.10    Without the prior written consent of Party A, they shall not cause or permit Party C to merge, consolidate with, acquire or invest in any person;

2.1.11    They shall immediately notify Party A of the occurrence or possible occurrence of any litigation, arbitration or administrative proceedings relating to Party C's assets, business or revenue;

2.1.12    To maintain the ownership by Party C of all of its assets, they shall execute all necessary or appropriate documents, take all necessary or appropriate actions, file all necessary or appropriate complaints, and raise necessary or appropriate defenses against all claims;

2.1.13    Without the prior written consent of Party A, they shall ensure that Party C shall not in any manner distribute dividends to its shareholders, provided that upon Party A's written request, Party C shall immediately distribute all distributable profits to its shareholders;

4

2.1.14    At the request of Party A, they shall appoint any person designated by Party A as the director or executive director of Party C.

2.1.15    Without Party A's prior written consent, they shall not engage in any business in competition with Party A or its affiliates; and

2.1.16    Unless otherwise required by PRC law, Party C shall not be dissolved or liquated without prior written consent by Party A.

2.2    Covenants of Party B

Party B hereby covenants as follows:

2.2.1 Without the prior written consent of Party A, Party B shall not sell, transfer, mortgage or dispose of in any other manner any legal or beneficial interest in the equity interests in Party C held by Party B, or allow the encumbrance thereon, except for the interest placed in accordance with Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney;

2.2.2 Without the prior written consent of Party A, Party B shall cause the shareholders' meeting and/or the directors (or the executive director) of Party C not to approve any sale, transfer, mortgage or disposition in any other manner of any legal or beneficial interest in the equity interests in Party C held by Party B, or allow the encumbrance thereon of any security interest, except for the interest placed in accordance with Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney;

2.2.3 Without the prior written consent of Party A, Party B shall cause the shareholders' meeting or the directors (or the executive director) of Party C not to approve the merger or consolidation with any person, or the acquisition of or investment in any person;

2.2.4 Party B shall immediately notify Party A of the occurrence or possible occurrence of any litigation, arbitration or administrative proceedings relating to the equity interests in Party C held by Party B;

2.2.5 Party B shall cause the shareholders' meeting or the directors (or the executive director) of Party C to vote their approval of the transfer of the Optioned Interests as set forth in this Agreement and to take any and all other actions that may be requested by Party A;

2.2.6 To the extent necessary to maintain Party B's ownership in Party C, Party B shall execute all necessary or appropriate documents, take all necessary or appropriate actions, file all necessary or appropriate complaints, and raise necessary or appropriate defenses against all claims;

5

2.2.7 Party B shall appoint any designee of Party A as the director or the executive director of Party C, at the request of Party A;

2.2.8 Party B hereby waives its right of first refusal to the transfer of equity interest by any other shareholder of Party C to Party A (if any), and gives consent to the execution by each other shareholder of Party C with Party A and Party C the exclusive option agreement, the equity interest pledge agreement and the power of attorney similar to this Agreement, Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney, and accepts not to take any action in conflict with such documents executed by the other shareholders;

2.2.9 Party B shall promptly donate any profit, interest, dividend or proceeds of liquidation to Party A or any other person designated by Party A to the extent permitted under the applicable PRC laws; and

2.2.10 Party B shall strictly abide by the provisions of this Agreement and other contracts jointly or separately executed by and among Party B, Party C and Party A, perform the obligations hereunder and thereunder, and refrain from any action/omission that may affect the effectiveness and enforceability thereof. To the extent that Party B has any remaining rights with respect to the equity interests subject to this Agreement hereunder or under Party B's Equity Interest Pledge Agreement or under Party B's Power of Attorney, Party B shall not exercise such rights except in accordance with the written instructions of Party A.

## 3. **Representations and Warranties**

Party B and Party C hereby represent and warrant to Party A, jointly and severally, as of the date of this Agreement and each date of the transfer of the Optioned Interests, that:

3.1 They have the power, capacity and authority to execute and deliver this Agreement and any equity interest transfer contracts to which they are parties concerning the Optioned Interests to be transferred thereunder (each, a "Transfer Contract"), and to perform their obligations under this Agreement and any Transfer Contracts. Party B and Party C agree to enter into Transfer Contracts consistent with the terms of this Agreement upon Party A's exercise of the Equity Interest Purchase Option. This Agreement and the Transfer Contracts to which they are parties constitute or will constitute their legal, valid and binding obligations and shall be enforceable against them in accordance with the provisions thereof;

3.2 Party B and Party C have obtained any and all approvals and consents from the competent government authorities and third parties (if required) for the execution, delivery and performance of this Agreement.

6

3.3 The execution and delivery of this Agreement or any Transfer Contracts and the obligations under this Agreement or any Transfer Contracts shall not: (i) cause any violation of any applicable laws of China; (ii) be inconsistent with the articles of association, bylaws or other organizational documents of Party C; (iii) cause the violation of any contracts or instruments to which they are a party or which are binding on them, or constitute any breach under any contracts or instruments to which they are a party or which are binding on them; (iv) cause any violation of any condition for the grant and/or continued effectiveness of any licenses or permits issued to either of them; or (v) cause the suspension or revocation of or imposition of additional conditions to any licenses or permits issued to either of them;

3.4 Party B has a good and merchantable title to the equity interests held by Party B in Party C. Except for Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney, Party B has not placed any security interest on such equity interests;

3.5 Party C has a good and merchantable title to all of its assets, and has not placed any security interest on the aforementioned assets;

3.6 Party C does not have any outstanding debts, except for (i) debt incurred within the normal business scope; and (ii) debts disclosed to Party A for which Party A's written consent has been obtained.

3.7 Party C has complied with all laws and regulations of China applicable to asset acquisitions; and

3.8    There are no pending or threatened litigation, arbitration or administrative proceedings relating to the equity interests in Party C, assets of Party C or Party C.

4.    **Effective Date and Term**

This Agreement shall become effective upon execution by the Parties, and remain effective until all equity interests held by Party B in Party C have been transferred or assigned to Party A and/or any other person designated by Party A in accordance with this Agreement.

5.    **Governing Law and Resolution of Disputes**

5.1    Governing Law

The execution, effectiveness, construction, performance, amendment and termination of this Agreement and the resolution of disputes hereunder shall be governed by the laws of the PRC.

<center>7</center>

5.2    Methods of Resolution of Disputes

In the event of any dispute with respect to the construction and performance of this Agreement, the Parties shall first resolve the dispute through friendly negotiations. In the event the Parties fail to reach an agreement on the dispute after either Party's request to the other Parties for resolution of the dispute through negotiations, either Party may submit the relevant dispute to Beijing Arbitration Commission for arbitration, in accordance with its arbitration rules. The arbitration shall be conducted in Beijing. The arbitration award shall be final and binding on all Parties.

6.    **Taxes and Fees**

Each Party shall pay any and all transfer and registration taxes, expenses and fees incurred thereby or levied thereon in accordance with the laws of China in connection with the preparation and execution of this Agreement and the Transfer Contracts, as well as the consummation of the transactions contemplated under this Agreement and the Transfer Contracts.

7.    **Notices**

7.1    All notices and other communications required or permitted to be given pursuant to this Agreement shall be delivered personally or sent by registered mail, prepaid postage, a commercial courier service or facsimile transmission to the address of such Party set forth below. A confirmation copy of each notice shall also be sent by email. The dates on which notices shall be deemed to have been effectively given shall be determined as follows:

7.1.1    Notices given by personal delivery, courier service, registered mail or prepaid postage shall be deemed effectively given on the date of receipt or refusal at the address specified for notices;

7.1.2    Notices given by facsimile transmission shall be deemed effectively given on the date of successful transmission (as evidenced by an automatically generated confirmation of transmission).

7.2    For the purpose of notices, the addresses of the Parties are as follows:

**Party A:**  Beijing Yiliulinger Information Technology Co., Ltd.
Address:  20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:     Ying Zhang
Phone:    010-5731 0733

**Party B:**  Xiaoliang Lei
Address:  20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:     Ying Zhang
Phone:    010-5731 0733

**Party C:**  Hainan Yilingliuer Network Technology Co., Ltd.
Address:  20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:     Ying Zhang
Phone:    010-5731 0733

<center>8</center>

7.3    Any Party may at any time change its address for notices by a notice delivered to the other Parties in accordance with the terms hereof.

8.    **Confidentiality**

The Parties acknowledge that the existence and the terms of this Agreement, and any oral or written information exchanged between the Parties in connection with the preparation and performance of this Agreement are regarded as confidential information. Each Party shall maintain confidentiality of all such confidential information, and without obtaining the written consent of other Parties, it shall not disclose any relevant confidential information to any third parties, except for the information that: (a) is or will be in the public domain (other than through the receiving

Party's unauthorized disclosure); (b) is under the obligation to be disclosed pursuant to the applicable laws or regulations, rules of any stock exchange, or orders of the court or other government authorities; or (c) is required to be disclosed by any Party to its shareholders, directors, employees, legal counsels or financial advisors regarding the transaction contemplated hereunder, provided that such shareholders, directors, employees, legal counsels, or financial advisors shall be bound by the confidentiality obligations similar to those set forth in this Section. Disclosure of any confidential information by the shareholders, director, employees of, or agencies engaged by any Party shall be deemed disclosure of such confidential information by such Party and such Party shall be held liable for breach of this Agreement.

**9. Further Warranties**

The Parties agree to promptly execute documents that are reasonably required for or are conducive to the implementation of the provisions and purposes of this Agreement and take further actions that are reasonably required for or are conducive to the implementation of the provisions and purposes of this Agreement.

**10. Breach of Agreement**

10.1 If Party B or Party C conducts any material breach of any term of this Agreement, Party A shall have right to terminate this Agreement and/or require Party B or Party C to compensate all damages; this Section 10 shall not prejudice any other rights of Party A herein;

10.2 Party B or Party C shall not have any right to terminate this Agreement in any event unless otherwise required by the applicable laws.

9

**11. Miscellaneous**

11.1 Amendments, changes and supplements

Any amendment, change and supplement to this Agreement shall require the execution of a written agreement by all of the Parties.

11.2 Entire agreement

Except for the amendments, supplements or changes in writing executed after the execution of this Agreement, this Agreement shall constitute the entire agreement reached by and among the Parties hereto with respect to the subject matter hereof, and shall supersede all prior oral and written consultations, representations and contracts reached with respect to the subject matter of this Agreement.

11.3 Headings

The headings of this Agreement are for convenience only, and shall not be used to interpret, explain or otherwise affect the meanings of the provisions of this Agreement.

11.4 Language

This Agreement is written in both Chinese and English language in three copies, each Party having one copy. The Chinese version and English version shall have equal legal validity.

11.5 Severability

In the event that one or several of the provisions of this Agreement are found to be invalid, illegal or unenforceable in any aspect in accordance with any laws or regulations, the validity, legality or enforceability of the remaining provisions of this Agreement shall not be affected or compromised in any respect. The Parties shall strive in good faith to replace such invalid, illegal or unenforceable provisions with effective provisions that accomplish to the greatest extent permitted by law and the intentions of the Parties, and the economic effect of such effective provisions shall be as close as possible to the economic effect of those invalid, illegal or unenforceable provisions.

11.6 Successors

This Agreement shall be binding on and shall inure to the interest of the respective successors of the Parties and the permitted assigns of such Parties.

10

11.7 Survival

11.7.1 Any obligations that occur or that are due as a result of this Agreement upon the expiration or early termination of this Agreement shall survive the expiration or early termination thereof.

11.7.2 The provisions of Sections 5, 8, 10 and this Section 11.7 shall survive the termination of this Agreement.

11.8 Waivers

Any Party may waive the terms and conditions of this Agreement, provided that such a waiver must be provided in writing and shall require the signatures of the Parties. No waiver by any Party in certain circumstances with respect to a breach by other Parties shall operate as a waiver by such a Party with respect to any similar breach in other circumstances.

11

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Exclusive Option Agreement as of the date first above written.

**Party A:**     Beijing Yiliulinger Information Technology Co.,
                 Ltd.

By:              /s/ Xiaoliang Lei /common seal/ _____
Name:            Xiaoliang Lei
Title:           Legal Representative


**Party B:**     Xiaoliang Lei

By:              /s/ Xiaoliang Lei _____


**Party C:**     Hainan Yilingliuer Network Technology Co., Ltd.

By:              /s/ Xiaoliang Lei /common seal/ _____
Name:            Xiaoliang Lei
Title:           Legal Representative

---

### Exclusive Option Agreement

This Exclusive Option Agreement (this "Agreement") is executed by and among the following Parties as of June 1, 2018 in Beijing, the People's Republic of China ("China" or the "PRC"):

**Party A:**     Beijing Yiliulinger Information Technology Co., Ltd., a wholly-owned subsidiaries of wholly foreign owned enterprise, organized and existing under the laws of the PRC, with its address at Room 305, Building 4, Yard 13, Kaifang East Road, Huairou District, Beijing;

**Party B:**     Wang Li, a Chinese citizen with Identification No.: ***; and

**Party C:**     Hainan Yilingliuer Network Technology Co., Ltd., a limited liability company organized and existing under the laws of the PRC, with its address at Room 201, Building A18, Hainan Ecological Software Park, High-tech Industries Demonstration Zone, Laocheng District, Hainan.

In this Agreement, each of Party A, Party B and Party C shall be referred to as a "Party" respectively, and they shall be collectively referred to as the "Parties".

Whereas:

1.   Party B is a shareholder of Party C and as of the date hereof holds RMB 5,000,000 in the registered capital of Party C.

2.   Party B agrees to grant Party A an exclusive right through this Agreement, and Party A agrees to accept such exclusive right to purchase all or part equity interest held by Party B in Party C.

3.   Party C agrees to grant Party A an exclusive right through this Agreement, and Party A agrees to accept such exclusive right to purchase all or part of the assets of Party C.

Now therefore, upon mutual discussion and negotiation, the Parties have reached the following agreement:


**1.    Sale and Purchase of Equity Interest and Asssets**

1.1    Equity Interest Purchase Option

Party B hereby irrevocably grants Party A an irrevocable and exclusive right to purchase, or designate one or more persons (each, a "Designee") to purchase the equity interests in Party C then held by Party B once or at multiple times at any time in part or in whole at Party A's sole and absolute discretion to the extent permitted by Chinese laws and at the price described in Section 1.1.2 herein (such right being the "Equity Interest Purchase Option"). Except for Party A and the Designee(s), no other person shall be entitled to the Equity Interest Purchase Option or other rights with respect to the equity interests of Party B. Party C hereby agrees to the grant by Party B of the Equity Interest Purchase Option to Party A. The term "person" as used herein shall refer to individuals, corporations, partnerships, partners, enterprises, trusts or non-corporate organizations.

1

1.1.1   Steps for Exercise of the Equity Interest Purchase Option

Subject to the provisions of the laws and regulations of China, Party A may exercise the Equity Interest Purchase Option by issuing a written notice to Party B (the "Equity Interest Purchase Option Notice"), specifying: (a) Party A's or the Designee's decision to exercise the Equity Interest Purchase Option; (b) the portion of equity interests to be purchased by Party A or the Designee from Party B (the "Optioned Interests"); and (c) the date for purchasing the Optioned Interests or the date for the transfer of the Optioned Interests.

1.1.2   Equity Interest Purchase Price

The purchase price of the Optioned Interests (the "Base Price") shall be RMB 10. If PRC law requires a minimum price higher than the Base Price when Party A exercises the Equity Interest Purchase Option, the minimum price regulated by PRC law shall be the purchase price (collectively, the "Equity Interest Purchase Price").

1.1.3    Transfer of Optioned Interests

For each exercise of the Equity Interest Purchase Option:

1.1.3.1    Party B shall cause Party C to promptly convene a shareholders' meeting, at which a resolution shall be adopted approving Party B's transfer of the Optioned Interests to Party A and/or the Designee(s);

1.1.3.2    Party B shall obtain written statements from the other shareholders of Party C giving consent to the transfer of the equity interest to Party A and/or the Designee(s) and waiving any right of first refusal related thereto;

1.1.3.3    Party B shall execute an equity interest transfer contract with respect to each transfer with Party A and/or each Designee (whichever is applicable), in accordance with the provisions of this Agreement and the Equity Interest Purchase Option Notice regarding the Optioned Interests;

2

1.1.3.4    The relevant Parties shall execute all other necessary contracts, agreements or documents, obtain all necessary government licenses and permits and take all necessary actions to transfer valid ownership of the Optioned Interests to Party A and/or the Designee(s), unencumbered by any security interests, and cause Party A and/or the Designee(s) to become the registered owner(s) of the Optioned Interests. For the purpose of this Section and this Agreement, "security interests" shall include securities, mortgages, third party's rights or interests, any stock options, acquisition right, right of first refusal, right to offset, ownership retention or other security arrangements, but shall be deemed to exclude any security interest created by this Agreement, Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney. "Party B's Equity Interest Pledge Agreement" as used in this Agreement shall refer to the Interest Pledge Agreement executed by and among Party A, Party B and Party C on the date hereof and any modification, amendment and restatement thereto. "Party B's Power of Attorney" as used in this Agreement shall refer to the Power of Attorney executed by Party B on the date hereof granting Party A with a power of attorney and any modification, amendment and restatement thereto.

1.2    Asset Purchase Option

Party C hereby grants to Party A an irrevocable and exclusive option to have Party A or its Designee to purchase from Party C, at Party A's sole discretion, at any time and in accordance with the procedures decided by Party A in its sole discretion, any or all of the assets of Party C, to the extent permitted under PRC law, and at the lowest purchase price permitted by PRC law. The Parties shall then enter into a separate assets transfer agreement, specifying the terms and conditions of the transfer of the assets.

## 2.    Covenants

2.1    Covenants regarding Party C

Party B (as a shareholder of Party C) and Party C hereby covenant as follows:

2.1.1    Without the prior written consent of Party A, they shall not in any manner supplement, change or amend the articles of association of Party C, increase or decrease its registered capital, or change its structure of registered capital in other manners;

2.1.2    They shall maintain Party C's corporate existence in accordance with good financial and business standards and practices, obtain and maintain all necessary government licenses and permits by prudently and effectively operating its business and handling its affairs;

2.1.3    Without the prior written consent of Party A, they shall not at any time following the date hereof, sell, transfer, mortgage or dispose of in any manner any material assets of Party C or legal or beneficial interest in the material business or revenues of Party C of more than RMB 5,000,000, or allow the encumbrance thereon of any security interest;

3

2.1.4    Without the prior written consent of Party A, they shall not incur, inherit, guarantee or suffer the existence of any debt, except for payables incurred in the ordinary course of business other than through loans;

2.1.5    They shall always operate all of Party C's businesses within the normal business scope to maintain the asset value of Party C and refrain from any action/omission that may affect Party C's operating status and asset value;

2.1.6    Without the prior written consent of Party A, they shall not cause Party C to execute any major contract, except the contracts in the ordinary course of business (for the purpose of this subsection, a contract with a price exceeding RMB 5,000,000 shall be deemed a major contract);

2.1.7    Without the prior written consent of Party A, they shall not cause Party C to provide any person with any loan or credit;

2.1.8    They shall provide Party A with information on Party C's business operations and financial condition at Party A's request;

2.1.9    If requested by Party A, they shall procure and maintain insurance in respect of Party C's assets and business from an insurance carrier acceptable to Party A, at an amount and type of coverage typical for companies that operate similar businesses;

2.1.10    Without the prior written consent of Party A, they shall not cause or permit Party C to merge, consolidate with, acquire or invest in any person;

2.1.11    They shall immediately notify Party A of the occurrence or possible occurrence of any litigation, arbitration or administrative proceedings relating to Party C's assets, business or revenue;

2.1.12   To maintain the ownership by Party C of all of its assets, they shall execute all necessary or appropriate documents, take all necessary or appropriate actions, file all necessary or appropriate complaints, and raise necessary or appropriate defenses against all claims;

2.1.13   Without the prior written consent of Party A, they shall ensure that Party C shall not in any manner distribute dividends to its shareholders, provided that upon Party A's written request, Party C shall immediately distribute all distributable profits to its shareholders;

2.1.14   At the request of Party A, they shall appoint any person designated by Party A as the director or executive director of Party C.

4

2.1.15   Without Party A's prior written consent, they shall not engage in any business in competition with Party A or its affiliates; and

2.1.16   Unless otherwise required by PRC law, Party C shall not be dissolved or liquated without prior written consent by Party A.

2.2   <u>Covenants of Party B</u>

Party B hereby covenants as follows:

2.2.1   Without the prior written consent of Party A, Party B shall not sell, transfer, mortgage or dispose of in any other manner any legal or beneficial interest in the equity interests in Party C held by Party B, or allow the encumbrance thereon, except for the interest placed in accordance with Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney;

2.2.2   Without the prior written consent of Party A, Party B shall cause the shareholders' meeting and/or the directors (or the executive director) of Party C not to approve any sale, transfer, mortgage or disposition in any other manner of any legal or beneficial interest in the equity interests in Party C held by Party B, or allow the encumbrance thereon of any security interest, except for the interest placed in accordance with Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney;

2.2.3   Without the prior written consent of Party A, Party B shall cause the shareholders' meeting or the directors (or the executive director) of Party C not to approve the merger or consolidation with any person, or the acquisition of or investment in any person;

2.2.4   Party B shall immediately notify Party A of the occurrence or possible occurrence of any litigation, arbitration or administrative proceedings relating to the equity interests in Party C held by Party B;

2.2.5   Party B shall cause the shareholders' meeting or the directors (or the executive director) of Party C to vote their approval of the transfer of the Optioned Interests as set forth in this Agreement and to take any and all other actions that may be requested by Party A;

2.2.6   To the extent necessary to maintain Party B's ownership in Party C, Party B shall execute all necessary or appropriate documents, take all necessary or appropriate actions, file all necessary or appropriate complaints, and raise necessary or appropriate defenses against all claims;

2.2.7   Party B shall appoint any designee of Party A as the director or the executive director of Party C, at the request of Party A;

5

2.2.8   Party B hereby waives its right of first refusal to the transfer of equity interest by any other shareholder of Party C to Party A (if any), and gives consent to the execution by each other shareholder of Party C with Party A and Party C the exclusive option agreement, the equity interest pledge agreement and the power of attorney similar to this Agreement, Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney, and accepts not to take any action in conflict with such documents executed by the other shareholders;

2.2.9   Party B shall promptly donate any profit, interest, dividend or proceeds of liquidation to Party A or any other person designated by Party A to the extent permitted under the applicable PRC laws; and

2.2.10  Party B shall strictly abide by the provisions of this Agreement and other contracts jointly or separately executed by and among Party B, Party C and Party A, perform the obligations hereunder and thereunder, and refrain from any action/omission that may affect the effectiveness and enforceability thereof. To the extent that Party B has any remaining rights with respect to the equity interests subject to this Agreement hereunder or under Party B's Equity Interest Pledge Agreement or under Party B's Power of Attorney, Party B shall not exercise such rights except in accordance with the written instructions of Party A.

**3.   Representations and Warranties**

Party B and Party C hereby represent and warrant to Party A, jointly and severally, as of the date of this Agreement and each date of the transfer of the Optioned Interests, that:

3.1   They have the power, capacity and authority to execute and deliver this Agreement and any equity interest transfer contracts to which they are parties concerning the Optioned Interests to be transferred thereunder (each, a "Transfer Contract"), and to perform their obligations under this Agreement and any Transfer Contracts. Party B and Party C agree to enter into Transfer Contracts consistent with the terms of this Agreement upon Party A's exercise of the Equity Interest Purchase Option. This Agreement and the Transfer Contracts to which they are parties constitute or will constitute their legal, valid and binding obligations and shall be enforceable against them in accordance with the provisions thereof;

3.2   Party B and Party C have obtained any and all approvals and consents from the competent government authorities and third parties (if

required) for the execution, delivery and performance of this Agreement.

6

3.3 The execution and delivery of this Agreement or any Transfer Contracts and the obligations under this Agreement or any Transfer Contracts shall not: (i) cause any violation of any applicable laws of China; (ii) be inconsistent with the articles of association, bylaws or other organizational documents of Party C; (iii) cause the violation of any contracts or instruments to which they are a party or which are binding on them, or constitute any breach under any contracts or instruments to which they are a party or which are binding on them; (iv) cause any violation of any condition for the grant and/or continued effectiveness of any licenses or permits issued to either of them; or (v) cause the suspension or revocation of or imposition of additional conditions to any licenses or permits issued to either of them;

3.4 Party B has a good and merchantable title to the equity interests held by Party B in Party C. Except for Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney, Party B has not placed any security interest on such equity interests;

3.5 Party C has a good and merchantable title to all of its assets, and has not placed any security interest on the aforementioned assets;

3.6 Party C does not have any outstanding debts, except for (i) debt incurred within the normal business scope; and (ii) debts disclosed to Party A for which Party A's written consent has been obtained.

3.7 Party C has complied with all laws and regulations of China applicable to asset acquisitions; and

3.8 There are no pending or threatened litigation, arbitration or administrative proceedings relating to the equity interests in Party C, assets of Party C or Party C.

**4.  Effective Date and Term**

This Agreement shall become effective upon execution by the Parties, and remain effective until all equity interests held by Party B in Party C have been transferred or assigned to Party A and/or any other person designated by Party A in accordance with this Agreement.

**5.  Governing Law and Resolution of Disputes**

5.1  Governing Law

The execution, effectiveness, construction, performance, amendment and termination of this Agreement and the resolution of disputes hereunder shall be governed by the laws of the PRC.

5.2  Methods of Resolution of Disputes

In the event of any dispute with respect to the construction and performance of this Agreement, the Parties shall first resolve the dispute through friendly negotiations. In the event the Parties fail to reach an agreement on the dispute after either Party's request to the other Parties for resolution of the dispute through negotiations, either Party may submit the relevant dispute to Beijing Arbitration Commission for arbitration, in accordance with its arbitration rules. The arbitration shall be conducted in Beijing. The arbitration award shall be final and binding on all Parties.

7

**6.  Taxes and Fees**

Each Party shall pay any and all transfer and registration taxes, expenses and fees incurred thereby or levied thereon in accordance with the laws of China in connection with the preparation and execution of this Agreement and the Transfer Contracts, as well as the consummation of the transactions contemplated under this Agreement and the Transfer Contracts.

**7.  Notices**

7.1  All notices and other communications required or permitted to be given pursuant to this Agreement shall be delivered personally or sent by registered mail, prepaid postage, a commercial courier service or facsimile transmission to the address of such Party set forth below. A confirmation copy of each notice shall also be sent by email. The dates on which notices shall be deemed to have been effectively given shall be determined as follows:

7.1.1  Notices given by personal delivery, courier service, registered mail or prepaid postage shall be deemed effectively given on the date of receipt or refusal at the address specified for notices;

7.1.2  Notices given by facsimile transmission shall be deemed effectively given on the date of successful transmission (as evidenced by an automatically generated confirmation of transmission).

7.2  For the purpose of notices, the addresses of the Parties are as follows:

**Party A:**  Beijing Yiliulinger Information Technology Co., Ltd.
Address:  20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:  Ying Zhang
Phone:  010-5731 0733

**Party B:**  Li Wang
Address:  20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.

Attn:    Ying Zhang
Phone:    010-5731 0733

**Party C:**  Hainan Yilingliuer Network Technology Co., Ltd.
Address:  20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:    Ying Zhang
Phone:    010-5731 0733

<div align="center">8</div>

7.3    Any Party may at any time change its address for notices by a notice delivered to the other Parties in accordance with the terms hereof.

8.    **Confidentiality**

The Parties acknowledge that the existence and the terms of this Agreement, and any oral or written information exchanged between the Parties in connection with the preparation and performance of this Agreement are regarded as confidential information. Each Party shall maintain confidentiality of all such confidential information, and without obtaining the written consent of other Parties, it shall not disclose any relevant confidential information to any third parties, except for the information that: (a) is or will be in the public domain (other than through the receiving Party's unauthorized disclosure); (b) is under the obligation to be disclosed pursuant to the applicable laws or regulations, rules of any stock exchange, or orders of the court or other government authorities; or (c) is required to be disclosed by any Party to its shareholders, directors, employees, legal counsels or financial advisors regarding the transaction contemplated hereunder, provided that such shareholders, directors, employees, legal counsels, or financial advisors shall be bound by the confidentiality obligations similar to those set forth in this Section. Disclosure of any confidential information by the shareholders, director, employees of, or agencies engaged by any Party shall be deemed disclosure of such confidential information by such Party and such Party shall be held liable for breach of this Agreement.

9.    **Further Warranties**

The Parties agree to promptly execute documents that are reasonably required for or are conducive to the implementation of the provisions and purposes of this Agreement and take further actions that are reasonably required for or are conducive to the implementation of the provisions and purposes of this Agreement.

10.    **Breach of Agreement**

10.1    If Party B or Party C conducts any material breach of any term of this Agreement, Party A shall have right to terminate this Agreement and/or require Party B or Party C to compensate all damages; this Section 10 shall not prejudice any other rights of Party A herein;

10.2    Party B or Party C shall not have any right to terminate this Agreement in any event unless otherwise required by the applicable laws.

11.    **Miscellaneous**

11.1    Amendments, changes and supplements

Any amendment, change and supplement to this Agreement shall require the execution of a written agreement by all of the Parties.

<div align="center">9</div>

11.2    Entire agreement

Except for the amendments, supplements or changes in writing executed after the execution of this Agreement, this Agreement shall constitute the entire agreement reached by and among the Parties hereto with respect to the subject matter hereof, and shall supersede all prior oral and written consultations, representations and contracts reached with respect to the subject matter of this Agreement.

11.3    Headings

The headings of this Agreement are for convenience only, and shall not be used to interpret, explain or otherwise affect the meanings of the provisions of this Agreement.

11.4    Language

This Agreement is written in both Chinese and English language in three copies, each Party having one copy. The Chinese version and English version shall have equal legal validity.

11.5    Severability

In the event that one or several of the provisions of this Agreement are found to be invalid, illegal or unenforceable in any aspect in accordance with any laws or regulations, the validity, legality or enforceability of the remaining provisions of this Agreement shall not be affected or compromised in any respect. The Parties shall strive in good faith to replace such invalid, illegal or unenforceable provisions with effective provisions that accomplish to the greatest extent permitted by law filed the intentions of the Parties, and the economic effect of such effective provisions shall be as close as possible to the economic effect of those invalid, illegal or unenforceable provisions.

11.6    Successors

This Agreement shall be binding on and shall inure to the interest of the respective successors of the Parties and the permitted assigns of such Parties.

11.7    Survival

11.7.1    Any obligations that occur or that are due as a result of this Agreement upon the expiration or early termination of this Agreement shall survive the expiration or early termination thereof.

11.7.2    The provisions of Sections 5, 8, 10 and this Section 11.7 shall survive the termination of this Agreement.

10

11.8    Waivers

Any Party may waive the terms and conditions of this Agreement, provided that such a waiver must be provided in writing and shall require the signatures of the Parties. No waiver by any Party in certain circumstances with respect to a breach by other Parties shall operate as a waiver by such a Party with respect to any similar breach in other circumstances.

11

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Exclusive Option Agreement as of the date first above written.

**Party A:**    Beijing Yiliulinger Information Technology Co., Ltd.

By:        /s/ Xiaoliang Lei /common seal/
Name:    Xiaoliang Lei
Title:     Legal Representative

**Party B:**    Li Wang

By:        /s/ Li Wang

**Party C:**    Hainan Yilingliuer Network Technology Co., Ltd.

By:        /s/ Xiaoliang Lei /common seal/
Name:    Xiaoliang Lei
Title:     Legal Representative

**Exhibit 4.35**

**CONFIRMATION LETTER**

As a shareholder of Hainan Yilingliuer Network Technology Co., Ltd. (the "**Company**"), I hereby confirm, represent and guarantee that my successor, guardian, creditor, spouse or any other person that may be entitled to assume rights and interests in the equity interest of the Company held by myself upon death, incapacity, divorce or any circumstances that may affect my ability to exercise my shareholder's rights in Company will not, in any manner and in any circumstances, carry out any act that may affect or hinder the fulfillment of my obligations under each of the contractual agreements (including the Equity Interest Pledge Agreement, the Power of Attorney, Exclusive Option Agreement which were executed by myself on June 1 , 2018, as well as the Exclusive Consulting and Management Services Agreement and the Business Operation Agreement which were executed by myself on June 1, 2018) (the "**Contractual Agreements**"). I further confirm and undertake that the Contractual Agreements and all of my rights and obligations thereunder shall be equally effective and binding upon my heir and successor.

I hereby further covenant that, I shall unwind the Contractual Agreements as soon as the applicable laws of the People's Republic of China ("**PRC**") allow Beijing Yiliulinger Information Technology Co., Ltd. to operate the business operated by the Company (which includes but not limited to the business of Network Information Service) without the Contractual Agreements. Subject to the applicable PRC laws, I shall return to the Beijing Yiliulinger Information Technology Co., Ltd. or the entity designated by Beijing Yiliulinger Information Technology Co., Ltd. any consideration I receive from Beijing Yiliulinger Information Technology Co., Ltd. for its acquisition of the equity interest of Company at the time when the Contractual Agreements are terminated.

/s/ Xiaoliang Lei
Date: June 1 , 2018

**CONFIRMATION LETTER**

As a shareholder of Hainan Yilingliuer Network Technology Co., Ltd. (the "**Company**"), I hereby confirm, represent and guarantee that my successor, guardian, creditor, spouse or any other person that may be entitled to assume rights and interests in the equity interest of the Company held by myself upon death, incapacity, divorce or any circumstances that may affect my ability to exercise my shareholder's rights in Company will not, in any manner and in any circumstances, carry out any act that may affect or hinder the fulfillment of my obligations under each of the contractual agreements (including the Equity Interest Pledge Agreement, the Power of Attorney, Exclusive Option Agreement which were executed by myself on June 1 , 2018, as well as the Exclusive Consulting and Management Services Agreement and the Business Operation Agreement which were executed by myself on June 1, 2018) (the "**Contractual Agreements**"). I further confirm and undertake that the Contractual Agreements and all of my rights and obligations thereunder shall be equally effective and binding upon my heir and successor.

I hereby further covenant that, I shall unwind the Contractual Agreements as soon as the applicable laws of the People's Republic of China ("**PRC**") allow Beijing Yiliulinger Information Technology Co., Ltd. to operate the business operated by the Company (which includes but not limited to the business of Network Information Service) without the Contractual Agreements. Subject to the applicable PRC laws, I shall return to the Beijing Yiliulinger Information Technology Co., Ltd. or the entity designated by Beijing Yiliulinger Information Technology Co., Ltd. any consideration I receive from Beijing Yiliulinger Information Technology Co., Ltd. for its acquisition of the equity interest of Company at the time when the Contractual Agreements are terminated.

/s/ Wang Li
Date: June 1 , 2018

<div align="right">**Exhibit 4.36**</div>

### Equity Interest Pledge Agreement

This Equity Interest Pledge Agreement (this "Agreement") has been executed by and among the following parties on June 1, 2018 in Beijing, the People's Republic of China ("China" or the "PRC"):

**Party A:**   Beijing Yiliulinger Information Technology Co., Ltd (hereinafter the "Pledgee"), a wholly-owned subsidiaries of wholly foreign owned enterprise, organized and existing under the laws of the PRC, with its address at Room 305, Building 4, Yard 13, Kaifang East Road, Huairou District, Beijing;

**Party B:**   Xiaoliang Lei (hereinafter the "Pledgor"), a Chinese citizen with Chinese Identification No.: ***; and

**Party C:**   Hainan Yilingliuer Network Technology Co., Ltd., a limited liability company organized and existing under the laws of the PRC, with its address at Room 201, Building A18, Hainan Ecological Software Park, High-tech Industries Demonstration Zone, Laocheng District, Hainan.

In this Agreement, each of the Pledgee, the Pledgor and Party C shall be referred to as a "Party" respectively, and they shall be collectively referred to as the "Parties".

Whereas:

1.   The Pledgor is a citizen of China who as of the date hereof holds RMB 5,000,000 in the registered capital of Party C. Party C is a limited liability company registered in Hainan, China, engaging in investment consultation. Party C acknowledges the respective rights and obligations of the Pledgor and the Pledgee under this Agreement, and intends to provide any necessary assistance in registering the Pledge; To ensure that Party C fully and timely pays the Secured Indebtedness and any or all of the payments under the Transaction Documents payable to the Pledgee, including but not limited to the management fees and service fees provided in the Transaction Documents (whether such fees become due and payable due to the arrival of the maturity date, advance payment requirements or any other reasons), the Pledgor hereby pledges to the Pledgee all of the equity interest hereafter acquired by the Pledgor in Party C;

2.   The Pledgee is a wholly-owned subsidiaries of wholly foreign-owned enterprise registered in China. The Pledgee and Party C which is partially owned by the Pledgor have executed an Exclusive Business Cooperation Agreement (as defined below) in Beijing; Party C, the Pledgee and the Pledgor have executed an Exclusive Option Agreement (as defined below); the Pledgor has executed a Power of Attorney (as defined below) in favor of the Pledgee;

<div align="center">1</div>

3.   To ensure that Party C and the Pledgor fully perform their obligations under the Exclusive Business Cooperation Agreement, the Exclusive Option Agreement and the Power of Attorney, the Pledgor hereby pledges to the Pledgee all of the equity interest that the Pledgor holds in Party C as security for Party C's and the Pledgor's obligations under the Exclusive Business Cooperation Agreement, the Exclusive Option Agreement and the Power of Attorney.

To perform the provisions of the Transaction Documents (as defined below), the Parties have mutually agreed to execute this Agreement upon the following terms.

**1.   Definitions**

Unless otherwise provided herein, the terms below shall have the following meanings:

1.1   Pledge: shall refer to the security interest granted by the Pledgor to the Pledgee pursuant to Section 2 of this Agreement, i.e., the right of the Pledgee to be paid in priority with the Equity Interest based on the monetary valuation that such Equity Interest is converted into or from the proceeds from the auction or sale of the Equity Interest.

1.2   Equity Interest: shall refer to RMB 5,000,000 in the registered capital of Party C, and all of the equity interest hereafter acquired by the Pledgor in Party C.

1.3   Term of the Pledge: shall refer to the term set forth in Section 3 of this Agreement.

1.4   Transaction Documents: shall refer to the Exclusive Consulting and Management Services Agreement executed by and between Party C and the Pledgee on June 1, 2018 (the "Exclusive Business Cooperation Agreement"), the Exclusive Option Agreement executed by and among Party C, the Pledgee and the Pledgor on June 1, 2018 (the "Exclusive Option Agreement"), Power of Attorney executed on June 1, 2018 by the Pledgor (the "Power of Attorney") and any modification, amendment and restatement to the aforementioned documents.

1.5   Contract Obligations: shall refer to all the obligations of the Pledgor under the Exclusive Option Agreement, the Power of Attorney and this Agreement; all the obligations of Party C under the Exclusive Business Cooperation Agreement, the Exclusive Option Agreement and this Agreement.

1.6   Secured Indebtedness: shall refer to RMB 5,000,000, as well as all the direct, indirect and derivative losses and losses of anticipated profits, suffered by the Pledgee, incurred as a result of any Event of Default. The amount of such loss shall be calculated in accordance with the reasonable business plan and profit forecast of the Pledgee, the consulting and service fees payable to the Pledgee under the Exclusive Business Cooperation Agreement, all expenses occurred in connection with enforcement by the Pledgee of the Pledgor's and/or Party C's Contract Obligations and etc.

<div align="center">2</div>

1.7    Event of Default: shall refer to any of the circumstances set forth in Section 7 of this Agreement.

1.8    Notice of Default: shall refer to the notice issued by the Pledgee in accordance with this Agreement declaring an Event of Default.

**2.    Pledge**

2.1    The Pledgor agrees to pledge all the Equity Interest as security for performance of the Contract Obligations and payment of the Secured Indebtedness under this Agreement. Party C hereby assents that the Pledgor pledges the Equity Interest to the Pledgee pursuant to this Agreement.

2.2    During the term of the Pledge, the Pledgee is entitled to receive dividends distributed on the Equity Interest. The Pledgor may receive dividends distributed on the Equity Interest only with prior written consent of the Pledgee. Dividends received by the Pledgor on Equity Interest after the deduction of individual income tax paid by the Pledgor shall be, as required by the Pledgee, (1) deposited into an account designated and supervised by the Pledgee and used to secure the Contract Obligations and pay the Secured Indebtedness prior and in preference to making any other payment; or (2) unconditionally donated to the Pledgee or any other person designated by the Pledgee to the extent permitted under the applicable PRC laws.

2.3    The Pledgor may subscribe for a capital increase in Party C only with prior written consent of the Pledgee. Any equity interest obtained by the Pledgor as a result of the Pledgor's subscription of the increased registered capital of Party C shall also be deemed as Equity Interest.

2.4    In the event that Party C is required by PRC law to be liquidated or dissolved, any interest distributed to the Pledgor upon Party C's dissolution or liquidation shall, upon the request of the Pledgee, be (1) deposited into an account designated and supervised by the Pledgee and used to secure the Contract Obligations and pay the Secured Indebtedness prior and in preference to make any other payment; or (2) unconditionally donated to the Pledgee or any other person designated by the Pledgee to the extent permitted under the applicable PRC laws.

**3.    Term of the Pledge**

3.1    The Pledge shall become effective on such date when the pledge of the Equity Interest contemplated herein is registered with the relevant administration for industry and commerce (the "AIC"). The Pledge shall remain effective until all Contract Obligations have been fully performed or all Secured Indebtedness has been fully paid. The Pledgor and Party C shall (1) register the Pledge in the shareholders' register of Party C within 3 business days following the execution of this Agreement, and (2) submit an application to the AIC for the registration of the Pledge of the Equity Interest contemplated herein within 30 business days following the execution of this Agreement. The parties covenant that for the purpose of registration of the Pledge, the parties hereto and all other shareholders of Party C shall submit to the AIC this Agreement or an equity interest pledge contract in the form required by the AIC at the location of Party C which shall truly reflect the information of the Pledge hereunder (the "AIC Pledge Contract"). For matters not specified in the AIC Pledge Contract, the Parties shall be bound by the provisions of this Agreement. The Pledgor and Party C shall submit all necessary documents and complete all necessary procedures, as required by the relevant PRC laws and regulations and the competent AIC, to ensure that the Pledge of the Equity Interest shall be registered with the AIC as soon as possible after submission for filing.

3

3.2    During the Term of the Pledge, in the event the Pledgor and/or Party C fails to perform the Contract Obligations or pay Secured Indebtedness, the Pledgee shall have the right, but not the obligation, to exercise the Pledge in accordance with the provisions of this Agreement.

**4.    Custody of Records for Equity Interest subject to the Pledge**

4.1    During the Term of the Pledge set forth in this Agreement, the Pledgor shall deliver to the Pledgee's custody the capital contribution certificate for the Equity Interest and the shareholders' register containing the Pledge within one week from the execution of this Agreement. The Pledgee shall have custody of such documents during the entire Term of the Pledge set forth in this Agreement.

**5.    Representations and Warranties of the Pledgor and Party C**

As of the execution date of this Agreement, the Pledgor and Party C hereby jointly and severally represent and warrant to the Pledgee that:

5.1    The Pledgor is the sole legal and beneficial owner of the Equity Interest.

5.2    The Pledgee shall have the right to dispose of and transfer the Equity Interest in accordance with the provisions set forth in this Agreement.

5.3    Except for the Pledge, the Pledgor has not placed any security interest or other encumbrance on the Equity Interest.

5.4    The Pledgor and Party C have obtained any and all approvals and consents from the applicable government authorities and third parties (if required) for the execution, delivery and performance of this Agreement.

5.5    The execution, delivery and performance of this Agreement will not: (i) violate any relevant PRC laws; (ii) conflict with Party C's articles of association or other constitutional documents; (iii) result in any breach of or constitute any default under any contract or instrument to which it is a party or by which it is otherwise bound; (iv) result in any violation of any condition for the grant and/or maintenance of any permit or approval granted to any Party; or (v) cause any permit or approval granted to any Party to be suspended, cancelled or attached with additional conditions.

4

**6. Covenants the Pledgor and Party C**

6.1 During the term of this Agreement, the Pledgor and Party C hereby jointly and severally covenant to the Pledgee:

6.1.1 The Pledgor shall not transfer the Equity Interest, place or permit the existence of any security interest or other encumbrance on the Equity Interest or any portion thereof, without the prior written consent of the Pledgee, except for the performance of the Transaction Documents;

6.1.2 The Pledgor and Party C shall comply with the provisions of all laws and regulations applicable to the pledge of rights, and within five (5) days of receipt of any notice, order or recommendation issued or prepared by the competent authorities regarding the Pledge, shall present the aforementioned notice, order or recommendation to the Pledgee, and shall comply with the aforementioned notice, order or recommendation or submit objections and representations with respect to the aforementioned matters upon the Pledgee's reasonable request or upon consent of the Pledgee;

6.1.3 The Pledgor and Party C shall promptly notify the Pledgee of any event or notice received by the Pledgor that may have an impact on the Equity Interest or any portion thereof, as well as any event or notice received by the Pledgor that may have an impact on any guarantees and other obligations of the Pledgor arising out of this Agreement.

6.1.4 Party C shall complete the registration procedures for the extension of the operation term within three (3) months prior to the expiration of such term to maintain the validity of this Agreement.

6.2 The Pledgor agrees that the rights acquired by the Pledgee in accordance with this Agreement with respect to the Pledge shall not be interrupted or harmed by the Pledgor or any heirs or representatives of the Pledgor or any other persons through any legal proceedings.

6.3 To protect or perfect the security interest granted by this Agreement for the Contract Obligations and Secured Indebtedness, the Pledgor hereby undertakes to execute in good faith and to cause other parties who have an interest in the Pledge to execute all certificates, agreements, deeds and/or covenants required by the Pledgee. The Pledgor also undertakes to perform and to cause other parties who have an interest in the Pledge to perform actions required by the Pledgee, to facilitate the exercise by the Pledgee of its rights and authority granted thereto by this Agreement, and to enter into all relevant documents regarding ownership of Equity Interest with the Pledgee or designee(s) of the Pledgee (natural persons/legal persons). The Pledgor undertakes to provide the Pledgee within a reasonable time with all notices, the orders and decisions regarding the Pledge that are required by the Pledgee.

5

6.4 The Pledgor hereby undertakes to comply with and perform all guarantees, promises, agreements, representations and conditions under this Agreement. In the event of failure or partial performance of its guarantees, promises, agreements, representations and conditions, the Pledgor shall indemnify the Pledgee for all losses resulting therefrom.

**7. Event of Breach**

7.1 The following circumstances shall be deemed an Event of Default:

7.1.1 The Pledgor's any breach to any obligations under the Transaction Documents and/or this Agreement.

7.1.2 Party C's any breach to any obligations under the Transaction Documents and/or this Agreement.

7.2 Upon notice or discovery of the occurrence of any circumstances or event that may lead to the aforementioned circumstances described in Section 7.1, the Pledgor and Party C shall immediately notify the Pledgee in writing accordingly.

7.3 Unless an Event of Default set forth in Section 7.1 has been successfully resolved to the Pledgee's satisfaction within twenty (20) days after the Pledgee and /or Party C delivers a notice to the Pledgor requesting ratification of such Event of Default, the Pledgee may issue a Notice of Default to the Pledgor in writing at any time thereafter, demanding the Pledgor to immediately exercise the Pledge in accordance with the provisions of Section 8 of this Agreement.

**8. Exercise of the Pledge**

8.1 The Pledgee shall issue a written Notice of Default to the Pledgor when it exercises the Pledge.

8.2 Subject to the provisions of Section 7.3, the Pledgee may exercise the right to enforce the Pledge at any time after the issuance of the Notice of Default in accordance with Section 8.1. Once the Pledgee elects to enforce the Pledge, the Pledgor shall cease to be entitled to any rights or interests associated with the Equity Interest.

8.3 After the Pledgee issues a Notice of Default to the Pledgor in accordance with Section 8.1, the Pledgee may exercise any remedy measure under the applicable PRC laws, the Transaction Documents and this Agreement, including but not limited to being paid in priority with the Equity Interest based on the monetary valuation that such Equity Interest is converted into or from the proceeds from the auction or sale of the Equity Interest. The Pledgee shall not be liable for any loss incurred by its duly exercise of such rights and powers.

6

8.4 The proceeds from the exercise of the Pledge by the Pledgee shall be used to pay for taxes and expenses incurred as a result of disposing the Equity Interest and to perform Contract Obligations and pay the Secured Indebtedness to the Pledgee prior and in preference to any other payment. After the payment of the aforementioned amounts, the remaining balance shall be returned to the Pledgor or any other person who have rights to such balance under applicable laws or be deposited to the local notary public office where the Pledgor resides, with all expenses incurred being borne by the Pledgor. To the extent permitted under the applicable PRC laws, the Pledgor shall unconditionally

donate the aforementioned proceeds to the Pledgee or any other person designated by the Pledgee.

8.5   The Pledgee may exercise any remedy measure available simultaneously or in any order. The Pledgee may exercise the right to being paid in priority with the Equity Interest based on the monetary valuation that such Equity Interest is converted into or from the proceeds from the auction or sale of the Equity Interest under this Agreement, without exercising any other remedy measure first.

8.6   The Pledgee is entitled to designate an attorney or other representatives to exercise the Pledge on its behalf, and the Pledgor or Party C shall not raise any objection to such exercise.

8.7   When the Pledgee disposes of the Pledge in accordance with this Agreement, the Pledgor and Party C shall provide the necessary assistance to enable the Pledgee to enforce the Pledge in accordance with this Agreement.

9.   **Breach of Agreement**

9.1   If the Pledgor or Party C conducts any material breach of any term of this Agreement, the Pledgee shall have right to terminate this Agreement and/or require the Pledgor or Party C to indemnify all damages; this Section 9 shall not prejudice any other rights of the Pledgee herein;

9.2   The Pledgor or Party C shall not have any right to terminate this Agreement in any event unless otherwise required by the applicable laws.

10.   **Assignment**

10.1   Without the Pledgee's prior written consent, the Pledgor and Party C shall not have the right to assign or delegate their rights and obligations under this Agreement.

10.2   This Agreement shall be binding on the Pledgor and his/her successors and permitted assigns, and shall be valid with respect to the Pledgee and each of its successors and assigns.

10.3   At any time, the Pledgee may assign any and all of its rights and obligations under the Transaction Documents and this Agreement to its designee(s), in which case the assigns shall have the rights and obligations of the Pledgee under the Transaction Documents and this Agreement, as if it were the original party to the Transaction Documents and this Agreement.

10.4   In the event of change of the Pledgee due to assignment, the Pledgor and/or Party C shall, at the request of the Pledgee, execute a new pledge agreement with the new pledgee on the same terms and conditions as this Agreement, and register the same with the competent AIC.

10.5   The Pledgor and Party C shall strictly abide by the provisions of this Agreement and other contracts jointly or separately executed by the Parties hereto or any of them, including the Transaction Documents, perform the obligations hereunder and thereunder, and refrain from any action/omission that may affect the effectiveness and enforceability thereof. Any remaining rights of the Pledgor with respect to the Equity Interest pledged hereunder shall not be exercised by the Pledgor except in accordance with the written instructions of the Pledgee.

11.   **Termination**

11.1   Upon the fulfillment of all Contract Obligations and the full payment of all Secured Indebtedness by the Pledgor and Party C, the Pledgee shall release the Pledge under this Agreement upon the Pledgor's request as soon as reasonably practicable and shall assist the Pledgor in de-registering the Pledge from the shareholders' register of Party C and with the competent PRC local administration for industry and commerce.

11.2   The provisions under Sections 9, 13, 14 and 11.2 herein of this Agreement shall survive the expiration or termination of this Agreement.

12.   **Handling Fees and Other Expenses**

All fees and out of pocket expenses relating to this Agreement, including but not limited to legal costs, costs of production, stamp tax and any other taxes and fees, shall be borne by Party C.

13.   **Confidentiality**

The Parties acknowledge that the existence and the terms of this Agreement and any oral or written information exchanged between the Parties in connection with the preparation and performance this Agreement are regarded as confidential information. Each Party shall maintain the confidentiality of all such confidential information, and without obtaining the written consent of the other Party, it shall not disclose any relevant confidential information to any third parties, except for the information that: (a) is or will be in the public domain (other than through the receiving Party's unauthorized disclosure); (b) is under the obligation to be disclosed pursuant to the applicable laws or regulations, rules of any stock exchange, or orders of the court or other government authorities; or (c) is required to be disclosed by any Party to its shareholders, directors, employees, legal counsels or financial advisors regarding the transaction contemplated hereunder, provided that such shareholders, directors, employees, legal counsels or financial advisors shall be bound by the confidentiality obligations similar to those set forth in this Section. Disclosure of any confidential information by the shareholders, director, employees of or agencies engaged by any Party shall be deemed disclosure of such confidential information by such Party and such Party shall be held liable for breach of this Agreement.

14.   **Governing Law and Resolution of Disputes**

14.1 The execution, effectiveness, construction, performance, amendment and termination of this Agreement and the resolution of disputes hereunder shall be governed by the laws of China.

14.2 In the event of any dispute with respect to the construction and performance of this Agreement, the Parties shall first resolve the dispute through friendly negotiations. In the event the Parties fail to reach an agreement on the dispute after either Party's request to the other Parties for resolution of the dispute through negotiations, either Party may submit the relevant dispute to Beijing Arbitration Commission for arbitration, in accordance with its Arbitration Rules. The arbitration shall be conducted in Beijing. The arbitration award shall be final and binding on all Parties.

14.3 Upon the occurrence of any disputes arising from the construction and performance of this Agreement or during the pending arbitration of any dispute, except for the matters under dispute, the Parties to this Agreement shall continue to exercise their respective rights under this Agreement and perform their respective obligations under this Agreement.

## 15. Notices

15.1 All notices and other communications required or permitted to be given pursuant to this Agreement shall be delivered personally or sent by registered mail, prepaid postage, a commercial courier service or facsimile transmission to the address of such party set forth below. A confirmation copy of each notice shall also be sent by E-mail. The dates on which notices shall be deemed to have been effectively given shall be determined as follows:

15.2 Notices given by personal delivery, courier service, registered mail or prepaid postage shall be deemed effectively given on the date of delivery or refusal at the address specified for notices.

15.3 Notices given by facsimile transmission shall be deemed effectively given on the date of successful transmission (as evidenced by an automatically generated confirmation of transmission).

9

15.4 For the purpose of notices, the addresses of the Parties are as follows:

**Party A:** Beijing Yiliulinger Information Technology Co., Ltd.
Address:  20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:    Ying Zhang
Phone:   010-5731 0733

**Party B:** Xiaoliang Lei
Address:  20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:    Ying Zhang
Phone:   010-5731 0733

**Party C:** Hainan Yilingliuer Network Technology Co., Ltd.
Address:  20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:    Ying Zhang
Phone:   010-5731 0733

15.5 Any Party may at any time change its address for notices by a notice delivered to the other Parties in accordance with the terms hereof.

## 16. Severability

In the event that one or several of the provisions of this Contract are found to be invalid, illegal or unenforceable in any aspect in accordance with any laws or regulations, the validity, legality or enforceability of the remaining provisions of this Contract shall not be affected or compromised in any respect. The Parties shall strive in good faith to replace such invalid, illegal or unenforceable provisions with effective provisions that accomplish to the greatest extent permitted by law and the intentions of the Parties, and the economic effect of such effective provisions shall be as close as possible to the economic effect of those invalid, illegal or unenforceable provisions.

## 17. Attachments

The attachments set forth herein shall be an integral part of this Agreement.

## 18. Effectiveness

18.1 This Agreement shall become effective upon execution by the Parties.

18.2 Any amendments, changes and supplements to this Agreement shall be in writing and shall become effective upon completion of the governmental filing procedures (if applicable) after the affixation of the signatures or seals of the Parties.

## 19. Language and Counterparts

This Agreement is written in Chinese and English in four copies. The Pledgor, the Pledgee and Party C shall hold one copy respectively and the other copy shall be used for registration. In the event there is any discrepancy between the Chinese and English versions, the Chinese version shall prevail.

*The Remainder of this page is intentionally left blank*

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Equity Interest Pledge Agreement as of the date first above written.

**Party A:** Beijing Yiliulinger Information Technology Co., Ltd.

By:      /s/ Xiaoliang Lei /common seal/
Name:   Xiaoliang Lei
Title:     Legal Representative

**Party B:** Xiaoliang Lei

By:  /s/ Xiaoliang Lei

**Party C:** Hainan Yilingliuer Network Technology Co., Ltd.

By:      /s/ Xiaoliang Lei /common seal/
Name:   Xiaoliang Lei
Title:     Legal Representative

11

**Attachments:**

1.      Shareholders' Register of Party C;

2.      The Capital Contribution Certificate for Party C;

3.      Exclusive Business Cooperation Agreement.

4.      Exclusive Option Agreement

5.      Power of Attorney

12

### Equity Interest Pledge Agreement

This Equity Interest Pledge Agreement (this "Agreement") has been executed by and among the following parties on June 1, 2018 in Beijing, the People's Republic of China ("China" or the "PRC"):

**Party A:**    Beijing Yiliulinger Information Technology Co., Ltd (hereinafter the "Pledgee"), a wholly-owned subsidiaries of wholly foreign owned enterprise, organized and existing under the laws of the PRC, with its address at Room 305, Building 4, Yard 13, Kaifang East Road, Huairou District, Beijing;

**Party B:**    Li Wang (hereinafter the "Pledgor"), a Chinese citizen with Chinese Identification No.: ***; and

**Party C:**    Hainan Yilingliuer Network Technology Co., Ltd., a limited liability company organized and existing under the laws of the PRC, with its address at Room 201, Building A18, Hainan Ecological Software Park, High-tech Industries Demonstration Zone, Laocheng District, Hainan.

In this Agreement, each of the Pledgee, the Pledgor and Party C shall be referred to as a "Party" respectively, and they shall be collectively referred to as the "Parties".

Whereas:

1.      The Pledgor is a citizen of China who as of the date hereof holds RMB 5,000,000 in the registered capital of Party C. Party C is a limited liability company registered in Hainan, China, engaging in investment consultation. Party C acknowledges the respective rights and obligations of the Pledgor and the Pledgee under this Agreement, and intends to provide any necessary assistance in registering the Pledge; To ensure that Party C fully and timely pays the Secured Indebtedness and any or all of the payments under the Transaction Documents payable to the Pledgee, including but not limited to the management fees and service fees provided in the Transaction Documents (whether such fees become due and payable due to the arrival of the maturity date, advance payment requirements or any other reasons), the Pledgor hereby pledges to the Pledgee all of the equity interest hereafter acquired by the Pledgor in Party C;

2.      The Pledgee is a wholly-owned subsidiaries of wholly foreign-owned enterprise registered in China. The Pledgee and Party C which is partially owned by the Pledgor have executed an Exclusive Business Cooperation Agreement (as defined below) in Beijing; Party C, the Pledgee and the Pledgor have executed an Exclusive Option Agreement (as defined below); the Pledgor has executed a Power of Attorney (as defined below) in favor of the Pledgee;

3.      To ensure that Party C and the Pledgor fully perform their obligations under the Exclusive Business Cooperation Agreement, the Exclusive Option Agreement and the Power of Attorney, the Pledgor hereby pledges to the Pledgee all of the equity interest that the Pledgor holds in Party C as security for Party C's and the Pledgor's obligations under the Exclusive Business Cooperation Agreement, the Exclusive Option Agreement and

the Power of Attorney.

To perform the provisions of the Transaction Documents (as defined below), the Parties have mutually agreed to execute this Agreement upon the following terms.

1

## 1. Definitions

Unless otherwise provided herein, the terms below shall have the following meanings:

1.1    Pledge: shall refer to the security interest granted by the Pledgor to the Pledgee pursuant to Section 2 of this Agreement, i.e., the right of the Pledgee to be paid in priority with the Equity Interest based on the monetary valuation that such Equity Interest is converted into or from the proceeds from the auction or sale of the Equity Interest.

1.2    Equity Interest: shall refer to RMB 5,000,000 in the registered capital of Party C, and all of the equity interest hereafter acquired by the Pledgor in Party C.

1.3    Term of the Pledge: shall refer to the term set forth in Section 3 of this Agreement.

1.4    Transaction Documents: shall refer to the Exclusive Consulting and Management Services Agreement executed by and between Party C and the Pledgee on June 1, 2018 (the "Exclusive Business Cooperation Agreement"), the Exclusive Option Agreement executed by and among Party C, the Pledgee and the Pledgor on June 1, 2018 (the "Exclusive Option Agreement"), Power of Attorney executed on June 1, 2018 by the Pledgor (the "Power of Attorney") and any modification, amendment and restatement to the aforementioned documents.

1.5    Contract Obligations: shall refer to all the obligations of the Pledgor under the Exclusive Option Agreement, the Power of Attorney and this Agreement; all the obligations of Party C under the Exclusive Business Cooperation Agreement, the Exclusive Option Agreement and this Agreement.

1.6    Secured Indebtedness: shall refer to RMB 5,000,000, as well as all the direct, indirect and derivative losses and losses of anticipated profits, suffered by the Pledgee, incurred as a result of any Event of Default. The amount of such loss shall be calculated in accordance with the reasonable business plan and profit forecast of the Pledgee, the consulting and service fees payable to the Pledgee under the Exclusive Business Cooperation Agreement, all expenses occurred in connection with enforcement by the Pledgee of the Pledgor's and/or Party C's Contract Obligations and etc.

1.7    Event of Default: shall refer to any of the circumstances set forth in Section 7 of this Agreement.

2

1.8    Notice of Default: shall refer to the notice issued by the Pledgee in accordance with this Agreement declaring an Event of Default.

## 2. Pledge

2.1    The Pledgor agrees to pledge all the Equity Interest as security for performance of the Contract Obligations and payment of the Secured Indebtedness under this Agreement. Party C hereby assents that the Pledgor pledges the Equity Interest to the Pledgee pursuant to this Agreement.

2.2    During the term of the Pledge, the Pledgee is entitled to receive dividends distributed on the Equity Interest. The Pledgor may receive dividends distributed on the Equity Interest only with prior written consent of the Pledgee. Dividends received by the Pledgor on Equity Interest after the deduction of individual income tax paid by the Pledgor shall be, as required by the Pledgee, (1) deposited into an account designated and supervised by the Pledgee and used to secure the Contract Obligations and pay the Secured Indebtedness prior and in preference to making any other payment; or (2) unconditionally donated to the Pledgee or any other person designated by the Pledgee to the extent permitted under the applicable PRC laws.

2.3    The Pledgor may subscribe for a capital increase in Party C only with prior written consent of the Pledgee. Any equity interest obtained by the Pledgor as a result of the Pledgor's subscription of the increased registered capital of Party C shall also be deemed as Equity Interest.

2.4    In the event that Party C is required by PRC law to be liquidated or dissolved, any interest distributed to the Pledgor upon Party C's dissolution or liquidation shall, upon the request of the Pledgee, be (1) deposited into an account designated and supervised by the Pledgee and used to secure the Contract Obligations and pay the Secured Indebtedness prior and in preference to make any other payment; or (2) unconditionally donated to the Pledgee or any other person designated by the Pledgee to the extent permitted under the applicable PRC laws.

## 3. Term of the Pledge

3.1    The Pledge shall become effective on such date when the pledge of the Equity Interest contemplated herein is registered with the relevant administration for industry and commerce (the "AIC"). The Pledge shall remain effective until all Contract Obligations have been fully performed or all Secured Indebtedness has been fully paid. The Pledgor and Party C shall (1) register the Pledge in the shareholders' register of Party C within 3 business days following the execution of this Agreement, and (2) submit an application to the AIC for the registration of the Pledge of the Equity Interest contemplated herein within 30 business days following the execution of this Agreement. The parties covenant that for the purpose of registration of the Pledge, the parties hereto and all other shareholders of Party C shall submit to the AIC this Agreement or an equity interest pledge contract in the form required by the AIC at the location of Party C which shall truly reflect the information of the Pledge hereunder (the "AIC Pledge Contract"). For matters not specified in the AIC Pledge Contract, the Parties shall be bound by the provisions of this Agreement. The Pledgor and Party C shall submit all necessary documents and complete all necessary

procedures, as required by the relevant PRC laws and regulations and the competent AIC, to ensure that the Pledge of the Equity Interest shall be registered with the AIC as soon as possible after submission for filing.

3

3.2 During the Term of the Pledge, in the event the Pledgor and/or Party C fails to perform the Contract Obligations or pay Secured Indebtedness, the Pledgee shall have the right, but not the obligation, to exercise the Pledge in accordance with the provisions of this Agreement.

**4.  Custody of Records for Equity Interest subject to the Pledge**

4.1 During the Term of the Pledge set forth in this Agreement, the Pledgor shall deliver to the Pledgee's custody the capital contribution certificate for the Equity Interest and the shareholders' register containing the Pledge within one week from the execution of this Agreement. The Pledgee shall have custody of such documents during the entire Term of the Pledge set forth in this Agreement.

**5.  Representations and Warranties of the Pledgor and Party C**

As of the execution date of this Agreement, the Pledgor and Party C hereby jointly and severally represent and warrant to the Pledgee that:

5.1 The Pledgor is the sole legal and beneficial owner of the Equity Interest.

5.2 The Pledgee shall have the right to dispose of and transfer the Equity Interest in accordance with the provisions set forth in this Agreement.

5.3 Except for the Pledge, the Pledgor has not placed any security interest or other encumbrance on the Equity Interest.

5.4 The Pledgor and Party C have obtained any and all approvals and consents from the applicable government authorities and third parties (if required) for the execution, delivery and performance of this Agreement.

5.5 The execution, delivery and performance of this Agreement will not: (i) violate any relevant PRC laws; (ii) conflict with Party C's articles of association or other constitutional documents; (iii) result in any breach of or constitute any default under any contract or instrument to which it is a party or by which it is otherwise bound; (iv) result in any violation of any condition for the grant and/or maintenance of any permit or approval granted to any Party; or (v) cause any permit or approval granted to any Party to be suspended, cancelled or attached with additional conditions.

4

**6.  Covenants the Pledgor and Party C**

6.1 During the term of this Agreement, the Pledgor and Party C hereby jointly and severally covenant to the Pledgee:

6.1.1 The Pledgor shall not transfer the Equity Interest, place or permit the existence of any security interest or other encumbrance on the Equity Interest or any portion thereof, without the prior written consent of the Pledgee, except for the performance of the Transaction Documents;

6.1.2 The Pledgor and Party C shall comply with the provisions of all laws and regulations applicable to the pledge of rights, and within five (5) days of receipt of any notice, order or recommendation issued or prepared by the competent authorities regarding the Pledge, shall present the aforementioned notice, order or recommendation to the Pledgee, and shall comply with the aforementioned notice, order or recommendation or submit objections and representations with respect to the aforementioned matters upon the Pledgee's reasonable request or upon consent of the Pledgee;

6.1.3 The Pledgor and Party C shall promptly notify the Pledgee of any event or notice received by the Pledgor that may have an impact on the Equity Interest or any portion thereof, as well as any event or notice received by the Pledgor that may have an impact on any guarantees and other obligations of the Pledgor arising out of this Agreement.

6.1.4 Party C shall complete the registration procedures for the extension of the operation term within three (3) months prior to the expiration of such term to maintain the validity of this Agreement.

6.2 The Pledgor agrees that the rights acquired by the Pledgee in accordance with this Agreement with respect to the Pledge shall not be interrupted or harmed by the Pledgor or any heirs or representatives of the Pledgor or any other persons through any legal proceedings.

6.3 To protect or perfect the security interest granted by this Agreement for the Contract Obligations and Secured Indebtedness, the Pledgor hereby undertakes to execute in good faith and to cause other parties who have an interest in the Pledge to execute all certificates, agreements, deeds and/or covenants required by the Pledgee. The Pledgor also undertakes to perform and to cause other parties who have an interest in the Pledge to perform actions required by the Pledgee, to facilitate the exercise by the Pledgee of its rights and authority granted thereto by this Agreement, and to enter into all relevant documents regarding ownership of Equity Interest with the Pledgee or designee(s) of the Pledgee (natural persons/legal persons). The Pledgor undertakes to provide the Pledgee within a reasonable time with all notices, the orders and decisions regarding the Pledge that are required by the Pledgee.

5

6.4 The Pledgor hereby undertakes to comply with and perform all guarantees, promises, agreements, representations and conditions under this Agreement. In the event of failure or partial performance of its guarantees, promises, agreements, representations and conditions, the Pledgor shall indemnify the Pledgee for all losses resulting therefrom.

**7. Event of Breach**

7.1    The following circumstances shall be deemed an Event of Default:

7.1.1    The Pledgor's any breach to any obligations under the Transaction Documents and/or this Agreement.

7.1.2    Party C's any breach to any obligations under the Transaction Documents and/or this Agreement.

7.2    Upon notice or discovery of the occurrence of any circumstances or event that may lead to the aforementioned circumstances described in Section 7.1, the Pledgor and Party C shall immediately notify the Pledgee in writing accordingly.

7.3    Unless an Event of Default set forth in Section 7.1 has been successfully resolved to the Pledgee's satisfaction within twenty (20) days after the Pledgee and /or Party C delivers a notice to the Pledgor requesting ratification of such Event of Default, the Pledgee may issue a Notice of Default to the Pledgor in writing at any time thereafter, demanding the Pledgor to immediately exercise the Pledge in accordance with the provisions of Section 8 of this Agreement.

**8. Exercise of the Pledge**

8.1    The Pledgee shall issue a written Notice of Default to the Pledgor when it exercises the Pledge.

8.2    Subject to the provisions of Section 7.3, the Pledgee may exercise the right to enforce the Pledge at any time after the issuance of the Notice of Default in accordance with Section 8.1. Once the Pledgee elects to enforce the Pledge, the Pledgor shall cease to be entitled to any rights or interests associated with the Equity Interest.

8.3    After the Pledgee issues a Notice of Default to the Pledgor in accordance with Section 8.1, the Pledgee may exercise any remedy measure under the applicable PRC laws, the Transaction Documents and this Agreement, including but not limited to being paid in priority with the Equity Interest based on the monetary valuation that such Equity Interest is converted into or from the proceeds from the auction or sale of the Equity Interest. The Pledgee shall not be liable for any loss incurred by its duly exercise of such rights and powers.

6

8.4    The proceeds from the exercise of the Pledge by the Pledgee shall be used to pay for taxes and expenses incurred as a result of disposing the Equity Interest and to perform Contract Obligations and pay the Secured Indebtedness to the Pledgee prior and in preference to any other payment. After the payment of the aforementioned amounts, the remaining balance shall be returned to the Pledgor or any other person who have rights to such balance under applicable laws or be deposited to the local notary public office where the Pledgor resides, with all expenses incurred being borne by the Pledgor. To the extent permitted under the applicable PRC laws, the Pledgor shall unconditionally donate the aforementioned proceeds to the Pledgee or any other person designated by the Pledgee.

8.5    The Pledgee may exercise any remedy measure available simultaneously or in any order. The Pledgee may exercise the right to being paid in priority with the Equity Interest based on the monetary valuation that such Equity Interest is converted into or from the proceeds from the auction or sale of the Equity Interest under this Agreement, without exercising any other remedy measure first.

8.6    The Pledgee is entitled to designate an attorney or other representatives to exercise the Pledge on its behalf, and the Pledgor or Party C shall not raise any objection to such exercise.

8.7    When the Pledgee disposes of the Pledge in accordance with this Agreement, the Pledgor and Party C shall provide the necessary assistance to enable the Pledgee to enforce the Pledge in accordance with this Agreement.

**9. Breach of Agreement**

9.1    If the Pledgor or Party C conducts any material breach of any term of this Agreement, the Pledgee shall have right to terminate this Agreement and/or require the Pledgor or Party C to indemnify all damages; this Section 9 shall not prejudice any other rights of the Pledgee herein;

9.2    The Pledgor or Party C shall not have any right to terminate this Agreement in any event unless otherwise required by the applicable laws.

**10. Assignment**

10.1    Without the Pledgee's prior written consent, the Pledgor and Party C shall not have the right to assign or delegate their rights and obligations under this Agreement.

10.2    This Agreement shall be binding on the Pledgor and his/her successors and permitted assigns, and shall be valid with respect to the Pledgee and each of its successors and assigns.

10.3    At any time, the Pledgee may assign any and all of its rights and obligations under the Transaction Documents and this Agreement to its designee(s), in which case the assigns shall have the rights and obligations of the Pledgee under the Transaction Documents and this Agreement, as if it were the original party to the Transaction Documents and this Agreement.

7

10.4    In the event of change of the Pledgee due to assignment, the Pledgor and/or Party C shall, at the request of the Pledgee, execute a new pledge agreement with the new pledgee on the same terms and conditions as this Agreement, and register the same with the competent AIC.

10.5    The Pledgor and Party C shall strictly abide by the provisions of this Agreement and other contracts jointly or separately executed by the

Parties hereto or any of them, including the Transaction Documents, perform the obligations hereunder and thereunder, and refrain from any action/omission that may affect the effectiveness and enforceability thereof. Any remaining rights of the Pledgor with respect to the Equity Interest pledged hereunder shall not be exercised by the Pledgor except in accordance with the written instructions of the Pledgee.

## 11.  Termination

11.1  Upon the fulfillment of all Contract Obligations and the full payment of all Secured Indebtedness by the Pledgor and Party C, the Pledgee shall release the Pledge under this Agreement upon the Pledgor's request as soon as reasonably practicable and shall assist the Pledgor in de-registering the Pledge from the shareholders' register of Party C and with the competent PRC local administration for industry and commerce.

11.2  The provisions under Sections 9, 13, 14 and 11.2 herein of this Agreement shall survive the expiration or termination of this Agreement.

## 12.  Handling Fees and Other Expenses

All fees and out of pocket expenses relating to this Agreement, including but not limited to legal costs, costs of production, stamp tax and any other taxes and fees, shall be borne by Party C.

## 13.  Confidentiality

The Parties acknowledge that the existence and the terms of this Agreement and any oral or written information exchanged between the Parties in connection with the preparation and performance this Agreement are regarded as confidential information. Each Party shall maintain the confidentiality of all such confidential information, and without obtaining the written consent of the other Party, it shall not disclose any relevant confidential information to any third parties, except for the information that: (a) is or will be in the public domain (other than through the receiving Party's unauthorized disclosure); (b) is under the obligation to be disclosed pursuant to the applicable laws or regulations, rules of any stock exchange, or orders of the court or other government authorities; or (c) is required to be disclosed by any Party to its shareholders, directors, employees, legal counsels or financial advisors regarding the transaction contemplated hereunder, provided that such shareholders, directors, employees, legal counsels or financial advisors shall be bound by the confidentiality obligations similar to those set forth in this Section. Disclosure of any confidential information by the shareholders, director, employees of or agencies engaged by any Party shall be deemed disclosure of such confidential information by such Party and such Party shall be held liable for breach of this Agreement.

8

## 14.  Governing Law and Resolution of Disputes

14.1  The execution, effectiveness, construction, performance, amendment and termination of this Agreement and the resolution of disputes hereunder shall be governed by the laws of China.

14.2  In the event of any dispute with respect to the construction and performance of this Agreement, the Parties shall first resolve the dispute through friendly negotiations. In the event the Parties fail to reach an agreement on the dispute after either Party's request to the other Parties for resolution of the dispute through negotiations, either Party may submit the relevant dispute to Beijing Arbitration Commission for arbitration, in accordance with its Arbitration Rules. The arbitration shall be conducted in Beijing. The arbitration award shall be final and binding on all Parties.

14.3  Upon the occurrence of any disputes arising from the construction and performance of this Agreement or during the pending arbitration of any dispute, except for the matters under dispute, the Parties to this Agreement shall continue to exercise their respective rights under this Agreement and perform their respective obligations under this Agreement.

## 15.  Notices

15.1  All notices and other communications required or permitted to be given pursuant to this Agreement shall be delivered personally or sent by registered mail, prepaid postage, a commercial courier service or facsimile transmission to the address of such party set forth below. A confirmation copy of each notice shall also be sent by E-mail. The dates on which notices shall be deemed to have been effectively given shall be determined as follows:

15.2  Notices given by personal delivery, courier service, registered mail or prepaid postage shall be deemed effectively given on the date of delivery or refusal at the address specified for notices.

15.3  Notices given by facsimile transmission shall be deemed effectively given on the date of successful transmission (as evidenced by an automatically generated confirmation of transmission).

9

15.4  For the purpose of notices, the addresses of the Parties are as follows:

**Party A:**  Beijing Yiliulinger Information Technology Co., Ltd.
Address:  20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:  Ying Zhang
Phone:  010-5731 0733

**Party B:**  Li Wang
Address:  20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.

Attn:    Ying Zhang
Phone:    010-5731 0733

**Party C:**  Hainan Yilingliuer Network Technology Co., Ltd.
Address:  20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:    Ying Zhang
Phone:    010-5731 0733

15.5   Any Party may at any time change its address for notices by a notice delivered to the other Parties in accordance with the terms hereof.

## 16. Severability

In the event that one or several of the provisions of this Contract are found to be invalid, illegal or unenforceable in any aspect in accordance with any laws or regulations, the validity, legality or enforceability of the remaining provisions of this Contract shall not be affected or compromised in any respect. The Parties shall strive in good faith to replace such invalid, illegal or unenforceable provisions with effective provisions that accomplish to the greatest extent permitted by law and the intentions of the Parties, and the economic effect of such effective provisions shall be as close as possible to the economic effect of those invalid, illegal or unenforceable provisions.

## 17. Attachments

The attachments set forth herein shall be an integral part of this Agreement.

## 18. Effectiveness

18.1   This Agreement shall become effective upon execution by the Parties.

18.2   Any amendments, changes and supplements to this Agreement shall be in writing and shall become effective upon completion of the governmental filing procedures (if applicable) after the affixation of the signatures or seals of the Parties.

## 19. Language and Counterparts

This Agreement is written in Chinese and English in four copies. The Pledgor, the Pledgee and Party C shall hold one copy respectively and the other copy shall be used for registration. In the event there is any discrepancy between the Chinese and English versions, the Chinese version shall prevail.

*The Remainder of this page is intentionally left blank*

10

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Equity Interest Pledge Agreement as of the date first above written.

**Party A:** Beijing Yiliulinger Information Technology Co., Ltd.

By:    /s/ Xiaoliang Lei /common seal/
Name:   Xiaoliang Lei
Title:   Legal Representative

**Party B:** Li Wang

By:  /s/ Li Wang

**Party C:** Hainan Yilingliuer Network Technology Co., Ltd.

By:    /s/ Xiaoliang Lei /common seal/
Name:   Xiaoliang Lei
Title:   Legal Representative

11

**Attachments:**

6.    Shareholders' Register of Party C;

7.    The Capital Contribution Certificate for Party C;

8.    Exclusive Business Cooperation Agreement.

9.    Exclusive Option Agreement

10.    Power of Attorney

Exhibit 4.37

**Business Operation Agreement**

This Business Operation Agreement (this "Agreement"), dated as of December 18, 2018, is made by and among the following parties:

| | |
|---|---|
| Party A: | QOOL Media Technology (Tianjin) Co., Ltd. |
| Address: | Room 502 Floor 5th, Podium Building, R&D Mansion, No. 1620, Zhongtian Avenue, Sino-Singapore Eco-city, Tianjin |
| Legal representative: | Yiu Pak LEUNG |

| | |
|---|---|
| Party B: | QOOL Media (Tianjin) Co., Ltd. |
| Address: | Room 501 Floor 5th, Podium Building, R&D Mansion, No. 1620, Zhongtian Avenue, Sino-Singapore Eco-city, Tianjin |
| Legal representative: | FENG Chen |

| | |
|---|---|
| Party C1: | Beijing Momo Technology Co., Ltd. |
| Address: | Room 222002, Floor 20th, Building No.6, Yard No.1, Futongdong Avenue, Chaoyang District, Beijing |
| Legal representative: | Yan Tang |

| | |
|---|---|
| Party C2: | Tianjin Mingqiao Media Partnership (Limited Partnership) |
| Address: | TG No.294, Room209, Floor 2nd, Zone C, Animation Mansion, No. 126, Dongmanzhong Road, Eco-city, Tianjin |
| Legal representative: | FENG Chen |

| | |
|---|---|
| Party C3: | |
| DA Ridan | (ID Card No. ***) |
| Address: | Room 1902, 17/F, Building 1, No.13 Workers' Stadium North Road, Chaoyang District, Beijing, PRC. |

| | |
|---|---|
| Party C4: | |
| FENG Chen | (ID Card No. ***) |
| Address: | Room 1902, 17/F, Building 1, No.13 Workers' Stadium North Road, Chaoyang District, Beijing, PRC. |

(Individually a "Party"; collectively the "Parties")

**WHEREAS:**

A.    Party A is a wholly foreign-owned enterprise incorporated and validly existing in the People's Republic of China (the "PRC");

B.    Party B is a limited liability company incorporated in the PRC and engaged in cultural and artistic exchanges, cultural brokerage, program production and distribution and advertising business etc.;

C.    Party A and Party B have established business relation by entering into a certain Exclusive Consulting and Management Services Agreement, under which Party B will make various payments to Party A and therefore Party B's activities in its ordinary course of business will have material effect upon its ability to make relevant payment to Party A; and

D.    Party C1 and Party C2 are the shareholders of Party B (collectively, the "Founding Shareholders"), in which each of Party C1 and Party C2 holds 70% and 30% of Party B, respectively.

1

NOW, THEREFORE, the Parties, through friendly consultations and based on the principle of equality and mutual benefit, hereby agree as follows:

**1.    Negative Obligations**

In order to guarantee the performance by Party B of the agreement entered into by and between Party A and Party B and all of Party B's obligations towards Party A, the Founding Shareholders hereby acknowledge, agree and jointly warrants that without prior written consent of Party A or any party designated by Party A, Party B shall not engage in any transaction which may have material or adverse effect on any of its assets, businesses, employees, obligations, rights or operations, including without limitation:

1.1    Conduct of any activity outside its ordinary course of business or in a manner inconsistent with its past practice;

1.2    Making any borrowing or undertaking any indebtedness from any third party;

1.3    Change or removal of any of its directors or senior officers;

1.4    Sale, acquisition or any other disposal of any assets or rights, including without limitation any intellectual property rights, with any third party;

1.5    Creation of any guarantee or any other security on any of its assets or intellectual properties in favor of any third party, or creation of any encumbrance on any of its assets;

1.6    Change of its articles of association or its scope of business;

1.7    Change of its ordinary course of business or any of its material bylaws;

1.8    Transfer any of its rights or obligations under this Agreement to any third party;

1.9    Making any material change to its business pattern, marketing strategy, business plan or customer relationship; and

1.10    Distribution of any bonus or dividend.

**2.    Business Management and Human Resources Arrangement**

2.1    Party B and the Founding Shareholders hereby jointly agree to accept and strictly implement any proposal made by Party A from time to time regarding employment and removal of Party B's employees, day-to-day business management and financial management system of Party B.

2.2    Party B and the Founding Shareholders hereby jointly agree that the Founding Shareholders elect or appoint, as applicable, any person designated by Party A as Party B's director, chairman, president, chief financial officer and any other executive officers in accordance with relevant laws, regulations and its articles of association.

2.3    Upon termination of his or her employment with Party A, either voluntarily or by Party A, each of the directors or senior officers elected or appointed under Section 2.2 will be simultaneously disqualified to hold any position in Party B; under such circumstance, the Founding Shareholders will elect any other person designated by Party A for such position.

2.4    For purpose of Section 2.3, the Founding Shareholders will take any actions required under relevant laws, articles of association and this Agreement to effect the employment and termination provided under Sections 2.2 and 2.3.

2

2.5    The Founding Shareholders hereby agree that in conjunction with execution of this Agreement, they will execute an irrevocable power of attorney authorizing Party A to exercise their respective rights as shareholders of Party B and respective voting rights at Party B's shareholders meeting.

**3.    Other Agreements**

3.1    Upon termination or expiration of any agreement between Party A and Party B, Party A may elect to terminate all of its agreements with Party B, including without limitation the Exclusive Consulting and Management Services Agreement.

3.2    Considering the business relationship established between Party A and Party B based on the executed Exclusive Consulting and Management Services Agreement, Party B's activities in its ordinary course of business will have material effect upon its ability to make relevant payment to Party A. The Founding Shareholders agree that any bonus, dividend or any other benefit or interest receivable by it as shareholder of Party B will be unconditionally and automatically paid or transferred to Party A.

**4.    All Agreements and Amendments**

4.1    This Agreement and all of the agreements and/or documents referred to or expressly included herein constitute entire agreements among the Parties with respect to the subject matter hereof and supersede all prior agreements, contracts, understandings and communications, written or oral, among the Parties with respect to the same.

4.2    This Agreement may not be amended unless by agreement of the Parties in writing. Any amendment or supplement hereto duly executed by the Parties shall be an integral part of and have the same effect with this Agreement.

**5.    Governing Law**

The execution, validity, performance of this Agreement and resolution of any dispute arising from this Agreement shall be governed by the laws of the PRC.

**6.    Dispute Resolution**

6.1    Should any dispute arise in connection with construction or performance of any provision under this Agreement, the Parties shall seek in good faith to resolve such dispute through negotiations. If the negotiations fail, any of the Parties may submit the dispute to Beijing Arbitration Commission for arbitration in accordance with its arbitration rules then in effect. The arbitration will be in Chinese. The arbitral award shall be final and binding on each of the Parties.

6.2    Except for the matter under dispute, each of the Parties shall continue to perform its obligations under this Agreement in good faith.

**7.    Notices**

All notices made by each of the Parties to exercise any of its rights or perform any of its obligations hereunder shall be in writing and given to the following address in person, by registered mail, prepaid mail, recognized courier service, or by fax.

| | |
|---|---|
| To Party A: | QOOL Media Technology (Tianjin) Co., Ltd. |
| Address: | 20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, |
| Telephone: | 010-8405 9335 |
| Attention: | Yiu Pak LEUNG |

3

| | |
|---|---|
| To Party B: | QOOL Media (Tianjin) Co., Ltd. |
| Address: | Room 1902, 17/F, Building 1, No.13 Workers' Stadium North Road, Chaoyang District, Beijing, PRC. |
| Telephone: | 010-8405 9335 |
| Attention: | Yiu Pak LEUNG |

To Party C:

Beijing Momo Technology Co., Ltd.
Address:                    20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing,
Telephone:                  010-5731 0555
Attention:                  Ying Zhang

Tianjin Mingqiao Media Partnership (Limited Partnership)
Address:                    Room 1902, 17/F, Building 1, No.13 Workers' Stadium North Road, Chaoyang District, Beijing, PRC.
Telephone:                  010-8405 9335
Attention:                  Yiu Pak LEUNG

DA Ridan
Address:                    Room 1902, 17/F, Building 1, No.13 Workers' Stadium North Road, Chaoyang District, Beijing, PRC.
Telephone:                  010-8405 9335
Attention:                  Yiu Pak LEUNG

FENG Chen
Address:                    Room 1902, 17/F, Building 1, No.13 Workers' Stadium North Road, Chaoyang District, Beijing, PRC.
Telephone:                  010-8405 9335
Attention:                  Yiu Pak LEUNG

8.    Effectiveness, Term and other terms of this Agreement

8.1    Any written consent, proposal, appointment and any other decision in connection with this Agreement which has material effect on Party B's day-to-day business operations shall be made by Party A's board of directors.

8.2    This Agreement shall become effective upon execution by each of the Parties on the date first written above. The term of this Agreement will be ten (10) years unless early terminated by Party A. Upon request from Party A, the Parties may extend the term of this Agreement prior to its expiration or enter into a separate business agreement, each as requested by Party A.

8.3    During the term of this Agreement, none of Party B or Founding Shareholders may terminate this Agreement. Party A shall have the right to terminate this Agreement at any time with notice to Party B and its Shareholders in writing.

8.4    If any term or provision hereof is found illegal or unenforceable under applicable laws, such term or provision shall be deemed deleted from this Agreement without any effect, and the remainder of this Agreement shall remain in force and effect as if such term or provision had never been contained herein. The Parties shall negotiate to replace such deleted term or provision with a lawful and valid term or provision acceptable to each of the Parties.

8.5    Failure to exercise any right, power or privilege hereunder shall not be deemed as waiver thereof. Any single or partial exercise of any right, power or privilege hereunder shall not preclude exercise of any other right, power or privilege under this Agreement.

4

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their duly authorized representatives on the date first written above.

*(The Remainder of this page is intentionally left blank)*

5

Party A:    QOOL Media Technology (Tianjin) Co., Ltd.
By:         /s/ Yiu Pak LEUNG /common seal/
Name:       Yiu Pak LEUNG

Party B:    QOOL Media (Tianjin) Co., Ltd.
By:         /s/ FENG Chen /common seal/
Name:       FENG Chen

Party C1:   Beijing Momo Technology Co., Ltd.
By:         /s/ Yan Tang /common seal/
Name:       Yan Tang

Party C2:   Tianjin Mingqiao Media Partnership (Limited Partnership)
By:         /s/ FENG Chen /common seal/
Name:       FENG Chen

Party C2:   DA Ridan
By:         /s/ DA Ridan

Party C2:   FENG Chen
By:         /s/ FENG Chen

**Exhibit 4.38**

**Exclusive Option Agreement**

This Exclusive Option Agreement (this "Agreement") is executed by and among the following Parties as of December 18, 2018 in Beijing, the People's Republic of China ("China" or the "PRC"):

**Party A:**   QOOL Media Technology (Tianjin) Co., Ltd., a wholly foreign-owned enterprise, organized and existing under the laws of the PRC, with its address at Room 502, Floor 5th, Podium Building, R&D Mansion, No. 1620, Zhongtian Avenue, Sino-Singapore Eco-city, Tianjin;

**Party B:**   Beijing Momo Technology Co., Ltd., a limited liability company organized and existing under the laws of the PRC, with its address at Room 222002, Floor 20th, Building No.6, Yard No.1, Futongdong Avenue, Chaoyang District, Beijing; and

**Party C:**   QOOL Media (Tianjin) Co., Ltd., a limited liability company organized and existing under the laws of the PRC, with its address at Room 501, Floor 5th, Podium Building, R&D Mansion, No. 1620, Zhongtian Avenue, Sino-Singapore Eco-city, Tianjin.

In this Agreement, Party A, Party B, and Party C shall each be referred to as a "Party" respectively, and they shall be collectively referred to as the "Parties."

Whereas:

Party B is a shareholder of Party C and as of the date hereof holds 70.00% of the equity interests of Party C, representing RMB 7,000,000 in the registered capital of Party C.

After mutual discussions and negotiations, the Parties have now reached the following agreement:

**1.   Sale and Purchase of Equity Interest**

1.1   Option Granted

Party B hereby irrevocably grants Party A a binding and exclusive right to purchase, or designate one or more persons (each, a "Designee") to purchase the equity interests in Party C then held by Party B at once or at multiple times at any time in part or in whole at Party A's sole and absolute discretion to the extent permitted by Chinese laws and at the price described in Section 1.3 herein (such right being the "Equity Interest Purchase Option"). Except for Party A and the Designee(s), no other person shall be entitled to the Equity Interest Purchase Option or other rights with respect to the equity interests of Party B. Party C hereby agrees to the grant by Party B of the Equity Interest Purchase Option to Party A. The term "person" as used herein shall refer to individuals, corporations, partnerships, partners, enterprises, trusts, or non-corporate organizations.

1

1.2   Steps for Exercise of the Equity Interest Purchase Option

Subject to the provisions of the laws and regulations of China, Party A may exercise the Equity Interest Purchase Option by issuing a written notice to Party B (the "Equity Interest Purchase Option Notice"), specifying: (a) Party A's or the Designee's decision to exercise the Equity Interest Purchase Option; (b) the portion of equity interests to be purchased by Party A or the Designee from Party B (the "Optioned Interests"); and (c) the date for purchasing the Optioned Interests or the date for transfer of the Optioned Interests.

1.3   Equity Interest Purchase Price

The purchase price of the Optioned Interests (the "Base Price") shall be RMB 1. If PRC law requires a minimum price higher than the Base Price when Party A exercises the Equity Interest Purchase Option, the minimum price regulated by PRC law shall be the purchase price (collectively, the "Equity Interest Purchase Price"). Party B shall return any difference between the Base Price and the Equity Interest Purchase Price to Party A.

1.4   Transfer of Optioned Interests

For each exercise of the Equity Interest Purchase Option:

1.4.1   Party B shall cause Party C to promptly convene a shareholders' meeting, at which a resolution shall be adopted approving Party B's transfer of the Optioned Interests to Party A and/or the Designee(s);

1.4.2   Party B shall obtain written statements from the other shareholders of Party C giving consent to the transfer of the equity interest to Party A and/or the Designee(s) and waiving any right of first refusal related thereto;

1.4.3   Party B shall execute an equity interest transfer contract with respect to each transfer with Party A and/or each Designee (whichever is applicable), in accordance with the provisions of this Agreement and the Equity Interest Purchase Option Notice regarding the Optioned Interests;

1.4.4   The relevant Parties shall execute all other necessary contracts, agreements, or documents, obtain all necessary government licenses and permits, and take all necessary actions to transfer the valid ownership of the Optioned Interests to Party A and/or the Designee (s), unencumbered by any security interests, and cause Party A and/or the Designee(s) to become the registered owner(s) of the Optioned Interests. For the purpose of this Section and this Agreement, "security interests" shall include securities, mortgages, third party's rights or interests, any stock options, acquisition right, right of first refusal, right to offset, ownership retention, or other security arrangements, but shall be deemed to exclude any security interest created by this Agreement, Party B's Equity Interest Pledge Agreement, and Party B's Power of Attorney. "Party B's Equity Interest Pledge Agreement" as used in this Agreement shall

refer to the Interest Pledge Agreement executed by and among Party A, Party B and Party C on the date hereof and any modifications, amendments, and restatements thereto. "Party B's Power of Attorney" as used in this Agreement shall refer to the Power of Attorney executed by Party B on the date hereof granting Party A with a power of attorney and any modifications, amendments, and restatements thereto.

2

1.5    Asset Purchase Option

Party C hereby grants to Party A an irrevocable and exclusive option to have Party A or its Designee to purchase from Party C, at Party A's sole discretion, at any time and in accordance with the procedures decided by Party A in its sole discretion, any or all of the assets of Party C, to the extent permitted under PRC law, and at the lowest purchase price permitted by PRC law. The Parties shall then enter into a separate assets transfer agreement, specifying the terms and conditions of the transfer of the assets.

2.    **Covenants**

2.1    Covenants regarding Party C

Party B (as a shareholder of Party C) and Party C hereby covenant on the following:

2.1.1    Without the prior written consent of Party A, they shall not in any manner supplement, change, or amend the articles of association of Party C, increase or decrease its registered capital, or change its structure of registered capital in other manners;

2.1.2    They shall maintain Party C's corporate existence in accordance with good financial and business standards and practices, as well as obtain and maintain all necessary government licenses and permits by prudently and effectively operating its business and handling its affairs;

2.1.3    Without the prior written consent of Party A, they shall not at any time following the date hereof, sell, transfer, mortgage, or dispose of in any manner any material assets of Party C or legal or beneficial interest in the material business or revenues of Party C of more than RMB 50,000, or allow the encumbrance thereon of any security interests;

3

2.1.4    Without the prior written consent of Party A, they shall not incur, inherit, guarantee, or suffer the existence of any debt, except for payables incurred in the ordinary course of business other than through loans;

2.1.5    They shall always operate all of Party C's businesses within the normal business scope to maintain the asset value of Party C and refrain from any action/omission that may affect Party C's operating status and asset value;

2.1.6    Without the prior written consent of Party A, they shall not cause Party C to execute any major contract, except the contracts in the ordinary course of business (for the purpose of this subsection, a contract with a price exceeding RMB 50,000 shall be deemed a major contract);

2.1.7    Without the prior written consent of Party A, they shall not cause Party C to provide any person with a loan or credit;

2.1.8    They shall provide Party A with information on Party C's business operations and financial condition at Party A's request;

2.1.9    If requested by Party A, they shall procure and maintain insurance in respect of Party C's assets and business from an insurance carrier acceptable to Party A, at an amount and type of coverage typical for companies that operate similar businesses;

2.1.10    Without the prior written consent of Party A, they shall not cause or permit Party C to merge, consolidate with, acquire, or invest in any person;

2.1.11    They shall immediately notify Party A of the occurrence or possible occurrence of any litigation, arbitration, or administrative proceedings relating to Party C's assets, business, or revenue;

2.1.12    To maintain the ownership by Party C of all of its assets, they shall execute all necessary or appropriate documents, take all necessary or appropriate actions, file all necessary or appropriate complaints, and raise necessary or appropriate defenses against all claims;

2.1.13    Without the prior written consent of Party A, they shall ensure that Party C shall not in any manner distribute dividends to its shareholders, provided that upon Party A's written request, Party C shall immediately distribute all distributable profits to its shareholders;

2.1.14    At the request of Party A, they shall appoint any person designated by Party A as the director or executive director of Party C.

4

2.1.15    Without Party A's prior written consent, they shall not engage in any business in competition with Party A or its affiliates; and

2.1.16    Unless otherwise required by PRC law, Party C shall not be dissolved or liquated without prior written consent by Party A.

2.2    Covenants of Party B

Party B hereby covenants to the following:

2.2.1    Without the prior written consent of Party A, Party B shall not sell, transfer, mortgage, or dispose of in any other manner any legal or

beneficial interest in the equity interests in Party C held by Party B, or allow the encumbrance thereon, except for the interest placed in accordance with Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney;

2.2.2    Without the prior written consent of Party A, Party B shall cause the shareholders' meeting and/or the directors (or the executive director) of Party C not to approve any sale, transfer, mortgage, or disposition in any other manner of any legal or beneficial interest in the equity interests in Party C held by Party B, or allow the encumbrance thereon of any security interest, except for the interest placed in accordance with Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney;

2.2.3    Without the prior written consent of Party A, Party B shall cause the shareholders' meeting or the directors (or the executive director) of Party C not to approve the merger or consolidation with any person, or the acquisition of or investment in any person;

2.2.4    Party B shall immediately notify Party A of the occurrence or possible occurrence of any litigation, arbitration, or administrative proceedings relating to the equity interests in Party C held by Party B;

2.2.5    Party B shall cause the shareholders' meeting or the directors (or the executive director) of Party C to vote their approval of the transfer of the Optioned Interests as set forth in this Agreement and to take any and all other actions that may be requested by Party A;

2.2.6    To the extent necessary to maintain Party B's ownership in Party C, Party B shall execute all necessary or appropriate documents, take all necessary or appropriate actions, file all necessary or appropriate complaints, and raise necessary or appropriate defenses against all claims;

2.2.7    Party B shall appoint any designee of Party A as the director or the executive director of Party C, at the request of Party A;

5

2.2.8    Party B hereby waives its right of first refusal in regards to the transfer of equity interest by any other shareholder of Party C to Party A (if any), and gives consent to the execution by each other shareholder of Party C with Party A and Party C the exclusive option agreement, the equity interest pledge agreement and the power of attorney similar to this Agreement, Party B's Equity Interest Pledge Agreement, and Party B's Power of Attorney, and accepts not to take any actions in conflict with such documents executed by the other shareholders;

2.2.9    Party B shall promptly donate any profits, interests, dividends, or proceeds of liquidation to Party A or any other person designated by Party A to the extent permitted under the applicable PRC laws; and

2.2.10   Party B shall strictly abide by the provisions of this Agreement and other contracts jointly or separately executed by and among Party B, Party C, and Party A, perform the obligations hereunder and thereunder, and refrain from any action/omission that may affect the effectiveness and enforceability thereof. To the extent that Party B has any remaining rights with respect to the equity interests subject to this Agreement hereunder or under Party B's Equity Interest Pledge Agreement or under Party B's Power of Attorney, Party B shall not exercise such rights except in accordance with the written instructions of Party A.

**3.    Representations and Warranties**

Party B and Party C hereby represent and warrant to Party A, jointly and severally, as of the date of this Agreement and each date of transfer of the Optioned Interests, that:

3.1    They have the power, capacity, and authority to execute and deliver this Agreement and any equity interest transfer contracts to which they are parties concerning the Optioned Interests to be transferred thereunder (each, a "Transfer Contract"), and to perform their obligations under this Agreement and any Transfer Contracts. Party B and Party C agree to enter into Transfer Contracts consistent with the terms of this Agreement upon Party A's exercise of the Equity Interest Purchase Option. This Agreement and the Transfer Contracts to which they are parties constitute or will constitute their legal, valid, and binding obligations, and shall be enforceable against them in accordance with the provisions thereof;

3.2    Party B and Party C have obtained any and all approvals and consents from the relevant government authorities and third parties (if required) for the execution, delivery, and performance of this Agreement.

6

3.3    The execution and delivery of this Agreement or any Transfer Contracts and the obligations under this Agreement or any Transfer Contracts shall not: (i) cause any violations of any applicable PRC laws; (ii) be inconsistent with the articles of association, bylaws, or other organizational documents of Party C; (iii) cause the violation of any contracts or instruments to which they are a party or which are binding on them, or constitute any breach under any contracts or instruments to which they are a party or which are binding on them; (iv) cause any violation of any condition for the grant and/or continued effectiveness of any licenses or permits issued to either of them; or (v) cause the suspension or revocation of or imposition of additional conditions to any licenses or permits issued to either of them;

3.4    Party B has a good and merchantable title to the equity interests held by Party B in Party C. Except for Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney, Party B has not placed any security interest on such equity interests;

3.5    Party C has a good and merchantable title to all of its assets, and has not placed any security interest on the aforementioned assets;

3.6    Party C does not have any outstanding debts, except for (i) debt incurred within its normal business scope; and (ii) debts disclosed to Party A for which Party A's written consent has been obtained.

3.7    Party C has complied with all laws and regulations of China applicable to asset acquisitions; and

3.8    There are no pending or threatened litigation, arbitration, or administrative proceedings relating to the equity interests in Party C, assets of

**4. Effective Date and Term**

This Agreement shall become effective upon execution by the Parties, and remain in effect until all equity interests held by Party B in Party C have been transferred or assigned to Party A and/or any other person designated by Party A in accordance with this Agreement.

**5. Governing Law and Dispute Resolution**

5.1    Governing Law

The execution, effectiveness, construction, performance, amendment, and termination of this Agreement as well as any dispute resolution hereunder shall be governed by the laws of the PRC.

5.2    Methods of Dispute Resolution

In the event of any dispute arising with respect to the construction and performance of this Agreement, the Parties shall first attempt to resolve the dispute through friendly negotiations. In the event that the Parties fail to reach an agreement on the dispute within 30 days after either Party's request to the other Parties for dispute resolution through negotiations, either Party may submit the relevant dispute to the Beijing Arbitration Commission for arbitration, in accordance with its arbitration rules. The arbitration shall be conducted in Beijing, and the arbitration award shall be final and binding to all Parties.

7

**6. Taxes and Fees**

Each Party shall pay any and all transfer and registration taxes, expenses, and fees incurred thereby or levied thereon in accordance with the laws of China in connection with the preparation and execution of this Agreement and the Transfer Contracts, as well as the consummation of the transactions contemplated under this Agreement and the Transfer Contracts.

**7. Notices**

7.1    All notices and other communications required or permitted to be given pursuant to this Agreement shall be delivered personally or sent by registered mail, prepaid postage, commercial courier services, or facsimile transmission to the address of such Party set forth below. A confirmation copy of each notice shall also be sent by email. The dates on which notices shall be deemed to have been effectively given shall be determined as follows:

7.1.1    Notices given by personal delivery, courier services, registered mail, or prepaid postage shall be deemed effectively given on the date of receipt or refusal at the address specified for such notices;

7.1.2    Notices given by facsimile transmission shall be deemed effectively given on the date of successful transmission (as evidenced by an automatically generated confirmation of the transmission).

7.1.3    Notices delivered by email shall be deemed effectively served on the date of receipt showed in the email system of recipients.

7.2    For the purpose of notices, the addresses of the Parties are as follows:

**Party A:**    **QOOL Media Technology (Tianjin) Co., Ltd.**
Address:    20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:    Yiu Pak LEUNG
Phone:    010 - 8405 9335

**Party B:**    **Beijing Momo Technology Co., Ltd.**
Address:    20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:    Ying Zhang
Phone:    010-5731 0555

**Party C:**    **QOOL Media (Tianjin) Co., Ltd.**
Address:    Room 1902, 17/F, Building 1, No.13 Workers' Stadium North Road, Chaoyang District, Beijing, PRC.
Attn:    Yiu Pak LEUNG
Phone:    010 - 8405 9335

8

7.3    Any Party may at any time change its address for notices by having a notice delivered to the other Parties in accordance with the terms hereof.

**8. Confidentiality**

The Parties acknowledge that the existence and the terms of this Agreement, and any oral or written information exchanged between the Parties in connection with the preparation and performance of this Agreement are regarded as confidential information. Each Party shall maintain the confidentiality of all such confidential information, and without obtaining the written consent of other Parties, it shall not disclose any relevant confidential information to any third parties, except for the information that: (a) is or will be featured in the public domain (other than through the

receiving Party's unauthorized disclosure); (b) is under the obligation to be disclosed pursuant to the applicable laws or regulations, rules of any stock exchange, or orders of the court or other government authorities; or (c) is required to be disclosed by any Party to its shareholders, directors, employees, legal counsels, or financial advisors regarding the transaction contemplated hereunder, provided that such shareholders, directors, employees, legal counsels, or financial advisors shall be bound by the confidential obligations similar to those set forth in this Section. Disclosure of any confidential information by the shareholders, director, employees of, or agencies engaged by any Party shall be deemed disclosure of such confidential information by such Party and that Party shall be held liable for breach of this Agreement.

9. **Further Warranties**

The Parties agree to promptly execute the documents that are reasonably required for or are conducive to the implementation of the provisions and purposes of this Agreement and to take further actions that are reasonably required for or are conducive to the implementation of the provisions and purposes of this Agreement.

10. **Breach of Agreement**

10.1  If Party B or Party C conducts any material breach of any term of this Agreement, Party A shall have right to terminate this Agreement and/or require Party B or Party C to compensate all damages; this Section 10 shall not prejudice any other rights of Party A herein;

10.2  Party B or Party C shall not have any right to terminate this Agreement in any event unless otherwise required by the applicable laws.

<div align="center">9</div>

11. **Miscellaneous**

11.1  <u>Amendments, changes, and supplements</u>

Any amendments, changes, and supplements to this Agreement shall require the execution of a written agreement by all of the Parties.

11.2  <u>Entire agreement</u>

Except for the amendments, supplements, or changes in writing executed after the execution of this Agreement, this Agreement shall constitute the entire agreement reached by and among the Parties hereto with respect to the subject matter hereof, and shall supersede all prior oral and written consultations, representations, and contracts reached with respect to the subject matter of this Agreement.

11.3  <u>Headings</u>

The headings of this Agreement are for convenience only, and shall not be used to interpret, explain, or otherwise affect the meanings of the provisions of this Agreement.

11.4  <u>Language</u>

This Agreement is written in both Chinese and English, and contains three copies, with each Party having one copy. The Chinese version and English version shall have equal legal validity.

11.5  <u>Severability</u>

In the event that one or several of the provisions of this Agreement are found to be invalid, illegal, or unenforceable in any aspect in accordance with any laws or regulations, the validity, legality, or enforceability of the remaining provisions of this Agreement shall not be affected or compromised in any respect. The Parties shall strive in good faith to replace such invalid, illegal, or unenforceable provisions with effective provisions that accomplish to the greatest extent permitted by the relevant laws and the intentions of the Parties, and the economic effect of such effective provisions shall be as close as possible to the economic effect of those invalid, illegal, or unenforceable provisions.

11.6  <u>Successors</u>

This Agreement shall be binding on and shall inure to the interest of the respective successors of the Parties and the permitted assigns of such Parties.

11.7  <u>Survival</u>

11.7.1  Any obligations that occur or are due as a result of this Agreement upon the expiration or early termination of this Agreement shall survive the expiration or early termination thereof.

<div align="center">10</div>

11.7.2  The provisions of Sections 5, 8, 10, and this Section 11.7 shall survive the termination of this Agreement.

11.8  <u>Waivers</u>

Any Party may waive the terms and conditions of this Agreement, provided that such a waiver must be provided in writing and shall require the signatures of the Parties. No waiver by any Party in certain circumstances with respect to a breach by other Parties shall operate as a waiver by such a Party with respect to any similar breach in other circumstances.

<div align="center">11</div>

IN WITNESS WHEREOF, the authorized representatives of the Parties have executed this Exclusive Option Agreement as of the date first above written.

**Party A: QOOL Media Technology (Tianjin) Co., Ltd.**

By:      /s/ Yiu Pak LEUNG /common seal/
Name:    Yiu Pak LEUNG
Title:   Legal Representative

IN WITNESS WHEREOF, the authorized representatives of the Parties have executed this Exclusive Option Agreement as of the date first above written.

**Party B: Beijing Momo Technology Co., Ltd.**

By:      /s/ Yan Tang /common seal/
Name:    Yan Tang
Title:   Legal Representative

IN WITNESS WHEREOF, the authorized representatives of the Parties have executed this Exclusive Option Agreement as of the date first above written.

**Party C: QOOL Media (Tianjin) Co., Ltd.**

By:      /s/ Chen Feng /common seal/
Name:    Chen Feng
Title:   Legal Representative

<div align="center"><b>Exclusive Option Agreement</b></div>

This Exclusive Option Agreement (this "Agreement") is executed by and among the following Parties as of December 18, 2018 in Beijing, the People's Republic of China ("China" or the "PRC"):

**Party A:**     QOOL Media Technology (Tianjin) Co., Ltd., a wholly foreign-owned enterprise, organized and existing under the laws of the PRC, with its address at Room 502, Floor 5th, Podium Building, R&D Mansion, No. 1620, Zhongtian Avenue, Sino-Singapore Eco-city, Tianjin;

**Party B1:**    Tianjin Mingqiao Media Partnership (Limited Partnership), a limited partnership organized and existing under the laws of the PRC, with its address at TG No.294, Room209, Floor 2nd, Zone C, Animation Mansion, No. 126, Dongmanzhong Road, Eco-city, Tianjin;

**Party B2:**    DA Ridan, a Chinese citizen with Chinese ID Number of ***;

**Party B3:**    FENG Chen, a Chinese citizen with Chinese ID Number of ***; together with Party B1 and Party B2, hereinafter referred to as Party B;

**Party C:**     QOOL Media (Tianjin) Co., Ltd., a limited liability company organized and existing under the laws of the PRC, with its address at Room 501, Floor 5th, Podium Building, R&D Mansion, No. 1620, Zhongtian Avenue, Sino-Singapore Eco-city, Tianjin.

In this Agreement, Party A, Party B, and Party C shall each be referred to as a "Party" respectively, and they shall be collectively referred to as the "Parties."

Whereas:

Party B1 is a shareholder of Party C and as of the date hereof holds 30.00% of the equity interests of Party C, representing RMB 3,000,000 in the registered capital of Party C.

After mutual discussions and negotiations, the Parties have now reached the following agreement:

**1.    Sale and Purchase of Equity Interest**

1.1    Option Granted

Party B hereby irrevocably grants Party A a binding and exclusive right to purchase, or designate one or more persons (each, a "Designee") to purchase the equity interests in Party C then held by Party B1 at once or at multiple times at any time in part or in whole at Party A's sole and absolute discretion to the extent permitted by Chinese laws and at the price described in Section 1.3 herein (such right being the "Equity Interest Purchase Option"). Except for Party A and the Designee(s), no other person shall be entitled to the Equity Interest Purchase Option or other rights with respect to the equity interests of Party B1. Party C hereby agrees to the grant by Party B of the Equity Interest Purchase Option to Party A. The term "person" as used herein shall refer to individuals, corporations, partnerships, partners, enterprises, trusts, or non-corporate organizations.

<div align="center">1</div>

1.2    Steps for Exercise of the Equity Interest Purchase Option

Subject to the provisions of the laws and regulations of China, Party A may exercise the Equity Interest Purchase Option by issuing a written notice to Party B (the "Equity Interest Purchase Option Notice"), specifying: (a) Party A's or the Designee's decision to exercise the Equity Interest Purchase Option; (b) the portion of equity interests to be purchased by Party A or the Designee from Party B1 (the "Optioned

Interests"); and (c) the date for purchasing the Optioned Interests or the date for transfer of the Optioned Interests.

1.3     Equity Interest Purchase Price

The purchase price of the Optioned Interests (the "Base Price") shall be RMB 1. If PRC law requires a minimum price higher than the Base Price when Party A exercises the Equity Interest Purchase Option, the minimum price regulated by PRC law shall be the purchase price (collectively, the "Equity Interest Purchase Price"). Party B shall return any difference between the Base Price and the Equity Interest Purchase Price to Party A.

1.4     Transfer of Optioned Interests

For each exercise of the Equity Interest Purchase Option:

1.4.1     Party B shall cause Party C to promptly convene a shareholders' meeting, at which a resolution shall be adopted approving Party B1's transfer of the Optioned Interests to Party A and/or the Designee(s);

1.4.2     Party B shall obtain written statements from the other shareholders of Party C giving consent to the transfer of the equity interest to Party A and/or the Designee(s) and waiving any right of first refusal related thereto;

1.4.3     Party B1 shall execute an equity interest transfer contract with respect to each transfer with Party A and/or each Designee (whichever is applicable), in accordance with the provisions of this Agreement and the Equity Interest Purchase Option Notice regarding the Optioned Interests;

2

1.4.4     The relevant Parties shall execute all other necessary contracts, agreements, or documents, obtain all necessary government licenses and permits, and take all necessary actions to transfer the valid ownership of the Optioned Interests to Party A and/or the Designee (s), unencumbered by any security interests, and cause Party A and/or the Designee(s) to become the registered owner(s) of the Optioned Interests. For the purpose of this Section and this Agreement, "security interests" shall include securities, mortgages, third party's rights or interests, any stock options, acquisition right, right of first refusal, right to offset, ownership retention, or other security arrangements, but shall be deemed to exclude any security interest created by this Agreement, Party B's Equity Interest Pledge Agreement, and Party B's Power of Attorney. "Party B's Equity Interest Pledge Agreement" as used in this Agreement shall refer to the Interest Pledge Agreement executed by and among Party A, Party B and Party C on the date hereof and any modifications, amendments, and restatements thereto. "Party B's Power of Attorney" as used in this Agreement shall refer to the Power of Attorney executed by Party B on the date hereof granting Party A with a power of attorney and any modifications, amendments, and restatements thereto.

1.5     Asset Purchase Option

Party C hereby grants to Party A an irrevocable and exclusive option to have Party A or its Designee to purchase from Party C, at Party A's sole discretion, at any time and in accordance with the procedures decided by Party A in its sole discretion, any or all of the assets of Party C, to the extent permitted under PRC law, and at the lowest purchase price permitted by PRC law. The Parties shall then enter into a separate assets transfer agreement, specifying the terms and conditions of the transfer of the assets.

**2.     Covenants**

2.1     Covenants regarding Party C

Party B (as a shareholder and beneficial owner of Party C) and Party C hereby covenant on the following:

2.1.1     Without the prior written consent of Party A, they shall not in any manner supplement, change, or amend the articles of association of Party C, increase or decrease its registered capital, or change its structure of registered capital in other manners;

2.1.2     They shall maintain Party C's corporate existence in accordance with good financial and business standards and practices, as well as obtain and maintain all necessary government licenses and permits by prudently and effectively operating its business and handling its affairs;

2.1.3     Without the prior written consent of Party A, they shall not at any time following the date hereof, sell, transfer, mortgage, or dispose of in any manner any material assets of Party C or legal or beneficial interest in the material business or revenues of Party C of more than RMB 50,000, or allow the encumbrance thereon of any security interests;

3

2.1.4     Without the prior written consent of Party A, they shall not incur, inherit, guarantee, or suffer the existence of any debt, except for payables incurred in the ordinary course of business other than through loans;

2.1.5     They shall always operate all of Party C's businesses within the normal business scope to maintain the asset value of Party C and refrain from any action/omission that may affect Party C's operating status and asset value;

2.1.6     Without the prior written consent of Party A, they shall not cause Party C to execute any major contract, except the contracts in the ordinary course of business (for the purpose of this subsection, a contract with a price exceeding RMB 50,000 shall be deemed a major contract);

2.1.7     Without the prior written consent of Party A, they shall not cause Party C to provide any person with a loan or credit;

2.1.8     They shall provide Party A with information on Party C's business operations and financial condition at Party A's request;

2.1.9    If requested by Party A, they shall procure and maintain insurance in respect of Party C's assets and business from an insurance carrier acceptable to Party A, at an amount and type of coverage typical for companies that operate similar businesses;

2.1.10    Without the prior written consent of Party A, they shall not cause or permit Party C to merge, consolidate with, acquire, or invest in any person;

2.1.11    They shall immediately notify Party A of the occurrence or possible occurrence of any litigation, arbitration, or administrative proceedings relating to Party C's assets, business, or revenue;

2.1.12    To maintain the ownership by Party C of all of its assets, they shall execute all necessary or appropriate documents, take all necessary or appropriate actions, file all necessary or appropriate complaints, and raise necessary or appropriate defenses against all claims;

2.1.13    Without the prior written consent of Party A, they shall ensure that Party C shall not in any manner distribute dividends to its shareholders, provided that upon Party A's written request, Party C shall immediately distribute all distributable profits to its shareholders;

4

2.1.14    At the request of Party A, they shall appoint any person designated by Party A as the director or executive director of Party C.

2.1.15    Without Party A's prior written consent, they shall not engage in any business in competition with Party A or its affiliates; and

2.1.16    Unless otherwise required by PRC law, Party C shall not be dissolved or liquated without prior written consent by Party A.

2.2    Covenants of Party B

Party B1 hereby covenants, and Party B2 and Party B3 hereby cause Party B1 to covenant, to the following:

2.2.1    Without the prior written consent of Party A, Party B shall not sell, transfer, mortgage, or dispose of in any other manner any legal or beneficial interest in the equity interests in Party C held by Party B, or allow the encumbrance thereon, except for the interest placed in accordance with Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney;

2.2.2    Without the prior written consent of Party A, Party B shall cause the shareholders' meeting and/or the directors (or the executive director) of Party C not to approve any sale, transfer, mortgage, or disposition in any other manner of any legal or beneficial interest in the equity interests in Party C held by Party B1, or allow the encumbrance thereon of any security interest, except for the interest placed in accordance with Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney;

2.2.3    Without the prior written consent of Party A, Party B shall cause the shareholders' meeting or the directors (or the executive director) of Party C not to approve the merger or consolidation with any person, or the acquisition of or investment in any person;

2.2.4    Party B shall immediately notify Party A of the occurrence or possible occurrence of any litigation, arbitration, or administrative proceedings relating to the equity interests in Party C held by Party B;

2.2.5    Party B shall cause the shareholders' meeting or the directors (or the executive director) of Party C to vote their approval of the transfer of the Optioned Interests as set forth in this Agreement and to take any and all other actions that may be requested by Party A;

2.2.6    To the extent necessary to maintain Party B's ownership in Party C, Party B shall execute all necessary or appropriate documents, take all necessary or appropriate actions, file all necessary or appropriate complaints, and raise necessary or appropriate defenses against all claims;

5

2.2.7    Party B shall appoint any designee of Party A as the director or the executive director of Party C, at the request of Party A;

2.2.8    Party B1 hereby waives its right of first refusal in regards to the transfer of equity interest by any other shareholder of Party C to Party A (if any), and gives consent to the execution by each other shareholder of Party C with Party A and Party C the exclusive option agreement, the equity interest pledge agreement and the power of attorney similar to this Agreement, Party B's Equity Interest Pledge Agreement, and Party B's Power of Attorney, and accepts not to take any actions in conflict with such documents executed by the other shareholders;

2.2.9    Party B shall promptly donate any profits, interests, dividends, or proceeds of liquidation to Party A or any other person designated by Party A to the extent permitted under the applicable PRC laws; and

2.2.10    Party B shall strictly abide by the provisions of this Agreement and other contracts jointly or separately executed by and among Party B, Party C, and Party A, perform the obligations hereunder and thereunder, and refrain from any action/omission that may affect the effectiveness and enforceability thereof. To the extent that Party B has any remaining rights with respect to the equity interests subject to this Agreement hereunder or under Party B's Equity Interest Pledge Agreement or under Party B's Power of Attorney, Party B shall not exercise such rights except in accordance with the written instructions of Party A.

## 3.    Representations and Warranties

Party B and Party C hereby represent and warrant to Party A, jointly and severally, as of the date of this Agreement and each date of transfer of the Optioned Interests, that:

3.1    They have the power, capacity, and authority to execute and deliver this Agreement and any equity interest transfer contracts to which they

are parties concerning the Optioned Interests to be transferred thereunder (each, a "Transfer Contract") and to perform their obligations under this Agreement and any Transfer Contracts. Party B and Party C agree to enter into Transfer Contracts consistent with the terms of this Agreement upon Party A's exercise of the Equity Interest Purchase Option. This Agreement and the Transfer Contracts to which they are parties constitute or will constitute their legal, valid, and binding obligations, and shall be enforceable against them in accordance with the provisions thereof;

3.2    Party B and Party C have obtained any and all approvals and consents from the relevant government authorities and third parties (if required) for the execution, delivery, and performance of this Agreement.

6

3.3    The execution and delivery of this Agreement or any Transfer Contracts and the obligations under this Agreement or any Transfer Contracts shall not: (i) cause any violations of any applicable PRC laws; (ii) be inconsistent with the articles of association, bylaws, or other organizational documents of Party C; (iii) cause the violation of any contracts or instruments to which they are a party or which are binding on them, or constitute any breach under any contracts or instruments to which they are a party or which are binding on them; (iv) cause any violation of any condition for the grant and/or continued effectiveness of any licenses or permits issued to either of them; or (v) cause the suspension or revocation of or imposition of additional conditions to any licenses or permits issued to either of them;

3.4    Party B1 has a good and merchantable title to the equity interests held by Party B in Party C. Except for Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney, Party B1 has not placed any security interest on such equity interests;

3.5    Party C has a good and merchantable title to all of its assets, and has not placed any security interest on the aforementioned assets;

3.6    Party C does not have any outstanding debts, except for (i) debt incurred within its normal business scope; and (ii) debts disclosed to Party A for which Party A's written consent has been obtained.

3.7    Party C has complied with all laws and regulations of China applicable to asset acquisitions; and

3.8    There are no pending or threatened litigation, arbitration, or administrative proceedings relating to the equity interests in Party C, assets of Party C, or Party C.

**4.    Effective Date and Term**

This Agreement shall become effective upon execution by the Parties, and remain in effect until all equity interests held by Party B1 in Party C have been transferred or assigned to Party A and/or any other person designated by Party A in accordance with this Agreement.

**5.    Governing Law and Dispute Resolution**

5.1    Governing Law

The execution, effectiveness, construction, performance, amendment, and termination of this Agreement as well as any dispute resolution hereunder shall be governed by the laws of the PRC.

5.2    Methods of Dispute Resolution

In the event of any dispute arising with respect to the construction and performance of this Agreement, the Parties shall first attempt to resolve the dispute through friendly negotiations. In the event that the Parties fail to reach an agreement on the dispute within 30 days after either Party's request to the other Parties for dispute resolution through negotiations, either Party may submit the relevant dispute to the Beijing Arbitration Commission for arbitration, in accordance with its arbitration rules. The arbitration shall be conducted in Beijing, and the arbitration award shall be final and binding to all Parties.

7

**6.    Taxes and Fees**

Each Party shall pay any and all transfer and registration taxes, expenses, and fees incurred thereby or levied thereon in accordance with the laws of China in connection with the preparation and execution of this Agreement and the Transfer Contracts, as well as the consummation of the transactions contemplated under this Agreement and the Transfer Contracts.

**7.    Notices**

7.1    All notices and other communications required or permitted to be given pursuant to this Agreement shall be delivered personally or sent by registered mail, prepaid postage, commercial courier services, or facsimile transmission to the address of such Party set forth below. A confirmation copy of each notice shall also be sent by email. The dates on which notices shall be deemed to have been effectively given shall be determined as follows:

7.1.1    Notices given by personal delivery, courier services, registered mail, or prepaid postage shall be deemed effectively given on the date of receipt or refusal at the address specified for such notices;

7.1.2    Notices given by facsimile transmission shall be deemed effectively given on the date of successful transmission (as evidenced by an automatically generated confirmation of the transmission).

7.1.3    Notices delivered by email shall be deemed effectively served on the date of receipt showed in the email system of recipients.

7.2    For the purpose of notices, the addresses of the Parties are as follows:

**Party A:**       **QOOL Media Technology (Tianjin) Co., Ltd.**
Address:       20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:          Yiu Pak LEUNG
Phone:         010 - 8405 9335

**Party B:**
Address:       Room 1902, 17/F, Building 1, No.13 Workers' Stadium North Road, Chaoyang District, Beijing, PRC.
Attn:          Yiu Pak LEUNG
Phone:         010 - 8405 9335

**Party C:**       **QOOL Media (Tianjin) Co., Ltd.**
Address:       Room 1902, 17/F, Building 1, No.13 Workers' Stadium North Road, Chaoyang District, Beijing, PRC.
Attn:          Yiu Pak LEUNG
Phone:         010 - 8405 9335

<center>8</center>

7.3     Any Party may at any time change its address for notices by having a notice delivered to the other Parties in accordance with the terms hereof.

## 8.     Confidentiality

The Parties acknowledge that the existence and the terms of this Agreement, and any oral or written information exchanged between the Parties in connection with the preparation and performance of this Agreement are regarded as confidential information. Each Party shall maintain the confidentiality of all such confidential information, and without obtaining the written consent of other Parties, it shall not disclose any relevant confidential information to any third parties, except for the information that: (a) is or will be featured in the public domain (other than through the receiving Party's unauthorized disclosure); (b) is under the obligation to be disclosed pursuant to the applicable laws or regulations, rules of any stock exchange, or orders of the court or other government authorities; or (c) is required to be disclosed by any Party to its shareholders, directors, employees, legal counsels, or financial advisors regarding the transaction contemplated hereunder, provided that such shareholders, directors, employees, legal counsels, or financial advisors shall be bound by the confidential obligations similar to those set forth in this Section. Disclosure of any confidential information by the shareholders, director, employees of, or agencies engaged by any Party shall be deemed disclosure of such confidential information by such Party and that Party shall be held liable for breach of this Agreement.

## 9.     Further Warranties

The Parties agree to promptly execute the documents that are reasonably required for or are conducive to the implementation of the provisions and purposes of this Agreement and to take further actions that are reasonably required for or are conducive to the implementation of the provisions and purposes of this Agreement.

## 10.    Breach of Agreement

10.1    If Party B or Party C conducts any material breach of any term of this Agreement, Party A shall have right to terminate this Agreement and/or require Party B or Party C to compensate all damages; this Section 10 shall not prejudice any other rights of Party A herein;

10.2    Party B or Party C shall not have any right to terminate this Agreement in any event unless otherwise required by the applicable laws.

<center>9</center>

## 11.    Miscellaneous

11.1    Amendments, changes, and supplements

Any amendments, changes, and supplements to this Agreement shall require the execution of a written agreement by all of the Parties.

11.2    Entire agreement

Except for the amendments, supplements, or changes in writing executed after the execution of this Agreement, this Agreement shall constitute the entire agreement reached by and among the Parties hereto with respect to the subject matter hereof, and shall supersede all prior oral and written consultations, representations, and contracts reached with respect to the subject matter of this Agreement.

11.3    Headings

The headings of this Agreement are for convenience only, and shall not be used to interpret, explain, or otherwise affect the meanings of the provisions of this Agreement.

11.4    Language

This Agreement is written in both Chinese and English, and contains three copies, with each Party having one copy. The Chinese version and English version shall have equal legal validity.

11.5    Severability

In the event that one or several of the provisions of this Agreement are found to be invalid, illegal, or unenforceable in any aspect in accordance with any laws or regulations, the validity, legality, or enforceability of the remaining provisions of this Agreement shall not be

affected or compromised in any respect. The Parties shall strive in good faith to replace such invalid, illegal, or unenforceable provisions with effective provisions that accomplish to the greatest extent permitted by the relevant laws and the intentions of the Parties, and the economic effect of such effective provisions shall be as close as possible to the economic effect of those invalid, illegal, or unenforceable provisions.

11.6    Successors

This Agreement shall be binding on and shall inure to the interest of the respective successors of the Parties and the permitted assigns of such Parties.

10

11.7    Survival

11.7.3    Any obligations that occur or are due as a result of this Agreement upon the expiration or early termination of this Agreement shall survive the expiration or early termination thereof.

11.7.4    The provisions of Sections 5, 8, 10, and this Section 11.7 shall survive the termination of this Agreement.

11.8    Waivers

Any Party may waive the terms and conditions of this Agreement, provided that such a waiver must be provided in writing and shall require the signatures of the Parties. No waiver by any Party in certain circumstances with respect to a breach by other Parties shall operate as a waiver by such a Party with respect to any similar breach in other circumstances.

11

IN WITNESS WHEREOF, the authorized representatives of the Parties have executed this Exclusive Option Agreement as of the date first above written.

**PartyA: QOOL Media Technology (Tianjin) Co., Ltd.**

By:        /s/ Yiu Pak LEUNG /common seal/
Name:    Yiu Pak LEUNG
Title:      Legal Representative

IN WITNESS WHEREOF, the authorized representatives of the Parties have executed this Exclusive Option Agreement as of the date first above written.

**Party B1: Tianjin Mingqiao Media Partnership (Limited Partnership)**

By:        /s/ FENG Chen /common seal/
Name:    FENG Chen
Title:      Executive Partner

**Party B2:**

By:        /s/ DA Ridan
Name:    DA Ridan

**Party B3:**

By:        /s/ FENG Chen /common seal/
Name:    FENG Chen

IN WITNESS WHEREOF, the authorized representatives of the Parties have executed this Exclusive Option Agreement as of the date first above written.

**Party C: QOOL Media (Tianjin) Co., Ltd.**

By:        /s/ FENG Chen /common seal/
Name:    FENG Chen
Title:      Legal Representative

**Exhibit 4.39**

**Equity Interest Pledge Agreement**

This Equity Interest Pledge Agreement (this "Agreement") has been executed by and among the following parties on December 18, 2018 in Beijing, the People's Republic of China ("China" or the "PRC"):

Party A:     QOOL Media Technology (Tianjin) Co., Ltd. (hereinafter "Pledgee"), a wholly foreign owned enterprise, organized and existing under the laws of the PRC, with its address at Room 502, Floor 5th, Podium Building, R&D Mansion, No. 1620, Zhongtian Avenue, Sino-Singapore Eco-city, Tianjin;

Party B1:    Tianjin Mingqiao Media Partnership (Limited Partnership) (hereinafter "Pledgor"), a limited partnership organized and existing under the laws of the PRC, with its address at TG No.294, Room209, Floor 2nd, Zone C, Animation Mansion, No. 126, Dongmanzhong Road, Eco-city, Tianjin;

Party B2:    DA Ridan, a Chinese citizen with Chinese ID Number of ***;

Party B3:    FENG Chen, a Chinese citizen with Chinese ID Number of ***; together with Party B1 and Party B2, hereinafter referred to as Party B;

Party C:     QOOL Media (Tianjin) Co., Ltd. (hereinafter "QOOL Tianjin"), a limited liability company organized and existing under the laws of the PRC, with its address at Room 501 Floor 5th, Podium Building, R&D Mansion, No. 1620, Zhongtian Avenue, Sino-Singapore Eco-city, Tianjin.

In this Agreement, each of Pledgee, Pledgor and Party C shall be referred to as a "Party" respectively, and they shall be collectively referred to as the "Parties".

Whereas:

1. Pledgor is a limited partnership registered in China who as of the date hereof holds 30.00% of equity interests of Party C, representing RMB3,000,000 in the registered capital of Party C. Party C is a limited liability company registered in Tianjin, China. Party C acknowledges the respective rights and obligations of Party B and Pledgee under this Agreement, and intends to provide any necessary assistance in registering the Pledge;

2. Pledgee is a wholly foreign-owned enterprise registered in China. Pledgee and Party C which is partially owned by Pledgor have executed an Exclusive Business Cooperation Agreement (as defined below) in Beijing; Party C, Pledgee and Party B have executed an Exclusive Option Agreement (as defined below); Party B has executed a Power of Attorney (as defined below) in favor of Pledgee.;

3. To ensure that Party C and Party B fully perform their obligations under the Exclusive Business Cooperation Agreement, the Exclusive Option Agreement and the Power of Attorney, Pledgor hereby pledges, and Party B2 and Party B3 hereby cause Pledgor to pledge, to the Pledgee all of the equity interest that Pledgor holds in Party C as security for Party C's and Pledgor's obligations under the Exclusive Business Cooperation Agreement, the Exclusive Option Agreement and the Power of Attorney.

1

To perform the provisions of the Transaction Documents (as defined below), the Parties have mutually agreed to execute this Agreement upon the following terms.

**1.     Definitions**

Unless otherwise provided herein, the terms below shall have the following meanings:

1.1    Pledge: shall refer to the security interest granted by Pledgor to Pledgee pursuant to Section 2 of this Agreement, i.e., the right of Pledgee to be paid in priority with the Equity Interest based on the monetary valuation that such Equity Interest is converted into or from the proceeds from auction or sale of the Equity Interest.

1.2    Equity Interest: shall refer to 30.00% equity interests in QOOL Tianjin currently held by Pledgor, representing RMB3,000,000 in the registered capital of QOOL Tianjin, and all of the equity interest hereafter acquired by Pledgor in Party C.

1.3    Term of Pledge: shall refer to the term set forth in Section 3 of this Agreement.

1.4    Transaction Documents: shall refer to the Exclusive Business Cooperation Agreement executed by and between Party C and Pledgee on December 18, 2018 (the "Exclusive Business Cooperation Agreement"), the Exclusive Option Agreement executed by and among Party C, Pledgee and Party B on December 18, 2018 (the "Exclusive Option Agreement"), Power of Attorney executed on December 18, 2018 by Party B (the "Power of Attorney") and any modification, amendment and restatement to the aforementioned documents.

1.5    Contract Obligations: shall refer to all the obligations of Pledgor under the Exclusive Option Agreement, the Power of Attorney and this Agreement; all the obligations of Party C under the Exclusive Business Cooperation Agreement, the Exclusive Option Agreement and this Agreement.

1.6    Secured Indebtedness: shall refer to all the direct, indirect and derivative losses and losses of anticipated profits, suffered by Pledgee, incurred as a result of any Event of Default. The amount of such loss shall be calculated in accordance with the reasonable business plan and profit forecast of Pledgee, the consulting and service fees payable to Pledgee under the Exclusive Business Cooperation Agreement, all expenses occurred in connection with enforcement by Pledgee of Pledgor's and/or Party C's Contract Obligations and etc.

1.7    Event of Default: shall refer to any of the circumstances set forth in Section 7 of this Agreement.

1.8    Notice of Default: shall refer to the notice issued by Pledgee in accordance with this Agreement declaring an Event of Default.

**2.    Pledge**

2.1    Party B agrees to pledge all the Equity Interest as security for performance of the Contract Obligations and payment of the Secured Indebtedness under this Agreement. Party C hereby assents that Party B pledges the Equity Interest to the Pledgee pursuant to this Agreement.

2.2    During the term of the Pledge, Pledgee is entitled to receive dividends distributed on the Equity Interest. Pledgor may receive dividends distributed on the Equity Interest only with prior written consent of Pledgee. Dividends received by Party B on Equity Interest after deduction of individual income tax paid by Party B shall be, as required by Pledgee, (1) deposited into an account designated and supervised by Pledgee and used to secure the Contract Obligations and pay the Secured Indebtedness prior and in preference to make any other payment; or (2) unconditionally donated to Pledgee or any other person designated by Pledgee to the extent permitted under applicable PRC laws.

2.3    Party B may subscribe for capital increase in Party C only with prior written consent of Pledgee. Any equity interest obtained by Pledgor as a result of Party B's subscription of the increased registered capital of the Company shall also be deemed as Equity Interest.

2.4    In the event that Party C is required by PRC law to be liquidated or dissolved, any interest distributed to Party B upon Party C's dissolution or liquidation shall, upon the request of the Pledgee, be (1) deposited into an account designate and supervised by Pledgee and used to secure the Contract Obligations and pay the Secured Indebtedness prior and in preference to make any other payment; or (2) unconditionally donated to Pledgee or any other person designated by Pledgee to the extent permitted under applicable PRC laws.

**3.    Term of Pledge**

3.1    The Pledge shall become effective on such date when the pledge of the Equity Interest contemplated herein is registered with relevant administration for industry and commerce (the "AIC"). The Pledge shall remain effective until all Contract Obligations have been fully performed and all Secured Indebtedness have been fully paid. Party B and Party C shall (1) register the Pledge in the shareholders' register of Party C within 3 business days following the execution of this Agreement, and (2) submit an application to the AIC for the registration of the Pledge of the Equity Interest contemplated herein within 30 business days following the execution of this Agreement. The parties covenant that for the purpose of registration of the Pledge, the parties hereto and all other shareholders of Party C shall submit to the AIC this Agreement or an equity interest pledge contract in the form required by the AIC at the location of Party C which shall truly reflect the information of the Pledge hereunder (the "AIC Pledge Contract"). For matters not specified in the AIC Pledge Contract, the parties shall be bound by the provisions of this Agreement. Party B and Party C shall submit all necessary documents and complete all necessary procedures, as required by the PRC laws and regulations and the relevant AIC, to ensure that the Pledge of the Equity Interest shall be registered with the AIC as soon as possible after submission for filing.

3.2    During the Term of Pledge, in the event Party B and/or Party C fails to perform the Contract Obligations or pay Secured Indebtedness, Pledgee shall have the right, but not the obligation, to exercise the Pledge in accordance with the provisions of this Agreement.

**4.    Custody of Records for Equity Interest subject to Pledge**

4.1    During the Term of Pledge set forth in this Agreement, Party B shall deliver to Pledgee's custody the capital contribution certificate for the Equity Interest and the shareholders' register containing the Pledge within one week from the execution of this Agreement. Pledgee shall have custody of such documents during the entire Term of Pledge set forth in this Agreement.

**5.    Representations and Warranties of Pledgor and Party C**

As of the execution date of this Agreement, Party B and Party C hereby jointly and severally represent and warrant to Pledgee that:

5.1    Pledgor is the sole legal and beneficial owner of the Equity Interest.

5.2    Pledgee shall have the right to dispose of and transfer the Equity Interest in accordance with the provisions set forth in this Agreement.

5.3    Except for the Pledge, Pledgor has not placed any security interest or other encumbrance on the Equity Interest.

5.4    Party B and Party C have obtained any and all approvals and consents from applicable government authorities and third parties (if required) for execution, delivery and performance of this Agreement.

5.5    The execution, delivery and performance of this Agreement will not: (i) violate any relevant PRC laws; (ii) conflict with Party C's articles of association or other constitutional documents; (iii) result in any breach of or constitute any default under any contract or instrument to which it is a party or by which it is otherwise bound; (iv) result in any violation of any condition for the grant and/or maintenance of any permit or approval granted to any Party; or (v) cause any permit or approval granted to any Party to be suspended, cancelled or attached with additional conditions.

**6.    Covenants Pledgor and Party C**

6.1    During the term of this Agreement, Pledgor and Party C hereby jointly and severally covenant, and Party B2 and Party B3 hereby cause Pledgor to covenant, to the Pledgee:

6.1.1    Pledgor shall not transfer the Equity Interest, place or permit the existence of any security interest or other encumbrance on the Equity Interest or any portion thereof, without the prior written consent of Pledgee, except for the performance of the Transaction Documents;

6.1.2    Pledgor and Party C shall comply with the provisions of all laws and regulations applicable to the pledge of rights, and within five (5) days of receipt of any notice, order or recommendation issued or prepared by relevant competent authorities regarding the Pledge, shall present the aforementioned notice, order or recommendation to Pledgee, and shall comply with the aforementioned notice, order or recommendation or submit objections and representations with respect to the aforementioned matters upon Pledgee's reasonable request or upon consent of Pledgee;

6.1.3    Pledgor and Party C shall promptly notify Pledgee of any event or notice received by Pledgor that may have an impact on the Equity Interest or any portion thereof, as well as any event or notice received by Pledgor that may have an impact on any guarantees and other obligations of Pledgor arising out of this Agreement.

6.1.4    Party C shall complete the registration procedures for extension of the term of operation within three (3) months prior to the expiration of such term to maintain the validity of this Agreement.

6.2    Party B agrees that the rights acquired by Pledgee in accordance with this Agreement with respect to the Pledge shall not be interrupted or harmed by Party B or any heirs or representatives of Party B or any other persons through any legal proceedings..

6.3    To protect or perfect the security interest granted by this Agreement for the Contract Obligations and Secured Indebtedness, Party B hereby undertakes to execute in good faith and to cause other parties who have an interest in the Pledge to execute all certificates, agreements, deeds and/or covenants required by Pledgee. Party B also undertakes to perform and to cause other parties who have an interest in the Pledge to perform actions required by Pledgee, to facilitate the exercise by Pledgee of its rights and authority granted thereto by this Agreement, and to enter into all relevant documents regarding ownership of Equity Interest with Pledgee or designee(s) of Pledgee (natural persons/legal persons). Party B undertakes to provide Pledgee within a reasonable time with all notices, orders and decisions regarding the Pledge that are required by Pledgee.

5

6.4    Party B hereby undertakes to comply with and perform all guarantees, promises, agreements, representations and conditions under this Agreement. In the event of failure or partial performance of its guarantees, promises, agreements, representations and conditions, Party B shall indemnify Pledgee for all losses resulting therefrom.

**7.    Event of Breach**

7.1    The following circumstances shall be deemed Event of Default:

7.1.1    Party B's any breach to any obligations under the Transaction Documents and/or this Agreement.

7.1.2    Party C's any breach to any obligations under the Transaction Documents and/or this Agreement.

7.2    Upon notice or discovery of the occurrence of any circumstances or event that may lead to the aforementioned circumstances described in Section 7.1, Party B and Party C shall immediately notify Pledgee in writing accordingly.

7.3    Unless an Event of Default set forth in this Section 7.1 has been successfully resolved to Pledgee's satisfaction within twenty (20) days after the Pledgee and /or Party C delivers a notice to Party B requesting ratification of such Event of Default, Pledgee may issue a Notice of Default to Party B in writing at any time thereafter, demanding the Pledgor to immediately exercise the Pledge in accordance with the provisions of Section 8 of this Agreement.

**8.    Exercise of the Pledge**

8.1    Pledgee shall issue a written Notice of Default to Party B when it exercises the Pledge.

8.2    Subject to the provisions of Section 7.3, Pledgee may exercise the right to enforce the Pledge at any time after the issuance of the Notice of Default in accordance with Section 8.1. Once Pledgee elects to enforce the Pledge, Party B (as a shareholder and beneficial owner of Party C) shall cease to be entitled to any rights or interests associated with the Equity Interest.

8.3    After Pledgee issues a Notice of Default to Pledgor in accordance with Section 8.1, Pledgee may exercise any remedy measure under applicable PRC laws, the Transaction Documents and this Agreement, including but not limited to being paid in priority with the Equity Interest based on the monetary valuation that such Equity Interest is converted into or from the proceeds from auction or sale of the Equity Interest. The Pledgee shall not be liable for any loss incurred by its duly exercise of such rights and powers.

6

8.4    The proceeds from exercise of the Pledge by Pledgee shall be used to pay for tax and expenses incurred as result of disposing the Equity Interest and to perform Contract Obligations and pay the Secured Indebtedness to the Pledgee prior and in preference to any other payment. After the payment of the aforementioned amounts, the remaining balance shall be returned to Pledgor or any other person who have rights to

such balance under applicable laws or be deposited to the local notary public office where Pledgor resides, with all expense incurred being borne by Pledgor. To the extent permitted under applicable PRC laws, Pledgor shall unconditionally donate the aforementioned proceeds to Pledgee or any other person designated by Pledgee.

8.5    Pledgee may exercise any remedy measure available simultaneously or in any order. Pledgee may exercise the right to being paid in priority with the Equity Interest based on the monetary valuation that such Equity Interest is converted into or from the proceeds from auction or sale of the Equity Interest under this Agreement, without exercising any other remedy measure first.

8.6    Pledgee is entitled to designate an attorney or other representatives to exercise the Pledge on its behalf, and Pledgor or Party C shall not raise any objection to such exercise.

8.7    When Pledgee disposes of the Pledge in accordance with this Agreement, Party B and Party C shall provide necessary assistance to enable Pledgee to enforce the Pledge in accordance with this Agreement.

9.    **Breach of Agreement**

9.1    If Party B or Party C conducts any material breach of any term of this Agreement, Pledgee shall have right to terminate this Agreement and/or require Party B or Party C to indemnify all damages; this Section 9 shall not prejudice any other rights of Pledgee herein;

9.2    Party B or Party C shall not have any right to terminate this Agreement in any event unless otherwise required by applicable laws.

10.    **Assignment**

10.1    Without Pledgee's prior written consent, Party B and Party C shall not have the right to assign or delegate their rights and obligations under this Agreement.

10.2    This Agreement shall be binding on Party B and their successors and permitted assigns, and shall be valid with respect to Pledgee and each of his/her successors and assigns.

10.3    At any time, Pledgee may assign any and all of its rights and obligations under the Transaction Documents and this Agreement to its designee(s), in which case the assigns shall have the rights and obligations of Pledgee under the Transaction Documents and this Agreement, as if it were the original party to the Transaction Documents and this Agreement.

10.4    In the event of change of Pledgee due to assignment, Party B and/or Party C shall, at the request of Pledgee, execute a new pledge agreement with the new pledgee on the same terms and conditions as this Agreement, and register the same with the relevant AIC.

10.5    Party B and Party C shall strictly abide by the provisions of this Agreement and other contracts jointly or separately executed by the Parties hereto or any of them, including the Transaction Documents, perform the obligations hereunder and thereunder, and refrain from any action/omission that may affect the effectiveness and enforceability thereof. Any remaining rights of Pledgor with respect to the Equity Interest pledged hereunder shall not be exercised by Party B (as a shareholder and beneficial owner of Party C) except in accordance with the written instructions of Pledgee.

11.    **Termination**

11.1    Upon the fulfillment of all Contract Obligations and the full payment of all Secured Indebtedness by Party B and Party C, Pledgee shall release the Pledge under this Agreement upon Party B's request as soon as reasonably practicable and shall assist Party B to de-register the Pledge from the shareholders' register of Party C and with relevant PRC local administration for industry and commerce.

11.2    The provisions under Sections 9, 13, 14 and 11.2 herein of this Agreement shall survive the expiration or termination of this Agreement.

12.    **Handling Fees and Other Expenses**

All fees and out of pocket expenses relating to this Agreement, including but not limited to legal costs, costs of production, stamp tax and any other taxes and fees, shall be borne by Party C.

13.    **Confidentiality**

The Parties acknowledge that the existence and the terms of this Agreement and any oral or written information exchanged between the Parties in connection with the preparation and performance this Agreement are regarded as confidential information. Each Party shall maintain confidentiality of all such confidential information, and without obtaining the written consent of the other Party, it shall not disclose any relevant confidential information to any third parties, except for the information that: (a) is or will be in the public domain (other than through the receiving Party's unauthorized disclosure); (b) is under the obligation to be disclosed pursuant to the applicable laws or regulations, rules of any stock exchange, or orders of the court or other government authorities; or (c) is required to be disclosed by any Party to its shareholders, directors, employees, legal counsels or financial advisors regarding the transaction contemplated hereunder, provided that such shareholders, directors, employees, legal counsels or financial advisors shall be bound by the confidentiality obligations similar to those set forth in this Section. Disclosure of any confidential information by the shareholders, director, employees of or agencies engaged by any Party shall be deemed disclosure of such confidential information by such Party and such Party shall be held liable for breach of this Agreement.

**14.    Governing Law and Resolution of Disputes**

14.1    The execution, effectiveness, construction, performance, amendment and termination of this Agreement and the resolution of disputes hereunder shall be governed by the laws of China.

14.2    In the event of any dispute with respect to the construction and performance of this Agreement, the Parties shall first resolve the dispute through friendly negotiations. In the event the Parties fail to reach an agreement on the dispute within 30 days after either Party's request to the other Parties for resolution of the dispute through negotiations, either Party may submit the relevant dispute to the Beijing Arbitration Commission for arbitration, in accordance with its Arbitration Rules. The arbitration shall be conducted in Beijing. The arbitration award shall be final and binding on all Parties.

14.3    Upon the occurrence of any disputes arising from the construction and performance of this Agreement or during the pending arbitration of any dispute, except for the matters under dispute, the Parties to this Agreement shall continue to exercise their respective rights under this Agreement and perform their respective obligations under this Agreement.

**15.    Notices**

15.1    All notices and other communications required or permitted to be given pursuant to this Agreement shall be delivered personally or sent by registered mail, postage prepaid, by a commercial courier service or by facsimile transmission to the address of such party set forth below. A confirmation copy of each notice shall also be sent by E-mail. The dates on which notices shall be deemed to have been effectively given shall be determined as follows:

15.1.1    Notices given by personal delivery, by courier service or by registered mail, postage prepaid, shall be deemed effectively given on the date of delivery or refusal at the address specified for notices.

15.1.2    Notices given by facsimile transmission shall be deemed effectively given on the date of successful transmission (as evidenced by an automatically generated confirmation of transmission).

15.1.3    Notices delivered by email shall be deemed effectively served on the date of receipt showed in the email system of recipients.

<div align="center">9</div>

15.2    For the purpose of notices, the addresses of the Parties are as follows:

**Party A:    QOOL Media Technology (Tianjin) Co., Ltd.**
Address:    20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:    Yiu Pak LEUNG
Phone:    010 - 8405 9335

**Party B:**
Address:    Room 1902, 17/F, Building 1, No.13 Workers' Stadium North Road, Chaoyang District, Beijing, PRC.
Attn:    Yiu Pak LEUNG
Phone:    010 - 8405 9335

**Party C:    QOOL Media (Tianjin) Co., Ltd.**
Address:    Room 1902, 17/F, Building 1, No.13 Workers' Stadium North Road, Chaoyang District, Beijing, PRC.
Attn:    Yiu Pak LEUNG
Phone:    010 - 8405 9335

15.3    Any Party may at any time change its address for notices by a notice delivered to the other Parties in accordance with the terms hereof.

**16.    Severability**

In the event that one or several of the provisions of this Contract are found to be invalid, illegal or unenforceable in any aspect in accordance with any laws or regulations, the validity, legality or enforceability of the remaining provisions of this Contract shall not be affected or compromised in any respect. The Parties shall strive in good faith to replace such invalid, illegal or unenforceable provisions with effective provisions that accomplish to the greatest extent permitted by law and the intentions of the Parties, and the economic effect of such effective provisions shall be as close as possible to the economic effect of those invalid, illegal or unenforceable provisions.

**17.    Attachments**

The attachments set forth herein shall be an integral part of this Agreement.

**18.    Effectiveness**

18.1    This Agreement shall become effective upon execution by the Parties.

18.2    Any amendments, changes and supplements to this Agreement shall be in writing and shall become effective upon completion of the governmental filing procedures (if applicable) after the affixation of the signatures or seals of the Parties.

<div align="center">10</div>

**19.**   **Language and Counterparts**

This Agreement is written in Chinese and English in four copies. Party B, Pledgee and Party C shall hold one copy respectively and the other copy shall be used for registration. The Chinese version and English version shall have equal legal validity.

*The Remainder of this page is intentionally left blank*

11

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Equity Interest Pledge Agreement as of the date first above written.

**Party A: QOOL Media Technology (Tianjin) Co., Ltd.**

By:      /s/ Yiu Pak LEUNG /common seal/
Name:   Yiu Pak LEUNG
Title:    Legal Representative

12

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Equity Interest Pledge Agreement as of the date first above written.

**Party B1: Tianjin Mingqiao Media Partnership (Limited Partnership)**

By:      /s/ FENG Chen /common seal/
Name:   FENG Chen
Title:    Executive Partner

**Party B2:**

By:      /s/ DA Ridan
Name:   DA Ridan

**Party B3:**

By:      /s/ FENG Chen /common seal/
Name:   FENG Chen

13

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Equity Interest Pledge Agreement as of the date first above written.

**Party C: QOOL Media (Tianjin) Co., Ltd.**

By:      /s/ FENG Chen /common seal/
Name:   FENG Chen
Title:    Legal Representative

14

**Attachments:**

1.   Shareholders' Register of Party C;

2.   The Capital Contribution Certificate for Party C;

3.   Exclusive Business Cooperation Agreement.

4.   Exclusive Option Agreement

5.   Power of Attorney

15

**Equity Interest Pledge Agreement**

This Equity Interest Pledge Agreement (this "Agreement") has been executed by and among the following parties on December 18, 2018 in Beijing, the People's Republic of China ("China" or the "PRC"):

Party A:      QOOL Media Technology (Tianjin) Co., Ltd. (hereinafter "Pledgee"), a wholly foreign owned enterprise, organized and existing under the laws of the PRC, with its address at Room 502, Floor 5th, Podium Building, R&D Mansion, No. 1620, Zhongtian Avenue, Sino-Singapore Eco-city, Tianjin;

Party B:      Beijing Momo Technology Co., Ltd. (hereinafter "Pledgor"), a limited liability company organized and existing under the laws of the PRC, with its address at Room 222002, Floor 20th, Building No.6, Yard No.1, Futongdong Avenue, Chaoyang District, Beijing; and

Party C:      QOOL Media (Tianjin) Co., Ltd. (hereinafter "QOOL Tianjin"), a limited liability company organized and existing under the laws of the PRC, with its address at Room 501, Floor 5th, Podium Building, R&D Mansion, No. 1620, Zhongtian Avenue, Sino-Singapore Eco-city, Tianjin.

In this Agreement, each of Pledgee, Pledgor and Party C shall be referred to as a "Party" respectively, and they shall be collectively referred to as the "Parties".

Whereas:

1. Pledgor is a limited liability company registered in China who as of the date hereof holds 70.00% of equity interests of Party C, representing RMB7,000,000 in the registered capital of Party C. Party C is a limited liability company registered in Tianjin, China. Party C acknowledges the respective rights and obligations of Pledgor and Pledgee under this Agreement, and intends to provide any necessary assistance in registering the Pledge;

2. Pledgee is a wholly foreign-owned enterprise registered in China. Pledgee and Party C which is partially owned by Pledgor have executed an Exclusive Business Cooperation Agreement (as defined below) in Beijing; Party C, Pledgee and Pledgor have executed an Exclusive Option Agreement (as defined below); Pledgor has executed a Power of Attorney (as defined below) in favor of Pledgee.

3. To ensure that Party C and Pledgor fully perform their obligations under the Exclusive Business Cooperation Agreement, the Exclusive Option Agreement and the Power of Attorney, Pledgor hereby pledges to the Pledgee all of the equity interest that Pledgor holds in Party C as security for Party C's and Pledgor's obligations under the Exclusive Business Cooperation Agreement, the Exclusive Option Agreement and the Power of Attorney.

To perform the provisions of the Transaction Documents (as defined below), the Parties have mutually agreed to execute this Agreement upon the following terms.

1

## 1.    Definitions

Unless otherwise provided herein, the terms below shall have the following meanings:

1.1    Pledge: shall refer to the security interest granted by Pledgor to Pledgee pursuant to Section 2 of this Agreement, i.e., the right of Pledgee to be paid in priority with the Equity Interest based on the monetary valuation that such Equity Interest is converted into or from the proceeds from auction or sale of the Equity Interest.

1.2    Equity Interest: shall refer to 70.00% equity interests in QOOL Tianjin currently held by Pledgor, representing RMB7,000,000 in the registered capital of QOOL Tianjin, and all of the equity interest hereafter acquired by Pledgor in Party C.

1.3    Term of Pledge: shall refer to the term set forth in Section 3 of this Agreement.

1.4    Transaction Documents: shall refer to the Exclusive Business Cooperation Agreement executed by and between Party C and Pledgee on December 18, 2018 (the "Exclusive Business Cooperation Agreement"), the Exclusive Option Agreement executed by and among Party C, Pledgee and Pledgor on December 18, 2018 (the "Exclusive Option Agreement"), Power of Attorney executed on December 18, 2018 by Pledgor (the "Power of Attorney") and any modification, amendment and restatement to the aforementioned documents.

1.5    Contract Obligations: shall refer to all the obligations of Pledgor under the Exclusive Option Agreement, the Power of Attorney and this Agreement; all the obligations of Party C under the Exclusive Business Cooperation Agreement, the Exclusive Option Agreement and this Agreement.

1.6    Secured Indebtedness: shall refer to all the direct, indirect and derivative losses and losses of anticipated profits, suffered by Pledgee, incurred as a result of any Event of Default. The amount of such loss shall be calculated in accordance with the reasonable business plan and profit forecast of Pledgee, the consulting and service fees payable to Pledgee under the Exclusive Business Cooperation Agreement, all expenses occurred in connection with enforcement by Pledgee of Pledgor's and/or Party C's Contract Obligations and etc.

1.7    Event of Default: shall refer to any of the circumstances set forth in Section 7 of this Agreement.

1.8    Notice of Default: shall refer to the notice issued by Pledgee in accordance with this Agreement declaring an Event of Default.

2

## 2.    Pledge

2.1    Pledgor agrees to pledge all the Equity Interest as security for performance of the Contract Obligations and payment of the Secured Indebtedness under this Agreement. Party C hereby assents that Pledgor pledges the Equity Interest to the Pledgee pursuant to this Agreement.

2.2    During the term of the Pledge, Pledgee is entitled to receive dividends distributed on the Equity Interest. Pledgor may receive dividends distributed on the Equity Interest only with prior written consent of Pledgee. Dividends received by Pledgor on Equity Interest after

deduction of individual income tax paid by Pledgor shall be, as required by Pledgee, (1) deposited into an account designated and supervised by Pledgee and used to secure the Contract Obligations and pay the Secured Indebtedness prior and in preference to make any other payment; or (2) unconditionally donated to Pledgee or any other person designated by Pledgee to the extent permitted under applicable PRC laws.

2.3    Pledgor may subscribe for capital increase in Party C only with prior written consent of Pledgee. Any equity interest obtained by Pledgor as a result of Pledgor's subscription of the increased registered capital of the Company shall also be deemed as Equity Interest.

2.4    In the event that Party C is required by PRC law to be liquidated or dissolved, any interest distributed to Pledgor upon Party C's dissolution or liquidation shall, upon the request of the Pledgee, be (1) deposited into an account designate and supervised by Pledgee and used to secure the Contract Obligations and pay the Secured Indebtedness prior and in preference to make any other payment; or (2) unconditionally donated to Pledgee or any other person designated by Pledgee to the extent permitted under applicable PRC laws.

## 3.    Term of Pledge

3.1    The Pledge shall become effective on such date when the pledge of the Equity Interest contemplated herein is registered with relevant administration for industry and commerce (the "AIC"). The Pledge shall remain effective until all Contract Obligations have been fully performed and all Secured Indebtedness have been fully paid. Pledgor and Party C shall (1) register the Pledge in the shareholders' register of Party C within 3 business days following the execution of this Agreement, and (2) submit an application to the AIC for the registration of the Pledge of the Equity Interest contemplated herein within 30 business days following the execution of this Agreement. The parties covenant that for the purpose of registration of the Pledge, the parties hereto and all other shareholders of Party C shall submit to the AIC this Agreement or an equity interest pledge contract in the form required by the AIC at the location of Party C which shall truly reflect the information of the Pledge hereunder (the "AIC Pledge Contract"). For matters not specified in the AIC Pledge Contract, the parties shall be bound by the provisions of this Agreement. Pledgor and Party C shall submit all necessary documents and complete all necessary procedures, as required by the PRC laws and regulations and the relevant AIC, to ensure that the Pledge of the Equity Interest shall be registered with the AIC as soon as possible after submission for filing.

3

3.2    During the Term of Pledge, in the event Pledgor and/or Party C fails to perform the Contract Obligations or pay Secured Indebtedness, Pledgee shall have the right, but not the obligation, to exercise the Pledge in accordance with the provisions of this Agreement.

## 4.    Custody of Records for Equity Interest subject to Pledge

4.1    During the Term of Pledge set forth in this Agreement, Pledgor shall deliver to Pledgee's custody the capital contribution certificate for the Equity Interest and the shareholders' register containing the Pledge within one week from the execution of this Agreement. Pledgee shall have custody of such documents during the entire Term of Pledge set forth in this Agreement.

## 5.    Representations and Warranties of Pledgor and Party C

As of the execution date of this Agreement, Pledgor and Party C hereby jointly and severally represent and warrant to Pledgee that:

5.1    Pledgor is the sole legal and beneficial owner of the Equity Interest.

5.2    Pledgee shall have the right to dispose of and transfer the Equity Interest in accordance with the provisions set forth in this Agreement.

5.3    Except for the Pledge, Pledgor has not placed any security interest or other encumbrance on the Equity Interest.

5.4    Pledgor and Party C have obtained any and all approvals and consents from applicable government authorities and third parties (if required) for execution, delivery and performance of this Agreement.

5.5    The execution, delivery and performance of this Agreement will not: (i) violate any relevant PRC laws; (ii) conflict with Party C's articles of association or other constitutional documents; (iii) result in any breach of or constitute any default under any contract or instrument to which it is a party or by which it is otherwise bound; (iv) result in any violation of any condition for the grant and/or maintenance of any permit or approval granted to any Party; or (v) cause any permit or approval granted to any Party to be suspended, cancelled or attached with additional conditions.

4

## 6.    Covenants of Pledgor and Party C

6.1    During the term of this Agreement, Pledgor and Party C hereby jointly and severally covenant to the Pledgee:

6.1.1    Pledgor shall not transfer the Equity Interest, place or permit the existence of any security interest or other encumbrance on the Equity Interest or any portion thereof, without the prior written consent of Pledgee, except for the performance of the Transaction Documents;

6.1.2    Pledgor and Party C shall comply with the provisions of all laws and regulations applicable to the pledge of rights, and within five (5) days of receipt of any notice, order or recommendation issued or prepared by relevant competent authorities regarding the Pledge, shall present the aforementioned notice, order or recommendation to Pledgee, and shall comply with the aforementioned notice, order or recommendation or submit objections and representations with respect to the aforementioned matters upon Pledgee's reasonable request or upon consent of Pledgee;

6.1.3    Pledgor and Party C shall promptly notify Pledgee of any event or notice received by Pledgor that may have an impact on the Equity

Interest or any portion thereof, as well as any event or notice received by Pledgor that may have an impact on any guarantees and other obligations of Pledgor arising out of this Agreement.

6.1.4   Party C shall complete the registration procedures for extension of the term of operation within three (3) months prior to the expiration of such term to maintain the validity of this Agreement.

6.2   Pledgor agrees that the rights acquired by Pledgee in accordance with this Agreement with respect to the Pledge shall not be interrupted or harmed by Pledgor or any heirs or representatives of Pledgor or any other persons through any legal proceedings.

6.3   To protect or perfect the security interest granted by this Agreement for the Contract Obligations and Secured Indebtedness, Pledgor hereby undertakes to execute in good faith and to cause other parties who have an interest in the Pledge to execute all certificates, agreements, deeds and/or covenants required by Pledgee. Pledgor also undertakes to perform and to cause other parties who have an interest in the Pledge to perform actions required by Pledgee, to facilitate the exercise by Pledgee of its rights and authority granted thereto by this Agreement, and to enter into all relevant documents regarding ownership of Equity Interest with Pledgee or designee(s) of Pledgee (natural persons/legal persons). Pledgor undertakes to provide Pledgee within a reasonable time with all notices, orders and decisions regarding the Pledge that are required by Pledgee.

6.4   Pledgor hereby undertakes to comply with and perform all guarantees, promises, agreements, representations and conditions under this Agreement. In the event of failure or partial performance of its guarantees, promises, agreements, representations and conditions, Pledgor shall indemnify Pledgee for all losses resulting therefrom.

5

## 7.   Event of Breach

7.1   The following circumstances shall be deemed Event of Default:

7.1.1   Pledgor's any breach to any obligations under the Transaction Documents and/or this Agreement.

7.1.2   Party C's any breach to any obligations under the Transaction Documents and/or this Agreement.

7.2   Upon notice or discovery of the occurrence of any circumstances or event that may lead to the aforementioned circumstances described in Section 7.1, Pledgor and Party C shall immediately notify Pledgee in writing accordingly.

7.3   Unless an Event of Default set forth in this Section 7.1 has been successfully resolved to Pledgee's satisfaction within twenty (20) days after the Pledgee and /or Party C delivers a notice to the Pledgor requesting ratification of such Event of Default, Pledgee may issue a Notice of Default to Pledgor in writing at any time thereafter, demanding the Pledgor to immediately exercise the Pledge in accordance with the provisions of Section 8 of this Agreement.

## 8.   Exercise of Pledge

8.1   Pledgee shall issue a written Notice of Default to Pledgor when it exercises the Pledge.

8.2   Subject to the provisions of Section 7.3, Pledgee may exercise the right to enforce the Pledge at any time after the issuance of the Notice of Default in accordance with Section 8.1. Once Pledgee elects to enforce the Pledge, Pledgor shall cease to be entitled to any rights or interests associated with the Equity Interest.

8.3   After Pledgee issues a Notice of Default to Pledgor in accordance with Section 8.1, Pledgee may exercise any remedy measure under applicable PRC laws, the Transaction Documents and this Agreement, including but not limited to being paid in priority with the Equity Interest based on the monetary valuation that such Equity Interest is converted into or from the proceeds from auction or sale of the Equity Interest. The Pledgee shall not be liable for any loss incurred by its duly exercise of such rights and powers.

8.4   The proceeds from exercise of the Pledge by Pledgee shall be used to pay for tax and expenses incurred as result of disposing the Equity Interest and to perform Contract Obligations and pay the Secured Indebtedness to the Pledgee prior and in preference to any other payment. After the payment of the aforementioned amounts, the remaining balance shall be returned to Pledgor or any other person who have rights to such balance under applicable laws or be deposited to the local notary public office where Pledgor resides, with all expense incurred being borne by Pledgor. To the extent permitted under applicable PRC laws, Pledgor shall unconditionally donate the aforementioned proceeds to Pledgee or any other person designated by Pledgee.

6

8.5   Pledgee may exercise any remedy measure available simultaneously or in any order. Pledgee may exercise the right to being paid in priority with the Equity Interest based on the monetary valuation that such Equity Interest is converted into or from the proceeds from auction or sale of the Equity Interest under this Agreement, without exercising any other remedy measure first.

8.6   Pledgee is entitled to designate an attorney or other representatives to exercise the Pledge on its behalf, and Pledgor or Party C shall not raise any objection to such exercise.

8.7   When Pledgee disposes of the Pledge in accordance with this Agreement, Pledgor and Party C shall provide necessary assistance to enable Pledgee to enforce the Pledge in accordance with this Agreement.

## 9.   Breach of Agreement

9.1   If Pledgor or Party C conducts any material breach of any term of this Agreement, Pledgee shall have right to terminate this Agreement and/or require Pledgor or Party C to indemnify all damages; this Section 9 shall not prejudice any other rights of Pledgee herein;

9.2    Pledgor or Party C shall not have any right to terminate this Agreement in any event unless otherwise required by applicable laws.

**10.    Assignment**

10.1    Without Pledgee's prior written consent, Pledgor and Party C shall not have the right to assign or delegate their rights and obligations under this Agreement.

10.2    This Agreement shall be binding on Pledgor and his/her successors and permitted assigns, and shall be valid with respect to Pledgee and each of his/her successors and assigns.

10.3    At any time, Pledgee may assign any and all of its rights and obligations under the Transaction Documents and this Agreement to its designee(s), in which case the assigns shall have the rights and obligations of Pledgee under the Transaction Documents and this Agreement, as if it were the original party to the Transaction Documents and this Agreement.

10.4    In the event of change of Pledgee due to assignment, Pledgor and/or Party C shall, at the request of Pledgee, execute a new pledge agreement with the new pledgee on the same terms and conditions as this Agreement, and register the same with the relevant AIC.

7

10.5    Pledgor and Party C shall strictly abide by the provisions of this Agreement and other contracts jointly or separately executed by the Parties hereto or any of them, including the Transaction Documents, perform the obligations hereunder and thereunder, and refrain from any action/omission that may affect the effectiveness and enforceability thereof. Any remaining rights of Pledgor with respect to the Equity Interest pledged hereunder shall not be exercised by Pledgor except in accordance with the written instructions of Pledgee.

**11.    Termination**

11.1    Upon the fulfillment of all Contract Obligations and the full payment of all Secured Indebtedness by Pledgor and Party C, Pledgee shall release the Pledge under this Agreement upon Pledgor's request as soon as reasonably practicable and shall assist Pledgor to de-register the Pledge from the shareholders' register of Party C and with relevant PRC local administration for industry and commerce.

11.2    The provisions under Sections 9, 13, 14 and 11.2 herein of this Agreement shall survive the expiration or termination of this Agreement.

**12.    Handling Fees and Other Expenses**

All fees and out of pocket expenses relating to this Agreement, including but not limited to legal costs, costs of production, stamp tax and any other taxes and fees, shall be borne by Party C.

**13.    Confidentiality**

The Parties acknowledge that the existence and the terms of this Agreement and any oral or written information exchanged between the Parties in connection with the preparation and performance this Agreement are regarded as confidential information. Each Party shall maintain confidentiality of all such confidential information, and without obtaining the written consent of the other Party, it shall not disclose any relevant confidential information to any third parties, except for the information that: (a) is or will be in the public domain (other than through the receiving Party's unauthorized disclosure); (b) is under the obligation to be disclosed pursuant to the applicable laws or regulations, rules of any stock exchange, or orders of the court or other government authorities; or (c) is required to be disclosed by any Party to its shareholders, directors, employees, legal counsels or financial advisors regarding the transaction contemplated hereunder, provided that such shareholders, directors, employees, legal counsels or financial advisors shall be bound by the confidentiality obligations similar to those set forth in this Section. Disclosure of any confidential information by the shareholders, director, employees of or agencies engaged by any Party shall be deemed disclosure of such confidential information by such Party and such Party shall be held liable for breach of this Agreement.

8

**14.    Governing Law and Resolution of Disputes**

14.1    The execution, effectiveness, construction, performance, amendment and termination of this Agreement and the resolution of disputes hereunder shall be governed by the laws of China.

14.2    In the event of any dispute with respect to the construction and performance of this Agreement, the Parties shall first resolve the dispute through friendly negotiations. In the event the Parties fail to reach an agreement on the dispute within 30 days after either Party's request to the other Parties for resolution of the dispute through negotiations, either Party may submit the relevant dispute to the Beijing Arbitration Commission for arbitration, in accordance with its Arbitration Rules. The arbitration shall be conducted in Beijing. The arbitration award shall be final and binding on all Parties.

14.3    Upon the occurrence of any disputes arising from the construction and performance of this Agreement or during the pending arbitration of any dispute, except for the matters under dispute, the Parties to this Agreement shall continue to exercise their respective rights under this Agreement and perform their respective obligations under this Agreement.

**15.    Notices**

15.1    1All notices and other communications required or permitted to be given pursuant to this Agreement shall be delivered personally or sent by registered mail, postage prepaid, by a commercial courier service or by facsimile transmission to the address of such party set forth below. A

confirmation copy of each notice shall also be sent by E-mail. The dates on which notices shall be deemed to have been effectively given shall be determined as follows:

15.1.1   Notices given by personal delivery, by courier service or by registered mail, postage prepaid, shall be deemed effectively given on the date of delivery or refusal at the address specified for notices.

15.1.2   Notices given by facsimile transmission shall be deemed effectively given on the date of successful transmission (as evidenced by an automatically generated confirmation of transmission).

15.1.3   Notices delivered by email shall be deemed effectively served on the date of receipt showed in the email system of recipients.

<div align="center">9</div>

15.2   For the purpose of notices, the addresses of the Parties are as follows:

**Party A:   QOOL Media Technology (Tianjin) Co., Ltd.**
Address:   20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:      Yiu Pak LEUNG
Phone:     010 - 8405 9335

**Party B:   Beijing Momo Technology Co., Ltd.**
Address:   20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:      Ying Zhang
Phone:     010 - 5731 0555]

**Party C:   QOOL Media (Tianjin) Co., Ltd.**
Address:   Room 1902, 17/F, Building 1, No.13 Workers' Stadium North Road, Chaoyang District, Beijing, PRC.
Attn:      Yiu Pak LEUNG
Phone:     010 - 8405 9335

15.3   Any Party may at any time change its address for notices by a notice delivered to the other Parties in accordance with the terms hereof.

## 16.   Severability

In the event that one or several of the provisions of this Contract are found to be invalid, illegal or unenforceable in any aspect in accordance with any laws or regulations, the validity, legality or enforceability of the remaining provisions of this Contract shall not be affected or compromised in any respect. The Parties shall strive in good faith to replace such invalid, illegal or unenforceable provisions with effective provisions that accomplish to the greatest extent permitted by law and the intentions of the Parties, and the economic effect of such effective provisions shall be as close as possible to the economic effect of those invalid, illegal or unenforceable provisions.

## 17.   Attachments

The attachments set forth herein shall be an integral part of this Agreement.

## 18.   Effectiveness

18.3   This Agreement shall become effective upon execution by the Parties.

18.4   Any amendments, changes and supplements to this Agreement shall be in writing and shall become effective upon completion of the governmental filing procedures (if applicable) after the affixation of the signatures or seals of the Parties.

## 19.   Language and Counterparts

This Agreement is written in Chinese and English in four copies. Pledgor, Pledgee and Party C shall hold one copy respectively and the other copy shall be used for registration. The Chinese version and English version shall have equal legal validity.

<div align="center">*The Remainder of this page is intentionally left blank*</div>

<div align="center">10</div>

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Equity Interest Pledge Agreement as of the date first above written.

**Party A: QOOL Media Technology (Tianjin) Co., Ltd.**

By:        /s/ Yiu Pak LEUNG /common seal/
Name:   Yiu Pak LEUNG
Title:     Legal Representative

<div align="center">11</div>

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Equity Interest Pledge Agreement as of the date first above written.

**Party B: Beijing Momo Technology Co., Ltd.**

By:      /s/ Yan Tang /common seal/
Name:   Yan Tang
Title:    Legal Representative

<div align="center">12</div>

---

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Equity Interest Pledge Agreement as of the date first above written.

**Party C: QOOL Media (Tianjin) Co., Ltd.**

By:      /s/ Chen Feng /common seal/
Name:   Chen Feng
Title:    Legal Representative

<div align="center">13</div>

---

**Attachments:**

6.    Shareholders' Register of Party C

7.    The Capital Contribution Certificate for Party C

8.    Exclusive Business Cooperation Agreement

9.    Exclusive Option Agreement

10.   Power of Attorney

<div align="center">14</div>

**Exhibit 4.40**

**Power of Attorney**

We, Beijing Momo Technology Co., Ltd., a limited liability company organized and existing under the laws of the PRC, with its address at Room 222002, Floor 20th, Building No.6, Yard No.1, Futongdong Avenue, Chaoyang District, Beijing, and a holder of 70.00% of the entire registered capital in QOOL Media (Tianjin) Co., Ltd. (hereinafter "QOOL Tianjin") as of the date when the Power of Attorney is executed, hereby irrevocably authorize QOOL Media Technology (Tianjin) Co., Ltd. ("WFOE") to exercise the following rights relating to all equity interests held by us now and in the future in QOOL Tianjin ("Our Shareholding") during the term of this Power of Attorney:

The WFOE is hereby authorized to act on our behalf as our exclusive agent and attorney with respect to all matters concerning Our Shareholding, including but not limited to: 1) attending shareholders' meetings of QOOL Tianjin; 2) exercising all the shareholder's rights and shareholder's voting rights that we are entitled to under the relevant PRC laws and QOOL Tianjin's Articles of Association, including but not limited to the sale, transfer, pledge, or disposition of Our Shareholding in part or in whole; and 3) designating and appointing on our behalf the legal representative, directors, supervisors, chief executive officer, and other senior management members of QOOL Tianjin.

Without limiting the generality of the powers granted hereunder, the WFOE shall have the power and authority to, on our behalf, execute all the documents we shall sign as stipulated in the Exclusive Option Agreement entered into by and among us, the WFOE, and QOOL Tianjin on December 18, 2018 and the Equity Pledge Agreement entered into by and among us, the WFOE, and QOOL Tianjin on December 18, 2018 (including any modifications, amendments, and restatements thereto, collectively referred to as the "Transaction Documents"), and perform the terms of the Transaction Documents.

All the actions associated with Our Shareholding conducted by the WFOE shall be deemed as our own actions, and all the documents related to Our Shareholding executed by the WFOE shall be deemed as executed by us. We hereby acknowledge and ratify those actions and/or documents by the WFOE.

The WFOE is entitled to re-authorize or assign its rights related to the aforesaid matters to any other person or entity at its own discretion and without giving prior notice to us or obtaining our consent. If required by PRC laws, the WFOE shall designate a PRC citizen to exercise the aforementioned rights.

During the period that We are a shareholder of QOOL Tianjin, this Power of Attorney shall be irrevocable and continuously effective and valid from the date of execution of this Power of Attorney.

During the term of this Power of Attorney, We hereby waive all the rights associated with Our Shareholding, which have been authorized to the WFOE through this Power of Attorney, and shall not exercise such rights by ourselves.

1

This Power of Attorney is written in Chinese and English. The Chinese version and English version shall have equal legal validity.

*The remainder of this page is intentionally left blank.*

2

**Beijing Momo Technology Co., Ltd.**

By:      /s/ Yan Tang /common seal/
Name:   Yan Tang
Title:    Legal Representative

3

Accepted by:

**QOOL Media Technology (Tianjin) Co., Ltd.**

By:      /s/ Yiu Pak LEUNG /common seal/
Name:   Yiu Pak LEUNG
Title:    Legal Representative

4

**Power of Attorney**

Tianjin Mingqiao Media Partnership (Limited Partnership) (hereinafter "Tianjin Mingqiao"), a limited partnership organized and existing under the laws of the PRC, with its address at TG No.294, Room209, Floor 2nd, Zone C, Animation Mansion, No. 126, Dongmanzhong Road, Eco-city, Tianjin, and a holder of 30.00% of the entire registered capital in QOOL Media (Tianjin) Co., Ltd. (hereinafter "QOOL Tianjin") as of the date when the Power of Attorney is executed; DA Ridan, a Chinese citizen with Chinese ID Number of ***, and a holder of 1% of the entire capital of Tianjin Mingqiao; FENG Chen (together with Tianjin Mingqiao and DA Ridan, "We"), a Chinese citizen with Chinese ID Number of *** , and a holder of 99% of the entire capital of Tianjin Mingqiao , hereby irrevocably authorize QOOL Media Technology (Tianjin) Co., Ltd. ("WFOE") to exercise the following rights relating to all

equity interests held by us now and in the future in QOOL Tianjin ("Tianjin Mingqiao's Shareholding") during the term of this Power of Attorney:

The WFOE is hereby authorized to act on our behalf as our exclusive agent and attorney with respect to all matters concerning Tianjin Mingqiao's Shareholding, including but not limited to: 1) attending shareholders' meetings of QOOL Tianjin; 2) exercising all the shareholder's rights and shareholder's voting rights that Tianjin Mingqiao is entitled to under the relevant PRC laws and QOOL Tianjin's Articles of Association, including but not limited to the sale, transfer, pledge, or disposition of Tianjin Mingqiao's Shareholding in part or in whole; and 3) designating and appointing on Tianjin Mingqiao's behalf the legal representative, directors, supervisors, chief executive officer, and other senior management members of QOOL Tianjin.

Without limiting the generality of the powers granted hereunder, the WFOE shall have the power and authority to, on our behalf, execute all the documents we shall sign as stipulated in the Exclusive Option Agreement entered into by and among us, the WFOE, and QOOL Tianjin on December 18, 2018 and the Equity Pledge Agreement entered into by and among us, the WFOE, and QOOL Tianjin on December 18, 2018 (including any modifications, amendments, and restatements thereto, collectively referred to as the "Transaction Documents"), and perform the terms of the Transaction Documents.

All the actions associated with Our Shareholding conducted by the WFOE shall be deemed as our own actions, and all the documents related to Our Shareholding executed by the WFOE shall be deemed as executed by us. We hereby acknowledge and ratify those actions and/or documents by the WFOE.

The WFOE is entitled to re-authorize or assign its rights related to the aforesaid matters to any other person or entity at its own discretion and without giving prior notice to us or obtaining our consent. If required by PRC laws, the WFOE shall designate a PRC citizen to exercise the aforementioned rights.

During the period that Tianjin Mingqiao is a shareholder of QOOL Tianjin, this Power of Attorney shall be irrevocable and continuously effective and valid from the date of execution of this Power of Attorney.

5

During the term of this Power of Attorney, We hereby waive all the rights associated with Our Shareholding, which have been authorized to the WFOE through this Power of Attorney, and shall not exercise such rights by ourselves.

This Power of Attorney is written in Chinese and English. The Chinese version and English version shall have equal legal validity.

*The remainder of this page is intentionally left blank.*

6

**Tianjin Mingqiao Media Partnership (Limited Partnership)**

By:      /s/ FENG Chen /common seal/
Name:   FENG Chen
Title:    Executive Partner

**Party B2:**

By:      /s/ DA Ridan
Name:   DA Ridan

**Party B3:**

By:      /s/ FENG Chen /common seal/
Name:   FENG Chen

7

Accepted by:

**QOOL Media Technology (Tianjin) Co., Ltd.**

By:    /s/ Yiu Pak LEUNG /common seal/
Name:  Yiu Pak LEUNG
Title:   Legal Representative

8

**Exhibit 4.41**

**CONFIRMATION LETTER**

As a shareholder of Tianjin Mingqiao Media Partnership (Limited Partnership) (the "**Company**"), I hereby confirm, represent and guarantee that my successor, guardian, creditor, spouse or any other person that may be entitled to assume rights and interests in the equity interest of the Company held by myself upon death, incapacity, divorce or any circumstances that may affect my ability to exercise my shareholder's rights in Company will not, in any manner and in any circumstances, carry out any act that may affect or hinder the fulfillment of my obligations under each of the contractual agreements (including the Equity Interest Pledge Agreement, the Power of Attorney, the Exclusive Option Agreement, the Exclusive Business Cooperation Agreement and the Business Operation Agreement which were executed by myself on December 18, 2018) (the "**Contractual Agreements**"). I further confirm and undertake that the Contractual Agreements and all of my rights and obligations thereunder shall be equally effective and binding upon my heir and successor.

I hereby further covenant that, I shall unwind the Contractual Agreements as soon as the applicable laws of the People's Republic of China ("**PRC**") allow QOOL Media Technology (Tianjin) Co., Ltd. (the "**WFOE**") to operate the business operated by the Company without the Contractual Agreements. Subject to the applicable PRC laws, I shall return to the WFOE or the entity designated by WFOE any consideration I receive from WFOE for its acquisition of the equity interest of Company at the time when the Contractual Agreements are terminated.

/s/ Chen Feng
Date:  December 18, 2018

**CONFIRMATION LETTER**

As a shareholder of Tianjin Mingqiao Media Partnership (Limited Partnership) (the "**Company**"), I hereby confirm, represent and guarantee that my successor, guardian, creditor, spouse or any other person that may be entitled to assume rights and interests in the equity interest of the Company held by myself upon death, incapacity, divorce or any circumstances that may affect my ability to exercise my shareholder's rights in Company will not, in any manner and in any circumstances, carry out any act that may affect or hinder the fulfillment of my obligations under each of the contractual agreements (including the Equity Interest Pledge Agreement, the Power of Attorney, the Exclusive Option Agreement, the Exclusive Business Cooperation Agreement and the Business Operation Agreement which were executed by myself on December 18, 2018) (the "**Contractual Agreements**"). I further confirm and undertake that the Contractual Agreements and all of my rights and obligations thereunder shall be equally effective and binding upon my heir and successor.

I hereby further covenant that, I shall unwind the Contractual Agreements as soon as the applicable laws of the People's Republic of China ("**PRC**") allow QOOL Media Technology (Tianjin) Co., Ltd. (the "**WFOE**") to operate the business operated by the Company without the Contractual Agreements. Subject to the applicable PRC laws, I shall return to the WFOE or the entity designated by WFOE any consideration I receive from WFOE for its acquisition of the equity interest of Company at the time when the Contractual Agreements are terminated.

/s/ DA Ridan
Date:  December 18, 2018

**Exhibit 4.42**

## EXCLUSIVE COOPERATION

## AGREEMENT

### QOOL Media (Tianjin) Co., Ltd.

**and**

### QOOL Media Technology (Tianjin) Co., Ltd.

### EXCLUSIVE COOPERATION AGREEMENT

This Service Agreement ("Agreement"), effective on <u>December 18, 2018</u> ("Effective Date"), is concluded by and between QOOL Media (Tianjin) Co., Ltd. ("QOOL Media"), a company incorporated under the laws of the People's Republic of China, with its principal place of business at Room 501, Floor 5th, Podium Building, R&D Mansion, No. 1620, Zhongtian Avenue, Sino-Singapore Eco-city, Tianjin and QOOL Media Technology (Tianjin) Co., Ltd. ("QOOL Media Technology"), a company incorporated under the laws of the People's Republic of China, with its principal place of business at Room 502, Floor 5th, Podium Building, R&D Mansion, No. 1620, Zhongtian Avenue, Sino-Singapore Eco-city, Tianjin (each "a Party" and collectively, "the Parties").

### BACKGROUND

Whereas, QOOL Media is responsible for operating the business in China by obtaining and maintaining the Radio and TV Program Production and Business Operation License required to carry out the artists' agency and training in China, copyright agency, music production and authorization, variety show production and distribution, music outsourcing service, art planning and production supervision service for third parties, etc. (hereinafter referred to as "diversified business") in China.

Whereas, QOOL Media obtains the core technology, equipment use, copyright license and other authorization and services related to diversified business development from QOOL Media Technology in order to develop diversified business in China

Whereas, this Agreement sets forth the terms and conditions under which QOOL Media Technology as agreed to provide, and QOOL Media has agreed to receive, the Licensing and the Services;

Whereas, the capitalized terms used and not otherwise defined in these recitals are defined in Article 1 of this Agreement;

Now, therefore, in consideration of the mutual promises, covenants, conditions and terms set forth herein, the Parties agree as follows:

## 1 DEFINITIONS.

Capitalized terms used in this Agreement have the meanings set forth in this Article 1 or as otherwise defined in the context of the provision.

"Effective Date" is December 18, 2018.

"Governing Laws" is defined in Section 6.a.

"Licensing" means QOOL Media Technology agrees to give the core technology, equipment use, copyright license and other authorization and services to QOOL Media under this Agreement (licensing details will be set forth in supplemental agreements to this Agreement).

"Services" means those technical and non-technical services to be provided by QOOL Media Technology to QOOL Media under this Agreement. Technical services include: (i) technical support and maintenance of hardware and software; (ii)call center management services; (iii) after-sale services including training and consulting, etc. Non-technical services include: (i) marketing and advertising services; (ii) sales and payment channel management and development; (ii) administrative services including legal, finance, HR and admin to support QOOL Media in the operation of the QOOL Media Novel and Bench Video App in China; and (iv) other services as the Parties may agree from time to time.

"License Fee" is defined in Section 4.

"Service Fee" is defined in Section 4.

"Term" is defined in Section 2.a.

## 2 TERM AND TERMINATION.

a. Term. The term of this Agreement will begin on the Effective Date and will remain effective for ten (10) years. After the effective period, QOOL Media Technology may decide if this Agreement will be renewed and how long it will be renewed for("Term").

b. Termination for Convenience. QOOL Media Technology may terminate this Agreement upon thirty (30) days' written notice. QOOL Media shall not terminate this Agreement under any circumstances.

c. Prior Agreements. This Agreement supersedes and terminates any and all prior agreements or contracts, oral or written, entered into between

The Parties relating to the subject matter thereof.

## 3 EXCLUSIVE COOPERATION AND INTELLECTUAL PROPERTY RIGHTS.

a.  During the Term, QOOL Media Technology shall provide the Licensing of intellectual properties and the Services to QOOL Media as agreed by the Parties from time to time. Without QOOL Media Technology's consent, QOOL Media is not entitled to the right to engage any other third parties to perform, any licensing of intellectual properties and services similar to the Licensing or the Services.

b.  QOOL Media Technology reserves all the intellectual property rights developed under this agreement, including but not limited to copyright, patent right, right of patent application, knowhow, business secret, etc.

## 4 LICENSE FEE, SERVICE FEE AND PAYMENT.

a.  Pursuant to this Agreement, QOOL Media Technology grants to QOOL Media the use right of the core technology, equipment use, copyright license and other authorization and services . QOOL Media agrees to pay QOOL Media Technology a license fee ("License Fee") in consideration of the rights granted. The calculation methodology of the License Fee will be set forth in supplemental agreements to this Agreement.

b.  Pursuant to this Agreement and QOOL Media's request from time to time, QOOL Media Technology provides QOOL Media with the Services. QOOL Media intends to pay QOOL Media Technology a level of compensation commensurate with the value of the Services it provides, which are essential and fundamental to the economic success or failure of QOOL Media's business in China.

c.  To ensure the high quality of the Licensing and the Services, QOOL Media Technology agrees to be compensated for the Licensing and the Services only if QOOL Media achieves a level of operating profit above a certain rate, initially agreed to be three point five percent (3.5%) ("Expected Profit Rate") of total revenue derived by QOOL Media Technology for operating the QOOL Media Novel and Bench Video App in China. The License Fee and the Service Fee will be calculated such that after it is paid, QOOL Media Technology's operating profit rate will not be lower than the Expected Profit Rate ("Service Fee""). If QOOL Media achieves a level of operating profit above the Expected Profit Rate, the excess profit will be paid to QOOL Media Technology in the form of License Fee and Service Fee. The calculation methodology of the License Fee and Service Fee will be set forth in supplemental agreements to this Agreement. If QOOL Media is unable to achieve the Expected Profit Rate due to QOOL Media Technology's failure in providing the high quality services, QOOL Media Technology will not be entitled to any License Fee or Service Fee. The Parties agree to review the Expected Profit Rate from time to time.

Operating profit rate = (Revenues-Cost of revenues-Sales tax and surcharges –Sales expense-G&A expense-R&D expense) /Revenues.

d.  Payments Due. Payment notice for the License Fee and the Service Fee shall be presented on a monthly basis. The Parties agrees to pay the total amounts shown as due within sixty (60) days from the end of such month. The Parties agrees to pay or offset the payments from time to time, as requested by either Party.

e.  Currency. All computations and payments made pursuant to this Article 4 shall be in Chinese RMB. A netting of any amount payable under this Agreement against existing accounts payable and accounts receivable shall be an acceptable manner of payment effective as of the date of the netting on the books of the Parties.

## 5 TAXES.

a.  QOOL Media Technology's Tax Responsibility. QOOL Media Technology is liable for any value-added tax, excise tax, tariff, duty or any other similar tax imposed by any governmental authority arising from the performance of Services under this Agreement.

b.  QOOL Media's Tax Responsibility. QOOL Media is liable for any value-added tax. excise tax, tariff, duty or any other similar tax imposed by any governmental authority arising from its performance of this Agreement.

## 6 COMPLIANCE WITHLAWS.

a.  Compliance. Each Party will perform its obligations under this Agreement in a manner that complies with all laws applicable to that Party's business. Without limiting the foregoing, the Parties will respectively identify and comply with all laws applicable to the Parties including:(a) laws requiring the procurement of inspections, certificates and approvals needed to perform the Services, and (b)laws regarding healthcare, workplace safety, immigration ,labor standars, wage and hour laws, insurance, data protection and privacy ( collectively, "Governing Laws' )

b.  Change in Law. The Parties will work together to identify the effect of changes in laws on this Agreement, and will promptly discuss the changes to the terms and provisions of this Agreement, if any, required to comply with all laws.

## 7 CONSTRUCTION.

a.  Severability. If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to Law, then the remaining provisions of this Agreement. If capable of substantial performance, will remain in full force and effect.

b.  Applicable Law. This Agreement shall be construed and enforced in accordance with the laws of the People's Republic of China without regard to conflict of laws principles.

c.  Resolution of Disputes. This Agreement shall be governed by the laws of the People's Republic of China. All the disputes arising from the conclusion, performance or interpretation of this Agreement shall be settled by the Parties through consultation.

If the consultation fails, the disputes shall be referred to China International economic and Trade Arbitration Commission for arbitration. The place of arbitration shall be in Beijing. The arbitral award shall be final and binding upon both Parties.

Each of QOOL Media Technology and QOOL Media has caused this Agreement to be signed and delivered by its duly authorized representative to be effective as of the Effective Date.

By: /seal of QOOL Media (Tianjin) Co., Ltd./        By: /seal of QOOL Media Technology (Tianjin) Co., Ltd./

Title: Legal Representative                   Title: Legal Representative
For and on behalf of                         For and on behalf of
QOOL Media (Tianjin) Co., Ltd.            QOOL Media Technology (Tianjin) Co., Ltd.

---

### Supplemental Agreement

Party A: QOOL Media (Tianjin) Co., Ltd.
Address: Room 501, Floor 5th, Podium Building, R&D Mansion, No. 1620,
Zhongtian Avenue, Sino-Singapore Eco-city, Tianjin

Party B: QOOL Media Technology (Tianjin) Co., Ltd.
Address: Room 502, Floor 5th, Podium Building, R&D Mansion, No. 1620,
Zhongtian Avenue, Sino-Singapore Eco-city, Tianjin

An Exclusive Cooperation Agreement ("the Agreement") was concluded between Party A and Party B ("the Parties") on December 18, 2018. The Parties agree on this supplemental agreement in accordance with the Contract Law of the PRC and other relevant laws and regulations for mutual benefit.

1. Supplementary Terms

   a) According to Section 1 of the Agreement, Party B authorizes Party A to use the core technology, equipment and copyright owned and developed by Party B starting from the effective date of this supplemental agreement.

   | List of core technologies | List of equipment | List of copyright |
   |---|---|---|
   |  |  |  |
   |  |  |  |
   |  |  |  |
   |  |  |  |

   Under the license: (i) Party B is responsible for the core technology, equipment and copyright for carrying out the artists' agency and training in China, copyright agency, music production and authorization, variety show production and distribution, music outsourcing service, art planning and production supervision service for third parties, etc.; (i) Party B obtains the ownership and/or legal authorization right to authorize Party A.

   According to Article 4. a of the Agreement, Party A agrees to pay Party B a license fee in consideration of the rights granted. The license fee will be twelve point five percent (12.5%) of the gross revenues generated by Party A from the QOOL Media Novel and Bench Video App.

   b) The Parties agree to review the pricing of license fee from time to time.

   c) Without written consent of Party B, Party A shall not sublicense, transfer or disclose the right to any third party, or try to develop, modify or decompile on the basis of Party B's intellectual properties. Party A agrees with all the exclusive ownership and interest of Party B, including all intellectual property, proprietary technology, development rights and other related rights. Party A shall not be involved in any activities that harm the interest of Party B under any circumstances.

2. Above are the supplementary terms to the Agreement. The Parties shall still comply with the terms of the Agreement concluded on December 18, 2018, which will not be affected by the supplemental agreement.

3. This supplemental agreement is an indivisible part of the Agreement concluded by the Parties on December 18, 2018. This supplemental agreement is made out in two (2) sets of originals with equal validity. Party A and Party B each have one of the originals. By signing below, the Parties agree to the terms of this supplemental agreement effective from the date of signature.

By: /seal of QOOL Media (Tianjin) Co., Ltd./        By: /seal of QOOL Media Technology (Tianjin) Co., Ltd./

Title: Legal Representative                   Title: Legal Representative
For and on behalf of                         For and on behalf of
QOOL Media (Tianjin) Co., Ltd.            QOOL Media Technology (Tianjin) Co., Ltd.

Exhibit 4.43

**Business Operation Agreement**

This Business Operation Agreement (this "Agreement"), dated as of April 1, 2019, is made by and among the following parties:

Party A:                          Beijing Momo Information Technology Co., Ltd.
Address:                          Room 305, Building 4, Yard 13, Kaifang East Road, Huairou District, Beijing
Legal representative:             Yan Tang

Party B:                          Beijing Fancy Reader Technology Co., Ltd.
Address:                          Room 221902, Units 2, Floor 16th, Building No.6, Yard No.1, Futongdong Avenue, Chaoyang District, Beijing
Legal representative:             Xiaoliang Lei

Party C:
Taizhong Wang                     (ID Card No. ***)
Address:                          20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC

(Individually a "Party"; collectively the "Parties")

**WHEREAS:**

A.    Party A is a wholly-owned subsidiaries of wholly foreign-owned enterprise incorporated and validly existing in the People's Republic of China (the "PRC");

B.    Party B is a limited liability company incorporated in the PRC and engaged in technology related investment consultation etc.;

C.    Party A and Party B have established business relation by entering into a certain Exclusive Consulting and Management Services Agreement, under which Party B will make various payments to Party A and therefore Party B's activities in its ordinary course of business will have material effect upon its ability to make relevant payment to Party A; and

D.    Party C is a shareholder of Party B (collectively, the "Founding Shareholders"), in which Taizhong Wang holds 100% of Party B.

**NOW, THEREFORE**, the Parties, through friendly consultations and based on the principle of equality and mutual benefit, hereby agree as follows:

**1.    Negative Obligations**

In order to guarantee the performance by Party B of the agreement entered into by and between Party A and Party B and all of Party B's obligations towards Party A, the Founding Shareholders hereby acknowledge, agree and jointly warrants that without prior written consent of Party A or any party designated by Party A, Party B shall not engage in any transaction which may have material or adverse effect on any of its assets, businesses, employees, obligations, rights or operations, including without limitation:

1.1    Conduct of any activity outside its ordinary course of business or in a manner inconsistent with its past practice;

1

1.2    Making any borrowing or undertaking any indebtedness from any third party;

1.3    Change or removal of any of its directors or senior officers;

1.4    Sale, acquisition or any other disposal of any assets or rights, including without limitation any intellectual property rights, with any third party;

1.5    Creation of any guarantee or any other security on any of its assets or intellectual properties in favor of any third party, or creation of any encumbrance on any of its assets;

1.6    Change of its articles of association or its scope of business;

1.7    Change of its ordinary course of business or any of its material bylaws;

1.8    Transfer any of its rights or obligations under this Agreement to any third party;

1.9    Making any material change to its business pattern, marketing strategy, business plan or customer relationship; and

1.10   Distribution of any bonus or dividend.

**2.    Business Management and Human Resources Arrangement**

2.1    Party B and the Founding Shareholders hereby jointly agree to accept and strictly implement any proposal made by Party A from time to time regarding employment and removal of Party B's employees, day-to-day business management and financial management system of Party B.

2.2    Party B and the Founding Shareholders hereby jointly agree that the Founding Shareholders elect or appoint, as applicable, any person designated by Party A as Party B's director, chairman, president, chief financial officer and any other executive officers in accordance with relevant laws, regulations and its articles of association.

2.3    Upon termination of his or her employment with Party A, either voluntarily or by Party A, each of the directors or senior officers elected or appointed under Section 2.2 will be simultaneously disqualified to hold any position in Party B; under such circumstance, the Founding Shareholders will elect any other person designated by Party A for such position.

2.4    For purpose of Section 2.3, the Founding Shareholders will take any actions required under relevant laws, articles of association and this Agreement to effect the employment and termination provided under Sections 2.2 and 2.3.

2.5    The Founding Shareholders hereby agree that in conjunction with execution of this Agreement, they will execute an irrevocable power of attorney authorizing Party A to exercise their respective rights as shareholders of Party B and respective voting rights at Party B's shareholders meeting.

**3.    Other Agreements**

3.1    Upon termination or expiration of any agreement between Party A and Party B, Party A may elect to terminate all of its agreements with Party B, including without limitation the Exclusive Consulting and Management Services Agreement.

3.2    Considering the business relationship established between Party A and Party B based on the executed Exclusive Consulting and Management Services Agreement, Party B's activities in its ordinary course of business will have material effect upon its ability to make relevant payment to Party A. The Founding Shareholders agree that any bonus, dividend or any other benefit or interest receivable by it as shareholder of Party B will be unconditionally and automatically paid or transferred to Party A.

2

**4.    All Agreements and Amendments**

4.1    This Agreement and all of the agreements and/or documents referred to or expressly included herein constitute entire agreements among the Parties with respect to the subject matter hereof and supersede all prior agreements, contracts, understandings and communications, written or oral, among the Parties with respect to the same.

4.2    This Agreement may not be amended unless by agreement of the Parties in writing. Any amendment or supplement hereto duly executed by the Parties shall be an integral part of and have the same effect with this Agreement.

**5.    Governing Law**

The execution, validity, performance of this Agreement and resolution of any dispute arising from this Agreement shall be governed by the laws of the PRC.

**6.    Dispute Resolution**

6.1    Should any dispute arise in connection with construction or performance of any provision under this Agreement, the Parties shall seek in good faith to resolve such dispute through negotiations. If the negotiations fail, any of the Parties may submit the dispute to Beijing Arbitration Commission for arbitration in accordance with its arbitration rules then in effect. The arbitration will be in Chinese. The arbitral award shall be final and binding on each of the Parties.

6.2    Except for the matter under dispute, each of the Parties shall continue to perform its obligations under this Agreement in good faith.

**7.    Notices**

All notices made by each of the Parties to exercise any of its rights or perform any of its obligations hereunder shall be in writing and given to the following address in person, by registered mail, prepaid mail, recognized courier service, or by fax.

| To Party A: | Beijing Momo Information Technology Co., Ltd. |
|---|---|
| Address: | 20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC |
| Telephone: | +86 10-57310567 |
| Attention: | Ying Zhang |

| To Party B: | Beijing Fancy Reader Technology Co., Ltd. |
|---|---|
| Address: | 20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC |
| Telephone: | +86 10-57310567 |
| Attention: | Ying Zhang |

| To Party C: | |
|---|---|
| Taizhong Wang | |
| Address: | 20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC |
| Telephone: | +86 10-57310567 |
| Attention: | Ying Zhang |

3

8.    Effectiveness, Term and other terms of this Agreement

8.1    Any written consent, proposal, appointment and any other decision in connection with this Agreement which has material effect on Party B's day-to-day business operations shall be made by Party A's board of shareholders.

8.2    This Agreement shall become effective upon execution by each of the Parties on the date first written above. The term of this Agreement will be ten (10) years unless early terminated by Party A. Upon request from Party A, the Parties may extend the term of this Agreement prior to its expiration or enter into a separate business agreement, each as requested by Party A.

8.3    During the term of this Agreement, none of Party B or Founding Shareholders may terminate this Agreement. Party A shall have the right to terminate this Agreement at any time with notice to Party B and its Shareholders in writing.

8.4    If any term or provision hereof is found illegal or unenforceable under applicable laws, such term or provision shall be deemed deleted from this Agreement without any effect, and the remainder of this Agreement shall remain in force and effect as if such term or provision had never been contained herein. The Parties shall negotiate to replace such deleted term or provision with a lawful and valid term or provision acceptable to each of the Parties.

8.5    Failure to exercise any right, power or privilege hereunder shall not be deemed as waiver thereof. Any single or partial exercise of any right, power or privilege hereunder shall not preclude exercise of any other right, power or privilege under this Agreement.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their duly authorized representatives on the date first written above.

*(The Remainder of this page is intentionally left blank)*

4

---

This is the Signature Page of Business Operation Agreement between Beijing Momo Information Technology Co., Ltd., Beijing Fancy Reader Technology Co., Ltd. and Taizhong Wang

Party A:    Beijing Momo Information Technology Co., Ltd.

By:        /s/ Yan Tang /common seal/
Title:      Legal representative

Party B:    Beijing Fancy Reader Technology Co., Ltd.

By:        /s/ Taizhong Wang /common seal/
Title:      Legal representative

Party C:

Taizhong Wang

By:        /s/ Taizhong Wang

5

**Exhibit 4.44**

**Power of Attorney**

I, Taizhong Wang, a People's Republic of China ("China" or the "PRC") citizen with PRC Identification Card No. ***, and a holder of RMB1,000,000 in the registered capital of Beijing Fancy Reader Technology Co., Ltd. (the "Company") as of the date when the Power of Attorney is executed, hereby irrevocably authorize Beijing Momo Information Technology Co., Ltd. (the "WFOE") to exercise the following rights relating to all equity interests held by me now and in the future in the Company ("My Shareholding") during the term of this Power of Attorney:

The WFOE is hereby authorized to act on behalf of myself as my exclusive agent and attorney with respect to all matters concerning My Shareholding, including without limitation to: 1) attending shareholders' meetings of the Company; 2) exercising all the shareholder's rights and shareholder's voting rights I am entitled to under the laws of China and the Company Articles of Association, including but not limited to the sale, transfer, pledge or disposition of My Shareholding in part or in whole; and 3) designating and appointing on behalf of myself the legal representative, directors, supervisors, chief executive officer and other senior management members of the Company.

Without limiting the generality of the powers granted hereunder, the WFOE shall have the power and authority to, on behalf of myself, execute all the documents I shall sign as stipulated in the Exclusive Option Agreement entered into by and among myself, the WFOE and the Company on April 1, 2019 and the Equity Pledge Agreement entered into by and among me, the WFOE and the Company on April 1, 2019 (including any modification, amendment and restatement thereto, collectively the "Transaction Documents"), and perform the terms of the Transaction Documents.

All the actions associated with My Shareholding conducted by the WFOE shall be deemed as my own actions, and all the documents related to My Shareholding executed by the WFOE shall be deemed to be executed by me. I hereby acknowledge and ratify those actions and/or documents by the WFOE.

The WFOE is entitled to re-authorize or assign its rights related to the aforesaid matters to any other person or entity at its own discretion and without giving prior notice to me or obtaining my consent. If required by PRC laws, the WFOE shall designate a PRC citizen to exercise the aforementioned rights.

During the period that I am a shareholder of the Company, this Power of Attorney shall be irrevocable and continuously effective and valid from the date of execution of this Power of Attorney.

During the term of this Power of Attorney, I hereby waive all the rights associated with My Shareholding, which have been authorized to the WFOE through this Power of Attorney, and shall not exercise such rights by myself.

This Power of Attorney is written in Chinese and English. The Chinese version and English version shall have equal legal validity.

Taizhong Wang

By:  /s/ Taizhong Wang

April 1, 2019

Accepted by

Beijing Momo Information Technology Co., Ltd.

By:      /s/ Yan Tang /common seal/
Name:   Yan Tang
Title:    Legal Representative

Acknowledged by:

Beijing Fancy Reader Technology Co., Ltd.

By:      /s/ Taizhong Wang /common seal/
Name:   Taizhong Wang
Title:    Legal Representative

**Exhibit 4.45**

<div align="center">

**EXCLUSIVE COOPERATION**

**AGREEMENT**

**Beijing Fancy Reader Technology Co., Ltd.**

**and**

**Beijing Momo Information Technology Co., Ltd.**

1

</div>

<div align="center">

**EXCLUSIVE COOPERATION AGREEMENT**

</div>

This Service Agreement ("Agreement"), effective on <u>April 1, 2019</u> ("Effective Date"), is concluded by and between Beijing Fancy Reader Technology Co., Ltd. ("Fancy Reader"), a company incorporated under the laws of the People's Republic of China, with its principal place of business at Room 221902, Units 2, Floor 16th, Building No.6, Yard No.1, Futongdong Avenue, Chaoyang District, Beijing and Beijing Momo Information Technology Co., Ltd. ("Momo"), a company incorporated under the laws of the People's Republic of China, with its principal place of business at Room 232005, Floor 20th, Building No.6, Yard No.1, Futongdong Avenue, Chaoyang District, Beijing (each "a Party" and collectively, "the Parties").

<div align="center">

**BACKGROUND**

</div>

Whereas, Fancy Reader is responsible for operating the Fancy Reader Novel and Bench Video App in China by obtaining and maintaining the Internet Content Provider ("ICP") license required to operate Internet service in China.

Whereas, Fancy Reader acquires the Licensing of Intellectual properties (the Fancy Reader Novel and Bench Video App and Emoticon) as well as the Services of Momo to carry out Internet service in China.

Whereas, this Agreement sets forth the terms and conditions under which Momo as agreed to provide, and Fancy Reader has agreed to receive, the Licensing and the Services;

Whereas, the capitalized terms used and not otherwise defined in these recitals are defined in Article 1 of this Agreement;

Now, therefore, in consideration of the mutual promises, covenants, conditions and terms set forth herein, the Parties agree as follows:

**1 DEFINITIONS.**

Capitalized terms used in this Agreement have the meanings set forth in this Article 1 or as otherwise defined in the context of the provision.

"Effective Date" is April 1, 2019.

"Governing Laws" is defined in Section 6.a.

"Licensing" means Momo agrees to grant the use right of its intellectual properties to Fancy Reader under this Agreement, including the Fancy Reader Novel and Bench Video App and Emoticon (licensing details will be set forth in supplemental agreements to this Agreement).

<div align="center">

2

</div>

"Services" means those technical and non-technical services to be provided by Momo to Fancy Reader under this Agreement. Technical services include: (i) assistance in the maintenance of the Fancy Reader Novel and Bench Video App, as well as statistics analysis on App users; (ii) technical support and maintenance of hardware and software ;(i)call center management services; (iv) after-sale services including training and consulting, etc. Non-technical services include: (i) marketing and advertising services; (ii) sales and payment channel management and development; (ii) administrative services including legal, finance, HR and admin to support Fancy Reader in the operation of the Fancy Reader Novel and Bench Video App in China; and (iv) other services as the Parties may agree from time to time.

"License Fee" is defined in Section 4.

"Service Fee" is defined in Section 4.

"Term" is defined in Section 2.a.

**2 TERM AND TERMINATION.**

    a.    Term. The term of this Agreement will begin on the Effective Date and will remain effective for ten (10) years. After the effective period, Momo may decide if this Agreement will be renewed and how long it will be renewed for ("Term").

b.  Termination for Convenience. Momo may terminate this Agreement upon thirty (30) days' written notice. Fancy Reader shall not terminate this Agreement under any circumstances.

c.  Prior Agreements. This Agreement supersedes and terminates any and all prior agreements or contracts, oral or written, entered into between The Parties relating to the subject matter thereof.

**3 EXCLUSIVE COOPERATION AND INTELLECTUAL PROPERTY RIGHTS.**

a.  During the Term, Momo shall provide the Licensing of intellectual properties and the Services to Fancy Reader as agreed by the Parties from time to time. Without Momo's consent, Fancy Reader is not entitled to the right to engage any other third parties to perform, any licensing of intellectual properties and services similar to the Licensing or the Services.

3

b.  Momo reserves all the intellectual property rights developed under this agreement, including but not limited to copyright, patent right, right of patent application, knowhow, business secret, etc.

**4 LICENSE FEE, SERVICE FEE AND PAYMENT.**

a.  Pursuant to this Agreement, Momo grants to Fancy Reader the use right of its intellectual properties including the Fancy Reader Novel and Bench Video App and Emoticons. Fancy Reader agrees to pay Momo a license fee ("License Fee") in consideration of the rights granted. The calculation methodology of the License Fee will be set forth in supplemental agreements to this Agreement.

b.  Pursuant to this Agreement and Fancy Reader's request from time to time, Momo provides Fancy Reader with the Services. Fancy Reader intends to pay Momo a level of compensation commensurate with the value of the Services it provides, which are essential and fundamental to the economic success or failure of Fancy Reader's business in China.

c.  To ensure the high quality of the Licensing and the Services, Momo agrees to be compensated for the Licensing and the Services only if Fancy Reader achieves a level of operating profit above a certain rate, initially agreed to be three point five percent (3.5%) ("Expected Profit Rate") of total revenue derived by Momo for operating the Fancy Reader Novel and Bench Video App in China. The License Fee and the Service Fee will be calculated such that after it is paid, Momo's operating profit rate will not be lower than the Expected Profit Rate ("Service Fee""). If Fancy Reader achieves a level of operating profit above the Expected Profit Rate, the excess profit will be paid to Momo in the form of License Fee and Service Fee. The calculation methodology of the License Fee and Service Fee will be set forth in supplemental agreements to this Agreement. If Fancy Reader is unable to achieve the Expected Profit Rate due to Momo's failure in providing the high quality services, Momo will not be entitled to any License Fee or Service Fee. The Parties agree to review the Expected Profit Rate from time to time.

Operating profit rate = (Revenues-Cost of revenues-Sales tax and surcharges –Sales expense-G&A expense-R&D expense) /Revenues.

d.  Payments Due. Payment notice for the License Fee and the Service Fee shall be presented on a monthly basis. The Parties agrees to pay the total amounts shown as due within sixty (60) days from the end of such month. The Parties agrees to pay or offset the payments from time to time, as requested by either Party.

4

e.  Currency. All computations and payments made pursuant to this Article 4 shall be in Chinese RMB. A netting of any amount payable under this Agreement against existing accounts payable and accounts receivable shall be an acceptable manner of payment effective as of the date of the netting on the books of the Parties.

f.  Retrospection. The Parties agree the License Fee and the Service Fee defined in this Section shall be retrospective to the Parties from the date April 1, 2019.

**5 TAXES.**

a.  Momo's Tax Responsibility. Momo is liable for any value-added tax, excise tax, tariff, duty or any other similar tax imposed by any governmental authority arising from the performance of Services under this Agreement.

b.  Fancy Reader's Tax Responsibility. Fancy Reader is liable for any value-added tax. excise tax, tariff, duty or any other similar tax imposed by any governmental authority arising from its performance of this Agreement.

**6 COMPLIANCE WITHLAWS.**

a.  Compliance. Each Party will perform its obligations under this Agreement in a manner that complies with all laws applicable to that Party's business. Without limiting the foregoing, the Parties will respectively identify and comply with all laws applicable to the Parties including:(a) laws requiring the procurement of inspections, certificates and approvals needed to perform the Services, and (b)laws regarding healthcare, workplace safety, immigration ,labor standars, wage and hour laws, insurance, data protection and privacy ( collectively, "Governing Laws" )

b.  Change in Law. The Parties will work together to identify the effect of changes in laws on this Agreement, and will promptly discuss the changes to the terms and provisions of this Agreement, if any, required to comply with all laws.

**7 CONSTRUCTION.**

a.  Severability. If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to Law, then the remaining provisions of this Agreement. If capable of substantial performance, will remain in full force and effect.

b.  Applicable Law. This Agreement shall be construed and enforced in accordance with the laws of the People's Republic of China without regard to conflict of laws principles.

5

c.  Resolution of Disputes. This Agreement shall be governed by the laws of the People's Republic of China. All the disputes arising from the conclusion, performance or interpretation of this Agreement shall be settled by the Parties through consultation.

If the consultation fails, the disputes shall be referred to China International economic and Trade Arbitration Commission for arbitration. The place of arbitration shall be in Beijing. The arbitral award shall be final and binding upon both Parties.

Each of Momo and Fancy Reader has caused this Agreement to be signed and delivered by its duly authorized representative to be effective as of the Effective Date.

By:  /s/ Taizhong Wang /common seal/

Title:  Legal Representative
For and on behalf of
Beijing Fancy Reader Technology Co., Ltd.

By:  /s/ Yan Tang /common seal/

Title:  Legal Representative
For and on behalf of
Beijing Momo Information Technology Co., Ltd.

6

## Supplemental Agreement

Party A: Beijing Fancy Reader Technology Co., Ltd.
Address: Room 221902, Units 2, Floor 16th, Building No.6, Yard No.1, Futongdong Avenue, Chaoyang District, Beijing, P.R.China

Party B: Beijing Momo Information Technology Co., Ltd.
Address: Room 232005, Floor 20th, Building No.6, Yard No.1, Futongdong Avenue, Chaoyang District, Beijing

An Exclusive Cooperation Agreement ("the Agreement") was concluded between Party A and Party B ("the Parties") on April 1,2019. The Parties agree on this supplemental agreement in accordance with the Contract Law of the PRC and other relevant laws and regulations for mutual benefit.

1.  Supplementary Terms

a)  According to Section 1 of the Agreement, Party B agrees to license the use right of the Fancy Reader Novel and Bench Video App (including but not limited to the following version) to Party A starting from the effective date of this supplemental agreement.

| App Android V |
| --- |
| Fancy Reader Novel |
| Bench Video |
|  |
|  |

Under the license: (i) Party B is responsible for the design, development and maintenance of the Fancy Reader Novel and Bench Video App; (i) Party A is granted with the right to operate the Fancy Reader Novel and Bench Video App and to generate income from in-App features sold to users.

According to Article 4. a of the Agreement, Party A agrees to pay Party B a license fee in consideration of the rights granted. The license fee will be twelve point five percent (12.5%) of the gross revenues generated by Party A from the Fancy Reader Novel and Bench Video App. The Parties agree to review the pricing of license fee from time to time.

b)  According to Section 1 of the Agreement, Party B agrees to license the use right of Emoticon (Emoticon details are listed in Appendix A) to Party A starting from the effective date of this supplemental agreement.

7

According to Article 4.a of the Agreement, Party A agrees to pay Party B a license fee in consideration of the rights granted. The license fee will be twelve point five percent (12.5%) of the gross revenues generated by Party A from sales of the emotions. The Parties agree to review the pricing of license fee from time to time.

c)  Without written consent of Party B, Party A shall not sublicense, transfer or disclose the right to any third party, or try to develop, modify or decompile on the basis of Party B's intellectual properties. Party A agrees with all the exclusive ownership and interest of Party B, including all intellectual property, proprietary technology, development rights and other related rights. Party A shall not be involved in any activities that harm the interest of Party B under any circumstances.

2.  Above are the supplementary terms to the Agreement. The Parties shall still comply with the terms of the Agreement concluded on April 1, 2019, which will not be affected by the supplemental agreement.

3.  This supplemental agreement is an indivisible part of the Agreement concluded by the Parties on April 1, 2019. The Parties agree that the license fee set forth in this supplemental agreement shall be retrospective from April 1, 2019. This supplemental agreement is made out in two (2) sets of originals with equal validity. Party A and Party B each have one of the originals. By signing below, the Parties agree to the terms of this supplemental agreement effective from the date of signature.

By:    /s/ Taizhong Wang /common seal/
Title:   Legal Representative
For and on behalf of
Beijing Fancy Reader Technology Co., Ltd.

By:    /s/ Yan Tang /common seal/
Title:   Legal Representative
For and on behalf of
Beijing Momo Information Technology Co., Ltd.

8

**Exhibit 4.46**

**Exclusive Option Agreement**

This Exclusive Option Agreement (this "Agreement") is executed by and among the following Parties as of June 1, 2018 in Beijing, the People's Republic of China ("China" or the "PRC"):

**Party A:**    Beijing Momo Information Technology Co., Ltd., a wholly foreign owned enterprise, organized and existing under the laws of the PRC, with its address at Room 232005, Floor 20th, Building No.6, Yard No.1, Futongdong Avenue, Chaoyang District, Beijing;

**Party B:**    Taizhong Wang, a Chinese citizen with Identification No.: ***; and

**Party C:**    Beijing Fancy Reader Technology Co., Ltd., a limited liability company organized and existing under the laws of the PRC, with its address at Room 221902, Units 2, Floor 16th, Building No.6, Yard No.1, Futongdong Avenue, Chaoyang District, Beijing.

In this Agreement, each of Party A, Party B and Party C shall be referred to as a "Party" respectively, and they shall be collectively referred to as the "Parties".

Whereas:

1. Party B is a shareholder of Party C and as of the date hereof holds RMB 1,000,000 in the registered capital of Party C.

2. Party B agrees to grant Party A an exclusive right through this Agreement, and Party A agrees to accept such exclusive right to purchase all or part equity interest held by Party B in Party C.

3. Party C agrees to grant Party A an exclusive right through this Agreement, and Party A agrees to accept such exclusive right to purchase all or part of the assets of Party C.

Now therefore, upon mutual discussion and negotiation, the Parties have reached the following agreement:

1. **Sale and Purchase of Equity Interest and Asssets**

    1.1    Equity Interest Purchase Option

    Party B hereby irrevocably grants Party A an irrevocable and exclusive right to purchase, or designate one or more persons (each, a "Designee") to purchase the equity interests in Party C then held by Party B once or at multiple times at any time in part or in whole at Party A's sole and absolute discretion to the extent permitted by Chinese laws and at the price described in Section 1.1.2 herein (such right being the "Equity Interest Purchase Option"). Except for Party A and the Designee(s), no other person shall be entitled to the Equity Interest Purchase Option or other rights with respect to the equity interests of Party B. Party C hereby agrees to the grant by Party B of the Equity Interest Purchase Option to Party A. The term "person" as used herein shall refer to individuals, corporations, partnerships, partners, enterprises, trusts or non-corporate organizations.

1

    1.1.1    Steps for Exercise of the Equity Interest Purchase Option

    Subject to the provisions of the laws and regulations of China, Party A may exercise the Equity Interest Purchase Option by issuing a written notice to Party B (the "Equity Interest Purchase Option Notice"), specifying: (a) Party A's or the Designee's decision to exercise the Equity Interest Purchase Option; (b) the portion of equity interests to be purchased by Party A or the Designee from Party B (the "Optioned Interests"); and (c) the date for purchasing the Optioned Interests or the date for the transfer of the Optioned Interests.

    1.1.2    Equity Interest Purchase Price

    The purchase price of the Optioned Interests (the "Base Price") shall be RMB 10. If PRC law requires a minimum price higher than the Base Price when Party A exercises the Equity Interest Purchase Option, the minimum price regulated by PRC law shall be the purchase price (collectively, the "Equity Interest Purchase Price").

    1.1.3    Transfer of Optioned Interests

    For each exercise of the Equity Interest Purchase Option:

    1.1.3.1    Party B shall cause Party C to promptly convene a shareholders' meeting, at which a resolution shall be adopted approving Party B's transfer of the Optioned Interests to Party A and/or the Designee(s);

    1.1.3.2    Party B shall obtain written statements from the other shareholders of Party C giving consent to the transfer of the equity interest to Party A and/or the Designee(s) and waiving any right of first refusal related thereto;

    1.1.3.3    Party B shall execute an equity interest transfer contract with respect to each transfer with Party A and/or each Designee (whichever is applicable), in accordance with the provisions of this Agreement and the Equity Interest Purchase Option Notice regarding the Optioned Interests;

2

    1.1.3.4    The relevant Parties shall execute all other necessary contracts, agreements or documents, obtain all necessary government licenses and permits and take all necessary actions to transfer valid ownership of the Optioned Interests to Party A and/or the Designee(s),

unencumbered by any security interests, and cause Party A and/or the Designee(s) to become the registered owner(s) of the Optioned Interests. For the purpose of this Section and this Agreement, "security interests" shall include securities, mortgages, third party's rights or interests, any stock options, acquisition right, right of first refusal, right to offset, ownership retention or other security arrangements, but shall be deemed to exclude any security interest created by this Agreement, Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney. "Party B's Equity Interest Pledge Agreement" as used in this Agreement shall refer to the Interest Pledge Agreement executed by and among Party A, Party B and Party C on the date hereof and any modification, amendment and restatement thereto. "Party B's Power of Attorney" as used in this Agreement shall refer to the Power of Attorney executed by Party B on the date hereof granting Party A with a power of attorney and any modification, amendment and restatement thereto.

1.2    Asset Purchase Option

Party C hereby grants to Party A an irrevocable and exclusive option to have Party A or its Designee to purchase from Party C, at Party A's sole discretion, at any time and in accordance with the procedures decided by Party A in its sole discretion, any or all of the assets of Party C, to the extent permitted under PRC law, and at the lowest purchase price permitted by PRC law. The Parties shall then enter into a separate assets transfer agreement, specifying the terms and conditions of the transfer of the assets.

**2.    Covenants**

2.1    Covenants regarding Party C

Party B (as a shareholder of Party C) and Party C hereby covenant as follows:

2.1.1    Without the prior written consent of Party A, they shall not in any manner supplement, change or amend the articles of association of Party C, increase or decrease its registered capital, or change its structure of registered capital in other manners;

2.1.2    They shall maintain Party C's corporate existence in accordance with good financial and business standards and practices, obtain and maintain all necessary government licenses and permits by prudently and effectively operating its business and handling its affairs;

2.1.3    Without the prior written consent of Party A, they shall not at any time following the date hereof, sell, transfer, mortgage or dispose of in any manner any material assets of Party C or legal or beneficial interest in the material business or revenues of Party C of more than RMB 1,000,000, or allow the encumbrance thereon of any security interest;

3

2.1.4    Without the prior written consent of Party A, they shall not incur, inherit, guarantee or suffer the existence of any debt, except for payables incurred in the ordinary course of business other than through loans;

2.1.5    They shall always operate all of Party C's businesses within the normal business scope to maintain the asset value of Party C and refrain from any action/omission that may affect Party C's operating status and asset value;

2.1.6    Without the prior written consent of Party A, they shall not cause Party C to execute any major contract, except the contracts in the ordinary course of business (for the purpose of this subsection, a contract with a price exceeding RMB 1,000,000 shall be deemed a major contract);

2.1.7    Without the prior written consent of Party A, they shall not cause Party C to provide any person with any loan or credit;

2.1.8    They shall provide Party A with information on Party C's business operations and financial condition at Party A's request;

2.1.9    If requested by Party A, they shall procure and maintain insurance in respect of Party C's assets and business from an insurance carrier acceptable to Party A, at an amount and type of coverage typical for companies that operate similar businesses;

2.1.10    Without the prior written consent of Party A, they shall not cause or permit Party C to merge, consolidate with, acquire or invest in any person;

2.1.11    They shall immediately notify Party A of the occurrence or possible occurrence of any litigation, arbitration or administrative proceedings relating to Party C's assets, business or revenue;

2.1.12    To maintain the ownership by Party C of all of its assets, they shall execute all necessary or appropriate documents, take all necessary or appropriate actions, file all necessary or appropriate complaints, and raise necessary or appropriate defenses against all claims;

2.1.13    Without the prior written consent of Party A, they shall ensure that Party C shall not in any manner distribute dividends to its shareholders, provided that upon Party A's written request, Party C shall immediately distribute all distributable profits to its shareholders;

4

2.1.14    At the request of Party A, they shall appoint any person designated by Party A as the director or executive director of Party C.

2.1.15    Without Party A's prior written consent, they shall not engage in any business in competition with Party A or its affiliates; and

2.1.16    Unless otherwise required by PRC law, Party C shall not be dissolved or liquated without prior written consent by Party A.

2.2    Covenants of Party B

Party B hereby covenants as follows:

2.2.1    Without the prior written consent of Party A, Party B shall not sell, transfer, mortgage or dispose of in any other manner any legal or beneficial interest in the equity interests in Party C held by Party B, or allow the encumbrance thereon, except for the interest placed in accordance with Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney;

2.2.2    Without the prior written consent of Party A, Party B shall cause the shareholders' meeting and/or the directors (or the executive director) of Party C not to approve any sale, transfer, mortgage or disposition in any other manner of any legal or beneficial interest in the equity interests in Party C held by Party B, or allow the encumbrance thereon of any security interest, except for the interest placed in accordance with Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney;

2.2.3    Without the prior written consent of Party A, Party B shall cause the shareholders' meeting or the directors (or the executive director) of Party C not to approve the merger or consolidation with any person, or the acquisition of or investment in any person;

2.2.4    Party B shall immediately notify Party A of the occurrence or possible occurrence of any litigation, arbitration or administrative proceedings relating to the equity interests in Party C held by Party B;

2.2.5    Party B shall cause the shareholders' meeting or the directors (or the executive director) of Party C to vote their approval of the transfer of the Optioned Interests as set forth in this Agreement and to take any and all other actions that may be requested by Party A;

2.2.6    To the extent necessary to maintain Party B's ownership in Party C, Party B shall execute all necessary or appropriate documents, take all necessary or appropriate actions, file all necessary or appropriate complaints, and raise necessary or appropriate defenses against all claims;

5

2.2.7    Party B shall appoint any designee of Party A as the director or the executive director of Party C, at the request of Party A;

2.2.8    Party B hereby waives its right of first refusal to the transfer of equity interest by any other shareholder of Party C to Party A (if any), and gives consent to the execution by each other shareholder of Party C with Party A and Party C the exclusive option agreement, the equity interest pledge agreement and the power of attorney similar to this Agreement, Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney, and accepts not to take any action in conflict with such documents executed by the other shareholders;

2.2.9    Party B shall promptly donate any profit, interest, dividend or proceeds of liquidation to Party A or any other person designated by Party A to the extent permitted under the applicable PRC laws; and

2.2.10    Party B shall strictly abide by the provisions of this Agreement and other contracts jointly or separately executed by and among Party B, Party C and Party A, perform the obligations hereunder and thereunder, and refrain from any action/omission that may affect the effectiveness and enforceability thereof. To the extent that Party B has any remaining rights with respect to the equity interests subject to this Agreement hereunder or under Party B's Equity Interest Pledge Agreement or under Party B's Power of Attorney, Party B shall not exercise such rights except in accordance with the written instructions of Party A.

**3.    Representations and Warranties**

Party B and Party C hereby represent and warrant to Party A, jointly and severally, as of the date of this Agreement and each date of the transfer of the Optioned Interests, that:

3.1    They have the power, capacity and authority to execute and deliver this Agreement and any equity interest transfer contracts to which they are parties concerning the Optioned Interests to be transferred thereunder (each, a "Transfer Contract"), and to perform their obligations under this Agreement and any Transfer Contracts. Party B and Party C agree to enter into Transfer Contracts consistent with the terms of this Agreement upon Party A's exercise of the Equity Interest Purchase Option. This Agreement and the Transfer Contracts to which they are parties constitute or will constitute their legal, valid and binding obligations and shall be enforceable against them in accordance with the provisions thereof;

3.2    Party B and Party C have obtained any and all approvals and consents from the competent government authorities and third parties (if required) for the execution, delivery and performance of this Agreement.

6

3.3    The execution and delivery of this Agreement or any Transfer Contracts and the obligations under this Agreement or any Transfer Contracts shall not: (i) cause any violation of any applicable laws of China; (ii) be inconsistent with the articles of association, bylaws or other organizational documents of Party C; (iii) cause the violation of any contracts or instruments to which they are a party or which are binding on them, or constitute any breach under any contracts or instruments to which they are a party or which are binding on them; (iv) cause any violation of any condition for the grant and/or continued effectiveness of any licenses or permits issued to either of them; or (v) cause the suspension or revocation of or imposition of additional conditions to any licenses or permits issued to either of them;

3.4    Party B has a good and merchantable title to the equity interests held by Party B in Party C. Except for Party B's Equity Interest Pledge Agreement and Party B's Power of Attorney, Party B has not placed any security interest on such equity interests;

3.5    Party C has a good and merchantable title to all of its assets, and has not placed any security interest on the aforementioned assets;

3.6    Party C does not have any outstanding debts, except for (i) debt incurred within the normal business scope; and (ii) debts disclosed to Party A for which Party A's written consent has been obtained.

3.7    Party C has complied with all laws and regulations of China applicable to asset acquisitions; and

3.8    There are no pending or threatened litigation, arbitration or administrative proceedings relating to the equity interests in Party C, assets of Party C or Party C.

**4.    Effective Date and Term**

This Agreement shall become effective upon execution by the Parties, and remain effective until all equity interests held by Party B in Party C have been transferred or assigned to Party A and/or any other person designated by Party A in accordance with this Agreement.

**5.    Governing Law and Resolution of Disputes**

5.1    Governing Law

The execution, effectiveness, construction, performance, amendment and termination of this Agreement and the resolution of disputes hereunder shall be governed by the laws of the PRC.

<center>7</center>

5.2    Methods of Resolution of Disputes

In the event of any dispute with respect to the construction and performance of this Agreement, the Parties shall first resolve the dispute through friendly negotiations. In the event the Parties fail to reach an agreement on the dispute after either Party's request to the other Parties for resolution of the dispute through negotiations, either Party may submit the relevant dispute to Beijing Arbitration Commission for arbitration, in accordance with its arbitration rules. The arbitration shall be conducted in Beijing. The arbitration award shall be final and binding on all Parties.

**6.    Taxes and Fees**

Each Party shall pay any and all transfer and registration taxes, expenses and fees incurred thereby or levied thereon in accordance with the laws of China in connection with the preparation and execution of this Agreement and the Transfer Contracts, as well as the consummation of the transactions contemplated under this Agreement and the Transfer Contracts.

**7.    Notices**

7.1    All notices and other communications required or permitted to be given pursuant to this Agreement shall be delivered personally or sent by registered mail, prepaid postage, a commercial courier service or facsimile transmission to the address of such Party set forth below. A confirmation copy of each notice shall also be sent by email. The dates on which notices shall be deemed to have been effectively given shall be determined as follows:

7.1.1    Notices given by personal delivery, courier service, registered mail or prepaid postage shall be deemed effectively given on the date of receipt or refusal at the address specified for notices;

7.1.2    Notices given by facsimile transmission shall be deemed effectively given on the date of successful transmission (as evidenced by an automatically generated confirmation of transmission).

7.2    For the purpose of notices, the addresses of the Parties are as follows:

**Party A:**    Beijing Momo Information Technology Co., Ltd.
Address:    20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:    Ying Zhang
Phone:    010-5731 0733

**Party B:**    Taizhong Wang
Address:    20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:    Ying Zhang
Phone:    010-5731 0733

<center>8</center>

**Party C:**    Beijing Fancy Reader Technology Co., Ltd.
Address:    20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:    Ying Zhang
Phone:    010-5731 0733

7.3    Any Party may at any time change its address for notices by a notice delivered to the other Parties in accordance with the terms hereof.

**8.    Confidentiality**

The Parties acknowledge that the existence and the terms of this Agreement, and any oral or written information exchanged between the Parties in connection with the preparation and performance of this Agreement are regarded as confidential information. Each Party shall maintain confidentiality of all such confidential information, and without obtaining the written consent of other Parties, it shall not disclose any relevant confidential information to any third parties, except for the information that: (a) is or will be in the public domain (other than through the receiving

Party's unauthorized disclosure); (b) is under the obligation to be disclosed pursuant to the applicable laws or regulations, rules of any stock exchange, or orders of the court or other government authorities; or (c) is required to be disclosed by any Party to its shareholders, directors, employees, legal counsels or financial advisors regarding the transaction contemplated hereunder, provided that such shareholders, directors, employees, legal counsels, or financial advisors shall be bound by the confidentiality obligations similar to those set forth in this Section. Disclosure of any confidential information by the shareholders, director, employees of, or agencies engaged by any Party shall be deemed disclosure of such confidential information by such Party and such Party shall be held liable for breach of this Agreement.

**9.   Further Warranties**

The Parties agree to promptly execute documents that are reasonably required for or are conducive to the implementation of the provisions and purposes of this Agreement and take further actions that are reasonably required for or are conducive to the implementation of the provisions and purposes of this Agreement.

**10.   Breach of Agreement**

10.1   If Party B or Party C conducts any material breach of any term of this Agreement, Party A shall have right to terminate this Agreement and/or require Party B or Party C to compensate all damages; this Section 10 shall not prejudice any other rights of Party A herein;

10.2   Party B or Party C shall not have any right to terminate this Agreement in any event unless otherwise required by the applicable laws.

<div align="center">9</div>

**11.   Miscellaneous**

11.1   Amendments, changes and supplements

Any amendment, change and supplement to this Agreement shall require the execution of a written agreement by all of the Parties.

11.2   Entire agreement

Except for the amendments, supplements or changes in writing executed after the execution of this Agreement, this Agreement shall constitute the entire agreement reached by and among the Parties hereto with respect to the subject matter hereof, and shall supersede all prior oral and written consultations, representations and contracts reached with respect to the subject matter of this Agreement.

11.3   Headings

The headings of this Agreement are for convenience only, and shall not be used to interpret, explain or otherwise affect the meanings of the provisions of this Agreement.

11.4   Language

This Agreement is written in both Chinese and English language in three copies, each Party having one copy. The Chinese version and English version shall have equal legal validity.

11.5   Severability

In the event that one or several of the provisions of this Agreement are found to be invalid, illegal or unenforceable in any aspect in accordance with any laws or regulations, the validity, legality or enforceability of the remaining provisions of this Agreement shall not be affected or compromised in any respect. The Parties shall strive in good faith to replace such invalid, illegal or unenforceable provisions with effective provisions that accomplish to the greatest extent permitted by law and the intentions of the Parties, and the economic effect of such effective provisions shall be as close as possible to the economic effect of those invalid, illegal or unenforceable provisions.

11.6   Successors

This Agreement shall be binding on and shall inure to the interest of the respective successors of the Parties and the permitted assigns of such Parties.

<div align="center">10</div>

11.7   Survival

11.7.1   Any obligations that occur or that are due as a result of this Agreement upon the expiration or early termination of this Agreement shall survive the expiration or early termination thereof.

11.7.2   The provisions of Sections 5, 8, 10 and this Section 11.7 shall survive the termination of this Agreement.

11.8   Waivers

Any Party may waive the terms and conditions of this Agreement, provided that such a waiver must be provided in writing and shall require the signatures of the Parties. No waiver by any Party in certain circumstances with respect to a breach by other Parties shall operate as a waiver by such a Party with respect to any similar breach in other circumstances.

<div align="center">11</div>

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Exclusive Option Agreement as of the date first above written.

**Party A:** Beijing Momo Information Technology Co., Ltd.

By:     /s/ Yan Tang /common seal/
Name:   Yan Tang
Title:  Legal Representative

**Party B:** Taizhong Wang

By:     /s/ Taizhong Wang

**Party C:** Beijing Fancy Reader Technology Co., Ltd.

By:     /s/ Taizhong Wang /common seal/
Name:   Taizhong Wang
Title:  Legal Representative

12

**Exhibit 4.47**

## CONFIRMATION LETTER

As a shareholder of Beijing Fancy Reader Technology Co., Ltd. (the "**Company**"), I hereby confirm, represent and guarantee that my successor, guardian, creditor, spouse or any other person that may be entitled to assume rights and interests in the equity interest of the Company held by myself upon death, incapacity, divorce or any circumstances that may affect my ability to exercise my shareholder's rights in Company will not, in any manner and in any circumstances, carry out any act that may affect or hinder the fulfillment of my obligations under each of the contractual agreements (including the Equity Interest Pledge Agreement, the Power of Attorney, Exclusive Option Agreement which were executed by myself on April 1, 2019, as well as the Exclusive Technical Consulting and Management Services Agreement and the Business Operation Agreement which were executed by myself on April 1, 2019) (the "**Contractual Agreements**"). I further confirm and undertake that the Contractual Agreements and all of my rights and obligations thereunder shall be equally effective and binding upon my heir and successor.

I hereby further covenant that, I shall unwind the Contractual Agreements as soon as the applicable laws of the People's Republic of China ("**PRC**") allow Beijing Momo Information Technology Co., Ltd. to operate the business operated by the Company (which includes but not limited to the business of Network Information Service) without the Contractual Agreements. Subject to the applicable PRC laws, I shall return to the Beijing Momo Information Technology Co., Ltd. or the entity designated by Beijing Momo Information Technology Co., Ltd. any consideration I receive from Beijing Momo Information Technology Co., Ltd. for its acquisition of the equity interest of Company at the time when the Contractual Agreements are terminated.

/s/ Taizhong Wang

Date: April 1, 2019

<div align="right"><b>Exhibit 4.48</b></div>

<div align="center"><b>Equity Interest Pledge Agreement</b></div>

This Equity Interest Pledge Agreement (this "Agreement") has been executed by and among the following parties on April 1 , 2019 in Beijing, the People's Republic of China ("China" or the "PRC"):

**Party A:** Beijing Momo Information Technology Co., Ltd (hereinafter the "Pledgee"), a wholly foreign owned enterprise, organized and existing under the laws of the PRC, with its address at Room 232005, Floor 20th, Building No.6, Yard No.1, Futongdong Avenue, Chaoyang District, Beijing;

**Party B:** Taizhong Wang (hereinafter the "Pledgor"), a Chinese citizen with Chinese Identification No.: ***; and

**Party C:** Beijing Fancy Reader Technology Co., Ltd., a limited liability company organized and existing under the laws of the PRC, with its address at Room 221902, Units 2, Floor 16th, Building No.6, Yard No.1, Futongdong Avenue, Chaoyang District, Beijing.

In this Agreement, each of the Pledgee, the Pledgor and Party C shall be referred to as a "Party" respectively, and they shall be collectively referred to as the "Parties".

Whereas:

1. The Pledgor is a citizen of China who as of the date hereof holds RMB 1,000,000 in the registered capital of Party C. Party C is a limited liability company registered in Beijing, China, engaging in development and operation of internet products. Party C acknowledges the respective rights and obligations of the Pledgor and the Pledgee under this Agreement, and intends to provide any necessary assistance in registering the Pledge; To ensure that Party C fully and timely pays the Secured Indebtedness and any or all of the payments under the Transaction Documents payable to the Pledgee, including but not limited to the management fees and service fees provided in the Transaction Documents (whether such fees become due and payable due to the arrival of the maturity date, advance payment requirements or any other reasons), the Pledgor hereby pledges to the Pledgee all of the equity interest hereafter acquired by the Pledgor in Party C;

2. The Pledgee is a wholly foreign-owned enterprise registered in China. The Pledgee and Party C which is partially owned by the Pledgor have executed an Exclusive Business Cooperation Agreement (as defined below) in Beijing; Party C, the Pledgee and the Pledgor have executed an Exclusive Option Agreement (as defined below); the Pledgor has executed a Power of Attorney (as defined below) in favor of the Pledgee;

<div align="center">1</div>

3. To ensure that Party C and the Pledgor fully perform their obligations under the Exclusive Business Cooperation Agreement, the Exclusive Option Agreement and the Power of Attorney, the Pledgor hereby pledges to the Pledgee all of the equity interest that the Pledgor holds in Party C as security for Party C's and the Pledgor's obligations under the Exclusive Business Cooperation Agreement, the Exclusive Option Agreement and the Power of Attorney.

To perform the provisions of the Transaction Documents (as defined below), the Parties have mutually agreed to execute this Agreement upon the following terms.

**1. Definitions**

Unless otherwise provided herein, the terms below shall have the following meanings:

1.1 Pledge: shall refer to the security interest granted by the Pledgor to the Pledgee pursuant to Section 2 of this Agreement, i.e., the right of the Pledgee to be paid in priority with the Equity Interest based on the monetary valuation that such Equity Interest is converted into or from the proceeds from the auction or sale of the Equity Interest.

1.2 Equity Interest: shall refer to RMB 1,000,000 in the registered capital of Party C, and all of the equity interest hereafter acquired by the Pledgor in Party C.

1.3 Term of the Pledge: shall refer to the term set forth in Section 3 of this Agreement.

1.4 Transaction Documents: shall refer to the Exclusive Consulting and Management Services Agreement executed by and between Party C and the Pledgee on April 1, 2019 (the "Exclusive Business Cooperation Agreement"), the Exclusive Option Agreement executed by and among Party C, the Pledgee and the Pledgor on April 1, 2019 (the "Exclusive Option Agreement"), Power of Attorney executed on April 1, 2019 by the Pledgor (the "Power of Attorney") and any modification, amendment and restatement to the aforementioned documents.

1.5 Contract Obligations: shall refer to all the obligations of the Pledgor under the Exclusive Option Agreement, the Power of Attorney and this Agreement; all the obligations of Party C under the Exclusive Business Cooperation Agreement, the Exclusive Option Agreement and this Agreement.

1.6 Secured Indebtedness: shall refer to RMB 1,000,000, as well as all the direct, indirect and derivative losses and losses of anticipated profits, suffered by the Pledgee, incurred as a result of any Event of Default. The amount of such loss shall be calculated in accordance with the reasonable business plan and profit forecast of the Pledgee, the consulting and service fees payable to the Pledgee under the Exclusive Business Cooperation Agreement, all expenses occurred in connection with enforcement by the Pledgee of the Pledgor's and/or Party C's Contract Obligations and etc.

<div align="center">2</div>

1.7   Event of Default: shall refer to any of the circumstances set forth in Section 7 of this Agreement.

1.8   Notice of Default: shall refer to the notice issued by the Pledgee in accordance with this Agreement declaring an Event of Default.

**2.   Pledge**

2.1   The Pledgor agrees to pledge all the Equity Interest as security for performance of the Contract Obligations and payment of the Secured Indebtedness under this Agreement. Party C hereby assents that the Pledgor pledges the Equity Interest to the Pledgee pursuant to this Agreement.

2.2   During the term of the Pledge, the Pledgee is entitled to receive dividends distributed on the Equity Interest. The Pledgor may receive dividends distributed on the Equity Interest only with prior written consent of the Pledgee. Dividends received by the Pledgor on Equity Interest after the deduction of individual income tax paid by the Pledgor shall be, as required by the Pledgee, (1) deposited into an account designated and supervised by the Pledgee and used to secure the Contract Obligations and pay the Secured Indebtedness prior and in preference to making any other payment; or (2) unconditionally donated to the Pledgee or any other person designated by the Pledgee to the extent permitted under the applicable PRC laws.

2.3   The Pledgor may subscribe for a capital increase in Party C only with prior written consent of the Pledgee. Any equity interest obtained by the Pledgor as a result of the Pledgor's subscription of the increased registered capital of the Company shall also be deemed as Equity Interest.

2.4   In the event that Party C is required by PRC law to be liquidated or dissolved, any interest distributed to the Pledgor upon Party C's dissolution or liquidation shall, upon the request of the Pledgee, be (1) deposited into an account designated and supervised by the Pledgee and used to secure the Contract Obligations and pay the Secured Indebtedness prior and in preference to make any other payment; or (2) unconditionally donated to the Pledgee or any other person designated by the Pledgee to the extent permitted under the applicable PRC laws.

**3.   Term of the Pledge**

3.1   The Pledge shall become effective on such date when the pledge of the Equity Interest contemplated herein is registered with the relevant administration for industry and commerce (the "AIC"). The Pledge shall remain effective until all Contract Obligations have been fully performed or all Secured Indebtedness has been fully paid. The Pledgor and Party C shall (1) register the Pledge in the shareholders' register of Party C within 3 business days following the execution of this Agreement, and (2) submit an application to the AIC for the registration of the Pledge of the Equity Interest contemplated herein within 30 business days following the execution of this Agreement. The parties covenant that for the purpose of registration of the Pledge, the parties hereto and all other shareholders of Party C shall submit to the AIC this Agreement or an equity interest pledge contract in the form required by the AIC at the location of Party C which shall truly reflect the information of the Pledge hereunder (the "AIC Pledge Contract"). For matters not specified in the AIC Pledge Contract, the Parties shall be bound by the provisions of this Agreement. The Pledgor and Party C shall submit all necessary documents and complete all necessary procedures, as required by the relevant PRC laws and regulations and the competent AIC, to ensure that the Pledge of the Equity Interest shall be registered with the AIC as soon as possible after submission for filing.

3

3.2   During the Term of the Pledge, in the event the Pledgor and/or Party C fails to perform the Contract Obligations or pay Secured Indebtedness, the Pledgee shall have the right, but not the obligation, to exercise the Pledge in accordance with the provisions of this Agreement.

**4.   Custody of Records for Equity Interest subject to the Pledge**

4.1   During the Term of the Pledge set forth in this Agreement, the Pledgor shall deliver to the Pledgee's custody the capital contribution certificate for the Equity Interest and the shareholders' register containing the Pledge within one week from the execution of this Agreement. The Pledgee shall have custody of such documents during the entire Term of the Pledge set forth in this Agreement.

**5.   Representations and Warranties of the Pledgor and Party C**

As of the execution date of this Agreement, the Pledgor and Party C hereby jointly and severally represent and warrant to the Pledgee that:

5.1   The Pledgor is the sole legal and beneficial owner of the Equity Interest.

5.2   The Pledgee shall have the right to dispose of and transfer the Equity Interest in accordance with the provisions set forth in this Agreement.

5.3   Except for the Pledge, the Pledgor has not placed any security interest or other encumbrance on the Equity Interest.

5.4   The Pledgor and Party C have obtained any and all approvals and consents from the applicable government authorities and third parties (if required) for the execution, delivery and performance of this Agreement.

5.5   The execution, delivery and performance of this Agreement will not: (i) violate any relevant PRC laws; (ii) conflict with Party C's articles of association or other constitutional documents; (iii) result in any breach of or constitute any default under any contract or instrument to which it is a party or by which it is otherwise bound; (iv) result in any violation of any condition for the grant and/or maintenance of any permit or approval granted to any Party; or (v) cause any permit or approval granted to any Party to be suspended, cancelled or attached with additional conditions.

4

**6. Covenants the Pledgor and Party C**

6.1 During the term of this Agreement, the Pledgor and Party C hereby jointly and severally covenant to the Pledgee:

6.1.1 The Pledgor shall not transfer the Equity Interest, place or permit the existence of any security interest or other encumbrance on the Equity Interest or any portion thereof, without the prior written consent of the Pledgee, except for the performance of the Transaction Documents;

6.1.2 The Pledgor and Party C shall comply with the provisions of all laws and regulations applicable to the pledge of rights, and within five (5) days of receipt of any notice, order or recommendation issued or prepared by the competent authorities regarding the Pledge, shall present the aforementioned notice, order or recommendation to the Pledgee, and shall comply with the aforementioned notice, order or recommendation or submit objections and representations with respect to the aforementioned matters upon the Pledgee's reasonable request or upon consent of the Pledgee;

6.1.3 The Pledgor and Party C shall promptly notify the Pledgee of any event or notice received by the Pledgor that may have an impact on the Equity Interest or any portion thereof, as well as any event or notice received by the Pledgor that may have an impact on any guarantees and other obligations of the Pledgor arising out of this Agreement.

6.1.4 Party C shall complete the registration procedures for the extension of the operation term within three (3) months prior to the expiration of such term to maintain the validity of this Agreement.

6.2 The Pledgor agrees that the rights acquired by the Pledgee in accordance with this Agreement with respect to the Pledge shall not be interrupted or harmed by the Pledgor or any heirs or representatives of the Pledgor or any other persons through any legal proceedings.

6.3 To protect or perfect the security interest granted by this Agreement for the Contract Obligations and Secured Indebtedness, the Pledgor hereby undertakes to execute in good faith and to cause other parties who have an interest in the Pledge to execute all certificates, agreements, deeds and/or covenants required by the Pledgee. The Pledgor also undertakes to perform and to cause other parties who have an interest in the Pledge to perform actions required by the Pledgee, to facilitate the exercise by the Pledgee of its rights and authority granted thereto by this Agreement, and to enter into all relevant documents regarding ownership of Equity Interest with the Pledgee or designee(s) of the Pledgee (natural persons/legal persons). The Pledgor undertakes to provide the Pledgee within a reasonable time with all notices, the orders and decisions regarding the Pledge that are required by the Pledgee.

5

6.4 The Pledgor hereby undertakes to comply with and perform all guarantees, promises, agreements, representations and conditions under this Agreement. In the event of failure or partial performance of its guarantees, promises, agreements, representations and conditions, the Pledgor shall indemnify the Pledgee for all losses resulting therefrom.

**7. Event of Breach**

7.1 The following circumstances shall be deemed an Event of Default:

7.1.1 The Pledgor's any breach to any obligations under the Transaction Documents and/or this Agreement.

7.1.2 Party C's any breach to any obligations under the Transaction Documents and/or this Agreement.

7.2 Upon notice or discovery of the occurrence of any circumstances or event that may lead to the aforementioned circumstances described in Section 7.1, the Pledgor and Party C shall immediately notify the Pledgee in writing accordingly.

7.3 Unless an Event of Default set forth in Section 7.1 has been successfully resolved to the Pledgee's satisfaction within twenty (20) days after the Pledgee and /or Party C delivers a notice to the Pledgor requesting ratification of such Event of Default, the Pledgee may issue a Notice of Default to the Pledgor in writing at any time thereafter, demanding the Pledgor to immediately exercise the Pledge in accordance with the provisions of Section 8 of this Agreement.

**8. Exercise of the Pledge**

8.1 The Pledgee shall issue a written Notice of Default to the Pledgor when it exercises the Pledge.

8.2 Subject to the provisions of Section 7.3, the Pledgee may exercise the right to enforce the Pledge at any time after the issuance of the Notice of Default in accordance with Section 8.1. Once the Pledgee elects to enforce the Pledge, the Pledgor shall cease to be entitled to any rights or interests associated with the Equity Interest.

8.3 After the Pledgee issues a Notice of Default to the Pledgor in accordance with Section 8.1, the Pledgee may exercise any remedy measure under the applicable PRC laws, the Transaction Documents and this Agreement, including but not limited to being paid in priority with the Equity Interest based on the monetary valuation that such Equity Interest is converted into or from the proceeds from the auction or sale of the Equity Interest. The Pledgee shall not be liable for any loss incurred by its duly exercise of such rights and powers.

6

8.4 The proceeds from the exercise of the Pledge by the Pledgee shall be used to pay for taxes and expenses incurred as a result of disposing the Equity Interest and to perform Contract Obligations and pay the Secured Indebtedness to the Pledgee prior and in preference to any other payment. After the payment of the aforementioned amounts, the remaining balance shall be returned to the Pledgor or any other person who have rights to such balance under applicable laws or be deposited to the local notary public office where the Pledgor resides, with all

expenses incurred being borne by the Pledgor. To the extent permitted under the applicable PRC laws, the Pledgor shall unconditionally donate the aforementioned proceeds to the Pledgee or any other person designated by the Pledgee.

8.5     The Pledgee may exercise any remedy measure available simultaneously or in any order. The Pledgee may exercise the right to being paid in priority with the Equity Interest based on the monetary valuation that such Equity Interest is converted into or from the proceeds from the auction or sale of the Equity Interest under this Agreement, without exercising any other remedy measure first.

8.6     The Pledgee is entitled to designate an attorney or other representatives to exercise the Pledge on its behalf, and the Pledgor or Party C shall not raise any objection to such exercise.

8.7     When the Pledgee disposes of the Pledge in accordance with this Agreement, the Pledgor and Party C shall provide the necessary assistance to enable the Pledgee to enforce the Pledge in accordance with this Agreement.

## 9.     Breach of Agreement

9.1     If the Pledgor or Party C conducts any material breach of any term of this Agreement, the Pledgee shall have right to terminate this Agreement and/or require the Pledgor or Party C to indemnify all damages; this Section 9 shall not prejudice any other rights of the Pledgee herein;

9.2     The Pledgor or Party C shall not have any right to terminate this Agreement in any event unless otherwise required by the applicable laws.

## 10.    Assignment

10.1    Without the Pledgee's prior written consent, the Pledgor and Party C shall not have the right to assign or delegate their rights and obligations under this Agreement.

10.2    This Agreement shall be binding on the Pledgor and his/her successors and permitted assigns, and shall be valid with respect to the Pledgee and each of its successors and assigns.

<center>7</center>

10.3    At any time, the Pledgee may assign any and all of its rights and obligations under the Transaction Documents and this Agreement to its designee(s), in which case the assigns shall have the rights and obligations of the Pledgee under the Transaction Documents and this Agreement, as if it were the original party to the Transaction Documents and this Agreement.

10.4    In the event of change of the Pledgee due to assignment, the Pledgor and/or Party C shall, at the request of the Pledgee, execute a new pledge agreement with the new pledgee on the same terms and conditions as this Agreement, and register the same with the competent AIC.

10.5    The Pledgor and Party C shall strictly abide by the provisions of this Agreement and other contracts jointly or separately executed by the Parties hereto or any of them, including the Transaction Documents, perform the obligations hereunder and thereunder, and refrain from any action/omission that may affect the effectiveness and enforceability thereof. Any remaining rights of the Pledgor with respect to the Equity Interest pledged hereunder shall not be exercised by the Pledgor except in accordance with the written instructions of the Pledgee.

## 11.    Termination

11.1    Upon the fulfillment of all Contract Obligations and the full payment of all Secured Indebtedness by the Pledgor and Party C, the Pledgee shall release the Pledge under this Agreement upon the Pledgor's request as soon as reasonably practicable and shall assist the Pledgor in de-registering the Pledge from the shareholders' register of Party C and with the competent PRC local administration for industry and commerce.

11.2    The provisions under Sections 9, 13, 14 and 11.2 herein of this Agreement shall survive the expiration or termination of this Agreement.

## 12.    Handling Fees and Other Expenses

All fees and out of pocket expenses relating to this Agreement, including but not limited to legal costs, costs of production, stamp tax and any other taxes and fees, shall be borne by Party C.

## 13.    Confidentiality

The Parties acknowledge that the existence and the terms of this Agreement and any oral or written information exchanged between the Parties in connection with the preparation and performance this Agreement are regarded as confidential information. Each Party shall maintain the confidentiality of all such confidential information, and without obtaining the written consent of the other Party, it shall not disclose any relevant confidential information to any third parties, except for the information that: (a) is or will be in the public domain (other than through the receiving Party's unauthorized disclosure); (b) is under the obligation to be disclosed pursuant to the applicable laws or regulations, rules of any stock exchange, or orders of the court or other government authorities; or (c) is required to be disclosed by any Party to its shareholders, directors, employees, legal counsels or financial advisors regarding the transaction contemplated hereunder, provided that such shareholders, directors, employees, legal counsels or financial advisors shall be bound by the confidentiality obligations similar to those set forth in this Section. Disclosure of any confidential information by the shareholders, director, employees of or agencies engaged by any Party shall be deemed disclosure of such confidential information by such Party and such Party shall be held liable for breach of this Agreement.

<center>8</center>

**14.**  **Governing Law and Resolution of Disputes**

14.1  The execution, effectiveness, construction, performance, amendment and termination of this Agreement and the resolution of disputes hereunder shall be governed by the laws of China.

14.2  In the event of any dispute with respect to the construction and performance of this Agreement, the Parties shall first resolve the dispute through friendly negotiations. In the event the Parties fail to reach an agreement on the dispute after either Party's request to the other Parties for resolution of the dispute through negotiations, either Party may submit the relevant dispute to Beijing Arbitration Commission for arbitration, in accordance with its Arbitration Rules. The arbitration shall be conducted in Beijing. The arbitration award shall be final and binding on all Parties.

14.3  Upon the occurrence of any disputes arising from the construction and performance of this Agreement or during the pending arbitration of any dispute, except for the matters under dispute, the Parties to this Agreement shall continue to exercise their respective rights under this Agreement and perform their respective obligations under this Agreement.

**15.**  **Notices**

15.1  All notices and other communications required or permitted to be given pursuant to this Agreement shall be delivered personally or sent by registered mail, prepaid postage, a commercial courier service or facsimile transmission to the address of such party set forth below. A confirmation copy of each notice shall also be sent by E-mail. The dates on which notices shall be deemed to have been effectively given shall be determined as follows:

15.2  Notices given by personal delivery, courier service, registered mail or prepaid postage shall be deemed effectively given on the date of delivery or refusal at the address specified for notices.

15.3  Notices given by facsimile transmission shall be deemed effectively given on the date of successful transmission (as evidenced by an automatically generated confirmation of transmission).

9

15.4  For the purpose of notices, the addresses of the Parties are as follows:

**Party A:**  Beijing Momo Information Technology Co., Ltd.
Address:  20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:  Ying Zhang
Phone:  010-5731 0733

**Party B:**  Taizhong Wang
Address:  20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:  Ying Zhang
Phone:  010-5731 0733

**Party C:**  Beijing Fancy Reader Technology Co., Ltd.
Address:  20/F Block B, Tower 2 Wangjing SOHO, No.1 Futong East Street Chaoyang District, Beijing, PRC.
Attn:  Ying Zhang
Phone:  010-5731 0733

15.5  Any Party may at any time change its address for notices by a notice delivered to the other Parties in accordance with the terms hereof.

**16.**  **Severability**

In the event that one or several of the provisions of this Contract are found to be invalid, illegal or unenforceable in any aspect in accordance with any laws or regulations, the validity, legality or enforceability of the remaining provisions of this Contract shall not be affected or compromised in any respect. The Parties shall strive in good faith to replace such invalid, illegal or unenforceable provisions with effective provisions that accomplish to the greatest extent permitted by law and the intentions of the Parties, and the economic effect of such effective provisions shall be as close as possible to the economic effect of those invalid, illegal or unenforceable provisions.

**17.**  **Attachments**

The attachments set forth herein shall be an integral part of this Agreement.

**18.**  **Effectiveness**

18.1  This Agreement shall become effective upon execution by the Parties.

18.2  Any amendments, changes and supplements to this Agreement shall be in writing and shall become effective upon completion of the governmental filing procedures (if applicable) after the affixation of the signatures or seals of the Parties.

10

**19.**  **Language and Counterparts**

This Agreement is written in Chinese and English in four copies. The Pledgor, the Pledgee and Party C shall hold one copy respectively and the other

copy shall be used for registration. In the event there is any discrepancy between the Chinese and English versions, the Chinese version shall prevail.

*The Remainder of this page is intentionally left blank*

IN WITNESS WHEREOF, the Parties have caused their authorized representatives to execute this Equity Interest Pledge Agreement as of the date first above written.

**Party A:** Beijing Momo Information Technology Co., Ltd.

By:      /s/ Yan Tang /common seal/
Name:   Yan Tang
Title:    Legal Representative

**Party B:** Taizhong Wang

By:      /s/ Taizhong Wang

**Party C:** Beijing Fancy Reader Technology Co., Ltd.

By:      /s/ Taizhong Wang /common seal/
Name:   Taizhong Wang
Title:    Legal Representative

**Attachments:**

1.     Shareholders' Register of Party C;

2.     The Capital Contribution Certificate for Party C;

3.     Exclusive Business Cooperation Agreement.

4.     Exclusive Option Agreement

5.     Power of Attorney

**Exhibit 8.1**

### List of Subsidiaries and Consolidated Entities of the Registrant

| Subsidiaries | Place of Incorporation |
| --- | --- |
| Momo Technology HK Company Limited | Hong Kong |
| Beijing Momo Information Technology Co., Ltd. | PRC |
| Momo Technology Overseas Holding Company Limited. | British Virgin Islands |
| Momo Information Technologies Corp. | U.S. |
| Tantan Limited. | Cayman Islands |
| QOOL Media Hong Kong Limited | Hong Kong |
| Tantan Social Inc. | U.S. |
| Tantan Hong Kong Limited. | Hong Kong |
| Tantan Technology (Beijing) Co., Ltd. | PRC |
| Beijing Yiliulinger Information Technology Co., Ltd. | PRC |
| QOOL Media Inc. | Cayman Islands |
| QOOL Media Technology (Tianjin) Co., Ltd. | PRC |
| **Consolidated Affiliated Entity** | |
| Beijing Momo Technology Co., Ltd. | PRC |
| Tantan Culture Development (Beijing) Co., Ltd. | PRC |
| Hainan Miaoka Network Technology Co., Ltd. | PRC |
| Hainan Yilingliuer Network Technology Co., Ltd. | PRC |
| QOOL Media (Tianjin) Co., Ltd. | PRC |
| Beijing Fancy Reader Technology Co., Ltd. | PRC |
| **Subsidiaries of the Consolidated Affiliated Entity** | |
| Chengdu Momo Technology Co., Ltd. | PRC |
| Shanghai Momo Technology Co., Ltd. | PRC |
| Tianjin Heer Technology Co., Ltd. | PRC |
| Chengdu Biyou Technology Co., Ltd. | PRC |
| Momo Pictures Co., Ltd. | PRC |
| Hainan Momo Pictures Co., Ltd. | PRC |
| Zhejiang Shengdian Digital Network Technology Co., Ltd. | PRC |
| Beijing Santi Cloud Union Technology Co., Ltd. | PRC |
| Beijing Santi Cloud Time Technology Co., Ltd. | PRC |
| Loudi Momo Technology Co., Ltd. | PRC |
| Ningbo Hongyi Equity Investment L.P. | PRC |
| Changsha Heer Technology Co., Ltd. | PRC |
| Hainan Heer Network Technology Co., Ltd. | PRC |

**Exhibit 12.1**

**Certification by the Principal Executive Officer**
**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Yan Tang, certify that:

1.    I have reviewed this annual report on Form 20-F of Momo Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4.    The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5.    The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date: April 26, 2019

By:      /s/ Yan Tang
Name:   Yan Tang
Title:    Chairman and Chief Executive Officer

**Exhibit 12.2**

**Certification by the Principal Financial Officer**
**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I,   Jonathan Xiaosong Zhang, certify that:

1.   I have reviewed this annual report on Form 20-F of Momo Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4.   The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

(a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)   Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)   Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5.   The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

(a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date: April 26, 2019

By:      /s/ Jonathan Xiaosong Zhang
Name:   Jonathan Xiaosong Zhang
Title:    Chief Financial Officer

**Exhibit 13.1**

**Certification by the Principal Executive Officer**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of Momo Inc. (the "Company") on Form 20-F for the year ended December 31, 2018 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Yan Tang, Chairman and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: April 26, 2019


By:    /s/ Yan Tang
Name:    Yan Tang
Title:    Chairman and Chief Executive Officer

**Exhibit 13.2**

**Certification by the Principal Financial Officer**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of Momo Inc. (the "Company") on Form 20-F for the year ended December 31, 2018 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Jonathan Xiaosong Zhang, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: April 26, 2019

By:      /s/ Jonathan Xiaosong Zhang
Name:    Jonathan Xiaosong Zhang
Title:    Chief Financial Officer

**Exhibit 15.1**

[Maples and Calder (Hong Kong) LLP Letterhead]

**Our ref:**   DKP/692329-000001/14278725v1
**Direct**      +852 3690 7523
**Email**      devika.parchment@maples.com

Momo Inc.
20th Floor, Block B, Tower 2
Wangjing SOHO
No.1 Futongdong Street
Chaoyang District
Beijing 100102
People's Republic of China

26 April 2019

Dear Sirs

**Momo Inc.**

We have acted as legal advisers as to the laws of the Cayman Islands to Momo Inc., an exempted company incorporated with limited liability in the Cayman Islands (the "**Company**"), in connection with the filing by the Company with the United States Securities and Exchange Commission (the "**SEC**") of an Annual Report on Form 20-F for the year ended 31 December 2018 (the "**Annual Report**"), which will be filed with the SEC in the month of April 2019.

We consent to the reference to our firm under the heading "Item 16G. Corporate Governance" in the Annual Report and further consent to the incorporation by reference into the registration statement on Form S-8 (File No. 333-201769) dated January 30, 2015, pertaining to the Company's Amended and Restated 2012 Share Incentive Plan and 2014 Share Incentive Plan, the registration statement on Form S-8 (File No. 333-215366) dated December 30, 2016, pertaining to the Company's 2014 Share Incentive Plan, and the registration statement on Form S-8 (File No. 333-229226) dated January 14, 2019, pertaining to the Company's 2014 Share Incentive Plan, of the summary of our opinion under the heading "Item 16G. Corporate Governance" in the Annual Report. We also consent to the filing with the SEC of this consent letter as an exhibit to the Annual Report.

In giving such consent, we do not thereby admit that we come within the category of persons whose consent is required under Section 7 of the Securities Act of 1933, or under the Securities Exchange Act of 1934, in each case, as amended, or the regulations promulgated thereunder.

Yours faithfully,

/s/ Maples and Calder (Hong Kong) LLP

**Exhibit 15.2**

April 26, 2019

Momo Inc. (the "Company")
20th Floor, Block B
Tower 2, Wangjing SOHO
No.1 Futongdong Street
Chaoyang District, Beijing 100102
People's Republic of China

Ladies and Gentlemen:

We have acted as legal advisors as to the laws of the People's Republic of China to the Company in connection with the filing by the Company with the United States Securities and Exchange Commission of an annual report on Form 20-F for the fiscal year ended December 31, 2018 and any amendments thereto (the "Annual Report"). We hereby consent to the use and reference to our name and our opinions and views in the Annual Report, and further consent to the incorporation by reference of the summaries of our opinions in the Annual Report into the Company's registration statement on Form S-8 (File No. 333-201769) dated January 30, 2015, pertaining to the Company's Amended and Stated 2012 Share Incentive Plan and 2014 Share Incentive Plan, the registration statement on Form S-8 (File No. 333-215366) dated December 30, 2016, pertaining to the Company's 2014 Share Incentive Plan, and the registration statement on Form S-8 (File No. 333-229226) dated January 14, 2019, pertaining to the Company's 2014 Share Incentive Plan.

We further consent to the filing of this letter as an exhibit to the Annual Report.

Sincerely yours,

/s/ Han Kun Law Offices

Han Kun Law Offices

**Exhibit 15.3**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in Registration Statements No. 333-201769, No. 333-215366 and No. 333-229226 on Forms S-8 of our reports dated April 26, 2019, relating to the financial statements of Momo Inc. (the "Company"), its subsidiaries, its variable interest entities ("VIEs"), and its VIEs' subsidiaries (which report expresses an unqualified opinion and includes explanatory paragraphs regarding the change of reporting currency from U.S. dollars to Renminbi and the translation of Renminbi amounts to U.S. dollar amounts for the convenience of the readers in the United States of America) and the effectiveness of the Company's internal control over financial reporting, appearing in this Annual Report on Form 20-F of Momo Inc. for the year ended December 31, 2018.

/s/ Deloitte Touche Tohmatsu Certified Public Accountants LLP

Beijing, the People's Republic of China
April 26, 2019

| Document and Entity Information | 12 Months Ended Dec. 31, 2018 shares |
|---|---|
| **Document Information [Line Items]** | |
| Document Type | 20-F |
| Amendment Flag | false |
| Document Period End Date | Dec. 31, 2018 |
| Document Fiscal Year Focus | 2018 |
| Document Fiscal Period Focus | FY |
| Trading Symbol | MOMO |
| Entity Registrant Name | Momo Inc. |
| Entity Central Index Key | 0001610601 |
| Current Fiscal Year End Date | --12-31 |
| Entity Well-known Seasoned Issuer | Yes |
| Entity Current Reporting Status | Yes |
| Entity Voluntary Filers | No |
| Entity Filer Category | Large Accelerated Filer |
| Entity Emerging Growth Company | false |
| Entity Shell Company | false |
| Class A Common Stock [Member] | |
| **Document Information [Line Items]** | |
| Entity Common Stock, Shares Outstanding | 333,512,014 |
| Class B Common Stock [Member] | |
| **Document Information [Line Items]** | |
| Entity Common Stock, Shares Outstanding | 80,364,466 |

| Consolidated Balance Sheets ¥ in Thousands, $ in Thousands | Dec. 31, 2018 CNY (¥) | Dec. 31, 2018 USD ($) | Dec. 31, 2017 CNY (¥) |
|---|---|---|---|
| **Current assets** | | | |
| Cash and cash equivalents | ¥ 2,468,034 | $ 358,961 | ¥ 4,462,194 |
| Term deposits | 8,824,610 | 1,283,486 | 2,432,016 |
| Accounts receivable, net of allowance for doubtful accounts of RMB585 and RMB nil as of December 31, 2017 and 2018, respectively | 719,606 | 104,662 | 257,633 |
| Amount due from related parties | | | 33,460 |
| Prepaid expenses and other current assets | 620,979 | 90,318 | 538,182 |
| Short-term investment | | | 10,500 |
| Total current assets | 12,633,229 | 1,837,427 | 7,733,985 |
| Property and equipment, net | 387,532 | 56,364 | 258,704 |
| Intangible assets | 1,036,986 | 150,823 | 48,553 |
| Rental deposits | 24,192 | 3,519 | 17,249 |
| Long-term investments | 447,465 | 65,081 | 288,471 |
| Other non-current assets | 71,519 | 10,402 | 55,271 |
| Deferred tax assets | 57,786 | 8,405 | 46,825 |
| Goodwill | 4,306,829 | 626,402 | 22,130 |
| Total assets | 18,965,538 | 2,758,423 | 8,471,188 |
| **Current liabilities** | | | |
| Accounts payable (including accounts payable of the consolidated VIEs without recourse to the Company of RMB357,437 and RMB 549,173 as of December 31, 2017 and 2018, respectively) | 718,362 | 104,481 | 484,945 |
| Deferred revenue (including deferred revenue of the consolidated VIEs without recourse to the Company of RMB421,528 and RMB 441,392 as of December 31, 2017 and 2018, respectively) | 441,892 | 64,271 | 422,028 |
| Accrued expenses and other current liabilities (including accrued expenses and other current liabilities of the consolidated VIEs without recourse to the Company of RMB200,406 and RMB 304,363 as of December 31, 2017 and 2018, respectively) | 846,710 | 123,148 | 571,333 |
| Amount due to related parties (including amount due to related parties of the consolidated VIEs without recourse to the Company of RMB188 and RMB 43,213 as of December 31, 2017 and 2018, respectively) | 82,948 | 12,064 | 37,760 |
| Income tax payable (including income tax payable of the consolidated VIEs without recourse to the Company of RMB76,549 and RMB 113,733 as of December 31, 2017 and 2018, respectively) | 137,090 | 19,939 | 175,887 |
| Deferred consideration in connection with business acquisitions (including deferred consideration in connection with business acquisitions of the consolidated VIEs without recourse to the Company of RMB nil and RMB nil as of December 31, 2017 and 2018, respectively) | 469,274 | 68,253 | |
| Total current liabilities | 2,696,276 | 392,156 | 1,691,953 |
| Deferred tax liabilities | 259,247 | 37,706 | 12,138 |
| Other non-current liabilities | 110,040 | 16,005 | 14,997 |
| Total liabilities | 7,942,679 | 1,155,214 | 1,719,088 |
| Commitments and contingencies (Note 16) | | | |
| **Equity** | | | |
| Treasury stock | (402,267) | (58,507) | (402,267) |

| | | | |
|---|---|---|---|
| Additional paid-in capital | 5,657,838 | 822,898 | 4,472,666 |
| Retained earnings | 5,361,154 | 779,749 | 2,545,379 |
| Accumulated other comprehensive income | 313,564 | 45,606 | 117,525 |
| Noncontrolling interest | 92,300 | 13,424 | 18,537 |
| Total equity | 11,022,859 | 1,603,209 | 6,752,100 |
| Total liabilities and equity | 18,965,538 | 2,758,423 | 8,471,188 |
| Senior Notes [Member] | | | |
| **Current liabilities** | | | |
| Convertible senior notes | 4,877,116 | 709,347 | |
| Class A Common Stock [Member] | | | |
| **Equity** | | | |
| Ordinary shares, value | 219 | 32 | 206 |
| Class B Common Stock [Member] | | | |
| **Equity** | | | |
| Ordinary shares, value | ¥ 51 | $ 7 | ¥ 54 |

| Consolidated Balance Sheets (Parenthetical) ¥ in Thousands, $ in Thousands | Dec. 31, 2018 CNY (¥) ¥ / shares shares | Dec. 31, 2018 USD ($) $ / shares shares | Dec. 31, 2017 CNY (¥) ¥ / shares shares |
|---|---|---|---|
| Allowance for doubtful accounts | ¥ 0 | | ¥ 585 |
| Accounts payable of consolidated VIE without recourse | 718,362 | $ 104,481 | 484,945 |
| Deferred revenue of consolidated VIE without recourse | 441,892 | 64,271 | 422,028 |
| Accrued expenses and other current liabilities of consolidated VIE without recourse | 846,710 | 123,148 | 571,333 |
| Amount due to related parties of the consolidated VIE without recourse the Company | 82,948 | 12,064 | 37,760 |
| Income tax payable of the consolidated VIE without recourse | 137,090 | 19,939 | 175,887 |
| Deferred consideration in connection with business acquisitions of the consolidated VIEs without recourse | 469,274 | $ 68,253 | |
| Beijing Momo Technology Co., Ltd. [Member] | | | |
| Allowance for doubtful accounts | 0 | | 585 |
| Accounts payable of consolidated VIE without recourse | 549,173 | | 357,437 |
| Deferred revenue of consolidated VIE without recourse | 441,392 | | 421,528 |
| Accrued expenses and other current liabilities of consolidated VIE without recourse | 304,363 | | 200,406 |
| Amount due to related parties of the consolidated VIE without recourse the Company | 43,213 | | 188 |
| Income tax payable of the consolidated VIE without recourse | 113,733 | | 76,549 |
| Deferred consideration in connection with business acquisitions of the consolidated VIEs without recourse | ¥ 0 | | ¥ 0 |
| Class A Common Stock [Member] | | | |
| Ordinary shares, par value | (per share) | ¥ 0.0001 | $ 0.0001 | ¥ 0.0001 |
| Ordinary shares, shares authorized | shares | 800,000,000 | 800,000,000 | 800,000,000 |
| Ordinary shares, shares issued | shares | 333,512,014 | 333,512,014 | 314,060,843 |
| Ordinary shares, shares outstanding | shares | 333,512,014 | 333,512,014 | 314,060,843 |
| Class B Common Stock [Member] | | | |
| Ordinary shares, par value | (per share) | ¥ 0.0001 | $ 0.0001 | ¥ 0.0001 |
| Ordinary shares, shares authorized | shares | 100,000,000 | 100,000,000 | 100,000,000 |
| Ordinary shares, shares issued | shares | 80,364,466 | 80,364,466 | 84,364,466 |
| Ordinary shares, shares outstanding | shares | 80,364,466 | 80,364,466 | 84,364,466 |

| Consolidated Statements of Operations ¥ in Thousands, $ in Thousands | 12 Months Ended | | | |
|---|---|---|---|---|
| | Dec. 31, 2018 CNY (¥) ¥ / shares shares | Dec. 31, 2018 USD ($) $ / shares shares | Dec. 31, 2017 CNY (¥) ¥ / shares shares | Dec. 31, 2016 CNY (¥) ¥ / shares shares |
| **Income Statement [Abstract]** | | | | |
| Net revenues | ¥ 13,408,421 | $ 1,950,174 | ¥ 8,886,390 | ¥ 3,707,358 |
| **Cost and expenses:** | | | | |
| Cost of revenues (including share-based compensation of RMB18,521, RMB13,547 and RMB 21,661 in 2016, 2017 and 2018, respectively) | (7,182,897) | (1,044,709) | (4,373,377) | (1,619,327) |
| Research and development (including share-based compensation of RMB37,455, RMB59,190 and RMB 152,806 in 2016, 2017 and 2018, respectively) | (760,644) | (110,631) | (346,144) | (208,647) |
| Sales and marketing (including share-based compensation of RMB39,139, RMB79,032 and RMB 142,927 in 2016, 2017 and 2018, respectively) | (1,812,262) | (263,583) | (1,467,376) | (647,238) |
| General and administrative (including share-based compensation of RMB115,724, RMB183,204 and RMB 263,419 in 2016, 2017 and 2018, respectively) | (640,023) | (93,087) | (422,005) | (259,712) |
| Total cost and expenses | (10,395,826) | (1,512,010) | (6,608,902) | (2,734,924) |
| Other operating income | 253,697 | 36,899 | 156,764 | 2,659 |
| Income (loss) from operations | 3,266,292 | 475,063 | 2,434,252 | 975,093 |
| Interest income | 272,946 | 39,698 | 145,568 | 54,603 |
| Interest expense | (56,503) | (8,218) | | |
| Impairment loss on long-term investments | (43,200) | (6,283) | (30,085) | (39,283) |
| Income before income tax and share of income on equity method investments | 3,439,535 | 500,260 | 2,549,735 | 990,413 |
| Income tax expense | (699,648) | (101,760) | (445,001) | (34,638) |
| Income before share of income on equity method investments | 2,739,887 | 398,500 | 2,104,734 | 955,775 |
| Share of income on equity method investments | 48,660 | 7,077 | 39,729 | 23,194 |
| Net income | 2,788,547 | 405,577 | 2,144,463 | 978,969 |
| Less: net loss attributable to non-controlling interest | (27,228) | (3,960) | (3,635) | |
| Net income attributable to Momo Inc. | 2,815,775 | 409,537 | 2,148,098 | 978,969 |
| Net income attributable to ordinary shareholders | ¥ 2,815,775 | $ 409,537 | ¥ 2,148,098 | ¥ 978,969 |
| **Net income per share attributable to ordinary shareholders** | | | | |
| Basic | (per share) | ¥ 6.92 | $ 1.01 | ¥ 5.44 | ¥ 2.54 |
| Diluted | (per share) | ¥ 6.59 | $ 0.96 | ¥ 5.17 | ¥ 2.41 |
| **Weighted average shares used in calculating net income per ordinary share** | | | | |
| Basic | 407,009,875 | 407,009,875 | 394,549,323 | 377,335,923 |
| Diluted | 433,083,643 [1] | 433,083,643 [1] | 415,265,078 | 407,041,165 |

[1] The calculation of the weighted average number of ordinary shares for the purpose of diluted net income per share has considered the effect of certain potentially dilutive securities. For the year ended December 31, 2016, an incremental weighted average number of 7,155,060 nonvested restricted shares and an incremental weighted average number of

22,550,182 ordinary shares from the assumed exercise of share options and vesting of restricted share units using the treasury stock method were included.

| Consolidated Statements of Operations (Parenthetical) ¥ in Thousands, $ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2018 CNY (¥) | Dec. 31, 2017 CNY (¥) | Dec. 31, 2016 CNY (¥) |
| Share-based compensation | ¥ 580,813 | ¥ 334,973 | ¥ 210,839 |
| Cost Of Revenues [Member] | | | |
| Share-based compensation | 21,661 | 13,547 | 18,521 |
| Research And Development [Member] | | | |
| Share-based compensation | 152,806 | 59,190 | 37,455 |
| Sales And Marketing [Member] | | | |
| Share-based compensation | 142,927 | 79,032 | 39,139 |
| General And Administrative [Member] | | | |
| Share-based compensation | ¥ 263,419 | ¥ 183,204 | ¥ 115,724 |

| Consolidated Statements of Comprehensive Income ¥ in Thousands, $ in Thousands | 12 Months Ended | | | |
|---|---|---|---|---|
| | Dec. 31, 2018 CNY (¥) | Dec. 31, 2018 USD ($) | Dec. 31, 2017 CNY (¥) | Dec. 31, 2016 CNY (¥) |
| **Statement of Comprehensive Income [Abstract]** | | | | |
| Net Income | ¥ 2,788,547 | $ 405,577 | ¥ 2,144,463 | ¥ 978,969 |
| **Other comprehensive (loss) income, net of tax:** | | | | |
| Foreign currency translation adjustment | 198,654 | 28,893 | (155,368) | 175,963 |
| Comprehensive income | 2,987,201 | 434,470 | 1,989,095 | 1,154,932 |
| Less: comprehensive loss attributed to the non-controlling interest | (24,613) | (3,580) | (3,635) | |
| Comprehensive income attributable to Momo Inc. | ¥ 3,011,814 | $ 438,050 | ¥ 1,992,730 | ¥ 1,154,932 |

| Consolidated Statements of Changes in Equity ¥ in Thousands, $ in Thousands | CNY (¥) shares | USD ($) shares | Tantan Limited [Member] CNY (¥) | Common Stock [Member] CNY (¥) shares | Common Stock [Member] Tantan Limited [Member] CNY (¥) shares | Additional Paid-in Capital [Member] CNY (¥) | Additional Paid-in Capital [Member] Qool Media Hong Kong Limited. [Member] CNY (¥) | Additional Paid-in Capital [Member] Tantan Limited [Member] CNY (¥) | Treasury Stock [Member] CNY (¥) | (Accumulated Deficit)/ Retained Earning [Member] CNY (¥) | Accum Oth Compre Inc [Mem CNY |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance at Dec. 31, 2015 | ¥ 3,034,115 | | | ¥ 250 | | ¥ 3,920,890 | | | ¥ (402,267) | ¥ (581,688) | ¥ 96,930 |
| Balance, Shares at Dec. 31, 2015 \| shares | | | | 383,751,403 | | | | | | | |
| Net Income | 978,969 | | | | | | | | | 978,969 | |
| Share-based compensation | 210,839 | | | | | 210,839 | | | | | |
| Issuance of ordinary shares in connection with exercise of options and vesting of restricted share units | ¥ 2,108 | | | ¥ 4 | | 2,104 | | | | | |
| Issuance of ordinary shares in connection with exercise of options and vesting of restricted share units \| shares | 5,197,032 | 5,197,032 | | 5,197,032 | | | | | | | |
| Foreign currency translation adjustment | ¥ 175,963 | | | | | | | | | | 175,963 |
| Balance at Dec. 31, 2016 | 4,401,994 | | | ¥ 254 | | 4,133,833 | | | (402,267) | 397,281 | 272,893 |
| Balance, Shares at Dec. 31, 2016 \| shares | | | | 388,948,435 | | | | | | | |
| Net Income | 2,144,463 | | | | | | | | | 2,148,098 | |
| Share-based compensation | 334,973 | | | | | 334,973 | | | | | |
| Issuance of ordinary shares in connection with exercise of options and vesting of restricted share units | ¥ 3,866 | | | ¥ 6 | | 3,860 | | | | | |
| Issuance of ordinary shares in connection with exercise of options and vesting of restricted share units \| shares | 9,476,874 | 9,476,874 | | 9,476,874 | | | | | | | |
| Addition in noncontrolling interest of a subsidiary | ¥ 22,172 | | | | | | | | | | |
| Foreign currency translation adjustment | (155,368) | | | | | | | | | | (155,368) |
| Balance at Dec. 31, 2017 | 6,752,100 | | | ¥ 260 | | 4,472,666 | | | (402,267) | 2,545,379 | 117,525 |
| Balance, Shares at Dec. 31, 2017 \| shares | | | | 398,425,309 | | | | | | | |
| Net Income | 2,788,547 | $ 405,577 | | | | | | | | 2,815,775 | |
| Share-based compensation | 494,036 | | | | | 398,493 | | | | | |
| Capital injection from noncontrolling interest shareholder of Ningbo Hongyi Equity Investment L.P. | 22 | | | | | | | | | | |
| Issuance of ordinary shares in connection with exercise of options and vesting of restricted share units | ¥ 5,285 | | | ¥ 7 | | 5,278 | | | | | |
| Issuance of ordinary shares in connection with exercise of options and vesting of restricted share units \| shares | 10,122,318 | 10,122,318 | | 10,122,318 | | | | | | | |
| Transfer of noncontrolling interest of QOOL HK | | | | | | | ¥ (2,811) | | | | |
| Share issued connection with the acquisition of Tantan Limited | ¥ 784,215 | $ 122,350 | ¥ 784,215 | | ¥ 3 | | | ¥ 784,212 | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Share issued connection with the acquisition of Tantan Limited, shares \| shares | | | 5,328,853 | | | | |
| Foreign currency translation adjustment | 198,654 | 28,893 | | | | | 196,039 |
| Balance at Dec. 31, 2018 | ¥ 11,022,859 | $ 1,603,209 | ¥ 270 | ¥ 5,657,838 | ¥ (402,267) | ¥ 5,361,154 | ¥ 313,56 |
| Balance, Shares at Dec. 31, 2018 \| shares | | | 413,876,480 | | | | |

| Consolidated Statements of Cash Flows ¥ in Thousands, $ in Thousands | 12 Months Ended | | | |
|---|---|---|---|---|
| | Dec. 31, 2018 CNY (¥) | Dec. 31, 2018 USD ($) | Dec. 31, 2017 CNY (¥) | Dec. 31, 2016 CNY (¥) |
| **Cash flows from operating activities** | | | | |
| Net Income | ¥ 2,788,547 | $ 405,577 | ¥ 2,144,463 | ¥ 978,969 |
| **Adjustments to reconcile net income to net cash provided by operating activities** | | | | |
| Depreciation of property and equipment | 148,238 | 21,560 | 78,885 | 55,845 |
| Amortization of intangible assets | 93,030 | 13,531 | 4,784 | |
| Share-based compensation | 580,813 | 84,476 | 334,973 | 210,839 |
| Share of income on equity method investments | (48,660) | (7,077) | (39,729) | (23,194) |
| Impairment loss on long-term investments | 43,200 | 6,283 | 30,085 | 39,283 |
| Impairment loss on intangible assets | | | 1,266 | |
| Loss (gain) on disposal of property and equipment | (1,283) | (187) | 112 | 107 |
| Provision (reversal) of allowance for doubtful accounts | (585) | (85) | 585 | |
| **Changes in operating assets and liabilities** | | | | |
| Accounts receivable | (440,644) | (64,089) | (7,725) | (154,000) |
| Prepaid expenses and other current assets | (67,304) | (9,789) | (306,838) | (104,992) |
| Amount due from related parties | 33,463 | 4,867 | (32,846) | 6,998 |
| Deferred tax assets | (10,961) | (1,594) | (44,883) | (1,942) |
| Rental deposits | (3,817) | (555) | (10,902) | (2,022) |
| Other non-current assets | (45,534) | (6,623) | (5,234) | |
| Accounts payable | 233,713 | 33,992 | 174,290 | 213,521 |
| Income tax payable | (38,791) | (5,642) | 152,277 | 26,948 |
| Deferred revenue | (14,249) | (2,072) | 135,443 | 103,432 |
| Accrued expenses and other current liabilities | 51,903 | 7,549 | 292,054 | 103,936 |
| Amount due to related parties | 43,024 | 6,258 | (16,070) | 11,113 |
| Deferred tax liability | (22,923) | (3,334) | (969) | |
| Other non-current liabilities | 6,538 | 951 | 2,086 | 1,449 |
| Net cash provided by operating activities | 3,327,718 | 483,997 | 2,886,107 | 1,466,290 |
| **Cash flows from investing activities** | | | | |
| Purchase of property and equipment | (242,843) | (35,320) | (218,627) | (46,839) |
| Proceeds from disposal of property and equipment | 2,214 | 322 | 59 | 418 |
| Payment for long-term investments | (65,125) | (9,472) | (53,928) | (96,365) |
| Prepayment for long-term investments | (55,000) | (7,999) | (50,000) | (18,000) |
| Payment for acquired intangible assets | | | (18,979) | |
| Payment for business acquisition, net of cash acquired | (3,318,841) | (482,705) | | |
| Purchase of term deposits | (20,287,302) | (2,950,666) | (4,028,058) | (3,378,030) |
| Cash received on maturity of term deposits | 13,922,393 | 2,024,928 | 4,191,859 | 2,737,897 |
| Payment for short-term investments | (457,200) | (66,497) | (15,700) | |
| Cash received from sales of short-term investment | 467,700 | 68,024 | 5,200 | |
| Net cash used in investing activities | (10,034,004) | (1,459,385) | (188,174) | (800,919) |
| **Cash flows from financing activities** | | | | |
| Capital contribution from non-controlling interest shareholder | 12 | 2 | 490 | |
| Deferred payment of purchase of property and equipment | (8,562) | (1,245) | (1,496) | (2,084) |

| | | | | |
|---|---|---|---|---|
| Proceeds from exercise of share options | 5,313 | 773 | 3,839 | 2,208 |
| Proceeds from bank loan | 1,913,190 | 278,262 | | |
| Repayment of bank loan | (2,041,680) | (296,950) | | |
| Proceeds from issuance of convertible notes, net of issuance cost of RMB114,382 | 4,819,678 | 700,993 | | |
| Net cash provided by financing activities | 4,687,951 | 681,835 | 2,833 | 124 |
| Effect of exchange rate changes | 24,175 | 3,515 | (26,840) | 24,990 |
| Net increase (decrease) in cash and cash equivalents | (1,994,160) | (290,038) | 2,673,926 | 690,485 |
| Cash and cash equivalents at the beginning of year | 4,462,194 | 648,999 | 1,788,268 | 1,097,783 |
| Cash and cash equivalents at the end of year | 2,468,034 | 358,961 | 4,462,194 | 1,788,268 |
| **Non-cash investing and financing activities** | | | | |
| Payable for purchase of property and equipment | 49,407 | 7,186 | 47,267 | 4,321 |
| Payable for repurchase of ordinary shares | 44,347 | 6,450 | ¥ 41,966 | ¥ 44,782 |
| Deferred consideration in connection with business acquisition | 469,274 | 68,253 | | |
| Ordinary shares issued for the acquisition of Tantan Limited. | ¥ 784,215 | $ 122,350 | | |

| Consolidated Statements of Cash Flows (Parenthetical) ¥ in Thousands | 12 Months Ended Dec. 31, 2018 CNY (¥) |
|---|---|
| **Statement of Cash Flows [Abstract]** | |
| Issuance cost | ¥ 114,382 |

| Organization and Principal Activities | 12 Months Ended Dec. 31, 2018 |
|---|---|

**Text Block [Abstract]**

Organization and Principal Activities

### 1. ORGANIZATION AND PRINCIPAL ACTIVITIES

Momo Inc. (the "Company") is the holding company for a group of companies, which is incorporated in the British Virgin Islands ("BVI") on November 23, 2011. In July 2014, the Company was redomiciled in the Cayman Islands ("Cayman") as an exempted company registered under the laws of the Cayman Islands, and was renamed Momo Inc. The Company, its subsidiaries, which include the wholly-foreign owned enterprises ("WFOEs"), its consolidated variable interest entities ("VIEs") and VIEs' subsidiaries (collectively the "Group") are principally engaged in providing mobile-based social and entertainment services. The Group started its operation in July 2011. The Group started its monetization in the third quarter of 2013, by offering a platform for live video services, value-added services, mobile marketing services, mobile games and other services.

In May 2018, the Company completed the acquisition of 100% equity stake of Tantan Limited ("Tantan"). Tantan is a leading social and dating app for the younger generation that was founded in 2014. Tantan is designed to help its users find and establish romantic connections as well as meet interesting people. The total consideration consisted of cash consideration of RMB 3,930,246 (US$613,181) and 5,328,853 Class A ordinary shares of the Company. Refer to Note 3 for further details.

As of December 31, 2018, details of the Company's major subsidiaries, VIEs and VIEs' subsidiaries are as follows:

*Major subsidiaries*
Momo Technology HK Company Limited ("Momo HK")
Beijing Momo Information Technology Co., Ltd. ("Beijing Momo IT")
Momo Technology Overseas Holding Company Limited ("Momo BVI")
Momo Information Technologies Corp. ("Momo US")
Qool Media HongKong Limited ("QOOL HK")
Tantan Limited ("Tantan")
Tantan Hong Kong Limited ("Tantan HK")
Tantan Social Inc. ("Tantan US")
Tantan Technology (Beijing) Co., Ltd. ("Tantan Technology")
QOOL Media Inc. ("QOOL Inc.")
QOOL Media Technology (Tianjin) Co., Ltd. ("QOOL Media")
*Major VIEs*
Beijing Momo Technology Co., Ltd. ("Beijing Momo") *
QOOL Media (Tianjin) Co., Ltd. ("QOOL Tianjin") *
Tantan Culture Development (Beijing) Co., Ltd. ("Tantan Culture") *
*Major VIEs' subsidiaries*
Chengdu Momo Technology Co., Ltd. ("Chengdu Momo") *
Tianjin Heer Technology Co., Ltd. ("Tianjin Heer") *
Loudi Momo Technology Co., Ltd. ("Loudi Momo") *

\* These entities are controlled by the Company pursuant to the contractual arrangements disclosed below.

The VIE arrangements

The People's Republic of China ("PRC") regulations currently limit direct foreign ownership of business entities providing value-added telecommunications services, advertising services and internet services in the PRC where certain licenses are required for the provision of such services. The Group provides substantially all of its services in China through certain PRC domestic companies, which hold the operating licenses and approvals to enable the Group to provide such mobile internet content services in the PRC. Specifically, these PRC domestic companies that are material to the Company's business are Beijing Momo, Chengdu Momo, Tianjin Heer, Loudi Momo, QOOL Tianjin and Tantan Culture. The equity interests of these PRC domestic companies are held by PRC citizens or by PRC entities owned and/or controlled by PRC citizens.

The Company obtained control over its VIEs by entering into a series of contractual arrangements with the VIEs and their equity holders (the "Nominee Shareholders"), which enable the Company to (1) have power to direct the activities that most significantly affects the economic performance of the VIEs, and (2) receive the economic benefits of the VIEs that could be significant to the VIEs. Accordingly, the Company is considered the primary beneficiary of VIEs and has consolidated the VIEs' financial results of operations, assets and liabilities in the Company's consolidated financial statements. In making the conclusion that the Company is the primary beneficiary of the VIEs, the

Company's rights under the Power of Attorney also provide the Company's abilities to direct the activities that most significantly impact the VIEs economic performance. The Company also believes that this ability to exercise control ensures that the VIEs will continue to execute and renew the Exclusive Cooperation Agreements and pay service fees to the Company. By charging service fees in whatever amounts the Company deems fit, and by ensuring that the Exclusive Cooperation Agreements is executed and renewed indefinitely, the Company has the rights to receive substantially all of the economic benefits from the VIEs.

Details of the typical structure of the Company's significant VIEs are set forth below:

Agreements that provide the Company effective control over the VIEs:

(1) Power of Attorney

Pursuant to the Power of Attorney, the Nominee Shareholders of the VIEs each irrevocably appointed respective WFOEs as the attorney-in-fact to act on their behalf on all matters pertaining to the VIEs and to exercise all of their rights as a shareholder of the VIEs, including but not limited to convene, attend and vote on their behalf at shareholders' meetings, designate and appoint directors and senior management members. The WFOEs may authorize or assign their rights under this appointment to a person as approved by its board of directors at its sole discretion. Each power of attorney will remain in force until the shareholder ceases to hold any equity interest in the VIEs. The Company believes the Powers of Attorney can demonstrate the power of its WFOEs to direct how the VIEs should conduct their daily operations.

(2) Exclusive Call Option Agreement

Under the Exclusive Call Option Agreement among the WFOEs, the VIEs and their Nominee Shareholders, each of the Nominee Shareholders irrevocably granted the respective WFOE or its designated representative(s) an exclusive option to purchase, to the extent permitted under PRC law, all or part of his, her or its equity interests in the VIEs at the consideration equal to the nominal price or at lowest price as permitted by PRC laws.

The WFOEs or their designated representative(s) have sole discretion as to when to exercise such options, either in part or in full. Without the WFOEs' written consent, the Nominee Shareholders of the VIEs shall not transfer, donate, pledge, or otherwise dispose any equity interests of the VIEs in any way. In addition, any consideration paid by the WFOEs to the Nominee Shareholders of the VIEs in exercising the option shall be transferred back to the respective WFOE or its designated representative(s). This agreement could be terminated when all the shareholders' equity were acquired by the WFOEs or their designated representative(s) subject to the law of People's Republic of China.

In addition, the VIEs irrevocably granted the WFOEs an exclusive and irrevocable option to purchase any or all of the assets owned by the VIEs at the lowest price permitted under PRC law. Without the WFOEs' prior written consent, the VIEs and their Nominee Shareholders will not sell, transfer, mortgage or otherwise dispose of the VIEs' material assets, legal or beneficial interests or revenues of more than certain amount or allow an encumbrance on any interest in the VIEs.

(3) Spousal Consent Letters

Each spouse of the married Nominee Shareholders of the VIEs entered into a Spousal Consent Letter, which unconditionally and irrevocably agreed that the equity interests in the VIEs held by and registered in the name of their spouse will be disposed of pursuant to the Equity Interest Pledge Agreement, the Exclusive Call Option Agreement, and the Power of Attorney. Each spouse agreed not to assert any rights over the equity interests in the VIEs held by their spouse. In addition, in the event that the spouse obtains any equity interests in the VIEs held by their spouse for any reason, they agreed to be bound by the contractual arrangements.

Agreements that transfer economic benefits to the Company:

(1) Exclusive Cooperation Agreements

Each relevant VIEs has entered into an exclusive technology services agreement or an exclusive services agreement with the respective WFOEs, pursuant to which the relevant WFOEs provides exclusive services to the VIEs. In exchange, the VIEs pay a service fee to the WFOEs, the amount of which shall be determined, to the extent permitted by applicable PRC laws as proposed by the WFOEs, resulting in a transfer of substantially all of the profits from the VIEs to the WFOEs.

(2) Equity Interest Pledge Agreement

Under the equity interest pledge agreement among the WFOEs and each of the Nominee Shareholders of the VIEs, the Nominee Shareholders pledged all of their equity interests

in the VIEs to the respective WFOEs to guarantee the VIEs' and their shareholders' payment obligations arising from the Exclusive Cooperation Agreements, Business Operation Agreement and the Exclusive Call Option Agreement, including but not limited to, the payments due to the respective WFOEs for services provided.

If any VIEs or any of their Nominee Shareholders breaches their contractual obligations under the above agreements, the respective WFOEs, as the pledgee, will be entitled to certain rights and entitlements, including receiving priority proceeds from the auction or sale of whole or part of the pledged equity interests of the VIEs in accordance with PRC legal procedures. During the term of the pledge, the shareholders of the VIEs shall cause the VIEs not to distribute any dividends and if they receive any dividends generated by the pledged equity interests, they shall transfer such received amounts to an account designated by the respective parties according to the instruction of the respective WFOEs.

The pledge will remain binding until the VIEs and their Nominee Shareholders have fully performed all their obligations under the Exclusive Cooperation Agreements, Business Operations Agreement and Exclusive Call Option Agreement.

(3) Business Operations Agreement

Under the Business Operations Agreement among the WFOEs, the VIEs and the Nominee Shareholders of the VIEs, without the prior written consent of the WFOEs or their designated representative(s), the VIEs shall not conduct any transaction that may substantially affect the assets, business, operation or interest of the WFOEs. The VIEs and Nominee Shareholders shall also follow the WFOEs' instructions on management of the VIEs' daily operation, finance and employee matters and appoint the nominee(s) designated by the WFOEs as the director(s) and senior management members of the VIEs. In the event that any agreements between the WFOEs and the VIEs terminates, the WFOEs have the sole discretion to determine whether to continue any other agreements with the VIEs. The WFOEs are entitled to any dividends or other interests declared by the VIEs and the shareholders of the VIEs have agreed to promptly transfer such dividends or other interests to the WFOEs. The agreement shall remain effective for 10 years. At the discretion of the WFOEs, this agreement will be renewed on applicable expiration dates, or the WFOEs and the VIEs will enter into another exclusive agreement.

Through these contractual agreements, the Company has the ability to effectively control the VIEs and is also able to receive substantially all the economic benefits of the VIEs.

Risk in relation to the VIE structure

The Company believes that the WFOEs' contractual arrangements with the VIEs are in compliance with PRC law and are legally enforceable. The shareholders of the VIEs are also shareholders of the Company and therefore have no current interest in seeking to act contrary to the contractual arrangements. However, uncertainties in the PRC legal system could limit the Company's ability to enforce these contractual arrangements and if the shareholders of the VIEs were to reduce their interest in the Company, their interests may diverge from that of the Company and that may potentially increase the risk that they would seek to act contrary to the contractual terms, for example by influencing the VIEs not to pay the service fees when required to do so.

However, the Company cannot assure that when conflicts of interest arise, the shareholders will act in the best interests of the Company or that conflicts of interests will be resolved in the Company's favor. Currently, the Company does not have existing arrangements to address potential conflicts of interest the shareholders of the VIEs may encounter in their capacity as the beneficial owners and director of the VIEs on the one hand, and as beneficial owners and directors or officer of the Company, on the other hand. The Company believes the shareholders of the VIEs will not act contrary to any of the contractual arrangements and the Exclusive Call Option Agreement provides the Company with a mechanism to remove the shareholders as the beneficial shareholders of the VIEs should they act to the detriment of the Company. The Company relies on the VIEs' shareholders, as directors and officer of the Company, to fulfill their fiduciary duties and abide by laws of the PRC and the Cayman and act in the best interest of the Company. If the Company cannot resolve any conflicts of interest or disputes between the Company and the VIEs' shareholders, the Company would have to rely on legal proceedings, which could result in disruption of its business, and there is substantial uncertainty as to the outcome of any such legal proceedings.

The Company's ability to control the VIEs also depends on the Power of Attorney. The WFOEs and VIEs have to vote on all matters requiring shareholder approval in the VIEs. As noted above, the Company believes this power of attorney is legally enforceable but may not be as effective as direct equity ownership.

In addition, if the legal structure and contractual arrangements were found to be in violation of any existing PRC laws and regulations, the PRC government could:

- revoke the Group's business and operating licenses;

- require the Group to discontinue or restrict operations;

- restrict the Group's right to collect revenues;

- block the Group's websites;

- require the Group to restructure the operations in such a way as to compel the Group to establish a new enterprise, re-apply for the necessary licenses or relocate our businesses, staff and assets;

- impose additional conditions or requirements with which the Group may not be able to comply; or

- take other regulatory or enforcement actions against the Group that could be harmful to the Group's business.

  The imposition of any of these penalties may result in a material and adverse effect on the Group's ability to conduct the Group's business. In addition, if the imposition of any of these penalties causes the Group to lose the rights to direct the activities of the VIEs or the right to receive their economic benefits, the Group would no longer be able to consolidate the VIEs. The Group does not believe that any penalties imposed or actions taken by the PRC government would result in the liquidation of the Company, WFOEs, or the VIEs.

The following consolidated financial statements amounts and balances of the VIEs were included in the accompanying consolidated financial statements after the elimination of intercompany balances and transactions as of and for the years ended December 31:

| | As of December 31, | |
| --- | --- | --- |
| | 2017 | 2018 |
| | RMB | RMB |
| Cash and cash equivalents | 410,611 | 1,502,395 |
| Accounts receivable, net of allowance for doubtful accounts of RMB585 and RMB nil as of December 31, 2017 and 2018, respectively | 257,633 | 719,606 |
| Amount due from related parties | 33,460 | — |
| Prepaid expenses and other current assets | 371,220 | 425,974 |
| Short-term investment | 10,500 | — |
| Total current assets | 1,083,424 | 2,647,975 |
| Property and equipment, net | 52,568 | 72,539 |
| Intangible assets | 48,554 | 42,821 |
| Rental deposits | 10,471 | 11,619 |
| Other non-current assets | 50,000 | 67,480 |
| Long-term investments | 281,935 | 447,465 |
| Deferred tax assets | 6,908 | 52,887 |
| Goodwill | 22,130 | 22,130 |
| Total assets | 1,555,990 | 3,364,916 |
| Accounts payable | 357,437 | 549,173 |
| Deferred revenue | 421,528 | 441,392 |
| Accrued expenses and other current liabilities | 200,406 | 304,363 |
| Amounts due to related parties | 188 | 43,213 |
| Income tax payable | 76,549 | 113,733 |
| Total current liabilities | 1,056,108 | 1,451,874 |
| Deferred tax liabilities | 12,138 | 10,705 |
| Total liabilities | 1,068,246 | 1,462,579 |

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2017 | 2018 |
| | RMB | RMB | RMB |
| Net revenues | 3,707,358 | 8,886,390 | 13,408,421 |
| Net income | 2,268,098 | 4,890,438 | 6,292,183 |
| Net cash provided by operating activities | 2,401,340 | 4,997,183 | 5,913,709 |
| Net cash used in investing activities | (73,224) | (174,333) | (151,546) |
| Net cash provided by financing activities | — | 490 | — |

The unrecognized revenue-producing assets that are held by the VIEs are primarily self-developed intangible assets such as domain names, trademark and various licenses which are un-recognized at the consolidated balance sheets.

The VIEs contributed an aggregate of 100% of the consolidated net revenues for each of the years ended December 31, 2016, 2017 and 2018, respectively. As of the fiscal years ended December 31, 2017 and 2018, the VIEs accounted for an aggregate of 18.4% and 17.7%, respectively, of the consolidated total assets, and 62.1% and 18.4%, respectively, of the consolidated total liabilities.

The assets that were not associated with the VIEs primarily consist of cash and cash equivalents, term deposits, intangible assets and goodwill.

There are no consolidated VIEs' assets that are collateral for the VIEs' obligations and can only be used to settle the VIEs' obligations. There are no creditors (or beneficial interest holders) of the VIEs that have recourse to the general credit of the Company or any of its consolidated subsidiaries. There are no terms in any arrangements, considering both explicit arrangements and implicit variable interests that require the Company or its subsidiaries to provide financial support to the VIEs. However, if the VIEs ever need financial support, the Company or its subsidiaries may, at its option and subject to statutory limits and restrictions, provide financial support to its VIEs through loans to the shareholders of the VIEs or entrustment loans to the VIEs. Relevant PRC laws and regulations restrict the VIEs from transferring a portion of their net assets, equivalent to the balance of their statutory reserve and their share capital, to the Company in the form of loans and advances or cash dividends. Please refer to Note 20 for disclosure of restricted net assets. The Group may lose the ability to use and enjoy assets held by the VIEs that are important to the operation of business if the VIEs declare bankruptcy or become subject to a dissolution or liquidation proceeding.

| Significant Accounting Policies | 12 Months Ended Dec. 31, 2018 |
|---|---|

**Accounting Policies [Abstract]**

Significant Accounting Policies

2. **SIGNIFICANT ACCOUNTING POLICIES**

Basis of presentation

The consolidated financial statements of the Group have been prepared in accordance with the accounting principles generally accepted in the United States of America ("U.S. GAAP").

Basis of consolidation

The consolidated financial statements of the Group include the financial statements of Momo Inc., its subsidiaries, its VIEs and VIEs' subsidiaries. All inter-company transactions and balances have been eliminated upon consolidation.

Use of estimates

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and revenues, cost and expenses in the financial statements and accompanying notes. Significant accounting estimates reflected in the Group's consolidated financial statements include revenue recognition, the acquisition's purchase price allocation, the useful lives and impairment of property and equipment and intangible assets, the impairment of goodwill, the valuation allowance for deferred tax assets, and share-based compensation.

Cash and cash equivalents

Cash and cash equivalents consist of cash on hand and highly liquid investments, which are unrestricted from withdrawal or use, or which have original maturities of three months or less when purchased.

Term deposits

Term deposits consist of bank deposits with an original maturity of over three months.

Accounts receivable

Accounts receivable primarily represents the cash due from third-party application stores and other payment channels and advertising customers, net of allowance for doubtful accounts. The Group makes estimates for the allowance for doubtful accounts based upon its assessment of various factors, including the age of accounts receivable balances, credit quality of third-party application stores and other payment channels, advertising customers and other customers, current economic conditions and other factors that may affect their ability to pay. An allowance for doubtful accounts is recorded in the period in which a loss is determined to be probable.

Financial instruments

Financial instruments of the Group primarily consist of cash and cash equivalents, term deposits, accounts receivable, equity securities without readily determinable fair value, accounts payable, deferred revenue, income tax payable, amount due from related parties and amount due to related parties.

Cash and cash equivalents are recorded at fair value based on the quoted market price in an active market. The carrying values of term deposits, accounts receivable, accounts payable, deferred revenue, income tax payable, amount due from related parties and amount due to related parties approximate their fair values due to short-term maturities. It is not practical to estimate the fair value of the Group's equity securities without readily determinable fair value because of the lack of quoted market price and the inability to estimate fair value without incurring excessive costs.

Foreign currency risk

The Renminbi ("RMB") is not a freely convertible currency. The State Administration for Foreign Exchange, under the authority of the People's Bank of China, controls the conversion of RMB into foreign currencies. The value of the RMB is subject to changes in central government policies and to international economic and political developments affecting supply and demand in the China Foreign Exchange Trading System market. Cash and cash equivalents of the Group included aggregate amounts of RMB4,116 million and RMB2,008 million as of December 31, 2017 and 2018, respectively, which were denominated in RMB.

Concentration of credit risk

Financial instruments that potentially expose the Group to concentration of credit risk consist primarily of cash and cash equivalents, term deposits and accounts receivable. The Group places

their cash with financial institutions with high-credit ratings and quality.

Third-party application stores and other payment channels accounting for 10% or more of accounts receivables are as follows:

|  | As of December 31, | |
|  | 2017 | 2018 |
|---|---|---|
| A | 23% | 14% |
| B | 19% | 12% |
| C | 21% | 0% |

Users or customers accounting for 10% or more of accounts receivables is as follows:

|  | As of December 31, | |
|  | 2017 | 2018 |
|---|---|---|
| D | 0% | 59% |

Concentration of revenue

No user or customer accounted for 10% or more of net revenues for the years ended December 31, 2016, 2017 and 2018, respectively.

Business combinations

Business combinations are recorded using the acquisition method of accounting in accordance with Accounting Standards Codification ("ASC") 805 "Business Combinations". The cost of an acquisition is measured as the aggregate of the acquisition date fair value of the assets transferred to the sellers and liabilities incurred by the Company and equity instruments issued. Identifiable assets and liabilities acquired or assumed are measured separately at their fair values as of the acquisition date, irrespective of the extent of any noncontrolling interests. The purchase price of business acquisition is allocated to the tangible assets, liabilities, identifiable intangible assets acquired and non-controlling interest, if any, based on their estimated fair values as of the acquisition date. The excess of the purchase price over those fair values is recorded as goodwill. Acquisition-related expenses and restructuring costs are expensed as incurred.

The Company adopted Accounting Standard Update ("ASU") 2017-01 "Business Combination (Topic 805): Clarifying the Definition of a Business" on January 1, 2018 and applied the new definition of a business prospectively for acquisitions made subsequent to December 31, 2017. Upon the adoption of ASU 2017-01, a new screen test is introduced to evaluate whether a transaction should be accounted for as an acquisition and/or disposal of a business versus assets. In order for a purchase to be considered an acquisition of a business, and receive business combination accounting treatment, the set of transferred assets and activities must include, at a minimum, an input and a substantive process that together significantly contribute to the ability to create outputs. If substantially all of the fair value of the gross assets acquired is concentrated in a single identifiable asset or a group of similar identifiable assets, then the set of transferred assets and activities is not a business. The adoption of this standard requires future purchases to be evaluated under the new framework.

Equity securities without readily determinable fair value

The Company adopted ASC Topic 321, Investments—Equity Securities ("ASC 321") on January 1, 2018. Prior to 2018, the Company carried at cost its investments in investees that do not have readily determinable fair value and over which the Company does not have significant influence, in accordance with ASC Subtopic 325-20, Investments-Other: Cost Method Investments. Management regularly evaluates the impairment of the cost method investments based on the performance and financial position of the investee as well as other evidence of market value. Such evaluation includes, but is not limited to, reviewing the investee's cash position, recent financing, projected and historical financial performance. An impairment loss is recognized in earnings equal to the excess of the investment's cost over its fair value at the balance sheet date of the reporting period for which the assessment is made. The fair value would then become the new cost basis of the investment.

Subsequent to the Company's adoption of ASC 321 for equity securities without readily determinable fair value that do not qualify for the existing practical expedient available in ASC Topic 820, *Fair Value Measurements and Disclosures* ("ASC 820"), the Company elected to use the measurement alternative to measure those investments at cost, less any impairment, plus or minus changes resulting from observable price changes in orderly transactions for identical or similar investments of the same issuer, if any.

Pursuant to ASC 321, for those equity securities that the Company elects to use the measurement alternative, the Company makes a qualitative assessment of whether the investment is impaired at each reporting date. If a qualitative assessment indicates that the investment is impaired, the

Company has to estimate the investment's fair value in accordance with the principles of ASC 820. If the fair value is less than the investment's carrying value, the Company recognizes an impairment loss in net income equal to the difference between the carrying value and fair value.

Equity method investments

The investee companies over which the Group has the ability to exercise significant influence, but does not have a controlling interest are accounted for using the equity method. Significant influence is generally considered to exist when the Group has an ownership interest in the voting stock of the investee between 20% and 50%. Other factors, such as representation in the investee's Board of Directors, voting rights and the impact of commercial arrangements, are also considered in determining whether the equity method of accounting is appropriate. For the investment in limited partnerships, where the Group holds less than a 20% equity or voting interest, the Group's influence over the partnership operating and financial policies is determined to be more than minor. Accordingly, the Group accounts for these investments as equity method investments.

Under the equity method of accounting, the affiliated company's accounts are not reflected within the Group's consolidated balance sheets and statements of operations; however, the Group's share of the earnings or losses of the affiliated company is reflected in the caption "share of income on equity method investments" in the consolidated statements of operations.

An impairment change is recorded if the carrying amount of the investment exceeds its fair value and this condition is determined to be other-than-temporary.

The Group estimates the fair value of the investee company based on comparable quoted price for similar investment in active market, if applicable, or discounted cash flow approach which requires significant judgments, including the estimation of future cash flows, which is dependent on internal forecasts, the estimation of long term growth rate of a company's business, the estimation of the useful life over which cash flows will occur, and the determination of the weighted average cost of capital.

Available-for-sale investments

For investments in investees' stocks which are determined to be debt securities, the Group accounts for them as long-term available-for-sale investments when they are not classified as either trading or held-to-maturityinvestments.

Available-for-sale investments are reported at fair value, with unrealized gains and losses recorded in accumulated other comprehensive income (loss) as a component of shareholders' equity. Realized gains and losses and provision for decline in value judged to be other than temporary, if any, are recognized in the consolidated statements of operations.

The Group continually reviews its available-for-sale investments to determine whether a decline in fair value below the carrying value is other than temporary. The primary factors the Group considers in its determination are the length of time that the fair value of the investment is below the Group's carrying value; the financial condition, operating performance and the prospects of the available-for-sale investee; and other specific information such as recent financing rounds. If the decline in fair value is deemed to be other than temporary, the carrying value of the available-for-sale investee is written down to fair value. The Group estimated the fair value of these investee companies based on discounted cash flow approach which requires significant judgments, including the estimation of future cash flows, which is dependent on internal forecasts, the estimation of long term growth rate of a company's business, the estimation of the useful life over which cash flows will occur, and the determination of the weighted average cost of capital.

Property and equipment, net

Property and equipment are stated at cost less accumulated depreciation. Depreciation is calculated on a straight-line basis over the following estimated useful lives:

| | |
|---|---|
| Office equipment | 3-5 years |
| Computer equipment | 3 years |
| Vehicles | 5 years |
| Leasehold improvement | Shorter of the lease term or estimated useful lives |

Intangible assets

Intangible assets acquired through business acquisitions are recognized as assets separate from goodwill if they satisfy either the "contractual-legal" or "separability" criterion. Purchased intangible assets and intangible assets arising from acquisitions are recognized and measured at fair value upon acquisition. Separately identifiable intangible assets that have determinable lives continue to be amortized over their estimated useful lives using the straight-line method as follows:

| | |
|---|---|
| Copyright | 1 year |
| License | 3.2-10 years |
| Technology | 3 years |
| User base | 5 years |
| Trade name | 10 years |

<u>Impairment of long-lived assets with finite lives</u>

The Group reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may no longer be recoverable. When these events occur, the Group measures impairment by comparing the carrying value of the long-lived assets to the estimated undiscounted future cash flows expected to result from the use of the assets and their eventual disposition. If the sum of the expected undiscounted cash flow is less than the carrying amount of the assets, the Group recognizes an impairment loss based on the fair value of the assets.

<u>Goodwill</u>

Goodwill represents the excess of the purchase consideration over the fair value of the identifiable tangible and intangible assets acquired and liabilities assumed of the acquired entity as a result of the Company's acquisitions of interests in its subsidiaries. Goodwill is not amortized but is tested for impairment on an annual basis, or more frequently if events or changes in circumstances indicate that it might be impaired. The Company has an option to first assess qualitative factors to determine whether it is necessary to perform the two-step quantitative goodwill impairment test. In the qualitative assessment, the Company considers primary factors such as industry and market considerations, overall financial performance of the reporting unit, and other specific information related to the operations. Based on the qualitative assessment, if it is more likely than not that the fair value of each reporting unit is less than the carrying amount, the quantitative impairment test is performed.

In performing the two-step quantitative impairment test, the first step compares the fair values of each reporting unit to its carrying amount, including goodwill. If the fair value of each reporting unit exceeds its carrying amount, goodwill is not considered to be impaired and the second step will not be required. If the carrying amount of a reporting unit exceeds its fair value, the second step compares the implied fair value of goodwill to the carrying value of a reporting unit's goodwill. The implied fair value of goodwill is determined in a manner similar to accounting for a business combination with the allocation of the assessed fair value determined in the first step to the assets and liabilities of the reporting unit. The excess of the fair value of the reporting unit over the amounts assigned to the assets and liabilities is the implied fair value of goodwill. This allocation process is only performed for the purposes of evaluating goodwill impairment and does not result in an entry to adjust the value of any assets or liabilities. Application of a goodwill impairment test requires significant management judgment, including the identification of reporting units, assigning assets, liabilities and goodwill to reporting units, and determining the fair value of each reporting unit.

<u>Convertible senior notes</u>

The Group determines the appropriate accounting treatment of its convertible senior notes in accordance with the terms in relation to the conversion feature, call and put options, and beneficial conversion feature. After considering the impact of such features, the Group may account for such instrument as a liability in its entirety, or separate the instrument into debt and equity components following the respective guidance described under ASC 815 "Derivatives and Hedging" and ASC 470 "Debt". The debt discount, if any, together with the related issuance cost are subsequently amortized as interest expense, using the effective interest method, from the issuance date to the earliest maturity date. Interest expenses are recognized in the consolidated statement of operation in the period in which they are incurred.

<u>Fair value</u>

Fair value is the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. When determining the fair value measurements for assets and liabilities required or permitted to be recorded at fair value, the Group considers the principal or most advantageous market in which it would transact and it considers assumptions that market participants would use when pricing the asset or liability.

Authoritative literature provides a fair value hierarchy that requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value. An asset or liability categorization within the fair value hierarchy is based upon the lowest level of input that is significant to the fair value measurement as follows:

*Level 1*

Level 1 applies to assets or liabilities for which there are quoted prices in active markets for identical assets or liabilities.

*Level 2*

Level 2 applies to assets or liabilities for which there are inputs other than quoted prices included within Level 1 that are observable for the assets or liabilities such as quoted prices for similar assets or liabilities in active markets; quoted prices for identical assets or liabilities in markets with insufficient volume or infrequent transactions (less active markets); or model-derived valuations in which significant inputs are observable or can be derived principally from, or corroborated by, observable market data.

*Level 3*

Level 3 applies to assets or liabilities for which there are unobservable inputs to the valuation methodology that are significant to the measurement of the fair value of the assets or liabilities.

<u>Revenue recognition</u>

*Adoption of ASC, "Revenue from Contracts with Customers"*

In May 2014, the Financial Accounting Standards Board ("FASB") issued ASU No. 2014-09, Revenue from Contracts with Customers (Topic 606) ("Topic 606") as modified by subsequently issued ASUs 2015-14, 2016-08,2016-10, 2016-12 and 2016-20 (collectively "ASU 2014-09").

On January 1, 2018, the Group adopted Topic 606 by applying the modified retrospective method to contracts that were not completed as of January 1, 2018. Results for the reporting periods beginning after January 1, 2018 are presented under Topic 606 while prior period amounts are not adjusted and continue to be reporting in accordance with the Group's historical accounting under Topic 605. The adoption of Topic 606 did not have a material impact on the Group's consolidated results of operations, financial position or cash flows but resulted in additional disclosures regarding the nature, amount, timing and uncertainty of revenue and cash flows arising from contracts with customers.

The Group principally derives its revenue from live video services, value-added services, mobile marketing services, mobile games and other services. The Group recognizes revenue when control of the promised goods or services are transferred to the customers, in an amount that reflects the consideration that the Group expects to receive in exchange for those goods or services. The Group applied the five steps method outlined in Topic 606 to all revenue streams. In addition, the standard requires disclosures of the nature, amount, timing and uncertainty of revenue and cash flows arising from contracts with customers.

For the years ended December 31, 2016, 2017 and 2018, all the revenue for the periods was recognized from contracts with customers. The Group's revenue is reported net of discounts, value added tax and surcharges.

The following table provides information about disaggregated revenue by types, including a reconciliation of the disaggregated revenue with the Group's reportable segments:

|  | For the year ended December 31, 2018 | | |
| --- | --- | --- | --- |
|  | Momo | Tantan | QOOL |
|  | RMB | RMB | RMB |
| Live video service | 10,709,491 | — | — |
| Value-added services | 1,465,152 | 417,998 | — |
| Mobile marketing | 500,321 | — | — |
| Mobile games | 130,392 | — | — |
| Other services | 7,065 | — | 178,002 |
| Total | 12,812,421 | 417,998 | 178,002 |

|  | For the year ended December 31, 2017 | | |
| --- | --- | --- | --- |
|  | Momo | Tantan | QOOL |
|  | RMB | RMB | RMB |
| Live video service | 7,429,906 | — | — |
| Value-added services | 695,798 | — | — |
| Mobile marketing | 514,279 | — | — |
| Mobile games | 241,388 | — | — |
| Other services | 3,452 | — | 1,567 |

Total                                                              8,884,823          1,567

| | For the year ended December 31, 2016 | | |
| --- | --- | --- | --- |
| | Momo | Tantan | QOOL |
| | RMB | RMB | RMB |
| Live video service | 2,534,604 | — | — |
| Value-added services | 449,781 | — | — |
| Mobile marketing | 441,644 | — | — |
| Mobile games | 236,238 | — | — |
| Other services | 45,091 | — | — |
| Total | 3,707,358 | — | — |

(a)  Live video service

The Group is principally engaged in providing live video services whereby users can enjoy live performances and interact with the broadcasters for free during the performance. Broadcasters can either host the performance on their own or join a talent agency. The Group generates revenue from sales of virtual items to its customers. The Group designs, creates and offers various virtual items for sales to users with pre-determined stand-alone selling price, which if users chose to, can be purchased and be presented to the broadcasters to show their support during their live video performance. The Group has a recharge system for users to purchase the Group's virtual currency that can then be used to purchase virtual items on the Group's platform. Users can recharge via various third-party application stores and other payment channels. Virtual currency is non-refundable and does not have any expiration date. Based on the turnover history of virtual currency, the Group determined that the virtual currency is often consumed soon after it is purchased and accordingly, the Group concluded that any breakage would be insignificant. Unconsumed virtual currency is recorded as deferred revenue. Virtual currencies used to purchase virtual items are recognized as revenue according to the prescribed revenue recognition policies of virtual items addressed below unless otherwise stated. All virtual items are non-refundable, consumed at a point-in-time and expire in a few days after the purchase. Under arrangements entered into with broadcasters and talent agencies, the Group shares a portion of the revenues derived from the sales of virtual items with them ("Revenue Sharing").

The Group has evaluated and determined that it is the principal and views the users to be its customers. Specifically, the Group controls the virtual items before they are transferred to users. Its control is evidenced by the Group's sole ability to monetize the virtual items before they are transferred to users, and is further supported by the Group being primarily responsible to the users for the delivery of the virtual items as well as having full discretion in establishing pricing for the virtual items. Accordingly, the Group reports its live video service revenues on a gross basis with amounts billed to users for the virtual items recorded as revenues and the Revenue Sharing paid to broadcasters and talent agencies recorded as cost of revenues. Sales proceeds are initially recorded as deferred revenue and recognized as revenue based on the consumption of the virtual items. The Group has determined that the virtual items represent one performance obligation in the live video service. Revenue related to each of the virtual items is recognized at the point in time when the virtual item is transferred directly to the broadcasters and consumed by them. Although some virtual items have expiry dates, the Group considers that the impact of breakage for the virtual items is insignificant as historical data shows that virtual items are consumed shortly after they are released to users and the forfeiture rate remains relatively low for the periods presented. The Group does not have further performance obligations to the user after the virtual items are consumed.

Users also have the right to purchase various combinations of virtual items in the live video, which are generally capable of being distinct. Specifically, the Group enters into certain contracts with its users where virtual item coupons are granted to users simultaneously with a purchase of a virtual item. The virtual item coupon can be used by the users to exchange for free virtual items in the future. Such virtual item coupons typically expire a few days after being granted. The Group has determined that the virtual item coupons represent a material right under Topic 606 which is recognized as a separate performance obligation at the outset of the arrangement. Judgment is required to determine the standalone selling price for each distinct virtual item and virtual item coupon. The Group allocates the consideration to each distinct virtual item and virtual item coupon based on their relative standalone selling prices. In instances where standalone selling price is not directly observable as the Group does not sell the virtual items separately, the Group determines the standalone selling price based on pricing strategies, market factors and strategic objectives. The Group recognizes revenue for each of the distinct virtual item in accordance with the revenue recognition method

discussed above unless otherwise stated. Revenue for the virtual item coupons are recognized when the virtual items purchased with the virtual item coupons are consumed. Although virtual item coupons have expiry dates, the Group considers that the impact of breakage for the virtual items is insignificant as historical data shows that virtual currency coupons are consumed shortly after they are released to users and the forfeiture rate remains relatively low for the periods presented.

The Group does not provide any right of return and does not provide any other credit or incentive to its users.

(b)  Value-added services

Value-added services revenues mainly include membership subscription revenue and virtual gift service revenue. Membership subscription is a service package which enables members to enjoy additional functions and privileges. The contract period for the membership subscription ranges from one month to one year. All membership subscription is nonrefundable. The Group has determined that its membership subscription services represent one performance obligation. The Group collects membership subscription in advance and records it as deferred revenue. Revenue is recognized ratably over the contract period as the membership subscription services are delivered.

Virtual gift service was launched in 2016 to enhance users' experience of interaction and social networking with each other. Users are able to purchase virtual items and send them to other users. The Group shares a portion of the revenues derived from the sales of virtual items with the recipient of the virtual item. All virtual items are nonrefundable, consumed at a point-in-time and expire a few days after the purchase. Although some virtual items have expiry dates, the Group considers that the impact of breakage for the virtual items is insignificant as historical data shows that virtual items are consumed shortly after they are released to users, and the forfeiture rate remains relatively low for the periods presented. The Group collects the cash from the purchase of virtual items and recognized the sales of virtual items when the performance obligation is satisfied. The Group has determined that it has one single performance obligation which is the display of the virtual item for the users who purchase them. Revenues derived from the sale of virtual items are recorded on a gross basis as the Group has determined that it is the principal in providing the virtual gift services for the same reasons outlined in the revenue recognition policy for its live video services. The portion paid to gift recipients is recognized as cost of revenues.

(c)  Mobile marketing

The Group provides advertising and marketing solutions to customers for promotion of their brands and conduction of effective marketing activities through its mobile application.

Display-based mobile marketing services

For display-based online advertising services such as banners and location-based advertising on the mobile applications, the Group has determined that its mobile marketing services represent one performance obligation. Accordingly, the Group recognizes mobile marketing revenue ratably over the period that the advertising is provided commencing on the date the customer's advertisement is displayed, or based on the number of times that the advertisement has been displayed for cost per thousand impressions advertising arrangements.

Performance-based mobile marketing services

The Group also enables advertising customers to place link on its mobile platform on a pay-for-effectiveness basis, which is referred to as the cost for performance model. The Group charges fees to advertising customers based on the effectiveness of advertising links, which is measured by active clicks. The Group has determined that its mobile marketing services represent one performance obligation. Accordingly, the Group recognizes mobile marketing revenue based on sales of effective clicks. Revenue is estimated by the Group based on its internal data, which is confirmed with respective customers periodically, or is recognized based on a fixed unit price.

The Group's mobile marketing revenues are recognized net of agency rebates, if applicable. Agency rebates have not been material for the years ended December 31, 2016, 2017 and 2018.

(d)  Mobile games

The Group publishes both licensed mobile games developed by third-party game developers and its self-developed games to the game players through its mobile application.

*Licensed mobile games*

The Group generates revenue from offering services of mobile games developed by third-party game developers. All of the licensed games can be accessed and played by game players directly through the Group's mobile game platform. The Group primarily views the game developers to be its customers and considers its responsibility under its agreements with the game developers to be the promotion of the game developers' games. The Group generally collects payments from game players in connection with the sale of in-game currencies and remits certain agreed-upon percentages of the proceeds to the game developers. Purchases of in-game currencies are not refundable after they have been sold unless there is unused in-game currencies at the time a game is discontinued. Typically, a game will only be discontinued when the monthly revenue generated by a game becomes consistently insignificant. The Group does not currently expect to pay any material cash refunds to game players or game developers in connection with a discontinued game. The majority of the licensed mobile games revenue is derived from non-exclusive mobile games services further discussed below.

*Licensed mobile games - Non-exclusive mobile games services*

The Group enters into non-exclusive agreements with the game developers and offers the Group's mobile game platform for the mobile games developed by the game developers. The Group considers its performance obligation under its arrangements with the game developers to be the offering of its mobile game platform for the game developers. The Group has determined that it has no additional performance obligation to the developers or game players upon the players completion of the corresponding in-game purchase. Therefore, the Group has determined that it is not the principal in the transaction and accordingly, revenues derived from the sale of in-game currencies are recorded net of remittances to game developers and commission fees made to third-party application stores and other payment channels. Revenue is further recognized at the end of the estimated consumption date by individual game (i.e., the estimated date in-game currencies are consumed within the game), which is typically within a short period of time ranging from two to three days after the purchase of the in-game currencies.

*Self-developed mobile game*

In February 2015, the Group launched one self-developed game on its platform and started to generate revenues by in-game sales of virtual items. The Group has determined that it has a single performance obligation to the players who purchased the virtual items to gain an enhanced game-playing experience over the playing period of the paying players. Accordingly, the Group recognizes revenues ratably over the estimated average period of player relationship starting from the point in time when the players purchase the virtual items and once all other revenue recognition criteria are met. The Group operated eight and four self-developed mobile games in 2017 and 2018, respectively. The estimated periods of the player relationship ranged from 56 to 79 days as of December 31, 2017, and was 77 days as of December 31, 2018, respectively.

The Group has determined that it is the principal in fulfilling all obligations related to the mobile game operations for self-developed games. Accordingly, revenues are recognized on a gross basis. Commission fees paid to third-party application stores and other payment channels are recorded as cost of revenues.

(e)   Other services

Revenues from other services in the year ended December 31, 2018 mainly consisted of revenues generated from advertisement resulting from the broadcasting of one television program produced by the Group. During the year ended December 31, 2018, the Group signed an agreement with a television station, under which the Group is responsible for the production of the television program content, which was completed by December 31, 2018. The television station was responsible for providing advertising and marketing solutions to customers in addition to broadcasting the television program content. Revenue generated from the above is in the form of the advertising fees, shared between the television station and the Group based on a pre-determined percentage stated in the agreement. The Group determined that its television content production service represented one performance obligation. The broadcasting of the content was completed in the year ended December 31, 2018 and the revenue was recognized ratably during the period when the content was broadcasted on the television station.

Practical expedients and exemptions

The Group's contracts have an original duration of one year or less. Accordingly, the Group does not disclose the value of unsatisfied performance obligations. Additionally, the Group generally expenses sales commissions when incurred because the amortization period would have been one

year or less. These costs are recorded within selling and marketing expenses.

Contract balances

Contract balances include accounts receivable and deferred revenue. Accounts receivable represent cash due from third-party application stores and other payment channels as well as from advertising customers and are recorded when the right to consideration is unconditional. The allowance for doubtful accounts reflects the best estimate of probable losses inherent to the account receivable balance. The Group recorded no impairment charges related to contract assets in the period. Deferred revenue primarily includes cash received from paying users related to the Group's live video service and value-added service as well as cash received from the Group's advertising customer. Deferred revenue is recognized as revenue over the estimated service period or when all of the revenue recognition criteria have been met. Revenue recognized in 2018 that was included in the deferred revenue balance as of January 1, 2018 was RMB 422,028.

Cost of revenues

Cost of revenues consist of expenditures incurred in the generation of the Group's revenues, including but not limited to revenue sharing with the broadcasters and talent agencies resulting from the sale of virtual items, production cost in connection the television content, bandwidth costs, commission fee paid third-party application stores and other payment channels except for those paid related to licensed mobile games which are recorded net of revenue, salaries and benefits paid to employee, depreciation and amortization. These costs are expensed as incurred except for the direct and incremental platform commission fees to third-party application stores and other payment channels and production cost in connection with the television content which are deferred in "Prepaid expenses and other current assets" on the consolidated balance sheets. Such deferred costs are recognized in the consolidated statements of operations in "Cost of revenues" in the period in which the related revenues are recognized.

Government subsidies

For the government subsidies not subject to further performance obligations or future returns, the Group records the amounts as other income when received from local government authority. Whereas for the government subsidies with certain future performance obligations, the Group recognizes those as liabilities when received until the performances obligations have been met at which time, those are recognized as other income. Government subsidies recorded as other income amounted to RMB2,000, RMB141,688 and RMB223,995 for the years ended December 31, 2016, 2017 and 2018.

Research and development expenses

Research and development expenses primarily consist of (i) salaries and benefits for research and development personnel, and (ii) technological service fee, office rental and depreciation expenses associated with the research and development activities. The Group's research and development activities primarily consist of the research and development of new features for its mobile platform and its self-developed mobile games. The Group has expensed all research and development expenses when incurred.

Value added taxes ("VAT")

Entities that are VAT general taxpayers are allowed to offset qualified input VAT paid to suppliers against their output VAT liabilities. Net VAT balance between input VAT and output VAT is recorded in accrued expenses and other current liabilities on the consolidated balance sheets. VAT is also reported as a deduction to revenue when incurred and amounted to RMB367,635, RMB812,249 and RMB1,136,034 for the years ended December 31, 2016, 2017 and 2018, respectively.

Income taxes

Current income taxes are provided for in accordance with the laws of the relevant tax authorities. Deferred income taxes are recognized when temporary differences exist between the tax bases of assets and liabilities and their reported amounts in the consolidated financial statements. Net operating loss carry forwards and credits are applied using enacted statutory tax rates applicable to future years. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more-likely-than-not that a portion of or all of the deferred tax assets will not be realized.

The impact of an uncertain income tax position on the income tax return is recognized at the largest amount that is more-likely-than- not to be sustained upon audit by the relevant tax authority. An uncertain income tax position will not be recognized if it has less than a 50% likelihood of being sustained. Interest and penalties on income taxes will be classified as a component of the provisions for income taxes.

Foreign currency translation and change in reporting currency

The reporting currency of the Company is the Renminbi ("RMB"). The functional currency of the Company is the US dollar ("US$"). The Company's operations are principally conducted through the subsidiaries, its VIEs and VIEs' subsidiaries located in the PRC where the local currency is the functional currency.

Monetary assets and liabilities denominated in currencies other than the functional currency are translated into the functional currency at the rates of exchange in place at the balance sheet date. Transactions in currencies other than the functional currency during the year are converted into the functional currency at the applicable rates of exchange prevailing when the transactions occurred. Transaction gains and losses are recognized in the consolidated statement of operations.

Assets and liabilities of the Group companies are translated from their respective functional currencies to the reporting currency at the exchange rates at the balance sheet dates, equity accounts are translated at historical exchange rates and revenues and expenses are translated at the average exchange rates in effect during the reporting period. The resulting foreign currency translation adjustment are recorded in other comprehensive income (loss).

Starting from the fourth quarter of 2018, the Group changed its reporting currency from US$ to RMB, to reduce the impact of increased volatility of the RMB to US$ exchange rate on the Group's reported operating results. The aligning of the reporting currency with the underlying operations will better depict the Group's results of operations for each period. The related financial statements prior to October 1, 2018 have been recasted to RMB as if the financial statements originally had been presented in RMB since the earliest periods presented. The change in reporting currency resulted in cumulative foreign currency translation adjustment to the Group's comprehensive income amounted to a gain of RMB175,963, a loss of RMB155,368 and a gain of RMB198,654 for the years ended December 31, 2016, 2017 and 2018, respectively.

Translations of amounts from RMB into US$ for the convenience of the reader were calculated at the noon buying rate of US$1.00 = RMB6.8755 on the last trading day of 2018 (December 31, 2018) representing the certificated exchange rate published by the Federal Reserve Board. No representation is made that the RMB amounts could have been, or could be, converted, realized or settled into US$ at such rate, or at any other rates.

Operating leases

Leases where the rewards and risks of ownership of assets primarily remain with the lessor are accounted for as operating leases. Payments made under operating leases are charged to the consolidated statements of operations on a straight-line basis over the lease periods.

Advertising expenses

The Group expenses advertising expenses as incurred. Total advertising expenses incurred were RMB367,532, RMB1,036,053 and RMB1,236,167 for the years ended December 31, 2016, 2017 and 2018, respectively, and have been included in sales and marketing expenses in the consolidated statements of operations.

Comprehensive income

Comprehensive income includes net income, unrealized gain or loss on available-for-sale investments and foreign currency translation adjustments. Comprehensive income is reported in the consolidated statements of comprehensive income.

Share-based compensation

Share-based payment transactions with employees and executives are measured based on the grant date fair value of the equity instrument issued and recognized as compensation expense net of a forfeiture rate on a straight-line basis, over the requisite service period, with a corresponding impact reflected in additional paid-in capital.

Share-based compensation with cash settlement features is classified as liabilities. The percentage of the fair value that is accrued as compensation cost at the end of each period is based on the percentage of the requisite service that has been rendered at that date. Changes in fair value of the liability classified award that occur during the requisite service period is recognized as compensation cost over that period. These awards typically vest over a period of four years, but may fully vest due to the achievement of certain performance conditions. Share-based compensation expense is recognized on an accelerated basis if it is probable that the performance conditions will be achieved during the vesting period.

Share awards issued to consultants are measured at fair value at the earlier of the commitment date or the date the services are completed and recognized over the period the services are provided.

The estimate of forfeiture rate is adjusted over the requisite service period to the extent that actual forfeiture rate differs, or is expected to differ, from such estimates. Changes in estimated forfeiture rate is recognized through a cumulative catch-up adjustment in the period of change.

Changes in the terms or conditions of share options are accounted as a modification. The Group calculates the excess of the fair value of the modified option over the fair value of the original option immediately before the modification, measured based on the share price and other pertinent factors at the modification date. For vested options, the Group recognizes incremental compensation cost in the period that the modification occurred. For unvested options, the Group recognizes, over the remaining requisite service period, the sum of the incremental compensation cost and the remaining unrecognized compensation cost for the original award on the modification date.

<u>Earnings per share</u>

Basic earnings per ordinary share is computed by dividing net income attributable to ordinary shareholders by the weighted average number of ordinary shares outstanding during the period.

The Group determined that the nonvested restricted shares are participating securities as the holders of the nonvested restricted shares have a nonforfeitable right to receive dividends with all ordinary shares but the nonvested restricted shares do not have a contractual obligation to fund or otherwise absorb the Group's losses. Accordingly, the Group uses the two-class method whereby undistributed net income is allocated on a pro rata basis to the ordinary shares and nonvested restricted shares to the extent that each class may share the income for the period; whereas the undistributed net loss for the period is allocated to ordinary shares only because the nonvested restricted shares are not contractually obligated to share the loss.

Diluted earnings per ordinary share reflect the potential dilution that could occur if securities were exercised or converted into ordinary shares. The Group had share options, restricted share units and convertible senior notes, which could potentially dilute basic earnings per share in the future. To calculate the number of shares for diluted earnings per ordinary share, the effect of the share options and restricted share units is computed using the treasury stock method, and the effect of the convertible senior notes is computed using the as-if-converted method.

<u>Recent accounting pronouncements adopted</u>

On January 1, 2018, the Company adopted Topic 606. Under the standard, revenue is recognized when a customer obtains control of promised goods or services in an amount that reflects the consideration the entity expects to receive in exchange for those goods or services. In addition, the standard requires disclosures of the nature, amount, timing and uncertainty of revenue and cash flows arising from contracts with customers. The Company applied the five step method outlined in Topic 606 to all revenue streams and elected to adopt the standard using the modified retrospective method. Refer to Note 2, Revenue recognition for further details.

In January 2016, the FASB issued a new pronouncement ASU 2016-01 Financial Instruments-Overall: Recognition and Measurement of Financial Assets and Financial Liabilities. The ASU also provides a new measurement alternative for equity investments that do not have readily determinable fair values and do not qualify for the net asset value practical expedient. The ASU requires equity investments (except those accounted for under the equity method of accounting or those that result in consolidation of the investee) to be measured at fair value with changes in fair value recognized in net income. The ASU also requires an entity to present separately in other comprehensive income the portion of the total change in the fair value of a liability resulting from a change in the instrument-specific credit risk when the entity has elected to measure the liability at fair value in accordance with the fair value option for financial instruments.

ASU 2016-01 was further amended in February 2018 by ASU 2018-03, "Technical Corrections and Improvements to Financial Instruments—Overall (Subtopic 825-10): Recognition and Measurement of Financial Assets and Financial Liabilities". This update was issued to clarify certain narrow aspects of the guidance concerning the recognition of financial assets and liabilities established in ASU 2016-01. This includes an amendment to clarify that an entity measuring an equity security using the measurement alternative may change its measurement approach to a fair valuation method in accordance with Topic 820, Fair Value Measurement, through an irrevocable election that would apply to that security and all identical or similar investments of the same issued.

ASU 2016-01 and ASU 2018-03 are effective for public companies for fiscal years beginning after December 15, 2017, including interim periods within those fiscal years. The new guidance permits early adoption for certain provisions. Adoption of the amendment must be applied by means of a cumulative-effect adjustment to the balance sheet as of the beginning of the fiscal year of adoption, except for amendments related to equity instruments that do not have readily determinable fair values which should be applied prospectively. The Group adopted ASU 2016-01 and ASU 2018-03 under the modified retrospective method in the fiscal year of 2018. The adoption of 2016-01 and ASU 2018-03 did not have a significant impact on the Company's consolidated results of operations, financial position or cash flows.

In November 2016, the FASB issued ASU 2016-18: Statement of Cash Flows (Topic 230): Restricted Cash. The amendments in this Update require that a statement of cash flows explain the change during the period in the total of cash, cash equivalents, and amounts generally described as restricted cash or restricted cash equivalents. Therefore, amounts generally described as restricted

cash and restricted cash equivalents should be included with cash and cash equivalents when reconciling the beginning-of-period and end-of-period total amounts shown on the statement of cash flows. The amendments in this Update do not provide a definition of restricted cash or restricted cash equivalents. The amendments in this Update are effective for public business entities for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years. Early adoption is permitted, including adoption in an interim period. The amendments in this Update should be applied using a retrospective transition method to each period presented. The Group adopted ASU 2016-18 under the retrospective method in the fiscal year of 2018. The adoption of 2016-18 did not have a significant impact on the Company's cash flows for the years ended December 31, 2016, 2017 and 2018.

In January 2017, the FASB issued ASU 2017-01: Business Combinations (Topic 805): Clarifying the Definition of a Business. The Update requires that when substantially all of the fair value of the gross assets acquired (or disposed of) is concentrated in a single identifiable asset or a group of similar identifiable assets, the set is not a business. This screen reduces the number of transactions that need to be further evaluated. If the screen is not met, the amendments in this update (1) require that to be considered a business, a set must include, at a minimum, an input and a substantive process that together significantly contribute to the ability to create output and (2) remove the evaluation of whether a market participant could replace missing elements. Public business entities should apply the amendments in this Update to annual periods beginning after December 15, 2017, including interim periods within those periods. Early application of the amendments in this update is allowed. The amendments in this Update should be applied prospectively on or after the effective date. No disclosures are required at transition. The Group adopted this guidance on January 1, 2018. The adoption did not have significant impact on the Company's consolidated results of operations, financial position or cash flows.

Recent accounting pronouncements not yet adopted

In February 2016, the FASB issued ASU No. 2016-02, Leases ("ASU 2016-02"). ASU 2016-02 specifies the accounting for leases. For operating leases, ASU 2016-02 requires a lessee to recognize a right-of-use asset and a lease liability, initially measured at the present value of the lease payments, in its balance sheet. The standard also requires a lessee to recognize a single lease cost, calculated so that the cost of the lease is allocated over the lease term, on a generally straight-line basis. ASU 2016-02 is effective for public business entities for annual reporting periods and interim periods within those years beginning after December 15, 2018. The Group will adopt ASU 2016-02 on January 1, 2019 using the modified retrospective method. The Group will elect the package of practical expedients permitted under the transition guidance, which allows the Group to carry forward the historical lease classification and, the assessment whether a contract is or contains a lease and initial direct costs for any leases that exist prior to adoption of the new standard. The Group will also elect the practical expedient not to separate lease and non-lease components for certain classes of underlying assets and the short-term lease exemption for contracts with lease terms of 12 months or less. Certain operating leases related to offices and internet data center ("IDC") facilities will be subject to ASU 2016-02 and right-of-use assets and lease liabilities will be recognized on the Group's consolidated balance sheet. The Company currently believes the most significant change will be related to the recognition of right-of-use assets and lease liabilities on the Company's balance sheet for certain in-scope operating leases. The Company does not expect any material impact on net assets and the consolidated statement of comprehensive income as a result of adopting the new standard.

In June 2016, the FASB issued ASU No. 2016-13, Financial Instruments-Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments ("ASU 2016-13") which requires the measurement and recognition of expected credit losses for financial assets held at amortized cost. ASU 2016-13 replaces the existing incurred loss impairment model with an expected loss methodology, which will result in more timely recognition of credit losses. ASU 2016-13 is effective for annual reporting periods, and interim periods within those years, beginning after December 15, 2019. The Company is currently in the process of evaluating the impact of the adoption of ASU 2016-13 on its consolidated financial statements.

In June 2018, the FASB issued ASU No. 2018-07, Compensation—Stock Compensation (Topic 718): Improvements to Nonemployee Share-Based Payment Accounting to simplify the accounting for share-based payments to nonemployees ("ASU 2018-07") by aligning it with the accounting for share-based payments to employees, with certain exceptions. Under the guidance, the measurement of equity-classified nonemployee awards will be fixed at the grant date, which may lower their cost and reduce volatility in the income statement. The guidance is effective for public business entities in annual periods beginning after December 15, 2018, and interim periods within those years. Early adoption is permitted, including in an interim period. The Group will adopt ASU 2018-07 on January 1, 2019 using grant date fair value to measure equity-classified nonemployee awards. The Group does not expect that the adoption of ASU 2018-07 will have a significant impact on the Group's consolidated financial statements.

In August 2018, the FASB issued ASU No. 2018-13, Fair Value Measurement (Topic 820):

Disclosure Framework—Changes to the Disclosure Requirements for Fair Value Measurement ("ASU 2018-13") which eliminates, adds and modifies certain disclosure requirements for fair value measurements. Under the guidance, public companies will be required to disclose the range and weighted average used to develop significant unobservable inputs for Level 3 fair value measurements. The guidance is effective for all entities for fiscal years beginning after December 15, 2019 and for interim periods within those fiscal years, but entities are permitted to early adopt either the entire standard or only the provisions that eliminate or modify the requirements. The Company is currently in the process of evaluating the impact of the adoption of ASU 2018-13 on its consolidated financial statements.

In March 2019, the FASB issued ASU 2019-02, Improvements to Accounting for Costs of Films and License Agreements for Program Materials ("ASU 2019-02") which improves GAAP by aligning the accounting for production costs of an episodic television series with the accounting for production costs of films by removing the content distinction for capitalization. In addition, ASU 2019-02 requires that an entity test a film or license agreement for program material within the scope of ASC 920-350 for impairment at a film group level when the film or license agreement is predominantly monetized with other films and/or license agreements. The presentation and disclosure requirements in ASU 2019-02 also increase the transparency of information provided to users of financial statements about produced and licensed content. This update will be effective for the Company's fiscal years beginning after December 15, 2019, and interim periods within those fiscal years. Early adoption is permitted. The Group is in the process of evaluating the impact of adoption of this guidance on its consolidated financial statements.

**Acquisitions**

**12 Months Ended**

**Dec. 31, 2018**

**Business Combinations [Abstract]**

Acquisitions

3.  **ACQUISITIONS**

Acquisition of Tantan Limited

On May 31, 2018, the Group acquired 100% equity interest of Tantan, a leading social and dating app for the younger generation that was founded in 2014. The Group believes that the acquisition of Tantan helps to enrich its product line, expands its user base and strengthens its leading position in China's open social market.

The consideration consisted of RMB3,930,246 of cash, of which RMB3,460,972 was paid as of December 31, 2018. The consideration also included 5,328,853 newly issued Class A ordinary shares of the Company which were fully issued as of the acquisition date.

| | |
|---|---|
| Cash consideration | 3,930,246 |
| Fair value of ordinary shares issued | 784,215 |
| Total consideration | 4,714,461 |

The transaction was accounted for as a business combination using the purchase method of accounting. The purchase price allocation of the transaction was determined by the Group with the assistance of an independent valuation firm, and the purchase price allocation to assets acquired and liabilities assumed as of the date of acquisition was as follows:

| | Indicated Value | Estimated useful lives |
|---|---|---|
| | RMB | |
| **Net tangible assets:** | | |
| Cash and cash equivalents and short term investment | 154,671 | |
| Accounts receivable | 20,079 | |
| Other current asset | 22,833 | |
| Property and equipment, net | 46,160 | |
| Other non-current asset | 3,030 | |
| **Intangible assets** | | |
| Trade name | 640,600 | 10 years |
| Technology | 26,100 | 3 years |
| User base | 342,500 | 5 years |
| Total assets | 1,255,973 | |
| Accounts payable | (21,037) | |
| Other current liabilities | (262,533) | |
| Deferred tax liabilities | (252,300) | |
| Goodwill | 3,994,358 | |
| Total consideration | 4,714,461 | |

The goodwill was mainly attributable to intangible assets that cannot be recognized separately as identifiable assets under U.S. GAAP, and comprise (a) the assembled work force and (b) the expected but unidentifiable business growth as a result of the synergy resulting from the acquisition.

The following information summarizes the results of operation attributable to the acquisition included in the Group's consolidated statement of operations since the acquisition date:

| | Year ended December 31, 2018 |
|---|---|
| | RMB |
| Net revenue | 417,998 |
| Net loss | 519,206 |

Pro forma information of acquisitions

The following unaudited pro forma information summarizes the results of operations of the Group for the years ended December 31, 2017 and 2018 assuming that the acquisition of Tantan occurred on January 1, 2017. The following pro forma financial information is not necessarily indicative of the results that would have occurred had the acquisition been completed at the beginning of the periods as indicated, nor is it indicative of future operating results:

| | Years ended December 31, | |
|---|---|---|
| | 2017 | 2018 |

|                                                                        | (Unaudited) RMB | (Unaudited) RMB |
| ---------------------------------------------------------------------- | --------------: | --------------: |
| Pro forma net revenue                                                  |       8,887,543 |      13,511,439 |
| Pro forma net income attributable to ordinary shareholders of Momo Inc. |       1,627,664 |       2,383,646 |
| Pro forma net income per ordinary share - basic                        |            4.13 |            5.86 |
| Pro forma net income per ordinary share - diluted                      |            3.92 |            5.50 |

| **Prepaid Expenses and Other Current Assets** | **12 Months Ended** |
| | **Dec. 31, 2018** |

**Deferred Costs, Capitalized, Prepaid, and Other Assets Disclosure [Abstract]**

Prepaid Expenses and Other Current Assets

**4.  PREPAID EXPENSES AND OTHER CURRENT ASSETS**

Prepaid expenses and other current assets consisted of the following:

| | As of December 31, | |
| --- | --- | --- |
| | 2017 | 2018 |
| | RMB | RMB |
| Deposit at third-party payment channels (i) | 190,238 | 258,039 |
| Advance to suppliers (ii) | 140,022 | 94,100 |
| Interest receivable | 54,920 | 87,057 |
| Input VAT (iii) | 24,164 | 69,075 |
| Prepaid income tax and other expenses | 52,499 | 55,084 |
| Deferred platform commission cost | 27,925 | 36,189 |
| Advance to game developers | 6,012 | 8,463 |
| Game promotions fees paid on behalf of game developers | 17,840 | 3,069 |
| Others | 24,562 | 9,903 |
| | 538,182 | 620,979 |

(i)  Deposit at third party payment channels are mainly the cash deposited in certain third party payment channels by the Group for the broadcasters and the gift recipients who received the virtual items to withdraw their revenue sharing and the customer payment to the Group's account through the third party payment channels.

(ii)  Advance to suppliers were primarily for advertising fees, live video broadcasting service fees and other professional service fees.

(iii)  Input VAT mainly occurred from the purchasing of goods or other services, property and equipment and advertising activities. It is subject to verification by related tax authorities before offsetting the VAT output.

**Long-Term Investments**

**12 Months Ended**

**Dec. 31, 2018**

**Investments Schedule [Abstract]**

Long-Term Investments

5.   **LONG-TERM INVESTMENTS**

|  | As of December 31, | |
|---|---|---|
|  | 2017 | 2018 |
|  | RMB | RMB |
| Equity method investments |  |  |
| Jingwei Chuangteng (Hangzhou) L.P. (i) | 48,273 | 64,441 |
| Beijing Autobot Venture Capital L.P. (ii) | 55,162 | 57,392 |
| Hangzhou Aqua Ventures Investment Management L.P. (iii) | 84,492 | 105,289 |
| Chengdu Tianfu Qianshi Equity Investment Partnership L.P. (iv) | — | 20,586 |
| Others (viii) | 20,753 | 21,632 |
| Equity securities without readily determinable fair values |  |  |
| Hunan Qindao Cultural Spread Ltd. (v) | 30,000 | 30,000 |
| Hangzhou Faceunity Technology Limited (vi) | — | 70,000 |
| Haining Yijiayi Culture Co., Ltd (vii) | — | 25,000 |
| Others (viii) | 49,791 | 53,125 |
|  | 288,471 | 447,465 |

Equity securities without readily determinable fair value were accounted as cost method investments prior to adopting ASC 321. The Group performed impairment analysis for equity method investments, equity securities without readily determinable fair values periodically. Impairment loss of RMB39,283, RMB 30,085 and RMB 43,200 was recorded for the long-term investments during the years ended December 31, 2016, 2017 and 2018, respectively.

(i)   On January 9, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Jingwei Chuangteng (Hangzhou) L.P. ("Jingwei"). According to the partnership agreement, the Group committed to subscribe 4.9% partnership interest in Jingwei for RMB30,000, which had been paid as of December 31, 2017. Due to Jingwei's further rounds of financing, the Group's partnership interest was diluted to 2.4% as of December 31, 2017 and 2018. The Group recognized its share of partnership profit in Jingwei of RMB4,245, RMB11,677 and RMB16,168 during the year ended December 31, 2016, 2017 and 2018, respectively.

(ii)   On February 13, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Beijing Autobot Venture Capital L.P. ("Autobot"). According to the partnership agreement, the Group committed to subscribe 31.9% partnership interest in Autobot for RMB30,000. Autobot had further rounds of financing, of which the Group subscribed for RMB10,000. Due to Autobot's further round of financing, the Group's partnership interest was diluted to 26.7% as of December 31, 2017 and 2018. The committed subscription and further round of financing subscription amount, RMB40,000, was paid as of December 31, 2016. The Group recognized its share of partnership profit in Autobot of RMB5,039, RMB8,392 and RMB2,230 during the year ended December 31, 2016, 2017 and 2018, respectively.

(iii)   On August 18, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Hangzhou Aqua Ventures Investment Management L.P. ("Aqua"). According to the partnership agreement, the Group committed to subscribe 42.7% partnership interest for RMB50,000. The committed subscription amount had been fully paid as of December 31, 2016. The Group recognized its share of partnership profit in Aqua of RMB14,346, RMB20,709 and RMB20,797 during the years ended December 31, 2016, 2017 and 2018, respectively.

(iv)   On September 12, 2018, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Chengdu Tianfu Qianshi Equity Investment Partnership L.P. ("Tianfu"). According to the partnership agreement, the Group committed to subscribe 6.8% partnership interest for RMB30,000, of which RMB12,000 had been paid as of December 31, 2018. The Group recognized its share of partnership profit in Tianfu of RMB nil, RMB nil and RMB8,586 during the years ended December 31, 2016, 2017 and 2018, respectively.

(v)   On June 8, 2016, the Group entered into a share purchase agreement to acquire 16.0% preferred shares of Hunan Qindao Cultural Spread Ltd. ("Qindao") for a total consideration of RMB30,000, which was fully paid off as of December 31, 2017. The investment was classified as available-for-sale security as the Group determined that the preferred shares were debt

securities due to the redemption option available to the investor and measured the investment subsequently at fair value. No unrealized holding gains was reported in other comprehensive income for the year ended December 31, 2016. On July 7, 2017, the Group signed a supplemental agreement with Qindao to waive the redemption right. The investment was reclassified to equity security as a result of the supplemental agreement.

(vi) On January 17, 2018, the Group entered into a preferred share subscription agreement to acquire 10% equity of Hangzhou Faceunity Technology Limited ("Faceunity") for a total consideration of RMB70,000, which had been paid as of December 31, 2018. As the investment was neither a debt security nor an in-substance common stock, it was accounted as an equity securities without readily determinable fair values and measured at fair value using the measurement alternative.

(vii) On August 2, 2018, the Group invested in Haining Yijiayi Culture Co., Ltd ("Yijiayi") and acquired 5% equity for a total consideration of RMB25,000, which had been paid as of December 31, 2018. As the investment was neither a debt security nor an in-substance common stock, it was accounted as an equity securities without readily determinable fair values and measured at fair value using the measurement alternative.

(viii) Others represent equity method investments or equity securities without readily determinable fair values that are individually insignificant.

**Property and Equipment, Net**

**12 Months Ended**

**Dec. 31, 2018**

**Property, Plant and Equipment [Abstract]**

Property and Equipment, Net

6.  **PROPERTY AND EQUIPMENT, NET**

Property and equipment, net consisted of the following:

|  | As of December 31, | |
| --- | --- | --- |
|  | 2017 | 2018 |
|  | RMB | RMB |
| Computer equipment | 296,559 | 513,448 |
| Office equipment | 79,470 | 115,048 |
| Vehicles | 1,230 | 3,599 |
| Leasehold improvement | 67,440 | 94,340 |
| Less: accumulated depreciation | (186,002) | (338,868) |
| Exchange difference | 7 | (35) |
|  | 258,704 | 387,532 |

Depreciation expenses charged to the consolidated statements of operations for the years ended December 31, 2016, 2017 and 2018 were RMB55, 845, RMB78, 885 and RMB148, 238, respectively.

**Intangible Assets, Net**

**12 Months Ended**

**Dec. 31, 2018**

**Goodwill and Intangible Assets Disclosure [Abstract]**

Intangible Assets, Net

7.   INTANGIBLE ASSETS, NET

Intangible assets, net consisted of the following:

| | As of December 31, | |
| --- | --- | --- |
| | 2017 | 2018 |
| | RMB | RMB |
| Trade name | — | 687,164 |
| Active user | — | 367,396 |
| Technology | — | 27,997 |
| License | 52,433 | 52,433 |
| Game copyright | 2,170 | 2,170 |
| Less: accumulated amortization and impairment | (6,050) | (99,080) |
| Exchange difference | — | (1,094) |
| Net book value | 48,553 | 1,036,986 |

Amortization expenses and impairment loss charged to the consolidated statements of operations for the years ended December 31, 2016, 2017 and 2018 were RMB nil, RMB6,050 and RMB93,030, respectively.

The estimated aggregate amortization expenses for each of the five succeeding fiscal years and thereafter are as follows:

| For the year ended December 31, | Amounts |
| --- | --- |
| | RMB |
| 2019 | 157,260 |
| 2020 | 157,260 |
| 2021 | 151,121 |
| 2022 | 147,209 |
| 2023 | 104,346 |
| Thereafter | 319,790 |
| Total | 1,036,986 |

**Goodwill**

**12 Months Ended**

**Dec. 31, 2018**

**Goodwill and Intangible Assets Disclosure [Abstract]**

Goodwill

8. **GOODWILL**

|  | As of December 31, 2018 | | |
|---|---|---|---|
|  | Momo | Tantan | Total |
|  | RMB | RMB | RMB |
| Balance, as of January 1, 2017 | — | — | — |
| Acquisition of other | 22,130 | — | 22,130 |
| Balance, as of December 31, 2017 | 22,130 | — | 22,130 |
| Acquisition of Tantan Limited (Note 3) | — | 3,994,358 | 3,994,358 |
| Foreign exchange differences | — | 290,341 | 290,341 |
| Balance, as of December 31, 2018 | 22,130 | 4,284,699 | 4,306,829 |

To assess potential impairment of goodwill, the Group performs an assessment of the carrying value of the reporting units at least on an annual basis or when events occur or circumstances change that would more likely than not reduce the estimated fair value of the reporting units below its carrying value. The Group performed a goodwill impairment analysis as of December 31, 2018. When determining the fair value of both the Momo and Tantan reporting units, the Group used a discounted cash flow model that included a number of significant unobservable inputs. Key assumptions used to determine the estimated fair value include: (a) internal cash flows forecasts including expected revenue growth, operating margins and estimated capital needs, (b) an estimated terminal value using a terminal year long-term future growth rate determined based on the growth prospects of the reporting units; and (c) a discount rate that reflects the weighted-average cost of capital adjusted for the relevant risk associated with the Momo and Tantan reporting units' operations and the uncertainty inherent in the Group's internally developed forecasts. Based on the Group's assessment as of December 31, 2018, the fair value of both business reporting units exceeded their carrying value.

| **Accrued Expenses and Other Current Liabilities** | **12 Months Ended Dec. 31, 2018** |
|---|---|

**Payables and Accruals [Abstract]**

Accrued Expenses and Other Current Liabilities

**9. ACCRUED EXPENSES AND OTHER CURRENT LIABILITIES**

Accrued expenses and other current liabilities consisted of the following:

| | As of December 31, | |
|---|---|---|
| | 2017 | 2018 |
| | RMB | RMB |
| Accrued payroll and welfare | 224,618 | 302,117 |
| Payable for advertisement | 122,211 | 254,872 |
| Balance of users' virtual accounts | 92,228 | 112,488 |
| Other tax payables | 61,529 | 99,964 |
| Accrued professional services and rental fee | 23,041 | 38,415 |
| VAT payable | 10,040 | 9,208 |
| Others | 37,666 | 29,646 |
| Total | 571,333 | 846,710 |

**Convertible Senior Notes**

**12 Months Ended**

**Dec. 31, 2018**

**Debt Disclosure [Abstract]**

Convertible Senior Notes

**10. CONVERTIBLE SENIOR NOTES**

In July 2018, the Company issued RMB4,985 million (US$725 million) of convertible senior notes (the "Notes") which will mature in on July 1, 2025. The Notes will be convertible into the Company's American depositary shares ("ADSs"), at the option of the holders, based on an initial conversion rate of 15.4776 of the Company's ADSs per US$1,000 principal amount of Notes (which is equivalent to an initial conversion price of approximately US$64.61 per ADS and represents an approximately 42.5% conversion premium over the closing trading price of the Company's ADSs on June 26, 2018, which was US$45.34 per ADS). The conversion rate for the Notes is subject to adjustments upon the occurrence of certain events.

The holders of the Notes may convert their notes, in integral multiples of US$1,000 principal amount, at any time prior to the day immediately preceding the maturity date. The Company will not have the right to redeem the Notes prior to maturity, except in the event of certain changes to the tax laws or their application or interpretation. The holders of the Notes will have the right to require the Company to repurchase all or part of their Notes in cash on July 1, 2023, or in the event of certain fundamental changes. As of December 31, 2018, no Notes were converted into the Company's ADSs.

The Notes bear interest at a rate of 1.25% per year and will be payable semiannually.

As of December 31, 2018, the carrying value of the Notes was RMB 4,877,116. The balance at December 31, 2018 included unamortized issuance costs of RMB107,622. The debt issuance costs are being amortized through interest expense over the period from July 2, 2018, the date of issuance, to July 1, 2025, the date of expiration, using the effective interest rate method which was 1.61% for the year ended December 31, 2018. Amortization and interest expenses related to the convertible senior notes amounted to RMB38,491 during the year ended December 31, 2018.

The conversion option meets the definition of a derivative. However, since the conversion option is considered indexed to the Company's own stock and classified in stockholders' equity, the scope exception is met, accordingly the bifurcation of the conversion option from the Notes is not required. There is no beneficial conversion feature attributable to the Notes as the set conversion prices for the Notes are greater than the respective fair values of the ordinary share price at date of issuance.

The feature of mandatory redemption upon maturity is clearly and closely related to the debt host and this feature does not need to be bifurcated.

Based on above, the Company accounted for the Notes in accordance with ASC 470, as a single instrument under long-term debt. Issuance costs related to the Notes is recorded in consolidated balance sheet as a direct deduction from the principal amount of the Notes.

**Fair Value**

**12 Months Ended**

**Dec. 31, 2018**

**Fair Value Disclosures [Abstract]**

Fair Value

**11. FAIR VALUE**

Measured on recurring basis

The Group measures its financial assets and liabilities including cash and cash equivalents at fair value on a recurring basis as of December 31, 2017 and 2018. Cash and cash equivalents are classified within Level 1 of the fair value hierarchy because they are valued based on the quoted market price in an active market.

As of December 31, 2017 and 2018, information about inputs for the fair value measurements of the Group's assets that are measured at fair value on a recurring basis in periods subsequent to their initial recognition is as follows:

| | | Fair Value Measured as of December 31, | | |
| | | Quoted Prices in Active Market for Identical Assets | Significant Other Observable Inputs | Significant Unobservable Inputs |
| Description | 2017 | | | |
| | RMB | (Level 1) | (Level 2) | (Level 3) |
| Cash and cash equivalents | 4,462,194 | 4,462,194 | — | — |
| Total | 4,462,194 | 4,462,194 | — | — |

| | | Fair Value Measured as of December 31, | | |
| | | Quoted Prices in Active Market for Identical Assets | Significant Other Observable Inputs | Significant Unobservable Inputs |
| Description | 2018 | | | |
| | RMB | (Level 1) | (Level 2) | (Level 3) |
| Cash and cash equivalents | 2,468,034 | 2,468,034 | — | — |
| Total | 2,468,034 | 2,468,034 | — | — |

Additional information about the reconciliation of the fair value measurement of long-term investments using significant unobservable inputs (level 3) on a recurring basis are is as follows:

| | RMB |
|---|---|
| Balance as of December 31, 2016 | 50,452 |
| Purchase | 10,000 |
| Other-than-temporary loss recognized | (30,085) |
| Reclassification to equity securities without readily determinable fair value (i) | (30,000) |
| Foreign exchange difference | (367) |
| Balance as of December 31, 2017 | — |
| Balance as of December 31, 2018 | — |

(i)  The investment in Qindao was reclassified from long-term investments to equity securities without readily determinable fair value as of result of the waiver of redemption right in July 2017. Please refer to Note 5 for additional information on the reclassification.

Measured on nonrecurring basis

The Group measures its equity method investments at fair value on a nonrecurring basis whenever events or changes in circumstances indicate that the carrying value may not be recoverable. As of December 31, 2017 and 2018, the Group performed an impairment test on its equity method investees and recorded an impairment loss of RMB nil and RMB nil, respectively.

Such impairments are considered level 3 fair value measurements because the Group used unobservable inputs such as the management projection of discounted future cash flow and the discount rate.

For goodwill impairment testing, refer to Note 8 for details.

**Income Taxes**

**12 Months Ended**

**Dec. 31, 2018**

**12.  INCOME TAXES**

Cayman

In July 2014, the Company was redomiciled in the Cayman Islands as an exempted company registered under the laws of the Cayman Islands. Under the current laws of the Cayman Islands, it is not subject to tax on either income or capital gain.

BVI

Momo BVI is a tax-exempted company incorporated in the BVI.

The United States ("US")

Momo US and Tantan US are incorporated in the U.S.A.

In December 2017, the U.S. government enacted comprehensive tax legislation commonly referred to as the Tax Cuts and Jobs Act (the "Tax Act"). The Tax Act makes broad and complex changes to the U.S. tax code including, but not limited to, (1) reducing the U.S. federal corporate tax rate, (2) requiring a one-time transition tax on certain unrepatriated earnings of foreign subsidiaries that is payable over eight years, and (3) bonus depreciation that will allow for full expensing of qualified property. The impact of the Tax Act is not material to the Group's operation and resulted in a decrease in income tax rate from 35% before January I, 2018 to 21% after January 1, 2018 for tax and income earned as determined in accordance with the relevant tax rules and regulations.

Hong Kong

The Company's subsidiaries domiciled in Hong Kong are subject to a two-tiered income tax rate for taxable income earned in Hong Kong effectively since April 1, 2018. The first 2 million Hong Kong dollars of profits earned by the company are subject to be taxed at an income tax rate of 8.25%, while the remaining profits will continue to be taxed at the existing tax rate, 16.5%.

PRC

In August 2014, Beijing Momo IT was qualified as a software enterprise. As such, Beijing Momo IT will be exempt from income taxes for two years beginning in its first profitable year which was from 2015 to 2016 followed by a tax rate of 12.5% for the succeeding three years which is from 2017 to 2019.

According to No. 23 announcement of the State Administration of Taxation of PRC in April 2018, Chengdu Momo is no longer required to submit the preferential tax rate application to the tax authority, but only required to keep the relevant materials for future tax inspection instead. Based on the historically experience, the Group believes Chengdu Momo will most likely to be qualified as western China development enterprise and accordingly be entitled to a preferential income tax rate of 15% for the year 2018. As a result, the Group applied 15% to determine the tax liabilities for Chengdu Momo.

In October 2018, Beijing Santi Cloud Union Technology Co., Ltd. ("Santi Cloud Union") qualified as a High and New Technology enterprise ("HNTE"). As such, Santi Cloud Union enjoyed a preferential tax rate of 15% from 2018 to 2020. Santi Cloud Union was in accumulated loss position for the year ended December 31, 2018.

The other entities incorporated in the PRC are subject to an enterprise income tax at a rate of 25%. Since January 1, 2011, the relevant tax authorities of the Group's subsidiaries have not conducted a tax audit on the Group's PRC entities. In accordance with relevant PRC tax administration laws, tax years from 2015 to 2017 of the Group's PRC subsidiaries, VIEs and VIEs' subsidiaries, remain subject to tax audits as of December 31, 2018, at the tax authority's discretion.

Under the Enterprise Income Tax Law (the "EIT Law") and its implementation rules which became effective on January 1, 2008, dividends generated after January 1, 2008 and payable by foreign-invested enterprise in the PRC to its foreign investors who are non-resident enterprises are subject to a 10% withholding tax, unless any such foreign investor's jurisdiction of incorporation has a tax treaty with PRC that provides for a different withholding arrangement. Under the taxation arrangement between the PRC and Hong Kong, a qualified Hong Kong tax resident which satisfies the criteria of "beneficial owner" and directly holds 25% or more of the equity interest in a PRC resident enterprise is entitled to a reduced withholding tax rate of 5% for dividends generated in the PRC. Cayman, where the Company is incorporated, does not have a tax treaty with PRC.

Uncertainties exist with respect to how the current income tax law in the PRC applies to the Group's overall operations, and more specifically, with regard to tax residency status. The EIT Law includes a provision specifying that legal entities organized outside of the PRC will be considered residents for Chinese income tax purposes if the place of effective management or control is within the PRC. The implementation rules to the EIT Law provide that non-resident legal entities will be considered China residents if substantial and overall management and control over the manufacturing and business operations, personnel, accounting, properties, etc., occurs within the PRC. Despite the present uncertainties resulting from the limited PRC tax guidance on the issue, the Group does not believe that the legal entities organized outside of the PRC within the Group should be treated as residents for EIT law purposes. If the PRC tax authorities subsequently determine that the Company and its subsidiaries registered outside the PRC should be deemed resident enterprises, the Company and its subsidiaries registered outside the PRC will be subject to the PRC income taxes, at a rate of 25%.

If any entity within the Group that is outside the PRC were to be a non-resident for PRC tax purposes dividends paid to it out of profits earned after January 1, 2008 would be subject to a withholding tax at a rate of 10%, subject to reduction by an applicable tax treaty with the PRC.

Aggregate undistributed earnings of the Company's PRC subsidiaries and the VIEs that are available for reinvestment. Upon distribution of such earnings, the Company will be subject to the PRC EIT, the amount of which is impractical to estimate. The Company did not record any withholding tax on any of the aforementioned undistributed earnings because the relevant subsidiaries and the VIEs do not intend to declare dividends and the Company intends to permanently reinvest it within the PRC. Additionally, no deferred tax liability was recorded for taxable temporary differences attributable to the undistributed earnings because the Company believes the undistributed earnings can be distributed in a manner that would not be subject to income tax.

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amount of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. The Group did not retrospectively apply the changes to prior years. Significant components of the Group's deferred tax assets and liabilities are as follows:

|  | As of December 31, | |
| --- | --- | --- |
|  | 2017 | 2018 |
|  | RMB | RMB |
| **Deferred tax assets:** | | |
| Advertising expense | 38,760 | 221,113 |
| Net operating tax losses carry-forward | 25,792 | 103,060 |
| Impairment on long-term investments and game copyright | 2,599 | 11,336 |
| Accrued expenses | 5,466 | 43,631 |
| Less: valuation allowance | (25,792) | (321,354) |
| Deferred tax assets, net | 46,825 | 57,786 |
| **Deferred tax liabilities:** | | |
| Intangible assets acquired | 12,138 | 259,247 |
| Deferred tax liabilities, net | 12,138 | 259,247 |

The Group considers the following factors, among other matters, when determining whether some portion or all of the deferred tax assets will more likely than not be realized: the nature, frequency and severity of losses, forecasts of future profitability, the duration of statutory carry-forward periods, the Group's experience with tax attributes expiring unused and tax planning alternatives. The Group's ability to realize deferred tax assets depends on its ability to generate sufficient taxable income within the carry-forward periods provided for in the tax law.

As of December 31, 2018, the tax loss carry-forward for the Company's subsidiaries domiciled in PRC, VIEs, and VIEs' subsidiaries amounted to RMB264,709. The tax losses in PRC can be carried forward for five years to offset future taxable profit, and the period was extended to 10 years for entities qualified as HNTE in 2018 and thereafter. The tax losses of entities in the PRC will begin to expire in 2020, if not utilized.

As of December 31, 2018, the tax loss carryforward for the Company's subsidiaries domiciled in Hong Kong amounted to RMB109,697, which would be carried forward indefinitely and set off against its future taxable profits.

As of December 31, 2018, the tax loss carry-forward for the Company's subsidiaries domiciled in US amounted to RMB70,055. RMB 61,774 was generated from the years before 2018, which can be carried back two years and forward twenty years. The remaining RMB 8,281 was generated in the year ended December 31, 2018, which can be carried forward indefinitely but cannot be carried back, and can be used to offset only 80 percent of the taxable income.

The Group does not file combined or consolidated tax returns, therefore, losses from individual subsidiaries or the VIEs may not be used to offset other subsidiaries' or VIEs' earnings within the

Group. Valuation allowance is considered on each individual subsidiary and legal entity basis. Valuation allowances have been established in respect of certain deferred tax assets as it is considered more likely than not that the relevant deferred tax assets will not be realized in the foreseeable future.

Reconciliation between income tax expense computed by applying the PRC EIT rate of 25% to income before income taxes and the actual provision for income tax is as follows:

|  | For the years ended December 31, | | |
|---|---|---|---|
|  | 2016 | 2017 | 2018 |
|  | RMB | RMB | RMB |
| Net income before provision for income tax | 990,413 | 2,549,735 | 3,439,535 |
| PRC statutory tax rate | 25% | 25% | 25% |
| Income tax expense at statutory tax rate | 247,603 | 637,434 | 859,884 |
| Permanent differences | (516) | (446) | 20,135 |
| Change in valuation allowance | (16,034) | 5,990 | 98,862 |
| Effect of income tax rate difference in other jurisdictions | 54,242 | 80,085 | 156,136 |
| Effect of tax holidays and preferential tax rates | (250,657) | (278,062) | (435,369) |
| Provision for income tax | 34,638 | 445,001 | 699,648 |

If Beijing Momo IT and Chengdu Momo did not enjoy income tax exemptions and preferential tax rates for the years ended December 31, 2016, 2017 and 2018, the increase in income tax expenses and resulting net income per share amounts would be as follows:

|  | For the years ended December 31, | | |
|---|---|---|---|
|  | 2016 | 2017 | 2018 |
|  | RMB | RMB | RMB |
| Increase in income tax expenses | 250,657 | 278,062 | 435,369 |
| Net income per ordinary share attributable to Momo Inc. - basic | 1.87 | 4.74 | 5.85 |
| Net income per ordinary share attributable to Momo Inc. - diluted | 1.74 | 4.50 | 5.59 |

No significant unrecognized tax benefit was identified for the years ended December 31, 2016, 2017 and 2018. The Group did not incur any interest and penalties related to potential underpaid income tax expenses and also believed that uncertainty in income taxes did not have a significant impact on the unrecognized tax benefits within next twelve months.

**Ordinary Shares**

**12 Months Ended**

**Dec. 31, 2018**

**Federal Home Loan Banks [Abstract]**

Ordinary Shares

**13. ORDINARY SHARES**

In 2016, 2017 and 2018, 5,197,032, 9,476,874 and 10,122,318 ordinary shares were issued in connection with the exercise of options and vesting of restricted share units previously granted to employees, executives and consultants under the Company's share incentive plans (see Note 14), respectively.

In May 2018, 5,328,853 ordinary shares were issued as part of consideration for the acquisition of Tantan. See Note 3.

As of December 31, 2018, there were 333,512,014 Class A ordinary shares and 80,364,466 Class B ordinary shares issued and outstanding, par value $0.0001 per share.

**Share-Based Compensation**

**12 Months Ended**

**Dec. 31, 2018**

**Disclosure of Compensation Related Costs, Share-based Payments [Abstract]**

Share-Based Compensation

14. **SHARE-BASED COMPENSATION**

***Share options granted by the Company***

In November 2012, the Company adopted a share incentive plan ("2012 Plan"), which was amended in October 2013. The maximum aggregate number of shares which may be issued pursuant to all awards under the 2012 Plan is 44,758,220 ordinary shares.

In November, 2014, the Company adopted the 2014 share incentive plan ("2014 Plan"), pursuant to which a maximum aggregate of 14,031,194 Class A ordinary shares may be issued pursuant to all awards granted thereunder. Starting from 2017, the number of shares reserved for future issuances under the 2014 Plan will be increased by a number equal to 1.5% of the total number of outstanding shares on the last day of the immediately preceding calendar year, or such lesser number of Class A ordinary shares as determined by the Company's board of directors, on the first day of each calendar year during the term of the 2014 Plan. With the adoption of the 2014 Plan, the Company will no longer grant any incentive shares under the 2012 Plan. The time and condition to exercise options will be determined by the Board or a committee of the Board. The term of the options may not exceed ten years from the date of the grant, except for the situation of amendment, modification and termination. Under the 2014 Plan, share options are subject to vesting schedules ranging from two to four years.

The following table summarizes the option activity for the year ended December 31, 2018:

| | Number of options | Weighted average exercise price per option (US$) | Weighted average remaining contractual life (years) | Aggregated intrinsic Value (US$) |
|---|---|---|---|---|
| Outstanding as of January 1, 2018 | 26,969,291 | 0.0536 | 7.40 | 328,658 |
| Granted | 5,502,868 | 0.0002 | | |
| Exercised | (10,028,568) | 0.0800 | | |
| Forfeited | (660,488) | 0.0002 | | |
| Outstanding as of December 31, 2018 | 21,783,103 | 0.0296 | 7.36 | 258,030 |
| Exercisable as of December 31, 2018 | 10,227,313 | 0.0628 | 5.98 | 120,807 |

There were 10,227,313 vested options, and 10,477,208 options expected to vest as of December 31, 2018. For options expected to vest, the weighted-average exercise price was US$0.0002 as of December 31, 2018 and aggregate intrinsic value was US$136,006 and US$124,415 as of December 2017 and 2018, respectively.

The weighted-average grant-date fair value of the share options granted during the years 2016, 2017, and 2018 was US$6.24, US$17.41 and US$17.75, respectively. Total intrinsic value of options exercised for the years ended December 31, 2016, 2017 and 2018 was US$45,581, US$154,233 and US$209,797, respectively. The total fair value of options vested during the years ended December 31, 2016, 2017 and 2018 was US$27,171, US$37,979 and US$59,226, respectively.

In July 2016, the Company canceled 187,500 outstanding employee share options granted under the 2014 Plan for one employee. As a result, the Company immediately recognized the unvested compensation cost attributable to the canceled award amounting to RMB10,002 in 2016.

The fair value of options granted was estimated on the date of grant using the Black-Sholes pricing model after the Company completed its IPO, with the following assumptions used for grants during the applicable periods:

| | Risk-free interest rate of return | Contractual term | Volatility | Dividend yield | Exercise price (US$) |
|---|---|---|---|---|---|
| 2016 | 1.75%~2.70% | 10 years | 52.5%~55.3% | — | 0.0002 |
| 2017 | 2.47%~2.87% | 10 years | 50.7%~54.0% | — | 0.0002 |
| 2018 | 3.16%~3.66% | 10 years | 50.0%~50.7% | — | 0.0002 |

(1)  Risk-free interest rate

Risk-free interest rate was estimated based on the yield to maturity of China international government bonds with a maturity period close to the expected term of the options.

(2) Contractual term

The Company used the original contractual term.

(3) Volatility

The volatility of the underlying ordinary shares during the life of the options was estimated based on the historical stock price volatility of comparable listed companies over a period comparable to the expected term of the options.

(4) Dividend yield

The dividend yield was estimated by the Group based on its expected dividend policy over the expected term of the options.

(5) Exercise price

The exercise price of the options was determined by the Group's board of directors.

The fair value of the ordinary shares is determined as the closing sales price of the ordinary shares as quoted on the principal exchange or system. For employee and executives share options, the Group recorded share-based compensation of RMB186,687, RMB286,119 and RMB377,241 during the years ended December 31, 2016, 2017 and 2018, respectively, based on the fair value on the grant dates over the requisite service period of award according to the vesting schedule for employee share option.

For non-employee share options the Group recorded share-based compensation of RMB20,767, RMB44,277 and RMB14,360 during the years ended December 31, 2016, 2017 and 2018, respectively, based on the fair value at the commitment date and recognized over the period the service is provided.

As of December 31, 2018, total unrecognized compensation expense relating to unvested share options was RMB1,054,778, which will be recognized over a weighted average period of 2.81 years. The weighted-average remaining contractual term of options outstanding is 7.36 years.

***Non-vested restricted shares granted by the Company***

In April 2012, the Company's four founding shareholders entered into an arrangement with the investor in conjunction with the issuance of Series A preferred shares, whereby all of their 147,000,000 ordinary shares ("Founders' shares") became subject to service and transfer restrictions. Such Founders' shares are subject to repurchase by the Company upon early termination of their four years of employment. The repurchase price is the par value of the ordinary shares. 25% of the Founders' shares shall be vested annually. The restricted share agreements were subsequently amended on June 11, 2012 and July 18, 2012, respectively. Pursuant to the agreements, 25% of the Founders' shares shall vest upon the closing of issuance of Series B preferred shares and the remaining 75% shall be vested monthly in equal installments over the next 36 months. This arrangement has been accounted for as a grant of restricted stock awards subject to service vesting conditions. Because the modification does not affect any of the other terms or conditions of the award, presumably the fair value before and after the modification is the same. The restrictions on the ordinary shares were fully released and such shares became fully vested in 2016.

On May 15, 2014, the Company's four founding shareholders entered into an agreement with the investors to renew the arrangement. The Company considered the amendment of agreement as a modification of vesting of the restricted shares. Pursuant to the agreement, the Company shall be entitled to repurchase 50% and 25% of such shares in the case that founders terminate their employments with the Company before April 17, 2015 and during the period from April 17, 2015 to April 17, 2016, respectively, at a price of US$0.0001 per share or the lowest price permitted under applicable laws. Therefore, the Company considered that 50% of the total restricted shares were vested immediately on the amendment date and 25% shall be vested annually on April 17 in the next two years ending April 17, 2016. Before the modification date, May 15, 2014, there were 131,348,411 ordinary shares, of which 45,937,500 were unvested restricted shares. As the result of modification, 19,736,705 vested ordinary shares were classified to unvested restricted shares on the modification date and the corresponding compensation costs for these unvested restricted shares were amortized over the remaining service period. Because the modification does not affect any of the other terms or conditions of the award, the fair value of the restricted shares before and after the modification is the same.

A summary of non-vested restricted share activity during the years ended December 31, 2016, 2017 and 2018 is presented below:

|  | Number of shares |
|---|---|
| Outstanding as of January 1, 2016 | 28,625,378 |

| | | |
|---|---|---|
| Granted | | |
| Modification | | — |
| Vested | | (28,625,378) |
| Outstanding as of December 31, 2016 | | — |

The weighted average grant date fair value of the non-vested restricted shares was US$0.01 per share and the aggregated fair value was US$1,470. The total fair value of non-vested restricted shares vested during the years ended December 31, 2016, 2017 and 2018 was US$286, US$ nil and US$ nil, respectively.

The Company recorded compensation expense of RMB348, RMB nil and RMB nil during the years ended December 31, 2016, 2017 and 2018, respectively, related to non-vested restricted shares.

As of December 31, 2018, total unrecognized compensation expense relating to the non-vested restricted shares was RMB nil.

***Restricted share units ("RSUs") granted by the Company***

On December 11, 2014, the Company granted a total of 40,001 shares of RSUs to independent directors under the 2014 Plan. The restricted share units will vest in accordance with the vesting schedule set out in the RSUs award agreement, which is 50% of the RSUs shall vest at the end of every six months since the grant date.

On May 17, 2016, March 7, 2017 and May 2, 2018, the Company further granted 200,000, 100,000 and 100,000 shares of RSUs, respectively, to the independent directors under the 2014 Plan with a vesting period of 4 years.

The Company will forfeit the unvested portion of the RSUs if the grantees terminate their service during the vesting period.

The Group recorded share-based compensation of RMB2,295, RMB4,173 and RMB6,609 for RSUs for the years ended December 31, 2016, 2017 and 2018, respectively, based on the fair value on the grant dates over the requisite service period of award using the straight-line method.

As of December 31, 2018, total unrecognized compensation expense relating to unvested RSUs was RMB17,979 which will be recognized over a weighted average period of 2.69 years.

***Share options granted by Tantan Limited***

In March, 2015, Tantan Limited adopted the 2015 share incentive plan ("2015 Plan"), pursuant to which a maximum aggregate of 1,000,000 shares may be issued pursuant to awards may be authorized, but unissued ordinary shares. The Board of Directors may in its discretion make adjustments to the numbers of shares. In April 2016 and March 2017, the Board of Directors of Tantan approved to adjust the numbers of shares to a maximum aggregate of 2,000,000 and 2,793,812, respectively.

In July, 2018, Tantan Limited adopted the 2018 share incentive plan ("2018 Plan"), pursuant to which the maximum aggregate number of shares which may be issued shall initially be 5,963,674 ordinary shares, plus that number of ordinary shares authorized for issuance under the 2015 Plan, in an amount equal to (i) the number of ordinary shares that were not granted pursuant to the 2015 Plan, plus (ii) the number of ordinary shares that were granted pursuant to the 2015 Plan that have expired without having been exercised in full or have otherwise become unexercisable. The time and condition to exercise options will be determined by Tantan's Board. The term of the options may not exceed ten years from the date of the grant, except for the situation of amendment, modification and termination.

Options classified as equity awards

The following table summarizes the option activity for the year ended December 31, 2018:

| | Number of options | Weighted average exercise price per option (US$) | Weighted average remaining contractual life (years) | Aggregated intrinsic value (US$) |
|---|---|---|---|---|
| Outstanding as of the acquisition date | 1,507,488 | 0.9062 | 7.07 | 45,969 |
| Granted | 575,629 | 21.4461 | | |
| Exercised | — | — | | |
| Forfeited | (186,531) | 0.7616 | | |
| Outstanding as of December 31, 2018 | 1,896,586 | 7.1544 | 7.45 | 35,666 |
| Exercisable as of December 31, 2018 | 358,281 | 1.0547 | 6.48 | 8,923 |

There were 358,281 vested options, and 1,353,711 options expected to vest as of December 31,

2018. For options expected to vest, the weighted-average exercise price was US$8.58 as of December 31, 2018 and the aggregate intrinsic value amounted to US$23,534 as of December 31, 2018.

The weighted-average grant-date fair value of the share options granted during the year ended December 31, 2018 was US$14.99. Total intrinsic value of options exercised for the year ended December 31, 2018 was US$ nil. The total fair value of options vested during the year ended December 31, 2018 was US$7,600.

The fair value of each option granted was estimated on the date of grant using the binomial tree pricing model with the following assumptions used for grants during the applicable periods:

| | Risk-free interest rate of return | Contractual term | Volatility | Dividend yield | Exercise price (US$) |
|---|---|---|---|---|---|
| During the year ended December 31, 2018 | 3.58% | 10 years | 55.4% | — | 1.6-25.0 |

(1)  Risk-free interest rate

Risk-free interest rate was estimated based on the yield to maturity of China international government bonds with a maturity period close to the expected term of the options.

(2)  Contractual term

Tantan Limited used the original contractual term.

(3)  Volatility

The volatility of the underlying ordinary shares during the life of the options was estimated based on the historical stock price volatility of comparable listed companies over a period comparable to the expected term of the options.

(4)  Dividend yield

The dividend yield was estimated by Tantan Limited based on its expected dividend policy over the expected term of the options.

(5)  Exercise price

The exercise price of the options was determined by the Tantan Limited's board of directors.

(6)  Fair value of underlying ordinary shares

The estimated fair value of the ordinary shares underlying the options as of the respective grant dates was determined based on a retrospective valuation, which used management's best estimate for projected cash flows as of each valuation date.

For share options classified as equity awards, Tantan Limited recorded share-based compensation of RMB94,977 during the year ended December 31, 2018 , based on the fair value of the grant dates over the requisite service period of award according to the vesting schedule for employee share option.

As of December 31, 2018, total unrecognized compensation expense relating to unvested share options was RMB236,053 which will be recognized over a weighted average period of 2.79 years. The weighted-average remaining contractual term of options outstanding is 7.45 years.

Options classified as liability awards

In August 2018, Tantan Limited granted 3,578,205 share options to its founders under the 2018 Plan. The founders have the right to request Tantan Limited to redeem for cash the vested options upon the termination of the founders' employment at a price based on a fixed equity value of Tantan Limited. Therefore, the awards are classified as liability on the consolidated balance sheet due to their cash settlement feature. The options include a four years vesting condition whereas options vest ratably at the end of each year. Accordingly, the awards are re-measured at each reporting date with a corresponding charge to stock-based compensation expense and are amortized over four years. The share options also include a performance condition in which the founders have the right to receive fully vested options immediately upon achieving certain performance conditions. As of December 31, 2018, the Group assessed and concluded that it is not probable that the achievement of the performance condition will be met prior to the end of the four years vesting term.

No liability classified options were vested, and 3,578,205 options were outstanding and expected to vest as of December 31, 2018. For options expected to vest, the weighted-average exercise price was US$0.002 and the aggregate intrinsic value amounted to US$92,883 as of December 31, 2018. The weighted-average grant-date fair value of the share options granted for the year ended December 31, 2018 was US$37.15.

The fair value of each option granted was estimated using the binomial tree pricing model with the following assumptions used during the applicable periods:

| | Risk-free interest rate of return | Contractual term | Volatility | Dividend yield | Exercise price (US$) |
|---|---|---|---|---|---|
| During the year ended December 31, 2018 | 3.39%~3.58% | 10 years | 55.4%~55.6% | — | 0.002 |

(1) Risk-free interest rate

Risk-free interest rate was estimated based on the yield to maturity of China international government bonds with a maturity period close to the expected term of the options.

(2) Contractual term

Tantan Limited used the original contractual term.

(3) Volatility

The volatility of the underlying ordinary shares during the life of the options was estimated based on the historical stock price volatility of comparable listed companies over a period comparable to the expected term of the options.

(4) Dividend yield

The dividend yield was estimated by Tantan Limited based on its expected dividend policy over the expected term of the options.

(5) Exercise price

The exercise price of the options was determined by the Board of Directors of Tantan Limited.

(6) Fair value of underlying ordinary shares

The estimated fair value of the ordinary shares underlying the options as of the respective grant dates was determined based on a retrospective valuation, which used management's best estimate for projected cash flows as of each valuation date.

For share options classified as liability awards, Tantan Limited recorded share-based compensation of RMB86,778 during the year ended December 31, 2018, based on the fair value at the grant date and adjusted subsequently at each reporting dates.

As of December 31, 2018, total unrecognized compensation expense relating to unvested share options was RMB818,092, which is expected to be recognized over a weighted average period of 3.62 years. Total unrecognized compensation expenses and recognition period may be adjusted for future changes in estimated forfeitures, and the probability and time of achieving the performance condition .The weighted-average remaining contractual term of options outstanding is 9.62 years.

**Net Income Per Share**

<div align="center">

**12 Months Ended**

**Dec. 31, 2018**

</div>

**Earnings Per Share [Abstract]**

Net Income Per Share

### 15. NET INCOME PER SHARE

For the year ended December 31, 2016, the Group determined that the nonvested restricted shares are participating securities as the holders of the nonvested restricted shares have a nonforfeitable right to receive dividends with all ordinary shares but the nonvested restricted shares do not have a contractual obligation to fund or otherwise absorb the Group's losses. Accordingly, the Group uses the two-class method of computing net income per share, for ordinary shares and nonvested restricted shares according to the participation rights in undistributed earnings.

The calculation of net income per share is as follows:

| | For the years ended December 31, | | |
|---|---|---|---|
| | 2016 | 2017 | 2018 |
| | RMB | RMB | RMB |
| Numerator: | | | |
| Net income attributable to Momo Inc. | 978,969 | 2,148,098 | 2,815,775 |
| Undistributed earnings allocated to participating nonvested restricted shares | (21,550) | — | — |
| Net income attributed to ordinary shareholders for computing net income per ordinary share-basic and diluted | 957,419 | 2,148,098 | 2,815,775 |

| | For the years ended December 31, | | |
|---|---|---|---|
| | 2016 | 2017 | 2018 |
| | RMB | RMB | RMB |
| Denominator: | | | |
| Denominator for computing net income per share -basic: | | | |
| Weighted average ordinary shares outstanding used in computing net income per ordinary share-basic | 377,335,923 | 394,549,323 | 407,009,875 |
| Weighted average shares used in computing net income per participating nonvested restricted share | 8,493,244 | — | — |
| Denominator for computing net income per share -diluted: | | | |
| Weighted average shares outstanding used in computing net income per ordinary share-diluted | 407,041,165 | 415,265,078 | 433,083,643(i) |
| Net income per ordinary share attributable to Momo Inc. - basic | 2.54 | 5.44 | 6.92 |
| Net income per participating nonvested restricted share | 2.54 | — | — |
| Net income per ordinary share attributable to Momo Inc. - diluted | 2.41 | 5.17 | 6.59 |

The following table summarizes potential ordinary shares outstanding excluded from the computation of diluted net income per ordinary share for the years ended December 31, 2016, 2017 and 2018, because their effect is anti-dilutive:

| | For the years ended December 31, | | |
|---|---|---|---|
| | 2016 | 2017 | 2018 |
| Share issuable upon exercise of share options | 152,500 | 768,266 | 1,117,334 |
| Share issuable upon exercise of RSUs | 50,000 | — | — |

(i) The calculation of the weighted average number of ordinary shares for the purpose of diluted net income per share has considered the effect of certain potentially dilutive securities. For the year ended December 31, 2016, an incremental weighted average number of 7,155,060 nonvested restricted shares and an incremental weighted average number of 22,550,182 ordinary shares from the assumed exercise of share options and vesting of RSUs using the treasury stock method were included.

For the year ended December 31, 2017, an incremental weighted average number of

20,715,755 ordinary shares from the assumed exercise of share options and RSUs were included.

For the year ended December 31, 2018, an incremental weighted average number of 14,821,852 ordinary shares from the assumed exercise of share options and RSUs and an incremental weighted average number of 11,251,916 ordinary shares resulting from the assumed conversion of convertible senior notes were included.

**Commitments and Contingencies**

**12 Months Ended**

**Dec. 31, 2018**

**Commitments and Contingencies Disclosure [Abstract]**

Commitments and Contingencies

16. **COMMITMENTS AND CONTINGENCIES**

Lease commitment

The Group leases certain office premises under non-cancellable leases. These leases expire through 2022 and are renewable upon negotiation. Rental expenses under operating leases for the years ended December 31, 2016, 2017 and 2018 were RMB31,554, RMB58,861 and RMB78,713, respectively.

Future minimum payments under non-cancellable operating leases as of December 31, 2018 were as follows:

|  | RMB |
|---|---|
| 2019 | 99,133 |
| 2020 | 82,697 |
| 2021 | 26,980 |
| 2022 | 8,633 |
| Total | 217,443 |

Investment commitments

The Group was obligated to subscribe RMB30,001 and RMB47,500 for partnership interest and equity interest of certain long-term investees under various arrangements as of December 31, 2017 and 2018, respectively.

Contingencies

The Group is subject to legal proceedings in the ordinary course of business. The Group does not believe that any currently pending legal or administrative proceeding to which the Group is a party will have a material effect on its business or financial condition.

**Related Party Balances and Transactions**

**12 Months Ended**

**Dec. 31, 2018**

**Related Party Transactions [Abstract]**

Related Party Balances and Transactions

17.  **RELATED PARTY BALANCES AND TRANSACTIONS**

| Major related parties | Relationship with the Group |
|---|---|
| Hangzhou Alimama Technology Co., Ltd. (i) | Affiliates of a Major Shareholder |
| Guangzhou UC Network Technology Co., Ltd. (i) | Affiliates of a Major Shareholder |
| Guangzhou Aijiuyou Informational Technology Co., Ltd. (i) | Affiliates of a Major Shareholder |
| Alibaba Cloud Computing Ltd. (i) | Affiliates of a Major Shareholder |
| Taobao (China) Software Co., Ltd. (i) | Affiliates of a Major Shareholder |
| Zhejiang Tmall Technology Co., Ltd. (i) | Affiliates of a Major Shareholder |
| Hangzhou Yihong Advertisement Co., Ltd. (i) | Affiliates of a Major Shareholder |
| Guangzhou Jianyue Information Technology Co., Ltd. (i) | Affiliates of a Major Shareholder |
| Shanghai Xisue Network Technology Co., Ltd. | Affiliate of a long-term investee |
| Hunan Qindao Network Media Technology Co., Ltd. | Affiliate of a long-term investee |
| Hunan Qindao Cultural Spread Ltd. | Long-term investee |
| Shanghai Touch Future Network Technology Co., Ltd. | Long-term investee |
| Beijing Shiyue Haofeng Media Co. Ltd. | Long-term investee |

(i)  The parent company of these entities ceased to be a major shareholder of the Group in November 2017.

(1)  Amount due from related parties-current

| | As of December 31, | |
|---|---|---|
| | 2017 | 2018 |
| | RMB | RMB |
| Hunan Qindao Network Media Technology Co., Ltd. (ii) | 33,460 | — |
| Total | 33,460 | — |

(ii)  The amount of RMB33,460 as of December 31, 2017 represented the advance payment of revenue sharing of live video service made to Hunan Qindao Network Media Technology Co., Ltd.

(2)  Amount due to related parties - current

| | As of December 31, | |
|---|---|---|
| | 2017 | 2018 |
| | RMB | RMB |
| Hunan Qindao Network Media Technology Co., Ltd. (iii) | 32 | 43,178 |
| Amount due to ordinary shareholders (iv) | 37,572 | 39,704 |
| Others | 156 | 66 |
| Total | 37,760 | 82,948 |

(iii)  The amount of RMB43,178 as of December 31, 2018 primarily represented the unpaid revenue sharing of live video service to Hunan Qindao Network Media Technology Co., Ltd.

(iv)  The amount of RMB37,572 and RMB39,704 as of December 31, 2017 and 2018 primarily included the unpaid repurchase amount by the Group to its ordinary shareholders.

(3)  Sales to related parties

| | For the years ended December 31, | | |
|---|---|---|---|
| | 2016 | 2017 | 2018 |
| | RMB | RMB | RMB |
| Hangzhou Yihong Advertisement Co., Ltd. (v) | — | 17,659 | — |
| Hangzhou Alimama Technology Co., Ltd. (v) | 273 | 2,309 | — |
| Guangzhou Aijiuyou Informational Technology Co., Ltd. (vi) | 2,660 | 1,242 | — |

| | | | |
|---|---|---|---|
| Zhejiang Tmall Technology Co., Ltd. (v) | 5,462 | 500 | — |
| Shanghai Xisue Network Technology Co., Ltd. (v) | 5,981 | — | — |
| Taobao (China) Software Co., Ltd. (v) | 1,698 | — | — |
| Others | 61 | 12 | — |
| Total | 16,135 | 21,722 | — |

(v)  The sales to related parties represented mobile marketing services provided.

(vi)  The sales to related parties represented mobile game revenue generated through those game operating companies.

(4)  Purchase from related parties

| | For the years ended December 31, | | |
|---|---|---|---|
| | 2016 | 2017 | 2018 |
| | RMB | RMB | RMB |
| Hunan Qindao Network Media Technology Co., Ltd. (vii) | 26,759 | 139,406 | 429,345 |
| Beijing Shiyue Haofeng Media Co., Ltd. (vii) | — | — | 2,005 |
| Alibaba Cloud Computing Ltd. (viii) | 22,534 | 74,705 | — |
| Hunan Qindao Cultural Spread Ltd. (vii) | — | 61,676 | — |
| Taobao (China) Software Co., Ltd. | 2,169 | 2,283 | — |
| Guangzhou Jianyue Information Technology Co., Ltd. | — | 803 | — |
| Shanghai Touch Future Network Technology Co., Ltd. | 2,335 | — | — |
| Total | 53,797 | 278,873 | 431,350 |

(vii)  The purchases from Hunan Qindao Network Media Technology Co., Ltd., Beijing Shiyue Haofeng Media Co. Ltd. and Hunan Qindao Cultural Spread Ltd. mainly represent the revenue sharing with talent agencies of live video service.

(viii) The purchase form Alibaba Cloud Computing Ltd. is mainly related to its cloud computing services.

**Segment Information**

**12 Months Ended**

**Dec. 31, 2018**

**Segment Reporting [Abstract]**

Segment Information

18. **SEGMENT INFORMATION**

The Group's chief operating decision maker has been identified as the Chief Executive Officer ("CEO") who reviews financial information of operating segments based on US GAAP amounts when making decisions about allocating resources and assessing performance of the Group.

During the years ended December 31, 2016 and 2017, the Group operated and managed its business as a single reporting segment, which included the provision of live video service, value-added services, mobile marketing services, mobile games and other services. The Group did not have discrete financial information of costs and expenses between various services in its internal reporting, and reported costs and expenses by nature as a whole. Therefore, the Group had one operating segment. During the year ended December 31, 2018, as a result of the Tantan acquisition discussed in Note 3, the Group determined that Tantan met the criteria for separate reportable segment given its financial information is separately reviewed by the Group's CEO. Additionally, the Group started its entertainment business that included TV content production through one of its subsidiary QOOL, for which the Group's CEO started to review discrete financial information. As a result, the Group determined that for the year ended December 31, 2018, it operated in three operating segments namely Momo, Tantan and QOOL. Momo's services mostly include live video services, value-added service, mobile marketing services and mobile games derived from the Momo's platform. Tantan's services mostly include value-added services provided on Tantan's platform. QOOL services mainly include advertisement services generated from the Group's broadcasting of content television.

The Group primarily operates in the PRC and substantially all of the Group's long-lived assets are located in the PRC.

The Group's chief operating decision maker evaluates performance based on each reporting segment's net revenue, operating cost and expenses, operating income and net income. Prior to Tantan acquisition, Tantan's financial information was not consolidated to the Group's financial statements, therefore Tantan's service lines do not have comparable financial information in 2016 and 2017. QOOL started its entertainment business since 2017 and the comparable financial information in 2016 and 2017 account for an insignificant portion to the Group's consolidated financial statements. Net revenues, operating cost and expenses, operating income, and net income by segment for the years ended December 31, 2016, 2017 and 2018 were as follows:

| | For the year ended December 31, 2016 | | | |
| --- | --- | --- | --- | --- |
| | Momo | Tantan | QOOL | Consolidated |
| | RMB | RMB | RMB | RMB |
| Net revenues: | 3,707,358 | — | — | 3,707,358 |
| Cost and expenses: | | | | |
|     Cost of revenues | (1,619,327) | — | — | (1,619,327) |
|     Research and development | (208,647) | — | — | (208,647) |
|     Sales and marketing | (647,238) | — | — | (647,238) |
|     General and administrative | (259,712) | — | — | (259,712) |
| Total cost and expenses | (2,734,924) | — | — | (2,734,924) |
| Other operating income | 2,659 | — | — | 2,659 |
| Income from operations | 975,093 | — | — | 975,093 |
| Interest income | 54,603 | — | — | 54,603 |
| Impairment loss on long-term investments | (39,283) | — | — | (39,283) |
| Income tax expense | (34,638) | — | — | (34,638) |
| Share of income on equity method investments | 23,194 | — | — | 23,194 |
| Net income | 978,969 | — | — | 978,969 |

| | For the year ended December 31, 2017 | | | |
| --- | --- | --- | --- | --- |
| | Momo | Tantan | QOOL | Consolidated |
| | RMB | RMB | RMB | RMB |
| Net revenues: | 8,884,823 | — | 1,567 | 8,886,390 |
| Cost and expenses: | | | | |
|     Cost of revenues | (4,373,377) | — | — | (4,373,377) |
|     Research and development | (346,144) | — | — | (346,144) |
|     Sales and marketing | (1,457,658) | — | (9,718) | (1,467,376) |
|     General and administrative | (417,866) | — | (4,139) | (422,005) |
| Total cost and expenses | (6,595,045) | — | (13,857) | (6,608,902) |
| Other operating income | 156,764 | — | — | 156,764 |

| | | | |
|---|---|---|---|
| Income (loss) from operations | 2,446,542 | (12,290) | 2,434,252 |
| Interest income | 145,568 | — | — | 145,568 |
| Impairment loss on long-term investments | (30,085) | — | — | (30,085) |
| Income tax expense | (445,001) | — | — | (445,001) |
| Share of income on equity method investments | 39,729 | — | — | 39,729 |
| Net income (loss) | 2,156,753 | — | (12,290) | 2,144,463 |

| | For the year ended December 31, 2018 | | | |
|---|---|---|---|---|
| | Momo | Tantan | QOOL | Consolidated |
| | RMB | RMB | RMB | RMB |
| Net revenues: | 12,812,421 | 417,998 | 178,002 | 13,408,421 |
| Cost and expenses: | | | | |
|     Cost of revenues | (6,572,954) | (174,858) | (435,085) | (7,182,897) |
|     Research and development | (614,064) | (146,580) | — | (760,644) |
|     Sales and marketing | (1,269,493) | (520,161) | (22,608) | (1,812,262) |
|     General and administrative | (472,057) | (121,887) | (46,079) | (640,023) |
| Total cost and expenses | (8,928,568) | (963,486) | (503,772) | (10,395,826) |
| Other operating income | 252,458 | 173 | 1,066 | 253,697 |
| Income (loss) from operations | 4,136,311 | (545,315) | (324,704) | 3,266,292 |
| Interest income | 268,583 | 4,285 | 78 | 272,946 |
| Interest expense | (56,503) | — | — | (56,503) |
| Impairment loss on long-term investments | (43,200) | — | — | (43,200) |
| Income tax expense | (716,729) | 21,824 | (4,743) | (699,648) |
| Share of income on equity method investments | 48,660 | — | — | 48,660 |
| Net income (loss) | 3,637,122 | (519,206) | (329,369) | 2,788,547 |

**Employee Benefit Plan**

**12 Months Ended**

**Dec. 31, 2018**

**Retirement Benefits [Abstract]**

Employee Benefit Plan

19. **EMPLOYEE BENEFIT PLAN**

Full time employees of the Group in the PRC participate in a government-mandated defined contribution plan pursuant to which certain pension benefits, medical care, unemployment insurance, employee housing fund and other welfare benefits are provided to employees. The Group accrues for these benefits based on certain percentages of the employees' salaries. The total provisions for such employee benefits were RMB60,403, RMB95,150 and RMB166,998 for the years ended December 31, 2016, 2017 and 2018, respectively.

**Statutory Reserves and Restricted Net Assets**

**12 Months Ended Dec. 31, 2018**

**Receivables [Abstract]**

Statutory Reserves and Restricted Net Assets

**20.  STATUTORY RESERVES AND RESTRICTED NET ASSETS**

In accordance with the Regulations on Enterprises with Foreign Investment of China and their articles of association, the Group's subsidiaries and VIEs located in the PRC, being foreign invested enterprises established in the PRC, are required to provide for certain statutory reserves. These statutory reserve funds include one or more of the following: (i) a general reserve, (ii) an enterprise expansion fund or discretionary reserve fund, and (iii) a staff bonus and welfare fund. Subject to certain cumulative limits, the general reserve fund requires a minimum annual appropriation of 10% of after-tax profit (as determined under accounting principles generally accepted in China at each year-end); the other fund appropriations are at the subsidiaries' or the affiliated PRC entities' discretion. These statutory reserve funds can only be used for specific purposes of enterprise expansion, staff bonus and welfare, and are not distributable as cash dividends except in the event of liquidation of our subsidiaries, our affiliated PRC entities and their respective subsidiaries. The Group's subsidiaries, VIEs and VIEs' subsidiaries are required to allocate at least 10% of their after tax profits to the general reserve until such reserve has reached 50% of their respective registered capital.

Appropriations to the enterprise expansion reserve and the staff welfare and bonus reserve are to be made at the discretion of the board of directors of each of the Group's subsidiaries.

The appropriations to these reserves by the Group's PRC subsidiaries, VIEs and VIEs' subsidiaries were RMB119,308, RMB185,270 and RMB5,194 for the years ended December 31, 2016, 2017 and 2018.

Relevant PRC laws and regulations restrict the WFOEs, VIEs and VIEs' subsidiaries from transferring a portion of their net assets, equivalent to the balance of their statutory reserves and their paid in capital, to the Company in the form of loans, advances or cash dividends. The WFOEs' accumulated profits may be distributed as dividends to the Company without the consent of a third party. The VIEs and VIEs' subsidiaries' revenues and accumulated profits may be transferred to the Company through contractual arrangements without the consent of a third party. Under applicable PRC law, loans from PRC companies to their offshore affiliated entities require governmental approval, and advances by PRC companies to their offshore affiliated entities must be supported by bona fide business transactions. The capital and statutory reserves restricted which represented the amount of net assets of the Group's PRC subsidiaries, VIEs and VIEs' subsidiaries in the Group not available for distribution were RMB677,213, RMB862,484 and RMB1,477,339 as of December 31, 2016, 2017 and 2018, respectively.

| Subsequent Events | 12 Months Ended |
| --- | --- |
| | Dec. 31, 2018 |

**Subsequent Events [Abstract]**

Subsequent Events

**21.  SUBSEQUENT EVENTS**

Special cash dividend

On March 12, 2019, the Company declared a special cash dividend in the amount of US$0.62 per ADS, or US$0.31 per ordinary share. The cash dividend will be paid on April 30, 2019 to shareholders of record at the close of business on April 5, 2019. The ex-dividend date will be April 4, 2019. The aggregate amount of cash dividends to be paid is approximately US$128 million, which will be funded by surplus cash on the Company's balance sheet.

Newly granted share options and RSUs

In April 2019, the Company granted 3,219,296 share options to its employees and executives with an exercise price of $0.0002 per share and 130,000 RSUs to its directors, with the vesting period of four years. The Group is in the process of finalizing the fair value assessment.

| Significant Accounting Policies (Policies) | 12 Months Ended Dec. 31, 2018 |
|---|---|

**Basis of presentation**

Basis of presentation

The consolidated financial statements of the Group have been prepared in accordance with the accounting principles generally accepted in the United States of America ("U.S. GAAP").

**Basis of consolidation**

Basis of consolidation

The consolidated financial statements of the Group include the financial statements of Momo Inc., its subsidiaries, its VIEs and VIEs' subsidiaries. All inter-company transactions and balances have been eliminated upon consolidation.

**Use of estimates**

Use of estimates

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and revenues, cost and expenses in the financial statements and accompanying notes. Significant accounting estimates reflected in the Group's consolidated financial statements include revenue recognition, the acquisition's purchase price allocation, the useful lives and impairment of property and equipment and intangible assets, the impairment of goodwill, the valuation allowance for deferred tax assets, and share-based compensation.

**Cash and cash equivalents**

Cash and cash equivalents

Cash and cash equivalents consist of cash on hand and highly liquid investments, which are unrestricted from withdrawal or use, or which have original maturities of three months or less when purchased.

**Term deposits**

Term deposits

Term deposits consist of bank deposits with an original maturity of over three months.

**Accounts receivable**

Accounts receivable

Accounts receivable primarily represents the cash due from third-party application stores and other payment channels and advertising customers, net of allowance for doubtful accounts. The Group makes estimates for the allowance for doubtful accounts based upon its assessment of various factors, including the age of accounts receivable balances, credit quality of third-party application stores and other payment channels, advertising customers and other customers, current economic conditions and other factors that may affect their ability to pay. An allowance for doubtful accounts is recorded in the period in which a loss is determined to be probable.

**Financial instruments**

Financial instruments

Financial instruments of the Group primarily consist of cash and cash equivalents, term deposits, accounts receivable, equity securities without readily determinable fair value, accounts payable, deferred revenue, income tax payable, amount due from related parties and amount due to related parties.

Cash and cash equivalents are recorded at fair value based on the quoted market price in an active market. The carrying values of term deposits, accounts receivable, accounts payable, deferred revenue, income tax payable, amount due from related parties and amount due to related parties approximate their fair values due to short-term maturities. It is not practical to estimate the fair value of the Group's equity securities without readily determinable fair value because of the lack of quoted market price and the inability to estimate fair value without incurring excessive costs.

**Foreign currency risk**

Foreign currency risk

The Renminbi ("RMB") is not a freely convertible currency. The State Administration for Foreign Exchange, under the authority of the People's Bank of China, controls the conversion of RMB into foreign currencies. The value of the RMB is subject to changes in central government policies and to international economic and political developments affecting supply and demand in the China Foreign Exchange Trading System market. Cash and cash equivalents of the Group included aggregate amounts of RMB4,116 million and RMB2,008 million as of December 31, 2017 and 2018, respectively, which were denominated in RMB.

**Business combinations**

Business combinations

Business combinations are recorded using the acquisition method of accounting in accordance with

Accounting Standards Codification ("ASC") 805 "Business Combinations". The cost of an acquisition is measured as the aggregate of the acquisition date fair value of the assets transferred to the sellers and liabilities incurred by the Company and equity instruments issued. Identifiable assets and liabilities acquired or assumed are measured separately at their fair values as of the acquisition date, irrespective of the extent of any noncontrolling interests. The purchase price of business acquisition is allocated to the tangible assets, liabilities, identifiable intangible assets acquired and non-controlling interest, if any, based on their estimated fair values as of the acquisition date. The excess of the purchase price over those fair values is recorded as goodwill. Acquisition-related expenses and restructuring costs are expensed as incurred.

The Company adopted Accounting Standard Update ("ASU") 2017-01 "Business Combination (Topic 805): Clarifying the Definition of a Business" on January 1, 2018 and applied the new definition of a business prospectively for acquisitions made subsequent to December 31, 2017. Upon the adoption of ASU 2017-01, a new screen is introduced to evaluate whether a transaction should be accounted for as an acquisition and/or disposal of a business versus assets. In order for a purchase to be considered an acquisition of a business, and receive business combination accounting treatment, the set of transferred assets and activities must include, at a minimum, an input and a substantive process that together significantly contribute to the ability to create outputs. If substantially all of the fair value of the gross assets acquired is concentrated in a single identifiable asset or a group of similar identifiable assets, then the set of transferred assets and activities is not a business. The adoption of this standard requires future purchases to be evaluated under the new framework.

### Equity securities without readily determinable fair value

The Company adopted ASC Topic 321, Investments—Equity Securities ("ASC 321") on January 1, 2018. Prior to 2018, the Company carried at cost its investments in investees that do not have readily determinable fair value and over which the Company does not have significant influence, in accordance with ASC Subtopic 325-20, Investments-Other: Cost Method Investments. Management regularly evaluates the impairment of the cost method investments based on the performance and financial position of the investee as well as other evidence of market value. Such evaluation includes, but is not limited to, reviewing the investee's cash position, recent financing, projected and historical financial performance. An impairment loss is recognized in earnings equal to the excess of the investment's cost over its fair value at the balance sheet date of the reporting period for which the assessment is made. The fair value would then become the new cost basis of the investment.

Subsequent to the Company's adoption of ASC 321 for equity securities without readily determinable fair value do not qualify for the existing practical expedient available in ASC Topic 820, *Fair Value Measurements and Disclosures* ("ASC 820") there the Company elected to use the measurement alternative to measure those investments at cost, less any impairment, plus or minus changes resulting from observable price changes in orderly transactions for identical or similar investments of the same issuer, if any.

Pursuant to ASC 321, for those equity securities that the Company elects to use the measurement alternative, the Company makes a qualitative assessment of whether the investment is impaired at each reporting date. If a qualitative assessment indicates that the investment is impaired, the Company has to estimate the investment's fair value in accordance with the principles of ASC 820. If the fair value is less than the investment's carrying value, the Company recognizes an impairment loss in net income equal to the difference between the carrying value and fair value.

### Equity method investments

The investee companies over which the Group has the ability to exercise significant influence, but does not have a controlling interest are accounted for using the equity method. Significant influence is generally considered to exist when the Group has an ownership interest in the voting stock of the investee between 20% and 50%. Other factors, such as representation in the investee's Board of Directors, voting rights and the impact of commercial arrangements, are also considered in determining whether the equity method of accounting is appropriate. For the investment in limited partnerships, where the Group holds less than a 20% equity or voting interest, the Group's influence over the partnership operating and financial policies is determined to be more than minor. Accordingly, the Group accounts for these investments as equity method investments.

Under the equity method of accounting, the affiliated company's accounts are not reflected within the Group's consolidated balance sheets and statements of operations; however, the Group's share of the earnings or losses of the affiliated company is reflected in the caption "share of income on equity method investments" in the consolidated statements of operations.

An impairment change is recorded if the carrying amount of the investment exceeds its fair value and this condition is determined to be other-than-temporary.

The Group estimates the fair value of the investee company based on comparable quoted price for similar investment in active market, if applicable, or discounted cash flow approach which requires significant judgments, including the estimation of future cash flows, which is dependent on internal forecasts, the estimation of long term growth rate of a company's business, the estimation of the useful

life over which cash flows will occur, and the determination of the weighted average cost of capital.

## Available-for-sale investments

Available-for-sale investments

For investments in investees' stocks which are determined to be debt securities, the Group accounts for them as long-term available-for-sale investments when they are not classified as either trading or held-to-maturity investments.

Available-for-sale investments are reported at fair value, with unrealized gains and losses recorded in accumulated other comprehensive income (loss) as a component of shareholders' equity. Realized gains and losses and provision for decline in value judged to be other than temporary, if any, are recognized in the consolidated statements of operations.

The Group continually reviews its available-for-sale investments to determine whether a decline in fair value below the carrying value is other than temporary. The primary factors the Group considers in its determination are the length of time that the fair value of the investment is below the Group's carrying value; the financial condition, operating performance and the prospects of the available-for-sale investee; and other specific information such as recent financing rounds. If the decline in fair value is deemed to be other than temporary, the carrying value of the available-for-sale investee is written down to fair value. The Group estimated the fair value of these investee companies based on discounted cash flow approach which requires significant judgments, including the estimation of future cash flows, which is dependent on internal forecasts, the estimation of long term growth rate of a company's business, the estimation of the useful life over which cash flows will occur, and the determination of the weighted average cost of capital.

## Property and equipment, net

Property and equipment, net

Property and equipment are stated at cost less accumulated depreciation. Depreciation is calculated on a straight-line basis over the following estimated useful lives:

| | |
|---|---|
| Office equipment | 3-5 years |
| Computer equipment | 3 years |
| Vehicles | 5 years |
| Leasehold improvement | Shorter of the lease term or estimated useful lives |

## Intangible assets

Intangible assets

Intangible assets acquired through business acquisitions are recognized as assets separate from goodwill if they satisfy either the "contractual-legal" or "separability" criterion. Purchased intangible assets and intangible assets arising from acquisitions are recognized and measured at fair value upon acquisition. Separately identifiable intangible assets that have determinable lives continue to be amortized over their estimated useful lives using the straight-line method as follows:

| | |
|---|---|
| Copyright | 1 year |
| License | 3.2-10 years |
| Technology | 3 years |
| User base | 5 years |
| Trade name | 10 years |

## Impairment of long-lived assets with finite lives

Impairment of long-lived assets with finite lives

The Group reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may no longer be recoverable. When these events occur, the Group measures impairment by comparing the carrying value of the long-lived assets to the estimated undiscounted future cash flows expected to result from the use of the assets and their eventual disposition. If the sum of the expected undiscounted cash flow is less than the carrying amount of the assets, the Group recognizes an impairment loss based on the fair value of the assets.

## Goodwill

Goodwill

Goodwill represents the excess of the purchase consideration over the fair value of the identifiable tangible and intangible assets acquired and liabilities assumed of the acquired entity as a result of the Company's acquisitions of interests in its subsidiaries. Goodwill is not amortized but is tested for impairment on an annual basis, or more frequently if events or changes in circumstances indicate that it might be impaired. The Company has an option to first assess qualitative factors to determine whether it is necessary to perform the two-step quantitative goodwill impairment test. In the qualitative assessment, the Company considers primary factors such as industry and market considerations, overall financial performance of the reporting unit, and other specific information related to the operations. Based on the qualitative assessment, if it is more likely than not that the fair value of each

reporting unit is less than the carrying amount, the quantitative impairment test is performed.

In performing the two-step quantitative impairment test, the first step compares the fair values of each reporting unit to its carrying amount, including goodwill. If the fair value of each reporting unit exceeds its carrying amount, goodwill is not considered to be impaired and the second step will not be required. If the carrying amount of a reporting unit exceeds its fair value, the second step compares the implied fair value of goodwill to the carrying value of a reporting unit's goodwill. The implied fair value of goodwill is determined in a manner similar to accounting for a business combination with the allocation of the assessed fair value determined in the first step to the assets and liabilities of the reporting unit. The excess of the fair value of the reporting unit over the amounts assigned to the assets and liabilities is the implied fair value of goodwill. This allocation process is only performed for the purposes of evaluating goodwill impairment and does not result in an entry to adjust the value of any assets or liabilities. Application of a goodwill impairment test requires significant management judgment, including the identification of reporting units, assigning assets, liabilities and goodwill to reporting units, and determining the fair value of each reporting unit.

## Convertible senior notes

The Group determines the appropriate accounting treatment of its convertible senior notes in accordance with the terms in relation to the conversion feature, call and put options, and beneficial conversion feature. After considering the impact of such features, the Group may account for such instrument as a liability in its entirety, or separate the instrument into debt and equity components following the respective guidance described under ASC 815 "Derivatives and Hedging" and ASC 470 "Debt". The debt discount, if any, together with the related issuance cost are subsequently amortized as interest expense, using the effective interest method, from the issuance date to the earliest maturity date. Interest expenses are recognized in the consolidated statement of operation in the period in which they are incurred.

## Fair value

Fair value is the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. When determining the fair value measurements for assets and liabilities required or permitted to be recorded at fair value, the Group considers the principal or most advantageous market in which it would transact and it considers assumptions that market participants would use when pricing the asset or liability.

Authoritative literature provides a fair value hierarchy that requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value. An asset or liability categorization within the fair value hierarchy is based upon the lowest level of input that is significant to the fair value measurement as follows:

*Level 1*

Level 1 applies to assets or liabilities for which there are quoted prices in active markets for identical assets or liabilities.

*Level 2*

Level 2 applies to assets or liabilities for which there are inputs other than quoted prices included within Level 1 that are observable for the assets or liabilities such as quoted prices for similar assets or liabilities in active markets; quoted prices for identical assets or liabilities in markets with insufficient volume or infrequent transactions (less active markets); or model-derived valuations in which significant inputs are observable or can be derived principally from, or corroborated by, observable market data.

*Level 3*

Level 3 applies to assets or liabilities for which there are unobservable inputs to the valuation methodology that are significant to the measurement of the fair value of the assets or liabilities.

## Revenue recognition

*Adoption of ASC, "Revenue from Contracts with Customers"*

In May 2014, the Financial Accounting Standards Board ("FASB") issued ASU No. 2014-09, Revenue from Contracts with Customers (Topic 606) ("Topic 606") as modified by subsequently issued ASUs 2015-14, 2016-08,2016-10, 2016-12 and 2016-20 (collectively "ASU 2014-09").

On January 1, 2018, the Group adopted Topic 606 by applying the modified retrospective method to contracts that were not completed as of January 1, 2018. Results for the reporting periods beginning after January 1, 2018 are presented under Topic 606 while prior period amounts are not

adjusted and continue to be reporting in accordance with the Group's historical accounting under Topic 605. The adoption of Topic 606 did not have a material impact on the Group's consolidated results of operations, financial position or cash flows but resulted in additional disclosures regarding the nature, amount, timing and uncertainty of revenue and cash flows arising from contracts with customers.

The Group principally derives its revenue from live video services, value-added services, mobile marketing services, mobile games and other services. The Group recognizes revenue when control of the promised goods or services are transferred to the customers, in an amount that reflects the consideration that the Group expects to receive in exchange for those goods or services. The Group applied the five steps method outlined in Topic 606 to all revenue streams. In addition, the standard requires disclosures of the nature, amount, timing and uncertainty of revenue and cash flows arising from contracts with customers.

For the years ended December 31, 2016, 2017 and 2018, all the revenue for the periods was recognized from contracts with customers. The Group's revenue is reported net of discounts, value added tax and surcharges.

The following table provides information about disaggregated revenue by types, including a reconciliation of the disaggregated revenue with the Group's reportable segments:

| | For the year ended December 31, 2018 | | |
| | Momo | Tantan | QOOL |
| | RMB | RMB | RMB |
| Live video service | 10,709,491 | — | — |
| Value-added services | 1,465,152 | 417,998 | — |
| Mobile marketing | 500,321 | — | — |
| Mobile games | 130,392 | — | — |
| Other services | 7,065 | — | 178,002 |
| Total | 12,812,421 | 417,998 | 178,002 |

| | For the year ended December 31, 2017 | | |
| | Momo | Tantan | QOOL |
| | RMB | RMB | RMB |
| Live video service | 7,429,906 | — | — |
| Value-added services | 695,798 | — | — |
| Mobile marketing | 514,279 | — | — |
| Mobile games | 241,388 | — | — |
| Other services | 3,452 | — | 1,567 |
| Total | 8,884,823 | — | 1,567 |

| | For the year ended December 31, 2016 | | |
| | Momo | Tantan | QOOL |
| | RMB | RMB | RMB |
| Live video service | 2,534,604 | — | — |
| Value-added services | 449,781 | — | — |
| Mobile marketing | 441,644 | — | — |
| Mobile games | 236,238 | — | — |
| Other services | 45,091 | — | — |
| Total | 3,707,358 | — | — |

(a) Live video service

The Group is principally engaged in providing live video services whereby users can enjoy live performances and interact with the broadcasters for free during the performance. Broadcasters can either host the performance on their own or join a talent agency. The Group generates revenue from sales of virtual items to its customers. The Group designs, creates and offers various virtual items for sales to users with pre-determined stand-alone selling price, which if users chose to, can be purchased and be presented to the broadcasters to show their support during their live video performance. The Group has a recharge system for users to purchase the Group's virtual currency that can then be used to purchase virtual items on the Group's platform. Users can recharge via various third-party application stores and other payment channels. Virtual currency is non-refundable and does not have any expiration date. Based on the turnover history of virtual currency, the Group determined that the virtual currency is often consumed soon after it is purchased and accordingly, the Group concluded that any breakage would be insignificant. Unconsumed virtual currency is recorded as deferred revenue.

Virtual currencies used to purchase virtual items are recognized as revenue according to the prescribed revenue recognition policies of virtual items addressed below unless otherwise stated. All virtual items are non-refundable, consumed at a point-in-time and expire in a few days after the purchase. Under arrangements entered into with broadcasters and talent agencies, the Group shares a portion of the revenues derived from the sales of virtual items with them ("Revenue Sharing").

The Group has evaluated and determined that it is the principal and views the users to be its customers. Specifically, the Group controls the virtual items before they are transferred to users. Its control is evidenced by the Group's sole ability to monetize the virtual items before they are transferred to users, and is further supported by the Group being primarily responsible to the users for the delivery of the virtual items as well as having full discretion in establishing pricing for the virtual items. Accordingly, the Group reports its live video service revenues on a gross basis with amounts billed to users for the virtual items recorded as revenues and the Revenue Sharing paid to broadcasters and talent agencies recorded as cost of revenues. Sales proceeds are initially recorded as deferred revenue and recognized as revenue based on the consumption of the virtual items. The Group has determined that the virtual items represent one performance obligation in the live video service. Revenue related to each of the virtual items is recognized at the point in time when the virtual item is transferred directly to the broadcasters and consumed by them. Although some virtual items have expiry dates, the Group considers that the impact of breakage for the virtual items is insignificant as historical data shows that virtual items are consumed shortly after they are released to users and the forfeiture rate remains relatively low for the periods presented. The Group does not have further performance obligations to the user after the virtual items are consumed.

Users also have the right to purchase various combinations of virtual items in the live video, which are generally capable of being distinct. Specifically, the Group enters into certain contracts with its users where virtual item coupons are granted to users simultaneously with a purchase of a virtual item. The virtual item coupon can be used by the users to exchange for free virtual items in the future. Such virtual item coupons typically expire a few days after being granted. The Group has determined that the virtual item coupons represent a material right under Topic 606 which is recognized as a separate performance obligation at the outset of the arrangement. Judgment is required to determine the standalone selling price for each distinct virtual item and virtual item coupon. The Group allocates the consideration to each distinct virtual item and virtual item coupon based on their relative standalone selling prices. In instances where standalone selling price is not directly observable as the Group does not sell the virtual items separately, the Group determines the standalone selling price based on pricing strategies, market factors and strategic objectives. The Group recognizes revenue for each of the distinct virtual item in accordance with the revenue recognition method discussed above unless otherwise stated. Revenue for the virtual item coupons are recognized when the virtual items purchased with the virtual item coupons are consumed. Although virtual item coupons have expiry dates, the Group considers that the impact of breakage for the virtual items is insignificant as historical data shows that virtual currency coupons are consumed shortly after they are released to users and the forfeiture rate remains relatively low for the periods presented.

The Group does not provide any right of return and does not provide any other credit or incentive to its users.

(b)   Value-added services

Value-added services revenues mainly include membership subscription revenue and virtual gift service revenue. Membership subscription is a service package which enables members to enjoy additional functions and privileges. The contract period for the membership subscription ranges from one month to one year. All membership subscription is nonrefundable. The Group has determined that its membership subscription services represent one performance obligation. The Group collects membership subscription in advance and records it as deferred revenue. Revenue is recognized ratably over the contract period as the membership subscription services are delivered.

Virtual gift service was launched in 2016 to enhance users' experience of interaction and social networking with each other. Users are able to purchase virtual items and send them to other users. The Group shares a portion of the revenues derived from the sales of virtual items with the recipient of the virtual item. All virtual items are nonrefundable, consumed at a point-in-time and expire a few days after the purchase. Although some virtual items have expiry dates, the Group considers that the impact of breakage for the virtual items is insignificant as historical data shows that virtual items are consumed shortly after they are released to users, and the forfeiture rate remains relatively low for

the periods presented. The Group collects the cash from the purchase of virtual items and recognized the sales of virtual items when the performance obligation is satisfied. The Group has determined that it has one single performance obligation which is the display of the virtual item for the users who purchase them. Revenues derived from the sale of virtual items are recorded on a gross basis as the Group has determined that it is the principal in providing the virtual gift services for the same reasons outlined in the revenue recognition policy for its live video services. The portion paid to gift recipients is recognized as cost of revenues.

(c)  Mobile marketing

The Group provides advertising and marketing solutions to customers for promotion of their brands and conduction of effective marketing activities through its mobile application.

Display-based mobile marketing services

For display-based online advertising services such as banners and location-based advertising on the mobile applications, the Group has determined that its mobile marketing services represent one performance obligation. Accordingly, the Group recognizes mobile marketing revenue ratably over the period that the advertising is provided commencing on the date the customer's advertisement is displayed, or based on the number of times that the advertisement has been displayed for cost per thousand impressions advertising arrangements.

Performance-based mobile marketing services

The Group also enables advertising customers to place link on its mobile platform on a pay-for-effectiveness basis, which is referred to as the cost for performance model. The Group charges fees to advertising customers based on the effectiveness of advertising links, which is measured by active clicks. The Group has determined that its mobile marketing services represent one performance obligation. Accordingly, the Group recognizes mobile marketing revenue based on sales of effective clicks. Revenue is estimated by the Group based on its internal data, which is confirmed with respective customers periodically, or is recognized based on a fixed unit price.

The Group's mobile marketing revenues are recognized net of agency rebates, if applicable. Agency rebates have not been material for the years ended December 31, 2016, 2017 and 2018.

(d)  Mobile games

The Group publishes both licensed mobile games developed by third-party game developers and its self-developed games to the game players through its mobile application.

*Licensed mobile games*

The Group generates revenue from offering services of mobile games developed by third-party game developers. All of the licensed games can be accessed and played by game players directly through the Group's mobile game platform. The Group primarily views the game developers to be its customers and considers its responsibility under its agreements with the game developers to be the promotion of the game developers' games. The Group generally collects payments from game players in connection with the sale of in-game currencies and remits certain agreed-upon percentages of the proceeds to the game developers. Purchases of in-game currencies are not refundable after they have been sold unless there is unused in-game currencies at the time a game is discontinued. Typically, a game will only be discontinued when the monthly revenue generated by a game becomes consistently insignificant. The Group does not currently expect to pay any material cash refunds to game players or game developers in connection with a discontinued game. The majority of the licensed mobile games revenue is derived from non-exclusive mobile games services further discussed below.

*Licensed mobile games - Non-exclusive mobile games services*

The Group enters into non-exclusive agreements with the game developers and offers the Group's mobile game platform for the mobile games developed by the game developers. The Group considers its performance obligation under its arrangements with the game developers to be the offering of its mobile game platform for the game developers. The Group has determined that it has no additional performance obligation to the developers or game players upon the players completion of the corresponding in-game purchase. Therefore, the Group has determined that it is not the principal in the transaction and accordingly, revenues derived from the sale of in-game currencies are recorded net of remittances to game developers and commission fees made to third-party

application stores and other payment channels. Revenue is further recognized at the end of the estimated consumption date by individual game (i.e., the estimated date in-game currencies are consumed within the game), which is typically within a short period of time ranging from two to three days after the purchase of the in-game currencies.

*Self-developed mobile game*

In February 2015, the Group launched one self-developed game on its platform and started to generate revenues by in-game sales of virtual items. The Group has determined that it has a single performance obligation to the players who purchased the virtual items to gain an enhanced game-playing experience over the playing period of the paying players. Accordingly, the Group recognizes revenues ratably over the estimated average period of player relationship starting from the point in time when the players purchase the virtual items and once all other revenue recognition criteria are met. The Group operated eight and four self-developed mobile games in 2017 and 2018, respectively. The estimated periods of the player relationship ranged from 56 to 79 days as of December 31, 2017, and was 77 days as of December 31, 2018, respectively.

The Group has determined that it is the principal in fulfilling all obligations related to the mobile game operations for self-developed games. Accordingly, revenues are recognized on a gross basis. Commission fees paid to third-party application stores and other payment channels are recorded as cost of revenues.

(e)  Other services

Revenues from other services in the year ended December 31, 2018 mainly consisted of revenues generated from advertisement resulting from the broadcasting of one television program produced by the Group. During the year ended December 31, 2018, the Group signed an agreement with a television station, under which the Group is responsible for the production of the television program content, which was completed by December 31, 2018. The television station was responsible for providing advertising and marketing solutions to customers in addition to broadcasting the television program content. Revenue generated from the above is in the form of the advertising fees, shared between the television station and the Group based on a pre-determined percentage stated in the agreement. The Group determined that its television content production service represented one performance obligation. The broadcasting of the content was completed in the year ended December 31, 2018 and the revenue was recognized ratably during the period when the content was broadcasted on the television station.

### Practical expedients and exemptions

Practical expedients and exemptions

The Group's contracts have an original duration of one year or less. Accordingly, the Group does not disclose the value of unsatisfied performance obligations. Additionally, the Company generally expenses sales commissions when incurred because the amortization period would have been one year or less. These costs are recorded within selling and marketing expenses.

### Contract balances

Contract balances

Contract balances include accounts receivable and deferred revenue. Accounts receivable represent cash due from third-party application stores and other payment channels as well as from advertising customers and are recorded when the right to consideration is unconditional. The allowance for doubtful accounts reflects the best estimate of probable losses inherent to the account receivable balance. The Group recorded no impairment charges related to contract assets in the period. Deferred revenue primarily includes cash received from paying users related to the Group's live video service and value-added service as well as cash received from the Group's advertising customer. Deferred revenue is recognized as revenue over the estimated service period or when all of the revenue recognition criteria have been met. Revenue recognized in 2018 that was included in the deferred revenue balance as of January 1, 2018 was RMB 422,028.

### Cost of revenues

Cost of revenues

Cost of revenues consist of expenditures incurred in the generation of the Group's revenues, including but not limited to revenue sharing with the broadcasters and talent agencies resulting from the sale of virtual items, production cost in connection the television content, bandwidth costs, commission fee paid to third-party application stores and other payment channels except for those paid related to licensed mobile games which are recorded net of revenue, salaries and benefits paid to employee, depreciation and amortization. These costs are expensed as incurred except for the direct and incremental platform commission fees to third-party application stores and other payment channels and production cost in connection with the television content which are deferred in "Prepaid expenses and other current assets" on the consolidated balance sheets. Such deferred costs are recognized in the consolidated statements of operations in "Cost of revenues" in the period in which the related revenues are recognized.

Government subsidies

**Government subsidies**

For the government subsidies not subject to further performance obligations or future returns, the Group records the amounts as other income when received from local government authority. Whereas for the government subsidies with certain future performance obligations, the Group recognizes those as liabilities when received until the performances obligations have been met at which time, those are recognized as other income. Government subsidies recorded as other income amounted to RMB2,000, RMB141,688 and RMB223,995 for the years ended December 31, 2016, 2017 and 2018.

Research and development expenses

**Research and development expenses**

Research and development expenses primarily consist of (i) salaries and benefits for research and development personnel, and (ii) technological service fee, office rental and depreciation expenses associated with the research and development activities. The Group's research and development activities primarily consist of the research and development of new features for its mobile platform and its self-developed mobile games. The Group has expensed all research and development expenses when incurred.

Value added taxes ("VAT")

**Value added taxes ("VAT")**

Entities that are VAT general taxpayers are allowed to offset qualified input VAT paid to suppliers against their output VAT liabilities. Net VAT balance between input VAT and output VAT is recorded in accrued expenses and other current liabilities on the consolidated balance sheets. VAT is also reported as a deduction to revenue when incurred and amounted to RMB367,635, RMB812,249 and RMB1,136,034 for the years ended December 31, 2016, 2017 and 2018, respectively.

Income taxes

**Income taxes**

Current income taxes are provided for in accordance with the laws of the relevant tax authorities. Deferred income taxes are recognized when temporary differences exist between the tax bases of assets and liabilities and their reported amounts in the consolidated financial statements. Net operating loss carry forwards and credits are applied using enacted statutory tax rates applicable to future years. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more-likely-than-not that a portion of or all of the deferred tax assets will not be realized.

The impact of an uncertain income tax position on the income tax return is recognized at the largest amount that is more-likely than- not to be sustained upon audit by the relevant tax authority. An uncertain income tax position will not be recognized if it has less than a 50% likelihood of being sustained. Interest and penalties on income taxes will be classified as a component of the provisions for income taxes.

Foreign currency translation and change in reporting currency

**Foreign currency translation and change in reporting currency**

The reporting currency of the Company is the Renminbi ("RMB"). The functional currency of the Company is the US dollar ("US$"). The Company's operations are principally conducted through the subsidiaries, its VIEs and VIEs' subsidiaries located in the PRC where the local currency is the functional currency.

Monetary assets and liabilities denominated in currencies other than the functional currency are translated into the functional currency at the rates of exchange in place at the balance sheet date. Transactions in currencies other than the functional currency during the year are converted into the functional currency at the applicable rates of exchange prevailing when the transactions occurred. Transaction gains and losses are recognized in the consolidated statement of operations.

Assets and liabilities of the Group companies are translated from their respective functional currencies to the reporting currency at the exchange rates at the balance sheet dates, equity accounts are translated at historical exchange rates and revenues and expenses are translated at the average exchange rates in effect during the reporting period. The resulting foreign currency translation adjustment are recorded in other comprehensive income (loss).

Starting from the fourth quarter of 2018, the Group changed its reporting currency from US$ to RMB, to reduce the impact of increased volatility of the RMB to US$ exchange rate on the Group's reported operating results. The aligning of the reporting currency with the underlying operations will better depict the Group's results of operations for each period. The related financial statements prior to October 1, 2018 have been recasted to RMB as if the financial statements originally had been presented in RMB since the earliest periods presented. The change in reporting currency resulted in cumulative foreign currency translation adjustment to the Group's comprehensive income amounted to a gain of RMB175,963, a loss of RMB155,368 and a gain of RMB198,654 for the years ended December 31, 2016, 2017 and 2018, respectively. Translations of amounts from RMB into US$ for the convenience of the reader were calculated at the noon buying rate of US$1.00 = RMB6.8755 on the last trading day of 2018 (December 31, 2018)

representing the certificated exchange rate published by the Federal Reserve Board. No representation is made that the RMB amounts could have been, or could be, converted, realized or settled into US$ at such rate, or at any other rates.

## Operating leases

Operating leases

Leases where the rewards and risks of ownership of assets primarily remain with the lessor are accounted for as operating leases. Payments made under operating leases are charged to the consolidated statements of operations on a straight-line basis over the lease periods.

## Advertising expenses

Advertising expenses

The Group expenses advertising expenses as incurred. Total advertising expenses incurred were RMB367,532, RMB1,036,053 and RMB1,236,167 for the years ended December 31, 2016, 2017 and 2018, respectively, and have been included in sales and marketing expenses in the consolidated statements of operations.

## Comprehensive income

Comprehensive income

Comprehensive income includes net income, unrealized gain or loss on available-for-sale investments and foreign currency translation adjustments. Comprehensive income is reported in the consolidated statements of comprehensive income.

## Share-based compensation

Share-based compensation

Share-based payment transactions with employees and executives are measured based on the grant date fair value of the equity instrument issued and recognized as compensation expense net of a forfeiture rate on a straight-line basis, over the requisite service period, with a corresponding impact reflected in additional paid-in capital.

Share-based compensation with cash settlement features is classified as liabilities. The percentage of the fair value that is accrued as compensation cost at the end of each period is based on the percentage of the requisite service that has been rendered at that date. Changes in fair value of the liability classified award that occur during the requisite service period is recognized as compensation cost over that period. These awards typically vest over a period of four years, but may fully vest due to the achievement of certain performance conditions. Share-based compensation expense is recognized on an accelerated basis if it is probable that the performance conditions will be achieved during the vesting period.

Share awards issued to consultants are measured at fair value at the earlier of the commitment date or the date the services are completed and recognized over the period the services are provided.

The estimate of forfeiture rate is adjusted over the requisite service period to the extent that actual forfeiture rate differs, or is expected to differ, from such estimates. Changes in estimated forfeiture rate is recognized through a cumulative catch-up adjustment in the period of change.

Changes in the terms or conditions of share options are accounted as a modification. The Group calculates the excess of the fair value of the modified option over the fair value of the original option immediately before the modification, measured based on the share price and other pertinent factors at the modification date. For vested options, the Group recognizes incremental compensation cost in the period that the modification occurred. For unvested options, the Group recognizes, over the remaining requisite service period, the sum of the incremental compensation cost and the remaining unrecognized compensation cost for the original award on the modification date.

## Earnings per share

Earnings per share

Basic earnings per ordinary share is computed by dividing net income attributable to ordinary shareholders by the weighted average number of ordinary shares outstanding during the period.

The Group determined that the nonvested restricted shares are participating securities as the holders of the nonvested restricted shares have a nonforfeitable right to receive dividends with all ordinary shares but the nonvested restricted shares do not have a contractual obligation to fund or otherwise absorb the Group's losses. Accordingly, the Group uses the two-class method whereby undistributed net income is allocated on a pro rata basis to the ordinary shares and nonvested restricted shares to the extent that each class may share the income for the period; whereas the undistributed net loss for the period is allocated to ordinary shares only because the nonvested restricted shares are not contractually obligated to share the loss.

Diluted earnings per ordinary share reflect the potential dilution that could occur if securities were exercised or converted into ordinary shares. The Group had share options, restricted share units and convertible senior notes, which could potentially dilute basic earnings per share in the future. To calculate the number of shares for diluted earnings per ordinary share, the effect of the share options

and restricted share units is computed using the treasury stock method, and the effect of the convertible senior notes is computed using the as-if-converted method.

Recent accounting
pronouncements adopted

Recent accounting pronouncements adopted

On January 1, 2018, the Company adopted Topic 606. Under the standard, revenue is recognized when a customer obtains control of promised goods or services in an amount that reflects the consideration the entity expects to receive in exchange for those goods or services. In addition, the standard requires disclosures of the nature, amount, timing and uncertainty of revenue and cash flows arising from contracts with customers. The Company applied the five step method outlined in Topic 606 to all revenue streams and elected to adopt the standard using the modified retrospective method. Refer to Note 2, Revenue recognition for further details.

In January 2016, the FASB issued a new pronouncement ASU 2016-01 Financial Instruments-Overall: Recognition and Measurement of Financial Assets and Financial Liabilities. The ASU also provides a new measurement alternative for equity investments that do not have readily determinable fair values and do not qualify for the net asset value practical expedient. The ASU requires equity investments (except those accounted for under the equity method of accounting or those that result in consolidation of the investee) to be measured at fair value with changes in fair value recognized in net income. The ASU also requires an entity to present separately in other comprehensive income the portion of the total change in the fair value of a liability resulting from a change in the instrument-specific credit risk when the entity has elected to measure the liability at fair value in accordance with the fair value option for financial instruments.

ASU 2016-01 was further amended in February 2018 by ASU 2018-03, "Technical Corrections and Improvements to Financial Instruments—Overall (Subtopic 825-10): Recognition and Measurement of Financial Assets and Financial Liabilities". This update was issued to clarify certain narrow aspects of the guidance concerning the recognition of financial assets and liabilities established in ASU 2016-01. This includes an amendment to clarify that an entity measuring an equity security using the measurement alternative may change its measurement approach to a fair valuation method in accordance with Topic 820, Fair Value Measurement, through an irrevocable election that would apply to that security and all identical or similar investments of the same issued.

ASU 2016-01 and ASU 2018-03 are effective for public companies for fiscal years beginning after December 15, 2017, including interim periods within those fiscal years. The new guidance permits early adoption for certain provisions. Adoption of the amendment must be applied by means of a cumulative-effect adjustment to the balance sheet as of the beginning of the fiscal year of adoption, except for amendments related to equity instruments that do not have readily determinable fair values which should be applied prospectively. The Group adopted ASU 2016-01 and ASU 2018-03 under the modified retrospective method in the fiscal year of 2018. The adoption of 2016-01 and ASU 2018-03 did not have a significant impact on the Company's consolidated results of operations, financial position or cash flows.

In November 2016, the FASB issued ASU 2016-18: Statement of Cash Flows (Topic 230): Restricted Cash. The amendments in this Update require that a statement of cash flows explain the change during the period in the total of cash, cash equivalents, and amounts generally described as restricted cash or restricted cash equivalents. Therefore, amounts generally described as restricted cash and restricted cash equivalents should be included with cash and cash equivalents when reconciling the beginning-of-period and end-of-period total amounts shown on the statement of cash flows. The amendments in this Update do not provide a definition of restricted cash or restricted cash equivalents. The amendments in this Update are effective for public business entities for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years. Early adoption is permitted, including adoption in an interim period. The amendments in this Update should be applied using a retrospective transition method to each period presented. The Group adopted ASU 2016-18 under the retrospective method in the fiscal year of 2018. The adoption of 2016-18 did not have a significant impact on the Company's cash flows for the years ended December 31, 2016, 2017 and 2018.

In January 2017, the FASB issued ASU 2017-01: Business Combinations (Topic 805): Clarifying the Definition of a Business. The Update requires that when substantially all of the fair value of the gross assets acquired (or disposed of) is concentrated in a single identifiable asset or a group of similar identifiable assets, the set is not a business. This screen reduces the number of transactions that need to be further evaluated. If the screen is not met, the amendments in this update (1) require that to be considered a business, a set must include, at a minimum, an input and a substantive process that together significantly contribute to the ability to create output and (2) remove the evaluation of whether a market participant could replace missing elements. Public business entities should apply the amendments in this Update to annual periods beginning after December 15, 2017, including interim periods within those periods. Early application of the amendments in this update is allowed. The amendments in this Update should be applied prospectively on or after the effective date. No disclosures are required at transition. The Group adopted this guidance on January 1, 2018. The adoption did not have significant impact on the

Company's consolidated results of operations, financial position or cash flows.

**Recent accounting pronouncements not yet adopted**

Recent accounting pronouncements not yet adopted

In February 2016, the FASB issued ASU No. 2016-02, Leases ("ASU 2016-02"). ASU 2016-02 specifies the accounting for leases. For operating leases, ASU 2016-02 requires a lessee to recognize a right-of-use asset and a lease liability, initially measured at the present value of the lease payments, in its balance sheet. The standard also requires a lessee to recognize a single lease cost, calculated so that the cost of the lease is allocated over the lease term, on a generally straight-line basis. ASU 2016-02 is effective for public business entities for annual reporting periods and interim periods within those years beginning after December 15, 2018. The Group will adopt ASU 2016-02 on January 1, 2019 using the modified retrospective method. The Group will elect the package of practical expedients permitted under the transition guidance, which allows the Group to carry forward the historical lease classification and, the assessment whether a contract is or contains a lease and initial direct costs for any leases that exist prior to adoption of the new standard. The Group will also elect the practical expedient not to separate lease and non-lease components for certain classes of underlying assets and the short-term lease exemption for contracts with lease terms of 12 months or less. Certain operating leases related to offices and internet data center ("IDC") facilities will be subject to ASU 2016-02 and right-of-use assets and lease liabilities will be recognized on the Group's consolidated balance sheet. The Company currently believes the most significant change will be related to the recognition of right-of-use assets and lease liabilities on the Company's balance sheet for certain in-scope operating leases. The Company does not expect any material impact on net assets and the consolidated statement of comprehensive income as a result of adopting the new standard.

In June 2016, the FASB issued ASU No. 2016-13, Financial Instruments-Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments ("ASU 2016-13") which requires the measurement and recognition of expected credit losses for financial assets held at amortized cost. ASU 2016-13 replaces the existing incurred loss impairment model with an expected loss methodology, which will result in more timely recognition of credit losses. ASU 2016-13 is effective for annual reporting periods, and interim periods within those years, beginning after December 15, 2019. The Company is currently in the process of evaluating the impact of the adoption of ASU 2016-13 on its consolidated financial statements.

In June 2018, the FASB issued ASU No. 2018-07, Compensation—Stock Compensation (Topic 718): Improvements to Nonemployee Share-Based Payment Accounting to simplify the accounting for share-based payments to nonemployees ("ASU 2018-07") by aligning it with the accounting for share-based payments to employees, with certain exceptions. Under the guidance, the measurement of equity-classified nonemployee awards will be fixed at the grant date, which may lower their cost and reduce volatility in the income statement. The guidance is effective for public business entities in annual periods beginning after December 15, 2018, and interim periods within those years. Early adoption is permitted, including in an interim period. The Group will adopt ASU 2018-07 on January 1, 2019 using grant date fair value to measure equity-classified nonemployee awards. The Group does not expect that the adoption of ASU 2018-07 will have a significant impact on the Group's consolidated financial statements.

In August 2018, the FASB issued ASU No. 2018-13, Fair Value Measurement (Topic 820): Disclosure Framework—Changes to the Disclosure Requirements for Fair Value Measurement ("ASU 2018-13") which eliminates, adds and modifies certain disclosure requirements for fair value measurements. Under the guidance, public companies will be required to disclose the range and weighted average used to develop significant unobservable inputs for Level 3 fair value measurements. The guidance is effective for all entities for fiscal years beginning after December 15, 2019 and for interim periods within those fiscal years, but entities are permitted to early adopt either the entire standard or only the provisions that eliminate or modify the requirements. The Company is currently in the process of evaluating the impact of the adoption of ASU 2018-13 on its consolidated financial statements.

In March 2019, the FASB issued ASU 2019-02, Improvements to Accounting for Costs of Films and License Agreements for Program Materials ("ASU 2019-02") which improves GAAP by aligning the accounting for production costs of an episodic television series with the accounting for production costs of films by removing the content distinction for capitalization. In addition, ASU 2019-02 requires that an entity test a film or license agreement for program material within the scope of ASC 920-350 for impairment at a film group level when the film or license agreement is predominantly monetized with other films and/or license agreements. The presentation and disclosure requirements in ASU 2019-02 also increase the transparency of information provided to users of financial statements about produced and licensed content. This update will be effective for the Company's fiscal years beginning after December 15, 2019, and interim periods within those fiscal years. Early adoption is permitted. The Group is in the process of evaluating the impact of adoption of this guidance on its consolidated financial statements.

**Revenues [Member]**

Concentration of credit risk and revenue

**Concentration of revenue**

No user or customer accounted for 10% or more of net revenues for the years ended December 31, 2016, 2017 and 2018, respectively.

Accounts Receivable [Member]
Concentration of credit risk and revenue

**Concentration of credit risk**

Financial instruments that potentially expose the Group to concentration of credit risk consist primarily of cash and cash equivalents, term deposits and accounts receivable. The Group places their cash with financial institutions with high-credit ratings and quality.

Third-party application stores and other payment channels accounting for 10% or more of accounts receivables are as follows:

|   | As of December 31, | |
|---|---|---|
|   | 2017 | 2018 |
| A | 23% | 14% |
| B | 19% | 12% |
| C | 21% | 0% |

Users or customers accounting for 10% or more of accounts receivables is as follows:

|   | As of December 31, | |
|---|---|---|
|   | 2017 | 2018 |
| D | 0% | 59% |

| **Organization and Principal Activities (Tables)** | **12 Months Ended**<br>**Dec. 31, 2018** |
| --- | --- |

**Text Block [Abstract]**

Schedule of Subsidiaries, VIEs and VIEs' Subsidiaries

As of December 31, 2018, details of the Company's major subsidiaries, VIEs and VIEs' subsidiaries are as follows:

*Major subsidiaries*
Momo Technology HK Company Limited ("Momo HK")
Beijing Momo Information Technology Co., Ltd. ("Beijing Momo IT")
Momo Technology Overseas Holding Company Limited ("Momo BVI")
Momo Information Technologies Corp. ("Momo US")
Qool Media HongKong Limited ("QOOL HK")
Tantan Limited ("Tantan")
Tantan Hong Kong Limited ("Tantan HK")
Tantan Social Inc. ("Tantan US")
Tantan Technology (Beijing) Co., Ltd. ("Tantan Technology")
QOOL Media Inc. ("QOOL Inc.")
QOOL Media Technology (Tianjin) Co., Ltd. ("QOOL Media")
*Major VIEs*
Beijing Momo Technology Co., Ltd. ("Beijing Momo") *
QOOL Media (Tianjin) Co., Ltd. ("QOOL Tianjin") *
Tantan Culture Development (Beijing) Co., Ltd. ("Tantan Culture") *
*Major VIEs' subsidiaries*
Chengdu Momo Technology Co., Ltd. ("Chengdu Momo") *
Tianjin Heer Technology Co., Ltd. ("Tianjin Heer") *
Loudi Momo Technology Co., Ltd. ("Loudi Momo") *

\* These entities are controlled by the Company pursuant to the contractual arrangements disclosed below.

Schedule of Amounts and Balances of VIEs Included in Consolidated Financial Statements After Elimination of Intercompany Balances and Transactions

The following consolidated financial statements amounts and balances of the VIEs were included in the accompanying consolidated financial statements after the elimination of intercompany balances and transactions as of and for the years ended December 31:

| | As of December 31, | |
| --- | --- | --- |
| | 2017 | 2018 |
| | RMB | RMB |
| Cash and cash equivalents | 410,611 | 1,502,395 |
| Accounts receivable, net of allowance for doubtful accounts of RMB585 and RMB nil as of December 31, 2017 and 2018, respectively | 257,633 | 719,606 |
| Amount due from related parties | 33,460 | — |
| Prepaid expenses and other current assets | 371,220 | 425,974 |
| Short-term investment | 10,500 | — |
| Total current assets | 1,083,424 | 2,647,975 |
| Property and equipment, net | 52,568 | 72,539 |
| Intangible assets | 48,554 | 42,821 |
| Rental deposits | 10,471 | 11,619 |
| Other non-current assets | 50,000 | 67,480 |
| Long-term investments | 281,935 | 447,465 |
| Deferred tax assets | 6,908 | 52,887 |
| Goodwill | 22,130 | 22,130 |
| Total assets | 1,555,990 | 3,364,916 |
| Accounts payable | 357,437 | 549,173 |
| Deferred revenue | 421,528 | 441,392 |
| Accrued expenses and other current liabilities | 200,406 | 304,363 |
| Amounts due to related parties | 188 | 43,213 |
| Income tax payable | 76,549 | 113,733 |
| Total current liabilities | 1,056,108 | 1,451,874 |
| Deferred tax liabilities | 12,138 | 10,705 |

Total liabilities                                                1,068,246   1,462,579

|  | For the years ended December 31, | | |
| --- | --- | --- | --- |
|  | 2016 | 2017 | 2018 |
|  | RMB | RMB | RMB |
| Net revenues | 3,707,358 | 8,886,390 | 13,408,421 |
| Net income | 2,268,098 | 4,890,438 | 6,292,183 |
| Net cash provided by operating activities | 2,401,340 | 4,997,183 | 5,913,709 |
| Net cash used in investing activities | (73,224) | (174,333) | (151,546) |
| Net cash provided by financing activities | — | 490 | — |

| **Significant Accounting Policies (Tables)** | **12 Months Ended Dec. 31, 2018** |
|---|---|

**Estimated Useful Lives**

Depreciation is calculated on a straight-line basis over the following estimated useful lives:

| | |
|---|---|
| Office equipment | 3-5 years |
| Computer equipment | 3 years |
| Vehicles | 5 years |
| Leasehold improvement | Shorter of the lease term or estimated useful lives |

**Identifiable Intangible Assets Amortized over their estimated useful lives using the straight line method**

Separately identifiable intangible assets that have determinable lives continue to be amortized over their estimated useful lives using the straight-line method as follows:

| | |
|---|---|
| Copyright | 1 year |
| License | 3.2-10 years |
| Technology | 3 years |
| User base | 5 years |
| Trade name | 10 years |

**Components of Revenues**

The following table provides information about disaggregated revenue by types, including a reconciliation of the disaggregated revenue with the Group's reportable segments:

| | For the year ended December 31, 2018 | | |
|---|---|---|---|
| | Momo | Tantan | QOOL |
| | RMB | RMB | RMB |
| Live video service | 10,709,491 | — | — |
| Value-added services | 1,465,152 | 417,998 | — |
| Mobile marketing | 500,321 | — | — |
| Mobile games | 130,392 | — | — |
| Other services | 7,065 | — | 178,002 |
| Total | 12,812,421 | 417,998 | 178,002 |

| | For the year ended December 31, 2017 | | |
|---|---|---|---|
| | Momo | Tantan | QOOL |
| | RMB | RMB | RMB |
| Live video service | 7,429,906 | — | — |
| Value-added services | 695,798 | — | — |
| Mobile marketing | 514,279 | — | — |
| Mobile games | 241,388 | — | — |
| Other services | 3,452 | — | 1,567 |
| Total | 8,884,823 | — | 1,567 |

| | For the year ended December 31, 2016 | | |
|---|---|---|---|
| | Momo | Tantan | QOOL |
| | RMB | RMB | RMB |
| Live video service | 2,534,604 | — | — |
| Value-added services | 449,781 | — | — |
| Mobile marketing | 441,644 | — | — |
| Mobile games | 236,238 | — | — |
| Other services | 45,091 | — | — |
| Total | 3,707,358 | — | — |

**Accounts Receivable [Member]**

**Schedules of Concentration of Risk, by Risk Factor**

Third-party application stores and other payment channels accounting for 10% or more of accounts receivables are as follows:

| | As of December 31, | |
|---|---|---|
| | 2017 | 2018 |
| A | 23% | 14% |
| B | 19% | 12% |
| C | 21% | 0% |

Users or customers accounting for 10% or more of accounts receivables is as follows:

| | As of December 31, | |
|---|---|---|
| | 2017 | 2018 |
| D | 0% | 59% |

**Acquisitions (Tables)**

**12 Months Ended**
**Dec. 31, 2018**

**Business Combinations [Abstract]**

Schedule of Total Consideration for
Acquisition

The consideration consisted of RMB3,930,246 of cash, of which RMB3,460,972 was paid
as of December 31, 2018. The consideration also included 5,328,853 newly issued Class
A ordinary shares of the Company which were fully issued as of the acquisition date.

| | |
|---|---|
| Cash consideration | 3,930,246 |
| Fair value of ordinary shares issued | 784,215 |
| Total consideration | 4,714,461 |

Schedule of Purchase Price Allocation to
Assets Acquired and Liabilities Assumed
as of the Date of Acquisition

The transaction was accounted for as a business combination using the purchase
method of accounting. The purchase price allocation of the transaction was determined
by the Group with the assistance of an independent valuation firm, and the purchase
price allocation to assets acquired and liabilities assumed as of the date of acquisition
was as follows:

| | Indicated Value | Estimated useful lives |
|---|---|---|
| | RMB | |
| Net tangible assets: | | |
| Cash and cash equivalents and short term investment | 154,671 | |
| Accounts receivable | 20,079 | |
| Other current asset | 22,833 | |
| Property and equipment, net | 46,160 | |
| Other non-current asset | 3,030 | |
| Intangible assets | | |
| Trade name | 640,600 | 10 years |
| Technology | 26,100 | 3 years |
| User base | 342,500 | 5 years |
| Total assets | 1,255,973 | |
| Accounts payable | (21,037) | |
| Other current liabilities | (262,533) | |
| Deferred tax liabilities | (252,300) | |
| Goodwill | 3,994,358 | |
| Total consideration | 4,714,461 | |

Summary of Operation Attributable to
Acquisition

The following information summarizes the results of operation attributable to the acquisition
included in the Group's consolidated statement of operations since the acquisition date:

| | Year ended December 31, 2018 |
|---|---|
| | RMB |
| Net revenue | 417,998 |
| Net loss | 519,206 |

Schedule of Pro Froma Result from
Operations

The following pro forma financial information is not necessarily indicative of the results
that would have occurred had the acquisition been completed at the beginning of the
periods as indicated, nor is it indicative of future operating results:

| | Years ended December 31, | |
|---|---|---|
| | 2017 | 2018 |
| | (Unaudited) | (Unaudited) |
| | RMB | RMB |
| Pro forma net revenue | 8,887,543 | 13,511,439 |
| Pro forma net income attributable to ordinary shareholders of Momo Inc. | 1,627,664 | 2,383,646 |
| Pro forma net income per ordinary share - basic | 4.13 | 5.86 |
| Pro forma net income per ordinary share - diluted | 3.92 | 5.50 |

**Prepaid Expenses and Other
Current Assets (Tables)**

**12 Months Ended**

**Dec. 31, 2018**

**Deferred Costs, Capitalized, Prepaid,
and Other Assets Disclosure [Abstract]**

Schedule of Prepaid Expenses and Other
Current Assets

Prepaid expenses and other current assets consisted of the following:

| | As of December 31, | |
| --- | --- | --- |
| | 2017 | 2018 |
| | RMB | RMB |
| Deposit at third-party payment channels (i) | 190,238 | 258,039 |
| Advance to suppliers (ii) | 140,022 | 94,100 |
| Interest receivable | 54,920 | 87,057 |
| Input VAT (iii) | 24,164 | 69,075 |
| Prepaid income tax and other expenses | 52,499 | 55,084 |
| Deferred platform commission cost | 27,925 | 36,189 |
| Advance to game developers | 6,012 | 8,463 |
| Game promotions fees paid on behalf of game developers | 17,840 | 3,069 |
| Others | 24,562 | 9,903 |
| | 538,182 | 620,979 |

(i)   Deposit at third party payment channels are mainly the cash deposited in certain third party payment channels by the Group for the broadcasters and the gift recipients who received the virtual items to withdraw their revenue sharing and the customer payment to the Group's account through the third party payment channels.

(ii)  Advance to suppliers were primarily for advertising fees, live video broadcasting service fees and other professional service fees.

(iii) Input VAT mainly occurred from the purchasing of goods or other services, property and equipment and advertising activities. It is subject to verification by related tax authorities before offsetting the VAT output.

**Long-Term Investments
(Tables)**

**12 Months Ended
Dec. 31, 2018**

**Investments Schedule
[Abstract]**

Summary of Equity and Cost
Method Investments

|  | As of December 31, | |
| --- | --- | --- |
|  | 2017 | 2018 |
|  | RMB | RMB |
| **Equity method investments** | | |
| Jingwei Chuangteng (Hangzhou) L.P. (i) | 48,273 | 64,441 |
| Beijing Autobot Venture Capital L.P. (ii) | 55,162 | 57,392 |
| Hangzhou Aqua Ventures Investment Management L.P. (iii) | 84,492 | 105,289 |
| Chengdu Tianfu Qianshi Equity Investment Partnership L.P. (iv) | — | 20,586 |
| Others (viii) | 20,753 | 21,632 |
| **Equity securities without readily determinable fair values** | | |
| Hunan Qindao Cultural Spread Ltd. (v) | 30,000 | 30,000 |
| Hangzhou Faceunity Technology Limited (vi) | — | 70,000 |
| Haining Yijiayi Culture Co., Ltd (vii) | — | 25,000 |
| Others (viii) | 49,791 | 53,125 |
|  | 288,471 | 447,465 |

Equity securities without readily determinable fair value were accounted as cost method investments prior to adopting ASC 321. The Group performed impairment analysis for equity method investments, equity securities without readily determinable fair values periodically. Impairment loss of RMB39,283, RMB 30,085 and RMB 43,200 was recorded for the long-term investments during the years ended December 31, 2016, 2017 and 2018, respectively.

(i)     On January 9, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Jingwei Chuangteng (Hangzhou) L.P. ("Jingwei"). According to the partnership agreement, the Group committed to subscribe 4.9% partnership interest in Jingwei for RMB30,000, which had been paid as of December 31, 2017. Due to Jingwei's further rounds of financing, the Group's partnership interest was diluted to 2.4% as of December 31, 2017 and 2018. The Group recognized its share of partnership profit in Jingwei of RMB4,245, RMB11,677 and RMB16,168 during the year ended December 31, 2016, 2017 and 2018, respectively.

(ii)    On February 13, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Beijing Autobot Venture Capital L.P. ("Autobot"). According to the partnership agreement, the Group committed to subscribe 31.9% partnership interest in Autobot for RMB30,000. Autobot had further rounds of financing, of which the Group subscribed for RMB10,000. Due to Autobot's further round of financing, the Group's partnership interest was diluted to 26.7% as of December 31, 2017 and 2018. The committed subscription and further round of financing subscription amount, RMB40,000, was paid as of December 31, 2016. The Group recognized its share of partnership profit in Autobot of RMB5,039, RMB8,392 and RMB2,230 during the year ended December 31, 2016, 2017 and 2018, respectively.

(iii)   On August 18, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Hangzhou Aqua Ventures Investment Management L.P. ("Aqua"). According to the partnership agreement, the Group committed to subscribe 42.7% partnership interest for RMB50,000. The committed subscription amount had been fully paid as of December 31, 2016. The Group recognized its share of partnership profit in Aqua of RMB14,346, RMB20,709 and RMB20,797 during the years ended December 31, 2016, 2017 and 2018, respectively.

(iv)    On September 12, 2018, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Chengdu Tianfu Qianshi Equity Investment Partnership L.P. ("Tianfu"). According to the partnership agreement, the Group committed to subscribe 6.8% partnership interest for RMB30,000, of which RMB12,000 had been paid as of December 31, 2018. The Group recognized its share of partnership profit in Tianfu of RMB nil, RMB nil and RMB8,586 during the years ended December 31, 2016, 2017 and 2018, respectively.

(v)     On June 8, 2016, the Group entered into a share purchase agreement to acquire 16.0% preferred shares of Hunan Qindao Cultural Spread Ltd. ("Qindao") for a total consideration of RMB30,000, which was fully paid off as of December 31, 2017. The investment was classified as available-for-sale security as the Group determined that the preferred shares were debt

securities due to the redemption option available to the investor and measured the investment subsequently at fair value. No unrealized holding gains was reported in other comprehensive income for the year ended December 31, 2016. On July 7, 2017, the Group signed a supplemental agreement with Qindao to waive the redemption right. The investment was reclassified to equity security as a result of the supplemental agreement.

(vi)   On January 17, 2018, the Group entered into a preferred share subscription agreement to acquire 10% equity of Hangzhou Faceunity Technology Limited ("Faceunity") for a total consideration of RMB70,000, which had been paid as of December 31, 2018. As the investment was neither a debt security nor an in-substance common stock, it was accounted as an equity securities without readily determinable fair values and measured at fair value using the measurement alternative.

(vii)  On August 2, 2018, the Group invested in Haining Yijiayi Culture Co., Ltd ("Yijiayi") and acquired 5% equity for a total consideration of RMB25,000, which had been paid as of December 31, 2018. As the investment was neither a debt security nor an in-substance common stock, it was accounted as an equity securities without readily determinable fair values and measured at fair value using the measurement alternative.

(viii) Others represent equity method investments or equity securities without readily determinable fair values that are individually insignificant.

**Property and Equipment, Net (Tables)**

**12 Months Ended**

**Dec. 31, 2018**

**Property, Plant and Equipment [Abstract]**

Schedule of Property and Equipment, Net

Property and equipment, net consisted of the following:

|  | As of December 31, | |
| --- | --- | --- |
|  | 2017 | 2018 |
|  | RMB | RMB |
| Computer equipment | 296,559 | 513,448 |
| Office equipment | 79,470 | 115,048 |
| Vehicles | 1,230 | 3,599 |
| Leasehold improvement | 67,440 | 94,340 |
| Less: accumulated depreciation | (186,002) | (338,868) |
| Exchange difference | 7 | (35) |
|  | 258,704 | 387,532 |

**Intangible Assets, Net
(Tables)**

**12 Months Ended**

**Dec. 31, 2018**

**Goodwill and Intangible Assets Disclosure [Abstract]**

Schedule of Intangible Assets

Intangible assets, net consisted of the following:

|  | As of December 31, | |
|---|---|---|
|  | 2017 | 2018 |
|  | RMB | RMB |
| Trade name | — | 687,164 |
| Active user | — | 367,396 |
| Technology | — | 27,997 |
| License | 52,433 | 52,433 |
| Game copyright | 2,170 | 2,170 |
| Less: accumulated amortization and impairment | (6,050) | (99,080) |
| Exchange difference | — | (1,094) |
| Net book value | 48,553 | 1,036,986 |

Schedule of Future Amortization Expense

The estimated aggregate amortization expenses for each of the five succeeding fiscal years and thereafter are as follows:

| For the year ended December 31, | Amounts |
|---|---|
|  | RMB |
| 2019 | 157,260 |
| 2020 | 157,260 |
| 2021 | 151,121 |
| 2022 | 147,209 |
| 2023 | 104,346 |
| Thereafter | 319,790 |
| Total | 1,036,986 |

**Goodwill (Tables)**

**12 Months Ended**

**Dec. 31, 2018**

**Goodwill and Intangible Assets Disclosure [Abstract]**

Schedule of Goodwill

| | As of December 31, 2018 | | |
| | Momo | Tantan | Total |
| | RMB | RMB | RMB |
|---|---|---|---|
| Balance, as of January 1, 2017 | — | — | — |
| Acquisition of other | 22,130 | — | 22,130 |
| Balance, as of December 31, 2017 | 22,130 | — | 22,130 |
| Acquisition of Tantan Limited (Note 3) | — | 3,994,358 | 3,994,358 |
| Foreign exchange differences | — | 290,341 | 290,341 |
| Balance, as of December 31, 2018 | 22,130 | 4,284,699 | 4,306,829 |

**Accrued Expenses and Other
Current Liabilities (Tables)**

**12 Months Ended

Dec. 31, 2018**

**Payables and Accruals [Abstract]**

Schedule of Accrued Expenses and Other Current Liabilities

Accrued expenses and other current liabilities consisted of the following:

|  | As of December 31, | |
|---|---|---|
|  | 2017 | 2018 |
|  | RMB | RMB |
| Accrued payroll and welfare | 224,618 | 302,117 |
| Payable for advertisement | 122,211 | 254,872 |
| Balance of users' virtual accounts | 92,228 | 112,488 |
| Other tax payables | 61,529 | 99,964 |
| Accrued professional services and rental fee | 23,041 | 38,415 |
| VAT payable | 10,040 | 9,208 |
| Others | 37,666 | 29,646 |
| Total | 571,333 | 846,710 |

**Fair Value (Tables)**

**12 Months Ended**
**Dec. 31, 2018**

**Fair Value Disclosures [Abstract]**

Schedule of Assets Measured at Fair Value on Recurring Basis

As of December 31, 2017 and 2018, information about inputs for the fair value measurements of the Group's assets that are measured at fair value on a recurring basis in periods subsequent to their initial recognition is as follows:

| Description | 2017 | Fair Value Measured as of December 31, | | |
| | | Quoted Prices in Active Market for Identical Assets | Significant Other Observable Inputs | Significant Unobservable Inputs |
| --- | --- | --- | --- | --- |
| | RMB | (Level 1) | (Level 2) | (Level 3) |
| Cash and cash equivalents | 4,462,194 | 4,462,194 | — | — |
| Total | 4,462,194 | 4,462,194 | — | — |

| Description | 2018 | Fair Value Measured as of December 31, | | |
| | | Quoted Prices in Active Market for Identical Assets | Significant Other Observable Inputs | Significant Unobservable Inputs |
| --- | --- | --- | --- | --- |
| | RMB | (Level 1) | (Level 2) | (Level 3) |
| Cash and cash equivalents | 2,468,034 | 2,468,034 | — | — |
| Total | 2,468,034 | 2,468,034 | — | — |

Schedule of Reconciliation of Fair Value Measurement of Long-term Investments Using Significant Unobservable Inputs on a Recurring Basis

Additional information about the reconciliation of the fair value measurement of long-term investments using significant unobservable inputs (level 3) on a recurring basis are is as follows:

| | RMB |
| --- | --- |
| Balance as of December 31, 2016 | 50,452 |
| Purchase | 10,000 |
| Other-than-temporary loss recognized | (30,085) |
| Reclassification to equity securities without readily determinable fair value (i) | (30,000) |
| Foreign exchange difference | (367) |
| Balance as of December 31, 2017 | — |
| Balance as of December 31, 2018 | — |

(i)   The investment in Qindao was reclassified from long-term investments to equity securities without readily determinable fair value as of result of the waiver of redemption right in July 2017. Please refer to Note 5 for additional information on the reclassification.

**Income Taxes (Tables)**

**Income Tax Disclosure [Abstract]**

**Components of Group's Deferred Tax Assets and Liabilities**

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amount of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. The Group did not retrospectively apply the changes to prior years. Significant components of the Group's deferred tax assets and liabilities are as follows:

|  | As of December 31, | |
|---|---|---|
|  | 2017 | 2018 |
|  | RMB | RMB |
| Deferred tax assets: | | |
| Advertising expense | 38,760 | 221,113 |
| Net operating tax losses carry-forward | 25,792 | 103,060 |
| Impairment on long-term investments and game copyright | 2,599 | 11,336 |
| Accrued expenses | 5,466 | 43,631 |
| Less: valuation allowance | (25,792) | (321,354) |
| Deferred tax assets, net | 46,825 | 57,786 |
| Deferred tax liabilities: | | |
| Intangible assets acquired | 12,138 | 259,247 |
| Deferred tax liabilities, net | 12,138 | 259,247 |

**Schedule of Reconciliation between Income Tax Expense to Income before Income Taxes and Actual Provision for Income Tax**

Reconciliation between income tax expense computed by applying the PRC EIT rate of 25% to income before income taxes and the actual provision for income tax is as follows:

|  | For the years ended December 31, | | |
|---|---|---|---|
|  | 2016 | 2017 | 2018 |
|  | RMB | RMB | RMB |
| Net income before provision for income tax | 990,413 | 2,549,735 | 3,439,535 |
| PRC statutory tax rate | 25% | 25% | 25% |
| Income tax expense at statutory tax rate | 247,603 | 637,434 | 859,884 |
| Permanent differences | (516) | (446) | 20,135 |
| Change in valuation allowance | (16,034) | 5,990 | 98,862 |
| Effect of income tax rate difference in other jurisdictions | 54,242 | 80,085 | 156,136 |
| Effect of tax holidays and preferential tax rates | (250,657) | (278,062) | (435,369) |
| Provision for income tax | 34,638 | 445,001 | 699,648 |

**Increase in Income Tax Expenses and Net Income Per Share Amounts**

If Beijing Momo IT and Chengdu Momo did not enjoy income tax exemptions and preferential tax rates for the years ended December 31, 2016, 2017 and 2018, the increase in income tax expenses and resulting net income per share amounts would be as follows:

|  | For the years ended December 31, | | |
|---|---|---|---|
|  | 2016 | 2017 | 2018 |
|  | RMB | RMB | RMB |
| Increase in income tax expenses | 250,657 | 278,062 | 435,369 |
| Net income per ordinary share attributable to Momo Inc. - basic | 1.87 | 4.74 | 5.85 |
| Net income per ordinary share attributable to Momo Inc. - diluted | 1.74 | 4.50 | 5.59 |

| **Share-Based Compensation (Tables)** | | **12 Months Ended**<br>**Dec. 31, 2018** |

Summary of Non-Vested Restricted Share Activity

A summary of non-vested restricted share activity during the years ended December 31, 2016, 2017 and 2018 is presented below:

| | Number of shares |
|---|---|
| Outstanding as of January 1, 2016 | 28,625,378 |
| Granted | — |
| Modification | — |
| Vested | (28,625,378) |
| Outstanding as of December 31, 2016 | — |

Company Share Incentive Plan [Member]

Summary of Option Activity

The following table summarizes the option activity for the year ended December 31, 2018:

| | Number of options | Weighted average exercise price per option (US$) | Weighted average remaining contractual life (years) | Aggregated intrinsic Value (US$) |
|---|---|---|---|---|
| Outstanding as of January 1, 2018 | 26,969,291 | 0.0536 | 7.40 | 328,658 |
| Granted | 5,502,868 | 0.0002 | | |
| Exercised | (10,028,568) | 0.0800 | | |
| Forfeited | (660,488) | 0.0002 | | |
| Outstanding as of December 31, 2018 | 21,783,103 | 0.0296 | 7.36 | 258,030 |
| Exercisable as of December 31, 2018 | 10,227,313 | 0.0628 | 5.98 | 120,807 |

Schedule of Assumptions Used to Estimate Fair Value of Stock Options Granted

The fair value of options granted was estimated on the date of grant using the Black-Sholes pricing model after the Company completed its IPO, with the following assumptions used for grants during the applicable periods:

| | Risk-free interest rate of return | Contractual term | Volatility | Dividend yield | Exercise price (US$) |
|---|---|---|---|---|---|
| 2016 | 1.75%~2.70% | 10 years | 52.5%~55.3% | — | 0.0002 |
| 2017 | 2.47%~2.87% | 10 years | 50.7%~54.0% | — | 0.0002 |
| 2018 | 3.16%~3.66% | 10 years | 50.0%~50.7% | — | 0.0002 |

Options classified as Equity Awards | 2018 Plan

Summary of Option Activity

The following table summarizes the option activity for the year ended December 31, 2018:

| | Number of options | Weighted average exercise price per option (US$) | Weighted average remaining contractual life (years) | Aggregated intrinsic value (US$) |
|---|---|---|---|---|
| Outstanding as of the acquisition date | 1,507,488 | 0.9062 | 7.07 | 45,969 |
| Granted | 575,629 | 21.4461 | | |
| Exercised | — | — | | |
| Forfeited | (186,531) | 0.7616 | | |
| Outstanding as of December 31, 2018 | 1,896,586 | 7.1544 | 7.45 | 35,666 |
| Exercisable as of December 31, 2018 | 358,281 | 1.0547 | 6.48 | 8,923 |

Schedule of Assumptions Used to Estimate Fair Value of Stock Options Granted

The fair value of each option granted was estimated on the date of grant using the binomial tree pricing model with the following assumptions used for grants during the applicable periods:

| | Risk-free interest rate of return | Contractual term | Volatility | Dividend yield | Exercise price (US$) |
|---|---|---|---|---|---|

| | Risk-free interest rate of return | Contractual term | Volatility | Dividend yield | Exercise price (US$) |
|---|---|---|---|---|---|
| During the year ended December 31, 2018 | 3.58% | 10 years | 55.4% | — | 1.6-25.0 |

Options classified as Liability Awards | 2018 Plan

Schedule of Assumptions Used to Estimate Fair Value of Stock Options Granted

The fair value of each option granted was estimated using the binomial tree pricing model with the following assumptions used during the applicable periods:

| | Risk-free interest rate of return | Contractual term | Volatility | Dividend yield | Exercise price (US$) |
|---|---|---|---|---|---|
| During the year ended December 31, 2018 | 3.39%~3.58% | 10 years | 55.4%~55.6% | — | 0.002 |

**Net Income Per Share**
**(Tables)**

**12 Months Ended**

**Dec. 31, 2018**

**Earnings Per Share [Abstract]**

Calculation of Net Income Per Share

The calculation of net income per share is as follows:

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2017 | 2018 |
| | RMB | RMB | RMB |
| Numerator: | | | |
| Net income attributable to Momo Inc. | 978,969 | 2,148,098 | 2,815,775 |
| Undistributed earnings allocated to participating nonvested restricted shares | (21,550) | — | — |
| Net income attributed to ordinary shareholders for computing net income per ordinary share-basic and diluted | 957,419 | 2,148,098 | 2,815,775 |

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2017 | 2018 |
| | RMB | RMB | RMB |
| Denominator: | | | |
| Denominator for computing net income per share-basic: | | | |
| Weighted average ordinary shares outstanding used in computing net income per ordinary share-basic | 377,335,923 | 394,549,323 | 407,009,875 |
| Weighted average shares used in computing net income per participating nonvested restricted share | 8,493,244 | — | — |
| Denominator for computing net income per share-diluted: | | | |
| Weighted average shares outstanding used in computing net income per ordinary share-diluted | 407,041,165 | 415,265,078 | 433,083,643(i) |
| Net income per ordinary share attributable to Momo Inc. - basic | 2.54 | 5.44 | 6.92 |
| Net income per participating nonvested restricted share | 2.54 | — | — |
| Net income per ordinary share attributable to Momo Inc. - diluted | 2.41 | 5.17 | 6.59 |

(i) The calculation of the weighted average number of ordinary shares for the purpose of diluted net income per share has considered the effect of certain potentially dilutive securities. For the year ended December 31, 2016, an incremental weighted average number of 7,155,060 nonvested restricted shares and an incremental weighted average number of 22,550,182 ordinary shares from the assumed exercise of share options and vesting of restricted share units using the treasury stock method were included.

Summary of Potential Ordinary Shares Outstanding Excluded from Computation of Diluted Net Loss Per Ordinary Share

The following table summarizes potential ordinary shares outstanding excluded from the computation of diluted net income per ordinary share for the years ended December 31, 2016, 2017 and 2018, because their effect is anti-dilutive:

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2017 | 2018 |
| Share issuable upon exercise of share options | 152,500 | 768,266 | 1,117,334 |
| Share issuable upon exercise of RSUs | 50,000 | — | — |

| **Commitments and Contingencies (Tables)** | **12 Months Ended**<br>**Dec. 31, 2018** |
|---|---|

**Commitments and Contingencies Disclosure [Abstract]**

Schedule of Future Minimum Payments under Non-Cancellable Operating Leases

Future minimum payments under non-cancellable operating leases as of December 31, 2018 were as follows:

|  | RMB |
|---|---|
| 2019 | 99,133 |
| 2020 | 82,697 |
| 2021 | 26,980 |
| 2022 | 8,633 |
| Total | 217,443 |

**Related Party Balances and Transactions (Tables)**

**12 Months Ended**

**Dec. 31, 2018**

**Related Party Transactions [Abstract]**

Schedule of Related Party Transactions

(1) Amount due from related parties-current

| | As of December 31, | |
|---|---|---|
| | 2017 | 2018 |
| | RMB | RMB |
| Hunan Qindao Network Media Technology Co., Ltd. (ii) | 33,460 | — |
| Total | 33,460 | — |

(ii)   The amount of RMB33,460 as of December 31, 2017 represented the advance payment of revenue sharing of live video service made to Hunan Qindao Network Media Technology Co., Ltd.

(2) Amount due to related parties - current

| | As of December 31, | |
|---|---|---|
| | 2017 | 2018 |
| | RMB | RMB |
| Hunan Qindao Network Media Technology Co., Ltd. (iii) | 32 | 43,178 |
| Amount due to ordinary shareholders (iv) | 37,572 | 39,704 |
| Others | 156 | 66 |
| Total | 37,760 | 82,948 |

(iii)   The amount of RMB43,178 as of December 31, 2018 primarily represented the unpaid revenue sharing of live video service to Hunan Qindao Network Media Technology Co., Ltd.

(iv)   The amount of RMB37,572 and RMB39,704 as of December 31, 2017 and 2018 primarily included the unpaid repurchase amount by the Group to its ordinary shareholders.

(3) Sales to related parties

| | For the years ended December 31, | | |
|---|---|---|---|
| | 2016 | 2017 | 2018 |
| | RMB | RMB | RMB |
| Hangzhou Yihong Advertisement Co., Ltd. (v) | — | 17,659 | — |
| Hangzhou Alimama Technology Co., Ltd. (v) | 273 | 2,309 | — |
| Guangzhou Aijiuyou Informational Technology Co., Ltd. (vi) | 2,660 | 1,242 | — |
| Zhejiang Tmall Technology Co., Ltd. (v) | 5,462 | 500 | — |
| Shanghai Xisue Network Technology Co., Ltd. (v) | 5,981 | — | — |
| Taobao (China) Software Co., Ltd. (v) | 1,698 | — | — |
| Others | 61 | 12 | — |
| Total | 16,135 | 21,722 | — |

(v)   The sales to related parties represented mobile marketing services provided.

(vi)   The sales to related parties represented mobile game revenue generated through those game operating companies.

(4) Purchase from related parties

| | For the years ended December 31, | | |
|---|---|---|---|
| | 2016 | 2017 | 2018 |
| | RMB | RMB | RMB |
| Hunan Qindao Network Media Technology Co., Ltd. (vii) | 26,759 | 139,406 | 429,345 |
| Beijing Shiyue Haofeng Media Co., Ltd. (vii) | — | — | 2,005 |
| Alibaba Cloud Computing Ltd. (viii) | 22,534 | 74,705 | — |
| Hunan Qindao Cultural Spread Ltd. (vii) | — | 61,676 | — |
| Taobao (China) Software Co., Ltd. | 2,169 | 2,283 | — |
| Guangzhou Jianyue Information Technology Co., Ltd. | — | 803 | — |

| | | | |
|---|---|---|---|
| Shanghai Touch Future Network Technology Co., Ltd. | 2,335 | — | — |
| Total | 53,797 | 278,873 | 431,350 |

(vii)  The purchases from Hunan Qindao Network Media Technology Co., Ltd., Beijing Shiyue Haofeng Media Co. Ltd. and Hunan Qindao Cultural Spread Ltd. mainly represent the revenue sharing with talent agencies of live video service.

(viii)  The purchase form Alibaba Cloud Computing Ltd. is mainly related to its cloud computing services.

**12 Months Ended**

**Dec. 31, 2018**

**Segment Information (Tables)**

**Segment Reporting [Abstract]**

Components of Revenues

Net revenues, operating cost and expenses, operating income, and net income by segment for the years ended December 31, 2016, 2017 and 2018 were as follows:

| | For the year ended December 31, 2016 | | | |
| --- | --- | --- | --- | --- |
| | Momo | Tantan | QOOL | Consolidated |
| | RMB | RMB | RMB | RMB |
| Net revenues: | 3,707,358 | — | — | 3,707,358 |
| Cost and expenses: | | | | |
| Cost of revenues | (1,619,327) | — | — | (1,619,327) |
| Research and development | (208,647) | — | — | (208,647) |
| Sales and marketing | (647,238) | — | — | (647,238) |
| General and administrative | (259,712) | — | — | (259,712) |
| Total cost and expenses | (2,734,924) | — | — | (2,734,924) |
| Other operating income | 2,659 | — | — | 2,659 |
| Income from operations | 975,093 | — | — | 975,093 |
| Interest income | 54,603 | — | — | 54,603 |
| Impairment loss on long-term investments | (39,283) | — | — | (39,283) |
| Income tax expense | (34,638) | — | — | (34,638) |
| Share of income on equity method investments | 23,194 | — | — | 23,194 |
| Net income | 978,969 | — | — | 978,969 |

| | For the year ended December 31, 2017 | | | |
| --- | --- | --- | --- | --- |
| | Momo | Tantan | QOOL | Consolidated |
| | RMB | RMB | RMB | RMB |
| Net revenues: | 8,884,823 | — | 1,567 | 8,886,390 |
| Cost and expenses: | | | | |
| Cost of revenues | (4,373,377) | — | — | (4,373,377) |
| Research and development | (346,144) | — | — | (346,144) |
| Sales and marketing | (1,457,658) | — | (9,718) | (1,467,376) |
| General and administrative | (417,866) | — | (4,139) | (422,005) |
| Total cost and expenses | (6,595,045) | — | (13,857) | (6,608,902) |
| Other operating income | 156,764 | — | — | 156,764 |
| Income (loss) from operations | 2,446,542 | — | (12,290) | 2,434,252 |
| Interest income | 145,568 | — | — | 145,568 |
| Impairment loss on long-term investments | (30,085) | — | — | (30,085) |
| Income tax expense | (445,001) | — | — | (445,001) |
| Share of income on equity method investments | 39,729 | — | — | 39,729 |
| Net income (loss) | 2,156,753 | — | (12,290) | 2,144,463 |

| | For the year ended December 31, 2018 | | | |
| --- | --- | --- | --- | --- |
| | Momo | Tantan | QOOL | Consolidated |
| | RMB | RMB | RMB | RMB |
| Net revenues: | 12,812,421 | 417,998 | 178,002 | 13,408,421 |
| Cost and expenses: | | | | |
| Cost of revenues | (6,572,954) | (174,858) | (435,085) | (7,182,897) |
| Research and development | (614,064) | (146,580) | — | (760,644) |
| Sales and marketing | (1,269,493) | (520,161) | (22,608) | (1,812,262) |
| General and administrative | (472,057) | (121,887) | (46,079) | (640,023) |
| Total cost and expenses | (8,928,568) | (963,486) | (503,772) | (10,395,826) |
| Other operating income | 252,458 | 173 | 1,066 | 253,697 |
| Income (loss) from operations | 4,136,311 | (545,315) | (324,704) | 3,266,292 |
| Interest income | 268,583 | 4,285 | 78 | 272,946 |
| Interest expense | (56,503) | — | — | (56,503) |
| Impairment loss on long-term investments | (43,200) | — | — | (43,200) |
| Income tax expense | (716,729) | 21,824 | (4,743) | (699,648) |
| Share of income on equity method investments | 48,660 | — | — | 48,660 |
| Net income (loss) | 3,637,122 | (519,206) | (329,369) | 2,788,547 |

| Organization and Principal Activities - Additional Information (Detail) ¥ in Thousands, shares in Thousands, $ in Thousands | | 12 Months Ended | | | |
| --- | --- | --- | --- | --- | --- |
| | May 31, 2018 CNY (¥) shares | Dec. 31, 2018 CNY (¥) asset_group related_party Term | Dec. 31, 2017 | Dec. 31, 2016 | May 31, 2018 USD ($) |
| **Variable Interest Entity [Line Items]** | | | | | |
| Date of incorporation | | Nov. 23, 2011 | | | |
| Percentage of VIEs revenues to the consolidated net revenues | | 100.00% | 100.00% | 100.00% | |
| Percentage of VIEs assets to the consolidated total assets | | 17.70% | 18.40% | | |
| Percentage of VIEs liability to the consolidated total liabilities | | 18.40% | 62.10% | | |
| Number of consolidated VIEs' assets that are collateral for the VIEs' obligations | asset_group | | 0 | | | |
| VIEs creditors having recourse to general credit of the Company | related_party | | 0 | | | |
| Number of terms under arrangement with VIEs to provide financial support | Term | | 0 | | | |
| Tantan Limited [Member] | | | | | |
| **Variable Interest Entity [Line Items]** | | | | | |
| Cash Consideration | ¥ 3,930,246 | ¥ 3,930,246 | | | $ 613,181 |
| Tantan Limited [Member] | Momo INC [Member] | | | | | |
| **Variable Interest Entity [Line Items]** | | | | | |
| Business acquisition percentage ownership | 100.00% | | | | 100.00% |
| Class A Common Stock [Member] | Tantan Limited [Member] | | | | | |
| **Variable Interest Entity [Line Items]** | | | | | |
| Business Acquisition , share issued | shares | 5,328,853 | | | | |
| Business Operations Agreement [Member] | | | | | |
| **Variable Interest Entity [Line Items]** | | | | | |
| Effective years of agreement | | 10 years | | | |

| Organization and Principal Activities - Schedule of Amounts and Balances of VIEs Included in Consolidated Financial Statements After Elimination of Intercompany Balances and Transactions (Detail) ¥ in Thousands, $ in Thousands | 12 Months Ended | | | | |
|---|---|---|---|---|---|
| | Dec. 31, 2018 CNY (¥) | Dec. 31, 2018 USD ($) | Dec. 31, 2017 CNY (¥) | Dec. 31, 2016 CNY (¥) | Dec. 31, 2018 USD ($) |
| **Variable Interest Entity [Line Items]** | | | | | |
| Cash and cash equivalents | ¥ 2,468,034 | | ¥ 4,462,194 | | $ 358,961 |
| Accounts receivable, net of allowance for doubtful accounts of RMB585 and RMB nil as of December 31, 2017 and 2018, respectively | 719,606 | | 257,633 | | 104,662 |
| Amount due from related parties | | | 33,460 | | |
| Prepaid expenses and other current assets | 620,979 | | 538,182 | | 90,318 |
| Short-term investment | | | 10,500 | | |
| Total current assets | 12,633,229 | | 7,733,985 | | 1,837,427 |
| Property and equipment, net | 387,532 | | 258,704 | | 56,364 |
| Intangible assets | 1,036,986 | | 48,553 | | 150,823 |
| Rental deposits | 24,192 | | 17,249 | | 3,519 |
| Other non-current assets | 71,519 | | 55,271 | | 10,402 |
| Long-term investments | 447,465 | | 288,471 | | 65,081 |
| Deferred tax assets | 57,786 | | 46,825 | | 8,405 |
| Goodwill | 4,306,829 | | 22,130 | | 626,402 |
| Total assets | 18,965,538 | | 8,471,188 | | 2,758,423 |
| Accounts payable | 718,362 | | 484,945 | | 104,481 |
| Deferred revenue | 441,892 | | 422,028 | | 64,271 |
| Accrued expenses and other current liabilities | 846,710 | | 571,333 | | 123,148 |
| Amounts due to related parties | 82,948 | | 37,760 | | 12,064 |
| Total current liabilities | 2,696,276 | | 1,691,953 | | 392,156 |
| Deferred tax liabilities | 259,247 | | 12,138 | | 37,706 |
| Total liabilities | 7,942,679 | | 1,719,088 | | $ 1,155,214 |
| Net revenues | 13,408,421 | | 8,886,390 | ¥ 3,707,358 | |
| Net income | 2,815,775 | $ 409,537 | 2,148,098 | 978,969 | |
| Net cash provided by operating activities | 3,327,718 | 483,997 | 2,886,107 | 1,466,290 | |
| Net cash used in investing activities | (10,034,004) | (1,459,385) | (188,174) | (800,919) | |
| Net cash provided by financing activities | 4,687,951 | $ 681,835 | 2,833 | 124 | |
| **Beijing Momo Technology Co., Ltd. [Member]** | | | | | |
| **Variable Interest Entity [Line Items]** | | | | | |
| Cash and cash equivalents | 1,502,395 | | 410,611 | | |
| Accounts receivable, net of allowance for doubtful accounts of RMB585 and RMB nil as of December 31, 2017 and 2018, respectively | 719,606 | | 257,633 | | |

| | | | |
|---|---|---|---|
| Amount due from related parties | | 33,460 | |
| Prepaid expenses and other current assets | 425,974 | 371,220 | |
| Short-term investment | | 10,500 | |
| Total current assets | 2,647,975 | 1,083,424 | |
| Property and equipment, net | 72,539 | 52,568 | |
| Intangible assets | 42,821 | 48,554 | |
| Rental deposits | 11,619 | 10,471 | |
| Other non-current assets | 67,480 | 50,000 | |
| Long-term investments | 447,465 | 281,935 | |
| Deferred tax assets | 52,887 | 6,908 | |
| Goodwill | 22,130 | 22,130 | |
| Total assets | 3,364,916 | 1,555,990 | |
| Accounts payable | 549,173 | 357,437 | |
| Deferred revenue | 441,392 | 421,528 | |
| Accrued expenses and other current liabilities | 304,363 | 200,406 | |
| Amounts due to related parties | 43,213 | 188 | |
| Income tax payable | 113,733 | 76,549 | |
| Total current liabilities | 1,451,874 | 1,056,108 | |
| Deferred tax liabilities | 10,705 | 12,138 | |
| Total liabilities | 1,462,579 | 1,068,246 | |
| Net revenues | 13,408,421 | 8,886,390 | 3,707,358 |
| Net income | 6,292,183 | 4,890,438 | 2,268,098 |
| Net cash provided by operating activities | 5,913,709 | 4,997,183 | 2,401,340 |
| Net cash used in investing activities | ¥ (151,546) | (174,333) | ¥ (73,224) |
| Net cash provided by financing activities | | ¥ 490 | |

| **Organization and Principal Activities - Schedule of Amounts and Balances of VIEs Included in Consolidated Financial Statements After Elimination of Intercompany Balances and Transactions (Parenthetical) (Detail) - CNY (¥) ¥ in Thousands** | **Dec. 31, 2018** | **Dec. 31, 2017** |
|---|---|---|
| **Variable Interest Entity [Line Items]** | | |
| Allowance for doubtful accounts | ¥ 0 | ¥ 585 |
| Beijing Momo Technology Co., Ltd. [Member] | | |
| **Variable Interest Entity [Line Items]** | | |
| Allowance for doubtful accounts | ¥ 0 | ¥ 585 |

| Significant Accounting Policies - Additional Information (Detail) ¥ in Thousands, $ in Thousands | Jan. 01, 2018 CNY (¥) | Dec. 31, 2018 CNY (¥) Customer Product | Dec. 31, 2018 USD ($) Customer Product | Dec. 31, 2017 CNY (¥) Customer Product | Dec. 31, 2016 CNY (¥) Customer | Dec. 31, 2018 USD ($) |
|---|---|---|---|---|---|---|
| **Accounting Policies [Line Items]** | | | | | | |
| Bank deposits maturity | | 3 months | 3 months | | | |
| Cash and cash equivalents | | ¥ 2,468,034 | | ¥ 4,462,194 | | $ 358,961 |
| Deferred revenue recognized | ¥ 422,028 | | | | | |
| Impairment charges related to contract assets | | 0 | | | | |
| Other operating income | | 253,697 | $ 36,899 | 156,764 | ¥ 2,659 | |
| Value added tax incurred | | 1,136,034 | | 812,249 | 367,635 | |
| Foreign currency adjustment gain loss | | ¥ 198,654 | $ 28,893 | (155,368) | 175,963 | |
| Foreign Currency Exchange difference | | Translations of amounts from RMB into US$ for the convenience of the reader were calculated at the noon buying rate of US$1.00 RMB6.8755 on the last trading day of 2018 (December 31, 2018) representing the certificated exchange rate published by the Federal Reserve Board. No representation is made that the RMB amounts could have been, or could be, converted, realized or settled into US$ at such rate, or at any other rates. | Translations of amounts from RMB into US$ for the convenience of the reader were calculated at the noon buying rate of US$1.00 RMB6.8755 on the last trading day of 2018 (December 31, 2018) representing the certificated exchange rate published by the Federal Reserve Board. No representation is made that the RMB amounts could have been, or could be, converted, realized or settled into US$ at such rate, or at any other rates. | | | |
| Foreign currency translation exchange rate | | 6.8755 | | | | 6.8755 |
| Advertising expense | | ¥ 1,236,167 | | ¥ 1,036,053 | 367,532 | |
| Share-based award, vesting period | | 4 years | 4 years | | | |
| Minimum [Member] | | | | | | |
| **Accounting Policies [Line Items]** | | | | | | |
| Percentage of ownership, equity method investment | | 20.00% | | | | 20.00% |
| Accounts receivable, payment terms on invoiced amounts | | 1 day | 1 day | | | |

Maximum [Member]

**Accounting Policies [Line Items]**

| | | | | |
|---|---|---|---|---|
| Percentage of ownership, equity method investment | 50.00% | | | 50.00% |
| Contracts, original duration | 1 year | 1 year | | |
| Accounts receivable, payment terms on invoiced amounts | 180 days | 180 days | | |

Self Developed Mobile Game [Member]

**Accounting Policies [Line Items]**

| | | | |
|---|---|---|---|
| Estimated usage life of product/service | 77 days | 77 days | |
| Number of games | Product | 4 | 4 | 8 |

Self Developed Mobile Game [Member] | Minimum [Member]

**Accounting Policies [Line Items]**

| | |
|---|---|
| Estimated usage life of product/service | 56 days |

Self Developed Mobile Game [Member] | Maximum [Member]

**Accounting Policies [Line Items]**

| | |
|---|---|
| Estimated usage life of product/service | 79 days |

Membership Subscription [Member]

**Accounting Policies [Line Items]**

| | | |
|---|---|---|
| Contract period, minimum | 1 month | 1 month |
| Contract period, maximum | 1 year | 1 year |

Government Subsidies

**Accounting Policies [Line Items]**

| | | | |
|---|---|---|---|
| Other operating income | ¥ 223,995 | | ¥ 141,688 ¥ 2,000 |

User Concentration Risk [Member] | Revenues [Member]

**Accounting Policies [Line Items]**

| | | | | |
|---|---|---|---|---|
| Number of users or customer accounted for 10% or more of total revenues | Customer | 0 | 0 | 0 | 0 |

China, Yuan Renminbi

**Accounting Policies [Line Items]**

| | | | |
|---|---|---|---|
| Cash and cash equivalents | ¥ 2,008,000 | | ¥ 4,116,000 |

| Significant Accounting Policies - Schedule of Third-Party Application Stores and Other Payment Channels Accounting Receivables (Detail) - Accounts Receivable [Member] - Credit Concentration Risk [Member] | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2018 | Dec. 31, 2017 |
| Third-party Payment Channel A [Member] | | |
| **Concentration Risk [Line Items]** | | |
| Concentration risk, percentage | 14.00% | 23.00% |
| Third-party Payment Channel B [Member] | | |
| **Concentration Risk [Line Items]** | | |
| Concentration risk, percentage | 12.00% | 19.00% |
| Third-party Payment Channel C [Member] | | |
| **Concentration Risk [Line Items]** | | |
| Concentration risk, percentage | 0.00% | 21.00% |
| Third-party Payment Channel D [Member] | | |
| **Concentration Risk [Line Items]** | | |
| Concentration risk, percentage | 59.00% | 0.00% |

| Significant Accounting Policies - Schedule of Estimated Useful Lives of Property and Equipment (Detail) | 12 Months Ended |
|---|---|
| | **Dec. 31, 2018** |
| Computer Equipment [Member] | |
| **Property, Plant and Equipment [Line Items]** | |
| Property and equipment, estimated useful life | 3 years |
| Vehicles [Member] | |
| **Property, Plant and Equipment [Line Items]** | |
| Property and equipment, estimated useful life | 5 years |
| Leasehold Improvement [Member] | |
| **Property, Plant and Equipment [Line Items]** | |
| Property and equipment, estimated useful life | Shorter of the lease term or estimated useful lives |
| Minimum [Member] \| Office Equipment [Member] | |
| **Property, Plant and Equipment [Line Items]** | |
| Property and equipment, estimated useful life | 3 years |
| Maximum [Member] \| Office Equipment [Member] | |
| **Property, Plant and Equipment [Line Items]** | |
| Property and equipment, estimated useful life | 5 years |

| Significant Accounting Policies - Schedule of Estimated Useful Lives of Intangible Assets (Detail) | 12 Months Ended Dec. 31, 2018 |
|---|---|
| Copyrights [Member] | |
| **Finite-Lived Intangible Liabilities [Line Items]** | |
| Finite-Lived Intangible Asset, Useful Life | 1 year |
| Technology [Member] | |
| **Finite-Lived Intangible Liabilities [Line Items]** | |
| Finite-Lived Intangible Asset, Useful Life | 3 years |
| User Base [Member] | |
| **Finite-Lived Intangible Liabilities [Line Items]** | |
| Finite-Lived Intangible Asset, Useful Life | 5 years |
| Trade Names [Member] | |
| **Finite-Lived Intangible Liabilities [Line Items]** | |
| Finite-Lived Intangible Asset, Useful Life | 10 years |
| Minimum [Member] | Licenses [Member] | |
| **Finite-Lived Intangible Liabilities [Line Items]** | |
| Finite-Lived Intangible Asset, Useful Life | 3 years 2 months 12 days |
| Maximum [Member] | Licenses [Member] | |
| **Finite-Lived Intangible Liabilities [Line Items]** | |
| Finite-Lived Intangible Asset, Useful Life | 10 years |

| Significant Accounting Policies - Components of Revenues (Detail) - CNY (¥) ¥ in Thousands | 12 Months Ended | | |
| --- | --- | --- | --- |
| | Dec. 31, 2018 | Dec. 31, 2017 | Dec. 31, 2016 |
| **Revenue From Contract With Customers [Line Items]** | | | |
| Total revenues | ¥ 13,408,421 | ¥ 8,886,390 | ¥ 3,707,358 |
| Momo Inc [Member] | | | |
| **Revenue From Contract With Customers [Line Items]** | | | |
| Total revenues | 12,812,421 | 8,884,823 | 3,707,358 |
| Momo Inc [Member] \| Live Video Service [Member] | | | |
| **Revenue From Contract With Customers [Line Items]** | | | |
| Total revenues | 10,709,491 | 7,429,906 | 2,534,604 |
| Momo Inc [Member] \| Value-added Services [Member] | | | |
| **Revenue From Contract With Customers [Line Items]** | | | |
| Total revenues | 1,465,152 | 695,798 | 449,781 |
| Momo Inc [Member] \| Mobile Marketing [Member] | | | |
| **Revenue From Contract With Customers [Line Items]** | | | |
| Total revenues | 500,321 | 514,279 | 441,644 |
| Momo Inc [Member] \| Mobile Games [Member] | | | |
| **Revenue From Contract With Customers [Line Items]** | | | |
| Total revenues | 130,392 | 241,388 | 236,238 |
| Momo Inc [Member] \| Other Services [Member] | | | |
| **Revenue From Contract With Customers [Line Items]** | | | |
| Total revenues | 7,065 | 3,452 | ¥ 45,091 |
| Tantan Limited [Member] | | | |
| **Revenue From Contract With Customers [Line Items]** | | | |
| Total revenues | 417,998 | | |
| Tantan Limited [Member] \| Value-added Services [Member] | | | |
| **Revenue From Contract With Customers [Line Items]** | | | |
| Total revenues | 417,998 | | |
| Qool Inc [Member] | | | |
| **Revenue From Contract With Customers [Line Items]** | | | |
| Total revenues | 178,002 | 1,567 | |
| Qool Inc [Member] \| Other Services [Member] | | | |
| **Revenue From Contract With Customers [Line Items]** | | | |
| Total revenues | ¥ 178,002 | ¥ 1,567 | |

| Acquisitions - Additional Information (Detail) - Tantan Limited [Member] ¥ in Thousands, shares in Thousands, $ in Thousands | May 31, 2018 CNY (¥) shares | Dec. 31, 2018 CNY (¥) | May 31, 2018 USD ($) |
|---|---|---|---|
| Cash Consideration | ¥ 3,930,246 | ¥ 3,930,246 | $ 613,181 |
| Business acquisition cash paid \| ¥ | | ¥ 3,460,972 | |
| Class A Common Stock [Member] | | | |
| Business Acquisition, share issued \| shares | 5,328,853 | | |
| Momo INC [Member] | | | |
| Business acquisition percentage ownership | 100.00% | | 100.00% |

| Acquisitions - Schedule of Business Acquisitions Contingent Consideration (Detail) - Tantan Limited [Member] ¥ in Thousands | 12 Months Ended Dec. 31, 2018 CNY (¥) |
|---|---|
| **Business Acquisition, Contingent Consideration [Line Items]** | |
| Cash consideration | ¥ 3,930,246 |
| Fair value of ordinary shares issued | 784,215 |
| Total consideration | ¥ 4,714,461 |

| **Acquisitions - Schedule of Recognized Identified Assets and Liabilities Acquired (Detail) - CNY (¥) ¥ in Thousands** | **12 Months Ended** | |
|---|---|---|
| | **Dec. 31, 2018** | **Dec. 31, 2017** |
| **Finite-Lived Intangible Assets [Line Items]** | | |
| Goodwill | ¥ 3,994,358 | ¥ 22,130 |
| Tantan Limited [Member] | | |
| **Finite-Lived Intangible Assets [Line Items]** | | |
| Cash and cash equivalents and short term investment | 154,671 | |
| Accounts receivable | 20,079 | |
| Other current asset | 22,833 | |
| Property and equipment, net | 46,160 | |
| Other non-current asset | 3,030 | |
| Total assets | 1,255,973 | |
| Accounts payable | (21,037) | |
| Other current liabilities | (262,533) | |
| Deferred tax liabilities | (252,300) | |
| Goodwill | 3,994,358 | |
| Total consideration | ¥ 4,714,461 | |
| Tantan Limited [Member] \| Trade Names [Member] | | |
| **Finite-Lived Intangible Assets [Line Items]** | | |
| Intangible assets useful life | 10 years | |
| Intangible assets | ¥ 640,600 | |
| Tantan Limited [Member] \| Technology [Member] | | |
| **Finite-Lived Intangible Assets [Line Items]** | | |
| Intangible assets useful life | 3 years | |
| Intangible assets | ¥ 26,100 | |
| Tantan Limited [Member] \| User Base [Member] | | |
| **Finite-Lived Intangible Assets [Line Items]** | | |
| Intangible assets useful life | 5 years | |
| Intangible assets | ¥ 342,500 | |

| Acquisitions - Summary of Operation Attributable to Acquisition (Detail) ¥ in Thousands, $ in Thousands | 12 Months Ended | | | |
|---|---|---|---|---|
| | Dec. 31, 2018 CNY (¥) | Dec. 31, 2018 USD ($) | Dec. 31, 2017 CNY (¥) | Dec. 31, 2016 CNY (¥) |
| Net revenue | ¥ 13,408,421 | | ¥ 8,886,390 | ¥ 3,707,358 |
| Net loss | 2,815,775 | $ 409,537 | ¥ 2,148,098 | ¥ 978,969 |
| Tantan Limited [Member] | | | | |
| Net revenue | 417,998 | | | |
| Net loss | ¥ 519,206 | | | |

| Acquisitions - Schedule of Proforma Information of Acquisitions (Detail) - Tantan Limited [Member] - CNY (¥) ¥ / shares in Units, ¥ in Thousands | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2018 | Dec. 31, 2017 |
| **Business Combination Segment Allocation [Line Items]** | | |
| Pro forma net revenue | ¥ 13,511,439 | ¥ 8,887,543 |
| Pro forma net income attributable to ordinary shareholders of Momo Inc. | ¥ 2,383,646 | ¥ 1,627,664 |
| Pro forma net income per ordinary share - basic | ¥ 5.86 | ¥ 4.13 |
| Pro forma net income per ordinary share - diluted | ¥ 5.50 | ¥ 3.92 |

| Prepaid Expenses and Other Current Assets - Schedule of Prepaid Expenses and Other Current Assets (Detail) ¥ in Thousands, $ in Thousands | | Dec. 31, 2018 CNY (¥) | Dec. 31, 2018 USD ($) | Dec. 31, 2017 CNY (¥) |
|---|---|---|---|---|
| **Deferred Costs, Capitalized, Prepaid, and Other Assets Disclosure [Abstract]** | | | | |
| Deposit at third-party payment channels | [1] | ¥ 258,039 | | ¥ 190,238 |
| Advance to suppliers | [2] | 94,100 | | 140,022 |
| Interest receivable | | 87,057 | | 54,920 |
| Input VAT | [3] | 69,075 | | 24,164 |
| Prepaid income tax and other expenses | | 55,084 | | 52,499 |
| Deferred platform commission cost | | 36,189 | | 27,925 |
| Advance to game developers | | 8,463 | | 6,012 |
| Game promotions fees paid on behalf of game developers | | 3,069 | | 17,840 |
| Others | | 9,903 | | 24,562 |
| Prepaid expenses and other current assets | | ¥ 620,979 | $ 90,318 | ¥ 538,182 |

[1] Deposit at third party payment channels are mainly the cash deposited in certain third party payment channels by the Group for the broadcasters and the gift recipients who received the virtual items to withdraw their revenue sharing and the customer payment to the Group's account through the third party payment channels.

[2] Advance to suppliers were primarily for advertising fees, live video broadcasting service fees and other professional service fees.

[3] Input VAT mainly occurred from the purchasing of goods or other services, property and equipment and advertising activities. It is subject to verification by related tax authorities before offsetting the VAT output.

| Long-Term Investments - Summary of Equity and Cost Method Investments (Detail) ¥ in Thousands, $ in Thousands | Dec. 31, 2018 CNY (¥) | Dec. 31, 2018 USD ($) | Sep. 12, 2018 CNY (¥) | Dec. 31, 2017 CNY (¥) | Aug. 18, 2015 CNY (¥) | Feb. 13, 2015 CNY (¥) |
|---|---|---|---|---|---|---|
| **Investment [Line Items]** | | | | | | |
| Long term Investments | ¥ 447,465 | $ 65,081 | | ¥ 288,471 | | |
| Hunan Qindao Cultural Spread Ltd. [Member] | | | | | | |
| **Investment [Line Items]** | | | | | | |
| Equity securities | [1] 30,000 | | | 30,000 | | |
| Hangzhou Faceunity Technology Limited [Member] | | | | | | |
| **Investment [Line Items]** | | | | | | |
| Equity securities | [2] 70,000 | | | | | |
| Haining Yijiayi Culture Co Ltd [Member] | | | | | | |
| **Investment [Line Items]** | | | | | | |
| Equity securities | [3] 25,000 | | | | | |
| Other Equity Securities [Member] | | | | | | |
| **Investment [Line Items]** | | | | | | |
| Equity securities | [4] 53,125 | | | 49,791 | | |
| Jingwei Chuangteng (Hangzhou) L.P. [Member] | | | | | | |
| **Investment [Line Items]** | | | | | | |
| Equity method investments | [5] 64,441 | | | 48,273 | | |
| Beijing Autobot Venture Capital L.P. [Member] | | | | | | |
| **Investment [Line Items]** | | | | | | |
| Equity method investments | 57,392 [6] | | | 55,162 [6] | | ¥ 30,000 |
| Hangzhou Aqua Ventures Investment Management L.P. [Member] | | | | | | |
| **Investment [Line Items]** | | | | | | |
| Equity method investments | 105,289 [7] | | | 84,492 [7] | ¥ 50,000 | |
| Chengdu Tianfu Qianshi Equity Lp Investment [Member] | | | | | | |
| **Investment [Line Items]** | | | | | | |
| Equity method investments | 20,586 [8] | | ¥ 30,000 | | | |
| Other Equity Method Investments [Member] | | | | | | |
| **Investment [Line Items]** | | | | | | |
| Equity method investments | [4] ¥ 21,632 | | | ¥ 20,753 | | |

[1] On June 8, 2016, the Group entered into a share purchase agreement to acquire 16.0% preferred shares of Hunan Qindao Cultural Spread Ltd. ("Qindao") for a total consideration of RMB30,000, which was fully paid off as of December 31, 2017. The investment was classified as available-for-sale security as the Group determined that the preferred shares were debt securities due to the redemption option available to the investor and measured the investment subsequently at fair value. No unrealized holding gains was reported in other comprehensive income for the year ended December 31, 2016. On July 7, 2017, the Group signed a supplemental agreement with Qindao to waive the redemption right. The investment was reclassified to equity security as a result of the supplemental agreement.

[2] On January 17, 2018, the Group entered into a preferred share subscription agreement to acquire 10% equity of Hangzhou Faceunity Technology Limited ("Faceunity") for a total consideration of RMB70,000, which had been paid as of December

31, 2018. As the investment was neither a debt security nor an in-substance common stock, it was accounted as an equity securities without readily determinable fair values and measured at fair value using the measurement alternative.

[3]  On August 2, 2018, the Group invested in Haining Yijiayi Culture Co., Ltd ("Yijiayi") and acquired 5% equity for a total consideration of RMB25,000, which had been paid as of December 31, 2018. As the investment was neither a debt security nor an in-substance common stock, it was accounted as an equity securities without readily determinable fair values and measured at fair value using the measurement alternative.

[4]  Others represent equity method investments or equity securities without readily determinable fair values that are individually insignificant.

[5]  On January 9, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Jingwei Chuangteng (Hangzhou) L.P. ("Jingwei"). According to the partnership agreement, the Group committed to subscribe 4.9% partnership interest in Jingwei for RMB30,000, which had been paid as of December 31, 2017. Due to Jingwei's further rounds of financing, the Group's partnership interest was diluted to 2.4% as of December 31, 2017 and 2018. The Group recognized its share of partnership profit in Jingwei of RMB4,245, RMB11,677 and RMB16,168 during the year ended December 31, 2016, 2017 and 2018, respectively.

[6]  On February 13, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Beijing Autobot Venture Capital L.P. ("Autobot"). According to the partnership agreement, the Group committed to subscribe 31.9% partnership interest in Autobot for RMB30,000. Autobot had further rounds of financing, of which the Group subscribed for RMB10,000. Due to Autobot's further round of financing, the Group's partnership interest was diluted to 26.7% as of December 31, 2017 and 2018. The committed subscription and further round of financing subscription amount, RMB40,000, was paid as of December 31, 2016. The Group recognized its share of partnership profit in Autobot of RMB5,039, RMB8,392 and RMB2,230 during the year ended December 31, 2016, 2017 and 2018, respectively.

[7]  On August 18, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Hangzhou Aqua Ventures Investment Management L.P. ("Aqua"). According to the partnership agreement, the Group committed to subscribe 42.7% partnership interest for RMB50,000. The committed subscription amount had been fully paid as of December 31, 2016. The Group recognized its share of partnership profit in Aqua of RMB14,346, RMB20,709 and RMB20,797 during the years ended December 31, 2016, 2017 and 2018, respectively.

[8]  On September 12, 2018, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Chengdu Tianfu Qianshi Equity Investment Partnership L.P. ("Tianfu"). According to the partnership agreement, the Group committed to subscribe 6.8% partnership interest for RMB30,000, of which RMB12,000 had been paid as of December 31, 2018. The Group recognized its share of partnership profit in Tianfu of RMB nil, RMB nil and RMB8,586 during the years ended December 31, 2016, 2017 and 2018, respectively.

| Long-Term Investments - Additional Information (Detail) ¥ in Thousands, $ in Thousands | 12 Months Ended | | | |
|---|---|---|---|---|
| | Dec. 31, 2018 CNY (¥) | Dec. 31, 2018 USD ($) | Dec. 31, 2017 CNY (¥) | Dec. 31, 2016 CNY (¥) |
| **Investments, All Other Investments [Abstract]** | | | | |
| Impairment loss on long-term investments | ¥ 43,200 | $ 6,283 | ¥ 30,085 | ¥ 39,283 |

| Long-Term Investments - Summary of Equity and Cost Method Investments (Parenthetical) (Detail) $ in Thousands | 12 Months Ended | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Dec. 31, 2018 CNY (¥) | Dec. 31, 2018 USD ($) | Dec. 31, 2017 CNY (¥) | Dec. 31, 2016 CNY (¥) | Dec. 31, 2015 CNY (¥) | Sep. 12, 2018 CNY (¥) | Aug. 02, 2018 | Jan. 17, 2018 | Jun. 08, 2016 | Aug. 18, 2015 CNY (¥) | Feb. 13, 2015 CNY (¥) | Jan. 09, 2015 |
| **Investment [Line Items]** | | | | | | | | | | | | |
| Share of income (loss) on equity method investments | ¥ 48,660,000 | $ 7,077 | ¥ 39,729,000 | ¥ 23,194,000 | | | | | | | | |
| Jingwei Chuangteng (Hangzhou) L.P. [Member] | | | | | | | | | | | | |
| **Investment [Line Items]** | | | | | | | | | | | | |
| Equity method investments | [1] ¥ 64,441,000 | | ¥ 48,273,000 | | | | | | | | | |
| Percentage of ownership | 2.40% | | 2.40% | | | | | | | | | 4.90% |
| Share of income (loss) on equity method investments | ¥ 16,168,000 | | ¥ 11,677,000 | 4,245,000 | | | | | | | | |
| Payment of equity method investment | | | 30,000,000 | | | | | | | | | |
| Beijing Autobot Venture Capital L.P. [Member] | | | | | | | | | | | | |
| **Investment [Line Items]** | | | | | | | | | | | | |
| Equity method investments | ¥ 57,392,000 [2] | | ¥ 55,162,000 [2] | | | | | | | | ¥ 30,000,000 | |
| Equity method investments, further financing | | | | | ¥ 10,000,000 | | | | | | | |
| Percentage of ownership | 26.70% | | 26.70% | | | | | | | | 31.90% | |
| Share of income (loss) on equity method investments | ¥ 2,230,000 | | ¥ 8,392,000 | 5,039,000 | | | | | | | | |
| Payment of equity method investment | | | | 40,000,000 | | | | | | | | |
| Hangzhou Aqua Ventures Investment Management L.P. [Member] | | | | | | | | | | | | |
| **Investment [Line Items]** | | | | | | | | | | | | |
| Equity method investments | 105,289,000 [3] | | 84,492,000 [3] | | | | | | | ¥ 50,000,000 | | |
| Percentage of ownership | | | | | | | | | | 42.70% | | |
| Share of income (loss) on equity method investments | 20,797,000 | | 20,709,000 | 14,346,000 | | | | | | | | |
| Chengdu Tianfu Qianshi Equity Lp Investment [Member] | | | | | | | | | | | | |
| **Investment [Line Items]** | | | | | | | | | | | | |
| Equity method investments | 20,586,000 [4] | | | | | ¥ 30,000,000 | | | | | | |
| Payments to acquire available-for-sale securities, equity | 12,000,000 | | | | | | | | | | | |
| Percentage of ownership | | | | | | 6.80% | | | | | | |
| Share of income (loss) on equity method investments | 8,586,000 | | | | | | | | | | | |
| Hunan Qindao Cultural Spread Ltd. [Member] | | | | | | | | | | | | |
| **Investment [Line Items]** | | | | | | | | | | | | |
| Percentage of shares acquired recorded as available for sale debt security | | | | | | | | | | 16.00% | | |
| Unrealized holding gains | | | | ¥ 0 | | | | | | | | |
| Payments to acquire available-for-sale securities, equity | | | ¥ 30,000,000 | | | | | | | | | |
| Hangzhou Faceunity Technology Limited [Member] | | | | | | | | | | | | |

**Investment [Line Items]**

Percentage of shares acquired recorded as available for sale debt security
                                                                        10.00%

Share purchase agreement, consideration paid          70,000,000

**Haining Yijiayi Culture Co Ltd [Member]**

**Investment [Line Items]**

Business acquisition, equity interests acquired
                                                                        5.00%

Payment of equity method investment          ¥ 25,000,000

[1] On January 9, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Jingwei Chuangteng (Hangzhou) L.P. ("Jingwei"). According to the partnership agreement, the Group committed to subscribe 4.9% partnership interest in Jingwei for RMB30,000, which had been paid as of December 31, 2017. Due to Jingwei's further rounds of financing, the Group's partnership interest was diluted to 2.4% as of December 31, 2017 and 2018. The Group recognized its share of partnership profit in Jingwei of RMB4,245, RMB11,677 and RMB16,168 during the year ended December 31, 2016, 2017 and 2018, respectively.

[2] On February 13, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Beijing Autobot Venture Capital L.P. ("Autobot"). According to the partnership agreement, the Group committed to subscribe 31.9% partnership interest in Autobot for RMB30,000. Autobot had further rounds of financing, of which the Group subscribed for RMB10,000. Due to Autobot's further round of financing, the Group's partnership interest was diluted to 26.7% as of December 31, 2017 and 2018. The committed subscription and further round of financing subscription amount, RMB40,000, was paid as of December 31, 2016. The Group recognized its share of partnership profit in Autobot of RMB5,039, RMB8,392 and RMB2,230 during the year ended December 31, 2016, 2017 and 2018, respectively.

[3] On August 18, 2015, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Hangzhou Aqua Ventures Investment Management L.P. ("Aqua"). According to the partnership agreement, the Group committed to subscribe 42.7% partnership interest for RMB50,000. The committed subscription amount had been fully paid as of December 31, 2016. The Group recognized its share of partnership profit in Aqua of RMB14,346, RMB20,709 and RMB20,797 during the years ended December 31, 2016, 2017 and 2018, respectively.

[4] On September 12, 2018, the Group entered into a partnership agreement to subscribe partnership interest, as a limited partner, in Chengdu Tianfu Qianshi Equity Investment Partnership L.P. ("Tianfu"). According to the partnership agreement, the Group committed to subscribe 6.8% partnership interest for RMB30,000, of which RMB12,000 had been paid as of December 31, 2018. The Group recognized its share of partnership profit in Tianfu of RMB nil, RMB nil and RMB8,586 during the years ended December 31, 2016, 2017 and 2018, respectively.

| Property and Equipment, Net - Schedule of Property and Equipment, Net (Detail) ¥ in Thousands, $ in Thousands | Dec. 31, 2018 CNY (¥) | Dec. 31, 2018 USD ($) | Dec. 31, 2017 CNY (¥) |
|---|---|---|---|
| **Property, Plant and Equipment [Line Items]** | | | |
| Less: accumulated depreciation | ¥ (338,868) | | ¥ (186,002) |
| Exchange difference | (35) | | 7 |
| Total | 387,532 | $ 56,364 | 258,704 |
| Computer Equipment [Member] | | | |
| **Property, Plant and Equipment [Line Items]** | | | |
| Property and equipment, gross | 513,448 | | 296,559 |
| Office Equipment [Member] | | | |
| **Property, Plant and Equipment [Line Items]** | | | |
| Property and equipment, gross | 115,048 | | 79,470 |
| Vehicles [Member] | | | |
| **Property, Plant and Equipment [Line Items]** | | | |
| Property and equipment, gross | 3,599 | | 1,230 |
| Leasehold Improvement [Member] | | | |
| **Property, Plant and Equipment [Line Items]** | | | |
| Property and equipment, gross | ¥ 94,340 | | ¥ 67,440 |

| Property and Equipment, Net - Additional information (Detail) ¥ in Thousands, $ in Thousands | 12 Months Ended | | | |
|---|---|---|---|---|
| | Dec. 31, 2018 CNY (¥) | Dec. 31, 2018 USD ($) | Dec. 31, 2017 CNY (¥) | Dec. 31, 2016 CNY (¥) |
| **Property, Plant and Equipment [Abstract]** | | | | |
| Depreciation expense | ¥ 148,238 | $ 21,560 | ¥ 78,885 | ¥ 55,845 |

| Intangible Assets, Net - Schedule of Intangible Assets (Detail) - CNY (¥) ¥ in Thousands | Dec. 31, 2018 | Dec. 31, 2017 |
|---|---|---|
| **Finite-Lived Intangible Liabilities [Line Items]** | | |
| Less: accumulated amortization and impairment | ¥ (99,080) | ¥ (6,050) |
| Exchange difference | (1,094) | |
| Net book value | 1,036,986 | 48,553 |
| Trade Names [Member] | | |
| **Finite-Lived Intangible Liabilities [Line Items]** | | |
| Intangible assets, gross | 687,164 | |
| Active User [Member] | | |
| **Finite-Lived Intangible Liabilities [Line Items]** | | |
| Intangible assets, gross | 367,396 | |
| Technology [Member] | | |
| **Finite-Lived Intangible Liabilities [Line Items]** | | |
| Intangible assets, gross | 27,997 | |
| Licenses [Member] | | |
| **Finite-Lived Intangible Liabilities [Line Items]** | | |
| Intangible assets, gross | 52,433 | 52,433 |
| Game copyright [Member] | | |
| **Finite-Lived Intangible Liabilities [Line Items]** | | |
| Intangible assets, gross | ¥ 2,170 | ¥ 2,170 |

| Intangible Assets, Net - Additional Information (Detail) - CNY (¥) ¥ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2018 | Dec. 31, 2017 | Dec. 31, 2016 |
| **Goodwill and Intangible Assets Disclosure [Abstract]** | | | |
| Depreciation expenses and impairment loss | ¥ 93,030 | ¥ 6,050 | ¥ 0 |

**Intangible Assets, Net - Schedule of Future Amortization Expense (Detail) - CNY (¥) ¥ in Thousands**

|  | **Dec. 31, 2018** | **Dec. 31, 2017** |
|---|---|---|
| **Goodwill and Intangible Assets Disclosure [Abstract]** | | |
| 2019 | ¥ 157,260 | |
| 2020 | 157,260 | |
| 2021 | 151,121 | |
| 2022 | 147,209 | |
| 2023 | 104,346 | |
| Thereafter | 319,790 | |
| Net book value | ¥ 1,036,986 | ¥ 48,553 |

| Goodwill - Schedule Of Goodwill (Detail) ¥ in Thousands, $ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2018 CNY (¥) | Dec. 31, 2018 USD ($) | Dec. 31, 2017 CNY (¥) |
| **Goodwill [Line Items]** | | | |
| Beginning balance | ¥ 22,130 | | |
| Goodwill acquired | 3,994,358 | | ¥ 22,130 |
| Foreign exchange differences | 290,341 | | |
| Ending balance | 4,306,829 | $ 626,402 | 22,130 |
| Momo Inc [Member] | | | |
| **Goodwill [Line Items]** | | | |
| Beginning balance | 22,130 | | |
| Goodwill acquired | | | 22,130 |
| Ending balance | 22,130 | | ¥ 22,130 |
| Tantan Limited [Member] | | | |
| **Goodwill [Line Items]** | | | |
| Goodwill acquired | 3,994,358 | | |
| Foreign exchange differences | 290,341 | | |
| Ending balance | ¥ 4,284,699 | | |

| Accrued Expenses and Other Current Liabilities - Schedule of Accrued Expenses and Other Current Liabilities (Detail) ¥ in Thousands, $ in Thousands | Dec. 31, 2018 CNY (¥) | Dec. 31, 2018 USD ($) | Dec. 31, 2017 CNY (¥) |
|---|---|---|---|
| **Payables and Accruals [Abstract]** | | | |
| Accrued payroll and welfare | ¥ 302,117 | | ¥ 224,618 |
| Payable for advertisement | 254,872 | | 122,211 |
| Balance of users' virtual accounts | 112,488 | | 92,228 |
| Other tax payables | 99,964 | | 61,529 |
| Accrued professional services and rental fee | 38,415 | | 23,041 |
| VAT payable | 9,208 | | 10,040 |
| Others | 29,646 | | 37,666 |
| Total | ¥ 846,710 | $ 123,148 | ¥ 571,333 |

| Convertible Senior Notes - Additional Information (Detail) - Convertible Senior Notes Due 2025 [Member] ¥ / shares in Units, $ / shares in Units, ¥ in Thousands, $ in Thousands | | 1 Months Ended | 12 Months Ended | | |
|---|---|---|---|---|---|
| | Jun. 26, 2018 $ / shares | Jul. 31, 2018 CNY (¥) ¥ / shares shares | Dec. 31, 2018 CNY (¥) | Dec. 31, 2018 USD ($) | Jul. 31, 2018 USD ($) |
| **Line of Credit Facility [Line Items]** | | | | | |
| Aggregate principal amount | | ¥ 4,985,000 | | | $ 725,000 |
| Debt Conversion, Converted Instrument, Shares Issued \| shares | | 15.4776 | | | |
| Conversion price \| (per share) | $ 45.34 | ¥ 64.61 | | | |
| Debt conversion premium percentage | 42.50% | | | | |
| Convertible senior notes maturity date | | Jul. 01, 2025 | | | |
| Principal amount of each convertible note \| $ | | | | $ 1,000 | |
| Number of notes converted into company's ADSs | | | 0 | 0 | |
| Convertible senior notes interest rate | | | 1.25% | | |
| Debt instrument, carrying value | | | ¥ 4,877,116 | | |
| Unamortized debt issuance costs | | | ¥ 107,622 | | |
| Debt instrument, effective interest rate | | | 1.61% | | |
| Amortization and interest expenses | | | ¥ 38,491 | | |

| **Fair Value - Schedule of Assets Measured at Fair Value on Recurring Basis (Detail) - Fair Value, Measurements, Recurring [Member] - CNY (¥) ¥ in Thousands** | **Dec. 31, 2018** | **Dec. 31, 2017** |
|---|---|---|
| **Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]** | | |
| Cash and cash equivalents | ¥ 2,468,034 | ¥ 4,462,194 |
| Total | 2,468,034 | 4,462,194 |
| Quoted Prices in Active Market for Identical Assets (Level 1) [Member] | | |
| **Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]** | | |
| Cash and cash equivalents | 2,468,034 | 4,462,194 |
| Total | ¥ 2,468,034 | ¥ 4,462,194 |

| **Fair Value - Schedule of Reconciliation of Fair Value Measurement of Long-term Investments Using Significant Unobservable Inputs on a Recurring Basis (Detail) ¥ in Thousands** | **12 Months Ended** |
|---|---|
| | **Dec. 31, 2017 CNY (¥)** |
| **Fair Value Disclosures [Abstract]** | |
| Beginning balance | ¥ 50,452 |
| Purchase | 10,000 |
| Other-than-temporary loss recognized | (30,085) |
| Reclassification to equity securities without readily determinable fair value | (30,000) [1] |
| Foreign exchange difference | ¥ (367) |

[1] The investment in Qindao was reclassified from long-term investments to equity securities without readily determinable fair value as of result of the waiver of redemption right in July 2017. Please refer to Note 5 for additional information on the reclassification.

| Fair Value - Additional Information (Detail) ¥ in Thousands, $ in Thousands | 12 Months Ended | | | |
|---|---|---|---|---|
| | Dec. 31, 2018 CNY (¥) | Dec. 31, 2018 USD ($) | Dec. 31, 2017 CNY (¥) | Dec. 31, 2016 CNY (¥) |
| **Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]** | | | | |
| Impairment loss on assets | ¥ 43,200 | $ 6,283 | ¥ 30,085 | ¥ 39,283 |
| Other Cost and Equity Method Investment [Member] | | | | |
| **Fair Value, Assets and Liabilities Measured on Recurring and Nonrecurring Basis [Line Items]** | | | | |
| Impairment loss on assets | ¥ 0 | | ¥ 0 | |

| Income Taxes - Additional Information (Detail) ¥ in Thousands | 1 Months Ended | | 12 Months Ended | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Oct. 31, 2018 | Aug. 31, 2014 | Dec. 31, 2018 CNY (¥) | Dec. 31, 2018 USD ($) | Dec. 31, 2017 USD ($) | Dec. 31, 2016 USD ($) | Dec. 31, 2018 USD ($) | Dec. 31, 2017 CNY (¥) | Dec. 31, 2017 USD ($) |
| **Income Tax Contingency [Line Items]** | | | | | | | | | |
| PRC statutory tax rate | | | 21.00% | 21.00% | 35.00% | | | | |
| Deferred tax liability | | | ¥ 259,247 | | | | | ¥ 12,138 | |
| Tax loss carry forward | | | ¥ 70,055 | | | | | ¥ 61,774 | |
| Tax loss carry forward period | | | 20 years | 20 years | | | | | |
| Tax loss carry backward period | | | 2 years | 2 years | | | | | |
| Tax loss carry forward, during period | | | ¥ 8,281 | | | | | | |
| Percentage of taxable income offset by tax losses | | | 80.00% | 80.00% | | | | | |
| Significant unrecognized tax benefit | $ | | | | | | $ 0 | $ 0 | | $ 0 |
| Interest related to penalties | $ | | | | $ 0 | $ 0 | 0 | | | |
| Significant impact on the unrecognized tax benefits for next twelve months | $ | | | | | | $ 0 | $ 0 | | $ 0 |
| Earliest Tax Year [Member] | | | | | | | | | |
| **Income Tax Contingency [Line Items]** | | | | | | | | | |
| Tax years subject to tax audits | | | 2015 | 2015 | | | | | |
| Latest Tax Year [Member] | | | | | | | | | |
| **Income Tax Contingency [Line Items]** | | | | | | | | | |
| Tax years subject to tax audits | | | 2017 | 2017 | | | | | |
| PRC [Member] | | | | | | | | | |
| **Income Tax Contingency [Line Items]** | | | | | | | | | |
| PRC statutory tax rate | | | 25.00% | 25.00% | 25.00% | 25.00% | | | |
| Withholding income tax rate for dividends distributed by the PRC subsidiaries | | | 10.00% | 10.00% | | | | | |
| Deferred tax liability | | | ¥ 0 | | | | | | |
| Tax loss carry forward | | | ¥ 264,709 | | | | | | |
| Tax loss carry forward period | | | 5 years | 5 years | | | | | |
| Tax loss carry forward, expiration year | | | 2020 | 2020 | | | | | |
| PRC [Member] | High And New Technology Enterprise ("HNTE") [Member] | | | | | | | | | |
| **Income Tax Contingency [Line Items]** | | | | | | | | | |
| Tax loss carry forward period | | | 10 years | 10 years | | | | | |
| PRC [Member] | Chengdu Momo Technology Company Limited Investment [Member] | | | | | | | | | |
| **Income Tax Contingency [Line Items]** | | | | | | | | | |
| Percentage of reduced tax rate | | | 15.00% | 15.00% | | | | | |

PRC [Member] | Beneficial Owner [Member]

**Income Tax Contingency [Line Items]**

| | | | |
|---|---|---|---|
| Withholding income tax rate for dividends distributed by the PRC subsidiaries | | 5.00% | 5.00% |

PRC [Member] | Beijing Santi Cloud Union Technology Co., Ltd. [Member]

**Income Tax Contingency [Line Items]**

| | | | |
|---|---|---|---|
| Percentage of reduced tax rate | 15.00% | | |

PRC [Member] | 2015 - 2016 [Member] | Beijing Momo Information Technology Co., Ltd. [Member]

**Income Tax Contingency [Line Items]**

| | | | |
|---|---|---|---|
| Tax exemption period | 2 years | | |

PRC [Member] | 2017 - 2019 [Member] | Beijing Momo Information Technology Co., Ltd. [Member]

**Income Tax Contingency [Line Items]**

| | | | |
|---|---|---|---|
| Reduced tax rate period | 3 years | | |
| Percentage of reduced tax rate | 12.50% | | |

PRC [Member] | Other Entities [Member]

**Income Tax Contingency [Line Items]**

| | | | |
|---|---|---|---|
| Effective income tax rate | | 25.00% | 25.00% |

Hong Kong [Member]

**Income Tax Contingency [Line Items]**

| | | | |
|---|---|---|---|
| Tax loss carry forward | | ¥ 109,697 | |

Hong Kong [Member] | Beneficial Owner [Member] | Minimum [Member]

**Income Tax Contingency [Line Items]**

| | | | |
|---|---|---|---|
| Equity interest in a PRC-resident enterprise | | 25.00% | 25.00% |

Hong Kong [Member] | The first 2 million Hong Kong dollars of profits [Member]

**Income Tax Contingency [Line Items]**

| | | | |
|---|---|---|---|
| Profit tax rate | | 8.25% | 8.25% |

Hong Kong [Member] | Remaining profits [Member]

**Income Tax Contingency [Line Items]**

| | | | |
|---|---|---|---|
| Profit tax rate | | 16.50% | 16.50% |

| Income Taxes - Components of Group's Deferred Tax Assets and Liabilities (Detail) - CNY (¥) ¥ in Thousands | Dec. 31, 2018 | Dec. 31, 2017 |
|---|---|---|
| **Deferred tax assets:** | | |
| Advertising expense | ¥ 221,113 | ¥ 38,760 |
| Net operating tax losses carry-forward | 103,060 | 25,792 |
| Impairment on long-term investments and game copyright | 11,336 | 2,599 |
| Accrued expenses | 43,631 | 5,466 |
| Less: valuation allowance | (321,354) | (25,792) |
| Deferred tax assets, net | 57,786 | 46,825 |
| **Deferred tax liabilities:** | | |
| Intangible assets acquired | 259,247 | 12,138 |
| Deferred tax liabilities, net | ¥ 259,247 | ¥ 12,138 |

| Income Taxes - Schedule of Reconciliation between Income Tax Expense to Income before Income Taxes and Actual Provision for Income Tax (Detail) ¥ in Thousands, $ in Thousands | 12 Months Ended | | | |
|---|---|---|---|---|
| | Dec. 31, 2018 CNY (¥) | Dec. 31, 2018 USD ($) | Dec. 31, 2017 CNY (¥) | Dec. 31, 2016 CNY (¥) |
| **Income Taxes And Tax Related [Line Items]** | | | | |
| Net income before provision for income tax | ¥ 3,439,535 | $ 500,260 | ¥ 2,549,735 | ¥ 990,413 |
| PRC statutory tax rate | 21.00% | 21.00% | 35.00% | |
| Income tax expense at statutory tax rate | ¥ 859,884 | | ¥ 637,434 | 247,603 |
| Permanent differences | 20,135 | | (446) | (516) |
| Change in valuation allowance | 98,862 | | 5,990 | (16,034) |
| Effect of income tax rate difference in other jurisdictions | 156,136 | | 80,085 | 54,242 |
| Effect of tax holidays and preferential tax rates | (435,369) | | (278,062) | (250,657) |
| Provision for income tax | ¥ 699,648 | $ 101,760 | ¥ 445,001 | ¥ 34,638 |
| **PRC [Member]** | | | | |
| **Income Taxes And Tax Related [Line Items]** | | | | |
| PRC statutory tax rate | 25.00% | 25.00% | 25.00% | 25.00% |

| Income Taxes - Increase in Income Tax Expenses and Net Income Per Share Amounts (Detail) - CNY (¥) ¥ / shares in Units, ¥ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2018 | Dec. 31, 2017 | Dec. 31, 2016 |
| **Income Tax Disclosure [Abstract]** | | | |
| Increase in income tax expenses | ¥ 435,369 | ¥ 278,062 | ¥ 250,657 |
| Earnings per share after increase in income tax expenses - basic | ¥ 5.85 | ¥ 4.74 | ¥ 1.87 |
| Earnings per share after increase in income tax expenses - diluted | ¥ 5.59 | ¥ 4.50 | ¥ 1.74 |

| Ordinary Shares - Additional Information (Detail) | 1 Months Ended | 12 Months Ended | | | |
|---|---|---|---|---|---|
| | May 31, 2018 shares | Dec. 31, 2018 $ / shares shares | Dec. 31, 2017 ¥ / shares shares | Dec. 31, 2016 shares | Dec. 31, 2018 ¥ / shares shares |
| **Class of Stock [Line Items]** | | | | | |
| Issuance of ordinary shares in connection with exercise of options and vesting of share units | | 10,122,318 | 9,476,874 | 5,197,032 | |
| Class A Common Stock [Member] | | | | | |
| **Class of Stock [Line Items]** | | | | | |
| Ordinary shares, shares issued | | 333,512,014 | 314,060,843 | | 333,512,014 |
| Ordinary shares, shares outstanding | | 333,512,014 | 314,060,843 | | 333,512,014 |
| Ordinary shares, par value \| (per share) | | $ 0.0001 | ¥ 0.0001 | | ¥ 0.0001 |
| Class A Common Stock [Member] \| Tantan Limited [Member] | | | | | |
| **Class of Stock [Line Items]** | | | | | |
| Share issued connection with acquisition of Tantan, shares | 5,328,853 | | | | |
| Class B Common Stock [Member] | | | | | |
| **Class of Stock [Line Items]** | | | | | |
| Ordinary shares, shares issued | | 80,364,466 | 84,364,466 | | 80,364,466 |
| Ordinary shares, shares outstanding | | 80,364,466 | 84,364,466 | | 80,364,466 |
| Ordinary shares, par value \| (per share) | | $ 0.0001 | ¥ 0.0001 | | ¥ 0.0001 |

| Share-Based Compensation - Additional Information (Detail) | May 31, 2018 | May 02, 2018 shares | Mar. 07, 2017 shares | May 17, 2016 shares | Dec. 11, 2014 shares | May 15, 2014 $ / shares shares | 1 Months Ended Aug. 31, 2018 shares | Jul. 31, 2018 shares | Jul. 31, 2016 shares | Nov. 30, 2014 shares | Apr. 30, 2012 shares | Dec. 31, 2018 CNY (¥) ¥ / shares shares |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | | | | | | | | | | |
| Options, vesting period | | | | | | | | | | | | 4 years |
| Options vested | | | | | | | | | | | | 10,227,313 |
| Options expected to vest | | | | | | | | | | | | 10,477,208 |
| Options expected to vest, weighted-average exercise price \| $ / shares | | | | | | | | | | | | |
| Options expected to vest, Aggregate intrinsic value \| $ | | | | | | | | | | | | |
| Weighted average fair value per option at grant date, Granted \| $ / shares | | | | | | | | | | | | |
| Total intrinsic value of options exercised \| $ | | | | | | | | | | | | |
| Total fair value of options vested \| $ | | | | | | | | | | | | |
| Number of options, Forfeited/Canceled | | | | | | | | | | | | 660,488 |
| Share-based compensation | | | | | | | | | | | | ¥ 580,813,000 |
| Weighted average remaining contractual term options outstanding | | | | | | | | | | | | 7 years 4 months 9 days |
| Number of options, Granted | | | | | | | | | | | | 5,502,868 |
| **Class A Common Stock [Member]** | | | | | | | | | | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | | | | | | | | | | |
| Ordinary shares, shares issued | | | | | | | | | | | | 333,512,014 |
| Ordinary shares, par value \| (per share) | | | | | | | | | | | | ¥ 0.0001 |
| **Non-Vested Restricted Shares [Member]** | | | | | | | | | | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | | | | | | | | | | |
| Share-based compensation \| ¥ | | | | | | | | | | | | ¥ 0 |
| Unrecognized compensation expense \| $ | | | | | | | | | | | | |
| Ordinary shares, shares issued | | | | | | 131,348,411 | | | | | 147,000,000 | |
| Modification of vesting of shares, description | | | | | | | | | | | | The Company shall be entitled to repurchase 50% and 25% of such shares in the case that founders terminate their employments with the |

Company before April 17, 2015 and during the period from April 17, 2015 to April 17, 2016, respectively, at a price of US$0.0001 per share or the lowest price permitted under applicable laws. Therefore, the Company considered that 50% of the total restricted shares were vested immediately on the amendment date and 25% shall be vested annually on April 17 in the next two years ending April 17, 2016. Before the modification date, May 15, 2014, there were 131,348,411 ordinary shares, of which 45,937,500 were unvested restricted shares. As the result of modification, 19,736,705 vested ordinary shares were classified to unvested restricted shares on the modification date and the corresponding compensation costs for these unvested restricted shares were amortized over the remaining service period.

| | | | |
|---|---|---|---|
| | | | p |
| Unvested restricted shares | 45,937,500 | | |
| Unvested restricted shares, modification | 19,736,705 | | |
| Ordinary shares, par value \| $ / shares | $ 0.0001 | | |
| Fair value of the restricted shares, per share \| $ / shares | | | |
| Fair value of the restricted shares \| $ | | | |
| Total fair value of non-vested restricted shares vested \| $ | | | $ |
| Non-Vested Restricted Shares [Member] \| Share-based Compensation Award, Tranche One [Member] | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | |
| Share based payment vesting percentage | 50.00% | 25.00% | |
| Non-Vested Restricted Shares [Member] \| Share-based Compensation Award, Tranche Two [Member] | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | |
| Options, vesting period | 2 years | 36 months | |
| Share based payment vesting percentage | 25.00% | 75.00% | |
| RSUs [Member] | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | |
| Share-based compensation \| ¥ | | ¥ 6,609,000 | |
| Unrecognized compensation expense \| ¥ | | ¥ 17,979,000 | |
| Weighted average recognition period | | 2 years 8 months 8 days | 2 n d |
| 2012 Plan [Member] | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | |
| Maximum aggregate number of shares issued | | 44,758,220 | |
| Number of share options granted | 0 | | |
| 2012 Plan [Member] \| Employee and Executives Share Option [Member] | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | |
| Share-based compensation \| ¥ | | | |
| 2012 Plan [Member] \| Non Employee Share Options [Member] | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | |
| Share-based compensation \| ¥ | | | |
| 2014 Plan [Member] | | | |
| **Share-based Compensation Arrangement by Share-based** | | | |

**Payment Award [Line Items]**

| | | |
|---|---|---|
| Share based compensation arrangements expiration Period | | 10 years | 1 |
| Number of options, Forfeited/Canceled | 187,500 | |
| Incremental cost for acceleration of vesting to permit immediate exercise \| ¥ | | |
| Unrecognized compensation expense \| ¥ | | ¥ 1,054,778,000 |
| Weighted average recognition period | | 2 years 9 months 21 days | 2 n d |
| Weighted average remaining contractual term options outstanding | | 7 years 4 months 9 days | 7 n d |

**2014 Plan [Member] | Class A Common Stock [Member]**

**Share-based Compensation Arrangement by Share-based Payment Award [Line Items]**

| | | |
|---|---|---|
| Maximum aggregate number of shares issued | 14,031,194 | |
| Increase in number of shares reserved for future issuances | | 1.50% | 1 |
| Number of shares reserved for future issuances, description | | Starting from 2017, the number of shares reserved for future issuances under the 2014 Plan will be increased by a number equal to 1.5% of the total number of outstanding shares on the last day of the immediately preceding calendar year, or such lesser number of Class A ordinary shares as determined by the Company's board of directors, on the first day of each calendar year during the term of the 2014 Plan. |

**2014 Plan [Member] | Minimum [Member]**

**Share-based Compensation Arrangement by Share-based Payment Award [Line Items]**

| | | |
|---|---|---|
| Options, vesting period | | 2 years | 2 |

2014 Plan [Member] | Maximum

[Member]

**Share-based Compensation Arrangement by Share-based Payment Award [Line Items]**

Options, vesting period — 4 years — 4

2014 Plan [Member] | RSUs [Member]

**Share-based Compensation Arrangement by Share-based Payment Award [Line Items]**

Options, vesting period — 4 years

2014 Plan [Member] | RSUs [Member] | Share-based Compensation Award, Tranche Three [Member]

**Share-based Compensation Arrangement by Share-based Payment Award [Line Items]**

Options, vesting period — 6 months

Share based payment vesting percentage — 50.00%

2014 Plan [Member] | RSUs [Member] | Independent Directors

**Share-based Compensation Arrangement by Share-based Payment Award [Line Items]**

Number of share options granted — 100,000 100,000 200,000 40,001

2014 Plan [Member] | Employee and Executives Share Option [Member]

**Share-based Compensation Arrangement by Share-based Payment Award [Line Items]**

Share-based compensation | ¥ — ¥ 377,241,000

2014 Plan [Member] | Non Employee Share Options [Member]

**Share-based Compensation Arrangement by Share-based Payment Award [Line Items]**

Share-based compensation | ¥ — ¥ 14,360,000

2015 Plan [Member] | Tantan Limited [Member]

**Share-based Compensation Arrangement by Share-based Payment Award [Line Items]**

Maximum aggregate number of shares issued

2018 Plan | Tantan Limited [Member]

**Share-based Compensation Arrangement by Share-based Payment Award [Line Items]**

Maximum aggregate number of shares issued — 5,963,674

Share based compensation arrangements expiration Period — 10 years

Number of shares reserved for issuance, description — The maximum aggregate number of shares which may be issued shall initially

be 5,963,674 ordinary shares, plus that number of ordinary shares authorized for issuance under the 2015 Plan, in an amount equal to (i) the number of ordinary shares that were not granted pursuant to the 2015 Plan, plus (ii) the number of ordinary shares that were granted pursuant to the 2015 Plan that have expired without having been exercised in full or have otherwise become unexercisable.

2018 Plan | Options classified as Equity Awards

**Share-based Compensation Arrangement by Share-based Payment Award [Line Items]**

| | | | | |
|---|---|---|---|---|
| Number of options, Forfeited/Canceled | | | 186,531 | 1 |
| Weighted average remaining contractual term options outstanding | 7 years 25 days | | 7 years 5 months 12 days | 7 n d |
| Number of options, Granted | | | 575,629 | 5 |

2018 Plan | Options classified as Equity Awards | Tantan Limited [Member]

**Share-based Compensation Arrangement by Share-based Payment Award [Line Items]**

| | | |
|---|---|---|
| Options vested | 358,281 | 3 |
| Options expected to vest | 1,353,711 | |
| Options expected to vest, weighted-average exercise price | $ / shares | | |
| Options expected to vest, Aggregate intrinsic value | $ | | |
| Weighted average fair value per option at grant date, Granted | $ / shares | | $ |
| Total intrinsic value of options exercised | $ | | $ |
| Total fair value of options vested | $ | | $ |
| Share-based compensation | ¥ | ¥ 94,977,000 | |

| | | | |
|---|---|---|---|
| Unrecognized compensation expense | ¥ | | ¥ 236,053,000 | |
| Weighted average recognition period | | 2 years 9 months 14 days | 2 n d |
| Weighted average remaining contractual term options outstanding | | 7 years 5 months 12 days | 7 n d |
| **2018 Plan \| Options classified as Liability Awards \| Tantan Limited [Member]** | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | |
| Options vested | | 0 | 0 |
| Options expected to vest | | 3,578,205 | |
| Options expected to vest, weighted-average exercise price \| $ / shares | | | |
| Options expected to vest, Aggregate intrinsic value \| $ | | | |
| Weighted average fair value per option at grant date, Granted \| $ / shares | | | $ |
| Share-based compensation \| ¥ | | ¥ 86,778,000 | |
| Unrecognized compensation expense \| ¥ | | ¥ 818,092,000 | |
| Weighted average recognition period | | 3 years 7 months 13 days | 3 n d |
| Weighted average remaining contractual term options outstanding | | 9 years 7 months 13 days | 9 n d |
| **2018 Plan \| Founders [Member] \| Options classified as Liability Awards \| Tantan Limited [Member]** | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | |
| Options, vesting period | 4 years | | 4 years | 4 |
| Number of options, Granted | 3,578,205 | | |
| Share based compensation arrangement by share-based payment award, amortization period | 4 years | | |

| Share-Based Compensation - Summary of Options Activity (Detail) - USD ($) $ / shares in Units, $ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | May 31, 2018 | Dec. 31, 2018 | Dec. 31, 2017 |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | |
| Number of options, Outstanding beginning balance | | 26,969,291 | |
| Number of options, Granted | | 5,502,868 | |
| Number of options, Exercised | | (10,028,568) | |
| Number of options, Forfeited | | (660,488) | |
| Number of options, Outstanding ending balance | | 21,783,103 | 26,969,291 |
| Number of options, Exercisable | | 10,227,313 | |
| Weighted average exercise price per option, Outstanding beginning balance | | $ 0.0536 | |
| Weighted average exercise price per option, Granted | | 0.0002 | |
| Weighted average exercise price per option, Exercised | | 0.0800 | |
| Weighted average exercise price per option, Forfeited | | 0.0002 | |
| Weighted average exercise price per option, Outstanding ending balance | | 0.0296 | $ 0.0536 |
| Weighted average exercise price per option, Exercisable | | $ 0.0628 | |
| Weighted average remaining contractual life, Outstanding beginning balance | | 7 years 4 months 9 days | 7 years 4 months 24 days |
| Weighted average remaining contractual term options outstanding | | 7 years 4 months 9 days | 7 years 4 months 24 days |
| Weighted average remaining contractual life, Exercisable | | 5 years 11 months 23 days | |
| Aggregated intrinsic value, Outstanding beginning balance | | $ 328,658 | |
| Aggregated intrinsic value, Outstanding ending balance | | 258,030 | $ 328,658 |
| Aggregated intrinsic value, Exercisable | | $ 120,807 | |
| Options classified as Equity Awards | 2018 Plan | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | |
| Number of options, Outstanding beginning balance | | 1,507,488 | |
| Number of options, Granted | | 575,629 | |
| Number of options, Forfeited | | (186,531) | |
| Number of options, Outstanding ending balance | | 1,896,586 | 1,507,488 |
| Number of options, Exercisable | | 358,281 | |
| Weighted average exercise price per option, Outstanding beginning balance | | $ 0.9062 | |
| Weighted average exercise price per option, Granted | | 21.4461 | |
| Weighted average exercise price per option, Forfeited | | 0.7616 | |
| Weighted average exercise price per option, Outstanding ending balance | | 7.1544 | $ 0.9062 |
| Weighted average exercise price per option, Exercisable | | $ 1.0547 | |
| Weighted average remaining contractual life, Outstanding beginning balance | 7 years 25 days | 7 years 5 months 12 days | |
| Weighted average remaining contractual term options outstanding | 7 years 25 days | 7 years 5 months 12 days | |

| | | |
|---|---|---|
| Weighted average remaining contractual life, Exercisable | 6 years 5 months 23 days | |
| Aggregated intrinsic value, Outstanding beginning balance | $ 45,969 | |
| Aggregated intrinsic value, Outstanding ending balance | 35,666 | $ 45,969 |
| Aggregated intrinsic value, Exercisable | $ 8,923 | |

| Share-Based Compensation - Schedule of Assumptions Used to Estimate Fair Value of Stock Options Granted (Detail) - $ / shares | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2018 | Dec. 31, 2017 | Dec. 31, 2016 |
| 2014 Plan [Member] | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | |
| Risk-free interest rate of return, minimum | 3.16% | 2.47% | 1.75% |
| Risk-free interest rate of return, maximum | 3.66% | 2.87% | 2.70% |
| Contractual term | 10 years | 10 years | 10 years |
| Volatility, minimum | 50.00% | 50.70% | 52.50% |
| Volatility, maximum | 50.70% | 54.00% | 55.30% |
| Dividend yield | 0.00% | 0.00% | 0.00% |
| Exercise price | $ 0.0002 | $ 0.0002 | $ 0.0002 |
| 2018 Plan | Options classified as Equity Awards | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | |
| Risk-free interest rate of return | 3.58% | | |
| Contractual term | 10 years | | |
| Volatility | 55.40% | | |
| Dividend yield | 0.00% | | |
| 2018 Plan | Options classified as Liability Awards | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | |
| Risk-free interest rate of return, minimum | 3.39% | | |
| Risk-free interest rate of return, maximum | 3.58% | | |
| Contractual term | 10 years | | |
| Volatility, minimum | 55.40% | | |
| Volatility, maximum | 55.60% | | |
| Dividend yield | 0.00% | | |
| Exercise price | $ 0.002 | | |
| 2018 Plan | Minimum [Member] | Options classified as Equity Awards | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | |
| Exercise price | 1.6 | | |
| 2018 Plan | Maximum [Member] | Options classified as Equity Awards | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | |
| Exercise price | $ 25 | | |

| Share-Based Compensation - Summary of Non-Vested Restricted Share Activity (Detail) - Non-Vested Restricted Shares [Member] - shares | | 12 Months Ended |
|---|---|---|
| | **May 15, 2014** | **Dec. 31, 2016** |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | |
| Number of shares, Outstanding beginning balance | | 28,625,378 |
| Number of shares, Granted | | 0 |
| Number of shares, Modification | 19,736,705 | 0 |
| Number of shares, Vested | | (28,625,378) |
| Number of shares, Outstanding ending balance | 45,937,500 | |

| Net Income Per Share - Calculation of Net Income Per Share (Detail) ¥ / shares in Units, $ / shares in Units, ¥ in Thousands, $ in Thousands | 12 Months Ended | | | |
|---|---|---|---|---|
| | Dec. 31, 2018 CNY (¥) ¥ / shares shares | Dec. 31, 2018 USD ($) $ / shares shares | Dec. 31, 2017 CNY (¥) ¥ / shares shares | Dec. 31, 2016 CNY (¥) ¥ / shares shares |
| **Numerator:** | | | | |
| Net income attributable to Momo Inc. | ¥ 2,815,775 | $ 409,537 | ¥ 2,148,098 | ¥ 978,969 |
| Net income attributed to ordinary shareholders for computing net income per ordinary share-basic and diluted | ¥ | ¥ 2,815,775 | | ¥ 2,148,098 | ¥ 957,419 |
| **Denominator for computing net income per share-basic:** | | | | |
| Weighted average ordinary shares outstanding used in computing net income per ordinary share-basic | 407,009,875 | 407,009,875 | 394,549,323 | 377,335,923 |
| **Denominator for computing net income per share-diluted:** | | | | |
| Weighted average shares outstanding used in computing net income per ordinary share-diluted | 433,083,643 [1] | 433,083,643 [1] | 415,265,078 | 407,041,165 |
| Net income per ordinary share attributable to Momo Inc. - basic \| (per share) | ¥ 6.92 | $ 1.01 | ¥ 5.44 | ¥ 2.54 |
| Net income per ordinary share attributable to Momo Inc. - diluted \| (per share) | ¥ 6.59 | $ 0.96 | ¥ 5.17 | ¥ 2.41 |
| Non-Vested Restricted Shares [Member] | | | | |
| **Numerator:** | | | | |
| Undistributed earnings \| ¥ | | | | ¥ (21,550) |
| **Denominator for computing net income per share-basic:** | | | | |
| Weighted average ordinary shares outstanding used in computing net income per ordinary share-basic | | | | 8,493,244 |
| **Denominator for computing net income per share-diluted:** | | | | |
| Net income per ordinary share attributable to Momo Inc. - basic \| ¥ / shares | | | | ¥ 2.54 |

[1] The calculation of the weighted average number of ordinary shares for the purpose of diluted net income per share has considered the effect of certain potentially dilutive securities. For the year ended December 31, 2016, an incremental weighted average number of 7,155,060 nonvested restricted shares and an incremental weighted average number of 22,550,182 ordinary shares from the assumed exercise of share options and vesting of restricted share units using the treasury stock method were included.

| Net Income Per Share - Summary of Potential Ordinary Shares Outstanding Excluded from Computation of Diluted Net Loss Per Ordinary Share (Detail) - shares | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2018 | Dec. 31, 2017 | Dec. 31, 2016 |
| Share Options [Member] | | | |
| **Antidilutive Securities Excluded from Computation of Earnings Per Share [Line Items]** | | | |
| Potential ordinary shares outstanding excluded from the computation of diluted net loss per ordinary share | 1,117,334 | 768,266 | 152,500 |
| RSUs [Member] | | | |
| **Antidilutive Securities Excluded from Computation of Earnings Per Share [Line Items]** | | | |
| Potential ordinary shares outstanding excluded from the computation of diluted net loss per ordinary share | | | 50,000 |

| **Net Income Per Share - Calculation of Net Income Per Share (Parenthetical) (Detail)** | **12 Months Ended** |
|---|---|
| | **Dec. 31, 2016 shares** |
| Non-Vested Restricted Shares [Member] | |
| **Earnings Per Share, Diluted, by Common Class, Including Two Class Method [Line Items]** | |
| Incremental weighted average number of shares | 7,155,060 |
| Share Options [Member] | |
| **Earnings Per Share, Diluted, by Common Class, Including Two Class Method [Line Items]** | |
| Incremental weighted average number of shares | 22,550,182 |

| **Net Income Per Share - Additional Information (Detail) - shares** | **12 Months Ended** | |
| :--- | ---: | ---: |
| | **Dec. 31, 2018** | **Dec. 31, 2017** |
| Convertible Note [Member] | | |
| **Earnings Per Share, Diluted, by Common Class, Including Two Class Method [Line Items]** | | |
| Incremental weighted average number of shares | 11,251,916 | |
| RSUs [Member] \| Share Options [Member] | | |
| **Earnings Per Share, Diluted, by Common Class, Including Two Class Method [Line Items]** | | |
| Incremental weighted average number of shares | 14,821,852 | 20,715,755 |

| Commitments and Contingencies - Additional Information (Detail) - CNY (¥) ¥ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2018 | Dec. 31, 2017 | Dec. 31, 2016 |
| **Lease and Investment Commitments [Line Items]** | | | |
| Lease expiration year | 2022 | | |
| Rental expenses under operating leases | ¥ 78,713 | ¥ 58,861 | ¥ 31,554 |
| Partnership Interest [Member] | | | |
| **Lease and Investment Commitments [Line Items]** | | | |
| Equity method investments equity contribution obligation | ¥ 47,500 | ¥ 30,001 | |

| Commitments and Contingencies - Schedule of Future Minimum Payments under Non-Cancellable Operating Leases (Detail) ¥ in Thousands | Dec. 31, 2018 CNY (¥) |
|---|---|
| **Leases [Abstract]** | |
| 2019 | ¥ 99,133 |
| 2020 | 82,697 |
| 2021 | 26,980 |
| 2022 | 8,633 |
| Total | ¥ 217,443 |

| **Related Party Balances and Transactions - Schedule of Amount Due from Related Parties-current (Detail)** <br> **¥ in Thousands** | **Dec. 31, 2017** <br> **CNY (¥)** |
|---|---|
| **Related Party Transaction [Line Items]** | |
| Amount due from related parties | ¥ 33,460 |
| Hunan Qindao Network Media Technology Co., Ltd. [Member] | |
| **Related Party Transaction [Line Items]** | |
| Amount due from related parties | ¥ 33,460    [1] |

[1] The amount of RMB33,460 as of December 31, 2017 represented the advance payment of revenue sharing of live video service made to Hunan Qindao Network Media Technology Co., Ltd.

| **Related Party Balances and Transactions - Schedule of Amount Due from Related Parties-current (Parenthetical) (Detail) ¥ in Thousands** | **Dec. 31, 2017 CNY (¥)** |
|---|---|
| **Related Party Transaction [Line Items]** | |
| Advance payment of revenue | ¥ 33,460 |
| Hunan Qindao Network Media Technology Co., Ltd. [Member] | |
| **Related Party Transaction [Line Items]** | |
| Advance payment of revenue | 33,460 [1] |
| Hunan Qindao Network Media Technology Co., Ltd. [Member] \| Deferred Revenues Net [Member] | |
| **Related Party Transaction [Line Items]** | |
| Advance payment of revenue | ¥ 33,460 |

[1] The amount of RMB33,460 as of December 31, 2017 represented the advance payment of revenue sharing of live video service made to Hunan Qindao Network Media Technology Co., Ltd.

| **Related Party Balances and Transactions - Schedule of Amount Due to Related Parties-current (Detail) ¥ in Thousands, $ in Thousands** | **Dec. 31, 2018 CNY (¥)** | **Dec. 31, 2018 USD ($)** | **Dec. 31, 2017 CNY (¥)** |
|---|---|---|---|
| **Related Party Transaction [Line Items]** | | | |
| Amount due to related parties | ¥ 82,948 | $ 12,064 | ¥ 37,760 |
| Hunan Qindao Network Media Technology Co., Ltd. [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Amount due to related parties | [1] 43,178 | | 32 |
| Ordinary Shareholders [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Amount due to related parties | [2] 39,704 | | 37,572 |
| Others [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Amount due to related parties | ¥ 66 | | ¥ 156 |

[1] The amount of RMB43,178 as of December 31, 2018 primarily represented the unpaid revenue sharing of live video service to Hunan Qindao Network Media Technology Co., Ltd.

[2] The amount of RMB37,572 and RMB39,704 as of December 31, 2017 and 2018 primarily included the unpaid repurchase amount by the Group to its ordinary shareholders.

| Related Party Balances and Transactions - Schedule of Amount Due to Related Parties-current (Parenthetical) (Detail) ¥ in Thousands, $ in Thousands | Dec. 31, 2018 CNY (¥) | Dec. 31, 2018 USD ($) | Dec. 31, 2017 CNY (¥) |
|---|---|---|---|
| **Related Party Transaction [Line Items]** | | | |
| Amount due to related parties | ¥ 82,948 | $ 12,064 | ¥ 37,760 |
| Hunan Qindao Network Media Technology Co., Ltd. [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Amount due to related parties | [1] 43,178 | | 32 |
| Ordinary Shareholders [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Amount due to related parties | [2] 39,704 | | 37,572 |
| Unpaid Repurchase [Member] \| Ordinary Shareholders [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Amount due to related parties | 39,704 | | ¥ 37,572 |
| Unpaid Revenue [Member] \| Hunan Qindao Network Media Technology Co., Ltd. [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Amount due to related parties | ¥ 43,178 | | |

[1] The amount of RMB43,178 as of December 31, 2018 primarily represented the unpaid revenue sharing of live video service to Hunan Qindao Network Media Technology Co., Ltd.

[2] The amount of RMB37,572 and RMB39,704 as of December 31, 2017 and 2018 primarily included the unpaid repurchase amount by the Group to its ordinary shareholders.

| Related Party Balances and Transactions - Schedule of Sales to Related Parties (Detail) - CNY (¥) ¥ in Thousands | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2017 | Dec. 31, 2016 |
| **Related Party Transaction [Line Items]** | | |
| Sales to related parties | ¥ 21,722 | ¥ 16,135 |
| Hangzhou Yihong Advertisement Co., Ltd. [Member] | | |
| **Related Party Transaction [Line Items]** | | |
| Sales to related parties | [1] 17,659 | |
| Hangzhou Alimama Technology Co., Ltd. [Member] | | |
| **Related Party Transaction [Line Items]** | | |
| Sales to related parties | [1] 2,309 | 273 |
| Guangzhou Aijiuyou Informational Technology Co., Ltd. [Member] | | |
| **Related Party Transaction [Line Items]** | | |
| Sales to related parties | [2] 1,242 | 2,660 |
| Zhejiang Tmall Technology Co., Ltd. [Member] | | |
| **Related Party Transaction [Line Items]** | | |
| Sales to related parties | [1] 500 | 5,462 |
| Shanghai Xisue Network Technology Co., Ltd. [Member] | | |
| **Related Party Transaction [Line Items]** | | |
| Sales to related parties | [1] | 5,981 |
| Taobao (China) Software Co., Ltd. [Member] | | |
| **Related Party Transaction [Line Items]** | | |
| Sales to related parties | [1] | 1,698 |
| Others [Member] | | |
| **Related Party Transaction [Line Items]** | | |
| Sales to related parties | ¥ 12 | ¥ 61 |

[1] The sales to related parties represented mobile marketing services provided.

[2] The sales to related parties represented mobile game revenue generated through those game operating companies.

| Related Party Balances and Transactions - Schedule of Purchase from Related Parties (Detail) - CNY (¥) ¥ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2018 | Dec. 31, 2017 | Dec. 31, 2016 |
| **Related Party Transaction [Line Items]** | | | |
| Purchase from related parties | ¥ 431,350 | ¥ 278,873 | ¥ 53,797 |
| Hunan Qindao Network Media Technology Co., Ltd. [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Purchase from related parties | [1] 429,345 | 139,406 | 26,759 |
| Beijing Shiyue Haofeng Media Co Ltd [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Purchase from related parties | [1] ¥ 2,005 | | |
| Alibaba Cloud Computing Co Ltd [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Purchase from related parties | [2] | 74,705 | 22,534 |
| Hunan Qindao Cultural Spread Ltd. [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Purchase from related parties | [1] | 61,676 | |
| Taobao (China) Software Co., Ltd. [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Purchase from related parties | | 2,283 | 2,169 |
| Guangzhou Jianyue Information Technology Co., Ltd. [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Purchase from related parties | | ¥ 803 | |
| Shanghai Touch Future Network Technology Co., Ltd. [Member] | | | |
| **Related Party Transaction [Line Items]** | | | |
| Purchase from related parties | | | ¥ 2,335 |

[1] The purchases from Hunan Qindao Network Media Technology Co., Ltd., Beijing Shiyue Haofeng Media Co. Ltd. and Hunan Qindao Cultural Spread Ltd. mainly represent the revenue sharing with talent agencies of live video service.

[2] The sales to related parties represented mobile game revenue generated through those game operating companies.

| Segment Information - Additional Information (Detail) - Segment | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2018 | Dec. 31, 2017 | Dec. 31, 2016 |
| **Segment Reporting [Abstract]** | | | |
| Number of operating segments | 3 | 1 | 1 |

| Segment Information - Components of Revenues (Detail) ¥ in Thousands, $ in Thousands | 12 Months Ended | | | |
|---|---|---|---|---|
| | Dec. 31, 2018 CNY (¥) | Dec. 31, 2018 USD ($) | Dec. 31, 2017 CNY (¥) | Dec. 31, 2016 CNY (¥) |
| **Revenue from External Customer [Line Items]** | | | | |
| Net revenues: | ¥ 13,408,421 | | ¥ 8,886,390 | ¥ 3,707,358 |
| **Cost and expenses:** | | | | |
| Cost of revenues | (7,182,897) | $ (1,044,709) | (4,373,377) | (1,619,327) |
| Research and development | (760,644) | | (346,144) | (208,647) |
| Sales and marketing | (1,812,262) | (263,583) | (1,467,376) | (647,238) |
| General and administrative | (640,023) | (93,087) | (422,005) | (259,712) |
| Total cost and expenses | (10,395,826) | (1,512,010) | (6,608,902) | (2,734,924) |
| Other operating income | 253,697 | 36,899 | 156,764 | 2,659 |
| Income (loss) from operations | 3,266,292 | 475,063 | 2,434,252 | 975,093 |
| Interest income | 272,946 | 39,698 | 145,568 | 54,603 |
| Interest expense | (56,503) | (8,218) | | |
| Impairment loss on long-term investments | (43,200) | (6,283) | (30,085) | (39,283) |
| Income tax expense | (699,648) | (101,760) | (445,001) | (34,638) |
| Share of income on equity method investments | 48,660 | 7,077 | 39,729 | 23,194 |
| Net income | 2,788,547 | $ 405,577 | 2,144,463 | 978,969 |
| **Momo Inc [Member]** | | | | |
| **Revenue from External Customer [Line Items]** | | | | |
| Net revenues: | 12,812,421 | | 8,884,823 | 3,707,358 |
| **Cost and expenses:** | | | | |
| Cost of revenues | (6,572,954) | | (4,373,377) | (1,619,327) |
| Research and development | (614,064) | | (346,144) | (208,647) |
| Sales and marketing | (1,269,493) | | (1,457,658) | (647,238) |
| General and administrative | (472,057) | | (417,866) | (259,712) |
| Total cost and expenses | (8,928,568) | | (6,595,045) | (2,734,924) |
| Other operating income | 252,458 | | 156,764 | 2,659 |
| Income (loss) from operations | 4,136,311 | | 2,446,542 | 975,093 |
| Interest income | 268,583 | | 145,568 | 54,603 |
| Interest expense | (56,503) | | | |
| Impairment loss on long-term investments | (43,200) | | (30,085) | (39,283) |
| Income tax expense | (716,729) | | (445,001) | (34,638) |
| Share of income on equity method investments | 48,660 | | 39,729 | 23,194 |
| Net income | 3,637,122 | | 2,156,753 | ¥ 978,969 |
| **Tantan Limited [Member]** | | | | |
| **Revenue from External Customer [Line Items]** | | | | |
| Net revenues: | 417,998 | | | |
| **Cost and expenses:** | | | | |
| Cost of revenues | (174,858) | | | |
| Research and development | (146,580) | | | |
| Sales and marketing | (520,161) | | | |
| General and administrative | (121,887) | | | |

| | | |
|---|---|---|
| Total cost and expenses | (963,486) | |
| Other operating income | 173 | |
| Income (loss) from operations | (545,315) | |
| Interest income | 4,285 | |
| Income tax expense | 21,824 | |
| Net income | (519,206) | |
| Qool Inc [Member] | | |
| **Revenue from External Customer [Line Items]** | | |
| Net revenues: | 178,002 | 1,567 |
| **Cost and expenses:** | | |
| Cost of revenues | (435,085) | |
| Sales and marketing | (22,608) | (9,718) |
| General and administrative | (46,079) | (4,139) |
| Total cost and expenses | (503,772) | (13,857) |
| Other operating income | 1,066 | |
| Income (loss) from operations | (324,704) | (12,290) |
| Interest income | 78 | |
| Income tax expense | (4,743) | |
| Net income | ¥ (329,369) | ¥ (12,290) |

| Employee Benefit Plan - Additional Information (Detail) - CNY (¥) ¥ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2018 | Dec. 31, 2017 | Dec. 31, 2016 |
| **Retirement Benefits [Abstract]** | | | |
| Provisions for employee benefits | ¥ 166,998 | ¥ 95,150 | ¥ 60,403 |

| Statutory Reserves and Restricted Net Assets - Additional Information (Detail) - CNY (¥) ¥ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2018 | Dec. 31, 2017 | Dec. 31, 2016 |
| **Regulated Operations [Abstract]** | | | |
| Required minimum percentage of annual appropriations | 10.00% | | |
| General reserve as a percentage of registered capital up to which after-tax profit shall be transferred | 50.00% | | |
| Appropriations to statutory reserves | ¥ 5,194 | ¥ 185,270 | ¥ 119,308 |
| Capital reserves not available for distribution | 1,477,339 | 862,484 | 677,213 |
| Statutory reserves not available for distribution | ¥ 1,477,339 | ¥ 862,484 | ¥ 677,213 |

| Subsequent Event -Additional Information (Detail) - USD ($) $ / shares in Units, $ in Millions | | 1 Months Ended Mar. 12, 2019 | 1 Months Ended Apr. 30, 2019 | 12 Months Ended Dec. 31, 2018 |
|---|---|---|---|---|
| **Subsequent Event [Line Items]** | | | | |
| Options, vesting period | | | | 4 years |
| Number of options, Granted | | | | 5,502,868 |
| Exercise price of share options granted | | | | $ 0.0800 |
| Subsequent Event [Member] | | | | |
| **Subsequent Event [Line Items]** | | | | |
| Dividend record date | | Apr. 05, 2019 | | |
| Ex-dividend date | | Apr. 04, 2019 | | |
| Employee and Executives Share Option [Member] \| Subsequent Event [Member] | | | | |
| **Subsequent Event [Line Items]** | | | | |
| Options, vesting period | | | 4 years | |
| Number of options, Granted | | | 3,219,296 | |
| Exercise price of share options granted | | | $ 0.0002 | |
| Directors [Member] \| Subsequent Event [Member] \| RSUs [Member] | | | | |
| **Subsequent Event [Line Items]** | | | | |
| Number of share options granted | | | 130,000 | |
| Dividend Declared [Member] \| Subsequent Event [Member] | | | | |
| **Subsequent Event [Line Items]** | | | | |
| Aggregate amount dividend payable | | $ 128 | | |
| Dividend Paid [Member] \| Subsequent Event [Member] | | | | |
| **Subsequent Event [Line Items]** | | | | |
| Dividend payable date | | Apr. 30, 2019 | | |
| American Depository Shares [Member] \| Dividend Declared [Member] \| Subsequent Event [Member] | | | | |
| **Subsequent Event [Line Items]** | | | | |
| Cash dividend amount per ADS | | $ 0.62 | | |
| Common Stock [Member] \| Dividend Declared [Member] \| Subsequent Event [Member] | | | | |
| **Subsequent Event [Line Items]** | | | | |
| Cash dividend amount per ADS | | $ 0.31 | | |