**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen (LR 5733)
Phillip Kim (PK 9384)
Yu Shi (YS 2182)
Jing Chen (JC 2908)
275 Madison Ave, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: info@rosenlegal.com

*Lead Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RICHARD RUPP and RODRIGO LEAL, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> MOMO INC., YAN TANG, and JONATHAN XIAOSONG ZHANG <br><br> Defendants. | Case No: 1:19-cv-04433-GBD <br><br><br> **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT MOMO INC.'S MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT** |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ...................................................................................................... 2

    I.    The Company and its Past Troubles with the Law ............................................................ 2

    II.   Momo Changes Business Model to Live Video Service and Invests in Beijing Mushang, a Related Party ............................................................................................................... 3

        1.    Live video services ................................................................................................. 3

        2.    Beijing Mushang ..................................................................................................... 4

        3.    GAAP and SEC Rules Require Disclosure of Momo's Relationship with Beijing Mushang ................................................................................................................... 4

        4.    Spruce Point Exposes Beijing Mushang as a Related Party, Momo Stock Plummets . 5

    III.  Momo Makes Detailed Claims about its Content Control Mechanism, but Actually Turns a Blind Eye to Blatant Prostitution on its Platform ............................................................... 5

        1.    Momo Tells Investors in Exacting Detail of Concrete Steps that It Supposedly Takes to Combat Illegal Content ................................................................................ 5

        2.    Sex Workers Follow a Uniform Approach in Advertising on Momo ......................... 6

        3.    Chinese Media Exposes Rampant Prostitution on Tantan; Chinese Government Severely Chastises Momo, Investors Suffer ................................................................. 7

ARGUMENT ......................................................................................................................... 7

    I.    Legal Standard .............................................................................................................. 7

    II.   The Complaint Adequately Pleads Falsity .................................................................... 8

        1.    The Complaint Adequately Pleads Failure to Disclose Related Party Transactions with Beijing Mushang ............................................................................................... 8

        2.    The Complaint Adequately Alleges that Momo Made Misrepresentations about Content Screening .................................................................................................. 12

    III.  The Complaint Adequately Alleges Scienter .............................................................. 17

        1.    The Complaint Adequately Alleges Motive and Opportunity .................................. 17

        2.    The Complaint Adequately Alleges Conscious Misbehavior or Recklessness .......... 21

    IV.  The Complaint Adequately Alleges Loss Causation ....................................................... 24

CONCLUSION...................................................................................................................... 25

## TABLE OF AUTHORITIES

**Pages**

**Cases**

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995)..................................................................................... 25

*Alaska Laborers Employers Ret. Fund v. Scholastic Corp.*,
  No. 07 CV 7402 GBD, 2011 WL 3427208 (S.D.N.Y. Aug. 3, 2011) .................................... 21

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................ 8

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007).................................................................................. 18

*Barrett v. PJT Partners Inc.*,
  2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017) .......................................................... 14

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................ 8

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
  957 F. Supp. 2d 277 (S.D.N.Y. 2013).................................................................... 12

*City of Brockton Ret. Sys. v. Avon Prod., Inc.*,
  2014 WL 4832321, (S.D.N.Y. Sept. 29, 2014)....................................................... 14

*City of Roseville Employees' Ret. Sys. v. Nokia Corp.*,
  2011 WL 7158548 (S.D.N.Y. Sept. 6. 2011) .......................................................... 16

*City of Taylor Gen. Employees Ret. Sys. v. Magna Int'l Inc.*,
  967 F. Supp. 2d 771 (S.D.N.Y. 2013).................................................................... 20

*City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*,
  412 F. Supp. 3d 206 (E.D.N.Y. 2019).................................................................... 20

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
  794 F.3d 297 (2d Cir. 2015)....................................................................... 19, 20, 23

*Fait v. Regions Fin. Corp.*,
  655 F.3d 105 (2d Cir. 2011).................................................................................. 12

*Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017) .................................................................................. 18

*Goldsmith v. Weibo Corp.*,
2018 WL 2733694, (D.N.J. June 7, 2018) ............................................................................ 16

*Hall v. Johnson & Johnson*,
No. CV 18-1833 (FLW), 2019 WL 7207491 (D.N.J. Dec. 27, 2019) .................................... 22

*Harris v. AmTrust Fin. Servs., Inc.*,
135 F. Supp. 3d 155 (S.D.N.Y. 2015) .................................................................................. 25

*In re AmTrust Fin. Servs., Inc.,*
*Sec.,* 2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019) .................................................................. 12

*In re Aratana Therapeutics Inc. Sec. Litig.*,
315 F. Supp. 3d 737 (S.D.N.Y. 2018) .................................................................................. 19

*In re China Mobile Games & Entm't Grp., Ltd. Sec. Litig.*,
2016 WL 922711 (S.D.N.Y. Mar. 7, 2016) ............................................................................ 10

*In re Insys Therapeutics, Inc. Sec. Litig.*,
No. 17 CIV. 1954 (PAC), 2018 WL 2943746 (S.D.N.Y. June 12, 2018) .............................. 22

*In re Keyspan Corp. Sec. Litig.*,
383 F. Supp. 2d 358 (E.D.N.Y. 2003) .................................................................................. 20

*In re Salix Pharm., Ltd.*,
No. 14-CV-8925 (KMW), 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) .............................. 17

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001) ................................................................................ 9, 17, 18, 19

*In re SINA Corp. Sec. Litig.*,
2006 WL 2742048 (S.D.N.Y. Sept. 26, 2008) ...................................................................... 16

*In re Travelzoo Inc. Sec. Litig.*,
No. 11 CIV. 5531 GBD, 2013 WL 1287342 (S.D.N.Y. Mar. 29, 2013) ................................ 19

*In re Winstar Commc'ns*,
No. 01 CV 11522, 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) ............................................ 25

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001) ............................................................................................ 22, 23

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
897 F. Supp. 2d 168 (S.D.N.Y. 2012) .................................................................................. 12

*Lea v. Tal Educ. Grp.*,
  2019 WL 4688691 (S.D.N.Y. Sept. 25, 2019) .......................................................................... 10

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) ...................................................................................................... 8

*Lewy v. SkyPeople Fruit Juice, Inc.*,
  No. 11 CIV. 2700 PKC, 2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012) ................................. 25

