UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

RICHARD RUPP and RODRIGO LEAL,  :   19-cv-4433-GBD
Individually and on Behalf of All Others  :
Similarly Situated,  :   **ECF Case**
  :   **Electronically Filed**
                 Plaintiff,  :
  :
     v.  :
  :
MOMO INC., YAN TANG, and  :
JONATHAN XIAOSONG ZHANG,  :
  :
              Defendants.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# REPLY MEMORANDUM OF LAW
## IN FURTHER SUPPORT OF DEFENDANT MOMO INC.'S
## <u>MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT</u>

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Scott D. Musoff
Robert A. Fumerton
Michael C. Griffin
One Manhattan West
New York, New York 10001
Phone:  (212) 735-3000

*Attorneys for Defendant Momo Inc.*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT..............................................................................................................................3

I.      PLAINTIFFS FAIL TO PLEAD ANY MISSTATEMENT OR OMISSION.....................3

        A.      Plaintiffs Do Not Allege Momo's Content Screening Was Non-Existent...............3

        B.      Plaintiffs Do Not Allege Any Undisclosed Related-Party Transactions .................5

II.     PLAINTIFFS FAIL TO PLEAD SCIENTER ....................................................................7

CONCLUSION...........................................................................................................................10

## TABLE OF AUTHORITIES

### CASES

*Alaska Laborer Employers Retirement Fund v. Scholastic Corp.*,
   No. 07 Civ. 7402(GBD), 2010 WL 3910211 (S.D.N.Y. Sept. 30, 2010)............................9

*Alaska Laborers Employers Retirement Fund v. Scholastic Corp.*,
   No. 07 CV 7402(GBD), 2011 WL 3427208 (S.D.N.Y. Aug. 3, 2011) ...............................9

*In re China XD Plastics Co. Ltd. Securities Litigation*,
   No. 14-cv-05308 (GBD), 2016 WL 1241522 (S.D.N.Y. Mar. 23, 2016)...........................7

*City of Brockton Retirement System. v. Avon Products Inc.*,
   No. 11 Civ. 4665(PGG), 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014) ...........................5

*City of Warren Police & Fire Retirement System v. Foot Locker, Inc.*,
   412 F. Supp. 3d 206 (E.D.N.Y. 2019) ...............................................................................8

*In re CRM Holdings, Ltd. Securities Litigation*,
   No. 10 Civ. 975(RPP), 2012 WL 1646888 (S.D.N.Y. May 10, 2012) ...............................9

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)................................................................................................6

*Employees Retirement System of City of Providence v. Embraer S.A.*,
   No. 16 Civ. 6277 (RMB), 2018 WL 1725574 (S.D.N.Y. Mar. 30, 2018).........................4

*Employees' Retirement System of Government of the Virgin Islands v. Blanford*,
   794 F.3d 297 (2d Cir. 2015)................................................................................................9

*Fresno County Employees' Retirement Ass'n v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017).................................................................................9

*In re Gilddan Activewear, Inc. Securities Litigation.*,
   636 F. Supp. 2d 261 (S.D.N.Y. 2009).................................................................................8

*Lea v. TAL Education Group*,
   No. 18 Civ. 5480 (LAP), 2019 WL 4688691 (S.D.N.Y. Sept. 25, 2019)
   *appeal docketed*, No. 19-3549 (2d Cir. Oct. 25, 2019)......................................................6

*In re Magnum Hunter Resources Corp. Securities Litigation*,
   26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd* 616 F. App'x 442 (2d Cir. 2015) ....................5

*Meyer v. Jinkosolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014)...........................................................................................3, 5

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) ...........................................................................................9

*In re Sanofi-Aventis Securities Litigation*,
     Nos. 07-cv-10279 (GBD), 08-cv-00021 (GBD), 2009 WL 3094957
     (S.D.N.Y. Sept. 25, 2009) ..................................................................................................10

*In re Scholastic Corp.Securities Litigation*,
     252 F.3d 63 (2d Cir. 2001) ...............................................................................................9

*Sinay v. CNOOC Ltd.*,
     554 F. App'x 40 (2d Cir. 2014) ........................................................................................10

*Stevelman v. Alias Research Inc.*,
     174 F.3d 79 (2d Cir. 1999) ................................................................................................9

*Wyche v. Advanced Drainage Systems, Inc.*,
     710 F. App'x 471 (2d Cir. 2017) ...................................................................................9, 10

*Zhong Zheng v. Pingtan Marine Enterprise Ltd.*,
     379 F. Supp. 3d 164 (E.D.N.Y. 2019) ..............................................................................10

**PRELIMINARY STATEMENT**

Momo's Opening Brief demonstrated that Plaintiffs have failed to allege securities fraud for multiple separate and independent reasons, including their fundamental failure to identify anything false or misleading in the Company's disclosures, much less that such disclosures were made as part of a years-long scheme to defraud investors.  Plaintiffs' Opposition fails to rebut any of these grounds for dismissal, and in fact confirms the fatal deficiencies in the Amended Complaint.