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015) ............................................................................................. 24, 25

*Louisiana Mun. Police Employees' Ret. Sys. v. Green Mountain Coffee Roasters, Inc.*,
  No. 2:11-CV-289, 2013 WL 6728869 (D. Vt. Dec. 20, 2013) ................................................ 19

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014) ...................................................................................... 13, 15, 24

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) .................................................................................................... 21

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) ................................................................................................. 18

*Shaw v. Digital Equip. Corp.*,
  82 F.3d 1194 (1st Cir. 1996) ................................................................................................... 20

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019) ...................................................................................................... 14

*Stevelman v. Alias Research Inc.*,
  174 F.3d 79 (2d Cir. 1999) ................................................................................................ 18, 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ................................................................................................................. 17

*Thomas v. Shiloh Indus., Inc.*,
  No. 15-CV-7449 (KMW), 2017 WL 1102664 (S.D.N.Y. Mar. 23, 2017) .............................. 23

*Villella v. Chem. & Mining Co. of Chile Inc.*,
  2017 WL 1169629 (S.D.N.Y. Mar. 28, 2017) .......................................................................... 8

*Water, Inc.*,
  887 F. Supp. 2d 547 (S.D.N.Y. 2012) ..................................................................................... 21

**Statutes**

15 U.S.C. § 78u-4(b)(1) ................................................................................................................ 9

iv

**<u>Rules</u>**

Fed. R. Civ. P. 9(b) ........................................................................................................... 8

Lead Plaintiff Richard Rupp and Named Plaintiff Rodrigo Leal (collectively, "Plaintiffs") respectfully submit this memorandum of law in opposition to the Motion to Dismiss the Amended Class Action Complaint filed by Defendant Momo Inc. ("Momo" or the "Company").[1]

**PRELIMINARY STATEMENT**

Momo is a Chinese social media company that operates several mobile-based social and entertainment apps. The Company has a lurid history: in 2014 and 2015, the Chinese government censured Momo for facilitating prostitution and disseminating pornography. Momo was fined and forced to issue a public apology.

Since then, Momo has been telling investors that it goes to extraordinary lengths to monitor the content on its platforms. In each of its annual reports filed with the SEC during the Class Period, Momo describes in detail the prophylactic measures that it was supposedly taking to detect and remove illegal content. But those measures were actually non-existent. Sex workers continued to openly advertise their services on Momo's dating app, meeting no resistance from what Momo claimed were highly effective content control measures designed specifically to weed out such content. Prostitution was so rampant on Momo's apps that, in 2019, the Chinese government cracked down on Momo once again and ordered Momo's apps to be removed from the Android and Apple app stores.

Momo also concealed to investors that Beijing Mushang, a talent agency that recruits and manages performers for Momo's live videos service, was a related party. Momo has good reason to hide its relationship with Beijing Mushang, as the latter specializes in finding young, attractive

---

[1] Defendants Yan Tang and Jonathan Xiaosong Zhang (the "Individual Defendants") are Chinese nationals residing in China. Plaintiffs are currently in the process of serving the Individual Defendants in China through the Hague Service Convention.

1

women who put on live shows for a predominantly male audience, in exchange for virtual online gifts. It is a dicey business model that risks censure from Chinese authorities. Hence Momo concealed that it had anything to do with Beijing Mushang, even though Momo owned 18.75% of Beijing Mushang, forced Beijing Mushang to do business exclusively with Momo, took a majority of the revenue that Beijing Mushang and its performers generated, and obligated Beijing Mushang's performers to sign a contract with it agreeing to "obey the management of [Momo]." Under GAAP and SEC rules, Beijing Mushang was a related party. GAAP and SEC rules required Momo to disclose related party transactions. It did not do so for Beijing Mushang.

The Complaint pleads a compelling inference of scienter. During the Class Period, Momo insiders – including its CEO and CFO – disposed of nearly 60 million shares of Momo stock, raking in proceeds of over $1.8 *billion*. Moreover, Momo told investors that content monitoring is a "critical part" of its business operations, undermining Momo's argument that Defendants didn't know whether or not Momo's content moderation measures were actually working.

Momo's arguments against loss causation misapprehend the nature of the Spruce Report and misstate the law on disaggregation at the pleading stage.

Momo's motion to dismiss should be denied in its entirety.

**STATEMENT OF FACTS**

**I.    The Company and its Past Troubles with the Law**

Momo is a Chinese social media company that operates several mobile-based social and entertainment platforms, or apps. ¶2.[2] In its early days, Momo gained notoriety as a sex app, drawing the attention and ire of the Chinese government. ¶31. In 2014, a Chinese state-owned

---

[2] All citations to "¶_" refer to paragraphs of the Amended Class Action Complaint for Violations of the Federal Securities Laws (Dkt. No. 35).

2

newspaper called out Momo as a "hormone-filled" app that facilitated prostitution and sexual assaults. *Id.* The same year, China's National Government Against Pornographic and Illegal Publications singled out Momo in a crackdown against online pornography. *Id.*

The sanctions soon became more severe. In March 2015, the Chinese government imposed a fine on Momo and ordered it to screen and remove all pages that featured pornographic content. *Id.* More ominously, the Chinese government also ordered Momo to issue a public apology and submit a rectification report – a grave administrative warning indicating more draconian penalties in the event of continued violation. *Id.*

## II. Momo Changes Business Model to Live Video Service and Invests in Beijing Mushang, a Related Party

### 1. Live video services

In September 2015, Momo adopted a new business model, which it called "live video service." ¶34. Performers record live video sessions for viewers on Momo's app. *Id.* Viewers can buy virtual gifts on Momo's app to send to the performers to show appreciation or to seek attention. *Id.* Momo earns revenue by keeping a portion of the sales price of the virtual gifts, while the performers and their agents split the remainder. *Id.*

The live video business soon became extraordinarily lucrative. In 2016, Momo earned 68% of its revenue from live videos; by 2017, live videos accounted for 83.6% of Momo's total revenue. ¶36. In 2018, Momo earned $1.56 billion from selling virtual gifts. *Id.*

At first, Momo relied on performers to promote themselves, but with the live video business booming on Momo and its competitor apps, professional talent agencies were formed to discover, train, and manage performers. ¶37.