With respect to content screening, the Company extensively disclosed its efforts to screen for objectionable content, while expressly warning that those efforts may not be 100% successful and that objectionable content posted by users could expose the Company to regulatory action or other material adverse effects.  Faced with these clear, candid disclosures, Plaintiffs' Opposition abandons its original theory that the Company improperly claimed that it was adequately preventing violations.  Instead, Plaintiffs now take the even more untenable position that the Company never had any content screening at all.  (Opp. at 17.)  Plaintiffs' sole purported basis for that new accusation is a lone article reporting on about a dozen allegedly illicit profiles on the Tantan app near the city of Nanchang in April 2019.  While such limited incidents (even if true) are precisely the type of risks of which the Company warned, a small number of illicit profiles among Tantan's 200 million users in 2019 does not remotely demonstrate that the Company had no content screening for any of its platforms during the entire four-year putative class period.

The Company's Opening Brief also established that Plaintiffs have not alleged any actionable omission regarding Beijing Mushang, as they do not adequately allege that (i) Beijing Mushang was a related party, (ii) the Company engaged in any material transactions with Beijing Mushang, (iii) the Company's accounting judgements, even if incorrect, were not sincerely believed, and (iv) disclosing Beijing Mushang as a related party would have been material to

investors in any event.  The Opposition tries to show material transactions between Momo and Beijing Mushang by attempting to reverse-engineer Momo's revenue based on Beijing Mushang's reported revenue in Chinese regulatory filings.  Yet Plaintiffs do not even submit the filings on which they rely, nor do they provide any information about Beijing Mushang's accounting treatments and any differences compared to U.S. accounting rules.  These failings alone warrant dismissal of Plaintiffs' claims, as this Court and others have held in other cases.

With respect to scienter, Plaintiffs do not allege a single fact suggesting that Defendants were engaged in an intentional or reckless scheme to defraud investors.  The Opposition argues that a handful of insider stock sales demonstrates motive, but Plaintiffs cannot identify anything unusual or suspicious about those sales.  Indeed, all of the sales occurred pursuant to legitimate 10b5-1 plans and took place *before* the release of the alleged misstatements, both of which undermine any inference of fraud.  The Opposition has even less to offer in support of a theory of recklessness, and falls back on the so-called "core operations" doctrine and allegations that Defendants simply must have known that the Company's disclosures supposedly were false.  Numerous courts, including this one, consistently have rejected these tired tropes.

Finally, the Opposition confirms that Plaintiffs cannot allege loss causation because the purported corrective disclosures they cite did not actually correct any misstatement in the Company's prior disclosures.  The Nanchang article simply reiterated a well-known and specifically disclosed risk, *i.e.*, that the Company may not be 100% effective at screening illicit user content from its apps.  Similarly, the short seller report on which Plaintiffs rely did not reveal that any of the Company's disclosures were false, and was based only on public information and thus could not have constituted a corrective disclosure in any event.  At most, it revealed only that the short seller disagreed with Company's accounting judgments.

2

## ARGUMENT

**I.    PLAINTIFFS FAIL TO PLEAD ANY MISSTATEMENT OR OMISSION**

### A.    Plaintiffs Do Not Allege Momo's Content Screening Was Non-Existent

Plaintiffs' claim that Momo misled investors simply because some inappropriate content allegedly went undetected on one platform fails as a matter of law.  (Br. at 11-16.)  The Opposition fails to address the points raised in the Opening Brief, and appears to simply abandon the Amended Complaint's theory that the Company's disclosures are actionable because its content screening was not 100% effective.  (*See* Opp. at 12-17.)[1]  Instead, Plaintiffs take the even more extreme position that "Momo's content control procedures . . . were in fact non-existent during the entire Class Period [from April 2015 to May 2019]."  (Opp. at 17.)  But Plaintiffs' factual allegations fall far short of supporting that sweeping contention.