The talent agencies' business model is risky. Live videos are primarily put on by attractive women performing for a predominantly male audience. ¶38. To earn virtual gifts, performers

3

need to engage viewers with content that is most likely to elicit virtual gifts – that means content that is as risqué as they can get away with.  ¶6.

### 2.  Beijing Mushang

Beijing Mushang is a talent agency that was founded in June 2016 to discover and manage performers for live video services on Momo and other similar platforms.  ¶57.  In March 2017, Momo – through a subsidiary – acquired an 18.75% ownership interest in Beijing Mushang.  ¶18.

In addition to its significant ownership interest in Beijing Mushang, Momo exercised a high degree of control over Beijing Mushang and its performers.  For example:

- Even though Momo faces significant competition in the live video market from well-known rivals, Beijing Mushang is required to contract exclusively with Momo. ¶59.
- Beijing Mushang's performers may only perform on Momo, and are prohibited from performing for any of Momo's accomplished competitors. ¶¶59-60.
- Momo keeps 60% of the virtual gifts the performers earn, while Beijing Mushang and its performers share the remaining 40%.  ¶59.
- Beijing Mushang's performers must sign a contract with Momo, agreeing to Momo's supervision and to "obey the management" of Momo.  ¶61.

Momo earned over $251 million from Beijing Mushang in 2017 and 2018.  ¶71.  Indeed, by 2018, Beijing Mushang was Momo's second largest talent agency in terms of revenue generated. ¶66.

### 3.  GAAP and SEC Rules Require Disclosure of Momo's Relationship with Beijing Mushang

As a NASDAQ-listed company, Momo must comply with SEC and NASDAQ rules, and prepare its financial statements in accordance with Generally Accepted Auditing Principles (GAAP).  ¶45.

Under GAAP, companies must disclose all transactions with related parties. ¶51.  Another entity is a related party of Momo if Momo can "control" or "significantly influence the

4

management or operating policies" of the entity such that it "might be prevented from fully pursuing its own separate interests." *Id.*

The SEC imposes a similar requirement. The SEC requires disclosure of transactions between a company and another entity that it controls *or* over which it exercises significant influence. ¶42. SEC rules define "significant influence" as "the power to participate in the financial and operating policy decisions of the enterprise, but [] less than control over those policies." *Id.* Shareholders beneficially owning a 10% interest in the voting power of the company are presumed to have a significant influence on the company." *Id.* Under SEC rules, Momo's 18.75% ownership interest in Beijing Mushang means that it is presumed to have significant influence over Beijing Mushang.

### 4. Spruce Point Exposes Beijing Mushang as a Related Party, Momo Stock Plummets

Despite Momo's 18.75% ownership interest in Beijing Mushang and its, at minimum, significant influence over Beijing Mushang, Momo's SEC filings do not identify Beijing Mushang as a related party – in fact, they don't mention Beijing Mushang at all. ¶71.

When the research firm Spruce Point Capital Management LLC issued a report (the "Spruce Report") on June 27, 2018 exposing Beijing Mushang as a Momo related party, Momo's stock price fell by 5.27%. ¶10.

## III. Momo Makes Detailed Claims about its Content Control Mechanism, but Actually Turns a Blind Eye to Blatant Prostitution on its Platform

### 1. Momo Tells Investors in Exacting Detail of Concrete Steps that It Supposedly Takes to Combat Illegal Content

Having drawn the Chinese government's ire in 2014 and 2015 for facilitating prostitution and promoting pornography, Momo sought to reassure investors that its lurid days were over. In its annual reports, Momo calls content management and monitoring a "critical part" of its business

5

and describes in exacting detail the concrete steps that it was supposedly taking to control the content on its platforms. ¶¶77-78. For example, Momo's 2018 annual report on Form 20-F told investors that it had a team of over 1,126 people dedicated to reviewing content (*i.e.* more than half as much as Momo's total workforce),[3] that it uses proprietary and third-party software to sweep Momo's platforms on a real-time and round-the-clock basis, and most importantly, that it has a "spam list" of content and behavior that is indicative of illegal content or illegal activity, and that Momo's content review team and software check user content against the spam list to remove illegal or indecent material. *Id.*

### 2. Sex Workers Follow a Uniform Approach in Advertising on Momo

During the Class Period Momo and Tantan (a Tinder-like app that Momo acquired in 2018) apps were rife with sex workers advertising their services. The sex workers follow a nearly uniform approach: they post a scantily-clad profile picture; they employ a suggestive username; and, crucially, they post their offline contact information directly on their profile picture – a dead giveaway that the profile is of a sex worker looking to sell her services. ¶81.

The approach used by sex workers to advertise prostitution was so uniform, and so obvious, that anyone could easily identify which profiles were sex workers. ¶82. If Momo did have a "spam list" of "content and behavior that [Momo] have determined are likely to be indicated of inappropriate or illegal content or illegal activities", as Momo claims in its annual reports filed with the SEC, these blatantly illicit profiles would have been on that list. *Id.* Moreover, both the Momo and Tantan apps require profile pictures to be approved before they are publicly shown.

---

[3] *i.e.* As of December 31, 2018, the "dedicated team" for reviewing content includes over 1,126 employees. ¶105. Momo employed a total of 2,147 people as of December 31, 2018. *See* Exhibit E to the Declaration of Robert A. Fumerton ("Fumerton Dec.", Dkt. No. 41-5), 2018 Form 20-F at 63.

¶83.  Therefore, Momo could not miss profile pictures of scantily-clad women with their contact information prominently displayed, unless Momo wanted to turn a blind eye.  *Id.*

### 3.  Chinese Media Exposes Rampant Prostitution on Tantan; Chinese Government Severely Chastises Momo, Investors Suffer

On April 19, 2019, the Nanchang Evening News, a newspaper from the city of Nanchang in China's Jiangxi Province, published an investigative article detailing widespread prostitution on Tantan.  ¶¶84-85.

The Chinese government acted swiftly. Less than 10 days later, on April 28, 2019, Chinese authorities ordered that Tantan be removed from all Android phones, stating that "Tantan disseminated illegal information including prostitution and pornography." ¶86.  Momo's stock price fell 6.81% on this news. *Id.*  Momo told investors that it would "conduct a comprehensive review of the content in the Tantan mobile app" to comply with Chinese law, contradicting and undermining Momo's claim in its annual reports of the superlative content control and review procedures that it supposedly already had in place.  ¶87.