Plaintiffs rely almost exclusively on a single newspaper article in April 2019 that recounted the anecdotal experience of one Tantan user who claimed to have encountered illicit activity on the app.  (*See* AC ¶ 84.)  The article further reports that the author created a profile on the app and encountered 10 profiles that the author believed to be offering prostitution or other illicit services.  (*See id.* ¶ 85.)  Thus, at most, the article alleges roughly a dozen instances of purported misconduct out of Tantan's 200 million users.  (*See* Ex. K, Nanchang Article, at 7.)  Even if true, these isolated anecdotes in no way suggest that the Company had no content screening for its apps during the four-year putative class period (April 2015 to May 2019).[2]

---

[1]    As the Opening Brief established, and as Plaintiffs' own cited cases recognize, such a theory fails as a matter of law.  (*See* Br. at 13-16); *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (cited in Opp. at 12-13) ("[Disclosures of environmental controls] did not guarantee 100% compliance 100% of the time. Such compliance may often be unobtainable, and reasonable investors may be deemed to know that.").

[2]    Exhibits A-L were submitted with the Declaration of Robert A. Fumerton, dated January 24, 2020 (ECF No. 41).  Exhibit M is submitted concurrently with the Declaration of Robert A. Fumerton, dated April 22, 2020.

As a threshold matter, the article says nothing about content (or content screening) on the Tantan app before April 2019—*i.e.*, the vast majority of the putative class period—and says nothing at all about the Momo app. Indeed, while the Opposition repeatedly references prior regulatory action against the Company in 2014 and 2015 (before the start of the putative class period) for illicit content on the Momo app (*see* Opp. at 1-3, 5, 13, 16, 22), Plaintiffs do not allege any misconduct on the Momo app during the putative class period. "Pre-class period allegations of misconduct are insufficient where 'there is scant else from which to infer that this was the company's practice at any pertinent time.'" *Emps. Ret. Sys. of Providence v. Embraer S.A.*, No. 16 Civ. 6277 (RMB), 2018 WL 1725574, at *9-11 (S.D.N.Y. Mar. 30, 2018) (Berman, J.) (citation omitted) (assertion that knowledge of pre-Class Period misconduct demonstrated "a clear breakdown of the Company's internal controls during the Class Period" was insufficient to allege deficient controls).

In any event, the handful of incidents reported in the article, even if credited, falls squarely within the Company's repeated warnings that its content screening "may not prevent all [improper] content from being posted or activities from being carried out." (Ex. A, 2014 Form 20-F at 9.) And far from asserting, as Plaintiffs do, that the Company "turn[ed] a blind eye" to misconduct on Tantan, (Opp. at 7), the article details the Company's content screening and explains how illicit users intentionally design their interactions to avoid the Company's filters by quickly moving the conversation to "third-party chat accounts such as WeChat and QQ." (Ex. K, Nanchang Article at 1, 7-8.) Thus, if anything, the article corroborates the Company's disclosures that Momo employs extensive content screening controls.

The Opposition also makes much of the ensuing regulatory reaction to the article, but this does nothing to bolster Plaintiffs' allegations. (*See* Opp. at 7, 14.) The regulatory response says

4

nothing about the existence or effectiveness of the Company's content screening, as regulators temporarily removed Tantan from certain app stores and directed the Company to undertake a one-month "self-inspection." (*See* AC ¶¶ 15-16, 86-88; Ex. G, 4/29/19 Press Release; Ex. H, 5/10/19 Press Release.) While Plaintiffs vaguely insinuate that "'[s]elf-inspection' is troubling because it indicates the possibility of subsequent, greater penalties" (AC ¶ 89), they do not allege any findings or penalties against the Company.[3]

The two cases on which Plaintiffs rely only serve to highlight the inadequacy of Plaintiffs' own allegations. For example, Plaintiffs cite extensively to *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245 (2d Cir. 2014) (Opp. at 12-13, 15), where the Second Circuit held that plaintiffs adequately pled that the company's descriptions of its pollution controls and related regulatory compliance were materially misleading because the company "fail[ed] to disclose ongoing, serious pollution problems," which it privately reported to regulators just three weeks after making the challenged disclosures. *See id.* at 247-48, 251. Those allegations stand in stark contrast to the Amended Complaint here, which tries to infer from a single news report of alleged isolated user misconduct that Momo had no content screening for the previous four years.[4]

### B.    Plaintiffs Do Not Allege Any Undisclosed Related-Party Transactions

Plaintiffs' second theory of fraud fails because Plaintiffs fail to allege facts demonstrating

---

[3]    Similarly, that the Company conducted a "'comprehensive internal review of the contents'" on Tantan does not "suggest[] that it was not doing so previously." (Opp. at 14.) *See In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 295 (S.D.N.Y. 2014) ("The fact that defendants recognized problems, announced that they were implementing effective controls and procedures, and then recognized more problems does not indicate that their statements were false at the time that they were made."), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).