Whatever measures Momo took in the wake of Tantan's ban were not enough, as the Chinese government imposed additional punishment on May 10, 2019, when it ordered Momo to undertake "self-inspection." ¶88.  As part of the self-inspection, Momo was ordered to "undertake certain internal measures aimed at strengthening its content screening efforts;" Momo was also ordered to suspend the ability of users to post newsfeeds on Momo's app for one entire month. *Id.*  Momo stock price fell 10.28% on this news.  *Id.*

### ARGUMENT

## I.  Legal Standard

On a Rule 12(b)6) motion to dismiss, courts "assum[e] that all the [factual] allegations in the complaint are true."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  To survive the

motion, a complaint need only allege sufficient facts to "state a claim of relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Rule 12(b)(6) does not countenance [] dismissals based on a judge's disbelief of a complaint's factual allegations." *Twombly*, 550 U.S. at 556.

Section 10(b) requires a plaintiff to plead, among other things, that the defendant: (1) made a misstatement or omission of material fact ("falsity"); (2) with scienter; (3) in connection with purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiff's reliance was the proximate cause of their injury ("loss causation"). *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005). Securities fraud claims are subject to the pleading standards of Fed. R. Civ. P. 9(b) which require that Plaintiffs "identify: (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent." *Villella v. Chem. & Mining Co. of Chile Inc.*, 2017 WL 1169629, at *5 (S.D.N.Y. Mar. 28, 2017). The PSLRA also requires that Plaintiffs "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, [] state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Still, "[courts] do not require pleading of detailed evidentiary matters." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

In its motion to dismiss, Momo contests falsity, scienter, and loss causation.

## II.    The Complaint Adequately Pleads Falsity

### 1.   The Complaint Adequately Pleads Failure to Disclose Related Party Transactions with Beijing Mushang

Under GAAP, Beijing Mushang is a related party of Momo if Momo "controls" **_or_** is able to "significantly influence the management or operating policies" of Beijing Mushang. ¶51. The SEC rules define "significant influence" as the "power to participate in the financial and operating policy decisions of the enterprise, *but is less than control over those policies*". ¶42. (emphasis added). Critically, SEC rules state that when a company owns 10% of another, "significant influence" is presumed. *Id.*

At the very least, Momo has "significant influence" over Beijing Mushang. Momo has 18.75% ownership interest in Beijing Mushang. ¶58. This triggers a presumption of "significant influence" under SEC rules. This presumption is bolstered by additional indicia showing that Momo at least had significant influence, if not actual control, over Beijing Mushang. For example:

- Beijing Mushang and its performers all have to sign exclusivity contracts with Momo. In other words, they are not allowed to do business with any of Momo's competitors – they must work exclusively with Momo. ¶¶59-60. Beijing Mushang depends completely on Momo for its revenue. *Id.* Because Beijing Mushang is not allowed to contract with any company other than Momo, it is prevented from pursuing its separate interests.

- Beijing Mushang's performers must sign a contract with Momo promising to promote Momo's interests, and critically, to "obey the management of [Momo]." ¶61.

Indeed, Momo controls Beijing Mushang to such an extent that Beijing Mushang cannot do business with anyone else other than Momo, and Beijing Mushang's employees have to "obey" Momo's management. On top of that, Momo keeps 60% of all virtual gifts that Beijing Mushang's performers earn, leaving Beijing Mushang and its performers to share in the remaining 40%. ¶59. These are compelling indicia of control, or at the very least, significant influence, requiring Momo to disclose Beijing Mushang as a related party.

Momo's cases are inapposite. Momo cites to *Lea v. Tal Educ. Grp.,* 2019 WL 4688691 (S.D.N.Y. Sept. 25, 2019), but *Lea* was not about the disclosure of related parties. In fact, TAL Education made it abundantly clear in its SEC filings that it owned 30% of Shunshun. The issue in *Lea* was whether TAL exercised such a high degree of control over Shunshun such that Shunshun's financials must be *consolidated* into TAL's financials. This is different from related party disclosures, where a company must disclose related party transactions even for entities over which it merely has "significant influence." And this case is nothing like *In re China Mobile Games & Entm't Grp., Ltd. Sec. Litig.,* 2016 WL 922711 (S.D.N.Y. Mar. 7, 2016), where the plaintiffs alleged that the defendant Ying continued to control the company even though he had already transferred his entire ownership of the company to two unrelated individuals, and there were no allegations that Ying had any relationship with those two individuals to whom he transferred his ownership interest.

Also unavailing is Momo's argument that even if Beijing Mushang was a related party, there were no material transactions between Momo and Beijing Mushang. The Complaint alleges that Beijing Mushang was Momo's second largest talent agency, and that Momo itself designated Beijing Mushang as one of its top 5 partners. ¶66. The Complaint also alleges that 60% of all virtual gifts that Beijing Mushang's performers earn go to Momo, while Beijing Mushang keeps the remaining 40% to share with its performers. ¶59. Since Beijing Mushang reports revenues of RMB34,547,000 and RMB1,143,710,000 in 2017 and 2018 respectively,[4] and as Beijing Mushang has no other sources of revenue besides its contract with Momo, Momo received

---

[4] Plaintiffs obtained Beijing Mushang's revenue figures from Beijing Mushang's filings with the Chinese State Administration for Industry and Commerce ("SAIC"), which became the State Administration for Market Regulation ("SAMR") in 2018.

10

RMB51,820,500 (US$7.3 million) and RMB1,715,565,000 (US$244.7 million) from Beijing Mushang in 2017 and 2018, respectively. ¶70.[5] Thus, there were transactions between Momo and Beijing Mushang, and for substantial, plainly material, amounts.

Momo also denies that its relationship with Beijing Mushang, whether related party or not, is material to investors. It absolutely is. Momo's transition to a business model that heavily relies on revenue from live video services means that talent agencies are a key part of Momo's business model. As the Complaint alleges, Beijing Mushang's performers record risqué live video sessions for viewers on Momo to earn virtual gifts. It is a risky business model. Beijing Mushang, like Momo, faces significant potential sanction from the Chinese government should authorities deem Beijing Mushang's performers to be disseminating illicit content, or if any of Beijing Mushang's performers cross the line from what is risqué to what is pornographic. It is irrelevant that Beijing Mushang has *not yet* been sanctioned by the Chinese government; it might have been and still might.