[4]    *City of Brockton Retirement System. v. Avon Products Inc.*, No. 11 Civ. 4665(PGG), 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014) is also inapposite and, if anything, supports dismissal. There, the court dismissed securities fraud claims premised on Avon's disclosures about compliance with the Foreign Corrupt Practices Act following the revelation of extensive violations of that act.

that (i) Momo and Beijing Mushang are related parties, (ii) there were any material transactions with Beijing Mushang, and (iii) Momo's accounting judgments were not sincerely held.  (Br. at 16-20.)  The Opposition fails to rebut any of these independent bases for dismissal.

First, Plaintiffs allege no facts showing that Momo had significant influence over Beijing Mushang's financial and operating policy decisions, as required to establish relatedness.  (*See* Opp. at 9-10.)  The Opposition focuses on the contention that "a 10% interest in the voting power of the company" constitutes significant influence.  (AC ¶ 42; *see also* Opp. at 9.)  But Plaintiffs ignore that the percentage interest is not dispositive, especially where, as here, Plaintiffs allege nothing about the extent of the Company's actual influence over Beijing Mushang.  *See Lea v. TAL Educ. Grp.*, No. 18 Civ. 5480 (LAP), 2019 WL 4688691, at *6 (S.D.N.Y. Sept. 25, 2019) (Preska, J.) (failure to allege control despite a 30 percent interest), *appeal docketed*, No. 19-3549 (2d Cir. Oct. 25, 2019).  Plaintiffs next point to the parties' exclusivity agreement (Opp. at 9), but do not allege that Beijing Mushang's decision to enter into that agreement was not made at arm's-length in its own self-interest.  Finally, Plaintiffs note the unremarkable fact that Beijing Mushang's performers must agree to abide by Momo's policies and procedures while on the Momo app.  (*Id.*)  However, this does not demonstrate that Momo has significant influence over Beijing Mushang's operations, *i.e.*, over how Beijing Mushang "discover[s], hire[s], train[s], and promote[s] performers" (AC ¶ 5).[5]

---

[5]  Plaintiffs also highlight that "Momo keeps 60% of all virtual gifts that Beijing Mushang's performers earn" (Opp. at 9), but that is Momo's standard revenue split with performers and agencies.  (*See* AC ¶ 34 ("Momo keeps 60% of the cost of the gift, while the performer and agent, *if any*, split the remaining 40%." (emphasis added)).)  Plaintiffs do not allege that Beijing Mushang's terms with Momo were more favorable than any other talent agency's terms, and Plaintiffs have not plausibly alleged that investors would have found the disclosure of Beijing Mushang as a related party material in any event.  Plaintiffs' assertion that Beijing Mushang "faces significant potential sanction[s] from the Chinese government" because it has a "risky business model" is wholly speculative.  (Opp. at 11; *see also* AC ¶ 7.)  Plaintiffs do not allege that Beijing Mushang has ever engaged in any improper activity or ever been sanctioned or how Beijing Mushang's risk of being sanctioned affects Momo.  *See ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 202 (2d Cir. 2009) (disclosure of related-party transactions immaterial).

Second, Plaintiffs effectively concede they cannot identify any material transactions between Momo and Beijing Mushang, and instead rely on a slew of assumptions and some back-of-the-envelope math to argue the overall business between the parties must have been material. (Opp. at 10-11.)  Plaintiffs' entire argument is purportedly derived from Beijing Mushang's reported revenues in Chinese SAIC filings.  (*Id.* at 10 n.4.)  Yet Plaintiffs do not provide the filings in question and, as this Court has aptly noted, the "omission of information regarding the SAIC filings, including reporting periods, accounting treatment, and auditing requirements ma[k]e it 'virtually impossible to determine whether the comparisons' to SEC filings were 'apple-to-apples' and warrant[] dismissal." *In re China XD Plastics Co. Sec. Litig.*, No. 14-cv-05308 (GBD), 2016 WL 1241522, at *6 (S.D.N.Y. Mar. 23, 2016) (Daniels, J.) (citation omitted).  Plaintiffs' "failure to attach . . . any of the SAIC filings may also be considered an independent pleading failure." *Id.* at *5 n.12.