Lastly, Momo argues that whether Beijing Mushang is a related party involves subjective accounting judgment and is therefore a statement of opinion. While certain accounting judgments are subjective, such as goodwill estimates and adequacy of reserves that the Second Circuit discusses in *Fait v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011), this is not one of those cases.[6] Related parties are clearly defined under GAAP and SEC rules. Significant influence or

---

[5] In 2017, Beijing Mushang reported revenues of RMB34,547,000. Since Beijing Mushang only keeps 40% of the money generated by its performers, that means Momo received RMB51,820,500. (RMB34,547,000 + RMB51,820,500 = RMB86,367,500). RMB34,547,000 (Beijing Mushang's portion) is 40% of RMB86,367,500. RMB51,820,500 (Momo's portion) is 60% of RMB86,367,500. The same calculation applies for 2018.

[6] Momo fails to cite a single case in which courts have held that the identification of related parties is a subjective judgment. *In re AmTrust Fin. Servs., Inc. Sec.,* 2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019) does not say that all GAAP disclosures are matters of subjective judgment – only those

11

control over a party establishes relatedness. SEC rules expressly state that 10% shareholding interest warrants a presumption of significant influence. ¶42. Here, Momo at minimum had significant influence over Bejing Mushang. Along with numerous indicia of significant influence, Momo owns 18.75% of Beijing Mushang, triggering a presumption of control. ¶58. Even if the Court indulged Momo's far-fetched argument, whether Momo actually believed its determination that Beijing Mushang was not a related party is a scienter inquiry, addressed below (*infra* III, "The Complaint Adequately Pleads Scienter"). *See City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, n.6 (S.D.N.Y. 2013) ("in a false statement of opinion case…the falsity and scienter requirements are essentially identical."). And if scienter is established, so is falsity. *AmTrust*, 2019 WL 4257110 at n.183 ("establishing scienter invariably will establish the falsity of an opinion").

### 2. The Complaint Adequately Alleges that Momo Made Misrepresentations about Content Screening

The Second Circuit held in *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) ("*Jinkosolar*"), which also involved a Chinese company's compliance with Chinese regulation, that when a company describes in detail prophylactic measures taken to comply the law, those descriptions are misleading if the measures actually don't work, even when the company warned of the risks of non-compliance:

> [T]he description of pollution-preventing equipment and 24–hour monitoring teams gave comfort to investors that reasonably effective steps were being taken to

---

specific statements implicated in that case, none of which concerned related parties. *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168 (S.D.N.Y. 2012), *aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013) is inapposite because this is not a case where Plaintiffs reached a different conclusion than Momo's auditors. Momo's auditors were unaware of Momo's relationship with Beijing Mushang because Defendants specific represented to Momo's auditors that there are no undisclosed related party transactions. ¶127.

12

comply with applicable environmental regulations. To be sure, these descriptions did not guarantee 100% compliance 100% of the time. Such compliance may often be unobtainable, and reasonable investors may be deemed to know that. However, investors would be misled by a statement such as that quoted above if in fact the equipment and 24–hour team were then failing to prevent substantial violations of the Chinese regulations.

*Id.* at 251.

*Jinkosolar* is binding here. Momo's detailed description of its army of employees and sophisticated software effectively monitoring content on a round-the-clock and realtime basis is similar to Jinkosolar's "description of pollution-preventing equipment and 24-hour monitoring teams" that the Second Circuit found actionable.

In assessing the falsity of Momo's statements about its content screening procedures, the context is important. The Chinese government singled out Momo in 2014 for disseminating pornography and facilitating prostitution. ¶31. Then, in March of 2015, the Chinese government imposed a monetary penalty on Momo and ordered it to submit a "rectification report", indicating that more draconian punishment would be forthcoming if Momo did not correct the problem. *Id.*

Every year since 2014, Momo has reassured investors in its annual reports that it took content screening seriously. Every year, Momo stated that it was dedicating more and more personnel to monitor content – over 1,100 persons in 2018, or more than half again as much as Momo's total employee count in 2018, were dedicated to content monitoring. ¶¶105-110. Every year, Momo told investors that it generates a "spam list" of content and behavior that suggest illegal activities, and its army of personnel, aided by sophisticated proprietary and third-party software, used the spam list to effectively weed out objectionable content on a round-the-clock and realtime basis. *Id..* In its 2018 annual report, Momo even calls content monitoring a "critical part" of its business operations. ¶105.

13

But Momo was not doing those things and did not have a spam list.  If it did, it would have easily caught those blatantly obvious profiles that sex workers use to advertise their services, because they follow a uniform approach: scantily-clad profile picture, suggestive username, and offline contact information on the profile picture.  It was not difficult to identify these profiles. Moreover, after the Chinese government ordered Tantan to be removed from the Android and Apple app stores, Momo stated that it would conduct a "comprehensive internal review of the contents" on Tantan – suggesting that it was not doing so previously.

Because Momo specified in such exacting detail the steps it was ***actually taking*** and the mechanisms in place to screen content, this case is unlike those that Momo string cites in its Motion, where courts dismissed complaints because the alleged false statements were aspirational, forward-looking, or puffery. *E.g. Singh v. Cigna Corp.*, 918 F.3d 57 (2d Cir. 2019) (alleged false statements not actionable because they were "simple and generic" assertions about the importance of acting lawfully and adhering to the company's code of conducts).[7]

*City of Brockton Ret. Sys. v. Avon Prod., Inc.*, 2014 WL 4832321, (S.D.N.Y. Sept. 29, 2014) is instructive.  There, the court differentiated aspirational statements that Avon employees were "strictly prohibited" from paying bribes and that Avon "continues to adhere to the highest standards of integrity, ethical conduct and good corporate citizenship," which the court rejected as immaterial puffery, from statements that Avon had "a comprehensive and well-documented set of internal controls that provides reasonable assurance that its financial transactions are recorded accurately and completely, and its assets are safeguarded," which the court held to be actionable statements of fact.  *Id.* at 16 ("Other statements in Avon's 2004 Corporate

---

[7] *See also Barrett v. PJT Partners Inc.,* 2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017) (statements about adherence to Code of Conducts not actionable because they are explicitly aspirational).