Finally, even if Momo's accounting judgments were incorrect, Plaintiffs do not allege that the judgments were not sincerely held.  (*See* Br. at 19-20.)  Plaintiffs' claims are for securities fraud, not accounting mistakes, and Plaintiffs' argument that related party disclosures are not subjective matters of judgment (Opp. at 11-12), ignores the very accounting rules on which they rely.  (*See* Ex. M, ASC 323-10-15-7 ("Determining the ability of an investor to exercise significant influence is not always clear and applying judgment is necessary to assess the status of each investment.").)  Plaintiffs' remaining arguments merely quibble with Momo's application of the accounting rules, but do not identify any facts suggesting intentional fraud as opposed to good-faith differences in accounting judgments.  (*See* Br. at 19-20.)

## II.    PLAINTIFFS FAIL TO PLEAD SCIENTER

Even setting aside Plaintiffs' failure to allege any materially false or misleading statements, the Amended Complaint also fails to allege any facts even remotely suggesting that

Defendants engaged in an intentional scheme to defraud investors. Far from pleading facts supporting the requisite cogent and compelling inference of scienter, the Amended Complaint overwhelmingly supports an inference of good faith, *i.e.*, that the Company (i) candidly disclosed the risks posed by illicit user content and increased regulatory scrutiny, and expanded its content screening team tenfold over four years in an effort to mitigate those risks; and (ii) exercised its best judgment in applying the relevant accounting rules. The Opposition fails to identify any well-pled facts supporting a theory of motive and opportunity or recklessness.

With respect to motive and opportunity, the Opposition largely ignores the fundamental problems with Plaintiffs' stock sale allegations: timing. The only alleged stock sales by the Individual Defendants occurred in April 2017 and April 2018, pursuant to legitimate 10b5-1 plans, **before** the Company's 2016 and 2017 Form 20-Fs were issued.[6] While trades made pursuant to 10b5-1 plans generally are not actionable in any event, even assuming *arguendo* that the Form 20-Fs contained misstatements designed to inflate the Company's stock price, it would make no sense for the Individual Defendants to sell significant holdings **before** those reports were released—rather than afterwards to take advantage of the resulting price inflation. And Plaintiffs allege no stock sales after the 2014, 2015, and 2018 Form 20-Fs, which also are alleged to contain false statements. *See In re Gilddan Activewear, Inc. Sec. Lit.*, 636 F. Supp. 2d 261, 271 (S.D.N.Y. 2009) ("Plaintiffs' allegations are empty vessels, as the trades occurred weeks before the principal allegation of material misstatement, and many months before the release of any negative information that caused [defendant's] stock price to plummet."). The theory of fraud Plaintiffs urge simply makes no sense. Far from supporting a strong inference of scienter,

---

[6]    Although the 10b5-1 plans were entered into during the putative class period, "plaintiffs have not alleged any facts that suggest there was strategic trading and manipulative intent involved in the trading plan." *City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 226 (E.D.N.Y. 2019).

8

the timing of the Individual Defendants' stock sales supports an inference of good faith.[7]

The Opposition likewise fails to identify anything unusual or suspicious about the non-defendant insiders' trading.  (Opp. at 20-21.)  The Amended Complaint simply lists what appear to be all of these individuals' sales during the four-year putative class period, which spans nearly Momo's entire time as a public company.  Plaintiffs do not identify any "statements or conduct attributable to the non-defendant [insiders]" and "never set forth facts demonstrating that the Individual Defendants engaged in any misconduct with the non-defendant insiders."  *Alaska Laborers Emp'rs Ret. Fund v. Scholastic Corp.*, No. 07 CV 7402(GBD), 2011 WL 3427208, at *2 (S.D.N.Y. Aug. 3, 2011) (Daniels, J.).  Accordingly, the non-defendant insiders "sales may not be used to prove Defendants' scienter."  *Alaska Laborer Emp'rs Ret. Fund v. Scholastic Corp.*, No. 07 CV 7402(GBD), 2010 WL 3910211, at *7 (S.D.N.Y. Sept. 30, 2010) (Daniels, J.).