14

Responsibility Report, however, go beyond generalized expressions of commitment to high corporate standards, and *address concrete steps that Avon has taken to ensure the integrity of its financial reporting*.") (emphasis added).  Momo's false detailed descriptions of the concrete steps it supposedly took to screen and remove content are the same as the statements *Avon* found actionable.

Momo's argument that it already warned investors that its content control procedures might not be effective misses the point.  As the Second Circuit noted in *Jinkosolar*, reasonable investors understand that compliance measures do not "guarantee 100% compliance 100% of the time."  Indeed, while investors do not expect Momo's content control procedures to be 100% foolproof, they do expect that Momo *is doing* the things that it said it is doing and that those measures were doing what Momo claimed they did.  *See Jinkosolar,* 761 F.3d at 251 ("[T]hese descriptions [of compliance measures] did not guarantee 100% compliance 100% of the time [but], investors would be misled by [Jinkosolar's description of its compliance measures] if in fact the equipment and 24–hour team were then failing to prevent substantial violations of the Chinese regulations.").  Indeed, the Second Circuit found Jinkosolar's description of measures misleading even though Jinkosolar included ample warnings about the potential risk and penalties if found non-compliant.  And none of the cases that Momo string cites stand for the proposition that a warning of potential ineffectiveness means that a company escapes liability when it actually was not doing, or was incapable of doing, what it told investors that it was doing.[8]

---

[8] For example, Momo cites *City of Roseville Employees' Ret. Sys. v. Nokia Corp.,* 2011 WL 7158548 (S.D.N.Y. Sept. 6. 2011) (Daniels, J.) for its assertion that Momo had adequately warned. But in *City of Roseville,* the alleged false statements were not actionable because they were forward-looking statements about future outlook and general statements of optimism. Momo's statements about its content control procedures are neither forward-looking nor

Momo tries to analogize this case to *In re SINA Corp. Sec. Litig.,* 2006 WL 2742048 (S.D.N.Y. Sept. 26, 2008), where investors sued after the Chinese government banned fortune-telling services, which formed a significant part of SINA's revenue.  The court held that SINA's warnings that it could not predict the actions of the Chinese government sufficed – indeed, the ban on fortune-telling services came as a surprise.  In contrast, the issue here is not about the unpredictability of a third party's actions. It is no secret that the Chinese government considers prostitution illegal; in fact, Momo had already been penalized for facilitating prostitution. Rather, the issue is that Momo was not doing what it claimed to in order to comply with known, existing Chinese laws, namely screening and removing indecent content. The Chinese government's reaction to its laws being broken by a company it had already warned was utterly predictable.

This case is also nothing like *Goldsmith v. Weibo Corp.,* 2018 WL 2733694, (D.N.J. June 7, 2018).  There, the plaintiffs ***assumed***, wrongly, from Weibo's disclosure that it was using third-party license-holding websites to deliver contents to mean that Weibo was itself exempt from the requirement to hold the necessary license.  Weibo never said that it was exempt from the license requirements.  Plaintiffs make no assumptions here: Momo told investors in detailed and precise disclosures the concrete steps that it was supposedly taking to moderate content and remove illegal content, but Momo wasn't doing those things.

Lastly, Momo argues that at most, its statement about content control were only false during the latter parts of the Class Period, and not throughout the entire Class Period, because the Nanchang Evening News article only came out in April of 2019.  But Momo was punished in 2014 and 2015, and then again in 2019, for essentially the identical transgressions, the plausible

---

generalized expressions of optimism, but address specific, concrete mechanisms that were supposedly in place to ensure compliance with Chinese law.

16

inference is that Momo's content control procedures – which did not change throughout the entire Class Period[9] – were in fact non-existent during the entire Class Period.  *See e.g., Scholastic*, 252 F.3d at 73 (even post-class period facts may be relevant to determining fraud during the class period).

### III.    The Complaint Adequately Alleges Scienter

In evaluating scienter, "courts must, as with any motion to dismiss, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309 (2007). The issue is then "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation [] meets that standard." *Id.* at 322-23. The inference of scienter "need not be [] of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. "When the competing inferences rest in equipoise, the tie [] goes to the plaintiff." *In re Salix Pharm., Ltd.*, No. 14-CV-8925 (KMW), 2016 WL 1629341, at *13 (S.D.N.Y. Apr. 22, 2016).

A plaintiff may plead scienter by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Here, Plaintiffs plead scienter through both motive and recklessness.

#### 1.  The Complaint Adequately Alleges Motive and Opportunity

"Unusual" insider sales of stock establish motive. *Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 554 (S.D.N.Y. 2017). Courts determine whether sales are

---

[9] The content screening procedures as described in Momo's annual reports during the Class Period did not change.  *See* ¶¶105-110.

17

unusual by weighing "the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *Id.*

Shortly after Momo filed its 2016 and 2017 20-Fs, Defendants Tang and Zhang each sold the majority of their shares for collective proceeds of almost $300 million:

| Seller | Date | Number of shares sold | % of total | Proceeds (rounded) |
|---|---|---|---|---|
| Tang | April 2017 | 4,000,000 | 60.1% | $152,800,000 |
| | April 2018 | 2,000,000 | 38.5% | $74,000,000 |
| | **Total** | | | **$226,800,000** |
| Zhang | April 2017 | 1,000,000 | At least 25% | $19,000,000 |
| | April 2018 | 1,500,000 | At least 37.5% | $27,400,000 |
| | **Total** | | | **$47,200,000** |

The amount of the sales is suspicious for two reasons. First, courts infer scienter when the absolute proceeds are substantial regardless of the percentage of their shares the insiders sold. *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (sale of 2.1% of total shares suspicious). The sales in this case are massive by any measure.