Having failed to make a showing of motive, the strength of Plaintiffs' allegations of conscious misbehavior or recklessness "'must be correspondingly greater.'"  *Wyche v. Advanced Drainage Sys., Inc.*, 710 F. App'x 471, 473 (2d Cir. 2017) (citation omitted).  Here too, they fall far short.  Plaintiffs allege no facts whatsoever showing what any of the Defendants knew or intended at any point in time regarding the disclosures relating to content screening or Beijing

---

[7]  Ignoring this fatal defect, the Opposition instead focuses solely on the size of the sales.  (Opp. at 18-19.)  "The sale of a large volume of stock alone, however, is not enough to adequately plead scienter."  *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10 Civ. 975(RPP), 2012 WL 1646888, at *23 (S.D.N.Y. May 10, 2012).  "Instead, Plaintiffs must plead facts charging that there was something 'unusual' or 'suspicious' about the *timing* of the sale or sales."  *Id.*  Plaintiffs' cited cases (Opp. at 17-19) are not to the contrary.  *See, e.g.*, *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 308 (2d Cir. 2015) (CEO and CFO sold stock "at opportune moments throughout the Class Period"); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001) (executive sold 80% of his holdings the month before company disclosed unexpected net loss); *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 82, 85 (2d Cir. 1999) (CEO sold 40% of his shares on the same day company postponed secondary public offering, which "supports the inference that [CEO] withheld disclosures that would depress his stock until he had profitably sold his shares"); *Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 555–56 (S.D.N.Y. 2017) (plaintiffs "fail[ed] to allege unusual trading on behalf of [CFO]" because, unlike other insiders, CFO's sale of 22% of his stock was "not unusually timed"); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (scienter alleged where "[t]he timing of the stock sales is also suspicious").

9

Mushang.  Instead, as to content screening, the Opposition relies solely on the so-called "core operations" doctrine (Opp. at 21-22), which is not an independent basis to allege scienter, and is inapplicable here as Plaintiffs have failed to allege facts showing any misstatement about anything that could be considered a "core operation" of the Company.[8]

Plaintiffs' allegations about the Company's accounting are equally inadequate.  The Opposition argues "it is inconceivable that Defendants did not know that Momo owned 18.75% of Beijing Mushang" and "it is unfathomable that Defendants were unaware of the degree of Momo's influence over Beijing Mushang."  (Opp. at 23.)  But courts, including this one and the Second Circuit, have repeatedly rejected arguments based on speculation about what Defendants "must have known."  *See, e.g.*, *Sinay v. CNOOC Ltd.*, 554 F. App'x 40, 42 (2d Cir. 2014) (plaintiff failed to adequately allege scienter based on what defendant "must have known"); *In re Sanofi-Aventis Sec. Litig.*, Nos. 07-cv-10279(GBD), 08-cv-00021(GBD), 2009 WL 3094957, at *7 (S.D.N.Y. Sept. 25, 2009) (Daniels, J.) (scienter not adequately alleged based on allegation "that '[i]t is inconceivable that the Individual Defendants did not have knowledge of the safety details of rimonabant'").  In any event, Plaintiffs must do more than just allege knowledge of the Company's relationship with Beijing Mushang.  They must allege that the Individual Defendants knew or recklessly disregarded that the Company's disclosures about that relationship were false. *See Wyche*, 710 F. App'x at 473-74 ("[T]he alleged GAAP violations . . . do not suggest the requisite 'fraudulent intent.'" (citation omitted)).  The Opposition offers nothing on this point.

## CONCLUSION

For at least these reasons and those in the Opening Brief, the Motion should be granted.

_____

[8]    "[T]he Second Circuit has . . . questioned whether the core operation doctrine has survived the enactment of the PSLRA[,]" and "the majority rule is to 'consider the core operations allegations to constitute supplementary, but not an independent means to plead scienter.'" *Zhong Zheng v. Pingtan Marine Enter. Ltd.*, 379 F. Supp. 3d 164, 181 (E.D.N.Y. 2019) (citations omitted).

Dated: New York, New York
       April 22, 2020

                              Respectfully submitted,

                              /s/ Robert A. Fumerton
                              Scott D. Musoff
                              Robert A. Fumerton
                              Michael C. Griffin
                              SKADDEN, ARPS, SLATE,
                                MEAGHER & FLOM LLP
                              One Manhattan West
                              New York, New York 10001
                              Phone:  (212) 735-3000
                              Fax:  (212) 735-2000
                              scott.musoff@skadden.com
                              robert.fumerton@skadden.com
                              michael.griffin@skadden.com

                              *Attorneys for Defendant Momo Inc.*