Second, stock sales are suspicious if they amount to a large percentage of the seller's total shares. *Scholastic,* 252 F.3d at 74. Ringleaders' stock sales are especially probative of scienter. *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 86 (2d Cir. 1999). Tang and Zhang were Momo's longtime CEO and CFO. They led Momo when it concealed that Beijing Mushang was a related party and they led Momo when it falsely reassured investors that its content monitoring was rigourous and state-of-the-art. And while Momo's disclosures do not permit investors to determine the precise percentages of their shares that they sold, Tang and Zhang each sold more than half

18

their shares.[10] The Second Circuit recently found such sales from the defendants principally responsible for the false statements sufficient to establish motive and opportunity. *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 308 (2d Cir. 2015) (sale of 18% and 38% were sufficient to establish scienter);[11] *see also Stevelman*, 174 F.3d at 82 (sales of 40% of shares from main defendant sufficed to plead motive and opportunity).

Moreover, the Complaint sufficiently alleges Defendants' profits. In the context of stock sales, "profits" means proceeds from Class Period stock sales minus costs of Class Period purchases and options exercise. *See In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 762 n.12 (S.D.N.Y. 2018) (noting that court could determine "profits" through Forms 4 that do not list common stock acquisition price). Thus, because during the Class Period there is no evidence that Defendants paid money to exercise options or purchase Momo shares, Defendants' "profits" are their sale proceeds. Moreover, because net profits are nearly impossible to calculate pre-discovery (without information such as tax liabilities), courts routinely use gross proceeds to determine whether insider sales were unusual. *See, e.g.*, *Scholastic*, 252 F.3d at 74 (considering gross proceeds in scienter analysis); *Blanford*, 794 F.3d at 308-09 (same).

Momo claims that the stock sales were not suspicious because they were made pursuant to 10b5-1 plans. But such plans are meaningless if adopted after false statements were made. *Blanford*, 794 F.3d at 309. Here, Tang and Zhang entered into their 10b5-1 plans in March 2017

---

[10] In *In re Travelzoo Inc. Sec. Litig.*, No. 11 CIV. 5531 GBD, 2013 WL 1287342, at *9 (S.D.N.Y. Mar. 29, 2013), of the four individual defendants, one sold a small percentage of his total shares, one sold a small number of shares, and the other two sold $9,000 in shares.

[11] The percentages are set out in the opinion the Second Circuit reversed, *Louisiana Mun. Police Employees' Ret. Sys. v. Green Mountain Coffee Roasters, Inc.*, No. 2:11-CV-289, 2013 WL 6728869, at *12 (D. Vt. Dec. 20, 2013).

19

and 2018 - *a month before their April 2017 and 2018 sales*. Their adoption of 10b5-1 plans well into the Class Period and well after they began misleading investors has no impact on scienter.

Momo also claims that the timing of stock sales is not suspicious, citing the suggestion of *City of Taylor Gen. Employees Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 800 (S.D.N.Y. 2013) that insiders would "rush[] to cash out" near the end of the Class Period. There, though, one seller sold stock in connection with a previously-announced retirement while another retained the overwhelming majority of his stock. More fundamentally, in *Magna*, the alleged scheme came to light through the defendants' own proactive disclosures. *Id.* at 784, 786-89, 793 n.9. Here, it was third parties – an outside analyst and a Chinese reporter – who disclosed Defendants' scheme. Because Defendants couldn't know when their scheme would be uncovered, they couldn't "rush[] to cash out" just before the world learned of it.

Finally, Momo argues that the stock sales of non-Defendant insiders, amounting to $1.5 billion, are not relevant. Courts consider non-Defendant stock sales in determining whether a complaint sufficiently alleges motive. *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1224 (1st Cir. 1996); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 384 (E.D.N.Y. 2003) ("[I]t is appropriate to consider the trading activity of other nondefendant high-level executives.").

And here, the non-Defendant selling shareholders are hardly the kinds of lower-level flunkies or captured directors whose sales do not contribute to scienter. *Cf. City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 227 (E.D.N.Y. 2019). The principal selling shareholders are Momo's private equity backers, including arguably the most powerful company in China, Alibaba. Defendants had every reason to help these powerful shareholders. Next in number of sales were Momo's co-founders – long-time colleagues and friends Defendants wanted to benefit. Last is Momo's Chief Operating Officer, who would have surely known of the

20

fraud but did not make any statements.  Moreover, as the false statements touch on Momo's core operations, the non-insider Defendants who closely monitored Momo's operations were well-positioned to know Defendants' statements were false.

Finally, unlike in the cases Momo cites, this is not a case where the Defendants' own stock sales were immaterial. *Cf. Alaska Laborers Employers Ret. Fund v. Scholastic Corp.*, No. 07 CV 7402 GBD, 2011 WL 3427208, at *2 (S.D.N.Y. Aug. 3, 2011). The Court is not faced with the peculiar situation where Defendants made false statements to benefit non-Defendants but failed to sell themselves: Defendants benefited, too.

Thus, the Complaint alleges a scheme in which Defendants, Momo's private equity backers, its co-founders, and its Chief Operations Officer all knew the Company's statements were false and all cashed out before the market discovered the truth and the share price dropped.

### 2. The Complaint Adequately Alleges Conscious Misbehavior or Recklessness

"For recklessness, plaintiffs may "specifically allege [] defendants' knowledge of facts or access to information contradicting [defendants'] public statements," or allege that defendants "failed to check information they had a duty to monitor." *Novak v. Kasaks*, 216 F.3d 300, 308, 311 (2d Cir. 2000).

"Knowledge of the falsity of a company's financial statements can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's financial statements were false when issued." *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012) (Daniels, J.) Core operations is not measured solely by financial metrics. *Hall v. Johnson & Johnson*, No. CV 18-1833 (FLW), 2019 WL 7207491, at *21 (D.N.J. Dec. 27, 2019) (product representing 0.3% of total sales "core operations" because it was important to company's image). Here, Tantan's young

21

clientele is Momo's future. ¶76. And Momo itself admits that content monitoring is a "critical part" of its operations. ¶78. The core operations inference supports an inference of scienter.

The Complaint also makes additional particularized allegations. First, the statements themselves were critical. In 2014 and 2015, the Chinese government cracked down on Momo because its platform facilitated illicit and casual sex and led to numerous incidents of sexual assault. ¶31. Momo was ordered, among other things, to screen all media for pornography and make a public apology. *Id.* Momo thus had to continually prove to the Chinese government's satisfaction that its seedy days were behind it and that its pornography controls worked. ¶31.

Indeed, Momo acknowledged that its content monitoring was a "critical" part of its business. ¶¶77-78. It then describes the steps it was taking in substantial detail. The Complaint sufficiently alleges that Momo was simply not following these steps. Thus, the importance of the statements themselves and the warning Momo had already received further support scienter.

Second, the Court must consider the compelling recklessness and motive allegations together. Motive allegations that do not suffice on their own to establish a strong inference of scienter can contribute to such an inference when coupled to allegations of recklessness. *In re Insys Therapeutics, Inc. Sec. Litig.*, No. 17 CIV. 1954 (PAC), 2018 WL 2943746, at *6 (S.D.N.Y. June 12, 2018).[12] Here, no non-culpable inference is as cogent and compelling as the inference that Defendants knew that Momo lacked a spam list and its content moderation methods were

---

[12] In *Kalnit v. Eichler*, 264 F.3d 131, 141 (2d Cir. 2001), the plaintiffs could not combine their motive allegations with recklessness allegations because they were not entitled to any weight. Here, Plaintiffs have alleged a concrete and personal benefit, with the only question whether that concrete benefit suffices. Since *Kalnit*, the Second Circuit has in fact considered stock sales alongside other scienter allegations. *Blanford*, 794 F. 3d at 309. In *Thomas v. Shiloh Indus., Inc.*, No. 15-CV-7449 (KMW), 2017 WL 1102664, at *3 (S.D.N.Y. Mar. 23, 2017), the plaintiffs admitted they had no motive allegations.

otherwise inadequate, but that they lied so they and their private equity backers and co-founders could sell their position.

As to Momo's failure to identify Beijing Mushang as a related party, it is inconceivable that Defendants did not know that Momo owned 18.75% of Beijing Mushang, its second largest talent agency, invoking a presumption of significant influence under SEC rules. Defendant Zhang is well-versed in accounting rules.  He is a licensed CPA, spent ten years working as an auditor at KPMG and PwC, served as the CFO of two publicly-traded companies and chaired the audit committees of two other NASDAQ-listed companies before becoming CFO of Momo.  ¶25.  As such, he is fully aware that Momo's 18.75% ownership of Beijing Mushang requires disclosure of the latter as a related party, especially given the numerous ways in which Momo actually exercised significant influence over Beijing Mushang, its employees, and its policies.  Indeed, considering the importance of live videos to Momo's business model, and the importance of Beijing Mushang specifically – it generated $244.7 million for Momo in 2018 – it is unfathomable that Defendants were unaware of the degree of Momo's influence over Beijing Mushang. Defendant Zhang and Defendant Yan both provided Momo's auditors with management representation letters claiming that they have disclosed all related parties – indicating knowledge of the importance of disclosing related parties.  ¶127.

Lastly, Momo claims that Defendants could not have acted with scienter when they concealed Momo's relationship with Beijing Mushang because Momo disclosed a relationship with another talent agency, Hunan Qingdao. Not so. In 2018, Momo earned $62.4 million from Hunan Qingdao – and $244.7 million from Beijing Mushang. *Compare* MTD at 24 *with* ¶70.  Thus, revenues from Hunan Qingdao were not material to Momo's operations, while revenues from Beijing Mushang were. It was perfectly rational for Momo to admit to the relatively immaterial

relationship with Hunan Qindao while concealing the four-times-larger relationship with Beijing Mushang that created a much greater peril to its operations.

## IV.        The Complaint Adequately Alleges Loss Causation

The Complaint adequately alleges loss causation as to both the content moderation and accounting allegations.

Loss causation is adequately alleged if Momo's false statements materially understated the risks investors bore and which resulted in their losses. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 186 (2d Cir. 2015). The Complaint satisfies *Loreley* by alleging that Momo's lack of a spam list and feeble content moderation made it materially more likely that the Chinese government would intervene – and intervene it did. That Momo disclosed the Chinese government might crack down is irrelevant because Momo also reassured investors that Momo employed state-of-the-art content moderation to address the risk. *See Jinkosolar*, 761 F.3d at 251.

Momo cites the Spruce Report's statement that it was based on "publicly available information" to deny loss causation. In context, the statement informs investors that the report does not contain material non-public information as defined in insider trading caselaw – *i.e.,* that the information was not obtained *from an insider*. In fact, the report was based on information that is not public for loss causation purposes, such as 50 interviews of industry representatives (Fumerton Dec. Ex. J, at 14) and Momo's talent agency partners' SAIC filings. *Id.* at 27. These Chinese regulatory filings are not considered public documents under existing caselaw because U.S. investors have neither ready access nor the ability to put them in context. *Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11 CIV. 2700 PKC, 2012 WL 3957916, at *17 (S.D.N.Y. Sept. 10, 2012) (SAIC filings not considered accessible to U.S. investors). In any case, the "claimed ability of [an analyst] to arrive at its findings by an examination of the publicly reported financials does not mean that a

reasonable investor could have drawn those same conclusions based on the total mix of the available information." *In re Winstar Commc'ns*, No. 01 CV 11522, 2006 WL 473885, at *15 (S.D.N.Y. Feb. 27, 2006) (Daniels, J.).  Momo further claims that Plaintiffs must allege the portion of the loss that results from unrelated statements in the Spruce Report. "The requirement, if any, to plead a causal link does not place on Plaintiffs a further pleading obligation to rule out other contributing factors or alternative causal explanations." *Loreley* 797 F.3d at 189.[13]

## CONCLUSION

For the foregoing reasons, the Court should deny Momo's motion. If the Court grants any part of the Motion, Plaintiffs respectfully request leave to amend. *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 55 (2d Cir. 1995) (courts should be especially liberal in granting leaves to amend in cases of dismissed securities fraud claims).

Dated: March 23, 2020

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: */s/ Laurence Rosen*
Laurence Rosen (LR 5733)
Phillip Kim (PK 9384)
Yu Shi (YS 2182)
Jing Chen (JC 2908)
275 Madison Ave, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: info@rosenlegal.com

*Lead Counsel for Plaintiffs*

---

[13] In *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 173 n.30 (S.D.N.Y. 2015), *aff'd,* 649 F. App'x 7 (2d Cir. 2016), the plaintiffs disclaimed the accuracy of the report they relied on.

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of March 2020, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Laurence Rosen*
Laurence Rosen